# EXHIBIT A

## CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## SARASOTA COUNTY, FLORIDA
## CIVIL DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

       Plaintiffs,

v

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO, UNITED ATLANTIC
VENTURES LLC, a Delaware Limited Liability
Company, ANDREW LITINSKY and WESLEY
MOSS

Case No.: 2024-CA-001061-NC

## SECOND AMENDED COMPLAINT

    Plaintiffs Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1]

("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] allege in support of their Second

Amended Complaint as follows:

## NATURE OF THE ACTION

    1.    TMTG is a publicly traded company that was formed through the merger of a

Special Purpose Acquisition Company ("SPAC") called Digital World Acquisition Corp.

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024.
For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when
referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media and & Technology Group Corp. On March 25, 2024, Old TMTG
merged with DWAC. Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed
its name to TMTG Sub Inc. DWAC, in turn, changed its name to Trump Media & Technology Group Corp.

("DWAC") and a private company, Old TMTG, which operates the Truth Social social media platform and is now a wholly-owned subsidiary of TMTG.

2.      The SPAC merger process is intended to be an efficient process for taking private companies public that follows a detailed and predictable timeline.  The process is subject to federal securities laws which require that truthful disclosures about the SPAC be made to the investing public.

3.      The DWAC merger was anything but efficient and predictable.  This routine process was intentionally derailed by the misconduct of Patrick Orlando (DWAC's former Chairman and Chief Executive Officer), with the aid and assistance of ARC Global Investments II, LLC ("ARC"), an entity controlled by Orlando that acted as DWAC's sponsor.

4.      Orlando did not act alone, however.  He enlisted Andrew Litinsky, Wesley Moss, and United Atlantic Ventures LLC, ("UAV"), an entity controlled by Litinsky and Moss (collectively, the "UAV Parties"), as his co-conspirators.  At the time, Moss and Litinsky were directors and officers of Old TMTG.  They were responsible for managing its day-to-day operations including the process of engaging in a merger with a SPAC and instructing Old TMTG's outside counsel.

5.      Together, Orlando, ARC, and the UAV Parties (collectively, the "Co-Conspirators") devised and executed an unlawful scheme to agree to merge Old TMTG and DWAC before DWAC had gone public through an Initial Public Offering (hereinafter referred to as part of the "Pre-Targeting Conspiracy" or "Plan B").[3]  The Co-Conspirators hid the Pre-Targeting Conspiracy from the public, regulators, the other members of the Board of Directors of DWAC, and others affiliated with Old TMTG.

---

[3] "Plan A" consisted of Orlando's pursuit of a merger with TMTG via another SPAC, non-party Benessere Capital Acquisition Corp.

6.      To effectuate the scheme, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company at any time before its initial public offering ("IPO").  He further falsely represented that he had participated in no discussions or contacts with any potential merger targets.  The Co-Conspirators knew that these statements were false when made.  Indeed, the Co-Conspirators had personally engaged in numerous discussions together and agreed to target Old TMTG for a merger with DWAC.

7.      The Co-Conspirators also breached their respective fiduciary duties to DWAC and Old TMTG by, among other things, engaging in the Pre-Targeting Conspiracy.  Together, their misconduct had a devastating impact on Plaintiffs.  What should have been a predictable and efficient six-month merger process between DWAC and Old TMTG transformed into a 29-month ordeal that included an investigation by the United States Securities & Exchange Commission ("SEC") into DWAC and dramatically delayed the business combination.  The damage to Plaintiffs was substantial.  On July 20, 2023, the SEC imposed an $18 million penalty through a Cease-and-Desist Order, attached hereto as **Exhibit 1**.  DWAC incurred more than $11 million in legal fees, which ultimately became the responsibility of TMTG.  In addition, Plaintiffs suffered hundreds of millions of dollars of loss as a result of the delay and damage to TMTG's reputation.

8.      Two weeks ago, on July 17, 2024, the SEC filed an enforcement action against Orlando alleging that Orlando engaged in securities fraud in connection with the Pre-Targeting Conspiracy.  A copy of the complaint in *SEC v. Orlando,* Case No. 24-cv-2097 (D.C. 2024) (ECF No. 1) ("SEC Orlando Complaint") is attached hereto as **Exhibit 2**.  The UAV Parties are not named as defendants or expressly identified by name in the SEC Orlando Complaint.  They are, however, clearly and prominently featured in the SEC Complaint and their involvement in the unlawful Pre-Targeting Conspiracy is irrefutable.  The claims set out herein are based, at least in

part, on the allegations contained in the SEC Orlando Complaint. Plaintiffs will prove those allegations through discovery once they have access to the documents that Orlando and the UAV Parties provided to the SEC and which are referred to or relied upon by the SEC as well as other relevant discovery.

9.     The Pre-Targeting Conspiracy along with Defendants' other fiduciary breaches threatened the viability of what is now a public Nasdaq-listed company valued at more than $5 billion. Despite the Co-Conspirators' best efforts to undermine TMTG, the merger was consummated but not until, and *only because*, they were ousted from control of DWAC and Old TMTG.

10.     Of course, the completion of the merger does not negate Defendants' staggering pre-merger harm that severely impacted Plaintiffs. Plaintiffs are therefore entitled to the relief sought herein.

## **PARTIES**

11.     Plaintiff TMTG is formerly known as DWAC. DWAC began as a SPAC that was formed for the purpose of effecting a merger or similar business combination following its initial public offering. DWAC was a Delaware corporation with its principal place of business in Miami, Florida. Post-merger, DWAC was renamed TMTG, which is a Delaware corporation with its principal place of business in Sarasota, Florida.

12.     Plaintiff Old TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. Old TMTG is a wholly owned subsidiary of TMTG.

13.     Defendant Patrick Orlando is an individual domiciled in Miami, Florida. He is the managing member of ARC. He served as a director of DWAC until the merger and previously served as DWAC's Chairman and CEO from in or about May 2021 to in or about March 2023.

14.     Defendant ARC is a Delaware limited liability company whose managing member (Orlando) is a Florida resident.  ARC has its principal place of business in Florida.  ARC served as DWAC's sponsor and is controlled by Orlando.  ARC initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares").  At the time of DWAC's IPO, ARC invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.  A unit is a security that is made up of one class of a common share and a fraction of a warrant.  A warrant is similar to a traditional stock option in that it gives the holder the right to buy or sell shares of a company at a pre-agreed price.  Units are commonly offered by SPACs that are seeking to raise money in a public stock offering with the primary goal of merging with a private business and taking it public.

15.     Defendant UAV is a Delaware limited liability company with its principal place of business in Fort Lauderdale, Florida.

16.     Defendant Andrew Litinsky is a resident of the State of Florida.  At all relevant times, Litinsky was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022.

17.     Defendant Wesley Moss is a resident of the State of Georgia.  At all relevant times, Moss was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022, and a director of Old TMTG until in or about September 2022.

18.     At all relevant times, Moss and Litinsky controlled and dominated UAV.  UAV served as the vehicle for Moss and Litinsky's wrongdoing, including breaching fiduciary duties owed to TMTG by participating in the Pre-Targeting Conspiracy, assisting in the submission of misleading financial statements to the SEC, and mismanaging the Company.  At all times during

2021, Moss and Litinsky controlled and dominated Old TMTG.  Together, Moss and Litinsky constituted the majority of the *de facto* board of Old TMTG.  In that capacity, Moss and Litinsky retained and directed outside counsel and were responsible for managing TMTG's business including its potential SPAC merger.

19.     Non-party Benessere Capital Acquisition Corp. ("Benessere") was a Florida limited liability company with its principal place of business in Miami, Florida.  It had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised).  In October 2022, Benessere dissolved and delisted its securities.  Orlando served as the CEO and Chairman of Benessere and the managing member of its sponsor during the relevant period.

## JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over Orlando as a Florida resident.

21.     This Court has personal jurisdiction over ARC under Florida's long-arm statute, Fla. Stat. § 48.193, because ARC has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, ARC has its principal place of business in Florida, and ARC has committed the tortious acts alleged in this Second Amended Complaint within Florida.

22.     This Court has personal jurisdiction over Litinsky as a Florida resident.

23.     This Court has personal jurisdiction over Moss under Florida's long-arm statute, Fla. Stat. § 48.193, because Moss has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, and Moss has committed the tortious acts alleged in this Second Amended Complaint within Florida.

24.     This Court has personal jurisdiction over UAV under Florida's long-arm statute, Fla. Stat. § 48.193, because UAV has operated, conducted, engaged in, and/or carried on a business

or business venture within Florida that resulted in harm to Plaintiffs, UAV has its principal place of business in Florida, and UAV has committed the tortious acts alleged in this Second Amended Complaint within Florida.

25.    This Court has jurisdiction over the subject matter of this action because the amount in controversy exceeds $50,000, exclusive of interest, court costs, and attorney's fees.

26.    Venue is proper in Sarasota County, Florida, pursuant to Fla. Stat. § 47.051, because the subject matter of the dispute affects a corporation with its principal place of business and headquarters in Sarasota County, Florida, and because the causes of action brought herein accrued in Sarasota County, Florida.

## FACTUAL BACKGROUND

### I.    SPACs and Regulatory Framework

27.    The UAV Parties incorporated Old TMTG on or around February 8, 2021.  From the time of Old TMTG's formation, the UAV Parties intended for it to become a public company by seeking to be acquired by a SPAC.

28.    A SPAC is a publicly traded corporation with a limited life span.  A SPAC is formed with the sole purpose of effecting a merger with a privately held business to enable it to go public.

29.    A SPAC has no underlying business operations.

30.    Each SPAC must have a "sponsor."  The SPAC sponsor creates the SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an unidentified and, as yet, undetermined private operating company within a specified time period (typically 18 months).

31.    During the fundraising period (IPO), investors rely on the management team that formed the SPAC (generally the sponsor) to acquire or combine with a target company.

32.     A SPAC may identify in its IPO *prospectus* (otherwise known as a Registration Statement or Form S-1) a specific *industry* that it will target as it seeks to combine with an operating company.  However, it cannot guarantee to investors that a certain target will be merged with or engage in substantive discussions with a potential target until *after* the SPAC's IPO.  *See* 17 C.F.R. § 230.419

33.     Under applicable securities regulations, SPACs are prohibited from making false or misleading statements to investors and from engaging in fraudulent conduct in connection with merging with a target.  15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  In the event a SPAC has identified a target prior to its IPO, it must disclose the target to the regulatory authorities and all potential investors.

34.     Once the SPAC has identified a merger target, its management negotiates with the operating company and, if approved by SPAC shareholders (if a shareholder vote is required), executes the merger with the target company.

35.     As will be thoroughly alleged herein, the Co-Conspirators planned and carried out a Pre-Targeting Conspiracy wherein an Orlando-affiliated entity (Benessere or DWAC) would merge with Old TMTG.  Orlando devised a scheme where he would publicly pursue a merger with Old TMTG through Benessere ("Plan A") as a rouse to cover up his real intentions: a merger between DWAC and Old TMTG ("Plan B").

36.     To carry out his scheme, Orlando, through ARC, gained control of DWAC prior to DWAC's IPO and for the purpose of merging it with Old TMTG.  According to the SEC, DWAC, under ARC and Orlando's control, did not disclose to regulatory bodies or potential investors that it had pre-determined before its IPO that it would merge with Old TMTG in violation of federal

securities laws.  *See* Ex. 2, SEC Compl. ¶ 1. The UAV Parties knowingly assisted Orlando and ARC in unlawful conduct.

37.     The Co-Conspirators' misconduct breached the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

**II.     The UAV Parties' Fiduciary Relationship with Old TMTG**

38.     In January 2021, Donald J. Trump returned to private life after serving as President of the United States.  President Trump agreed to work with Moss and Litinsky to create a social media platform that would become a safe harbor for free expression amid censorship by other social media companies.

39.     To facilitate their participation in the business opportunity with President Trump, Moss and Litinsky formed UAV on January 26, 2021.

40.     The UAV Parties agreed that they would, *inter alia*, incorporate Old TMTG on behalf of President Trump and other shareholders, establish its corporate governance, execute a plan to get the social media platform operating, and work toward a near-term merger between Old TMTG and a SPAC.

41.     Old TMTG was incorporated on February 8, 2021.  The UAV Parties served as *de facto* directors of Old TMTG and constituted the majority of the *de facto* Board.

42.     In their role as *de facto* directors, the UAV Parties were responsible for hiring, directing, and instructing legal counsel, managing Old TMTG's day to day operations, and for carrying out Old TMTG's business plan.

43.     The UAV Parties' charge was straightforward: (1) establish Old TMTG's governance structure; (2) launch a social media platform; and (3) find a publicly traded merger partner so Old TMTG could obtain the capital necessary to carry out its business plan.  The UAV

Parties received 8.6 million shares in Old TMTG.  Moss and Litinsky were significantly incentivized to secure a merger partner and carry out the remainder of their duties.

44.    As initial *de facto* directors, the UAV Parties were required to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Old TMTG.  *See* Fla. Stat. § 607.0830.

45.    The UAV Parties owed Old TMTG a duty of care, including but not limited to:

    a.    ensuring that all corporate formalities were carried out;

    b.    establishing an adequate corporate governance structure for Old TMTG;

    c.    allocating resources in a lawful manner and in Old TMTG's best interests;

    d.    executing contracts and business ventures that were commercially reasonably and beneficial to Old TMTG and with the proper approval from the Old TMTG Board;

    e.    launching the social media platform, including employing a technical team with the requisite technical skills;

    f.    accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

    g.    lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch the social media platform; and

    h.    retaining, managing and overseeing outside counsel in a manner that was in the best interests for Old TMTG.

46.    The UAV Parties owed Old TMTG a duty of loyalty and good faith, including but not limited to:

    a.    avoiding self-dealing and conflicts with Old TMTG's best interests;

    b.    securing a successful and lawful merger between Old TMTG and a third party;

    c.    accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

      d.     refraining from violating the law while carrying out their duties at Old TMTG; and

      e.     managing Old TMTG's employees and outside counsel in a lawful manner and avoiding incurring any liabilities to third parties or regulatory bodies.

47.     The UAV Parties failed on all fronts, violating the fiduciary duties owed to Old TMTG.

48.     As the entity through which Litinsky and Moss conducted business, UAV had an obligation to act in good faith and with due care.

49.     Because Litinsky and Moss dominated and controlled UAV, UAV had knowledge of Litinsky and Moss's breaches of fiduciary duties.

50.     UAV, through Litinsky and Moss, substantially assisted Litinsky and Moss in their breaches of fiduciary duties.

51.     Most critically, the UAV Parties assisted with and actively participated in Orlando's Pre-Targeting Conspiracy to unlawfully pursue a merger with Old TMTG through Benessere ("Plan A") while concealing their efforts to pursue a merger with DWAC ("Plan B"), in violation of their fiduciary duties to Old TMTG and in violation of the federal securities laws that require truthful disclosures to the public in connection with the purchase and sale of securities.

52.     In doing so, the UAV Parties placed their own financial interests above the interests of Old TMTG.  Indeed, by participating in the Pre-Targeting Conspiracy, the UAV Parties ensured that a merger with an Orlando-affiliated entity would occur, instead of focusing on other possible merger combinations that did not involve an unlawful scheme that could potentially harm Old TMTG and DWAC n/k/a TMTG.

53.     The Pre-Targeting Conspiracy was ultimately the subject of two separate enforcement actions against DWAC and Orlando, resulting in an $18 million fine against DWAC and at least $11 million in related legal fees.

54.     The UAV Parties were also aware of several conflicts of interest and instances of self-dealing involving an outside attorney for Old TMTG ("Lawyer A").

55.     While Lawyer A held himself out as counsel for Old TMTG, in reality, Lawyer A was acting as *de facto* counsel to the UAV Parties to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy.  Lawyer A took actions purportedly on behalf of Old TMTG that were, in reality, adverse to Old TMTG's interests and designed to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy while covering their tracks. Notably, Lawyer A communicated with Orlando using a messaging application that was set to automatically delete such communications.

56.     Despite Lawyer A's obvious and troubling conflicts of interest, Lawyer A did not recuse himself and the UAV Parties did not terminate Lawyer A's representation of Old TMTG. Instead, the UAV Parties worked alongside Orlando and Lawyer A to advance a merger between Old TMTG and DWAC in a manner that was not in the best interests of Old TMTG.  Particularly, the Co-Conspirators and Lawyer A knowingly assisted DWAC in making statements in public filings and misleading potential investors that the SEC has alleged were false.

57.     The UAV Parties also failed to establish the Company's corporate governance and made a series of reckless and wasteful decisions that caused significant damage to Old TMTG and a decline in the stock price of its ultimate merger partner (DWAC).

**III.**    **Orlando's Fiduciary Relationship with DWAC and ARC's Knowledge Thereof**

58.    As DWAC's Chairman and CEO, Orlando was responsible for the day-to-day operations of DWAC through March 2023.

59.    Orlando, during his tenure as CEO and Chairman of DWAC, director of DWAC, and managing member of ARC, owed fiduciary duties of care and loyalty to Plaintiffs.

60.    Orlando had a duty to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Plaintiffs and their shareholders.  *See* Fla. Stat. § 607.0830.

61.    Orlando was required to manage DWAC's daily operations in good faith and in a manner that would not harm DWAC.

62.    Orlando owed DWAC a duty of care, including but not limited to:

    a.    ensuring that all corporate formalities were carried out;

    b.    establishing an adequate corporate governance structure for DWAC,

    c.    allocating resources in a lawful manner and in DWAC's best interest;

    d.    accurately representing information to regulatory authorities, DWAC's Board, and the general public;

    e.    accurately accounting for funds raised by ARC, as DWAC's sponsor;

    f.    lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch Truth Social;

    g.    safely handling and storing DWAC-related documents, including vendor contracts and invoices, in his personal email account; and

    h.    maintaining separate corporate formalities between Benessere and DWAC.

63.    Orlando owed DWAC a duty of loyalty including but not limited to:

    a.    lawfully and successfully causing a merger between DWAC and a merger target;

b.    avoiding self-dealing or self-interested actions and conflicts with DWAC's best interests;

c.    using his position at DWAC to benefit DWAC and its shareholders, not himself;

d.    refraining from violating the law while carrying out his duties at DWAC;

e.    abstaining from making public statements that were harmful to DWAC and leaking information to the press;

f.    ensuring all encumbrances on behalf of DWAC to ARC, such as promissory notes, were ratified by disinterested board members; and

g.    releasing all funds raised by ARC for the benefit of DWAC to DWAC.

64.    As set forth herein, Orlando violated the aforementioned duties, placing his own interests above those of DWAC and failing to exercise due care or in good faith.

65.    As a sponsor of DWAC, ARC had an obligation to act with due care and in good faith.

66.    Because Orlando dominated and controlled ARC, ARC had knowledge of Orlando's breaches of fiduciary duties.

67.    ARC, through Orlando, substantially assisted and encouraged Orlando's breaches of fiduciary duty.

**IV.    The UAV Parties, Orlando, and ARC Conspire to a Pre-Targeting Conspiracy**

**A.    <u>Old TMTG and Benessere's Initial Negotiations (Plan A)</u>**

68.    In mid-February 2021, Litinsky approached Orlando regarding a potential deal between Benessere and Old TMTG.  According to the SEC, about a week later, Orlando met in person with TMTG representatives.  *See* Exh. 2, SEC Compl. ¶ 32.  Upon information and belief, the TMTG representatives included Litinsky.

69.     On or about March 12, 2021, Benessere and Old TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies ("Benessere LOI").  The Benessere LOI was then extended to last through April 5, 2021.  Orlando negotiated and signed the Benessere LOI on behalf of Benessere.  Litinsky and Moss were both actively involved in the negotiation of the Benessere LOI.

70.     According to the SEC, as the non-exclusive letter of intent neared its expiration date, the UAV Parties and Orlando discussed having Old TMTG and Benessere sign a mutually exclusive letter of intent.  *See* Exh. 2, SEC Compl. ¶ 34.  Benessere ultimately did not sign that mutually exclusive letter of intent.

71.     During the negotiations, Orlando learned that some of Benessere's directors and officers opposed the merger with Old TMTG.  He shared this information with the UAV Parties.  In light of this hurdle, Orlando conjured a scheme to ensure that a merger with Old TMTG would occur and that Orlando would individually benefit from any such merger.  Orlando enlisted the Co-Conspirators to assist with carrying out the Pre-Targeting Conspiracy, which they referred to as "Plan B."

**B.     Orlando Takes Control of DWAC and Resumes Merger Discussions With Old TMTG**

72.     In or about April 2021, merger discussions between Benessere and Old TMTG paused, and the Co-Conspirators put "Plan B" into effect.

73.     The Co-Conspirators began referring to "Plan A" which was a continued effort to find a way for Benessere to merge with Old TMTG.  According to the SEC, Orlando discussed options to replace the Benessere officials who were opposed to a transaction with Old TMTG in order to effectuate Plan A.  *See* Exh. 2, SEC Compl. ¶ 36.

74.     "Plan B" referred to Orlando's scheme to pursue a competing merger between DWAC and Old TMTG, ensuring that he would financially gain from either business opportunity. *See* Ex. 2, SEC Compl. ¶ 37.

75.     Orlando planned to continue publicly pursuing a merger between Old TMTG and Benessere (Plan A), while secretly pursuing a competing merger between Old TMTG and DWAC (Plan B).

76.     Orlando's scheme was simple: merge an Orlando-affiliated SPAC with Old TMTG in order to ensure that Orlando would financially benefit under any merger.

77.     Orlando recognized that he would lose the opportunity to merge a SPAC with Old TMTG in light of strong opposition to the TMTG merger from Benessere's Board.  To avoid losing a deal with Old TMTG, Orlando shared the details of the Pre-Targeting Conspiracy with the UAV Parties and enlisted the UAV Parties' support.

78.     The UAV Parties knew or had reason to know that Orlando's Plan B violated securities laws and that their participation in it would breach their fiduciary duties to Old TMTG. Indeed, Litinsky wrote about the April 14 meeting: "roughest day so far, meet in board room in coconut grove - Patrick says [the Benessere COO] freaked out - he is 28 - his dad won't let him do the deal - plus 2 [Benessere] directors already replaced - ***Patrick [Orlando] pitches [h]is plan b. I get scared, is he wearing a wire?***"

79.     Despite knowing that Plan B could potentially violate securities laws, the UAV Parties continued assisting Orlando with the scheme to secure a merger between Old TMTG and an Orlando-affiliated company (either Benessere or DWAC).

80.     According to the SEC, on or about April 24, 2021, Orlando learned that he had an opportunity to obtain substantial control over DWAC.  *See* Exh. 2, SEC Compl. ¶ 44.  Then, on or

about April 28, 2021, Orlando signed a letter of intent under which he would obtain 90% ownership of ARC, DWAC's sponsor. *Id.*

81. Orlando, through ARC, raised millions of dollars for the benefit of DWAC n/k/a TMTG by promising various investors shares of DWAC n/k/a TMTG in exchange for capital.

82. Litinsky memorialized in his notes that Orlando met with the UAV Parties on or about April 29, 2021 in Palm Beach, Florida and continued discussions about a potential merger with Old TMTG.

83. According to the SEC, on or about May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news. . . Patrick called [TMTG's outside counsel] yesterday. . . The LOI with our other group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with Benessere and a big breakup fee." *See* Exh. 2, SEC Compl. ¶ 45. The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?" *Id.* Upon information and belief, the two "TMTG representatives" referred to by the SEC in these allegations are Moss and Litinsky and "TMTG's outside counsel" refers to Lawyer A.

84. On or about May 4, 2021, Lawyer A, at the direction of the UAV Parties, emailed Orlando and others a draft letter of intent that contemplated a merger between Benessere and Old TMTG "with new terms they discussed," including a breakup fee releasing Orlando of any liability. *See infra* ¶ 108. The letter of intent (the "June 4 LOI") was eventually executed on June 4, 2021. *Id.*

85. The purpose of the June 4 LOI was to further Orlando's self-dealing. In particular, Orlando wanted to ensure that TMTG would merge with a SPAC that he controlled so that he would financially benefit from the merger.

86.     By this time, the UAV Parties knew that the Plan A merger with Benessere was highly unlikely and would be used solely as a placeholder for Plan B.  Indeed, on or about April 14, 2021, Litinsky and Moss met in person with Orlando.  Litinsky and Moss left that meeting with a clear understanding that Plan A no longer in consideration.  Indeed, Litinsky memorialized in his notes for April 14, 2021 that "the BENE deal is OFF!!!!"

87.     Before the June 4 LOI was even signed, Orlando made it clear that his preference was a DWAC and Old TMTG combination (Plan B).  According to the SEC, on or about May 8, 2021, Orlando exchanged messages with representatives of a Shanghai investment bank (the "Investment Bank").  *See* Exh. 2, SEC Compl. ¶ 47.  The message group name between Orlando and the Investment Bank, which appears to have been coined by Orlando, was, "Get it done ***one way or another***."  *Id.*  Orlando and the Investment Bank representative discussed possible combinations for both DWAC and Benessere.  Orlando stated that the "optimal" combinations were ones between Benessere and another target and a combination between DWAC and Old TMTG.  A representative of the Investment Bank responded, "Yes absolutely, that's the best.  It's just time.  Get enough time to get DWAC to mkt."  *Id*.

88.     According to the SEC, on or about May 14, 2021, the Investment Bank transferred a 90% ownership interest in ARC to Orlando.  *See* Exh. 2, SEC Compl. ¶ 48.  Around this same time, Orlando was appointed CEO and Chairman of DWAC.  *Id*.  These two actions gave Orlando effective control over DWAC.  *Id*.

89.     Notably, even though a draft of the June 4 LOI was circulated on May 4, 2021, Orlando did not execute it until June 4, 2021, *after* he obtained control of DWAC.

**C.     DWAC's May 2021 Form S-1 and Conflicted Lawyer A**

90.     Once Orlando took control over DWAC, he moved to file its Form S-1 in May 2021.

91.     A Form S-1 may be used to prepare a registration statement prior to an IPO.  A registration statement on Form S-1 is an investment prospectus describing material information about the business' operations, financial condition, risk factors, and management.

92.     Notably, on or about May 20, 2021, five days before the filing of the Form S-1 and six days after Orlando gained control over DWAC, Lawyer A pivoted from helping Old TMTG raise money and began collaborating directly with Orlando to raise funding for DWAC's sponsor, ARC.  In so doing, Lawyer A's conduct violated the fiduciary duties owed to Old TMTG.  The UAV Parties knew or should have known of Lawyer A's misconduct.

93.     On May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"), which is attached hereto as **Exhibit 3**.  The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board.   According to the SEC, both of those new DWAC directors were also Benessere directors who had been supportive of a transaction between Benessere and Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 49.  Notably, the Benessere directors and officer who had opposed a transaction with Old TMTG was not given the opportunity to assume any role with DWAC.  *Id.* ¶ 50.

94.     The May Form S-1 contained several statements—by or at the direction of Orlando—about the state of discussions between DWAC and potential targets, including:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

95.     The SEC subsequently alleged that the foregoing statement was misleading.  *See* Exh. 2, SEC Compl. ¶ 52.

96.     According to the SEC, these statements are misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with Old TMTG, because Orlando had been in discussions with the UAV Parties for several months, and because Orlando had discussed Plan B with the UAV Parties.  *See* Exh. 2, SEC Compl. ¶ 52.

97.     According to the SEC, the statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with Old TMTG) that had already taken steps toward accomplishing that goal.  *See* Exh. 2, SEC Compl. ¶ 52.

98.     By conspiring to make material misstatements in furtherance of a DWAC/Old TMTG business combination, the Co-Conspirators violated their respective fiduciary duties to DWAC and Old TMTG, respectively.

99.     The May Form S-1 became publicly available on the morning of May 26, 2021.  *See* Exh. 2, SEC Compl. ¶ 53.

100.     The SEC alleges that same day, presumably at Orlando's direction, Lawyer A incorporated a limited liability company in New Mexico. *Id*. at ¶ 54.  That entity entered into an agreement to invest in ARC, DWAC's sponsor, on or about May 29, 2021.  *Id*. Lawyer A signed that agreement as the "authorized representative" for the New Mexico entity. Upon information and belief, Lawyer A is the sole member of the New Mexico entity. Orlando counter-signed this May 29 agreement.  *Id*.

101.     According to the SEC, on or about May 30, 2021, Orlando, "one of the TMTG founders," and TMTG's "external counsel", believed to be Lawyer A, met at the home of a DWAC director to engage in "brainstorming sessions."  *See* Exh. 2, SEC Compl. ¶ 55.  A video of this event shows that during the meeting, they called DWAC's CFO.  *Id*. In the video, Orlando thanked

everyone for figuring out "how to get this done." *Id.* The "TMTG representative" then thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this." *Id.* Upon information and belief, Litinsky is the TMTG founder/representative referred to by the SEC in connection with this allegation. *Id.*

102.    The SEC further alleges that on May 30, 2021, an individual who helped raise funds for ARC sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TM[T]G deal." *Id.* at ¶ 56. "It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." *Id.* The potential investor responded and asked, "Is there any brochure ready for the TM[T]G SPAC?" *Id.* Orlando responded, "There is no TM[T]G SPAC. There is a SPAC and I have a great relationship with TM[T]G. I believe with extremely high confidence that TM[T]G will [end] up in one of my SPACs. Better I explain in person." *Id.*

103.    Litinsky records in his notes for May 30, 2021: "Orlando tells Litinsky he 'wants [Litinsky] to sign LOI in Miami on [M]ay 31.'"

104.    Between May 31 and June 1, 2021, Litinsky instructed Lawyer A to remove Litinsky's name as the signatory of the June 4 LOI and replace it with the only founder of Old TMTG who was not affiliated with UAV and was unaware of the Pre-Targeting Conspiracy. Lawyer A did exactly as Litinsky instructed.

105.    On June 5, 2021, Lawyer A, on behalf of that same New Mexico LLC, *infra* at ¶ 119, entered into a consulting agreement with ARC to formalize Lawyer A's ongoing efforts to introduce investors to ARC and raise money for DWAC (the "Consulting Agreement"). The Consulting Agreement created a compensation structure payable in an equity interest in ARC. This arrangement constitutes a clear conflict of interest. Lawyer A created a financial advantage for

himself based on his representation of Old TMTG.  The UAV Parties were aware or should have been aware of Lawyer A's conflict of interest in the continued representation of Old TMTG.

> ### D.      The Co-Conspirators Continue the Pre-Targeting Conspiracy

106.    The Co-Conspirators knew that Plan A with Benessere would never go forward, yet they used Plan A as a placeholder until they could "legally" reveal DWAC as the merger partner (Plan B).  Indeed, revealing a merger between DWAC and Old TMTG before DWAC's IPO would violate securities laws.

107.    Although the Co-Conspirators knew by no later than April 14, 2021 that certain Benessere directors opposed a Benessere/Old TMTG merger and would not approve the transaction, the Co-Conspirators arranged to have Old TMTG and Benessere sign the June 4 LOI on June 4, 2021 to keep up the ruse.  The June 4 LOI would prevent Old TMTG from negotiating with any acquirers other than a SPAC controlled by Orlando but would not require Benessere to be exclusive to Old TMTG.

108.    According to the SEC, on June 4, 2021, Orlando (in his personal capacity and on behalf of Benessere) signed the June 4 LOI, expressing an intent to pursue a merger between Benessere and Old TMTG. *See* Exh. 2, SEC Compl. ¶ 60.

109.    According to the SEC, the June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee ($4 million less than the break-up fee contained in the draft June 4 LOI, *supra* ¶ 84) if Benessere and Old TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). *See* Exh. 2, SEC Compl. ¶ 61.  The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [Old TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and

absolute discretion) and such terms are ultimately accepted by the Company." *Id*. Notably, the break-up fee was inconsequential to Orlando as he knew that if Plan A with Benessere did not close, there was a Plan B: a merger between Old TMTG and DWAC. This further demonstrates the Co-Conspirator's intent to use Plan A with Benessere as a placeholder for Plan B with DWAC and to benefit Orlando at the expense of DWAC.

110.    The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. *See* Exh. 2, SEC Compl. ¶ 61. The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021. *Id.*

111.    Thus, while Orlando outwardly pursued the Plan A merger between Benessere and Old TMTG, the Co-Conspirators continued plotting the Plan B merger between DWAC and Old TMTG.

112.    According to the SEC, on or about June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. *See* Exh. 2, SEC Compl. ¶ 66. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey['re] exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [Benessere]. [sic] It's crazy but let me try!!"

113.    Also, according to the SEC, in spring and summer of 2021, Orlando met and talked with TMTG representatives about a merger with DWAC. *See* Exh. 2, SEC Compl. ¶¶ 67–71. On information and belief, those representatives include Moss and Litinsky.

114.    Nevertheless, according to the SEC, in late June 2021, Orlando misrepresented to a potential investor in DWAC that Old TMTG was merely one of the many targets DWAC was considering.  Orlando stated:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other.  TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO.  We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

*See* Exh. 2, SEC Compl. ¶ 72.

115.    According to the SEC, despite this and similar misrepresentations to potential investors, Orlando and the UAV Parties continued pursing a potential merger between DWAC and Old TMTG (Plan B) before DWAC's IPO, while also maintaining the fig leaf of a potential merger between Benessere and Old TMTG (Plan A).  *See* Exh. 2, SEC Compl. ¶ 71.

### E.    The Co-Conspirators Aided and Abetted Each Other in Furthering the Pre-Targeting Conspiracy and Breach of Fiduciary Duties

116.    The UAV Parties, Orlando, and ARC assisted each other and participated in furthering the Pre-Targeting Conspiracy, which violated the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

117.    The UAV Parties knew or should have known—based on Orlando's statements to them—that Orlando was pursuing an unlawful Plan B and was misrepresenting to potential investors DWAC's communications (or lack thereof) with Old TMTG.  Indeed, the UAV Parties communicated with Orlando about a DWAC merger before DWAC's IPO and while Old TMTG was seemingly still in negotiations with Benessere. Litinsky's own notes specifically reference discussing "plan B" with Orlando almost five months prior to DWAC's IPO.

118.    According to the SEC, Orlando participated in more than 100 phone calls with representatives from Old TMTG and Lawyer A from the time DWAC filed the Form S-1 on May 25, 2021 through on or about September 2, 2021, which was the day before the commencement of DWAC's IPO.  *See* Exh. 2, SEC Compl. ¶ 74.  Upon information and belief, the Old TMTG representatives and outside counsel referred to by the SEC in these allegations are the UAV Parties and Lawyer A.

119.    Orlando also signed "consulting agreements" with individuals that, in addition to other terms, provided financial incentives to individuals (such as Lawyer A) for helping Orlando raise funds for ARC, DWAC's Sponsor.  *See* Exh. 2, SEC Compl. ¶ 76.  The June 5, 2021 Consulting Agreement, created and executed by Lawyer A and Orlando, is one such agreement. *See supra* at ¶ 105.  This link between Orlando and Lawyer A is further evidence that the UAV Parties knew or should have known about Orlando's Plan B when they continued participating in, and aiding and abetting, the Pre-Targeting Conspiracy in violation of their fiduciary duties.

120.    Additionally, according to the SEC, from in or about June 2021 to in or about August 2021, Lawyer A was copied on a series of email communications from an existing DWAC investor to prospective investors.  *See* Exh. 2, SEC Compl. ¶ 77.  The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick [Orlando]'s team, and [Lawyer A] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."  *Id.*  Lawyer A proceeded to attend videoconference meetings with Orlando and potential DWAC investors throughout May, June and July of 2021.

121.    According to the SEC, on or about July 8, 2021, Orlando traveled to Old TMTG's offices and spent the entire day there.  *See* Exh. 2, SEC Compl. ¶ 81.

122.    That same day, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Rodrigo Veloso and two other individuals as directors.  *See* Exh. 2, SEC Compl. ¶ 78.  According to the SEC, Veloso had been involved with Orlando in discussions with Old TMTG.  *Id*.

123.    The timing of Orlando's visit to Old TMTG's offices and the subsequent filing of DWAC's amended Form S-1 indicate that the UAV Parties assisted or, at a minimum, knew of Orlando's plan to cause DWAC to file the Form S-1.  In doing so, the UAV Parties breached the fiduciary duties they owed to Old TMTG.

124.    The July Form S-1 contained several of the same material statements alleged by the SEC to be false that appeared in the May Form S-1.  Orlando reviewed and signed the July Form S-1.

125.    According to the SEC, on July 15, 2021, a TMTG executive emailed himself an audio recording in which he made mental notes to himself, including, "For [another TMTG executive], TMTG ticker symbol.  Tell him about that. . . . The merger agreement arrived.  Also potentially flipping it to another SPAC." *See* Exh. 2, SEC Compl. ¶ 82. Upon information and belief, the "TMTG executive" referenced by the SEC is either Litinsky or Moss.

126.    Also, according to the SEC, on or about August 18, 2021, a TMTG representative emailed himself and wrote, "Everything is lined up. Platform is weeks away.  Backed by $300 million in cash.  Billions of stock.  Press conference video is ready.  Only thing missing is licensing Agreement."  *See* Exh. 2, SEC Compl. ¶ 84.  At the time, Old TMTG was in the process of renegotiating a licensing agreement.  *Id*.  Also, at the time, Benessere had approximately $115 million in its trust account.  *Id*.  DWAC, on the other hand, had filed a Form S-1/A on July 8, 2021

announcing that it had planned to do a $300 million IPO.  *Id*.  Upon information and belief, the

"TMTG representative" referred to by the SEC in this allegation is either Litinsky or Moss.

127.    According to the SEC, on or about August 28, 2021, Orlando received a text from

a DWAC representative that read, "Talked to [TMTG's outside counsel].  [He represented that Old]

TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate

announcement.  I told them we'd need a month.  Probably gonna settle at 2-3 weeks."  *See* Exh. 2,

SEC Compl. ¶ 85.  Upon information and belief, the SEC's reference to "TMTG's outside counsel"

is to Lawyer A.

128.    The SEC alleged that on August 31, 2021, three days prior to the commencement

of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed

and signed.  *See* Exh. 2, SEC Compl. ¶ 86.  Orlando, in breach of his fiduciary duties, caused

DWAC to make several representations that the SEC has alleged were materially false and

misleading in the Final Form S-1 about discussions between DWAC and potential targets,

including the following:

> To date, our efforts have been limited to organizational activities as
> well as activities related to this offering.  We have not selected any
> specific business combination target and we have not, nor has
> anyone on our behalf, engaged in any substantive discussions,
> directly or indirectly, with any business combination target with
> respect to an initial business combination with us.

129.    Orlando also caused the Final Form S-1 to contain the following statements

regarding DWAC's contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive
> discussions, directly or indirectly, with any business combination
> target.  From the period commencing with our formation through the
> date of this prospectus, there have been no communications or
> discussions between any of our officers, directors or our sponsor and
> any of their potential contacts or relationships regarding a potential
> initial business combination.  Additionally, we have not engaged or
> retained any agent or other representative to identify or locate any

suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

[…]

We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

*See* Exh. 2, SEC Compl. ¶¶ 86–89.

130.    The SEC has found that these statements were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with Old TMTG; (b) Orlando told Lawyer A, Litinsky, and perhaps others during the summer of 2021 of the possibility of using DWAC to complete a merger with Old TMTG and Litinsky even noted that by April 14, 2021 he was aware of Plan B; (c) through the Consulting agreement, Lawyer A was actively soliciting investments for DWAC through ARC, for which it had a compensation structure in the spring of 2021; (d) the discussions between Benessere and Old TMTG had ceased before DWAC's IPO; and (e) Orlando had selected Old TMTG as DWAC's preferred target prior to its IPO. *See* Exh. 1, SEC Cease and Desist Order ¶ 39.

131.    DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

132.     According to the SEC, DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described in paragraphs ¶¶ 128–29.  *See* Exh. 2, SEC Compl. ¶ 92.

133.     The UAV Parties knew or should have known that Orlando's conduct with respect to the SEC filings was improper.

F.     **DWAC's Post-IPO Negotiations with Old TMTG**

134.     Following DWAC's IPO, DWAC and Old TMTG could publicly engage in merger communications.  However, to avoid raising red flags for securities violations, the Co-Conspirators had to make it seem like DWAC was considering multiple merger targets, including Old TMTG.

135.     According to the SEC, on or about September 8, 2021—the day DWAC's IPO closed—DWAC sent Old TMTG (and other companies) a draft nondisclosure agreement.  *See* Exh. 2, SEC Compl. ¶ 95.

136.     On September 13, 2021, DWAC and Old TMTG signed the nondisclosure agreement.  The next day, Lawyer A emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent to pursue a merger between DWAC and Old TMTG.

137.     According to the SEC, on or about September 15, 2021, a mere week after DWAC's IPO closed, DWAC began coordinating an in-person event to sign the letter of intent with Old TMTG on September 22, 2021, and started preparing a press announcement by the end of September 2021.  *See* Exh. 2, SEC Compl. ¶ 93.

138.     On September 18, 2021, Lawyer A emailed Benessere a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

139.     According to the SEC, on or about September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 100.  That same day, Orlando met with representatives from Old TMTG and signed a mutually exclusive letter of intent between DWAC and Old TMTG.  *Id*.

140.     Also on September 22, 2021, Orlando (on behalf of Benessere) and Old TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause.

141.     According to the SEC, on or about October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 101.  DWAC and Old TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market closed that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing became publicly available at approximately 6 a.m. on October 21, 2021.

142.     Also, according to the SEC, on May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  *See* Ex. 2, SEC Compl. ¶ 103.  DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.  *Id*.  For example, the Form S-4 disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed.  Accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.  *Id*.

143.     According to the SEC, the Form S-4 described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. *See*

Ex. 2, SEC Compl. ¶ 103.  However, the SEC found that Orlando had numerous interactions with TMTG prior to DWAC's IPO.  *Id*.

### G.    <u>SEC Investigation Into DWAC Merger with Old TMTG and Related Fines</u>

144.    Shortly thereafter, the legal consequences of the Co-Conspirators' conduct began to threaten the merger between DWAC and Old TMTG.  In or about January 2022, the SEC initiated an investigation and subsequently declined to review a registration statement on form S-4, effectively stalling the deal to the determine of both DWAC and Old TMTG.

145.    On or about July 20, 2023—after Orlando was removed as DWAC CEO—the SEC instituted a cease-and-desist proceeding against DWAC, finding that, under Orlando's leadership, DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.  *See generally* Exh. 1, SEC Cease and Desist Order. In addition to other remedies, the SEC imposed a civil penalty of $18 million and required to DWAC to file an amended registration statement on form S-4.  *Id*.

146.    Among other findings, the SEC determined that Orlando "communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with [Old] TMTG."  Exh. 1, SEC Cease and Desist Order ¶ 27.  He did so despite DWAC's interest in [Old] TMTG not being public, and despite the fact that SPACs, by definition, are not permitted to have a predetermined merger target.  *See generally* 17 C.F.R. § 230.419.

147.    As noted above, the government investigation and enforcement action substantially delayed the merger between DWAC and Old TMTG.  This delay threatened DWAC's survival and frustrated Old TMTG's access to the capital the merger was anticipated to provide and its ability to timely pursue its business plans.

**H.** **Orlando and the UAV Parties' Pre-Targeting Conspiracy Damaged DWAC and Old TMTG**

148.    The Co-Conspirators' conduct harmed DWAC n/k/a TMTG and Old TMTG in several ways.

149.    First, and most obvious, the Co-Conspirator's misconduct harmed DWAC n/k/a TMTG and its shareholders and exposed the company to regulatory liability and financial harm, ultimately resulting in a settlement with the SEC resulting in, among other things, the imposition of an $18 million penalty.  Further, DWAC and its shareholders incurred at least $11 million in related legal costs and fees.

150.    The Co-Conspirators' misconduct also jeopardized DWAC's pending merger with Old TMTG.  As a result of the investigation, Old TMTG (with the UAV parties no longer in control) threatened to withdraw from the Merger Agreement, pending renegotiation.  It was only *after* the DWAC Board of Directors navigated the SEC investigation—and Orlando was removed as CEO—that Old TMTG eventually agreed to reenter the Merger Agreement with DWAC.

151.    Notwithstanding Old TMTG's reaffirmation the Merger Agreement, the SEC investigation resulted in material delay to DWAC's merger timeline with Old TMTG.  As a result of the investigation, DWAC was forced to conduct two shareholder votes to extend the Company's automatic liquidation date, *i.e.*, the Company's deadline by which it was required to effectuate the merger.  DWAC was also forced to incur legal and administrative expenses as a direct result of the Co-Conspirators' tortious conduct, breaches of fiduciary duties, and other misconduct.

152.    Facilitating and executing two major shareholder votes resulted in massive monetary costs to DWAC.  To facilitate the votes and the necessary proxies, DWAC was forced to expend millions of dollars.  These votes would not have been necessary but for the delays imposed by the SEC investigation caused by the Co-Conspirators' conduct.

153.    Old TMTG further suffered significant monetary harm in delaying its plans to go public because of the Co-Conspirators' conduct.  The timing of such mergers is highly consequential and the delays imposed by the SEC investigation caused substantial injury to Old TMTG.

154.    The reputational damage to DWAC and Old TMTG as a result of the SEC investigation was also substantial.  For example, during and immediately following the SEC investigation, DWAC faced extreme difficulty in raising funds to continue its efforts towards a de-SPAC merger.  Consequently, DWAC and Old TMTG were forced to issue additional convertible notes to finance operations.

155.    Moreover, not wanting to be associated with Orlando and the SEC investigation, nearly all of DWAC's Board of Directors resigned in November and December 2022.  Orlando's conduct therefore forced a company leadership changeover in an already-turbulent time for DWAC.

**V.    The UAV Parties Failed to Manage Old TMTG Using Good Faith or Due Care**

156.    In addition to the damage the UAV Parties caused to Old TMTG and DWAC through their knowledge of and participation in the Pre-Targeting Conspiracy, the UAV Parties further breached their fiduciary obligations to Old TMTG through their woeful mismanagement of the company and subsequent retaliatory conduct.

157.    As the *de facto* officers and directors of Old TMTG, the UAV Parties were in control of Old TMTG's day-to-day operations and major decisions of corporate policy until the new CEO and Board of Directors took the reins in early 2022.  The UAV Parties' primary responsibility (apart from securing a successful merger) was to competently prepare Old TMTG to launch the Truth Social platform.

158.    Instead, the UAV Parties misallocated Old TMTG's resources, executed (or attempted to execute) bad contracts without proper approval, and failed to carry out Old TMTG's most important goals.

159.    The UAV Parties failed to successfully launch Truth Social, leading an already hostile media to criticize Old TMTG for long user wait times and technical failings, to the detriment of the Old TMTG's business reputation.

160.    On June 12, 2022, Old TMTG's Board authorized the creation of the "Special Committee re: United Atlantic Ventures" (the "Special Committee") to investigate events that occurred in early 2022, including the UAV Parties' derelict management of Old TMTG.

161.    On January 16, 2023, the Special Committee issued a report making numerous findings of pervasive, reckless mismanagement by the UAV Parties, dating back to the beginning of Moss and Litinsky's service as Old TMTG's *de facto* officers and directors.  This included findings that:

>    a.    The UAV Parties failed to conduct an organizational meeting, adopt incorporator resolutions, adopt corporate by-laws, or cause the adoption of a shareholders' agreement that would have established a corporate governance structure for Old TMTG.  This required Old TMTG to spend substantial effort and resources to ensure that Moss and Litinsky's failures did not call into question the authority Old TMTG had to make and execute on several of the business decisions to which it was committed;

>    b.    The UAV Parties hand-picked a technical team to develop the Truth Social platform that lacked the skill and maturity necessary to build a platform at the size and scale needed to achieve commercial success;

>    c.    The UAV Parties failed to manage the technical team;

>    d.    The UAV Parties caused Old TMTG to enter into a commercially unreasonable relationship with a cloud services provider, who charged exorbitant rates for substandard or non-existent services.  The provider's equipment operated slowly, severely limiting capacity, while suffering frequent outages; and

>    e.    Even after a new CEO was appointed, the UAV Parties attempted to assert control of Old TMTG's operations by, among other things, threatening that

if their decisions were not followed, they would cause a walkout of their hand-picked technical team, to the detriment of Old TMTG and the Truth Social launch.

162.    In addition to these problems, the UAV Parties failed entirely to develop a business plan for Old TMTG's streaming video on demand services, which jeopardized Plaintiffs' ability to follow through on representations made to investors and the public.

## VI.    Orlando Failed to Manage DWAC Using Good Faith or Due Care

163.    Throughout his tenure as a DWAC officer and director, Orlando failed to exercise minimum levels of competence and care required of a CEO. These failures caused extensive harm to DWAC and its shareholders.

164.    Orlando failed to employ basic company governance necessary to protect company and shareholder interests. He failed to hold formal votes for major company decisions, failed to record Board meeting proceedings with formal minutes or notes, failed to maintain sufficient records, and withheld pertinent information from Board members when seeking ratification of his decisions. Upon information and belief, despite conducting dozens of Board meetings during his tenure as DWAC CEO, Orlando failed to ensure minutes were recorded for many of them.

165.    Orlando failed to employ or institute basic accounting and record-keeping functions that further caused harm to DWAC. In particular, Orlando failed to institute proper corporate partitions between DWAC and Benessere Enterprises, Inc., another Orlando-affiliated entity, resulting in two material restatements to DWAC's financials and extensive costs for accounting services. Such deficiencies negatively impacted market confidence in DWAC's business and shareholder value, and also resulted in the resignation of DWAC's auditor.

166.    Similarly, Orlando, acting as an agent of ARC, engaged in negligent and reckless handling of storage of DWAC-related documents, including vendor contracts and invoices, in his

personal email account.  Such conduct resulted in the omission of multiple vendors in internal company reporting, and required DWAC to remedy actions that violate industry standard practices.

167.    As CEO of DWAC and as a member of its Board of Directors, Orlando utilized his position to enrich himself and ARC, often in direct conflict with DWAC's interests.

168.    As CEO, Orlando executed promissory notes on behalf of DWAC to ARC with no ratification by a disinterested Board of Directors.  Because Orlando controls ARC, he had a duty to follow proper procedures to ensure that the interests of DWAC's shareholders were represented by disinterested leadership.

169.    Orlando continued to leverage his position as a director in relation to the promissory notes that he issued to himself via ARC.  For example, he chose to prioritize his own enrichment over the needs of DWAC at a critical moment for the Company as part of its annual 10-K report.

170.    As part of the 10-K reporting process, DWAC's external auditor sent letters to all entities to whom the Company owed a form of debt such as promissory notes.  To finalize the reporting process, the auditor required a response and verification from all such persons.  In his capacity as controller of ARC, Orlando received such a notice with regard to the promissory notes he issued to ARC as DWAC CEO.

171.    Rather than sign and verify the forms as requested, Orlando refused to sign unless DWAC agreed to transform his promissory notes into convertible notes.  By transforming the notes, Orlando stood to profit substantially through the prospect of obtaining DWAC shares in far excess of the monetary value of the notes in their original promissory form.

172.    Knowing that DWAC faced potential de-listing from the NASDAQ stock exchange for failure to complete the 10-K audit process, Orlando effectively forced DWAC to transform his

standard shareholder loan into more-profitable convertible notes for the benefit of ARC, and by extension, himself.

173.    Orlando's actions related to the promissory notes, aided by ARC, were calculated to benefit ARC and Orlando, not DWAC.  As a Director, Orlando had a fiduciary duty to DWAC to facilitate the audit process, not utilize the process as an opportunity for self-enrichment.

174.    Such self-interested conduct by Defendants extends further back as well. Throughout the merger process, Orlando—both in his personal and ARC capacities—made a habit of obstructing straightforward board-of-director votes, meetings, and actions by DWAC as a means to demand additional monetary compensation.  For example, Orlando refused to sign routine SEC filings and necessary amendments to the Merger Agreement. Such actions had no material benefit to DWAC's shareholders.  Instead, Orlando used such instances as means to exert leverage over DWAC for pending disagreements or disputes.  Orlando's reckless and irrational behavior extended beyond the boardroom.  On more than one occasion, Orlando published social media posts that were harmful to the standing and reputation of DWAC as a public company.

175.    Upon information and belief, Orlando went so far as to discourage investors from investing money in DWAC based on his own personal grievances.  After being removed as DWAC's CEO in March 2023, Orlando convinced a DWAC investor who previously had earned money from DWAC's IPO not to invest more money in DWAC.  When confronted about why he did this, Orlando stated that it was his turn to make the life of the new CEO miserable.

176.    Upon information and belief, Orlando also leaked confidential business information to the press for his own personal benefit and without benefit to DWAC's shareholders.  On at least one occasion when Orlando was on the phone with other DWAC personnel, he excused himself to take another phone call but forgot to mute the first call.  As a result, DWAC personnel heard

Orlando leaking details about DWAC's prospective merger with Old TMTG to the press.  When confronted, Orlando lied and claimed that he told the reporter "no comment."

177.    After years of additional negotiation, coordination, and preparation, DWAC completed one of the final prerequisites to the merger consummation by having its registration statement on Form S-4 declared "effective" by the SEC on February 14, 2024.  Building off the registration statement, DWAC filed a merger proxy/prospectus for DWAC's proposed business combination with Old TMTG on February 16, 2024, and scheduled a special shareholder meeting for approval of the merger and related matters on March 22, 2024.

## VII.    ARC and Orlando's Obstruction of Business Operations and Merger Consummation

178.    In the lead-up to the merger consummation and imminent shareholder vote, Orlando and ARC sought to frustrate and obstruct the consummation as a means to extract monetary consideration from DWAC and its shareholders, notwithstanding Orlando and ARC's obligation to help lead DWAC toward consummation as fiduciaries.  Throughout that time, Orlando and ARC's motivation was self-dealing—*i.e.*, not in the best interest of DWAC, its shareholders, or the merger.

179.    One of the closing prerequisites of the Merger Agreement was that all DWAC Board members must provide conditional resignation letters to take effect at the moment of the merger consummation.  The purpose of the resignations was to enable the combined entity to establish its Board pursuant to the structure and allocations set forth in the Merger Agreement, and consistent with the proxy/prospectus delivered to DWAC's stockholders.

180.    In the months leading up to the shareholder vote, Orlando, in both his personal capacity and as a controller of ARC, attempted a blatant shakedown extortion effort, stating that he would decline to issue his resignation—and thus attempt to kill the merger in its entirety by preventing a necessary closing condition—unless DWAC agreed to a series of unconscionable

demands. These demands included a $100,000 note convertible into 10,000 Class A shares, an additional 97,000 shares for being a director, and 6.5 million warrants exercisable at $11.50 per share, which, net of the warrant exercise price, would reflect approximately $222,587,500 in additional value to Orlando based on a per share DWAC Class A common stock trading price of $45.00 (DWAC closed at $47.23 per share on February 26, 2024).

181.    Additionally, as a result of the SEC investigation and settlement, a significant portion of DWAC's management and Board turned over, yet Orlando refused to provide promised compensation to management and directors for their service, reducing the incentive for such individuals to take on the burden and potential liability of managing DWAC through the merger. As a result, in December 2023, DWAC received shareholder approval for a management and director compensation plan and arrangement. Orlando's refusal to fulfill these promised compensatory obligations, in favor of his own pecuniary and personal interests, caused DWAC significant delay and expense. His failure to do so also resulted in potential future dilution to the public shareholders.

182.    Orlando also levied additional demands that had nothing to do with the well-being of DWAC's shareholders, but rather related only to his own pecuniary and personal interests. For example, he demanded that in exchange for his resignation commitment, the then-CEO of DWAC would need to provide a signed affidavit providing witness testimony regarding a collateral dispute concerning Orlando and a non-party that has no connection to DWAC. Orlando further demanded that DWAC provide "cooperation" in any investigation by the SEC into Orlando's past conduct.

183.    These motivations and demands had nothing to do with DWAC shareholders, and would have served to benefit Orlando only.

184.    DWAC was forced to expend hundreds of thousands of dollars in time and legal fees to address these demands by Orlando and ARC through its lawyers.  Such expenditures were borne by DWAC, and by extension, its shareholders.

185.    Orlando also withdrew money from DWAC to serve his own purposes.  For example, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal being for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.  Upon information and belief, Orlando failed to utilize the $15,000 in cash for legal services as represented to DWAC.  At no time prior or subsequent to the withdrawal did Orlando purport to pay for legal services in cash.

186.    Around the time of the merger consummation, Orlando failed to identify justifiable business bases for his conduct which violated his fiduciary obligations, ultimately reflecting his continued desire to utilize his position and control over DWAC to enrich himself at the expense of DWAC's shareholders.  The enumerated purpose of DWAC was to effectuate a SPAC merger, and Orlando and ARC's conduct disregarded this corporate mandate in pursuit of personal gain.

187.    Orlando and ARC sought to undermine, threaten, and oppose the merger through a series of actions motivated by a desire to extort the company, and by extension, its public shareholders.  For example, in its role as sponsor of DWAC, ARC had a contractual obligation to vote its shares in favor of the business combination.  ARC, however, withheld its vote even though the voting window had opened.  This conduct resulted in millions of dollars of added expense to the Company in effectuating the merger on the contingency that ARC would not perform its contractual duties at Orlando's direction.

188.    As noted above, at the time that the voting window for the merger consummation opened in February 2024, Orlando communicated to DWAC that he was supposedly entitled to

additional unreasonable compensation in his personal capacity as a director of the Company. The Board declined his request. Additionally, after the voting window for the merger consummation opened, Orlando made unfounded and unreasonable demands for personal reimbursement without adequate proof or justification for the demands.

189.    While Orlando was making demands of DWAC for his personal benefit during the voting window for the merger consummation, ARC declined to lodge its vote despite its contractual obligation to do so. During this time, ARC made its demands on DWAC separate from that of Orlando. In particular, ARC demanded certain adjustments be made to the ratio by which its shares in DWAC would be converted to new shares in the new merger entity. By withholding ARC's vote, both Orlando and ARC attempted to leverage DWAC into a less favorable bargaining positions on these various disputes, with each standing to benefit in separate capacities, but nonetheless providing aid to the other in the process. Old TMTG suffered similar harm as a result of the uncertainty and increased complexity of a last-minute vote scenario.

190.    And just seven days before the vote on the business combination, Orlando sent an extensive demand for documents clearly aimed to interfere with the vote and the closing of the business combination. In the demand, Orlando indicated that his vote in favor of the business combination was contingent upon receipt of the documents, even though the documents had no bearing on the merits of the business combination and should have been requested long before the vote. The demand caused DWAC to incur additional, substantial costs and distraction in its efforts to comply with the demand.

191.    Orlando, through ARC, raised millions of dollars, through various means, based on misrepresentations about his personal, financial self-dealing and adherence to statutory and

regulatory requirements, promising investors shares in DWAC n/k/a TMTG in exchange for capital to be used in support of DWAC's merger with Old TMTG.

192.    Orlando, through ARC, failed to maintain and produce a clear accounting of who is owed what shares of DWAC n/k/a TMTG, leading to significant disruption to TMTG, including damages.

193.    Indeed, Orlando's failure is the subject of several multiple litigation matters brought by investors against Orlando and ARC. DWAC n/k/a TMTG has been tangentially brought into those litigations resulting in business disruption and expenditure of attorney's fees and costs.

194.    Orlando's misconduct and deficient accounting practices breached the fiduciary duties owed to DWAC n/k/a TMTG.

195.    Moreover, upon information and belief, Orlando failed to release the funds collected through ARC for the benefit of the merger between Old TMTG and DWAC and at issue in various lawsuits to DWAC n/k/a TMTG.

196.    Orlando's failure to turn these funds over to DWAC n/k/a TMTG breached the fiduciary duties owed to DWAC n/k/a TMTG.

197.    All conditions precedent to the maintenance of this action have occurred or have been performed, waived, or otherwise satisfied.

<u>**COUNT I**</u>
<u>**BREACH OF FIDUCIARY DUTY OF LOYALTY**</u>
**(BY DWAC N/K/A TMTG AGAINST ORLANDO)**

198.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 58–62, 68–155, 163–194 as though fully alleged herein.

199.    Orlando, during his tenure as CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of loyalty to DWAC.

200.     To fulfill this duty, Orlando was required to place the best interest of DWAC and its shareholders above his own.

201.     Orlando breached his fiduciary duty of loyalty by engaging in conduct which benefitted himself or ARC at the expense of DWAC and its shareholders.

202.     Orlando devised and engaged in a scheme to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

203.     In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with Old TMTG representatives, including the UAV Parties, for a merger between Old TMTG and DWAC.

204.     Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

205.     Orlando also generally refused to cooperate in DWAC corporate governance and business processes in furtherance of his personal interests.

206.     While serving as a Director of DWAC, Orlando made public statements that were harmful to the company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

207.     Orlando also continuously obstructed DWAC's eventual merger with Old TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

208.     Orlando also engaged in self-interested issuance of various encumbrances from DWAC to ARC (essentially himself) without the ratification of disinterested board members.

209.     Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures.

210.     Upon information and belief, Orlando also failed to deliver all funds raised by ARC for the benefit of DWAC.

211.     As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his fiduciary breaches that are subject to disgorgement.

212.     The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's fiduciary breaches, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, disgorgement of benefits, and such other relief as the Court deems appropriate

## COUNT II
## BREACH OF FIDUCIARY DUTY OF CARE
### (BY DWAC N/K/A TMTG AGAINST ORLANDO)

213.     DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 63, 68–155, 163–194 as though fully alleged herein.

214.     Orlando, as the now-former CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of care to DWAC.

215.    To fulfill this duty, Orlando was required to exercise his responsibilities as CEO and a Director of DWAC in an informed and considered manner which an ordinarily prudent and careful CEO and Director would have used in the same circumstances.

216.    Orlando breached his fiduciary duty of care by engaging in the Pre-Targeting Conspiracy.

217.    Specifically, Orlando devised and engaged in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

218.    In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with his fellow Co-Conspirators.

219.    Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

220.    Orlando further breached his fiduciary duty of care by failing to employ industry standard governance and business practices, including inadequate recordkeeping, failure to properly ratify Company decisions, and deficient accounting practices.

221.    Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures and deficiencies.

222.    Upon information, Orlando also failed to accurately account for or deliver funds raised by ARC, as DWAC's sponsor.

223.    As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his breaches of fiduciary duty that are subject to disgorgement.

224.    The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's breaches of his fiduciary duties, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT III
## CONVERSION
## (BY DWAC N/K/A TMTG AGAINST ORLANDO)

225.    DWAC n/k/a TMTG realleges and incorporates Paragraph 185 as though fully alleged herein.

226.    Orlando wrongfully asserted dominion over DWAC assets inconsistent with DWAC's possessory rights over those assets.

227.    On at least one occasion, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal as having been for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.

Upon information and belief Orlando has engaged in similar improper utilization of Company funds without prior authorization or verification of valid business purpose.

228.    Plaintiffs have demanded return of their property and assets.

229.    Plaintiffs have suffered damages as a direct and proximate result of Orlando's wrongful assertion of dominion over DWAC's assets.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for the fair market value of DWAC's assets at the time of their conversion, plus interest, together with the costs of this action, including along with all such other relief and remedies as the Court finds fit and proper under the circumstances.

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY DWAC N/K/A TMTG AGAINST ARC)

230.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 68–143, 148–155 as though fully alleged herein.

231.    Orlando owed fiduciary duties of care and loyalty to DWAC.

232.    Orlando breached those fiduciary duties by exposing DWAC to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

233.    Orlando also repeatedly threatened to obstruct DWAC's merger with Old TMTG and threatened to cause DWAC to lose its business operations to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

234.    ARC had knowledge of Orlando's breaches of fiduciary duty.

235.    ARC substantially assisted and encouraged Orlando's breaches of fiduciary duty.

236.    Orlando has, and at all relevant times, had a personal stake in the object of his conduct that is separate and distinct from ARC's interest.

237.    As a direct and proximate result of ARC aiding and abetting Orlando's breaches of fiduciary duty, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT V
## VIOLATION OF FLORIDA'S DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
## (BY ALL PLAINTIFFS AGAINST ORLANDO AND ARC)

238.    Plaintiffs reallege and incorporate Paragraphs 63, 68–143, 168–173, 180, 187 as though fully alleged herein.

239.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

240.    Solicitation of Old TMTG as a DWAC merger target constitutes "trade or commerce" as defined by Fla. Stat. § 501.203(8).

241.    Orlando issued promissory notes to ARC for his personal benefit, and later refused to cooperate in critical accounting processes unless DWAC agreed to transform the promissory notes into convertible notes.

242.    Orlando generally refused to cooperate in Company governance and business processes in furtherance of his personal interests.

243.     While serving as a Director of DWAC, Orlando made public statements that were harmful to the Company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

244.     Orlando also continuously obstructed DWAC's merger with TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

245.     Old TMTG and DWAC are both harmed by Defendants' conduct alleged herein. The conduct of Orlando and ARC, which caused a delay of the merger and the SEC investigation, has caused significant harm to both DWAC and Old TMTG in the form of lost opportunity costs and substantial out of pocket costs.

246.     The damages available to Plaintiffs are inadequate to compensate Plaintiffs for the entire extent of the harm incurred by them that results from Defendants' violations of FDUTPA, including their violations of regulations and corporate governance standards, self-interested transactions made without DWAC board approval, and their efforts to derail the merger.  Such harm is irreparable. Plaintiffs have a clear legal right to relief.

247.     As the direct and proximate result of Defendants' deceptive and unfair acts or practices, Plaintiffs have sustained substantial actual damages in an amount to be proven at trial. Plaintiffs also are entitled to attorneys' fees arising from Defendants' violations of FDUTPA.

WHEREFORE, Plaintiffs respectfully requests that this Court enter final judgment against Orlando and ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, any statutorily-available exemplary damages, injunctive relief barring future conduct as alleged herein, reasonable attorneys' fees and court costs, and such other relief as the Court deems appropriate.

## COUNT VI
## BREACH OF FIDUCIARY DUTY OF CARE
### (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

248.    Plaintiffs reallege and incorporate Paragraphs 5, 45, 47, 68–144, 156–162 as though fully alleged herein.

249.    Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

250.    Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

251.    As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of care.  This means that they were required to exercise their duties in a manner in which ordinary careful and prudent men would use in the same circumstances and consider all material information reasonably available in making business decisions.

252.    During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

253.    Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to agree to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

254.    Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

255.     This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

256.     Litinsky and Moss also failed to ensure that all corporate formalities were carried out, to establish an adequate corporate governance structure for Old TMTG, and to allocate resources in a lawful and efficient manner.

257.     Litinsky and Moss also breached their duty of care by failing to execute contracts and business ventures that were commercially reasonable and beneficial to Old TMTG and with the proper approval from the Old TMTG Board.

258.     Litinsky and Moss also failed to launch the social medial platform, including hiring a technical team with the requisite technical skills to launch the platform.

259.     Plaintiffs suffered damages as a result of Moss and Litinsky's breaches of care, including increased legal and administrative costs, additional costs to remedy their breaches, lost business opportunities, and lost ability to execute on the Company's business plan.

WHEREFORE, Plaintiffs respectfully request that this Court render a judgment against Moss and Litinsky for damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VII
## BREACH OF FIDUCIARY DUTY OF LOYALTY
## (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

260.     Plaintiffs reallege and incorporate Paragraphs 5, 46, 47, 68–162 as though fully alleged herein.

261.     Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

262.     Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

263.     As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of loyalty.

264.     To fulfill this duty, Litinsky and Moss were required to place the best interest of Plaintiffs and their shareholders above their own.

265.     During their terms as directors and/or *de facto* directors of Plaintiffs, Litinsky and/or Moss breached their duty of loyalty.

266.     During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

267.     Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

268.     Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

269.     This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

270.     Litinsky and Moss held Plaintiffs hostage by threatening that any deviation from their directives would result in Litinsky and Moss retaliating against Old TMTG by provoking a walkout of the Company's technical team.

271.     Upon information and belief, Litinsky and Moss directed Plaintiffs' personnel to wipe servers belonging to one of social media platform's contractual partners in a retaliatory effort to destroy valuable code and sabotage the social media platform.

WHEREFORE, Plaintiffs respectfully request that this Court enter final judgment against Moss and Litinsky for monetary damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST UAV)

272.     Plaintiffs reallege and incorporate Paragraphs 5, 18, 68–162 as though fully alleged herein.

273.     Litinsky and Moss owed fiduciary duties of care and loyalty to Plaintiffs.

274.     Litinsky and Moss breached those fiduciary duties by exposing Plaintiffs to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

275.     Litinsky and Moss also failed to manage Plaintiffs with due care or in good faith as alleged in Paragraphs 246 through 269.

276.     UAV, as the entity through which Litinsky and Moss conducted business and was controlled and dominated at all times by Litinsky and Moss, substantially assisted Litinsky and Moss's breaches of fiduciary duties.

277.     Litinsky and Moss have, and had at all relevant times, a personal stake in the object of their conduct that is separate and distinct from UAV's interest.

278.     As a direct and proximate result of UAV aiding and abetting Litinsky and Moss's breaches of fiduciary duties, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against UAV and award damages for UAV's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

**COUNT IX**
**CONSPIRACY TO BREACH FIDUCIARY DUTY**
**(BY ALL PLAINTIFFS AGAINST ORLANDO, LITINSKY, AND MOSS)**

279.     Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

280.     At all relevant times, Old TMTG entrusted Moss and Litinsky as its fiduciaries to act with due care and in good faith.

281.     At all relevant times, DWAC n/k/a TMTG entrusted Orlando as its fiduciary to act with due care and in good faith.

282.     Moss and Litinsky breached their fiduciary duties of care and loyalty by allowing Orlando to dual-track merger discussions with Benessere and DWAC as alleged in Counts VI and VII.

283.     Orlando breached his fiduciary duties of care and loyalty by placing his own self-interests above those of Plaintiffs', as alleged in Counts I and II and throughout this Second

Amended Complaint.

284.    Orlando, Moss, and Litinsky constituted a confederation of persons who have taken unlawful acts as alleged in herein and in furtherance of an agreement causing each other to breach their fiduciary duties to Plaintiffs.

285.    Plaintiffs have suffered damages a result of Orlando, Moss, and Litinksy's breaches of fiduciary duty as alleged in Counts I, II, VI, and VII.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment against Orlando, Moss, and Litinsky and award damages for their conspiracy to breach fiduciary duties owed to Plaintiffs, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT X
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST ORLANDO)

286.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

287.    Moss and Litinsky breached their fiduciary duties of care and loyalty to Plaintiffs through their partnership with Orlando as alleged in Counts VI and VII.

288.    Orlando knew that Moss's and Litinksy's conduct constituted a breach of their fiduciary duties because of the severe legal risk it posed to the merger, which risk materialized in the form of investigations and a substantial delay of the merger.

289.    Orlando substantially assisted Moss's and Litinksy's breaches.

290.    Plaintiffs have suffered damages as a result of Moss's and Litinsky's breaches of fiduciary duty as alleged in Counts VI and VII.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Orlando and award damages for Orlando's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS LITINSKY AND MOSS)

291.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

292.    Orlando breached his fiduciary duties of care and loyalty to DWAC n/k/a TMTG through the carrying out of the Pre-Targeting Conspiracy alleged in Counts I and II and throughout this Second Amended Complaint.

293.    Litinsky and Moss knew that Orlando's conduct constituted a breach of his fiduciary duties owed to DWAC n/k/a TMTG because of the severe legal risk it posed to the merger with Old TMTG, which risk materialized in the form of investigations and a substantial delay of the merger.

294.    Litinsky and Moss substantially assisted Orlando in the breaching of the fiduciary duties of loyalty and care owed to DWAC n/k/a TMTG.

295.    Plaintiffs have suffered damages as a result of Orlando's breaches of fiduciary duty as alleged in Counts I and II.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Moss and Litinsky and award damages for Moss's and Litinsky's aiding and abetting Orlando's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XII
## UNJUST ENRICHMENT
### (BY PLAINTIFFS AGAINST UAV)

296.    Plaintiffs reallege and incorporate Paragraph 43 as though fully alleged herein.

297.    Old TMTG conferred a benefit upon UAV in the form of 8.6 million shares of stock in Old TMTG.

298.    UAV voluntarily accepted the benefit, has knowledge of that benefit, and has retained it.[4]

299.    Equity and good conscience require that UAV restore the benefit to Plaintiffs. UAV provided nothing of value to Plaintiffs in exchange for its shares: it failed to establish Old TMTG's corporate structure, its principals were a cause of legal hurdles and delay for the merger; it botched the management of Old TMTG to the company's detriment; and it failed to develop and execute a plan for streaming video on demand services.

300.    Old TMTG has no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment ordering UAV to return the shares of stock it received, or, alternatively, to restore the value of those shares to Plaintiffs together with prejudgment interest and such other relief as the Court deems appropriate.

---

[4] UAV benefited because its Old TMTG shares have been exchanged for TMTG shares and are of significant value.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, Plaintiffs respectfully request the Court

enter judgment in their favor and against Defendants for damages, attorneys' fees where available

by contract or statute, any statutorily-available exemplary damages, and any other and further relief

as the Court deems just and proper.

Dated: July 31, 2024                             Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN: 122080)
Tal Aburos (FBN: 1010901)
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8522
Facsimile: (305) 657-6366
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com
*Counsel for Plaintiffs*

*/s/ Samuel J. Salario, Jr.*
Samuel J. Salario, Jr., Esq. (FBN: 83460)
Jason B. Gonzalez, Esq. (FBN: 146854)
Mathew D. Gutierrez, Esq. (FBN: 94014)
Raymond F. Treadwell, Esq. (FBN: 93834)
**LAWSON HUCK GONZALEZ PLLC**
215 S. Monroe St., Suite 320
Tallahassee, Florida 32301
Telephone: (850) 825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com
*Counsel for Plaintiffs*

# EXHIBIT  1

## UNITED STATES OF AMERICA
### Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 11213 / July 20, 2023**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 97958 / July 20, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No.  3-21534**

| | |
|---|---|
| **In the Matter of**<br><br>**DIGITAL WORLD ACQUISITION CORP.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Digital World Acquisition Corp. ("DWAC" or "Respondent").

### II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondent admits the Commission's jurisdiction over it and the subject matter of these proceedings and consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1] The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

**Summary**

1.      This matter concerns materially false and misleading statements and omissions by DWAC, a special purpose acquisition company ("SPAC") that in October 2021 announced an agreement to merge with Trump Media & Technology Group Corp. ("TMTG"), a social media company.  In an amended Form S-1 filed with the Commission in support of its initial public offering ("IPO") in early September 2021, DWAC stated that neither DWAC nor its officers and directors had had any discussions with any potential target companies prior to the IPO.  In a Form S-4 filed with the Commission following the announcement of the proposed merger with TMTG, DWAC mischaracterized and omitted information about the history of its interactions with TMTG.

2.      DWAC's filings were materially false and misleading.  Dating back to February 2021, an individual who would later become DWAC's Chief Executive Officer ("CEO") and Chairman ("Individual A"), and others involved with DWAC, had extensive discussions with TMTG.  While Individual A initially pursued these discussions with TMTG on behalf of another SPAC that he also controlled ("SPAC A"), Individual A created a plan in the spring and summer of 2021 to potentially use DWAC to pursue a merger with TMTG.

3.      DWAC also failed to disclose that Individual A had a potential conflict of interest stemming from a Letter of Intent ("LOI") that SPAC A had entered into with TMTG in June 2021.  This agreement made Individual A personally liable to pay a $1 million break-up fee if SPAC A or another substitute entity did not complete a merger with TMTG.  DWAC failed to disclose this potential conflict of interest in any of the documents filed with the Commission and never otherwise disclosed this information to the public.

**Respondent**

4.      **DWAC**, a Delaware corporation based in Miami, Florida, is a SPAC.  DWAC has no operations of its own and exists for the purpose of merging with a privately held company with the effect of taking that company public.  On September 8, 2021, DWAC completed an IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated.  DWAC has securities that trade on the Nasdaq Global Market under the symbols DWACU, DWACW and DWAC.[2]  Each of these securities is registered under Section 12(b) of the Exchange Act.

---

[2]      DWACU is the symbol for units consisting of one share of Class A DWAC common stock and one half of one redeemable warrant.  DWACW is the symbol for redeemable warrants exercisable for one share of Class A DWAC common stock.  DWAC is the symbol for Class A DWAC common stock.

2

### Other Relevant Individuals and Entities

5.      **DWAC Sponsor**, a Delaware corporation based in Miami, Florida, is the sponsor of DWAC.  DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC.[3]  At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 restricted DWAC units.  DWAC Sponsor's investments fund DWAC's operations and will not be returned to DWAC Sponsor if a business combination is not consummated.

6.      **Individual A**, a resident of Miami, Florida, was the CEO and Chairman of DWAC. Individual A owns a significant percentage of, and is the managing member of, DWAC Sponsor. Individual A also was the CEO and Chairman of SPAC A and the managing member of SPAC A's sponsor.

7.      **SPAC A**, a Delaware corporation based in Miami, Florida, was a SPAC controlled by Individual A.  In October 2022, SPAC A issued a press release announcing it was dissolving, would liquidate its trust account, and would return the funds held in trust to investors.

8.      **TMTG**, a Delaware corporation with its principal place of business in Sarasota, Florida, operates a social media platform.  On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was amended on May 11, 2022.

9.      **Investment Bank** is a Shanghai, China-based investment bank that describes itself as a leading advisor in the SPAC market in the United States.  Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

### Facts

#### *Background*

10.      A SPAC is a company with no underlying business operations that is formed to raise capital through an IPO for the purpose of using the proceeds to acquire an unidentified private operating company at a later date but within a specified period of time (typically two years).

11.      Following its IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction after which the company will continue the operations of the acquired company as a public company.  Investors in a SPAC at the IPO stage therefore are relying on the management team that formed the SPAC[4] to expend efforts after the IPO to identify and look to acquire or combine with a private operating company.

---

[3]      This quantity of shares reflects a three-for-one stock split effected on July 1, 2021.

[4]      A SPAC sponsor is the entity and/or persons primarily responsible for establishing the SPAC, which is thereafter managed by a board of directors and management.

3

12.     Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, steps a SPAC has taken in furtherance of a particular acquisition would be material to a reasonable SPAC investor, who would want to know about the SPAC's prospects with future acquisition targets.  Disclosures made in a SPAC's IPO – including as it relates to any pre-IPO discussions or negotiations with future acquisition targets or concerning potential business combinations – need to be clear and accurate, and cannot be materially false or misleading.

13.     In addition, the economic interests of the sponsors and the directors, officers, and affiliates of a SPAC often differ from the economic interests of public shareholders, which may lead to conflicts of interests as they evaluate and decide whether to recommend business combination transactions to shareholders.  Clear and accurate disclosure regarding these potential conflicts of interest and the nature of the sponsors', directors', officers' and affiliates' economic interests in the SPAC is particularly important because these parties are generally responsible for negotiating the SPAC's post-IPO business combination transaction.

14.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities at a discount at or around the time of the SPAC's formation.  Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO.  Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash in the event the SPAC fails to complete a business transaction, and the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

### Individual A's Initial Interactions with TMTG

15.     In mid-February 2021, a representative of TMTG approached Individual A regarding a potential deal between SPAC A and TMTG.  Shortly after that initial contact, SPAC A and TMTG signed a non-exclusive LOI to explore a potential merger between the two companies which, after being extended, lasted through April 5, 2021.  As that LOI neared expiration, TMTG and SPAC A discussed entering into a mutually exclusive LOI.  Two directors and one officer of SPAC A opposed pursuing a merger with TMTG, and SPAC A ultimately did not sign that exclusive LOI.

16.     On or about April 8, 2021, Individual A began exploring two plans to pursue a merger with TMTG, "Plan A" and "Plan B."  "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG.  For example, Individual A discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.  "Plan B" referred to Individual A's attempt to identify an alternative SPAC to pursue a merger with TMTG.  Individual A considered several SPACs that could be used for "Plan B," and Individual A started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs.  By April 9, 2021, a representative of Investment Bank wrote an email to Individual A stating: "DWAC could be a solution for [TMTG]."  At the time, Investment Bank had a majority interest in DWAC Sponsor, and Individual A had no ownership interest in DWAC Sponsor or role with DWAC.

17.     On April 14, 2021, Individual A met with representatives of TMTG.  During the meeting, Individual A suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Individual A would try to identify another vehicle to potentially pursue a merger with TMTG.

18.     On April 18, 2021, a representative of Investment Bank sent a message to Individual A and wrote: "We do [TMTG] one way or other.  Now let's sign up [TMTG].  That's the way to get the most $$$.  Anyhow, we'll figure it out.  Opciones hay."[5]  Individual A responded: "Yes.  Done this week."

### *Individual A Took Control of DWAC and Resumed Merger Discussions with TMTG*

19.     On or about April 24, 2021, Individual A learned that there was an opportunity for him to obtain substantial control over DWAC.  A few days later, Individual A signed a LOI with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor.  Individual A met with TMTG's representatives the next day and continued discussions with TMTG about a potential merger shortly thereafter.

20.     On May 14, 2021, Investment Bank and Individual A executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Individual A.  Individual A was appointed CEO and Chairman of DWAC around this same time.  These two actions gave Individual A effective control over DWAC.

21.     On the night of May 25, 2021, DWAC filed a Form S-1 (the "Form S-1").  The Form S-1 was signed by Individual A and included two additional nominee directors to DWAC's Board.  Both of those new DWAC directors were also SPAC A directors who were supportive of a transaction between SPAC A and TMTG.  This Form S-1 also identified a DWAC officer, who had been involved in some preliminary discussions about TMTG in connection with SPAC A prior to being named a DWAC officer.  The SPAC A directors and officer who opposed a transaction with TMTG did not assume any role with DWAC.

22.     The Form S-1 contained several statements about the state of discussions between DWAC and potential targets.  For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

### *The June 4 LOI and Break-Up Fee Clause*

23.     By at least June 1, 2021, Individual A made plans with TMTG to sign a unilaterally exclusive LOI between SPAC A and TMTG on June 4, 2021.  At that time, the SPAC A officer

---

[5]     In Spanish, "Opciones hay" translates to "There are options."

and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

24.     On June 1, 2021, Individual A communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the LOI signing event and wrote: "I want [TMTG] to meet the [SPAC A] AND DWAC team."

25.     On June 4, 2021, SPAC A, TMTG, and Individual A (in his personal capacity and on behalf of SPAC A) signed a LOI (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.  The June 4 LOI included a break-up fee clause under which Individual A would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause").  The Break-Up Fee Clause had several conditions that would result in Individual A owing no break-up fee.  One of those conditions was that Individual A would owe no break-up fee if he "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG] (in its sole and absolute discretion) and such terms are ultimately accepted by [TMTG]."  The parties signed several extensions to the June 4 LOI over the summer of 2021, the last extension of which was signed on or about August 27, 2021.  The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021.

26.     The Break-Up Fee Clause created a potential conflict of interest for Individual A in that it put him at personal financial risk if he did not find a way complete a merger with TMTG.

### *Individual A Contemplated a DWAC Merger with TMTG*

27.     Within days of signing the June 4 LOI, Individual A communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG.  For example, on June 7, 2021, Individual A received a text in which an individual who was a director for both SPAC A and DWAC wrote: "I still don't know why you are switching it out of [SPAC A] other than you will make more money.  I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic."  Individual A responded: "DWAC is better and will make the project clear [sic] more successful."

28.     On June 8, 2021, Individual A exchanged additional messages with representatives of Investment Bank.  Individual A sent a picture from the June 4 LOI signing event and wrote: "You have no idea!!  I worked thousands of hours to get this," and "It's ours wherever we want.  Let's make it DWAC."

29.     On June 9, 2021, Individual A emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG.

6

30.     By contrast, Individual A's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other targets.

### *Discussions with TMTG*

31.     Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

32.     During the same time period, Individual A raised funds from numerous individuals who made investments in DWAC Sponsor.  Individual A informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

33.     On July 8, 2021, DWAC filed an amended Form S-1 increasing its planned offering from $100 million to $300 million and announcing three additional directors.  One of those directors had been involved with Individual A in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

34.     Individual A travelled to TMTG's offices on July 8 and spent the entire day there. After Individual A left, a representative of TMTG sent a message to Individual A stating: "Today was a big day for [TMTG] and a huge step for our team to be able to meet and spend time with you.  Thank you so much for making the trip."

35.     On August 28, 2021, Individual A received a text from a DWAC representative that stated: "Talked to [TMTG's outside counsel].  TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement.  I told them we'd need a month. Probably gonna settle at 2-3 weeks."

### *DWAC's IPO*

36.     On August 31, 2021, three days prior to the commencement of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") signed by Individual A.  The Final Form S-1 contained several statements about discussions between DWAC and potential targets, including the following statement:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering.  We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

37.     The Final Form S-1 also contained the following statement regarding DWAC's contact with potential targets:

We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

38.     In addition, the Final Form S-1 contained the following statement regarding DWAC's contact with potential targets:

We have not contacted any of the prospective target businesses that [SPAC A and another SPAC] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

39.     Certain of the statements described in paragraphs 36 through 38 were false or misleading because, among other things and as discussed above: (a) Individual A assumed control of DWAC in May 2021 with the idea that it might be used to pursue a merger with TMTG; (b) Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG; and (c) the discussions between SPAC A and TMTG had ceased before DWAC's IPO.

40.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated.

41.     DWAC filed a prospectus on September 8, 2021 that included the same statements described in paragraphs 36 through 38.

### *DWAC's Post-IPO Negotiations with TMTG*

42.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement.  On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement.  TMTG emailed DWAC a draft LOI the next day.  Two days later, DWAC and TMTG began coordinating an in-person event to sign the LOI on September 22, 2021.  On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Individual A from the Break-Up Fee clause.

43.     On September 22, 2021, DWAC's Board communicated via WhatsApp and voted to approve signing an LOI with TMTG.  That same day, Individual A met with representatives from TMTG and signed a mutually exclusive LOI between DWAC and TMTG.  That same day, Individual A (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Individual A from the $1 million Break-Up Fee Clause under the June 4 LOI.  That letter was dated to be effective as of September 1, 2021.

44.     On October 19, 2021, DWAC's Board approved the signing of a definitive merger agreement with TMTG.  DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after market close that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on Edgar at approximately 6 a.m. on October 21, 2021.  DWAC's common stock, which had closed at $9.96 on October 20, 2021, closed at $45.50 on October 21, 2021.

### *DWAC's Form S-4*

45.     On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  DWAC's Form S-4 contains materially inadequate and misleading disclosures regarding various issues.  For example, DWAC's Form S-4:

a.  Did not disclose the Break-Up Fee Clause contained in the June 4, 2021 LOI between SPAC A and TMTG and did not disclose Individual A's potential conflict of interest caused by the Break-Up Fee Clause.

b.  Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Individual A was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Individual A met with TMTG and executed the LOI between DWAC and TMTG.

c.  Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021.  As discussed above in detail, Individual A had numerous interactions with TMTG prior to DWAC's IPO.  DWAC also did not disclose that Individual A assumed control

9

of DWAC in spring 2021 with the idea that it might be the vehicle to close a deal with TMTG and that Individual A told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

## Violations

46.     As a result of the conduct described above, the Commission finds that DWAC violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, which prohibit any person, in connection with the purchase or sale of any security, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

47.     As a result of the conduct described above, the Commission finds that DWAC also violated Section 17(a)(2) of the Securities Act, which prohibits any person, in the offer or sale of any securities, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## Undertaking

48.     Respondent undertakes that, should it file an amended Form S-4, any such Form S-4 will be materially complete and accurate and consistent with the findings in this Order.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent DWAC's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent DWAC cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.     Respondent shall comply with the undertaking enumerated in Section III, paragraph 48 above.

C.     Respondent shall pay a civil money penalty in the amount of $18 million to the Securities and Exchange Commission.  The penalty shall be due the earlier of: (a) 14 days after the closing of any merger or a comparable business combination or transaction, whether with TMTG or any other entity; or (b) January 1, 2025.  If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, the Commission will forgo the penalty upon written notice that the funds in trust have been returned to shareholders.  The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the

establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying DWAC as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Thomas P. Smith, Jr., Division of Enforcement, Securities and Exchange Commission, 100 Pearl St., Suite 20-100, New York, NY 10004-2616. If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, DWAC will provide written notice to Mr. Smith regarding the decision to dissolve the SPAC and an additional written notice when the money in trust has been returned to the shareholders. DWAC shall provide these written notices no later than 5 business days after dissolving the SPAC and no later than 5 business days after the money in trust has been returned to the shareholders.

D.      Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in

11

this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.


Vanessa A. Countryman
Secretary

12

# EXHIBIT  2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street NE**<br>**Washington, DC 20549** | **1:24-CV-2097** |
| **Plaintiff,** | **Complaint** |
| **v.** | |
| **PATRICK ORLANDO,** | **Jury Trial Demanded** |
| **Defendant.** | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Patrick Orlando, alleges as follows:

## SUMMARY

1.      This case involves fraudulent conduct and materially false and misleading statements and omissions made by Patrick Orlando ("Orlando"), in his capacity as the Chief Executive Officer ("CEO") and Chairman of Digital World Acquisition Corp. ("DWAC"), in filings made with the Commission. Through these publicly available filings, Orlando falsely represented that DWAC, a special purpose acquisition company ("SPAC") that he controlled, did not intend to merge with any specific company and, indeed, had had no discussions or contacts with any potential merger targets. Orlando knew these statements were false because he personally engaged in numerous lengthy discussions with representatives of Trump Media & Technology Group Corp. ("TMTG"), a social media company, and because he had targeted TMTG for merger with DWAC for months.

2.      At the time of the relevant conduct, Orlando was the CEO and Chairman of
DWAC and managing member of DWAC's sponsor ("DWAC Sponsor"). In those roles, Orlando
reviewed and signed the relevant filings at issue in this action.

3.      In February 2021, Orlando and others who later became involved with DWAC
began extensive merger discussions with TMTG. Orlando initially pursued these discussions
with TMTG on behalf of SPAC A, another SPAC he controlled.

4.      In the spring of 2021, Orlando planned and executed a scheme to use DWAC,
which had not yet had its IPO, to pursue a merger with TMTG. Orlando discussed his scheme
with at least one individual at TMTG.

5.      As part of this scheme, Orlando signed Forms S-1 in the spring and summer of
2021 that falsely and misleadingly stated that DWAC had not selected any merger target or
engaged in any substantive discussions with any merger target. These Forms S-1 were filed with
the Commission on DWAC's behalf.

6.      On September 8, 2021, DWAC completed an IPO, pursuant to which the
company raised $287.5 million from the investing public. In support of its IPO, DWAC filed an
amended Form S-1 with the Commission on or about August 31, 2021 (the "Final Form S-1").
Orlando signed the Final Form S-1.

7.      Among other defects, the Final Form S-1 contained material misrepresentations
and omissions regarding DWAC's conduct prior to its IPO. Specifically, the Final Form S-1
falsely and misleadingly stated that: (a) neither DWAC nor its officers and directors had any
discussions or contacts with any potential target companies prior to the IPO; and (b) that DWAC
had not selected any specific business combination target.

8.      In October 2021, DWAC announced an agreement to merge with TMTG. Following the disclosure of the planned merger and its target, the price of DWAC stock rose over 400% in a single day of trading.

9.      As a result of Orlando's actions, DWAC's spring and summer Forms S-1 and its Final Form S-1 were materially false and misleading.

10.     On May 16, 2022, Orlando signed, and DWAC filed, a Form S-4 regarding its planned merger with TMTG that continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.

11.     On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing an $18 million civil penalty. On November 13, 2023, DWAC filed an amended Form S-4 that made disclosures consistent with the findings in the Commission's published order instituting the settled cease-and-desist proceeding.

12.     DWAC closed its merger with TMTG on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT." This Complaint will solely refer to the entity names prior to the closing of the merger.

13.     As a result of the conduct alleged herein, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14. The Commission seeks a permanent injunction against Defendant that enjoins him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an officer and director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16. Venue lies in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Columbia, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, Orlando signed at least four different documents containing the misrepresentations at issue, all of which were filed with the SEC, an agency headquartered in this judicial district. Additionally, records indicate that at least one investor located in Washington, D.C., sold shares of DWAC prior to the October disclosure of the merger agreement, presumably without the benefit of the information that Orlando concealed from investors and the market.

17. Orlando, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a

national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## BACKGROUND AND TERMINOLOGY

18.     A SPAC sponsor is the management team primarily responsible for establishing and launching the SPAC. After a SPAC is launched, it is managed by a board of directors and management.

19.     A SPAC has no underlying business operations. The SPAC sponsor creates the SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an unidentified private operating company, within a specified period (typically two years).

20.     Once it has raised funds through an IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction, after which the company will continue the operations of the acquired company as a public company. Although the post-IPO SPAC is technically led by a new board of directors and management, these roles are often filled by the leaders of the SPAC's sponsor. Thus, investors in a SPAC at the IPO stage rely on the management team that formed the sponsor to expend efforts after the IPO to identify and acquire or combine with a private operating company.

21.     Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, a reasonable SPAC investor would want to know about the SPAC's future acquisition targets and steps the SPAC has taken in furtherance of a particular acquisition.

22.     Generally, in a SPAC IPO, investors purchase units. A unit is a security that is typically redeemable for one share of common stock and a fraction of a warrant. A warrant gives the holder the right to purchase a certain number of shares of the SPAC's common stock at a specific price on a future date.

23.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities (typically called "founder's shares") for nominal consideration at or around the time of the SPAC's formation. These founder's shares convert into the SPAC's common stock when the SPAC completes its acquisition of the private operating company, giving the sponsor a significant ownership interest (typically 20% of the common stock) in the SPAC – provided that the SPAC completes the business combination. Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO. Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash and are subject to forfeit in the event the SPAC fails to complete a business transaction. Moreover, the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

## DEFENDANT

24.     Patrick Orlando, age 52, is a resident of Miami, Florida. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC. He owns a significant percentage of, and at the time of the relevant conduct was the managing member of, DWAC's sponsor ("DWAC Sponsor"). Orlando also was the CEO and Chairman of SPAC A (*see infra* ¶ 2) and the managing member of SPAC A's sponsor until SPAC A was unwound in late October 2022. Orlando is also involved with several other SPACs. In addition, Orlando currently is (and, at the time of the relevant conduct, was) a registered representative of a broker-dealer registered with the Commission.

## RELATED PARTIES AND ENTITIES

25.     DWAC, a Delaware corporation based in Miami, Florida, was a SPAC. DWAC had no operations of its own and existed for the purpose of merging with a privately held company to, in effect, take that company public. On September 8, 2021, DWAC completed an

IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until completion of a business combination. DWAC had securities that traded on the NASDAQ Global Market under the ticker symbols DWACU (units), DWACW (warrants) and DWAC (common stock).

26.     TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. TMTG operates a social media platform. On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was subsequently amended several times. TMTG was initially named Trump Media Group, and accordingly, some documents refer to it as "TMG" instead of TMTG. TMTG closed its merger with DWAC on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT."

27.     DWAC Sponsor is a Delaware corporation based in Miami, Florida. DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares"). At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.

28.     SPAC A was a Delaware corporation with its principal place of business in Miami, Florida. SPAC A had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised). In October 2022, SPAC A dissolved and delisted its securities. Orlando was the CEO and Chairman of SPAC A and the managing member of the SPAC A sponsor during the relevant period.

29.     Investment Bank is an investment bank based in Shanghai, China that describes itself as a leading advisor in the SPAC market in the United States. Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

30.     Individual X was a DWAC Director and investor in the sponsors of both SPAC A and DWAC. Individual X held no formal management role with respect to SPAC A.

**FACTS**

A.     **Orlando's Initial Interactions With TMTG**

31.     TMTG was incorporated on approximately February 8, 2021. Its founders intended to use the company to create a social media platform, among other business lines. From the time of TMTG's formation, its founders intended for it to become a public company by seeking to be acquired by a SPAC.

32.     In mid-February 2021, a representative of TMTG approached Orlando regarding a potential deal between SPAC A and TMTG. About a week later, Orlando and Individual X met in person with TMTG representatives.

33.     A few weeks after the initial contact, SPAC A and TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies. The letter was then extended to last through April 5, 2021. Orlando negotiated and signed that letter on behalf of SPAC A.

34.     As the non-exclusive letter of intent neared its expiration date, TMTG and SPAC A discussed signing a mutually exclusive letter of intent. Two directors and one officer of SPAC A opposed pursuing a merger with TMTG. SPAC A ultimately did not sign that mutually exclusive letter of intent.

35.     On or about April 8, 2021, discussions between SPAC A and TMTG paused, and Orlando began exploring two plans to pursue a merger with TMTG, which he called "Plan A" and "Plan B."

36.    "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG. For example, Orlando discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.

37.    "Plan B" referred to Orlando's attempt to identify an alternative SPAC to pursue a merger with TMTG. Orlando considered several SPACs with ties to Investment Bank that could be used for "Plan B." Orlando started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs. One of SPAC A's directors invested in this effort. In a communication with Orlando, both the director and Orlando referred to this as an investment in "the Trump SPAC." That SPAC A director later became a DWAC director and, in June 2021, rolled his investment into the purchase of DWAC Sponsor shares.

38.    As part of Plan B, on April 9, 2021, a representative of Investment Bank wrote an email to Orlando stating: "DWAC could be a solution for Trump." At the time, Investment Bank had a majority interest in DWAC Sponsor (which was still pre-IPO), and Orlando had no ownership interest in DWAC Sponsor or role with DWAC. Investment Bank had worked with others to incorporate DWAC Sponsor and DWAC in December 2020.

39.    On April 14, 2021, Orlando had two meetings with representatives of TMTG. During the first meeting, Orlando told the TMTG executives that SPAC A was not available to pursue a merger with TMTG because of opposition from at least one SPAC A officer or director. Orlando then suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Orlando would try to identify another vehicle to potentially pursue a merger with TMTG.

40.    Shortly after that first meeting, TMTG representatives asked Orlando to meet them again. In that second meeting, a TMTG executive said that they could only discuss other merger options after those companies were public. Orlando acknowledged that those are "the

rules we have to play by," that they "have to be very smart," but that "obviously we can talk hypothetically about if there were another vehicle."

41.     Later that day, Orlando exchanged messages with a representative of Investment Bank and wrote, "Met with TMG today." The Investment Bank representative asked, "How was it?" Orlando replied, "Was fabulous,[. . . ] wonderful then once I left all went sideways. Better to jump on the phone and discuss. . . . I had a clear strategy – got a little complicated."

42.     On April 18, 2021, four days later, a representative of Investment Bank sent a message to Orlando and wrote, "We do Trump one way or other. Now let's sign up Trump. That's the way to get the most $$$. Anyhow, we'll figure it out. Opciones hay." The last sentence of the message roughly translates to "There are options." Orlando responded, "Yes. Done this week."

43.     Also on April 18, 2021, Orlando exchanged messages with Individual X and referred to a meeting scheduled for April 20, 2021 at the offices of TMTG's outside counsel. Individual X wrote, "We will get this done!" Orlando responded, "It is done. Just need to keep the black swan out of the picture." The "black swan" was a reference to one of the SPAC A officers who opposed a deal with TMTG.

**B.     Orlando Took Control of DWAC and Resumed Merger Discussions With TMTG**

44.     On or about April 24, 2021, Investment Bank told Orlando that he had an opportunity to obtain substantial control over DWAC. A few days later, on April 28, Orlando signed a letter of intent with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor. Orlando met with TMTG's representatives on April 29 and continued discussions with TMTG about a potential merger shortly thereafter.

45.     On May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news . . . Patrick called [TMTG's outside counsel] yesterday. . . . The LOI with our other

group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with SPAC A and a big breakup fee." The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?"

46.     On May 4, 2021, TMTG's outside counsel emailed Orlando and others a draft letter of intent that contemplated a merger between SPAC A and TMTG. That draft contained a break-up fee clause that would have held Orlando and Individual X personally liable for a $5 million fee if SPAC A did not consummate a merger agreement with TMTG. Notably, however, the draft also contained an exception: the fee would not be owed if Orlando and/or Individual X "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG]."

47.     On May 8, 2021, Orlando exchanged messages with representatives of Investment Bank. The message group name, which appears to have been coined by Orlando, was, "Get it done one way or another." Orlando shared with the message group a spreadsheet that presented different merger scenarios for TMTG and another target under consideration. One of the scenarios was "47-DWAC" and "[other target]-[SPAC A]." According to Orlando, the number "47" is a reference to TMTG. The spreadsheet listed the cons for this transaction as, "Timing, can't happen, 47 too" and listed the pros as "Great $." Orlando wrote to the group, "[O]ptimal combination is clearly [SPAC A]-[other target] or another good target and DWAC-47 . . . how do we make that happen." A representative of Investment Bank responded, "Yes absolutely, that's the best. It's just time. Get enough time to get DWAC to mkt."

48.     On May 14, 2021, Investment Bank and Orlando executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Orlando.

Orlando was appointed CEO and Chairman of DWAC around this same time. These two actions gave Orlando effective control over DWAC.

49. On the night of May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"). The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board. Both of those new DWAC directors were also SPAC A directors who had been supportive of a transaction between SPAC A and TMTG.

50. The May Form S-1 also identified a CFO for DWAC. Before being named DWAC's CFO, that person had communicated with Orlando and Individual X about TMTG in connection with SPAC A. Records of the DWAC CFO's communications suggest that he hoped to create a Latin American version of TMTG. The SPAC A directors and officer who had opposed a transaction with TMTG did not assume any role with DWAC.

51. The Form S-1 contained several statements about the state of discussions between DWAC and potential targets. For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

52. The statement described in the prior paragraph was misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with TMTG, because Orlando had been in discussions with TMTG for several months, and because Orlando had discussed Plan B with representatives of TMTG. The statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with TMTG) that had already taken steps toward accomplishing that goal.

53.     Given the operation of the SEC's document filing system, the May Form S-1 became publicly visible on the morning of May 26, 2021.

54.     On May 26, 2021, an entity was incorporated in New Mexico. That entity entered into an agreement to invest in DWAC Sponsor on May 29, 2021. TMTG's external counsel signed that agreement as the "authorized representative" for the New Mexico entity. Orlando counter-signed this May 29 agreement.

55.     On May 30, 2021, Orlando, Individual X, DWAC's in-house counsel, one of the TMTG founders, and TMTG's external counsel met at Individual X's home to engage in "brainstorming sessions." A video of this event shows that, during the meeting, they called DWAC's CFO. In the video, Orlando thanked everyone for figuring out "how to get this done." The TMTG representative thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this."

56.     On May 31, 2021, an individual who helped raise funds for DWAC Sponsor sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TMG deal. It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." The potential investor responded and asked, "Is there any brochure ready for the TMG SPAC?" Orlando responded, "There is no TMG SPAC. There is a SPAC and I have a great relationship with TMG. I believe with extremely high confidence that TMG will [end] up in one of my SPACs. Better I explain in person."

C.     **The June 4 LOI and Break-Up Fee Clause**

57.     By at least June 1, 2021, Orlando made plans with TMTG to sign a unilaterally exclusive letter of intent between SPAC A and TMTG on Friday, June 4, 2021. The June 4 LOI would prevent TMTG from negotiating with any other acquirers but would not require SPAC A

to be exclusive to TMTG. At that time, the SPAC A officer and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

58.     On June 1, 2021, Orlando communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the letter of intent signing event, texting: "I want Trump to meet the SPAC A AND DWAC team."

59.     On June 3, 2021, Individual X, who had hosted the May 30 meeting with TMTG, wrote to a TMTG representative and stated, "My apologies, but I will not be able to join this coming Friday. If you think it makes sense for [DWAC's CFO] and I to say a few words to the 47th, we will be ready and at his disposal." Individual X and the DWAC CFO had no formal role with SPAC A.

60.     On June 4, 2021, SPAC A, TMTG, and Orlando (in his personal capacity and on behalf of SPAC A) signed the unilaterally exclusive letter of intent (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.

61.     The June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and absolute discretion) and such terms are ultimately accepted by the Company." The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. The extensions collectively extended the trigger date for the Break-Up Fee Clause from

August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021.

62.     After the signing of the June 4 LOI, Orlando met with a representative of TMTG. During this meeting, they discussed, among other things, potential logos and names for the future public company.

**D.     Orlando Contemplated a DWAC Merger With TMTG**

63.     Within days of signing the June 4 LOI, Orlando communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG. On June 7, 2021, Orlando received a text from an individual who was a director for both SPAC A and DWAC, stating: "I still don't know why you are switching it out of [SPAC A] other than you will make more money. I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic." Orlando responded: "DWAC is better and will make the project clear [sic] more successful."

64.     As noted in the director's text message, Orlando stood to "make more money" if DWAC merged with TMTG than if SPAC A did because Orlando owned a substantial percentage of DWAC Sponsor, a position that was significantly larger than his ownership interest in SPAC A's sponsor.

65.     On June 7, 2021, Orlando exchanged messages with representatives of Investment Bank. Orlando wrote, "Let's make DWAC great. I gave [T]rump a [SPAC A] tombstone. I will [g]ive him a DWAC ONE THE SIZE OF A GOLF CART!!" In the financial industry, a "tombstone" is a notice that is used to formally announce a transaction, such as an IPO. At the LOI signing event on June 4, 2021, Orlando gave TMTG representatives a commemorative plaque tombstone related to SPAC A's IPO.

66.     On June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [SPAC A]. [sic] It's crazy but let me try!!"

67.     In yet another message regarding the other target company for SPAC A, Orlando explained to an Investment Bank executive, "[C]an't do a deal until earlier [of] aug 6 or another target switching SPACs." The Investment Bank executive asked, "Why the August 6th date? It's basically enough time to IPO DWAC, right?" Orlando replied, "Read Trump LOI." As discussed above, the June 4 LOI required Orlando to pay a $1 million Break-Up Fee if there was not a merger by August 6.

68.     On June 9, 2021, Orlando emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG at approximately $375 million.

69.     On June 11, 2021, DWAC's in-house counsel emailed Orlando and wrote, "I think the digital world logo can be a little bit more fun. Maybe we can use [TMTG representative]'s logo idea for the digital world logo and that may entice him even more to make the switch."

70.     By contrast, Orlando's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other acquisition targets.

### E. Orlando Had Discussions With TMTG About a Merger With DWAC

71.    In the spring and summer of 2021, Orlando met and talked with representatives of TMTG about a merger with DWAC.

72.    In addition to the April 14 conversation between Orlando and TMTG representatives in which Orlando acknowledged that he could not talk with TMTG about a merger involving a pre-IPO company, *see supra* ¶¶ 39-41, Orlando had an email exchange in late June with potential investors in DWAC Sponsor, in which he made similar disclaimers. One of those investors wrote that he had "discussed with Patrick a ROFR on future payment processing needs for the Trump Media Group." Orlando responded:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO. We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

73.    Despite having this understanding, Orlando had discussions with at least one TMTG representative about a potential merger with DWAC prior to DWAC's IPO.

74.    Orlando, DWAC's in-house counsel, and Individual X participated in more than 100 phone calls with representatives from TMTG and TMTG's outside counsel from the time DWAC filed the Form S-1 on May 25, 2021 through September 2, 2021, which was the day before the commencement of DWAC's IPO. Orlando told at least one TMTG representative (specifically, TMTG's outside counsel) during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

75.    During the same time, Orlando raised funds from numerous individuals who made investments in DWAC Sponsor. Orlando informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

76.     Orlando also signed "consulting agreements" with some individuals that, in addition to other terms, contemplated rewarding those individuals with shares for helping Orlando raise funds for DWAC Sponsor. On June 5, 2021, TMTG's outside attorney signed one such agreement on behalf of the New Mexico company that had been formed on May 26. *See supra* ¶ 54. This link between DWAC's sponsor and TMTG's outside attorney is further evidence that Orlando had discussed a DWAC/TMTG combination with highly placed individuals at TMTG in the spring and early summer of 2021.

77.     TMTG's outside counsel was copied on some emails from an existing DWAC investor to prospective investors. The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick's team, and [TMTG's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."

78.     On July 8, 2021, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Individual X and two other individuals as directors. Individual X had been involved with Orlando in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

79.     The July Form S-1 contained several of the same material misstatements that appeared in the May Form S-1. Orlando reviewed and signed the July Form S-1.

80.     Two days before this filing, Individual X sent a WhatsApp message to DWAC's CFO and wrote: "AVANTE! Vamos fazer historia com a DWAC + TMG," which roughly translates to "Onward! Let's make history with DWAC + TMG."

81.     Orlando travelled to TMTG's offices on July 8 and spent the entire day there. After Orlando left, a representative of TMTG sent a message to Orlando stating, "Today was a big day for TMG and a huge step for our team to be able to meet and spend time with you. Thank you so much for making the trip."

82.     Individuals at TMTG were aware that Orlando hoped to use DWAC to pursue a merger with TMTG. For example, on July 15, 2021, a TMTG executive emailed himself an audio recording in which he made mental notes to himself, including, "For [another TMTG executive], TMTG ticker symbol. Tell him about that. . . . The merger agreement arrived. Also potentially flipping it to another SPAC."

83.     On August 11, 2021, DWAC's CFO sent a message to Individual X and asked, "Tudo certo para semana que vem?", which roughly translates to "Everything OK for next week?" Minutes after that, Individual X sent a message to a TMTG executive and wrote, "Are we set to meet in Atlanta next week?" Individual X then called that TMTG executive and spoke for several minutes. A few hours later, Individual X replied to DWAC's CFO and wrote, "TMG pede para confirmar o encontro depois do IPO," which roughly translates to, "TMG is asking to confirm the meeting after the IPO," referring to DWAC's IPO scheduled for September.

84.     On August 18, 2021, a TMTG representative emailed himself and wrote, "Everything is lined up. Platform is weeks away. Backed by $300 million in cash. Billions of stock. Press conference video is ready. Only thing missing is license Agreement." At the time, TMTG was in the process of renegotiating a licensing agreement. Also, at the time, SPAC A had approximately $115 million in its trust account. As mentioned above, DWAC had filed a Form S-1/A on July 8, 2021 announcing that it planned to do a $300 million IPO.

85.     On August 28, 2021, Orlando received a text from a DWAC representative that read, "Talked to [TMTG's outside counsel]. TMTG wants to announce soon so if it's plan B,

they're going to push hard for relative immediate announcement. I told them we'd need a month.

Probably gonna settle at 2-3 weeks."

**F.     DWAC's Form S-1 Contained Material Misrepresentations**

86.     On August 31, 2021, three days prior to the commencement of its IPO, DWAC

filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed and signed. The

Final Form S-1 contained several material misrepresentations about discussions between DWAC

and potential targets, including the following:

> To date, our efforts have been limited to organizational activities as well as
> activities related to this offering. We have not selected any specific business
> combination target and we have not, nor has anyone on our behalf, engaged in any
> substantive discussions, directly or indirectly, with any business combination target
> with respect to an initial business combination with us.

87.     The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions,
> directly or indirectly, with any business combination target. From the period
> commencing with our formation through the date of this prospectus, there have
> been no communications or discussions between any of our officers, directors or
> our sponsor and any of their potential contacts or relationships regarding a potential
> initial business combination. Additionally, we have not engaged or retained any
> agent or other representative to identify or locate any suitable acquisition candidate,
> to conduct any research or take any measures, directly or indirectly, to locate or
> contact a target business. However, we may contact such targets subsequent to the
> closing of this offering if we become aware that such targets are interested in a
> potential initial business combination with us and such transaction would be
> attractive to our stockholders. Accordingly, there is no current basis for investors
> in this offering to evaluate the possible merits or risks of the target business with
> which we may ultimately complete our initial business combination.

88.     The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not contacted any of the prospective target businesses that [SPAC A and
> another SPAC controlled by Orlando] had considered and rejected. We do not
> currently intend to contact any of such targets; however, we may do so in the future
> if we become aware that the valuations, operations, profits or prospects of such

target business, or the benefits of any potential transaction with such target business, would be attractive.

89.     Certain statements in the preceding paragraphs were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with TMTG; (b) Orlando told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC to complete a merger with TMTG; (c) it appears that TMTG's outside attorney was being paid to find investors for DWAC's sponsor in June 2021; (d) the discussions between SPAC A and TMTG had ceased before DWAC's IPO; and (e) Orlando and others at DWAC had selected TMTG as DWAC's preferred target prior to its IPO.

90.     The misstatements described above were material to investors because SPAC investors base their investment decisions on a SPAC's disclosures about discussions with potential targets. This information is particularly important because the purpose of a SPAC is to identify and acquire an operating business.

91.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

92.     DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described above.

**G.     DWAC's Post-IPO Negotiations With TMTG**

93.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement. On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement. TMTG's outside counsel

emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent the next day. Two days later, on September 15, 2021, DWAC began coordinating an in-person event to sign the letter of intent on September 22, 2021 and started discussing TMTG's hope to do a press announcement by the end of September 2021. On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

94.     On September 21, 2021, DWAC's Board (including Orlando) met and voted to "follow up/negotiate and execute LOIs with TMG" and two other purported potential targets (one of which was "Target B"). As mentioned above, DWAC in-house counsel, working with Orlando, was already in the process of negotiating a letter of intent with TMTG and had already scheduled a signing event, a fact that Orlando knew.

95.     DWAC representatives had previously sent Target B an NDA on September 8, 2021. A representative of Target B responded on September 9 and wrote: "Given [Target B's] transaction objectives and timing of requested indications of interest next week, it may make sense for our team to reach out to you with any future opportunities that arise rather than this particular target." DWAC later disclosed this fact in its Form S-4 filed February 14, 2024, which stated:

> DWAC sent an NDA to Target B, an American pet care company that offers a technology platform to enable on-demand and scheduled dog-walking, training, and other pet care related services. However, Target B informed Digital World that it was in advanced discussions with other groups and did not want to pursue separate SPAC discussions with Digital World at that time.

96.     The discussions about Target B at the September 21 board meeting appear to have been pretextual because Target B was not, in fact, an acquisition option for DWAC.

97.     During the September 21 board meeting, DWAC's directors also purportedly discussed the merits of four other potential merger targets. One of those targets was "Target G."

DWAC sent Target G an NDA on September 8, 2021. A representative of Target G responded on September 9: "We're currently under exclusivity with a potential buyer for [Target G]. We'll reach out if the situation changes." In its February 14, 2024 Form S-4, DWAC disclosed: "Target G, a defense contractor and arms manufacturer, was sent an NDA; however, Digital World was informed that Target G was under exclusivity with another SPAC at the time and could not engage in conversations until after that exclusivity period expired."

98.     The discussions about Target G at the September 21 board meeting appear to have been pretextual because Target G was not, in fact, an acquisition option for DWAC.

99.     A third potential "target" discussed at the September 21 board meeting was "Target I." Target I did not even sign an NDA with DWAC until the evening of September 21.

100.     On September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with TMTG. That same day, Orlando met with representatives from TMTG and signed a mutually exclusive letter of intent between DWAC and TMTG. Also on that same day, Orlando (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause under the June 4 LOI. That letter was backdated to be effective as of September 1, 2021.

101.     On October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with TMTG. DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market close that day. DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on EDGAR at approximately 6 a.m. on October 21, 2021.

102.     DWAC's common stock closed at $9.96 on October 20, 2021. On October 21, 2021, it closed at $45.50, up more than 400% from the prior day's closing price.

103.     On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG. DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts. For example, DWAC's Form S-4:

    a.     Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.

    b.     Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. As discussed above in detail, Orlando had numerous interactions with TMTG prior to DWAC's IPO. DWAC also did not disclose that Orlando assumed control of DWAC in spring 2021 envisioning it as a potential vehicle to close a deal with TMTG or that Orlando told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

104.     On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing a civil penalty of $18 million. The settlement also imposed an undertaking on DWAC, requiring any amended Form S-4 to be materially complete, accurate, and consistent with the findings in the Commission's order. On November 23, 2023, pursuant to the undertaking, DWAC filed an amended Form S-4 incorporating many of the Commission's findings.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder

105.     The Commission realleges and incorporates by reference paragraphs 1 through 104, as though fully set forth herein.

106.     By engaging in the conduct described above, Patrick Orlando, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or recklessly (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

107.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of merging with TMTG. That conduct included, but was not limited to, the following: (1) he discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG; and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary conversations with potential "target" companies in September 2021 without any intention of moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

selected a merger target and had not engaged in discussions with potential targets. Orlando carried out this deceptive course of business as part of a scheme to allow him to reap the financial benefit of the DWAC merger and avoid opposition from the SPAC A directors. Orlando's scheme continued through the spring of 2022, when he continued to mislead investors through false statements and omissions in the Form S-4, which he signed.

108.     While engaging in the conduct described above, Orlando acted knowingly or recklessly.

109.     By reason of the conduct described above, Orlando, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

110.     The Commission realleges and incorporates by reference paragraphs 1 through 104, as though fully set forth herein.

111.     By engaging in the conduct described above, Orlando, directly or indirectly, in connection with the offer or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, directly or indirectly: (i) employed devices, schemes, or artifices to defraud; (ii) obtained money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or (iii) engaged in transactions, practices, or courses of business that operated or would operate as a fraud or deceit upon the purchaser.

112.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of

merging with TMTG. That conduct included, but was not limited to, the following: (1) he discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG; and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary conversations with potential "target" companies in September 2021 without any intention of moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed multiple public filings that falsely stated, among other misrepresentations, that DWAC had not selected a merger target and had not engaged in discussions with potential targets. Orlando carried out this deceptive course of business as part of a scheme to allow him to reap the financial benefit of the DWAC merger and avoid opposition from the SPAC A directors. Orlando's scheme continued through the spring of 2022, when he continued to mislead investors through false statements and omissions in the Form S-4, which he signed.

113.    While engaging in the conduct described above, Orlando acted knowingly, recklessly, or negligently.

114.    By reason of the conduct described above, Orlando, directly or indirectly, violated and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

**I.**

Enter a Final Judgment permanently restraining and enjoining Defendant and his agents,

servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter a Final Judgment directing Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)].

## III.

Enter a Final Judgment directing Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)].

## IV.

Enter a Final Judgment permanently barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Grant such other and further relief as this Court may deem equitable and just.

## <u>JURY DEMAND</u>

The Commission demands a jury in this matter for all claims so triable.

Dated: July 17, 2024

Respectfully submitted,

By: *<u>/s/ John B. Timmer</u>*
John B. Timmer (D.C. Bar No. 997309)
Andrew McFall (D.C. Bar No. 497878)
Securities and Exchange Commission
100 F Street NE
Washington, DC 20549
(202) 551-7687 (Timmer)
(202) 551-5538 (McFall)
Email: TimmerJ@SEC.gov
Email: McFallA@SEC.gov

*Attorneys for the Plaintiff*

<u>Of Counsel</u>

Lindsay S. Moilanen

## CIVIL COVER SHEET

JS-44 (Rev. 11/2020 DC)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Patrick Orlando |

| **(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____<br>(EXCEPT IN U.S. PLAINTIFF CASES) | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Miami-Dade<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| **(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| John B. Timmer, Andrew McFall<br>Securities and Exchange Commission<br>100 F Street NE, Washington, DC 20549<br>202-551-7687 | Adam L. Schwartz, Brooke E. Conner, Vedder Price P.C.<br>600 Brickell Ave, Suite 1500, Miami, FL 33131<br><br>Hartley M.K. West, Anthony S. Kelly, Dechert LLP<br>45 Fremont St, 26th Floor, San Francisco, CA 94105 |

### II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⊙ 1 U.S. Government Plaintiff
- ○ 2 U.S. Government Defendant
- ○ 3 Federal Question (U.S. Government Not a Party)
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

### IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

**○ A. Antitrust**
- ☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**⊙ E. General Civil (Other)** OR **○ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

Other Statutes
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| G. *Habeas Corpus/ 2255* | H. *Employment Discrimination* | I. *FOIA/Privacy Act* | J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |

| K. *Labor/ERISA (non-employment)* | L. *Other Civil Rights (non-employment)* | M. *Contract* | N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi-district Litigation ○ 7 Appeal to District Judge from Mag. Judge ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Securities Fraud - 15 U.S.C. 78j(b) and 17 C.F.R. 240.10b-5 thereunder, 15 U.S.C. 77q(a)

**VII. REQUESTED IN COMPLAINT**   ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $   JURY DEMAND:   Check YES only if demanded in complaint   YES ☒   NO ☐

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form

DATE: _____7/17/2024_____   SIGNATURE OF ATTORNEY OF RECORD _____/s/ John B. Timmer_____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

**I.**   COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

**VI.**   CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**   RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia  ▼

| | |
|---|---|
| Securities and Exchange Commission | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Patrick Orlando | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.  1:24-CV-2097

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Patrick Orlando
c/o
Adam L. Schwartz
VedderPrice LLP
600 Brickell Avenue, Suite 1500
Miami, FL 33131

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  John B. Timmer
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
timmerj@sec.gov
202-551-7687

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date:  _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.   1:24-CV-2097

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❑ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❑ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)*

_____ on *(date)* _____ ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT  3

As filed with the U.S. Securities and Exchange Commission on May 25, 2021

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**
**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# Digital World Acquisition Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 6770 | 85-4293042 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Patrick Orlando**
**Chairman and Chief Executive Officer**
**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

*Copies to:*

| | |
|---|---|
| **Barry I. Grossman, Esq.** | **Mitchell S. Nussbaum, Esq.** |
| **Wei Wang, Esq.** | **David J. Levine, Esq.** |
| **Ellenoff Grossman & Schole LLP** | **Loeb & Loeb LLP** |
| **1345 Avenue of the Americas** | **345 Park Avenue** |
| **New York, New York 10105** | **New York, New York 10154** |
| **Telephone: (212) 370-1300** | **Telephone: (212) 407-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| | | Smaller reporting company | |
| Non-accelerated filer | ☒ | company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

**CALCULATION OF REGISTRATION FEE**

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security[(1)] | Proposed Maximum Aggregate Offering Price[(1)] | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value, one-half of one redeemable warrant and a right entitling the holder to receive one-tenth of one share of Class A common stock[(2)] | 11,500,000 Units | $ 10.00 | $ 115,000,000 | $ 12,547 |
| Shares of Class A common stock included as part of the units[(3)] | 11,500,000 Shares | — | — | —[(4)] |
| Rights included as part of the units[(2)] | 11,500,000 Rights | | | |
| Shares of Class A common stock underlying rights included as part of the units | 1,150,000 Shares | $ 10.00 | $ 11,500,000 | 1,255 |
| Redeemable warrants included as part of the units[(3)] | 5,750,000 Warrants | | | —[(4)] |
| Total | | | $ 126,500,000 | $ 13,802 |

(1) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended (the "Securities Act").

(2) Includes 1,500,000 units, consisting of 1,500,000 shares of Class A common stock, 1,500,000 rights and 750,000 redeemable warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3)    Pursuant to Rule 416, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4)    No fee pursuant to Rule 457(g).

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                                    **SUBJECT TO COMPLETION, DATED MAY 25, 2021**

**$100,000,000**
**Digital World Acquisition Corp.**
**10,000,000 Units**

Digital World Acquisition Corp. is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination throughout this prospectus. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we may pursue an initial business combination target in any business or industry, we intend to focus our search on middle-market emerging growth technology-focused companies in the Americas, in the SaaS and Technology or Fintech and Financial Services sector.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock, one-half of one redeemable warrant and one right as described in more detail in this prospectus. Only whole warrants are exercisable. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination. The underwriters have a 45-day option from the date of this prospectus to purchase up to an additional 1,500,000 units to cover over-allotments, if any.

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination, subject to the limitations described herein. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares for cash, subject to applicable law and certain conditions as further described herein.

Our sponsor, ARC Global Investments II LLC, has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriter's over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250 if the over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units will be sold in a private placement that will close simultaneously with the closing of this offering.

Our initial stockholders own an aggregate of 2,875,000 shares of our Class B common stock (up to 375,000 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised), which will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein.

Currently, there is no public market for our units, Class A common stock, warrants or rights. We intend to apply to have our units listed on The Nasdaq Capital Market, or Nasdaq, under the symbol "DWACU". We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless Kingswood Capital Markets, division of Benchmark Investments (the "representative") informs us of its decision to allow earlier separate trading, subject to our satisfaction of certain conditions. Once the securities comprising the units begin separate trading, we expect that the Class A common stock, warrants and rights will be listed on Nasdaq under the symbols "DWAC", "DWACW", and "DWACR," respectively.

1

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

|  | Per Unit | | Total |
|---|---|---|---|
| Public offering price | $ | 10.00 | $ | 100,000,000 |
| Underwriting discounts and commissions[1] | $ | 0.475 | $ | 4,750,000 |
| Proceeds, before expenses, to Digital World Acquisition Corp. | $ | 9.525 | $ | 95,250,000 |

(1)    Includes $0.35 per unit, or $3,500,000 (or $4,025,000 if the over-allotment option is exercised in full) in the aggregate, payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative of the underwriters only on completion of an initial business combination, as described in this prospectus. Does not include certain fees and expenses payable to the underwriters in connection with this offering. In addition, designees of the representative of the underwriters will receive a fee equal to 0.5% of the gross proceeds payable in shares of Class A Common Stock at the public offering price of $10.00 per share. See the section of this prospectus entitled "Underwriting" beginning on page 154 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the placement units described in this prospectus, $100,500,000 or $115,575,000 if the underwriters' over-allotment option is exercised in full ($10.05 per unit in either case) will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about , 2021.

Sole Book-Running Manager

**KINGSWOOD CAPITAL MARKETS**

division of Benchmark Investments, Inc.

, 2021

**TABLE OF CONTENTS**

| | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 70 |
| Use of Proceeds | 71 |
| Dividend Policy | 75 |
| Dilution | 75 |
| Capitalization | 78 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
| Proposed Business | 85 |
| Management | 113 |
| Principal Stockholders | 121 |
| Certain Relationships and Related Party Transactions | 123 |
| Description of Securities | 126 |
| United States Federal Income Tax Considerations | 144 |
| Underwriting | 154 |
| Legal Matters | 164 |
| Experts | 164 |
| Where You Can Find Additional Information | 164 |
| Index to Financial Statements | F-1 |

**We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

This prospectus includes estimates regarding market and industry data and forecasts which are based on publicly available information, industry reports and publications, reports from government agencies and management's estimates based on third-party data. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable. The third-party industry sources referenced in this prospectus include, among others, EY Global and Deal Logic. We have not independently verified such third-party information, nor have we ascertained the underlying economic assumptions relied upon in those sources, and we cannot assure you of the accuracy or completeness of such information contained in this prospectus. Such data involve risks and uncertainties and is subject to change based on various factors, see "Risk Factors".

This prospectus contains trademarks, service marks and trade names of other companies which are the property of their respective owners. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

**SUMMARY**

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*
- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;*
- *"initial stockholders" are to our sponsor and any other holders of our founder shares (including the holders of the representative shares) prior to this offering (or their permitted transferees);*
- *"management" or our "management team" are to our officers and directors;*
- *"placement units" are to the units being purchased by our sponsor, with each placement unit consisting of one placement share, one-half of one placement warrant and one placement right;*
- *"placement shares" are to the shares of our common stock included within the placement units being purchased by our sponsor in the private placement;*
- *"placement rights" are to the rights included within the placement units being purchased by our sponsor in the private placement;*
- *"placement warrants" are to the warrants included within the placement units being purchased by our sponsor in the private placement;*
- *"private placement" are to the private placement of 306,275 placement units (up to 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 (up to $3,325,250 if the underwriters' over-allotment option is exercised in full), which will occur simultaneously with the completion of this offering;*
- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*
- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*
- *"public rights" are to the rights sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*
- *"public warrants" are to our redeemable warrants sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market, including warrants that may be acquired by our sponsor or its affiliates in this offering or thereafter in the open market);*
- *"representative" are to Kingswood Capital Markets, division of Benchmark Investments, Inc., who is the representative of the underwriters in this offering;*

1

- *"representative shares" are the 50,000 shares of our Class A common stock issuable to the representative and/or its designees at the closing of this offering (or 57,500 shares if the underwriters' over-allotment option is exercised in full);*
- *"rights" are to our rights, which include the public rights as well as the placement rights;*
- *"sponsor" are to ARC Global Investments II LLC, a Delaware limited liability company;*
- *"underwriters" are to the underwriters of this offering, for which the representative is acting as representative;*
- *"warrants" are to our redeemable warrants, which includes the public warrants as well as the placement warrants and any warrants sold as part of the placement units issued upon conversion of working capital loans; and*
- *"we," "us," "company" or "our company" are to Digital World Acquisition Corp.*

*Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

2

**General**

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services

**Our Management Team**

Our management team is led by Mr. Patrick Orlando, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as Executive, Sponsor and Director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021. Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a

boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

**Our CFO**, *Mr. Luis Orleans-Braganza* is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

3

*Our directors and director nominees*

*Eric Swider,* our director nominee, has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Justin Shaner,* our director nominee, founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

*Lee Jacobson,* our director, is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997.

4

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in Fintech and Financial Services or SaaS and Technology. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled , industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- **Established Deal Sourcing Network.** We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor, have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies,

private equity and venture capital funds, investment bankers, attorneys and accountants.

- ***Status as a Publicly Listed Acquisition Company.*** We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

**Industry Opportunity**

While we may acquire a business in any industry, our focus will be middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We believe that our target industries are attractive for a number of reasons:

*SaaS and Technology*

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. This is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

*FinTech and Financial Services*

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join us, as we believe they have fewer exit options than presently exist for unicorns.

**Acquisition Criteria**

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- ***Target Size:*** Consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services
- ***Businesses with Revenue and Earnings Growth Potential.*** We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.
- ***Businesses with Potential for Strong Free Cash Flow Generation.*** We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.
- ***Strong Management.*** We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.
- ***Benefit from Being a Public Company.*** We intend to acquire one or more businesses that will benefit from being publicly-traded and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.
- ***Defensible Market Position.*** We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

**Initial Business Combination**

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

7

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

8

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors. In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Sourcing of Potential Initial Business Combination Targets**

Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have developed a wide network of professional services contacts and business relationships in that industry. The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and bring additional relationships that further broaden our industry network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

9

**Corporate Information**

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130, and our telephone number is (305) 735-1517.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company will have the meaning associated with it in the JOBS Act. Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

**THE OFFERING**

*In deciding whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

| | |
|---|---|
| Securities offered | 10,000,000 units (or 11,500,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of:<br>• one share of Class A common stock; and<br>• one-half of one redeemable warrant; and<br>• one right to receive one-tenth (1/10) of one share of Class A common stock upon the consummation of our initial business combination. |

10

| | |
|---|---|
| Proposed Nasdaq symbols | Units: "DWACU"<br>Class A Common Stock: "DWAC"<br>Warrants: "DWACW"<br>Rights: "DWACR" |
| Trading commencement and separation of Class A common stock, warrants and rights | The units will begin trading on or promptly after the date of this prospectus. We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock, warrants and rights commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock, warrants and rights. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. |
| Separate trading of the Class A common stock, warrants and rights is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock, warrants and rights be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |
| **Units:** | |
| Number outstanding before this offering and the | 0 |

private placement

| | |
|---|---|
| Number or placement units to be sold in a private placement simultaneously with this offering | 306,275 [1] |
| Number outstanding after this offering and the private placement | 10,306,275 [1] |
| **Common stock:** | |
| Number outstanding before this offering and the private placement | 2,875,000 shares of Class B common stock [2] |

---

11

---

| | |
|---|---|
| Number outstanding after this offering and the private placement | 12,856,275 shares of Class A common stock and Class B common stock [1][3] |
| **Rights:** | |
| Number outstanding before this offering and the private placement | 0 |
| Number outstanding after this offering and the private placement | 10,306,275 [1] |
| **Warrants:** | |
| Number outstanding before this offering and the private placement | 0 |
| Number of warrants to be outstanding after this offering and the private placement | 5,153,138 [1] |
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock, subject to adjustment as provided herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade and are exercisable. We structured each unit to contain one-half of one redeemable warrant, with each whole warrant exercisable for one share of Class A common stock, as compared to units issued by some other similar special purpose acquisition companies which contain whole warrants exercisable for one whole share, in order to reduce the dilutive effect of the warrants upon completion of an initial business combination as compared to units that each contain a whole warrant to purchase one whole share, thus making us, we believe, a more attractive initial business combination partner for target businesses. |

(1)  Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 375,000 founder shares. Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) for an aggregate purchase price of $3,062,750 ($3,325,250 if the underwriters' over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units are not subject to forfeiture but will be subject to transfer restrictions as described in "Principal Stockholders — Transfers of Founder Shares and Placement Units".

(2)  Includes 2,875,000 founder shares of which an aggregate of up to 375,000 shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)  Comprised of 10,306,275 shares of Class A common stock (including 306,275 placement shares), 2,500,000 shares of Class B common stock (or founder shares) and 50,000 representative shares (57,500 representative shares if the underwriters' over-allotment option is exercised in full). The Class B common stock is convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution rights."

---

12

---

| | |
|---|---|
| Exercise price | $11.50 per share, subject to adjustment as described herein. In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Class A common stock during the 20 trading day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described below under "Redemption of warrants" will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. |
| Exercise period | The warrants will become exercisable on the later of:<br>• 30 days after the completion of our initial business combination, and<br>• 12 months from the closing of this offering;<br>provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders |

to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis.

13

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation. On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants

Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the placement warrants):

• in whole and not in part;

• at a price of $0.01 per warrant;

• upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and

• if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing after the warrants become exercisable and ending on the third trading day before we send the notice of redemption to the warrant holders.

We will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of Class A common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of Class A common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

14

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants.

Please see the section of this prospectus entitled "Description of Securities — Redeemable Warrants — Public Stockholders' Warrants" for additional information.

None of the placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

Terms of Rights

Each holder of a right will receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination. In the event we will not be the survivor upon completion of our initial business combination, each holder of a right will be required to affirmatively convert his, her or its rights in order to receive the 1/10 share

underlying each right (without paying any additional consideration) upon consummation of the business combination. If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, holders of rights will not receive any of such funds for their rights and the rights will expire worthless. No fractional shares will be issued upon conversion of any rights. As a result, you must have 10 rights to receive one share of Class A common stock at the closing of the business combination.

Founder shares

On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our independent director and director nominees. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). As such, our initial stockholders will collectively own approximately 21.8% of our issued and outstanding shares after this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Neither our sponsor nor any of our officers, directors or director nominees have expressed an intention to purchase any units in this offering. Up to 375,000 founder shares held by our sponsor will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering (excluding the representative shares and the placement units and underlying securities). We will effect a stock dividend or share contribution prior to this offering should the size of the offering change, in order to maintain such ownership percentage.

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

• the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

• the founder shares are subject to certain transfer restrictions, as described in more detail below;

• our sponsor, officers and directors have entered, and we anticipate our director nominees will enter, into a letter agreement with us, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

• pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. As a result, in the event that only the minimum number of shares representing a quorum is present at a stockholders' meeting held to vote on our initial business combination, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor

of an initial business combination in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction); and

• the founder shares are entitled to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). Any permitted transferees will be subject to the same restrictions and other agreements of our initial stockholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the lock-up. |
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (excluding the representative shares and the placement units and underlying securities) plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of working capital loans made to us). The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities. |

17

| | |
|---|---|
| Voting Rights | Holders of record of the Class A common stock and holders of record of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, with each share of common stock entitling the holder to one vote, except as required by law. |
| Placement units | Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250) if the underwriters' over-allotment option is exercised in full. Each placement unit is identical to the units offered by this prospectus except as described below. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares, placement warrants or placement rights, which will expire worthless if we do not consummate a business combination within 18 months from the closing of this offering. Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares or placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto, to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the completion of this offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) if we fail to consummate a business combination within 18 months from the completion of this |

| | offering or if we liquidate prior to the expiration of the 18-month period. However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 18-month period. |
| --- | --- |
| Transfer restrictions on placement units | The placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees. |

18

| Redeemability and exercise of placement warrants | The placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by our sponsor or its permitted transferees. If the placement warrants are held by someone other than our sponsor or its permitted transferees, the placement warrants will be redeemable by us and exercisable by such holders on the same basis as the warrants included in the units being sold in this offering. If holders of placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following an initial business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time.

Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| --- | --- |
| Accounting Treatment | Due to certain provisions contained in our warrant agreement, both the public warrants and the placement warrants will be treated as a derivative liability and, upon the issuance of such warrants, we will be required to record the fair value of each warrant as a liability in accordance with the guidance contained in ASC 815-40. As a result, for each reporting period, we will be required to determine the fair value of each warrant and record the change in the value of the warrants from the prior reporting period as a gain or a loss on our income statement, which will change the value of the liability for the warrants on our balance sheet. |
| Representative shares | Upon the closing of this offering, we will issue to the representative and/or its designee 50,000 shares of Class A common stock (57,500 shares of Class A common stock if the underwriters' over-allotment option is exercised in full). The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 18 months from the closing of this offering. The representative shares are deemed to be underwriters' compensation by FINRA pursuant to FINRA Rule 5110. |
| Proceeds to be held in trust account | Nasdaq rules provide that at least 90% of the gross proceeds from this offering and the sale of the placement units deposited in a trust account. Of the net proceeds of this offering and the sale of the placement units, $100,500,000, or $10.05 per unit ($115,575,000, or $10.05 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

These proceeds include $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions. |

19

| | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units held in the trust account will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial |
| --- | --- |

|  | business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 18 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested in U.S. government securities with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $200,000 of pre-tax interest annually assuming an interest rate of 0.2% per year; however, we can provide no assurances regarding this amount.

Unless and until we complete our initial business combination, we may pay our expenses only from:

• the net proceeds of this offering and the sale of the placement units not held in the trust account, which will be approximately $650,000 in working capital after the payment of approximately $662,750 in expenses relating to this offering; and

• any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of an initial business combination. |

| Conditions to completing our initial business combination | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination target, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination target, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. There is no limitation on our ability to raise funds privately, or through loans in connection with our initial business combination. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

We anticipate structuring our initial business combination either (i) in such a way so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses, or (ii) in such a way so that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders, or for other reasons. However, we will only complete an initial business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act.

Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. |
|---|---|

| | In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be taken into account for purposes of Nasdaq's 80% fair market value test. If the initial business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the transactions and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |
|---|---|
| Permitted purchases of public shares and public warrants by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares or warrants our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, apart from the purchase of the placement units, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements. |
| | None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination. See "Proposed Business — Permitted purchases of our securities" for a description of how our sponsor, initial stockholders, directors, officers or any of their affiliates will select which stockholders to purchase securities from in any private transaction. |

| | The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange. |
|---|---|
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.05 per public share, however, there is no guarantee that investors will receive $10.05 per share upon redemption. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants or rights. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights |

with respect to any founder shares and placement shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our initial business combination or otherwise.

| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed initial business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Under Nasdaq rules, asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would typically require stockholder approval. We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. So long as we obtain and maintain a listing for our securities on Nasdaq, we will be required to comply with Nasdaq's stockholder approval rules. |
|---|---|
| | If stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will: |
| | • conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and |
| | • file proxy materials with the SEC. |
| | If we seek stockholder approval, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of our outstanding shares of common stock representing a majority of the voting power of all outstanding shares of our common stock entitled to vote at such meeting. Our initial stockholders will count towards this quorum and, pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares acquired by them during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795 or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, and that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction). |

| | We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, officers and directors, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction. |
|---|---|
| | If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation: |
| | • conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and |

• file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Whether or not we maintain our registration under the Exchange Act or our listing on Nasdaq, we will provide our public stockholders with the opportunity to redeem their public shares by one of the two methods listed above. Upon the public announcement of our initial business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, we will not redeem any public shares unless our net tangible assets will be at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents mailed to such holders, or up to two business days prior to the vote on the proposal to approve the initial business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. We believe that this will allow our transfer agent to efficiently process any redemptions without the need for further communication or action from the redeeming public stockholders, which could delay redemptions and result in additional administrative cost. If the proposed initial business combination is not approved and we continue to search for a target company, we will promptly return any certificates delivered, or shares tendered electronically, by public stockholders who elected to redeem their shares.

Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed initial business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed initial business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed initial business combination exceed the aggregate amount of cash available to us, we will not complete the initial business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

| Limitation on redemption rights of stockholders holding 15% or more of the shares sold in this offering if we hold stockholder vote | Notwithstanding the foregoing redemption rights, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 15% of the shares sold in this offering, without our prior consent. We believe the restriction described above will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to redeem their shares as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem no more than 15% of the shares sold in this offering, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our initial business combination, particularly in connection with an initial business combination with a target that requires as a closing condition that we |

have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including all shares held by those stockholders that hold more than 15% of the shares sold in this offering) for or against our initial business combination.

| | |
|---|---|
| Redemption rights in connection with proposed amendments to our certificate of incorporation | Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-initial business combination activity (including the requirement to deposit proceeds of this offering and the private placement of units into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) may be amended if approved by holders of at least 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of at least 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the Delaware General Corporation Law, or DGCL, or applicable stock exchange rules. |
| | Under our amended and restated certificate of incorporation, we may not issue additional securities that can vote on amendments to our amended and restated certificate of incorporation or on our initial business combination or that would entitle holders thereof to receive funds from the trust account. Our initial stockholders, who will collectively beneficially own approximately 21.8% of our common stock upon the closing of this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. Our sponsor, executive officers, and directors have agreed, and we anticipate that our director nominees will agree, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow holders to redeem their shares in connection with an initial business combination or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable) divided by the number of then outstanding public shares. Our sponsor, officers, directors director nominees will enter into a letter agreement with us pursuant to which they will agree to waive their redemption rights with respect to any founder shares and placement shares and any public shares held by them in connection with the completion of our initial business combination. |

| | |
|---|---|
| Release of funds in trust account on closing of our initial business combination | On the completion of our initial business combination, the funds held in the trust account will be used to pay amounts due to any public stockholders who exercise their redemption rights as described above under "Redemption rights for public stockholders upon completion of our initial business combination." We will use the remaining funds to pay the underwriters their deferred underwriting commissions, to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of post-transaction businesses, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. |
| Redemption of public shares and distribution and liquidation if no initial business combination | Our amended and restated certificate of incorporation will provide that we will have only 18 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within such 18-month period (and our stockholders have not approved an amendment to our charter extending this time period), we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public |

stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants or rights, which will expire worthless if we fail to complete our initial business combination within the 18-month time period.

Our sponsor, officers and directors have entered into a letter agreement with us pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and placement shares if we are forced to liquidate. The underwriters have agreed to waive their rights to their deferred underwriting commission in the event we do not complete our initial business combination and subsequently liquidate and, in such event, the deferred fees will be included with the funds held in the trust account that will be available to fund the redemption of our public shares. The holders of representative shares will not participate in any distribution from our trust account with respect to such shares.

---

28

---

| Limited payments to insiders | There will be no finder's fees, reimbursement, consulting fee, non-cash payments, monies in respect of any payment of a loan or other compensation paid by us to our sponsor, officers or directors or any affiliate of our sponsor, officers or directors prior to, or in connection with any services rendered in order to effectuate, the consummation of our initial business combination (regardless of the type of transaction that it is). However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering and the sale of the placement units held in the trust account prior to the completion of our initial business combination: |
| --- | --- |
| | • Repayment of up to an aggregate of $300,000 in loans made to us by our sponsor to cover offering-related and organizational expenses; |
| | • Payment to Benessere Enterprises Inc., an affiliate of our sponsor, of $10,000 per month, for up to 18 months, for office space, utilities and secretarial and administrative support; |
| | • Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and |
| | • Repayment of non-interest bearing loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which (other than as described above) have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. |
| | Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors or our or their affiliates. |
| Audit Committee | We will establish an audit committee, which is composed entirely of independent directors to, among other things, monitor compliance with the terms described above and the other terms relating to this offering. If any noncompliance is identified, then the audit committee will be charged with the responsibility to immediately take all action necessary to rectify such noncompliance or otherwise to cause compliance with the terms of this offering. For more information, see the section of this prospectus entitled "Management — Committees of the Board of Directors — Audit Committee." |

---

29

---

| Indemnity | Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the trust account to below the lesser of (i) $10.05 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account, if less than $10.05 per public share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. However, we have not asked our |
| --- | --- |

sponsor to reserve for such indemnification obligations, nor have we independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

## RISKS

We are a newly formed company that has conducted no operations and has generated no revenues. Until we complete our initial business combination, we will have no operations and will generate no operating revenues. In making your decision whether to invest in our securities, you should take into account not only the background of our management team, but also the special risks we face as a blank check company. This offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. Accordingly, you will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. For additional information concerning how Rule 419 blank check offerings differ from this offering, please see the section of this prospectus entitled "Proposed Business — Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419." You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors" beginning on page 34 of this prospectus.

### Summary of Risk Factors

Our business is subject to numerous risks and uncertainties, including those highlighted in the section title "Risk Factors," that represent challenges that we face in connection with the successful implementation of our strategy. The occurrence of one or more of the events or circumstances described in the section titled "Risk Factors," alone or in combination with other events or circumstances, may adversely affect our ability to effect a business combination, and may have an adverse effect on our business, cash flows, financial condition and results of operations. Such risks include, but are not limited to:

- our being a newly formed company without an operating history;
- our ability to continue as a "going concern;"
- lack of opportunity to vote on our proposed business combination;
- lack of protections afforded to investors of blank check companies;

30

- issuance of equity and/or debt securities to complete a business combination;
- lack of working capital;
- third-party claims reducing the per-share redemption price;
- potential negative interest rate for securities in which we invest the funds held in the trust account;
- our stockholders being held liable for claims by third parties against us;
- failure to enforce our sponsor's indemnification obligations;
- the ability of warrant holders to obtain a favorable judicial forum for disputes with our company;
- dependence on key personnel;
- conflicts of interest of our sponsor, officers and directors and the representative;
- the delisting of our securities by Nasdaq;
- dependence on a single target business with a limited number of products or services;
- shares being redeemed and warrants and rights becoming worthless;
- our competitors with advantages over us in seeking business combinations;
- ability to obtain additional financing;
- the issuance of shares to investors in connection with our initial business combination at a price that is less than the prevailing market price of our shares at that time;
- our initial stockholders controlling a substantial interest in us;
- warrants', rights' and founder shares' adverse effect on the market price of our common stock;
- disadvantageous timing for redeeming warrants;
- registration rights' adverse effect on the market price of our common stock;
- impact of COVID-19 and related risks;
- business combination with a company located in a foreign jurisdiction;
- changes in laws or regulations; tax consequences to business combinations; and
- exclusive forum provisions in our amended and restated certificate of incorporation.

31

## SUMMARY FINANCIAL DATA

The following table summarizes the relevant financial data for our business and should be read with our financial statements, which are included in this prospectus. We have not had any significant operations to date, so only balance sheet data is presented.

|  | March 31, 2021 |  |
| --- | --- | --- |
| Balance Sheet Data: |  |  |
| Working capital deficiency | $ | (37,985) |
| Total assets | $ | 87,500 |
| Total liabilities | $ | 62,985 |
| Stockholder's equity | $ | 24,515 |

32

## RISK FACTORS

*An investment in our securities involves a high degree of risk. You should consider carefully all of the risks described below, together with the other information contained in this prospectus, before making a decision to invest in our units. If any of the following events occur, our business, financial condition and operating results may be materially adversely affected. In that event, the trading price of our securities could decline, and you could lose all or part of your investment.*

**Risks Relating to our Search for, Consummation of, or Inability to Consummate a Business Combination and Post-Business Combination Risks**
**Our search for a business combination, and any target business with which we ultimately consummate a business combination, may be materially adversely affected by the ongoing coronavirus (COVID-19) pandemic.**

The COVID-19 pandemic has resulted in a widespread health crisis that has adversely affected the economies and financial markets worldwide, and the business of any potential target business with which we consummate a business combination could be materially and adversely affected. Furthermore, we may be unable to complete a business combination if continued concerns relating to COVID-19 restrict travel, limit the ability to have meetings with potential investors or the target company's personnel, vendors and services providers are unavailable to negotiate and consummate a transaction in a timely manner. The extent to which COVID-19 impacts our search for a business combination will depend on future developments, which are highly uncertain and cannot be predicted, including new information which may emerge concerning the severity of COVID-19 and the actions to contain COVID-19 or treat its impact, among others. If the disruptions posed by COVID-19 or other matters of global concern continue for an extensive period of time, our ability to consummate a business combination, or the operations of a target business with which we ultimately consummate a business combination, may be materially adversely affected.

**Our public stockholders may not be afforded an opportunity to vote on our proposed initial business combination, which means we may complete our initial business combination even though a majority of our public stockholders do not support such a combination.**

We may choose not to hold a stockholder vote to approve our initial business combination unless the initial business combination would require stockholder approval under applicable law or stock exchange listing requirements or if we decide to hold a stockholder vote for business or other legal reasons. Except as required by applicable law or stock exchange requirements, the decision as to whether we will seek stockholder approval of a proposed initial business combination or will allow stockholders to sell their shares to us in a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors, such as the timing of the transaction and whether the terms of the transaction would otherwise require us to seek stockholder approval. Accordingly, we may complete our initial business combination even if holders of a majority of our public shares do not approve of the initial business combination we complete. Please see the section of this prospectus entitled "Proposed Business — Stockholders May Not Have the Ability to Approve Our Initial Business Combination" for additional information.

**If we seek stockholder approval of our initial business combination, our initial stockholders have agreed to vote in favor of such initial business combination, regardless of how our public stockholders vote.**

Pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them, as well as any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions), in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares, placement shares and representative shares, we would need only 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised). Our initial stockholders will own shares representing approximately 21.8 % of our outstanding shares of common stock immediately following the completion of this offering and the private placement (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Accordingly, if we seek stockholder approval of our initial business combination, the agreement by our initial stockholders to vote in favor of our initial business combination will increase the likelihood that we will receive the requisite stockholder approval for such initial business combination.

**Your only opportunity to affect the investment decision regarding a potential business combination will be limited to the exercise of your right to redeem your shares from us for cash, unless we seek stockholder approval of the initial business combination.**

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of our initial business combination. Since our board of directors may complete an initial business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the initial business combination, unless we seek such stockholder vote. Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

**The ability of our public stockholders to redeem their shares for cash may make our financial condition unattractive to potential business combination targets, which may make it difficult for us to enter into an initial business combination with a target.**

We may seek to enter into an initial business combination agreement with a prospective target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights, we would not be able to meet such closing condition and, as a result, would not be able to proceed with the initial business combination. Furthermore, in no event will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. Consequently, if accepting all properly submitted redemption requests would cause our net tangible assets to be less than $5,000,001 upon consummation of our initial business combination and after payment of underwriters' fees and commissions or such greater amount necessary to satisfy a closing condition, each as described above, we would not proceed with such redemption and the related business combination and may instead search for an alternate business combination. Prospective targets will be aware of these risks and, thus, may be reluctant to enter into an initial business combination with us.

**The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares may not allow us to complete the most desirable business combination or optimize our capital structure.**

At the time we enter into an agreement for our initial business combination, we will not know how many stockholders may exercise their redemption rights, and therefore will need to structure the transaction based on our expectations as to the number of shares that will be submitted for redemption. If our initial business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, we will need to reserve a portion of the cash in the trust account to meet such requirements, or arrange for third party financing. In addition, if a larger number of shares are submitted for redemption than we initially expected, we may need to restructure the transaction to reserve a greater portion of the cash in the trust account or arrange for third party financing. Raising additional third-party financing may involve dilutive equity issuances or the incurrence of indebtedness at higher than desirable levels. Furthermore, this dilution would increase to the extent that the anti-dilution provision of the Class B common stock result in the issuance of Class A shares on a greater than one-to-one basis upon conversion of the Class B common stock at the time of the consummation of our business combination. The above considerations may limit our ability to complete the most desirable business combination available to us or optimize our capital structure. The amount of the deferred underwriting commissions payable to the underwriters will not be adjusted for any shares that are redeemed in connection with an initial business combination. The per-share amount we will distribute to stockholders who properly exercise their

redemption rights will not be reduced by the deferred underwriting commission and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the deferred underwriting commissions.

34

**The ability of our public stockholders to exercise redemption rights with respect to a large number of our shares could increase the probability that our initial business combination would be unsuccessful and that you would have to wait for liquidation in order to redeem your stock.**

If our initial business combination agreement requires us to use a portion of the cash in the trust account to pay the purchase price, or requires us to have a minimum amount of cash at closing, the probability that our initial business combination would be unsuccessful is increased. If our initial business combination is unsuccessful, you would not receive your pro rata portion of the trust account until we liquidate the trust account. If you are in need of immediate liquidity, you could attempt to sell your stock in the open market; however, at such time our stock may trade at a discount to the pro rata amount per share in the trust account. In either situation, you may suffer a material loss on your investment or lose the benefit of funds expected in connection with our redemption until we liquidate or you are able to sell your stock in the open market.

**The requirement that we complete our initial business combination within the prescribed time frame may give potential target businesses leverage over us in negotiating an initial business combination and may decrease our ability to conduct due diligence on potential business combination targets as we approach our dissolution deadline, which could undermine our ability to complete our initial business combination on terms that would produce value for our stockholders.**

Any potential target business with which we enter into negotiations concerning an initial business combination will be aware that we must complete our initial business combination within 18 months from the closing of this offering. Consequently, such target business may obtain leverage over us in negotiating an initial business combination, knowing that if we do not complete our initial business combination with that particular target business, we may be unable to complete our initial business combination with any target business. This risk will increase as we get closer to the timeframe described above. In addition, we may have limited time to conduct due diligence and may enter into our initial business combination on terms that we would have rejected upon a more comprehensive investigation.

**We may not be able to complete our initial business combination within the prescribed time frame, in which case we would cease all operations except for the purpose of winding up and we would redeem our public shares and liquidate, in which case our public stockholders may only receive $10.05 per share, or less than such amount in certain circumstances, and our warrants and rights will expire worthless.**

Our amended and restated certificate of incorporation will provide that we must complete our initial business combination within 18 months from the closing of this offering. We may not be able to find a suitable target business and complete our initial business combination within such time period. Our ability to complete our initial business combination may be negatively impacted by general market conditions, volatility in the capital and debt markets and the other risks described herein. For example, if the outbreak of COVID-19 continues to grow both in the U.S. and globally and, while the extent of the impact of the outbreak on us will depend on future developments, it could limit our ability to complete our initial business combination, including as a result of increased market volatility, decreased market liquidity and third-party financing being unavailable on terms acceptable to us or at all. Additionally, the outbreak of COVID-19 may negatively impact businesses we may seek to acquire.

If we have not completed our initial business combination within such time period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. In such case, our public stockholders may only receive $10.05 per share, and our warrants and rights will expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share on the redemption of their shares. See "— If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors below.

35

**We may issue our shares to investors in connection with our initial business combination at a price that is less than the prevailing market price of our shares at that time.**

In connection with our initial business combination, we may issue shares to investors in private placement transactions (so-called PIPE transactions) at a price of $10.00 per share or which approximates the per-share amounts in our trust account at such time, which is generally approximately $10.05. The purpose of such issuances will be to enable us to provide sufficient liquidity to the post-business combination entity. The price of the shares we issue may therefore be less, and potentially significantly less, than the market price for our shares at such time.

**If we seek stockholder approval of our initial business combination, our sponsor, directors, officers and their affiliates may elect to purchase shares or warrants from public stockholders, which may influence a vote on a proposed initial business combination and reduce the public "float" of our Class A common stock.**

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, directors, officers or their affiliates may purchase public shares or public warrants or a combination thereof in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination, although they are under no obligation to do so. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. None of the funds in the trust account will be used to purchase shares or public warrants in such transactions.

Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our sponsor, directors, officers or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights or submitted a proxy to vote against our initial business combination, such selling stockholders would be required to revoke their prior elections to redeem their shares and any proxy to vote against our initial business combination. The price per share paid in any such transaction may be different than the amount per share a public stockholder would receive if it elected to redeem its shares in connection with our initial business combination. The purpose of such purchases could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination, or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants

outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination.

Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our Class A common stock or public warrants and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on a national securities exchange.

**If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our initial business combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.**

We will comply with the tender offer rules or proxy rules, as applicable, when conducting redemptions in connection with our initial business combination. Despite our compliance with these rules, if a stockholder fails to receive our tender offer or proxy materials, as applicable, such stockholder may not become aware of the opportunity to redeem its shares. In addition, proxy materials or tender offer documents, as applicable, that we will furnish to holders of our public shares in connection with our initial business combination will describe the various procedures that must be complied with in order to validly tender or redeem public shares. For example, we may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either deliver their stock certificates to our transfer agent prior to the date set forth in the tender offer documents mailed to such holders, or up to two business days prior to the vote on the proposal to approve the initial business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. In the event that a stockholder fails to comply with these or any other procedures disclosed in the proxy or tender offer materials, as applicable, its shares may not be redeemed. See the section of this prospectus entitled "Proposed Business — Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination — Tendering Stock Certificates in Connection with a Tender Offer or Redemption Rights."

**You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares, warrants or rights, potentially at a loss.**

Our public stockholders will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, and then only in connection with those shares of Class A common stock that such stockholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) the redemption of our public shares if we are unable to complete an initial business combination within 18 months from the closing of this offering, subject to applicable law and as further described herein. In no other circumstances will a public stockholder have any right or interest of any kind in the trust account. Holders of warrants and rights will not have any right to the proceeds held in the trust account with respect to the warrants. Accordingly, to liquidate your investment, you may be forced to sell your public shares, warrants or rights, potentially at a loss.

**The representative may have a conflict of interest if they render services to us in connection with our initial business combination.**

We may elect to engage Kingswood Capital Markets, division of Benchmark Investments (who is the representative of the underwriters of this offering) to assist us in connection with our initial business combination. The representative shares held by the representative and/or its designees of the representative will also be worthless if we do not consummate an initial business combination. Therefore, if the representative provides services to us in connection with our initial business combination, these financial interests may result in the representative having a conflict of interest when providing such services to us.

**You will not be entitled to protections normally afforded to investors of many other blank check companies.**

Since the net proceeds of this offering and the sale of the placement units are intended to be used to complete an initial business combination with a target business that has not been identified, we may be deemed to be a "blank check" company under the United States securities laws. However, because we will have net tangible assets in excess of $5,000,000 upon the successful completion of this offering and the sale of the placement units and will file a Current Report on Form 8-K, including an audited balance sheet demonstrating this fact, we are exempt from rules promulgated by the SEC to protect investors in blank check companies, such as Rule 419. Accordingly, investors will not be afforded the benefits or protections of those rules. Among other things, this means our units will be immediately tradable and we will have a longer period of time to complete our business combination than do companies subject to Rule 419. Moreover, if this offering were subject to Rule 419, that rule would prohibit the release of any interest earned on funds held in the trust account to us unless and until the funds in the trust account were released to us in connection with our completion of an initial business combination. For a more detailed comparison of our offering to offerings that comply with Rule 419, please see the section of this prospectus entitled "Proposed Business — Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419."

**Because of our limited resources and the significant competition for business combination opportunities, it may be more difficult for us to complete our initial business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on our redemption of our public shares, or less than such amount in certain circumstances, and our warrants and rights will expire worthless.**

We expect to encounter intense competition from other entities having a business objective similar to ours, including private investors (which may be individuals or investment partnerships), other blank check companies and other entities competing for the types of businesses we intend to acquire. Many of these individuals and entities are well-established and have extensive experience in identifying and effecting, directly or indirectly, acquisitions of companies operating in or providing services to various industries. Many of these competitors possess greater technical, human and other resources or more industry knowledge than we do, and our financial resources will be relatively limited when contrasted with those of many of these competitors. While we believe there are numerous target businesses we could potentially acquire with the net proceeds of this offering and the sale of the placement units, our ability to compete with respect to the acquisition of certain target businesses that are sizable will be limited by our available financial resources. This inherent competitive limitation gives others an advantage in pursuing the acquisition of certain target businesses. Furthermore, because we are obligated to pay cash for the shares of Class A common stock which our public stockholders redeem in connection with our initial business combination, target companies will be aware that this may reduce the resources available to us for our initial business combination. This may place us at a competitive disadvantage in successfully negotiating and completing an initial business

combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on the liquidation of our trust account and our warrants and rights will expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share upon our liquidation. See "— If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors herein.

**If the net proceeds of this offering and the sale of the placement units not being held in the trust account are insufficient to allow us to operate for at least the 18 months following the closing of this offering, we may be unable to complete our initial business combination, in which case our public stockholders may only receive $10.05 per share, or less than such amount in certain circumstances, and our warrants and rights will expire worthless.**

The funds available to us outside of the trust account to fund our working capital requirements may not be sufficient to allow us to operate for at least the 18 months following the closing of this offering, assuming that our initial business combination is not completed during that time. We believe that, upon the closing of this offering, the funds available to us outside of the trust account will be sufficient to allow us to operate for at least the 18 months following such closing; however, we cannot assure you that our estimate is accurate. Of the funds available to us, we could use a portion of the funds available to us to pay fees to consultants to assist us with our search for a target business. We could also use a portion of the funds as a down payment or to fund a "no-shop" provision (a provision in letters of intent or merger agreements designed to keep target businesses from "shopping" around for transactions with other companies or investors on terms more favorable to such target businesses) with respect to a particular proposed initial business combination, although we do not have any current intention to do so. If we entered into a letter of intent or merger agreement where we paid for the right to receive exclusivity from a target business and were subsequently required to forfeit such funds (whether as a result of our breach or otherwise), we might not have sufficient funds to continue searching for, or conduct due diligence with respect to, a target business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on the liquidation of our trust account and our warrants and rights will expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share upon our liquidation. See "— If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors herein.

**If the net proceeds of this offering and the sale of the placement units not being held in the trust account are insufficient, it could limit the amount available to fund our search for a target business or businesses and complete our initial business combination and we will depend on loans from our sponsor or management team to fund our search for an initial business combination, to pay our taxes and to complete our initial business combination. If we are unable to obtain these loans, we may be unable to complete our initial business combination.**

Of the net proceeds of this offering and the sale of the placement units, only approximately $650,000 will be available to us initially outside the trust account to fund our working capital requirements. In the event that our offering expenses exceed our estimate of $662,750, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. The amount held in the trust account will not be impacted as a result of such increase or decrease. Conversely, in the event that the offering expenses are less than our estimate of $662,750, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount. If we are required to seek additional capital, we would need to borrow funds from our sponsor, management team or other third parties to operate or may be forced to liquidate. None of our sponsor, members of our management team nor any of their affiliates is under any obligation to advance funds to us in such circumstances. Any such advances would be repaid only from funds held outside the trust account or from funds released to us upon completion of our initial business combination. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. Prior to the completion of our initial business combination, we do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account. If we are unable to obtain these loans, we may be unable to complete our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. Consequently, our public stockholders may only receive approximately $10.05 per share on our redemption of our public shares, and our warrants and rights may expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share on the redemption of their shares. See "— If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors below.

**Subsequent to the completion of our initial business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.**

Even if we conduct extensive due diligence on a target business with which we combine, we cannot assure you that this diligence will surface all material issues that may be present inside a particular target business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of the target business and outside of our control will not later arise. As a result of these factors, we may be forced to later write-down or write-off assets, restructure our operations, or incur impairment or other charges that could result in our reporting losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about us or our securities. In addition, charges of this nature may cause us to violate net worth or other covenants to which we may be subject as a result of assuming pre-existing debt held by a target business or by virtue of our obtaining debt financing to partially finance the initial business combination. Accordingly, any stockholders who choose to remain stockholders following the initial business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value unless they are able to successfully claim that the reduction was due to the breach by our officers or directors of a duty of care or other fiduciary duty owed to them, or if they are able to successfully bring a private claim under securities laws that the proxy solicitation or tender offer materials, as applicable, relating to the initial business combination constituted an actionable material misstatement or omission.

**If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share.**

Our placing of funds in the trust account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers, prospective target businesses and other entities with which we do business execute agreements with us waiving any right, title,

interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the trust account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative. Marcum LLP, our independent registered public accounting firm, and the underwriters of this offering, will not execute agreements with us waiving such claims to the monies held in the trust account.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Upon redemption of our public shares, if we are unable to complete our initial business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our initial business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the 10 years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.05 per share initially held in the trust account, due to claims of such creditors. Pursuant to the letter agreement, the form of which will be filed as Exhibit 10.1 to the registration statement of which this prospectus forms a part, our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the trust account to below the lesser of (i) $10.05 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account, if less than $10.05 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. However, we have not asked our sponsor to reserve for such indemnification obligations, nor have we independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

**Our directors may decide not to enforce the indemnification obligations of our sponsor, resulting in a reduction in the amount of funds in the trust account available for distribution to our public stockholders.**

In the event that the proceeds in the trust account are reduced below the lesser of (i) $10.05 per share and (ii) the actual amount per share held in the trust account as of the date of the liquidation of the trust account if less than $10.05 per share due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations.

40

While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the trust account available for distribution to our public stockholders may be reduced below $10.05 per share.

**We may not have sufficient funds to satisfy indemnification claims of our directors and executive officers.**

We have agreed to indemnify our officers and directors to the fullest extent permitted by law. However, our officers and directors have agreed to waive any right, title, interest or claim of any kind in or to any monies in the trust account and to not seek recourse against the trust account for any reason whatsoever. Accordingly, any indemnification provided will be able to be satisfied by us only if (i) we have sufficient funds outside of the trust account or (ii) we consummate an initial business combination. Our obligation to indemnify our officers and directors may discourage stockholders from bringing a lawsuit against our officers or directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against our officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against our officers and directors pursuant to these indemnification provisions.

**If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our board may be exposed to claims of punitive damages.**

If, after we distribute the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by our stockholders. In addition, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors.

**If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.**

If, before distributing the proceeds in the trust account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

41

**If we are deemed to be an investment company under the Investment Company Act, we may be required to institute burdensome compliance requirements and our activities may be restricted, which may make it difficult for us to complete our initial business combination.**

If we are deemed to be an investment company under the Investment Company Act, our activities may be restricted, including:

- restrictions on the nature of our investments; and
- restrictions on the issuance of securities, each of which may make it difficult for us to complete our initial business combination.

In addition, we may have imposed upon us burdensome requirements, including:

- registration as an investment company with the SEC;
- adoption of a specific form of corporate structure; and
- reporting, record keeping, voting, proxy and disclosure requirements and other rules and regulations that we are currently not subject to.

In order not to be regulated as an investment company under the Investment Company Act, unless we can qualify for an exclusion, we must ensure that we are engaged primarily in a business other than investing, reinvesting or trading in securities and that our activities do not include investing, reinvesting, owning, holding or trading "investment securities" constituting more than 40% of our total assets (exclusive of U.S. government securities and cash items) on an unconsolidated basis. Our business will be to identify and complete an initial business combination and thereafter to operate the post-transaction business or assets for the long term. We do not plan to buy businesses or assets with a view to resale or profit from their resale. We do not plan to buy unrelated businesses or assets or to be a passive investor.

We do not believe that our anticipated principal activities will subject us to the Investment Company Act. To this end, the proceeds held in the trust account may only be invested in United States "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. Pursuant to the trust agreement, the trustee is not permitted to invest in other securities or assets. By restricting the investment of the proceeds to these instruments, and by having a business plan targeted at acquiring and growing businesses for the long term (rather than on buying and selling businesses in the manner of a merchant bank or private equity fund), we intend to avoid being deemed an "investment company" within the meaning of the Investment Company Act. This offering is not intended for persons who are seeking a return on investments in government securities or investment securities. The trust account is intended as a holding place for funds pending the earliest to occur of: (i) the completion of our initial business combination; (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity; or (iii) absent an initial business combination within 18 months from the closing of this offering, our return of the funds held in the trust account to our public stockholders as part of our redemption of the public shares. If we do not invest the proceeds as discussed above, we may be deemed to be subject to the Investment Company Act. If we were deemed to be subject to the Investment Company Act, compliance with these additional regulatory burdens would require additional expenses for which we have not allotted funds and may hinder our ability to complete an initial business combination or may result in our liquidation. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on the liquidation of our trust account and our warrants and rights will expire worthless.

**Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.**

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 18 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is our intention to redeem our public shares as soon as reasonably possible following the 18th month from the closing of this offering in the event we do not complete our initial business combination and, therefore, we do not intend to comply with the foregoing procedures.

42

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the 10 years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 18 months from the closing of this offering is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful (potentially due to the imposition of legal proceedings that a party may bring or due to other circumstances that are currently unknown), then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

**We may not hold an annual meeting of stockholders until after the consummation of our initial business combination, which could delay the opportunity for our stockholders to elect directors.**

In accordance with Nasdaq corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on Nasdaq. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination,

and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

**The grant of registration rights to our initial stockholders (including the holders of representative shares) may make it more difficult to complete our initial business combination, and the future exercise of such rights may adversely affect the market price of our Class A common stock.**

Pursuant to an agreement to be entered into concurrently with the issuance and sale of the securities in this offering, our initial stockholders, their permitted transferees and the holders of representative shares can demand that we register the resale of the placement units, the placement shares, the representative shares, the placement warrants, the placement rights, the shares of Class A common stock issuable upon exercise of the placement warrants, the shares of Class A common stock underlying the placement rights, the shares of Class A common stock issuable upon conversion of the founder shares, the shares of Class A common stock included in the placement units and holders of units that may be issued upon conversion of working capital loans may demand that we register the resale of such units and the underlying securities. We will bear the cost of registering these securities. The registration and availability of such a significant number of securities for trading in the public market may have an adverse effect on the market price of our Class A common stock. In addition, the existence of registration rights may make our initial business combination more costly or difficult to complete. This is because the stockholders of the target business may increase the equity stake they seek in the combined entity or ask for more cash consideration to offset the negative impact on the market price of our Class A common stock that is expected when the securities owned by our initial stockholders or holders of working capital loans or their respective permitted transferees are registered.

**Because we are neither limited to evaluating a target business in a particular industry sector nor have we selected any specific target businesses with which to pursue our initial business combination, you will be unable to ascertain the merits or risks of any particular target business's operations.**

We will seek to complete an initial business combination with middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services but may also pursue other business combination opportunities, except that we will not, under our amended and restated certificate of incorporation, be permitted to effectuate our initial business combination with another blank check company or similar company with nominal operations. Because we have not yet selected or approached any specific target business with respect to a business combination, there is no basis to evaluate the possible merits or risks of any particular target business's operations, results of operations, cash flows, liquidity, financial condition or prospects. To the extent we complete our initial business combination, we may be affected by numerous risks inherent in the business operations with which we combine. For example, if we combine with a financially unstable business or an entity lacking an established record of sales or earnings, we may be affected by the risks inherent in the business and operations of a financially unstable or a development stage entity. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all of the significant risk factors or that we will have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business. We also cannot assure you that an investment in our units will ultimately prove to be more favorable to investors than a direct investment, if such opportunity were available, in a business combination target. Accordingly, any stockholders who choose to remain stockholders following our initial business combination could suffer a reduction in the value of their securities. Such stockholders are unlikely to have a remedy for such reduction in value unless they are able to successfully claim that the reduction was due to the breach by our officers or directors of a duty of care or other fiduciary duty owed to them, or if they are able to successfully bring a private claim under securities laws that the proxy solicitation or tender offer materials, as applicable, relating to the business combination contained an actionable material misstatement or material omission.

**We may seek business combination opportunities in industries or sectors which may or may not be outside of our management's area of expertise.**

Although we intend to focus on identifying technology companies, we will consider an initial business combination outside of our management's area of expertise if an initial business combination candidate is presented to us and we determine that such candidate offers an attractive business combination opportunity for our company or we are unable to identify a suitable candidate in this sector after having expanded a reasonable amount of time and effort in an attempt to do so. Although our management will endeavor to evaluate the risks inherent in any particular business combination candidate, we cannot assure you that we will adequately ascertain or assess all of the significant risk factors. We also cannot assure you that an investment in our units will not ultimately prove to be less favorable to investors in this offering than a direct investment, if an opportunity were available, in an initial business combination candidate. In the event we elect to pursue a business combination outside of the areas of our management's expertise, our management's expertise may not be directly applicable to its evaluation or operation, and the information contained in this prospectus regarding the areas of our management's expertise would not be relevant to an understanding of the business that we elect to acquire. As a result, our management may not be able to adequately ascertain or assess all of the significant risk factors. Accordingly, any stockholders who choose to remain stockholders following our initial business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

**Although we have identified general criteria and guidelines that we believe are important in evaluating prospective target businesses, we may enter into our initial business combination with a target that does not meet such criteria and guidelines, and as a result, the target business with which we enter into our initial business combination may not have attributes entirely consistent with our general criteria and guidelines.**

Although we have identified general criteria and guidelines for evaluating prospective target businesses, it is possible that a target business with which we enter into our initial business combination will not have all of these positive attributes. If we complete our initial business combination with a target that does not meet some or all of these guidelines, such combination may not be as successful as a combination with a business that does meet all of our general criteria and guidelines. In addition, if we announce a prospective business combination with a target that does not meet our general criteria and guidelines, a greater number of stockholders may exercise their redemption rights, which may make it difficult for us to meet any closing condition with a target business that requires us to have a minimum net worth or a certain amount of cash. In addition, if stockholder approval of the transaction is required by applicable law or stock exchange requirements, or we decide to obtain stockholder approval for business or other legal reasons, it may be more difficult for us to attain stockholder approval of our initial business combination if the target business does not meet our general criteria and guidelines. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on the liquidation of our trust account and our warrants and rights will expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share on the redemption of their shares. See "— If third parties bring claims against us, the

proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors herein.

**We may seek business combination opportunities with a financially unstable business or an entity lacking an established record of revenue, cash flow or earnings, which could subject us to volatile revenues, cash flows or earnings or difficulty in retaining key personnel.**

To the extent we complete our initial business combination with a financially unstable business or an entity lacking an established record of revenues or earnings, we may be affected by numerous risks inherent in the operations of the business with which we combine. These risks include volatile revenues or earnings and difficulties in obtaining and retaining key personnel. Although our officers and directors will endeavor to evaluate the risks inherent in a particular target business, we may not be able to properly ascertain or assess all of the significant risk factors and we may not have adequate time to complete due diligence. Furthermore, some of these risks may be outside of our control and leave us with no ability to control or reduce the chances that those risks will adversely impact a target business.

**We are not required to obtain a fairness opinion and consequently, you may have no assurance from an independent source that the price we are paying for the business is fair to our company from a financial point of view.**

Unless we complete our initial business combination with an affiliated entity or our board cannot independently determine the fair market value of the target business or businesses, we are not required to obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions that the price we are paying is fair to our company from a financial point of view. If no opinion is obtained, our stockholders will be relying on the judgment of our board of directors, who will determine fair market value based on standards generally accepted by the financial community. Such standards used will be disclosed in our proxy materials or tender offer documents, as applicable, related to our initial business combination.

45

**Resources could be wasted in researching business combinations that are not completed, which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share, or less than such amount in certain circumstances, on the liquidation of our trust account and our warrants and rights will expire worthless.**

We anticipate that the investigation of each specific target business and the negotiation, drafting and execution of relevant agreements, disclosure documents and other instruments will require substantial management time and attention and substantial costs for accountants, attorneys, consultants and others. If we decide not to complete a specific initial business combination, the costs incurred up to that point for the proposed transaction likely would not be recoverable. Furthermore, if we reach an agreement relating to a specific target business, we may fail to complete our initial business combination for any number of reasons including those beyond our control. Any such event will result in a loss to us of the related costs incurred which could materially adversely affect subsequent attempts to locate and acquire or merge with another business. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share on the liquidation of our trust account and our warrants and rights will expire worthless. In certain circumstances, our public stockholders may receive less than $10.05 per share on the redemption of their shares. See "— If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share" and other risk factors herein.

46

**We may issue notes or other debt securities, or otherwise incur substantial debt, to complete an initial business combination, which may adversely affect our leverage and financial condition and thus negatively impact the value of our stockholders' investment in us.**

Although we have no commitments as of the date of this prospectus to issue any notes or other debt securities, or to otherwise incur outstanding debt following this offering, we may choose to incur substantial debt to complete our initial business combination. We have agreed that we will not incur any indebtedness unless we have obtained from the lender a waiver of any right, title, interest or claim of any kind in or to the monies held in the trust account. As such, no issuance of debt will affect the per-share amount available for redemption from the trust account. Nevertheless, the incurrence of debt could have a variety of negative effects, including:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;
- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;
- our immediate payment of all principal and accrued interest, if any, if the debt security is payable on demand;
- our inability to obtain necessary additional financing if the debt security contains covenants restricting our ability to obtain such financing while the debt security is outstanding;
- our inability to pay dividends on our common stock;
- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;
- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;
- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;
- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and
- other disadvantages compared to our competitors who have less debt.

**We may only be able to complete one business combination with the proceeds of this offering, the sale of the placement units, which will cause us to be solely dependent on a single business which may have a limited number of services and limited operating activities. This lack of diversification may negatively impact our operating results and profitability.**

Of the net proceeds from this offering and the sale of the placement units, $101,150,000 (or $116,225,000 if the underwriters' over-allotment option is exercised in full) will be available to complete our initial business combination and pay related fees and expenses (which includes up to $3,500,000, or up to $4,025,000 if the underwriters' over-allotment option is exercised in full, for the payment of deferred underwriting commissions).

47

We may effectuate our initial business combination with a single target business or multiple target businesses simultaneously or within a short period of time. However, we may not be able to effectuate our initial business combination with more than one target business because of various

factors, including the existence of complex accounting issues and the requirement that we prepare and file pro forma financial statements with the SEC that present operating results and the financial condition of several target businesses as if they had been operated on a combined basis. By completing our initial business combination with only a single entity, our lack of diversification may subject us to numerous economic, competitive and regulatory developments. Further, we would not be able to diversify our operations or benefit from the possible spreading of risks or offsetting of losses, unlike other entities which may have the resources to complete several business combinations in different industries or different areas of a single industry. In addition, we intend to focus our search for an initial business combination in a single industry. Accordingly, the prospects for our success may be:

- • solely dependent upon the performance of a single business, property or asset, or
- • dependent upon the development or market acceptance of a single or limited number of products, processes or services.

This lack of diversification may subject us to numerous economic, competitive and regulatory risks, any or all of which may have a substantial adverse impact upon the particular industry in which we may operate subsequent to our initial business combination.

**We may attempt to simultaneously complete business combinations with multiple prospective targets, which may hinder our ability to complete our initial business combination and give rise to increased costs and risks that could negatively impact our operations and profitability.**

If we determine to simultaneously acquire several businesses that are owned by different sellers, we will need for each of such sellers to agree that our purchase of its business is contingent on the simultaneous closings of the other business combinations, which may make it more difficult for us, and delay our ability, to complete our initial business combination. We do not, however, intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. With multiple business combinations, we could also face additional risks, including additional burdens and costs with respect to possible multiple negotiations and due diligence investigations (if there are multiple sellers) and the additional risks associated with the subsequent assimilation of the operations and services or products of the acquired companies in a single operating business. If we are unable to adequately address these risks, it could negatively impact our profitability and results of operations.

**We may attempt to complete our initial business combination with a private company about which little information is available, which may result in an initial business combination with a company that is not as profitable as we suspected, if at all.**

In pursuing our initial business combination strategy, we may seek to effectuate our initial business combination with a privately held company. Very little public information generally exists about private companies, and we could be required to make our decision on whether to pursue a potential initial business combination on the basis of limited information, which may result in an initial business combination with a company that is not as profitable as we suspected, if at all.

**Our management may not be able to maintain control of a target business after our initial business combination.**

We may structure an initial business combination so that the post-transaction company in which our public stockholders own shares will own less than 100% of the equity interests or assets of a target business, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for us not to be required to register as an investment company under the Investment Company Act. We will not consider any transaction that does not meet such criteria. Even if the post-transaction company owns 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post business combination company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares of Class A common stock in exchange for all of the outstanding capital stock of a target. In this case, we would acquire a 100% interest in the target. However, as a result of the issuance of a substantial number of new shares of common stock, our stockholders immediately prior to such transaction could own less than a majority of our outstanding shares of common stock subsequent to such transaction. In addition, other minority stockholders may subsequently combine their holdings resulting in a single person or group obtaining a larger share of the company's stock than we initially acquired. Accordingly, this may make it more likely that our management will not be able to maintain our control of the target business. We cannot provide assurance that, upon loss of control of a target business, new management will possess the skills, qualifications or abilities necessary to profitably operate such business.

48

**We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete an initial business combination with which a substantial majority of our stockholders do not agree.**

Our amended and restated certificate of incorporation does not provide a specified maximum redemption threshold, except that in no event will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (such that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. As a result, we may be able to complete our initial business combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or, if we seek stockholder approval of our initial business combination and do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, have entered into privately negotiated agreements to sell their shares to our sponsor, officers, directors or their affiliates. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed initial business combination exceed the aggregate amount of cash available to us, we will not complete the initial business combination or redeem any shares, all shares of Class A common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

**In order to effectuate an initial business combination, blank check companies have, in the recent past, amended various provisions of their charters and other governing instruments, including their warrant agreements. We cannot assure you that we will not seek to amend our amended and restated certificate of incorporation or governing instruments in a manner that will make it easier for us to complete our initial business combination that our stockholders may not support.**

In order to effectuate an initial business combination, blank check companies have, in the recent past, amended various provisions of their charters and modified governing instruments, including their warrant agreements. For example, blank check companies have amended the definition of business combination, increased redemption thresholds and extended the time to consummate an initial business combination and, with respect to their warrants, amended their warrant agreements to require the warrants to be exchanged for cash and/or other securities. Amending our amended and restated certificate of incorporation with respect to any provisions related to pre-initial business combination activity (including the requirement to deposit proceeds of this offering and the private placement of units into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein) will require the approval of holders of 65% of our common stock entitled to vote thereon, amending other provisions of our amended and restated certificate of incorporation will require the approval of holders of a majority of our common stock and amending our warrant agreement will require a vote of holders of at least a majority of the public warrants (which may include public warrants acquired by our sponsor or its affiliates in this offering or thereafter in the open market). In addition, our amended and restated certificate of incorporation will require us to provide our public stockholders with the opportunity to redeem their public shares for cash if we propose an amendment to our amended and restated certificate of incorporation (A) to modify the substance or

timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity.

49

To the extent any such amendments would be deemed to fundamentally change the nature of any securities offered through this registration statement, we would register, or seek an exemption from registration for, the affected securities. We cannot assure you that we will not seek to amend our charter or governing instruments or extend the time to consummate an initial business combination in order to effectuate our initial business combination.

**The provisions of our amended and restated certificate of incorporation that relate to our pre-business combination activity (and corresponding provisions of the agreement governing the release of funds from our trust account), including an amendment to permit us to withdraw funds from the trust account such that the per share amount investors will receive upon any redemption or liquidation is substantially reduced or eliminated, may be amended with the approval of holders of at least 65% of our common stock, which is a lower amendment threshold than that of some other blank check companies. It may be easier for us, therefore, to amend our amended and restated certificate of incorporation and the trust agreement to facilitate the completion of an initial business combination that some of our stockholders may not support.**

Our amended and restated certificate of incorporation will provide that any of its provisions related to pre-initial business combination activity (including the requirement to deposit proceeds of this offering and the sale of the placement units into the trust account and not release such amounts except in specified circumstances, and to provide redemption rights to public stockholders as described herein and including to permit us to withdraw funds from the trust account such that the per share amount investors will receive upon any redemption or liquidation is substantially reduced or eliminated) may be amended if approved by holders of at least 65% of our common stock entitled to vote thereon, and corresponding provisions of the trust agreement governing the release of funds from our trust account may be amended if approved by holders of at least 65% of our common stock entitled to vote thereon. In all other instances, our amended and restated certificate of incorporation may be amended by holders of a majority of our outstanding common stock entitled to vote thereon, subject to applicable provisions of the DGCL or applicable stock exchange rules. We may not issue additional securities that can vote on amendments to our amended and restated certificate of incorporation. Our initial stockholders, who will collectively beneficially own approximately 21.8 % of our common stock upon the closing of this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and/or trust agreement and will have the discretion to vote in any manner they choose. As a result, we may be able to amend the provisions of our amended and restated certificate of incorporation which govern our pre-initial business combination behavior more easily than some other blank check companies, and this may increase our ability to complete an initial business combination with which you do not agree. Our stockholders may pursue remedies against us for any breach of our amended and restated certificate of incorporation.

Our sponsor, officers, directors and director nominees will agree, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, divided by the number of then outstanding public shares. These agreements are contained in a letter agreement that we will enter into with our sponsor, officers, directors and director nominees. Our stockholders are not parties to, or third-party beneficiaries of, these agreements and, as a result, will not have the ability to pursue remedies against our sponsor, officers or directors for any breach of these agreements. As a result, in the event of a breach, our stockholders would need to pursue a stockholder derivative action, subject to applicable law.

50

**We may be unable to obtain additional financing to complete our initial business combination or to fund the operations and growth of a target business, which could compel us to restructure or abandon a particular business combination.**

We have not selected any specific business combination target, but intend to target businesses larger than we could acquire with the net proceeds of this offering and the sale of the placement units. As a result, we may be required to seek additional financing to complete such proposed initial business combination. We cannot assure you that such financing will be available on acceptable terms, if at all. To the extent that additional financing proves to be unavailable when needed to complete our initial business combination, we would be compelled to either restructure the transaction or abandon that particular business combination and seek an alternative target business candidate. Further, the amount of additional financing we may be required to obtain could increase as a result of future growth capital needs for any particular transaction, the depletion of the available net proceeds in search of a target business, the obligation to repurchase for cash a significant number of shares from stockholders who elect redemption in connection with our initial business combination and/or the terms of negotiated transactions to purchase shares in connection with our initial business combination. If we are unable to complete our initial business combination, our public stockholders may receive only approximately $10.05 per share plus any pro rata interest earned on the funds held in the trust account and not previously released to us to pay our taxes on the liquidation of our trust account and our warrants and rights will expire worthless. In addition, even if we do not need additional financing to complete our initial business combination, we may require such financing to fund the operations or growth of the target business. The failure to secure additional financing could have a material adverse effect on the continued development or growth of the target business. None of our officers, directors or stockholders is required to provide any financing to us in connection with or after our initial business combination. If we are unable to complete our initial business combination, our public stockholders may only receive approximately $10.05 per share on the liquidation of our trust account, and our warrants and rights will expire worthless. Furthermore, as described in the risk factor entitled "If third parties bring claims against us, the proceeds held in the trust account could be reduced and the per-share redemption amount received by stockholders may be less than $10.05 per share," under certain circumstances our public stockholders may receive less than $10.05 per share upon the liquidation of the trust account.

**Our initial stockholders may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support.**

Upon the closing of this offering, our initial stockholders will own shares representing approximately 21.8% of our issued and outstanding shares of common stock (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Accordingly, they may exert a substantial influence on actions requiring a stockholder vote, potentially in a manner that you do not support, including amendments to our amended and restated certificate of incorporation and approval of major corporate transactions. If our initial stockholders purchase any units in this offering or if our initial stockholders purchase any additional shares of common stock in the aftermarket or

in privately negotiated transactions, this would increase their control. Factors that would be considered in making such additional purchases would include consideration of the current trading price of our Class A common stock. In addition, our board of directors, whose members were or will be elected by our initial stockholders, is and will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. We may not hold an annual meeting of stockholders to elect new directors prior to the completion of our initial business combination, in which case all of the current directors and director nominees will continue in office until at least the completion of the initial business combination. If there is an annual meeting, as a consequence of our "staggered" board of directors, only a minority of the board of directors will be considered for election and our initial stockholders, because of their ownership position, will have considerable influence regarding the outcome. Accordingly, our initial stockholders will continue to exert control at least until the completion of our initial business combination.

**Our sponsor paid an aggregate of $25,000 for the founder shares, or approximately $0.009 per founder share. As a result of this low initial price, our sponsor, its affiliates and our management team stand to make a substantial profit even if an initial business combination subsequently declines in value or is unprofitable for our public stockholders.**

As a result of the low acquisition cost of our founder shares, our sponsor, its affiliates and our management team could make a substantial profit even if we select and consummate an initial business combination with an acquisition target that subsequently declines in value or is unprofitable for our public stockholders. Thus, such parties may have more of an economic incentive for us to enter into an initial business combination with a riskier, weaker-performing or financially unstable business, or an entity lacking an established record of revenues or earnings, than would be the case if such parties had paid the full offering price for their founder shares.

**Because we must furnish our stockholders with target business financial statements, we may lose the ability to complete an otherwise advantageous initial business combination with some prospective target businesses.**

The federal proxy rules require that a proxy statement with respect to a vote on an initial business combination meeting certain financial significance tests include historical and/or pro forma financial statement disclosure in periodic reports. We will include the same financial statement disclosure in connection with our tender offer documents, whether or not they are required under the tender offer rules. These financial statements may be required to be prepared in accordance with, or be reconciled to, accounting principles generally accepted in the United States of America, or GAAP, or international financial reporting standards as issued by the International Accounting Standards Board, or IFRS, depending on the circumstances and the historical financial statements may be required to be audited in accordance with the standards of the Public Company Accounting Oversight Board (United States), or PCAOB. These financial statement requirements may limit the pool of potential target businesses we may acquire because some targets may be unable to provide such financial statements in time for us to disclose such statements in accordance with federal proxy rules and complete our initial business combination within the prescribed time frame.

**Compliance obligations under the Sarbanes-Oxley Act may make it more difficult for us to effectuate our initial business combination, require substantial financial and management resources, and increase the time and costs of completing an initial business combination.**

Section 404 of the Sarbanes-Oxley Act requires that we evaluate and report on our system of internal controls beginning with our Annual Report on Form 10-K for the year ending December 31, 2022. Only in the event we are deemed to be a large accelerated filer or an accelerated filer, and no longer qualify as an emerging growth company, will we be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. Further, for as long as we remain an emerging growth company, we will not be required to comply with the independent registered public accounting firm attestation requirement on our internal control over financial reporting. The fact that we are a blank check company makes compliance with the requirements of the Sarbanes-Oxley Act particularly burdensome on us as compared to other public companies because a target company with which we seek to complete our initial business combination may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of its internal controls. The development of the internal control of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such business combination.

**Your only opportunity to affect the investment decision regarding a potential business combination will be limited to the exercise of your right to redeem your shares from us for cash, unless we seek stockholder approval of the initial business combination.**

At the time of your investment in us, you will not be provided with an opportunity to evaluate the specific merits or risks of our initial business combination. Since our board of directors may complete an initial business combination without seeking stockholder approval, public stockholders may not have the right or opportunity to vote on the initial business combination, unless we seek such stockholder vote. Accordingly, if we do not seek stockholder approval, your only opportunity to affect the investment decision regarding a potential business combination may be limited to exercising your redemption rights within the period of time (which will be at least 20 business days) set forth in our tender offer documents mailed to our public stockholders in which we describe our initial business combination.

**You will not have any rights or interests in funds from the trust account, except under certain limited circumstances. To liquidate your investment, therefore, you may be forced to sell your public shares, warrants or rights, potentially at a loss.**

Our public stockholders will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, and then only in connection with those shares of Class A common stock that such stockholder properly elected to redeem, subject to the limitations described herein, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) the redemption of our public shares if we are unable to complete an initial business combination within 18 months from the closing of this offering, subject to applicable law and as further described herein. In no other circumstances will a public stockholder have any right or interest of any kind in the trust account. Holders of warrants will not have any right to the proceeds held in the trust account with respect to the warrants. Accordingly, to liquidate your investment, you may be forced to sell your public shares, warrants or rights, potentially at a loss.

**If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to a variety of additional risks that may negatively impact our operations.**

If we effect our initial business combination with a company with operations or opportunities outside of the United States, we would be subject to any special considerations or risks associated with companies operating in an international setting, including any of the following:

- higher costs and difficulties inherent in managing cross-border business operations and complying with different commercial and legal requirements of overseas markets;
- rules and regulations regarding currency redemption;

- complex corporate withholding taxes on individuals;
- laws governing the manner in which future business combinations may be effected;
- tariffs and trade barriers;
- regulations related to customs and import/export matters;
- longer payment cycles and challenges in collecting accounts receivable;
- tax issues, including but not limited to tax law changes and variations in tax laws as compared to the United States;
- currency fluctuations and exchange controls;
- rates of inflation;
- cultural and language differences;
- employment regulations;
- crime, strikes, riots, civil disturbances, terrorist attacks, natural disasters and wars;
- deterioration of political relations with the United States; and
- government appropriations of assets.

53

**If our management team following our initial business combination is unfamiliar with United States securities laws, they may have to expend time and resources becoming familiar with such laws, which could lead to various regulatory issues.**

Following our initial business combination, our founding team may resign from their positions as officers or directors of the company and the management of the business combination partner will may assume the roles of executive officers and directors of our company. Such officers and directors may not be familiar with United States securities laws. If our new management following our initial business combination is unfamiliar with United States securities laws, they may have to expend time and resources becoming familiar with such laws. This could be expensive and time-consuming and could lead to various regulatory issues which may adversely affect our operations.

**After our initial business combination, substantially all of our assets may be located in a foreign country and substantially all of our revenue may be derived from our operations in such country. Accordingly, our results of operations and prospects will be subject, to a significant extent, to the economic, political and social conditions and government policies, developments and conditions in the country in which we operate.**

As we may acquire a business located outside of the United States as part of our initial business combination, the economic, political and social conditions, as well as government policies, of the country in which our operations would be located following our initial business combination could affect our business. Economic growth could be uneven, both geographically and among various sectors of our economy and such growth may not be sustained in the future. If in the future such country's economy experiences a downturn or grows at a slower rate than expected, there may be less demand for spending in certain industries. A decrease in demand for spending in certain industries could materially and adversely affect our ability to find an attractive target business with which to consummate our initial business combination and if we effect our initial business combination, the ability of that target business to become profitable.

**Exchange rate fluctuations and currency policies may cause our target business' ability to succeed in the international markets to be diminished.**

In the event we acquire a non-U.S. business as part of our initial business combination, all revenues and income would likely be received in a foreign currency, and the dollar equivalent of our net assets and distributions, if any, could be adversely affected by reductions in the value of the local currency. The value of the currencies in our target regions fluctuate and are affected by, among other things, changes in political and economic conditions. Any change in the relative value of such currency against our reporting currency may affect the attractiveness of any target business or, following consummation of our initial business combination, our financial condition and results of operations. Additionally, if a currency appreciates in value against the dollar prior to the consummation of our initial business combination, the cost of a target business as measured in dollars will increase, which may make it less likely that we are able to consummate such transaction.

**We may reincorporate in another jurisdiction in connection with our initial business combination, and the laws of such jurisdiction may govern some or all of our future material agreements and we may not be able to enforce our legal rights.**

In connection with our initial business combination, we may relocate the home jurisdiction of our business from the U.S. to another jurisdiction. If we determine to do this, the laws of such jurisdiction may govern some or all of our future material agreements. The system of laws and the enforcement of existing laws in such jurisdiction may not be as certain in implementation and interpretation as in the United States. The inability to enforce or obtain a remedy under any of our future agreements could result in a significant loss of business, business opportunities or capital.

54

**Risks Relating to our Sponsor and Management Team**

**Our ability to successfully effect our initial business combination and to be successful thereafter will be totally dependent upon the efforts of our key personnel, some of whom may join us following our initial business combination. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.**

Our ability to successfully effect our initial business combination is dependent upon the efforts of our key personnel. The role of our key personnel in the target business, however, cannot presently be ascertained. Although some of our key personnel may remain with the target business in senior management or advisory positions following our initial business combination, it is likely that some or all of the management of the target business will remain in place. While we intend to closely scrutinize any individuals we employ after our initial business combination, we cannot assure you that our assessment of these individuals will prove to be correct. These individuals may be unfamiliar with the requirements of operating a company regulated by the SEC, which could cause us to have to expend time and resources helping them become familiar with such requirements. In addition, the officers and directors of an initial business combination candidate may resign upon completion of our initial business combination. The departure of an initial business combination target's key personnel could negatively impact the operations and profitability of our post-combination business. The role of an initial business combination candidate's key personnel upon the completion of our initial business combination cannot be ascertained at this time. Although we contemplate that certain members of an initial business combination candidate's management team will remain associated with the initial business combination candidate following our initial business combination, it is possible that members of the management of an initial business combination candidate will not wish to remain in place. The loss of key personnel could negatively impact the operations and profitability of our post-combination business.

**We are dependent upon our executive officers, directors and director nominees and their departure could adversely affect our ability to operate.**

Our operations are dependent upon a relatively small group of individuals and, in particular, our executive officers, directors and director nominees. We believe that our success depends on the continued service of our executive officers and directors, at least until we have completed our initial business combination. We do not have an employment agreement with, or key-man insurance on the life of, any of our directors or executive officers. The unexpected loss of the services of one or more of our directors or executive officers could have a detrimental effect on us.

**Our key personnel may negotiate employment or consulting agreements with a target business in connection with a particular business**

**combination. These agreements may provide for them to receive compensation following our initial business combination and as a result, may cause them to have conflicts of interest in determining whether a particular business combination is the most advantageous.**

Our key personnel may be able to remain with the company after the completion of our initial business combination only if they are able to negotiate employment or consulting agreements in connection with the initial business combination. Such negotiations would take place simultaneously with the negotiation of the initial business combination and could provide for such individuals to receive compensation in the form of cash payments and/or our securities for services they would render to us after the completion of the initial business combination. The personal and financial interests of such individuals may influence their motivation in identifying and selecting a target business. However, we believe the ability of such individuals to remain with us after the completion of our initial business combination will not be the determining factor in our decision as to whether or not we will proceed with any potential business combination. There is no certainty, however, that any of our key personnel will remain with us after the completion of our initial business combination. We cannot assure you that any of our key personnel will remain in senior management or advisory positions with us. The determination as to whether any of our key personnel will remain with us will be made at the time of the consummation of our initial business combination.

**We may have a limited ability to assess the management of a prospective target business and, as a result, may effect our initial business combination with a target business whose management may not have the skills, qualifications or abilities to manage a public company, which could, in turn, negatively impact the value of our stockholders' investment in us.**

When evaluating the desirability of effecting our initial business combination with a prospective target business, our ability to assess the target business's management may be limited due to a lack of time, resources or information. Our assessment of the capabilities of the target's management, therefore, may prove to be incorrect and such management may lack the skills, qualifications or abilities we suspected. Should the target's management not possess the skills, qualifications or abilities necessary to manage a public company, the operations and profitability of the post-combination business may be negatively impacted. Accordingly, any stockholders who choose to remain stockholders following the initial business combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

**Our officers and directors will allocate their time to other businesses thereby causing conflicts of interest in their determination as to how much time to devote to our affairs. This conflict of interest could have a negative impact on our ability to complete our initial business combination.**

Our officers and directors are not required to, and will not, commit their full time to our affairs, which may result in a conflict of interest in allocating their time between our operations and our search for an initial business combination and their other businesses. We do not intend to have any full-time employees prior to the completion of our initial business combination. Each of our officers is engaged in other business endeavors for which he may be entitled to substantial compensation and our officers are not obligated to contribute any specific number of hours per week to our affairs. Our independent directors may also serve as officers or board members for other entities. If our officers' and directors' other business affairs require them to devote substantial amounts of time to such affairs in excess of their current commitment levels, it could limit their ability to devote time to our affairs which may have a negative impact on our ability to complete our initial business combination. For a complete discussion of our officers' and directors' other business affairs, please see the section of this prospectus entitled "Management — Directors and Officers."

**The nominal purchase price paid by our sponsor for the founder shares may result in significant dilution to the implied value of your public shares upon the consummation of our initial business combination.**

We are offering our units at an offering price of $10.00 per unit and the amount in our trust account is initially anticipated to be $10.05 per public share, implying an initial value of $10.05 per public share. However, prior to this offering, our sponsor paid a nominal aggregate purchase price of $25,000 for the founder shares, or approximately $0.009 per share. As a result, the value of your public shares may be significantly diluted upon the consummation of our initial business combination, when the founder shares are converted into public shares. For example, the following table shows the dilutive effect of the founder shares on the implied value of the public shares upon the consummation of our initial business combination, assuming that our equity value at that time is $5,000,001, which is the amount we would have for our initial business combination in the trust account after payment of $3,500,000 of deferred underwriting commissions, assuming the underwriters' over-allotment option is not exercised, no interest is earned on the funds held in the trust account, and no public shares are redeemed in connection with our initial business combination, and without taking into account any other potential impacts on our valuation at such time, such as the trading price of our public shares, the business combination transaction costs, any equity issued or cash paid to the target's sellers or other third parties, or the target's business itself, including its assets, liabilities, management and prospects, as well as the value of our public and private warrants. At such valuation, each of our shares of common stock would have an implied value of $8.15 per share upon consummation of our initial business combination, which would be a 89.6% decrease as compared to the initial implied value per public share of $9.09 (the price per unit in this offering, assuming no value to the public warrants).

| | |
|---|---:|
| Public shares | 10,000,000 |
| Founder shares | 2,500,000 |
| Total shares | 12,500,000 |
| Total funds in trust available for initial business combination (less deferred underwriting commissions) | $ 100,500,000 |
| Initial implied value per public share | $ 9.09 |
| Implied value per share upon consummation of initial business combination | $ 10.00 |

**The value of the founder shares following completion of our initial business combination is likely to be substantially higher than the nominal price paid for them, even if the trading price of our common stock at such time is substantially less than $10.00 per share.**

Upon the closing of this offering, assuming no exercise of the underwriters' over-allotment option, our sponsor will have invested in us an aggregate of $3,087,750, comprised of the $25,000 purchase price for the founder shares and the $3,062,750 purchase price for the private placement units. Assuming a trading price of $10.00 per share upon consummation of our initial business combination, the 2,500,000 founder shares would have an aggregate implied value of $25,000,000. Even if the trading price of our common stock was as low as $1.10 per share, and the private warrants and private rights were worthless, the value of the founder shares and private shares would be equal to the sponsor's initial investment in us. As a result, our sponsor is likely to be able to recoup its investment in us and make a substantial profit on that investment, even if our public shares have lost significant value. Accordingly, our management team, which owns interests in our sponsor, may have an economic incentive that differs from that of the public shareholders to pursue and consummate an initial business combination rather than to liquidate and to return all of the cash in the trust to the public shareholders, even if that business combination were with a riskier or less-established target business. For the foregoing reasons, you should consider our management team's financial incentive to complete an initial business combination when evaluating whether to redeem your shares prior to or in connection with the initial business combination.

**Certain of our officers, directors and director nominees are now, and all of them may in the future become, affiliated with entities engaged in business activities similar to those intended to be conducted by us and, accordingly, may have conflicts of interest in allocating their time and determining to which entity a particular business opportunity should be presented.**

Following the completion of this offering and until we consummate our initial business combination, we intend to engage in the business of identifying and combining with one or more businesses. Our sponsor and officers and directors are, and may in the future become, affiliated with entities (such as operating companies or investment vehicles) that are engaged in a similar business and our officers and directors may become officers or directors of another special purpose acquisition company with a class of securities intended to be registered under the Exchange Act, even prior to us entering into a definitive agreement for our initial business combination. Our officers and directors also may become aware of business opportunities which may be appropriate for presentation to us and the other entities to which they owe certain fiduciary or contractual duties (including Benessere Capital Acquisition Corporation and Maquia Capital Acquisition Corporation).

Accordingly, they may have conflicts of interest in determining to which entity a particular business opportunity should be presented. These conflicts may not be resolved in our favor and a potential target business may be presented to another entity prior to its presentation to us. Our amended and restated certificate of incorporation will provide that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue, and to the extent the director or officer is permitted to refer that opportunity to us without violating another legal obligation.

For a complete discussion of our officers' and directors' business affiliations and the potential conflicts of interest that you should be aware of, please see the sections of this prospectus entitled "Management — Directors and Officers," "Management — Conflicts of Interest" and "Certain Relationships and Related Party Transactions."

**Our officers, directors, security holders and their respective affiliates may have competitive pecuniary interests that conflict with our interests.**

We have not adopted a policy that expressly prohibits our directors, officers, security holders or affiliates from having a direct or indirect pecuniary or financial interest in any investment to be acquired or disposed of by us or in any transaction to which we are a party or have an interest. In fact, we may enter into an initial business combination with a target business that is affiliated with our sponsor, our directors or officers, although we do not intend to do so. We do not have a policy that expressly prohibits any such persons from engaging for their own account in business activities of the types conducted by us. Accordingly, such persons or entities may have a conflict between their interests and ours.

**We may engage in an initial business combination with one or more target businesses that have relationships with entities that may be affiliated with our sponsor, officers, directors or existing holders which may raise potential conflicts of interest.**

In light of the involvement of our sponsor, officers and directors with other entities, we may decide to acquire one or more businesses affiliated with our sponsor, officers or directors. Our directors and officers also serve as officers and board members for other entities, including, without limitation, those described under the section of this prospectus entitled "Management — Conflicts of Interest." Such entities may compete with us for business combination opportunities. Our sponsor, officers and directors are not currently aware of any specific opportunities for us to complete our initial business combination with any entities with which they are affiliated, and there have been no preliminary discussions concerning an initial business combination with any such entity or entities. Although we will not be specifically focusing on, or targeting, any transaction with any affiliated entities, we would pursue such a transaction if we determined that such affiliated entity met our criteria for an initial business combination as set forth in the section of this prospectus entitled "Proposed Business — Selection of a Target Business and Structuring of our Initial Business Combination" and such transaction was approved by a majority of our disinterested directors. Despite our agreement to obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions, regarding the fairness to our stockholders from a financial point of view of an initial business combination with one or more businesses affiliated with our sponsor, officers, directors or existing holders, potential conflicts of interest still may exist and, as a result, the terms of the initial business combination may not be as advantageous to our public stockholders as they would be absent any conflicts of interest.

**Since our sponsor, officers and directors will lose their entire investment in us if our initial business combination is not completed, a conflict of interest may arise in determining whether a particular business combination target is appropriate for our initial business combination.**

On January 20, 2021, our sponsor purchased an aggregate of 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our three independent directors.. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). The founder shares will be worthless if we do not complete an initial business combination. Our sponsor has agreed to purchase an aggregate of 306,275 placement units at a price of $10.00 per unit for an aggregate purchase price of $3,062,750. If the underwriters' over-allotment option is exercised in full, the amount of placement units sold will be 332,525 for an aggregate purchase price of $3,325,250). Each placement unit consists of one share of Class A common stock, one-half of one warrant and one right. Each whole warrant is exercisable to purchase one whole share of common stock at $11.50 per share. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination. These securities will also be worthless if we do not complete an initial business combination. Holders of founder shares have agreed (A) to vote any shares owned by them in favor of any proposed initial business combination and (B) not to redeem any founder shares or placement shares held by them in connection with a stockholder vote to approve a proposed initial business combination. In addition, we may obtain loans from our sponsor, affiliates of our sponsor or an officer or director. The personal and financial interests of our officers and directors may influence their motivation in identifying and selecting a target business combination, completing an initial business combination and influencing the operation of the business following the initial business combination.

### Risks Relating to Our Securities

**The securities in which we invest the funds held in the trust account could bear a negative rate of interest, which could reduce the value of the assets held in trust such that the per-share redemption amount received by public stockholders may be less than $10.05 per share.**

The proceeds held in the trust account will be invested only in U.S. government treasury obligations with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act, which invest only in direct U.S. government treasury obligations. While short-term U.S. government treasury obligations currently yield a positive rate of interest, they have briefly yielded negative interest rates in recent years. Central banks in Europe and Japan pursued interest rates below zero in recent years, and the Open Market Committee of the Federal Reserve has not ruled out the possibility that it may in the future adopt similar policies in the United States. In the event that we are unable to complete our initial business combination or make certain amendments to our amended and restated certificate of incorporation, our public stockholders are entitled to receive their pro-rata share of the proceeds held in the trust account, plus any interest income, net of taxes paid or payable (less, in the case we are unable to complete our initial business combination, $100,000 of interest). Negative interest rates could reduce the value of the assets held in trust such that the per-share redemption amount received by public stockholders may be less than $10.05 per share.

**Nasdaq may delist our securities from trading on its exchange, which could limit investors' ability to make transactions in our securities and**

**subject us to additional trading restrictions.**

We will apply for the listing of our units on Nasdaq. Following the date the shares of our Class A common stock, warrants and rights are eligible to trade separately, we anticipate that the shares of our Class A common stock, warrants and rights will be separately listed on Nasdaq. Although after giving effect to this offering we expect to meet, on a pro forma basis, the minimum initial listing standards set forth in the Nasdaq listing standards, we cannot assure you that our securities will be, or will continue to be, listed on Nasdaq in the future or prior to our initial business combination. In order to continue listing our securities on Nasdaq prior to our initial business combination, we must maintain certain financial, distribution and stock price levels. Generally, we must maintain a minimum amount in stockholders' equity (generally $2,500,000) and a minimum number of holders of our securities (generally 300 public holders). Additionally, in connection with our initial business combination, we will be required to demonstrate compliance with Nasdaq's initial listing requirements, which are more rigorous than Nasdaq's continued listing requirements, in order to continue to maintain the listing of our securities on Nasdaq. For instance, our stock price would generally be required to be at least $4.00 per share, our stockholders' equity would generally be required to be at least $5.0 million and we would be required to have a minimum of 300 round lot holders (with at least 50% of such round lot holders holding securities with a market value of at least $2,500) of our securities. We cannot assure you that we will be able to meet those initial listing requirements at that time.

58

If Nasdaq delists our securities from trading on its exchange and we are not able to list our securities on another national securities exchange, we expect our securities could be quoted on an over-the-counter market. If this were to occur, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;
- reduced liquidity for our securities;
- a determination that our Class A common stock is a "penny stock" which will require brokers trading in our Class A common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;
- a limited amount of news and analyst coverage; and
- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." Because we expect that our units and eventually our Class A common stock, warrants and rights will be listed on Nasdaq, our units, Class A common stock, warrants and rights will be covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state having used these powers to prohibit or restrict the sale of securities issued by blank check companies, other than the State of Idaho, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states. Further, if we were no longer listed on Nasdaq, our securities would not be covered securities and we would be subject to regulation in each state in which we offer our securities, including in connection with our initial business combination.

**If we seek stockholder approval of our initial business combination and we do not conduct redemptions pursuant to the tender offer rules, and if you or a "group" of stockholders are deemed to hold in excess of 15% of our Class A common stock, you will lose the ability to redeem all such shares in excess of 15% of our Class A common stock.**

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 15% of the shares sold in this offering without our prior consent, which we refer to as the "Excess Shares." However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our initial business combination. Your inability to redeem the Excess Shares will reduce your influence over our ability to complete our initial business combination and you could suffer a material loss on your investment in us if you sell Excess Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Excess Shares if we complete our initial business combination. And as a result, you will continue to hold that number of shares exceeding 15% and, in order to dispose of such shares, would be required to sell your stock in open market transactions, potentially at a loss.

59

**We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants except on a cashless basis. If the issuance of the shares upon exercise of warrants is not registered, qualified or exempt from registration or qualification, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless.**

We are not registering the shares of Class A common stock issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the issuance of the shares of Class A common stock issuable upon exercise of the warrants and thereafter will use our best efforts to cause the same to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to the Class A common stock issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current, complete or correct or the SEC issues a stop order. If the shares of Class A common stock issuable upon exercise of the warrants are not registered under the Securities Act, we will be required to permit holders to exercise their warrants on a cashless basis. However, no warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption from registration is available. Notwithstanding the foregoing, if a registration statement covering the issuance of the Class A common stock issuable upon exercise of the warrants is not effective within a specified period following the consummation of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we shall have failed to maintain an effective registration statement, exercise warrants on a cashless basis pursuant to the exemption provided by

Section 3(a)(9) of the Securities Act, provided that such exemption is available. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis. We will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any warrant, or issue securities or other compensation in exchange for the warrants in the event that we are unable to register or qualify the shares underlying the warrants under applicable state securities laws and there is no exemption available. If the issuance of the shares upon exercise of the warrants is not so registered or qualified or exempt from registration or qualification, the holder of such warrant will not be entitled to exercise such warrant and such warrant may have no value and expire worthless. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Class A common stock included in the units. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering. However, there may be instances in which holders of our public warrants may be unable to exercise such public warrants but holders of our placement warrants may be able to exercise such placement warrants.

**If you exercise your public warrants on a "cashless basis," you will receive fewer shares of Class A common stock from such exercise than if you were to exercise such warrants for cash.**

There are circumstances in which the exercise of the public warrants may be required or permitted to be made on a cashless basis. First, if a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement, exercise warrants on a cashless basis in accordance with Section 3(a)(9) of the Securities Act or another exemption. Second, if a registration statement covering the Class A common stock issuable upon exercise of the warrants is not effective within a specified period following the consummation of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we shall have failed to maintain an effective registration statement, exercise warrants on a cashless basis pursuant to the exemption provided by Section 3(a)(9) of the Securities Act, provided that such exemption is available; if that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis. Third, if we call the public warrants for redemption, our management will have the option to require all holders that wish to exercise warrants to do so on a cashless basis. In the event of an exercise on a cashless basis, a holder would pay the warrant exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (as defined in the next sentence) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of exercise is received by the warrant agent or on which the notice of redemption is sent to the holders of warrants, as applicable. As a result, you would receive fewer shares of Class A common stock from such exercise than if you were to exercise your warrants for cash.

60

**We may issue additional common stock or preferred stock to complete our initial business combination or under an employee incentive plan after completion of our initial business combination. We may also issue shares of Class A common stock upon the conversion of the Class B common stock at a ratio greater than one-to-one at the time of the consummation of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. Any such issuances would dilute the interest of our stockholders and likely present other risks.**

Our amended and restated certificate of incorporation authorizes the issuance of up to 100,000,000 shares of Class A common stock, par value $0.0001 per share, 10,000,000 shares of Class B common stock, par value $0.0001 per share, and 1,000,000 shares of preferred stock, par value $0.0001 per share. Immediately after this offering and the sale of the placement units, there will be 89,643,725 and 7,500,000 (assuming, in each case, that the underwriters have not exercised their over-allotment option) authorized but unissued shares of Class A common stock and Class B common stock, respectively, available for issuance, which amount does not take into account the shares of Class A common stock reserved for issuance upon exercise of outstanding warrants and rights or the shares of Class A common stock issuable upon conversion of Class B common stock. Immediately after the consummation of this offering, there will be no shares of preferred stock issued and outstanding. Shares of Class B common stock are convertible into shares of our Class A common stock initially at a one-for-one ratio but subject to adjustment as set forth herein, including in certain circumstances in which we issue Class A common stock or equity-linked securities related to our initial business combination.

We may issue a substantial number of additional shares of common or preferred stock to complete our initial business combination or under an employee incentive plan after completion of our initial business combination (although our amended and restated certificate of incorporation provides that we may not issue securities that can vote with common stockholders on matters related to our pre-initial business combination activity). We may also issue shares of Class A common stock upon conversion of the Class B common stock at a ratio greater than one-to-one at the time of the consummation of our initial business combination as a result of the anti-dilution provisions contained in our amended and restated certificate of incorporation. However, our amended and restated certificate of incorporation will provide, among other things, that prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination. These provisions of our amended and restated certificate of incorporation, like all provisions of our amended and restated certificate of incorporation, may be amended with the approval of our stockholders. However, our executive officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, unless we provide our public stockholders with the opportunity to redeem their shares of common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest (which interest shall be net of taxes payable), divided by the number of then outstanding public shares.

61

The issuance of additional shares of common or preferred stock:

- may significantly dilute the equity interest of investors in this offering, which dilution would increase if the anti-dilution provisions in the Class B common stock resulted in the issuance of Class A common stock on a greater than one-to-one basis upon conversion of the Class B common stock;

- may subordinate the rights of holders of our common stock if preferred stock is issued with rights senior to those afforded our common

stock;

- could cause a change of control if a substantial number of shares of our common stock are issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;
- may have the effect of delaying or preventing a change of control of us by diluting the stock ownership or voting rights of a person seeking to obtain control of us; and
- may adversely affect prevailing market prices for our units, Class A common stock, rights and/or warrants.

**Our initial stockholders (including the holders of the representative shares) paid a nominal price for the founders' shares and representative shares and, accordingly, you will experience immediate and substantial dilution from the purchase of our shares of common stock.**

The difference between the public offering price per share (allocating all of the unit purchase price to the Class A common stock and none to the warrants and rights included in the unit) and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to you and the other investors in this offering. Our sponsor and the holders of the representative shares acquired the founder shares and the representative shares at a nominal price, significantly contributing to this dilution. Upon the closing of this offering, and assuming no value is ascribed to the warrants and rights included in the units, you and the other public stockholders will incur an immediate and substantial dilution of approximately 89.6% (or $8.15 per share, assuming no exercise of the underwriters' over-allotment option), the difference between the pro forma net tangible book value per share of $0.95 and the initial offering price of $9.09 per unit. In addition, because of the anti-dilution rights of the founder shares, any equity or equity-linked securities issued or deemed issued in connection with our initial business combination would be disproportionately dilutive to our Class A common stock.

**Unlike many other similarly structured special purpose acquisition companies, our initial stockholders will receive additional shares of Class A common stock if we issue shares to consummate an initial business combination.**

The founder shares will automatically convert into Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities convertible or exercisable for Class A common stock, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which founder shares shall convert into Class A common stock will be adjusted so that the number of Class A common stock issuable upon conversion of all founder shares will equal, in the aggregate, on an as-converted basis, 20% of the total number of all outstanding shares of common stock upon completion of the initial business combination, excluding the representative shares, the placement units and underlying securities, and any shares or equity-linked securities issued, or to be issued, to any seller in the business combination and any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of loans made to us. This is different from most other similarly structured blank check companies in which the initial stockholder will only be issued an aggregate of 20% of the total number of shares to be outstanding prior to the initial business combination. Additionally, the aforementioned adjustment will not take into account any shares of Class A common stock redeemed in connection with the business combination. Accordingly, the holders of the founder shares could receive additional shares of Class A common stock even if the additional shares of Class A common stock, or equity-linked securities convertible or exercisable for Class A common stock, are issued or deemed issued solely to replace those shares that were redeemed in connection with the business combination. The foregoing may make it more difficult and expensive for us to consummate an initial business combination.

**We may amend the terms of the rights in a way that may be adverse to holders with the approval by the holders of a majority of the then outstanding rights.**

Our rights will be issued in registered form under a rights agreement between Continental Stock Transfer & Trust Company, as rights agent, and us. The rights agreement provides that the terms of the rights may be amended without the consent of any holder to cure any ambiguity or correct any defective provision. The rights agreement requires the approval by the holders of a majority of the then outstanding rights in order to make any change that adversely affects the interests of the registered holders.

**We may amend the terms of the warrants in a manner that may be adverse to holders of public warrants with the approval by the holders of at least a majority of the then outstanding public warrants. As a result, the exercise price of your warrants could be increased, the exercise period could be shortened and the number of shares of our Class A common stock purchasable upon exercise of a warrant could be decreased, all without your approval.**

Our warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any mistake, including to conform the provisions of the warrant agreement to the description of the terms of the warrants and the warrant agreement set forth in this prospectus, or defective provision, but requires the approval by the holders of at least a majority of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants (which may include public warrants acquired by our sponsor or its affiliates in this offering or thereafter in the open market). Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least a majority of the then outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least a majority of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, convert the warrants into cash or stock, shorten the exercise period or decrease the number of shares of our Class A common stock purchasable upon exercise of a warrant.

**Our warrant agreement will designate the courts of the State of New York or the United States District Court for the Southern District of New York as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by holders of our warrants, which could limit the ability of warrant holders to obtain a favorable judicial forum for disputes with our company.**

Our warrant agreement will provide, subject to applicable law, (i) any action, proceeding or claim against us arising out of or relating in any way to the warrant agreement, including under the Securities Act, will be brought and enforced in the courts of the State of New York or the United States District Court for the Southern District of New York, and (ii) that we irrevocably submit to such jurisdiction, which jurisdiction shall be the exclusive forum for any such action, proceeding or claim. We will waive any objection to such exclusive jurisdiction and that such courts represent an inconvenient forum.

Notwithstanding the foregoing, these provisions of the warrant agreement will not apply to suits brought to enforce any liability or duty created by the Exchange Act or any other claim for which the federal district courts of the United States of America are the sole and exclusive forum. Any person or entity purchasing or otherwise acquiring any interest in any of our warrants shall be deemed to have notice of and to have consented to the forum provisions in our warrant agreement. If any action, the subject matter of which is within the scope the forum provisions of the warrant agreement, is filed in a court other than a court of the State of New York or the United States District Court for the Southern District of New York (a "foreign action") in the name of any holder of our warrants, such holder shall be deemed to have consented to: (x) the personal jurisdiction of the state and federal courts located in the State of New York in connection with any action brought in any such court to enforce the forum provisions

(an "enforcement action"), and (y) having service of process made upon such warrant holder in any such enforcement action by service upon such warrant holder's counsel in the foreign action as agent for such warrant holder.

63

This choice-of-forum provision may limit a warrant holder's ability to bring a claim in a judicial forum that it finds favorable for disputes with our company, which may discourage such lawsuits. Alternatively, if a court were to find this provision of our warrant agreement inapplicable or unenforceable with respect to one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could materially and adversely affect our business, financial condition and results of operations and result in a diversion of the time and resources of our management and board of directors.

**We may redeem your unexpired warrants prior to their exercise at a time that is disadvantageous to you, thereby making your warrants worthless.**

We have the ability to redeem outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that the reported last sale price of our Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period commencing once the warrants become exercisable and ending on the third trading day prior to the date on which we give proper notice of such redemption and provided certain other conditions are met. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering. Redemption of the outstanding warrants could force you (i) to exercise your warrants and pay the exercise price therefor at a time when it may be disadvantageous for you to do so, (ii) to sell your warrants at the then-current market price when you might otherwise wish to hold your warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of your warrants. None of the placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

**Our warrants, rights and founder shares may have an adverse effect on the market price of our Class A common stock and make it more difficult to effectuate our initial business combination.**

We will be issuing warrants to purchase 5,000,000 shares of our Class A common stock (or up to 5,750,000 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) and rights convertible into 1,000,000 shares of our Class A common stock (or up to 1,150,000 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) as part of the units offered by this prospectus and, simultaneously with the closing of this offering, we will be issuing placement units, in a private placement, consisting of an aggregate of 153,137 placement warrants (or 166,262 if the underwriters' over-allotment option is exercised in full) and 306,275 placement rights convertible into an aggregate of 30,627 shares of Class A common stock (or 332,525 placement rights convertible into an aggregate of 33,252 shares of Class A common stock if the underwriters' over-allotment option is exercised in full). Our initial stockholders currently own an aggregate of 2,875,000 founder shares. The founder shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment as set forth herein. In addition, if our sponsor makes any working capital loans, up to $1,500,000 of such loans may be converted into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. To the extent we issue shares of Class A common stock to effectuate an initial business combination, the potential for the issuance of a substantial number of additional shares of Class A common stock upon exercise of these warrants, conversion of these rights and loan conversion rights could make us a less attractive business combination vehicle to a target business. Any such issuance will increase the number of issued and outstanding shares of our Class A common stock and reduce the value of the shares of Class A common stock issued to complete the initial business combination. Therefore, our warrants, rights and founder shares may make it more difficult to effectuate an initial business combination or increase the cost of acquiring the target business.

64

The placement warrants included in the placement units are identical to the warrants sold as part of the units in this offering except that, so long as they are held by our sponsor or its permitted transferees, (i) they will not be redeemable by us, (ii) they (including the Class A common stock issuable upon exercise of these warrants) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holders until 30 days after the completion of our initial business combination, (iii) they may be exercised by the holders on a cashless basis, and (iv) will be entitled to registration rights.

**Because each unit contains one-half of one redeemable warrant and only a whole warrant may be exercised, the units may be worth less than units of other special purpose acquisition companies.**

Each unit contains one-half of one redeemable warrant. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. This is different from other offerings similar to ours whose units include one share of common stock and one warrant to purchase one whole share. We have established the components of the units in this way in order to reduce the dilutive effect of the warrants upon completion of an initial business combination since the warrants will be exercisable in the aggregate for one-half of the number of shares compared to units that each contain a warrant to purchase one whole share, thus making us, we believe, a more attractive partner for target businesses. Nevertheless, this unit structure may cause our units to be worth less than if they included a warrant to purchase one whole share.

**A provision of our warrant agreement may make it more difficult for us to consummate an initial business combination.**

Unlike most blank check companies, if

(i)   we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at a Newly Issued Price of less than $9.20 per share;

(ii)  the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and

(iii) the Market Value is below $9.20 per share,

then the exercise price of the warrants will be adjusted to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. This may make it more difficult for us to consummate an initial business combination with a target business.

**The determination of the offering price of our units, the size of this offering and the terms of the units is more arbitrary than the pricing of securities and size of an offering of an operating company in a particular industry. You may have less assurance, therefore, that the offering price of our units properly reflects the value of such units than you would have in a typical offering of an operating company.**

Prior to this offering there was no public market for any of our securities. The public offering price of the units and the terms of the warrants were negotiated between us and the underwriters. In determining the size of this offering, management held customary organizational meetings with the representative of the underwriters, both prior to our inception and thereafter, with respect to the state of capital markets, generally, and the amount the underwriters believed they reasonably could raise on our behalf. Factors considered in determining the size of this offering, prices and terms of the units, including the Class A common stock, warrants and rights underlying the units, include:

- the history and prospects of companies whose principal business is the acquisition of other companies;
- prior offerings of those companies;

- our prospects for acquiring an operating business;
- a review of debt to equity ratios in leveraged transactions;
- our capital structure;
- an assessment of our management and their experience in identifying operating companies;
- general conditions of the securities markets at the time of this offering; and
- other factors as were deemed relevant.

Although these factors were considered, the determination of our offering price, size and terms of the units is more arbitrary than the pricing of securities of an operating company in a particular industry since we have no historical operations or financial results.

**There is currently no market for our securities and a market for our securities may not develop, which would adversely affect the liquidity and price of our securities.**

There is currently no market for our securities. Stockholders therefore have no access to information about prior market history on which to base their investment decision. Following this offering, the price of our securities may vary significantly due to one or more potential business combinations and general market or economic conditions. Furthermore, an active trading market for our securities may never develop or, if developed, it may not be sustained. You may be unable to sell your securities unless a market can be established and sustained.

**Provisions in our amended and restated certificate of incorporation and Delaware law may inhibit a takeover of us, which could limit the price investors might be willing to pay in the future for our Class A common stock and could entrench management.**

Our amended and restated certificate of incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. These provisions include a staggered board of directors and the ability of the board of directors to designate the terms of and issue new series of preferred shares, which may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make the removal of management more difficult and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities.

**Our amended and restated certificate of incorporation will require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, other employees or stockholders for breach of fiduciary duty and certain other actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will, subject to certain exceptions, be deemed to have consented to service of process on such stockholder's counsel, which may have the effect of discouraging lawsuits against our directors, officers, other employees or stockholders.**

Our amended and restated certificate of incorporation will require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against our directors, officers, other employees or stockholders for breach of fiduciary duty and certain other actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery or (C) for which the Court of Chancery does not have subject matter jurisdiction. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and consented to the forum provisions in our amended and restated certificate of incorporation. This choice of forum provision may limit or make more costly a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims. Alternatively, if a court were to find the choice of forum provision contained in our amended and restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results and financial condition.

Our amended and restated certificate of incorporation will provide that the exclusive forum provision will be applicable to the fullest extent permitted by applicable law, subject to certain exceptions. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. In addition, our amended and restated certificate of incorporation will provide that, unless we consent in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, or the rules and regulations promulgated thereunder. We note, however, that there is uncertainty as to whether a court would enforce this provision and that investors cannot waive compliance with the federal securities laws and the rules and regulations thereunder. Section 22 of the Securities Act creates concurrent jurisdiction for state and federal courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

### General Risk Factors

**We are a newly formed company with no operating history and no revenues, and you have no basis on which to evaluate our ability to achieve our business objective.**

We are a newly formed company with no operating results, and we will not commence operations until obtaining funding through this offering. Because we lack an operating history, you have no basis upon which to evaluate our ability to achieve our business objective of completing our initial business combination with one or more target businesses. We have no plans, arrangements or understandings with any prospective target business concerning an initial business combination and may be unable to complete our initial business combination. If we fail to complete our initial business combination, we will never generate any operating revenues.

**Our independent registered public accounting firm's report contains an explanatory paragraph that expresses substantial doubt about our ability to continue as a "going concern."**

On March 31, 2021, we had cash of $25,000 and working capital deficit of $37,985. Further, we have incurred and expect to continue to incur significant costs in pursuit of our financing and acquisition plans. Management's plans to address this need for capital through this offering are discussed in the section of this prospectus titled "Management's Discussion and Analysis of Financial Condition and Results of Operations." We cannot assure you that our plans to raise capital or to consummate an initial business combination will be successful. These factors, among others, raise substantial doubt about our ability to continue as a going concern. The financial statements contained elsewhere in this prospectus do not include any adjustments that might result from our inability to consummate this offering or our inability to continue as a going concern.

**Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect our business, including our ability to negotiate and complete our initial business combination and results of operations.**

We are subject to laws and regulations enacted by national, regional and local governments. In particular, we are required to comply with certain SEC and other legal requirements. Compliance with, and monitoring of, applicable laws and regulations may be difficult, time consuming and costly.

Those laws and regulations and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws or regulations, as interpreted and applied, could have a material adverse effect on our business, including our ability to negotiate and complete our initial business combination and results of operations.

**Changes in the market for directors and officers liability insurance could make it more difficult and more expensive for us to negotiate and complete an initial business combination.**

In recent months, the market for directors and officers liability insurance for special purpose acquisition companies has changed. Fewer insurance companies are offering quotes for directors and officers liability coverage, the premiums charged for such policies have generally increased and the terms of such policies have generally become less favorable. There can be no assurance that these trends will not continue.

The increased cost and decreased availability of directors and officers liability insurance could make it more difficult and more expensive for us to negotiate an initial business combination. In order to obtain directors and officers liability insurance or modify its coverage as a result of becoming a public company, the post-business combination entity might need to incur greater expense, accept less favorable terms or both. However, any failure to obtain adequate directors and officers liability insurance could have an adverse impact on the post-business combination's ability to attract and retain qualified officers and directors.

In addition, even after we were to complete an initial business combination, our directors and officers could still be subject to potential liability from claims arising from conduct alleged to have occurred prior to the initial business combination. As a result, in order to protect our directors and officers, the post-business combination entity may need to purchase additional insurance with respect to any such claims ("run-off insurance"). The need for run-off insurance would be an added expense for the post-business combination entity, and could interfere with or frustrate our ability to consummate an initial business combination on terms favorable to our investors.

**Past performance by our management team may not be indicative of future performance of an investment in us.**

Past performance by our management team is not a guarantee that (i) that we will be able to locate a suitable candidate for our initial business combination or (ii) of success with respect to any business combination we may consummate. You should not rely on the historical record of our management team's performance as indicative of our future performance of an investment in the company or the returns the company will, or is likely to, generate going forward. Other than Messrs. Orlando, Shaner and Swider, none of our officers and directors has experience with blank check companies or special purpose acquisition companies. Additionally, in the course of their respective careers, members of our management team have been involved in businesses and deals that were unsuccessful.

**Cyber incidents or attacks directed at us could result in information theft, data corruption, operational disruption and/or financial loss.**

We depend on digital technologies, including information systems, infrastructure and cloud applications and services, including those of third parties with which we may deal. Sophisticated and deliberate attacks on, or security breaches in, our systems or infrastructure, or the systems or infrastructure of third parties or the cloud, could lead to corruption or misappropriation of our assets, proprietary information and sensitive or confidential data. As an early stage company without significant investments in data security protection, we may not be sufficiently protected against such occurrences. We may not have sufficient resources to adequately protect against, or to investigate and remediate any vulnerability to, cyber incidents. It is possible that any of these occurrences, or a combination of them, could have adverse consequences on our ability to consummate a business combination and lead to financial loss.

**We are an emerging growth company and a smaller reporting company within the meaning of the rules adopted by the Securities and Exchange Commission, and if we take advantage of certain exemptions from disclosure requirements available to emerging growth companies and smaller reporting companies, this could make our securities less attractive to investors and may make it more difficult to compare our performance with other public companies.**

We are an "emerging growth company" within the meaning of the rules adopted by the Securities and Exchange Commission, as modified by the JOBS Act, and we may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor internal controls attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. As a result, our stockholders may not have access to certain information they may deem important. We could be an emerging growth company for up to five years, although circumstances could cause us to lose that status earlier, including if the market value of our Class A common stock held by non-affiliates exceeds $700 million as of any June 30 before that time, in which case we would no longer be an emerging growth company as of the following December 31. We cannot predict whether investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result of our reliance on these exemptions, the trading prices of our securities may be lower than they otherwise would be, there may be a less active trading market for our securities and the trading prices of our securities may be more volatile.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. We have elected not to opt out of such extended transition period,

which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates equals or exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th. To the extent we take advantage of such reduced disclosure obligations, it may also make comparison of our financial statements with other public companies difficult or impossible.

***Our warrants are accounted for as liabilities and the changes in value of our warrants could have a material effect on our financial results.***

On April 12, 2021, the Acting Director of the Division of Corporation Finance and Acting Chief Accountant of the SEC together issued a statement regarding the accounting and reporting considerations for warrants issued by special purpose acquisition companies entitled "Staff Statement on Accounting and Reporting Considerations for Warrants Issued by Special Purpose Acquisition Companies, or the SEC Statement. Specifically, the SEC Statement focused on certain settlement terms and provisions related to certain tender offers following a business combination, which terms are similar to those contained in the warrant agreement governing our warrants.

As a result, included on our balance sheet as of March 31, 2021 contained elsewhere in this prospectus are derivative liabilities related to embedded features contained within our warrants. Accounting Standards Codification 815, Derivatives and Hedging ("ASC 815") provides for the remeasurement of the fair value of such derivatives at each balance sheet date, with a resulting non-cash gain or loss related to the change in the fair value being recognized in earnings in the statements of operations. As a result of the recurring fair value measurement, our financial statements and results of operations may fluctuate quarterly based on factors which are outside of our control. Due to the recurring fair value measurement, we expect that we will recognize non-cash gains or losses on our warrants each reporting period and that the amount of such gains or losses could be material.

69

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements in this prospectus may constitute "forward-looking statements" for purposes of the federal securities laws. Our forward-looking statements include, but are not limited to, statements regarding our or our management team's expectations, hopes, beliefs, intentions or strategies regarding the future. In addition, any statements that refer to projections, forecasts or other characterizations of future events or circumstances, including any underlying assumptions, are forward-looking statements. The words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. Forward-looking statements in this prospectus may include, for example, statements about:

- our ability to select an appropriate target business or businesses in our target industry or otherwise;
- our ability to complete our initial business combination in our target industry or otherwise;
- our expectations around the performance of the prospective target business or businesses in the technology industry;
- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following our initial business combination;
- our officers and directors allocating their time to other businesses and potentially having conflicts of interest with our business or in approving our initial business combination, as a result of which they would then receive expense reimbursements;
- our potential ability to obtain additional financing to complete our initial business combination;
- our pool of prospective target businesses in the technology industry;
- our ability to consummate an initial business combination due to the uncertainty resulting from the recent COVID-19 pandemic;
- the ability of our officers and directors to generate a number of potential business combination opportunities;
- our public securities' potential liquidity and trading;
- the lack of a market for our securities;
- the use of proceeds not held in the trust account or available to us from interest income on the trust account balance;
- the trust account not being subject to claims of third parties; or
- our financial performance following this offering.

The forward-looking statements contained in this prospectus are based on our current expectations and beliefs concerning future developments and their potential effects on us. There can be no assurance that future developments affecting us will be those that we have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond our control) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section of this prospectus entitled "Risk Factors." Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. We undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

70

## USE OF PROCEEDS

We are offering 10,000,000 units at an offering price of $10.00 per unit. We estimate that the net proceeds of this offering together with the funds we will receive from the sale of the placement units will be used as set forth in the following table.

| | Without Over-Allotment Option | | Over-Allotment Option Fully Exercised | |
|---|---|---|---|---|
| ***Gross proceeds*** | | | | |
| Gross proceeds from units offered to public[1] | $ | 100,000,000 | $ | 115,000,000 |
| Gross proceeds from placement units offered in the private placement to the sponsor | | 3,062,750 | | 3,325,250 |
| Total gross proceeds | $ | 103,062,750 | $ | 118,325,250 |

*Estimated Offering expenses*[2]

| | | | | |
|---|---|---|---|---|
| Underwriting commissions (1.25% of gross proceeds from units offered to public, excluding deferred portion) [3] | $ | 1,250,000 | $ | 1,437,500 |
| Legal fees and expenses | | 225,000 | | 225,000 |
| Accounting fees and expenses | | 40,000 | | 40,000 |
| SEC/FINRA Expenses | | 32,750 | | 32,750 |
| Reimbursement to underwriters for expenses | | 100,000 | | 100,000 |
| Nasdaq listing and filing fees | | 75,000 | | 75,000 |
| Director and Officer liability insurance premiums | | 150,000 | | 150,000 |
| Printing and engraving expenses | | 30,000 | | 30,000 |
| Miscellaneous, including listing and filing fees | | 10,000 | | 10,000 |
| Total offering expenses (excluding underwriting commissions) | $ | 662,750 | $ | 662,750 |
| Proceeds after estimated offering expenses | $ | 101,150,000 | $ | 116,225,000 |
| Held in trust account[3] | $ | 100,500,000 | $ | 115,575,000 |
| % of public offering size | | *100.5%* | | *100.5%* |
| Not held in trust account | $ | 650,000 | $ | 650,000 |

The following table shows the use of the approximately $650,000 of net proceeds not held in the trust account.[4]

| | | Amount | % of Total |
|---|---|---|---|
| Legal, accounting, due diligence, travel, and other expenses in connection with any business combination[5] | $ | 360,000 | 55.4% |
| Legal and accounting fees related to regulatory reporting obligations | | 100,000 | 15.4% |
| Payment for office space, utilities and secretarial and administrative support ($10,000 per month for up to 18 months) | | 180,000 | 27.7% |
| Working capital to cover miscellaneous expenses | | 10,000 | 1.5% |
| Total | $ | 650,000 | 100.0% |

(1)   Includes amounts payable to public stockholders who properly redeem their shares in connection with our successful completion of our initial business combination.

(2)   A portion of the offering expenses will be paid from the proceeds of loans from our sponsor of up to $300,000 as described in this prospectus. As of March 31, 2021, we had borrowed $62,985 under the promissory note with our sponsor. These amounts will be repaid upon completion of this offering out of the $650,000 of offering proceeds that has been allocated for the payment of offering expenses (other than underwriting commissions). In the event that offering expenses are more than as set forth in this table, they will be repaid using a portion of the $650,000 of offering proceeds not held in the trust account and set aside for post-closing working capital expenses. In the event that offering expenses are less than set forth in this table, any such amounts will be used for post-closing working capital expenses.

(3)   The underwriters have agreed to defer underwriting commissions equal to 3.5% of the gross proceeds of this offering. Upon completion of our initial business combination, $3,500,000, which constitutes the underwriters' deferred commissions (or $4,025,000 if the underwriters' over-allotment option is exercised in full) will be paid to the underwriters from the funds held in the trust account, and the remaining funds, less amounts released to the trustee to pay redeeming stockholders, will be released to us and can be used to pay all or a portion of the purchase price of the business or businesses with which our initial business combination occurs or for general corporate purposes, including payment of principal or interest on indebtedness incurred in connection with our initial business combination, to fund the purchases of other companies or for working capital. The underwriters will not be entitled to any interest accrued on the deferred underwriting discounts and commissions.

71

(4)   These expenses are estimates only. Our actual expenditures for some or all of these items may differ from the estimates set forth herein. For example, we may incur greater legal and accounting expenses than our current estimates in connection with negotiating and structuring our initial business combination based upon the level of complexity of such business combination. In the event we identify an initial business combination target in a specific industry subject to specific regulations, we may incur additional expenses associated with legal due diligence and the engagement of special legal counsel. In addition, our staffing needs may vary and as a result, we may engage a number of consultants to assist with legal and financial due diligence. We do not anticipate any change in our intended use of proceeds, other than fluctuations among the current categories of allocated expenses, which fluctuations, to the extent they exceed current estimates for any specific category of expenses, would not be available for our expenses.

(5)   Includes estimated amounts that may also be used in connection with our initial business combination to fund a "no shop" provision and commitment fees for financing.

Of the net proceeds of this offering and the sale of the placement units, $100,500,000 (or $115,575,000 if the underwriters' over-allotment option is exercised in full), including $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions, will be placed in a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee, and will be invested only in U.S. government treasury bills with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We estimate that the pre-tax interest earned on the trust account will be approximately $200,000 per year, assuming an interest rate of 0.2% per year; however, we can provide no assurance regarding this amount. Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 18 months from the closing of this offering, subject to applicable law.

The net proceeds held in the trust account may be used as consideration to pay the sellers of a target business with which we ultimately complete our initial business combination. If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination, we may apply the balance of the cash released from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction

company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital. There is no limitation on our ability to raise funds privately or through loans in connection with our initial business combination.

We believe that amounts not held in trust will be sufficient to pay the costs and expenses to which such proceeds are allocated. This belief is based on the fact that while we may begin preliminary due diligence of a target business in connection with an indication of interest, we intend to undertake in-depth due diligence, depending on the circumstances of the relevant prospective business combination, only after we have negotiated and signed a letter of intent or other preliminary agreement that addresses the terms of an initial business combination. However, if our estimate of the costs of undertaking in-depth due diligence and negotiating an initial business combination is less than the actual amount necessary to do so, we may be required to raise additional capital, the amount, availability and cost of which is currently unascertainable. If we are required to seek additional capital, we could seek such additional capital through loans or additional investments from our sponsor, members of our management team or their affiliates, but such persons are not under any obligation to advance funds to, or invest in, us.

72

Commencing on the date of this prospectus, we have agreed to pay Benessere Enterprises Inc., an affiliate of our sponsor, a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Prior to the closing of this offering, our sponsor agreed to loan us up to $300,000 to be used for a portion of the expenses of this offering. As of March 31, 2021, we had borrowed $62,985 (of up to $300,000 available to us) under the promissory note with our sponsor. These loans are non-interest bearing, unsecured and are due at the earlier of July 31, 2021 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the offering proceeds not held in the trust account.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds on a non-interest bearing basis as may be required. If we complete our initial business combination, we would repay such loaned amounts out of the proceeds of the trust account released to us. Otherwise, such loans would be repaid only out of funds held outside the trust account. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used to repay such loaned amounts. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. Other than as described above, the terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares our initial stockholders, directors, officers or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements. None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination. See "Proposed Business — Permitted purchases of our securities" for a description of how our sponsor, initial stockholders, directors, officers or any of their affiliates will select which stockholders to purchase securities from in any private transaction.

The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

73

In no event will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) and the agreement for our initial business combination may require as a closing condition that we have a minimum net worth or a certain amount of cash. If too many public stockholders exercise their redemption rights so that we cannot satisfy the net tangible asset requirement or any net worth or cash requirements, we would not proceed with the redemption of our public shares or the initial business combination, and instead may search for an alternate business combination.

A public stockholder will be entitled to receive funds from the trust account only upon the earliest to occur of: (i) our completion of an initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, and (iii) the redemption of our public shares if we are unable to complete our initial business combination within 18 months following the closing of this offering, subject to applicable law and as further described herein and any limitations (including but not limited to cash requirements) created by the terms of the proposed initial business combination. In no other circumstances will a public stockholder have any right or interest of any kind to or in the trust account.

Our sponsor, officers, directors and director nominees will enter into a letter agreement with us, pursuant to which they will agree to waive their redemption rights with respect to any founder shares and placement shares and any public shares held by them in connection with the completion of our initial business combination. In addition, our initial stockholders have agreed to waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within the prescribed time frame. However, if our sponsor or any of our officers, directors or affiliates acquires public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the prescribed time frame.

74

## DIVIDEND POLICY

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of our initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of our initial business combination. If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock (excluding the representative shares and the placement units and underlying securities and assuming the initial stockholders do not purchase units in this offering) upon the consummation of this offering. Further, if we incur any indebtedness in connection with our initial business combination, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

## DILUTION

The difference between the public offering price per share of Class A common stock, assuming no value is attributed to the warrants and rights included in the units we are offering pursuant to this prospectus or the placement units, and the pro forma net tangible book value per share of our Class A common stock after this offering constitutes the dilution to investors in this offering. Such calculation does not reflect any dilution associated with the sale and exercise of warrants and rights, including the placement warrants and placement rights, which would cause the actual dilution to the public stockholders to be higher, particularly where a cashless exercise is utilized. Net tangible book value per share is determined by dividing our net tangible book value, which is our total tangible assets less total liabilities (including the value of Class A common stock which may be redeemed for cash), by the number of outstanding shares of our Class A common stock.

At March 31, 2021, our net tangible book deficit was $37,985, or approximately $(0.01) per share of common stock. For purposes of the dilution calculation, in order to present the maximum estimated dilution as a result of this offering, we have assumed (i) the issuance of 0.10 of a shares for each right outstanding, as such issuance will occur upon a business combination without the payment of additional consideration and (ii) the number of shares included in the units offered hereby will be deemed to be 11,000,000 (consisting of 10,000,000 shares of Class A common stock and 1,000,000 shares of Class A common stock underlying the outstanding rights), and the price per share in this offering will be deemed to be $9.09. After giving effect to the sale of 10,000,000 shares of Class A common stock included in the units we are offering by this prospectus (or 11,500,000 shares of Class A common stock if the underwriters' over-allotment option is exercised in full), the sale of the placement units and the deduction of underwriting commissions and estimated expenses of this offering, our pro forma net tangible book value at March 31, 2021 would have been $5,000,001, or approximately $0.94 per share (or $0.83 per share if the underwriters' over-allotment option is exercised in full), representing an immediate increase in net tangible book value (as decreased by the value of the approximately 8,536,290 shares of Class A common stock that may be redeemed for cash, or 9,882,635 shares of Class A common stock if the underwriters' over-allotment option is exercised in full) of 0.95 per share (or $0.84 per share if the underwriters' over-allotment option is exercised in full) to our initial stockholders as of the date of this prospectus and an immediate dilution of $8.15 per share or 89.6% to our public stockholders (or $8.26 per share or 90.8% if the underwriters' over-allotment option is exercised in full) not exercising their conversion rights.

The following table illustrates the dilution to the public stockholders on a per-share basis, assuming no value is attributed to the warrants included in the units or the placement warrants:

|  | No exercise of over-allotment option | | Exercise of over-allotment option in full | |
|---|---|---|---|---|
| Public offering price | | $ 9.09 | | $ 9.09 |
| Net tangible book value before this offering | $ (0.01) | | $ (0.01) | |
| Increase attributable to public stockholders and sale of the placement units | 0.95 | | 0.84 | |
| Pro forma net tangible book value after this offering | | 0.94 | | 0.83 |
| Dilution to public stockholders | | $ 8.15 | | $ 8.26 |
| Percentage of dilution to public stockholders | | 89.6% | | 90.8% |

75

For purposes of presentation, our pro forma net tangible book value after this offering is $85,789,716 (or $99,320,484 if the underwriters exercise their over-allotment option in full) less than it otherwise would have been because if we effect our initial business combination, the conversion rights of the public stockholders (but not our insiders) may result in the conversion or tender of up to 8,536,290 (or 9,882,635 if the underwriters exercise their over-allotment option in full) shares sold in this offering.

The following table sets forth information with respect to our initial stockholders, holders of the placement shares and the public stockholders:

|  | Shares Purchased | | Total Consideration | | Average Price Per Share |
|---|---|---|---|---|---|
|  | Number | Percentage | Amount | Percentage | |
| Initial Stockholders[1] | 2,500,000 | 18.07% | $ 25,000 | 0.03% | $ 0.009 |
| Holders of placement shares[2] | 336,902 | 2.43% | 3,062,750 | 2.97% | 9.09 |
| Public Stockholders[3] | 11,000,000 | 79.50% | 100,000,000 | 97.00% | 9.09 |
|  | 13,836,903 | 100.0% | $ 103,087,750 | 100.00% | |

(1) Assumes no exercise of the underwriters' over-allotment option and the corresponding forfeiture of an aggregate of 375,000 shares of Class B common stock held by our sponsor.

(2) Assumes the issuance of an additional 30,627 shares underlying the placement rights issued to our sponsor upon the closing of this offering.

(3)   Assumes the issuance of an additional 1,000,000 shares underlying the rights issued to public shareholders upon the closing of this offering. The pro forma net tangible book value per share after the offering is calculated as follows:

| | Without Over-allotment | With Over-allotment |
|---|---|---|
| **Numerator:** | | |
| Net tangible book deficit before this offering | $ (37,985) | (37,985) |
| Net proceeds from this offering and sale of the placement units, net of expenses[(1)] | 101,150,000 | 116,225,000 |
| Plus: Offering costs paid in advance, excluded from tangible book value | 62,500 | 62,500 |
| Less: Warrant liability | (6,884,798) | (7,904,030) |
| Less: Deferred underwriting commissions | (3,500,000) | (4,025,000) |
| Less: Proceeds held in trust subject to redemption to maintain net tangible assets of $5,000,001[(2)] | (85,789,716) | (99,320,484) |
| | $ 5,000,001 | 5,000,001 |

| | Without Over-allotment | With Over-allotment |
|---|---|---|
| **Denominator:** | | |
| Shares of Class B common stock outstanding prior to this offering | 2,875,000 | 2,875,000 |
| Shares of Class B common stock forfeited if underwriters' over-allotment is not exercised | (375,000) | - |
| Shares of Class A common stock included in the units offered[(3)] | 11,000,000 | 12,650,000 |
| Shares of common stock included in the placement units issued[(4)] | 336,902 | 365,777 |
| Less: Shares subject to redemption | (8,536,290) | (9,882,635) |
| | 5,300,612 | 6,008,142 |

(1)   Expenses applied against gross proceeds include offering expenses of $662,750 and underwriting commissions of $1,250,000 (or $1,437,500 if the underwriters' over-allotment option is exercised in full) (excluding deferred underwriting fees). See "Use of Proceeds."

(2)   If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, executive officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. In the event of any such purchases of our shares prior to the completion of our initial business combination, the number of shares of Class A common stock subject to redemption will be reduced by the amount of any such purchases, increasing the pro forma net tangible book value per share. See "Proposed Business — Effecting Our Initial Business Combination — Permitted Purchases of Our Securities."

(3)   Assumes the issuance of an additional 1,000,000 shares (or 1,150,000 if the underwriters' over-allotment option is exercised in full) underlying the rights issued to public shareholders upon the closing of this offering.

(4)   Assumes the issuance of an additional 30,627 shares (or 33,252 if the underwriters' over-allotment option is exercised in full) underlying the placement rights issued to our sponsor upon the closing of this offering.

# CAPITALIZATION

The following table sets forth our capitalization at March 31, 2021, and as adjusted to give effect to the filing of our amended and restated certificates of incorporation, the sale of our units in this offering and the sale of the placement units and the application of the estimated net proceeds derived from the sale of such securities, assuming no exercise by the underwriters of their over-allotment option.

| | March 31, 2021 | |
|---|---|---|
| | Actual | As Adjusted |
| Notes payable to related party[(1)] | $ 62,985 | - |
| Warrant liability [(2)] | - | 6,884,798 |
| Deferred underwriting commissions | - | 3,500,000 |
| Class A common stock, $0.0001 par value, 100,000,000 shares authorized; -0- and 8,536,290 shares are subject to possible redemption, respectively[(3)] | - | 85,789,716 |
| Preferred stock, $0.0001 par value, 1,000,000 shares authorized; none issued and outstanding, actual and as adjusted | - | - |
| Class A common stock, $0.0001 par value, 100,000,000 shares authorized; -0- and 1,769,985 shares issued and outstanding, actual and as adjusted, respectively | - | 177 |
| Class B common stock, $0.0001 par value, 10,000,000 shares authorized, 2,875,000 and 2,500,000 shares issued and outstanding, actual and as adjusted, respectively[(4)] | 288 | 250 |
| Additional paid-in capital | 24,712 | 5,351,374 |
| Accumulated deficit | (485) | (351,800) |
| Total stockholders' equity (deficit) | $ 24,515 | 5,000,001 |
| Total capitalization | $ 87,500 | 101,174,515 |

(1)   Our sponsor agreed to loan us up to $300,000 to be used for a portion of the expenses of this offering. The "as adjusted" information gives effect to the repayment of any loans made under this note out of the proceeds from this offering and the sale of the placement units. As of March 31, 2021, we had borrowed $62,985 (of up to $300,000 available to us) under the promissory note with our sponsor.

(2)   We will account for the 5,153,137 warrants to be issued in connection with this offering (the 5,000,000 warrants included in the units and the 153,137 placement warrants included in the placement units, assuming the underwriters' over-allotment option is not exercised) in accordance with the guidance contained in ASC 815-40. Such guidance provides that because warrants do not meet the criteria for equity treatment thereunder, each warrant must be recorded as a liability. Accordingly, we will classify each of the warrants as a liability at its fair value which will be estimated using a valuation model prepared by an outside valuation firm. The valuation model uses inputs such as assumed share prices, volatility, discount factors and other assumptions and may not be reflective of the price at which they can be settled.

The estimated fair value will be reclassified from Class A common stock subject to possible redemption to warrant liability.

(3) Upon the completion of our initial business combination, we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, subject to the limitations described herein whereby our net tangible assets will be maintained at a minimum of $5,000,001 after payment of underwriters' fees and commissions and any limitations (including, but not limited to, cash requirements) created by the terms of the proposed initial business combination.

(4) Actual share amount is prior to any forfeiture of founder shares by our sponsor and as adjusted amount assumes no exercise of the underwriters' over-allotment option.

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

**Overview**

We are a newly-organized blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. While our efforts to identify a target business may span many industries and regions worldwide, we intend to focus our search for prospects within middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the sale of the placement units, the proceeds of the sale of our shares in connection with our initial business combination (including pursuant to backstop agreements we may enter into following the consummation of this offering or otherwise), shares issued to the owners of the target, debt issued to bank or other lenders or the owners of the target, or a combination of the foregoing.

The issuance of additional shares in connection with an initial business combination to the owners of the target or other investors:

- may significantly dilute the equity interest of investors in this offering, which dilution would increase if the anti-dilution provisions in the Class B common stock resulted in the issuance of Class A shares on a greater than one-to-one basis upon conversion of the Class B common stock;
- may subordinate the rights of holders of our common stock if preferred stock is issued with rights senior to those afforded our common stock;
- could cause a change in control if a substantial number of shares of our common stock is issued, which may affect, among other things, our ability to use our net operating loss carry forwards, if any, and could result in the resignation or removal of our present officers and directors;
- may have the effect of delaying or preventing a change of control of us by diluting the stock ownership or voting rights of a person seeking to obtain control of us; and
- may adversely affect prevailing market prices for our Class A common stock, warrants and/or rights.

Similarly, if we issue debt securities or otherwise incur significant debt to bank or other lenders or the owners of a target, it could result in:

- default and foreclosure on our assets if our operating revenues after an initial business combination are insufficient to repay our debt obligations;
- acceleration of our obligations to repay the indebtedness even if we make all principal and interest payments when due if we breach certain covenants that require the maintenance of certain financial ratios or reserves without a waiver or renegotiation of that covenant;
- our immediate payment of all principal and accrued interest, if any, if the debt is payable on demand;
- our inability to obtain necessary additional financing if the debt contains covenants restricting our ability to obtain such financing while the debt is outstanding;
- our inability to pay dividends on our common stock;

- using a substantial portion of our cash flow to pay principal and interest on our debt, which will reduce the funds available for dividends on our common stock if declared, our ability to pay expenses, make capital expenditures and acquisitions, and fund other general corporate purposes;
- limitations on our flexibility in planning for and reacting to changes in our business and in the industry in which we operate;
- increased vulnerability to adverse changes in general economic, industry and competitive conditions and adverse changes in government regulation;
- limitations on our ability to borrow additional amounts for expenses, capital expenditures, acquisitions, debt service requirements, and execution of our strategy; and
- other purposes and other disadvantages compared to our competitors who have less debt.

As indicated in the accompanying financial statements, at March 31, 2021, we had $25,000 cash and deferred offering costs of $62,500. Further, we expect to continue to incur significant costs in the pursuit of our initial business combination plans. We cannot assure you that our plans to raise capital or to complete our initial business combination will be successful.

**Results of Operations and Known Trends or Future Events**

We have neither engaged in any operations nor generated any revenues to date. Our only activities since inception have been organizational activities and those necessary to prepare for this offering. Following this offering, we will not generate any operating revenues until after completion of our initial business combination. We will generate non-operating income in the form of interest income on cash and cash equivalents after this offering. There has been no significant change in our financial or trading position and no material adverse change has occurred since the date of our audited financial statements. After this offering, we expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as expenses as we conduct due diligence on prospective business combination candidates. We expect our expenses to increase substantially after the closing of this offering.

**Liquidity and Capital Resources**

As indicated in the accompanying financial statements, at March 31, 2021, we had $25,000 cash and a working capital deficit of $37,985. Further, we have incurred and expect to continue to incur significant costs in pursuit of our financing and acquisition plans. We cannot assure you that our plans to raise capital or to consummate an initial business combination will be successful. These factors, among others, raise substantial doubt about our ability to continue as a going concern.

Our liquidity needs have been satisfied prior to the completion of this offering through a capital contribution from our sponsor of $25,000 for the founder shares and up to $300,000 in loans available from our sponsor under an unsecured promissory note. We estimate that the net proceeds from (i) the sale of the units in this offering, after deducting offering expenses of approximately $662,750, underwriting commissions of $1,250,000 ($1,437,500 if the underwriters' over-allotment option is exercised in full) (excluding deferred underwriting commissions of $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full)), and (ii) the sale of the placement units for a purchase price of $3,062,750 (or $3,325,250 if the underwriters' over-allotment option is exercised in full), will be held in the trust account, which includes $3,500,000 (or $116,225,000 if the underwriters' over-allotment option is exercised in full). Of this amount, $100,500,000 (or $115,575,000 if the underwriters' over-allotment option is exercised in full) will be held in the trust account, which includes $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) of deferred underwriting commissions. The proceeds held in the trust account will be invested only in U.S. government treasury obligations with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. The remaining approximately $650,000 will not be held in the trust account. In the event that our offering expenses exceed our estimate of $662,750, we may fund such excess with funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $662,750, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

We intend to use substantially all of the funds held in the trust account, including any amounts representing interest earned on the trust account (less deferred underwriting commissions), to complete our initial business combination. We may withdraw interest to pay taxes. We estimate our annual franchise tax obligations, based on the number of shares of our common stock authorized and outstanding after the completion of this offering, to be $200,000, which is the maximum amount of annual franchise taxes payable by us as a Delaware corporation per annum, which we may pay from funds from this offering held outside of the trust account or from interest earned on the funds held in our trust account and released to us for this purpose. Our annual income tax obligations will depend on the amount of interest and other income earned on the amounts held in the trust account. We expect the interest earned on the amount in the trust account will be sufficient to pay our income taxes. To the extent that our capital stock or debt is used, in whole or in part, as consideration to complete our initial business combination, the remaining proceeds held in the trust account will be used as working capital to finance the operations of the target business or businesses, make other acquisitions and pursue our growth strategies.

Prior to the completion of our initial business combination, we will have available to us the approximately $650,000 of proceeds held outside the trust account. We will use these funds to identify and evaluate target businesses, perform business due diligence on prospective target businesses, travel to and from the offices, plants or similar locations of prospective target businesses or their representatives or owners, review corporate documents and material agreements of prospective target businesses, and structure, negotiate and complete an initial business combination.

In order to fund working capital deficiencies or finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds on a non-interest bearing basis as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. Other than as described above, the terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

We expect our primary liquidity requirements during that period to include approximately $360,000 for legal, accounting, due diligence, travel and other expenses associated with structuring, negotiating and documenting successful business combinations; $100,000 for legal and accounting fees related to regulatory reporting requirements; $180,000 for office space, utilities and secretarial and administrative support; and approximately $10,000 for working capital that will be used for miscellaneous expenses and reserves.

These amounts are estimates and may differ materially from our actual expenses. In addition, we could use a portion of the funds not being placed in trust to pay commitment fees for financing, fees to consultants to assist us with our search for a target business or as a down payment or to fund a "no-shop" provision (a provision designed to keep target businesses from "shopping" around for transactions with other companies or investors on terms more favorable to such target businesses) with respect to a particular proposed initial business combination, although we do not have any current intention to do so. If we entered into an agreement where we paid for the right to receive exclusivity from a target business, the amount that would be used as a down payment or to fund a "no-shop" provision would be determined based on the terms of the specific business combination and the amount of our available funds at the time. Our forfeiture of such funds (whether as a result of our breach or otherwise) could result in our not having sufficient funds to continue searching for, or conducting due diligence with respect to, prospective target businesses.

We do not believe we will need to raise additional funds following this offering in order to meet the expenditures required for operating our business. However, if our estimates of the costs of identifying a target business, undertaking in-depth due diligence and negotiating an initial business combination are less than the actual amount necessary to do so, we may have insufficient funds available to operate our business prior to our initial business combination. Moreover, we may need to obtain additional financing either to complete our initial business combination or because we become obligated to redeem a significant number of our public shares upon completion of our initial business combination, in which case we may issue additional securities or incur debt in connection with such business combination. In addition, we intend to target businesses larger than we could acquire with the net proceeds of this offering and the sale of the placement units, and may as a result be required to seek additional financing to complete such proposed initial business combination. Subject to compliance with applicable securities laws, we would only complete such financing simultaneously with the completion of our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the trust account. In addition, following our initial business combination, if cash on hand is insufficient, we may need to obtain additional financing in order to meet our obligations.

**Controls and Procedures**

We are not currently required to maintain an effective system of internal controls as defined by Section 404 of the Sarbanes-Oxley Act. We will be required to comply with the internal control requirements of the Sarbanes-Oxley Act for the fiscal year ending December 31, 2022. Only in the event that we are deemed to be a large accelerated filer or an accelerated filer would we be required to comply with the independent registered public

accounting firm attestation requirement. Further, for as long as we remain an emerging growth company as defined in the JOBS Act, we intend to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirement.

Prior to the closing of this offering, we have not completed an assessment, nor has our independent registered public accounting firm tested our systems, of internal controls. We expect to assess the internal controls of our target business or businesses prior to the completion of our initial business combination and, if necessary, to implement and test additional controls as we may determine are necessary in order to state that we maintain an effective system of internal controls. A target business may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding the adequacy of internal controls. Many small and mid-sized target businesses we may consider for our initial business combination may have internal controls that need improvement in areas such as:

- staffing for financial, accounting and external reporting areas, including segregation of duties;
- reconciliation of accounts;
- proper recording of expenses and liabilities in the period to which they relate;
- evidence of internal review and approval of accounting transactions;
- documentation of processes, assumptions and conclusions underlying significant estimates; and
- documentation of accounting policies and procedures.

Because it will take time, management involvement and perhaps outside resources to determine what internal control improvements are necessary for us to meet regulatory requirements and market expectations for our operation of a target business, we may incur significant expense in meeting our public reporting responsibilities, particularly in the areas of designing, enhancing, or remediating internal and disclosure controls. Doing so effectively may also take longer than we expect, thus increasing our exposure to financial fraud or erroneous financing reporting.

Once our management's report on internal controls is complete, we will retain our independent registered public accounting firm to audit and render an opinion on such report when required by Section 404 of the Sarbanes-Oxley Act. The independent registered public accounting firm may identify additional issues concerning a target business's internal controls while performing their audit of internal control over financial reporting.

**Quantitative and Qualitative Disclosures about Market Risk**

The net proceeds of this offering and the sale of the placement units held in the trust account will be invested in U.S. government treasury bills with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. Due to the short-term nature of these investments, we believe there will be no associated material exposure to interest rate risk.

**Related Party Transactions**

On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our independent director and director nominees. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering (excluding the representative shares and the placement units and underlying securities). The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of the issued and outstanding shares of our common stock (excluding the placement units and underlying securities and the representative shares and assuming the initial stockholders do not purchase units in this offering) upon the consummation of this offering. Up to 375,000 founder shares held by our sponsor are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised. The founder shares (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder. Commencing on the date of this prospectus, we have agreed to pay Benessere Enterpises Inc., an affiliate of our sponsor, a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

Our sponsor, officers and directors, or any of their respective affiliates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Prior to the consummation of this offering, our sponsor agreed to loan us up to $300,000 to be used for a portion of the expenses of this offering. These loans are non-interest bearing, unsecured and are due at the earlier of July 31, 2021 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the $650,000 of offering proceeds that has been allocated to the payment of offering expenses (other than underwriting commissions).

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete our initial business combination, we would repay such loaned amounts. In the event that our initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. The terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

Our sponsor has agreed to purchase an aggregate of 306,275 placement units at a price of $10.00 per unit for an aggregate purchase price of $3,062,750. If the underwriters' over-allotment option is exercised in full, the amount of placement units sold will be 332,525 for an aggregate purchase price of $3,325,250. Each placement unit consists of one share of Class A common stock and one-half of one warrant. Each whole warrant is exercisable to purchase one whole share of common stock at $11.50 per share. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so the holder must hold rights in multiples of 10 in

order to receive shares for all of the holder's rights upon closing of a business combination. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, the representative shares, the placement shares, placement warrants or the placement rights, which will expire worthless if we do not consummate a business combination within 18 months from the closing of this offering. The placement units are identical to the units sold in this offering except that (a) the placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees, (b) the placement warrants, so long as they are held by our sponsor or its permitted transferees, (i) will not be redeemable by us, (ii) may be exercised by the holders on a cashless basis, and (iii) will be entitled to registration rights.

Our initial stockholders have agreed to waive their redemption rights with respect to their founder shares and placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the completion of this offering and (iii) if we fail to consummate a business combination within 18 months from the completion of this offering or if we liquidate prior to the expiration of the 18-month period. However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 18-month period. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 18 months from the closing of this offering.

Pursuant to a registration rights agreement we will enter into with our initial stockholders on or prior to the closing of this offering, we may be required to register certain securities for sale under the Securities Act. These holders (including the holders of representative shares), and holders of units issued upon conversion of working capital loans, if any, are entitled under the registration rights agreement to make up to three demands that we register certain of our securities held by them for sale under the Securities Act and to have the securities covered thereby registered for resale pursuant to Rule 415 under the Securities Act. In addition, these holders have the right to include their securities in other registration statements filed by us. We will bear the costs and expenses of filing any such registration statements. See the section of this prospectus entitled "Certain Relationships and Related Party Transactions."

**Off-Balance Sheet Arrangements; Commitments and Contractual Obligations; Quarterly Results**

As of March 31, 2021, we did not have any off-balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K and did not have any commitments or contractual obligations. No unaudited quarterly operating data is included in this prospectus, as we have conducted no operations to date.

**JOBS Act**

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We will qualify as an "emerging growth company" and under the JOBS Act will be allowed to comply with new or revised accounting pronouncements based on the effective date for private (not publicly traded) companies. We are electing to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates.

Additionally, we are in the process of evaluating the benefits of relying on the other reduced reporting requirements provided by the JOBS Act. Subject to certain conditions set forth in the JOBS Act, if, as an "emerging growth company", we choose to rely on such exemptions we may not be required to, among other things, (i) provide an independent registered public accounting firm's attestation report on our system of internal controls over financial reporting pursuant to Section 404, (ii) provide all of the compensation disclosure that may be required of non-emerging growth public companies under the Dodd-Frank Wall Street Reform and Consumer Protection Act, (iii) comply with any requirement that may be adopted by the PCAOB regarding mandatory audit firm rotation or a supplement to the report of independent registered public accounting firm providing additional information about the audit and the financial statements (auditor discussion and analysis), and (iv) disclose certain executive compensation related items such as the correlation between executive compensation and performance and comparisons of the Chief Executive Officers' compensation to median employee compensation. These exemptions will apply for a period of five years following the completion of this offering or until we are no longer an "emerging growth company," whichever is earlier.

**PROPOSED BUSINESS**

**General**

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services.

**Our Management Team**

Our management team is led by Mr. Patrick Orlando, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as Executive, Sponsor and Director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021.

Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served

in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

85

**Our CFO**, *Mr. Luis Orleans-Braganza* is a businessman and currently a member Brazil's National Congress, originally elected in 2018 representing the state of São Paulo. He founded Zap Tech in February of 2012 and developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January 1994 and December 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

***Our directors and director nominees***

*Eric Swider* is a nominee for director of our company as of the date hereof. Mr. Swider has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. SErwider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Justin Shaner* is a nominee for director of our company as of the date hereof. Mr. Shaner founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

86

*Lee Jacobson,* our director. Lee is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997. Mr. Jacobson majored in computer science and software engineering at Control Data Institute and graduated in 1986.

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide a platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

87

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- **Established Deal Sourcing Network.** We believe the strong track record of our management team and financial advisor will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor,

have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

- ***Status as a Publicly Listed Acquisition Company***. We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

**Industry Opportunity**

While we may acquire a business in any industry, our focus will be in the industries referenced in the General section of this document. We believe that our target industries are attractive for a number of reasons:

*SaaS and Technology*

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. We believe this is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

*FinTech and Financial Services*

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join with us, as we believe they have fewer exit options than presently exist for unicorns.

**Acquisition Criteria**

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- ***Target Size:*** consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services.

- ***Businesses with Revenue and Earnings Growth Potential.*** We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.

- ***Businesses with Potential for Strong Free Cash Flow Generation.*** We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.

- ***Strong Management.*** We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.

- ***Benefit from Being a Public Company.*** We intend to acquire one or more businesses that will benefit from being publicly-traded

and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- • **Defensible Market Position.** We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

90

### Initial Business Combination

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors. In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

91

### Sourcing of Potential Initial Business Combination Targets

Certain members of our management team have developed a wide network of professional services contacts and business relationships. The members of our board of directors also have significant executive management and public company experience with technology related companies and bring additional relationships that further broaden our network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination.

Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

**Status as a Public Company**

We believe our structure will make us an attractive business combination partner to target businesses. As a public company, we offer a target business an alternative to the traditional initial public offering through a merger or other business combination with us. Following an initial business combination, we believe the target business would have greater access to capital and additional means of creating management incentives that are better aligned with stockholders' interests than it would as a private company. A target business can further benefit by augmenting its profile among potential new customers and vendors and aid in attracting talented employees. In a business combination transaction with us, the owners of the target business may, for example, exchange their shares of stock in the target business for our shares of Class A common stock (or shares of a new holding company) or for a combination of our shares of Class A common stock and cash, allowing us to tailor the consideration to the specific needs of the sellers.

Although there are various costs and obligations associated with being a public company, we believe target businesses will find this method a more expeditious and cost effective method to becoming a public company than the typical initial public offering. The typical initial public offering process takes a significantly longer period of time than the typical business combination transaction process, and there are significant expenses in the initial public offering process, including underwriting discounts and commissions, marketing and road show efforts that may not be present to the same extent in connection with an initial business combination with us.

Furthermore, once a proposed initial business combination is completed, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriters' ability to complete the offering, as well as general market conditions, which could delay or prevent the offering from occurring or could have negative valuation consequences. Following an initial business combination, we believe the target business would then have greater access to capital and an additional means of providing management incentives consistent with stockholders' interests and the ability to use its shares as currency for acquisitions. Being a public company can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented employees.

While we believe that our structure and our management team's backgrounds will make us an attractive business partner, some potential target businesses may view our status as a blank check company, such as our lack of an operating history and our ability to seek stockholder approval of any proposed initial business combination, negatively.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates equals or exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

**Financial Position**

With funds available for an initial business combination initially in the amount of $97,650,000, after payment of $3,500,000 of deferred underwriting fees (or $112,200,000 after payment of $4,025,000 of deferred underwriting fees if the underwriters' over-allotment option is exercised in full), in each case before fees and expenses associated with our initial business combination (other than deferred underwriting fees), we offer a target business a variety of options such as creating a liquidity event for its owners, providing capital for the potential growth and expansion of its operations or strengthening its balance sheet by reducing its debt or leverage ratio. Because we are able to complete our initial business combination using our cash, debt or equity securities, or a combination of the foregoing, we have the flexibility to use the most efficient combination that will allow us to tailor the consideration to be paid to the target business to fit its needs and desires. However, we have not taken any steps to secure third party financing and there can be no assurance it will be available to us.

**Effecting Our Initial Business Combination**

We are not presently engaged in, and we will not engage in, any operations for an indefinite period of time following this offering. We intend to effectuate our initial business combination using cash from the proceeds of this offering and the sale of the placement units, the proceeds of the sale of our shares in connection with our initial business combination (pursuant to backstop agreements we may enter into following the consummation of this offering or otherwise), shares issued to the owners of the target, debt issued to bank or other lenders or the owners of the target, or a combination of the foregoing. We may seek to complete our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, which would subject us to the numerous risks inherent in such companies and businesses.

If our initial business combination is paid for using equity or debt securities, or not all of the funds released from the trust account are used for payment of the consideration in connection with our initial business combination or used for redemptions of our Class A common stock, we may apply the balance of the cash released to us from the trust account for general corporate purposes, including for maintenance or expansion of operations of the post-transaction company, the payment of principal or interest due on indebtedness incurred in completing our initial business combination, to fund the purchase of other companies or for working capital.

We may seek to raise additional funds through a private offering of debt or equity securities in connection with the completion of our initial business combination, and we may effectuate our initial business combination using the proceeds of such offering rather than using the amounts held in the trust account. In addition, we intend to target businesses larger than we could acquire with the net proceeds of this offering and the sale of the placement units, and may as a result be required to seek additional financing to complete such proposed initial business combination. Subject to compliance with applicable securities laws, we would expect to complete such financing only simultaneously with the completion of our initial business combination. In the case of an initial business combination funded with assets other than the trust account assets, our proxy materials or tender offer documents disclosing the initial business combination would disclose the terms of the financing and, only if required by applicable law or stock exchange requirements, we would seek stockholder approval of such financing. There are no prohibitions on our ability to raise funds privately, or through loans in connection with our initial business combination. At this time, we are not a party to any arrangement or understanding with any third party with respect to raising any additional funds through the sale of securities or otherwise.

We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination. Although our management will assess the risks inherent in a particular target business with which we may combine, we cannot assure you that this assessment will result in our identifying all risks that a target business may encounter. Furthermore, some of those risks may be outside of our control, meaning that we can do nothing to control or reduce the chances that those risks will adversely impact a target business.

**Sources of Target Businesses**

We anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment bankers and investment professionals, as a result of being solicited by us by calls or mailings. These sources may also introduce us to target businesses in which they think we may be interested on an unsolicited basis, since many of these sources will have read this prospectus and know what types of businesses we are targeting. Our officers and directors, as well as our sponsor and their affiliates, may also bring to our attention target business candidates that they become aware of through their business contacts as a result of formal or informal inquiries or discussions they may have, as well as attending trade shows or conventions. In addition, we expect to receive a number of deal flow opportunities that would not otherwise necessarily be available to us as a result of the business relationships of our officers and directors and our sponsor and their affiliates. While we do not presently anticipate engaging the services of professional firms or other individuals that specialize in business acquisitions on any formal basis, we may engage these firms or other individuals in the future, in which event we may pay a finder's fee, consulting fee, advisory fee or other compensation to be determined in an arm's length negotiation based on the terms of the transaction. We will engage a finder only to the extent our management determines that the use of a finder may bring opportunities to us that may not otherwise be available to us or if finders approach us on an unsolicited basis with a potential transaction that our management determines is in our best interest to pursue. Payment of finder's fees is customarily tied to completion of a transaction, in which case any such fee will be paid out of the funds held in the trust account. In no event, however, will our sponsor or any of our existing officers or directors be paid any finder's fee, reimbursement, consulting fee, monies in respect of any payment of a loan or other compensation by the company prior to, or in connection with any services rendered for any services they render in order to effectuate, the completion of our initial business combination (regardless of the type of transaction that it is). None of our sponsor, executive officers or directors, or any of their respective affiliates, will be allowed to receive any compensation, finder's fees or consulting fees from a prospective business combination target in connection with a contemplated initial business combination except as set forth herein. We have agreed to pay Benessere Enterprises Inc., an affiliate of our sponsor, a total of $10,000 per month for office space, utilities and secretarial and administrative support and to reimburse our sponsor for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination. Some of our officers and directors may enter into employment or consulting agreements with the post-transaction company following our initial business combination. The presence or absence of any such fees or arrangements will not be used as a criterion in our selection process of an initial business combination candidate.

We are not prohibited from pursuing an initial business combination with an initial business combination target that is affiliated with our sponsor, officers or directors or making the initial business combination through a joint venture or other form of shared ownership with our sponsor, officers or directors. In the event we seek to complete our initial business combination with an initial business combination target that is affiliated with our sponsor, officers or directors, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions that such an initial business combination is fair to our company from a financial point of view. We are not required to obtain such an opinion in any other context.

As more fully discussed in the section of this prospectus entitled "Management — Conflicts of Interest," if any of our officers or directors becomes aware of an initial business combination opportunity that falls within the line of business of any entity to which he or she has pre-existing fiduciary or contractual obligations, he or she may be required to present such business combination opportunity to such entity prior to presenting such business combination opportunity to us (including Benessere Capital Acquisition Corporation and Maquia Capital Acquisition Corporation). Our officers and directors currently have certain relevant fiduciary duties or contractual obligations that may take priority over their duties to us.

**Selection of a Target Business and Structuring of our Initial Business Combination**

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. The fair market value of our initial business combination will be determined by our board of directors based upon one or more standards generally accepted by the financial community, such as discounted cash flow valuation, a valuation based on trading multiples of comparable public businesses or a valuation based on the financial metrics of M&A transactions of comparable businesses. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do

so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. We do not intend to purchase multiple businesses in unrelated industries in conjunction with our initial business combination. Subject to this requirement, our management will virtually have unrestricted flexibility in identifying and selecting one or more prospective target businesses, although we will not be permitted to effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In any case, we will only complete an initial business combination in which we own or acquire 50% or more of the outstanding voting securities of the target or otherwise acquire a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. If we own or acquire less than 100% of the equity interests or assets of a target business or businesses, the portion of such business or businesses that are owned or acquired by the post-transaction company is what will be taken into account for purposes of Nasdaq's 80% fair market value test. There is no basis for investors in this offering to evaluate the possible merits or risks of any target business with which we may ultimately complete our initial business combination.

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors. In evaluating a prospective business target, we expect to conduct a thorough due diligence review, which may encompass, among other things, meetings with incumbent management and employees, document reviews, interviews of customers and suppliers, inspection of facilities, as well as a review of financial and other information that will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Lack of Business Diversification**

For an indefinite period of time after the completion of our initial business combination, the prospects for our success may depend entirely on the future performance of a single business. Unlike other entities that have the resources to complete business combinations with multiple entities in one or several industries, it is probable that we will not have the resources to diversify our operations and mitigate the risks of being in a single line of business. In addition, we intend to focus our search for an initial business combination in a single industry. By completing our initial business combination with only a single entity, our lack of diversification may:

- subject us to negative economic, competitive and regulatory developments, any or all of which may have a substantial adverse impact on the particular industry in which we operate after our initial business combination, and
- cause us to depend on the marketing and sale of a single product or limited number of products or services.

**Limited Ability to Evaluate the Target's Management Team**

Although we intend to closely scrutinize the management of a prospective target business when evaluating the desirability of effecting our initial business combination with that business, our assessment of the target business' management may not prove to be correct. In addition, the future management may not have the necessary skills, qualifications or abilities to manage a public company. Furthermore, the future role of members of our management team, if any, in the target business cannot presently be stated with any certainty. The determination as to whether any of the members of our management team will remain with the combined company will be made at the time of our initial business combination. While it is possible that one or more of our directors will remain associated in some capacity with us following our initial business combination, it is unlikely that any of them will devote their full efforts to our affairs subsequent to our initial business combination. Moreover, we cannot assure you that members of our management team will have significant experience or knowledge relating to the operations of the particular target business.

We cannot assure you that any of our key personnel will remain in senior management or advisory positions with the combined company. The determination as to whether any of our key personnel will remain with the combined company will be made at the time of our initial business combination.

Following an initial business combination, we may seek to recruit additional managers to supplement the incumbent management of the target business. We cannot assure you that we will have the ability to recruit additional managers, or that additional managers will have the requisite skills, knowledge or experience necessary to enhance the incumbent management.

**Stockholders May Not Have the Ability to Approve Our Initial Business Combination**

We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC. However, we will seek stockholder approval if it is required by applicable law or applicable stock exchange listing requirements, or we may decide to seek stockholder approval for business or other legal reasons. Presented in the table below is a graphic explanation of the types of initial business combinations we may consider and whether stockholder approval is currently required under Delaware law for each such transaction.

| Type of Transaction | Whether Stockholder Approval is Required |
| --- | --- |
| Purchase of assets | No |
| Purchase of stock of target not involving a merger with the company | No |
| Merger of target into a subsidiary of the company | No |
| Merger of the company with a target | Yes |

Under Nasdaq's listing rules, stockholder approval would be required for our initial business combination if, for example:

- we issue shares of Class A common stock that will be equal to or in excess of 20% of the number of shares of our Class A common stock then outstanding (other than in a public offering);
- any of our directors, officers or substantial stockholders (as defined by Nasdaq rules) has a 5% or greater interest (or such persons collectively have a 10% or greater interest), directly or indirectly, in the target business or assets to be acquired or otherwise and the present or potential issuance of common stock could result in an increase in outstanding common stock or voting power of 5% or more; or
- the issuance or potential issuance of common stock will result in our undergoing a change of control.

**Permitted Purchases of our Securities**

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares our sponsor, initial stockholders, directors, officers or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements. None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination.

The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange.

Our sponsor, officers, directors and/or their affiliates anticipate that they may identify the stockholders with whom our sponsor, officers, directors or their affiliates may pursue privately negotiated purchases by either the stockholders contacting us directly or by our receipt of redemption requests submitted by stockholders following our mailing of proxy materials in connection with our initial business combination. To the extent that our sponsor, officers, directors or their affiliates enter into a private purchase, they would identify and contact only potential selling stockholders who have expressed their election to redeem their shares for a pro rata share of the trust account or vote against our initial business combination, whether or not such stockholder has already submitted a proxy with respect to our initial business combination. Our sponsor, officers, directors or their affiliates will only purchase public shares if such purchases comply with Regulation M under the Exchange Act and the other federal securities laws.

Any purchases by our sponsor, officers, directors and/or their affiliates who are affiliated purchasers under Rule 10b-18 under the Exchange Act will only be made to the extent such purchases are able to be made in compliance with Rule 10b-18, which is a safe harbor from liability for manipulation under Section 9(a)(2) and Rule 10b-5 of the Exchange Act. Rule 10b-18 has certain technical requirements that must be complied with in order for the safe harbor to be available to the purchaser. Our sponsor, officers, directors and/or their affiliates will not make purchases of common stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchases are subject to such reporting requirements.

**Redemption Rights for Public Stockholders upon Completion of our Initial Business Combination**

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.05 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and placement shares and any public shares held by them in connection with the completion of our initial business combination.

*Manner of Conducting Redemptions*

We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares of Class A common stock upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed initial business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under the law or stock exchange listing requirement. Under Nasdaq rules, asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would require stockholder approval. If we structure an initial business combination with a target company in a manner that requires stockholder approval, we will not have discretion as to whether to seek a stockholder vote to approve the proposed initial business combination. We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. So long as we obtain and maintain a listing for our securities on Nasdaq, we will be required to comply with such rules.

If stockholder approval of the transaction is required by law or stock exchange listing requirement, or we decide to obtain stockholder approval for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and
- file proxy materials with the SEC.

In the event that we seek stockholder approval of our initial business combination, we will distribute proxy materials and, in connection therewith, provide our public stockholders with the redemption rights described above upon completion of the initial business combination.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock

present and entitled to vote at the meeting to approve the initial business combination when a quorum is present are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the Company representing a majority of the voting power of all outstanding shares of capital stock of the Company entitled to vote at such meeting. Our initial stockholders will count toward this quorum and pursuant to the letter agreement, our sponsor, officers and directors have agreed to vote any founder shares and placement shares held by them and any public shares acquired during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction). We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

99

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and
- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Upon the public announcement of our initial business combination, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market if we elect to redeem our public shares through a tender offer, to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, we will not redeem any public shares unless our net tangible assets will be at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

Our amended and restated certificate of incorporation will provide that we may not redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed initial business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed initial business combination exceed the aggregate amount of cash available to us, we will not complete the initial business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof.

***Limitation on Redemption upon Completion of our Initial Business Combination if we Seek Stockholder Approval***

Notwithstanding the foregoing, if we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to more than an aggregate of 15% of the shares sold in this offering, which we refer to as the "Excess Shares." Such restriction shall also be applicable to our affiliates. We believe this restriction will discourage stockholders from accumulating large blocks of shares, and subsequent attempts by such holders to use their ability to exercise their redemption rights against a proposed initial business combination as a means to force us or our management to purchase their shares at a significant premium to the then-current market price or on other undesirable terms. By limiting our stockholders' ability to redeem no more than 15% of the shares sold in this offering without our prior consent, we believe we will limit the ability of a small group of stockholders to unreasonably attempt to block our ability to complete our initial business combination, particularly in connection with an initial business combination with a target that requires as a closing condition that we have a minimum net worth or a certain amount of cash. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our initial business combination.

100

***Tendering Stock Certificates in Connection with Redemption Rights***

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent up to two business days prior to the vote on the proposal to approve the initial business combination, or to deliver their shares to the transfer agent electronically using the Depository Trust Company's DWAC (Deposit/Withdrawal At Custodian) System, at the holder's option. The proxy materials that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. Accordingly, a public stockholder would have up to two days prior to the vote on the initial business combination to tender its shares if it wishes to seek to exercise its redemption rights. Given the relatively short exercise period, it is advisable for stockholders to use electronic delivery of their public shares.

There is a nominal cost associated with the above-referenced tendering process and the act of certificating the shares or delivering them through the DWAC System. The transfer agent will typically charge the tendering broker $80.00 and it would be up to the broker whether or not to pass this

cost on to the redeeming holder. However, this fee would be incurred regardless of whether or not we require holders seeking to exercise redemption rights to tender their shares. The need to deliver shares is a requirement of exercising redemption rights regardless of the timing of when such delivery must be effectuated.

The foregoing is different from the procedures used by many special purpose acquisition companies. In order to perfect redemption rights in connection with their business combinations, many blank check companies would distribute proxy materials for the stockholders' vote on an initial business combination, and a holder could simply vote against a proposed initial business combination and check a box on the proxy card indicating such holder was seeking to exercise his or her redemption rights. After the initial business combination was approved, the company would contact such stockholder to arrange for him or her to deliver his or her certificate to verify ownership. As a result, the stockholder then had an "option window" after the completion of the initial business combination during which he or she could monitor the price of the company's stock in the market. If the price rose above the redemption price, he or she could sell his or her shares in the open market before actually delivering his or her shares to the company for cancellation. As a result, the redemption rights, to which stockholders were aware they needed to commit before the stockholder meeting, would become "option" rights surviving past the completion of the initial business combination until the redeeming holder delivered its certificate. The requirement for physical or electronic delivery prior to the meeting ensures that a redeeming holder's election to redeem is irrevocable once the initial business combination is approved.

Any request to redeem such shares, once made, may be withdrawn at any time up to the date of the stockholder meeting. Furthermore, if a holder of a public share delivered its certificate in connection with an election of redemption rights and subsequently decides prior to the applicable date not to elect to exercise such rights, such holder may simply request that the transfer agent return the certificate (physically or electronically). It is anticipated that the funds to be distributed to holders of our public shares electing to redeem their shares will be distributed promptly after the completion of our initial business combination.

If our initial business combination is not approved or completed for any reason, then our public stockholders who elected to exercise their redemption rights would not be entitled to redeem their shares for the applicable pro rata share of the trust account. In such case, we will promptly return any certificates delivered by public holders who elected to redeem their shares.

If our initial proposed initial business combination is not completed, we may continue to try to complete an initial business combination with a different target until 18 months from the closing of this offering.

### *Redemption of Public Shares and Liquidation if no Initial Business Combination*

Our amended and restated certificate of incorporation will provide that we will have only 18 months from the closing of this offering to complete our initial business combination. If we are unable to complete our initial business combination within 18-month period, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. There will be no redemption rights or liquidating distributions with respect to our warrants or rights, which will expire worthless if we fail to complete our initial business combination within the 18-month time period.

Our sponsor, officers, directors and director nominees will enter into a letter agreement with us, pursuant to which they will waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering. However, if our sponsor, officers or directors acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within 18 months from the closing of this offering.

Our sponsor, officers and directors have agreed, pursuant to a written agreement with us, that they will not propose any amendment to our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, unless we provide our public stockholders with the opportunity to redeem their shares of Class A common stock upon approval of any such amendment at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes divided by the number of then outstanding public shares. However, we may not redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules). If this optional redemption right is exercised with respect to an excessive number of public shares such that we cannot satisfy the net tangible asset requirement (described above), we would not proceed with the amendment or the related redemption of our public shares at such time.

We expect that all costs and expenses associated with implementing our plan of dissolution, as well as payments to any creditors, will be funded from amounts remaining out of the approximately $650,000 of proceeds held outside the trust account, although we cannot assure you that there will be sufficient funds for such purpose. We will depend on sufficient interest being earned on the proceeds held in the trust account to pay any tax obligations we may owe. However, if those funds are not sufficient to cover the costs and expenses associated with implementing our plan of dissolution, to the extent that there is any interest accrued in the trust account not required to pay taxes, we may request the trustee to release to us an additional amount of up to $70,000 of such accrued interest to pay those costs and expenses.

If we were to expend all of the net proceeds of this offering and the sale of the placement units, other than the proceeds deposited in the trust account, and without taking into account interest, if any, earned on the trust account, the per-share redemption amount received by stockholders upon our dissolution would be approximately $10.05. The proceeds deposited in the trust account could, however, become subject to the claims of our creditors which would have higher priority than the claims of our public stockholders. We cannot assure you that the actual per-share redemption amount received by stockholders will not be substantially less than $10.05. Under Section 281(b) of the DGCL, our plan of dissolution must provide for all claims against us to be paid in full or make provision for payments to be made in full, as applicable, if there are sufficient assets. These claims must be paid or provided for before we make any distribution of our remaining assets to our stockholders. While we intend to pay such amounts, if any, we cannot assure you that we will have funds sufficient to pay or provide for all creditors' claims.

Although we will seek to have all vendors, service providers, prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account for the benefit of our public stockholders, there is no guarantee that they will execute such agreements or even if they execute such agreements that they would be prevented from bringing claims against the trust account including but not limited to fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain an advantage with respect to a claim against our assets, including the funds held in the trust account. If any third party refuses to execute an agreement waiving such claims to the monies held in the trust account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative. Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. Marcum LLP, our independent registered public accounting firm, and the underwriters of the offering, will not execute agreements with us waiving such claims to the monies held in the trust account.

In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the trust account for any reason. Our sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the trust account to below the lesser of (i) $10.05 per public share and (ii) the actual amount per public share held in the trust account as of the date of the liquidation of the trust account, if less than $10.05 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the trust account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. However, we have not asked our sponsor to reserve for such indemnification obligations, nor have we independently verified whether our sponsor has sufficient funds to satisfy its indemnity obligations and believe that our sponsor's only assets are securities of our company. Therefore, we cannot assure you that our sponsor would be able to satisfy those obligations. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

In the event that the proceeds in the trust account are reduced below (i) $10.05 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest which may be withdrawn to pay taxes, and our sponsor asserts that it is unable to satisfy its indemnification obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment may choose not to do so if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. We have not asked our sponsor to reserve for such indemnification obligations and we cannot assure you that our sponsor would be able to satisfy those obligations. Accordingly, we cannot assure you that due to claims of creditors the actual value of the per-share redemption price will not be less than $10.05 per public share.

We will seek to reduce the possibility that our sponsor will have to indemnify the trust account due to claims of creditors by endeavoring to have all vendors, service providers, prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to monies held in the trust account. Our sponsor will also not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. We will have access to up to approximately $650,000 from the proceeds of this offering and the sale of the placement units with which to pay any such potential claims (including costs and expenses incurred in connection with our liquidation, currently estimated to be no more than approximately $100,000). In the event that we liquidate and it is subsequently determined that the reserve for claims and liabilities is insufficient, stockholders who received funds from our trust account could be liable for claims made by creditors. In the event that our offering expenses exceed our estimate of $662,750, we may fund such excess with funds from the funds not to be held in the trust account. In such case, the amount of funds we intend to be held outside the trust account would decrease by a corresponding amount. Conversely, in the event that the offering expenses are less than our estimate of $662,750, the amount of funds we intend to be held outside the trust account would increase by a corresponding amount.

103

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 18 months from the closing of this offering may be considered a liquidating distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

Furthermore, if the pro rata portion of our trust account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete our initial business combination within 18 months from the closing of this offering, is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful (potentially due to the imposition of legal proceedings that a party may bring or due to other circumstances that are currently unknown), then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible following our 18th

month and, therefore, we do not intend to comply with those procedures. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

Because we will not be complying with Section 280, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent 10 years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. As described above, pursuant to the obligation contained in our underwriting agreement, we will seek to have all vendors, service providers, prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any monies held in the trust account. As a result of this obligation, the claims that could be made against us are significantly limited and the likelihood that any claim that would result in any liability extending to the trust account is remote. Further, our sponsor may be liable only to the extent necessary to ensure that the amounts in the trust account are not reduced below (i) $10.05 per public share or (ii) such lesser amount per public share held in the trust account as of the date of the liquidation of the trust account, due to reductions in value of the trust assets, in each case net of the amount of interest withdrawn to pay taxes and will not be liable as to any claims under our indemnity of the underwriters of this offering against certain liabilities, including liabilities under the Securities Act. In the event that an executed waiver is deemed to be unenforceable against a third party, our sponsor will not be responsible to the extent of any liability for such third-party claims.

104

If we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the trust account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the trust account, we cannot assure you we will be able to return $10.05 per share to our public stockholders. Additionally, if we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover some or all amounts received by our stockholders. Furthermore, our board of directors may be viewed as having breached its fiduciary duty to our creditors and/or may have acted in bad faith, thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the trust account prior to addressing the claims of creditors. We cannot assure you that claims will not be brought against us for these reasons.

Our public stockholders will be entitled to receive funds from the trust account only upon the earlier to occur of: (i) the completion of our initial business combination, (ii) the redemption of any public shares properly tendered in connection with a stockholder vote to amend any provisions of our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, and (iii) the redemption of all of our public shares if we are unable to complete our business combination within 18 months from the closing of this offering, subject to applicable law. In no other circumstances will a stockholder have any right or interest of any kind to or in the trust account. In the event we seek stockholder approval in connection with our initial business combination, a stockholder's voting in connection with the initial business combination alone will not result in a stockholder's redeeming its shares to us for an applicable pro rata share of the trust account. Such stockholder must have also exercised its redemption rights as described above. These provisions of our amended and restated certificate of incorporation, like all provisions of our amended and restated certificate of incorporation, may be amended with a stockholder vote.

***Comparison of Redemption or Purchase Prices in Connection with Our Initial Business Combination and if We Fail to Complete Our Initial Business Combination***

The following table compares the redemptions and other permitted purchases of public shares that may take place in connection with the completion of our initial business combination and if we are unable to complete our initial business combination within 18 months from the closing of this offering.

| | Redemptions in Connection with our Initial Business Combination | Other Permitted Purchases of Public Shares by us or our Affiliates | Redemptions if we fail to Complete an Initial Business Combination |
|---|---|---|---|
| **Calculation of redemption price** | Redemptions at the time of our initial business combination may be made pursuant to a tender offer or in connection with a stockholder vote. The redemption price will be the same whether we conduct redemptions pursuant to a tender offer or in connection with a stockholder vote. In either case, our public stockholders may redeem their public shares for cash equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of the initial business combination (which is initially anticipated to be $10.05 per public share), including interest earned on the funds held in the trust account and not previously released to us to pay our taxes divided by the number of then outstanding public shares, subject to the limitation that no redemptions will take place if all of the redemptions would cause our net tangible assets to be less than $5,000,001 as described elsewhere in this prospectus and any limitations (including but not limited to cash requirements) agreed | If we seek stockholder approval of our initial business combination, our sponsor, directors, officers or their affiliates may purchase shares in privately negotiated transactions or in the open market prior to or following completion of our initial business combination. There is no limit to the prices that our sponsor, directors, officers or their affiliates may pay in these transactions. | If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem all public shares at a per-share price, payable in cash, equal to the aggregate amount, then on deposit in the trust account (which is initially anticipated to be $10.05 per public share) including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares. |

| | | |
|---|---|---|
| | to in connection with the negotiation of terms of a proposed initial business combination. | | |
| **Impact to remaining stockholders** | The redemptions in connection with our initial business combination will reduce the book value per share for our remaining stockholders, who will bear the burden of the deferred underwriting commissions and taxes payable. | If the permitted purchases described above are made there would be no impact to our remaining stockholders because the purchase price would not be paid by us. | The redemption of our public shares if we fail to complete our initial business combination will reduce the book value per share for the shares held by our initial stockholders, who will be our only remaining stockholders after such redemptions. |

**Comparison of This Offering to Those of Blank Check Companies Subject to Rule 419**

The following table compares the terms of this offering to the terms of an offering by a blank check company subject to the provisions of Rule 419. This comparison assumes that the gross proceeds, underwriting commissions and underwriting expenses of our offering would be identical to those of an offering undertaken by a company subject to Rule 419, and that the underwriters will not exercise their over-allotment option. None of the provisions of Rule 419 apply to our offering.

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Escrow of offering proceeds** | $100,500,000 of the net proceeds of this offering and the sale of the placement units will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee. | Approximately $88,875,000 of the offering proceeds would be deposited into either an escrow account with an insured depositary institution or in a separate bank account established by a broker-dealer in which the broker-dealer acts as trustee for persons having the beneficial interests in the account. |
| **Investment of net proceeds** | $100,500,000 of the net offering proceeds and the sale of the placement units held in trust will be invested only in U.S. government treasury bills with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. | Proceeds could be invested only in specified securities such as a money market fund meeting conditions of the Investment Company Act or in securities that are direct obligations of, or obligations guaranteed as to principal or interest by, the United States. |
| **Receipt of interest on escrowed funds** | Interest on proceeds from the trust account to be paid to stockholders is reduced by (i) any taxes paid or payable, and (ii) in the event of our liquidation for failure to complete our initial business combination within the allotted time, up to $100,000 of net interest that may be released to us should we have no or insufficient working capital to fund the costs and expenses of our dissolution and liquidation. | Interest on funds in escrow account would be held for the sole benefit of investors, unless and only after the funds held in escrow were released to us in connection with our completion of a business combination. |
| **Limitation on fair value or net assets of target business** | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the income earned on the trust account) at the time of the agreement to enter into the initial business combination. | The fair value or net assets of a target business must represent at least 80% of the maximum offering proceeds. |

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Trading of securities issued** | We expect the units will begin trading on or promptly after the date of this prospectus. The Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, an additional Current Report on Form 8-K will be filed to provide updated financial information to reflect the | No trading of the units or the underlying Class A common stock and warrants would be permitted until the completion of a business combination. During this period, the securities would be held in the escrow or trust account. |

|  |  |  |
|---|---|---|
|  | exercise of the underwriters' over-allotment option. |  |
| **Exercise of the warrants** | The warrants cannot be exercised until the later of 30 days after the completion of our initial business combination and 12 months from the closing of this offering. | The warrants could be exercised prior to the completion of a business combination, but securities received and cash paid in connection with the exercise would be deposited in the escrow or trust account. |
| **Election to remain an investor** | We will provide our public stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, upon the completion of our initial business combination, subject to the limitations described herein. We may not be required by applicable law or stock exchange listing requirements to hold a stockholder vote. We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. If we are not required by applicable law or stock exchange listing requirements and do not otherwise decide to hold a stockholder vote, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC and file tender offer documents with the SEC which will contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under the SEC's proxy rules. In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. If, however, we hold a stockholder vote, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules. | A prospectus containing information pertaining to the business combination required by the SEC would be sent to each investor. Each investor would be given the opportunity to notify the company in writing, within a period of no less than 20 business days and no more than 45 business days from the effective date of a post-effective amendment to the company's registration statement, to decide if it elects to remain a stockholder of the company or require the return of its investment. If the company has not received the notification by the end of the 45th business day, funds and interest or dividends, if any, held in the trust or escrow account are automatically returned to the stockholder. Unless a sufficient number of investors elect to remain investors, all funds on deposit in the escrow account must be returned to all of the investors and none of the securities are issued. |

107

| **Terms of Our Offering** | **Terms Under a Rule 419 Offering** |
|---|---|
| If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial business combination. Additionally, each public stockholder may elect to redeem their public shares irrespective of whether they vote for or against the proposed transaction. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. |  |

| **Business combination deadline** | If we are unable to complete an initial business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest | If a business combination has not been completed within 18 months after the effective date of the company's registration statement, funds held in the trust or escrow account are returned to investors. |

earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

108

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Limitation on redemption rights of stockholders holding more than 15% of the shares sold in this offering if we hold a stockholder vote** | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder (including our affiliates), together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from seeking redemption rights with respect to Excess Shares (more than an aggregate of 15% of the shares sold in this offering). Our public stockholders' inability to redeem Excess Shares will reduce their influence over our ability to complete our initial business combination and they could suffer a material loss on their investment in us if they sell any Excess Shares in open market transactions. | Many blank check companies provide no restrictions on the ability of stockholders to redeem shares based on the number of shares held by such stockholders in connection with an initial business combination. |
| **Tendering stock certificates in connection with redemption rights** | We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent up to two business days prior to the vote on the proposal to approve the initial business combination, or to deliver their shares to the transfer agent electronically using The Depository Trust Company's DWAC System, at the holder's option. The proxy materials that we will furnish to holders of our public shares in connection with our initial business combination will indicate whether we are requiring public stockholders to satisfy such delivery requirements. Accordingly, a public stockholder would have up to two days prior to the vote on the initial business combination to tender its shares if it wishes to seek to exercise its redemption rights. | In order to perfect redemption rights in connection with their business combinations, holders could vote against a proposed initial business combination and check a box on the proxy card indicating such holders were seeking to exercise their redemption rights. After the business combination was approved, the company would contact such stockholders to arrange for them to deliver their certificate to verify ownership. |

109

| | Terms of Our Offering | Terms Under a Rule 419 Offering |
|---|---|---|
| **Release of funds** | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds held in the trust account will not be released until the earliest to occur of: (i) the completion of our initial business combination, (ii) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended | The proceeds held in the escrow account are not released until the earlier of the completion of a business combination or the failure to effect a business combination within the allotted time. |

and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-business combination activity and (iii) the redemption of 100% of our public shares if we are unable to complete an initial business combination within the required time frame (subject to the requirements of applicable law). On the completion of our initial business combination, all amounts held in the trust account will be released to us, less amounts released to a separate account controlled by the trustee for disbursal to redeeming stockholders. We will use these funds to pay amounts due to any public stockholders who exercise their redemption rights as described above under "Redemption rights for public stockholders upon completion of our initial business combination," to pay the underwriters their deferred underwriting commissions, to pay all or a portion of the consideration payable to the target or owners of the target of our initial business combination and to pay other expenses associated with our initial business combination.

110

**Competition**

In identifying, evaluating and selecting a target business for our initial business combination, we may encounter intense competition from other entities having a business objective similar to ours, including other blank check companies (including Benessere Capital Acquisition Corporation and Maquia Capital Acquisition Corporation), private equity groups and leveraged buyout funds, and operating businesses seeking strategic business combinations. Many of these entities are well established and have extensive experience identifying and effecting business combinations directly or through affiliates. Moreover, many of these competitors possess greater financial, technical, human and other resources than we do. Our ability to acquire larger target businesses will be limited by our available financial resources. This inherent limitation gives others an advantage in pursuing the initial business combination of a target business. Furthermore, our obligation to pay cash in connection with our public stockholders who exercise their redemption rights may reduce the resources available to us for our initial business combination and our outstanding warrants and rights, and the future dilution they potentially represent, may not be viewed favorably by certain target businesses. Either of these factors may place us at a competitive disadvantage in successfully negotiating an initial business combination.

**Facilities**

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130 and our telephone number is (305) 735-1517. Our executive offices are provided to us by Benessere Enterprises Inc., an affiliate of our sponsor. Commencing on the date of this prospectus, we have agreed to pay Benessere Enterprises Inc. a total of $10,000 per month for office space, utilities and secretarial and administrative support. We consider our current office space adequate for our current operations.

**Employees**

We currently have two officers. These individuals are not obligated to devote any specific number of hours to our matters but they intend to devote as much of their time as they deem necessary, in the exercise of their respective business judgement, to our affairs until we have completed our initial business combination. The amount of time they will devote in any time period will vary based on whether a target business has been selected for our initial business combination and the stage of the initial business combination process we are in. We do not intend to have any full-time employees prior to the completion of our initial business combination. We do not have an employment agreement with any member of our management team.

**Periodic Reporting and Financial Information**

We will register our units, Class A common stock, warrants and rights under the Exchange Act and have reporting obligations, including the requirement that we file annual, quarterly and current reports with the SEC. In accordance with the requirements of the Exchange Act, our annual reports will contain financial statements audited and reported on by our independent registered public accountants.

We will provide stockholders with audited financial statements of the prospective target business as part of the tender offer materials or proxy solicitation materials sent to stockholders to assist them in assessing the target business. In all likelihood, these financial statements will need to be prepared in accordance with, or reconciled to, GAAP, or IFRS, depending on the circumstances, and the historical financial statements may be required to be audited in accordance with the standards of the PCAOB. These financial statement requirements may limit the pool of potential targets we may conduct an initial business combination with because some targets may be unable to provide such statements in time for us to disclose such statements in accordance with federal proxy rules and complete our initial business combination within the prescribed time frame. We cannot assure you that any particular target business identified by us as a potential business combination candidate will have financial statements prepared in accordance with GAAP or that the potential target business will be able to prepare its financial statements in accordance with the requirements outlined above. To the extent that these requirements cannot be met, we may not be able to acquire the proposed target business. While this may limit the pool of potential business combination candidates, we do not believe that this limitation will be material.

111

We will be required to evaluate our internal control procedures for the fiscal year ending December 31, 2022 as required by the Sarbanes-Oxley Act.

Only in the event we are deemed to be a large accelerated filer or an accelerated filer, and no longer qualify as an emerging growth company, will we be required to have our internal control procedures audited. A target company may not be in compliance with the provisions of the Sarbanes-Oxley Act regarding adequacy of their internal controls. The development of the internal controls of any such entity to achieve compliance with the Sarbanes-Oxley Act may increase the time and costs necessary to complete any such business combination. We will file a Registration Statement on Form 8-A with the SEC to voluntarily register our securities under Section 12 of the Exchange Act. As a result, we are subject to the rules and regulations promulgated under the Exchange Act. We have no current intention of filing a Form 15 to suspend our reporting or other obligations under the Exchange Act prior or subsequent to the consummation of our initial business combination.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our shares of Class A common stock that are held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period. References herein to "emerging growth company" will have the meaning associated with it in the JOBS Act.

Additionally, we are a "smaller reporting company" as defined in Item 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates equals or exceeds $250 million as of the end of that year's second fiscal quarter, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the end of that year's second fiscal quarter.

**Legal Proceedings**

There is no material litigation, arbitration or governmental proceeding currently pending against us or any members of our management team in their capacity as such.

**MANAGEMENT**

**Officers, Directors and Director Nominees**

Our officers and directors are as follows:

| Name | Age | Position |
| --- | --- | --- |
| Patrick Orlando | 48 | Chairman and Chief Executive Officer |
| Luis Orleans-Braganza | 52 | Chief Financial Officer |
| Lee Jacobson | 55 | Director |
| Justin Shaner | 39 | Director Nominee |
| Eric Swider | 47 | Director Nominee |

Patrick Orlando has served as our Chairman and Chief Executive Officer since May 2021. Mr. Orlando has been serving as Chief Executive Officer of Yunhong International, a publicly listed special acquisition purpose corporation since January 2020 (Nasdaq: ZGYH) and as Chief Executive Officer of Benessere Capital Acquisition Corp. a publicly listed special acquisition purpose corporation since September 2020. He has also been serving as a director of Maquia Capital Acquisition Corp., special purpose acquisition corporation since February 2021. Mr. Orlando is Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company that he managed all financial matters including insurance and banking relationships. From November 2014 to August 2018, Mr. Orlando served as the Vice President of Sucro Can International LLC, a sugar processing company, where he focused on compliance, finance, and processing technology. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

Luis Orleans-Braganza has served as our Chief Financial Officer since May 2021. Mr. Orleans-Braganza is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado. .

Lee Jacobson has served as a director since December 2020. Since January 2018, he has been the co-founder and Chief Executive Officer of Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct,

LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. From September 2012 through 2016, Lee was the Chief Executive Officer of Apmetrix Analytics Inc., which liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and international categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997. We believe Mr. Jacobson is well-qualified to serve as a member of our board of directors due to his experience in the video game and digital distribution sector, as well as for his extensive career in management positions.

Eric Swider will serve as our director upon the effective of the registration statement of which this prospectus forms a part. Mr. Swider has been serving as the Chief Executive Officer of RUBIDEX since January 2020, a start-up company focusing on data security. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp., a special purpose acquisition company. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles. We believe Mr. Swider is well-qualified to serve as a member of our board of directors due to his experience in business strategy, international expertise, and his contacts and relationships.

113

Justin L. Shaner will serve as our director upon the effective of the registration statement of which this prospectus forms a part. Mr. Shaner founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp., a special purpose acquisition company. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to December 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from the Pennsylvania State University. We believe Mr. Shaner is well-qualified to serve as a member of our board of directors due to his experience in business strategy, board experience, and experience investing in the technology sector.

**Family Relationships**

There are no family relationships among any of our directors or executive officers that are required to be disclosed by Regulation S-K.

**Number and Terms of Office of Officers and Directors**

We have two directors and two director nominees. Our board of directors is divided into three classes with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. In accordance with Nasdaq corporate governance requirements, we are not required to hold an annual meeting until one year after our first fiscal year end following our listing on Nasdaq. The term of office of the first class of directors, which will consist of Justin L. Shaner will expire at our first annual meeting of stockholders. The term of office of the second class of directors, which will consist of Eric Swider, will expire at the second annual meeting of stockholders. The term of office of the third class of directors, consisting of Patrick Orlando and Lee Jacobson will expire at the third annual meeting of stockholders.

Our officers are appointed by the board of directors and serve at the discretion of the board of directors, rather than for specific terms of office. Our board of directors is authorized to appoint persons to the offices set forth in our bylaws as it deems appropriate. Our bylaws provide that our officers may consist of a Chairman of the Board, Chief Executive Officer, Chief Financial Officer, President, Vice Presidents, Secretary, Treasurer, Assistant Secretaries and such other offices as may be determined by the board of directors.

**Director Independence**

Nasdaq listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the company's board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director. Our board of directors has determined that Lee Jacobson is, and Justin L. Shaner, and Eric Swider will be "independent directors" as defined in the Nasdaq listing standards and applicable SEC rules. Our independent directors will have regularly scheduled meetings at which only independent directors are present.

114

**Officer and Director Compensation**

None of our officers have received any cash compensation for services rendered to us. Commencing on the date of this prospectus, we have agreed to pay Benessere Enterprises Inc, an affiliate of our sponsor, a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees. No compensation of any kind, including any finder's fee, reimbursement, consulting fee or monies in respect of any payment of a loan, will be paid by us to our sponsor, officers or directors or any affiliate of our sponsor, officers or directors, prior to, or in connection with any services rendered in order to effectuate, the consummation of our initial business combination (regardless of the type of transaction that it is). However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers or directors or our or their affiliates. Any such payments prior to an initial business combination will be made using funds held outside the trust account. Other than quarterly audit committee review of such payments, we do not expect to have any additional controls in place governing our reimbursement payments to our directors and executive officers for their out-of-pocket expenses incurred in connection with identifying and consummating an initial business combination.

After the completion of our initial business combination, directors or members of our management team who remain with us may be paid consulting

or management fees from the combined company. All of these fees will be fully disclosed to stockholders, to the extent then known, in the tender offer materials or proxy solicitation materials furnished to our stockholders in connection with a proposed initial business combination. We have not established any limit on the amount of such fees that may be paid by the combined company to our directors or members of management. It is unlikely that such compensation will be known at the time of the proposed initial business combination, because the directors of the post-combination business will be responsible for determining officer and director compensation. Any compensation to be paid to our officers will be determined, or recommended to the board of directors for determination, either by a compensation committee constituted solely by independent directors or by a majority of the independent directors on our board of directors.

We do not intend to take any action to ensure that members of our management team maintain their positions with us after the consummation of our initial business combination, although it is possible that some or all of our officers and directors may negotiate employment or consulting arrangements to remain with us after our initial business combination. The existence or terms of any such employment or consulting arrangements to retain their positions with us may influence our management's motivation in identifying or selecting a target business but we do not believe that the ability of our management to remain with us after the consummation of our initial business combination will be a determining factor in our decision to proceed with any potential business combination. We are not party to any agreements with our officers and directors that provide for benefits upon termination of employment.

**Committees of the Board of Directors**

Our board of directors has two standing committees: an audit committee and a compensation committee. Subject to phase-in rules and a limited exception, Nasdaq rules and Rule 10A-3 under the Exchange Act require that the audit committee of a listed company be comprised solely of independent directors, and Nasdaq rules require that the compensation committee of a listed company be comprised solely of independent directors.

*Audit Committee*

We will establish an audit committee of the board of directors upon effectiveness of the registration statement of this prospectus forms a part. Justin Shaner, Eric Swider and Lee Jacobson will serve as members of our audit committee, and Eric Swider will chair the audit committee. Under the Nasdaq listing standards and applicable SEC rules, we are required to have at least three members of the audit committee, all of whom must be independent. Each of Justin Shaner, Eric Swider and Lee Jacobson meet the independent director standard under Nasdaq listing standards and under Rule 10-A-3(b)(1) under the Exchange Act.

Each member of the audit committee is financially literate and our board of directors has determined that Eric Swider will qualify as an "audit committee financial expert" as defined in applicable SEC rules.

We will adopt an audit committee charter, which details the principal functions of the audit committee, including:

- the appointment, compensation, retention, replacement, and oversight of the work of the independent registered public accounting firm engaged by us;
- pre-approving all audit and permitted non-audit services to be provided by the independent registered public accounting firm engaged by us, and establishing pre-approval policies and procedures;
- setting clear hiring policies for employees or former employees of the independent registered public accounting firm, including but not limited to, as required by applicable laws and regulations;
- setting clear policies for audit partner rotation in compliance with applicable laws and regulations;
- obtaining and reviewing a report, at least annually, from the independent registered public accounting firm describing (i) the independent registered public accounting firm's internal quality-control procedures, (ii) any material issues raised by the most recent internal quality-control review, or peer review, of the audit firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and any steps taken to deal with such issues and (iii) all relationships between the independent registered public accounting firm and us to assess the independent registered public accounting firm's independence;
- reviewing and approving any related party transaction required to be disclosed pursuant to Item 404 of Regulation S-K promulgated by the SEC prior to us entering into such transaction; and
- reviewing with management, the independent registered public accounting firm, and our legal advisors, as appropriate, any legal, regulatory or compliance matters, including any correspondence with regulators or government agencies and any employee complaints or published reports that raise material issues regarding our financial statements or accounting policies and any significant changes in accounting standards or rules promulgated by the Financial Accounting Standards Board, the SEC or other regulatory authorities.

*Compensation Committee*

We will establish a compensation committee of the board of directors upon effectiveness of the registration statement of this prospectus forms a part. Justin Shaner, Eric Swider and Lee Jacobson will serve as members of our compensation committee and Justin Shaner will chair the compensation committee. Under the Nasdaq listing standards and applicable SEC rules, we are required to have at least two members of the compensation committee, all of whom must be independent. Justin Shaner, Eric Swider and Lee Jacobson are independent.

We will adopt a compensation committee charter, which details the principal functions of the compensation committee, including:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, if any is paid by us, evaluating our Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer based on such evaluation;
- reviewing and approving on an annual basis the compensation, if any is paid by us, of all of our other officers;
- reviewing on an annual basis our executive compensation policies and plans;

- implementing and administering our incentive compensation equity-based remuneration plans;
- assisting management in complying with our proxy statement and annual report disclosure requirements;
- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our officers and employees;
- if required, producing a report on executive compensation to be included in our annual proxy statement; and
- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

Notwithstanding the foregoing, as indicated above, other than the payment to Benessere Enterprises Inc, an affiliate of our sponsor, of $10,000 per month, for up to 18 months, for office space, utilities and secretarial and administrative support, no compensation of any kind, including finders, consulting or other similar fees, will be paid to any of our existing stockholders, officers, directors or any of their respective affiliates, prior to, or for

any services they render in order to effectuate the consummation of an initial business combination. Accordingly, it is likely that prior to the consummation of an initial business combination, the compensation committee will only be responsible for the review and recommendation of any compensation arrangements to be entered into in connection with such initial business combination.

The charter also provides that the compensation committee may, in its sole discretion, retain or obtain the advice of a compensation consultant, legal counsel or other adviser and will be directly responsible for the appointment, compensation and oversight of the work of any such adviser. However, before engaging or receiving advice from a compensation consultant, external legal counsel or any other adviser, the compensation committee will consider the independence of each such adviser, including the factors required by Nasdaq and the SEC.

**Director Nominations**

We do not have a standing nominating committee though we intend to form a corporate governance and nominating committee as and when required to do so by law or Nasdaq rules. In accordance with Rule 5605 of the Nasdaq rules, a majority of the independent directors may recommend a director nominee for selection by the board of directors. The board of directors believes that the independent directors can satisfactorily carry out the responsibility of properly selecting or approving director nominees without the formation of a standing nominating committee. The directors who will participate in the consideration and recommendation of director nominees will be Justin Shaner, Eric Swider and Lee Jacobson. In accordance with Rule 5605 of the Nasdaq rules, all such directors are independent. As there is no standing nominating committee, we do not have a nominating committee charter in place.

The board of directors will also consider director candidates recommended for nomination by our stockholders during such times as they are seeking proposed nominees to stand for election at the next annual meeting of stockholders (or, if applicable, a special meeting of stockholders). Our stockholders that wish to nominate a director for election to our board of directors should follow the procedures set forth in our bylaws.

We have not formally established any specific, minimum qualifications that must be met or skills that are necessary for directors to possess. In general, in identifying and evaluating nominees for director, the board of directors considers educational background, diversity of professional experience, knowledge of our business, integrity, professional reputation, independence, wisdom, and the ability to represent the best interests of our stockholders.

**Code of Ethics**

We will adopt a Code of Ethics applicable to our directors, officers and employees upon effectiveness of the registration statement of this prospectus forms a part. We will file a copy of our Code of Ethics and our audit and compensation committee charters as exhibits to the registration statement of which this prospectus is a part. You are able to review these documents by accessing our public filings at the SEC's web site at *www.sec.gov*. In addition, a copy of the Code of Ethics will be provided without charge upon request from us. We intend to disclose any amendments to or waivers of certain provisions of our Code of Ethics in a Current Report on Form 8-K. See the section of this prospectus entitled "Where You Can Find Additional Information."

117

**Conflicts of Interest**

Subject to pre-existing fiduciary or contractual duties as described below, our officers and directors have agreed to present any business opportunities presented to them in their capacity as a director or officer of our company to us. Certain of our officers and directors presently have fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity. Accordingly, if any of our officers or directors becomes aware of a business combination opportunity which is suitable for an entity to which he or she has then-current fiduciary or contractual obligations, he or she will honor his or her fiduciary or contractual obligations to present such opportunity to such entity. We believe, however, that the fiduciary duties or contractual obligations of our officers or directors will not materially affect our ability to complete our initial business combination. Our amended and restated certificate of incorporation provides that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue, and to the extent the director or officer is permitted to refer that opportunity to us without violating another legal obligation.

Our officers and directors may become officers or directors of another special purpose acquisition company with a class of securities intended to be registered under the Exchange Act (including Yunhong International, Benessere Capital Acquisition Corporation, and Maquia Capital Acquisition Corporation), even prior to us entering into a definitive agreement for our initial business combination.

Potential investors should also be aware of the following other potential conflicts of interest:

- None of our officers or directors is required to commit his or her full time to our affairs and, accordingly, may have conflicts of interest in allocating his or her time among various business activities.

- In the course of their other business activities, our officers and directors may become aware of investment and business opportunities which may be appropriate for presentation to us as well as the other entities with which they are affiliated. Our management may have conflicts of interest in determining to which entity a particular business opportunity should be presented.

- Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares and placement shares and any public shares held by them in connection with the consummation of our initial business combination. Additionally, our initial stockholders have agreed to waive their redemption rights with respect to any founder shares and placement shares held by them if we fail to consummate our initial business combination within 18 months after the closing of this offering. If we do not complete our initial business combination within such applicable time period, the proceeds of the sale of the placement units held in the trust account will be used to fund the redemption of our public shares. With certain limited exceptions, the founder shares will not be transferable, assignable or salable by our sponsor until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. With certain limited exceptions, the placement units, placement shares, placement warrants and placement rights and the Class A common stock underlying such warrants and rights, will not be transferable, assignable or saleable by our sponsor or its permitted transferees until 30 days after the completion of our initial business combination. Since our sponsor and officers and directors may directly or indirectly own common stock, warrants and rights following this offering, our officers and directors may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination.

118

- Our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.
- Our sponsor, officers or directors may have a conflict of interest with respect to evaluating a business combination and financing arrangements as we may obtain loans from our sponsor or an affiliate of our sponsor or any of our officers or directors to finance transaction costs in connection with an intended initial business combination. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units.

The conflicts described above may not be resolved in our favor.

In general, officers and directors of a corporation incorporated under the laws of the State of Delaware are required to present business opportunities to a corporation if:

- the corporation could financially undertake the opportunity;
- the opportunity is within the corporation's line of business; and
- it would not be fair to our company and its stockholders for the opportunity not to be brought to the attention of the corporation.

Accordingly, as a result of multiple business affiliations, our officers and directors may have similar legal obligations relating to presenting business opportunities meeting the above-listed criteria to multiple entities. Furthermore, our amended and restated certificate of incorporation provides that we renounce our interest in any corporate opportunity offered to any director or officer unless such opportunity is expressly offered to such person solely in his or her capacity as a director or officer of our company and such opportunity is one we are legally and contractually permitted to undertake and would otherwise be reasonable for us to pursue, and to the extent the director or officer is permitted to refer that opportunity to us without violating another legal obligation.

Below is a table summarizing the entities to which our executive officers and directors currently have fiduciary duties or contractual obligations:

| Individual[1] | Entity[2] | Entity's Business | Affiliation |
|---|---|---|---|
| Patrick Orlando | Yunhong International | Special Purpose Acquisition Corporation | Chief Executive Officer |
| | Benessere Capital, LLC | Investment consulting and investment banking investing | Chief Executive Officer |
| | Benessere Enterprises Inc. | Investment consulting | Chief Executive Officer |
| | Benessere Capital Acquisition Corp. | Special Purpose Acquisition Corporation | Chief Executive Officer |
| | Maquia Capital Acquisition Corp. | Special Purpose Acquisition Corporation | Director |
| Lee Jacobson | Robot Cache US Inc. | PC games digital distribution company | Chief Executive Officer |
| Justin L. Shaner | Shaner Ciocco S.r.l. | Hotels | Director |
| | Benessere Capital Acquisition Corp. | Special Purpose Acquisition Corporation | Director |
| Eric Swider | Rubidex | Data security | Chief Executive Officer |
| | Shaner Properties LLC | Real estate | Chief Executive Officer |
| | Sobe Brooks Studios LLC | Film production | Chief Executive Officer |
| | Benessere Capital Acquisition Corp. | Special Purpose Acquisition Corporation | Director |

119

(1) Each person has a fiduciary duty with respect to the listed entities next to their respective names.

(2) Each of the entities listed in this table has priority and preference relative to our company with respect to the performance by each individual listed in this table of his obligations and the presentation by each such individual of business opportunities.

Accordingly, if any of the above executive officers or directors becomes aware of a business combination opportunity which is suitable for any of the above entities to which he or she has current fiduciary or contractual obligations (including Yunhong International, Benessere Capital Acquisition Corporation, and Maquia Capital Acquisition Corporation), he or she will honor his or her fiduciary or contractual obligations to present such business combination opportunity to such entity, and only present it to us if such entity rejects the opportunity.

We are not prohibited from pursuing an initial business combination with a company that is affiliated with our sponsor, officers or directors. In the event we seek to complete our initial business combination with such a company, we, or a committee of independent directors, would obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions, that such an initial business combination is fair to our company from a financial point of view.

In the event that we submit our initial business combination to our public stockholders for a vote, pursuant to the letter agreement, our sponsor, officers and directors have agreed to vote any founder shares or placement shares held by them and any public shares purchased during or after the offering (including in open market and privately negotiated transactions) in favor of our initial business combination.

**Limitation on Liability and Indemnification of Officers and Directors**

Our amended and restated certificate of incorporation will provide that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our amended and restated certificate of incorporation will provide that our directors will not be personally liable for monetary damages to us or our stockholders for breaches of their fiduciary duty as directors, unless they violated their duty of loyalty to us or our stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived an improper personal benefit from their actions as directors.

120

We will enter into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our amended and restated certificate of incorporation. Our bylaws also permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We have purchased a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify our officers and directors.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs

of settlement and damage awards against officers and directors pursuant to these indemnification provisions.

We believe that these provisions, the directors' and officers' liability insurance and the indemnity agreements are necessary to attract and retain talented and experienced officers and directors.

## PRINCIPAL STOCKHOLDERS

The following table sets forth information regarding the beneficial ownership of our common stock as of the date of this prospectus, and as adjusted to reflect the sale of our common stock included in the units offered by this prospectus, and assuming no purchase of units in this offering, by:

- each person known by us to be the beneficial owner of more than 5% of our outstanding shares of common stock;
- each of our executive officers, directors and director nominees that beneficially owns shares of our common stock; and
- all of our executive officers, directors and director nominees as a group.

Unless otherwise indicated, we believe that all persons named in the table have sole voting and investment power with respect to all shares of common stock beneficially owned by them. The following table does not reflect record or beneficial ownership of the placement warrants and placement rights as these warrants are not exercisable and these rights are not convertible within 60 days of the date of this prospectus.

On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our chief financial officer and 7,500 founder shares to each of our independent director and director nominees. In addition, our sponsor has committed, pursuant to a written agreement, to purchase an aggregate of 306,275 placement units for a purchase price of $10.00 per unit in a private placement that will occur simultaneously with the closing of this offering (assuming the underwriters do not exercise their over-allotment option. The following table presents the number of shares and percentage of our common stock beneficially owned as of the filing date, before and after this offering, by each person, or group of persons, known to us who beneficially owns more than 5% of our capital stock, each named executive officer, each of our directors and director nominees and all directors, director nominees and executive officers as a group. The post-offering numbers and percentages presented assume that the underwriters do not exercise their over-allotment option, that our sponsor forfeits 375,000 founder shares on a pro rata basis, and that there are 12,856,275 shares of our common stock issued and outstanding after this offering, consisting of (i) 10,356,275 shares of our Class A common stock (including 10,000,000 public shares, 306,275 placement shares and 50,000 representative shares) and (ii) 2,500,000 shares of our Class B common stock, issued and outstanding after this offering.

121

| Name and Address of Beneficial Owner[1] | Before Offering | | After Offering | |
|---|---|---|---|---|
| | Number of Shares Beneficially Owned | Approximate Percentage of Outstanding Common Stock | Number of Shares Beneficially Owned[2] | Approximate Percentage of Outstanding Common Stock |
| ARC Global Investments II LLC[1][2] | 2,842,500 | 100% | 2,773,775 | 21.8% |
| Patrick Orlando | 2,842,500 | 100% | 2,773,775 | 21.8% |
| Luis Orleans-Braganza | 10,000 | * | 10,000 | * |
| Lee Jacobson | 7,500 | * | 7,500 | * |
| Justin Shaner | 7,500 | * | 7,500 | * |
| Eric Swider | 7,500 | * | 7,500 | * |
| All executive officers, directors and director nominees as a group (5 individuals) | 2,875,000 | 100% | 2,806,275 | 21.8% |

\* Less than 1%

(1) ARC Global Investments II LLC, our sponsor, is the record holder of the securities reported herein. Patrick Orlando, our chairman and chief executive officer, is the managing member of our sponsor. By virtue of this relationship, Mr. Orlando may be deemed to share beneficial ownership of the securities held of record by our sponsor. Mr. Orlando disclaims any such beneficial ownership except to the extent of his pecuniary interest. The business address of each of these entities and individuals is 78 SW 7th Street, Miami, Florida 33130.

(2) Interests shown consist solely of founder shares, classified as shares of Class B common stock, as well as placement shares after this offering (assumes the underwriters' over-allotment option has not been exercised, and an aggregate of 375,000 founder shares have been forfeited by our sponsor). Founder shares are convertible into shares of Class A common stock on a one-for-one basis, subject to adjustment, as described in the section of this prospectus entitled "Description of Securities."

After giving effect to the issuance of founder shares and the sale of the placement units, our initial stockholders will own approximately 21.8% of the outstanding common stock following the offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering or the public market). Because of this ownership block, our initial stockholders and the holders of placement shares will have significant influence over the outcome of all matters requiring approval by our stockholders, including the election of directors, amendments to our amended and restated certificate of incorporation and approval of significant corporate transactions other than approval of our initial business combination. If we increase or decrease the size of the offering, we will effect a stock dividend or a share contribution back to capital, or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20% of the issued and outstanding shares of our common stock (excluding the representative shares and the placement units and the underlying securities and representative shares and assuming they do not purchase any units in this offering) upon the consummation of this offering. The initial stockholders have agreed (A) to vote any shares owned by them in favor of any proposed initial business combination and (B) not to redeem any shares in connection with a stockholder vote to approve a proposed initial business combination.

Our sponsor, executive officers and directors are deemed to be our "promoters" as such term is defined under the federal securities laws.

**Restrictions on Transfers of Founder Shares and Placement Units**

The founder shares, and placement units, and securities contained therein, are each subject to transfer restrictions pursuant to lock-up provisions in a letter agreement with us to be entered into by our sponsor, officers and directors. Those lock-up provisions provide that such securities are not transferable or salable (i) in the case of the founder shares (or shares of common stock issuable upon conversion thereof), until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property. In the case of the placement units, including the component securities therein, until 30 days after the completion of our initial business combination, except in each case (a) to our

officers or directors, any affiliates or family members of any of our officers or directors, any members of our sponsor, or any affiliates of our sponsor, (b) in the case of an individual, by gift to a member of one of the members of the individual's immediate family or to a trust, the beneficiary of which is a member of one of the individual's immediate family, an affiliate of such person or to a charitable organization; (c) in the case of an individual, by virtue of laws of descent and distribution upon death of any of our officers, our directors, the initial stockholders or members of our sponsor; (d) in the case of an individual, pursuant to a qualified domestic relations order; (e) by private sales or transfers made in connection with the consummation of our initial business combination at prices no greater than the price at which the securities were originally purchased; (f) in the event of our liquidation prior to the completion of our initial business combination; (g) by virtue of the laws of Delaware or our sponsor's limited liability company agreement upon dissolution of our sponsor; or (h) in the event of our liquidation, merger, capital stock exchange, reorganization or other similar transaction which results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property subsequent to our completion of our initial business combination; provided, however, that in the case of clauses (a) through (e) or (g) these permitted transferees must enter into a written agreement agreeing to be bound by these transfer restrictions and the other restrictions contained in the letter agreements and by the same agreements entered into by our sponsor with respect to such securities (including provisions relating to voting, the trust account and liquidating distributions described elsewhere in this prospectus).

122

**Registration Rights**

The holders of the founder shares, representative shares, placement units (including securities contained therein) and units (including securities contained therein) that may be issued upon conversion of working capital loans, and any shares of Class A common stock issuable upon the exercise of the placement warrants and placement rights and any shares of Class A common stock, warrants and rights (and underlying Class A common stock) that may be issued upon conversion of the units issued as part of the working capital loans and Class A common stock issuable upon conversion of the founder shares, are entitled to registration rights pursuant to a registration rights agreement signed on the effective date of this offering, requiring us to register such securities for resale (in the case of the founder shares, only after conversion to our Class A common stock). The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our completion of our initial business combination and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. The registration rights agreement does not contain liquidated damages or other cash settlement provisions resulting from delays in registering our securities. We will bear the expenses incurred in connection with the filing of any such registration statements.

CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

On January 20, 2021, we issued an aggregate of 2,875,000 founder shares to our sponsor for an aggregate purchase price of $25,000 in cash, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our chief financial officer and 7,500 founder shares to each of our independent director and our director nominees. The number of founder shares issued was determined based on the expectation that such founder shares would represent 20% of the outstanding shares upon completion of this offering (excluding the representative shares and the placement units and underlying securities). If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock (excluding the placement units and the underlying securities and representative shares and assuming they do not purchase any units in this offering) upon the consummation of this offering. Up to 375,000 founder shares held by our sponsor are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised. The founder shares (including the Class A common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

123

Our sponsor has agreed to purchase an aggregate of 306,275 placement units at a price of $10.00 per unit for an aggregate purchase price of $3,062,750. If the underwriters' over-allotment option is exercised in full, the amount of placement units sold will be 332,525 for an aggregate purchase price of $3,325,250. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares, placement warrants or placement rights, which will expire worthless if we do not consummate a business combination within 18 months from the closing of this offering.

Commencing on the date of this prospectus, we have agreed to pay Benessere Enterprises Inc., an affiliate of our sponsor, a total of $10,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly fees.

No compensation of any kind, including any finder's fee, reimbursement, consulting fee or monies in respect of any payment of a loan, will be paid by us to our sponsor, officers or directors or any affiliate of our sponsor, officers or directors prior to, or in connection with any services rendered in order to effectuate, the consummation of an initial business combination (regardless of the type of transaction that it is). However, these individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates and will determine which expenses and the amount of expenses that will be reimbursed. There is no cap or ceiling on the reimbursement of out-of-pocket expenses incurred by such persons in connection with activities on our behalf.

Prior to the closing of this offering, our sponsor agreed to loan us up to $300,000 to be used for a portion of the expenses of this offering. These loans are non-interest bearing, unsecured and are due at the earlier of July 31, 2021 or the closing of this offering. The loan will be repaid upon the closing of this offering out of the estimated $662,750 of offering proceeds that has been allocated to the payment of offering expenses (other than underwriting commissions). The value of our sponsor's interest in this transaction corresponds to the principal amount outstanding under any such loan.

In addition, in order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds on a non-interest bearing basis as may be required. If we complete an initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the trust account to repay such loaned amounts but no proceeds from our trust account would be used for such repayment. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. Other than as described above, the terms of such loans by our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans.

We do not expect to seek loans from parties other than our sponsor or an affiliate of our sponsor as we do not believe third parties will be willing to

loan such funds and provide a waiver against any and all rights to seek access to funds in our trust account.

After our initial business combination, members of our management team who remain with us may be paid consulting, management or other fees from the combined company with any and all amounts being fully disclosed to our stockholders, to the extent then known, in the tender offer or proxy solicitation materials, as applicable, furnished to our stockholders. It is unlikely the amount of such compensation will be known at the time of distribution of such tender offer materials or at the time of a stockholder meeting held to consider our initial business combination, as applicable, as it will be up to the directors of the post-combination business to determine executive and director compensation.

124

The holders of the founder shares, representative shares, placement shares, and units that may be issued upon conversion of working capital loans (and in each case holders of their component securities, as applicable) will have registration rights to require us to register a sale of any of our securities held by them pursuant to a registration rights agreement to be signed prior to or on the effective date of this offering. These holders will be entitled to make up to three demands, excluding short form registration demands, that we register such securities for sale under the Securities Act. In addition, these holders will have "piggy-back" registration rights to include their securities in other registration statements filed by us.

We will enter into agreements with our officers and directors to provide contractual indemnification in addition to the indemnification provided for in our amended and restated certificate of incorporation. Our bylaws also permit us to secure insurance on behalf of any officer, director or employee for any liability arising out of his or her actions, regardless of whether Delaware law would permit such indemnification. We will purchase a policy of directors' and officers' liability insurance that insures our officers and directors against the cost of defense, settlement or payment of a judgment in some circumstances and insures us against our obligations to indemnify our officers and directors.

**Related Party Policy**

We have not yet adopted a formal policy for the review, approval or ratification of related party transactions. Accordingly, the transactions discussed above were not reviewed, approved or ratified in accordance with any such policy.

We will adopt a code of ethics requiring us to avoid, wherever possible, all conflicts of interests, except under guidelines or resolutions approved by our board of directors (or the appropriate committee of our board) or as disclosed in our public filings with the SEC. Under our code of ethics, conflict of interest situations will include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) involving the company. A form of the code of ethics that we plan to adopt prior to the consummation of this offering is filed as an exhibit to the registration statement of which this prospectus is a part.

In addition, our audit committee, pursuant to a written charter to be adopted by us, will be responsible for reviewing and approving related party transactions to the extent that we enter into such transactions. An affirmative vote of a majority of the members of the audit committee present at a meeting at which a quorum is present will be required in order to approve a related party transaction. A majority of the members of the entire audit committee will constitute a quorum. Without a meeting, the unanimous written consent of all of the members of the audit committee will be required to approve a related party transaction. A form of the audit committee charter that we plan to adopt prior to the consummation of this offering will be filed as an exhibit to the registration statement of which this prospectus is a part. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

125

To further minimize conflicts of interest, we have agreed not to consummate an initial business combination with an entity that is affiliated with any of our sponsor, officers or directors unless we, or a committee of independent directors, have obtained an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions that our initial business combination is fair to our company from a financial point of view. Furthermore, no finder's fees, reimbursements, consulting fee, monies in respect of any payment of a loan or other compensation will be paid by us to our sponsor, officers or directors or any affiliate of our sponsor, officers or directors prior to, for services rendered to us prior to, or in connection with any services rendered in order to effectuate, the consummation of our initial business combination (regardless of the type of transaction that it is). However, the following payments will be made to our sponsor, officers or directors, or our or their affiliates, none of which will be made from the proceeds of this offering held in the trust account prior to the completion of our initial business combination:

- Repayment of up to an aggregate of $300,000 in loans made to us by our sponsor to cover offering-related and organizational expenses;
- Payment to Benessere Enterprises Inc., an affiliate of our sponsor, of $10,000 per month, for up to 18 months, for office space, utilities and secretarial and administrative support;
- Reimbursement for any out-of-pocket expenses related to identifying, investigating and completing an initial business combination; and
- Repayment of non-interest bearing loans which may be made by our sponsor or an affiliate of our sponsor or certain of our officers and directors to finance transaction costs in connection with an intended initial business combination, the terms of which (other than as described above) have not been determined nor have any written agreements been executed with respect thereto. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units.

Our audit committee will review on a quarterly basis all payments that were made to our sponsor, officers, directors or our or their affiliates.

**DESCRIPTION OF SECURITIES**

Pursuant to our amended and restated certificate of incorporation, our authorized capital stock consists of 100,000,000 shares of Class A common stock, $0.0001 par value, 10,000,000 shares of Class B common stock, $0.0001 par value, and 1,000,000 shares of undesignated preferred stock, $0.0001 par value. The following description summarizes the material terms of our capital stock. Because it is only a summary, it may not contain all the information that is important to you.

**Units**

Each unit has an offering price of $10.00 and consists of one share of Class A common stock, one-half of one redeemable warrant and one right. Only whole warrants are exercisable. Each whole warrant entitles the holder to purchase one share of common stock. Pursuant to the warrant agreement, a warrant holder may exercise his, her or its warrants only for a whole number of shares of common stock. This means that only a whole warrant may be exercised at any given time by a warrant holder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination.

We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock, warrants and rights commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock, warrants and rights.

In no event will the Class A common stock, warrants and rights be traded separately until we have filed with the SEC a Current Report on Form 8-K which includes an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file a Current Report on Form 8-K which includes this audited balance sheet upon the completion of this offering, which is anticipated to take place three business days after the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option.

126

### Placement Units

The placement units are identical to the units sold in this offering except that (a) the placement units and their component securities will not be transferable, assignable or salable until 30 days after the consummation of our initial business combination except to permitted transferees, (b) the placement warrants, so long as they are held by our sponsor or its permitted transferees, (i) will not be redeemable by us, (ii) may be exercised by the holders on a cashless basis, and (iii) will be entitled to registration rights.

### Common Stock

Upon the closing of this offering, 12,856,275 shares of our common stock will be outstanding (assuming no exercise of the underwriters' over-allotment option and the corresponding forfeiture of 375,000 founder shares by our sponsor), consisting of:

- 10,306,275 shares of our Class A common stock underlying the units being offered in this offering and the private placement;
- 2,500,000 shares of Class B common stock held by our initial stockholders; and
- 50,000 shares of Class B common stock held by the representative and its designees.

127

Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 (or $3,325,250 if the underwriters' over-allotment option is exercised in full). The initial stockholders will hold an aggregate of approximately 21.8% of the issued and outstanding common stock following the offering and the expiration of the underwriters' over-allotment option (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering or the public market). If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock (excluding the placement units and the underlying securities and representative shares and assuming they do not purchase any units in this offering) upon the consummation of this offering.

Common stockholders of record are entitled to one vote for each share held on all matters to be voted on by stockholders. Holders of the Class A common stock and holders of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, except as required by law. Unless specified in our amended and restated certificate of incorporation or bylaws, or as required by applicable provisions of the DGCL or applicable stock exchange rules, the affirmative vote of a majority of our shares of common stock that are voted is required to approve any such matter voted on by our stockholders. Our board of directors will be divided into three classes, each of which will generally serve for a term of three years with only one class of directors being elected in each year. There is no cumulative voting with respect to the election of directors, with the result that the holders of more than 50% of the shares voted for the election of directors can elect all of the directors. Our stockholders are entitled to receive ratable dividends when, as and if declared by the board of directors out of funds legally available therefor.

Because our amended and restated certificate of incorporation authorizes the issuance of up to 100,000,000 shares of Class A common stock, if we were to enter into an initial business combination, we may (depending on the terms of such an initial business combination) be required to increase the number of shares of Class A common stock which we are authorized to issue at the same time as our stockholders vote on the initial business combination to the extent we seek stockholder approval in connection with our initial business combination.

In accordance with Nasdaq corporate governance requirements, we are not required to hold an annual meeting until no later than one year after our first fiscal year end following our listing on Nasdaq. Under Section 211(b) of the DGCL, we are, however, required to hold an annual meeting of stockholders for the purposes of electing directors in accordance with our bylaws, unless such election is made by written consent in lieu of such a meeting. We may not hold an annual meeting of stockholders to elect new directors prior to the consummation of our initial business combination, and thus we may not be in compliance with Section 211(b) of the DGCL, which requires an annual meeting. Therefore, if our stockholders want us to hold an annual meeting prior to the consummation of our initial business combination, they may attempt to force us to hold one by submitting an application to the Delaware Court of Chancery in accordance with Section 211(c) of the DGCL.

We will provide our stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be approximately $10.05 per public share. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. Our sponsor, officers and directors have entered into, and we anticipate the our director nominees will enter into, a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and any public shares held by them in connection with the completion of our initial business combination. Unlike many blank check companies that hold stockholder votes and conduct proxy solicitations in conjunction with their initial business combinations and provide for related redemptions of public shares for cash upon completion of such initial business combinations even when a vote is not required by applicable law or stock exchange requirements, if a stockholder vote is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation, conduct the redemptions pursuant to the tender offer rules of the SEC, and file tender offer documents with the SEC prior to completing our initial business combination. Our amended and restated certificate of incorporation will require these tender offer documents to contain substantially the same financial and other information about the initial business combination and the redemption rights as is

required under the SEC's proxy rules. If, however, a stockholder approval of the transaction is required by applicable law or stock exchange requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will, like many blank check companies, offer to redeem shares in conjunction with a proxy solicitation pursuant to the proxy rules and not pursuant to the tender offer rules. If we seek stockholder approval, we will complete our initial business combination only if a majority of the outstanding shares of common stock voted are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of outstanding capital stock of the company representing a majority of the voting power of all outstanding shares of capital stock of the company entitled to vote at such meeting. The underwriters will have the same redemption rights as a public stockholder with respect to any public shares it acquires. The representative has informed us that it has no current commitments, plans or intentions to acquire any public shares for its own account; however, if they do acquire public shares, it will do so in the ordinary course of business or in the types of transaction described in the first paragraph under "Proposed Business — Effecting our Initial Business Combination — Permitted purchases of our securities." The underwriters will not make any such purchases when in possession of any material nonpublic information not disclosed to the seller, during a restricted period under Regulation M under the Exchange Act, in transactions that would violate Section 9(a)(2) or Rule 10(b)-5 under the Exchange Act, or if prohibited by applicable state securities laws or broker-dealer regulations. To the extent our initial stockholders or purchasers of placement units transfer any of these securities to certain permitted transferees, such permitted transferees will agree, as a condition to such transfer, to waive these redemption rights. Also, our sponsor has committed to purchase 306,275 placement units (or up to 332,525 placement units if the underwriters' over-allotment option is exercised in full) at the price of $10.00 per unit in a private placement that will occur simultaneously with the completion of this offering. If we submit our initial business combination to our public stockholders for a vote, our sponsor, the other initial stockholders, our officers and our directors have agreed to vote their respective founder shares, placement shares and any public shares held by them in favor of our initial business combination.

128

The participation of our sponsor, officers, directors or their affiliates in privately-negotiated transactions (as described in this prospectus), if any, could result in the approval of our initial business combination even if a majority of our public stockholders vote, or indicate their intention to vote, against such business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, may make it more likely that we will consummate our initial business combination.

If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our amended and restated certificate of incorporation will provide that a public stockholder, together with any affiliate of such stockholder or any other person with whom such stockholder is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming its shares with respect to more than an aggregate of 15% of the shares of common stock sold in this offering, which we refer to as the Excess Shares. However, we would not be restricting our stockholders' ability to vote all of their shares (including Excess Shares) for or against our initial business combination. Our stockholders' inability to redeem the Excess Shares will reduce their influence over our ability to complete our initial business combination, and such stockholders could suffer a material loss in their investment if they sell such Excess Shares on the open market. Additionally, such stockholders will not receive redemption distributions with respect to the Excess Shares if we complete the initial business combination. And, as a result, such stockholders will continue to hold that number of shares exceeding 15% and, in order to dispose such shares in open market transactions, potentially at a loss.

129

If we seek stockholder approval in connection with our initial business combination, pursuant to the letter agreement our sponsor, officers and directors have agreed to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction). Additionally, each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction (subject to the limitation described in the preceding paragraph).

Pursuant to our amended and restated certificate of incorporation, if we are unable to complete our initial business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than ten business days thereafter subject to lawfully available funds therefor, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Our sponsor, officers, directors hand director nominees will enter into a letter agreement with us, pursuant to which they will agree to waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering. However, if our initial stockholders acquire public shares in or after this offering, they will be entitled to liquidating distributions from the trust account with respect to such public shares if we fail to complete our initial business combination within the prescribed time period.

In the event of a liquidation, dissolution or winding up of the company after an initial business combination, our stockholders are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the common stock. Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to the common stock, except that we will provide our stockholders with the opportunity to redeem their public shares for cash equal to their pro rata share of the aggregate amount then on deposit in the trust account, upon the completion of our initial business combination, subject to the limitations described herein.

**Founder Shares and Placement Shares**

The founder shares and placement shares are identical to the shares of Class A common stock included in the units being sold in this offering, and

holders of founder shares and placement shares have the same stockholder rights as public stockholders, except that (i) the founder shares and placement shares are subject to certain transfer restrictions, as described in more detail below, (ii) our sponsor, officers, directors and director nominees will enter into a letter agreement with us, pursuant to which they will agree (A) to waive their redemption rights with respect to any founder shares and placement shares and any public shares held by them in connection with the completion of our initial business combination, (B) to waive their redemption rights with respect to their founder shares and placement shares and any public shares in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (x) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (y) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (C) to waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within such time period, (iii) the founder shares are shares of our Class B common stock that will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein, and (iv) are entitled to registration rights. If we submit our initial business combination to our public stockholders for a vote, our sponsor, officers, directors and director nominees will vote any founder shares and placement shares held by them and any public shares purchased during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. The placement shares will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees.

130

The shares of Class B common stock will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis (subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like), and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon completion of this offering (excluding the representative shares and the placement units and underlying securities) plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination, any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of loans made to us). We cannot determine at this time whether a majority of the holders of our Class B common stock at the time of any future issuance would agree to waive such adjustment to the conversion ratio. They may waive such adjustment due to (but not limited to) the following: (i) closing conditions which are part of the agreement for our initial business combination; (ii) negotiation with Class A stockholders on structuring an initial business combination; or (iii) negotiation with parties providing financing which would trigger the anti-dilution provisions of the Class B common stock. If such adjustment is not waived, the issuance would not reduce the percentage ownership of holders of our Class B common stock, but would reduce the percentage ownership of holders of our Class A common stock. If such adjustment is waived, the issuance would reduce the percentage ownership of holders of both classes of our common stock. The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issues in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities.

With certain limited exceptions, the founder shares are not transferable, assignable or saleable (except to our officers and directors and other persons or entities affiliated with our sponsor, each of whom will be subject to the same transfer restrictions) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property.

**Preferred Stock**

Our amended and restated certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series. Our board of directors will be authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. Our board of directors will be able to, without stockholder approval, issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the common stock and could have anti-takeover effects. The ability of our board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of us or the removal of existing management. We have no preferred stock outstanding at the date hereof. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future. No shares of preferred stock are being issued or registered in this offering.

131

**Redeemable Warrants**

*Public Stockholders' Warrants*

Each whole warrant entitles the registered holder to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of this offering and 30 days after the completion of our initial business combination. Pursuant to the warrant agreement, a warrant holder may exercise its warrants only for a whole number of shares of Class A common stock. This means that only a whole warrant may be exercised at any given time by a warrant holder. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant.

The warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle

such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common stock underlying the warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration. No warrant will be exercisable and we will not be obligated to issue shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a warrant, the holder of such warrant will not be able to exercise such warrant and such warrant may have no value and expire worthless. In no event will we be required to net cash settle any warrant. In the event that a registration statement is not effective for the exercised warrants, the purchaser of a unit containing such warrant will have paid the full purchase price for the unit solely for the share of Class A common stock underlying such unit.

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. Notwithstanding the foregoing, if a registration statement covering the Class A common stock issuable upon exercise of the warrants is not effective within a specified period following the consummation of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we shall have failed to maintain an effective registration statement, exercise warrants on a cashless basis pursuant to the exemption provided by Section 3(a)(9) of the Securities Act of 1933, as amended, or the Securities Act, provided that such exemption is available. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis.

132

Once the warrants become exercisable, we may call the warrants for redemption:

- in whole and not in part;
- at a price of $0.01 per warrant;
- upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and
- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing once the warrants become exercisable and ending three business days before we send the notice of redemption to the warrant holders.

If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the warrants, each warrant holder will be entitled to exercise its warrant prior to the scheduled redemption date. However, the price of the Class A common stock may fall below the $18.00 redemption trigger price (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) as well as the $11.50 warrant exercise price after the redemption notice is issued.

If we call the warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. If our management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of Class A common stock to be received upon exercise of the warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. We believe this feature is an attractive option to us if we do not need the cash from the exercise of the warrants after our initial business combination. If we call our warrants for redemption and our management does not take advantage of this option, our sponsor and its permitted transferees would still be entitled to exercise their placement warrants for cash or on a cashless basis using the same formula described above that other warrant holders would have been required to use had all warrant holders been required to exercise their warrants on a cashless basis, as described in more detail below.

A holder of a warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 4.9% or 9.8% (or such other amount as a holder may specify) of the shares of Class A common stock outstanding immediately after giving effect to such exercise.

If the number of outstanding shares of Class A common stock is increased by a stock dividend payable in shares of Class A common stock, or by a split-up of shares of Class A common stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Class A common stock issuable on exercise of each whole warrant will be increased in proportion to such increase in the outstanding shares of Class A common stock. A rights offering to holders of Class A common stock entitling holders to purchase shares of Class A common stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Class A common stock equal to the product of (i) the number of shares of Class A common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Class A common stock) and (ii) one (1) minus the quotient of (x) the price per share of Class A common stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Class A common stock, in determining the price payable for Class A common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market

value means the volume weighted average price of Class A common stock as reported during the ten (10) trading day period ending on the trading day prior to the first date on which the shares of Class A common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

133

In addition, if we, at any time while the warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of Class A common stock on account of such shares of Class A common stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as described above, (b) certain ordinary cash dividends, (c) to satisfy the redemption rights of the holders of Class A common stock in connection with a proposed initial business combination, (d) to satisfy the redemption rights of the holders of Class A common stock in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our Class A common stock if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity, or (e) in connection with the redemption of our public shares upon our failure to complete our initial business combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of Class A common stock in respect of such event.

If the number of outstanding shares of our Class A common stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Class A common stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Class A common stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Class A common stock.

Whenever the number of shares of Class A common stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of Class A common stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Class A common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Class A common stock (other than those described above or that solely affects the par value of such shares of Class A common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of Class A common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of our Class A common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event. However, if less than 70% of the consideration receivable by the holders of Class A common stock in such a transaction is payable in the form of Class A common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the warrant properly exercises the warrant within thirty days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the Black-Scholes value (as defined in the warrant agreement) of the warrant. The purpose of such exercise price reduction is to provide additional value to holders of the warrants when an extraordinary transaction occurs during the exercise period of the warrants pursuant to which the holders of the warrants otherwise do not receive the full potential value of the warrants in order to determine and realize the option value component of the warrant. This formula is to compensate the warrant holder for the loss of the option value portion of the warrant due to the requirement that the warrant holder exercise the warrant within 30 days of the event. The Black-Scholes model is an accepted pricing model for estimating fair market value where no quoted market price for an instrument is available.

134

The warrants will be issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which has been filed as an exhibit to the registration statement of which this prospectus is a part, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any mistake, including to conform the provisions of the warrant agreement to the description of the terms of the warrants and the warrant agreement set forth in this prospectus, or defective provision, but requires the approval by the holders of at least a majority of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at a Newly Issued Price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the Market Value is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described above will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price.

The warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of warrants being exercised. The warrant holders do not have the rights or privileges of holders of Class A common stock and any voting rights until they exercise their warrants and receive shares of Class A common stock. After the issuance of shares of Class A common stock upon exercise of the warrants, each holder will be entitled to one (1) vote for each share held of record on all matters to be voted on by stockholders.

No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number of shares of Class A common stock to be issued to the warrant holder.

We have agreed that, subject to applicable law, any action, proceeding or claim against us arising out of or relating in any way to the warrant agreement will be brought and enforced in the courts of the State of New York or the United States District Court for the Southern District of New York, and we irrevocably submit to such jurisdiction, which jurisdiction will be the exclusive forum for any such action, proceeding or claim. See "Risk Factors — Our warrant agreement designates the courts of the State of New York or the United States District Court for the Southern District of New York as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by holders of our warrants, which could limit the ability of warrant holders to obtain a favorable judicial forum for disputes with our company." This provision applies to claims under the Securities Act but does not apply to claims under the Exchange Act or any claim for which the federal district courts of the United States of America are the sole and exclusive forum.

135

*Placement warrants*

Except as described below, the placement warrants have terms and provisions that are identical to those of the warrants being sold as part of the units in this offering, including as to exercise price, exercisability and exercise period. The placement warrants (including the Class A common stock issuable upon exercise of the placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Warrants", to our officers and directors and other persons or entities affiliated with our sponsor). They will also be exercisable on a cashless basis and will not be redeemable by us so long as they are held by our sponsor or its permitted transferees. Our sponsor or its permitted transferees have the option to exercise the placement warrants on a cashless basis. If the placement warrants are held by holders other than the sponsor or its permitted transferees, the placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units being sold in this offering.

136

If holders of the placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following an initial business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. Even during such periods of time when insiders will be permitted to sell our securities, an insider cannot trade in our securities if he or she is in possession of material non-public information. Accordingly, unlike public stockholders who typically could sell their shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate.

In addition, holders of our placement warrants are entitled to certain registration rights.

In order to finance transaction costs in connection with an intended initial business combination, our sponsor or an affiliate of our sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. Up to $1,500,000 of such loans may be convertible into units, at a price of $10.00 per unit at the option of the lender, upon consummation of our initial business combination. The units would be identical to the placement units. However, as the units would not be issued until consummation of our initial business combination, any warrants underlying such units would not be able to be voted on an amendment to the warrant agreement in connection with such business combination.

Our sponsor has agreed not to transfer, assign or sell any of the placement warrants (including the Class A common stock issuable upon exercise of any of these warrants) until the date that is 30 days after the date we complete our initial business combination, except that, among other limited exceptions as described under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Warrants" made to our officers and directors and other persons or entities affiliated with our sponsor.

**Rights**

Each holder of a right will receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, even if the holder of such right redeemed all Class A common stock held by it in connection with the initial business combination. No additional consideration will be required to be paid by a holder of rights in order to receive its additional shares upon consummation of an initial business combination, as the consideration related thereto has been included in the unit purchase price paid for by investors in this offering. If we enter into a definitive agreement for a business combination in which we will not be the surviving entity, the definitive agreement will provide for the holders of rights to receive the same per share consideration the holders of the Class A common stock will receive in the transaction on an as-converted into Class A common basis, and each holder of a right will be required to affirmatively convert its rights in order to receive the 1/10 share underlying each right (without paying any additional consideration) upon consummation of the business combination. More specifically, the right holder will be required to indicate its election to convert the rights into underlying shares as well as to return the original rights certificates to us.

If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, holders of rights will not receive any such funds with respect to their rights, nor will they receive any distribution from our assets held outside of the trust account with respect to such rights, and the rights will expire worthless.

137

As soon as practicable upon the consummation of our initial business combination, we will direct registered holders of the rights to return their rights to our rights agent. Upon receipt of the rights, the rights agent will issue to the registered holder of such rights the number of full Class A common stock to which it is entitled. We will notify registered holders of the rights to deliver their rights to the rights agent promptly upon consummation of such business combination and have been informed by the rights agent that the process of exchanging their rights for Class A common stock should take no more than a matter of days. The foregoing exchange of rights is solely ministerial in nature and is not intended to provide us with any means of avoiding our obligation to issue the shares underlying the rights upon consummation of our initial business combination. Other than confirming that the rights delivered by a registered holder are valid, we will have no ability to avoid delivery of the shares underlying the rights. Nevertheless, there are no contractual penalties for failure to deliver securities to the holders of the rights upon consummation of an initial business combination.

The shares issuable upon conversion of the rights will be freely tradable (except to the extent held by affiliates of ours). We will not issue fractional shares upon conversion of the rights. Fractional shares will be rounded down to the nearest whole share. As a result, you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination. If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, holders of rights will not receive any of such funds with respect to their rights, nor will they receive any distribution from our assets held outside of the trust account with respect to such rights, and the rights will expire worthless. Further, there are no contractual penalties for failure to deliver securities to the holders of the rights upon consummation of an initial business combination. Accordingly, the rights may expire worthless.

**Dividends**

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of an initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial conditions subsequent to completion of an initial business combination. The payment of any cash dividends subsequent to an initial business combination will be within the discretion of our board of directors at such time. If we increase or decrease the size of the offering we will effect a stock dividend or a share contribution back to capital or other appropriate mechanism, as applicable, with respect to our Class B common stock immediately prior to the consummation of the offering in such amount as to maintain the ownership of our initial stockholders at 20.0% of the issued and outstanding shares of our common stock (excluding the placement units and the underlying securities and representative shares and assuming they do not purchase any units in this offering) upon the consummation of this offering. Further, if we incur any indebtedness, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

**Our Transfer Agent and Warrant Agent**

The transfer agent for our common stock and warrant agent for our warrants and right agent for our rights is Continental Stock Transfer & Trust Company. We have agreed to indemnify Continental Stock Transfer & Trust Company in its roles as transfer agent and warrant agent, its agents and each of its stockholders, directors, officers and employees against all claims and losses that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

**Our Amended and Restated Certificate of Incorporation**

Our amended and restated certificate of incorporation will contain certain requirements and restrictions relating to this offering that will apply to us until the completion of our initial business combination. These provisions cannot be amended without the approval of the holders of at least 65% of our common stock. Our initial stockholders, who will collectively beneficially own approximately 21.8% of our common stock upon the closing of this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering), will participate in any vote to amend our amended and restated certificate of incorporation and will have the discretion to vote in any manner they choose. Specifically, our amended and restated certificate of incorporation provides, among other things, that:

- If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter subject to lawfully available funds therefor, redeem 100% of the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account including interest earned on the funds held in the trust account and not previously released to us to pay our taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in the case of clauses (ii) and (iii) above to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law;

- Prior to our initial business combination, we may not issue additional shares of capital stock that would entitle the holders thereof to (i) receive funds from the trust account or (ii) vote on any initial business combination;

- Although we do not intend to enter into an initial business combination with a target business that is affiliated with our sponsor, our directors or our officers, we are not prohibited from doing so. In the event we enter into such a transaction, we, or a committee of independent directors, will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions that such an initial business combination is fair to our company from a financial point of view;

- If a stockholder vote on our initial business combination is not required by law and we do not decide to hold a stockholder vote for business or other legal reasons, we will offer to redeem our public shares pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, and will file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about our initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act; whether or not we maintain our registration under the Exchange Act or our listing on Nasdaq, we will provide our public stockholders with the opportunity to redeem their public shares by one of the two methods listed above;

- So long as we obtain and maintain a listing for our securities on Nasdaq, Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination;

- If our stockholders approve an amendment to our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, we will provide our public stockholders with the opportunity to redeem all or a portion of their shares of Class A common stock upon such approval at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares; and

- We will not effectuate our initial business combination with another blank check company or a similar company with nominal operations.

In addition, our amended and restated certificate of incorporation provides that under no circumstances will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of

underwriters' fees and commissions.

**Certain Anti-Takeover Provisions of Delaware Law and our Amended and Restated Certificate of Incorporation and Bylaws**

We are subject to the provisions of Section 203 of the DGCL regulating corporate takeovers upon completion of this offering. This statute prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");
- an affiliate of an interested stockholder; or
- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;
- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or
- on or subsequent to the date of the transaction, the initial business combination is approved by our board of directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Our amended and restated certificate of incorporation will provide that our board of directors will be classified into three classes of directors. As a result, in most circumstances, a person can gain control of our board only by successfully engaging in a proxy contest at two or more annual meetings.

Our authorized but unissued common stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

*Exclusive forum for certain lawsuits*

Our amended and restated certificate of incorporation will require, to the fullest extent permitted by law, that derivative actions brought in our name, actions against directors, officers and employees for breach of fiduciary duty and certain other actions may be brought only in the Court of Chancery in the State of Delaware, except any action (A) as to which the Court of Chancery in the State of Delaware determines that there is an indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), (B) which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery or (C) for which the Court of Chancery does not have subject matter jurisdiction. If an action is brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel. Although we believe this provision benefits us by providing increased consistency in the application of law in the types of lawsuits to which it applies, a court may determine that this provision is unenforceable, and to the extent it is enforceable, the provision may have the effect of discouraging lawsuits against our directors and officers.

Our amended and restated certificate of incorporation will provide that the exclusive forum provision will be applicable to the fullest extent permitted by applicable law, subject to certain exceptions. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all suits brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. As a result, the exclusive forum provision will not apply to suits brought to enforce any duty or liability created by the Exchange Act or any other claim for which the federal courts have exclusive jurisdiction. In addition, our amended and restated certificate of incorporation provides that, unless we consent in writing to the selection of an alternative forum, the federal district courts of the United States of America shall, to the fullest extent permitted by law, be the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act, or the rules and regulations promulgated thereunder. We note, however, that there is uncertainty as to whether a court would enforce this provision and that investors cannot waive compliance with the federal securities laws and the rules and regulations thereunder. Section 22 of the Securities Act creates concurrent jurisdiction for state and federal courts over all suits brought to enforce any duty or liability created by the Securities Act or the rules and regulations thereunder.

*Special meeting of stockholders*

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of our board of directors, by our Chief Executive Officer or by our Chairman.

*Advance notice requirements for stockholder proposals and director nominations*

Our bylaws provide that stockholders seeking to bring business before our annual meeting of stockholders, or to nominate candidates for election as directors at our annual meeting of stockholders, must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be received by the company secretary at our principal executive offices not later than the close of business on the 90th day nor earlier than the opening of business on the 120th day prior to the anniversary date of the immediately preceding annual meeting of stockholders. Pursuant to Rule 14a-8 of the Exchange Act, proposals seeking inclusion in our annual proxy statement must comply with the notice periods contained therein. Our bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders.

*Action by written consent*

Subsequent to the consummation of the offering, any action required or permitted to be taken by our common stockholders must be effected by a duly called annual or special meeting of such stockholders and may not be effected by written consent of the stockholders other than with respect to our Class B common stock.

*Classified Board of Directors*

Our board of directors is divided into three classes, Class I, Class II and Class III, with members of each class serving staggered three-year terms. Our amended and restated certificate of incorporation will provide that the authorized number of directors may be changed only by resolution of the board of directors. Subject to the terms of any preferred stock, any or all of the directors may be removed from office at any time, but only for cause and only by the affirmative vote of holders of a majority of the voting power of all then outstanding shares of our capital stock entitled to vote generally in the election of directors, voting together as a single class. Any vacancy on our board of directors, including a vacancy resulting from an enlargement of our board of directors, may be filled only by vote of a majority of our directors then in office.

***Class B Common Stock Consent Right***

For so long as any shares of Class B common stock remain outstanding, we may not, without the prior vote or written consent of the holders of a majority of the shares of Class B common stock then outstanding, voting separately as a single class, amend, alter or repeal any provision our certificate of incorporation, whether by merger, consolidation or otherwise, if such amendment, alteration or repeal would alter or change the powers, preferences or relative, participating, optional or other special rights of the Class B common stock. Any action required or permitted to be taken at any meeting of the holders of Class B common stock may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of the outstanding Class B common stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares of Class B common stock were present and voted.

**Securities Eligible for Future Sale**

Immediately after the consummation of this offering (assuming no exercise of the underwriters' over-allotment option) we will have 12,856,275 (or 14,765,025 if the underwriters' over-allotment option is exercised in full) shares of common stock outstanding. Of these shares, the 10,000,000 shares (or 11,500,000 if the underwriters' over-allotment option is exercised in full) sold in this offering will be freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. All of the remaining 2,500,000 (or 2,875,000 if the underwriters' over-allotment option is exercised in full) founder shares, all 306,275 placement units (or 332,525 if the underwriter's over-allotment option is exercised in full, including component securities contained therein) and all 50,000 representative shares (or 57,500 representative shares if the underwriters' over-allotment option is exercised in full) are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering, and the shares of Class B common stock and placement units (including component securities contained therein) are subject to transfer restrictions as set forth elsewhere in this prospectus. These restricted securities will be entitled to registration rights as more fully described below under "— Registration Rights."

**Rule 144**

Pursuant to Rule 144, a person who has beneficially owned restricted shares of our common stock, warrants or rights for at least six months would be entitled to sell their securities provided that (i) such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale and (ii) we are subject to the Exchange Act periodic reporting requirements for at least three months before the sale and have filed all required reports under Section 13 or 15(d) of the Exchange Act during the 12 months (or such shorter period as we were required to file reports) preceding the sale.

Persons who have beneficially owned restricted shares of our common stock, warrants or rights for at least six months but who are our affiliates at the time of, or at any time during the three months preceding, a sale, would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of common stock then outstanding, which will equal 128,563 shares immediately after this offering (or 147,650 shares if the underwriters exercise their over-allotment option in full); or
- the average weekly reported trading volume of the common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by our affiliates under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about us.

**Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;
- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;
- the issuer of the securities has filed all Exchange Act reports and materials required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Current Reports on Form 8-K; and
- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As a result, our initial stockholders will be able to sell their founder shares and placement units (including component securities contained therein), as applicable, pursuant to Rule 144 without registration one year after we have completed our initial business combination.

**Registration Rights**

The holders of the founder shares, representative shares, placement units (including component securities contained therein) and units (including securities contained therein) that may be issued upon conversion of working capital loans, and any shares of Class A common stock issuable upon the exercise of the placement warrants and any shares of Class A common stock and warrants (and underlying Class A common stock) that may be issued upon conversion of the units issued as part of the working capital loans and Class A common stock issuable upon conversion of the founder shares, are entitled to registration rights pursuant to a registration rights agreement signed on the effective date of this offering, requiring us to register such securities for resale (in the case of the founder shares, only after conversion to our Class A common stock). The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our completion of our initial business combination and rights to require us to register for resale such securities pursuant to Rule 415 under the Securities Act. The registration rights agreement does not contain liquidated damages or other cash settlement provisions resulting from delays in registering our securities. We will bear the expenses incurred in connection with the filing of any such registration statements. We will bear the expenses incurred in connection with the filing of any such registration statements.

**Listing of Securities**

We intend to apply to list our units, Class A common stock, warrants and rights on Nasdaq under the symbols "DWACU," "DWAC," "DWACW" and "DWACR," respectively. Our units will be listed on Nasdaq on or promptly after the effective date of the registration statement. Following the date the shares of our Class A common stock, warrants and rights are eligible to trade separately, we anticipate that the shares of our Class A common stock, warrants and rights will be listed separately and as a unit on Nasdaq.

## UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

The following discussion summarizes certain U.S. federal income tax considerations generally applicable to the acquisition, ownership and disposition of our units (each consisting of one share of our Class A common stock, one-half of one redeemable warrant to acquire one share of our Class A common stock, and one right to receive one-tenth of one share of our Class A common stock) that are purchased in this offering by U.S. Holders (as defined below) and Non-U.S. Holders (as defined below). Because the components of a unit are generally separable at the option of the holder, the holder of a unit generally should be treated, for U.S. federal income tax purposes, as the owner of the underlying share of our Class A common stock, the one-half of one warrant and the one right components of the unit. As a result, the discussion below with respect to holders of shares of our Class A common stock, warrants and rights should also apply to holders of units (as the deemed owners of the underlying common stock, warrants and rights that constitute the units).

This discussion is limited to certain U.S. federal income tax considerations to beneficial owners of our securities who are initial purchasers of a unit pursuant to this offering and hold the unit and each component of the unit as capital assets within the meaning of Section 1221(a) of the U.S. Internal Revenue Code of 1986, as amended (the "Code") (generally, property held for investment). This discussion assumes that the shares of our Class A common stock, warrants and rights will trade separately and that any distributions made (or deemed made) by us on the shares of our Class A common stock and any consideration received (or deemed received) by a holder in consideration for the sale or other disposition of our securities will be in U.S. dollars. This discussion is a summary only and does not consider all aspects of U.S. federal income taxation that may be relevant to the acquisition, ownership and disposition of a unit by a prospective investor in light of its particular circumstances or that is subject to special rules under the U.S. federal income tax laws, including, but not limited to:

- our sponsor, officers, directors or other holders of our Class B common stock or private placement warrants;
- banks and other financial institutions or financial services entities;
- broker-dealers;
- mutual funds;
- retirement plans, individual retirement accounts or other tax-deferred accounts;
- taxpayers that are subject to the mark-to-market tax accounting rules;
- tax-exempt entities;
- S-corporations, partnerships or other flow-through entities and investors therein;
- governments or agencies or instrumentalities thereof;
- insurance companies;
- regulated investment companies;
- real estate investment trusts;
- passive foreign investment companies;
- controlled foreign corporations;
- qualified foreign pension funds;

144

- expatriates or former long-term residents of the United States;
- persons that actually or constructively own five percent or more of our voting shares;
- persons that acquired our securities pursuant to an exercise of employee share options, in connection with employee share incentive plans or otherwise as compensation or in connection with services;
- persons required for U.S. federal income tax purposes to conform the timing of income accruals to their financial statements under Section 451 of the Code;
- persons subject to the alternative minimum tax;
- persons that hold our securities as part of a straddle, constructive sale, hedging, conversion or other integrated or similar transaction; or
- U.S. Holders (as defined below) whose functional currency is not the U.S. dollar.

The discussion below is based upon current provisions of the Code, applicable U.S. Treasury regulations promulgated under the Code ("Treasury Regulations"), judicial decisions and administrative rulings of the IRS, all as in effect on the date hereof, and all of which are subject to differing interpretations or change, possibly on a retroactive basis. Any such differing interpretations or change could alter the U.S. federal income tax consequences discussed below. Furthermore, this discussion does not address any aspect of U.S. federal non-income tax laws, such as gift, estate or Medicare contribution tax laws, or state, local or non-U.S. tax laws.

We have not sought, and will not seek, a ruling from the IRS as to any U.S. federal income tax consequence described herein. The IRS may disagree with the discussion herein, and its determination may be upheld by a court. Moreover, there can be no assurance that future legislation, regulations, administrative rulings or court decisions will not adversely affect the accuracy of the statements in this discussion.

As used herein, the term "U.S. Holder" means a beneficial owner of units, shares of our Class A common stock, warrants or rights that is for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States, (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) that is created or organized (or treated as created or organized) in or under the laws of the United States, any state thereof or the District of Columbia, (iii) an estate the income of which is subject to U.S. federal income taxation regardless of its source or (iv) a trust if (A) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust, or (B) it has in effect a valid election under Treasury Regulations to be treated as a United States person.

This discussion does not consider the tax treatment of partnerships or other pass-through entities (including branches) or persons who hold our securities through such entities. If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is the beneficial owner of our securities, the U.S. federal income tax treatment of a partner in the partnership generally will depend on the status of the partner and the activities of the partner and the partnership. If you are a partner or a partnership holding our securities, we urge you to consult your own tax advisor.

THIS DISCUSSION IS ONLY A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS ASSOCIATED WITH THE ACQUISITION, OWNERSHIP AND DISPOSITION OF OUR UNITS. EACH PROSPECTIVE INVESTOR IN OUR UNITS IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PARTICULAR TAX CONSEQUENCES TO SUCH INVESTOR OF THE ACQUISITION, OWNERSHIP AND DISPOSITION OF OUR UNITS, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, AND NON-UNITED STATES TAX LAWS

145

*Personal Holding Company Status*

We could be subject to a second level of U.S. federal income tax on a portion of our income if we are determined to be a personal holding company (a "PHC") for U.S. federal income tax purposes. A U.S. corporation generally will be classified as a PHC for U.S. federal income tax purposes in a given taxable year if (i) at any time during the last half of such taxable year, five or fewer individuals (without regard to their citizenship or residency and including as individuals for this purpose certain entities such as certain tax-exempt organizations, pension funds and charitable trusts) own or are deemed to own (pursuant to certain constructive ownership rules) more than 50% of the stock of the corporation by value and (ii) at least 60% of the corporation's adjusted ordinary gross income, as determined for U.S. federal income tax purposes, for such taxable year consists of PHC income (which includes, among other things, dividends, interest, certain royalties, annuities and, under certain circumstances, rents).

Depending on the date and size of our initial business combination, it is possible that at least 60% of our adjusted ordinary gross income may consist of PHC income as discussed above. In addition, depending on the concentration of our stock in the hands of individuals, including the members of our sponsor and certain tax-exempt organizations, pension funds and charitable trusts, it is possible that more than 50% of our stock may be owned or deemed owned (pursuant to the constructive ownership rules) by such persons during the last half of a taxable year. Thus, no assurance can be given that we will not be a PHC following this offering or in the future. If we are or were to become a PHC in a given taxable year, we would be subject to an additional PHC tax, currently 20%, on our undistributed PHC income, which generally includes our taxable income, subject to certain adjustments.

*Allocation of Purchase Price and Characterization of a Unit*

No statutory, administrative or judicial authority directly addresses the treatment of a unit or instruments similar to a unit for U.S. federal income tax purposes, and therefore, that treatment is not entirely clear. The acquisition of a unit should be treated for U.S. federal income tax purposes as the acquisition of one share of our Class A common stock, one right to receive one-tenth of one share of our Class A common stock, and one-half of one warrant, with each whole warrant exercisable to acquire one share of our Class A common stock, and we intend to treat the acquisition of a unit in this manner. For U.S. federal income tax purposes, each holder of a unit must allocate the purchase price paid by such holder for such unit among the one share of our Class A common stock, the one right, and the one-half of one warrant based on the relative fair market value of each at the time of issuance. Under U.S. federal income tax law, each investor must make its own determination of such value based on all the relevant facts and circumstances. Therefore, we strongly urge each investor to consult its tax advisor regarding the determination of value for these purposes. The price allocated to each share of our Class A common stock, one right and one-half of one warrant should constitute the holder's initial tax basis in such share, right and one-half of one warrant, respectively. Any disposition of a unit should be treated for U.S. federal income tax purposes as a disposition of the share of our Class A common stock, right, and one-half of one warrant comprising the unit, and the amount realized on the disposition should be allocated among the share of our Class A common stock, the right and one-half of one warrant based on their respective relative fair market values at the time of disposition. Neither the separation of the share of our Class A common stock, the right and the one-half of one warrant constituting a unit nor the combination of halves of warrants into a single warrant should be a taxable event for U.S. federal income tax purposes.

The foregoing treatment of the shares of our Class A common stock, rights and warrants and a holder's purchase price allocation are not binding on the IRS or the courts. Because there are no authorities that directly address instruments that are similar to the units, no assurance can be given that the IRS or the courts will agree with the characterization described above or the discussion below. Accordingly, each prospective investor is urged to consult its tax advisor regarding the tax consequences of an investment in a unit (including alternative characterizations of a unit). The balance of this discussion assumes that the characterization of the units described above is respected for U.S. federal income tax purposes.

*U.S. Holders*

*Taxation of Distributions*

If we pay distributions in cash or other property (other than certain distributions of our stock or rights to acquire our stock) to U.S. Holders of our Class A common stock, such distributions will constitute dividends for U.S. federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. Holder's adjusted tax basis in our shares of our Class A common stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the shares of our Class A common stock and will be treated as described under "U.S. Holders — Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Our Class A Common Stock and Warrants" below.

Dividends we pay to a corporate U.S. Holder generally will qualify for the dividends received deduction if certain holding period requirements are met. With certain exceptions (including, but not limited to, dividends treated as investment income for purposes of investment interest deduction limitations), and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. Holder will generally be taxed as qualified dividend income at the preferential tax rate for long-term capital gains. It is unclear whether the redemption rights with respect to the shares of our Class A common stock described in this prospectus may prevent a U.S. Holder from satisfying the applicable holding period requirements with respect to the dividends received deduction or the preferential tax rate on qualified dividend income, as the case may be. If the holding period requirements are not met, then a corporation may not be able to qualify for the dividends received deduction and would have taxable income equal to the entire dividend amount, and non-corporate holders may be subject to tax on such dividend at regular ordinary income tax rates instead of the preferential rate that applies to qualified dividend income.

*Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities*

A U.S. Holder generally will recognize capital gain or loss on a sale or other taxable disposition of our shares of Class A common stock, rights or warrants (including on our dissolution and liquidation if we do not complete an initial business combination within the required time period). Any such capital gain or loss generally will be long-term capital gain or loss if the U.S. Holder's holding period for such shares of our Class A common stock, rights or warrants exceeds one year. Long-term capital gains recognized by a non-corporate U.S. Holder are currently eligible to be taxed preferential rates. It is unclear, however, whether certain redemption rights described in this prospectus may suspend the running of the applicable holding period for this purpose. If the running of the holding period for the Class A common stock is suspended, then non-corporate U.S. Holders may not be able to satisfy the one-year holding period requirement for long-term capital gain treatment, in which case any gain on a sale or taxable disposition of the shares would be subject to short-term capital gain treatment and would be taxed at regular ordinary income tax rates. The deductibility of capital losses is subject to limitations.

The amount of gain or loss recognized on a sale or other taxable disposition generally will be equal to the difference between (i) the sum of the amount of cash and the fair market value of any property received in such disposition (or, if the shares of our Class A common stock, rights or warrants are held as part of units at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the shares of our Class A common stock, rights or warrants based upon the then relative fair market values of the shares of our Class A common stock, rights and the warrants included in the units) and (ii) the U.S. Holder's adjusted tax basis in its shares of our Class A common stock, rights or warrants so disposed of. A U.S. Holder's adjusted tax basis in its shares of our Class A common stock, rights and warrants generally will equal the U.S. Holder's acquisition cost (that is, the portion of the purchase price of a unit allocated to a share of our Class A common stock, right or one-half of one warrant, as described above under "— Allocation of Purchase Price and Characterization of a Unit") reduced, in the case of a share of our Class A common stock, by any prior distributions treated as a return of capital. See "U.S. Holders — Exercise, Lapse or Redemption of a Warrant" below for a discussion regarding a U.S. Holder's tax basis in a share of our Class A common stock acquired pursuant to the exercise of a warrant. See U.S. Holders — Acquisition of Common Stock Pursuant to the Rights" below for a discussion regarding a U.S. Holder's tax basis in a share of our Class A common stock acquired pursuant to the rights.

*Redemption of Our Class A Common Stock*

In the event that a U.S. Holder's shares of our Class A common stock are redeemed pursuant to the redemption provisions described in this prospectus under "Description of Securities — Common Stock" or if we purchase a U.S. Holder's shares of our Class A common stock in an open market transaction (each referred to herein as a "redemption"), the treatment of the redemption for U.S. federal income tax purposes will depend on whether it qualifies as a sale or exchange of the shares of our Class A common stock under Section 302 of the Code. If the redemption qualifies as a sale or exchange of the shares of our Class A common stock under the tests described below, the U.S. Holder will be treated as described under "U.S. Holders — Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Our Class A Common Stock and Warrants" above. If the redemption does not qualify as a sale or exchange of the shares of our Class A common stock, the U.S. Holder will be treated as receiving a corporate distribution with the tax consequences described above under "U.S. Holders — Taxation of Distributions." Whether a redemption qualifies for sale or exchange treatment will depend largely on the total number of our shares treated as held by the U.S. Holder (including any shares constructively owned by the U.S. Holder as described in the following paragraph) relative to all of our shares outstanding both before and after such redemption. The redemption of our Class A common stock generally will be treated as a sale or exchange of the shares of our Class A common stock (rather than as a corporate distribution) if, within the meaning of Section 302 of the Code, such redemption (i) is "substantially disproportionate" with respect to the U.S. Holder, (ii) results in a "complete termination" of the U.S. Holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. Holder.

In determining whether any of the foregoing tests are satisfied, a U.S. Holder must take into account not only shares of our stock actually owned by the U.S. Holder, but also shares of our stock that are constructively owned by it. A U.S. Holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. Holder has an interest or that have an interest in such U.S. Holder, as well as any stock the U.S. Holder has a right to acquire by exercise of an option, which would generally include shares of our Class A common stock which could be acquired pursuant to the exercise of the warrants and possibly the rights. In order to meet the "substantially disproportionate" test, the percentage of our outstanding voting shares actually and constructively owned by the U.S. Holder immediately following the redemption of shares of our Class A common stock must, among other requirements, be less than 80% of the percentage of our outstanding voting stock actually and constructively owned by the U.S. Holder immediately before the redemption. Prior to our initial business combination, the shares of our Class A common stock may not be treated as voting shares for this purpose and, consequently, this substantially disproportionate test may not be applicable. There will be a complete termination of a U.S. Holder's interest if either (i) all of our shares actually and constructively owned by the U.S. Holder are redeemed or (ii) all of our shares actually owned by the U.S. Holder are redeemed and the U.S. Holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of shares owned by certain family members and the U.S. Holder does not constructively own any other shares of our stock. The redemption of the shares of our Class A common stock will not be essentially equivalent to a dividend with respect to a U.S. Holder if it results in a "meaningful reduction" of the U.S. Holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. Holder's proportionate interest in us will depend on the particular facts and circumstances. However, the IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly-held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction." A U.S. Holder should consult with its own tax advisors as to the tax consequences of a redemption.

If none of the foregoing tests are satisfied, then the redemption will be treated as a corporate distribution and the tax effects will be as described under "U.S. Holders — Taxation of Distributions" above. After the application of those rules, any remaining tax basis of the U.S. Holder in the redeemed shares of our Class A common stock will be added to the U.S. Holder's adjusted tax basis in its remaining shares, or, if it has none, to the U.S. Holder's adjusted tax basis in its warrants or possibly in other stock constructively owned by it.

*Exercise, Lapse or Redemption of a Warrant*

Except as discussed below with respect to the cashless exercise of a warrant, a U.S. Holder generally will not recognize gain or loss upon the acquisition of a share of our Class A common stock on the exercise of a warrant for cash. A U.S. Holder's initial tax basis in a share of our Class A common stock received upon exercise of the warrant generally will equal the sum of the U.S. Holder's initial investment in the warrant (that is, the portion of the U.S. Holder's purchase price for the units that is allocated to the warrant, as described above under "— Allocation of Purchase Price and Characterization of a Unit") and the exercise price of such warrant. It is unclear whether a U.S. Holder's holding period for the share of our Class A common stock received upon exercise of the warrants will commence on the date of exercise of the warrant or the day following the date of exercise of the warrant; in either case, the holding period will not include the period during which the U.S. Holder held the warrant. If a warrant is allowed to lapse unexercised, a U.S. Holder generally will recognize a capital loss equal to such holder's tax basis in the warrant.

The tax consequences of a cashless exercise of a warrant are not clear under current law. A cashless exercise may not be taxable, either because the exercise is not a realization event or because the exercise is treated as a "recapitalization" for U.S. federal income tax purposes. In either situation, a U.S. Holder's tax basis in the shares of our Class A common stock received generally would equal the U.S. Holder's tax basis in the warrants exercised therefor. If the cashless exercise were not a realization event, it is unclear whether a U.S. Holder's holding period for the shares of our Class A common stock will commence on the date of exercise of the warrant or the day following the date of exercise of the warrant. If the cashless exercise were treated as a recapitalization, the holding period of the shares of our Class A common stock would include the holding period of the warrants exercised therefor.

It is also possible that a cashless exercise could be treated in whole or in part as a taxable exchange in which gain or loss would be recognized. In such event, a U.S. Holder could be deemed to have surrendered a number of warrants having an aggregate value (as measured by the excess of the fair market value of our Class A common stock over the exercise price of the warrants) equal to the exercise price for the total number of warrants to be exercised (*i.e.*, the warrants underlying the number of shares of our Class A common stock actually received by the U.S. Holder pursuant to the cashless exercise). The U.S. Holder would recognize capital gain or loss in an amount equal to the difference between the value of the warrants deemed surrendered and the U.S. Holder's tax basis in such warrants. Such gain or loss would be long-term or short-term, depending on the U.S.

Holder's holding period in the warrants deemed surrendered. In this case, a U.S. Holder's tax basis in the Class A common stock received would equal the sum of the U.S. Holder's tax basis in the warrants exercised and the exercise price of such warrants. It is unclear whether a U.S. Holder's holding period for the Class A common stock would commence on the date following the date of exercise or on the date of exercise of the warrant; in either case, the holding period would not include the period during which the U.S. Holder held the warrant.

Alternative characterizations are also possible (including as a taxable exchange of all of the warrants surrendered by the U.S. Holder for shares of our Class A common stock received upon exercise). Due to the absence of authority on the U.S. federal income tax treatment of a cashless exercise, including when a U.S. Holder's holding period would commence with respect to the Class A common stock received, there can be no assurance which, if any, of the alternative tax consequences and holding periods described above would be adopted by the IRS or a court of law. Accordingly, U.S. Holders should consult their tax advisors regarding the tax consequences of a cashless exercise.

If we redeem warrants for cash pursuant to the redemption provisions described in the section of this prospectus entitled "Description of Securities — Warrants — Public Stockholders' Warrants" or if we purchase warrants in an open market transaction, such redemption or purchase generally will be treated as a taxable disposition to the U.S. Holder, taxed as described above under "U.S. Holders — Gain or Loss on Sale, Taxable Exchange or Other Taxable Disposition of Our Class A Common Stock and Warrants."

*Acquisition of Common Stock Pursuant to the Rights.*

In general, a U.S. Holder should not recognize gain or loss upon the acquisition of common stock pursuant to the rights. The tax basis of the common stock acquired pursuant to the rights should be equal to such U.S. Holder's tax basis in such rights. The holding period of such common stock should begin on the day after the receipt of such common stock pursuant to such rights. The tax treatment of a right that expires worthless is unclear. U.S. Holders of rights should consult their own tax advisors regarding the tax treatment of any losses that result if the rights expire worthless.

*Possible Constructive Distributions*

The terms of each warrant provide for an adjustment to the number of shares of our Class A common stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus entitled "Description of Securities — Warrants — Public Stockholders' Warrants." Depending on the circumstances, such adjustments may be treated as constructive distributions. An adjustment which has the effect of preventing dilution pursuant to a bona fide reasonable adjustment formula generally is not taxable. The U.S. Holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrant holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of our Class A common stock that would be obtained upon exercise or through a decrease to the exercise price) as a result of a taxable distribution of cash or other property to the holders of shares of our Class A common stock. Any such constructive distribution would generally be subject to tax as described under "U.S. Holders — Taxation of Distributions" above in the same manner as if the U.S. Holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest resulting from the adjustment.

**Non-U.S. Holders**

This section applies to "Non-U.S. Holders." As used herein, the term "Non-U.S. Holder" means a beneficial owner of our units, Class A common stock, rights or warrants that is not a U.S. Holder and is not a partnership or entity classified as a partnership for U.S. federal income tax purposes, but such term generally does not include an individual who is present in the United States for 183 days or more in the taxable year of disposition. If you are such an individual, you should consult your tax advisor regarding the U.S. federal income tax consequences of the acquisition, ownership or sale or other disposition of our securities.

*Taxation of Distributions*

In general, any distributions (including constructive distributions) we make to a Non-U.S. Holder of shares of our Class A common stock, to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles), will constitute dividends for U.S. federal income tax purposes. Provided such dividends are not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States (or, if required pursuant to an applicable income tax treaty, are not attributable to a permanent establishment of fixed base maintained by the Non-U.S. Holder in the United States), we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. Holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E, as applicable). In the case of any constructive dividend, it is possible that this tax would be withheld from any amount owed to a Non-U.S. Holder by the applicable withholding agent, including cash distributions on other property or sale proceeds from warrants or other property subsequently paid or credited to such holder. Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. Holder's adjusted tax basis in its shares of our Class A common stock and, to the extent such distribution exceeds the Non-U.S. Holder's adjusted tax basis, as gain realized from the sale or other disposition of the shares of our Class A common stock, which will be treated as described under "Non-U.S. Holders — Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities" below. In addition, if we determine that we are or are likely to be classified as a "United States real property holding corporation" (see "Non-U.S. Holders — Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities" below), we will withhold 15% of any distribution that exceeds our current and accumulated earnings and profits, including a distribution in redemption of shares of our Class A common stock. See also "Non-U.S. Holders — Possible Constructive Distributions" for potential U.S. federal tax consequences with respect to constructive distributions.

Dividends that we pay to a Non-U.S. Holder that are effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States (and, if a tax treaty applies, are attributable to a permanent establishment or fixed base maintained by the Non-U.S. Holder in the United States) will not be subject to U.S. withholding tax, provided such Non-U.S. Holder complies with certain certification and disclosure requirements (usually by providing an IRS Form W-8ECI). Instead, the effectively connected dividends will be subject to regular U.S. federal income tax as if the Non-U.S. Holder were a U.S. resident, unless an applicable income tax treaty provides otherwise. A Non-U.S. Holder that is a foreign corporation receiving effectively connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower treaty rate).

*Exercise, Lapse or Redemption of a Warrant; Acquisition of Common Stock Pursuant to the Rights.*

The U.S. federal income tax treatment of a Non-U.S. Holder's exercise of a warrant, the lapse of a warrant held by a Non-U.S. Holder, or the acquisition of common stock pursuant to the rights generally will correspond to the U.S. federal income tax treatment of a U.S. Holder, as described under "U.S. Holders — Exercise, Lapse or Redemption of a Warrant; Acquisition of Common Stock Pursuant to the Rights" above, although to the extent a cashless exercise results in a taxable exchange, the consequences would be similar to those described below under "Non-U.S. Holders — Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities." The U.S. federal income tax treatment for a Non-U.S. Holder of a

redemption of warrants for cash (or if we purchase warrants in an open market transaction) would be similar to that described below in "Non-U.S. Holders — Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities."

*Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities*

Subject to the discussion of FATCA and backup withholding below, a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized on a sale, taxable exchange or other taxable disposition of shares of our Class A common stock (including upon a dissolution and liquidation if we do not complete an initial business combination within the required time period), rights or warrants (including an expiration or redemption of our warrants), in each case without regard to whether such securities were held as part of a unit, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, under certain income tax treaties, is attributable to a permanent establishment or fixed base maintained by the Non-U.S. Holder in the United States); or

- we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. Holder held our Class A common stock, and, in the case where shares of our Class A common stock are regularly traded on an established securities market, the Non-U.S. Holder has owned, directly or constructively, more than 5% of our Class A common stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. Holder's holding period for the shares of our Class A common stock. There can be no assurance that our Class A common stock will be treated as regularly traded on an established securities market for this purpose. These rules may be modified for Non-U.S. Holders of rights or warrants. If we are or have been a "United States real property holding corporation" and you own rights or warrants, you are urged to consult your own tax advisor regarding the application of these rules.

152

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will generally be subject to tax at the applicable U.S. federal income tax rates as if the Non-U.S. Holder were a U.S. resident. Any gains described in the first bullet point above of a Non-U.S. Holder that is a foreign corporation may also be subject to an additional "branch profits tax" at a 30% rate (or lower treaty rate).

If the second bullet point above applies to a Non-U.S. Holder, gain recognized by such holder on the sale, exchange or other disposition of our Class A common stock, rights or warrants will generally be subject to tax at applicable U.S. federal income tax rates as if the Non-U.S. Holder were a U.S. resident. In addition, a buyer of our Class A common stock, rights or warrants from such holder may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such disposition. We cannot determine whether we will be a United States real property holding corporation in the future until we complete an initial business combination. In general, we would be classified as a United States real property holding corporation if the fair market value of our "United States real property interests" equals or exceeds 50% of the sum of the fair market value of our worldwide real property interests plus our other assets used or held for use in a trade or business, as determined for U.S. federal income tax purposes.

*Redemption of Our Class A Common Stock*

The characterization for U.S. federal income tax purposes of the redemption of a Non-U.S. Holder's shares of our Class A common stock pursuant to the redemption provisions described in the section of this prospectus entitled "Description of Securities — Common Stock" will generally correspond to the U.S. federal income tax characterization of such a redemption of a U.S. Holder's shares of our Class A common stock, as described under "U.S. Holders — Redemption of Our Class A Common Stock" above, and the consequences of the redemption to the Non-U.S. Holder will be as described above under "Non-U.S. Holders — Taxation of Distributions" and "Non-U.S. Holders — Gain on Sale, Taxable Exchange or Other Taxable Disposition of Our Securities," as applicable.

*Possible Constructive Distributions*

The terms of each warrant provide for an adjustment to the number of shares of our Class A common stock for which the warrant may be exercised or to the exercise price of the warrant in certain events, as discussed in the section of this prospectus entitled "Description of Securities — Warrants — Public Stockholders' Warrants." Depending on the circumstances, such adjustments may be treated as constructive distributions. An adjustment which has the effect of preventing dilution pursuant to a bona fide reasonable adjustment formula generally is not taxable. The Non-U.S. Holders of the warrants would, however, be treated as receiving a constructive distribution from us if, for example, the adjustment increases the warrant holders' proportionate interest in our assets or earnings and profits (e.g., through an increase in the number of shares of our Class A common stock that would be obtained upon exercise or through a decrease to the exercise price) as a result of a taxable distribution of cash or other property to the holders of shares of our Class A common stock. Any such constructive distribution would generally be taxed as described under "Non-U.S. Holders — Taxation of Distributions" above, in the same manner as if the Non-U.S. Holders of the warrants received a cash distribution from us equal to the fair market value of such increased interest resulting from the adjustment.

**Information Reporting and Backup Withholding**

Dividend payments (including constructive dividends) with respect to our Class A common stock and proceeds from the sale, exchange or redemption of shares of our Class A common stock, rights or warrants may be subject to information reporting to the IRS and possible United States backup withholding. Backup withholding will not apply, however, to payments made to a U.S. Holder who furnishes a correct taxpayer identification number and makes other required certifications, or who is otherwise exempt from backup withholding and establishes such exempt status. Payments made to a Non-U.S. Holder generally will not be subject to backup withholding if the Non-U.S. Holder provides certification of its foreign status, under penalties of perjury, on a duly executed applicable IRS Form W-8 or by otherwise establishing an exemption.

153

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder generally may obtain a refund of any excess amounts withheld by timely filing the appropriate claim for refund with the IRS and furnishing any required information. All holders should consult their tax advisors regarding the application of information reporting and backup withholding to them.

**FATCA Withholding Taxes**

Sections 1471 through 1474 of the Code and the Treasury Regulations and administrative guidance promulgated thereunder (commonly referred to as the "Foreign Account Tax Compliance Act" or "FATCA") generally impose withholding of 30% in certain circumstances on payments of dividends (including constructive dividends) and, subject to the proposed Treasury Regulations discussed below, on proceeds from sales or other disposition of our securities paid to "foreign financial institutions" (which is broadly defined for this purpose and includes investment vehicles) and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied or an exemption applies (typically certified as to by the delivery of a properly

completed IRS Form W-8BEN-E). If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution will be entitled to a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Similarly, dividends and, subject to the proposed Treasury Regulations discussed below, proceeds from sales or other disposition in respect of our units held by an investor that is a non-financial non-U.S. entity that does not qualify under certain exceptions generally will be subject to withholding at a rate of 30%, unless such entity either (i) certifies to us or the applicable withholding agent that such entity does not have any "substantial United States owners" or (ii) provides certain information regarding the entity's "substantial United States owners," which will in turn be provided to the U.S. Department of the Treasury. The U.S. Department of the Treasury has proposed regulations which eliminate the federal withholding tax of 30% applicable to the gross proceeds of a sale or other disposition of our securities. Withholding agents may rely on the proposed Treasury Regulations until final regulations are issued. Prospective investors should consult their tax advisors regarding the possible effects of FATCA on their investment in our securities.

**THE U.S. FEDERAL INCOME TAX DISCUSSION SET FORTH ABOVE IS INCLUDED FOR GENERAL INFORMATION ONLY AND MAY NOT BE APPLICABLE DEPENDING UPON A HOLDER'S PARTICULAR SITUATION. HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES TO THEM OF THE ACQUISITION, OWNERSHIP AND DISPOSITION OF OUR CLASS A COMMON STOCK, RIGHTS AND WARRANTS, INCLUDING THE TAX CONSEQUENCES UNDER STATE, LOCAL, ESTATE, NON-U.S. AND OTHER TAX LAWS AND TAX TREATIES AND THE POSSIBLE EFFECTS OF CHANGES IN U.S. OR OTHER TAX LAWS.**

## UNDERWRITING

The representative is acting as the sole book-running manager of the offering and as representative of the underwriters named below. Subject to the terms and conditions of the underwriting agreement dated the date of this prospectus, the underwriters named below, through the representative, have severally agreed to purchase, and we have agreed to sell to the underwriters, the following respective number of units set forth opposite the underwriter's name.

| Underwriters | Number of Units |
|---|---|
| Kingswood Capital Markets, division of Benchmark Investments, Inc. | |
| Total | 10,000,000 |

The underwriting agreement provides that the obligations of the underwriters to purchase the units included in this offering are subject to approval of legal matters by counsel and to other conditions. The underwriters are obligated to purchase all of the units (other than those covered by the underwriters' over-allotment option described below) if they purchase any of the units.

Units sold by the underwriters to the public will initially be offered at the initial public offering price set forth on the cover of this prospectus. Any units sold by the underwriters to securities dealers may be sold at a discount from the initial public offering price not to exceed $ per unit. If all of the units are not sold at the initial offering price, the underwriters may change the offering price and the other selling terms. The underwriters have advised us that they do not intend to make sales to discretionary accounts.

If the underwriters sell more units than the total number set forth in the table above, we have granted to the underwriters an option, exercisable for 45 days from the date of this prospectus, to purchase up to 1,500,000 additional units at the public offering price less the underwriting discount. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, in connection with this offering. Any units issued or sold under the option will be issued and sold on the same terms and conditions as the other units that are the subject of this offering.

We, our sponsor and our officers and directors have agreed, and our director nominees will agree, that, for a period of 180 days from the date of this prospectus, we and they will not, without the prior written consent of the representative, sell, offer to sell, contract or agree to sell, hypothecate, pledge, grant any option to purchase or otherwise dispose of or agree to dispose of, directly or indirectly, or establish or increase a put equivalent position or liquidate or decrease a call equivalent position within the meaning of Section 16 of the Exchange Act with respect to any units, shares of common stock, warrants, rights or any securities convertible into, or exercisable, or exchangeable for, shares of common stock, (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any units, shares of common stock, warrants, rights or any securities convertible into, or exercisable, or exchangeable for, shares of common stock, whether any such transaction is to be settled by delivery of such securities, in cash or otherwise, or (iii) publicly announce any intention to effect any transaction specified in clause (i) or (ii), subject to certain exceptions. The representative in its sole discretion may release any of the securities subject to the lock-up agreement at any time without notice, other than in the case of the officers and directors, which shall be with notice. Our sponsor, officers and directors will also be subject to separate transfer restrictions on their founder shares and placement units pursuant to the letter agreement as described herein.

Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination, or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). The placement units, placement shares, placement warrants (including the Class A common stock issuable upon exercise of the placement warrants) and placement rights (including the Class A common stock issuable upon conversion of the placement rights) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination (except with respect to permitted transferees as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units").

Prior to this offering, there was no public market for our securities. Consequently, the initial public offering price for the units was determined by negotiations between us and the underwriters. Among the factors considered in determining the initial public offering price were the history and prospects of companies whose principal business is the acquisition of other companies, prior offerings of those companies, our management, our capital structure, and currently prevailing general conditions in the equity securities markets, including current market valuations of publicly traded companies considered comparable to our company. We cannot assure you, however, that the price at which the units, Class A common stock, warrants or rights will sell in the public market after this offering will not be lower than the initial public offering price or that an active trading market in our units, Class A common stock, warrants or rights will develop and continue after this offering.

We intend to apply to have our units listed on Nasdaq under the symbol "DWACU" on or promptly after the date of this prospectus. We expect that our Class A common stock, warrants and rights will be listed under the symbols "DWAC", "DWACW", and "DWACR" respectively, once the Class A common stock, warrants and rights begin separate trading.

The following table shows the underwriting discounts and commissions that we are to pay to the underwriters in connection with this offering. These amounts are shown assuming both no exercise and full exercise of the underwriters' over-allotment option. The upfront portion of the underwriting discounts and commissions will be $0.125 per unit.

| | Payable by Digital World Acquisition Corp. | |
| --- | --- | --- |
| | No Exercise | Full Exercise |
| Per Unit[1] | $ 0.475 | $ 0.475 |
| Total[1] | $ 4,750,000 | $ 5,462,500 |

(1) Includes $0.35 per unit, or $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) in the aggregate payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative only on completion of an initial business combination as described in this prospectus.

If we do not complete our initial business combination and subsequently liquidate, the underwriters have agreed that (i) they will forfeit any rights or claims to their deferred underwriting discounts and commissions, including any accrued interest thereon, then in the trust account upon liquidation, and (ii) that the deferred underwriters' discounts and commissions will be distributed on a pro rata basis, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes to the public stockholders.

In addition to the underwriting discount, we have agreed to pay or reimburse the underwriters for bound volumes in form and style reasonably satisfactory to the Representative and transaction Lucite cubes or similar commemorative items in a style as reasonably requested by the Representative, reimbursement for background checks on our directors and executive officers, and the reasonable fees of counsel of the Underwriters which such fees and expenses are capped at an aggregate of $100,000 (less amounts previously paid).

**Representative Shares**

We will issue 50,000 representative shares (or 57,500 representative shares if the underwriters' over-allotment option is exercised in full) to the representative upon closing of this offering. The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 18 months following the closing of this offering.

The representative shares have been deemed compensation by FINRA and are therefore subject to a lock-up for a period of 180 days immediately following the date of the effectiveness of the registration statement of which this prospectus forms a part pursuant to Rule 5110(e)(1) of the FINRA Manual. Pursuant to FINRA Rule 5110(e)(1), these securities will not be sold during the offering, or sold, transferred, assigned, pledged, or hypothecated, or be the subject of any hedging, short sale, derivative, put or call transaction that would result in the economic disposition of the securities by any person for a period of 180 days immediately following the effective date of the registration statement of which this prospectus forms a part or commencement of sales of the public offering, except to any underwriter and selected dealer participating in the offering and their bona fide officers or partners, provided that all securities so transferred remain subject to the lockup restriction above for the remainder of the time period.

We have granted the holders of these shares the registration rights as described under the section "Shares Eligible for Future Sale — Registration Rights." Notwithstanding anything to the contrary, under FINRA Rule 5110(g)(8), the underwriters and/or their designees may only make a demand registration on one occasion during the five-year period beginning on the effective date of the registration statement of which this prospectus is a part, and the underwriters and/or their designees may participate in a "piggy-back" registration only during the seven-year period beginning on the effective date of the registration statement of which this prospectus is a part.

**Right of First Refusal**

Subject to certain conditions, we granted the representative, for a period of 24 months after the date of the consummation of our business combination, a right of first refusal to act as sole book runner, and/or sole placement agent, at the representative's sole discretion, for each and every future public and private equity and debt offering, including all equity linked financings for us or any of our successors or subsidiaries. In accordance with FINRA Rule 5110(g)(6)(A), such right of first refusal shall not have a duration of more than three years from the effective date of the registration statement of which this prospectus forms a part.

**Stabilization**

In connection with the offering, the underwriters may purchase and sell units in the open market. Purchases and sales in the open market may include short sales, purchases to cover short positions, which may include purchases pursuant to the over-allotment option and stabilizing purchases, in accordance with Regulation M under the Exchange Act.

- Short sales involve secondary market sales by the underwriters of a greater number of units than it is required to purchase in the offering.
- "Covered" short sales are sales of units in an amount up to the number of units represented by the underwriters' over-allotment option.
- "Naked" short sales are sales of units in an amount in excess of the number of units represented by the underwriters' over-allotment option.
- Covering transactions involve purchases of units either pursuant to the over-allotment option or in the open market after the distribution has been completed in order to cover short positions.
- To close a naked short position, the underwriters must purchase units in the open market after the distribution has been completed. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the units in the open market after pricing that could adversely affect investors who purchase in the offering.
- To close a covered short position, the underwriters must purchase units in the open market after the distribution has been completed or must exercise the over-allotment option. In determining the source of units to close the covered short position, the underwriters will consider, among other things, the price of units available for purchase in the open market as compared to the price at which they may purchase units through the over-allotment option.
- Stabilizing transactions involve bids to purchase units so long as the stabilizing bids do not exceed a specified maximum.

Purchases to cover short positions and stabilizing purchases, as well as other purchases by the underwriters for their own account, may have the effect of preventing or retarding a decline in the market price of the units. They may also cause the price of the units to be higher than the price that would otherwise exist in the open market in the absence of these transactions. The underwriters may conduct these transactions in the over-the-counter market or otherwise. If the underwriters commence any of these transactions, it may discontinue them at any time.

We estimate that our portion of the total expenses of this offering payable by us will be $662,750, excluding underwriting discounts and commissions.

We have agreed to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act, or to contribute to payments the underwriters may be required to make because of any of those liabilities.

158

We are not under any contractual obligation to engage the underwriters to provide any services for us after this offering, and have no present intent to do so. However, the underwriters may introduce us to potential target businesses or assist us in raising additional capital in the future. If the underwriters provide services to us after this offering, we may pay the underwriters fair and reasonable fees that would be determined at that time in an arm's length negotiation; provided that no agreement will be entered into with the underwriters and no fees for such services will be paid to the underwriters prior to the date that is 90 days from the date of this prospectus, unless FINRA determines that such payment would not be deemed underwriters' compensation in connection with this offering and we may pay the underwriters of this offering or any entity with which it is affiliated a finder's fee or other compensation for services rendered to us in connection with the completion of an initial business combination.

The underwriters and their affiliates may in the future engage in, investment banking and other commercial dealings in the ordinary course of business with us or our affiliates, for which it may in the future receive, customary fees and commissions for any such transactions.

The underwriters and their respective affiliates are financial institutions engaged in various activities, which may include, among other things, securities trading, commercial and investment banking, financial advisory, investment management, financing and brokerage activities. Such underwriters and their affiliates have in the past, in the ordinary course of business, provided certain of these services to affiliates of the sponsor, and have arrangements in place whereby they may currently or in the future provide such services to affiliates of the sponsor, for which they have received and may receive customary fees, interest, commissions and other compensation.

In addition, in the ordinary course of their business activities, the underwriters and their affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers. Such investments and securities activities may involve securities and/or instruments of ours or our affiliates. The underwriters and their affiliates may also make investment recommendations and/or publish or express independent research views in respect of such securities or financial instruments and may hold, or recommend to clients that they acquire, long and/or short positions in such securities and instruments.

A prospectus in electronic format may be made available by e-mail or on the web sites or through online services maintained by one or more of the underwriters or their affiliates. In those cases, prospective investors may view offering terms online and may be allowed to place orders online. The underwriters may agree with us to allocate a specific number of common shares for sale to online brokerage account holders. Any such allocation for online distributions will be made by the underwriters on the same basis as other allocations. Other than the prospectus in electronic format, the information on the underwriters' web sites and any information contained in any other web site maintained by any of the underwriters is not part of this prospectus, has not been approved and/or endorsed by us or the underwriters and should not be relied upon by investors.

**Selling Restrictions**

*Notice to Prospective Investors in the European Economic Area and the United Kingdom*

In relation to each member state of the European Economic Area and the United Kingdom (each, a "relevant state"), no units have been offered or will be offered pursuant to the offering to the public in that relevant state prior to the publication of a prospectus in relation to the units that has been approved by the competent authority in that relevant state or, where appropriate, approved in another relevant state and notified to the competent authority in that relevant state, all in accordance with the Prospectus Regulation, except that offers of our units may be made to the public in that relevant state at any time under the following exemptions under the Prospectus Regulation:

- to any legal entity which is a qualified investor as defined under the Prospectus Regulation;
- to fewer than 150 natural or legal persons (other than qualified investors as defined under the Prospectus Regulation), subject to obtaining the prior consent of the representative for any such offer; or
- in any other circumstances falling within Article 1(4) of the Prospectus Regulation.

159

provided that no such offer of units shall require the issuer or the representative to publish a prospectus pursuant to Article 3 of the Prospectus Regulation or supplement a prospectus pursuant to Article 23 of the Prospectus Regulation.

Each person in a relevant state who initially acquires any units or to whom any offer is made will be deemed to have represented, acknowledged and agreed to and with the Company and the representative that it is a qualified investor within the meaning of the Prospectus Regulation.

In the case of any units being offered to a financial intermediary as that term is used in Article 5(1) of the Prospectus Regulation, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the units acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer to the public other than their offer or resale in a relevant state to qualified investors, in circumstances in which the prior consent of the representative has been obtained to each such proposed offer or resale.

We, the representative and each of our and the representative's respective affiliates will rely upon the truth and accuracy of the foregoing representations, acknowledgements and agreements.

For the purposes of this provision, the expression an "offer to the public" in relation to any units in any relevant state means the communication in any form and by any means of sufficient information on the terms of the offer and any units to be offered so as to enable an investor to decide to purchase or subscribe for any units, and the expression "Prospectus Regulation" means Regulation (EU) 2017/1129.

References to the Prospectus Regulation include, in relation to the United Kingdom, the Prospectus Regulation as it forms part of United Kingdom domestic law by virtue of the European Union (Withdrawal) Act 2018.

The above selling restriction is in addition to any other selling restrictions set out below.

In connection with the offering, the representative is not acting for anyone other than the issuer and will not be responsible to anyone other than the issuer for providing the protections afforded to its clients nor for providing advice in relation to the offering.

*Notice to Prospective Investors in the United Kingdom*

This prospectus is for distribution only to persons who (i) have professional experience in matters relating to investments and who qualify as

investment professionals within the meaning of Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (as amended, the "Financial Promotion Order"), (ii) are persons falling within Article 49(2)(a) to (d) ("high net worth companies, unincorporated associations etc.") of the Financial Promotion Order, (iii) are outside the United Kingdom, or (iv) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000, as amended ("FSMA")) in connection with the issue or sale of any securities may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to as "relevant persons"). This document is directed only at relevant persons and must not be acted on or relied by persons who are not relevant persons. Any investment or investment activity to which this document relates is available only to relevant persons and will be engaged in only with relevant persons.

160

*Notice to Prospective Investors in France*

Neither this prospectus nor any other offering material relating to the units described in this prospectus has been submitted to the clearance procedures of the Autorité des Marchés Financiers or of the competent authority of another member state of the European Economic Area and notified to the Autorité des Marchés Financiers. The units have not been offered or sold and will not be offered or sold, directly or indirectly, to the public in France. Neither this prospectus nor any other offering material relating to the units has been or will be:

- released, issued, distributed or caused to be released, issued or distributed to the public in France; or
- used in connection with any offer for subscription or sale of the units to the public in France.

Such offers, sales and distributions will be made in France only:

- To qualified investors (investisseurs qualifiés) and/or to a restricted circle of investors (cercle restreint d'investisseurs), in each case investing for their own account, all as defined in, and in accordance with, articles L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 and D.764-1 of the French Code monétaire et financier;
- to investment services providers authorized to engage in portfolio management on behalf of third parties; or
- in a transaction that, in accordance with article L.411-2-II-1° -or-2° -or 3° of the French Code monétaire et financier and article 211-2 of the General Regulations (Règlement Général) of the Autorité des Marchés Financiers, does not constitute a public offer (appel public à l'épargne).

The units may be resold directly or indirectly, only in compliance with articles L.411-1, L.411-2, L.412-1 and L.621-8 through L.621-8-3 of the French Code monétaire et financier.

*Notice to Prospective Investors in Hong Kong*

The units have not been offered or sold and will not be offered or sold in Hong Kong, by means of any document, other than to (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32) of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance. No advertisement, invitation or document relating to the units has been or may be issued or has been or may be in the possession of any person for the purposes of issue, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public of Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to units which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance.

*Notice to Prospective Investors in Japan*

The units have not been and will not be registered under the Financial Instruments and Exchange Law of Japan (Law No. 25 of 1948, as amended) and, accordingly, will not be offered or sold, directly or indirectly, in Japan, or for the benefit of any Japanese Person or to others for re-offering or resale, directly or indirectly, in Japan or to any Japanese Person, except in compliance with all applicable laws, regulations and ministerial guidelines promulgated by relevant Japanese governmental or regulatory authorities in effect at the relevant time. For the purposes of this paragraph, "Japanese Person" shall mean any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

*Notice to Prospective Investors in Singapore*

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, the units were not offered or sold or caused to be made the subject of an invitation for subscription or purchase and will not be offered or sold or caused to be made the subject of an invitation for subscription or purchase, and this prospectus or any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the units, has not been circulated or distributed, nor will it be circulated or distributed, whether directly or indirectly, to any person in Singapore other than (i) to an institutional investor (as defined in Section 4A of the Securities and Futures Act (Chapter 289) of Singapore, as modified or amended from time to time (the "SFA")) pursuant to Section 274 of the SFA, (ii) to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA, or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

161

Where the units are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

- (a) a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or
- (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the units pursuant to an offer made under Section 275 of the SFA except:

- (a) to an institutional investor or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;
- (b) where no consideration is or will be given for the transfer;
- (c) where the transfer is by operation of law;
- (d) as specified in Section 276(7) of the SFA.

*Notice to Prospective Investors in Canada*

The units may be sold in Canada only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions* or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the units must be made in

accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 *Underwriting Conflicts* (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Notice to Prospective Investors in the Dubai International Financial Centre

This prospectus relates to an Exempt Offer in accordance with the Offered Securities Rules of the Dubai Financial Services Authority ("DFSA"). This prospectus is intended for distribution only to persons of a type specified in the Offered Securities Rules of the DFSA. It must not be delivered to, or relied on by, any other person. The DFSA has no responsibility for reviewing or verifying any documents in connection with Exempt Offers. The DFSA has not approved this prospectus nor taken steps to verify the information set forth herein and has no responsibility for the prospectus. The securities to which this prospectus relates may be illiquid and/or subject to restrictions on their resale.

162

Prospective purchasers of the securities offered should conduct their own due diligence on the securities. If you do not understand the contents of this prospectus you should consult an authorized financial advisor.

### Notice to Prospective Investors in Australia

No placement document, prospectus, product disclosure statement or other disclosure document has been lodged with the Australian Securities and Investments Commission ("ASIC"), in relation to the offering. This prospectus does not constitute a prospectus, product disclosure statement or other disclosure document under the Corporations Act 2001 (the "Corporations Act"), and does not purport to include the information required for a prospectus, product disclosure statement or other disclosure document under the Corporations Act. Any offer in Australia of the securities may only be made to persons (the "Exempt Investors") who are "sophisticated investors" (within the meaning of section 708(8) of the Corporations Act), "professional investors" (within the meaning of section 708(11) of the Corporations Act) or otherwise pursuant to one or more exemptions contained in section 708 of the Corporations Act so that it is lawful to offer the securities without disclosure to investors under Chapter 6D of the Corporations Act.

The securities applied for by Exempt Investors in Australia must not be offered for sale in Australia in the period of 12 months after the date of allotment under the offering, except in circumstances where disclosure to investors under Chapter 6D of the Corporations Act would not be required pursuant to an exemption under section 708 of the Corporations Act or otherwise or where the offer is pursuant to a disclosure document which complies with Chapter 6D of the Corporations Act. Any person acquiring securities must observe such Australian on-sale restrictions. This prospectus contains general information only and does not take account of the investment objectives, financial situation or particular needs of any particular person. It does not contain any securities recommendations or financial product advice. Before making an investment decision, investors need to consider whether the information in this prospectus is appropriate to their needs, objectives and circumstances, and, if necessary, seek expert advice on those matters.

### Notice to Prospective Investors in Switzerland

The securities may not be publicly offered in Switzerland and will not be listed on the SIX Swiss Exchange ("SIX") or on any other stock exchange or regulated trading facility in Switzerland. This document has been prepared without regard to the disclosure standards for issuance prospectuses under art. 652a or art. 1156 of the Swiss Code of Obligations or the disclosure standards for listing prospectuses under art. 27 ff. of the SIX Listing Rules or the listing rules of any other stock exchange or regulated trading facility in Switzerland. Neither this document nor any other offering or marketing material relating to the securities or the offering may be publicly distributed or otherwise made publicly available in Switzerland.

Neither this document nor any other offering or marketing material relating to the offering, the company, the shares have been or will be filed with or approved by any Swiss regulatory authority. In particular, this document will not be filed with, and the offer of securities will not be supervised by, the Swiss Financial Market Supervisory Authority FINMA (FINMA), and the offer of securities has not been and will not be authorized under the Swiss Federal Act on Collective Investment Schemes ("CISA"). The investor protection afforded to acquirers of interests in collective investment schemes under the CISA does not extend to acquirers of securities.

### Notice to Prospective Investors in Israel

In the State of Israel, this prospectus shall not be regarded as an offer to the public to purchase securities under the Israeli Securities Law, 5728 – 1968, which requires a prospectus to be published and authorized by the Israel Securities Authority, if it complies with certain provisions of Section 15 of the Israeli Securities Law, 5728 – 1968, including, inter alia, if: (i) the offer is made, distributed or directed to not more than 35 investors, subject to certain conditions (the "Addressed Investors"); or (ii) the offer is made, distributed or directed to certain qualified investors defined in the First Addendum of the Israeli Securities Law, 5728 –1968, subject to certain conditions (the "Qualified Investors"). The Qualified Investors shall not be taken into account in the count of the Addressed Investors and may be offered to purchase securities in addition to the 35 Addressed Investors. The Company has not and will not take any action that would require it to publish a prospectus in accordance with and subject to the Israeli Securities Law, 5728 – 1968. We have not and will not distribute this prospectus or make, distribute or direct an offer to subscribe for our securities to any person within the State of Israel, other than to Qualified Investors and up to 35 Addressed Investors.

163

Qualified Investors may have to submit written evidence that they meet the definitions set out in of the First Addendum to the Israeli Securities Law, 5728 – 1968. In particular, we may request, as a condition to be offered securities, that Qualified Investors will each represent, warrant and certify to us and/or to anyone acting on our behalf: (i) that it is an investor falling within one of the categories listed in the First Addendum to the Israeli Securities Law, 5728 – 1968; (ii) which of the categories listed in the First Addendum to the Israeli Securities Law, 5728 – 1968 regarding Qualified Investors is applicable to it; (iii) that it will abide by all provisions set forth in the Israeli Securities Law, 5728 – 1968 and the regulations promulgated thereunder in connection with the offer to be issued securities; (iv) that the securities that it will be issued are, subject to exemptions available under the Israeli Securities Law, 5728 – 1968: (a) for its own account; (b) for investment purposes only; and (c) not issued with a view to resale within the State of Israel, other than in accordance with the provisions of the Israeli Securities Law, 5728 – 1968; and (v) that it is willing to provide further evidence of its Qualified Investor status. Addressed Investors may have to submit written evidence in respect of their identity and may have to sign and submit a declaration containing, inter alia, the Addressed Investor's name, address and passport number or Israeli identification number.

We have not authorized and do not authorize the making of any offer of securities through any financial intermediary on our behalf, other than

offers made by the underwriters and their respective affiliates, with a view to the final placement of the securities as contemplated in this document. Accordingly, no purchaser of the shares, other than the underwriters, is authorized to make any further offer of shares on our behalf or on behalf of the underwriters.

## LEGAL MATTERS

Ellenoff Grossman & Schole LLP, New York, New York, is acting as counsel in connection with the registration of our securities under the Securities Act, and as such, will pass upon the validity of the securities offered in this prospectus. Certain legal matters will be passed upon on behalf of the underwriters by Loeb & Loeb LLP, New York, New York.

## EXPERTS

The financial statements of Digital World Acquisition Corp. as of March 31, 2021, and for the periods from December 11, 2020 (inception) through December 31, 2020 and January 1, 2021 through March 31, 2021 appearing in this prospectus have been audited by Marcum LLP, independent registered public accounting firm, as stated in their report herein (which contains an explanatory paragraph relating to substantial doubt about the ability of Digital World Acquisition Corp. to continue as a going concern as described in Note 1 to the financial statements), appearing elsewhere in this prospectus, and are included in reliance upon such report given on the authority of such firm as experts in accounting and auditing.

## WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the securities we are offering by this prospectus. This prospectus does not contain all of the information included in the registration statement. For further information about us and our securities, you should refer to the registration statement and the exhibits and schedules filed with the registration statement. Whenever we make reference in this prospectus to any of our contracts, agreements or other documents, the references are materially complete but may not include a description of all aspects of such contracts, agreements or other documents, and you should refer to the exhibits attached to the registration statement for copies of the actual contract, agreement or other document.

164

Upon completion of this offering, we will be subject to the information requirements of the Exchange Act and will file annual, quarterly and current event reports, proxy statements and other information with the SEC. You can read our SEC filings, including the registration statement, over the Internet at the SEC's website at *www.sec.gov*.

165

**10,000,000 Units**

**Digital World Acquisition Corp.**

**PROSPECTUS**

, 2021

Sole Book-Running Manager

# KINGSWOOD CAPITAL MARKETS

division of Benchmark Investments, Inc.

Until , 2021 (25 days after the date of this prospectus), all dealers that buy, sell or trade our Class A common stock, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to its unsold allotments or subscriptions.

**You should rely only on the information contained in this prospectus. We have not, and the underwriters have not, authorized anyone to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

**No dealer, salesperson or any other person is authorized to give any information or make any representations in connection with this offering other than those contained in this prospectus and, if given or made, the information or representations must not be relied upon as having been authorized by us. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any security other than the securities offered by this prospectus, or an offer to sell or a solicitation of an offer to buy any securities by anyone in any jurisdiction in which the offer or solicitation is not authorized or is unlawful.**

**DIGITAL WORLD ACQUISITION CORP.**
**INDEX TO FINANCIAL STATEMENTS**

| | Page(s) |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Financial Statements: | |
| Balance Sheet as of March 31, 2021 and December 31, 2020 | F-3 |
| Statement of Operations and for the period from January 1, 2021 through March 31, 2021, and for the period from December 11, 2020 (inception) through December 31, 2020 | F-4 |
| Statement of Changes in Stockholders' Equity for the period from January 1, 2021 through March 31, 2021, and for the period from December 11, 2020 (inception) through December 31, 2020 | F-5 |
| Statement of Cash Flows for the period from January 1, 2021 through March 31, 2021, and for the period from December 11, 2020 (inception) through December 31, 2020 | F-6 |
| Notes to the Financial Statements | F-7 - F-17 |

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors of
Digital World Acquisition Corp.

**Opinion on the Financial Statements**

We have audited the accompanying balance sheets of Digital World Acquisition Corp. (the "Company") as of December 31, 2020 and March 31, 2021, the related statements of operations, shareholder's equity and cash flows for the periods from December 11, 2020 (inception) through December 31, 2020 and January 1, 2021 through March 31, 2021, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020 and March 31, 2021, and the results of its operations and its cash flows for the period from December 11, 2020 (inception) through December 31, 2020 and for the period ended March 31, 2021, in conformity with accounting principles generally accepted in the United States of America.

**Explanatory Paragraph – Going Concern**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As more fully described in Note 1 to the financial statements, the Company's ability to execute its business plan is dependent upon its completion of the proposed initial public offering described in Note 3 to the financial statements. The Company has a working capital deficit as of March 31, 2021 and lacks the financial resources it needs to sustain operations for a reasonable period of time, which is considered to be one year from the issuance date of the financial statements. These conditions raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also described in Notes 1 and 3. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ Marcum LLP

Marcum LLP

We have served as the Company's auditor since 2021.

New York, NY

May 25, 2021

F-2

**DIGITAL WORLD ACQUISITION CORP.**
**BALANCE SHEET**

| | March 31, 2021 | | December 31, 2020 | |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current asset - cash | $ | 25,000 | $ | - |
| Deferred offering costs associated with the initial public offering | | 62,500 | | - |
| **Total Assets** | $ | **87,500** | $ | - |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Current Liabilities | | | | |
| Promissory note - related party | $ | 62,985 | $ | - |
| **Total Current Liabilities** | | **62,985** | | - |
| **Commitments and Contingencies** | | | | |
| **Stockholders' Equity** | | | | |
| Preferred shares, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | | - | | - |
| Class A common stock, $0.0001 par value; 100,000,000 shares authorized; none issued and outstanding | | - | | - |
| Class B common stock, par value $0.0001; 10,000,000 shares authorized; 2,875,000 issued and outstanding [1] | | 288 | | - |
| Additional paid-in capital | | 24,712 | | - |
| Accumulated deficit | | (485) | | - |
| **Total Stockholders' Equity** | | **24,515** | | - |
| **Total Liabilities and Stockholders' Equity** | $ | **87,500** | $ | - |

(1) Includes an aggregate of 375,000 shares that are subject to forfeiture to the extent that the underwriters' over-allotment is not exercised in full or in part by the underwriters.

**The accompanying notes are an integral part of the financial statements**

F-3

**DIGITAL WORLD ACQUISITION CORP.**
**STATEMENT OF OPERATIONS**

| | For the Period from January 1, 2021 through March 31, 2021 | For the Period from December 11, 2020 (inception) through December 31, 2020 |
|---|---|---|
| General and administrative expenses | (485) | - |
| **Net Loss** | (485) | - |
| Weighted average shares outstanding, basic and diluted (1) | 2,500,000 | - |
| **Basic and diluted net loss per common stock** | $ 0.00 | $ - |

(1) Excludes an aggregate of 375,000 shares that are subject to forfeiture to the extent that the underwriters' over-allotment is not exercised in full or in part by the underwriters.

**The accompanying notes are an integral part of the financial statements**

F-4

**DIGITAL WORLD ACQUISITION CORP.**
**STATEMENT OF CHANGES STOCKHOLDERS' EQUITY**

| | Common stock | | Additional Paid-In Capital | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|
| | Shares | Amount | | | |
| **Balance – December 11, 2020 (inception)** | - | $ - | $ - | $ - | $ - |
| Net Loss | - | - | - | - | - |
| **Balance – December 31, 2020** | - | - | - | - | - |
| Issuance of Class B common stock to Sponsor [1] | 2,875,000 | 288 | 24,712 | - | 25,000 |
| Net loss | - | - | - | (485) | (485) |
| **Balance – March 31, 2021** | 2,875,000 | $ 288 | $ 24,712 | $ (485) | $ 24,515 |

(1) Includes an aggregate of 375,000 shares that are subject to forfeiture to the extent that the underwriters' over-allotment is not exercised in full or in part by the underwriters.

**The accompanying notes are an integral part of the financial statements**

F-5

**DIGITAL WORLD ACQUISITION CORP.**
**STATEMENT OF CASH FLOWS**

| | For the Period from January 1, 2021 through March 31, 2021 | For the Period from December 11, 2020 (inception) through December 31, 2020 |
|---|---|---|
| **Cash flows from Operating Activities:** | | |
| Net Loss | $ (485) | $ - |
| Changes in operating assets and liabilities: | | |
| Accrued expense paid by promissory note | 485 | - |
| **Net cash used in operating activities** | $ - | $ - |
| **Cash Flows from Financing Activities:** | | |
| Proceeds from issuance of common stock to Sponsor | $ 25,000 | $ - |
| **Net cash provided by financing activities** | **25,000** | **-** |
| **Net Change in Cash** | 25,000 | - |
| Cash – Beginning of period | - | - |
| **Cash – Ending of period** | **$ 25,000** | **$ -** |
| **Supplemental Disclosures of Noncash Financing Activities** | | |
| Accrued deferred offering costs | $ 62,500 | $ - |

The accompanying notes are an integral part of the financial statements

F-6

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**
**NOTE 1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS**

Digital World Acquisition Corp. (the "Company") is a blank check company incorporated in the State of Delaware on December 11, 2020. The Company was formed for the purpose of acquiring, engaging in a share exchange, share reconstruction and amalgamation with, purchasing all or substantially all of the assets of, entering into contractual arrangements with, or engaging in any other similar business combination with one or more businesses or entities ("Business Combination"). Although the Company is not limited to a particular industry or geographic region for purposes of consummating a Business Combination, the Company intends to focus on companies in the healthcare industry in the United States. At March 31, 2021, the Company had not yet commenced any operations. All activity through March 31, 2021 relates to the Company's formation and the Proposed Offering (as defined below). The Company will not generate any operating revenues until after the completion of its initial Business Combination, at the earliest. The Company will generate non-operating income in the form of interest income on cash and cash equivalents from the proceeds derived from the Proposed Offering. The Company has selected December 31 as its fiscal year end. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

The Company's ability to commence operations is contingent upon obtaining adequate financial resources through a proposed initial public offering of 10,000,000 units at $10.00 per unit (or 11,500,000 units if the underwriters' over-allotment option is exercised in full) (the "Units" and, with respect to the common stock included in the Units being offered, the "Public Shares") which is discussed in Note 3 (the "Proposed Offering") and the sale of 306,275 Units (or 332,525 Units if the underwriters' over-allotment option is exercised in full) (the "Private Units") at a price of $10.00 per Unit in a private placement to the Company's sponsor, ARC Global Investments LLC (the "Sponsor"), that will close simultaneously with the Proposed Offering. The Company intends to list the Units on the Nasdaq Capital Market ("NASDAQ"). The Company's management has broad discretion with respect to the specific application of the net proceeds of the Proposed Offering and sale of the Private Units, although substantially all of the net proceeds are intended to be applied generally toward consummating a Business Combination. NASDAQ rules provide that the Business Combination must be with one or more target businesses that together have a fair market value equal to at least 80% of the balance in the Trust Account (as defined below) (less any deferred underwriting commissions and taxes payable on interest earned and less any interest earned thereon that is released for taxes) at the time of the signing of an agreement to enter into a Business Combination. The Company will only complete a Business Combination if the post-Business Combination company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). There is no assurance that the Company will be able to successfully effect a Business Combination. Upon the closing of the Proposed Offering, management has agreed that $10.05 per Unit sold in the Proposed Offering, including the proceeds of the sale of the Private Units, will be held in a trust account ("Trust Account") and invested in U.S. government securities, within the meaning set forth in Section 2(a)(16) of the Investment Company Act, with a maturity of 180 days or less, or in any open-ended investment company that holds itself out as a money market fund meeting the conditions of Rule 2a-7 of the Investment Company Act, as determined by the Company, until the earlier of: (i) the consummation of a Business Combination or (ii) the distribution of the funds in the Trust Account to the Company's shareholders, as described below.

The Company will provide its shareholders with the opportunity to redeem all or a portion of their Public Shares upon the completion of a Business Combination either (i) in connection with a shareholder meeting called to approve the Business Combination or (ii) by means of a tender offer. In connection with a proposed Business Combination, the Company may seek shareholder approval of a Business Combination at a meeting called for such purpose at which shareholders may seek to redeem their shares, regardless of whether they vote for or against a Business Combination. The Company will proceed with a Business Combination only if the Company has net tangible assets of at least $5,000,001 upon such consummation of a Business Combination and, if the Company seeks shareholder approval, a majority of the outstanding shares voted are voted in favor of the Business Combination.

If the Company seeks shareholder approval of a Business Combination and it does not conduct redemptions pursuant to the tender offer rules, the Company's Amended and Restated Memorandum and Articles of Association provides that a public shareholder, together with any affiliate of such shareholder or any other person with whom such shareholder is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")), will be restricted from seeking redemption rights with respect to 15% or more of the Public Shares without the Company's prior written consent.

The shareholders will be entitled to redeem their Public Shares for a pro rata portion of the amount then in the Trust Account (initially $10.05 per share, plus any pro rata interest earned on the funds held in the Trust Account and not previously released to the Company to pay its tax obligations). The per-share amount to be distributed to shareholders who redeem their Public Shares will not be reduced by the deferred underwriting commissions the Company will pay to the underwriter. There will be no redemption rights upon the completion of a Business Combination with respect to the Company's warrants or rights. These common stock will be recorded at a redemption value and classified as temporary equity upon the completion of the Proposed Offering, in accordance with Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity."

F-7

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

If a shareholder vote is not required and the Company does not decide to hold a shareholder vote for business or other legal reasons, the Company will, pursuant to its Amended and Restated Memorandum and Articles of Association, offer such redemption pursuant to the tender offer rules of the Securities and Exchange Commission ("SEC"), and file tender offer documents containing substantially the same information as would be included in a proxy statement with the SEC prior to completing a Business Combination.

The Sponsor has agreed (a) to vote its Class B common stock, the common stock included in the Private Units (the "Private Shares") and any Public Shares purchased during or after the Proposed Offering in favor of a Business Combination, (b) not to propose an amendment to the Company's Amended and Restated Memorandum and Articles of Association with respect to the Company's pre-Business Combination activities prior to the consummation of a Business Combination unless the Company provides dissenting public shareholders with the opportunity to redeem their Public Shares in conjunction with any such amendment; (c) not to redeem any shares (including the Class B common stock) and Private Units (including underlying securities) into the right to receive cash from the Trust Account in connection with a shareholder vote to approve a Business Combination (or to sell their shares in a tender offer in connection with a Business Combination if the Company does not seek shareholder approval in connection therewith) or a vote to amend the provisions of the Amended and Restated Memorandum and Articles of Association relating to shareholders' rights of pre-Business Combination activity and (d) that the Class B common stock and Private Units (including underlying securities) shall not participate in any liquidating distributions upon winding up if a Business Combination is not consummated. However, the Sponsor will be entitled to liquidating distributions from the Trust Account with respect to any Public Shares purchased during or after the Proposed Offering if the Company fails to complete its Business Combination.

The Company will have until 18 months from the closing of the Proposed Offering to consummate a Business Combination (the "Combination Period"). If the Company is unable to complete a Business Combination within the Combination Period, the Company will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but no more than five business days thereafter, redeem 100% of the outstanding Public Shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including interest earned (net of taxes payable and less interest to pay dissolution expenses up to $100,000), divided by the number of then outstanding Public Shares, which redemption will completely extinguish public shareholders' rights as shareholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of the remaining shareholders and the Company's board of directors, proceed to commence a voluntary liquidation and thereby a formal dissolution of the Company, subject in each case to its obligations to provide for claims of creditors and the requirements of applicable law. The underwriter has agreed to waive its rights to the deferred underwriting commission held in the Trust Account in the event the Company does not complete a Business Combination within the Combination Period and, in such event, such amounts will be included with the funds held in the Trust Account that will be available to fund the redemption of the Public Shares. In the event of such distribution, it is possible that the per share value of the assets remaining available for distribution will be less than the Proposed Offering price per Unit ($10.05).

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

The Sponsor has agreed that it will be liable to the Company, if and to the extent any claims by a vendor for services rendered or products sold to the Company, or a prospective target business with which the Company has discussed entering into a transaction agreement, reduce the amounts in the Trust Account to below $10.05 per share (whether or not the underwriters' over-allotment option is exercised in full), except as to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under the Company's indemnity of the underwriters of the Proposed Offering against certain liabilities, including liabilities under the Securities Act of 1933, as amended (the "Securities Act"). In the event that an executed waiver is deemed to be unenforceable against a third party, the Sponsor will not be responsible to the extent of any liability for such third party claims. The Company will seek to reduce the possibility that the Sponsor will have to indemnify the Trust Account due to claims of creditors by endeavoring to have all vendors, service providers (except for the company's independent registered accounting firm), prospective target businesses or other entities with which the Company does business, execute agreements with the Company waiving any right, title, interest or claim of any kind in or to monies held in the Trust Account.

**Going Concern Consideration**

The Company does not have sufficient liquidity to meet its anticipated obligations over the next year from the issuance of these financial statements. In connection with the Company's assessment of going concern considerations in accordance with FASB's Accounting Standards Update ("ASU") 2014-15, "Disclosures of Uncertainties about an Entity's Ability to Continue as a Going Concern," management has determined that the Company has access to funds from the Sponsor that are sufficient to fund the working capital needs of the Company until the earlier of the consummation of the Proposed Public Offering or one year from the issuance of these financial statements.

**NOTE 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of presentation**

The accompanying financial statements are presented in U.S. Dollars and conformity with accounting principles generally accepted in the United States of America ("GAAP") and pursuant to the rules and regulations of the SEC.

**Emerging growth company**

The Company is an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the Jumpstart Our Business Startups Act of 2012 (the "JOBS Act"), and it may take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in its periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved.

Further, Section 102(b)(1) of the JOBS Act exempts emerging growth companies from being required to comply with new or revised financial accounting standards until private companies (that is, those that have not had a Securities Act registration statement declared effective or do not have a class of securities registered under the Exchange Act) are required to comply with the new or revised financial accounting standards. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies but any such election to opt out is irrevocable. The Company has elected not to opt out of such extended transition period which means that when a standard is issued or revised and it has different application dates for public or private companies, the Company, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of the Company's financial statements with another public company which is neither an emerging growth company nor an emerging growth company which has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

F-9

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

**Use of estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

Making estimates requires management to exercise significant judgment. It is at least reasonably possible that the estimate of the effect of a condition, situation or set of circumstances that existed at the date of the financial statements, which management considered in formulating its estimate, could change in the near term due to one or more future confirming events. Accordingly, the actual results could differ significantly from those estimates.

**Deferred offering costs**

Deferred offering costs consist of underwriting, legal, accounting and other expenses incurred through the balance sheet date that are directly related to the Proposed Offering and that will be charged to stockholders' equity upon the completion of the Proposed Offering. Should the Proposed Offering prove to be unsuccessful, these deferred costs, as well as additional expenses incurred, will be charged to operations.

**Income taxes**

The Company complies with the accounting and reporting requirements of ASC Topic 740, "Income Taxes," which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts, based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

ASC Topic 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The Company's management determined United States is the Company's only major tax jurisdiction. The Company recognizes accrued interest and penalties related to unrecognized tax benefits, if any, as income tax expense. There were no unrecognized tax benefits as of March 31, 2021 and no amounts accrued for interest and penalties. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position.

The Company may be subject to potential examination by foreign taxing authorities in the area of income taxes. These potential examinations may include questioning the timing and amount of deductions, the nexus of income among various tax jurisdictions and compliance with foreign tax laws. The Company's management does not expect that the total amount of unrecognized tax benefits will materially change over the next twelve months.

F-10

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

The Company is considered an exempted State of Delaware company and is presently not subject to income taxes or income tax filing requirements in the State of Delaware or the United States. As such, the Company's tax provision is zero for the period presented.

**Net loss per share**

The Company complies with accounting and disclosure requirements of ASC Topic 260, "Earnings Per Share." Net loss per share is computed by dividing net loss by the weighted average number of common stock outstanding during the period, excluding common stock subject to forfeiture. Weighted average shares were reduced for the effect of an aggregate of 375,000 common stock that are subject to forfeiture if the over-allotment option is not exercised by the underwriters (see Note 7). At March 31, 2021 and December 31, 2020, the Company did not have any dilutive securities and other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company. As a result, diluted loss per share is the same as basic loss per share for the periods presented.

**Concentration of credit risk**

Financial instruments that potentially subject the Company to concentration of credit risk consist of a cash account in a financial institution which, at times may exceed the Federal depository insurance coverage of $250,000. At both March 31, 2021 and December 31, 2020, the Company had not experienced losses on this account and management believes the Company is not exposed to significant risks on such account.

**Fair value of financial instruments**

The fair value of the Company's assets and liabilities, which qualify as financial instruments under ASC Topic 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the accompanying balance sheet, primarily due to their short-term nature.

**Derivative financial instruments**

The Company evaluates its financial instruments to determine if such instruments are derivatives or contain features that qualify as embedded derivatives in accordance with ASC Topic 815, "Derivatives and Hedging". Derivative instruments are initially recorded at fair value on the grant date and re-valued at each reporting date, with changes in the fair value reported in the statements of operations. Derivative assets and liabilities are classified in the balance sheet as current or non-current based on whether or not net-cash settlement or conversion of the instrument could be required within 12 months of the balance sheet date.

**Recently issued accounting standards**

Management does not believe that any recently issued, but not yet effective, accounting pronouncements, if currently adopted, would have a material effect on the Company's financial statements.

**Risks and Uncertainties**

Management is currently evaluating the impact of the COVID-19 pandemic on the industry and has concluded that while it is reasonably possible that the virus could have a negative effect on the Company's financial position, results of its operations, close of the Proposed Offering, and/or search for a target company, the specific impact is not readily determinable as of the date of these financial statements. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

**NOTE 3. PROPOSED OFFERING**

Pursuant to the Proposed Offering, the Company will offer for sale up to 10,000,000 Units (or 11,500,000 Units if the underwriters' overallotment option is exercised in full) at a purchase price of $10.00 per Unit. Each Unit will consist of one common stock, one-half of one redeemable warrant ("Public Warrant") and one right ("Public Right"). Each Public Warrant will entitle the holder to purchase one-half of one common stock at an exercise price of $11.50 per whole share (see Note 7). Each Public Right will entitle the holder to receive one-tenth of one common stock upon completion of the Business Combination (see Note 8).

**NOTE 4. PRIVATE PLACEMENT**

The Sponsor (and/or its designees) has committed to purchase an aggregate of 306,275 Private Units (or 332,525 Private Units if the underwriters' over-allotment is exercised in full) at a price of $10.00 per Private Unit, ($3,062,750 in the aggregate, or $3,325,250 in the aggregate if the underwriters' over-allotment is exercised in full), from the Company in a private placement that will occur simultaneously with the closing of the Proposed Offering. The proceeds from the sale of the Private Units will be added to the net proceeds from the Proposed Offering held in the Trust Account. The Private Units are identical to the Units sold in the Proposed Offering, except for the private warrants ("Private Warrants"), as described in Note 7. If the Company does not complete a Business Combination within the Combination Period, the proceeds from the sale of the Private Units will be used to fund the redemption of the Public Shares (subject to the requirements of applicable law) and the Private Warrants and the rights underlying the Private Units ("Private Rights") will expire worthless.

F-11

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

**NOTE 5. RELATED PARTY TRANSACTIONS**

**Class B Common stock**

During the period ended March 31, 2021, the Company issued an aggregate of 2,875,000 Class B common stock to the Sponsor for an aggregate purchase price of $25,000 in cash. The Class B common stock include an aggregate of up to 375,000 shares subject to forfeiture by the Sponsor to the extent that the underwriters' over-allotment is not exercised in full or in part, so that the Sponsor will collectively own 20% of the Company's issued and outstanding shares after the Proposed Offering (assuming the initial shareholders do not purchase any Public Shares in the Proposed Offering and excluding the Private Units and underlying securities).

The initial shareholder has agreed not to transfer, assign or sell any of the Class B common stock (except to certain permitted transferees) until, with respect to 50% of the Class B common stock, the earlier of (i) six months after the date of the consummation of a Business Combination, or (ii) the date on which the closing price of the Company's common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days within any 30-trading day period commencing after a Business Combination, with respect to the remaining 50% of the Class B common stock, upon six months after the date of the consummation of a Business Combination, or earlier, in each case, if, subsequent to a Business Combination, the Company consummates a subsequent liquidation, merger, stock exchange or other similar transaction which results in all of the Company's shareholders having the right to exchange their common stock for cash, securities or other property.

**Promissory Note – Related Party**

On December 11, 2020, the Sponsor issued an unsecured promissory note to the Company, pursuant to which the Company may borrow up to an aggregate principal amount of $300,000, of which $62,985 was outstanding under the Promissory Note as of March 31, 2021. The note is non-interest bearing and payable on the earlier of (i) July 31, 2021 or (ii) the consummation of the Proposed Offering.

**Administrative Services Arrangement**

The Company's Sponsor has agreed, commencing from the date that the Company's securities are first listed on NASDAQ through the earlier of the Company's consummation of a Business Combination and its liquidation, to make available to the Company certain general and administrative services, including office space, utilities and administrative services, as the Company may require from time to time. The Company has agreed to pay the Sponsor $10,000 per month for these services.

**Related Party Loans**

In order to finance transaction costs in connection with a Business Combination, the Company's Sponsor or an affiliate of the Sponsor, or the Company's officers and directors may, but are not obligated to, loan the Company funds as may be required ("Working Capital Loans"). Such Working Capital Loans would be evidenced by promissory notes. The notes would either be repaid upon consummation of a Business Combination, without interest, or, at the lender's discretion, up to $1,500,000 of notes may be converted upon consummation of a Business Combination into additional Private Units at a price of $10.00 per Unit. In the event that a Business Combination does not close, the Company may use a portion of proceeds held outside the Trust Account to repay the Working Capital Loans, but no proceeds held in the Trust Account would be used to repay the Working Capital Loans.

F-12

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

**NOTE 6. COMMITMENTS AND CONTINGENCIES**

**Registration Rights**

The holders of the insider shares, as well as the holders of the Private Units (and underlying securities) and any securities issued in payment of working capital loans made to the Company, will be entitled to registration rights pursuant to an agreement to be signed prior to or on the effective date of Proposed Public Offering. The holders of a majority of these securities are entitled to make up to two demands that the Company register such securities. Notwithstanding anything to the contrary, the underwriters (and/or their designees) may only make a demand registration (i) on one occasion and (ii) during the five year period beginning on the effective date of the Proposed Public Offering. The holders of the majority of the insider shares can elect to exercise these registration rights at any time commencing three months prior to the date on which these common stock are to be released from escrow. The holders of a majority of the Private Units (and underlying securities) and securities issued in payment of working capital loans (or underlying securities) can elect to exercise these registration rights at any time after the Company consummates a Business Combination. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the consummation of a Business Combination. Notwithstanding anything to the contrary, the underwriters (and/or their designees) may participate in a "piggy-back" registration only during the seven year period beginning on the effective date of the Proposed Public Offering. The Company will bear the expenses incurred in connection with the filing of any such registration statements. Notwithstanding anything to the contrary, under FINRA Rule 5110, the underwriters and/or their designees may only make a demand registration (i) on one occasion and (ii) during the five-year period beginning on the effective date of the registration statement relating to the Proposed Public Offering, and the underwriters and/or their designees may participate in a "piggy-back" registration only during the seven-year period beginning on the effective date of the registration statement relating to the Proposed Public Offering.

**Underwriting Agreement**

The Company will grant the underwriters a 45-day option to purchase up to 1,500,000 additional Units to cover over-allotments at the Proposed Offering price, less the underwriting discounts and commissions.

The underwriters will be entitled to a cash underwriting discount of: (i) one point twenty-five percent (1.25%) of the gross proceeds of the Proposed Offering, or $1,250,000 (or up to $1,437,500 if the underwriters' over-allotment is exercised in full); (ii) zero point five percent (0.50%) of the total number of Class A common stock issued in the Proposed Offering, or 50,000 Class B common stock. In addition, the underwriters are entitled to a deferred fee of three points five percent (3.50%) of the gross proceeds of the Proposed Offering, or $3,500,000 (or up to $4,025,000 if the underwriters' over- allotment is exercised in full) upon closing of the Business Combination. The deferred fee will be paid in cash upon the closing of a Business Combination from the amounts held in the Trust Account, subject to the terms of the underwriting agreement.

**Right of First Refusal**

For a period beginning on the closing of this offering and ending 24 months from the closing of a business combination, we have granted Maxim a right of first refusal to act as lead-left book running manager and lead left manager for any and all future private or public equity, convertible and debt offerings during such period. In accordance with FINRA Rule 5110(f)(2)(E)(i), such right of first refusal shall not have a duration of more than three years from the effective date of the registration statement of which this prospectus forms a part.

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

**NOTE 7. WARRANT LIABILITY**

Public Warrants may only be exercised for a whole number of shares. No fractional warrants will be issued upon separation of the Units and only whole warrants will trade. The Public Warrants will become exercisable on the date that is 30 days after the completion of the initial Business Combination, provided that the Company has an effective registration statement under the Securities Act covering the issuance of the shares of common stock issuable upon exercise of the warrants and a current prospectus relating to them is available and such shares are registered, qualified or exempt from registration under the securities, or blue sky, laws of the state of residence of the holder (or the Company permits holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement). The Company will not be obligated to deliver any shares of Class A common stock pursuant to the exercise of a warrant and will have no obligation to settle such warrant exercise unless a registration statement under the Securities Act with respect to the shares of Class A common underlying the warrants is then effective and a prospectus relating thereto is current, subject to the Company satisfying its obligations with respect to registration. No warrant will be exercisable and the Company will not be obligated to issue any shares of Class A common stock upon exercise of a warrant unless Class A common stock issuable upon such warrant exercise has been registered, qualified or deemed to be exempt under the securities laws of the state of residence of the registered holder of the warrants.

The Company has agreed that as soon as practicable, but in no event later than 20 business days, after the closing of a Business Combination, the Company will use its best efforts to file, and within 60 business days following a Business Combination to have declared effective, a registration statement for the registration, under the Securities Act, of the shares of Class A common stock issuable upon exercise of the warrants. The Company will use its reasonable best efforts to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. Notwithstanding the above, if the Class A common stock is at the time of any exercise of a warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, the Company may, at its option, require holders of Public Warrants who exercise their warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event the Company so elects, the Company will not be required to file or maintain in effect a registration statement, but will be required to use its best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available.

The warrants will expire five years after the completion of a Business Combination or earlier upon redemption or liquidation. In addition, if (x) the Company issues additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of the initial Business Combination at an issue price or effective issue price of less than $11.50 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by the board of directors and, in the case of any such issuance to the Sponsor or its affiliates, without taking into account any Founder Shares held by the Sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of the initial Business Combination on the date of the consummation of the initial Business Combination (net of redemptions), and (z) the volume-weighted average trading price of Class A common stock during the 10-trading day period starting on the trading day after to the day on which the Company consummates its initial Business Combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the higher of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described under "Description of Securities—Warrants—Public Stockholders' Warrants—Redemption of warrants when the price per share of Class A common stock equals or exceeds $18.00" will be adjusted (to the nearest cent) to be equal to 180% of the higher of the Market Value and the Newly Issued Price, and the $10.00 per share redemption trigger price will be adjusted (to the nearest cent) to be equal to the higher of the market value and the Newly Issued Price.

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

*Redemptions of Warrants When the Price Per Share of Class A Common Stock Equals or Exceeds $18.00*—Once the warrants become exercisable, the Company may redeem the Public Warrants:

- in whole and not in part;
- at a price of $0.01 per warrant;
- upon not less than 30 days' prior written notice of redemption to each warrant holder; and
- if, and only if, the last reported sale price of Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like and for certain issuances of Class A common stock and equity-linked securities as described above) for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date on which the Company sends the notice of redemption to the warrant holders.

If and when the warrants become redeemable by the Company, the Company may exercise its redemption right even if it is unable to register or qualify the underlying securities for sale under all applicable state securities laws.

If the Company calls the Public Warrants for redemption for cash, management will have the option to require all holders that wish to exercise the Public Warrants to do so on a "cashless basis," as described in the warrant agreement. The exercise price and number of shares of Class A common stock issuable upon exercise of the warrants may be adjusted in certain circumstances including in the event of a stock dividend, or recapitalization, reorganization, merger or consolidation. However, the warrants will not be adjusted for issuance of Class A common stock at a price below its exercise price. Additionally, in no event will the Company be required to net cash settle the warrants. If the Company is unable to complete a Business Combination within the Combination Period or during any Extension Period, and the Company liquidates the funds held in the Trust Account, holders of warrants will not receive any of such funds with respect to their warrants, nor will they receive any distribution from the Company's assets held outside of the Trust Account with the respect to such warrants. Accordingly, the warrants may expire worthless.

The Private Placement Warrants will be identical to the Public Warrants underlying the Units being sold in the Proposed Public Offering, except that the Private Placement Warrants and the Class A common stock issuable upon the exercise of the Private Placement Warrants will not be transferable, assignable or salable until 30 days after the completion of a Business Combination, subject to certain limited exceptions. Additionally, the Placement Warrants will be exercisable on a cashless basis and be non-redeemable so long as they are held by the initial purchasers or their permitted transferees (except as set forth under "Redemption of Warrants when the Price per Share of Class A Common Stock Equals or Exceeds $10.00"). If the Private Placement Warrants are held by someone other than the initial purchasers or their permitted transferees, the Private Placement Warrants will be redeemable by the Company and exercisable by such holders on the same basis as the Public Warrants.

The Company will account for the 5,153,137 warrants to be issued in connection with the Proposed Public Offering (including 5,000,000 Public Warrants and 153,137 Private Placement Warrants assuming the underwriters' over-allotment option is not exercised) in accordance with the guidance contained in ASC 815-40. Such guidance provides that because the warrants do not meet the criteria for equity treatment thereunder, each warrant must be recorded as a liability. The warrant agreement contains an Alternative Issuance provision that if less than 70% of the consideration receivable by the holders of the Class A common stock in the Business Combination is payable in the form of common equity in the successor entity, and if the holders of the warrants properly exercises the warrants within thirty days following the public disclosure of the consummation of Business Combination by the Company, the Warrant Price shall be reduced by an amount (in dollars) equal to the difference of (i) the Warrant Price in effect prior to such reduction minus (ii) (A) the Per Share Consideration (as defined below) (but in no event less than zero) minus (B) the Black-Scholes Warrant Value (as defined below). The "Black-Scholes Warrant Value" means the value of a Warrant immediately prior to the consummation of the Business Combination based on the Black-Scholes Warrant Model for a Capped American Call on Bloomberg Financial Markets. "Per Share Consideration" means (i) if the consideration paid to holders of the common stock consists exclusively of cash, the amount of such cash per common stock, and (ii) in all other cases, the volume weighted average price of the common stock as reported during the ten-trading day period ending on the trading day prior to the effective date of the Business Combination.

F-15

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

The Company believes that the adjustments to the exercise price of the warrants is based on a variable that is not an input to the fair value of a "fixed-for-fixed" option as defined under FASB ASC Topic No. 815 – 40, and thus the warrants are not eligible for an exception from derivative accounting.

The accounting treatment of derivative financial instruments requires that the Company record a derivative liability upon the closing of the Proposed Public Offering. Accordingly, the Company will classify each warrant as a liability at its fair value and the warrants will be estimated using a valuation model prepared by an outside valuation firm. The valuation model uses inputs such as assumed share prices, volatility, discount factors and other assumptions and may not be reflective of the price at which they can be settled. This liability is subject to re-measurement at each balance sheet date. With each such re-measurement, the warrant liability will be adjusted to fair value, with the change in fair value recognized in the Company's statement of operations. The Company will reassess the classification at each balance sheet date. If the classification changes as a result of events during the period, the warrants will be reclassified as of the date of the event that causes the reclassification.

**NOTE 8. STOCKHOLDERS' EQUITY**

*Class A Common stock* — The Company is authorized to issue 100,000,000 shares of Class A common stock with a par value of $0.0001 per share. Holders of the Company's Class A common stock are entitled to one vote for each share. At March 31, 2021 and December 31, 2020, there were no Class A common stock issued and outstanding.

*Class B Common stock* — The Company is authorized to issue 10,000,000 shares of Class B common stock with a par value of $0.0001 per share. Holders of the Company's Class B common stock are entitled to one vote for each share. At March 31, 2021, there were 2,875,000 shares of Class B common stock issued and outstanding, of which 375,000 shares are subject to forfeiture to the extent that the underwriter's over-allotment option is not exercised in full so that the Initial Shareholders will own 20% of the issued and outstanding shares after the Proposed Offering (assuming the Initial Shareholders do not purchase any Public Shares in the Proposed Offering and excluding the Founder Units). At December 31, 2020, there were no shares of Class B common stock outstanding.

*Preferred Shares* — The Company is authorized to issue 1,000,000 preferred shares with a par value of $0.0001 per share with such designation, rights and preferences as may be determined from time to time by the Company's Board of Directors. At March 31, 2021 and December 31, 2020, there were no preferred shares issued or outstanding.

F-16

**DIGITAL WORLD ACQUISITION CORP.**
**NOTES TO FINANCIAL STATEMENTS**

**Rights**

Each holder of a right will receive one-tenth (1/10) of one Class A common stock upon consummation of a Business Combination, even if the holder of such shares redeemed all shares held by it in connection with a Business Combination. No fractional shares will be issued upon exchange of the rights. No additional consideration will be required to be paid by a holder of rights in order to receive its additional shares upon consummation of a Business Combination as the consideration related thereto has been included in the unit purchase price paid for by investors in the Proposed Offering. If the Company enters into a definitive agreement for a Business Combination in which the Company will not be the surviving entity, the definitive agreement will provide for the holders of rights to receive the same per share consideration the holders of the Class A common stock will receive in the transaction on an as-converted into Class A common stock basis and each holder of a right will be required to affirmatively convert its rights in order to receive 1/10 share underlying each right (without paying additional consideration). The shares issuable upon exchange of the rights will be freely tradable (except to the extent held by affiliates of the Company).

**NOTE 9. SUBSEQUENT EVENTS**

In accordance with ASC Topic 855, "Subsequent Events", which establishes general standards of accounting for and disclosure of events that occur after the balance sheet date but before financial statements are issued, the Company has evaluated all events or transactions that occurred after March 31, 2021, up to May 25, 2021, the date the Company issued the audited financial statements. Based upon this review, the Company did not identify any subsequent events that would have required adjustment or disclosure in the condensed financial statements.

On April 12, 2021, the SEC issued a statement with respect to the accounting for warrants issued by Special Purpose Acquisition companies. In light of the SEC Staff's Statement, the Company has determined that the fair value of the warrants should be classified as a warrant liability on the Company's balance sheet as of the closing of the Proposed Public Offering. Subsequent changes to the fair value of the warrants will be recorded in the Company's statement of operations

F-17

**PART II**
**INFORMATION NOT REQUIRED IN PROSPECTUS**

**Item 13. Other Expenses of Issuance and Distribution.**

The estimated approximate expenses payable by us in connection with the offering described in this registration statement (other than the underwriting discount and commissions) will be as follows:

| | |
|---|---:|
| SEC/FINRA Expenses | 32,750 |
| Accounting fees and expenses | 40,000 |
| Printing and engraving expenses | 30,000 |
| Reimbursement to underwriters for expenses | 100,000 |
| Directors & officers liability insurance premiums[1] | 150,000 |
| Legal fees and expenses | 225,000 |
| Nasdaq listing and filing fees | 75,000 |
| Miscellaneous | 10,000 |
| Total | $ 662,750 |

(1) This amount represents the approximate amount of annual director and officer liability insurance premiums the registrant anticipates paying following the completion of its initial public offering and until it completes an initial business combination.

**Item 14. Indemnification of Directors and officers.**

Our amended and restated certificate of incorporation will provide that all of our directors, officers, employees and agents shall be entitled to be indemnified by us to the fullest extent permitted by Section 145 of the Delaware General Corporation Law ("DGCL"). Section 145 of the Delaware General Corporation Law concerning indemnification of officers, directors, employees and agents is set forth below.

Section 145. Indemnification of officers, directors, employees and agents; insurance.

    (a)  A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with such action, suit or proceeding if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that the person's conduct was unlawful.

    (b)  A corporation shall have power to indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that the person is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against expenses (including attorneys' fees) actually and reasonably incurred by the person in connection with the defense or settlement of such action or suit if the person acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation and except that no indemnification shall be made in respect of any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation unless and only to the extent that the Court of Chancery or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses which the Court of Chancery or such other court shall deem proper.

(c)   To the extent that a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

(d)   Any indemnification under subsections (a) and (b) of this section (unless ordered by a court) shall be made by the corporation only as authorized in the specific case upon a determination that indemnification of the present or former director, officer, employee or agent is proper in the circumstances because the person has met the applicable standard of conduct set forth in subsections (a) and (b) of this section. Such determination shall be made, with respect to a person who is a director or officer at the time of such determination, (1) by a majority vote of the directors who are not parties to such action, suit or proceeding, even though less than a quorum, or (2) by a committee of such directors designated by majority vote of such directors, even though less than a quorum, or (3) if there are no such directors, or if such directors so direct, by independent legal counsel in a written opinion, or (4) by the stockholders.

(e)   Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the corporation as authorized in this section. Such expenses (including attorneys' fees) incurred by former officers and directors or other employees and agents may be so paid upon such terms and conditions, if any, as the corporation deems appropriate.

(f)   The indemnification and advancement of expenses provided by, or granted pursuant to, the other subsections of this section shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office. A right to indemnification or to advancement of expenses arising under a provision of the certificate of incorporation or a bylaw shall not be eliminated or impaired by an amendment to such provision after the occurrence of the act or omission that is the subject of the civil, criminal, administrative or investigative action, suit or proceeding for which indemnification or advancement of expenses is sought, unless the provision in effect at the time of such act or omission explicitly authorizes such elimination or impairment after such action or omission has occurred.

(g)   A corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the corporation, or is or was serving at the request of the corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the corporation would have the power to indemnify such person against such liability under this section.

(h)   For purposes of this section, references to "the corporation" shall include, in addition to the resulting corporation, any constituent corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer, employee or agent of such constituent corporation, or is or was serving at the request of such constituent corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this section with respect to the resulting or surviving corporation as such person would have with respect to such constituent corporation if its separate existence had continued.

II-2

(i) For purposes of this section, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the corporation" shall include any service as a director, officer, employee or agent of the corporation which imposes duties on, or involves services by, such director, officer, employee or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner such person reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the corporation" as referred to in this section.

(j) The indemnification and advancement of expenses provided by, or granted pursuant to, this section shall, unless otherwise provided when authorized or ratified, continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

(k) The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all actions for advancement of expenses or indemnification brought under this section or under any by law, agreement, vote of stockholders or disinterested directors, or otherwise. The Court of Chancery may summarily determine a corporation's obligation to advance expenses (including attorneys' fees).

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to our directors, officers, and controlling persons pursuant to the foregoing provisions, or otherwise, we have been advised that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment of expenses incurred or paid by a director, officer or controlling person in a successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, we will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to the court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

In accordance with Section 102(b)(7) of the DGCL, our amended and restated certificate of incorporation, will provide that no director shall be personally liable to us or any of our stockholders for monetary damages resulting from breaches of their fiduciary duty as directors, except to the extent such limitation on or exemption from liability is not permitted under the DGCL. The effect of this provision of our amended and restated certificate of incorporation is to eliminate our rights and those of our stockholders (through stockholders' derivative suits on our behalf) to recover monetary damages against a director for breach of the fiduciary duty of care as a director, including breaches resulting from negligent or grossly negligent behavior, except, as restricted by Section 102(b)(7) of the DGCL. However, this provision does not limit or eliminate our rights or the rights of any stockholder to seek non-monetary relief, such as an injunction or rescission, in the event of a breach of a director's duty of care.

If the DGCL is amended to authorize corporate action further eliminating or limiting the liability of directors, then, in accordance with our amended and restated certificate of incorporation, the liability of our directors to us or our stockholders will be eliminated or limited to the fullest extent authorized by the DGCL, as so amended. Any repeal or amendment of provisions of our amended and restated certificate of incorporation limiting or eliminating the liability of directors, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to further limit or eliminate the liability of directors on a retroactive basis.

Our amended and restated certificate of incorporation will also provide that we will, to the fullest extent authorized or permitted by applicable law, indemnify our current and former officers and directors, as well as those persons who, while directors or officers of our corporation, are or were serving as directors, officers, employees or agents of another entity, trust or other enterprise, including service with respect to an employee benefit plan, in connection with any threatened, pending or completed proceeding, whether civil, criminal, administrative or investigative, against all expense, liability and loss (including, without limitation, attorney's fees, judgments, fines, ERISA excise taxes and penalties and amounts paid in settlement) reasonably incurred or suffered by any such person in connection with any such proceeding.

Notwithstanding the foregoing, a person eligible for indemnification pursuant to our amended and restated certificate of incorporation will be indemnified by us in connection with a proceeding initiated by such person only if such proceeding was authorized by our board of directors, except for proceedings to enforce rights to indemnification.

The right to indemnification which will be conferred by our amended and restated certificate of incorporation is a contract right that includes the right to be paid by us the expenses incurred in defending or otherwise participating in any proceeding referenced above in advance of its final disposition, provided, however, that if the DGCL requires, an advancement of expenses incurred by our officer or director (solely in the capacity as an officer or director of our corporation) will be made only upon delivery to us of an undertaking, by or on behalf of such officer or director, to repay all amounts so advanced if it is ultimately determined that such person is not entitled to be indemnified for such expenses under our amended and restated certificate of incorporation or otherwise.

The rights to indemnification and advancement of expenses will not be deemed exclusive of any other rights which any person covered by our amended and restated certificate of incorporation may have or hereafter acquire under law, our amended and restated certificate of incorporation, our bylaws, an agreement, vote of stockholders or disinterested directors, or otherwise.

Any repeal or amendment of provisions of our amended and restated certificate of incorporation affecting indemnification rights, whether by our stockholders or by changes in law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision with respect to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision. Our amended and restated certificate of incorporation will also permit us, to the extent and in the manner authorized or permitted by law, to indemnify and to advance expenses to persons other that those specifically covered by our amended and restated certificate of incorporation.

Our bylaws, which we intend to adopt immediately prior to the closing of this offering, include the provisions relating to advancement of expenses and indemnification rights consistent with those which will be set forth in our amended and restated certificate of incorporation. In addition, our bylaws provide for a right of indemnity to bring a suit in the event a claim for indemnification or advancement of expenses is not paid in full by us within a specified period of time. Our bylaws also permit us to purchase and maintain insurance, at our expense, to protect us and/or any director, officer, employee or agent of our corporation or another entity, trust or other enterprise against any expense, liability or loss, whether or not we would have the power to indemnify such person against such expense, liability or loss under the DGCL.

Any repeal or amendment of provisions of our bylaws affecting indemnification rights, whether by our board of directors, stockholders or by changes in applicable law, or the adoption of any other provisions inconsistent therewith, will (unless otherwise required by law) be prospective only, except to the extent such amendment or change in law permits us to provide broader indemnification rights on a retroactive basis, and will not in any way diminish or adversely affect any right or protection existing thereunder with respect to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

We will enter into indemnification agreements with each of our officers and directors a form of which is to be filed as an exhibit to this Registration Statement. These agreements will require us to indemnify these individuals to the fullest extent permitted under Delaware law against liabilities that may arise by reason of their service to us, and to advance expenses incurred as a result of any proceeding against them as to which they could be indemnified.

Pursuant to the Underwriting Agreement to be filed as Exhibit 1.1 to this Registration Statement, we have agreed to indemnify the underwriters and the underwriters have agreed to indemnify us against certain civil liabilities that may be incurred in connection with this offering, including certain liabilities under the Securities Act.

**Item 15. Recent Sales of Unregistered Securities.**

On January 20, 2021, ARC Global Investments II LLC, our sponsor, purchased an aggregate of 2,875,000 founder shares, for an aggregate offering price of $25,000 at an average purchase price of approximately $0.009 per share. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares of common stock upon completion of this offering (excluding the representative shares and the placement units and underlying securities). Such securities were issued in connection with our organization pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act. Our sponsor is an accredited investor for purposes of Rule 501 of Regulation D.

On or before the date of the prospectus accompanying this registration statement, our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full), at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250 if the underwriters' over-allotment option is exercised in full). These placement units will be issued pursuant to the exemption from registration contained in Section 4(2) of the Securities Act as they will be sold to "accredited investors" as defined in Rule 501(a) of the Securities Act. No underwriting discounts or commissions will be paid with respect to such sales. Subscription agreements will be entered into with our sponsor in connection with these placement units and copies of such agreements will be attached as exhibits to this registration statement.

**Item 16. Exhibits and Financial Statement Schedules.**

(a) *Exhibits.* The list of exhibits following the signature page of this registration statement is incorporated herein by reference.

(b) *Financial Statements.* See page F-1 for an index to the financial statements and schedules included in the registration statement.

**Item 17. Undertakings.**

(a) The undersigned registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreements, certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

(b) Insofar as indemnification for liabilities arising under the Securities Act of 1933 may be permitted to directors, officers and controlling persons of the registrant pursuant to the foregoing provisions, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer or controlling person of the registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Act and will be governed by the final adjudication of such issue.

(c) The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act of 1933, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) For the purpose of determining liability under the Securities Act of 1933 to any purchaser, if the registrant is subject to Rule 430C, each prospectus filed pursuant to Rule 424(b) as part of a registration statement relating to an offering, other than registration statements relying on Rule 430B or other than prospectuses filed in reliance on Rule 430A, shall be deemed to be part of and included in the registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in a registration statement or prospectus that is part of the registration statement or made in a document incorporated or deemed incorporated by reference into the registration statement or prospectus that is part of the registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in the registration statement or prospectus that was part of the registration statement or made in any such document immediately prior to such date of first use.

(4) For the purpose of determining liability of a registrant under the Securities Act of 1933 to any purchaser in the initial distribution of the securities, the undersigned registrant undertakes that in a primary offering of securities of an undersigned registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned registrant will be a seller to the purchaser and will be considered to offer or sell such securities to such purchaser:

(i) Any preliminary prospectus or prospectus of the undersigned registrant relating to the offering required to be filed pursuant to Rule 424;

(ii) Any free writing prospectus relating to the offering prepared by or on behalf of the undersigned registrant or used or referred to by an undersigned registrant;

(iii) The portion of any other free writing prospectus relating to the offering containing material information about the undersigned registrant or its securities provided by or on behalf of the undersigned registrant; and

(iv) Any other communication that is an offer in the offering made by the undersigned registrant to the purchaser.

II-6

**EXHIBIT INDEX**

| Exhibit | Description |
|---|---|
| 1.1 | Form of Underwriting Agreement** |
| 3.1 | Certificate of Incorporation* |
| 3.2 | Form of Amended and Restated Certificate of Incorporation** |
| 3.3 | By Laws* |
| 4.1 | Specimen Unit Certificate** |
| 4.2 | Specimen Class A Common Stock Certificate** |
| 4.3 | Specimen Warrant Certificate** |
| 4.4 | Specimen Right Certificate** |
| 4.5 | Form of Warrant Agreement between Continental Stock Transfer & Trust Company and the Registrant** |
| 4.6 | Form of Rights Agreement between Continental Stock Transfer & Trust Company and the Registrant** |
| 5.1 | Opinion of Ellenoff Grossman & Schole LLP** |
| 10.1 | Form of Letter Agreement among the Registrant and our officers, directors and ARC Global Investments II LLC** |
| 10.2 | Promissory Note, dated December 11, 2020, issued to ARC Global Investments II LLC* |
| 10.3 | Form of Investment Management Trust Agreement between Continental Stock Transfer & Trust Company and the Registrant** |
| 10.4 | Form of Registration Rights Agreement between the Registrant and certain security holders** |
| 10.5 | Securities Subscription Agreement, dated January 20, 2021, between the Registrant and ARC Global Investments II LLC* |
| 10.7 | Form of Placement Unit Purchase Agreement between the Registrant and ARC Global Investments II LLC** |
| 10.8 | Form of Indemnity Agreement** |
| 10.9 | Form of Administrative Support Agreement by and between the Registrant and Benessere Enterprises Inc.** |
| 14 | Form of Code of Ethics** |
| 23.1 | Consent of Marcum LLP* |
| 23.2 | Consent of Ellenoff Grossman & Schole LLP (included in Exhibit 5.1)** |
| 23.3 | Consent of Justin L. Shaner* |
| 23.4 | Consent of Eric Swider* |
| 24 | Power of Attorney (included on the signature page to the initial filing of this Registration Statement)* |
| 99.1 | Form of Audit Committee Charter** |
| 99.2 | Form of Compensation Committee Charter** |

\*    Filed herewith.

\*\*   To be filed by amendment.

**SIGNATURES**

Pursuant to the requirements of the Securities Act of 1933, as amended, the registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Miami, Florida, on the 25th day of May, 2021.

**Digital World Acquisition Corp.**

By:/s/ Patrick Orlando

Name: Patrick Orlando

Title: Chairman and Chief Executive Officer

KNOW ALL MEN BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints each of Patrick Orlando and Luis Orleans-Braganza his true and lawful attorney-in-fact, with full power of substitution and resubstitution for him and in his name, place and stead, in any and all capacities to sign any and all amendments including post-effective amendments to this registration statement, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, hereby ratifying and confirming all that said attorney-in-fact or his substitute, each acting alone, may lawfully do or cause to be done by virtue thereof.

Pursuant to the requirements of the Securities Act of 1933, as amended, this Registration Statement has been signed below by the following persons in the capacities and on the dates indicated.

| NAME | POSITION | DATE |
|---|---|---|
| /s/ Patrick Orlando | Chief Executive Officer and Chairman | May 25, 2021 |
| Patrick Orlando | (principal executive officer) | |
| /s/ Luis Orleans-Braganza | Chief Financial Officer | May 25, 2021 |
| Luis Orleans-Braganza | (principal financial and accounting officer) | |
| /s/ Lee Jacobson | Director | May 25, 2021 |
| Lee Jacobson | | |

II-8