# EXHIBIT B-3

## COURT APPEARANCE RECORD

DIVISION: DIVISION C CIRCUIT

CASE NUMBER: 2024 CA 001061 NC

PLAINTIFF(S):
DIGITAL WORLD ACQUISITION CORPORATION
TRUMP MEDIA & TECHNOLOGY GROUP CORP

VS. DEFENDANT(S):
ARC GLOBAL INVESTMENTS II LLC
PATRICK ORLANDO

**COURT EVENT: MOTIONS**
**JUDGE: HUNTER W CARROLL**

**DATE: Thursday, July 25, 2024**
**TIME: 04:00 PM**

**APPEARANCE:**

**PLAINTIFF**

**DIGITAL WORLD ACQUISITION CORPORATION**
[ ] DID NOT APPEAR    [ ] APPEARED PRO SE    [ ] APPEARED WITH ATTORNEY    [X] ATTORNEY ONLY
ATTORNEY NAME: _Matthew Gutierrez, Chris Oprison, Tal Aburos, Samuel Salano_

**TRUMP MEDIA & TECHNOLOGY GROUP CORP**
[ ] DID NOT APPEAR    [ ] APPEARED PRO SE    [ ] APPEARED WITH ATTORNEY    [ ] ATTORNEY ONLY
ATTORNEY NAME: _Matthew Gutierrez, Chris Oprison, Tal Aburos_

**DEFENDANT**

**ARC GLOBAL INVESTMENTS II LLC**
[ ] DID NOT APPEAR    [ ] APPEARED PRO SE    [ ] APPEARED WITH ATTORNEY    [X] ATTORNEY ONLY
ATTORNEY NAME: _Andrew Vitali_

**PATRICK ORLANDO**
[ ] DID NOT APPEAR    [ ] APPEARED PRO SE    [ ] APPEARED WITH ATTORNEY    [X] ATTORNEY ONLY
ATTORNEY NAME: _Andrew Figueroa_

COURT REPORTER: _Michelle Deshield w/ veritext_

**PETITIONS / MOTIONS:**

[X] PLAINTIFF'S    [ ] DEFENDANT'S
[ ] PETITION    [X] MOTION
DIN# _(33) To consolidate_
_____

**RULINGS:**

[ ] GRANTED    [ ] DENIED    [ ] CONTINUED
[ ] GRANTED / DENIED IN PART    [ ] CANCELLED
[X] TAKEN UNDER ADVISEMENT
[ ] OTHER _Ruling scheduled for next week_

[ ] PLAINTIFF'S    [ ] DEFENDANT'S
[ ] PETITION    [ ] MOTION
DIN#_____

[ ] GRANTED    [ ] DENIED    [ ] CONTINUED
[ ] GRANTED / DENIED IN PART    [ ] CANCELLED
[ ] TAKEN UNDER ADVISEMENT
[ ] OTHER _____

[ ] SUPPLEMENTAL PAGE ATTACHED

**COURT COMMENTS:** _____
_____
_____
_____
_____

**KAREN E. RUSHING, CLERK OF THE CIRCUIT COURT**
BY: _____ , Deputy Clerk
DATE: July 25, 2024

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA,
CIVIL DIVISION

CASE NO.: 2024-CA-001061

TRUMP MEDIA & TECHNOLOGY GROUP
CORP, F/K/A DIGITAL WORLD
ACQUISITION CORPORATION, and TMTG
SUB., INC.,

        Plaintiffs,

  v.

ARC GLOBAL INVESTMENTS II LLC, and
PATRICK ORLANDO,

        Defendants.

_____/

### <u>ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR STAY</u>

**THIS CAUSE** came before the Court for hearing on July 10, 2024, and being otherwise

fully informed and advised in the premises, it is hereby **ORDERED** and **ADJUDGED**, for the

reasons set forth on the record, a transcription of which is attached as Exhibit A:

1.    Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay

    this Proceeding is **DENIED**.

2.    Defendants shall file separate answers within twenty (20) days of entry of this

    Order.

**DONE and ORDERED**, in Sarasota, Florida, on 07/29/2024.

e-Signed 7/29/2024 7:17 AM 2024 CA 001061 NC

**HUNTER W. CARROLL**
**Circuit Court Judge**

Copies furnished to: All parties of record

**Vedder**Price

Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
Dallas
Miami
vedderprice.com

July 28, 2024

TO: THE CLERK OF COURT
FROM: JUDGE HUNTER W. CARROLL
DATE:_____ 7/29/24
THE JUDGE REVIEWED THIS DOCUMENT.
PLEASE PLACE IN APPROPRIATE COURT FILE.

Adam L. Schwartz
Shareholder
+1 (786) 741 3240
aschwartz@vedderprice.com

**VIA E-FILING PORTAL**

Honorable Hunter W. Carroll
Judge Lynn N. Silvertooth Judicial Center
2002 Ringling Blvd.
Sarasota, FL 34237

     RE: *Digital World Acquisition Corp. et al. v. ARC Global Investments II LLC et al.*,
        Case No. 2024-CA-001061-NC

Dear Judge Carroll:

Pursuant to the Court's ruling in Court on July 10, 2024, please find attached a Proposed Order denying Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay This Proceeding (the "Motion") (DIN 28). Consistent with the Court's instructions at the hearing, also attached is the relevant portion of the transcript referenced in the Proposed Order. The Parties conferred on the form of the Proposed Order as to the Motion and agree to same.

Defendants ARC Global Investments II LLC and Patrick Orlando submit the Proposed Order in accordance with the Court's instructions, and expressly maintain and do not waive their positions briefed and argued at the July 10, 2024 hearing.

Regards,

Adam L. Schwartz
Shareholder

ALS/atf

Encl.

600 Brickell Avenue, Suite 1500  |  Miami, Florida 33131  |  T +1 (786) 741 3200  |  F +1 (786) 741 3202

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price Pte. Ltd., which operates in Singapore, and Vedder Price (FL) LLP, which operates in Florida.

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 6 of 1832 PageID 3483

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061-NC

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

        Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II LLC and
PATRICK ORLANDO,

        Defendants.

_____/

## NOTICE OF APPEAL OF A NONFINAL ORDER

**NOTICE IS GIVEN** that ARC Global Investments II LLC and Patrick Orlando, Defendants/Appellants, appeal to the Second District Court of Appeal, the Order of this Court rendered July 29, 2024. (DIN 93, conformed copy attached hereto.)   The nature of the Order is a nonfinal order denying Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay This Proceeding based on improper venue and *forum non conveniens*.  (*See* DIN 28, filed on April 3, 2024); *see also* FLA. R. APP. P. 9.130(a)(3)(A) & (C)(viii).

Dated: Miami, Florida
       July 30, 2024

Respectfully submitted,

Homer
Bonner

1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Phone: +1 (305) 350-5100
Fax: +1 (305) 372-2738

By: /s/ Kevin P. Jacobs
kjacobs@homerbonner.com
Florida Bar No. 169821
Andrew Vitali, III, Esq.
avitali@homerbonner.com
Florida Bar No. 057828

*Attorneys for Defendant ARC Global
Investments II LLC*

VEDDER PRICE (FL), LLP
600 Brickell Avenue, Suite 1500
Miami, Florida 33131
Phone: +1 (786) 741 3200
Fax: +1 (786) 741 3202

By: /s/ Adam L. Schwartz
    Adam L. Schwartz
    aschwartz@vedderprice.com
    Florida Bar No. 103163
    Andrew T. Figueroa
    afigueroa@vedderprice.com

and

DECHERT LLP
Joshua D. N. Hess
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Phone: +1 (415) 262 4583
Fax: +1 (415) 262 4555
joshua.hess@dechert.com
Admitted *Pro Hac Vice*

*Attorneys for Defendant Patrick Orlando*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 30, 2024, a true and correct copy of the foregoing was served by email generated by the Florida Courts E-Filing system to all parties of record.

Dated: July 30, 2024

Respectfully submitted,

By: /s/ Adam L. Schwartz

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA,
CIVIL DIVISION

CASE NO.: 2024-CA-001061

TRUMP MEDIA & TECHNOLOGY GROUP
CORP, F/K/A DIGITAL WORLD
ACQUISITION CORPORATION, and TMTG
SUB., INC.,

        Plaintiffs,

  v.

ARC GLOBAL INVESTMENTS II LLC, and
PATRICK ORLANDO,

        Defendants.

_____/

## <u>ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR STAY</u>

**THIS CAUSE** came before the Court for hearing on July 10, 2024, and being otherwise fully informed and advised in the premises, it is hereby **ORDERED** and **ADJUDGED**, for the reasons set forth on the record, a transcription of which is attached as Exhibit A:

1.    Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay this Proceeding is **DENIED**.

2.    Defendants shall file separate answers within twenty (20) days of entry of this Order.

**DONE and ORDERED**, in Sarasota, Florida, on 07/29/2024.

e-Signed 7/29/2024 7:17 AM 2024 CA 001061 NC

**HUNTER W. CARROLL**
**Circuit Court Judge**

Copies furnished to: All parties of record

# EXHIBIT A

Page 68

```
 1      private factors, TMTG and DWAC and now the merged

 2      entity, it's a Delaware corporation.  Every

 3      director by becoming a Delaware -- being -- by the

 4      nature of being a director of a Delaware

 5      corporation consents to jurisdiction in Delaware

 6      for all things related.  So, therefore, that makes

 7      things a lot easier, because not every director is

 8      an individual in the state of Florida.  I think

 9      some of them are even in Puerto Rico.

10           And, last, just with respect to the

11      conversion claim, the problem here is that

12      Mr. Orlando is the CEO and has a bank account and

13      used funds.  That in and of itself is not

14      conversion.  It has to be "I give you a specific

15      sum of money that can only be used for a specific

16      purpose."  It's very limited what a conversion

17      claim can be when we deal with bank accounts and

18      cash in the state of Florida, and our case law

19      makes that clear.  So I don't think they meet the

20      pleading requirements there.

21           If there's any other questions, Your Honor,

22      that's really what I wanted to cover in the reply.

23           THE COURT:  The Court has before it the

24      Defendant's Joint Motion to Dismiss the Amended

25      Complaint or, alternatively, to Stay This
```

Page 69

1      Proceeding at DIN 28.  There's a response in

2      opposition at DIN 65 and reply at DIN 72.

3           There are multiple items that this motion is

4      seeking.  It's seeking a dismissal, dismissal with

5      prejudice.  It's seeking a forum non conveniens,

6      not the Section 47.122 Florida Statutes forum

7      non conveniens but the outside of the state of

8      Florida forum non conveniens.  All parties agree

9      the Court has jurisdiction, but it's question of

10     venue.

11          In the Court's mind, I'm always trying to

12     wrap do I address venue first or do I address the

13     motion to dismiss, and I think I need to address

14     the motion to dismiss.

15          I'm supposed to take all well-pled

16     allegations in favor of the plaintiffs, and their

17     obligation is to set forth ultimate facts to state

18     a cause of action.  I disagree with the defendants

19     that the case does not state a cause of action on

20     conversion.  I think it does.  And I have been on

21     the fence having to do with FDUPTA.  But going

22     back and looking at the allegations, I was

23     concerned about the actual damages, and I think

24     it -- I think it's enough.

25          Would I like to see more?  Sure.  But this

Page 70

1    isn't what Judge Carroll wants to see.  It's was

2    there enough ultimate facts to allege a cause of

3    action, and I -- having reviewed this complaint --

4    or I should say the amended complaint several

5    times, I do find that it does state a cause of

6    action.

7         The next concept in my mind is, well, we have

8    got this Delaware case up there, and is the

9    Florida case an inconvenient forum for the

10   allegations that are in the complaint, the amended

11   complaint.  And looking at the case law with

12   respect to transferring something out of the

13   state, I haven't gotten past the public factor

14   issue, because I don't see how the defense has

15   actually gotten close to that factor being in

16   equipoise.

17        I disagree with the analysis of the charter.

18   I think the plain language of the charter very

19   clearly indicates -- I have got it right here.

20   "The Court of Chancery of the state of Delaware

21   shall the sole and exclusive forum for any

22   stockholder, including beneficial owner, to

23   bring."  Well, that's pretty clear as to what type

24   of action is sole and exclusive, and that's not in

25   this case.  So I don't believe that the language

1    of that charter applies.

2        There is no other evidence, so I don't think

3    I even need to get to the other factors because

4    we're not at equipoise or close to equipoise as it

5    relates to the public factor.

6        So ultimately the answer is I'm denying the

7    motion to dismiss based on forum non conveniens.

8        I'm denying the motion to dismiss for failure

9    to state a cause of action.  I know we referenced

10   venue.  I think technically venue would be within

11   the State of Florida, so really it's a motion to

12   dismiss for forum non conveniens.  And since I'm

13   denying that, I next have to address the question

14   of stay.

15       I don't see why Florida should not be able to

16   vindicate the issues.  It was the first filed.  It

17   was -- there was the first service.  So I am not

18   going to stay the Florida action.

19       Mr. Salario, if you could do a short order

20   articulating.  If you want to just get an

21   electronic copy of my ruling and staple it, I'm

22   fine with that.  Just submit it through the

23   portal.

24       MR. SALARIO:  Will do, Your Honor.

25       THE COURT:  Okay.  So that takes us next to

## Sarasota County Receipt of Transaction

## Receipt #    2024072606

Karen E. Rushing
Clerk of the Circuit Court and County Comptroller
Sarasota County, FL
www.SarasotaClerk.com

**Received From:**
SCHWARTZ, ADAM L
600 BRICKELL AVENUE
SUITE 1500

**On Behalf Of:**

On:  7/30/24   7:31 pm  By:  sshinn
Transaction # 101493438

| CaseNumber   2024 CA 001061 NC |
|---|

**Judge   HUNTER W CARROLL**

**DIGITAL WORLD ACQUISITION CORPORATION   *VS*   ARC GLOBAL INVESTMENTS II LLC**

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (CPL) COMPLAINT | 400.00 | 400.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (SUMCIRE) SUMMONS CIRCUIT EFILED - REQUEST | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (SUMCIRE) SUMMONS CIRCUIT EFILED - REQUEST | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (NOTAPPR) NOTICE OF APPEAL - FILED AND RECOF | 100.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 |
| **Total:** | **520.00** | **420.00** | **0.00** | **100.00** | **100.00** | **0.00** |
| **Grand Total:** | **520.00** | **420.00** | **0.00** | **100.00** | **100.00** | **0.00** |

| PAYMENTS |
|---|

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| E-Portal | 12005714 | OK | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| | | **Payments Total:** | **100.00** | **0.00** | **0.00** | **0.00** | **100.00** |



## DISTRICT COURT OF APPEAL OF FLORIDA, SECOND DISTRICT
1700 N. Tampa Street, Suite 300
Tampa, FL 33602
(727) 610-3741

ACKNOWLEDGEMENT OF NEW CASE
July 31, 2024

ARC GLOBAL INVESTMENTS, II, LLC, AND          CASE NUMBER:
PATRICK ORLANDO,                              2D2024-1780
        APPELLANT(S)

V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
        APPELLEE(S).

The Second District Court of Appeal has received a case initiation document reflecting a filing date of July 30, 2024. The county of origin is Sarasota County.

The lower tribunal case number is 2024CA-001061.

The filing fee is: Fee Owed

Case Type: NOA Non Final - Circuit Civil - Other.

The Second District Court of Appeal's case number must be used on all pleadings filed in this case.

Please review and comply with any handouts enclosed with this acknowledgement letter.

LS

cc:
SARASOTA CLERK
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
ADAM LOUIS SCHWARTZ
ANDREW VITALI, III

IN THE DISTRICT COURT OF APPEAL IN AND FOR THE STATE OF FLORIDA
SECOND DISTRICT

## NOTICE TO ATTORNEYS AND PARTIES

The substantial case load of this court together with the orderly and timely movement of appeals requires strict compliance with the appellate rules. The following items are brought to your attention for easy reference.

### 1. Critical Time Requirements for Appeals from Final Orders

(a) Appellant's initial brief is due 70 days from the notice of appeal in civil appeals; 30 days from the later of transmission of the record or designation of appointed counsel in criminal appeals; and 30 days from the notice of appeal in summary postconviction appeals for the optional brief.

(b) A party has 15 days to voluntarily respond to an opponent's motion.

### 2. Extensions of Time

Good cause must be shown.  File before the applicable deadline.  Failure to comply may subject the appeal to dismissal or result in sanctions.  Specify the expiration day of the requested extension.  Pursuant to rule 9.300, attorneys must include a certificate that opposing counsel has been consulted and either has no objection or will promptly file an objection.

### RELATED CASES

All attorneys and self-represented parties shall advise this court of related cases currently pending or recently decided by this court.  Fla. R. App. P. 9.380.  File a separate "Notice of Related Cases" within seven days of receipt of the acknowledgement letter.  A form is provided in rule 9.900(k).  This includes appeals or original proceedings that arise from the same trial court case, as well as proceedings, even if not in the same trial court case, that arise from the same or related factual circumstances.  Proceedings involving criminal defendants who are not codefendants but who have been accused of being confederates in a criminal act or acts would qualify under this definition of related cases in this court.

### CHILD CUSTODY/VISITATION

The Court expedites appeals that involve disputes over child custody or visitation.  All attorneys and self-represented parties shall advise this court if child custody or visitation is an issue in their case.  File a separate "Notice of Custody or Visitation Issue" within ten days of receipt of the acknowledgement letter.

3.    **<u>Electronic Filing</u>**

All attorneys must file electronically via the Florida Courts e-Filing Portal: <u>www.myflcourtaccess.com</u>.  Electronic fee payments may also be submitted through this portal.

4.    **<u>Oral Argument Request and Continuances</u>**

(a)  Requests must be made not later than 15 days after the last brief or reply is due to be served and shall be filed in a separate document.  Each side will have twenty minutes to argue unless the court orders otherwise prior to the date of argument.  Fla. R. App. P. 9.320.

(b)  Motions for continuance of oral argument must be based on either a substantial commitment <u>preexisting the receipt of the oral argument notice</u> or an emergency situation.

(c)  Timely requests for oral argument, submitted in a separate document that complies with Florida Rule of Appellate Procedure 9.320, will generally be granted.  Except in extraordinary cases, however, the court does not allow oral argument on motions and in the following types of proceedings:

i)      appeals in which a pro se party is incarcerated;
ii)     summary postconviction appeals; and
iii)    nonsummary postconviction appeals where the parties are not represented.

Requests for oral argument in expedited proceedings, including termination of parental rights and dependency cases, are presented first to the merits panel.

(d)  Upon receipt of an order setting oral argument, please check <u>WHERE</u> argument is to be held.  This court sets cases in Tampa, by video, and from time to time in other cities.

5.    **<u>Briefs</u>**

Any brief submitted to the court must comply with Florida Rules of Appellate Procedure 9.045 and 9.210.  If submitted by an attorney, it must be filed electronically.  If the brief is typewritten or computer-generated, the lettering shall be black and in distinct type, double-spaced, with margins no less than 1 inch.   Computer-generated briefs shall be prepared with either Arial 14-point font or Bookman Old Style 14-point font.

6.    **Record References in Briefs**

Failure to comply with rule 9.210(b)(3) by reference to appropriate pages of the record in the statement of the case and facts may result in the striking of the brief, even in the absence of a motion filed by the opposing party.  When a record is required, any document appearing in an appendix must also be contained in the record on appeal.

7.    **Use of Trial Court Evidentiary Exhibits**

    **(a) Contraband and dangerous items:**  Please do not designate as part of the record on appeal such tangible evidence as drugs, firearms, or explosives without prior permission of the court.  If the court approves transmission of these kinds of exhibits, it will identify the role of the circuit court clerk and appropriate law enforcement personnel in transporting the exhibits.

    **(b) Large charts, and heavy or bulky items**: Please do not designate as part of the record on appeal large items without prior approval by the court.  In the event such approval is given, in civil cases it will be the responsibility of the party gaining such approval to see that oversized evidence is delivered to this court and redelivered to the trial court at the conclusion of the appeal.  In criminal cases, the court upon motion will designate the means of transmission of the subject exhibits.  This restriction does not apply to normal-size documents, photographs, maps, graphs, etc.

8.    **Appendices**

Appendices filed electronically must contain an index and be bookmarked, text-searchable, and paginated so that the page numbers displayed by the PDF reader exactly match the pagination of the index. Paper appendices may only be submitted by self-represented parties.  With a paper appendix, text is permitted on one side of the page only.

9.    **Supplemental Authority**

Notify opposing party of full citation BEFORE oral argument and file with this court.  This should be done, except in exceptional circumstances, early enough for opposing counsel to be prepared to respond to the supplemental authority at oral argument.

**10.**   **Waiving Oral Argument**

Cases without oral argument are subject to the same review, analysis, and consideration by a three-judge panel as are cases that are orally argued.

**11.**   **Florida Bar Numbers**

All attorneys MUST put their Florida Bar membership number on all pleadings filed with the appellate court.

**12.**   **Changes of Address of Attorneys or Parties**

All attorneys representing parties in this court and parties representing themselves shall promptly notify this court of any changes of their address or email address.  All orders and decisions of this court sent to the last email or mailing address in the court file will be presumed to be adequate notice for all purposes.

DANIEL H. SLEET, CHIEF JUDGE
Second District Court of Appeal
July 1, 2023

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT

1700 N. Tampa Street, Suite 300, Tampa FL 33602

July 31, 2024

ARC GLOBAL INVESTMENTS, II,     CASE NO.: 2D2024-1780
LLC, AND PATRICK ORLANDO,       L.T. No.: 2024CA-001061
         APPELLANT(S)
V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
         APPELLEE(S).

_____

**BY ORDER OF THE COURT:**

    This appeal has been filed without a filing fee required by section 35.22(2)(a), Florida Statutes.

    The attorney for Appellant shall forward the required $300.00 filing fee or, if applicable, a certificate or order of the lower tribunal finding Appellant insolvent pursuant to section 57.081, Florida Statutes, within twenty days from the date of this order.

    If this court does not receive either of the above within the prescribed time, this appeal may be subject to dismissal without further notice.

    I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

*Mary Elizabeth Kuenzel*

Mary Elizabeth Kuenzel, Clerk
2D2024-1780 7/31/24



LS

Served:
SARASOTA CLERK
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
ADAM LOUIS SCHWARTZ
ANDREW VITALI, III

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT

1700 N. Tampa Street, Suite 300, Tampa FL 33602

July 31, 2024

ARC GLOBAL INVESTMENTS, II,      CASE NO.: 2D2024-1780
LLC, AND PATRICK ORLANDO,       L.T. No.: 2024CA-001061
      APPELLANT(S)
V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
      APPELLEE(S).

_____

**BY ORDER OF THE COURT:**

     This proceeding is a nonfinal appeal, or an appeal of a specified final order, governed by Florida Rule of Appellate Procedure 9.130.  The initial brief and appendix shall be served within twenty days of the date of this order.  Appellee(s) shall serve the answer brief(s) within thirty days of service of the initial brief.

     I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

*Mary Elizabeth Kuenzel*
Mary Elizabeth Kuenzel, Clerk
2D2024-1780 7/31/24

LS

Served:
SARASOTA CLERK
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
ADAM LOUIS SCHWARTZ
ANDREW VITALI, III

Filed 07/31/2024 03:04 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT

1700 N. Tampa Street, Suite 300, Tampa FL 33602

July 31, 2024

| | |
|---|---|
| ARC GLOBAL INVESTMENTS, II, LLC, AND PATRICK ORLANDO, APPELLANT(S) | CASE NO.: 2D2024-1780 L.T. No.: 2024CA-001061 |

V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
APPELLEE(S).

_____

**BY ORDER OF THE COURT:**

The Notice of Appeal that initiated this proceeding does not provide mailing addresses for those served with the Notice of Appeal.  Within five days from the date of this order, Appellant shall submit an amended certificate of service that lists current mailing addresses for all who were served with the Notice of Appeal.

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

Mary Elizabeth Kuenzel

Mary Elizabeth Kuenzel, Clerk

2D2024-1780 7/31/24



LS

Served:
SARASOTA CLERK
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
ADAM LOUIS SCHWARTZ
ANDREW VITALI, III

**DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA**
**SECOND DISTRICT**

1700 N. Tampa Street, Suite 300, Tampa FL 33602

July 31, 2024

| | |
|---|---|
| ARC GLOBAL INVESTMENTS, II, LLC, AND PATRICK ORLANDO,     APPELLANT(S) | CASE NO.: 2D2024-1780 <br> L.T. No.: 2024CA-001061 |

V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
    APPELLEE(S).

---

**BY ORDER OF THE COURT:**

    Within 20 days from the date of this order, Attorney Joshua D.N. Hess shall move to appear in this court pro hac vice pursuant to Florida Rule of General Practice and Judicial Administration 2.510, or the attorney will be removed from this proceeding.

    I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

*Mary Elizabeth Kuenzel*
Mary Elizabeth Kuenzel, Clerk
2D2024-1780 7/31/24

CL

Served:
SARASOTA CLERK
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
ADAM LOUIS SCHWARTZ
ANDREW VITALI, III

**CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**SARASOTA COUNTY, FLORIDA**
**CIVIL DIVISION**

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

      Plaintiffs,

v.                                                                                    Case No.: 2024-CA-001061-NC

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company,
PATRICK ORLANDO, UNITED ATLANTIC
VENTURES LLC, a Delaware Limited Liability
Company, ANDREW LITINSKY, and WESLEY
MOSS

      Defendants.

_____/

**PLAINTIFFS' MOTION FOR LEAVE**
**TO FILE SECOND AMENDED COMPLAINT**

      Plaintiffs, Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1]

("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] (collectively, "Plaintiffs"), pursuant

to Rule 1.190(a), Florida Rules of Civil Procedure, move this Court for leave permitting Plaintiffs

to file the Second Amended Complaint attached hereto as Exhibit A. In support of this Motion,

Plaintiffs state as follows:

_____

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media and & Technology Group Corp.  On March 25, 2024, Old TMTG merged with DWAC.  Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc.  DWAC, in turn, changed its name to Trump Media & Technology Group Corp.

1

## BACKGROUND

**A.    Plaintiffs seek to protect DWAC and Old TMTG from egregious breaches of fiduciary duties by former key officers and directors.**

1.    DWAC n/k/a TMTG was a Special Purpose Acquisition Company ("SPAC") that in March 2024 completed a merger with Old TMTG, a technology company headquartered in Sarasota County that operates the "Truth Social" social media platform.

2.    Unfortunately, former fiduciaries of DWAC and Old TMTG engaged in self-dealing and other misconduct. Specifically, Defendant, Patrick Orlando, the former director and CEO of DWAC, prioritized his financial self-interest over the interests of DWAC and its shareholders in breach of his fiduciary duties and the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"). Orlando further used Defendant, ARC Global Investments II, LLC ("ARC"), to convert funds from DWAC for his personal use as well as to obstruct DWAC's progress toward a merger with Old TMTG as a tactic to enrich himself.

3.    Similarly, Andrew Litinsky and Wesley Moss, former directors of Old TMTG, aided Orlando with his scheme and breached their own fiduciary duties of loyalty and care to Old TMTG.

4.    The former directors caused significant damage to Old TMTG and DWAC.  An investigation into Orlando's conduct led to an $18 million penalty imposed by the U.S. Securities and Exchange Commission ("SEC") against DWAC. The two years of unnecessary delay in the merger between DWAC and Old TMTG caused significant lost revenues and opportunities. And, the loss of access to needed capital and other harm to Plaintiffs' shareholders, as well as to the consumers of Truth Social cannot be overstated.

**B.    Procedural posture of this case.**

5.    Compelled to initiate litigation to mitigate and recover their damages, Plaintiffs

filed their Complaint for Declaratory Judgment and Other Relief on February 27, 2024.

6.     On March 17, 2024, Plaintiffs filed an Amended Complaint asserting the following claims:

- Count I: Breach of Fiduciary Duty of Loyalty (by DWAC against Orlando);

- Count II: Breach of Fiduciary Duty of Care (by DWAC against Orlando);

- Count III: Conversion (by DWAC against Orlando);

- Count IV: Aiding and Abetting Breach of Fiduciary Duty (by DWAC against ARC); and

- Count V: Violation of FDUTPA (by TMTG and DWAC against Orlando and ARC).

Thus, all existing claims in this case involve breaches of fiduciary duties and related misconduct by Orlando and ARC.

7.     On April 3, 2024, Defendants filed their 754-page Joint Motion to Dismiss Amended Complaint, or, Alternatively, to Stay This Proceeding (the "Motion to Dismiss"). In the Motion to Dismiss, Defendants raised multiple non-meritorious challenges to the Amended Complaint, including whether venue is proper in Sarasota County notwithstanding the fact that TMTG f/k/a DWAC is headquartered in Sarasota County.

8.     On July 10, 2024, this Court conducted a hearing on the Motion to Dismiss and other pending motions. At the close of the hearing, the Court announced its decision to deny the Motion to Dismiss, but also indicated the Court's desire to see additional allegations of fact to frame Plaintiffs' claims.

9.     As of the date of this motion, Defendants have not filed a responsive pleading to the Amended Complaint.

**C.**    **Other cases involving some of the parties.**

10.    Multiple cases with different parties are being litigated at the same time.  It is therefore critical to understand the scope and status of each action.

11.    Civil Action No. 2024-0186-LWW (the "ARC Delaware Action"), is pending in the Court of Chancery of the State of Delaware. This case arose from a dispute regarding the mathematical formula used by DWAC to convert shares of Class B Common Stock into shares of Class A Common Stock in connection with the merger.

12.    The claims involved in the Delaware Action include:

- Count I: Breach of Charter (by ARC against DWAC);

- Count II: Declaratory Judgment (by ARC against DWAC); and

- Count III: Breach of Fiduciary Duty (by ARC against DWAC's now-former directors who allegedly used the wrong formula to convert shares).

DWAC and its directors have not asserted any counterclaim or claims for affirmative relief in the ARC Delaware Action, although they have asserted certain affirmative defenses. The ARC Delaware Action focuses on the conversion ratio.  On July 10, 2024, this Court dismissed a motion to stay in the instant action in light of the ARC Delaware Action.

13.    The second lawsuit is Circuit Court Case No. 2024-CA-1545-NC (the "Second Sarasota Action"), which is pending in the Twelfth Judicial Circuit in and for Sarasota County, Florida.  Old TMTG filed this action against Orlando, Litinsky, Orlando, and United Atlantic Ventures, LLC ("UAV").

14.    The claims in the Second Sarasota Action fall into two categories. Counts I through IV and VI seek declaratory relief regarding the status of a Services Agreement to which Old TMTG was not a party, but pursuant to which UAV was making various demands.

15.    In contrast, Counts V and VII through X arise from fiduciary breaches by Orlando,

Moss, and Litinsky:

- Count V: Unjust Enrichment (by Old TMTG against UAV);

- Count VII: Breach of the Fiduciary Duty of Care (by Old TMTG against Moss and Litinsky);

- Count VIII: Breach of the Fiduciary Duty of Loyalty (by Old TMTG against Moss and Litinsky);

- Count IX: Aiding and Abetting Breach of Fiduciary Duty (by Old TMTG against Orlando); and

- Count X: Conspiracy to Breach Fiduciary Duty (by Old TMTG against Orlando).

16.     Civil Action No. 2024-0184-MTZ (the "UAV Delaware Action") is pending in the Court of Chancery of the State of Delaware. This case arose from a dispute regarding Old TMTG's capitalization table in connection with the merger.

17.     As amended now three times by UAV, including in direct response to the Second Sarasota Action, the claims in the UAV Delaware Action focus on a lockup of UAV's TMTG shares imposed in connection with the merger and the status of the Services Agreement

18.     On June 27, 2024, perceiving an overlap between the UAV Delaware Action and Counts I through IV and VI of the Second Sarasota Action, the Court in the Second Sarasota Action stayed those proceedings pending resolution of the Delaware Action.  Old TMTG is seeking certiorari to appeal the stay, including because the court there improperly compared Old TMTG's claims to a later-filed version of UAV's complaint that was not operative when the Second Sarasota Action was filed and served.

19.     Since Counts V and VII through X of the Second Sarasota Action allege fiduciary breaches and an unjust enrichment claim that are distinct from and non-existent in the Delaware Action, they are only stayed because they are part of the Second Sarasota Action. The resolution

of the Delaware Action is irrelevant to these claims.

**D.    Plaintiffs seek leave to file Second Amended Complaint.**

20.    Plaintiffs seek leave to file the Second Amended Complaint attached hereto as Exhibit A.

21.    The proposed amendments incorporate additional allegations and claims based on new facts and information drawn from, at least in part, an SEC Complaint filed against Orlando on July 17, 2024, alleging that Orlando engaged in securities fraud in connection with the Pre-Targeting Conspiracy.  A copy of the complaint in *SEC v. Orlando,* Case No. 24-cv-2097 (D.C. 2024) (ECF No. 1) ("SEC Orlando Complaint") is attached as Exhibit 2 to the proposed Second Amended Complaint.

22.    Plaintiffs also know that Orlando did not act alone.  He enlisted Litinsky, Moss, and UAV, an entity controlled by Litinsky and Moss (collectively, the "UAV Parties"), as his co-conspirators.  At the time, Moss and Litinsky were directors and officers of Old TMTG and were responsible for managing its day-to-day operations including the process of engaging in a merger with a SPAC and instructing Old TMTG's outside counsel.

23.    Together, Orlando, ARC, and the UAV Parties (collectively, the "Co-Conspirators") devised and executed an unlawful scheme to agree to merge Old TMTG and DWAC before DWAC had gone public through an Initial Public Offering (referred to in the Second Amended Complaint as the "Pre-Targeting Conspiracy").   The Co-Conspirators hid the Pre-Targeting Conspiracy from the public, regulators, the other members of the Board of Directors of DWAC, and others affiliated with Old TMTG.

24.    To effectuate the scheme, Orlando made false representations in public filings to conceal the unlawful Pre-Targeting Conspiracy, which all Co-Conspirators knew to be false at the

time made. The Co-Conspirators also breached their respective fiduciary duties to DWAC and Old TMTG by, among other things, engaging in the Pre-Targeting Conspiracy which, in turn, caused significant harm to Plaintiffs.

25.     The new claims and allegations in the Second Amended Complaint include:

- Additional allegations of fact supporting Plaintiffs' claims against Orlando and ARC;

- New claims against Moss and Litinsky for breaches of fiduciary duties owed to Old TMTG and for aiding and abetting Orlando's breaches of fiduciary duties owed to DWAC;

- New claim against UAV for aiding and abetting breach of fiduciary duty and unjust enrichment; and

- An additional conspiracy count against Orlando.

26.     That certain new allegations are factually related to Counts V and VII through X of the Second Sarasota Action is of no moment. The new claims are separate and distinct from the legal issues in the Delaware Action. As a result, this Court may and should properly grant leave to amend regardless of the temporary stay in the Second Sarasota Action.

## ARGUMENT

27.     This Court may properly grant Plaintiffs leave to file the Second Amended Complaint because it serves the interest of justice, promotes judicial economy, and allows the Court to adjudicate claims arising from Defendants' fiduciary breaches.

28.     Rule 1.190(a), Florida Rules of Civil Procedure, provides that "[l]eave of court [to amend pleadings] shall be given freely when justice so requires." Broadly construing this rule, Florida courts resolve all doubts in favor of allowing the amendment of pleadings to allow cases

to be decided on their merits. *See Friedel v. Edwards*, 327 So. 3d 1242 (Fla. 2d DCA 2021); *Laurencio v. Deutsche Bank Nat'l Trust Co.*, 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011).

29.     A trial court's refusal to permit an amendment of a pleading is an abuse of discretion unless the privilege to amend has been abused, the amendment would be futile, or the amendment would prejudice the opposing parties. *See S. Developers & Earthmoving, Inc. v. Caterpillar Fin. Servs. Corp.,* 56 So.3d 56, 62-63 (Fla. 2d DCA 2011); *Sun Valley Homeowners, Inc. v. American Land Lease, Inc.*, 927 So. 2d 259 (Fla. 2d DCA 2006).

30.     Here, this Court may properly grant leave to amend because the proposed Second Amended Complaint is not prejudicial, abusive, or futile.  Having only amended once as a matter of right before Defendants even filed a motion to dismiss, Plaintiffs have not abused the privilege to amend.

31.     No party will be prejudiced by the amendment. This case is in the early stages of discovery. Trial is not anticipated until August 2025. Orlando and ARC have yet to file a responsive pleading to the operative complaint and, in fact, do not even accept the most recent decision denying their motion to dismiss.  The proposed Second Amended Complaint will also not prejudice Moss, Litinsky or UAV who are not yet parties to this case.

32.     The proposed amendment is not futile. It simply adds additional parties, crystallizes the claims in dispute, and incorporates more detailed and specific allegations.

33.     This Court may properly grant leave to amend without waiting for the UAV Delaware Action to be adjudicated. The new fiduciary duty and unjust enrichment claims against UAV are separate and distinct from the issues presented in the UAV Delaware Action, as amended. Moss, Litinsky, and Orlando are not parties to the UAV Delaware Action.  Regardless of how the Court of Chancery adjudicates the UAV Delaware Action, this instant case may still proceed

8

without delay.

34.    Granting leave to amend the complaint would also further the interests of justice and judicial economy. The proposed amendment would allow the Court to efficiently adjudicate legally and factually related claims arising from Defendants' fiduciary breaches.  These claims belong in a single case before this Court.

**WHEREFORE**, Plaintiffs, Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp. and TMTG Sub Inc., respectfully request that this Honorable Court enter an order: (i) granting Plaintiffs leave to file the Second Amended Complaint; and (ii) providing Plaintiffs any such other and further relief that the Court deems just and proper.

[signature page to follow]

DATED this 31st day of July, 2024.

Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN: 122080)
Tal Aburos (FBN: 1010901)
**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8522
Facsimile: (305) 657-6366
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

*Counsel for Plaintiffs*

*/s/ Samuel J. Salario, Jr.*
Samuel J. Salario, Jr., Esq. (FBN: 83460)
Jason B. Gonzalez, Esq. (FBN: 146854)
Mathew D. Gutierrez, Esq. FBN: 94014)
Raymond F. Treadwell, Esq. (FBN: 93834)
**LAWSON HUCK GONZALEZ, PLLC**
215 S. Monroe St., Suite 320
Tallahassee, FL 32301
Telephone: (850) 825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of July, 2024, a true and correct copy of the foregoing has been filed the Florida Courts E-Portal, and a copy of said document has been served via the Florida Courts E-Portal to all counsel of record.

Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison

## <u>EXHIBIT "A"</u>

**Second Amended Complaint**

**CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT**
**SARASOTA COUNTY, FLORIDA**
**CIVIL DIVISION**

| | |
|---|---|
| TRUMP MEDIA & TECHNOLOGY GROUP CORP., a Delaware Corporation (f/k/a Digital World Acquisition Corp.) and TMTG Sub Inc., <br><br>       Plaintiffs, <br><br> v <br><br> ARC GLOBAL INVESTMENTS II, LLC, a Delaware Limited Liability Company, and PATRICK ORLANDO, UNITED ATLANTIC VENTURES LLC, a Delaware Limited Liability Company, ANDREW LITINSKY and WESLEY MOSS | Case No.: 2024-CA-001061-NC |

**SECOND AMENDED COMPLAINT**

Plaintiffs Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1] ("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] allege in support of their Second Amended Complaint as follows:

**NATURE OF THE ACTION**

1.  TMTG is a publicly traded company that was formed through the merger of a Special Purpose Acquisition Company ("SPAC") called Digital World Acquisition Corp.

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media and & Technology Group Corp. On March 25, 2024, Old TMTG merged with DWAC. Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc. DWAC, in turn, changed its name to Trump Media & Technology Group Corp.

1

("DWAC") and a private company, Old TMTG, which operates the Truth Social social media platform and is now a wholly-owned subsidiary of TMTG.

2.    The SPAC merger process is intended to be an efficient process for taking private companies public that follows a detailed and predictable timeline.  The process is subject to federal securities laws which require that truthful disclosures about the SPAC be made to the investing public.

3.    The DWAC merger was anything but efficient and predictable.  This routine process was intentionally derailed by the misconduct of Patrick Orlando (DWAC's former Chairman and Chief Executive Officer), with the aid and assistance of ARC Global Investments II, LLC ("ARC"), an entity controlled by Orlando that acted as DWAC's sponsor.

4.    Orlando did not act alone, however.  He enlisted Andrew Litinsky, Wesley Moss, and United Atlantic Ventures LLC, ("UAV"), an entity controlled by Litinsky and Moss (collectively, the "UAV Parties"), as his co-conspirators.  At the time, Moss and Litinsky were directors and officers of Old TMTG.  They were responsible for managing its day-to-day operations including the process of engaging in a merger with a SPAC and instructing Old TMTG's outside counsel.

5.    Together, Orlando, ARC, and the UAV Parties (collectively, the "Co-Conspirators") devised and executed an unlawful scheme to agree to merge Old TMTG and DWAC before DWAC had gone public through an Initial Public Offering (hereinafter referred to as part of the "Pre-Targeting Conspiracy" or "Plan B").[3]  The Co-Conspirators hid the Pre-Targeting Conspiracy from the public, regulators, the other members of the Board of Directors of DWAC, and others affiliated with Old TMTG.

---

[3] "Plan A" consisted of Orlando's pursuit of a merger with TMTG via another SPAC, non-party Benessere Capital Acquisition Corp.

6.      To effectuate the scheme, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company at any time before its initial public offering ("IPO").  He further falsely represented that he had participated in no discussions or contacts with any potential merger targets.  The Co-Conspirators knew that these statements were false when made.  Indeed, the Co-Conspirators had personally engaged in numerous discussions together and agreed to target Old TMTG for a merger with DWAC.

7.      The Co-Conspirators also breached their respective fiduciary duties to DWAC and Old TMTG by, among other things, engaging in the Pre-Targeting Conspiracy.  Together, their misconduct had a devastating impact on Plaintiffs.  What should have been a predictable and efficient six-month merger process between DWAC and Old TMTG transformed into a 29-month ordeal that included an investigation by the United States Securities & Exchange Commission ("SEC") into DWAC and dramatically delayed the business combination.  The damage to Plaintiffs was substantial.  On July 20, 2023, the SEC imposed an $18 million penalty through a Cease-and-Desist Order, attached hereto as **Exhibit 1**.  DWAC incurred more than $11 million in legal fees, which ultimately became the responsibility of TMTG.  In addition, Plaintiffs suffered hundreds of millions of dollars of loss as a result of the delay and damage to TMTG's reputation.

8.      Two weeks ago, on July 17, 2024, the SEC filed an enforcement action against Orlando alleging that Orlando engaged in securities fraud in connection with the Pre-Targeting Conspiracy.  A copy of the complaint in *SEC v. Orlando,* Case No. 24-cv-2097 (D.C. 2024) (ECF No. 1) ("SEC Orlando Complaint") is attached hereto as **Exhibit 2**.  The UAV Parties are not named as defendants or expressly identified by name in the SEC Orlando Complaint.  They are, however, clearly and prominently featured in the SEC Complaint and their involvement in the unlawful Pre-Targeting Conspiracy is irrefutable.  The claims set out herein are based, at least in

3

part, on the allegations contained in the SEC Orlando Complaint.  Plaintiffs will prove those allegations through discovery once they have access to the documents that Orlando and the UAV Parties provided to the SEC and which are referred to or relied upon by the SEC as well as other relevant discovery.

9.      The Pre-Targeting Conspiracy along with Defendants' other fiduciary breaches threatened the viability of what is now a public Nasdaq-listed company valued at more than $5 billion.  Despite the Co-Conspirators' best efforts to undermine TMTG, the merger was consummated but not until, and *only because*, they were ousted from control of DWAC and Old TMTG.

10.     Of course, the completion of the merger does not negate Defendants' staggering pre-merger harm that severely impacted Plaintiffs.  Plaintiffs are therefore entitled to the relief sought herein.

## PARTIES

11.     Plaintiff TMTG is formerly known as DWAC.  DWAC began as a SPAC that was formed for the purpose of effecting a merger or similar business combination following its initial public offering.  DWAC was a Delaware corporation with its principal place of business in Miami, Florida.  Post-merger, DWAC was renamed TMTG, which is a Delaware corporation with its principal place of business in Sarasota, Florida.

12.     Plaintiff Old TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida.  Old TMTG is a wholly owned subsidiary of TMTG.

13.     Defendant Patrick Orlando is an individual domiciled in Miami, Florida.  He is the managing member of ARC.  He served as a director of DWAC until the merger and previously served as DWAC's Chairman and CEO from in or about May 2021 to in or about March 2023.

14.     Defendant ARC is a Delaware limited liability company whose managing member (Orlando) is a Florida resident.  ARC has its principal place of business in Florida.  ARC served as DWAC's sponsor and is controlled by Orlando.  ARC initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares").  At the time of DWAC's IPO, ARC invested an additional $11,334,840 in exchange for 1,133,484 DWAC units. A unit is a security that is made up of one class of a common share and a fraction of a warrant.  A warrant is similar to a traditional stock option in that it gives the holder the right to buy or sell shares of a company at a pre-agreed price.  Units are commonly offered by SPACs that are seeking to raise money in a public stock offering with the primary goal of merging with a private business and taking it public.

15.     Defendant UAV is a Delaware limited liability company with its principal place of business in Fort Lauderdale, Florida.

16.     Defendant Andrew Litinsky is a resident of the State of Florida.  At all relevant times, Litinsky was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022.

17.     Defendant Wesley Moss is a resident of the State of Georgia.  At all relevant times, Moss was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022, and a director of Old TMTG until in or about September 2022.

18.     At all relevant times, Moss and Litinsky controlled and dominated UAV.  UAV served as the vehicle for Moss and Litinsky's wrongdoing, including breaching fiduciary duties owed to TMTG by participating in the Pre-Targeting Conspiracy, assisting in the submission of misleading financial statements to the SEC, and mismanaging the Company.  At all times during

2021, Moss and Litinsky controlled and dominated Old TMTG.  Together, Moss and Litinsky constituted the majority of the *de facto* board of Old TMTG.  In that capacity, Moss and Litinsky retained and directed outside counsel and were responsible for managing TMTG's business including its potential SPAC merger.

19.     Non-party Benessere Capital Acquisition Corp. ("Benessere") was a Florida limited liability company with its principal place of business in Miami, Florida.  It had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised).  In October 2022, Benessere dissolved and delisted its securities.  Orlando served as the CEO and Chairman of Benessere and the managing member of its sponsor during the relevant period.

## JURISDICTION AND VENUE

20.     This Court has personal jurisdiction over Orlando as a Florida resident.

21.     This Court has personal jurisdiction over ARC under Florida's long-arm statute, Fla. Stat. § 48.193, because ARC has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, ARC has its principal place of business in Florida, and ARC has committed the tortious acts alleged in this Second Amended Complaint within Florida.

22.     This Court has personal jurisdiction over Litinsky as a Florida resident.

23.     This Court has personal jurisdiction over Moss under Florida's long-arm statute, Fla. Stat. § 48.193, because Moss has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, and Moss has committed the tortious acts alleged in this Second Amended Complaint within Florida.

24.     This Court has personal jurisdiction over UAV under Florida's long-arm statute, Fla. Stat. § 48.193, because UAV has operated, conducted, engaged in, and/or carried on a business

or business venture within Florida that resulted in harm to Plaintiffs, UAV has its principal place

of business in Florida, and UAV has committed the tortious acts alleged in this Second Amended

Complaint within Florida.

25.     This Court has jurisdiction over the subject matter of this action because the amount

in controversy exceeds $50,000, exclusive of interest, court costs, and attorney's fees.

26.     Venue is proper in Sarasota County, Florida, pursuant to Fla. Stat. § 47.051, because

the subject matter of the dispute affects a corporation with its principal place of business and

headquarters in Sarasota County, Florida, and because the causes of action brought herein accrued

in Sarasota County, Florida.

## FACTUAL BACKGROUND

### I.      SPACs and Regulatory Framework

27.     The UAV Parties incorporated Old TMTG on or around February 8, 2021.  From

the time of Old TMTG's formation, the UAV Parties intended for it to become a public company

by seeking to be acquired by a SPAC.

28.     A SPAC is a publicly traded corporation with a limited life span.  A SPAC is formed

with the sole purpose of effecting a merger with a privately held business to enable it to go public.

29.      A SPAC has no underlying business operations.

30.     Each SPAC must have a "sponsor."  The SPAC sponsor creates the SPAC to raise

capital through an IPO for the purpose of using the proceeds to later acquire an unidentified and,

as yet, undetermined private operating company within a specified time period (typically 18

months).

31.     During the fundraising period (IPO), investors rely on the management team that

formed the SPAC (generally the sponsor) to acquire or combine with a target company.

32.     A SPAC may identify in its IPO *prospectus* (otherwise known as a Registration Statement or Form S-1) a specific *industry* that it will target as it seeks to combine with an operating company.  However, it cannot guarantee to investors that a certain target will be merged with or engage in substantive discussions with a potential target until *after* the SPAC's IPO.  *See* 17 C.F.R. § 230.419

33.     Under applicable securities regulations, SPACs are prohibited from making false or misleading statements to investors and from engaging in fraudulent conduct in connection with merging with a target.  15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  In the event a SPAC has identified a target prior to its IPO, it must disclose the target to the regulatory authorities and all potential investors.

34.     Once the SPAC has identified a merger target, its management negotiates with the operating company and, if approved by SPAC shareholders (if a shareholder vote is required), executes the merger with the target company.

35.     As will be thoroughly alleged herein, the Co-Conspirators planned and carried out a Pre-Targeting Conspiracy wherein an Orlando-affiliated entity (Benessere or DWAC) would merge with Old TMTG.  Orlando devised a scheme where he would publicly pursue a merger with Old TMTG through Benessere ("Plan A") as a rouse to cover up his real intentions: a merger between DWAC and Old TMTG ("Plan B").

36.     To carry out his scheme, Orlando, through ARC, gained control of DWAC prior to DWAC's IPO and for the purpose of merging it with Old TMTG.  According to the SEC, DWAC, under ARC and Orlando's control, did not disclose to regulatory bodies or potential investors that it had pre-determined before its IPO that it would merge with Old TMTG in violation of federal

securities laws. *See* Ex. 2, SEC Compl. ¶ 1. The UAV Parties knowingly assisted Orlando and ARC in unlawful conduct.

37.    The Co-Conspirators' misconduct breached the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

## II.    The UAV Parties' Fiduciary Relationship with Old TMTG

38.    In January 2021, Donald J. Trump returned to private life after serving as President of the United States. President Trump agreed to work with Moss and Litinsky to create a social media platform that would become a safe harbor for free expression amid censorship by other social media companies.

39.    To facilitate their participation in the business opportunity with President Trump, Moss and Litinsky formed UAV on January 26, 2021.

40.    The UAV Parties agreed that they would, *inter alia*, incorporate Old TMTG on behalf of President Trump and other shareholders, establish its corporate governance, execute a plan to get the social media platform operating, and work toward a near-term merger between Old TMTG and a SPAC.

41.    Old TMTG was incorporated on February 8, 2021. The UAV Parties served as *de facto* directors of Old TMTG and constituted the majority of the *de facto* Board.

42.    In their role as *de facto* directors, the UAV Parties were responsible for hiring, directing, and instructing legal counsel, managing Old TMTG's day to day operations, and for carrying out Old TMTG's business plan.

43.    The UAV Parties' charge was straightforward: (1) establish Old TMTG's governance structure; (2) launch a social media platform; and (3) find a publicly traded merger partner so Old TMTG could obtain the capital necessary to carry out its business plan. The UAV

Parties received 8.6 million shares in Old TMTG.  Moss and Litinsky were significantly incentivized to secure a merger partner and carry out the remainder of their duties.

44.      As initial *de facto* directors, the UAV Parties were required to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Old TMTG.  *See* Fla. Stat. § 607.0830.

45.      The UAV Parties owed Old TMTG a duty of care, including but not limited to:

      a.      ensuring that all corporate formalities were carried out;

      b.      establishing an adequate corporate governance structure for Old TMTG;

      c.      allocating resources in a lawful manner and in Old TMTG's best interests;

      d.      executing contracts and business ventures that were commercially reasonably and beneficial to Old TMTG and with the proper approval from the Old TMTG Board;

      e.      launching the social media platform, including employing a technical team with the requisite technical skills;

      f.      accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

      g.      lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch the social media platform; and

      h.      retaining, managing and overseeing outside counsel in a manner that was in the best interests for Old TMTG.

46.      The UAV Parties owed Old TMTG a duty of loyalty and good faith, including but not limited to:

      a.      avoiding self-dealing and conflicts with Old TMTG's best interests;

      b.      securing a successful and lawful merger between Old TMTG and a third party;

      c.      accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

  d. refraining from violating the law while carrying out their duties at Old TMTG; and

  e. managing Old TMTG's employees and outside counsel in a lawful manner and avoiding incurring any liabilities to third parties or regulatory bodies.

47. The UAV Parties failed on all fronts, violating the fiduciary duties owed to Old TMTG.

48. As the entity through which Litinsky and Moss conducted business, UAV had an obligation to act in good faith and with due care.

49. Because Litinsky and Moss dominated and controlled UAV, UAV had knowledge of Litinsky and Moss's breaches of fiduciary duties.

50. UAV, through Litinsky and Moss, substantially assisted Litinsky and Moss in their breaches of fiduciary duties.

51. Most critically, the UAV Parties assisted with and actively participated in Orlando's Pre-Targeting Conspiracy to unlawfully pursue a merger with Old TMTG through Benessere ("Plan A") while concealing their efforts to pursue a merger with DWAC ("Plan B"), in violation of their fiduciary duties to Old TMTG and in violation of the federal securities laws that require truthful disclosures to the public in connection with the purchase and sale of securities.

52. In doing so, the UAV Parties placed their own financial interests above the interests of Old TMTG.  Indeed, by participating in the Pre-Targeting Conspiracy, the UAV Parties ensured that a merger with an Orlando-affiliated entity would occur, instead of focusing on other possible merger combinations that did not involve an unlawful scheme that could potentially harm Old TMTG and DWAC n/k/a TMTG.

53.     The Pre-Targeting Conspiracy was ultimately the subject of two separate enforcement actions against DWAC and Orlando, resulting in an $18 million fine against DWAC and at least $11 million in related legal fees.

54.     The UAV Parties were also aware of several conflicts of interest and instances of self-dealing involving an outside attorney for Old TMTG ("Lawyer A").

55.     While Lawyer A held himself out as counsel for Old TMTG, in reality, Lawyer A was acting as *de facto* counsel to the UAV Parties to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy.  Lawyer A took actions purportedly on behalf of Old TMTG that were, in reality, adverse to Old TMTG's interests and designed to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy while covering their tracks. Notably, Lawyer A communicated with Orlando using a messaging application that was set to automatically delete such communications.

56.     Despite Lawyer A's obvious and troubling conflicts of interest, Lawyer A did not recuse himself and the UAV Parties did not terminate Lawyer A's representation of Old TMTG. Instead, the UAV Parties worked alongside Orlando and Lawyer A to advance a merger between Old TMTG and DWAC in a manner that was not in the best interests of Old TMTG.  Particularly, the Co-Conspirators and Lawyer A knowingly assisted DWAC in making statements in public filings and misleading potential investors that the SEC has alleged were false.

57.     The UAV Parties also failed to establish the Company's corporate governance and made a series of reckless and wasteful decisions that caused significant damage to Old TMTG and a decline in the stock price of its ultimate merger partner (DWAC).

### III.    Orlando's Fiduciary Relationship with DWAC and ARC's Knowledge Thereof

58.     As DWAC's Chairman and CEO, Orlando was responsible for the day-to-day operations of DWAC through March 2023.

59.     Orlando, during his tenure as CEO and Chairman of DWAC, director of DWAC, and managing member of ARC, owed fiduciary duties of care and loyalty to Plaintiffs.

60.     Orlando had a duty to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Plaintiffs and their shareholders. *See* Fla. Stat. § 607.0830.

61.     Orlando was required to manage DWAC's daily operations in good faith and in a manner that would not harm DWAC.

62.     Orlando owed DWAC a duty of care, including but not limited to:

    a.      ensuring that all corporate formalities were carried out;

    b.      establishing an adequate corporate governance structure for DWAC,

    c.      allocating resources in a lawful manner and in DWAC's best interest;

    d.      accurately representing information to regulatory authorities, DWAC's Board, and the general public;

    e.      accurately accounting for funds raised by ARC, as DWAC's sponsor;

    f.      lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch Truth Social;

    g.      safely handling and storing DWAC-related documents, including vendor contracts and invoices, in his personal email account; and

    h.      maintaining separate corporate formalities between Benessere and DWAC.

63.     Orlando owed DWAC a duty of loyalty including but not limited to:

    a.      lawfully and successfully causing a merger between DWAC and a merger target;

b.      avoiding self-dealing or self-interested actions and conflicts with DWAC's best interests;

c.      using his position at DWAC to benefit DWAC and its shareholders, not himself;

d.      refraining from violating the law while carrying out his duties at DWAC;

e.      abstaining from making public statements that were harmful to DWAC and leaking information to the press;

f.      ensuring all encumbrances on behalf of DWAC to ARC, such as promissory notes, were ratified by disinterested board members; and

g.      releasing all funds raised by ARC for the benefit of DWAC to DWAC.

64.    As set forth herein, Orlando violated the aforementioned duties, placing his own interests above those of DWAC and failing to exercise due care or in good faith.

65.    As a sponsor of DWAC, ARC had an obligation to act with due care and in good faith.

66.    Because Orlando dominated and controlled ARC, ARC had knowledge of Orlando's breaches of fiduciary duties.

67.    ARC, through Orlando, substantially assisted and encouraged Orlando's breaches of fiduciary duty.

**IV.    The UAV Parties, Orlando, and ARC Conspire to a Pre-Targeting Conspiracy**

   **A.    <u>Old TMTG and Benessere's Initial Negotiations (Plan A)</u>**

68.    In mid-February 2021, Litinsky approached Orlando regarding a potential deal between Benessere and Old TMTG.  According to the SEC, about a week later, Orlando met in person with TMTG representatives.  *See* Exh. 2, SEC Compl. ¶ 32.  Upon information and belief, the TMTG representatives included Litinsky.

69.      On or about March 12, 2021, Benessere and Old TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies ("Benessere LOI").  The Benessere LOI was then extended to last through April 5, 2021.  Orlando negotiated and signed the Benessere LOI on behalf of Benessere.  Litinsky and Moss were both actively involved in the negotiation of the Benessere LOI.

70.      According to the SEC, as the non-exclusive letter of intent neared its expiration date, the UAV Parties and Orlando discussed having Old TMTG and Benessere sign a mutually exclusive letter of intent.  *See* Exh. 2, SEC Compl. ¶ 34.  Benessere ultimately did not sign that mutually exclusive letter of intent.

71.      During the negotiations, Orlando learned that some of Benessere's directors and officers opposed the merger with Old TMTG.  He shared this information with the UAV Parties. In light of this hurdle, Orlando conjured a scheme to ensure that a merger with Old TMTG would occur and that Orlando would individually benefit from any such merger.  Orlando enlisted the Co-Conspirators to assist with carrying out the Pre-Targeting Conspiracy, which they referred to as "Plan B."

**B.**    **Orlando Takes Control of DWAC and Resumes Merger Discussions With Old TMTG**

72.      In or about April 2021, merger discussions between Benessere and Old TMTG paused, and the Co-Conspirators put "Plan B" into effect.

73.      The Co-Conspirators began referring to "Plan A" which was a continued effort to find a way for Benessere to merge with Old TMTG.  According to the SEC, Orlando discussed options to replace the Benessere officials who were opposed to a transaction with Old TMTG in order to effectuate Plan A.  *See* Exh. 2, SEC Compl. ¶ 36.

74.    "Plan B" referred to Orlando's scheme to pursue a competing merger between DWAC and Old TMTG, ensuring that he would financially gain from either business opportunity. *See* Ex. 2, SEC Compl. ¶ 37.

75.    Orlando planned to continue publicly pursuing a merger between Old TMTG and Benessere (Plan A), while secretly pursuing a competing merger between Old TMTG and DWAC (Plan B).

76.    Orlando's scheme was simple: merge an Orlando-affiliated SPAC with Old TMTG in order to ensure that Orlando would financially benefit under any merger.

77.    Orlando recognized that he would lose the opportunity to merge a SPAC with Old TMTG in light of strong opposition to the TMTG merger from Benessere's Board.  To avoid losing a deal with Old TMTG, Orlando shared the details of the Pre-Targeting Conspiracy with the UAV Parties and enlisted the UAV Parties' support.

78.    The UAV Parties knew or had reason to know that Orlando's Plan B violated securities laws and that their participation in it would breach their fiduciary duties to Old TMTG. Indeed, Litinsky wrote about the April 14 meeting: "roughest day so far, meet in board room in coconut grove - Patrick says [the Benessere COO] freaked out - he is 28 - his dad won't let him do the deal - plus 2 [Benessere] directors already replaced - ***Patrick [Orlando] pitches [h]is plan b. I get scared, is he wearing a wire?***"

79.    Despite knowing that Plan B could potentially violate securities laws, the UAV Parties continued assisting Orlando with the scheme to secure a merger between Old TMTG and an Orlando-affiliated company (either Benessere or DWAC).

80.    According to the SEC, on or about April 24, 2021, Orlando learned that he had an opportunity to obtain substantial control over DWAC.  *See* Exh. 2, SEC Compl. ¶ 44.  Then, on or

about April 28, 2021, Orlando signed a letter of intent under which he would obtain 90% ownership of ARC, DWAC's sponsor. *Id.*

81.    Orlando, through ARC, raised millions of dollars for the benefit of DWAC n/k/a TMTG by promising various investors shares of DWAC n/k/a TMTG in exchange for capital.

82.    Litinsky memorialized in his notes that Orlando met with the UAV Parties on or about April 29, 2021 in Palm Beach, Florida and continued discussions about a potential merger with Old TMTG.

83.    According to the SEC, on or about May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news. . . Patrick called [TMTG's outside counsel] yesterday. . . The LOI with our other group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with Benessere and a big breakup fee." *See* Exh. 2, SEC Compl. ¶ 45.  The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?"  *Id.*  Upon information and belief, the two "TMTG representatives" referred to by the SEC in these allegations are Moss and Litinsky and "TMTG's outside counsel" refers to Lawyer A.

84.    On or about May 4, 2021, Lawyer A, at the direction of the UAV Parties, emailed Orlando and others a draft letter of intent that contemplated a merger between Benessere and Old TMTG "with new terms they discussed," including a breakup fee releasing Orlando of any liability. *See infra* ¶ 108.  The letter of intent (the "June 4 LOI") was eventually executed on June 4, 2021. *Id.*

85.    The purpose of the June 4 LOI was to further Orlando's self-dealing.  In particular, Orlando wanted to ensure that TMTG would merge with a SPAC that he controlled so that he would financially benefit from the merger.

86. By this time, the UAV Parties knew that the Plan A merger with Benessere was highly unlikely and would be used solely as a placeholder for Plan B. Indeed, on or about April 14, 2021, Litinsky and Moss met in person with Orlando. Litinsky and Moss left that meeting with a clear understanding that Plan A no longer in consideration. Indeed, Litinsky memorialized in his notes for April 14, 2021 that "the BENE deal is OFF!!!!"

87. Before the June 4 LOI was even signed, Orlando made it clear that his preference was a DWAC and Old TMTG combination (Plan B). According to the SEC, on or about May 8, 2021, Orlando exchanged messages with representatives of a Shanghai investment bank (the "Investment Bank"). *See* Exh. 2, SEC Compl. ¶ 47. The message group name between Orlando and the Investment Bank, which appears to have been coined by Orlando, was, "Get it done ***one way or another***." *Id.* Orlando and the Investment Bank representative discussed possible combinations for both DWAC and Benessere. Orlando stated that the "optimal" combinations were ones between Benessere and another target and a combination between DWAC and Old TMTG. A representative of the Investment Bank responded, "Yes absolutely, that's the best. It's just time. Get enough time to get DWAC to mkt." *Id.*

88. According to the SEC, on or about May 14, 2021, the Investment Bank transferred a 90% ownership interest in ARC to Orlando. *See* Exh. 2, SEC Compl. ¶ 48. Around this same time, Orlando was appointed CEO and Chairman of DWAC. *Id.* These two actions gave Orlando effective control over DWAC. *Id.*

89. Notably, even though a draft of the June 4 LOI was circulated on May 4, 2021, Orlando did not execute it until June 4, 2021, *after* he obtained control of DWAC.

**C.**    **DWAC's May 2021 Form S-1 and Conflicted Lawyer A**

90. Once Orlando took control over DWAC, he moved to file its Form S-1 in May 2021.

91.     A Form S-1 may be used to prepare a registration statement prior to an IPO.  A registration statement on Form S-1 is an investment prospectus describing material information about the business' operations, financial condition, risk factors, and management.

92.     Notably, on or about May 20, 2021, five days before the filing of the Form S-1 and six days after Orlando gained control over DWAC, Lawyer A pivoted from helping Old TMTG raise money and began collaborating directly with Orlando to raise funding for DWAC's sponsor, ARC.  In so doing, Lawyer A's conduct violated the fiduciary duties owed to Old TMTG.  The UAV Parties knew or should have known of Lawyer A's misconduct.

93.     On May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"), which is attached hereto as **Exhibit 3**.  The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board.   According to the SEC, both of those new DWAC directors were also Benessere directors who had been supportive of a transaction between Benessere and Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 49.  Notably, the Benessere directors and officer who had opposed a transaction with Old TMTG was not given the opportunity to assume any role with DWAC.  *Id.* ¶ 50.

94.     The May Form S-1 contained several statements—by or at the direction of Orlando—about the state of discussions between DWAC and potential targets, including:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

95.     The SEC subsequently alleged that the foregoing statement was misleading.  *See* Exh. 2, SEC Compl. ¶ 52.

96.    According to the SEC, these statements are misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with Old TMTG, because Orlando had been in discussions with the UAV Parties for several months, and because Orlando had discussed Plan B with the UAV Parties.  *See* Exh. 2, SEC Compl. ¶ 52.

97.    According to the SEC, the statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with Old TMTG) that had already taken steps toward accomplishing that goal.  *See* Exh. 2, SEC Compl. ¶ 52.

98.    By conspiring to make material misstatements in furtherance of a DWAC/Old TMTG business combination, the Co-Conspirators violated their respective fiduciary duties to DWAC and Old TMTG, respectively.

99.    The May Form S-1 became publicly available on the morning of May 26, 2021. *See* Exh. 2, SEC Compl. ¶ 53.

100.    The SEC alleges that same day, presumably at Orlando's direction, Lawyer A incorporated a limited liability company in New Mexico. *Id*. at ¶ 54.  That entity entered into an agreement to invest in ARC, DWAC's sponsor, on or about May 29, 2021.  *Id*. Lawyer A signed that agreement as the "authorized representative" for the New Mexico entity. Upon information and belief, Lawyer A is the sole member of the New Mexico entity. Orlando counter-signed this May 29 agreement.  *Id*.

101.    According to the SEC, on or about May 30, 2021, Orlando, "one of the TMTG founders," and TMTG's "external counsel", believed to be Lawyer A, met at the home of a DWAC director to engage in "brainstorming sessions."  *See* Exh. 2, SEC Compl. ¶ 55.  A video of this event shows that during the meeting, they called DWAC's CFO.  *Id*. In the video, Orlando thanked

everyone for figuring out "how to get this done." *Id*. The "TMTG representative" then thanked

the DWAC executive on the phone and said that the DWAC executive would be a "big part of

this." *Id*. Upon information and belief, Litinsky is the TMTG founder/representative referred to

by the SEC in connection with this allegation. *Id*.

102.    The SEC further alleges that on May 30, 2021, an individual who helped raise funds

for ARC sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off

the phone with Patrick and he is officially moving forward with the TM[T]G deal." *Id*. at ¶ 56.

"It's now game time to start teeing up investor calls and showing Patrick what we can bring to the

table." *Id*. The potential investor responded and asked, "Is there any brochure ready for the

TM[T]G SPAC?" *Id*. Orlando responded, "There is no TM[T]G SPAC. There is a SPAC and I

have a great relationship with TM[T]G. I believe with extremely high confidence that TM[T]G

will [end] up in one of my SPACs. Better I explain in person." *Id*.

103.    Litinsky records in his notes for May 30, 2021: "Orlando tells Litinsky he 'wants

[Litinsky] to sign LOI in Miami on [M]ay 31.'"

104.    Between May 31 and June 1, 2021, Litinsky instructed Lawyer A to remove

Litinsky's name as the signatory of the June 4 LOI and replace it with the only founder of Old

TMTG who was not affiliated with UAV and was unaware of the Pre-Targeting Conspiracy.

Lawyer A did exactly as Litinsky instructed.

105.    On June 5, 2021, Lawyer A, on behalf of that same New Mexico LLC, *infra* at

¶ 119, entered into a consulting agreement with ARC to formalize Lawyer A's ongoing efforts to

introduce investors to ARC and raise money for DWAC (the "Consulting Agreement"). The

Consulting Agreement created a compensation structure payable in an equity interest in ARC. This

arrangement constitutes a clear conflict of interest. Lawyer A created a financial advantage for

himself based on his representation of Old TMTG. The UAV Parties were aware or should have

been aware of Lawyer A's conflict of interest in the continued representation of Old TMTG.

      **D.**    **The Co-Conspirators Continue the Pre-Targeting Conspiracy**

    106.    The Co-Conspirators knew that Plan A with Benessere would never go forward, yet

they used Plan A as a placeholder until they could "legally" reveal DWAC as the merger partner

(Plan B). Indeed, revealing a merger between DWAC and Old TMTG before DWAC's IPO would

violate securities laws.

    107.    Although the Co-Conspirators knew by no later than April 14, 2021 that certain

Benessere directors opposed a Benessere/Old TMTG merger and would not approve the

transaction, the Co-Conspirators arranged to have Old TMTG and Benessere sign the June 4 LOI

on June 4, 2021 to keep up the ruse. The June 4 LOI would prevent Old TMTG from negotiating

with any acquirers other than a SPAC controlled by Orlando but would not require Benessere to

be exclusive to Old TMTG.

    108.    According to the SEC, on June 4, 2021, Orlando (in his personal capacity and on

behalf of Benessere) signed the June 4 LOI, expressing an intent to pursue a merger between

Benessere and Old TMTG. *See* Exh. 2, SEC Compl. ¶ 60.

    109.    According to the SEC, the June 4 LOI included a break-up fee clause under which

Orlando would be personally liable to pay a $1 million break-up fee ($4 million less than the break-

up fee contained in the draft June 4 LOI, *supra* ¶ 84) if Benessere and Old TMTG did not enter an

acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). *See* Exh. 2, SEC Compl.

¶ 61. The Break-Up Fee Clause contained several exceptions, including that Orlando would owe

no break-up fee if he "should propose to the Company [Old TMTG] an alternative special purpose

acquisition corporation with combination terms that are acceptable to the Company (in its sole and

absolute discretion) and such terms are ultimately accepted by the Company." *Id*. Notably, the break-up fee was inconsequential to Orlando as he knew that if Plan A with Benessere did not close, there was a Plan B: a merger between Old TMTG and DWAC. This further demonstrates the Co-Conspirator's intent to use Plan A with Benessere as a placeholder for Plan B with DWAC and to benefit Orlando at the expense of DWAC.

110.    The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. *See* Exh. 2, SEC Compl. ¶ 61. The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021. *Id*.

111.    Thus, while Orlando outwardly pursued the Plan A merger between Benessere and Old TMTG, the Co-Conspirators continued plotting the Plan B merger between DWAC and Old TMTG.

112.    According to the SEC, on or about June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. *See* Exh. 2, SEC Compl. ¶ 66. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey['re] exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [Benessere]. [sic] It's crazy but let me try!!"

113.    Also, according to the SEC, in spring and summer of 2021, Orlando met and talked with TMTG representatives about a merger with DWAC. *See* Exh. 2, SEC Compl. ¶¶ 67–71. On information and belief, those representatives include Moss and Litinsky.

114.    Nevertheless, according to the SEC, in late June 2021, Orlando misrepresented to a potential investor in DWAC that Old TMTG was merely one of the many targets DWAC was considering.  Orlando stated:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other.  TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO.  We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

*See* Exh. 2, SEC Compl. ¶ 72.

115.    According to the SEC, despite this and similar misrepresentations to potential investors, Orlando and the UAV Parties continued pursing a potential merger between DWAC and Old TMTG (Plan B) before DWAC's IPO, while also maintaining the fig leaf of a potential merger between Benessere and Old TMTG (Plan A).  *See* Exh. 2, SEC Compl. ¶ 71.

### E.    The Co-Conspirators Aided and Abetted Each Other in Furthering the Pre-Targeting Conspiracy and Breach of Fiduciary Duties

116.    The UAV Parties, Orlando, and ARC assisted each other and participated in furthering the Pre-Targeting Conspiracy, which violated the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

117.    The UAV Parties knew or should have known—based on Orlando's statements to them—that Orlando was pursuing an unlawful Plan B and was misrepresenting to potential investors DWAC's communications (or lack thereof) with Old TMTG.  Indeed, the UAV Parties communicated with Orlando about a DWAC merger before DWAC's IPO and while Old TMTG was seemingly still in negotiations with Benessere. Litinsky's own notes specifically reference discussing "plan B" with Orlando almost five months prior to DWAC's IPO.

118.    According to the SEC, Orlando participated in more than 100 phone calls with representatives from Old TMTG and Lawyer A from the time DWAC filed the Form S-1 on May 25, 2021 through on or about September 2, 2021, which was the day before the commencement of DWAC's IPO.  *See* Exh. 2, SEC Compl. ¶ 74.  Upon information and belief, the Old TMTG representatives and outside counsel referred to by the SEC in these allegations are the UAV Parties and Lawyer A.

119.    Orlando also signed "consulting agreements" with individuals that, in addition to other terms, provided financial incentives to individuals (such as Lawyer A) for helping Orlando raise funds for ARC, DWAC's Sponsor.  *See* Exh. 2, SEC Compl. ¶ 76.  The June 5, 2021 Consulting Agreement, created and executed by Lawyer A and Orlando, is one such agreement. *See supra* at ¶ 105.  This link between Orlando and Lawyer A is further evidence that the UAV Parties knew or should have known about Orlando's Plan B when they continued participating in, and aiding and abetting, the Pre-Targeting Conspiracy in violation of their fiduciary duties.

120.    Additionally, according to the SEC, from in or about June 2021 to in or about August 2021, Lawyer A was copied on a series of email communications from an existing DWAC investor to prospective investors.  *See* Exh. 2, SEC Compl. ¶ 77.  The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick [Orlando]'s team, and [Lawyer A] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."  *Id.*  Lawyer A proceeded to attend videoconference meetings with Orlando and potential DWAC investors throughout May, June and July of 2021.

121.    According to the SEC, on or about July 8, 2021, Orlando traveled to Old TMTG's offices and spent the entire day there.  *See* Exh. 2, SEC Compl. ¶ 81.

25

122.    That same day, DWAC filed an amended Form S-1 (the "July Form S-1") increasing

its planned offering from $100 million to $300 million and announcing the addition of Rodrigo

Veloso and two other individuals as directors.  *See* Exh. 2, SEC Compl. ¶ 78.  According to the

SEC, Veloso had been involved with Orlando in discussions with Old TMTG.  *Id*.

123.    The timing of Orlando's visit to Old TMTG's offices and the subsequent filing of

DWAC's amended Form S-1 indicate that the UAV Parties assisted or, at a minimum, knew of

Orlando's plan to cause DWAC to file the Form S-1.  In doing so, the UAV Parties breached the

fiduciary duties they owed to Old TMTG.

124.    The July Form S-1 contained several of the same material statements alleged by the

SEC to be false that appeared in the May Form S-1.  Orlando reviewed and signed the July Form

S-1.

125.    According to the SEC, on July 15, 2021, a TMTG executive emailed himself an

audio recording in which he made mental notes to himself, including, "For [another TMTG

executive], TMTG ticker symbol.  Tell him about that. . . . The merger agreement arrived.  Also

potentially flipping it to another SPAC." *See* Exh. 2, SEC Compl. ¶ 82. Upon information and

belief, the "TMTG executive" referenced by the SEC is either Litinsky or Moss.

126.    Also, according to the SEC, on or about August 18, 2021, a TMTG representative

emailed himself and wrote, "Everything is lined up.  Platform is weeks away.  Backed by $300

million in cash.  Billions of stock.  Press conference video is ready.  Only thing missing is licensing

Agreement." *See* Exh. 2, SEC Compl. ¶ 84.  At the time, Old TMTG was in the process of

renegotiating a licensing agreement.  *Id*.  Also, at the time, Benessere had approximately $115

million in its trust account.  *Id*.  DWAC, on the other hand, had filed a Form S-1/A on July 8, 2021

26

announcing that it had planned to do a $300 million IPO. *Id*. Upon information and belief, the "TMTG representative" referred to by the SEC in this allegation is either Litinsky or Moss.

127. According to the SEC, on or about August 28, 2021, Orlando received a text from a DWAC representative that read, "Talked to [TMTG's outside counsel]. [He represented that Old] TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement. I told them we'd need a month. Probably gonna settle at 2-3 weeks." *See* Exh. 2, SEC Compl. ¶ 85. Upon information and belief, the SEC's reference to "TMTG's outside counsel" is to Lawyer A.

128. The SEC alleged that on August 31, 2021, three days prior to the commencement of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed and signed. *See* Exh. 2, SEC Compl. ¶ 86. Orlando, in breach of his fiduciary duties, caused DWAC to make several representations that the SEC has alleged were materially false and misleading in the Final Form S-1 about discussions between DWAC and potential targets, including the following:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

129. Orlando also caused the Final Form S-1 to contain the following statements regarding DWAC's contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any

27

suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

[…]

We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

See Exh. 2, SEC Compl. ¶¶ 86–89.

130.    The SEC has found that these statements were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with Old TMTG; (b) Orlando told Lawyer A, Litinsky, and perhaps others during the summer of 2021 of the possibility of using DWAC to complete a merger with Old TMTG and Litinsky even noted that by April 14, 2021 he was aware of Plan B; (c) through the Consulting agreement, Lawyer A was actively soliciting investments for DWAC through ARC, for which it had a compensation structure in the spring of 2021; (d) the discussions between Benessere and Old TMTG had ceased before DWAC's IPO; and (e) Orlando had selected Old TMTG as DWAC's preferred target prior to its IPO. See Exh. 1, SEC Cease and Desist Order ¶ 39.

131.    DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

132.    According to the SEC, DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described in paragraphs ¶¶ 128–29.  *See* Exh. 2, SEC Compl. ¶ 92.

133.    The UAV Parties knew or should have known that Orlando's conduct with respect to the SEC filings was improper.

F.    **DWAC's Post-IPO Negotiations with Old TMTG**

134.    Following DWAC's IPO, DWAC and Old TMTG could publicly engage in merger communications.  However, to avoid raising red flags for securities violations, the Co-Conspirators had to make it seem like DWAC was considering multiple merger targets, including Old TMTG.

135.    According to the SEC, on or about September 8, 2021—the day DWAC's IPO closed—DWAC sent Old TMTG (and other companies) a draft nondisclosure agreement.  *See* Exh. 2, SEC Compl. ¶ 95.

136.    On September 13, 2021, DWAC and Old TMTG signed the nondisclosure agreement.  The next day, Lawyer A emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent to pursue a merger between DWAC and Old TMTG.

137.    According to the SEC, on or about September 15, 2021, a mere week after DWAC's IPO closed, DWAC began coordinating an in-person event to sign the letter of intent with Old TMTG on September 22, 2021, and started preparing a press announcement by the end of September 2021.  *See* Exh. 2, SEC Compl. ¶ 93.

138.    On September 18, 2021, Lawyer A emailed Benessere a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

139.    According to the SEC, on or about September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 100.  That same day, Orlando met with representatives from Old TMTG and signed a mutually exclusive letter of intent between DWAC and Old TMTG.  *Id*.

140.    Also on September 22, 2021, Orlando (on behalf of Benessere) and Old TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause.

141.    According to the SEC, on or about October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 101.  DWAC and Old TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market closed that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing became publicly available at approximately 6 a.m. on October 21, 2021.

142.    Also, according to the SEC, on May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  *See* Ex. 2, SEC Compl. ¶ 103.  DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.  *Id*.  For example, the Form S-4 disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed.  Accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.  *Id.*

143.    According to the SEC, the Form S-4 described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. *See*

Ex. 2, SEC Compl. ¶ 103.  However, the SEC found that Orlando had numerous interactions with TMTG prior to DWAC's IPO.  *Id*.

G.    **SEC Investigation Into DWAC Merger with Old TMTG and Related Fines**

144.    Shortly thereafter, the legal consequences of the Co-Conspirators' conduct began to threaten the merger between DWAC and Old TMTG.  In or about January 2022, the SEC initiated an investigation and subsequently declined to review a registration statement on form S-4, effectively stalling the deal to the determine of both DWAC and Old TMTG.

145.    On or about July 20, 2023—after Orlando was removed as DWAC CEO—the SEC instituted a cease-and-desist proceeding against DWAC, finding that, under Orlando's leadership, DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.  *See generally* Exh. 1, SEC Cease and Desist Order. In addition to other remedies, the SEC imposed a civil penalty of $18 million and required to DWAC to file an amended registration statement on form S-4.  *Id*.

146.    Among other findings, the SEC determined that Orlando "communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with [Old] TMTG."  Exh. 1, SEC Cease and Desist Order ¶ 27.  He did so despite DWAC's interest in [Old] TMTG not being public, and despite the fact that SPACs, by definition, are not permitted to have a predetermined merger target.  *See generally* 17 C.F.R. § 230.419.

147.    As noted above, the government investigation and enforcement action substantially delayed the merger between DWAC and Old TMTG.  This delay threatened DWAC's survival and frustrated Old TMTG's access to the capital the merger was anticipated to provide and its ability to timely pursue its business plans.

**H.    Orlando and the UAV Parties' Pre-Targeting Conspiracy Damaged DWAC and Old TMTG**

148.    The Co-Conspirators' conduct harmed DWAC n/k/a TMTG and Old TMTG in several ways.

149.    First, and most obvious, the Co-Conspirator's misconduct harmed DWAC n/k/a TMTG and its shareholders and exposed the company to regulatory liability and financial harm, ultimately resulting in a settlement with the SEC resulting in, among other things, the imposition of an $18 million penalty.  Further, DWAC and its shareholders incurred at least $11 million in related legal costs and fees.

150.    The Co-Conspirators' misconduct also jeopardized DWAC's pending merger with Old TMTG.  As a result of the investigation, Old TMTG (with the UAV parties no longer in control) threatened to withdraw from the Merger Agreement, pending renegotiation.  It was only *after* the DWAC Board of Directors navigated the SEC investigation—and Orlando was removed as CEO—that Old TMTG eventually agreed to reenter the Merger Agreement with DWAC.

151.    Notwithstanding Old TMTG's reaffirmation the Merger Agreement, the SEC investigation resulted in material delay to DWAC's merger timeline with Old TMTG.  As a result of the investigation, DWAC was forced to conduct two shareholder votes to extend the Company's automatic liquidation date, *i.e.*, the Company's deadline by which it was required to effectuate the merger.  DWAC was also forced to incur legal and administrative expenses as a direct result of the Co-Conspirators' tortious conduct, breaches of fiduciary duties, and other misconduct.

152.    Facilitating and executing two major shareholder votes resulted in massive monetary costs to DWAC.  To facilitate the votes and the necessary proxies, DWAC was forced to expend millions of dollars.  These votes would not have been necessary but for the delays imposed by the SEC investigation caused by the Co-Conspirators' conduct.

153.    Old TMTG further suffered significant monetary harm in delaying its plans to go public because of the Co-Conspirators' conduct.  The timing of such mergers is highly consequential and the delays imposed by the SEC investigation caused substantial injury to Old TMTG.

154.    The reputational damage to DWAC and Old TMTG as a result of the SEC investigation was also substantial.  For example, during and immediately following the SEC investigation, DWAC faced extreme difficulty in raising funds to continue its efforts towards a de-SPAC merger.  Consequently, DWAC and Old TMTG were forced to issue additional convertible notes to finance operations.

155.    Moreover, not wanting to be associated with Orlando and the SEC investigation, nearly all of DWAC's Board of Directors resigned in November and December 2022.  Orlando's conduct therefore forced a company leadership changeover in an already-turbulent time for DWAC.

## V.    The UAV Parties Failed to Manage Old TMTG Using Good Faith or Due Care

156.    In addition to the damage the UAV Parties caused to Old TMTG and DWAC through their knowledge of and participation in the Pre-Targeting Conspiracy, the UAV Parties further breached their fiduciary obligations to Old TMTG through their woeful mismanagement of the company and subsequent retaliatory conduct.

157.    As the *de facto* officers and directors of Old TMTG, the UAV Parties were in control of Old TMTG's day-to-day operations and major decisions of corporate policy until the new CEO and Board of Directors took the reins in early 2022.  The UAV Parties' primary responsibility (apart from securing a successful merger) was to competently prepare Old TMTG to launch the Truth Social platform.

158.    Instead, the UAV Parties misallocated Old TMTG's resources, executed (or attempted to execute) bad contracts without proper approval, and failed to carry out Old TMTG's most important goals.

159.    The UAV Parties failed to successfully launch Truth Social, leading an already hostile media to criticize Old TMTG for long user wait times and technical failings, to the detriment of the Old TMTG's business reputation.

160.    On June 12, 2022, Old TMTG's Board authorized the creation of the "Special Committee re: United Atlantic Ventures" (the "Special Committee") to investigate events that occurred in early 2022, including the UAV Parties' derelict management of Old TMTG.

161.    On January 16, 2023, the Special Committee issued a report making numerous findings of pervasive, reckless mismanagement by the UAV Parties, dating back to the beginning of Moss and Litinsky's service as Old TMTG's *de facto* officers and directors.  This included findings that:

    a.    The UAV Parties failed to conduct an organizational meeting, adopt incorporator resolutions, adopt corporate by-laws, or cause the adoption of a shareholders' agreement that would have established a corporate governance structure for Old TMTG.  This required Old TMTG to spend substantial effort and resources to ensure that Moss and Litinsky's failures did not call into question the authority Old TMTG had to make and execute on several of the business decisions to which it was committed;

    b.    The UAV Parties hand-picked a technical team to develop the Truth Social platform that lacked the skill and maturity necessary to build a platform at the size and scale needed to achieve commercial success;

    c.    The UAV Parties failed to manage the technical team;

    d.    The UAV Parties caused Old TMTG to enter into a commercially unreasonable relationship with a cloud services provider, who charged exorbitant rates for substandard or non-existent services.  The provider's equipment operated slowly, severely limiting capacity, while suffering frequent outages; and

    e.    Even after a new CEO was appointed, the UAV Parties attempted to assert control of Old TMTG's operations by, among other things, threatening that

if their decisions were not followed, they would cause a walkout of their hand-picked technical team, to the detriment of Old TMTG and the Truth Social launch.

162.    In addition to these problems, the UAV Parties failed entirely to develop a business plan for Old TMTG's streaming video on demand services, which jeopardized Plaintiffs' ability to follow through on representations made to investors and the public.

## VI.    Orlando Failed to Manage DWAC Using Good Faith or Due Care

163.    Throughout his tenure as a DWAC officer and director, Orlando failed to exercise minimum levels of competence and care required of a CEO. These failures caused extensive harm to DWAC and its shareholders.

164.    Orlando failed to employ basic company governance necessary to protect company and shareholder interests. He failed to hold formal votes for major company decisions, failed to record Board meeting proceedings with formal minutes or notes, failed to maintain sufficient records, and withheld pertinent information from Board members when seeking ratification of his decisions. Upon information and belief, despite conducting dozens of Board meetings during his tenure as DWAC CEO, Orlando failed to ensure minutes were recorded for many of them.

165.    Orlando failed to employ or institute basic accounting and record-keeping functions that further caused harm to DWAC. In particular, Orlando failed to institute proper corporate partitions between DWAC and Benessere Enterprises, Inc., another Orlando-affiliated entity, resulting in two material restatements to DWAC's financials and extensive costs for accounting services. Such deficiencies negatively impacted market confidence in DWAC's business and shareholder value, and also resulted in the resignation of DWAC's auditor.

166.    Similarly, Orlando, acting as an agent of ARC, engaged in negligent and reckless handling of storage of DWAC-related documents, including vendor contracts and invoices, in his

personal email account.  Such conduct resulted in the omission of multiple vendors in internal company reporting, and required DWAC to remedy actions that violate industry standard practices.

167.    As CEO of DWAC and as a member of its Board of Directors, Orlando utilized his position to enrich himself and ARC, often in direct conflict with DWAC's interests.

168.    As CEO, Orlando executed promissory notes on behalf of DWAC to ARC with no ratification by a disinterested Board of Directors.  Because Orlando controls ARC, he had a duty to follow proper procedures to ensure that the interests of DWAC's shareholders were represented by disinterested leadership.

169.    Orlando continued to leverage his position as a director in relation to the promissory notes that he issued to himself via ARC.  For example, he chose to prioritize his own enrichment over the needs of DWAC at a critical moment for the Company as part of its annual 10-K report.

170.    As part of the 10-K reporting process, DWAC's external auditor sent letters to all entities to whom the Company owed a form of debt such as promissory notes.  To finalize the reporting process, the auditor required a response and verification from all such persons.  In his capacity as controller of ARC, Orlando received such a notice with regard to the promissory notes he issued to ARC as DWAC CEO.

171.    Rather than sign and verify the forms as requested, Orlando refused to sign unless DWAC agreed to transform his promissory notes into convertible notes.  By transforming the notes, Orlando stood to profit substantially through the prospect of obtaining DWAC shares in far excess of the monetary value of the notes in their original promissory form.

172.    Knowing that DWAC faced potential de-listing from the NASDAQ stock exchange for failure to complete the 10-K audit process, Orlando effectively forced DWAC to transform his

standard shareholder loan into more-profitable convertible notes for the benefit of ARC, and by extension, himself.

173.    Orlando's actions related to the promissory notes, aided by ARC, were calculated to benefit ARC and Orlando, not DWAC.  As a Director, Orlando had a fiduciary duty to DWAC to facilitate the audit process, not utilize the process as an opportunity for self-enrichment.

174.    Such self-interested conduct by Defendants extends further back as well. Throughout the merger process, Orlando—both in his personal and ARC capacities—made a habit of obstructing straightforward board-of-director votes, meetings, and actions by DWAC as a means to demand additional monetary compensation.  For example, Orlando refused to sign routine SEC filings and necessary amendments to the Merger Agreement. Such actions had no material benefit to DWAC's shareholders.  Instead, Orlando used such instances as means to exert leverage over DWAC for pending disagreements or disputes.  Orlando's reckless and irrational behavior extended beyond the boardroom.  On more than one occasion, Orlando published social media posts that were harmful to the standing and reputation of DWAC as a public company.

175.    Upon information and belief, Orlando went so far as to discourage investors from investing money in DWAC based on his own personal grievances.  After being removed as DWAC's CEO in March 2023, Orlando convinced a DWAC investor who previously had earned money from DWAC's IPO not to invest more money in DWAC.  When confronted about why he did this, Orlando stated that it was his turn to make the life of the new CEO miserable.

176.    Upon information and belief, Orlando also leaked confidential business information to the press for his own personal benefit and without benefit to DWAC's shareholders.  On at least one occasion when Orlando was on the phone with other DWAC personnel, he excused himself to take another phone call but forgot to mute the first call.  As a result, DWAC personnel heard

Orlando leaking details about DWAC's prospective merger with Old TMTG to the press. When

confronted, Orlando lied and claimed that he told the reporter "no comment."

177.    After years of additional negotiation, coordination, and preparation, DWAC

completed one of the final prerequisites to the merger consummation by having its registration

statement on Form S-4 declared "effective" by the SEC on February 14, 2024. Building off the

registration statement, DWAC filed a merger proxy/prospectus for DWAC's proposed business

combination with Old TMTG on February 16, 2024, and scheduled a special shareholder meeting

for approval of the merger and related matters on March 22, 2024.

**VII.    ARC and Orlando's Obstruction of Business Operations and Merger Consummation**

178.    In the lead-up to the merger consummation and imminent shareholder vote,

Orlando and ARC sought to frustrate and obstruct the consummation as a means to extract

monetary consideration from DWAC and its shareholders, notwithstanding Orlando and ARC's

obligation to help lead DWAC toward consummation as fiduciaries. Throughout that time,

Orlando and ARC's motivation was self-dealing—*i.e.*, not in the best interest of DWAC, its

shareholders, or the merger.

179.    One of the closing prerequisites of the Merger Agreement was that all DWAC

Board members must provide conditional resignation letters to take effect at the moment of the

merger consummation. The purpose of the resignations was to enable the combined entity to

establish its Board pursuant to the structure and allocations set forth in the Merger Agreement, and

consistent with the proxy/prospectus delivered to DWAC's stockholders.

180.    In the months leading up to the shareholder vote, Orlando, in both his personal

capacity and as a controller of ARC, attempted a blatant shakedown extortion effort, stating that

he would decline to issue his resignation—and thus attempt to kill the merger in its entirety by

preventing a necessary closing condition—unless DWAC agreed to a series of unconscionable

demands.  These demands included a $100,000 note convertible into 10,000 Class A shares, an additional 97,000 shares for being a director, and 6.5 million warrants exercisable at $11.50 per share, which, net of the warrant exercise price, would reflect approximately $222,587,500 in additional value to Orlando based on a per share DWAC Class A common stock trading price of $45.00 (DWAC closed at $47.23 per share on February 26, 2024).

181.    Additionally, as a result of the SEC investigation and settlement, a significant portion of DWAC's management and Board turned over, yet Orlando refused to provide promised compensation to management and directors for their service, reducing the incentive for such individuals to take on the burden and potential liability of managing DWAC through the merger. As a result, in December 2023, DWAC received shareholder approval for a management and director compensation plan and arrangement.  Orlando's refusal to fulfill these promised compensatory obligations, in favor of his own pecuniary and personal interests, caused DWAC significant delay and expense.  His failure to do so also resulted in potential future dilution to the public shareholders.

182.    Orlando also levied additional demands that had nothing to do with the well-being of DWAC's shareholders, but rather related only to his own pecuniary and personal interests.  For example, he demanded that in exchange for his resignation commitment, the then-CEO of DWAC would need to provide a signed affidavit providing witness testimony regarding a collateral dispute concerning Orlando and a non-party that has no connection to DWAC.  Orlando further demanded that DWAC provide "cooperation" in any investigation by the SEC into Orlando's past conduct.

183.    These motivations and demands had nothing to do with DWAC shareholders, and would have served to benefit Orlando only.

184.    DWAC was forced to expend hundreds of thousands of dollars in time and legal fees to address these demands by Orlando and ARC through its lawyers.  Such expenditures were borne by DWAC, and by extension, its shareholders.

185.    Orlando also withdrew money from DWAC to serve his own purposes.  For example, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal being for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.  Upon information and belief, Orlando failed to utilize the $15,000 in cash for legal services as represented to DWAC.  At no time prior or subsequent to the withdrawal did Orlando purport to pay for legal services in cash.

186.    Around the time of the merger consummation, Orlando failed to identify justifiable business bases for his conduct which violated his fiduciary obligations, ultimately reflecting his continued desire to utilize his position and control over DWAC to enrich himself at the expense of DWAC's shareholders.  The enumerated purpose of DWAC was to effectuate a SPAC merger, and Orlando and ARC's conduct disregarded this corporate mandate in pursuit of personal gain.

187.    Orlando and ARC sought to undermine, threaten, and oppose the merger through a series of actions motivated by a desire to extort the company, and by extension, its public shareholders.  For example, in its role as sponsor of DWAC, ARC had a contractual obligation to vote its shares in favor of the business combination.  ARC, however, withheld its vote even though the voting window had opened.  This conduct resulted in millions of dollars of added expense to the Company in effectuating the merger on the contingency that ARC would not perform its contractual duties at Orlando's direction.

188.    As noted above, at the time that the voting window for the merger consummation opened in February 2024, Orlando communicated to DWAC that he was supposedly entitled to

additional unreasonable compensation in his personal capacity as a director of the Company. The Board declined his request. Additionally, after the voting window for the merger consummation opened, Orlando made unfounded and unreasonable demands for personal reimbursement without adequate proof or justification for the demands.

189.    While Orlando was making demands of DWAC for his personal benefit during the voting window for the merger consummation, ARC declined to lodge its vote despite its contractual obligation to do so. During this time, ARC made its demands on DWAC separate from that of Orlando. In particular, ARC demanded certain adjustments be made to the ratio by which its shares in DWAC would be converted to new shares in the new merger entity. By withholding ARC's vote, both Orlando and ARC attempted to leverage DWAC into a less favorable bargaining positions on these various disputes, with each standing to benefit in separate capacities, but nonetheless providing aid to the other in the process. Old TMTG suffered similar harm as a result of the uncertainty and increased complexity of a last-minute vote scenario.

190.    And just seven days before the vote on the business combination, Orlando sent an extensive demand for documents clearly aimed to interfere with the vote and the closing of the business combination. In the demand, Orlando indicated that his vote in favor of the business combination was contingent upon receipt of the documents, even though the documents had no bearing on the merits of the business combination and should have been requested long before the vote. The demand caused DWAC to incur additional, substantial costs and distraction in its efforts to comply with the demand.

191.    Orlando, through ARC, raised millions of dollars, through various means, based on misrepresentations about his personal, financial self-dealing and adherence to statutory and

regulatory requirements, promising investors shares in DWAC n/k/a TMTG in exchange for capital to be used in support of DWAC's merger with Old TMTG.

192.    Orlando, through ARC, failed to maintain and produce a clear accounting of who is owed what shares of DWAC n/k/a TMTG, leading to significant disruption to TMTG, including damages.

193.    Indeed, Orlando's failure is the subject of several multiple litigation matters brought by investors against Orlando and ARC. DWAC n/k/a TMTG has been tangentially brought into those litigations resulting in business disruption and expenditure of attorney's fees and costs.

194.    Orlando's misconduct and deficient accounting practices breached the fiduciary duties owed to DWAC n/k/a TMTG.

195.    Moreover, upon information and belief, Orlando failed to release the funds collected through ARC for the benefit of the merger between Old TMTG and DWAC and at issue in various lawsuits to DWAC n/k/a TMTG.

196.    Orlando's failure to turn these funds over to DWAC n/k/a TMTG breached the fiduciary duties owed to DWAC n/k/a TMTG.

197.    All conditions precedent to the maintenance of this action have occurred or have been performed, waived, or otherwise satisfied.

### COUNT I
### BREACH OF FIDUCIARY DUTY OF LOYALTY
### (BY DWAC N/K/A TMTG AGAINST ORLANDO)

198.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 58–62, 68–155, 163–194 as though fully alleged herein.

199.    Orlando, during his tenure as CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of loyalty to DWAC.

200.    To fulfill this duty, Orlando was required to place the best interest of DWAC and its shareholders above his own.

201.    Orlando breached his fiduciary duty of loyalty by engaging in conduct which benefitted himself or ARC at the expense of DWAC and its shareholders.

202.    Orlando devised and engaged in a scheme to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

203.    In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with Old TMTG representatives, including the UAV Parties, for a merger between Old TMTG and DWAC.

204.    Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

205.    Orlando also generally refused to cooperate in DWAC corporate governance and business processes in furtherance of his personal interests.

206.    While serving as a Director of DWAC, Orlando made public statements that were harmful to the company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

207.    Orlando also continuously obstructed DWAC's eventual merger with Old TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

208.    Orlando also engaged in self-interested issuance of various encumbrances from DWAC to ARC (essentially himself) without the ratification of disinterested board members.

209.    Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures.

210.    Upon information and belief, Orlando also failed to deliver all funds raised by ARC for the benefit of DWAC.

211.    As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his fiduciary breaches that are subject to disgorgement.

212.    The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's fiduciary breaches, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, disgorgement of benefits, and such other relief as the Court deems appropriate

<u>COUNT II</u><br/><u>BREACH OF FIDUCIARY DUTY OF CARE</u><br/><strong>(BY DWAC N/K/A TMTG AGAINST ORLANDO)</strong>

213.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 63, 68–155, 163–194 as though fully alleged herein.

214.    Orlando, as the now-former CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of care to DWAC.

215.    To fulfill this duty, Orlando was required to exercise his responsibilities as CEO and a Director of DWAC in an informed and considered manner which an ordinarily prudent and careful CEO and Director would have used in the same circumstances.

216.    Orlando breached his fiduciary duty of care by engaging in the Pre-Targeting Conspiracy.

217.    Specifically, Orlando devised and engaged in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

218.    In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with his fellow Co-Conspirators.

219.    Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

220.    Orlando further breached his fiduciary duty of care by failing to employ industry standard governance and business practices, including inadequate recordkeeping, failure to properly ratify Company decisions, and deficient accounting practices.

221.    Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures and deficiencies.

222.    Upon information, Orlando also failed to accurately account for or deliver funds raised by ARC, as DWAC's sponsor.

223.    As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his breaches of fiduciary duty that are subject to disgorgement.

224.    The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's breaches of his fiduciary duties, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT III
## CONVERSION
### (BY DWAC N/K/A TMTG AGAINST ORLANDO)

225.    DWAC n/k/a TMTG realleges and incorporates Paragraph 185 as though fully alleged herein.

226.    Orlando wrongfully asserted dominion over DWAC assets inconsistent with DWAC's possessory rights over those assets.

227.    On at least one occasion, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal as having been for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.

Upon information and belief Orlando has engaged in similar improper utilization of Company funds without prior authorization or verification of valid business purpose.

228.    Plaintiffs have demanded return of their property and assets.

229.    Plaintiffs have suffered damages as a direct and proximate result of Orlando's wrongful assertion of dominion over DWAC's assets.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for the fair market value of DWAC's assets at the time of their conversion, plus interest, together with the costs of this action, including along with all such other relief and remedies as the Court finds fit and proper under the circumstances.

### COUNT IV
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY DWAC N/K/A TMTG AGAINST ARC)

230.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 68–143, 148–155 as though fully alleged herein.

231.    Orlando owed fiduciary duties of care and loyalty to DWAC.

232.    Orlando breached those fiduciary duties by exposing DWAC to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

233.    Orlando also repeatedly threatened to obstruct DWAC's merger with Old TMTG and threatened to cause DWAC to lose its business operations to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

234.    ARC had knowledge of Orlando's breaches of fiduciary duty.

235.    ARC substantially assisted and encouraged Orlando's breaches of fiduciary duty.

236.    Orlando has, and at all relevant times, had a personal stake in the object of his conduct that is separate and distinct from ARC's interest.

237.     As a direct and proximate result of ARC aiding and abetting Orlando's breaches of fiduciary duty, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT V
## VIOLATION OF FLORIDA'S DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
## (BY ALL PLAINTIFFS AGAINST ORLANDO AND ARC)

238.     Plaintiffs reallege and incorporate Paragraphs 63, 68–143, 168–173, 180, 187 as though fully alleged herein.

239.     FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

240.     Solicitation of Old TMTG as a DWAC merger target constitutes "trade or commerce" as defined by Fla. Stat. § 501.203(8).

241.     Orlando issued promissory notes to ARC for his personal benefit, and later refused to cooperate in critical accounting processes unless DWAC agreed to transform the promissory notes into convertible notes.

242.     Orlando generally refused to cooperate in Company governance and business processes in furtherance of his personal interests.

243.    While serving as a Director of DWAC, Orlando made public statements that were harmful to the Company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

244.    Orlando also continuously obstructed DWAC's merger with TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

245.    Old TMTG and DWAC are both harmed by Defendants' conduct alleged herein. The conduct of Orlando and ARC, which caused a delay of the merger and the SEC investigation, has caused significant harm to both DWAC and Old TMTG in the form of lost opportunity costs and substantial out of pocket costs.

246.    The damages available to Plaintiffs are inadequate to compensate Plaintiffs for the entire extent of the harm incurred by them that results from Defendants' violations of FDUTPA, including their violations of regulations and corporate governance standards, self-interested transactions made without DWAC board approval, and their efforts to derail the merger. Such harm is irreparable. Plaintiffs have a clear legal right to relief.

247.    As the direct and proximate result of Defendants' deceptive and unfair acts or practices, Plaintiffs have sustained substantial actual damages in an amount to be proven at trial. Plaintiffs also are entitled to attorneys' fees arising from Defendants' violations of FDUTPA.

WHEREFORE, Plaintiffs respectfully requests that this Court enter final judgment against Orlando and ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, any statutorily-available exemplary damages, injunctive relief barring future conduct as alleged herein, reasonable attorneys' fees and court costs, and such other relief as the Court deems appropriate.

## COUNT VI
## BREACH OF FIDUCIARY DUTY OF CARE
### (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

248.    Plaintiffs reallege and incorporate Paragraphs 5, 45, 47, 68–144, 156–162 as though fully alleged herein.

249.    Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

250.    Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

251.    As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of care.  This means that they were required to exercise their duties in a manner in which ordinary careful and prudent men would use in the same circumstances and consider all material information reasonably available in making business decisions.

252.    During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

253.    Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to agree to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

254.    Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

255.    This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

256.    Litinsky and Moss also failed to ensure that all corporate formalities were carried out, to establish an adequate corporate governance structure for Old TMTG, and to allocate resources in a lawful and efficient manner.

257.    Litinsky and Moss also breached their duty of care by failing to execute contracts and business ventures that were commercially reasonable and beneficial to Old TMTG and with the proper approval from the Old TMTG Board.

258.    Litinsky and Moss also failed to launch the social medial platform, including hiring a technical team with the requisite technical skills to launch the platform.

259.    Plaintiffs suffered damages as a result of Moss and Litinsky's breaches of care, including increased legal and administrative costs, additional costs to remedy their breaches, lost business opportunities, and lost ability to execute on the Company's business plan.

WHEREFORE, Plaintiffs respectfully request that this Court render a judgment against Moss and Litinsky for damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VII
## BREACH OF FIDUCIARY DUTY OF LOYALTY
## (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

260.    Plaintiffs reallege and incorporate Paragraphs 5, 46, 47, 68–162 as though fully alleged herein.

261.    Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

262.    Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

263.    As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of loyalty.

264.    To fulfill this duty, Litinsky and Moss were required to place the best interest of Plaintiffs and their shareholders above their own.

265.    During their terms as directors and/or *de facto* directors of Plaintiffs, Litinsky and/or Moss breached their duty of loyalty.

266.    During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

267.    Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

268.    Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

269.    This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

270.    Litinsky and Moss held Plaintiffs hostage by threatening that any deviation from their directives would result in Litinsky and Moss retaliating against Old TMTG by provoking a walkout of the Company's technical team.

271.    Upon information and belief, Litinsky and Moss directed Plaintiffs' personnel to wipe servers belonging to one of social media platform's contractual partners in a retaliatory effort to destroy valuable code and sabotage the social media platform.

WHEREFORE, Plaintiffs respectfully request that this Court enter final judgment against Moss and Litinsky for monetary damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST UAV)

272.    Plaintiffs reallege and incorporate Paragraphs 5, 18, 68–162 as though fully alleged herein.

273.    Litinsky and Moss owed fiduciary duties of care and loyalty to Plaintiffs.

274.    Litinsky and Moss breached those fiduciary duties by exposing Plaintiffs to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

275.    Litinsky and Moss also failed to manage Plaintiffs with due care or in good faith as alleged in Paragraphs 246 through 269.

276.    UAV, as the entity through which Litinsky and Moss conducted business and was controlled and dominated at all times by Litinsky and Moss, substantially assisted Litinsky and Moss's breaches of fiduciary duties.

277.    Litinsky and Moss have, and had at all relevant times, a personal stake in the object of their conduct that is separate and distinct from UAV's interest.

278.    As a direct and proximate result of UAV aiding and abetting Litinsky and Moss's breaches of fiduciary duties, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against UAV and award damages for UAV's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT IX
## CONSPIRACY TO BREACH FIDUCIARY DUTY
## (BY ALL PLAINTIFFS AGAINST ORLANDO, LITINSKY, AND MOSS)

279.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

280.    At all relevant times, Old TMTG entrusted Moss and Litinsky as its fiduciaries to act with due care and in good faith.

281.    At all relevant times, DWAC n/k/a TMTG entrusted Orlando as its fiduciary to act with due care and in good faith.

282.    Moss and Litinsky breached their fiduciary duties of care and loyalty by allowing Orlando to dual-track merger discussions with Benessere and DWAC as alleged in Counts VI and VII.

283.    Orlando breached his fiduciary duties of care and loyalty by placing his own self-interests above those of Plaintiffs', as alleged in Counts I and II and throughout this Second

Amended Complaint.

284.    Orlando, Moss, and Litinsky constituted a confederation of persons who have taken unlawful acts as alleged in herein and in furtherance of an agreement causing each other to breach their fiduciary duties to Plaintiffs.

285.    Plaintiffs have suffered damages a result of Orlando, Moss, and Litinksy's breaches of fiduciary duty as alleged in Counts I, II, VI, and VII.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment against Orlando, Moss, and Litinsky and award damages for their conspiracy to breach fiduciary duties owed to Plaintiffs, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT X
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST ORLANDO)

286.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

287.    Moss and Litinsky breached their fiduciary duties of care and loyalty to Plaintiffs through their partnership with Orlando as alleged in Counts VI and VII.

288.    Orlando knew that Moss's and Litinksy's conduct constituted a breach of their fiduciary duties because of the severe legal risk it posed to the merger, which risk materialized in the form of investigations and a substantial delay of the merger.

289.    Orlando substantially assisted Moss's and Litinksy's breaches.

290.    Plaintiffs have suffered damages as a result of Moss's and Litinksy's breaches of fiduciary duty as alleged in Counts VI and VII.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Orlando and award damages for Orlando's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS LITINSKY AND MOSS)

291.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

292.    Orlando breached his fiduciary duties of care and loyalty to DWAC n/k/a TMTG through the carrying out of the Pre-Targeting Conspiracy alleged in Counts I and II and throughout this Second Amended Complaint.

293.    Litinsky and Moss knew that Orlando's conduct constituted a breach of his fiduciary duties owed to DWAC n/k/a TMTG because of the severe legal risk it posed to the merger with Old TMTG, which risk materialized in the form of investigations and a substantial delay of the merger.

294.    Litinsky and Moss substantially assisted Orlando in the breaching of the fiduciary duties of loyalty and care owed to DWAC n/k/a TMTG.

295.    Plaintiffs have suffered damages as a result of Orlando's breaches of fiduciary duty as alleged in Counts I and II.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Moss and Litinsky and award damages for Moss's and Litinsky's aiding and abetting Orlando's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XII
## UNJUST ENRICHMENT
### (BY PLAINTIFFS AGAINST UAV)

296.    Plaintiffs reallege and incorporate Paragraph 43 as though fully alleged herein.

297.    Old TMTG conferred a benefit upon UAV in the form of 8.6 million shares of stock in Old TMTG.

298.    UAV voluntarily accepted the benefit, has knowledge of that benefit, and has retained it.[4]

299.    Equity and good conscience require that UAV restore the benefit to Plaintiffs. UAV provided nothing of value to Plaintiffs in exchange for its shares: it failed to establish Old TMTG's corporate structure, its principals were a cause of legal hurdles and delay for the merger; it botched the management of Old TMTG to the company's detriment; and it failed to develop and execute a plan for streaming video on demand services.

300.    Old TMTG has no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment ordering UAV to return the shares of stock it received, or, alternatively, to restore the value of those shares to Plaintiffs together with prejudgment interest and such other relief as the Court deems appropriate.

---

[4] UAV benefited because its Old TMTG shares have been exchanged for TMTG shares and are of significant value.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth herein, Plaintiffs respectfully request the Court enter judgment in their favor and against Defendants for damages, attorneys' fees where available by contract or statute, any statutorily-available exemplary damages, and any other and further relief as the Court deems just and proper.

Dated: July 31, 2024

Respectfully submitted,

*/s/ Christopher G. Oprison*
Christopher G. Oprison (FBN: 122080)
Tal Aburos (FBN: 1010901)
**DLA PIPER LLP (US)**
200 South Biscayne Boulevard
Suite 2500
Miami, Florida 33131
Telephone: (305) 423-8522
Facsimile: (305) 657-6366
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com
*Counsel for Plaintiffs*

*/s/ Samuel J. Salario, Jr.*
Samuel J. Salario, Jr., Esq. (FBN: 83460)
Jason B. Gonzalez, Esq. (FBN: 146854)
Mathew D. Gutierrez, Esq. (FBN: 94014)
Raymond F. Treadwell, Esq. (FBN: 93834)
**LAWSON HUCK GONZALEZ PLLC**
215 S. Monroe St., Suite 320
Tallahassee, Florida 32301
Telephone: (850) 825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
mathew@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com
*Counsel for Plaintiffs*

# EXHIBIT 1

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 11213 / July 20, 2023**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 97958 / July 20, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No.  3-21534**

| | |
|---|---|
| **In the Matter of**<br><br>**DIGITAL WORLD ACQUISITION CORP.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Digital World Acquisition Corp. ("DWAC" or "Respondent").

### II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondent admits the Commission's jurisdiction over it and the subject matter of these proceedings and consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

### III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1]     The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

## Summary

1.       This matter concerns materially false and misleading statements and omissions by DWAC, a special purpose acquisition company ("SPAC") that in October 2021 announced an agreement to merge with Trump Media & Technology Group Corp. ("TMTG"), a social media company.  In an amended Form S-1 filed with the Commission in support of its initial public offering ("IPO") in early September 2021, DWAC stated that neither DWAC nor its officers and directors had had any discussions with any potential target companies prior to the IPO.  In a Form S-4 filed with the Commission following the announcement of the proposed merger with TMTG, DWAC mischaracterized and omitted information about the history of its interactions with TMTG.

2.       DWAC's filings were materially false and misleading.  Dating back to February 2021, an individual who would later become DWAC's Chief Executive Officer ("CEO") and Chairman ("Individual A"), and others involved with DWAC, had extensive discussions with TMTG.  While Individual A initially pursued these discussions with TMTG on behalf of another SPAC that he also controlled ("SPAC A"), Individual A created a plan in the spring and summer of 2021 to potentially use DWAC to pursue a merger with TMTG.

3.       DWAC also failed to disclose that Individual A had a potential conflict of interest stemming from a Letter of Intent ("LOI") that SPAC A had entered into with TMTG in June 2021.  This agreement made Individual A personally liable to pay a $1 million break-up fee if SPAC A or another substitute entity did not complete a merger with TMTG.  DWAC failed to disclose this potential conflict of interest in any of the documents filed with the Commission and never otherwise disclosed this information to the public.

## Respondent

4.       **DWAC**, a Delaware corporation based in Miami, Florida, is a SPAC.  DWAC has no operations of its own and exists for the purpose of merging with a privately held company with the effect of taking that company public.  On September 8, 2021, DWAC completed an IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated.  DWAC has securities that trade on the Nasdaq Global Market under the symbols DWACU, DWACW and DWAC.[2]  Each of these securities is registered under Section 12(b) of the Exchange Act.

---

[2]       DWACU is the symbol for units consisting of one share of Class A DWAC common stock and one half of one redeemable warrant.  DWACW is the symbol for redeemable warrants exercisable for one share of Class A DWAC common stock.  DWAC is the symbol for Class A DWAC common stock.

## Other Relevant Individuals and Entities

5.      **DWAC Sponsor**, a Delaware corporation based in Miami, Florida, is the sponsor of DWAC.  DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC.[3]  At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 restricted DWAC units.  DWAC Sponsor's investments fund DWAC's operations and will not be returned to DWAC Sponsor if a business combination is not consummated.

6.      **Individual A**, a resident of Miami, Florida, was the CEO and Chairman of DWAC. Individual A owns a significant percentage of, and is the managing member of, DWAC Sponsor. Individual A also was the CEO and Chairman of SPAC A and the managing member of SPAC A's sponsor.

7.      **SPAC A**, a Delaware corporation based in Miami, Florida, was a SPAC controlled by Individual A.  In October 2022, SPAC A issued a press release announcing it was dissolving, would liquidate its trust account, and would return the funds held in trust to investors.

8.      **TMTG**, a Delaware corporation with its principal place of business in Sarasota, Florida, operates a social media platform.  On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was amended on May 11, 2022.

9.      **Investment Bank** is a Shanghai, China-based investment bank that describes itself as a leading advisor in the SPAC market in the United States.  Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

## Facts

### Background

10.      A SPAC is a company with no underlying business operations that is formed to raise capital through an IPO for the purpose of using the proceeds to acquire an unidentified private operating company at a later date but within a specified period of time (typically two years).

11.      Following its IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction after which the company will continue the operations of the acquired company as a public company.  Investors in a SPAC at the IPO stage therefore are relying on the management team that formed the SPAC[4] to expend efforts after the IPO to identify and look to acquire or combine with a private operating company.

---

[3]      This quantity of shares reflects a three-for-one stock split effected on July 1, 2021.

[4]      A SPAC sponsor is the entity and/or persons primarily responsible for establishing the SPAC, which is thereafter managed by a board of directors and management.

3

12.     Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, steps a SPAC has taken in furtherance of a particular acquisition would be material to a reasonable SPAC investor, who would want to know about the SPAC's prospects with future acquisition targets.  Disclosures made in a SPAC's IPO – including as it relates to any pre-IPO discussions or negotiations with future acquisition targets or concerning potential business combinations – need to be clear and accurate, and cannot be materially false or misleading.

13.     In addition, the economic interests of the sponsors and the directors, officers, and affiliates of a SPAC often differ from the economic interests of public shareholders, which may lead to conflicts of interests as they evaluate and decide whether to recommend business combination transactions to shareholders.  Clear and accurate disclosure regarding these potential conflicts of interest and the nature of the sponsors', directors', officers' and affiliates' economic interests in the SPAC is particularly important because these parties are generally responsible for negotiating the SPAC's post-IPO business combination transaction.

14.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities at a discount at or around the time of the SPAC's formation.  Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO.  Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash in the event the SPAC fails to complete a business transaction, and the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

### *Individual A's Initial Interactions with TMTG*

15.     In mid-February 2021, a representative of TMTG approached Individual A regarding a potential deal between SPAC A and TMTG.  Shortly after that initial contact, SPAC A and TMTG signed a non-exclusive LOI to explore a potential merger between the two companies which, after being extended, lasted through April 5, 2021.  As that LOI neared expiration, TMTG and SPAC A discussed entering into a mutually exclusive LOI.  Two directors and one officer of SPAC A opposed pursuing a merger with TMTG, and SPAC A ultimately did not sign that exclusive LOI.

16.     On or about April 8, 2021, Individual A began exploring two plans to pursue a merger with TMTG, "Plan A" and "Plan B."  "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG.  For example, Individual A discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.  "Plan B" referred to Individual A's attempt to identify an alternative SPAC to pursue a merger with TMTG.  Individual A considered several SPACs that could be used for "Plan B," and Individual A started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs.  By April 9, 2021, a representative of Investment Bank wrote an email to Individual A stating: "DWAC could be a solution for [TMTG]."  At the time, Investment Bank had a majority interest in DWAC Sponsor, and Individual A had no ownership interest in DWAC Sponsor or role with DWAC.

4

17.     On April 14, 2021, Individual A met with representatives of TMTG.  During the meeting, Individual A suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Individual A would try to identify another vehicle to potentially pursue a merger with TMTG.

18.     On April 18, 2021, a representative of Investment Bank sent a message to Individual A and wrote: "We do [TMTG] one way or other.  Now let's sign up [TMTG].  That's the way to get the most $$$.  Anyhow, we'll figure it out.  Opciones hay."[5]  Individual A responded: "Yes.  Done this week."

### Individual A Took Control of DWAC and Resumed Merger Discussions with TMTG

19.     On or about April 24, 2021, Individual A learned that there was an opportunity for him to obtain substantial control over DWAC.  A few days later, Individual A signed a LOI with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor.  Individual A met with TMTG's representatives the next day and continued discussions with TMTG about a potential merger shortly thereafter.

20.     On May 14, 2021, Investment Bank and Individual A executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Individual A.  Individual A was appointed CEO and Chairman of DWAC around this same time.  These two actions gave Individual A effective control over DWAC.

21.     On the night of May 25, 2021, DWAC filed a Form S-1 (the "Form S-1").  The Form S-1 was signed by Individual A and included two additional nominee directors to DWAC's Board.  Both of those new DWAC directors were also SPAC A directors who were supportive of a transaction between SPAC A and TMTG.  This Form S-1 also identified a DWAC officer, who had been involved in some preliminary discussions about TMTG in connection with SPAC A prior to being named a DWAC officer.  The SPAC A directors and officer who opposed a transaction with TMTG did not assume any role with DWAC.

22.     The Form S-1 contained several statements about the state of discussions between DWAC and potential targets.  For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

### The June 4 LOI and Break-Up Fee Clause

23.     By at least June 1, 2021, Individual A made plans with TMTG to sign a unilaterally exclusive LOI between SPAC A and TMTG on June 4, 2021.  At that time, the SPAC A officer

---

[5]     In Spanish, "Opciones hay" translates to "There are options."

and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

24.     On June 1, 2021, Individual A communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the LOI signing event and wrote: "I want [TMTG] to meet the [SPAC A] AND DWAC team."

25.     On June 4, 2021, SPAC A, TMTG, and Individual A (in his personal capacity and on behalf of SPAC A) signed a LOI (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.  The June 4 LOI included a break-up fee clause under which Individual A would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause").  The Break-Up Fee Clause had several conditions that would result in Individual A owing no break-up fee.  One of those conditions was that Individual A would owe no break-up fee if he "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG] (in its sole and absolute discretion) and such terms are ultimately accepted by [TMTG]."  The parties signed several extensions to the June 4 LOI over the summer of 2021, the last extension of which was signed on or about August 27, 2021.  The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021.

26.     The Break-Up Fee Clause created a potential conflict of interest for Individual A in that it put him at personal financial risk if he did not find a way complete a merger with TMTG.

### *Individual A Contemplated a DWAC Merger with TMTG*

27.     Within days of signing the June 4 LOI, Individual A communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG.  For example, on June 7, 2021, Individual A received a text in which an individual who was a director for both SPAC A and DWAC wrote: "I still don't know why you are switching it out of [SPAC A] other than you will make more money.  I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic."  Individual A responded: "DWAC is better and will make the project clear [sic] more successful."

28.     On June 8, 2021, Individual A exchanged additional messages with representatives of Investment Bank.  Individual A sent a picture from the June 4 LOI signing event and wrote: "You have no idea!!  I worked thousands of hours to get this," and "It's ours wherever we want.  Let's make it DWAC."

29.     On June 9, 2021, Individual A emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG.

30.     By contrast, Individual A's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other targets.

### *Discussions with TMTG*

31.     Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

32.     During the same time period, Individual A raised funds from numerous individuals who made investments in DWAC Sponsor.  Individual A informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

33.     On July 8, 2021, DWAC filed an amended Form S-1 increasing its planned offering from $100 million to $300 million and announcing three additional directors.  One of those directors had been involved with Individual A in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

34.     Individual A travelled to TMTG's offices on July 8 and spent the entire day there. After Individual A left, a representative of TMTG sent a message to Individual A stating: "Today was a big day for [TMTG] and a huge step for our team to be able to meet and spend time with you.  Thank you so much for making the trip."

35.     On August 28, 2021, Individual A received a text from a DWAC representative that stated: "Talked to [TMTG's outside counsel].  TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement.  I told them we'd need a month. Probably gonna settle at 2-3 weeks."

### *DWAC's IPO*

36.     On August 31, 2021, three days prior to the commencement of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") signed by Individual A.  The Final Form S-1 contained several statements about discussions between DWAC and potential targets, including the following statement:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering.  We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

37.     The Final Form S-1 also contained the following statement regarding DWAC's contact with potential targets:

We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

38.    In addition, the Final Form S-1 contained the following statement regarding DWAC's contact with potential targets:

We have not contacted any of the prospective target businesses that [SPAC A and another SPAC] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

39.    Certain of the statements described in paragraphs 36 through 38 were false or misleading because, among other things and as discussed above: (a) Individual A assumed control of DWAC in May 2021 with the idea that it might be used to pursue a merger with TMTG; (b) Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG; and (c) the discussions between SPAC A and TMTG had ceased before DWAC's IPO.

40.    DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated.

41.    DWAC filed a prospectus on September 8, 2021 that included the same statements described in paragraphs 36 through 38.

***DWAC's Post-IPO Negotiations with TMTG***

42.    On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement.  On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement.  TMTG emailed DWAC a draft LOI the next day.  Two days later, DWAC and TMTG began coordinating an in-person event to sign the LOI on September 22, 2021.  On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Individual A from the Break-Up Fee clause.

43.    On September 22, 2021, DWAC's Board communicated via WhatsApp and voted to approve signing an LOI with TMTG.  That same day, Individual A met with representatives from TMTG and signed a mutually exclusive LOI between DWAC and TMTG.  That same day, Individual A (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Individual A from the $1 million Break-Up Fee Clause under the June 4 LOI.  That letter was dated to be effective as of September 1, 2021.

44.    On October 19, 2021, DWAC's Board approved the signing of a definitive merger agreement with TMTG.  DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after market close that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on Edgar at approximately 6 a.m. on October 21, 2021.  DWAC's common stock, which had closed at $9.96 on October 20, 2021, closed at $45.50 on October 21, 2021.

***DWAC's Form S-4***

45.    On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  DWAC's Form S-4 contains materially inadequate and misleading disclosures regarding various issues.  For example, DWAC's Form S-4:

  a.   Did not disclose the Break-Up Fee Clause contained in the June 4, 2021 LOI between SPAC A and TMTG and did not disclose Individual A's potential conflict of interest caused by the Break-Up Fee Clause.

  b.   Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Individual A was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Individual A met with TMTG and executed the LOI between DWAC and TMTG.

  c.   Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021.  As discussed above in detail, Individual A had numerous interactions with TMTG prior to DWAC's IPO.  DWAC also did not disclose that Individual A assumed control

9

of DWAC in spring 2021 with the idea that it might be the vehicle to close a deal with TMTG and that Individual A told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

## Violations

46.     As a result of the conduct described above, the Commission finds that DWAC violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, which prohibit any person, in connection with the purchase or sale of any security, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

47.     As a result of the conduct described above, the Commission finds that DWAC also violated Section 17(a)(2) of the Securities Act, which prohibits any person, in the offer or sale of any securities, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

## Undertaking

48.     Respondent undertakes that, should it file an amended Form S-4, any such Form S-4 will be materially complete and accurate and consistent with the findings in this Order.

## IV.

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent DWAC's Offer.

Accordingly, it is hereby ORDERED that:

A.     Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent DWAC cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.     Respondent shall comply with the undertaking enumerated in Section III, paragraph 48 above.

C.     Respondent shall pay a civil money penalty in the amount of $18 million to the Securities and Exchange Commission.  The penalty shall be due the earlier of: (a) 14 days after the closing of any merger or a comparable business combination or transaction, whether with TMTG or any other entity; or (b) January 1, 2025.  If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, the Commission will forgo the penalty upon written notice that the funds in trust have been returned to shareholders.  The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the

10

establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002. The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)     Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)     Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)     Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying DWAC as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Thomas P. Smith, Jr., Division of Enforcement, Securities and Exchange Commission, 100 Pearl St., Suite 20-100, New York, NY 10004-2616. If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, DWAC will provide written notice to Mr. Smith regarding the decision to dissolve the SPAC and an additional written notice when the money in trust has been returned to the shareholders. DWAC shall provide these written notices no later than 5 business days after dissolving the SPAC and no later than 5 business days after the money in trust has been returned to the shareholders.

D.     Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in

this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.


Vanessa A. Countryman
Secretary

12

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street NE<br>Washington, DC 20549 | 1:24-CV-2097 |
| Plaintiff, | **Complaint** |
| v. | |
| PATRICK ORLANDO, | **Jury Trial Demanded** |
| Defendant. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Patrick Orlando, alleges as follows:

## SUMMARY

1.      This case involves fraudulent conduct and materially false and misleading statements and omissions made by Patrick Orlando ("Orlando"), in his capacity as the Chief Executive Officer ("CEO") and Chairman of Digital World Acquisition Corp. ("DWAC"), in filings made with the Commission. Through these publicly available filings, Orlando falsely represented that DWAC, a special purpose acquisition company ("SPAC") that he controlled, did not intend to merge with any specific company and, indeed, had had no discussions or contacts with any potential merger targets. Orlando knew these statements were false because he personally engaged in numerous lengthy discussions with representatives of Trump Media & Technology Group Corp. ("TMTG"), a social media company, and because he had targeted TMTG for merger with DWAC for months.

2. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC and managing member of DWAC's sponsor ("DWAC Sponsor"). In those roles, Orlando reviewed and signed the relevant filings at issue in this action.

3. In February 2021, Orlando and others who later became involved with DWAC began extensive merger discussions with TMTG. Orlando initially pursued these discussions with TMTG on behalf of SPAC A, another SPAC he controlled.

4. In the spring of 2021, Orlando planned and executed a scheme to use DWAC, which had not yet had its IPO, to pursue a merger with TMTG. Orlando discussed his scheme with at least one individual at TMTG.

5. As part of this scheme, Orlando signed Forms S-1 in the spring and summer of 2021 that falsely and misleadingly stated that DWAC had not selected any merger target or engaged in any substantive discussions with any merger target. These Forms S-1 were filed with the Commission on DWAC's behalf.

6. On September 8, 2021, DWAC completed an IPO, pursuant to which the company raised $287.5 million from the investing public. In support of its IPO, DWAC filed an amended Form S-1 with the Commission on or about August 31, 2021 (the "Final Form S-1"). Orlando signed the Final Form S-1.

7. Among other defects, the Final Form S-1 contained material misrepresentations and omissions regarding DWAC's conduct prior to its IPO. Specifically, the Final Form S-1 falsely and misleadingly stated that: (a) neither DWAC nor its officers and directors had any discussions or contacts with any potential target companies prior to the IPO; and (b) that DWAC had not selected any specific business combination target.

8.     In October 2021, DWAC announced an agreement to merge with TMTG. Following the disclosure of the planned merger and its target, the price of DWAC stock rose over 400% in a single day of trading.

9.     As a result of Orlando's actions, DWAC's spring and summer Forms S-1 and its Final Form S-1 were materially false and misleading.

10.    On May 16, 2022, Orlando signed, and DWAC filed, a Form S-4 regarding its planned merger with TMTG that continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.

11.    On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing an $18 million civil penalty. On November 13, 2023, DWAC filed an amended Form S-4 that made disclosures consistent with the findings in the Commission's published order instituting the settled cease-and-desist proceeding.

12.    DWAC closed its merger with TMTG on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT." This Complaint will solely refer to the entity names prior to the closing of the merger.

13.    As a result of the conduct alleged herein, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14.     The Commission seeks a permanent injunction against Defendant that enjoins him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an officer and director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16.     Venue lies in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Columbia, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, Orlando signed at least four different documents containing the misrepresentations at issue, all of which were filed with the SEC, an agency headquartered in this judicial district. Additionally, records indicate that at least one investor located in Washington, D.C., sold shares of DWAC prior to the October disclosure of the merger agreement, presumably without the benefit of the information that Orlando concealed from investors and the market.

17.     Orlando, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a

national securities exchange in connection with the acts, practices, and courses of conduct
alleged herein.

## BACKGROUND AND TERMINOLOGY

18.     A SPAC sponsor is the management team primarily responsible for establishing
and launching the SPAC. After a SPAC is launched, it is managed by a board of directors and
management.

19.     A SPAC has no underlying business operations. The SPAC sponsor creates the
SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an
unidentified private operating company, within a specified period (typically two years).

20.     Once it has raised funds through an IPO, a SPAC will seek to identify acquisition
candidates and attempt to complete a business combination transaction, after which the company
will continue the operations of the acquired company as a public company. Although the post-
IPO SPAC is technically led by a new board of directors and management, these roles are often
filled by the leaders of the SPAC's sponsor. Thus, investors in a SPAC at the IPO stage rely on
the management team that formed the sponsor to expend efforts after the IPO to identify and
acquire or combine with a private operating company.

21.     Given that the purpose of a SPAC is to identify and acquire an operating business
after conducting its IPO, a reasonable SPAC investor would want to know about the SPAC's
future acquisition targets and steps the SPAC has taken in furtherance of a particular acquisition.

22.     Generally, in a SPAC IPO, investors purchase units. A unit is a security that is
typically redeemable for one share of common stock and a fraction of a warrant. A warrant gives
the holder the right to purchase a certain number of shares of the SPAC's common stock at a
specific price on a future date.

23.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities (typically called "founder's shares") for nominal consideration at or around the time of the SPAC's formation. These founder's shares convert into the SPAC's common stock when the SPAC completes its acquisition of the private operating company, giving the sponsor a significant ownership interest (typically 20% of the common stock) in the SPAC – provided that the SPAC completes the business combination. Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO. Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash and are subject to forfeit in the event the SPAC fails to complete a business transaction. Moreover, the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

## **DEFENDANT**

24.     <u>Patrick Orlando</u>, age 52, is a resident of Miami, Florida. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC. He owns a significant percentage of, and at the time of the relevant conduct was the managing member of, DWAC's sponsor ("DWAC Sponsor"). Orlando also was the CEO and Chairman of SPAC A (*see infra* ¶ 2) and the managing member of SPAC A's sponsor until SPAC A was unwound in late October 2022. Orlando is also involved with several other SPACs. In addition, Orlando currently is (and, at the time of the relevant conduct, was) a registered representative of a broker-dealer registered with the Commission.

## **RELATED PARTIES AND ENTITIES**

25.     <u>DWAC</u>, a Delaware corporation based in Miami, Florida, was a SPAC. DWAC had no operations of its own and existed for the purpose of merging with a privately held company to, in effect, take that company public. On September 8, 2021, DWAC completed an

IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until completion of a business combination. DWAC had securities that traded on the NASDAQ Global Market under the ticker symbols DWACU (units), DWACW (warrants) and DWAC (common stock).

26.  TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. TMTG operates a social media platform. On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was subsequently amended several times. TMTG was initially named Trump Media Group, and accordingly, some documents refer to it as "TMG" instead of TMTG. TMTG closed its merger with DWAC on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT."

27.  DWAC Sponsor is a Delaware corporation based in Miami, Florida. DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares"). At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.

28.  SPAC A was a Delaware corporation with its principal place of business in Miami, Florida. SPAC A had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised). In October 2022, SPAC A dissolved and delisted its securities. Orlando was the CEO and Chairman of SPAC A and the managing member of the SPAC A sponsor during the relevant period.

29.  Investment Bank is an investment bank based in Shanghai, China that describes itself as a leading advisor in the SPAC market in the United States. Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

30.     Individual X was a DWAC Director and investor in the sponsors of both SPAC A and DWAC. Individual X held no formal management role with respect to SPAC A.

## FACTS

### A.     Orlando's Initial Interactions With TMTG

31.     TMTG was incorporated on approximately February 8, 2021. Its founders intended to use the company to create a social media platform, among other business lines. From the time of TMTG's formation, its founders intended for it to become a public company by seeking to be acquired by a SPAC.

32.     In mid-February 2021, a representative of TMTG approached Orlando regarding a potential deal between SPAC A and TMTG. About a week later, Orlando and Individual X met in person with TMTG representatives.

33.     A few weeks after the initial contact, SPAC A and TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies. The letter was then extended to last through April 5, 2021. Orlando negotiated and signed that letter on behalf of SPAC A.

34.     As the non-exclusive letter of intent neared its expiration date, TMTG and SPAC A discussed signing a mutually exclusive letter of intent. Two directors and one officer of SPAC A opposed pursuing a merger with TMTG. SPAC A ultimately did not sign that mutually exclusive letter of intent.

35.     On or about April 8, 2021, discussions between SPAC A and TMTG paused, and Orlando began exploring two plans to pursue a merger with TMTG, which he called "Plan A" and "Plan B."

36.     "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG. For example, Orlando discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.

37.     "Plan B" referred to Orlando's attempt to identify an alternative SPAC to pursue a merger with TMTG. Orlando considered several SPACs with ties to Investment Bank that could be used for "Plan B." Orlando started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs. One of SPAC A's directors invested in this effort. In a communication with Orlando, both the director and Orlando referred to this as an investment in "the Trump SPAC." That SPAC A director later became a DWAC director and, in June 2021, rolled his investment into the purchase of DWAC Sponsor shares.

38.     As part of Plan B, on April 9, 2021, a representative of Investment Bank wrote an email to Orlando stating: "DWAC could be a solution for Trump." At the time, Investment Bank had a majority interest in DWAC Sponsor (which was still pre-IPO), and Orlando had no ownership interest in DWAC Sponsor or role with DWAC. Investment Bank had worked with others to incorporate DWAC Sponsor and DWAC in December 2020.

39.     On April 14, 2021, Orlando had two meetings with representatives of TMTG. During the first meeting, Orlando told the TMTG executives that SPAC A was not available to pursue a merger with TMTG because of opposition from at least one SPAC A officer or director. Orlando then suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Orlando would try to identify another vehicle to potentially pursue a merger with TMTG.

40.     Shortly after that first meeting, TMTG representatives asked Orlando to meet them again. In that second meeting, a TMTG executive said that they could only discuss other merger options after those companies were public. Orlando acknowledged that those are "the

rules we have to play by," that they "have to be very smart," but that "obviously we can talk hypothetically about if there were another vehicle."

41.     Later that day, Orlando exchanged messages with a representative of Investment Bank and wrote, "Met with TMG today." The Investment Bank representative asked, "How was it?" Orlando replied, "Was fabulous,[. . . ] wonderful then once I left all went sideways. Better to jump on the phone and discuss. . . . I had a clear strategy – got a little complicated."

42.     On April 18, 2021, four days later, a representative of Investment Bank sent a message to Orlando and wrote, "We do Trump one way or other. Now let's sign up Trump. That's the way to get the most $$$. Anyhow, we'll figure it out. Opciones hay." The last sentence of the message roughly translates to "There are options." Orlando responded, "Yes. Done this week."

43.     Also on April 18, 2021, Orlando exchanged messages with Individual X and referred to a meeting scheduled for April 20, 2021 at the offices of TMTG's outside counsel. Individual X wrote, "We will get this done!" Orlando responded, "It is done. Just need to keep the black swan out of the picture." The "black swan" was a reference to one of the SPAC A officers who opposed a deal with TMTG.

**B.     Orlando Took Control of DWAC and Resumed Merger Discussions With TMTG**

44.     On or about April 24, 2021, Investment Bank told Orlando that he had an opportunity to obtain substantial control over DWAC. A few days later, on April 28, Orlando signed a letter of intent with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor. Orlando met with TMTG's representatives on April 29 and continued discussions with TMTG about a potential merger shortly thereafter.

45.     On May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news . . . Patrick called [TMTG's outside counsel] yesterday. . . . The LOI with our other

group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with SPAC A and a big breakup fee." The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?"

46.     On May 4, 2021, TMTG's outside counsel emailed Orlando and others a draft letter of intent that contemplated a merger between SPAC A and TMTG. That draft contained a break-up fee clause that would have held Orlando and Individual X personally liable for a $5 million fee if SPAC A did not consummate a merger agreement with TMTG. Notably, however, the draft also contained an exception: the fee would not be owed if Orlando and/or Individual X "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG]."

47.     On May 8, 2021, Orlando exchanged messages with representatives of Investment Bank. The message group name, which appears to have been coined by Orlando, was, "Get it done one way or another." Orlando shared with the message group a spreadsheet that presented different merger scenarios for TMTG and another target under consideration. One of the scenarios was "47-DWAC" and "[other target]-[SPAC A]." According to Orlando, the number "47" is a reference to TMTG. The spreadsheet listed the cons for this transaction as, "Timing, can't happen, 47 too" and listed the pros as "Great $." Orlando wrote to the group, "[O]ptimal combination is clearly [SPAC A]-[other target] or another good target and DWAC-47 . . . how do we make that happen." A representative of Investment Bank responded, "Yes absolutely, that's the best. It's just time. Get enough time to get DWAC to mkt."

48.     On May 14, 2021, Investment Bank and Orlando executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Orlando.

Orlando was appointed CEO and Chairman of DWAC around this same time. These two actions gave Orlando effective control over DWAC.

49. On the night of May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"). The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board. Both of those new DWAC directors were also SPAC A directors who had been supportive of a transaction between SPAC A and TMTG.

50. The May Form S-1 also identified a CFO for DWAC. Before being named DWAC's CFO, that person had communicated with Orlando and Individual X about TMTG in connection with SPAC A. Records of the DWAC CFO's communications suggest that he hoped to create a Latin American version of TMTG. The SPAC A directors and officer who had opposed a transaction with TMTG did not assume any role with DWAC.

51. The Form S-1 contained several statements about the state of discussions between DWAC and potential targets. For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

52. The statement described in the prior paragraph was misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with TMTG, because Orlando had been in discussions with TMTG for several months, and because Orlando had discussed Plan B with representatives of TMTG. The statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with TMTG) that had already taken steps toward accomplishing that goal.

Case 8:24-cv-01363-KKM-AEP  Document 1-5  Filed 07/10/24  Page 22 of 832 PageID 3599
Case 21-cv-02017  Document 1  Filed 07/10/24  Page 122 of 1832
PageID 3599

53.     Given the operation of the SEC's document filing system, the May Form S-1 became publicly visible on the morning of May 26, 2021.

54.     On May 26, 2021, an entity was incorporated in New Mexico. That entity entered into an agreement to invest in DWAC Sponsor on May 29, 2021. TMTG's external counsel signed that agreement as the "authorized representative" for the New Mexico entity. Orlando counter-signed this May 29 agreement.

55.     On May 30, 2021, Orlando, Individual X, DWAC's in-house counsel, one of the TMTG founders, and TMTG's external counsel met at Individual X's home to engage in "brainstorming sessions." A video of this event shows that, during the meeting, they called DWAC's CFO. In the video, Orlando thanked everyone for figuring out "how to get this done." The TMTG representative thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this."

56.     On May 31, 2021, an individual who helped raise funds for DWAC Sponsor sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TMG deal. It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." The potential investor responded and asked, "Is there any brochure ready for the TMG SPAC?" Orlando responded, "There is no TMG SPAC. There is a SPAC and I have a great relationship with TMG. I believe with extremely high confidence that TMG will [end] up in one of my SPACs. Better I explain in person."

## C.     The June 4 LOI and Break-Up Fee Clause

57.     By at least June 1, 2021, Orlando made plans with TMTG to sign a unilaterally exclusive letter of intent between SPAC A and TMTG on Friday, June 4, 2021. The June 4 LOI would prevent TMTG from negotiating with any other acquirers but would not require SPAC A

to be exclusive to TMTG. At that time, the SPAC A officer and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

58.     On June 1, 2021, Orlando communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the letter of intent signing event, texting: "I want Trump to meet the SPAC A AND DWAC team."

59.     On June 3, 2021, Individual X, who had hosted the May 30 meeting with TMTG, wrote to a TMTG representative and stated, "My apologies, but I will not be able to join this coming Friday. If you think it makes sense for [DWAC's CFO] and I to say a few words to the 47th, we will be ready and at his disposal." Individual X and the DWAC CFO had no formal role with SPAC A.

60.     On June 4, 2021, SPAC A, TMTG, and Orlando (in his personal capacity and on behalf of SPAC A) signed the unilaterally exclusive letter of intent (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.

61.     The June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and absolute discretion) and such terms are ultimately accepted by the Company." The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. The extensions collectively extended the trigger date for the Break-Up Fee Clause from

August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021.

62.     After the signing of the June 4 LOI, Orlando met with a representative of TMTG. During this meeting, they discussed, among other things, potential logos and names for the future public company.

**D.     Orlando Contemplated a DWAC Merger With TMTG**

63.     Within days of signing the June 4 LOI, Orlando communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG. On June 7, 2021, Orlando received a text from an individual who was a director for both SPAC A and DWAC, stating: "I still don't know why you are switching it out of [SPAC A] other than you will make more money. I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic." Orlando responded: "DWAC is better and will make the project clear [sic] more successful."

64.     As noted in the director's text message, Orlando stood to "make more money" if DWAC merged with TMTG than if SPAC A did because Orlando owned a substantial percentage of DWAC Sponsor, a position that was significantly larger than his ownership interest in SPAC A's sponsor.

65.     On June 7, 2021, Orlando exchanged messages with representatives of Investment Bank. Orlando wrote, "Let's make DWAC great. I gave [T]rump a [SPAC A] tombstone. I will [g]ive him a DWAC ONE THE SIZE OF A GOLF CART!!" In the financial industry, a "tombstone" is a notice that is used to formally announce a transaction, such as an IPO. At the LOI signing event on June 4, 2021, Orlando gave TMTG representatives a commemorative plaque tombstone related to SPAC A's IPO.

66.     On June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [SPAC A]. [sic] It's crazy but let me try!!"

67.     In yet another message regarding the other target company for SPAC A, Orlando explained to an Investment Bank executive, "[C]an't do a deal until earlier [of] aug 6 or another target switching SPACs." The Investment Bank executive asked, "Why the August 6[th] date? It's basically enough time to IPO DWAC, right?" Orlando replied, "Read Trump LOI." As discussed above, the June 4 LOI required Orlando to pay a $1 million Break-Up Fee if there was not a merger by August 6.

68.     On June 9, 2021, Orlando emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG at approximately $375 million.

69.     On June 11, 2021, DWAC's in-house counsel emailed Orlando and wrote, "I think the digital world logo can be a little bit more fun. Maybe we can use [TMTG representative]'s logo idea for the digital world logo and that may entice him even more to make the switch."

70.     By contrast, Orlando's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other acquisition targets.

### E. Orlando Had Discussions With TMTG About a Merger With DWAC

71.     In the spring and summer of 2021, Orlando met and talked with representatives of TMTG about a merger with DWAC.

72.     In addition to the April 14 conversation between Orlando and TMTG representatives in which Orlando acknowledged that he could not talk with TMTG about a merger involving a pre-IPO company, *see supra* ¶¶ 39-41, Orlando had an email exchange in late June with potential investors in DWAC Sponsor, in which he made similar disclaimers. One of those investors wrote that he had "discussed with Patrick a ROFR on future payment processing needs for the Trump Media Group." Orlando responded:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO. We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

73.     Despite having this understanding, Orlando had discussions with at least one TMTG representative about a potential merger with DWAC prior to DWAC's IPO.

74.     Orlando, DWAC's in-house counsel, and Individual X participated in more than 100 phone calls with representatives from TMTG and TMTG's outside counsel from the time DWAC filed the Form S-1 on May 25, 2021 through September 2, 2021, which was the day before the commencement of DWAC's IPO. Orlando told at least one TMTG representative (specifically, TMTG's outside counsel) during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

75.     During the same time, Orlando raised funds from numerous individuals who made investments in DWAC Sponsor. Orlando informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

76.     Orlando also signed "consulting agreements" with some individuals that, in addition to other terms, contemplated rewarding those individuals with shares for helping Orlando raise funds for DWAC Sponsor. On June 5, 2021, TMTG's outside attorney signed one such agreement on behalf of the New Mexico company that had been formed on May 26. *See supra* ¶ 54. This link between DWAC's sponsor and TMTG's outside attorney is further evidence that Orlando had discussed a DWAC/TMTG combination with highly placed individuals at TMTG in the spring and early summer of 2021.

77.     TMTG's outside counsel was copied on some emails from an existing DWAC investor to prospective investors. The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick's team, and [TMTG's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."

78.     On July 8, 2021, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Individual X and two other individuals as directors. Individual X had been involved with Orlando in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

79.     The July Form S-1 contained several of the same material misstatements that appeared in the May Form S-1. Orlando reviewed and signed the July Form S-1.

80.     Two days before this filing, Individual X sent a WhatsApp message to DWAC's CFO and wrote: "AVANTE! Vamos fazer historia com a DWAC + TMG," which roughly translates to "Onward! Let's make history with DWAC + TMG."

81.     Orlando travelled to TMTG's offices on July 8 and spent the entire day there.
After Orlando left, a representative of TMTG sent a message to Orlando stating, "Today was a
big day for TMG and a huge step for our team to be able to meet and spend time with you. Thank
you so much for making the trip."

82.     Individuals at TMTG were aware that Orlando hoped to use DWAC to pursue a
merger with TMTG. For example, on July 15, 2021, a TMTG executive emailed himself an
audio recording in which he made mental notes to himself, including, "For [another TMTG
executive], TMTG ticker symbol. Tell him about that. . . . The merger agreement arrived. Also
potentially flipping it to another SPAC."

83.     On August 11, 2021, DWAC's CFO sent a message to Individual X and asked,
"Tudo certo para semana que vem?", which roughly translates to "Everything OK for next
week?" Minutes after that, Individual X sent a message to a TMTG executive and wrote, "Are
we set to meet in Atlanta next week?" Individual X then called that TMTG executive and spoke
for several minutes. A few hours later, Individual X replied to DWAC's CFO and wrote, "TMG
pede para confirmar o encontro depois do IPO," which roughly translates to, "TMG is asking to
confirm the meeting after the IPO," referring to DWAC's IPO scheduled for September.

84.     On August 18, 2021, a TMTG representative emailed himself and wrote,
"Everything is lined up. Platform is weeks away. Backed by $300 million in cash. Billions of
stock. Press conference video is ready. Only thing missing is license Agreement." At the time,
TMTG was in the process of renegotiating a licensing agreement. Also, at the time, SPAC A had
approximately $115 million in its trust account. As mentioned above, DWAC had filed a Form
S-1/A on July 8, 2021 announcing that it planned to do a $300 million IPO.

85.     On August 28, 2021, Orlando received a text from a DWAC representative that
read, "Talked to [TMTG's outside counsel]. TMTG wants to announce soon so if it's plan B,

they're going to push hard for relative immediate announcement. I told them we'd need a month.

Probably gonna settle at 2-3 weeks."

**F.      DWAC's Form S-1 Contained Material Misrepresentations**

86.      On August 31, 2021, three days prior to the commencement of its IPO, DWAC

filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed and signed. The

Final Form S-1 contained several material misrepresentations about discussions between DWAC

and potential targets, including the following:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

87.      The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

88.      The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such

20

target business, or the benefits of any potential transaction with such target business, would be attractive.

89.     Certain statements in the preceding paragraphs were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with TMTG; (b) Orlando told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC to complete a merger with TMTG; (c) it appears that TMTG's outside attorney was being paid to find investors for DWAC's sponsor in June 2021; (d) the discussions between SPAC A and TMTG had ceased before DWAC's IPO; and (e) Orlando and others at DWAC had selected TMTG as DWAC's preferred target prior to its IPO.

90.     The misstatements described above were material to investors because SPAC investors base their investment decisions on a SPAC's disclosures about discussions with potential targets. This information is particularly important because the purpose of a SPAC is to identify and acquire an operating business.

91.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

92.     DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described above.

## G.     DWAC's Post-IPO Negotiations With TMTG

93.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement. On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement. TMTG's outside counsel

emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent the next day. Two days later, on September 15, 2021, DWAC began coordinating an in-person event to sign the letter of intent on September 22, 2021 and started discussing TMTG's hope to do a press announcement by the end of September 2021. On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

94.    On September 21, 2021, DWAC's Board (including Orlando) met and voted to "follow up/negotiate and execute LOIs with TMG" and two other purported potential targets (one of which was "Target B"). As mentioned above, DWAC in-house counsel, working with Orlando, was already in the process of negotiating a letter of intent with TMTG and had already scheduled a signing event, a fact that Orlando knew.

95.    DWAC representatives had previously sent Target B an NDA on September 8, 2021. A representative of Target B responded on September 9 and wrote: "Given [Target B's] transaction objectives and timing of requested indications of interest next week, it may make sense for our team to reach out to you with any future opportunities that arise rather than this particular target." DWAC later disclosed this fact in its Form S-4 filed February 14, 2024, which stated:

> DWAC sent an NDA to Target B, an American pet care company that offers a technology platform to enable on-demand and scheduled dog-walking, training, and other pet care related services. However, Target B informed Digital World that it was in advanced discussions with other groups and did not want to pursue separate SPAC discussions with Digital World at that time.

96.    The discussions about Target B at the September 21 board meeting appear to have been pretextual because Target B was not, in fact, an acquisition option for DWAC.

97.    During the September 21 board meeting, DWAC's directors also purportedly discussed the merits of four other potential merger targets. One of those targets was "Target G."

DWAC sent Target G an NDA on September 8, 2021. A representative of Target G responded on September 9: "We're currently under exclusivity with a potential buyer for [Target G]. We'll reach out if the situation changes." In its February 14, 2024 Form S-4, DWAC disclosed: "Target G, a defense contractor and arms manufacturer, was sent an NDA; however, Digital World was informed that Target G was under exclusivity with another SPAC at the time and could not engage in conversations until after that exclusivity period expired."

98.     The discussions about Target G at the September 21 board meeting appear to have been pretextual because Target G was not, in fact, an acquisition option for DWAC.

99.     A third potential "target" discussed at the September 21 board meeting was "Target I." Target I did not even sign an NDA with DWAC until the evening of September 21.

100.    On September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with TMTG. That same day, Orlando met with representatives from TMTG and signed a mutually exclusive letter of intent between DWAC and TMTG. Also on that same day, Orlando (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause under the June 4 LOI. That letter was backdated to be effective as of September 1, 2021.

101.    On October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with TMTG. DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market close that day. DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on EDGAR at approximately 6 a.m. on October 21, 2021.

102.    DWAC's common stock closed at $9.96 on October 20, 2021. On October 21, 2021, it closed at $45.50, up more than 400% from the prior day's closing price.

103.    On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG. DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts. For example, DWAC's Form S-4:

     a.   Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.

     b.   Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. As discussed above in detail, Orlando had numerous interactions with TMTG prior to DWAC's IPO. DWAC also did not disclose that Orlando assumed control of DWAC in spring 2021 envisioning it as a potential vehicle to close a deal with TMTG or that Orlando told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

104.    On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing a civil penalty of $18 million. The settlement also imposed an undertaking on DWAC, requiring any amended Form S-4 to be materially complete, accurate, and consistent with the findings in the Commission's order. On November 23, 2023, pursuant to the undertaking, DWAC filed an amended Form S-4 incorporating many of the Commission's findings.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder

105. The Commission realleges and incorporates by reference paragraphs 1 through 104, as though fully set forth herein.

106. By engaging in the conduct described above, Patrick Orlando, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or recklessly (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

107. In the spring of 2021, Orlando engaged in deceptive conduct that would allow him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of merging with TMTG. That conduct included, but was not limited to, the following: (1) he discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG; and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary conversations with potential "target" companies in September 2021 without any intention of moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

selected a merger target and had not engaged in discussions with potential targets. Orlando

carried out this deceptive course of business as part of a scheme to allow him to reap the

financial benefit of the DWAC merger and avoid opposition from the SPAC A directors.

Orlando's scheme continued through the spring of 2022, when he continued to mislead investors

through false statements and omissions in the Form S-4, which he signed.

108.     While engaging in the conduct described above, Orlando acted knowingly or

recklessly.

109.     By reason of the conduct described above, Orlando, directly or indirectly, violated

and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**

110.     The Commission realleges and incorporates by reference paragraphs 1 through

104, as though fully set forth herein.

111.     By engaging in the conduct described above, Orlando, directly or indirectly, in

connection with the offer or sale of securities, by the use of means or instrumentalities of

interstate commerce, or of the mails, directly or indirectly: (i) employed devices, schemes, or

artifices to defraud; (ii) obtained money or property by means of any untrue statement of

material fact or any omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and/or (iii)

engaged in transactions, practices, or courses of business that operated or would operate as a

fraud or deceit upon the purchaser.

112.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow

him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of

Case 8:24-cv-02097   Document 1   Filed 09/24/24   Page 27 of 136
PageID 3613
Case 8:21-cv-02997   Document 1   Filed 07/09/24   Page 27 of 32
PageID 3613

merging with TMTG. That conduct included, but was not limited to, the following: (1) he discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG; and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary conversations with potential "target" companies in September 2021 without any intention of moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed multiple public filings that falsely stated, among other misrepresentations, that DWAC had not selected a merger target and had not engaged in discussions with potential targets. Orlando carried out this deceptive course of business as part of a scheme to allow him to reap the financial benefit of the DWAC merger and avoid opposition from the SPAC A directors. Orlando's scheme continued through the spring of 2022, when he continued to mislead investors through false statements and omissions in the Form S-4, which he signed.

113.    While engaging in the conduct described above, Orlando acted knowingly, recklessly, or negligently.

114.    By reason of the conduct described above, Orlando, directly or indirectly, violated and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

**I.**

Enter a Final Judgment permanently restraining and enjoining Defendant and his agents,

Case 8:24-cv-02049   Document 1   Filed 07/09/24   Page 28 of 33
PageID 3614
Case 8:21-cv-02997   Document 1   Filed 07/09/24   Page 137 of 1832

servants, employees and attorneys, and those persons in active concert or participation with him

who receive actual notice of the injunction by personal service or otherwise, and each of them,

from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter a Final Judgment directing Defendant to disgorge, with prejudgment interest, all

illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged

in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15

U.S.C. § 78u(d)(3), (d)(5), and (d)(7)].

## III.

Enter a Final Judgment directing Defendant to pay a civil monetary penalty pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) of the Exchange

Act [15 U.S.C. §§ 78u(d)(3)].

## IV.

Enter a Final Judgment permanently barring Defendant from acting as an officer or

director of any issuer that has a class of securities registered pursuant to Section 12 of the

Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the

Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. §

77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Grant such other and further relief as this Court may deem equitable and just.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.


Dated: July 17, 2024                                    Respectfully submitted,

                                                        By: */s/ John B. Timmer*
                                                        John B. Timmer (D.C. Bar No. 997309)
                                                        Andrew McFall (D.C. Bar No. 497878)
                                                        Securities and Exchange Commission
                                                        100 F Street NE
                                                        Washington, DC 20549
                                                        (202) 551-7687 (Timmer)
                                                        (202) 551-5538 (McFall)
                                                        Email: TimmerJ@SEC.gov
                                                        Email: McFallA@SEC.gov

                                                        *Attorneys for the Plaintiff*

Of Counsel

Lindsay S. Moilanen

JS-44 (Rev. 11/2020 DC)
## CIVIL COVER SHEET

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Securities and Exchange Commission | Patrick Orlando |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
John B. Timmer, Andrew McFall
Securities and Exchange Commission
100 F Street NE, Washington, DC 20549
202-551-7687

ATTORNEYS (IF KNOWN)
Adam L. Schwartz, Brooke E. Conner, Vedder Price P.C.
600 Brickell Ave, Suite 1500, Miami, FL 33131

Hartley M.K. West, Anthony S. Kelly, Dechert LLP
45 Fremont St, 26th Floor, San Francisco, CA 94105

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

- ⦿ 1 U.S. Government Plaintiff
- ◯ 3 Federal Question (U.S. Government Not a Party)
- ◯ 2 U.S. Government Defendant
- ◯ 4 Diversity (Indicate Citizenship of Parties in item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◯ 1 | ◯ 1 | Incorporated or Principal Place of Business in This State | ◯ 4 | ◯ 4 |
| Citizen of Another State | ◯ 2 | ◯ 2 | Incorporated and Principal Place of Business in Another State | ◯ 5 | ◯ 5 |
| Citizen or Subject of a Foreign Country | ◯ 3 | ◯ 3 | Foreign Nation | ◯ 6 | ◯ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place an X in one category, A-N, that best represents your Cause of Action and one in a corresponding Nature of Suit)**

◯ **A. Antitrust**
- ☐ 410 Antitrust

◯ **B. Personal Injury/ Malpractice**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Product Liability

◯ **C. Administrative Agency Review**
- ☐ 151 Medicare Act

Social Security
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

◯ **D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

⦿ **E. General Civil (Other)** OR ◯ **F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Conditions
- ☐ 560 Civil Detainee – Conditions of Confinement

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016 (DTSA)

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant)
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

Other Statutes
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc
- ☐ 460 Deportation
- ☐ 462 Naturalization Application

- ☐ 465 Other Immigration Actions
- ☐ 470 Racketeer Influenced & Corrupt Organization
- ☐ 480 Consumer Credit
- ☐ 485 Telephone Consumer Protection Act (TCPA)
- ☐ 490 Cable/Satellite TV
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/Privacy Act* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus – General<br>☐ 510 Motion/Vacate Sentence<br>☐ 463 Habeas Corpus – Alien Detainee | ☐ 442 Civil Rights – Employment (criteria: race, gender/sex, national origin, discrimination, disability, age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loan (excluding veterans) |
| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 740 Labor Railway Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 440 Other Civil Rights<br>☐ 445 Americans w/Disabilities – Employment<br>☐ 446 Americans w/Disabilities – Other<br>☐ 448 Education | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights – Voting (if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi-district Litigation  ○ 7 Appeal to District Judge from Mag. Judge  ○ 8 Multi-district Litigation – Direct File

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
Securities Fraud - 15 U.S.C. 78j(b) and 17 C.F.R. 240.10b-5 thereunder, 15 U.S.C. 77q(a)

| VII. REQUESTED IN COMPLAINT | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $<br>JURY DEMAND: | Check YES only if demanded in complaint<br>YES ☒  NO ☐ |
|---|---|---|---|
| VIII. RELATED CASE(S) IF ANY | (See instruction) | YES ☐  NO ☒ | If yes, please complete related case form |

DATE: _____ 7/17/2024 _____  SIGNATURE OF ATTORNEY OF RECORD _____ /s/ John B. Timmer _____

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
**Authority for Civil Cover Sheet**

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and services of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the cover sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff if resident of Washington, DC, 88888 if plaintiff is resident of United States but not Washington, DC, and 99999 if plaintiff is outside the United States.

III.     CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.     CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of the case.

VI.     CAUSE OF ACTION: Cite the U.S. Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.     RELATED CASE(S), IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

Case 8:24-cv-02097   Document 1-5   Filed 07/09/24   Page 141 of 1832
Case 1:24-cv-02097   Document 1-2-5   Filed 07/09/24   Page 141 of
PageID 3618

AO 440 (Rev. 06/12; DC 3/15)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

### District of Columbia  ▼

| | |
|---|---|
| Securities and Exchange Commission | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| Patrick Orlando | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | ) |

Civil Action No.  1:24-CV-2097

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   Patrick Orlando
c/o
Adam L. Schwartz
VedderPrice LLP
600 Brickell Avenue, Suite 1500
Miami, FL 33131

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are: John B. Timmer
Securities and Exchange Commission
100 F Street NE
Washington, D.C. 20549
timmerj@sec.gov
202-551-7687

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*ANGELA D. CAESAR, CLERK OF COURT*

Date:  _____          _____
                                                                          *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.  1:24-CV-2097

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                            *Server's signature*

                                                        _____
                                                            *Printed name and title*


                                                        _____
                                                            *Server's address*

Additional information regarding attempted service, etc:

# EXHIBIT  3

S-1 1 tm2117087d1_s1.htm FORM S-1

**As filed with the U.S. Securities and Exchange Commission on May 25, 2021**

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# Digital World Acquisition Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 6770 | 85-4293042 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Patrick Orlando**
**Chairman and Chief Executive Officer**
**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

*Copies to:*

| | |
|---|---|
| **Barry I. Grossman, Esq.** | **Mitchell S. Nussbaum, Esq.** |
| **Wei Wang, Esq.** | **David J. Levine, Esq.** |
| **Ellenoff Grossman & Schole LLP** | **Loeb & Loeb LLP** |
| **1345 Avenue of the Americas** | **345 Park Avenue** |
| **New York, New York 10105** | **New York, New York 10154** |
| **Telephone: (212) 370-1300** | **Telephone: (212) 407-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | Large accelerated filer | ☐ | Accelerated filer | ☐ |
| | Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security[1] | Proposed Maximum Aggregate Offering Price[1] | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value, one-half of one redeemable warrant and a right entitling the holder to receive one-tenth of one share of Class A common stock[2] | 11,500,000 Units | $ 10.00 | $ 115,000,000 | $ 12,547 |
| Shares of Class A common stock included as part of the units[3] | 11,500,000 Shares | — | — | —[4] |
| Rights included as part of the units[2] | 11,500,000 Rights | | | |
| Shares of Class A common stock underlying rights included as part of the units | 1,150,000 Shares | $ 10.00 | $ 11,500,000 | 1,255 |
| Redeemable warrants included as part of the units[3] | 5,750,000 Warrants | — | — | —[4] |
| Total | | | $ 126,500,000 | $ 13,802 |

(1) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended (the "Securities Act").

(2) Includes 1,500,000 units, consisting of 1,500,000 shares of Class A common stock, 1,500,000 rights and 750,000 redeemable warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3) Pursuant to Rule 416, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4) No fee pursuant to Rule 457(g).

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                                **SUBJECT TO COMPLETION, DATED MAY 25, 2021**

**$100,000,000**
**Digital World Acquisition Corp.**
**10,000,000 Units**

Digital World Acquisition Corp. is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination throughout this prospectus. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we may pursue an initial business combination target in any business or industry, we intend to focus our search on middle-market emerging growth technology-focused companies in the Americas, in the SaaS and Technology or Fintech and Financial Services sector.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock, one-half of one redeemable warrant and one right as described in more detail in this prospectus. Only whole warrants are exercisable. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination. The underwriters have a 45-day option from the date of this prospectus to purchase up to an additional 1,500,000 units to cover over-allotments, if any.

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination, subject to the limitations described herein. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares for cash, subject to applicable law and certain conditions as further described herein.

Our sponsor, ARC Global Investments II LLC, has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriter's over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250 if the over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units will be sold in a private placement that will close simultaneously with the closing of this offering.

Our initial stockholders own an aggregate of 2,875,000 shares of our Class B common stock (up to 375,000 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised), which will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein.

Currently, there is no public market for our units, Class A common stock, warrants or rights. We intend to apply to have our units listed on The Nasdaq Capital Market, or Nasdaq, under the symbol "DWACU". We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless Kingswood Capital Markets, division of Benchmark Investments (the "representative") informs us of its decision to allow earlier separate trading, subject to our satisfaction of certain conditions. Once the securities comprising the units begin separate trading, we expect that the Class A common stock, warrants and rights will be listed on Nasdaq under the symbols "DWAC", "DWACW", and "DWACR," respectively.

1

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| | Per Unit | Total |
|---|---|---|
| Public offering price | $ 10.00 | $ 100,000,000 |
| Underwriting discounts and commissions[1] | $ 0.475 | $ 4,750,000 |
| Proceeds, before expenses, to Digital World Acquisition Corp. | $ 9.525 | $ 95,250,000 |

(1) Includes $0.35 per unit, or $3,500,000 (or $4,025,000 if the over-allotment option is exercised in full) in the aggregate, payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative of the underwriters only on completion of an initial business combination, as described in this prospectus. Does not include certain fees and expenses payable to the underwriters in connection with this offering. In addition, designees of the representative of the underwriters will receive a fee equal to 0.5% of the gross proceeds payable in shares of Class A Common Stock at the public offering price of $10.00 per share. See the section of this prospectus entitled "Underwriting" beginning on page 154 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the placement units described in this prospectus, $100,500,000 or $115,575,000 if the underwriters' over-allotment option is exercised in full ($10.05 per unit in either case) will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about                    , 2021.

Sole Book-Running Manager

# KINGSWOOD CAPITAL MARKETS

division of Benchmark Investments, Inc.

, 2021

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 70 |
| Use of Proceeds | 71 |
| Dividend Policy | 75 |
| Dilution | 75 |
| Capitalization | 78 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
| Proposed Business | 85 |
| Management | 113 |
| Principal Stockholders | 121 |
| Certain Relationships and Related Party Transactions | 123 |
| Description of Securities | 126 |
| United States Federal Income Tax Considerations | 144 |
| Underwriting | 154 |
| Legal Matters | 164 |
| Experts | 164 |
| Where You Can Find Additional Information | 164 |
| Index to Financial Statements | F-1 |

We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.

This prospectus includes estimates regarding market and industry data and forecasts which are based on publicly available information, industry reports and publications, reports from government agencies and management's estimates based on third-party data. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable. The third-party industry sources referenced in this prospectus include, among others, EY Global and Deal Logic. We have not independently verified such third-party information, nor have we ascertained the underlying economic assumptions relied upon in those sources, and we cannot assure you of the accuracy or completeness of such information contained in this prospectus. Such data involve risks and uncertainties and is subject to change based on various factors, see "Risk Factors".

This prospectus contains trademarks, service marks and trade names of other companies which are the property of their respective owners. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;*

- *"initial stockholders" are to our sponsor and any other holders of our founder shares (including the holders of the representative shares) prior to this offering (or their permitted transferees);*

- *"management" or our "management team" are to our officers and directors;*

- *"placement units" are to the units being purchased by our sponsor, with each placement unit consisting of one placement share, one-half of one placement warrant and one placement right;*

- *"placement shares" are to the shares of our common stock included within the placement units being purchased by our sponsor in the private placement;*

- *"placement rights" are to the rights included within the placement units being purchased by our sponsor in the private placement;*

- *"placement warrants" are to the warrants included within the placement units being purchased by our sponsor in the private placement;*

- *"private placement" are to the private placement of 306,275 placement units (up to 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 (up to $3,325,250 if the underwriters' over-allotment option is exercised in full), which will occur simultaneously with the completion of this offering;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"public rights" are to the rights sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public warrants" are to our redeemable warrants sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market, including warrants that may be acquired by our sponsor or its affiliates in this offering or thereafter in the open market);*

- *"representative" are to Kingswood Capital Markets, division of Benchmark Investments, Inc., who is the representative of the underwriters in this offering;*

1

- "representative shares" are the 50,000 shares of our Class A common stock issuable to the representative and/or its designees at the closing of this offering (or 57,500 shares if the underwriters' over-allotment option is exercised in full);

- "rights" are to our rights, which include the public rights as well as the placement rights;

- "sponsor" are to ARC Global Investments II LLC, a Delaware limited liability company;

- "underwriters" are to the underwriters of this offering, for which the representative is acting as representative;

- "warrants" are to our redeemable warrants, which includes the public warrants as well as the placement warrants and any warrants sold as part of the placement units issued upon conversion of working capital loans; and

- "we," "us," "company" or "our company" are to Digital World Acquisition Corp.

Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.

2

## General

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services

## Our Management Team

Our management team is led by Mr. Patrick Orlando, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as Executive, Sponsor and Director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021. Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

***Our CFO***, *Mr. Luis Orleans-Braganza* is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

3

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 18-5    Filed 09/12/24    Page 153 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3630

### Our directors and director nominees

*Eric Swider,* our director nominee, has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Justin Shaner,* our director nominee, founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

*Lee Jacobson,* our director, is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997.

4

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in Fintech and Financial Services or SaaS and Technology. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled , industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- ***Established Deal Sourcing Network.*** We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor, have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

5

- **_Status as a Publicly Listed Acquisition Company_**. We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

## Industry Opportunity

While we may acquire a business in any industry, our focus will be middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We believe that our target industries are attractive for a number of reasons:

### _SaaS and Technology_

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. This is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

### _FinTech and Financial Services_

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

6

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join with us, as we believe they have fewer exit options than presently exist for unicorns.

**Acquisition Criteria**

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- ***Target Size***: Consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services

- ***Businesses with Revenue and Earnings Growth Potential.*** We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.

- ***Businesses with Potential for Strong Free Cash Flow Generation.*** We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.

- ***Strong Management.*** We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.

- ***Benefit from Being a Public Company.*** We intend to acquire one or more businesses that will benefit from being publicly-traded and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- ***Defensible Market Position.*** We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

**Initial Business Combination**

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

7

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 157 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3634

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

8

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Sourcing of Potential Initial Business Combination Targets**

Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have developed a wide network of professional services contacts and business relationships in that industry. The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and bring additional relationships that further broaden our industry network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

9

**Corporate Information**

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130, and our telephone number is (305) 735-1517.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company will have the meaning associated with it in the JOBS Act. Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

## THE OFFERING

*In deciding whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

Securities offered                10,000,000 units (or 11,500,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of:

- one share of Class A common stock; and

- one-half of one redeemable warrant; and

- one right to receive one-tenth (1/10) of one share of Class A common stock upon the consummation of our initial business combination.

10

| | |
|---|---|
| Proposed Nasdaq symbols | Units: "DWACU" |
| | Class A Common Stock: "DWAC" |
| | Warrants: "DWACW" |
| | Rights: "DWACR" |
| Trading commencement and separation of Class A common stock, warrants and rights | The units will begin trading on or promptly after the date of this prospectus. We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock, warrants and rights commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock, warrants and rights. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. |
| Separate trading of the Class A common stock, warrants and rights is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock, warrants and rights be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

**Units:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 0 |
| Number or placement units to be sold in a private placement simultaneously with this offering | 306,275 [1] |
| Number outstanding after this offering and the private placement | 10,306,275 [1] |

**Common stock:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 2,875,000 shares of Class B common stock[2] |

7/21/24, 4:51 PM    Case 8:24-cv-02161-KKM-AEP    Document 8d.qec195v/Archives/edga/data/1849635/00011046592d.G79d592ar119M87f.dm2d7Page_161nof 1832

https://www.sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

PageID 3638

| | |
|---|---|
| Number outstanding after this offering and the private placement | 12,856,275 shares of Class A common stock and Class B common stock[1][3] |

**Rights:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 0 |
| Number outstanding after this offering and the private placement | 10,306,275 [1] |

**Warrants:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 0 |
| Number of warrants to be outstanding after this offering and the private placement | 5,153,138 [1] |
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock, subject to adjustment as provided herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade and are exercisable. |
| | We structured each unit to contain one-half of one redeemable warrant, with each whole warrant exercisable for one share of Class A common stock, as compared to units issued by some other similar special purpose acquisition companies which contain whole warrants exercisable for one whole share, in order to reduce the dilutive effect of the warrants upon completion of an initial business combination as compared to units that each contain a whole warrant to purchase one whole share, thus making us, we believe, a more attractive initial business combination partner for target businesses. |

(1)    Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 375,000 founder shares. Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) for an aggregate purchase price of $3,062,750 ($3,325,250 if the underwriters' over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units are not subject to forfeiture but will be subject to transfer restrictions as described in "Principal Stockholders — Transfers of Founder Shares and Placement Units".

(2)    Includes 2,875,000 founder shares of which an aggregate of up to 375,000 shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)    Comprised of 10,306,275 shares of Class A common stock (including 306,275 placement shares), 2,500,000 shares of Class B common stock (or founder shares) and 50,000 representative shares (57,500 representative shares if the underwriters' over-allotment option is exercised in full). The Class B common stock is convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution rights."

| Exercise price | $11.50 per share, subject to adjustment as described herein. In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Class A common stock during the 20 trading day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described below under "Redemption of warrants" will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. |
|---|---|
| Exercise period | The warrants will become exercisable on the later of: |

- 30 days after the completion of our initial business combination, and

- 12 months from the closing of this offering;

provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis.

13

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation.  On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants

Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the placement warrants):

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing after the warrants become exercisable and ending on the third trading day before we send the notice of redemption to the warrant holders.

We will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of Class A common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of Class A common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

14

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants.

Please see the section of this prospectus entitled "Description of Securities — Redeemable Warrants — Public Stockholders' Warrants" for additional information.

None of the placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

|  |  |
|---|---|
| Terms of Rights | Each holder of a right will receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination. In the event we will not be the survivor upon completion of our initial business combination, each holder of a right will be required to affirmatively convert his, her or its rights in order to receive the 1/10 share underlying each right (without paying any additional consideration) upon consummation of the business combination. If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, holders of rights will not receive any of such funds for their rights and the rights will expire worthless. No fractional shares will be issued upon conversion of any rights. As a result, you must have 10 rights to receive one share of Class A common stock at the closing of the business combination. |
| Founder shares | On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our independent director and director nominees. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). As such, our initial stockholders will collectively own approximately 21.8% of our issued and outstanding shares after this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Neither our sponsor nor any of our officers, directors or director nominees have expressed an intention to purchase any units in this offering. Up to 375,000 founder shares held by our sponsor will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering (excluding the representative shares and the placement units |

and underlying securities). We will effect a stock dividend or share contribution prior to this offering should the size of the offering change, in order to maintain such ownership percentage.

15

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

- our sponsor, officers and directors have entered, and we anticipate our director nominees will enter, into a letter agreement with us, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

16

- pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. As a result, in the event that only the minimum number of shares representing a quorum is present at a stockholders' meeting held to vote on our initial business combination, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction); and

- the founder shares are entitled to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). Any permitted transferees will be subject to the same restrictions and other agreements of our initial stockholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the lock-up. |
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (excluding the representative shares and the placement units and underlying securities) plus all |

shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of working capital loans made to us). The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities.

17

| | |
|---|---|
| Voting Rights | Holders of record of the Class A common stock and holders of record of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, with each share of common stock entitling the holder to one vote, except as required by law. |
| Placement units | Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250) if the underwriters' over-allotment option is exercised in full). Each placement unit is identical to the units offered by this prospectus except as described below. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares, placement warrants or placement rights, which will expire worthless if we do not consummate a business combination within 18 months from the closing of this offering. Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares or placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto, to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the completion of this offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) if we fail to consummate a business combination within 18 months from the completion of this offering or if we liquidate prior to the expiration of the 18-month period. However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 18-month period. |
| Transfer restrictions on placement units | The placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees. |

18

| | |
|---|---|
| Redeemability and exercise of placement warrants | The placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by our sponsor or its permitted transferees. If the placement warrants are held by someone other than our sponsor or its permitted transferees, the placement warrants will be redeemable by us and exercisable by such holders on the same basis as the warrants included in the units being sold in this offering. If holders of placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following an initial business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. |
| | Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| Accounting Treatment | Due to certain provisions contained in our warrant agreement, both the public warrants and the placement warrants will be treated as a derivative liability and, upon the issuance of such warrants, we will be required to record the fair value of each warrant as a liability in accordance with the guidance contained in ASC 815-40. As a result, for each reporting period, we will be required to determine the fair value of each warrant and record the change in the value of the warrants from the prior reporting period as a gain or a loss on our income statement, which will change the value of the liability for the warrants on our balance sheet. |
| Representative shares | Upon the closing of this offering, we will issue to the representative and/or its designee 50,000 shares of Class A common stock (57,500 shares of Class A common stock if the underwriters' over-allotment option is exercised in full). The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 18 months from the closing of this offering. The representative shares are deemed to be underwriters' compensation by FINRA pursuant to FINRA Rule 5110. |
| Proceeds to be held in trust account | Nasdaq rules provide that at least 90% of the gross proceeds from this offering and the sale of the placement units be deposited in a trust account. Of the net proceeds of this offering and the sale of the placement units, $100,500,000, or $10.05 per unit ($115,575,000, or $10.05 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee. |

These proceeds include $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions.

19

| | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units held in the trust account will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 18 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $200,000 of pre-tax interest annually assuming an interest rate of 0.2% per year; however, we can provide no assurances regarding this amount. |

Unless and until we complete our initial business combination, we may pay our expenses only from:

- the net proceeds of this offering and the sale of the placement units not held in the trust account, which will be approximately $650,000 in working capital after the payment of approximately $662,750 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of an initial business combination.

20

| Conditions to completing our initial business combination | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination target, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination target, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. There is no limitation on our ability to raise funds privately, or through loans in connection with our initial business combination. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

We anticipate structuring our initial business combination either (i) in such a way so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses, or (ii) in such a way so that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders, or for other reasons. However, we will only complete an initial business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act.

Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. |

| | In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be taken into account for purposes of Nasdaq's 80% fair market value test. If the initial business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the transactions and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |
|---|---|
| Permitted purchases of public shares and public warrants by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares or warrants our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, apart from the purchase of the placement units, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements. |

None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination. See "Proposed Business — Permitted purchases of our securities" for a description of how our sponsor, initial stockholders, directors, officers or any of their affiliates will select which stockholders to purchase securities from in any private transaction.

22

| | |
|---|---|
| | The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange. |
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.05 per public share, however, there is no guarantee that investors will receive $10.05 per share upon redemption. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants or rights. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and placement shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our initial business combination or otherwise. |

23

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 18-5   Filed 09/13/24   Page 176 of 1832
PageID 3653
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed initial business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Under Nasdaq rules, asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would typically require stockholder approval. We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. So long as we obtain and maintain a listing for our securities on Nasdaq, we will be required to comply with Nasdaq's stockholder approval rules. |
|---|---|

If stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of our outstanding shares of common stock representing a majority of the voting power of all outstanding shares of our common stock entitled to vote at such meeting. Our initial stockholders will count towards this quorum and, pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares acquired by them during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795 or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, and that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction).

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 177 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3654

We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, officers and directors, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Whether or not we maintain our registration under the Exchange Act or our

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 181 of 1832
PageID 3658
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 182 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3659

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 185 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3662

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 186 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3663

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 188 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3665

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 189 of 1832
PageID 3666
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 192 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3669

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 193 of 1832
PageID 3670
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 194 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3671

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 195 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/...
PageID 3672

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 196 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3673

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 198 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3675

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 199 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3676

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 200 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3677

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 201 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3678

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 202 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3679

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 204 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3681

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 207 of 1832
PageID 3684
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 209 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3686

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 211 of 1832
PageID 3688
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm211...

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 212 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3689

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 18-5    Filed 09/12/24    Page 214 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3691

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 18-5   Filed 09/12/24   Page 216 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3693

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 217 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3694

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 218 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3695

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 200 of 1832
PageID 3697
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 221 of 1832
PageID 3698
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 222 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3699

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/13/24    Page 223 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3700

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 225 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/...m211...2125...
PageID 3702

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 230 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3707

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 231 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3708

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 232 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3709

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 234 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3711

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 235 of 1832 sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

PageID 3712

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 238 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3715

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 239 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3716

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 240 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3717

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 241 of 1832
PageID 3718
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 18-5   Filed 09/12/24   Page 243 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3720

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 244 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3721

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 247 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3724

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 19-5   Filed 09/12/24   Page 248 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3725

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 249 of 1832
PageID 3726
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 250 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3727

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 251 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3728

7/21/24, 4:51 PM                    Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 252 of 1832
                                                     sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
                                                                          PageID 3729

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 255 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3732

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 256 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3733

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 257 of 1832
PageID 3734
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 258 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3735

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 259 of 1832
PageID 3736
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 260 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3737

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 267 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3744

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 271 of 1832
PageID 3748
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 274 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3751

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 276 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3753

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 277 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3754

7/21/24, 4:51 PM — Case 8:24-cv-02161-KKM-AEP — sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm — Document 81-5 — Filed 09/12/24 — Page 278 of 1832

PageID 3755

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 280 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3757

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 281 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm211...
PageID 3758

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 282 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3759

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 283 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3760

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 284 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3761

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 287 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3764

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 291 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3768

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 292 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3769

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 293 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3770

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 294 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3771

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 295 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3772

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 296 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3773

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 297 of 1832
PageID 3774
sec.gov/Archives/edgar/data/1849635/000111046592107198...m211.htm

sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 299 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3776

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 301 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3778

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 302 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3779

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 303 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3780

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 306 of 1832
PageID 3783
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 308 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3785

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 309 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3786

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 310 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3787

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 311 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3788

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 312 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3789

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 314 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3791

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 315 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3792

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 316 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/...m211...1.htm
PageID 3793

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 317 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3794

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP  Document 81-5  Filed 09/13/24  Page 319 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3796

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 321 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3798

7/21/24, 4:51 PM    Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 322 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3799

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 324 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3801

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 326 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3803

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP
Document 81-5
Filed 09/12/24
Page 328 of 1832
PageID 3805

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 329 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3806

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 330 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3807

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 333 of 1832
PageID 3810
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 334 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3811

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 336 of 1832
PageID 3813
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 337 of 1832
PageID 3814
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 338 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3815

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 340 of 1832
PageID 3817
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 341 of 1832
PageID 3818
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 342 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3819

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 344 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3821

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 348 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/...
PageID 3825

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 349 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3826

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 352 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3829

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 353 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3830

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 355 of 1832
PageID 3832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 357 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3834

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 358 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3835

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 359 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3836

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 360 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3837

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 361 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3838

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 363 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 3840



**DISTRICT COURT OF APPEAL OF FLORIDA, SECOND DISTRICT**
1700 N. Tampa Street, Suite 300
Tampa, FL 33602
(727) 610-3741

## AMENDED ACKNOWLEDGEMENT OF NEW CASE
August 1, 2024

ARC GLOBAL INVESTMENTS, II, LLC, AND            CASE NUMBER:
PATRICK ORLANDO,                                2D2024-1780
        APPELLANT(S)
V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
        APPELLEE(S).

The Second District Court of Appeal has received a case initiation document reflecting a filing date of July 30, 2024.  The county of origin is Sarasota County.

The lower tribunal case number is 2024CA-001061.

The filing fee is: Fee Paid Through Portal

Case Type: NOA Non Final - Circuit Civil - Other.

The Second District Court of Appeal's case number must be used on all pleadings filed in this case.

Please review and comply with any handouts enclosed with this acknowledgement letter.

LS

cc:
JODY A. ARENAS STAFFORD
SARASOTA CLERK
ANDREW THOMAS FIGUEROA
JASON BRENT GONZALEZ
MATHEW DANIEL GUTIERREZ
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
CHRISTOPHER KING
CHRISTOPHER GEORGE OPRISON
SAMUEL JOSEPH SALARIO, JR.
ADAM LOUIS SCHWARTZ
RAYMOND FREDERICK TREADWELL
ANDREW VITALI, III

IN THE DISTRICT COURT OF APPEAL IN AND FOR THE STATE OF FLORIDA
SECOND DISTRICT

## NOTICE TO ATTORNEYS AND PARTIES

The substantial case load of this court together with the orderly and timely movement of appeals requires strict compliance with the appellate rules. The following items are brought to your attention for easy reference.

### 1. Critical Time Requirements for Appeals from Final Orders

(a) Appellant's initial brief is due 70 days from the notice of appeal in civil appeals; 30 days from the later of transmission of the record or designation of appointed counsel in criminal appeals; and 30 days from the notice of appeal in summary postconviction appeals for the optional brief.

(b) A party has 15 days to voluntarily respond to an opponent's motion.

### 2. Extensions of Time

Good cause must be shown. File before the applicable deadline. Failure to comply may subject the appeal to dismissal or result in sanctions. Specify the expiration day of the requested extension. Pursuant to rule 9.300, attorneys must include a certificate that opposing counsel has been consulted and either has no objection or will promptly file an objection.

### RELATED CASES

All attorneys and self-represented parties shall advise this court of related cases currently pending or recently decided by this court. Fla. R. App. P. 9.380. File a separate "Notice of Related Cases" within seven days of receipt of the acknowledgement letter. A form is provided in rule 9.900(k). This includes appeals or original proceedings that arise from the same trial court case, as well as proceedings, even if not in the same trial court case, that arise from the same or related factual circumstances. Proceedings involving criminal defendants who are not codefendants but who have been accused of being confederates in a criminal act or acts would qualify under this definition of related cases in this court.

### CHILD CUSTODY/VISITATION

The Court expedites appeals that involve disputes over child custody or visitation. All attorneys and self-represented parties shall advise this court if child custody or visitation is an issue in their case. File a separate "Notice of Custody or Visitation Issue" within ten days of receipt of the acknowledgement letter.

3.    **Electronic Filing**

All attorneys must file electronically via the Florida Courts e-Filing Portal: www.myflcourtaccess.com.  Electronic fee payments may also be submitted through this portal.

4.    **Oral Argument Request and Continuances**

(a)  Requests must be made not later than 15 days after the last brief or reply is due to be served and shall be filed in a separate document.  Each side will have twenty minutes to argue unless the court orders otherwise prior to the date of argument.  Fla. R. App. P. 9.320.

(b)  Motions for continuance of oral argument must be based on either a substantial commitment preexisting the receipt of the oral argument notice or an emergency situation.

(c) Timely requests for oral argument, submitted in a separate document that complies with Florida Rule of Appellate Procedure 9.320, will generally be granted.  Except in extraordinary cases, however, the court does not allow oral argument on motions and in the following types of proceedings:

i)      appeals in which a pro se party is incarcerated;
ii)     summary postconviction appeals; and
iii)    nonsummary postconviction appeals where the parties are not represented.

Requests for oral argument in expedited proceedings, including termination of parental rights and dependency cases, are presented first to the merits panel.

(d)  Upon receipt of an order setting oral argument, please check WHERE argument is to be held.  This court sets cases in Tampa, by video, and from time to time in other cities.

5.    **Briefs**

Any brief submitted to the court must comply with Florida Rules of Appellate Procedure 9.045 and 9.210.  If submitted by an attorney, it must be filed electronically.  If the brief is typewritten or computer-generated, the lettering shall be black and in distinct type, double-spaced, with margins no less than 1 inch.   Computer-generated briefs shall be prepared with either Arial 14-point font or Bookman Old Style 14-point font.

**6.**   **Record References in Briefs**

Failure to comply with rule 9.210(b)(3) by reference to appropriate pages of the record in the statement of the case and facts may result in the striking of the brief, even in the absence of a motion filed by the opposing party.  When a record is required, any document appearing in an appendix must also be contained in the record on appeal.

**7.**   **Use of Trial Court Evidentiary Exhibits**

   **(a) Contraband and dangerous items:**  Please do not designate as part of the record on appeal such tangible evidence as drugs, firearms, or explosives without prior permission of the court.  If the court approves transmission of these kinds of exhibits, it will identify the role of the circuit court clerk and appropriate law enforcement personnel in transporting the exhibits.

   **(b) Large charts, and heavy or bulky items**: Please do not designate as part of the record on appeal large items without prior approval by the court.  In the event such approval is given, in civil cases it will be the responsibility of the party gaining such approval to see that oversized evidence is delivered to this court and redelivered to the trial court at the conclusion of the appeal.  In criminal cases, the court upon motion will designate the means of transmission of the subject exhibits.  This restriction does not apply to normal-size documents, photographs, maps, graphs, etc.

**8.**   **Appendices**

Appendices filed electronically must contain an index and be bookmarked, text-searchable, and paginated so that the page numbers displayed by the PDF reader exactly match the pagination of the index. Paper appendices may only be submitted by self-represented parties.  With a paper appendix, text is permitted on one side of the page only.

**9.**   **Supplemental Authority**

Notify opposing party of full citation BEFORE oral argument and file with this court.  This should be done, except in exceptional circumstances, early enough for opposing counsel to be prepared to respond to the supplemental authority at oral argument.

10.    **Waiving Oral Argument**

Cases without oral argument are subject to the same review, analysis, and consideration by a three-judge panel as are cases that are orally argued.

11.    **Florida Bar Numbers**

All attorneys MUST put their Florida Bar membership number on all pleadings filed with the appellate court.

12.    **Changes of Address of Attorneys or Parties**

All attorneys representing parties in this court and parties representing themselves shall promptly notify this court of any changes of their address or email address.  All orders and decisions of this court sent to the last email or mailing address in the court file will be presumed to be adequate notice for all purposes.

DANIEL H. SLEET, CHIEF JUDGE
Second District Court of Appeal
July 1, 2023

IN THE TWELFTH JUDICIAL CIRCUIT COURT
IN AND FOR SARASOTA COUNTY, FLORIDA

DIGITAL WORLD ACQUISITION
CORPORATION,
TRUMP MEDIA & TECHNOLOGY
GROUP CORP,
       Plaintiff,

v.

ARC GLOBAL INVESTMENTS II
LLC,
PATRICK ORLANDO,
      Defendant.

CASE NO.  2024 CA 001061 NC
DIVISION C CIRCUIT

_____

**ORDER DENYING WITHOUT PREJUDICE**
**REQUEST FOR 2024-CA-1545 TO BE TRANSFERRED INTO DIVISION C**

This Order is being filed in the following two cases:

·  **2024-CA-1061**, <u>Digital World Acquisition Corp. and Trump Media & Technology
Group, Corp. v. ARC Global Investments II, LLC and Patrick Orlando</u>, currently
assigned to Division C, Judge Carroll currently presiding.

·  **2024-CA-1545**, <u>Trump Media & Technology Group, Corp. v. United Atlantic
Ventures, LLC, Wesley Moss, Andrew Litinsky, and Patrick Orlando</u>, currently
assigned to Division A, Judge Walker currently presiding.

On April 25, 2024, the Plaintiffs in both cases have moved to consolidate these two cases
[DIN 33 in the -1061 case; and DIN 24 in the -1545 case]. During argument on the consolidation
motion before the Division C judge—the judge with the lower case number—Plaintiffs made
clear their use of "consolidate" did not necessarily mean the filings would be in one case only
but instead they sought to have both cases pend in the same division and that both cases travel
together. Defendants opposed the request.

On the surface, these cases are sufficiently related that the Circuit's long-standing
practice of transferring all such cases into one division for further adjudication before one
judge—the judge with the lowest case number—would seem to apply. Having one judge handle
all cases that have some commonality makes sense from an administration of justice standpoint,
reduces concerns of inconsistent rulings, makes scheduling easier, and a host of other reasons.
And in most cases, this transfer is perfunctory, and welcomed, by the litigants.

Complicating the analysis here, though, is a circumstance not envisioned by the Circuit's practice. Neither assigned judge can recall this situation having occurred before.

That complication here is the judge in the -1545 case granted a stay of the -1545 case due to the existence of an action pending in the Delaware Chancery Court. Plaintiff in the -1545 case has filed a Petition for Writ of Certiorari in the Second District Court of Appeal seeking to quash that order, and that court has directed Defendants in the -1545 to respond [DIN 58 in the -1545 case]. The Second District has docketed that case as Case Number 2D2024-1642.

Separately, the judge in the -1061 case denied the Defendants' request in the -1061 case to dismiss the case or alternatively stay the case, notwithstanding the existence of the Delaware Chancery Court case. The Defendants in the -1061 case have filed a nonfinal appeal, and the Second District has docketed that case as Case Number 2D2024-1780.

Given that Defendants in the -1061 just filed their nonfinal appeal earlier this week (and after the argument on the motion to consolidate) it is not known at this time whether the Second District will direct that these cases travel together.

During argument on the motion to consolidate the trial court cases, Plaintiffs contended that discovery in the two cases will largely be the same. This includes discovery directed at parties in the -1545 case that are technically nonparties in the -1061 case. Plaintiffs also extolled the virtues of having one judge handle all matters involving this case. And Plaintiffs suggested that they will seek to stay the trial court's ruling in the -1545 case that had granted the stay.

Defendants opposed, and primarily contended that Plaintiffs are engaged in judge shopping, and they also contend that Plaintiffs seek an end-run around the stay granted by the judge in the -1545 case. Those arguments, though, are wholly meritless. In fact, they are belied by the record.

Defendants did not file their motion to stay the -1545 case until May 6, which was a week-and-a-half *after* Plaintiffs filed their motion to consolidate. And it certainly was well before the judge in the -1545 case stayed the -1545 case. Plaintiffs' consolidation motions could not have been designed to be an end-run around an order not-yet rendered on a motion not-yet filed. With respect to the judge-shopping argument, that too, is meritless. The Circuit's practice of having the judge with the lowest case number assigned avoids Defendants' claim. It is this simple: if the -1061 case had been assigned to Division A and the -1545 case been assigned to Division C, the Division A judge would have handled Plaintiffs' motion to consolidate. Defendants' arguments in this regard are meritless.

The Court, though, is left with what to do under the unusual posture of these cases as they currently exist. And perhaps the Court's analysis is more practical than anything else. The benefits of moving the higher case into the division in which the lower case pends do not seem to be currently present. One case is moving; the other case is not. If a case is not moving at the trial court level, there likely would not be inconsistent rulings on a going forward basis because no rulings will be issued in the stayed case. Further, the benefits of cases "traveling together" would

not seem to exist, either, unless the -1061 case pauses, which is not something the Plaintiffs in that case seek.

The Court is aware of the discovery issue—that Plaintiffs in the -1061 case desire discovery from certain of the Defendants in the -1545 case who are not parties in the -1061 case. But that issue, though, does not suggest a need to transfer the -1545 case into Division C currently. Even if the case were transferred, those Defendants in the -1545 case not parties in the -1061 case would still not be parties in the -1061 case. The judge in the Division C case would still handle issues relating to discovery in the -1061 case, which would include potential future discovery of nonparties to the -1061 case, which would include those nonparties who may be parties in the -1545 case.

Balancing out these factors—and in consultation with the Division A judge—the Court has determined not to transfer the -1545 case into Division C at the present time. If or when the -1545 case begins to move again at the trial court level, the Court would then be willing to reevaluate whether the -1545 case should be transfer into Division C.

Plaintiffs' motion is denied without prejudice.

DONE AND ORDERED in Sarasota, Sarasota County, Florida, on August 02, 2024.

e-Signed 8/2/2024 10:45 AM 2024 CA 001061 NC

**HUNTER W CARROLL**
Circuit Judge

## SERVICE CERTIFICATE

On August 02, 2024, the Court caused the foregoing document to be served via the Clerk of Court's case management system, which served the following individuals via email (where indicated). On the same date, the Court also served a copy of the foregoing document via First Class U.S. Mail on the individuals who do not have an email address on file with the Clerk of Court.

JASON BRENT GONZALEZ
215 SOUTH MONROE STREET SUITE 320
TALLAHASSEE, FL  32301
jason@lawsonhuckgonzalez.com

PAUL B THANASIDES
500 E KENNEDY BLVD STE 200
TAMPA, FL  33602

Page 3 of 4

christina@mcintyrefirm.com

SAMUEL J SALARIO
CARLTON FIELDS, P.A.
4221 W. BOY SCOUT BOULEVARD STE 1000
TAMPA, FL  33607
leah@lawsonhuckgonzalez.com

ANDREW VITALI III
1441 BRICKELL AVE. SUITE 1200
MIAMI, FL  33131
ndrubin@homerbonner.com

JORGE E CALLAOS
2050 M STREET NW
WASHINGTON, DC  20036
jorgecallaos@napleslaw.us

RAYMOND F TREADWELL
215 S. MONROE STREET, SUITE 320
TALLAHASSEE, FL  32301

ANDREW FIGUEROA
600 BRICKELL AVENUE, SUITE 1500
MIAMI, FL  33131
mserranocid@vedderprice.com


MICHAEL C KELLEY
4705 SOUTH APOPKA VINELAND ROAD #210
ORLANDO, FL  32819
jason@lawsonhuckgonzalez.com

KEVIN JACOBS
KJACOBS@HOMERBONNER.COM

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

          Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II LLC, and
PATRICK ORLANDO,

          Defendants.

_____/

## DEFENDANTS' MOTION FOR STAY PENDING APPEAL

Defendants ARC Global Investments II LLC ("ARC II") and Patrick Orlando, through their undersigned counsel, and pursuant to Florida Rule of Appellate Procedure 9.310, move this Court to enter a stay pending review by the Second District Court of Appeal of this Court's July 29, 2024 non-final Order denying Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay This Proceeding (the "Joint Motion to Dismiss" or "Joint MTD") based on improper venue and *forum non conveniens*. *See* FLA. R. APP. P. 9.130(a)(3)(A).

## I.    INTRODUCTION

This Court should stay this lawsuit pending the appeal because venue does not lie in Sarasota. The Advisory Committee Notes to Rule 9.130 expressly state that "stays of proceedings in lower tribunals should be liberally granted if the interlocutory appeal involves venue." FLA. R. APP. P. 9.130 (1977 Am. Comm. Notes). This is such a case, and a brief stay while Defendants' appeal is considered will cause no harm to any party. In fact, the only risk of harm is if this lawsuit

proceeds pending that appeal, because of the resulting time and expense required to conduct discovery in this forum, while nearly all the evidence and witnesses are located elsewhere.

Defendants have moved expeditiously—far more quickly than required under the governing rules—and do not seek a stay for purposes of delay. Defendants desire only to preserve judicial economy and the limited resources of the Court and the parties while Defendants pursue a meritorious appeal. Considering these conditions and the compelling grounds for appeal as discussed below, this Court should grant the stay.

## II.    BACKGROUND AND PROCEDURAL HISTORY[1]

Plaintiffs Digital World Acquisition Corporation ("DWAC") and Trump Media and Technology Group ("TMTG") are Delaware corporations that completed a business combination in March 2024 related to a special purpose acquisition company transaction. Defendant ARC II is a sponsor of DWAC, which funded a substantial amount of DWAC's pre-merger operations. Mr. Orlando is the managing member of ARC II and was previously the CEO and a director of DWAC. During that merger process, a dispute arose between DWAC and Defendants related principally to the conversion of DWAC common stock after the business combination.

On February 26, 2024, Defendants shared a draft complaint with Plaintiffs, which Defendants intended to file the following day in the Delaware Court of Chancery, seeking relief related to the improper conversion ratio employed by DWAC. DWAC's prior counsel implored Defendants to hold off on filing that complaint so that the parties could have meaningful settlement discussions. Those promises were blatantly false and were intended instead to induce Defendants not to file their Delaware action. Plaintiffs used the delay that DWAC manufactured to file this

---

[1] The background of the parties and this dispute is explained in detail in Defendants' Joint Motion to Dismiss, attached as Exhibit A, at pages 3-7, which Defendants incorporate by reference. In order to keep the volume of pages down, the attached Joint Motion to Dismiss does not include its Exhibits, which consist of voluminous public SEC filings.

action in the wrong venue, Sarasota County, in violation of a governing forum selection clause in DWAC's charter.

The Amended Complaint purports to assert five claims for relief against Defendants: breaches of fiduciary duties of loyalty and care by DWAC against Mr. Orlando (Counts I and II); conversion by DWAC against Mr. Orlando (Count III); aiding and abetting breaches of fiduciary duty by DWAC against ARC II (Count IV); and a violation of FDUTPA against Defendants (Count V). On April 3, 2024, Defendants filed the Joint Motion to Dismiss, arguing that the venue is improper, that the effort to anchor the venue in Sarasota County on a FDUTPA claim had to fail because DWAC had alleged and could allege no actual damages, and that dismissal is appropriate based on *forum non conveniens*, among other reasons. The Court held a hearing on the Joint Motion to Dismiss on July 10, 2024 and issued its ruling in Court. (*See* Ex. B, July 10, 2024 Tr.)

At the hearing, the Court held that "technically venue would be within the State of Florida," interpreting the motion to dismiss for improper venue as "really [] a motion to dismiss for *forum non conveniens*." (*Id.* 71:8-12.) The Court found that there were "enough ultimate facts" to establish "actual damages" under FDUTPA, doing so despite being "on the fence . . . with FDUTPA." (*Id.* 69:15-70:5.) Further, and as to the *forum non conveniens* issue, the Court held the public factor was not at "equipoise" and declined "to get to the other factors," concluding Delaware is not a more convenient forum than Sarasota County. (*Id.* 70:7-71:5.) The Court then entered a written Order denying the Joint Motion to Dismiss on July 29, 2024, incorporating relevant portions of the July 10, 2024 hearing transcript. (*See* Order of Dismissal, DIN 93.)

Defendants timely filed their Notice of Appeal on July 30, 2024. For the reasons that follow, this action should be stayed while that appeal is heard by the Second District Court of Appeal.

III.    **ARGUMENT**

   A.    **Legal standard.**

This Court has authority to stay this case pending appeal to preserve the status quo during

an appellate proceeding. *See* FLA. R. APP. P. 9.310(a). Courts consider the harm to the parties and

the moving party's likelihood of success on appeal. *See Planned Parenthood of Greater Orlando

v. MMB Props.*, 148 So. 3d 810, 812 (Fla. 5th DCA 2014). Both factors weigh in favor of granting

Defendants' Motion to Stay.

   B.    **Defendants will suffer significant harm without a stay.**

Defendants—and indeed all parties—face significant harm if they are forced to litigate in

this venue pending Defendants' appeal. No meaningful connection exists between the parties and

claims in this case and Sarasota County. Instead, nearly all the evidence and witnesses are located

in Delaware, whose law governs and which is the preselected venue for the alleged dispute, or

Miami-Dade County. Trying the case in the wrong venue exponentially increases the cost of

discovery if this matter proceeds.

   **First**, the only connection between the parties to this case and Sarasota is that TMTG has

its principal place of business here. The other Plaintiff, DWAC, is a Delaware corporation with its

principal place of business in Miami. ARC II is a Delaware limited liability company with its

principal place of business in Miami, and Mr. Orlando is a Miami resident. Most of the relevant

non-party witnesses will necessarily reside outside of this county, and there is no guarantee that

they will participate voluntarily in Sarasota. Attempting to secure compliance with potentially

dozens of witnesses who reside well outside the county and have no regular presence in Sarasota

will needlessly burden the parties and the Court while the appeal is pending.

   **Second**, the relevant documents and evidence are not located in Sarasota, which is not

where any of the alleged conduct at issue in this case occurred. Those documents reside in

Delaware, where all the entity parties are organized, and Miami, where three of the four parties are physically located.

**Third**, Plaintiffs will not be harmed by a stay. The parties' dispute, including substantially similar issues that are being litigated in this case, is currently progressing in the Delaware action on a more advanced timeline. This case should have been filed in Delaware originally in accordance with the cited forum selection clause, and Plaintiffs' active litigation in the Delaware Action more than sufficiently mitigates any purported harm that Plaintiffs may claim from the requested stay. In other words, Plaintiffs cannot complain that they will face delay if this Court grants the Motion to Stay. *See Flaig ex rel. Palmcrest Homes of Tampa Bay, LLC v. Sullivan*, 141 So. 3d 1274,1276 (Fla. 2d DCA 2014) (observing that delay is not usually irreparable harm); *see also Blinco v. Green Tree Servicing, LLC*, 366 F.3d 1249, 1252 (11th Cir. 2004) (noting a trial court should stay litigation since the appeal was determinative of the venue where the case was to be litigated).

**Fourth**, proceeding with this lawsuit while venue is being challenged on appeal under a forum selection clause, and when none of the relevant events occurred in Sarasota County, encumbers Defendants' ability to prosecute the case. An appropriate venue in Delaware, or alternatively Miami, dictates which counterclaims and third-party claims can be pursued, the timeline and the propounding of discovery, and the compulsion of witnesses, militating in favor of a stay pending appeal.

## C. Defendants are likely to succeed on the merits of their appeal.

The Second District Court of Appeal reviews a trial court's ruling on venue *de novo*. *See PricewaterhouseCoopers LLP v. Cedar Resources, Inc.*, 761 So. 2d 1131, 1133 (Fla. 2d DCA 1999). The standard of review of a ruling on a motion to dismiss based on *forum non conveniens* is abuse of discretion. *See Kinney Sys., Inc. v. Continental Ins. Co.*, 674 So. 2d 86, 95 (Fla. 1996).

Where, as here, a trial court makes its determination based solely on written submissions, the appellate court stands on equal footing with the trial court as to the interpretation of the written submissions. *See Crawford v. Barker*, 64 So. 3d 1246, 1251 (Fla. 2011).

### 1. Venue is improper because no claims accrued in Sarasota County, Florida.

Defendants are likely to prevail on appeal because dismissal or transfer was warranted based on improper venue. Plaintiffs cite section 47.051, Florida Statutes, as the sole basis for venue, which states in full:

> Actions against domestic corporations shall be brought only in the county where such corporation has, or usually keeps, an office for transaction of its customary business, where the cause of action accrued, or where the property in litigation is located. Actions against foreign corporations doing business in this state shall be brought in a county where such corporation has an agent or other representative, where the cause of action accrued, or where the property in litigation is located.

(*See* Am. Compl. ¶ 14 (citing Fla. Stat. § 47.051).) There is no dispute that two of the three potential grounds for venue are clearly inapplicable. Defendants do not (1) reside in Sarasota County; or (2) maintain an office, agent, or representative in Sarasota County. (*See id.* ¶¶ 9-10.) Nor is there any property at issue in this litigation, much less property located in Sarasota County.

In its response and at the hearing, Plaintiffs confirmed they were traveling under the accrual prong of the venue statute—that is, TMTG's FDUTPA cause of action accrued in Sarasota County. TMTG and DWAC, as Plaintiffs, bear the initial burden of alleging facts sufficient to show that the FDUTPA claim accrued in the proper venue. *See Woodson Elec. Sols., Inc. v. Port Royal Prop., LLC*, 271 So. 3d 111, 113 (Fla. 3d DCA 2019). In that regard, a FDUTPA claim accrues when a plaintiff suffers *actual damages* because of a consumer injury or on the date of the sale of a consumer product or good. *See Sundance Apartments I, Inc. v. Gen. Elec. Capital Corp.*, 581 F. Supp. 2d 1215, 1223 (S.D. Fla. 2008) (noting a FDUTPA claim accrues upon actual damages); *S. Motor Co. of Dade Cnty. v. Doktorczyk*, 957 So. 2d 1215, 1218 (Fla. 3d DCA 2007) (stating the

FDUTPA "cause of action accrued on the date of sale").

The inquiry is whether TMTG suffered actual damages under FDUTPA in Sarasota County. The answer is clear: "Florida courts construing FDUTPA have consistently defined the statute's provision of 'actual damages' to mean 'the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties.'" *Vintage Motors of Sarasota, Inc. v. MAC Enters. of N.C., LLC*, 336 So. 3d 374, 378 (Fla. 2d DCA 2022). Put another way, the term "actual damages" under FDUTPA has an established meaning of either (1) the value between what was promised and what was delivered; or (2) the total price paid for a valueless good or service. *See id.* "For purposes of recovery under FDUTPA, 'actual damages' do not include consequential damages." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). To establish proper venue, Plaintiffs were required to plausibly allege facts that TMTG suffered actual damages under FDUTPA in Sarasota County. This they did not do.

TMTG did not plead that Defendants caused it actual damages as is required to establish venue in this forum. The only amount TMTG may seek to recover under FDUTPA is the difference in the market value of a product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered according to the contract of the parties. In other words, TMTG must have alleged a diminution of the market value damage model of a consumer good or service to plausibly allege its FDUTPA claim accrued in Sarasota County. TMTG, however, did not even attempt to allege actual damages under FDUTPA. Nor could it have had. TMTG and Defendants were not parties to a good or service transaction, and, importantly, there is no product or service upon which TMTG's FDUTPA claim centers. There are thus no allegations—none—pertaining to when TMTG suffered actual damages in Sarasota County. As a

result, no FDUTPA claim accrued in Sarasota County, and thus venue is improper in this forum.

*See, e.g.*, *Vintage Motors of Sarasota, Inc.*, 336 So. 3d at 378; *Stewart Agency, Inc. v. Arrigo Enters., Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019) (acknowledging entities often "do not suffer actual damages[;] their damages are frequently special or consequential damages, and thus, not compensable[.]" (alterations added)).

Notwithstanding the overwhelming case law limiting FDUTPA plaintiffs to a diminution in market value theory relating to goods and services, TMTG urged the Court to abandon this precedent and include consequential damages within the otherwise well-established definition of actual damages under FDUTPA. Specifically, TMTG's FDUTPA claim is comprised entirely of the following consequential damages:[2]

- "[A] delay of the merger and the SEC investigation." (Am. Compl. ¶ 100.)

- "[L]ost opportunity costs." (*Id.* ¶ 101.)

- "[L]oss of revenue, lost profits, [and] lost business value." (*Id.* at p. 26.)

TMTG cannot shirk its burden of demonstrating that its FDUTPA claim accrued in Sarasota County with consequential damage allegations that are expressly precluded under the act.[3] *See ClarkLangan Eng'g & Env't Servs., Inc. v. Harris Constructors, Inc.*, 743 So. 2d 1177, 1178 (Fla. 2d DCA 1999) (a plaintiff must allege facts to establish where the cause of action accrued); *Nicholas v. Ross*, 721 So. 2d 1241, 1242 (Fla. 4th DCA 1998) (the complaint must include factual

---

[2] TMTG's incessant use of the term "continue" makes clear TMTG is seeking consequential damages. (*See* Am. Compl. ¶¶ 5, 25, 35, 43, 61.)

[3] At the hearing, Plaintiffs explained "actual damages actually just means real damages." (Tr. at 53:5.) This is wrong as a matter of law. TMTG has failed to point to a Florida state case that calls into question the established calculation of FDUTPA damages or refutes the extensive, uniform, and absolute case law that holds consequential damages, including lost profits, are not recoverable under FDUTPA. *See, e.g., Vintage Motors of Sarasota, Inc.*, 336 So. 3d at 378 (collecting cases and noting Florida courts' consistent definition of "actual damages").

allegations that the cause of action accrued in the selected forum). Rather, for the accrual prong, TMTG was required to plausibly allege *actual damages*, not consequential damages.

Authority abounds for this proposition. *See Marjam Supply Co. of Fla., LLC v. Pliteq, Inc.*, No. 15-24363-Civ, 2018 WL 4932871, at *4 (S.D. Fla. Apr. 23, 2018) ("Florida courts specifically reject the recovery of consequential damages under FDUTPA." (cleaned up)); *see also, e.g.*, *Five for Entm' t S.A. v. Rodriguez*, 877 F. Supp. 2d 1321, 1331 (S.D. Fla. 2012) ("It remains well-settled in Florida that consequential damages in the form of lost profits are not recoverable under FDUTPA."); *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 181 (Fla. 3d DCA 2010) (concluding that "[b]ecause the proper measure of 'actual damages' is the difference in the market value of the jet-boat as delivered and market value as it should have been delivered," the plaintiff "cannot recover damages for the down payment and loan payments, as those are consequential damages"); *Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 263 (Fla. 2d DCA 2004) (noting that FDUTPA "permits a consumer to recover only the diminished value of the services received," and not "special, consequential, and incidental damages"); *Urling v. Helms Exterminators, Inc.*, 468 So. 2d 451, 454 (Fla. 1st DCA 1985) (finding that the plaintiffs' claim for costs of repairing termite damage was impermissible under FDUTPA because such costs constituted "special or consequential damages").

Even if the Court is inclined to accept TMTG's alternative definition of actual damages, none of the venue provisions in section 47.051 supports Plaintiffs' claim that venue is proper in Sarasota County. The sole allegation related to Sarasota County is the fact that TMTG's principal place of business is in the forum. This is insufficient as a matter of law, however. This is particularly so when the other factual allegations of the Amended Complaint make clear that Defendants are not located in Sarasota County, no alleged actions occurred in Sarasota County,

and Defendants do not maintain any business or residence in the forum. *See Host Marriott Tollroads, Inc. v. Petrol Enters., Inc.*, 810 So. 2d 1086, 1088 (Fla. 4th DCA 2002) ("The only fact alleged with regards to venue is that [plaintiff] maintains its principal place of business in Broward County. This factual allegation is irrelevant to a venue determination pursuant to section 47.051.").

Because TMTG failed to plead actual damages to satisfy the accrual prong in Count V as required by Florida law, no cause of action accrued in Sarasota County, and the Joint Motion to Dismiss should have been granted for improper venue. *Cf. Plain Bay Sales, LLC v. Gallaher*, No. 9:18-cv-80581, 2020 WL 202960, at *4 (S.D. Fla. Jan. 14, 2020) ("Because the Prudent Parties fail to plead actual damages in Count V as required by Florida law, the Court DISMISSES Count V of the Third Party Counterclaim as to Haunert.").

Moreover, a stay is appropriate because Defendants' appeal raises a serious legal question—that is, whether a corporate plaintiff, here TMTG, can seek actual damages under FDUTPA based on non-consumer claims brought against a fiduciary, a party supposedly aiding and abetting that fiduciary, or shareholders.

The Court's holding is inconsistent with both the plain language of FDUTPA and Florida law. FDUTPA does not apply to "[a] claim for damage to property other than the property that is the subject of the consumer transaction." Fla. Stat. § 501.212. As a result, under FDUTPA, a party may recover only actual damages, which is defined as: "the difference between the market value of the jet-boat as delivered and its market value as it should have been delivered." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 181 (Fla. 3d DCA 2010). Actual damages do not include "recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 873 (Fla. 2d DCA 2006); *see also Dorestin v. Hollywood Imports, Inc.*, 45 So. 3d 819, 824 (Fla. 3rd DCA 2010) (noting that the

10

"statute does not allow the recovery of other damages, such as consequential damages"). Case law is extensive, uniform, and absolute that consequential damages, including lost profits, are not recoverable under FDUTPA. *See Vintage Motors of Sarasota, Inc.*, 336 So. 3d at 378. Accordingly, the case should be stayed to permit the Second District Court of Appeal to address the legal question Defendants present in their venue appeal.

Defendants respectfully posit that their appeal will be successful due to the overwhelming authority limiting actual damages under FDUTPA to the diminution in market value and TMTG's failure to present any allegations of damages within the confines of this standard. Thus, no cause of action accrued in Sarasota County, Florida, and venue is improper. Defendants are likely to prevail on their appeal of the Court's venue ruling, and this case should be stayed.

> ## 2.    Only two of the four *forum non conveniens* factors were in dispute, and they both favor dismissal or transfer.

Defendants are also likely to prevail on the issue of *forum non conveniens*. In *Kinney*, the Florida Supreme Court adopted the federal *forum non conveniens* doctrine and set out the process by which Florida courts are required to analyze motions under *forum non conveniens*. *See Kinney*, 647 So. 2d at 90. Those factors are: (1) whether there is an adequate alternative forum for the case; (2) whether the private interest factors favor dismissal; (3) whether the public interest favors dismissal; and (4) whether a plaintiff can reinstate the lawsuit without undue inconvenience. *See id.* at 90. The U.S. Supreme Court has further instructed that "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. W.D. Tex.*, 571 U.S. 49, 60 (2014). A court determines first whether the forum-selection clause is valid and, second, whether the *forum non conveniens* public-interest factors militate against its enforcement. *See id.* at 581-82. Because these factors "will rarely defeat" a motion to dismiss on forum non conveniens grounds, the

11

practical result is that forum-selection clauses should control except in unusual circumstances. *Id.* at 582. A "party contesting the application of a forum selection clause bears the burden of establishing its non-enforcement." *Royal Caribbean Cruises, Ltd. v. Clarke*, 148 So. 3d 155, 157 (Fla. 3d DCA 2014). In this case, each of these factors weighs in favor of dismissal. The Court failed to analyze each of them, however. Defendants are likely to prevail on their appeal.

### a.  The Court did not properly address the forum selection clause.

Section 12.1 of DWAC's charter unambiguously lists an "action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation" among the actions that must be filed exclusively in Delaware. DWAC does not dispute that this is an action against a director and former CEO for breach of fiduciary duty owed to DWAC. Instead, DWAC argues that the forum selection clause applies only to actions brought by a stockholder, not the "Corporation." That misreads the provision.

An action based on a fiduciary duty owed to the corporation can be brought <u>only</u> as a direct action in the name of the corporation itself, or as a derivative action. *E.g., In re Syncor Int' l Corp. S' holders Litig.*, 857 A.2d 994, 998 (Del. Ch. 2004) (dismissing shareholder action for lack of standing where "the misconduct alleged involved a duty owed **to the corporation** and gave rise to injury to that entity" (emphasis added)). Any contention that the clause is limited to actions where stockholders are *named plaintiffs* is refuted on its face. A stockholder can *never* be a named plaintiff in a direct action for breach of a fiduciary duty to the corporation. *Id*. It is true that stockholders can bring derivative actions on behalf of the corporation, but section 12.1(i) already provides that <u>all</u> derivative actions must be filed in Delaware, no matter their subject matter. *See* Charter § 12.1(i) (listing "any derivative action . . . brought on behalf of the Corporation"). Therefore, the reference to "a claim for breach of a fiduciary duty owed . . . to the Corporation"

must mean something more than derivative actions, as otherwise it is superfluous. *See, e.g.*, *Austin Commer., Ltd. P' ship v. L.M.C.C. Specialty Contractors, Inc.*, 268 So. 3d 215, 220 (Fla. 2d DCA 2019) (ruling "[a] contract is not to be read so as to make one section superfluous" (citation omitted)); *Reybold Venture Grp. XVI LLC v. Furniture Servs. Unlimited, LLC*, No. N10C-05-078 RRC, 2014 Del. Super. LEXIS 623, at *9 (Super. Ct. Nov. 26, 2014) (same). It can only mean direct actions in the name of the corporation.

DWAC assumes a stockholder cannot bring a direct action in the name of the corporation, but that is incorrect. The very point of section 12.1 is to enumerate the types of claims stockholders *can* bring that must be brought in Delaware. One of them is a direct action in the name of the corporation (i.e., a claim for breach of a fiduciary duty owed to the corporation). A shareholder who is a CEO, shareholders who are members of the board of directors, and all shareholders by a majority vote have the power to bring a direct action in the name of the corporation. The agreement is clear: "***any*** shareholder" who brings an action for breach of fiduciary duty to DWAC against a director or officer must do so in Delaware. DWAC makes no allegation that a non-shareholder brought this action or could bring this action. Therefore, the forum selection clause is valid and enforceable in this case, and since the private interest factors favor dismissal, the Court should have enforced it. *See infra* § C.2.b; *Atlantic Marine*, 571 U.S. at 63.

### b. The private and public interest factors strongly favored dismissal.

Plaintiffs conceded the first and fourth *forum non conveniens* factors—adequacy and ability to re-file in Delaware or Miami—by failing to address them in their response to the Joint Motion to Dismiss. The Court did not address either of those factors in its ruling, presumably because there was no dispute that they both favored dismissal. Assuming that the Court skipped

the first factor because it was clearly satisfied,[4] under *Kinney*, the trial court was next *required* to analyze the second factor—whether the private interest factors favor dismissal of this action—before reaching the public interest factors.[5] *See Kinney*, 647 So. 2d at 90 (noting that the court "must" consider the private interest factors as the second step of the *forum non conveniens* analysis). However, the Court did not consider the private interest factors *at all*, which was reversible error because those factors weigh in favor of dismissal. The relevant evidence in this case exists outside of Sarasota and is easily transferred between the parties electronically, and most relevant witnesses reside outside of Sarasota. (*See* Joint MTD at 11.) Additionally, the core of this dispute concerns competing interpretations of a Delaware charter and a merger agreement between two Delaware corporations under Delaware law. (*See id.*) Thus, the private interest is best served by litigating this case in Delaware.

Further, the Court did not meaningfully analyze the public interest factors. It is now settled law that the "public interest factors, including Florida's interest in the dispute, should *always* be considered as part of the *forum non conveniens* analysis." *Abeid-Saba v. Carnival Corp.*, 184 So. 3d 593, 603 (Fla. 3d DCA 2016). The Court summarily concluded that the public interest factors are not in equipoise and found that the forum provision in the Charter is not applicable to Plaintiffs' claims in this case but made no other findings with respect to the *forum non conveniens* factors or whether venue is proper in this Court. (*See* Tr. at 70:7-71:5.) But the public interest factors do not

---

[4] Delaware, where the parties are already litigating a substantially similar suit, is an adequate forum.

[5] Where the trial court fails to address (and therefore does not exercise any discretion regarding) certain *Kinney* factors, the appellate court is empowered to review the unaddressed factors *de novo*. *See Tome v. Herrera-Zenil*, 273 So. 3d 140, 141 n.1 (Fla. 3d DCA 2019).

hinge entirely on the application of the Charter,[6] and instead require the Court to analyze burdens

on the court and the jury, the local interest in having localized controversies decided at home, and

the application of a different jurisdiction's law. *See Kinney*, 674 So. 2d at 90. Those factors each

favor dismissal because this case is not at home in Sarasota, and there is no local interest that

should be adjudicated by a Florida court. (*See* Joint MTD at 11-12.) This is a Delaware dispute

involving Delaware-based parties and the application of Delaware law. Further, Florida has no

public interest in rewarding Plaintiffs' blatant forum shopping. (*See id.*) The Court erred by

misapplying and failing to consider the relevant public interest factors, which weigh in favor of

dismissal or transfer.

Where, as here, the trial court fails to meaningfully analyze each of the four factors, reversal

is warranted. *See Sports Channel Ltd. v. Tabib*, 323 So. 3d 336, 337 (Fla. 3d DCA 2021) (reversing

order denying a motion to dismiss based on *forum non conveniens* because "the trial court failed

to conduct the requisite analysis under [*Kinney*]"); *Sybac Solar AG, Co. v. Falz*, 174 So. 3d 383,

386 (Fla. 2d DCA 2015) (reversing denial of *forum non conveniens* motion because "a trial court

abuses its discretion in denying a motion if the record does not indicate that the *forum non*

*conveniens* factors were considered"); *Camperos v. Estrella*, 126 So. 3d 351, 351-52 (Fla. 3d DCA

2013) (reversing order denying a motion to dismiss for *forum non conveniens* "so that the trial

court may articulate its findings on each of the '*Kinney*' factors' determinative of such motions.").

For all these reasons, Defendants are thus likely to prevail on their appeal of the *forum non*

*conveniens* ruling.

## IV.    CONCLUSION

For these reasons, Defendants respectfully request that this Court grant their motion to

---

[6] Indeed, the Charter is most relevant to the private interest factors, as explained in the Joint Motion to Dismiss. (*See* Joint MTD at 9-10.)

stay this lawsuit pending appeal.

Dated: Miami, Florida                                  Respectfully submitted,
            August 2, 2024

**Homer Bonner**                                    VEDDER PRICE (FL), LLP
                                                    600 Brickell Avenue, Suite 1500
1200 Four Seasons Tower                             Miami, Florida 33131
1441 Brickell Avenue                                Phone: +1 (786) 741 3200
Miami, Florida 33131                                Fax: +1 (786) 741 3202
Phone: +1 (305) 350-5100
Fax: +1 (305) 372-2738                              By: /s/ Adam L. Schwartz

By: /s/ Kevin P. Jacobs                                 Adam L. Schwartz
kjacobs@homerbonner.com                                 aschwartz@vedderprice.com
Florida Bar No. 169821                                  Florida Bar No. 103163
Andrew Vitali, III, Esq.                                Andrew T. Figueroa
avitali@homerbonner.com                                 afigueroa@vedderprice.com
Florida Bar No. 057828                                  Florida Bar No. 1002745

*Attorneys for Defendant ARC Global*               and
*Investments II LLC*
                                                   DECHERT LLP
                                                   Joshua D. N. Hess
                                                   45 Fremont Street, 26th Floor
                                                   San Francisco, CA 94105
                                                   Phone: +1 (415) 262 4583
                                                   Fax: +1 (415) 262 4555
                                                   joshua.hess@dechert.com
                                                   Admitted *Pro Hac Vice*

                                                   *Attorneys for Defendant Patrick Orlando*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 2, 2024, a true and correct copy of the foregoing was served by email generated by the Florida Courts E-Filing system to all parties of record.

Dated: August 2, 2024                          Respectfully submitted,

By: /s/ Adam L. Schwartz

# EXHIBIT A

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 392 of 1832 PageID 3869

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

        Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II, LLC,
and PATRICK ORLANDO,

        Defendants.

_____/

## **DEFENDANTS' JOINT MOTION TO DISMISS AMENDED COMPLAINT OR, ALTERNATIVELY, TO STAY THIS PROCEEDING**

VEDDER PRICE (FL), LLP

Adam L. Schwartz, Esq.
Florida Bar No. 103163
Andrew T. Figueroa, Esq.
Florida Bar No. 1002745
600 Brickell Ave., Ste. 1500
Miami, Florida 33131
Telephone: (786) 741-3220
Email: aschwartz@vedderprice.com
afigueroa@vedderprice.com

*Attorneys for Defendant Patrick Orlando*



1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Phone: (305) 350-5100
Fax: (305) 372-2738

Kevin P. Jacobs, Esq.
Email: kjacobs@homerbonner.com
Florida Bar No. 169821
Andrew Vitali, III, Esq.
Email: avitali@homerbonner.com
Florida Bar No. 057828

*Attorneys for Defendant ARC Global Investments II, LLC*

## TABLE OF CONTENTS

**Page**

I.      PRELIMINARY STATEMENT ........................................................................ 1

II.     BACKGROUND ............................................................................................ 3

III.    LEGAL STANDARDS .................................................................................. 7

IV.     ARGUMENT ................................................................................................. 8

        A.    Under the forum non conveniens doctrine, Delaware, not Florida, is the
              proper forum ....................................................................................... 8

              i.     Delaware is an adequate and available alternative forum.......................... 8

              ii.    The private factors overwhelmingly favor dismissal ............................... 9

              iii.   The public factors also favor dismissal .................................................... 11

              iv.    Plaintiffs will not be unduly inconvenienced ........................................... 12

        B.    Venue is improper in this forum ........................................................ 13

        C.    The Amended Complaint fails to state a cause of action ..................................... 14

              i.     Plaintiffs fail to comply with Florida Rule of Civil Procedure
                     1.130(a) ............................................................................... 14

              ii.    Plaintiffs' claims are moot given the completed merger ......................... 15

              iii.   Mr. Orlando did not breach any fiduciary duty (Counts I and II)............ 15

                     a.     The Charter Exculpates Mr. Orlando from Plaintiffs'
                            Claims ......................................................................... 16

                     b.     Plaintiffs Fail to Allege any Violation of Mr. Orlando's
                            Duty of Loyalty............................................................ 17

                     c.     Plaintiffs Fail to Allege any Violation of Mr. Orlando's
                            Duty of Care................................................................ 18

                     d.     The Amended Complaint Fails to Allege How Any of
                            Alleged Breaches Were the Proximate Cause of Any
                            Damages ....................................................................... 19

              iv.    The Amended Complaint fails to properly plead a conversion
                     claim................................................................................ 20

              v.     Plaintiffs' aiding and abetting fiduciary claim fails for several
                     reasons.............................................................................. 22

              vi.    Plaintiffs' purported FDUTPA claim fails as a matter of law ................. 23

        D.    Alternatively, if the Court is not inclined to dismiss this case it should,
              based on principle of priority as a matter of comity, stay this matter
              pending resolution of the stock conversion ratio issue in the Delaware
              Action....................................................................................... 25

V.      CONCLUSION............................................................................................. 27

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Policy Tr.*,
  No. 18-cv-25099, 2021 WL 7368630 (S.D. Fla. Sept. 24, 2021) ...........................................15

*ACP Master, Ltd. v. Sprint Corp.*,
  No. CV 8508, 2017 WL 3421142 (Del. Ch. July 21, 2017) ...................................................20

*Allen v. Jacksonville Univ.*,
  No. 3:21-cv-178, 2022 WL 17668615 (M.D. Fla. Dec. 14, 2022) .........................................14

*ARC Glob. Invs. II, LLC v. Digital World Acquisition Corp., et al.*,
  No. 2024-0186 (Del. Ch. 2024) ...............................................................................1, 2, 6, 29

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
  571 U.S. 49 (2013)..................................................................................................................8, 9

*Beckel v. Fagron Holding USA, LLC*,
  No. 8:16-cv-2059, 2017 WL 3730395 (M.D. Fla. June 30, 2017) ........................................23

*Bogert v. Morrison (In re Morrison)*,
  972 So. 2d 905 (Fla. 2d DCA 2007) ..................................................................................26, 27

*Buckner v. Lower Fla. Keys Hosp. Dist.*,
  403 So. 2d 1025 (Fla. 3d DCA 1981) ....................................................................................22

*Buttonwood Tree Value Partners, L.P. v. R.L Polk & Co., Inc.*,
  No. Civ. A. 9250, 2014 WL 3954987 (Del. Ch. Aug. 7, 2014).............................................22

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) .......................................................................................................17

*Circuitronix, LLC v. Shenzen Kinwong Elec. Co.*,
  No. 17-cv-22462, 2018 WL 7287192 (S.D. Fla. Jan. 31, 2018).............................................25

*Crowell v. Morgan, Stanley, Dean Witter Servs. Co., Inc.*,
  87 F. Supp. 2d 1287 (S.D. Fla. 2000) .....................................................................................24

*Dewitt Stern Grp., Inc. v. Eisenberg*,
  257 F. Supp. 3d 542 (S.D.N.Y. 2017).....................................................................................22

*Diaz v. Bell MicroProducts-Future Tech, Inc.*,
  43 So. 3d 138 (Fla. 3d DCA 2010) .........................................................................................15

*In re Draw Another Circle.*,
  602 B.R. 878 (Bankr. D. Del. 2019) ..................................................23

*In re DSI Renal Holdings, LLC*,
  No. 11-11722, 2020 WL 7054390 (Bankr. D. Del. Dec. 2, 2020)..........................18

*Fannin v. UMTH Land Dev.*,
  L.P., No. CV 12541, 2020 WL 4384230 (Del. Ch. July 31, 2020) .......................16

*In re Fedders N. Am., Inc.*,
  405 B.R. 527 (Bankr. D. Del. 2009) ..................................................16

*Feng v. Walsh*,
  No. 19-24138-Civ, 2021 WL 8055449 (S.D. Fla. Dec. 21, 2021)....................23, 24

*Gasparini v. Pordomingo*,
  972 So. 2d 1053 (Fla. 3d DCA 2008) ..................................................20

*Ground Improvement Techniques, Inc. v. Merchants Bonding Co.*,
  707 So. 2d 1138 (Fla. 5th DCA 1998) ...................................................7

*HNA LH OD, LLC v. Local House Int'l, Inc.*,
  No. 21-cv-21022, 2021 WL 4459404 (S.D. Fla. Sept. 29, 2021) ..........................9

*Intabill, Inc. v. Elie*,
  No. 8:09-cv-834, 2009 WL 3232520 (M.D. Fla. Sept. 29, 2009)..........................21

*Inverpan, S.A. v. Britten*,
  646 F. Supp. 2d 1354 (S.D. Fla. 2009) ...............................................11

*In re January 2021 Short Squeeze Trading Litig.*,
  584 F. Supp. 3d 1161 (S.D. Fla. 2022) ................................................5

*Johnson v. Johnson*,
  288 So. 3d 745 (Fla. 2d DCA 2019) ...................................................12

*Kinney Sys., Inc. v. Cont'l Ins. Co.*,
  674 So. 2d 86 (Fla. 1996)....................................................... *passim*

*Kurnow v. Abbott*,
  114 So. 3d 1099 (Fla. 1st DCA 2013) .................................................22

*Lanoue v. Rizk*,
  987 So. 2d 724 (Fla. 3d DCA 2008) ...................................................12

*Lombardo v. Johnson & Johnson Consumer Cos., Inc.*,
  124 F. Supp. 3d 1283 (S.D. Fla. 2015) ............................................24, 25

*Mayo v. Allen*,
973 So. 2d 1257 (Fla. 1st DCA 2008) ...................................................20

*McGowan v. Ferro*,
No. Civ. A. 18672, 2002 WL 77712 (Del. Ch. Jan. 11, 2002) ................23

*Molina v. Aurora Loan Servs., LLC*,
635 F. App'x 618 (11th Cir. 2015) ......................................................24

*Mukamal v. Bakes*,
378 F. App'x 890 (11th Cir. 2010) ................................................12, 16

*In re Paypal Holdings, Inc. S'holder Derivative Litig.*,
No. 17-cv-00162, 2018 WL 466527 (N.D. Cal. Jan. 18, 2018)..............16

*Pilevsky v. Morgans Hotel Grp. Mgmt., LLC*,
961 So. 2d 1032 (Fla. 3d DCA 2007) .............................................26, 27

*Piper Aircraft Co. v. Reyno*,
454 U.S. 235 (1981).............................................................................12

*Porsche Cars N. Am., Inc. v. Diamond*,
140 So. 3d 1090 (Fla. 3d DCA 2014) ...................................................24

*Principal Growth Strategies, LLC v. AGH Parent LLC*,
No. 2019-0431, 2024 WL 274246 (Del. Ch. Jan. 25, 2024)...................22

*Prop. Registration Champions, LLC v. Mulberry*,
373 So. 3d 675 (Fla. 5th DCA 2023) ......................................................7

*Rankel v. Kabateck*,
No. 12-cv-216, 2013 WL 7161687 (S.D.N.Y. Dec. 9, 2013) ..................14

*Rodriguez v. Recovery Performance & Marine, LLC*,
38 So. 3d 178 (Fla. 3d DCA 2010) .......................................................25

*Rollins, Inc. v. Butland*,
951 So. 2d 860 (Fla. 2d DCA 2006) ......................................................25

*Schrenkel v. LendUS, LLC*,
No. 2:18-cv-382, 2018 WL 5619358 (M.D. Fla. Oct. 30, 2018)............10

*Sclar v. OsteoMed, L.P.*,
No. 17-23247-Civ, 2018 WL 559137 (S.D. Fla. Jan. 24, 2018)............24

*Scotts Co. v. Hacienda Loma Linda*,
942 So. 2d 900 (Fla. 3d DCA 2006) .....................................................11

*SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Worldwide, Inc.*,
    306 So. 3d 1021 (Fla. 3d DCA 2020) ...............................................................9, 12

*Siegel v. Siegel*,
    575 So. 2d 1267 (Fla. 1991)...........................................................................25, 26

*State v. Beach Blvd. Auto. Inc.*,
    139 So. 3d 380 (Fla. 1st DCA 2014) ...................................................................24

*Transcapital Bank v. Shadowbrook at Vero, LLC*,
    226 So. 3d 856 (Fla. 4th DCA 2017) ...................................................................21

*Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*,
    No. Civ. A. 3290, 2009 WL 1387115 ...................................................................22

*United States v. Cuya*,
    964 F.3d 969 (11th Cir. 2020) .............................................................................21

*United States v. Garelick, et al.*,
    No. 23-CR-00370-LJL (S.D.N.Y. 2023) .............................................................19

*In re USA Detergents, Inc.*,
    418 B.R. 533 (Bankr. D. Del. 2009) ....................................................................16

*Veal v. Voyager Prop. & Cas. Ins. Co.*,
    51 So. 3d 1246 (Fla. 2d DCA 2011) .......................................................................4

*Wallace v. Dean*,
    3 So. 3d 1035 (Fla. 2009)........................................................................................8

*In re Walt Disney Co. Derivative Litig.*,
    907 A.2d 693 (Del. Ch. 2005)...............................................................................18

*Walter Auto Loan Tr. v. Track Motors, LLC*,
    No. 22-cv-61923, 2023 WL 5747432 (S.D. Fla. Aug. 3, 2023) ..........................21

*Worldwide Distribs., Inc. v. Maven Med, Inc.*,
    No. 22-23635-Civ, 2023 WL 4303847 (S.D. Fla. June 15, 2023)........................21

**Statutes**

Fla. Stat.
    § 47.051.................................................................................................................13
    § 517.021(22).........................................................................................................23

*Sec. Exch. Act of 1934 Release No. 97773 (Jun. 21, 2023)* ........................................18

**Rules**

Fla. R. Civ. P.

1.061(a) ................................................................................................................7, 8
1.061(c) ..................................................................................................................13
1.110(b) ...................................................................................................................8
1.130 .......................................................................................................................15
1.130(a) ............................................................................................................14, 18
1.140(b) and 1.061 ..................................................................................................1

**Other Authorities**

Florida's Deceptive and Unfair Trade Practices Act .................................................7

https://www.sec.gov/Archives/edgar/data/1849635/000119312524038590/d40856
3d424b4.htm ........................................................................................................5

https://www.sec.gov/Archives/edgar/data/1849635/000119312524038664/d79174
9d425.htm ...........................................................................................................5

https://www.sec.gov/Archives/edgar/data/1849635/000119312524069431/d80848
4d8k.htm .............................................................................................................3

https://www.sec.gov/files/litigation/admin/2023/34-97773.pdf ...................................18

Defendants ARC Global Investments II, LLC ("**ARC II**") and Patrick Orlando move, pursuant to Florida Rules of Civil Procedure 1.140(b) and 1.061, to dismiss the Amended Complaint. Alternatively, Defendants move to stay this action pending resolution of a similar action already pending in Delaware Chancery Court between ARC II and Plaintiff Digital World Acquisition Corporation ("**DWAC**"), over which the Delaware court has asserted jurisdiction and for which it has granted expedited treatment for resolution by August 19, 2024, i.e., within 150 days from the March 22, 2024 merger between DWAC and Plaintiff Trump Media & Technology Group Corp. ("**TMTG**").[1] *See ARC Glob. Invs. II, LLC v. Digital World Acquisition Corp., et al.*, No. 2024-0186 (the "**Delaware Action**"), Stipulation and Proposed Order, at *2 (Del. Ch. 2024) (attached hereto as Exhibit A).

I.    **PRELIMINARY STATEMENT.**

Sometimes lawsuits are not about the claims they purport to state but about something else. This is one of those times. Under cover of the privileges that protect litigants, Plaintiffs filed an Amended Complaint that is not about the purported claims—Plaintiffs already dropped the first count—but instead about publicly disparaging Defendants. This meritless lawsuit is more about public relations than legal grievance. Plaintiffs aim to discredit Defendants to force them to drop their claim in the Delaware Action seeking a determination that Plaintiffs have improperly diluted Defendants' shares of DWAC by using the wrong stock conversion ratio.

If this Amended Complaint was actually about the claims it purports to assert, Plaintiffs would have noted to this Court that these purported claims do not belong in Sarasota County. Plaintiffs undeniably know that these purported claims belong in Delaware because the parties are already fighting there about the very issue that was raised in Count I of the initial Complaint and which permeates the Amended Complaint, i.e., DWAC's erroneous stock conversion ratio in violation of ARC II's anti-dilution rights and Defendants' insistence that DWAC adhere to its contractual obligations (which Plaintiffs claim obstructed the merger between them). By knowingly filing this lawsuit in the wrong forum, Plaintiffs gave themselves license to fill the Complaint and Amended Complaint with overblown or apocryphal tales of misconduct about

---

[1] On March 29, 2024, Plaintiffs filed a Notice of Changes to Plaintiffs' names, advising the Court that "the name of Plaintiff Digital World Acquisition Corp. has been changed to Trump Media & Technology Group Corp., and the name of Plaintiff Trump Media & Technology Group, Inc. has been changed to TMTG Sub, Inc." Mar. 29, 2024 Notice. For purposes of this Motion, Defendants utilize the original names of Plaintiffs.

Defendants, which Plaintiffs will never have to support and will not have to defend to the Delaware judge already presiding.

That this lawsuit is not about the alleged misdeeds can also be gleaned from the facts leading to its abrupt filing. On February 26, 2024, Defendants wrote to Plaintiffs about Defendants' issues related to the erroneous stock conversion ratio applied by DWAC, which Defendants explained was inconsistent with the plain language of the DWAC Amended and Restated Certificate of Incorporation (the "**Charter**"). *See* Ex. B. Defendants' letter attached a copy of a draft Delaware state chancery court complaint seeking a ruling on this important issue. In response, Plaintiffs implored Defendants to hold off on filing the complaint and assured Defendants that negotiations would continue in earnest. *See* Ex. C. They did not. Instead, Plaintiffs used the delay induced by their promise of further good-faith discussions and rushed to Sarasota to file their Complaint on February 27, 2024.

Days later, DWAC's Chief Executive Officer emailed ARC II's members making defamatory accusations against Mr. Orlando, ARC II's managing member. Greed underlies it all. Defendants' planned Delaware lawsuit threatened to delay Plaintiffs' payday. The tens of millions of dollars that DWAC's executives and its Board of Directors will now have due to DWAC shareholders' approval of its merger with TMTG (defined below) was the driving force behind this smear and pressure campaign parading as a lawsuit. Its goal was to force Mr. Orlando to immediately vote ARC II's shares in favor of the Merger Agreement without any assurances that DWAC would live up to its obligations to not dilute ARC II and its more than seventy members through the deal.

Defendants' Delaware lawsuit was necessary to protect ARC II's and its member's rights to not be improperly diluted by, among other things, DWAC's Board and Executives' rich compensation packages and the unfavorable financing agreements that DWAC entered into to make it happen. And it has already paid dividends, the Delaware Chancery Court required DWAC to escrow the additional shares that ARC II believes it is due upon the conversion until it can decide the issue on an expedited basis. *See* Ex. A. Moreover, the Delaware Court also made DWAC agree that ARC II would not waive its standing if it voted in favor of the DWAC/TMTG merger. *Id*. Likewise, ARC II stipulated it would vote in favor of the merger. *Id*. And that is what ARC II and Mr. Orlando did—ARC II complied with its contractual obligations and voted its shares in favor of the deal. Contrary to DWAC's insinuations, there was no contractual agreement to vote its

shares at any time prior to the shareholder meeting, which makes sense given the fact that the Merger Agreement continued to be modified until the eleventh hour. *See* DWAC's Am. No. 6 to Form S-1, Exhibit 10.1, Letter Agreement (Ex. D). Thus, to the extent any of the claims have merit (and they do not), they are now moot as a result of the Merger Agreement.

In sum, this case does not belong in any court, let alone a Florida court. The irrelevancy and insufficiency of the Amended Complaint's allegations leave no doubt that its purpose was to publicly disparage Defendants and improperly bully them into voting ARC II's shares in favor of the Merger Agreement without any protections of their rights for anti-dilution. The Court should dismiss the Amended Complaint pursuant to the forum non conveniens doctrine, for improper venue, and for failure to state any claims upon which relief can be granted. Alternatively, this Court should, as a matter of comity, exercise its discretion to stay this matter pending resolution of the stock conversion ratio issue in the Delaware Action.

## II.    BACKGROUND.

A complaint should be statement of relevant facts, not a litany of irrelevant libels. The opposite is true here. This Motion's arguments ignore most of the spurious allegations because they are irrelevant to the reasons the Court should dismiss the Amended Complaint. The relevant factual allegations follow.[2]

***Introduction to the parties***. Plaintiff DWAC and Plaintiff Trump Media & Technology Group Corp. ("**TMTG**") are Delaware corporations. *See* Am. Compl. ¶¶ 7-8. DWAC is a special purpose acquisition company ("**SPAC**") (also described as a blank check company) that raises money via an initial public offering ("**IPO**"), with the sole purpose to combine with a privately held business. *See id.* ¶¶ 1, 16. DWAC entered into an Agreement and Plan of Merger ("**Merger Agreement**") on October 20, 2021, which provides for DWAC's business combination with TMTG. *See id.* ¶¶ 8, 23. On March 22, 2024, DWAC announced that its shareholders (including ARC II) voted in favor of the business combination, and the business combination was finalized last week. *See* Mar. 22, 2024 DWAC Form 8-K Report.[3]

---

[2] By summarizing the allegations, Defendants do not admit any allegations or the existence of any claim and do not waive or concede any defense or any other matter.

[3] The Form 8-K Report is available at:
 https://www.sec.gov/Archives/edgar/data/1849635/000119312524069431/d808484d8k.htm.

3

ARC II is a Delaware limited liability and the sponsor of DWAC. *See id.* ¶¶ 10, 19. As DWAC's sponsor, ARC II has provided more than $11 million of at-risk capital to DWAC to fund its IPO and pre-merger operations. Mr. Orlando is a former director and former chairman and chief executive officer of DWAC. *See id.* ¶¶ 9, 19. Mr. Orlando is also the managing member of ARC II. *See id.*; *see also* Ex. C, DWAC's Am. No. 6 to Form S-1, Exhibit 10.1, Letter Agreement (noting the sponsor shall vote any shares of common stock in favor of business combination). On March 22, ARC II voted its shares in favor of the merger. *See* Mar. 22, 2024 DWAC Form 8-K Report.

***DWAC's formation and its Charter***. In December 2020, DWAC was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination, involving the SPAC and one or more businesses. *See id.* ¶¶ 7, 15-18. In connection with its IPO, DWAC filed its Charter with the Secretary of the State of Delaware on September 2, 2021. *See generally* Ex. B.[4]

The Charter, among other things, authorizes 210,000,000 shares of common stock, consisting of 200,000,000 shares of Class A common stock and 10,000,000 shares of Class B common stock. *See id.*, Art. IV, § 4.1. The Charter provides that at the closing of a business combination, the shares of Class B common stock will automatically convert into shares of Class A common stock. *See id.*, Art. IV, § 4.3(b). The Charter initially fixed the conversion ratio at one-to-one. *See id.*, Art. IV, § 4.3(b)(i).

To protect Class B stockholders, including ARC II, from dilution, however, Section 4.3 of the Charter includes an automatic adjustment increasing the conversion ratio based on the number of shares of Class A common stock, or specified "Equity-linked Securities," issued or deemed issued in excess of the amounts sold in DWAC's IPO. *See id.*, Art. IV, § 4.3(b)(i)(ii). The Charter defines "Equity-linked Securities" as any debt or equity securities that are convertible, exercisable, or exchangeable for shares of Class A common stock issued in a financing transaction in connection with the initial business combination, including but not limited to a private placement of equity or debt. *See id.*

Since 2021, DWAC's Charter has included a forum-selection clause requiring any claims related to a Charter provision or related to breaches of directors' and officers' fiduciary duty be

---

[4] Where the terms of a document are impliedly incorporated by reference into the complaint, a trial court may consider the contents of the document in ruling on a motion to dismiss. *See, e.g.*, *Veal v. Voyager Prop. & Cas. Ins. Co.*, 51 So. 3d 1246, 1249-50 (Fla. 2d DCA 2011).

brought in the Delaware Court of Chancery. *See* Ex. B, Art. XII. The same governing document exculpates directors and/or officers from personal liability for breaches of fiduciary duty to the fullest extent permitted by law, subject to a few limited exceptions. *See id.*, Art. VII.

*The Merger Agreement*. On October 20, 2021, DWAC entered into the Merger Agreement with DWAC Merger Sub Inc. (a separate entity) and TMTG. ARC II, in the capacity as the purchaser representative, and TMTG's chief legal officer, in the capacity as the representative for stockholders of TMTG. *See* Am. Compl. ¶ 23. Pursuant to the Merger Agreement, DWAC will merge (and has merged) with and into TMTG, with TMTG becoming a wholly owned subsidiary of DWAC. *See id.* At the time of the Merger Agreement, Mr. Orlando served as the CEO of DWAC and was integral to reaching the agreement with TMTG.

The Merger Agreement provides that once the business combination is consummated, DWAC will amend and restate its Charter. The Merger Agreement further appoints ARC II as the purchaser representative and empowers ARC II to enforce the rights and obligations of any such persons under any purchaser representative documents, including giving and receiving all notices and communications on behalf of such person. *See* Merger Agreement, § 10.14.[5] The Merger Agreement defines "Purchaser Representative Documents" to mean the Merger Agreement along with "any Ancillary Documents to which the Purchaser Representative is a party or otherwise has rights in such capacity." *Id.* The Merger Agreement was completed on March 22, 2024.

*Proxy Statement*. DWAC issued a proxy statement in February 2024 and publicly filed its statement with the United States Securities and Exchange Commission.[6] The proxy statement defines "New Digital World common stock" as the common stock of DWAC following the business combination that was previously designated as Class A common stock of DWAC and any

---

[5] The Merger Agreement is available at:
https://www.sec.gov/Archives/edgar/data/1849635/000119312524038590/d408563d424b4.htm, and is attached as Exhibit E. *See In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1177 n.11 (S.D. Fla. 2022) (taking judicial notice of SEC filings at the motion to dismiss stage because "SEC filings are generally recognized as the most accurate and authoritative source of public information about a company" (quotation marks and citation omitted)).

[6] The February 2024 proxy statement is available at:
https://www.sec.gov/Archives/edgar/data/1849635/000119312524038664/d791749d425.htm, and is attached as Exhibit F. Again, the Court can and should consider the February 2024 proxy statement because it is explicitly referenced in the Complaint. *See, e.g.*, *In re January 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d at 1177 n.11.

shares of Class B common stock that will be converted into shares of Class A common stock. *See* Proxy Statement, Frequently Used Terms. The proxy statement further contained an incorrect conversion ratio and disclosed a present dispute between DWAC and ARC II relating to the conversion ratio and concomitant calculation. *See id.*, at pp. 96-97; *see also* Compl. ¶¶ 48-57.[7]

    *Plaintiffs manufacture claims*. Against this backdrop, Defendants prepared a proposed complaint against DWAC and others. That draft complaint explained the proper calculation of the conversion ratio and exposed DWAC's false proxy statement disclosure. Defendants delivered the complaint and a cover letter to DWAC on February 26, 2024. The letter advised, that due to the impending March 22, 2024 stockholder vote, if the matter was not resolved, ARC II would have to pursue its claims on an expedited basis in the Delaware Court of Chancery the next day. *See generally ARC Glob. Invs. II, LLC v. Digital World Acquisition Corp., et al.*, No. 2024-0186, Mot. to Expedite (Del. Ch. 2024) (attached hereto as <u>Exhibit G</u>). Plaintiffs pleaded with ARC II to not file suit in Delaware in order to give the parties time to engage in further discussions. *See id.*; *see also* <u>Ex. A</u>.

    Plaintiffs used their promises of good faith settlement discussions to induce ARC II not to file the Delaware Action and then filed the initial Complaint in this action the very next day. On March 8, 2024, DWAC voluntarily dismissed Count I's declaratory relief claim against Defendants. *See generally* Not. of Voluntary Dismissal. DWAC did so because the Delaware Chancery Court asserted jurisdiction over the matter and agreed to expedite and resolve ARC II's declaratory action lawsuit and issue a ruling prior to the conclusion of the lock-up period of ARC II's shares. *See* <u>Ex. A</u>. As part of the Delaware Chancery Court's ruling, DWAC agreed to place the disputed shares in escrow pending the Delaware Chancery Court's ruling. *Id*. And ARC II submitted a declaration confirming it would vote in favor of the business combination, which it did.[8] *Id*.

---

[7] The dispute between DWAC and ARC II concerns the application of the Charter's plain terms, which ARC II says control. DWAC, on the other hand, urges a conversion ratio that excludes certain securities from its calculation in contravention of the Charter's plain terms and to the detriment of Defendants and stockholders. *See ARC Glob. Invs. II, LLC v. Digital World Acquisition Corp., et al.*, No. 2024-0186, Compl. (Del. Ch. 2024) (<u>Ex. H</u>).

[8] Mr. Orlando and ARC II emphasize that Plaintiffs' mudslinging is false, and, but for a litigation privilege, would constitute defamation *per se*. The lack of candor by Plaintiffs in their Complaint and Amended Complaint is astounding. For example, Mr. Orlando did, in fact, submit his

Plaintiffs abandoned their initial pleading and filed an Amended Complaint on March 17, curing few of the basic pleading deficiencies that doomed the original Complaint. Like the original Complaint, the Amended Complaint spends much of itself smearing Mr. Orlando with defamatory allegations unrelated to the dispute, which relates to the conversion ratio, a proper interpretation of the Charter, and the supposed delay with the now-completed Merger Agreement. *See id.* ¶¶ 3-5, 24-25, 37-51. Other allegations reveal confidential settlement communications and disclose information that runs afoul of a joint defense agreement.[9] *See id.* ¶¶ 28-36, 52-64.

***Plaintiffs' purported claims***. Based on these allegations, Plaintiffs purport to assert five claims for relief against Defendants: breaches of fiduciary duties of loyalty and care by DWAC against Mr. Orlando (Counts I and II); conversion by DWAC against Mr. Orlando (Count III); aiding and abetting breaches of fiduciary duty by DWAC against ARC II (Count IV); and a violation of Florida's Deceptive and Unfair Trade Practices Act ("**FDUTPA**") against Defendants (Count V).

## III. LEGAL STANDARDS.

***Forum non conveniens***. "The decision to grant or deny the motion for dismissal [on forum non conveniens grounds] rests in the sound discretion of the trial court, subject to review for abuse of discretion." Fla. R. Civ. P. 1.061(a). When considering a motion to dismiss on forum non conveniens grounds, a court is <u>not</u> limited to the allegations in a complaint, and it can consider evidence that sheds "light on the issue of the convenience of the parties and witnesses." *Ground Improvement Techniques, Inc. v. Merchants Bonding Co.*, 707 So. 2d 1138, 1139 (Fla. 5th DCA 1998).

***Improper venue***. "While a plaintiff generally may choose the venue in which to bring his suit, and his choice will not be disturbed when it is one provided for by Florida Statutes, parties to a contract, of course, may in their contract agree on a venue for actions related to the contract." *Prop. Registration Champions, LLC v. Mulberry*, 373 So. 3d 675, 678 (Fla. 5th DCA 2023).

---

resignation from DWAC's Board of Directors, which was contingent upon the completion of the business combination.

[9] Defendants specifically reserve all rights, and waive nothing, related to Plaintiffs' disclosure of confidential settlement communications and joint defense agreement privileges that are incessantly mentioned and referenced in the Complaint and Amended Complaint.

*Failure to state a claim.* To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief. *See* Fla. R. Civ. P. 1.110(b). "For purposes of a motion to dismiss for failure to state a cause of action, allegations of the complaint are assumed to be true and all reasonable inferences arising therefrom are allowed in favor of the plaintiff." *Wallace v. Dean*, 3 So. 3d 1035, 1042-43 (Fla. 2009) (cleaned up).

## IV.   ARGUMENT.

The Amended Complaint's purported claims do not belong in a Florida court. Indeed, Florida is not the best forum for this dispute—Delaware is. Substantively, the Amended Complaint fails to state any actionable claim and controlling law compels dismissal.

### A.   Under the forum non conveniens doctrine, Delaware, not Florida, is the proper forum.

Florida is not the proper forum for this case. "Forum non conveniens is a common law doctrine addressing the problem that arises when a local court technically has jurisdiction over a suit but the cause of action may be fairly and more conveniently litigated elsewhere." *Kinney Sys., Inc. v. Cont'l Ins. Co.*, 674 So. 2d 86, 87 (Fla. 1996). Under Florida's forum non conveniens doctrine, courts must look at four factors: whether there is an adequate alternative forum for the case; whether the private interests favor dismissal; whether the public interest favors dismissal; and whether a plaintiff can reinstate the lawsuit without undue inconvenience. *See id.* at 90; Fla. R. Civ. P. 1.061(a). Importantly, "the plaintiff's choice of forum merits no weight[;] [r]ather, as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). Because the factors weigh in favor of Defendants, the Court should dismiss the Amended Complaint.

### i.   Delaware is an adequate and available alternative forum.

The first factor—whether an adequate and available alternative forum exists—is straightforward. "It is important to note that the chief concern of the first level of analysis is the ability to perfect service of process." *Kinney Sys.*, 674 So. 2d at 90. An alternative and available forum is not inadequate "merely because the available legal theories or potential recovery there are less generous than those available where suit was brought." *Id.*

There can be no dispute Delaware is an adequate alternative forum. ARC II, the real party in interest, is a Delaware entity, *see* Am. Compl. ¶ 10, and consents to Delaware jurisdiction (for the purported claims asserted against it). *See Kinney Sys., Inc.*, 674 So. 2d at 93 n.7 (A "trial court

8

may exercise discretion to dismiss under the doctrine where a plaintiff has named a 'straw man' Florida defendant who is merely the employee of the actual target of the dispute, an out-of-state corporation[;] [i]n that situation, residency is that of the real party in interest, not the straw man."). This makes ARC II susceptible to service of process in Delaware. Equally important, DWAC is presently involved, and appeared, in the pending related-lawsuit in a Delaware court, and by virtue of the forum-selection clause in its Charter admits the Delaware Chancery Court is an adequate and available forum. DWAC's actions are plainly relevant to the Court's analysis. *See generally* Ex. G; *see also SGIC Strategic Glob. Inv. Cap., Inc. v. Burger King Worldwide, Inc.*, 306 So. 3d 1021, 1024 (Fla. 3d DCA 2020) (pending lawsuit is evidence the foreign forum is available and adequate). As managing member of ARC II, Mr. Orlando also consents to Delaware jurisdiction. There is therefore no credible argument that Plaintiffs would be deprived of perfecting service of process over Defendants in Delaware.

Simply put, Delaware is an adequate and available forum because it possesses jurisdiction over the case, including all real parties in interests, and because the Delaware Chancery Court is already presiding over claims between ARC II and DWAC related to the claims in this case. The first factor is met.

### ii.    *The private factors overwhelmingly favor dismissal.*

Once the Court concludes there is an adequate alternative forum, it must balance the "private factors," which essentially means the parties' access to evidence, the parties' access to witnesses, the parties' ability to enforce judgments, and the other practicalities associated with litigation. *See Kinney Sys.*, 674 So. 2d at 91. "'Private interests' do not involve consideration of the availability or unavailability of advantageous legal theories, a history of generous or stingy damage awards, or procedural nuances that may affect outcomes but that do not effectively deprive the plaintiff of any remedy." *Id.* The applicable private interest factors weigh in favor of dismissal.

As a threshold matter, the Charter's forum-selection clause overwhelmingly favors dismissal. Indeed, a court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine Constr. Co., Inc.*, 571 U.S. at 63; *see also HNA LH OD, LLC v. Local House Int'l, Inc.*, No. 21-cv-21022, 2021 WL 4459404, at *9 (S.D. Fla. Sept. 29, 2021) ("The Supreme Court has held that the existence of a forum-selection clause is essentially dispositive in the forum non conveniens analysis."). Here, DWAC and TMTG (via DWAC)

9

designated Delaware as an appropriate forum by agreeing, in the Charter, to jurisdiction and venue in Delaware. The plain language of the DWAC's charter provides:

### EXCLUSIVE FORUM FOR CERTAIN LAWSUITS[.]

> [U]nless the Corporation consents in writing to the selection of an alternative forum, to the fullest extent permitted by the applicable law, the ***Court of Chancery of the State of Delaware shall be the sole and exclusive forum*** for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, ***(ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the DGCL or this Amended and Restated Certificate or the By-Laws***, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine[.]

<u>Ex. B</u>, Art. XII (emphasis added).

The forum-selection clause is relevant to Plaintiffs' lawsuit for two independent reasons. First, this lawsuit is against an officer and/or director that relates to a provision or provisions of the Charter. *See* Am. Compl. ¶¶ 27, 33, 37, 42, 47, 54, 61; *see also id.* ¶ 9 (claim asserted against office or director). The Charter's forum-selection clause broadly covers "any action asserting a claim against the Corporation['s] . . . directors [or] officers . . . arising pursuant to any provision of the" Charter. Ex. B, Art. XII. Second, DWAC brings a claim against a current DWAC director and/or officer for alleging breaching his fiduciary duties. *See, e.g.*, Am. Compl. ¶¶ 3, 6, 27, 66-80. The Charter's provision separately covers "any action asserting a claim of breach of a fiduciary duty owed by any director [or] officer." <u>Ex. B</u>, Art. XII.

The types of claims asserted, and DWAC's agreement to have these types of claims heard in Delaware, strongly support the conclusion that Delaware is an appropriate and well-suited forum for the present dispute. It defies reason to suggest DWAC can circumvent forum selection merely by stating claims on behalf of itself and TMTG, while at the same time requiring shareholders to bring precisely the same claims they assert against Defendants in Delaware. The Charter's forum-selection clause thus militates heavily in favor of dismissal. *See Schrenkel v. LendUS, LLC*, No. 2:18-cv-382, 2018 WL 5619358, at *8 (M.D. Fla. Oct. 30, 2018) (dismissing case on forum non conveniens where forum-selection clause provided forum in state or federal court in Delaware).

Access to relevant evidence also weighs in favor of dismissal. The relevant evidence in this case is not in Sarasota, Florida. Moreover, it is documentation that can be easily transmitted between the parties, which favors the Delaware forum. *See Inverpan, S.A. v. Britten*, 646 F. Supp. 2d 1354, 1358 (S.D. Fla. 2009) (dismissing complaint where "even if all the documents were located in Miami, the ease of document transfer in this day and age makes that a minor consideration. Thus, this factor weighs in favor of the [alternate] forum."). There is also no guarantee that any of the necessary witnesses would voluntarily participate in this proceeding in Sarasota, Florida. DWAC is a Delaware corporation with its principal place of business in Miami, Florida, ARC II is a Delaware limited liability company, with its headquarters in Miami, and Mr. Orlando resides in Miami. None of the purported acts alleged by Plaintiffs occurred in this venue. Thus, the documents and witnesses will be in either Delaware or Miami-Dade County, Florida.

The practicalities and expenses associated with litigation also heavily favor dismissal. Personal attacks aside, the Amended Complaint and its allegations center around an interpretation of a Delaware Charter under Delaware law, and a completed Merger Agreement between two Delaware incorporated entities. *See* Am. Compl. ¶¶ 15-24, 52-55. Hence, to litigate the claims, the parties would have to educate the judge and jury about the laws of Delaware, a Delaware Charter, and the specific application of those laws to Plaintiffs and this case, potentially through an expert.

Dismissal in favor of the courts in Delaware will best serve the private interests.

### iii.    *The public factors also favor dismissal.*

The public factors overwhelmingly favor dismissal on forum non conveniens grounds. The first public interest is a locality's interest in having localized controversies decided at home. *See Kinney Sys.*, 674 So. 2d at 92. Next, courts must consider their familiarity with the governing law. *See id.* And, finally, courts "may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it[.]" *Id.* None of these public interests weighs in favor of retaining this case in Florida.

First, there is no public interest in keeping this controversy in Sarasota because the controversy is not at home here. The controversy is at home in Delaware. This lawsuit centers on the application of a Delaware Charter and its governance under Delaware law. This is not a local dispute that needs to be decided in Florida, and the finite resources of Florida courts and its citizens should not be burdened with matters that concern issues substantially more relevant and accessible to the Delaware judicial system, Delaware entities, and the application of Delaware law. *See Scotts*

11

*Co. v. Hacienda Loma Linda*, 942 So. 2d 900, 901, 903 (Fla. 3d DCA 2006) (concluding Florida had "no interest in adjudicating the dispute of a Panama corporation whose property was injured in Panama by events taking place there" even though the president resided in Florida, promoted the business in Florida, and the company sold 91% of its product in Florida).

Second, Florida has a public interest in not permitting parties to circumvent valid forum-selection clauses. *See SGIC Strategic Glob. Inv. Cap.,* 306 So. 3d at 1025 (finding that the public interest factor weighed in favor of affirming dismissal on forum non conveniens grounds where the court considered "the public interest in enforcing the mandatory forum selection clause in the franchise agreements").

Third, as the United States Supreme Court noted, "[m]any forum non conveniens decisions have held that the need to apply foreign law favors dismissal." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 260 n.29 (1981). Plaintiffs' purported claims predominantly relate to the terms and provisions of the Charter, so the law of the place where the contract was formed governs—namely, Delaware—and will be applied. *See Lanoue v. Rizk*, 987 So. 2d 724, 727 (Fla. 3d DCA 2008); *see also* Am. Compl. ¶¶ 27, 33, 37, 42, 47, 54, 61. Not only that, Plaintiffs' purported claims relate to the internal affairs of DWAC and are thus governed by the laws of the state of incorporation, Delaware. *See Mukamal v. Bakes*, 378 F. App'x 890, 897 (11th Cir. 2010) (explaining under Florida's choice-of-law rules, claims for breach of fiduciary duty are considered the internal affairs of a corporation, and are governed by the laws of the state of incorporation).

Fourth, and relatedly, this lawsuit lacks the nexus with the forum to justify this Court's and jurors' efforts. Again, the sole actual tie between this case and Florida is that Plaintiffs rushed to the Florida courthouse to avoid a meritorious lawsuit (which is currently pending) in Delaware, and they would rather undertake their lawsuit here. Plaintiffs' mere inconvenience, forum shopping, and desire for Florida publicity, is not enough to require Florida's taxpayers, judges, and jurors to spend money and time to decide Plaintiffs' case. *See Johnson v. Johnson*, 288 So. 3d 745, 750 (Fla. 2d DCA 2019) (transfer to proper venue was necessary to prevent forum shopping).

### iv.    *Plaintiffs will not be unduly inconvenienced.*

The fourth factor "is designed to ensure that when a forum non conveniens dismissal is granted, the remedy potentially available in the alternative forum does not become illusory." *Kinney Sys.*, 674 So. 2d at 92. This requirement is generally met when, to avoid statute-of-limitations issues, a defendant stipulates that the action "will be treated in the new forum as though

it had been filed in that forum on the date it was filed in Florida," which Defendants automatically did when they filed this Motion. *Id.*; *see also* Fla. R. Civ. P. 1.061(c) ("In moving for forum-non-conveniens dismissal, defendants shall be deemed to automatically stipulate that the action will be treated in the new forum as though it had been filed in that forum on the date it was filed in Florida, with service of process accepted as of that date."). This factor thus favors dismissal.

* * *

To recap, Delaware is an available and adequate alternative forum, and both the private and public interest factors weigh strongly in favor of litigating this case in Delaware. All forum non conveniens factors favor dismissal.

### B.    Venue is improper in this forum

As Plaintiffs fail to allege that their claims have any connection to this forum, dismissal is also warranted for improper venue. The cited venue statute provides:

> Actions against domestic corporations shall be brought only in the county where such corporation has, or usually keeps, an office for transaction of its customary business, where the cause of action accrued, or where the property in litigation is located. Actions against foreign corporations doing business in this state shall be brought in a county where such corporation has an agent or other representative, where the cause of action accrued, or where the property in litigation is located.

Fla. Stat. § 47.051; Am. Compl. ¶ 14.

Sarasota County is not a proper venue under Florida Statutes § 47.051. Two of the three potential grounds for venue are clearly inapplicable. Defendants do not (1) reside in Sarasota County; or (2) maintain an office, agent, or representative in Sarasota County. Am. Compl. ¶¶ 9-10. Nor is there any property at issue in this litigation, much less property located in Sarasota County.

Still, Plaintiffs allege venue is proper here because "causes of action brought herein accrued in Sarasota County, Florida." *Id.* ¶ 14. But, as described above, none of the events alleged occurred in Sarasota County. Insofar as Defendants engaged in any activities giving rise to Plaintiffs' claims (and, as discussed, they did not), there is not a single allegation in the Complaint or the Amended Complaint that any event or omission occurred in this forum This makes sense; after all, the events giving rise to the purported claims occurred in Delaware, where Plaintiffs and ARC II are incorporated; and in Miami, where Mr. Orlando resides and where Plaintiff DWAC and ARC II have headquarters.

The only connection between this forum and Plaintiffs' claims is that TMTG maintains an

office in Sarasota County. This lone connection, however, is insufficient to establish venue. *See Rankel v. Kabateck*, No. 12-cv-216, 2013 WL 7161687, at *7 (S.D.N.Y. Dec. 9, 2013) ("Standing alone, plaintiff's status as a New York resident (and the resulting convenience to her of litigating this action here) does not support venue in this district."). Presumably, Plaintiffs will say TMTG's single cause of action under FDUTPA accrued in Sarasota. This is nonsensical. FDUTPA claims accrue when the last element constituting the cause of actions occurs—actual damages. "A plaintiff suffers actual damages under FDUTPA when the plaintiff purchases something different from what he or she was led to believe was being purchased." *Allen v. Jacksonville Univ.*, No. 3:21-cv-178, 2022 WL 17668615, at *5 (M.D. Fla. Dec. 14, 2022) (collecting cases). The purported notes at issue in the FDUTPA claim were issued by DWAC, a Delaware corporation with its principal place of business in Miami, Florida to ARC II, a Delaware LLC, with its principal place of business in Miami, Florida. There are no allegations pertaining to how and when Plaintiffs suffered actual damages, as defined above, in this venue as a result of Defendants' purported conduct. Therefore, venue in this County is not proper, and this Court need not address any of the remaining arguments for dismissal set forth below. However, even if venue were proper, the case should nevertheless be dismissed for each of the following, independently sufficient reasons.[10]

**C.      The Amended Complaint fails to state a cause of action.**

Plaintiffs attempt but fail to state claims for breach of fiduciary duty of loyalty (Count I); breach of fiduciary duty of care (Count II); conversion (Count III); aiding and abetting breach of fiduciary duty (Count IV); and a violation of FDUTPA (Count V).[11]

**i.      Plaintiffs fail to comply with Florida Rule of Civil Procedure 1.130(a).**

As a threshold matter, Plaintiffs fail to state causes of action by failing to comply with Rule 1.130(a). Plaintiffs purport to assert claims that incorporate allegations related to their misinterpretation of the conversion ratio in the Charter, Mr. Orlando's supposed non-compliance with the Charter, several supposed breaches of written contractual obligations, and a one-sided interpretation of promissory notes. *See* Am. Compl. ¶¶ 35, 38, 39, 40, 42, 43, 44, 45, 54, 57, 62,

---

[10] While the Court has discretion either to dismiss Plaintiffs' claims for improper venue or to transfer the claims to an appropriate venue (Miami-Dade County), dismissal is warranted because Plaintiffs' claims also are insufficiently pled to survive a motion to dismiss in any forum.

[11] Defendants reserve all rights related to any choice-of-law analysis. Even assuming Plaintiffs chose the correct forum and that Florida is the more convenient forum, Plaintiffs fail to allege any claim for relief.

64. "Florida Rule of Civil Procedure 1.130 provides that a written contract or document that forms the basis of a claim for relief shall be attached to or incorporated in the pleading and any exhibit that is attached to the pleading is considered a part of that pleading." *Diaz v. Bell MicroProducts-Future Tech, Inc.*, 43 So. 3d 138, 139-40 (Fla. 3d DCA 2010). Though the Amended Complaint states no actual claims, it purports to state claims that are expressly based on the Charter, written contractual obligations, and promissory notes, which the Amended Complaint conspicuously fails to attach. Consequently, each count must be dismissed as a matter of law. *See Id.*

### ii.    Plaintiffs' claims are moot given the completed merger.

The Amended Complaint focuses on the allegedly wrongful obstruction of the Merger Agreement. *See* Am. Compl. ¶¶ 1-5. Plaintiffs have no stake here, however. They sued exclusively to bully Defendants into voting ARC II shares in favor of the Merger Agreement. But since Defendants have already voted ARC II shares, as a practical matter, this case is over. The merger was completed on March 22, 2024. ARC II voted its shares in favor of the transaction. *See* Mar. 22, 2024 DWAC Form 8-K Report. Plaintiffs' claims were thus rendered moot. There is simply no independent claim that would survive the completion of the Merger Agreement.

Plaintiffs repeatedly say Mr. Orlando is delaying or obstructing the shareholder vote. These are demonstrably false accusations. Following the Delaware court's finding that Defendants had a colorable claim related to the conversion ratio, Defendants stated to the court that ARC II intended to vote its shares in favor of the business combination. *See* Ex. A ("ARC, through its counsel, has represented that ARC presently intends to vote its shares of DWAC stock in favor of the Business Combination[.]"). The allegation "ARC declined to lodge its vote" is false. Am. Compl. ¶ 64. Plaintiffs disregard this fact because it does not fit their false narrative that Mr. Orlando and ARC II harmed Plaintiffs.

Under the circumstances, there is nothing left to litigate, and the claims in the Amended Complaint are moot. Indeed, Plaintiffs do not and cannot explain what specific relief they seek that survives the completed merger, much less why they should (or even could) be entitled to such relief. *See Acheron Portfolio Tr. v. Mukamal as Tr. of Mut. Benefits Keep Policy Tr.*, No. 18-cv-25099, 2021 WL 7368630, at *37 (S.D. Fla. Sept. 24, 2021) (claim mooted by events that occur subsequent to lawsuit).

### iii.    Mr. Orlando did not breach any fiduciary duty (Counts I and II).

In Counts I and II, DWAC alleges Mr. Orlando, personally and individually, owed it

15

fiduciary duties of loyalty and care and that Mr. Orlando breached those duties by "refusing to cooperate with Company governance and business processes," making "public statements," obstructing the Merger Agreement, and "illegal[ly] targeting." Am. Compl. ¶¶ 70, 71, 72, 77, 78.

Even assuming the fiduciary duty claims are not moot[12]—which they are—they fail as a matter of law. "A claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Fannin v. UMTH Land Dev.*, L.P., No. CV 12541, 2020 WL 4384230, at *17 (Del. Ch. July 31, 2020) (cleaned up).[13] Under Delaware law, directors and officers have certain fiduciary "duties, often referred to as a triad of duties, include the duties of care, loyalty and good faith." *In re USA Detergents, Inc.*, 418 B.R. 533, 543 (Bankr. D. Del. 2009) (cleaned up). "Delaware law requires that a plaintiff plead facts supporting an inference that officers and directors committed a cognizable breach of duty." *In re Fedders N. Am., Inc.*, 405 B.R. 527, 541 (Bankr. D. Del. 2009).

### a.    The Charter Exculpates Mr. Orlando from Plaintiffs' Claims.

Here, however, the Charter explicitly **exculpates** directors from personal liability for breaches of fiduciary duty to the fullest extent permitted by law, subject to a few limited exceptions:

> A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, . . . unless they violated their duty of loyalty to the Corporation or its stockholders, acted in bad faith, knowingly or intentionally violated the law, authorized unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or derived improper personal benefit from their actions as directors.

Ex. B, Art. VII. This clause is consistent with Delaware corporate law expressly authorizing such exculpatory clauses, which eliminate or limit the personal liability of corporate actors for alleged breaches of fiduciary duty. *See In re Paypal Holdings, Inc. S'holder Derivative Litig.*, No. 17-cv-00162, 2018 WL 466527, at *3 (N.D. Cal. Jan. 18, 2018) (analyzing a similar provision and noting

---

[12] By way of example, DWAC says Mr. Orlando "continuously obstructed [the] merger," Am. Compl. ¶ 71; yet, as discussed, the Merger Agreement is now completed, rendering any allegations in that regard moot.

[13] Delaware law applies to all claims related to breach of fiduciary duty or corporate governance (Counts I, II, and IV). *See* Am. Compl. ¶¶ 7-8 (admitting both Plaintiffs are Delaware corporations); *Mukamal*, 378 F. App'x at 897 (explaining under Florida's choice-of-law rules, claims for breach of fiduciary duty are considered the internal affairs of a corporation, and are governed by the laws of the state of incorporation).

"a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim, which requires plaintiffs to allege particularized facts showing that the directors engaged in disloyal, fraudulent, illegal or bad faith conduct, and acted with scienter" (cleaned up)).

The Amended Complaint fails to allege facts to support an inference that Mr. Orlando's supposed fiduciary breaches fall within the Charter's limited exceptions for personal liability. Mr. Orlando faces no possibility of liability for claims of negligence, gross negligence, or any other conduct short of bad faith or unlawful. Instead, DWAC must plead scienter demonstrating bad faith or unlawfulness. Yet, none of the Amended Complaint's allegations come close to establishing any basis for inferring that Mr. Orlando acted in conscious bad faith—an absolute prerequisite to the claims.

> **b.**    **Plaintiffs Fail to Allege any Violation of Mr. Orlando's Duty of Loyalty.**

To support the breach of fiduciary duty of loyalty claim, the Amended Complaint essentially alleges that Mr. Orlando obstructed the merger by conducting due diligence with documentation requests to confirm proper conversion ratio, declining to immediately resign as a director (though not contractually required to do so), and requiring DWAC to comply with its own Charter. Am. Compl. ¶¶ 68, 76. None of these allegations, even when drenched with inflammatory rhetoric, falls within the Charter's exceptions, and none would constitute a breach of a fiduciary duty or duty of loyalty even if the Charter did not limit Mr. Orlando's exposure to such claims.

The pleading says Mr. Orlando breached his duty of loyalty by: (1) "refusing to cooperate in Company governance"; (2) making "public statements";[14] and (3) "obstruct[ing] the merger" that is now completed. Am. Compl. ¶¶ 69-71. These vague and conclusory allegations could not possibly constitute the type of self-dealing and personal gain necessary to establish a breach of the duty of loyalty. "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). Mr. Orlando seeks to hold DWAC to the plain terms of the Charter and acted prudently and expeditiously by seeking a Court declaration in this regard. It is thus

---

[14] Remarkably, DWAC fails to identify any specific "public statements" that were purportedly harmful to DWAC, nor describes what information was "leaked to the press"—despite the allegation stating that both statements and information are *public*. Am. Compl. ¶ 70.

unsurprising the Amended Complaint does not allege facts plausibly implying that Mr. Orlando acted with an intent to benefit third parties or himself at the expense of stockholders. The opposite is true. Mr. Orlando shares the same interest with stockholders—full compliance with the Charter. *In re DSI Renal Holdings, LLC*, No. 11-11722, 2020 WL 7054390, at *7 (Bankr. D. Del. Dec. 2, 2020) ("In an arm's length transaction, a transacting party has every right to pursue the best possible deal for itself." (cleaned up)).

The Amended Complaint also alleges Mr. Orlando "executed promissory notes on behalf of DWAC to ARC with no ratification of disinterested leadership," insisting this was a violation of an unspecified "duty" to shareholders. Am. Compl. ¶ 42. The notes referenced—but not attached in violation of Rule 1.130(a)—were agreed to in order to keep the SPAC in operation—surely a benefit to shareholders, not the contrary. Plaintiffs omit the notes and the other incorporated-by-reference documents for good reason—each would disprove a number of the false allegations in the Amended Complaint.

        c.    <u>Plaintiffs Fail to Allege any Violation of Mr. Orlando's Duty of Care.</u>

Plaintiffs fail to allege any actionable breach of the duty of care. The duty of care is the requirement to "use that amount of care which ordinarily careful and prudent [person] would use in similar circumstances, and consider all material information reasonably available in making business decisions, with alleged breaches giving rise to liability only if the actions are grossly negligent." *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005). The Amended Complaint says Mr. Orlando breached his duty of care by engaging in "illegal targeting", by failing to "recordkeep[]",[15] "ratify Company decisions", and "account[]." Am. Compl. ¶ 78. These speculative and conclusory allegations are based on cherry-picked events and unsupported inferences untethered to any *actual* fiduciary duty on the part of Mr. Orlando. Even if the allegations could, in the abstract, support such an inference, they do not do so here because each

---

[15] The Amended Complaint claims Mr. Orlando "failed to institute proper corporate partitions . . . , resulting in two material restatements to the Company's financials and extensive costs for accounting services." Am. Compl. ¶ 39. Plaintiffs offer no specifics because they cannot. Moreover, their claim that DWAC's accounting firm (Marcum LLP_ resigned due to Mr. Orlando is false. Indeed, as widely reported Marcum's resignation was related to its settlement with the SEC regarding allegations related to quality control of its SPAC auditing business. *See Sec. Exch. Act of 1934 Release No.* 97773 (Jun. 21, 2023), available at: https://www.sec.gov/files/litigation/admin/2023/34-97773.pdf.

of the allegations is false. Mr. Orlando, for instance, has not been charged, let alone found liable, for any violation of law. The Amended Complaint also does not explain (nor can it) how any of the supposed remaining duties of care are actionable under the exculpatory provision of the Charter. DWAC's fiduciary duty of care claims fails as well.

DWAC's bare allegation of "illegally targeting" against Mr. Orlando also falls short of the breach of fiduciary duty standard. Am. Compl. ¶ 77. As the Charter makes clear, a director's fiduciary liability only exists if a plaintiff pleads a *non-exculpated* claim based on particularized facts. Ex. B, Art. VII. DWAC does not allege (because it cannot) that the alleged SEC incident was due to a director acting in bad faith, knowingly or intentionally violating the law, authorizing unlawful payments of dividends, unlawful stock purchases or unlawful redemptions, or deriving improper personal benefit—i.e., a non-exculpated claim. DWAC's Board voluntarily decided to settle with the SEC in its own business judgment. Mr. Orlando has not been charged, let alone found liable, for any violation of the federal securities laws. Put another way, the Amended Complaint does not allege any non-exculpatory conduct that resulted in harm to DWAC. The pleading's irrelevant and unsubstantiated allegations are unsupported by the factual allegations necessary to plead a breach of fiduciary duty claim under the Charter. Neither are such facts available against Mr. Orlando.[16] Plaintiffs claim against Mr. Orlando is particularly ironic, as they have not taken any action against former DWAC Director Bruce Garlick who has been **indicted** in the Southern District of New York for insider trading related to DWAC stock. *See United States v. Garelick, et al.*, No. 23-CR-00370-LJL (S.D.N.Y. 2023). DWAC's true colors are exposed—this lawsuit has nothing to do with facts or reality.

### d.    The Amended Complaint Fails to Allege How Any of Alleged Breaches Were the Proximate Cause of Any Damages.

Equally, the Amended Complaint does not plead facts supporting how any of the alleged damages were *proximately* caused by Mr. Orlando's alleged breaches of fiduciary duties. Proximate causation is an essential element when pleading a fiduciary duty claim in this post-

---

[16] On the other hand, however, DWAC's Board of Directors assented to an unfavorable settlement agreement, which benefitted them personally because it meant that the SEC would agree to permit the business combination to move forward and the Board to realize their rich compensation packages—all at the expense of shareholders, whose funds will foot the bill to pay a civil monetary penalty. If there was any breach of fiduciary duty alleged in the Amended Complaint, it is that of DWAC's other board members, not Mr. Orlando.

closing context. *See ACP Master, Ltd. v. Sprint Corp.*, No. CV 8508, 2017 WL 3421142, at *20 (Del. Ch. July 21, 2017) (concluding transaction was entirely fair where controller engaged in acts of unfair dealing, but third party bidder intervened and severed any causal connection between controller's actions and ultimate deal price). Yet, the pleading fails to plead allegations sufficient to connect anything Mr. Orlando did or did not do with harm to DWAC or its stockholders. DWAC, for instance, says Mr. Orlando "reaped unearned benefits as a result of his breaches of fiduciary duty" but offers no specifics as to what those purported benefits are and how such benefits were earned by Mr. Orlando or harmed DWAC and its investors. Am. Compl. ¶ 72. Similarly, DWAC claims Mr. Orlando "destr[oyed] [] records" but, again, proffers no allegations as to what "records" were purportedly destroyed. *Id.* ¶ 80. Moreover, Mr. Orlando did not procure any breach of contract to which DWAC is party, and his alleged actions show only that he was seeking DWAC to comply with the plain terms of its own Charter and to secure the correct value for the shareholders as delineated in the Charter—nothing more.

Because the Amended Complaint has not plead facts supporting how Mr. Orlando is liable under any of the fiduciary duty exception in the Charter or how the alleged breaches proximately caused the alleged damages suffered by DWAC, Counts I and II should be dismissed.[17]

### iv. The Amended Complaint fails to properly plead a conversion claim.

The Amended Complaint's conversion claim fails as a matter of law. A claim for conversion in Florida requires three elements: (1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein. *See Mayo v. Allen*, 973 So. 2d 1257, 1258 (Fla. 1st DCA 2008). DWAC's conversion claim is deficient for multiple reasons.

First, the Amended Complaint offers a vague assertion that Mr. Orlando is liable for conversion for utilizing business expenses for legal fees, which total "$15,000 in cash from a DWAC bank account." Am. Compl. ¶ 83. This theory makes no sense. "For money to be the object of conversion there must be an obligation to keep intact or deliver the specific money in question, so that [the] money can be identified." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1056 (Fla. 3d DCA 2008) (cleaned up). The Amended Complaint offers no plausible allegations that Mr. Orlando had an obligation to keep the $15,000.00 intact or had any restriction on what he could

---

[17] Defendants reserve all rights to move to strike the categories of relief Plaintiffs seek in the Amended Complaint, including injunctive relief and disgorgement, as there is no basis in law or fact to request certain categories of relief in this action.

do with alleged funds. *See, e.g.*, *Worldwide Distribs., Inc. v. Maven Med, Inc.*, No. 22-23635-Civ, 2023 WL 4303847, at *20-21 (S.D. Fla. June 15, 2023) (dismissing conversion claim where the complaint did not contain any allegations the defendant was required to keep the money intact, especially considering the fact the money was subsequently sent to a third-party attorney).

Second, the purported "cash from a DWAC bank account" is not specifically identifiable and cannot be the subject of a conversion claim. Am. Compl. ¶ 83. Courts routinely dismiss claims based on unspecified monies in accounts and hold that these claims are not a proper subject for a conversion claim, even when the allegations include a specific amount converted and the potential to locate the funds. *See, e.g.*, *Walter Auto Loan Tr. v. Track Motors, LLC*, No. 22-cv-61923, 2023 WL 5747432, at *3 (S.D. Fla. Aug. 3, 2023) (deciding that conversion claims failed where cross-plaintiff claimed cross-defendant wrongfully withheld $103,000.00 from certain portfolios); *Intabill, Inc. v. Elie*, No. 8:09-cv-834, 2009 WL 3232520, at *2 (M.D. Fla. Sept. 29, 2009) (dismissing conversion claim with prejudice where complaint alleged that defendant wrongly withdrew $4 million from a specific account). The Amended Complaint comes nowhere close to alleging facts to satisfy the specifically identifiable requirement of a conversion claim.

Third, a party who does not personally receive property that is the subject of an alleged conversion cannot be held liable for conversion. *See Transcapital Bank v. Shadowbrook at Vero, LLC*, 226 So. 3d 856, 864 (Fla. 4th DCA 2017). The Amended Complaint makes no allegations to support the claim Mr. Orlando used any of the $15,000.00 towards personal use. Nor can it. Without any plausible allegations of Mr. Orlando's personal use of the money, the conversion claim must be dismissed. *See, e.g.*, *id.* (finding defendants not liable for conversion where no facts established they used the money at issue for personal use).

Finally, the Amended Complaint alleges "[u]pon information and belief, Mr. Orlando has engaged in similar improper utilization of Company funds[.]" Am. Compl. ¶ 83. In other words, DWAC alleges no wrongdoing on the part of Mr. Orlando but does hope to identify such facts someday. But this punishment-in-search-of-a-crime theory of litigation will find no welcome in Florida. In civil cases, "a party is not entitled to discovery" until after it "has not only filed a complaint, but a well-pleaded one." *United States v. Cuya*, 964 F.3d 969, 973 (11th Cir. 2020). Because the Amended Complaint fails to allege the appropriate elements or facts to support the claim and because the Amended Complaint assumes that it can uncover facts in discovery without appropriately pleading its claims, dismissal is required.

21

*v.    Plaintiffs' aiding and abetting fiduciary claim fails for several reasons.*

The Amended Complaint fails to state a claim for aiding and abetting. "Under Delaware law, the claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach." *Principal Growth Strategies, LLC v. AGH Parent LLC*, No. 2019-0431, 2024 WL 274246, at *8 (Del. Ch. Jan. 25, 2024).

First, because Mr. Orlando is an agent of ARC II, it is impossible for ARC II to aid and abet a breach of fiduciary duty allegedly committed by Mr. Orlando. Delaware law recognizes the obvious deficiency in alleging that agents and principals somehow aid and abet each other to commit a tort. For that reason, DWAC is precluded from stating a claim that alleges an agent aided and abetted with a principal—which is what, in essence, the Amended Complaint alleges. *See Buttonwood Tree Value Partners, L.P. v. R.L Polk & Co., Inc.*, No. Civ. A. 9250, 2014 WL 3954987, at *5 (Del. Ch. Aug. 7, 2014) ("a corporation cannot aid and abet violations by the fiduciaries who serve it" (cleaned up)); *cf. Kurnow v. Abbott*, 114 So. 3d 1099, 1102 (Fla. 1st DCA 2013) (collecting cases).

Second, under Delaware law, aiding and abetting is not a freestanding cause of action, but rather requires proof of a completed underlying *breach* of fiduciary duty. *See Principal Growth Strategies, LLC*, 2024 WL 274246, at *8. The purported aiding and abetting claim is based on the deficient underlying fiduciary duty claims. Yet, as discussed, DWAC does not plausibly state breach of fiduciary duty claims. Without a viable breach of fiduciary duty claim against Mr. Orlando, there can be no aiding and abetting to commit the tort. *See Dewitt Stern Grp., Inc. v. Eisenberg*, 257 F. Supp. 3d 542, 588 (S.D.N.Y. 2017) ("For the reasons discussed above, there was no breach of fiduciary duty, and therefore no aiding or abetting of a non-existent breach."); *cf. Buckner v. Lower Fla. Keys Hosp. Dist.*, 403 So. 2d 1025, 1027-29 (Fla. 3d DCA 1981) (upholding dismissal of conspiracy claims where underlying tort count was not actionable).

Third, the Amended Complaint does not allege ARC II had actual knowledge of the purported breaches of fiduciary duty. Aiding and abetting requires "the nonfiduciary act with the knowledge that the conduct advocated or assisted constitutes such a breach." *Triton Constr. Co., Inc. v. E. Shore Elec. Servs., Inc.*, No. Civ. A. 3290, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009. In other words, a plaintiff must, at the very least allege plausible facts, that the defendant should have known of the underlying violation. Here, the Amended Complaint alleges ARC II

"had knowledge of Mr. Orlando's breaches of fiduciary duty." Am. Compl. ¶ 89. Conclusory statements, such as the one alleged in the Amended Complaint, cannot support an aiding and abetting claim. Even assuming the Amended Complaint plausibly alleges a breach of fiduciary duty—which it does not—there are no allegations or facts that support an inference that ARC *knew or should have known* of Mr. Orlando's breaches—a requirement of its claim. *See In re Draw Another Circle.*, 602 B.R. 878, 904 (Bankr. D. Del. 2019) (conclusory allegations that a defendant "knew or should have known" of an underlying breach of fiduciary duty are not sufficient to plead a claim of aiding and abetting); *McGowan v. Ferro*, No. Civ. A. 18672, 2002 WL 77712, at *4 (Del. Ch. Jan. 11, 2002) (dismissing aiding and abetting claim for inadequacy of pleading because "[c]onclusory allegations that [defendant] 'knew of the fiduciary duty breach alone would not establish its complicity with the defendants' alleged breach'").

Fourth, the Amended Complaint fails to allege how ARC II substantially assisted in Mr. Orlando's supposed "obstruction" or "targeting." Am. Compl. ¶¶ 87, 88. When, and how, exactly, did ARC II assist and encourage Mr. Orlando's supposed "obstruction" or "targeting"? And why would ARC II substantially assist Mr. Orlando in "obstruction" or "targeting," particularly when its financial interests were aligned with the merger (assuming the correct conversion ratio is used)? The Amended Complaint does not say, relying only on the vague and generalized fallacy that Mr. Orlando's efforts securing the correct conversion calculation and DWAC's *own* settlement with the SEC are obstruction and motivated by self-interest. This defies both logic, and there are no plausible factual allegations of substantial assistance that are or could be made.

For these reasons, the Court should dismiss the aiding and abetting count.

### vi.    Plaintiffs' purported FDUTPA claim fails as a matter of law.

Plaintiffs' purported FDUTPA claim similarly fails. FDUTPA does not apply to claims involving securities like those alleged in the Amended Complaint. Equally dispositive, Plaintiffs have not sufficiently alleged the elements of FDUTPA claim. The claim should be dismissed.

*First*, FDUTPA is "inapplicable to securities claims." *Feng v. Walsh*, No. 19-24138-Civ, 2021 WL 8055449, at *13 (S.D. Fla. Dec. 21, 2021). Plaintiffs hurl some allegations relating to Mr. Orlando's alleged improper benefit as to the issuance of "promissory notes," which animates their FDUTPA claim.[18] *See, e.g.*, Am. Compl. ¶¶ 38, 42-46, 96; *see also* Fla. Stat. § 517.021(22)

---

[18] To the extent Plaintiffs' FDUTPA claim is predicated on internal affairs of a corporation or its governance, the claim is barred. *See Beckel v. Fagron Holding USA, LLC*, No. 8:16-cv-2059, 2017

(defining "security" to include a "note"). As a result, this case is "rooted in securities transactions" and thus, "FUDTPA does not apply in this case." *Feng*, 2021 WL 8055449, at *13. This alone is grounds for dismissal. *See Crowell v. Morgan, Stanley, Dean Witter Servs. Co., Inc.*, 87 F. Supp. 2d 1287, 1295 (S.D. Fla. 2000) (dismissing FDUTPA claim on this basis).

**Second**, Plaintiffs fail to allege the elements of a FDUTPA claim. A plaintiff must establish three elements to assert a FDUTPA claim: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *See Sclar v. OsteoMed, L.P.*, No. 17-23247-Civ, 2018 WL 559137, at *3 (S.D. Fla. Jan. 24, 2018). An act or practice is deceptive if it "is likely to mislead consumers acting reasonably in the circumstances, to the consumers' detriment." *State v. Beach Blvd. Auto. Inc.*, 139 So. 3d 380, 387 (Fla. 1st DCA 2014). An act or practice is "unfair" if it causes consumer injury that is (1) substantial, (2) not outweighed by any countervailing benefits to consumers or competition, and (3) one that consumers themselves could not have reasonably avoided. *See Porsche Cars N. Am., Inc. v. Diamond*, 140 So. 3d 1090, 1096-98 (Fla. 3d DCA 2014).

Nowhere does the Amended Complaint allege that Defendants said or did anything that would deceive a consumer. Nor does the Amended Complaint allege that Defendants' actions would mislead consumers acting reasonably in the circumstances or explain how Defendants' actions or statements would deceive a consumer. *See Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 627 (11th Cir. 2015) (dismissing FDUTPA claim for failure to "explain what was deceptive about the" statement). Likewise, the Amended Complaint fails to plausibly plead Defendants' conduct was "unfair" under FDUTPA. The pleading does not, for instance, identify any established public policy the alleged conduct violates or otherwise plead facts plausibly raising that conduct to the level of consumer "unfairness" required for FDUTPA liability. Divorced from bare allegations of Defendants' alleged motive, all the Amended Complaint does is parrot the statutory definition and proclaim Defendants are liable. This bare recitation and proclamation are insufficient to state a FDUTPA claim. Plaintiffs fail to establish a predicate for FDUTPA liability.

Independently, Plaintiffs' allegations also fall far short of alleging the required "direct" causal nexus between Defendants and any actual damage Plaintiffs suffered, as required to state a FDUTPA claim. *See Lombardo v. Johnson & Johnson Consumer Cos., Inc.*, 124 F. Supp. 3d 1283,

---

WL 3730395, at *9 (M.D. Fla. June 30, 2017) ("An enforceable choice of law clause providing that Delaware's substantive law applies bars claims brought under Florida's (or any other state's) statutory law.").

1290 (S.D. Fla. 2015) (observing that "causation must be direct, rather than remote or speculative"). Here, the "direct" cause of Plaintiffs' injuries was their own misconduct, not Defendants'. Defendants have long been committed to negotiating a conversion ratio with DWAC that correctly tracks the Charter's unambiguous language—but DWAC has other motivations. Mr. Orlando cannot be culpable simply by advancing an interpretation of the conversion ratio on behalf of ARC II and its members. Any "merger delay" is thus Plaintiffs' own wrongdoing, not Defendants. Where, as here, a plaintiff is damaged by another party's actions, the causal chain is broken and the FDUTPA claim fails. *See Lombardo*, 124 F. Supp. 3d at 1290.

Additionally, Plaintiffs do not adequately allege they suffered "actual damages" for purposes of FDUTPA. Actual damages are "the difference between the market value of the jet-boat as delivered and its market value as it should have been delivered." *Rodriguez v. Recovery Performance & Marine, LLC*, 38 So. 3d 178, 181 (Fla. 3d DCA 2010). Actual damages do <u>not</u> include "recovery of nominal damages, speculative losses, or compensation for subjective feelings of disappointment." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 873 (Fla. 2d DCA 2006). But speculation is all the Amended Complaint provides. *See* Am. Compl. ¶ 101. Plaintiffs do not allege, for instance, facts showing actual losses with respect to the Merger Agreement that is now consummated. In fact, completion of the merger in the wake of Defendants' alleged wrongdoing negates any alleged corporate trauma or actual loss. This, too, mandates dismissal because Plaintiffs' then-speculative and now impossible losses do not qualify as "actual damages," as that term is applied in FDUTPA claims. *See Circuitronix, LLC v. Shenzen Kinwong Elec. Co.*, No. 17-cv-22462, 2018 WL 7287192, at *14 (S.D. Fla. Jan. 31, 2018) (dismissing FDUTPA claim where "Plaintiff pleads no facts from which one could plausibly infer the degree to which, or even whether, the market value of any product or service has changed" (cleaned up)).

Simply put, Plaintiffs' FDUTPA claim fails as a matter of law and dismissal is merited.

> ### D.    Alternatively, if the Court is not inclined to dismiss this case it should, based on principle of priority as a matter of comity, stay this matter pending resolution of the stock conversion ratio issue in the Delaware Action.

Florida courts follow the "principle of priority" such that where courts within Florida have concurrent jurisdiction, the court which first exercises its jurisdiction acquires exclusive jurisdiction to proceed with that case. *Siegel v. Siegel*, 575 So. 2d 1267, 1272 (Fla. 1991). Although this principle is not mechanically applied between sovereign jurisdictions, as a matter of comity, however, a court of one state may, in its discretion, stay a proceeding pending before it on the

grounds that a case involving substantial the same parties and issues is pending in the court of another state. *Id.*; *Bogert v. Morrison (In re Morrison)*, 972 So. 2d 905, 908 (Fla. 2d DCA 2007) (collecting cases and explaining that that "a stay does not require complete identity of both the parties and the causes of action, but requires a substantial similarity of the parties and actions."). This makes sense as "[t]he purpose of applying the principle of priority as a matter of comity is to prevent 'unnecessary and duplicitous lawsuits' that 'would be oppressive to both parties.'" *Bogert*, 972 So. 2d at 908 (quoting *Siegel*, 575 So. 2d at 1272).

Despite Plaintiffs' bad faith tactics delaying the filing of the Delaware Action so that Plaintiffs could file this action first, the Delaware Action has priority because the Delaware Chancery Court was first to exercise jurisdiction in a March 18, 2024 Stipulation and Order Regarding Motion to Expedite. *See* Ex. A, *see also Bogert*, 972 So. 2d at 908 (staying a Florida action in favor of an action pending in New Jersey where the New Jersey court first exercised jurisdiction via an order to show cause and explaining that "there is no reasonable basis to conclude that the trigger for priority is anything but the exercise of jurisdiction as was stated by the supreme court in *Siegel*"). Plaintiffs cannot legitimately argue otherwise because DWAC stipulated and agreed to the Delaware Chancery Court's jurisdiction and expedited resolution of the stock conversion ratio issue, and then dismissed its claim for declaratory judgment in the initial Complaint. *Id*.

Moreover, this action is sufficiently similar in parties and issues to stay it pending resolution of the expedited stock conversion ratio issue in the Delaware Action. The parties and causes of action need not be identical. Instead, it is sufficient that the two actions involve a single set of facts and that resolution of the priority case will resolve many of the issues involved in the other case. *Bogert*, 972 So. 2d at 908 (citations omitted). That is plainly the case here as ARC II and DWAC are parties in both actions and Mr. Orlando, a party to this action, is the managing member of ARC II. In addition, both Mr. Orlando and TMTG are interested non-parties in the Delaware Action.[19] *See generally* Ex. H.

---

[19] Minor differences between the parties do not justify denying a stay, particularly where, as here, Plaintiffs engaged in underhanded tactics and blatant forum shopping. *See Pilevsky v. Morgans Hotel Grp. Mgmt., LLC*, 961 So. 2d 1032, 1035 (Fla. 3d DCA 2007) ("Florida courts, including this one, regard forum shopping with displeasure, and that policy would be meaningless if a party could avoid the dictates of comity by simply naming nominal defendants in a second-filed action.").

The Delaware Action will also resolve many of the issues in this case. Both operative complaints concern the facts leading up to the planned merger between DWAC and TMTG. *Compare* Ex. H, *with* Am. Compl. Significantly, the crux of the instant action is that Defendants allegedly obstructed or delayed the merger between DWAC and TMTG. *See, e.g.*, Am. Compl. ¶¶ 3-5, 23-27, 32, 48, 52-55, 62-64, 66, 71, 74, 81, 85, 88, 93, and 99. However, as described herein, Defendants acted prudently (not unlawfully) in questioning DWAC's erroneous stock conversion ratio and insisting on the protections which, following Plaintiffs' gamesmanship, required filing the Delaware Action. The Delaware Action and this action will necessarily involve an examination of Defendants' and Plaintiffs' actions and inactions concerning the stock conversion ratio issue and the same governing documents, i.e., the Charter and public filings relating to the merger. A finding in the Delaware Action that ARC II's conversion ratio is correct and that it acted lawfully while DWAC acted unlawfully will resolve the central crux of this case. *Pilevsky*, 961 So. 2d at 1036 (finding it was an abuse of discretion to refuse to stay a Florida action based on comity when, although not identical, the disposition of a New York action would resolve many of the issues in the Florida action).

Significantly, "[a]lthough the principle of priority is discretionary, a trial court should stay proceedings when prior proceedings are pending in a court of another state unless there are special circumstances that would justify a denial of the stay. Thus, absent any such special circumstances, a trial court abuses its discretion in refusing to grant a stay based on the principle of priority." *Bogert*, 972 So. 2d at 910 (citations omitted). There are no special circumstances here. Indeed, "the most common example of such special circumstances is undue delay by the court with priority"; however, that is plainly inapplicable as the Delaware Chancery Court is expediting resolution of the stock conversion ratio issue. *Id*.; *see also* Ex. A.

## V.    CONCLUSION.

For these reasons, Defendants respectfully request that this Court dismiss the Amended Complaint, for forum non conveniens, for improper venue, and for failure to state a cause of action. Alternatively, if the Court is not inclined to dismiss this action, it should stay this action pending resolution of the Delaware Action.

Dated:  Miami, Florida
         April 3, 2024

Respectfully submitted,

VEDDER PRICE (FL), LLP

By: */s/ Adam L. Schwartz*
      Adam L. Schwartz, Esq.
      Florida Bar No. 103163
      Andrew T. Figueroa, Esq.
      Florida Bar No. 1002745
      600 Brickell Ave., Ste. 1500
      Miami, FL 33131
      Telephone: (786) 741-3220
      Email:    aschwartz@vedderprice.com
                afigueroa@vedderprice.com

*Attorneys for Defendant Patrick Orlando*

and

HOMER
BONNER

1200 Four Seasons Tower
1441 Brickell Avenue
Miami Florida 33131
Phone: (305) 350-5100
Fax: (305) 372-2738

Kevin P. Jacobs, Esq.
Email: kjacobs@homerbonner.com
Florida Bar No. 169821
Andrew Vitali, III, Esq.
Email: avitali@homerbonner.com
Florida Bar No. 057828

*Attorneys for Defendant ARC Global
Investments II, LLC*

28

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 3, 2024, a true and correct copy of the foregoing Joint Motion to Dismiss Amended Complaint was served by email generated by the Florida Courts E-Filing system to all parties of record.

Paul Thanasides
**McIntyre Thanasides Bringgold Elliott**
**Grimaldi Guito & Matthews, P.A.**
1228 E. 7th Avenue, Suite 100
Tampa, FL, 33605
Telephone: 813-223-0000
paul@mcintyrefirm.com
complexlit@mcintyrefirm.com
elservice@mcintyrefirm.com

*Counsel for Digital World Acquisition Corporation and Trump Media & Technology Group Corp.*

Samuel J. Salario, Jr., Esq.
Jason B. Gonzalez, Esq.
Raymond F. Treadwell, Esq.
**Lawson Huck Gonzalez PLLC**
215 S. Monroe St., Suite 320
Tallahassee, FL 32301
Telephone: 850-825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com

*Counsel for Plaintiff Trump Media & Technology Group Corp.*

Bradley J. Bondi
**Paul Hastings LLP**
2050 Street NW
Washington, DC 20036
bradbondi@pauhastings.com
Telephone: 202-551-1700

*Counsel for Plaintiff Digital World Acquisition Corp.*

Dated: April 3, 2024

Respectfully submitted,

By: /s/ Adam L. Schwartz

# EXHIBIT B

Page 1

1          IN THE CIRCUIT COURT OF THE TWELFTH JUDICIAL
           CIRCUIT OF FLORIDA, IN AND FOR SARASOTA COUNTY

2                       Case No. 2024-CA-001061

3

   DIGITAL WORLD ACQUISITION
4  CORPORATION, et al.,

5          Plaintiffs,

6  vs.

7  ARC GLOBAL INVESTMENTS II,
   LLC, and PATRICK ORLANDO,

8

           Defendants.

9

10

                       TRANSCRIPT OF HEARING

11

12  DATE TAKEN:    July 10, 2024

13  TIME:          9:22 a.m. - 11:22 a.m.

14  PLACE:         VIA ZOOM

15  BEFORE:        HONORABLE HUNTER CARROLL
                   CIRCUIT COURT JUDGE

16

    TAKEN BY:      Tami Cline, RMR, CRR

17

18

19

20

21

22

23

24

25

Page 2

1
                    APPEARANCES VIA ZOOM
2
3      Counsel for the Plaintiff Trump Media & Technology
       Group Corp.:
4
          SAMUEL J. SALARIO JR., ESQ.
5         Lawson Huck Gonzalez, PLLC
          1700 South Macdill Avenue
6         Suite 300
          Tampa, Florida 33629-5244
7         Samuel@lawsonhuckgonzalez.com
8         JASON GONZALEZ, ESQ.
          Lawson Huck Gonzalez PLLC
9         215 South Monroe Street
          Suite 320
10        Tallahassee, Florida 32301-1852
          850-825-4334
11        Jason@lawsonhuckgonzalez.com
12        MATHEW GUTIERREZ, ESQ.
          Lawson Huck Gonzalez PLLC
13        334 Minorca Avenue
          Coral Gables, Florida 33134
14        786-564-2225
          Mathew@lawsonhuckgonzalez.com
15
       Counsel for Plaintiff Digital World Acquisition
16     Corporation:
17        CHRISTOPHER OPRISON, ESQ.
          JODY STAFFORD, ESQ.
18        DLA Piper LLP (US)
          200 South Biscayne Boulevard
19        Suite 2500
          Miami, Florida 33131-5340
20        305-423-8522
          Chris.oprison@dlapiper.com
21        Jody.stafford@dlapiper.com
22
23
24
25

Page 3

1    Counsel for Defendant Patrick Orlando:
2      ADAM L. SCHWARTZ, ESQ.
       ANDREW T. FIGUEROA, ESQ.
3      Vedder Price (FL), LLP
       600 Brickell Avenue
4      Suite 1500
       Miami, Florida 33131
5      786-741-3244
       Aschwartz@vedderprice.com
6      Afigueroa@vedderprice.com
7      JOSHUA HESS, ESQ.
       Dechert, LLP
8      1900 K Street, NW
       Washington, DC 20006-1110
9      202-261-3438
       Joshua.hess@dechert.com
10

11   Counsel for Defendant ARC Global Investments II,
     LLC:
12
       ANDREW VITALI III, ESQ.
13     Homer Bonner
       1200 Four Seasons Tower
14     1441 Brickell Avenue
       Miami, Florida 33131
15     305-350-5100
       Avitali@homerbonner.com
16
17
18
19
20
21
22
23
24
25

Page 4

1                    I N D E X

2                                              PAGE

3    MOTION TO DISMISS

4        ARGUMENT BY MR. SCHWARTZ                    9

5        ARGUMENT BY MR. SALARIO                    39

6        ARGUMENT BY MR. SCHWARTZ                   62

7        COURT'S RULING                             69

8    MOTION TO COMPEL AND MOTION TO STAY

9        ARGUMENT BY MR. VITALI                     72

10       ARGUMENT BY MR. OPRISON                    75

11       ARGUMENT BY MR. VITALI                     80

12   JUDGE'S RULING                                 82

13   JUDGE'S RULING                                 85

14   CERTIFICATE OF REPORTER                        90

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1        THEREUPON, the following proceedings were had

 2    and taken:

 3        THE COURT:  This is Case Number 2024-1061,

 4    Digital World Acquisition Corporation, et al., vs

 5    ARC Global Investments II, LLC, et al.

 6        Y'all are free to sit down if you'd like.  I

 7    apologize.

 8        Let's -- starting with the plaintiff here in

 9    the courtroom, let's take appearances, please.

10        MR. SALARIO:  Sam Salario, Lawson Huck

11    Gonzalez, for the plaintiffs.

12        MR. GONZALEZ:  Jason Gonzalez, also with

13    Lawson and Gonzalez.

14        THE COURT:  And on Zoom --

15        MR. OPRISON:  Chris Oprison from DLA Piper.

16    Chris Oprison, O-p-r-i-s-o-n, from DLA Piper for

17    the plaintiffs as well, Your Honor.

18        THE COURT:  For the defendants here in the

19    courtroom --

20        MR. GUTIERREZ:  Your Honor, also Mathew

21    Gutierrez on behalf of the plaintiffs from Lawson

22    Huck Gonzalez.

23        THE COURT:  Mr. Gutierrez, can you redo your

24    name so that the court reporter will have it a

25    little bit easier?
```

```
                                                        Page 6
 1          MR. GUTIERREZ:  Okay.

 2          THE COURT:  Thank you.

 3          MR. SCHWARTZ:  Good morning, Your Honor.

 4     Adam Schwartz, Vedder Price, on behalf of

 5     defendant Patrick Orlando.

 6          MR. HESS:  Good morning, Your Honor.  Joshua

 7     Hess, Dechert, LLP, also on behalf of the

 8     defendant Patrick --

 9          THE COURT REPORTER:  I'm sorry, I didn't hear

10     his appearance.

11          THE COURT:  You've got to get a little bit

12     closer to the microphone, or that one.  That was

13     going to be my next announcement.

14          MR. HESS:  Your Honor, Joshua Hess, Dechert,

15     LLP, also on behalf of the defendant Patrick

16     Orlando.

17          MR. VITALI:  Good morning, Your Honor.

18     Andrew Vitali on behalf of ARC II Global

19     Investments.

20          THE COURT:  Defendants on Zoom.

21          MR. FIGUEROA:  Andrew Figueroa on behalf of

22     Patrick Orlando.

23          THE COURT:  Thank you.

24          Obviously we have some people here live in

25     the courtroom, and we have some people by Zoom.
```

Page 7

1     The court reporter is by Zoom.  The microphones

2     work pretty well, but you do need to be in

3     somewhat proximity.  You don't have to speak

4     directly into it, but let's just try to -- I'm

5     fine if you want to argue from counsel table.  If

6     you want to argue from the lectern, I don't care.

7     Just be somewhat close to a microphone.

8         We do have a little static.  We have been

9     trying to figure that out the last few days.  We

10    haven't been successful.  So if you ultimately

11    have some difficulty with the sound, let me know

12    and I can trade the speaker.  But it would not be

13    the house audio at that point.  It would be a

14    random speaker we have up here.

15        So we have got a number of motions.  My

16    understanding is we have got a motion to dismiss

17    that's at Docket Identification Number, or DIN,

18    DIN 28.  There's a response in opposition at

19    DIN 65 with a reply at 72.  We have got a motion

20    to stay at DIN 29.  The response is at 69.  The

21    reply is at 72 -- sorry, 71 I believe.  And then

22    we also have the motion to compel, which is at

23    DIN 42.  I know that there's a response.  I just

24    didn't write the DIN number down, but I'll get

25    that.

Page 8

1        Are there other issues we need or that are

2    going to be argued today?

3        MR. SCHWARTZ:  I don't believe so, Your

4    Honor.  I remember at the case management

5    conference there was a motion to consolidate that

6    Your Honor is going to consider.  But as, I think

7    we put in our response brief, that case -- that

8    case that was in front of Judge Walker, Judge

9    Walker stayed that case.

10       THE COURT:  I saw that now.  I saw that you

11   have a hearing on that on July 22nd.  So perhaps

12   at the conclusion of today, depending on how today

13   goes, we'll figure out if we need to have that

14   discussion or not and whether it needs to happen

15   on the 22nd.

16       Are there any other preliminary matters that

17   we need to address?

18       MR. SALARIO:  Not from the plaintiffs, Your

19   Honor.

20       MR. SCHWARTZ:  Not from the defense, Your

21   Honor.

22       THE COURT:  You have the floor.  And I'll say

23   I appreciate everybody's briefing.  I know there's

24   been a lot of issues addressed, but let's make

25   sure when we're making our argument -- let's try

1          to keep the hyperbole to a minimum and just focus

2          in on the legal issues.

3               MR. SCHWARTZ:  Yes, Your Honor.  If I may

4          just -- I know this is a motion to dismiss.

5               THE COURT REPORTER:  I apologize, Your Honor.

6          That microphone is not working.

7               THE COURT:  Can you go to that microphone?

8               MR. SCHWARTZ:  Is this better?

9               THE COURT REPORTER:  Yes, sir.  Thank you.

10              MR. SCHWARTZ:  Okay.  Perfect.

11              And, Your Honor, I understand this is a

12         motion to dismiss.  I just want to at least give a

13         few sentences of background about my client

14         because of a lot of the statements that were

15         stated in the plaintiff's pleadings.  You know,

16         Mr. Orlando took a fledgeling special purpose

17         acquisition company, or SPAC, that was yet to IPO

18         called Digital World Acquisition Corp.  It was

19         about to dissolve, didn't have any funding to go

20         to IPO.  And he took control of its sponsor,

21         ARC II, and raised more than $11 million and

22         helped get it through a successful IPO, which

23         raised $280 million, which was then suddenly used

24         to conduct a business combination with Trump Media

25         & Technology Group, which was a -- for all

Page 10

1    accounts, successful from the very beginning in

2    2020 and through today for all shareholders.  And

3    it's been known as one of the most successful SPAC

4    combinations in recent history for the

5    shareholders as well.

6         In short, he is a sine qua non of this being

7    the newly formed entity being a publically traded

8    company that has benefitted shareholders young,

9    old, and including its largest shareholder, the

10   former President.  All the clichés apply in this

11   lawsuit, unfortunately, Your Honor.

12        DWAC and TMTG -- those are the acronyms I'll

13   use for the two entities -- are now biting the

14   hand that feeds it, going after the goose that

15   laid the golden egg, doing revisionist history.

16   But --

17        THE COURT:  Now that we have got those out of

18   our system --

19        MR. SCHWARTZ:  I've got that.  I'll focus on

20   the arguments.

21        THE COURT:  Thank you.

22        MR. SCHWARTZ:  So let me give you a road map,

23   Your Honor, because I think I'd like to focus the

24   Court first on venue and --

25        THE COURT:  Well, let me ask this.

Page 11

1              MR. SCHWARTZ:  Yeah.

2              THE COURT:  Because I know you lead off with

3       forum non conveniens.  You agree I have

4       jurisdiction.  Let's just start at the foundation.

5              MR. SCHWARTZ:  Correct.

6              THE COURT:  I have jurisdiction; is that

7       correct?

8              MR. SCHWARTZ:  You have personal

9       jurisdiction, yes, Your Honor, the Court does.

10             THE COURT:  And your main argument is forum

11      non conveniens as opposed to improper venue.

12             MR. SCHWARTZ:  No, Your Honor.  I'm going to

13      argue venue first and FDUPTA.  I think that's the

14      cleanest and clearest and most straightforward

15      path.

16             THE COURT:  Because that wasn't how it was

17      laid out in your --

18             MR. SCHWARTZ:  We laid it out second --

19      secondary, but I think if you address venue first

20      it's an easier path for the Court to reach the

21      conclusion that we're suggesting.  So my road map

22      for you, Your Honor, would be venue and FDUPTA

23      together, because the only hook for venue in this

24      district is their FDUPTA claim, which is Count 5.

25      And then I'll discuss the convergent claim, which

Page 12

1    is the only other Florida state law claim.

2         THE COURT:  But let's back up.  Take away the

3    participants and just focus in on the law.  You

4    agree with me that under Florida law so long as

5    the plaintiff has a singular count that has venue

6    in one of many multiple possible venues, it's

7    really the plaintiff's call on where it is unless

8    it's a non conveniens situation.  Is that the

9    correct state of the law?

10         MR. SCHWARTZ:  It is with the caveat that the

11    count has to, one, legally state a cause of action

12    and, two, actually accrue, right, per the statute.

13    So -- but that is correct.  It doesn't have -- not

14    all counts have to accrue.  Just one does.  That

15    is correct.

16         THE COURT:  And plaintiffs are saying the

17    cause of action accrued here in Sarasota County,

18    and you're saying, no, it didn't.

19         MR. SCHWARTZ:  No, it didn't.  There's no

20    allegation that supports that it did.  And as a

21    matter of law, the FDUPTA claim is deficient as a

22    matter of law and should be dismissed with

23    prejudice.

24         THE COURT:  Okay.

25         MR. SCHWARTZ:  So let me start with that

Page 13

1      first, Your Honor, because I think venue is -- you

2      know, plaintiff's argument in their response is

3      essentially that their hook for Sarasota venue is

4      that the FDUPTA claim accrued in Sarasota County.

5      So as I said before, if the FDUPTA claim isn't

6      alleged to have -- and we submit that it has not

7      been alleged to properly accrue in Sarasota County

8      or they failed to allege a FDUPTA claim, which we

9      also -- I'll get to in a minute and explain that

10     as well -- then venue in Sarasota is improper, and

11     the case should either be dismissed or

12     transferred.

13          And, Your Honor, the FDUPTA argument and

14     their theory of FDUPTA isn't -- that they raise in

15     their response brief isn't even alleged in the

16     amended complaint, but I'll get -- but let me

17     first start with the base fact.

18          They still have to -- plaintiffs are required

19     to allege facts sufficient to support venue, and

20     those are the case law we cited in our reply.  And

21     here, Your Honor, the problem that the FDUPTA

22     claims have, putting aside their legal

23     deficiencies, is that all of the harm and all of

24     the damage alleged is to Digital World Acquisition

25     Corp, which as alleged in the complaint, is a

Page 14

1    Delaware corporation with its principal place of

2    business in Miami, Florida.

3         Patrick Orlando, the individual they said who

4    was acting, as they allege in their complaint,

5    paragraph 9, he is a Miami-Dade County resident.

6    ARC II, in paragraph 10 of the amended complaint,

7    is a Delaware company with its principal place of

8    business.

9         So what does it mean for a cause of action to

10   accrue?  The case law that respondents -- that --

11   sorry, that the plaintiffs cite to is correct.  A

12   tort claim -- this is the Weinberg case.  "A tort

13   claim accrues for venue purposes where the last

14   event necessary to make the defendant liable for

15   the tort took place, or where the harmful effect

16   of the defendant's acts first took place."

17        So first harm and last act of the defendant,

18   first harm to the plaintiff.  And here the

19   allegations are -- that are actually in the

20   amended complaint are clear that they only relate

21   to Digital World Acquisition Corporation, which is

22   a Delaware corporation that operated in Miami-Dade

23   County, Florida, not Sarasota.  So any accrual of

24   damages had to have occurred in Miami-Dade County

25   based on the allegations in the complaint.  Now,

Page 15

1      let me walk you through those briefly, Your Honor.

2          Paragraph 96 of the amended complaint.  They

3      allege that Mr. Orlando issued promissory notes as

4      the CEO of Digital World to ARC for his own

5      personal benefit and refused to cooperate with the

6      accounting processes unless Digital World agreed

7      to it.  Well, that's a harm to Digital World.

8      Again, a Miami-Dade County entity.

9          Paragraph 97, Orlando refused to cooperate

10     with company, and the company is defined in the

11     amended complaint as Digital World.  Governance,

12     again, a harm felt and an action taken in Miami

13     County.

14         Paragraph 98, while serving as a director of

15     DWAC, Orlando made public statements harmful to

16     the company -- again, company defined as DWAC --

17     in violation of his duties and leaked information

18     to the press for his personal benefit while

19     harming DWAC.  The harm that they specifically

20     allege is to DWAC.

21         Paragraph 99, Mr. Orlando obstructed DWAC's

22     merger with TMTG to exhort -- extort various

23     concessions that only benefitted himself while

24     harming DWAC and its shareholders.  That's their

25     own allegations, Your Honor.

Page 16

1          And, in fact, the only allegation you see

2      that relates to this newfound theory that they

3      raise for the first time in their response is in

4      paragraph 95 where they allege that solicitation

5      of a merger target constitutes trader commerce

6      under the Florida Statutes, nothing else.

7          It then generally alleges damages -- and I'll

8      get to it in a second -- while none of these

9      allegations are FDUPTA claims.  But what

10     plaintiffs then try to do, realizing that this is

11     their deficiency -- and maybe that's why they

12     started with venue first in their response

13     brief -- is they conflate DWAC and TMTG.  But,

14     Your Honor, those are two separate entities at the

15     time this lawsuit was filed, and that's how the

16     Court must look at it.  They're two separate

17     entities at the time of the alleged harm, reported

18     harm, and they are two separate entities at the

19     time of the amended complaint in their own

20     allegations.  You can't conflate the two.  They

21     have to be treated separately.  They're alleged to

22     be treated separately.

23         So then what do they do?  They then argue in

24     their response brief that defendants unlawfully

25     solicited TMTG as a DWAC merger target in

Page 17

1    Sarasota.  So that's it.  That's their sole claim

2    of accrual in Sarasota County.  But, first of all,

3    that's nowhere in -- alleged in the amended

4    complaint.  The paragraph that they cite to in

5    their response brief for this proposition is

6    paragraph 30.  I think in my reply brief -- I

7    apologize.  I think I typed -- I had a typo.  It

8    said 39, but it's actually paragraph 30.

9        If you look at paragraph 30, paragraph 30

10   talks about -- says this:  Mr. Orlando's conduct

11   harmed DWAC and its shareholders and exposed the

12   company to regulatory liability and financial

13   harm, ultimately resulting in a settlement with

14   the SEC.  Not a single mention of TMTG.

15       But even putting that aside, Your Honor --

16   and if Your Honor wanted to consider this as a

17   theory that was properly alleged in the amended

18   complaint, this claim fails as a matter of law

19   because it relates to a securities transaction, a

20   merger, a legal solicitation.  How -- why is the

21   solicitation, quote-unquote, illegal under their

22   allegations?  Because it violates the federal

23   securities laws.

24       And, in fact, in paragraph 29, the prior

25   paragraph that I just referenced, they actually

Page 18

1    cite to -- for purposes of a motion to dismiss, we

2    accept it as true as the proper applicable CFR for

3    the securities laws.  It's the wrong one, but

4    they're citing to the federal securities laws.

5    And that's what makes it illegal.

6         And the case law that we cite to in both our

7    initial motion and in our reply brief makes clear

8    that securities transactions in cases involving

9    securities are barred from the FDUPTA.  You can't

10   state a claim under the FDUPTA.  That's the Feng v

11   Walsh case.

12        And then in the Crowell v Morgan Stanley case

13   we cite to in our reply, that's actually a case

14   involving a solicitation of a merger target in

15   violation of securities laws, where it said, no,

16   you can't try to plead around, you know, and

17   manufacture another allegation under FDUPTA when

18   you're really dealing with a securities

19   transaction.  You have got to go with federal

20   securities laws or the state securities laws, and

21   that's -- and under FDUPTA it doesn't fly.

22        There's another reason too.

23        THE COURT:  Why?

24        MR. SCHWARTZ:  Why?  Because FDUPTA, like,

25   all the other sort of state FTC acts are modeled

Page 19

1      after the FTC, and the case law says that

2      because -- that FDUPTA and other case -- there's

3      case law in Florida that says you look to the FTC

4      Act and how the courts are interpreting the FTC

5      Act.  And the FTC Act -- the case law is

6      abundantly clear in federal court that under the

7      FTC Act all securities-related transactions do not

8      apply to the FTC Act.  And that's how the state

9      courts have been applying the FDUPTA in the same

10     way.

11          But there's a second reason, Your Honor.

12     Because this related to a merger of two businesses

13     and the solicitation related to a merger of two

14     businesses, well, there's a merger agreement,

15     right, which forms the ultimate basis.  And we

16     attached that as Exhibit E to our motion to

17     dismiss.  And that has a choice of law clause at

18     page 506 of the PDF.  It's -- the page number is

19     886.  It's from an SEC filing.

20          And under the law that we cited to in our

21     original motion, the Beckel case, it says that,

22     look, if you are -- if you are bringing, like, a

23     securities-related claim -- and in the Beckel case

24     it was actually a business combination.  There

25     was -- instead of a merger agreement, it was a

Page 20

1      stock purchase agreement.  It was the acquisition

2      of a company.  Same exact thing.  Same names,

3      different -- different nomenclature but the same

4      exact thing.

5           They said, well, because your claims are

6      really securities claims and because there's a

7      choice of law provision that favors not Florida

8      law, you can't bring Florida statutory claims.

9      Here the choice of law is New York; and,

10     therefore, you can't bring a FDUPTA claim if the

11     broad choice of law provision says New York law

12     applies.

13          So because that -- those reasons alone, venue

14     doesn't apply.  But none of the FDUPTA claims

15     survive a motion to dismiss and must be dismissed

16     with prejudice, Your Honor, because they fail --

17     inherently fail as a matter of law really for

18     three reasons.  One of them I just addressed,

19     because their theory relates to security claims.

20     The issuance of convertible notes, that's one,

21     right?  And also this illegal solicitation of

22     TMTG, that's the other one.

23          But there's two other reasons, and the first

24     is that none of the purported deceptive acts are

25     alleged to have caused consumer injury.  And the

Page 21

1        second reason is because the plaintiffs fail to

2        allege actual damages, which is a term of art

3        under all the FDUPTA cases.  It's very limited,

4        Your Honor.  It doesn't include consequential

5        damages.  It does not include lost profits.  It's

6        limited strictly to the difference between the

7        marketed value of the product or service and the

8        condition in which it was delivered to which it

9        should have been delivered.  That's it.

10           And the case law has addressed issues with

11        respect to lost profits, lost opportunities, all

12        rejected.  Legal fees, subsequent fees related to

13        settlements, all those are consequential damages

14        which courts have rejected.  And we cite to a

15        number of them in our brief.

16           But let me first turn to the issue of

17        consumer injury, because plaintiffs in their

18        response brief argued, well, companies can bring

19        FDUPTA claims, and that's correct.  The law

20        changed in 2021.  I think the language changed

21        from "consumer" to "person," and person means

22        companies.  Well, that's true.  But what hasn't

23        changed in the law is the fact that the injury

24        that has to be discussed and the damage related to

25        the deception, it has to relate to consumers, not

Page 22

 1      to a company issue or not to an individual issue.

 2      That's not a consumer harm.

 3          And the best example I can give Your Honor is

 4      the Eleventh Circuit case that we cite to in our

 5      reply brief called Ounjian.  In that case, Your

 6      Honor, the plaintiff was an employee of a company

 7      that was selling gift cards to -- to corporations,

 8      and those gift cards were then given to employees

 9      as sort of, you know, job well done.  And this

10      plaintiff, this employee alleged or, you know,

11      basically blew the whistle and said, wait, you're

12      misrepresenting and you're saying the cost of

13      these gift cards to you, the company, is much

14      higher than what it really was.

15          So on its face it seemed to allege a type of

16      consumer harm, but what was the plaintiff seeking?

17      They weren't seeking damages on behalf of the

18      consumers that were harmed.  No.  Instead, they

19      were seeking damages for constructive termination.

20      So the harm didn't relate to consumer injury.

21          And the other cases we cite to make that

22      abundantly clear.  This is a case where, you know,

23      none of these allegations -- they all relate to

24      breaches of fiduciary duty, Mr. Orlando's

25      self-dealing --

Page 23

1          THE COURT:  Let me ask this.

2          MR. SCHWARTZ:  Yes.

3          THE COURT:  For the sake of argument I agree

4     that the FDUPTA count as currently pled is

5     insufficient.  So make that assumption.  Isn't the

6     normal reaction to such a conclusion on what is

7     effectively first go-around leave to amend?

8          MR. SCHWARTZ:  Well, Your Honor, this is

9     their -- this isn't --

10          THE COURT:  Because you're asking me to make

11     a declaration that there's no conceivable way

12     there could ever be a FDUPTA count at all, and

13     isn't that somewhat against Florida case law

14     allowing plaintiffs opportunities to amend their

15     pleadings to address deficiencies that the Court

16     might find?

17          MR. SCHWARTZ:  Well, Your Honor, I think

18     there's two things.  One is this is going to be

19     the third go-around in their complaint, right?  So

20     there is already an amended complaint.

21          But, second, based on the types of

22     allegations -- based on the cases we know -- and

23     assuming everything they said is true, they're not

24     able to allege consumer harm because this isn't a

25     consumer harm case.  This is at its core a breach

Page 24

1    of fiduciary duty case, and all of these sort of

2    ancillary claims that they bring in to try to get

3    a Florida hook, they just don't fit.  It's fitting

4    a -- you know, it's a round -- square peg in a

5    round hole or vice versa.  I always get the

6    analogy messed up.

7        But here they're not going to be able to.

8    And in the cases that we cite to the courts are,

9    like, you just can't, because what you're really

10   allegedly at the core are securities violations

11   and violations of a fiduciary duty, which just are

12   not -- it's just not what FDUPTA is about.  And so

13   in that regard, Your Honor, what I'm asking you to

14   do is not inconsistent with what the case law is

15   suggesting that you do.

16       You know, a few other examples, if I can

17   just, I think, highlight it and show the

18   deficiency in what they're trying to allege is

19   that -- in one of the arguments they make in their

20   response brief is that, well, this allegation that

21   Mr. Orlando withheld -- withdrew $15,000 -- it

22   says on the records it was used for legal

23   expenses, but they can't find an invoice.  Well,

24   look, that's exactly -- that's a FDUPTA, and they

25   cite to this Taubert v State.  If you look at

Page 25

1    Taubert v State, that case is completely

2    different.  In Taubert v State a company was

3    making -- creating phony invoices, sending them to

4    consumers, and then consumers were paying for

5    services they never received.  That's what a

6    FDUPTA claim is about.  This is just a

7    recordkeeping violation.  And maybe it's a --

8        THE COURT:  But isn't that more of a summary

9    judgment type of argument?  And I hear what you're

10   saying, but it seems like you're asking me to take

11   a leap beyond the pleadings on that particular

12   issue.

13       MR. SCHWARTZ:  I'm not.  I'm actually just

14   having you look at the pleadings because

15   they're --

16       THE COURT:  I have them right now.

17       MR. SCHWARTZ:  Yeah.  I'm walking through.

18   There's just not one thing in there, Your Honor,

19   nor could there be, quite frankly.  And this is

20   going to be -- it will be -- I guess if you grant

21   them, it will be a third go-around.  They won't be

22   able to address it.

23       And the issue is that if we are -- you know,

24   dismissal is proper to narrow the issues that are

25   going to be before Your Honor or before another

Page 26

1    court.  And here, Your Honor, they're just -- none

2    of these claims even fit in that -- the homeland

3    of what FDUPTA is about.  It's -- and the other

4    problem is damages.

5         And here's the big problem, Your Honor.  So

6    they have to allege very limited type of damage,

7    which is the damage of the goods that an

8    individual received and what they were supposed to

9    receive.  Those are -- that's it, right?  The case

10   law is pretty clear.  They're alleging -- and

11   their whole basis of damages for what Mr. Orlando

12   and ARC II allegedly did relates to lost

13   opportunity costs, millions of dollars of legal

14   fees spent.  But the case law says that's never

15   cognizable under FDUPTA.

16        And, look, there's no -- look, there's no

17   love lost for our client.  So they could add --

18   you know, they have had opportunities to list

19   specifically a whole bunch of -- host of damages,

20   but their damages here and the entire case are we

21   have to pay a lot of attorney's fees.  We have to

22   pay a settlement with the SEC, and, you know, we

23   could have -- maybe we combined earlier or done

24   something differently and we lost those

25   opportunity costs.  Well, the case law that we

Page 27

1      cite to in our case, in our motion and in the

2      reply all say you can't get those in FDUPTA.

3      That's why this doesn't fit and can't fit.

4          In paragraph 100 they argue lost opportunity

5      cost and out-of-pocket costs.  Well, out-of-pocket

6      costs, their own case law says you can't get that.

7      Those are consequential damages.

8          And this Vintage Motors of Sarasota case they

9      cite to is sort of instructive on that.  In that

10     case a company that sells cars on consignment sold

11     the plaintiff's car, didn't tell the plaintiff, in

12     fact, lied to the plaintiff and said, "No, I

13     didn't sell your car."  Plaintiff hires an

14     attorney, sends demand letters.  Defendant then

15     says -- the seller says, "Okay, yeah.  I sold it.

16     Here's your money."

17         THE COURT:  Just so you know, you're about 15

18     minutes into your argument.

19         MR. SCHWARTZ:  Okay.

20         THE COURT:  I know you have got other points.

21         MR. SCHWARTZ:  Yeah.  But I think I made my

22     point fairly clear.  It's that lost opportunity

23     cost, and that's the diversified case.  We said

24     you never get either.  So -- but attorney's fees

25     you don't get.  That's in the Sarasota case as

Page 28

1    well.

2        Let me jump to conversion, which is the only

3    other Florida-based claim that Florida law applies

4    to.  The sum total of their allegation on

5    conversion is that Mr. Orlando withdrew $50,000

6    cash.  It's marked as -- for legal services, and

7    they're unable to find an invoice that matches,

8    matches it essentially.  That's the

9    paragraph 1683.  Under Florida law, conversion for

10   cash for a bank account is very limited in

11   circuit.  It really only -- you can do it and get

12   the claim in three circumstances when you're

13   talking about bank accounts and sort of commingled

14   accounts and money.

15       It's whether -- it's if someone's entrusted

16   to hold money in escrow.  It's if they're

17   providing funds that are with an expressed

18   explicit instruction that it can only be used for

19   this one purpose.  And then, three, the sort of

20   odd one is that if there's account holders who

21   have owned -- have a joint tenancy with

22   survivorship where there's a delineated sort of

23   "I'm entitled to 50 percent; you're entitled to

24   the other 50 percent."  Those are the only three

25   issues.

Page 29

1           And here the problem is the funds are not

2     identifiable, and it's not dollar amount.  It's --

3     when you're dealing with cash for conversion under

4     Florida law, it's "I'm giving you this money and

5     it can only be used for this purpose, purpose X,"

6     and that person takes the money and uses it for

7     purpose Y.  It's not identifying the dollar

8     amount.  It's not dollar amount.  It's the purpose

9     for the funds.

10          And here Mr. Orlando is a CEO of Digital

11    World, and the fact that money was moved and used

12    to pay a debt that they say was -- should have

13    been paid, that could be a claim for --

14          THE COURT:  What am I supposed to do as far

15    as taking the pleadings?  Because, again, this is

16    a motion to dismiss and not a summary judgment

17    motion.

18          MR. SCHWARTZ:  Right.  But the -- I'm saying

19    the allegations are deficient as a matter of law,

20    and that's -- the case law we cite to are all

21    motions to dismiss that were granted, and those

22    cases show and explain that it's insufficient.  If

23    they want to try to replead that they -- Your

24    Honor, they can try, but they're not going to be

25    able to based on the -- just what they're -- the

Page 30

1          theory that they're arguing here.

2               And it's also the third go-around, Your

3          Honor.  This is the third time.  This is -- or the

4          second time.  It will be the third time.

5               There's no alleged obligation that the funds

6          need to be kept intact, because Mr. Orlando's

7          allowed to use company funds for certain issues

8          and others.  And if there's not a specific holding

9          of note, these funds can only be used for this

10         particular purpose.  That's not alleged here nor

11         could be alleged.

12              Let me briefly touch on a third issue which I

13         think is easier -- it's easy for Your Honor before

14         I get to forum non.  It's Count 2, which is the

15         duty of care.  Under the duty of care, that must

16         be dismissed because there is a provision in the

17         bylaws -- or they refer to in the Delaware as the

18         charter -- of Digital World that exculpates any

19         breaches of fiduciary duty except duties of

20         loyalty and then intentional and illegal

21         activities.  So the duty of care is exculpated as

22         a matter of law, and this is sort of commonplace

23         under Delaware law and it's sort of a common

24         practice.

25              And the plaintiffs concede that -- and this

Page 31

```
 1        is Section 8.1 of the bylaws, which are Exhibit B

 2        to our motion.  And so these are exempted as a

 3        matter of law, and the only way they try to get

 4        around this on the duty of care is because they

 5        allege -- you know, the two allegations for duty

 6        of care are failing to employ standard governance

 7        and business practices, including inadequate

 8        recordkeeping, failure to properly ratify company

 9        decisions, and deficient accounting practices.

10            That's 78.  That's the heartland of the type

11        of claims that duty -- that this exculpation

12        clause always, you know, applies to and means you

13        can't bring this as a claim.

14            The other -- that other allegation they make

15        is that they say that Mr. Orlando engaged in

16        conduct the SEC has characterized as illegal

17        targeting.  But even if they're characterizing

18        this as a duty of care allegation, which I

19        probably don't think it is, but they're -- they

20        don't have an allegation that at the time

21        Mr. Orlando was conducting this illegal targeting

22        that he knew it was, in fact, illegal, which is a

23        pretty high burden, right?  That's even more than

24        what you have to prove in any criminal case, that

25        a person knows and the is illegal.
```

Page 32

1          And what they try to do in the response is

2      they say, well, we have this allegation in

3      paragraph 31 that Mr. Orlando received a Wells

4      Notice from the SEC that they made, you know,

5      like, they're going to -- the Division of

6      Enforcement recommended an enforcement case

7      against them.

8          First of all, there hasn't been an

9      enforcement case filed against Mr. Orlando, and

10     it's been a number of years.  But second of all, a

11     Wells Notice, as counsel is well aware, is a

12     notice that's given after the conduct at issue,

13     after the SEC conducted a thorough investigation.

14     So it's not -- you know, and they're trying to

15     sort of conflate things and say, well, he got this

16     Wells Notice before he did the action.  Well, that

17     just -- you know, if they actually allege it that

18     way, they would be running up against 57.105.

19          And, you know, the second claim issue is that

20     the case law they cite to just -- that was a

21     Caremark case, which is a duty of loyalty case,

22     which really doesn't apply here.

23          Putting all those issues aside, let me get to

24     forum non, because I think here there's two points

25     I just want to make.  And really you're stuck --

Page 33

1    Your Honor has to evaluate the forum -- the sort

2    of private and public factors.  And with the

3    private factors, one argument we think is very

4    sort of almost determinative here is that there

5    is, in fact, a venue -- you know, a venue clause

6    in the charter.

7         And, now, plaintiffs argue, well, that

8    provision says it's -- it involves -- I lost my

9    train of thought -- that it involved -- only

10   shareholders can bring.  And the language is in

11   there.  But two reasons.  One, their

12   interpretation that shareholders can only bring

13   breaches of fiduciary duty and other claims in

14   Delaware and the company can bring it anywhere

15   they want just seems inconsistent and doesn't seem

16   to be the proper application.

17        But, two, even if you accept that as true,

18   what does that tell Your Honor?  It tells Your

19   Honor that plaintiffs believe that Delaware is the

20   proper forum to bring these types of claims.  It's

21   the more convenient one.  Delaware has a chancery

22   court that only deals with breaches of fiduciary

23   duty and does it on an expedited basis.

24        So there's a reason why they chose Delaware.

25   And because that's in their actual bylaws, Your

Page 34

1    Honor, that should discount any choice of forum by

2    the plaintiffs in this case and particularly

3    because, you know, TMTG isn't even a resident of

4    Sarasota at the time of the filing of this case of

5    the amended complaint.

6         So the other -- going to the public factors,

7    Your Honor, you know, the only real cognizable

8    claims here are the breaches of fiduciary duty and

9    that, we all agree, applies Delaware law.

10   Delaware has consistently stated that Delaware

11   courts have an interest in developing their

12   corporate law.  They have an entire court that

13   does this, but also more importantly is that the

14   cases that are currently in front of Delaware deal

15   with a lot of the same issues.

16        In fact, plaintiffs have injected these

17   issues not just recently, from the very beginning

18   in that case that is currently pending in

19   Delaware.

20        THE COURT:  Wasn't this case filed first, the

21   one here in Florida?

22        MR. SCHWARTZ:  Well, Your Honor, technically

23   under Delaware law the other case was filed first

24   because sending a draft complaint saying we're

25   going to file immediately, it's -- it's first to

Page 35

1      file and first to assert jurisdiction.  So two

2      things.  One is Delaware asserted jurisdiction

3      first.  And the other reason why this case was

4      technically filed first was based on deceit, and

5      the court and the case law says it shouldn't favor

6      forum shopping and sort of the tactics used to,

7      you know -- we -- I don't want to -- it's not

8      current counsel.  It's former counsel.  But former

9      counsel, after receiving a draft complaint and

10     instructions from Delaware counsel that -- look,

11     we're going to -- ARC II is going to have to file

12     this the next day unless we reach an agreement.

13          And their response was -- that was on a

14     Monday.  Let's talk on Wednesday.  We can resolve

15     this issue.  And then unbeknownst after, you know,

16     being convinced to wait until Wednesday to have

17     that discussion or to file after a discussion, you

18     know, TMTG and DWAC go ahead and file and rush to

19     the courthouse here.  That's -- those sort of

20     tactics shouldn't be advanced or they should be

21     disfavored by the court, and the case law suggests

22     that that type of that forum shopping, trying to

23     race to the courthouse when clearly Delaware is

24     the proper case and the Delaware court quickly

25     asserted jurisdiction and said, "no, no, no, we're

Page 36

1       going to hear this in Delaware," you know, under

2       the first filed in Florida, it's not only first

3       filed but first court to assert jurisdiction to

4       issue an order, which was, in fact, the Delaware

5       court.

6           THE COURT:  When did Delaware issue its first

7       order?

8           MR. SCHWARTZ:  What?

9           THE COURT:  When did Delaware issue its first

10      order?

11          MR. SCHWARTZ:  It's attached to our motion,

12      but I believe it was by the end of the --

13          MR. SALARIO:  It's March 18th, Your Honor.

14          THE COURT:  March 18th?

15          MR. SALARIO:  That's what they say in the

16      brief, Your Honor.

17          THE COURT:  So my order on March 6 doesn't

18      count?

19          MR. SCHWARTZ:  Let's see.  Let me see.

20          THE COURT:  We're getting pretty close to 30

21      minutes.

22          MR. SCHWARTZ:  Okay.  Your Honor, I would say

23      that, Your Honor, that case has been progressing

24      quickly.  The plaintiffs have raised these issues,

25      and they filed a notice of filing yesterday to try

Page 37

1      to argue that, well, we're trying -- you know,

2      ARC II is trying to keep these issues of fiduciary

3      duty out.  That's not the case.  From the very

4      beginning they have been injecting these issues.

5      It's part of their affirmative defenses.

6          The motion for protective order that they

7      filed with the clerk yesterday actually shows

8      that -- and says that Mr. Orlando was deposed in

9      that case.  He was asked all about the government

10     investigations, all about breaches of fiduciary

11     duty.  And when the amended -- the complaint was

12     amended and agreed to be allowed to be amended,

13     there was a very narrow issue, which was a

14     differential number for the anti-dilution multiple

15     that ARC II is seeking and also that there was bad

16     faith and DWAC not applying the proper

17     anti-dilution for ARC II shares.

18         And so the courts have said they'll allow

19     discovery for that limited purpose.  Instead, what

20     ARC II did is that they set Mr. Orlando with

21     24-hour notice for a deposition and added in all

22     of these additional 30(b)(6) deposition

23     essentially for ARC II on issues that they could

24     have raised in the prior discovery and chose not

25     to.

Page 38

1      So the issues are going to be before the

2   Court.  And, quite frankly, if their affirmative

3   defenses go forward, we may be back in front of

4   Your Honor with a collateral estoppel or res

5   judicata, you know, barring certain of their

6   fiduciary duty claims.  In essence these claims

7   really should be handled in Delaware.  The court

8   there is very familiar.  Discovery is --

9      THE COURT:  So my prior question is, when did

10   Delaware issue its first order?

11      MR. SCHWARTZ:  So that's the stipulation and

12   proposed order regarding motion to expedite.

13   There was a hearing, I believe, at the end of

14   February where the judge said she was going to

15   hear the case.  So what we attached was the

16   first -- was a stipulation.  I don't have that in

17   front of me, Your Honor, but there was a hearing,

18   I know.  It was at the end of -- very end of

19   February or the first week of March, and that is

20   where the Court explained that she was going to

21   hear this issue of the anti-dilution and the --

22   and those claims and in that -- I can get a copy

23   of the transcript and submit that to Your Honor.

24      I apologize.  I don't have that in here.

25   What we attached was the first sort of -- the

Page 39

1    stipulation that showed the parties agreed that

2    ARC II would vote the shares in favor of the

3    transaction, which was March 18th.

4         THE COURT:  Is there any other points you

5    want to make in your oral argument?  Because we're

6    at 30 minutes.

7         MR. SCHWARTZ:  Yeah.  I'll rely on the

8    briefs, Your Honor, because I know we're at 30

9    minutes if that's okay.

10        THE COURT:  Thank you.

11        From the plaintiff's side who is going to

12   argue?

13        MR. SALARIO:  I will, Your Honor.

14        THE COURT:  Go ahead, Mr. Salario.

15        MR. SALARIO:  So I had kind of a

16   shock-and-awe opening as well, but given Your

17   Honor's predisposition to just get down it, I'm

18   going to get down to brass tacks.  We obviously

19   think we've got some serious misconduct that we

20   want to address through this case.  I'm not going

21   to belabor what's in the complaint because I know

22   Your Honor is familiar with it.

23        What I do think, though, is that kind of the

24   resolution of this motion really boils down to

25   three basic things that I think the defendants are

Page 40

1    trying to dodge here.  The first is this is a suit

2    entirely between businesses located in Florida on

3    the plaintiff's side and an individual and a

4    business located in Florida on the defendant's

5    side.  So the idea that this is not a suit whose

6    home is in Florida is just contrary to fact.

7        The second thing that I think the defendants

8    missed the boat on here is they're kind of

9    attacking a complaint that isn't the complaint

10   that's been pleaded.  This is not a lawsuit about

11   securities.  Our causes of action aren't founded

12   on the security.  Our causes of action don't arise

13   or fall on the existence or transaction of a

14   security.  It is a case about bad conduct, conduct

15   that was a breach of Mr. Orlando's duty to DWAC

16   when he was serving as its chief executive officer

17   and the chairman of its board and conduct that was

18   deceptive and unfair as to both DWAC and TMTG

19   because of the nature in which it was executed.

20       And the third thing -- and this is the one

21   that I think Your Honor kind of alluded to already

22   is that this is a motion to dismiss.  It's not a

23   motion for summary judgment.  And where the rubber

24   really meets the road, I think, is you just heard

25   defense counsel ask you to kick the FDUPTA claim

Page 41

1    with prejudice on the basis of a merger agreement

2    that's not attached to the complaint and that they

3    are asking you to judiciously notice.  And you

4    just heard them ask you to kick the duty of care

5    claim on the basis of a direct exculpation

6    provision in DWAC's corporate charter that isn't

7    even referred to in the complaint and that they're

8    asking you to take -- that they're asking you to

9    use as a basis to kick the claim.

10        THE COURT:  I mean, the Second District has

11    been pretty clear with me on me taking judicial

12    notice of items outside of the pleadings on a

13    motion to dismiss.

14        MR. SALARIO:  And I was wondering if I could

15    hand the Court one authority.

16        THE COURT:  If that's Bayview Loan Servicing

17    v Brown, I'm very aware of it.

18        MR. SALARIO:  Okay.  Bayview Loan Servicing v

19    Brown.  You know, one, they haven't made a proper

20    request for judicial notice under 90.203.  Two,

21    even if they had, we're not consenting to it.

22    And, listen, the proper time for that is summary

23    judgment.

24        THE COURT:  My views as to whether I should

25    be able to are probably well known, but the Second

Page 42

1    says otherwise and I live with what the Second

2    says.

3         MR. SALARIO:  Okay.  So with that I'll just

4    go ahead and move on then.

5         And I think the first thing is to kind of get

6    the venue argument.  And, you know, I mean, this

7    is really an uncommon thing, argument, right?

8    Normally what happens is the plaintiff alleges

9    venue is proper and the forum.  The defendant

10   comes in and says, no, it's not.  Here's an

11   affidavit.  Here's a bunch of documents that show

12   you that you really should have venue someplace

13   else.  And then you're asked to dismiss or

14   transfer.

15        Defendants aren't asking you to do that.

16   They haven't produced evidence that venue belongs

17   someplace else, and they haven't produced any

18   evidence that says this isn't the proper venue.

19   And they're not even really asking you to kick

20   us -- kick us on venue because our allegations are

21   deficient.  Like, they haven't cited to you any

22   case that shows the allegation of venue that we've

23   made in the complaint is somehow deficient as a

24   matter of law and you ought to kick it on that

25   basis.

Page 43

1          What they're really saying is you should

2     dismiss the FDUPTA claim on the merits.  And then

3     with the FDUPTA claim gone, you should dismiss the

4     whole case for improper venue.  And there's --

5     there's, I think --

6          THE COURT:  Let me ask you the same question

7     I asked your opponent.  What if the Court finds

8     the FDUPTA allegations are a little thin but I

9     don't -- with prejudice, so grant leave to amend.

10    How does that impact this forum non conveniens and

11    venue analysis, if at all?

12         MR. SALARIO:  So I think on venue -- I think

13    on venue what -- one, I think Your Honor is

14    absolutely right, that to the extent that you were

15    to find the FDUPTA count deficient, we ought to be

16    granted leave to amend the complaint, and that's

17    for two reasons.  One, we may be able to amend the

18    FDUPTA count to sufficiently plead a claim and

19    thereby to tie venue here.

20         Secondly, we may have other claims that we

21    might want to assert in respect to Mr. Orlando's

22    conduct and how it affected TMTG.  And I want to

23    be clear about this.  Like, this is not an only

24    injury to DWAC case.  Mr. Orlando's conduct as

25    alleged in the complaint did not simply injure

Page 44

1    DWAC.  Oh, not simply injure DWAC.  It delayed a

2    merger to which TMTG was a counter party, that it

3    was counting on for purposes of going public,

4    raising capital, and doing all of the things it

5    could do as a publicly traded company.

6         So regardless of whether you think the FDUPTA

7    claim is adequate as presently pleaded, it could

8    either be re-pled or some other claim might be

9    asserted, and that injury to TMTG and contestably

10   would have occurred in Sarasota County because

11   TMTG has at all times materially been located in

12   Sarasota County.

13        In addition, I think it's worth noting that

14   post merger DWAC is located in Sarasota County

15   too.  They share the same address on Cattlemen

16   Road.  But irrespective of that, I think Your

17   Honor's instinct on amendment is correct, and that

18   just means we amend.  And since the venue

19   allegation is based on the -- you know, since the

20   venue argument is based on the sufficiency of the

21   pleadings anyway, I think you get the amended

22   complaint if you decide whether that passes

23   muster.

24        And on that I just want to note so I don't

25   forget it.  I think you just heard the defendants

Page 45

1    make a big deal, oh, this would be their third

2    try.  You know, I mean, we amended the complaint

3    in this case before they had even moved to

4    dismiss.  So it's not like we filed our amendment

5    with notice of the arguments they were going to

6    make or anything like that.  It was our amendment

7    as a right.  We took it, and, you know, it's

8    not -- you know, we weren't reacting to a pleading

9    or a motion that they had filed or that would have

10   somehow put us on notice of the deficiency that

11   they're not claiming.  So I think it would be a

12   mistake to just dismiss the FDUPTA claim with

13   prejudice at that point.

14       I don't think it -- so that handles the

15   sufficiency of the pleading and the venue piece of

16   it.  I want to get to the rest of your question,

17   how does it address the forum non piece, and then

18   I'll come back to the sufficiency of FDUPTA.  I

19   mean, I just -- I think the forum non piece is

20   really kind of hard to credit when you think about

21   it, because what they are asking you to do is to

22   take a lawsuit that is between Florida folks on

23   both sides of the case and say it ought to be

24   heard in Delaware.

25       And the way they get there is kind of by two

Page 46

1    sleights of hand, and the first sleight of hand is

2    to focus on Sarasota County.  They act as -- and

3    you read it in their briefs.  I mean, "Sarasota

4    County" is probably used more than any other word

5    in their briefs.

6         And they read it as though what you're

7    choosing between on forum non is Sarasota County

8    and Delaware, and it's not.  What you're choosing

9    between on forum non is Florida and Delaware, and

10   that is the very first sentence of Rule 1.061(a),

11   which says that you can apply the doctrine of

12   forum non conveniens when, quote, a satisfactory

13   remedy may be more conveniently sought in a

14   jurisdiction other than Florida, closed quote.

15        And like -- cases like Kinney make this clear

16   to what we're talking about.  Is Florida the place

17   or is Delaware the place?  Not is Sarasota County

18   the place or is Delaware the place.  The way you

19   address county is through, you know, a motion to

20   dismiss or transfer venue.

21        THE COURT:  Let me ask you this, because, I

22   mean, obviously on a non conveniens if it's within

23   the state we would normally see the 47.122

24   evidence.

25        MR. SALARIO:  That's correct.

1           THE COURT:  So since we're talking about, you

2      know, non conveniens outside of the state, what

3      does the absence of evidence do, if at all, to

4      their position?

5           MR. SALARIO:  Well, and I think that actually

6      goes to the second point, right?  Because really

7      the only evidence they have -- and I'll explain

8      why this is legally relevant -- is the fact -- is

9      the -- is the charter provision that they say

10     ought to be interpreted to require litigation in

11     Delaware.  But apart from that there's nothing,

12     right?  You have speculation about witnesses and

13     parties.  Why that's speculation would be

14     well-founded in the circumstance where everybody's

15     located in Florida seems a little bit odd to me.

16          So it's -- it's really about this -- so

17     without that, all you have, which is the

18     presumption that is stated explicitly in

19     Rule 1.061 and that's discussed in Kinney, which

20     is that you give strong weight to the plaintiff's

21     choice of forum.  I believe that's 1.061(a)(3).

22          And so you have got, as far as private

23     interest factors are concerned, a heavy

24     presumption in favor of the plaintiff's choice of

25     forum.  And if you kick the charter provision out

Page 48

1    on the other side, you have got nothing, and that

2    makes the decision easy because Rule 1.061 also

3    tells you you don't even have to get to the public

4    interest factors unless the private interest

5    factors are equipoise or very close to equipoise.

6         I do want to talk about the charter provision

7    briefly.  You know, I just think as a matter of

8    text they're just wrong on the charter provision

9    three times over.  The first reason they're wrong

10   on the charter provision is that it says that --

11   well, I'll say two times over.  The first reason

12   they're wrong on the charter provision is they say

13   that Delaware is -- it says that Delaware is the

14   forum, quote, for any stockholder to bring, closed

15   quote, certain categories of action against the

16   company or its officers or directors.  It doesn't

17   say anything about actions by the company DWAC

18   against its own officers or directors.

19        Secondly, the forum selection provision in

20   the charter is waivable.  I mean, the first

21   sentence of that provision as quoted on page 10 of

22   their brief is that the provision -- provides --

23   it applies, quote, unless the corporation consents

24   otherwise in writing, closed quote.  And it's hard

25   to conceive a more clear consent to litigate

Page 49

1      outside of Delaware than the filing of a complaint

2      outside of Delaware.

3          So as a matter of text the thing just doesn't

4      apply, and their response to the unambiguous

5      text -- and, please, take no offense, but it's

6      like the left refuge of the interpretive

7      scoundrel, right?  You reach for the absurdity

8      doctrine and say that's an absurd result, but it's

9      not.  You can imagine a rational reason why a

10     company would want to channel stockholder claims

11     to one place while still retaining the liberty to

12     have a case litigated in a forum that is where it

13     maintains its principal place of business.

14         THE COURT:  Why don't we do this.  Why don't

15     we push pause.  I have got a 10:15 hearing that

16     probably is only going to take a few moments.  My

17     hearing behind you-all has cancelled, so I'll be

18     able to give you a little bit more time if y'all

19     have the time.  But let me take the 10:15, get

20     them out of the way and then let you finish up

21     with your argument.  Does that work for everybody?

22         MR. SCHWARTZ:  Thank you, Your Honor.

23         THE COURT:  If anyone needs to use the

24     restroom or take a personal comfort break, that's

25     fine.  We'll take at least five minutes with this

Page 50

1      next hearing.

2              (A recess was taken from 10:16 a.m. until

3      10:30 a.m.)

4              THE COURT:  Let's go back into our Case

5      Number 2024-CA-1061.

6              Let's see.  Mr. Salario, you were on deck.

7              MR. SALARIO:  Thank you, Your Honor.

8              I think we left off talking about the private

9      interest factors on forum non conveniens, and I

10     think I was pretty much finished.  And where I

11     left off was once you dispose of the charter

12     provision, which is their position -- it's just

13     entirely inconsistent with its text -- all you

14     have got left is the presumption that's strong

15     under the rule in favor of the plaintiff's choice

16     of forum, and so you don't even need to get to an

17     evaluation of the public interest factors.

18              But if you did, like, really the only thing

19     that they have to say in their column on that is,

20     well, you know, the fiduciary duty claim is

21     involving Delaware law.  Obviously that ignores

22     the fact that we have alleged Florida law claims

23     as well.  But I just think it kind of fails on its

24     own terms.  I mean, Florida courts apply foreign

25     law all the time.  You know, TMTG and DWAC are,

Page 51

1          you know, far from being the only corporations

2          that are incorporated in Delaware that are

3          headquartered in the state of Florida.

4               I know in a prior life I used to argue

5          Delaware law cases in Florida courts all the time.

6          So the idea that there is -- there is some

7          necessity that compels a case involving the law of

8          another jurisdiction to be forum non there, I

9          mean, that would militate in favor of every case

10         being -- involving foreign law be moved out of the

11         state, which really can't be right.

12              In contrast, I do think -- and we have argued

13         this in the brief, and I don't want to belabor

14         that it -- that Florida does have a strong

15         interest in having localized controversies decided

16         at home.  And here you have a case between Florida

17         people on all sides of the case.

18              So unless Your Honor has any additional

19         questions about forum non, I was going to hop back

20         to venue and FDUPTA.

21              THE COURT:  Yeah.  I'd like to hear more on

22         your FDUPTA argument, please.

23              MR. SALARIO:  Okay.  Yeah.  So I think there

24         really if I'm -- if I'm hearing the plaintiff

25         correctly, the FDUPTA argument kind of boils down

Page 52

1      to the -- there's no consumer injury.  There's no

2      actual damages, and the complaint doesn't allege

3      injury to TMTG anyway.

4           And I think on the consumer injury, that's

5      just inconsistent with the text of the statute.  I

6      mean, if you take a look at Section 501.203 --

7           THE COURT:  Yeah, I'm not concerned about

8      that issue.  I'm more concerned about the actual

9      damage and the -- more concerned about the actual

10     damages.

11          MR. SALARIO:  Sure.  So they take the

12     position kind of as a matter of law that the --

13     one, they take the position as a matter of law

14     that actual damages are the difference in -- are

15     the difference between the market value of the

16     good or service and the value of the good or

17     services actually, right?  And I think as an

18     initial point, like, the statute doesn't define

19     actual damages that way, and that test does not

20     fit every case.

21          I mean, that test is really good for a case

22     where, you know, I was sold a car that was other

23     than is warranted or I hire a florist to do a

24     wedding and the florist shows up with just

25     cactuses.  Like, that's a great test for that, but

Page 53

1    I don't know that that's a test that applies to

2    every case.  And we have cited the Dorestin

3    decision where Judge Gross has a pretty extensive

4    concurrence on this subject and talks about how

5    actual damages actually just means real damages.

6    And, you know, kind of the dividing line is, yeah,

7    they can't be indirect and consequential, but they

8    can be actual.

9        And here both DWAC and TMTG are alleging to

10   have suffered direct damages as a consequence of

11   Orlando's misconduct, particularly in connection

12   with the frustration of the merger transaction.  I

13   mean, DWAC alleges direct damages in the form of

14   having to pay an $18 million settlement and having

15   to pay attorney's fees to respond to this SEC

16   investigation.  Those aren't indirect or

17   consequential.  Those are the direct natural

18   probable result of Orlando's conduct.

19       Likewise, at paragraph 100 of the complaint,

20   which was not one of the ones the defendants

21   referred to, we allege specifically, "TMTG and

22   DWAC are both harmed by defendant's conduct

23   alleged herein.  The conduct of Mr. Orlando and

24   ARC which caused the delay of the merger and the

25   SEC investigation caused significant harm to both

Page 54

1    DWAC and TMTG in the form of lost opportunity

2    costs," which you might have a debate about, "and,

3    however, substantial out-of-pocket costs."

4        So I think, you know, you have got the

5    allegation of damage to both entities in there,

6    and that ought to be sufficient to sustain the

7    count.  And, you know, if Your Honor were to

8    conclude otherwise, of course, we think we ought

9    to be afforded an opportunity to amend that.

10       I don't know if there's anything you wanted

11   to hear from me on the -- with respect to the

12   FDUPTA count.

13       THE COURT:  Is there anything else that you

14   want to say on -- I'll say I was concerned

15   about -- I think your actual damages allegations

16   were a little thin, so that was kind of where I

17   was going with the -- well, if I dismiss it and

18   with leave, how does that impact the venue

19   analysis.  Is -- is --

20       MR. SALARIO:  Right.  And I think the answer

21   to that is each of those arguments, both venue and

22   the sufficiency of the FDUPTA claim, are directed

23   to the sufficiency of the pleading, right?

24   They're not coming in with evidence and saying

25   venue here is improper as a matter of fact and the

Page 55

1    Court finding facts and making a determination one

2    way or another about that.  There's no reason why,

3    to the extent the Court would find the venue

4    allegation defective because the FDUPTA allegation

5    is defective, that both couldn't be cured

6    simultaneously by amendment.

7         So I think the correct course would be to

8    amend, and then they can either not file a motion,

9    file a motion directed to the sufficiency of that

10   pleading, or file a motion with documents and

11   evidence in support of the venue allegation.  But

12   I don't really think -- I don't think as an

13   original matter that the venue allegation standing

14   alone is insufficient anyway.

15        And I think it's worth taking a look at the

16   Procacci case that they rely on.  That actually

17   originated in this court, Procacci v Harlee.  And

18   in that case, one, you actually had a defendant

19   coming in with an affidavit saying, hey, I was --

20   I reside in Collier County, you know, and that's

21   where I would have received the benefit of the

22   payment that they're talking about.  So, one,

23   there was evidence in the case.

24        But, two, the court in that case didn't say

25   that a venue allegation has to be supported by the

Page 56

1    same kind of ultimate facts that a substantive

2    claim for relief would be afforded -- has to be

3    supported.  What it said was that dismissal on the

4    face of the pleadings was proper, quote, when the

5    complaint on its face shows that venue is

6    improper, closed quote.

7        And this is not a complaint that on its face

8    shows the venue is improper in Sarasota County,

9    and I'll just kind of walk through some of the

10   things our complaint says.

11       Paragraph 8 says that TMTG is located in

12   Sarasota County.

13       Paragraph 14 says that the cause of action

14   accrued in Sarasota County.

15       Paragraph 32 says that TMTG, located in

16   Sarasota, withdrew from the merger agreement

17   because of Orlando's pretargeting.

18       Paragraph 34 alleges that delays caused by

19   the SEC investigation, quote, caused substantial

20   injury to RMTG, which is located in Sarasota

21   County.

22       And then we have the terms of paragraph 100,

23   which I just read to you.

24       So I think the bottom line on that is you

25   have a complaint that on its face demonstrates a

Page 57

1    clear connection between causes of action and
2    Sarasota County.  This is not a complaint that you
3    could look at and say on its face it affirmatively
4    demonstrates that venue is improper.
5         THE COURT:  Well, let me recast and I'm going
6    to ask the same question on -- to your opponent
7    and see if I can articulate it.
8         Assume for the sake of argument I conclude
9    that the FDUPTA count at a minimum is deficient
10   and I give you leave to amend.  Do I address the
11   venue issue as well?  Because under this
12   hypothetical I'm addressing a procedural-related
13   issue as opposed to basically a substantive issue.
14   Do I address the venue provision today or do I
15   wait until you replead and see what comes from
16   your opponent?
17        MR. SALARIO:  I think the answer is it
18   doesn't really matter because I think in this case
19   they are both pleadings issues.  And let me just
20   take the venue piece of it first.  Like, pretend
21   this was a motion, right?  Sometimes you get a
22   motion to dismiss for lack of personal
23   jurisdiction that just says the jurisdictional
24   allegation is insufficient, right?  Like, it
25   doesn't come forward with affidavits or anything.

Page 58

1    It just says you haven't alleged a basis for

2    jurisdiction under the statute.

3        What courts regularly do with those motions

4    is they dismiss and then they say, "but you can

5    have leave to replead so you can plead the

6    jurisdictional allegation," correct?  Inasmuch as

7    the defendant's argument here is a pleading-based

8    argument and not a challenge to venue in fact, I

9    think the same result would apply.

10        Secondly, I think to the extent that the

11    venue argument hinges on the FDUPTA count, which

12    says that's the only count where you're alleging

13    that -- you know, that the last element of the

14    cause of action occurred in Sarasota County, if

15    you just want to -- you know, if you found that

16    allegation -- if you found that allegation of

17    injury insufficient and you just wanted to dismiss

18    based on its insufficiency, you could just do

19    that.  We have got notice of the venue issue.  We

20    can plead to address it.

21        So I think at the end of the day if that's

22    where the Court goes, it doesn't really much

23    matter.

24        THE COURT:  Okay.  Anything else,

25    Mr. Salario?

Page 59

1        MR. SALARIO:  So I don't want to take up too

2    much of the Court's time.  I did just briefly want

3    to address the question of the motion to stay in

4    favor of Delaware, and then -- but if I'm running

5    out of the time, you know, we addressed briefs on

6    that, but I can --

7        THE COURT:  Why don't you spend up to five

8    minutes, and then we'll have your opponent have

9    some reply.

10        MR. SALARIO:  Yes.  Just very, very briefly.

11    I think this is a case where priority pretty

12    clearly does not apply, but the Delaware action

13    that was initiated by ARC against DWAC and its

14    Board of Directors is not substantially similar

15    either in terms of parties or in terms of issues

16    to this case.

17        One, the Delaware action is brought solely by

18    ARC.  Mr. Orlando's not a plaintiff, and it's

19    brought solely against DWAC and its board.  TMTG

20    is not a defendant.  So those rights and

21    obligations don't get resolved in this case.

22        Secondly, in terms of the substance, the

23    Delaware action -- and you'll find the current

24    first amended complaint attached as Exhibit A to

25    our response -- is really in a very different case

Page 60

1      than this case, and I think the best way to get

2      there is just to take a look at the introduction

3      and the prayer for relief in each case and you can

4      see what it's about.

5          I mean, the first paragraph of the Delaware

6      action says, quote, this action arises from a

7      dispute over the interpretation and application of

8      DWAC's certificate of incorporation in connection

9      with the recent business combination with TMTG.

10         What the rest of the introduction makes clear

11     is the interpretative dispute is over what is the

12     ratio at which Class B shares of DWAC pre-merger

13     convert to Class A shares of DWAC post-merger.

14     That's what that case is about, and the claim --

15     and the prayer for relief proves it, because what

16     they ask for is a declaratory judgment on the

17     conversion ratio, specific performance with

18     respect to the conversion ratio, and damages.

19         So it is a fundamentally different case.

20     Resolution of the conversion ratio in Delaware

21     doesn't resolve any of the issues that are pending

22     in this case.  The defendants point out that

23     the -- they made some allegation -- that there has

24     been raised some issue about Orlando or ARC's

25     misconduct by way of affirmative defense in the

Page 61

1    Delaware case, and they attach the answer to their

2    reply brief.  You know, I think it is important to

3    contextualize that they are not asserting

4    affirmative claims for relief on these issues

5    there.  The reason for that is that is an

6    expedited proceeding going to trial next month on

7    this conversion rate issue.  That case is not

8    about these issues.

9         But even if you determine that they were, if

10   you look at Docket Identification Number 6, you'll

11   see that the complaint in this case was served on

12   the 28th of February before the stipulation and

13   order in Delaware on the 18th of March, and that's

14   the only thing they point to in their motion and

15   in their reply brief.

16        And I think the case law is pretty clear that

17   the court that first exercises jurisdiction is the

18   court where service of process is first effected.

19   And I know they have got some complaints about the

20   manner in which service of process was effected.

21   That kind of is -- was not -- it was previous to

22   my involvement.  But they haven't, you know --

23   this case was served first, so this case has

24   priority.

25        And I don't think you have got much of an

Page 62

1      argument on stay.

2           Just real quick by way of cleanup, I did want

3      to touch on the cause of action for conversion

4      real quick.

5           THE COURT:  Can you do it in 30 seconds?

6      Because you have gone about 30 minutes total.

7           MR. SALARIO:  I would just direct the Court

8      to paragraphs 60, 83 and 82 of our complaint.

9      We're talking about $15,000 that came from a

10     specific bank account for a specific purpose.

11     That's money you can identify, and it is money

12     that was used without authorization with the

13     possessor -- you know, with an intent to divest of

14     its possession.

15          So that's what I have got unless the Court

16     has any questions for me.

17          THE COURT:  No.

18          Remind me your name.  I apologize, sir.

19          MR. SCHWARTZ:  Adam Schwartz.

20          THE COURT:  Mr. Schwartz.  Come on down,

21     Mr. Schwartz.

22          MR. SCHWARTZ:  I will be brief, Your Honor,

23     because I know we have gone over time.  I

24     appreciate the Court's indulgence.

25          First, I think your -- I would rely -- and on

Page 63

1      the question with respect to venue, Your Honor,

2      our view and our position is and the case law that

3      we cited, to include the Procacci case, I'm

4      mispronouncing, and the other two cases we cited,

5      the allegations have to be -- show that there's an

6      accrual of the damage, that the defense had to

7      accrue in Sarasota County.  And all of the

8      allegations related to the FDUPTA claim, which is

9      deficient as a matter of law, they all

10     specifically relate to DWAC.  They specifically

11     even say DWAC, that this harmed DWAC, this harmed

12     DWAC.  And so the venue claim fails.

13          With respect to FDUPTA, Your Honor, the

14     damage issue I think is a big problem for them,

15     because the cases they cite is not a FDUPTA case.

16     And they're right that the term of art of what

17     actually is a damage in FDUPTA, it's limited, and

18     there's a reason why it's limited.  It's because

19     FDUPTA claims aren't for everything.  They're

20     limited to consumer claims where there's a service

21     or good that you're given and what you are

22     promised to be given, and it's the difference

23     between the two.

24          And the cases we cited to say that the lost

25     opportunity you can't get.  And also these -- what

Page 64

1     Mr. -- what my -- what opposition counsel

2     referenced as direct damages are really the

3     out-of-pocket costs and legal fees.  Their own

4     case law, that Sarasota Vintage Motors case says

5     you can't get legal fees as a result of a

6     deceptive action.  You can get legal fees after

7     the fact.  It's ancillary if you win your claim at

8     the end of the day, but that case dismissed --

9     they dismissed the FDUPTA claim because the only

10    damages there were legal fees.

11         So it's reason why it's a narrow term of art

12    and issues, because that's what the statute says.

13    And that's what every case that's from -- from the

14    beginning of time to the current says with respect

15    to FDUPTA.  And so, therefore, they haven't pled

16    FDUPTA.

17         Now, Your Honor could allow them to replead,

18    and then we would readdress the venue.  I believe

19    that's the case.  But I don't think they will be

20    able to do it, is what I'm saying, based on the

21    types of harm that they have been alleging and the

22    type of case this is.

23         THE COURT:  Your opponent is suggesting that

24    I could address venue even if I were to find the

25    complaint to be procedurally deficient somehow.

Page 65

1          MR. SCHWARTZ:  If it's procedurally

2     deficient, right, your only hook is forum

3     non conveniens, and the case law we cited says you

4     don't have -- sorry.  It's venue.  If you don't --

5     it's the FDUPTA claim.  If the FDUPTA claim, which

6     is the only hook, is improperly pled, then there's

7     no venue.  So they can try to replead and fix the

8     venue issue, fix the FDUPTA issue and we'll be

9     back here, Your Honor, but I don't think they'll

10    be able to based on what this case is really

11    about.

12          And another point I just wanted to make is,

13    you know, we reference the merger agreement as

14    well as the charter, but -- and we cite in our

15    motion to dismiss the Veal v Voyager Property and

16    Casualty Insurance case, which is a Second DCA

17    case, which says that if certain documents are

18    implicitly referenced in the complaint, Your Honor

19    can review them in a motion to dismiss.

20          And here in paragraph 23 they specifically

21    mention the merger agreement, so you can look at

22    that merger agreement and that choice of law

23    provision.

24          In addition, they reference that, you know,

25    these entities are Delaware corporations based

Page 66

1    upon their charters.  That's implicit.  And Your

2    Honor can look at those as well.  So the case law

3    in the Second DCA -- we're not asking to look at

4    random documents.  We're asking for documents

5    they've referenced either directly or implicitly

6    through their allegations.  We're very narrow in

7    the type of outside documents we have asked for

8    the Court to look to, so you do have authority

9    under the Second DCA.

10        THE COURT:  I agree that -- if it's expressly

11   referenced, then yes.  But, I mean, I have got my

12   knuckles rapped because I have done your implicit

13   analysis.  And I agree a lot of these things

14   are -- they are what they are.  They're not going

15   to change, but --

16        MR. SCHWARTZ:  Paragraph 23, Your Honor, it

17   specifically references a merger agreement, so --

18   and that's the merger agreement we attached, so

19   you have authority there.

20        And, Your Honor, the -- with respect to forum

21   non conveniens, if I can, a few things.  One, you

22   know, these are all Delaware companies.  They're

23   all Delaware corporations.  This isn't a case

24   where it's -- where they're just Florida entities.

25   They're all Delaware corporations.  So this isn't,

Page 67

1    as Mr. Salario mentioned, everyone here is

2    Florida.  Well, everyone's also Delaware.

3        Second, Your Honor, in the Delaware matter --

4    I conferred with my colleagues that there was a

5    minute order on March 1st in that case, and then

6    on March 5th there was a hearing where the Court

7    granted a motion to expedite at the hearing.  So

8    there is a -- the first court to exercise

9    jurisdiction over the matter is Delaware.

10        And, also, as we include in our reply brief,

11    you can see that the affirmative defenses of the

12    plaintiffs -- the defendants in that case, the

13    plaintiffs here, are essentially Mr. Orlando's

14    breaches of fiduciary duty, unlawful and legal

15    actions.  It's injected.  It's there in that case.

16    And if Your Honor -- the original complaint in

17    this case had the issue of the dec action for

18    anti-dilution, what is the proper multiple that

19    should be applied to ARC's shares, well, that was

20    first -- that was filed here first.  And because

21    of what the Court did in Delaware and said, no,

22    I'm going to hear this claim, plaintiffs, you

23    know, amended their complaint here and removed it.

24    So just to say that there is an interest.

25        And on top of that, with respect to the

Page 68

1      private factors, TMTG and DWAC and now the merged

2      entity, it's a Delaware corporation.  Every

3      director by becoming a Delaware -- being -- by the

4      nature of being a director of a Delaware

5      corporation consents to jurisdiction in Delaware

6      for all things related.  So, therefore, that makes

7      things a lot easier, because not every director is

8      an individual in the state of Florida.  I think

9      some of them are even in Puerto Rico.

10          And, last, just with respect to the

11     conversion claim, the problem here is that

12     Mr. Orlando is the CEO and has a bank account and

13     used funds.  That in and of itself is not

14     conversion.  It has to be "I give you a specific

15     sum of money that can only be used for a specific

16     purpose."  It's very limited what a conversion

17     claim can be when we deal with bank accounts and

18     cash in the state of Florida, and our case law

19     makes that clear.  So I don't think they meet the

20     pleading requirements there.

21          If there's any other questions, Your Honor,

22     that's really what I wanted to cover in the reply.

23          THE COURT:  The Court has before it the

24     Defendant's Joint Motion to Dismiss the Amended

25     Complaint or, alternatively, to Stay This

Page 69

1    Proceeding at DIN 28.  There's a response in

2    opposition at DIN 65 and reply at DIN 72.

3         There are multiple items that this motion is

4    seeking.  It's seeking a dismissal, dismissal with

5    prejudice.  It's seeking a forum non conveniens,

6    not the Section 47.122 Florida Statutes forum

7    non conveniens but the outside of the state of

8    Florida forum non conveniens.  All parties agree

9    the Court has jurisdiction, but it's question of

10   venue.

11        In the Court's mind, I'm always trying to

12   wrap do I address venue first or do I address the

13   motion to dismiss, and I think I need to address

14   the motion to dismiss.

15        I'm supposed to take all well-pled

16   allegations in favor of the plaintiffs, and their

17   obligation is to set forth ultimate facts to state

18   a cause of action.  I disagree with the defendants

19   that the case does not state a cause of action on

20   conversion.  I think it does.  And I have been on

21   the fence having to do with FDUPTA.  But going

22   back and looking at the allegations, I was

23   concerned about the actual damages, and I think

24   it -- I think it's enough.

25        Would I like to see more?  Sure.  But this

Page 70

1       isn't what Judge Carroll wants to see.  It's was

2       there enough ultimate facts to allege a cause of

3       action, and I -- having reviewed this complaint --

4       or I should say the amended complaint several

5       times, I do find that it does state a cause of

6       action.

7            The next concept in my mind is, well, we have

8       got this Delaware case up there, and is the

9       Florida case an inconvenient forum for the

10      allegations that are in the complaint, the amended

11      complaint.  And looking at the case law with

12      respect to transferring something out of the

13      state, I haven't gotten past the public factor

14      issue, because I don't see how the defense has

15      actually gotten close to that factor being in

16      equipoise.

17           I disagree with the analysis of the charter.

18      I think the plain language of the charter very

19      clearly indicates -- I have got it right here.

20      "The Court of Chancery of the state of Delaware

21      shall the sole and exclusive forum for any

22      stockholder, including beneficial owner, to

23      bring."  Well, that's pretty clear as to what type

24      of action is sole and exclusive, and that's not in

25      this case.  So I don't believe that the language

Page 71

1     of that charter applies.

2          There is no other evidence, so I don't think

3     I even need to get to the other factors because

4     we're not at equipoise or close to equipoise as it

5     relates to the public factor.

6          So ultimately the answer is I'm denying the

7     motion to dismiss based on forum non conveniens.

8          I'm denying the motion to dismiss for failure

9     to state a cause of action.  I know we referenced

10    venue.  I think technically venue would be within

11    the State of Florida, so really it's a motion to

12    dismiss for forum non conveniens.  And since I'm

13    denying that, I next have to address the question

14    of stay.

15         I don't see why Florida should not be able to

16    vindicate the issues.  It was the first filed.  It

17    was -- there was the first service.  So I am not

18    going to stay the Florida action.

19         Mr. Salario, if you could do a short order

20    articulating.  If you want to just get an

21    electronic copy of my ruling and staple it, I'm

22    fine with that.  Just submit it through the

23    portal.

24         MR. SALARIO:  Will do, Your Honor.

25         THE COURT:  Okay.  So that takes us next to

Page 72

1      the discovery issues.  I know that there is the

2      defendant's motion to stay, which is at DIN 29

3      with a response at DIN 69 and a reply at 71.

4      There is the plaintiffs's motion to compel at

5      DIN 42 and reply at DIN 67.

6           What was your name again?

7           MR. VITALI:  Mr. Vitali, Andrew Vitali.

8           THE COURT:  Mr. Vitali?

9           MR. VITALI:  Yes.

10          THE COURT:  Vitali?

11          MR. VITALI:  Vitali, yes.

12          THE COURT:  Mr. Vitali, why don't you

13     handle -- you said you were going to handle that

14     one?

15          MR. VITALI:  Yes.

16          THE COURT:  Why don't we do both the --

17          MR. VITALI:  Yes.

18          THE COURT:  -- motion to compel and the

19     motion to stay at the same time.

20          MR. VITALI:  Thank you.  Thank you, Your

21     Honor.  That's exactly what I was going to

22     suggest.  They are two sides of the same coin, I

23     think, here.

24          Your Honor, I don't think there's any

25     disagreement between the parties that Your Honor

Page 73

1    has broad discretion when it comes to discovery

2    and protecting the parties that come before you.

3    Here the defendants filed a joint motion pursuant

4    to Rule 1.280(c), and that allows the Court, of

5    course, upon a showing of good cause to protect a

6    party or a person from annoyance, embarrassment or

7    pressure, undue burden and expense that justice

8    requires, including that discovery not be had or

9    conditioning when it may be had.

10        That rule -- and we have cited cases that

11   support this -- allows the Court to relieve a

12   party of responding to discovery pending a motion

13   to dismiss.  And that's especially the case, Your

14   Honor, where, like in this case, you have a motion

15   to dismiss that's sought to dispose of the entire

16   action, okay?  And that -- we just went through

17   that analysis, that if Your Honor granted the

18   forum non conveniens dismissal, this case would

19   probably be refiled in Delaware.

20        THE COURT:  Let me ask this.

21        MR. VITALI:  Yeah.

22        THE COURT:  At the end of the day -- and I'll

23   ask the -- I guess it's Mr. -- is it Oprison?

24        In any event, now that I have ruled the way I

25   have ruled, do we -- and since I'm not staying

Page 74

1    this action, I think we need to get to discovery.

2    On the motion to compel I'm -- you know, if I

3    agree not to -- you know, fees, I think there was

4    probably a good reason to not do discovery.  But

5    now that I made the ruling, don't you agree we

6    should just start discovery and you get X number

7    of days to do it?  Isn't that --

8        MR. VITALI:  Yes, Your Honor.  If you want to

9    cut to the chase --

10       THE COURT:  I want to cut to the chase.

11       MR. VITALI:  I would say -- I would say that

12   is exactly what I would propose.  If Your Honor is

13   not going to award fees, which we don't think

14   there's a basis for, we'll get a response to the

15   pending discovery for the first and second request

16   for production within 14 days if that's --

17       THE COURT:  Let me ask the plaintiffs,

18   because -- since I'm jumping the gun saying no

19   fees here, let me -- is there any problem with

20   that or opposition to that position?

21       MR. OPRISON:  Your Honor, we think we're

22   entitled to it, but if the Court is not inclined

23   to grant it, we would appreciate an expedited

24   track of --

25       THE COURT:  I mean, I would give you an

Page 75

1    opportunity to argue why there's not a good basis

2    for their action.  I'm happy to listen to that if

3    you want to make that argument.  I agree that we

4    need to get discovery going, though, and it needs

5    to get going not on a leisurely path but on a

6    quick path.

7        MR. OPRISON:  Your Honor, I don't mean to

8    step in front of Mr. Vitali here, but I wanted to

9    respond to your points, that I do think, though,

10   that the course of action that the defendants took

11   by simply filing a motion to stay was limited to

12   just the motion to dismiss pending the ruling on

13   the motion to dismiss.  I don't believe, Your

14   Honor, that any Florida court has held that a stay

15   is appropriate on a motion to dismiss that is not

16   raised as you have in some cases a personal

17   jurisdiction issue, right?  Where you have an

18   actual case that says we're not subject to

19   personal jurisdiction here, all parties concede

20   that the defendants are, but where you have

21   personal jurisdiction challenges you wouldn't

22   really have the opportunity to do -- and most

23   courts would agree with this -- to do full-scale

24   discovery.  You would do more jurisdictional

25   discovery to flesh that issue out.  That's not

Page 76

1     what we have here.

2          And what they cite to is a number of cases

3     that are really not on all fours with our case.

4     They either cite to the Bank of America case that

5     is an immunity issue.  They cite to the Fresh

6     Results case, which I appreciate because that was

7     my case that I argued in front of Judge Bloom on

8     forum non conveniens grounds.  And that case does

9     not -- is not on all fours here because we had a

10    foreign defendant that was a Dutch entity where

11    all paper documents and bills of lading and

12    whatnot -- so it's a factually -- factually very

13    different than what we have here.

14         So, Your Honor, we believe the motion to stay

15    did not -- was not filed for the proper purpose of

16    addressing the breadth or scope that they are now

17    saying is a problem.  We believe that they should

18    have filed a motion for protective order and

19    identified what those burdens were.  They didn't

20    do that.  And the motion to stay is not the

21    functional equivalent when you don't raise and

22    preserve objections.  It is not the functional

23    equivalent of a protective order.

24         And what we have here, Your Honor, is them

25    attempting to delay for an improper purpose the

Page 77

1    discovery in this case claiming that it should be

2    stayed pending a transfer to the Delaware case.

3    Yet, if you trust what they're saying in the

4    Delaware case, we submitted the motion for

5    protective order that they filed up there, that's

6    not what that case is about.

7        So they're saying it's a very different case

8    up there, that Mr. Orlando's misconduct is not to

9    be part of that case up in Delaware, yet they're

10   saying that it's now not proper for this case.

11   And so, Your Honor, we think what they're doing is

12   for an improper purpose trying to completely

13   obstruct our ability to get discovery.  They have

14   never filed objections.  They filed a motion to

15   stay, and where we are, now more than two or three

16   months into this process, we still haven't been

17   able to get discovery.

18       And I understand Your Honor just ruled on the

19   motion to dismiss.  But for a discovery in state

20   court on issues that are clearly relevant, we

21   should have been enabled and allowed to proceed

22   with discovery.  And them trying to block it by

23   simply filing a motion to stay without any

24   objections, without any preservation of rights, we

25   believe was for an improper purpose.

Page 78

1          And we believe some form of sanction, whether

2     it's fees or a waiver of the objections -- likely

3     the latter, I think, is the more mainstream

4     sanctions award.  But without filing any

5     objections to the actual discovery requests, which

6     are clearly on all fours with our breach of duty

7     of care, breach of duty of loyalty claims, is

8     improper, Your Honor.  We believe that they are

9     now obligated to respond to those fully without

10    objection so that we can move this case forward.

11         We believe 14 days is probably a little long

12    since they have had now three months, but if Your

13    Honor orders 14 days, we're going to hold them to

14    14 days.  But they shouldn't be allowed to raise

15    any objections.  They waived those objections by

16    sitting on their rights.

17         THE COURT:  And, now, I understand the delay

18    argument, and I agree that the better course of

19    action and the proper procedural would be to file

20    a motion for protective order.  I get all that.

21    But how are you actually harmed, if at all?

22         MR. OPRISON:  Your Honor, these issues are

23    significant and imminent to our company's ability

24    to continue to do business as it's doing business.

25    So the harm that was caused upfront caused

Page 79

1          investor hesitation, caused other harm to the

2          reputation of the company.  We need to discover

3          the scope and breadth of what exactly was leaked

4          by Mr. Orlando that was confidential information.

5          We need to know exactly what the scope of any

6          Wells submission or Wells Notice he received from

7          the SEC was, because that will give us an idea of

8          how broad their investigation of Mr. Orlando is.

9          We understand obviously that there -- and we

10         submitted this to the Court -- the order for a

11         cease and desist was directed to Mr. Orlando's

12         conduct.

13              So the harm is that we have been delayed in

14         fleshing this out.  It exposes our companies to

15         continued harm and risk.  It exposes our companies

16         to potential regulatory enforcement proceedings,

17         and it exposes our company to monetary loss as a

18         result of investor hesitation and concern about

19         what our company has done and whether or not it's

20         going to be subject to an enforcement proceeding

21         or other risk.

22              So that's the harm, Your Honor, is we waited

23         this long now.  We're into a company that is now

24         merged and is now operating, but we need to

25         understand quickly -- and we should have known

Page 80

1    several months ago so that we could have prepared

2    it and remedied those harms -- what exactly

3    Mr. Orlando's conduct and ARC's conduct entails

4    beyond what we have alleged in our complaint.

5         THE COURT:  Okay.  Do you want to respond on

6    that particular issue, the attorney fee issue?

7    Because that's --

8         MR. VITALI:  Yes.  Yes.

9         THE COURT:  We've argued the motion to compel

10   first, and then you would have gotten a chance to

11   respond.  So why don't you respond there.

12        MR. VITALI:  Yes.  Thank you, Your Honor.

13        So really quickly, I know Mr. Oprison is new

14   to the case, so he may or may not be aware.  But

15   he's speaking about potential prejudice by virtue

16   of some sort of SEC investigation or something

17   along those lines.  DWAC settled with the SEC over

18   a year ago, so I don't know what that could

19   possibly be referring to.

20        The other -- the other fact is that the

21   plaintiff's own conduct in this case shows that

22   there is no exigency as it comes to the discovery

23   they seek.  They waited 56 days after we filed the

24   motion to stay to file their motion to compel,

25   okay?

Page 81

1           And the other thing that they haven't
2      disclosed as well is the fact that DWAC,
3      Mr. Orlando and ARC were actually part -- had a
4      joint defense agreement during the SEC
5      investigation, and DWAC already has a good amount
6      of the documents and communications that were
7      exchanged with the SEC in connection with that
8      investigation.  So this idea that they somehow
9      have been prejudiced by any sort of temporary
10     delay while Your Honor is considering the motion
11     to dismiss is just pure fiction.
12          And in terms of the fact that the style of
13     the motion being a motion to stay versus a motion
14     for protective order, the federal -- we cited
15     cases -- Judge Altonaga in the Lord v University
16     of Miami case where she analyzes this issue under
17     the equivalent federal rule.  And of course
18     Florida courts, our Florida rules are modeled
19     after the federal courts.  We look to them for
20     guidance.  And she says that a motion to stay is
21     the equivalent of a motion for protective order.
22     And plaintiffs have stated zero cases saying
23     otherwise.
24          So I appreciate the argument that we're
25     hearing today, but there is just no support for it

Page 82

1    that we have seen in any of the papers or case law

2    from plaintiffs.

3         THE COURT:  The -- I guess the initial issue

4    that I was trying to address is whether there

5    should be any sort of sanction for the delay in

6    responding to discovery.  I conclude in this

7    particular case there should not.  I do agree with

8    the concept that it would have been better for a

9    motion for protective order to be filed.  However,

10   the motion for stay functionally was an

11   equivalent.

12        I did -- do see in the court file there was

13   an effort to -- for the parties to schedule

14   something with the magistrate and then there was

15   an objection, so the parties got in rather

16   quickly.  I don't see that this was a "we're not

17   going to give over discovery."  I think the --

18   there was a good faith argument that, hey, this

19   case shouldn't belong in Florida.  There's a more

20   appropriate forum in Delaware.  So I don't believe

21   sanctions are appropriate at this time.

22        So having made that ruling, I heard we're

23   going to be able to get the discovery responses

24   done in 14 days.  Is that what I heard?

25        MR. VITALI:  Yes, Your Honor.

Page 83

1          THE COURT:  And does that include the

2     production of any documents or are we just talking

3     about the -- are we just talking about the

4     responses?

5          MR. SCHWARTZ:  Your Honor, I think we can

6     begin a rolling production.  We can begin the

7     production of documents that we don't have

8     specific objections to as well.

9          THE COURT:  And are we contemplating the need

10    of some sort of confidentiality order in this

11    case?

12         MR. SCHWARTZ:  Yes, Your Honor.

13         THE COURT:  Make sure -- because I'm assuming

14    you-all are going to be able to work that out

15    amongst yourselves.  Make sure that in your

16    confidentiality order very clearly put in that

17    nothing in the order alters the obligations under

18    Rule 2.420, which is the rule of general practice

19    and judicial administration.  That rule kind of

20    talks about how you file documents under seal and

21    things like that.

22         So please don't present something that would

23    purport to change the obligations under that rule.

24    Otherwise I get motions from nonparties saying

25    what are you doing?  So let's avoid that.

Page 84

1          What do I hear from the plaintiffs on the

2     question of rolling production?  And I don't know

3     which of the plaintiffs' lawyers wishes to speak

4     to that particular issue.

5          MR. OPRISON:  Your Honor, I can.  I don't

6     know what they are -- what they have done up to

7     this point.  A rolling production is typically

8     when two parties are working well together, a

9     fairly appropriate way to conduct this.  But what

10    we don't want to see is a bunch of fluff produced

11    on day one or day 14, as it is, and then we're not

12    getting anything for months.  And I believe we

13    ought to have something in place that requires

14    them to complete their production -- start with

15    within 14 days, complete it within, say, 30 days.

16    So that gives them 45 days to complete the

17    production as to those specific requests that are

18    part of this motion.

19          MR. SCHWARTZ:  It's not going to be feasible

20    based on the breadth of their requests.  Obviously

21    if they want certain documents which we don't have

22    any objection to -- and there are certain ones

23    which I know we can produce which either -- which

24    Mr. Oprison even mentioned.  They want the Wells

25    Notice that's -- you know, certain documents which

Page 85

1    I think he mentioned specifically we can produce

2    those quickly.

3        But given the breadth, we just haven't

4    even -- you know, we've made sure we captured

5    everything and preserved everything, but we --

6    it's quite broad.  So I think the parties can work

7    together.  We can talk about the extent.  We can

8    talk about the utilizing search terms, but I don't

9    want to hamstring something and make promises that

10   just, you know, physically we can't keep.

11       But I can -- I can submit to the Court we're

12   happy to work with counsel to producing on an

13   efficient basis, and we --

14       THE COURT:  Would the parties this week be

15   able to have a conversation about, sounds like,

16   ESI and the parameters of how production is going

17   to occur, when it's going to occur?  Is that

18   something that both sides can do this week?

19       MR. OPRISON:  Absolutely, Judge.

20       MR. SCHWARTZ:  We can set up a call this

21   week, sure.

22       THE COURT:  So the answer on the motion to

23   stay the discovery, that is going to be denied.

24   On the motion for -- to compel, that's going to be

25   denied.  The discovery responses will be 14 days

Page 86

1      from today's date, not 14 days from the date of

2      the order.

3            Mr. Oprison, you're going to do this order.

4      So 14 days from today's date to get the responses.

5      I have not waived any objections.  So if there are

6      objections that need to be raised, then the

7      defendants will be able to raise those.  And then

8      I do want a call this week between the parties to

9      discuss production, ESI, and any issues that the

10     parties wish to raise amongst themselves about the

11     logistics of discovery.

12           Any questions, clarifications, concerns that

13     we need to address?

14           MR. VITALI:  None from me, Your Honor.

15           MR. OPRISON:  None from plaintiffs, sir.

16           THE COURT:  Now -- and I tell this to pretty

17     much all my cases.  If ultimately you need hearing

18     time, you go online on our system and you see very

19     little hearing time, call my judicial assistant.

20     You know, we might be able to find time.

21     Sometimes they're first thing in the morning.

22     Sometimes they're at lunch.  But we will always

23     find hearing time, especially if it's, like, 30

24     minutes or less if you need.  Bigger blocks might

25     take a little bit longer.  But if you can't find

Page 87

1     something online, then call Ms. Scibak.

2          MR. VITALI:  Thank you, Your Honor.

3          MR. OPRISON:  Thank you, Your Honor.

4          THE COURT:  Anything -- anything else?  I

5     know -- because we also talked about this being a

6     case management.  I don't see that we have a trial

7     date.  Have y'all given thoughts about a trial

8     term yet?

9          MR. VITALI:  I think that's probably

10    something we can talk with new counsel that's come

11    in for DWAC on the call that we're going to have

12    this week as well.

13         MR. OPRISON:  I agree with Mr. Vitali.

14         THE COURT:  And it looks like I have got a

15    hearing with you-all on July 22nd, so two weeks

16    from now.

17         MR. VITALI:  I think that was on the motion

18    to consolidate, which --

19         THE COURT:  Yes.

20         MR. VITALI:  Yes.  So that -- I don't know

21    what we want to do about that now.

22         THE COURT:  I mean, do y'all want to talk

23    about it or -- here's the thing.  I read Judge

24    Walker's order.  I don't know if -- I can go and

25    look.  Do I have all the parties in this case that

Page 88

1    were in the same -- in front of Judge Walker or

2    were there different parties?

3        MR. SCHWARTZ:  Different parties.

4        THE COURT:  Okay.  Then I don't want to talk

5    about the motion to consolidate because I need

6    everybody to be part of that conversation.  But

7    let's -- let's make sure by that date that y'all

8    have looked at trial dates unless y'all want to

9    set one now.  But if you-all want to talk about

10   the trial date this week --

11       MR. VITALI:  Yeah.

12       THE COURT:  -- and then we can get it set.

13   We have trial dates already set for 2024, 2025

14   online on my calendars.  So you can just pick what

15   trial term, and depending on how long -- how long

16   do you think this trial is going to be?

17       MR. OPRISON:  I would say -- Mr. Salario, if

18   he disagrees with me -- he's been in this case

19   longer, but I would say at least five days.

20       MR. SALARIO:  We may be -- I would need to go

21   back and check our case management report.  I know

22   at the case management conference we set a

23   proposed trial date and an estimated trial time.

24   I just didn't think to look back at it before

25   coming here today.

Page 89

1          MR. SCHWARTZ:  I remember the trial time is

2     three weeks.

3          MR. SALARIO:  I think so.

4          THE COURT:  Well, the trial terms are three

5     weeks except -- well, in 2025 they're all three

6     weeks except for March, which is two weeks.  But

7     if you're saying you need three weeks -- or are

8     you saying you need, like, five or six days?

9          MR. SCHWARTZ:  No.

10          MR. SALARIO:  I don't remember if we said we

11     needed three weeks.

12          MR. SCHWARTZ:  I think we -- I think that's

13     what was said, but we can -- we'll double-check,

14     Your Honor, and reconfirm this week.

15          THE COURT:  Okay.  Anything else?

16          MR. VITALI:  Nothing, Your Honor.

17          THE COURT:  Thank you-all for your time.

18     Have a good afternoon.  We'll be in recess.

19          (Proceedings concluded at 11:22 a.m.)

20

21

22

23

24

25

Page 90

1                    CERTIFICATE OF REPORTER

2

3      STATE OF FLORIDA        )

4      COUNTY OF SARASOTA       )

5

6           I, Tami Cline, Registered Merit Reporter,

7      Certified Realtime Reporter, and Florida

8      Professional Reporter, do hereby certify that I was

9      authorized to and did report the foregoing

10     proceedings and evidence in the captioned case, and

11     that the transcript, pages 1 through 90, is a true

12     and correct transcription of my stenographic notes.

13          Dated this July 11, 2024, at Lakeland, Polk

14     County, Florida.

15

16

17     _____

18          Tami Cline, RMR, CRR, FPR

19

20

21

22

23

24

25

**[& - 90.203.]**

Page 91

| & |
|---|
| **&** 2:3 9:25 |

| 0 |
|---|
| **001061** 1:2 |

| 1 |
|---|
| **1** 90:11 |
| **1.061** 46:10 47:19,21 48:2 |
| **1.280** 73:4 |
| **10** 1:12 14:6 48:21 |
| **100** 27:4 53:19 56:22 |
| **1061** 50:5 |
| **10:15** 49:15,19 |
| **10:16** 50:2 |
| **10:30** 50:3 |
| **11** 9:21 90:13 |
| **11:22** 1:13 89:19 |
| **1200** 3:13 |
| **14** 56:13 74:16 78:11,13,14 82:24 84:11,15 85:25 86:1,4 |
| **1441** 3:14 |
| **15** 27:17 |
| **15,000** 24:21 62:9 |
| **1500** 3:4 |
| **1683** 28:9 |
| **1700** 2:5 |
| **18** 53:14 |

| (1 continued) |
|---|
| **18th** 36:13,14 39:3 61:13 |
| **1900** 3:8 |
| **1st** 67:5 |

| 2 |
|---|
| **2** 30:14 |
| **2.420** 83:18 |
| **200** 2:18 |
| **20006-1110** 3:8 |
| **202-261-3438** 3:9 |
| **2020** 10:2 |
| **2021** 21:20 |
| **2024** 1:2,12 50:5 88:13 90:13 |
| **2024-1061** 5:3 |
| **2025** 88:13 89:5 |
| **20426** 90:16 |
| **215** 2:9 |
| **22nd** 8:11,15 87:15 |
| **23** 65:20 66:16 |
| **24** 37:21 |
| **2500** 2:19 |
| **28** 7:18 69:1 |
| **280** 9:23 |
| **28th** 61:12 |
| **29** 7:20 17:24 72:2 |

| 3 |
|---|
| **3** 47:21 |
| **30** 17:6,8,9,9 36:20 37:22 39:6,8 62:5,6 |

| (3 continued) |
|---|
| 84:15 86:23 |
| **300** 2:6 |
| **305-350-5100** 3:15 |
| **305-423-8522** 2:20 |
| **31** 32:3 |
| **32** 56:15 |
| **320** 2:9 |
| **32301-1852** 2:10 |
| **33131** 3:4,14 |
| **33131-5340** 2:19 |
| **33134** 2:13 |
| **334** 2:13 |
| **33629-5244** 2:6 |
| **34** 56:18 |
| **39** 4:5 17:8 |

| 4 |
|---|
| **42** 7:23 72:5 |
| **45** 84:16 |
| **47.122** 46:23 69:6 |

| 5 |
|---|
| **5** 11:24 |
| **50** 28:23,24 |
| **50,000** 28:5 |
| **501.203** 52:6 |
| **506** 19:18 |
| **56** 80:23 |
| **57.105.** 32:18 |
| **5th** 67:6 |

| 6 |
|---|
| **6** 36:17 37:22 61:10 |
| **60** 62:8 |
| **600** 3:3 |
| **62** 4:6 |
| **65** 7:19 69:2 |
| **67** 72:5 |
| **69** 4:7 7:20 72:3 |

| 7 |
|---|
| **71** 7:21 72:3 |
| **72** 4:9 7:19,21 69:2 |
| **75** 4:10 |
| **78** 31:10 |
| **786-564-2225** 2:14 |
| **786-741-3244** 3:5 |

| 8 |
|---|
| **8** 56:11 |
| **8.1** 31:1 |
| **80** 4:11 |
| **82** 4:12 62:8 |
| **83** 62:8 |
| **85** 4:13 |
| **850-825-4334** 2:10 |
| **886** 19:19 |

| 9 |
|---|
| **9** 4:4 14:5 |
| **90** 4:14 90:11 |
| **90.203.** 41:20 |

**[95 - allegation]**                                          Page 92

**95**  16:4
**96**  15:2
**97**  15:9
**98**  15:14
**99**  15:21
**9:22**  1:13

**a**

**a.m.**  1:13,13
  50:2,3 89:19
**ability**  77:13
  78:23
**able**  23:24 24:7
  25:22 29:25
  41:25 43:17
  49:18 64:20
  65:10 71:15
  77:17 82:23
  83:14 85:15
  86:7,20
**absence**  47:3
**absolutely**
  43:14 85:19
**absurd**  49:8
**absurdity**  49:7
**abundantly**
  19:6 22:22
**accept**  18:2
  33:17
**account**  28:10
  28:20 62:10
  68:12
**accounting**  15:6
  31:9
**accounts**  10:1
  28:13,14 68:17

**accrual**  14:23
  17:2 63:6
**accrue**  12:12,14
  13:7 14:10 63:7
**accrued**  12:17
  13:4 56:14
**accrues**  14:13
**acquisition**  1:3
  2:15 5:4 9:17,18
  13:24 14:21
  20:1
**acronyms**  10:12
**act**  14:17 19:4,5
  19:5,7,8 46:2
**acting**  14:4
**action**  12:11,17
  14:9 15:12
  32:16 40:11,12
  48:15 56:13
  57:1 58:14
  59:12,17,23
  60:6,6 62:3 64:6
  67:17 69:18,19
  70:3,6,24 71:9
  71:18 73:16
  74:1 75:2,10
  78:19
**actions**  48:17
  67:15
**activities**  30:21
**acts**  14:16 18:25
  20:24
**actual**  21:2
  33:25 52:2,8,9
  52:14,19 53:5,8

54:15 69:23
  75:18 78:5
**actually**  12:12
  14:19 17:8,25
  18:13 19:24
  25:13 32:17
  37:7 47:5 52:17
  53:5 55:16,18
  63:17 70:15
  78:21 81:3
**adam**  3:2 6:4
  62:19
**add**  26:17
**added**  37:21
**addition**  44:13
  65:24
**additional**
  37:22 51:18
**address**  8:17
  11:19 23:15
  25:22 39:20
  44:15 45:17
  46:19 57:10,14
  58:20 59:3
  64:24 69:12,12
  69:13 71:13
  82:4 86:13
**addressed**  8:24
  20:18 21:10
  59:5
**addressing**
  57:12 76:16
**adequate**  44:7
**administration**
  83:19

**advanced**  35:20
**affected**  43:22
**affidavit**  42:11
  55:19
**affidavits**  57:25
**affirmative**  37:5
  38:2 60:25 61:4
  67:11
**affirmatively**
  57:3
**afforded**  54:9
  56:2
**afigueroa**  3:6
**afternoon**  89:18
**ago**  80:1,18
**agree**  11:3 12:4
  23:3 34:9 66:10
  66:13 69:8 74:3
  74:5 75:3,23
  78:18 82:7
  87:13
**agreed**  15:6
  37:12 39:1
**agreement**
  19:14,25 20:1
  35:12 41:1
  56:16 65:13,21
  65:22 66:17,18
  81:4
**ahead**  35:18
  39:14 42:4
**al**  1:4 5:4,5
**allegation**  12:20
  16:1 18:17
  24:20 28:4

31:14,18,20
32:2 42:22
44:19 54:5 55:4
55:4,11,13,25
57:24 58:6,16
58:16 60:23
**allegations**
14:19,25 15:25
16:9,20 17:22
22:23 23:22
29:19 31:5
42:20 43:8
54:15 63:5,8
66:6 69:16,22
70:10
**allege**   13:8,19
14:4 15:3,20
16:4 21:2 22:15
23:24 24:18
26:6 31:5 32:17
52:2 53:21 70:2
**alleged**   13:6,7
13:15,24,25
16:17,21 17:3
17:17 20:25
22:10 30:5,10
30:11 43:25
50:22 53:23
58:1 80:4
**allegedly**   24:10
26:12
**alleges**   16:7
42:8 53:13
56:18

**alleging**   26:10
53:9 58:12
64:21
**allow**   37:18
64:17
**allowed**   30:7
37:12 77:21
78:14
**allowing**   23:14
**allows**   73:4,11
**alluded**   40:21
**alternatively**
68:25
**alters**   83:17
**altonaga**   81:15
**amend**   23:7,14
43:9,16,17
44:18 54:9 55:8
57:10
**amended**   13:16
14:6,20 15:2,11
16:19 17:3,17
23:20 34:5
37:11,12,12
44:21 45:2
59:24 67:23
68:24 70:4,10
**amendment**
44:17 45:4,6
55:6
**america**   76:4
**amount**   29:2,8,8
81:5
**analogy**   24:6

**analysis**   43:11
54:19 66:13
70:17 73:17
**analyzes**   81:16
**ancillary**   24:2
64:7
**andrew**   3:2,12
6:18,21 72:7
**announcement**
6:13
**annoyance**   73:6
**answer**   54:20
57:17 61:1 71:6
85:22
**anti**   37:14,17
38:21 67:18
**anyway**   44:21
52:3 55:14
**apart**   47:11
**apologize**   5:7
9:5 17:7 38:24
62:18
**appearance**
6:10
**appearances**   2:1
5:9
**applicable**   18:2
**application**
33:16 60:7
**applied**   67:19
**applies**   20:12
28:3 31:12 34:9
48:23 53:1 71:1
**apply**   10:10
19:8 20:14

32:22 46:11
49:4 50:24 58:9
59:12
**applying**   19:9
37:16
**appreciate**   8:23
62:24 74:23
76:6 81:24
**appropriate**
75:15 82:20,21
84:9
**arc**   1:7 3:11 5:5
6:18 9:21 14:6
15:4 26:12
35:11 37:2,15
37:17,20,23
39:2 53:24
59:13,18 81:3
**arc's**   60:24
67:19 80:3
**argue**   7:5,6
11:13 16:23
27:4 33:7 37:1
39:12 51:4 75:1
**argued**   8:2
21:18 51:12
76:7 80:9
**arguing**   30:1
**argument**   4:4,5
4:6,9,10,11 8:25
11:10 13:2,13
23:3 25:9 27:18
33:3 39:5 42:6,7
44:20 49:21
51:22,25 57:8

[argument - board]                                                Page 94

58:7,8,11 62:1
75:3 78:18
81:24 82:18
**arguments**
10:20 24:19
45:5 54:21
**arises** 60:6
**art** 21:2 63:16
64:11
**articulate** 57:7
**articulating**
71:20
**aschwartz** 3:5
**aside** 13:22
17:15 32:23
**asked** 37:9
42:13 43:7 66:7
**asking** 23:10
24:13 25:10
41:3,8,8 42:15
42:19 45:21
66:3,4
**assert** 35:1 36:3
43:21
**asserted** 35:2,25
44:9
**asserting** 61:3
**assistant** 86:19
**assume** 57:8
**assuming** 23:23
83:13
**assumption**
23:5
**attach** 61:1

**attached** 19:16
36:11 38:15,25
41:2 59:24
66:18
**attacking** 40:9
**attempting**
76:25
**attorney** 27:14
80:6
**attorney's** 26:21
27:24 53:15
**audio** 7:13
**authority** 41:15
66:8,19
**authorization**
62:12
**authorized** 90:9
**avenue** 2:5,13
3:3,14
**avitali** 3:15
**avoid** 83:25
**award** 74:13
78:4
**aware** 32:11
41:17 80:14
**awe** 39:16

**b**

**b** 31:1 37:22
60:12
**back** 12:2 38:3
45:18 50:4
51:19 65:9
69:22 88:21,24
**background**
9:13

**bad** 37:15 40:14
**bank** 28:10,13
62:10 68:12,17
76:4
**barred** 18:9
**barring** 38:5
**base** 13:17
**based** 14:25
23:21,22 28:3
29:25 35:4
44:19,20 58:7
58:18 64:20
65:10,25 71:7
84:20
**basic** 39:25
**basically** 22:11
57:13
**basis** 19:15
26:11 33:23
41:1,5,9 42:25
58:1 74:14 75:1
85:13
**bayview** 41:16
41:18
**beckel** 19:21,23
**becoming** 68:3
**beginning** 10:1
34:17 37:4
64:14
**behalf** 5:21 6:4
6:7,15,18,21
22:17
**belabor** 39:21
51:13

**believe** 7:21 8:3
33:19 36:12
38:13 47:21
64:18 70:25
75:13 76:14,17
77:25 78:1,8,11
82:20 84:12
**belong** 82:19
**belongs** 42:16
**beneficial** 70:22
**benefit** 15:5,18
55:21
**benefitted** 10:8
15:23
**best** 22:3 60:1
**better** 9:8 78:18
82:8
**beyond** 25:11
80:4
**big** 26:5 45:1
63:14
**bigger** 86:24
**bills** 76:11
**biscayne** 2:18
**bit** 5:25 6:11
47:15 49:18
86:25
**biting** 10:13
**blew** 22:11
**block** 77:22
**blocks** 86:24
**bloom** 76:7
**board** 40:17
59:14,19

**boat** 40:8
**boils** 39:24
   51:25
**bonner** 3:13
**bottom** 56:24
**boulevard** 2:18
**brass** 39:18
**breach** 23:25
   40:15 78:6,7
**breaches** 22:24
   30:19 33:13,22
   34:8 37:10
   67:14
**breadth** 76:16
   79:3 84:20 85:3
**break** 49:24
**brickell** 3:3,14
**brief** 8:7 13:15
   16:13,24 17:5,6
   18:7 21:15,18
   22:5 24:20
   36:16 48:22
   51:13 61:2,15
   62:22 67:10
**briefing** 8:23
**briefly** 15:1
   30:12 48:7 59:2
   59:10
**briefs** 39:8 46:3
   46:5 59:5
**bring** 20:8,10
   21:18 24:2
   31:13 33:10,12
   33:14,20 48:14
   70:23

**bringing** 19:22
**broad** 20:11
   73:1 79:8 85:6
**brought** 59:17
   59:19
**brown** 41:17,19
**bunch** 26:19
   42:11 84:10
**burden** 31:23
   73:7
**burdens** 76:19
**business** 9:24
   14:2,8 19:24
   31:7 40:4 49:13
   60:9 78:24,24
**businesses**
   19:12,14 40:2
**bylaws** 30:17
   31:1 33:25

**c**

**c** 73:4
**ca** 1:2 50:5
**cactuses** 52:25
**calendars** 88:14
**call** 12:7 85:20
   86:8,19 87:1,11
**called** 9:18 22:5
**cancelled** 49:17
**capital** 44:4
**captioned** 90:10
**captured** 85:4
**car** 27:11,13
   52:22
**cards** 22:7,8,13

**care** 7:6 30:15
   30:15,21 31:4,6
   31:18 41:4 78:7
**caremark** 32:21
**carroll** 1:15
   70:1
**cars** 27:10
**case** 1:2 5:3 8:4
   8:7,8,9 13:11,20
   14:10,12 18:6
   18:11,12,13
   19:1,2,3,5,21,23
   21:10 22:4,5,22
   23:13,25 24:1
   24:14 25:1 26:9
   26:14,20,25
   27:1,6,8,10,23
   27:25 29:20
   31:24 32:6,9,20
   32:21,21 34:2,4
   34:18,20,23
   35:3,5,21,24
   36:23 37:3,9
   38:15 39:20
   40:14 42:22
   43:4,24 45:3,23
   49:12 50:4 51:7
   51:9,16,17
   52:20,21 53:2
   55:16,18,23,24
   57:18 59:11,16
   59:21,25 60:1,3
   60:14,19,22
   61:1,7,11,16,23
   61:23 63:2,3,15

   64:4,4,8,13,19
   64:22 65:3,10
   65:16,17 66:2
   66:23 67:5,12
   67:15,17 68:18
   69:19 70:8,9,11
   70:25 73:13,14
   73:18 75:18
   76:3,4,6,7,8
   77:1,2,4,6,7,9
   77:10 78:10
   80:14,21 81:16
   82:1,7,19 83:11
   87:6,25 88:18
   88:21,22 90:10
**cases** 18:8 21:3
   22:21 23:22
   24:8 29:22
   34:14 46:15
   51:5 63:4,15,24
   73:10 75:16
   76:2 81:15,22
   86:17
**cash** 28:6,10
   29:3 68:18
**casualty** 65:16
**categories** 48:15
**cattlemen** 44:15
**cause** 12:11,17
   14:9 56:13
   58:14 62:3
   69:18,19 70:2,5
   71:9 73:5
**caused** 20:25
   53:24,25 56:18

56:19 78:25,25
79:1
**causes**  40:11,12
57:1
**caveat**  12:10
**cease**  79:11
**ceo**  15:4 29:10
68:12
**certain**  30:7
38:5 48:15
65:17 84:21,22
84:25
**certificate**  4:14
60:8 90:1
**certified**  90:7
**certify**  90:8
**cfr**  18:2
**chairman**  40:17
**challenge**  58:8
**challenges**
75:21
**chance**  80:10
**chancery**  33:21
70:20
**change**  66:15
83:23
**changed**  21:20
21:20,23
**channel**  49:10
**characterized**
31:16
**characterizing**
31:17
**charter**  30:18
33:6 41:6 47:9

47:25 48:6,8,10
48:12,20 50:11
65:14 70:17,18
71:1
**charters**  66:1
**chase**  74:9,10
**check**  88:21
89:13
**chief**  40:16
**choice**  19:17
20:7,9,11 34:1
47:21,24 50:15
65:22
**choosing**  46:7,8
**chose**  33:24
37:24
**chris**  5:15,16
**chris.oprison**
2:20
**christopher**
2:17
**circuit**  1:1,1,15
22:4 28:11
**circumstance**
47:14
**circumstances**
28:12
**cite**  14:11 17:4
18:1,6,13 21:14
22:4,21 24:8,25
27:1,9 29:20
32:20 63:15
65:14 76:2,4,5
**cited**  13:20
19:20 42:21

53:2 63:3,4,24
65:3 73:10
81:14
**citing**  18:4
**claim**  11:24,25
12:1,21 13:4,5,8
14:12,13 17:1
17:18 18:10
19:23 20:10
25:6 28:3,12
29:13 31:13
32:19 40:25
41:5,9 43:2,3,18
44:7,8 45:12
50:20 54:22
56:2 60:14 63:8
63:12 64:7,9
65:5,5 67:22
68:11,17
**claiming**  45:11
77:1
**claims**  13:22
16:9 20:5,6,8,14
20:19 21:19
24:2 26:2 31:11
33:13,20 34:8
38:6,6,22 43:20
49:10 50:22
61:4 63:19,20
78:7
**clarifications**
86:12
**class**  60:12,13
**clause**  19:17
31:12 33:5

**cleanest**  11:14
**cleanup**  62:2
**clear**  14:20 18:7
19:6 22:22
26:10 27:22
41:11 43:23
46:15 48:25
57:1 60:10
61:16 68:19
70:23
**clearest**  11:14
**clearly**  35:23
59:12 70:19
77:20 78:6
83:16
**clerk**  37:7
**clichés**  10:10
**client**  9:13
26:17
**cline**  1:16 90:6
90:18
**close**  7:7 36:20
48:5 70:15 71:4
**closed**  46:14
48:14,24 56:6
**closer**  6:12
**cognizable**
26:15 34:7
**coin**  72:22
**collateral**  38:4
**colleagues**  67:4
**collier**  55:20
**column**  50:19
**combination**
9:24 19:24 60:9

**combinations**
10:4
**combined** 26:23
**come** 45:18
57:25 62:20
73:2 87:10
**comes** 42:10
57:15 73:1
80:22
**comfort** 49:24
**coming** 54:24
55:19 88:25
**commerce** 16:5
**commingled**
28:13
**common** 30:23
**commonplace**
30:22
**communicatio...**
81:6
**companies**
21:18,22 66:22
79:14,15
**company** 9:17
10:8 14:7 15:10
15:10,16,16
17:12 20:2 22:1
22:6,13 25:2
27:10 30:7 31:8
33:14 44:5
48:16,17 49:10
79:2,17,19,23
**company's**
78:23

**compel** 4:8 7:22
72:4,18 74:2
80:9,24 85:24
**compels** 51:7
**complaint** 13:16
13:25 14:4,6,20
14:25 15:2,11
16:19 17:4,18
23:19,20 34:5
34:24 35:9
37:11 39:21
40:9,9 41:2,7
42:23 43:16,25
44:22 45:2 49:1
52:2 53:19 56:5
56:7,10,25 57:2
59:24 61:11
62:8 64:25
65:18 67:16,23
68:25 70:3,4,10
70:11 80:4
**complaints**
61:19
**complete** 84:14
84:15,16
**completely** 25:1
77:12
**concede** 30:25
75:19
**conceivable**
23:11
**conceive** 48:25
**concept** 70:7
82:8

**concern** 79:18
**concerned**
47:23 52:7,8,9
54:14 69:23
**concerns** 86:12
**concessions**
15:23
**conclude** 54:8
57:8 82:6
**concluded**
89:19
**conclusion** 8:12
11:21 23:6
**concurrence**
53:4
**condition** 21:8
**conditioning**
73:9
**conduct** 9:24
17:10 31:16
32:12 40:14,14
40:17 43:22,24
53:18,22,23
79:12 80:3,3,21
84:9
**conducted**
32:13
**conducting**
31:21
**conference** 8:5
88:22
**conferred** 67:4
**confidential**
79:4

**confidentiality**
83:10,16
**conflate** 16:13
16:20 32:15
**connection**
53:11 57:1 60:8
81:7
**consent** 48:25
**consenting**
41:21
**consents** 48:23
68:5
**consequence**
53:10
**consequential**
21:4,13 27:7
53:7,17
**consider** 8:6
17:16
**considering**
81:10
**consignment**
27:10
**consistently**
34:10
**consolidate** 8:5
87:18 88:5
**constitutes** 16:5
**constructive**
22:19
**consumer** 20:25
21:17,21 22:2
22:16,20 23:24
23:25 52:1,4
63:20

**consumers**
21:25 22:18
25:4,4
**contemplating**
83:9
**contestably**
44:9
**contextualize**
61:3
**continue**  78:24
**continued**  79:15
**contrary**  40:6
**contrast**  51:12
**control**  9:20
**controversies**
51:15
**conveniens**  11:3
11:11 12:8
43:10 46:12,22
47:2 50:9 65:3
66:21 69:5,7,8
71:7,12 73:18
76:8
**convenient**
33:21
**conveniently**
46:13
**convergent**
11:25
**conversation**
85:15 88:6
**conversion**  28:2
28:5,9 29:3
60:17,18,20
61:7 62:3 68:11

68:14,16 69:20
**convert**  60:13
**convertible**
20:20
**convinced**  35:16
**cooperate**  15:5
15:9
**copy**  38:22
71:21
**coral**  2:13
**core**  23:25
24:10
**corp**  2:3 9:18
13:25
**corporate**  34:12
41:6
**corporation**  1:4
2:16 5:4 14:1,21
14:22 48:23
68:2,5
**corporations**
22:7 51:1 65:25
66:23,25
**correct**  11:5,7
12:9,13,15
14:11 21:19
44:17 46:25
55:7 58:6 90:12
**correctly**  51:25
**cost**  22:12 27:5
27:23
**costs**  26:13,25
27:5,6 54:2,3
64:3

**counsel**  2:3,15
3:1,11 7:5 32:11
35:8,8,9,10
40:25 64:1
85:12 87:10
**count**  11:24
12:5,11 23:4,12
30:14 36:18
43:15,18 54:7
54:12 57:9
58:11,12
**counter**  44:2
**counting**  44:3
**counts**  12:14
**county**  1:1
12:17 13:4,7
14:5,23,24 15:8
15:13 17:2
44:10,12,14
46:2,4,7,17,19
55:20 56:8,12
56:14,21 57:2
58:14 63:7 90:4
90:14
**course**  54:8 55:7
73:5 75:10
78:18 81:17
**court**  1:1,15 5:3
5:14,18,23,24
6:2,9,11,20,23
7:1 8:10,22 9:5
9:7,9 10:17,21
10:24,25 11:2,6
11:9,10,16,20
12:2,16,24

16:16 18:23
19:6 23:1,3,10
23:15 25:8,16
26:1 27:17,20
29:14 33:22
34:12,20 35:5
35:21,24 36:3,5
36:6,9,14,17,20
38:2,7,9,20 39:4
39:10,14 41:10
41:15,16,24
43:6,7 46:21
47:1 49:14,23
50:4 51:21 52:7
54:13 55:1,3,17
55:24 57:5
58:22,24 59:7
61:17,18 62:5,7
62:15,17,20
64:23 66:8,10
67:6,8,21 68:23
68:23 69:9
70:20 71:25
72:8,10,12,16
72:18 73:4,11
73:20,22 74:10
74:17,22,25
75:14 77:20
78:17 79:10
80:5,9 82:3,12
83:1,9,13 85:11
85:14,22 86:16
87:4,14,19,22
88:4,12 89:4,15
89:17

**court's** 4:7 59:2
62:24 69:11
**courthouse**
35:19,23
**courtroom** 5:9
5:19 6:25
**courts** 19:4,9
21:14 24:8
34:11 37:18
50:24 51:5 58:3
75:23 81:18,19
**cover** 68:22
**creating** 25:3
**credit** 45:20
**criminal** 31:24
**crowell** 18:12
**crr** 1:16 90:18
**cured** 55:5
**current** 35:8
59:23 64:14
**currently** 23:4
34:14,18
**cut** 74:9,10

**d**

**d** 4:1
**dade** 14:5,22,24
15:8
**damage** 13:24
21:24 26:6,7
52:9 54:5 63:6
63:14,17
**damages** 14:24
16:7 21:2,5,13
22:17,19 26:4
26:11,19,20

27:7 52:2,10,14
52:19 53:5,5,10
53:13 54:15
60:18 64:2,10
69:23
**date** 1:12 86:1,1
86:4 87:7 88:7
88:10,23
**dated** 90:13
**dates** 88:8,13
**day** 35:12 58:21
64:8 73:22
84:11,11
**days** 7:9 74:7,16
78:11,13,14
80:23 82:24
84:15,15,16
85:25 86:1,4
88:19 89:8
**dc** 3:8
**dca** 65:16 66:3,9
**deal** 34:14 45:1
68:17
**dealing** 18:18
22:25 29:3
**deals** 33:22
**debate** 54:2
**debt** 29:12
**dec** 67:17
**deceit** 35:4
**deception** 21:25
**deceptive** 20:24
40:18 64:6
**dechert** 3:7 6:7
6:14

**dechert.com** 3:9
**decide** 44:22
**decided** 51:15
**decision** 48:2
53:3
**decisions** 31:9
**deck** 50:6
**declaration**
23:11
**declaratory**
60:16
**defective** 55:4,5
**defendant** 3:1
3:11 6:5,8,15
14:14,17 27:14
42:9 55:18
59:20 76:10
**defendant's**
14:16 40:4
53:22 58:7
68:24 72:2
**defendants** 1:8
5:18 6:20 16:24
39:25 40:7
42:15 44:25
53:20 60:22
67:12 69:18
73:3 75:10,20
86:7
**defense** 8:20
40:25 60:25
63:6 70:14 81:4
**defenses** 37:5
38:3 67:11

**deficiencies**
13:23 23:15
**deficiency** 16:11
24:18 45:10
**deficient** 12:21
29:19 31:9
42:21,23 43:15
57:9 63:9 64:25
65:2
**define** 52:18
**defined** 15:10
15:16
**delaware** 14:1,7
14:22 30:17,23
33:14,19,21,24
34:9,10,10,14
34:19,23 35:2
35:10,23,24
36:1,4,6,9 38:7
38:10 45:24
46:8,9,17,18
47:11 48:13,13
49:1,2 50:21
51:2,5 59:4,12
59:17,23 60:5
60:20 61:1,13
65:25 66:22,23
66:25 67:2,3,9
67:21 68:2,3,4,5
70:8,20 73:19
77:2,4,9 82:20
**delay** 53:24
76:25 78:17
81:10 82:5

**delayed** 44:1
79:13
**delays** 56:18
**delineated**
28:22
**delivered** 21:8,9
**demand** 27:14
**demonstrates**
56:25 57:4
**denied** 85:23,25
**denying** 71:6,8
71:13
**depending** 8:12
88:15
**deposed** 37:8
**deposition**
37:21,22
**desist** 79:11
**determination**
55:1
**determinative**
33:4
**determine** 61:9
**developing**
34:11
**difference** 21:6
52:14,15 63:22
**different** 20:3,3
25:2 59:25
60:19 76:13
77:7 88:2,3
**differential**
37:14
**differently**
26:24

**difficulty** 7:11
**digital** 1:3 2:15
5:4 9:18 13:24
14:21 15:4,6,7
15:11 29:10
30:18
**dilution** 37:14
37:17 38:21
67:18
**din** 7:17,18,19
7:20,23,24 69:1
69:2,2 72:2,3,5
72:5
**direct** 41:5
53:10,13,17
62:7 64:2
**directed** 54:22
55:9 79:11
**directly** 7:4 66:5
**director** 15:14
68:3,4,7
**directors** 48:16
48:18 59:14
**disagree** 69:18
70:17
**disagreement**
72:25
**disagrees** 88:18
**disclosed** 81:2
**discount** 34:1
**discover** 79:2
**discovery** 37:19
37:24 38:8 72:1
73:1,8,12 74:1,4
74:6,15 75:4,24

75:25 77:1,13
77:17,19,22
78:5 80:22 82:6
82:17,23 85:23
85:25 86:11
**discretion** 73:1
**discuss** 11:25
86:9
**discussed** 21:24
47:19
**discussion** 8:14
35:17,17
**disfavored**
35:21
**dismiss** 4:3 7:16
9:4,12 18:1
19:17 20:15
29:16,21 40:22
41:13 42:13
43:2,3 45:4,12
46:20 54:17
57:22 58:4,17
65:15,19 68:24
69:13,14 71:7,8
71:12 73:13,15
75:12,13,15
77:19 81:11
**dismissal** 25:24
56:3 69:4,4
73:18
**dismissed** 12:22
13:11 20:15
30:16 64:8,9
**dispose** 50:11
73:15

**dispute** 60:7,11
**dissolve** 9:19
**district** 11:24
41:10
**diversified**
27:23
**divest** 62:13
**dividing** 53:6
**division** 32:5
**dla** 2:18 5:15,16
**dlapiper.com**
2:20,21
**docket** 7:17
61:10
**doctrine** 46:11
49:8
**documents**
42:11 55:10
65:17 66:4,4,7
76:11 81:6 83:2
83:7,20 84:21
84:25
**dodge** 40:1
**doing** 10:15
44:4 77:11
78:24 83:25
**dollar** 29:2,7,8
**dollars** 26:13
**dorestin** 53:2
**double** 89:13
**draft** 34:24 35:9
**dutch** 76:10
**duties** 15:17
30:19

| | | | |
|---|---|---|---|
| **duty** 22:24 24:1 | **effectively** 23:7 | **entrusted** 28:15 | **exact** 20:2,4 |
| 24:11 30:15,15 | **efficient** 85:13 | **equipoise** 48:5,5 | **exactly** 24:24 |
| 30:19,21 31:4,5 | **effort** 82:13 | 70:16 71:4,4 | 72:21 74:12 |
| 31:11,18 32:21 | **egg** 10:15 | **equivalent** | 79:3,5 80:2 |
| 33:13,23 34:8 | **either** 13:11 | 76:21,23 81:17 | **example** 22:3 |
| 37:3,11 38:6 | 27:24 44:8 55:8 | 81:21 82:11 | **examples** 24:16 |
| 40:15 41:4 | 59:15 66:5 76:4 | **escrow** 28:16 | **except** 30:19 |
| 50:20 67:14 | 84:23 | **esi** 85:16 86:9 | 89:5,6 |
| 78:6,7 | **electronic** 71:21 | **especially** 73:13 | **exchanged** 81:7 |
| **dwac** 10:12 | **element** 58:13 | 86:23 | **exclusive** 70:21 |
| 15:15,16,19,20 | **eleventh** 22:4 | **esq** 2:4,8,12,17 | 70:24 |
| 15:24 16:13,25 | **embarrassment** | 2:17 3:2,2,7,12 | **exculpated** |
| 17:11 35:18 | 73:6 | **essence** 38:6 | 30:21 |
| 37:16 40:15,18 | **employ** 31:6 | **essentially** 13:3 | **exculpates** |
| 43:24 44:1,1,14 | **employee** 22:6 | 28:8 37:23 | 30:18 |
| 48:17 50:25 | 22:10 | 67:13 | **exculpation** |
| 53:9,13,22 54:1 | **employees** 22:8 | **estimated** 88:23 | 31:11 41:5 |
| 59:13,19 60:12 | **enabled** 77:21 | **estoppel** 38:4 | **executed** 40:19 |
| 60:13 63:10,11 | **enforcement** | **et** 1:4 5:4,5 | **executive** 40:16 |
| 63:11,12 68:1 | 32:6,6,9 79:16 | **evaluate** 33:1 | **exempted** 31:2 |
| 80:17 81:2,5 | 79:20 | **evaluation** | **exercise** 67:8 |
| 87:11 | **engaged** 31:15 | 50:17 | **exercises** 61:17 |
| **dwac's** 15:21 | **entails** 80:3 | **event** 14:14 | **exhibit** 19:16 |
| 41:6 60:8 | **entire** 26:20 | 73:24 | 31:1 59:24 |
| **e** | 34:12 73:15 | **everybody** | **exhort** 15:22 |
| | **entirely** 40:2 | 49:21 88:6 | **exigency** 80:22 |
| **e** 4:1 19:16 | 50:13 | **everybody's** | **existence** 40:13 |
| **earlier** 26:23 | **entities** 10:13 | 8:23 47:14 | **expedite** 38:12 |
| **easier** 5:25 | 16:14,17,18 | **everyone's** 67:2 | 67:7 |
| 11:20 30:13 | 54:5 65:25 | **evidence** 42:16 | **expedited** 33:23 |
| 68:7 | 66:24 | 42:18 46:24 | 61:6 74:23 |
| **easy** 30:13 48:2 | **entitled** 28:23 | 47:3,7 54:24 | **expense** 73:7 |
| **effect** 14:15 | 28:23 74:22 | 55:11,23 71:2 | **expenses** 24:23 |
| **effected** 61:18 | **entity** 10:7 15:8 | 90:10 | **explain** 13:9 |
| 61:20 | 68:2 76:10 | | 29:22 47:7 |

explained 38:20
explicit 28:18
explicitly 47:18
exposed 17:11
exposes 79:14
  79:15,17
expressed 28:17
expressly 66:10
extensive 53:3
extent 43:14
  55:3 58:10 85:7
extort 15:22

**f**

face 22:15 56:4
  56:5,7,25 57:3
fact 13:17 16:1
  17:24 21:23
  27:12 29:11
  31:22 33:5
  34:16 36:4 40:6
  47:8 50:22
  54:25 58:8 64:7
  80:20 81:2,12
factor 70:13,15
  71:5
factors 33:2,3
  34:6 47:23 48:4
  48:5 50:9,17
  68:1 71:3
facts 13:19 55:1
  56:1 69:17 70:2
factually 76:12
  76:12
fail 20:16,17
  21:1

failed 13:8
failing 31:6
fails 17:18 50:23
  63:12
failure 31:8
  71:8
fairly 27:22
  84:9
faith 37:16
  82:18
fall 40:13
familiar 38:8
  39:22
far 29:14 47:22
  51:1
favor 35:5 39:2
  47:24 50:15
  51:9 59:4 69:16
favors 20:7
fdupta 11:13,22
  11:24 12:21
  13:4,5,8,13,14
  13:21 16:9 18:9
  18:10,17,21,24
  19:2,9 20:10,14
  21:3,19 23:4,12
  24:12,24 25:6
  26:3,15 27:2
  40:25 43:2,3,8
  43:15,18 44:6
  45:12,18 51:20
  51:22,25 54:12
  54:22 55:4 57:9
  58:11 63:8,13
  63:15,17,19

64:9,15,16 65:5
  65:5,8 69:21
feasible 84:19
february 38:14
  38:19 61:12
federal 17:22
  18:4,19 19:6
  81:14,17,19
fee 80:6
feeds 10:14
fees 21:12,12
  26:14,21 27:24
  53:15 64:3,5,6
  64:10 74:3,13
  74:19 78:2
felt 15:12
fence 69:21
feng 18:10
fiction 81:11
fiduciary 22:24
  24:1,11 30:19
  33:13,22 34:8
  37:2,10 38:6
  50:20 67:14
figueroa 3:2
  6:21,21
figure 7:9 8:13
file 34:25 35:1
  35:11,17,18
  55:8,9,10 78:19
  80:24 82:12
  83:20
filed 16:15 32:9
  34:20,23 35:4
  36:2,3,25 37:7

45:4,9 67:20
  71:16 73:3
  76:15,18 77:5
  77:14,14 80:23
  82:9
filing 19:19 34:4
  36:25 49:1
  75:11 77:23
  78:4
financial 17:12
find 23:16 24:23
  28:7 43:15 55:3
  59:23 64:24
  70:5 86:20,23
  86:25
finding 55:1
finds 43:7
fine 7:5 49:25
  71:22
finish 49:20
finished 50:10
first 10:24 11:13
  11:19 13:1,17
  14:16,17,18
  16:3,12 17:2
  20:23 21:16
  23:7 32:8 34:20
  34:23,25 35:1,3
  35:4 36:2,2,3,6
  36:9 38:10,16
  38:19,25 40:1
  42:5 46:1,10
  48:9,11,20
  57:20 59:24
  60:5 61:17,18

61:23 62:25
67:8,20,20
69:12 71:16,17
74:15 80:10
86:21
**fit** 24:3 26:2
27:3,3 52:20
**fitting** 24:3
**five** 49:25 59:7
88:19 89:8
**fix** 65:7,8
**fl** 3:3
**fledgeling** 9:16
**flesh** 75:25
**fleshing** 79:14
**floor** 8:22
**florida** 1:1 2:6
2:10,13,19 3:4
3:14 12:1,4 14:2
14:23 16:6 19:3
20:7,8 23:13
24:3 28:3,3,9
29:4 34:21 36:2
40:2,4,6 45:22
46:9,14,16
47:15 50:22,24
51:3,5,14,16
66:24 67:2 68:8
68:18 69:6,8
70:9 71:11,15
71:18 75:14
81:18,18 82:19
90:3,7,14
**florist** 52:23,24

**fluff** 84:10
**fly** 18:21
**focus** 9:1 10:19
10:23 12:3 46:2
**folks** 45:22
**following** 5:1
**foregoing** 90:9
**foreign** 50:24
51:10 76:10
**forget** 44:25
**form** 53:13 54:1
78:1
**formed** 10:7
**former** 10:10
35:8,8
**forms** 19:15
**forth** 69:17
**forum** 11:3,10
30:14 32:24
33:1,20 34:1
35:6,22 42:9
43:10 45:17,19
46:7,9,12 47:21
47:25 48:14,19
49:12 50:9,16
51:8,19 65:2
66:20 69:5,6,8
70:9,21 71:7,12
73:18 76:8
82:20
**forward** 38:3
57:25 78:10
**found** 58:15,16
**foundation** 11:4

**founded** 40:11
47:14
**four** 3:13
**fours** 76:3,9
78:6
**fpr** 90:18
**frankly** 25:19
38:2
**free** 5:6
**fresh** 76:5
**front** 8:8 34:14
38:3,17 75:8
76:7 88:1
**frustration**
53:12
**ftc** 18:25 19:1,3
19:4,5,7,8
**full** 75:23
**fully** 78:9
**functional**
76:21,22
**functionally**
82:10
**fundamentally**
60:19
**funding** 9:19
**funds** 28:17
29:1,9 30:5,7,9
68:13

**g**

**gables** 2:13
**general** 83:18
**generally** 16:7
**getting** 36:20
84:12

**gift** 22:7,8,13
**give** 9:12 10:22
22:3 47:20
49:18 57:10
68:14 74:25
79:7 82:17
**given** 22:8 32:12
39:16 63:21,22
85:3 87:7
**gives** 84:16
**giving** 29:4
**global** 1:7 3:11
5:5 6:18
**go** 9:7,19 18:19
23:7,19 25:21
30:2 35:18 38:3
39:14 42:4 50:4
86:18 87:24
88:20
**goes** 8:13 47:6
58:22
**going** 6:13 8:2,6
10:14 11:12
23:18 24:7
25:20,25 29:24
32:5 34:6,25
35:11,11 36:1
38:1,14,20
39:11,18,20
44:3 45:5 49:16
51:19 54:17
57:5 61:6 66:14
67:22 69:21
71:18 72:13,21
74:13 75:4,5

78:13 79:20
82:17,23 83:14
84:19 85:16,17
85:23,24 86:3
87:11 88:16
**golden** 10:15
**gonzalez** 2:5,8,8
2:12 5:11,12,12
5:13,22
**good** 6:3,6,17
52:16,16,21
63:21 73:5 74:4
75:1 81:5 82:18
89:18
**goods** 26:7
**goose** 10:14
**gotten** 70:13,15
80:10
**governance**
15:11 31:6
**government**
37:9
**grant** 25:20
43:9 74:23
**granted** 29:21
43:16 67:7
73:17
**great** 52:25
**gross** 53:3
**grounds** 76:8
**group** 2:3 9:25
**guess** 25:20
73:23 82:3
**guidance** 81:20

**gun** 74:18
**gutierrez** 2:12
5:20,21,23 6:1

**h**

**hamstring** 85:9
**hand** 10:14
41:15 46:1,1
**handle** 72:13,13
**handled** 38:7
**handles** 45:14
**happen** 8:14
**happens** 42:8
**happy** 75:2
85:12
**hard** 45:20
48:24
**harlee** 55:17
**harm** 13:23
14:17,18 15:7
15:12,19 16:17
16:18 17:13
22:2,16,20
23:24,25 53:25
64:21 78:25
79:1,13,15,22
**harmed** 17:11
22:18 53:22
63:11,11 78:21
**harmful** 14:15
15:15
**harming** 15:19
15:24
**harms** 80:2
**headquartered**
51:3

**hear** 6:9 25:9
36:1 38:15,21
51:21 54:11
67:22 84:1
**heard** 40:24
41:4 44:25
45:24 82:22,24
**hearing** 1:10
8:11 38:13,17
49:15,17 50:1
51:24 67:6,7
81:25 86:17,19
86:23 87:15
**heartland** 31:10
**heavy** 47:23
**held** 75:14
**helped** 9:22
**hesitation** 79:1
79:18
**hess** 3:7 6:6,7,14
6:14
**hey** 55:19 82:18
**high** 31:23
**higher** 22:14
**highlight** 24:17
**hinges** 58:11
**hire** 52:23
**hires** 27:13
**history** 10:4,15
**hold** 28:16
78:13
**holders** 28:20
**holding** 30:8
**hole** 24:5

**home** 40:6
51:16
**homeland** 26:2
**homer** 3:13
**homerbonner....**
3:15
**honor** 5:17,20
6:3,6,14,17 8:4
8:6,19,21 9:3,5
9:11 10:11,23
11:9,12,22 13:1
13:13,21 15:1
15:25 16:14
17:15,16 19:11
20:16 21:4 22:3
22:6 23:8,17
24:13 25:18,25
26:1,5 29:24
30:3,13 33:1,18
33:19 34:1,7,22
36:13,16,22,23
38:4,17,23 39:8
39:13,22 40:21
43:13 49:22
50:7 51:18 54:7
62:22 63:1,13
64:17 65:9,18
66:2,16,20 67:3
67:16 68:21
71:24 72:21,24
72:25 73:14,17
74:8,12,21 75:7
75:14 76:14,24
77:11,18 78:8
78:13,22 79:22

80:12 81:10
82:25 83:5,12
84:5 86:14 87:2
87:3 89:14,16
**honor's** 39:17
44:17
**honorable** 1:15
**hook** 11:23 13:3
24:3 65:2,6
**hop** 51:19
**host** 26:19
**hour** 37:21
**house** 7:13
**huck** 2:5,8,12
5:10,22
**hunter** 1:15
**hyperbole** 9:1
**hypothetical**
57:12

**i**

**idea** 40:5 51:6
79:7 81:8
**identifiable**
29:2
**identification**
7:17 61:10
**identified** 76:19
**identify** 62:11
**identifying** 29:7
**ignores** 50:21
**ii** 1:7 3:11 5:5
6:18 9:21 14:6
26:12 35:11
37:2,15,17,20
37:23 39:2

**iii** 3:12
**illegal** 17:21
18:5 20:21
30:20 31:16,21
31:22,25
**imagine** 49:9
**immediately**
34:25
**imminent** 78:23
**immunity** 76:5
**impact** 43:10
54:18
**implicit** 66:1,12
**implicitly** 65:18
66:5
**important** 61:2
**importantly**
34:13
**improper** 11:11
13:10 43:4
54:25 56:6,8
57:4 76:25
77:12,25 78:8
**improperly** 65:6
**inadequate** 31:7
**inasmuch** 58:6
**inclined** 74:22
**include** 21:4,5
63:3 67:10 83:1
**including** 10:9
31:7 70:22 73:8
**inconsistent**
24:14 33:15
50:13 52:5

**inconvenient**
70:9
**incorporated**
51:2
**incorporation**
60:8
**indicates** 70:19
**indirect** 53:7,16
**individual** 14:3
22:1 26:8 40:3
68:8
**indulgence**
62:24
**information**
15:17 79:4
**inherently**
20:17
**initial** 18:7
52:18 82:3
**initiated** 59:13
**injected** 34:16
67:15
**injecting** 37:4
**injure** 43:25
44:1
**injury** 20:25
21:17,23 22:20
43:24 44:9 52:1
52:3,4 56:20
58:17
**instinct** 44:17
**instruction**
28:18
**instructions**
35:10

**instructive** 27:9
**insufficiency**
58:18
**insufficient** 23:5
29:22 55:14
57:24 58:17
**insurance** 65:16
**intact** 30:6
**intent** 62:13
**intentional**
30:20
**interest** 34:11
47:23 48:4,4
50:9,17 51:15
67:24
**interpretation**
33:12 60:7
**interpretative**
60:11
**interpreted**
47:10
**interpreting**
19:4
**interpretive**
49:6
**introduction**
60:2,10
**investigation**
32:13 53:16,25
56:19 79:8
80:16 81:5,8
**investigations**
37:10
**investments** 1:7
3:11 5:5 6:19

**investor**  79:1,18
**invoice**  24:23
    28:7
**invoices**  25:3
**involved**  33:9
**involvement**
    61:22
**involves**  33:8
**involving**  18:8
    18:14 50:21
    51:7,10
**ipo**  9:17,20,22
**irrespective**
    44:16
**issuance**  20:20
**issue**  21:16 22:1
    22:1 25:12,23
    30:12 32:12,19
    35:15 36:4,6,9
    37:13 38:10,21
    52:8 57:11,13
    57:13 58:19
    60:24 61:7
    63:14 65:8,8
    67:17 70:14
    75:17,25 76:5
    80:6,6 81:16
    82:3 84:4
**issued**  15:3
**issues**  8:1,24 9:2
    21:10 25:24
    28:25 30:7
    32:23 34:15,17
    36:24 37:2,4,23
    38:1 57:19

59:15 60:21
61:4,8 64:12
71:16 72:1
77:20 78:22
86:9
**items**  41:12 69:3

**j**

**j**  2:4
**jason**  2:8,11
    5:12
**job**  22:9
**jody**  2:17
**jody.stafford**
    2:21
**joint**  28:21
    68:24 73:3 81:4
**joshua**  3:7 6:6
    6:14
**joshua.hess**  3:9
**jr**  2:4
**judge**  1:15 8:8,8
    38:14 53:3 70:1
    76:7 81:15
    85:19 87:23
    88:1
**judge's**  4:12,13
**judgment**  25:9
    29:16 40:23
    41:23 60:16
**judicata**  38:5
**judicial**  1:1
    41:11,20 83:19
    86:19
**judiciously**  41:3

**july**  1:12 8:11
    87:15 90:13
**jump**  28:2
**jumping**  74:18
**jurisdiction**
    11:4,6,9 35:1,2
    35:25 36:3
    46:14 51:8
    57:23 58:2
    61:17 67:9 68:5
    69:9 75:17,19
    75:21
**jurisdictional**
    57:23 58:6
    75:24
**justice**  73:7

**k**

**k**  3:8
**keep**  9:1 37:2
    85:10
**kept**  30:6
**kick**  40:25 41:4
    41:9 42:19,20
    42:24 47:25
**kind**  39:15,23
    40:8,21 42:5
    45:20,25 50:23
    51:25 52:12
    53:6 54:16 56:1
    56:9 61:21
    83:19
**kinney**  46:15
    47:19
**knew**  31:22

**know**  7:11,23
    8:23 9:4,15 11:2
    13:2 18:16 22:9
    22:10,22 23:22
    24:4,16 25:23
    26:18,22 27:17
    27:20 31:5,12
    32:4,14,17,19
    33:5 34:3,7 35:7
    35:15,18 36:1
    37:1 38:5,18
    39:8,21 41:19
    42:6 44:19 45:2
    45:7,8 46:19
    47:2 48:7 50:20
    50:25 51:1,4
    52:22 53:1,6
    54:4,7,10 55:20
    58:13,15 59:5
    61:2,19,22
    62:13,23 65:13
    65:24 66:22
    67:23 71:9 72:1
    74:2,3 79:5
    80:13,18 84:2,6
    84:23,25 85:4
    85:10 86:20
    87:5,20,24
    88:21
**known**  10:3
    41:25 79:25
**knows**  31:25
**knuckles**  66:12

## l

**l** 3:2
**lack** 57:22
**lading** 76:11
**laid** 10:15 11:17
11:18
**lakeland** 90:13
**language** 21:20
33:10 70:18,25
**largest** 10:9
**law** 12:1,3,4,9
12:21,22 13:20
14:10 17:18
18:6 19:1,3,5,17
19:20 20:7,8,9
20:11,11,17
21:10,19,23
23:13 24:14
26:10,14,25
27:6 28:3,9 29:4
29:19,20 30:22
30:23 31:3
32:20 34:9,12
34:23 35:5,21
42:24 50:21,22
50:25 51:5,7,10
52:12,13 61:16
63:2,9 64:4 65:3
65:22 66:2
68:18 70:11
82:1
**laws** 17:23 18:3
18:4,15,20,20
**lawson** 2:5,8,12
5:10,13,21

**lawsonhuckg...**
2:7,11,14
**lawsuit** 10:11
16:15 40:10
45:22
**lawyers** 84:3
**lead** 11:2
**leaked** 15:17
79:3
**leap** 25:11
**leave** 23:7 43:9
43:16 54:18
57:10 58:5
**lectern** 7:6
**left** 49:6 50:8,11
50:14
**legal** 9:2 13:22
17:20 21:12
24:22 26:13
28:6 64:3,5,6,10
67:14
**legally** 12:11
47:8
**leisurely** 75:5
**letters** 27:14
**liability** 17:12
**liable** 14:14
**liberty** 49:11
**lied** 27:12
**life** 51:4
**likely** 78:2
**likewise** 53:19
**limited** 21:3,6
26:6 28:10
37:19 63:17,18

63:20 68:16
75:11
**line** 53:6 56:24
**lines** 80:17
**list** 26:18
**listen** 41:22 75:2
**litigate** 48:25
**litigated** 49:12
**litigation** 47:10
**little** 5:25 6:11
7:8 43:8 47:15
49:18 54:16
78:11 86:19,25
**live** 6:24 42:1
**llc** 1:7 3:11 5:5
**llp** 2:18 3:3,7
6:7,15
**loan** 41:16,18
**localized** 51:15
**located** 40:2,4
44:11,14 47:15
56:11,15,20
**logistics** 86:11
**long** 12:4 78:11
79:23 88:15,15
**longer** 86:25
88:19
**look** 16:16 17:9
19:3,22 24:24
24:25 25:14
26:16,16 35:10
52:6 55:15 57:3
60:2 61:10
65:21 66:2,3,8
81:19 87:25

88:24
**looked** 88:8
**looking** 69:22
70:11
**looks** 87:14
**lord** 81:15
**loss** 79:17
**lost** 21:5,11,11
26:12,17,24
27:4,22 33:8
54:1 63:24
**lot** 8:24 9:14
26:21 34:15
66:13 68:7
**love** 26:17
**loyalty** 30:20
32:21 78:7
**lunch** 86:22

## m

**macdill** 2:5
**made** 15:15
27:21 32:4
41:19 42:23
60:23 74:5
82:22 85:4
**magistrate**
82:14
**main** 11:10
**mainstream**
78:3
**maintains** 49:13
**make** 8:24
14:14 22:21
23:5,10 24:19
31:14 32:25

39:5 45:1,6
46:15 65:12
75:3 83:13,15
85:9 88:7
**makes** 18:5,7
48:2 60:10 68:6
68:19
**making** 8:25
25:3 55:1
**management**
8:4 87:6 88:21
88:22
**manner** 61:20
**manufacture**
18:17
**map** 10:22
11:21
**march** 36:13,14
36:17 38:19
39:3 61:13 67:5
67:6 89:6
**marked** 28:6
**market** 52:15
**marketed** 21:7
**matches** 28:7,8
**materially**
44:11
**mathew** 2:12,14
5:20
**matter** 12:21,22
17:18 20:17
29:19 30:22
31:3 42:24 48:7
49:3 52:12,13
54:25 55:13

57:18 58:23
63:9 67:3,9
**matters** 8:16
**mean** 14:9
41:10 42:6 45:2
45:19 46:3,22
48:20 50:24
51:9 52:6,21
53:13 60:5
66:11 74:25
75:7 87:22
**means** 21:21
31:12 44:18
53:5
**media** 2:3 9:24
**meet** 68:19
**meets** 40:24
**mention** 17:14
65:21
**mentioned** 67:1
84:24 85:1
**merged** 68:1
79:24
**merger** 15:22
16:5,25 17:20
18:14 19:12,13
19:14,25 41:1
44:2,14 53:12
53:24 56:16
60:12,13 65:13
65:21,22 66:17
66:18
**merit** 90:6
**merits** 43:2

**messed** 24:6
**miami** 2:19 3:4
3:14 14:2,5,22
14:24 15:8,12
81:16
**microphone**
6:12 7:7 9:6,7
**microphones**
7:1
**militate** 51:9
**million** 9:21,23
53:14
**millions** 26:13
**mind** 69:11 70:7
**minimum** 9:1
57:9
**minorca** 2:13
**minute** 13:9
67:5
**minutes** 27:18
36:21 39:6,9
49:25 59:8 62:6
86:24
**misconduct**
39:19 53:11
60:25 77:8
**mispronounci...**
63:4
**misrepresenting**
22:12
**missed** 40:8
**mistake** 45:12
**modeled** 18:25
81:18

**moments** 49:16
**monday** 35:14
**monetary** 79:17
**money** 27:16
28:14,16 29:4,6
29:11 62:11,11
68:15
**monroe** 2:9
**month** 61:6
**months** 77:16
78:12 80:1
84:12
**morgan** 18:12
**morning** 6:3,6
6:17 86:21
**motion** 4:3,8,8
7:16,19,22 8:5
9:4,12 18:1,7
19:16,21 20:15
27:1 29:16,17
31:2 36:11 37:6
38:12 39:24
40:22,23 41:13
45:9 46:19 55:8
55:9,10 57:21
57:22 59:3
61:14 65:15,19
67:7 68:24 69:3
69:13,14 71:7,8
71:11 72:2,4,18
72:19 73:3,12
73:14 74:2
75:11,12,13,15
76:14,18,20
77:4,14,19,23

78:20 80:9,24
80:24 81:10,13
81:13,13,20,21
82:9,10 84:18
85:22,24 87:17
88:5
**motions** 7:15
29:21 58:3
83:24
**motors** 27:8
64:4
**move** 42:4 78:10
**moved** 29:11
45:3 51:10
**multiple** 12:6
37:14 67:18
69:3
**muster** 44:23

**n**

**n** 4:1 5:16
**name** 5:24
62:18 72:6
**names** 20:2
**narrow** 25:24
37:13 64:11
66:6
**natural** 53:17
**nature** 40:19
68:4
**necessary** 14:14
**necessity** 51:7
**need** 7:2 8:1,13
8:17 30:6 50:16
69:13 71:3 74:1
75:4 79:2,5,24

83:9 86:6,13,17
86:24 88:5,20
89:7,8
**needed** 89:11
**needs** 8:14
49:23 75:4
**never** 25:5
26:14 27:24
77:14
**new** 20:9,11
80:13 87:10
**newfound** 16:2
**newly** 10:7
**nomenclature**
20:3
**non** 10:6 11:3
11:11 12:8
30:14 32:24
43:10 45:17,19
46:7,9,12,22
47:2 50:9 51:8
51:19 65:3
66:21 69:5,7,8
71:7,12 73:18
76:8
**nonparties**
83:24
**normal** 23:6
**normally** 42:8
46:23
**note** 30:9 44:24
**notes** 15:3 20:20
90:12
**notice** 32:4,11
32:12,16 36:25

37:21 41:3,12
41:20 45:5,10
58:19 79:6
84:25
**noting** 44:13
**number** 5:3
7:15,17,24
19:18 21:15
32:10 37:14
50:5 61:10 74:6
76:2
**nw** 3:8

**o**

**o** 5:16,16
**objection** 78:10
82:15 84:22
**objections**
76:22 77:14,24
78:2,5,15,15
83:8 86:5,6
**obligated** 78:9
**obligation** 30:5
69:17
**obligations**
59:21 83:17,23
**obstruct** 77:13
**obstructed**
15:21
**obviously** 6:24
39:18 46:22
50:21 79:9
84:20
**occur** 85:17,17
**occurred** 14:24
44:10 58:14

**odd** 28:20 47:15
**offense** 49:5
**officer** 40:16
**officers** 48:16
48:18
**oh** 44:1 45:1
**okay** 6:1 9:10
12:24 27:15,19
36:22 39:9
41:18 42:3
51:23 58:24
71:25 73:16
80:5,25 88:4
89:15
**old** 10:9
**once** 50:11
**ones** 53:20
84:22
**online** 86:18
87:1 88:14
**opening** 39:16
**operated** 14:22
**operating** 79:24
**opponent** 43:7
57:6,16 59:8
64:23
**opportunities**
21:11 23:14
26:18
**opportunity**
26:13,25 27:4
27:22 54:1,9
63:25 75:1,22
**opposed** 11:11
57:13

**opposition** 7:18
64:1 69:2 74:20
**oprison** 2:17
4:10 5:15,15,16
73:23 74:21
75:7 78:22
80:13 84:5,24
85:19 86:3,15
87:3,13 88:17
**oral** 39:5
**order** 36:4,7,10
36:17 37:6
38:10,12 61:13
67:5 71:19
76:18,23 77:5
78:20 79:10
81:14,21 82:9
83:10,16,17
86:2,3 87:24
**orders** 78:13
**original** 19:21
55:13 67:16
**originated**
55:17
**orlando** 1:7 3:1
6:5,16,22 9:16
14:3 15:3,9,15
15:21 24:21
26:11 28:5
29:10 31:15,21
32:3,9 37:8,20
53:23 60:24
68:12 79:4,8
81:3

**orlando's** 17:10
22:24 30:6
40:15 43:21,24
53:11,18 56:17
59:18 67:13
77:8 79:11 80:3
**ought** 42:24
43:15 45:23
47:10 54:6,8
84:13
**ounjian** 22:5
**outside** 41:12
47:2 49:1,2 66:7
69:7
**own** 15:4,25
16:19 27:6
48:18 50:24
64:3 80:21
**owned** 28:21
**owner** 70:22

**p**

**p** 5:16
**page** 4:2 19:18
19:18 48:21
**pages** 90:11
**paid** 29:13
**paper** 76:11
**papers** 82:1
**paragraph** 14:5
14:6 15:2,9,14
15:21 16:4 17:4
17:6,8,9,9,24,25
27:4 28:9 32:3
53:19 56:11,13
56:15,18,22

60:5 65:20
66:16
**paragraphs**
62:8
**parameters**
85:16
**part** 37:5 77:9
81:3 84:18 88:6
**participants**
12:3
**particular**
25:11 30:10
80:6 82:7 84:4
**particularly**
34:2 53:11
**parties** 39:1
47:13 59:15
69:8 72:25 73:2
75:19 82:13,15
84:8 85:6,14
86:8,10 87:25
88:2,3
**party** 44:2 73:6
73:12
**passes** 44:22
**past** 70:13
**path** 11:15,20
75:5,6
**patrick** 1:7 3:1
6:5,8,15,22 14:3
**pause** 49:15
**pay** 26:21,22
29:12 53:14,15
**paying** 25:4

**payment** 55:22
**pdf** 19:18
**peg** 24:4
**pending** 34:18
60:21 73:12
74:15 75:12
77:2
**people** 6:24,25
51:17
**percent** 28:23
28:24
**perfect** 9:10
**performance**
60:17
**person** 21:21,21
29:6 31:25 73:6
**personal** 11:8
15:5,18 49:24
57:22 75:16,19
75:21
**phony** 25:3
**physically** 85:10
**pick** 88:14
**piece** 45:15,17
45:19 57:20
**piper** 2:18 5:15
5:16
**place** 1:14 14:1
14:7,15,16
46:16,17,18,18
49:11,13 84:13
**plain** 70:18
**plaintiff** 2:3,15
5:8 12:5 14:18
22:6,10,16

27:11,12,13
42:8 51:24
59:18
**plaintiff's** 9:15
12:7 13:2 27:11
39:11 40:3
47:20,24 50:15
80:21
**plaintiffs** 1:5
5:11,17,21 8:18
12:16 13:18
14:11 16:10
21:1,17 23:14
30:25 33:7,19
34:2,16 36:24
67:12,13,22
69:16 74:17
81:22 82:2 84:1
84:3 86:15
**plaintiffs's** 72:4
**plead** 18:16
43:18 58:5,20
**pleaded** 40:10
44:7
**pleading** 45:8
45:15 54:23
55:10 58:7
68:20
**pleadings** 9:15
23:15 25:11,14
29:15 41:12
44:21 56:4
57:19
**please** 5:9 49:5
51:22 83:22

**pled** 23:4 44:8
64:15 65:6
69:15
**pllc** 2:5,8,12
**pocket** 27:5,5
54:3 64:3
**point** 7:13 27:22
45:13 47:6
52:18 60:22
61:14 65:12
84:7
**points** 27:20
32:24 39:4 75:9
**polk** 90:13
**portal** 71:23
**position** 47:4
50:12 52:12,13
63:2 74:20
**possession**
62:14
**possessor** 62:13
**possible** 12:6
**possibly** 80:19
**post** 44:14 60:13
**potential** 79:16
80:15
**practice** 30:24
83:18
**practices** 31:7,9
**prayer** 60:3,15
**pre** 60:12
**predisposition**
39:17
**prejudice** 12:23
20:16 41:1 43:9

45:13 69:5
80:15
**prejudiced** 81:9
**preliminary**
8:16
**prepared** 80:1
**present** 83:22
**presently** 44:7
**preservation**
77:24
**preserve** 76:22
**preserved** 85:5
**president** 10:10
**press** 15:18
**pressure** 73:7
**presumption**
47:18,24 50:14
**pretargeting**
56:17
**pretend** 57:20
**pretty** 7:2 26:10
31:23 36:20
41:11 50:10
53:3 59:11
61:16 70:23
86:16
**previous** 61:21
**price** 3:3 6:4
**principal** 14:1,7
49:13
**prior** 17:24
37:24 38:9 51:4
**priority** 59:11
61:24

**private** 33:2,3
47:22 48:4 50:8
68:1
**probable** 53:18
**probably** 31:19
41:25 46:4
49:16 73:19
74:4 78:11 87:9
**problem** 13:21
26:4,5 29:1
63:14 68:11
74:19 76:17
**procacci** 55:16
55:17 63:3
**procedural**
57:12 78:19
**procedurally**
64:25 65:1
**proceed** 77:21
**proceeding** 61:6
69:1 79:20
**proceedings** 5:1
79:16 89:19
90:10
**process** 61:18
61:20 77:16
**processes** 15:6
**produce** 84:23
85:1
**produced** 42:16
42:17 84:10
**producing**
85:12
**product** 21:7

**production**
74:16 83:2,6,7
84:2,7,14,17
85:16 86:9
**professional**
90:8
**profits** 21:5,11
**progressing**
36:23
**promised** 63:22
**promises** 85:9
**promissory** 15:3
**proper** 18:2
25:24 33:16,20
35:24 37:16
41:19,22 42:9
42:18 56:4
67:18 76:15
77:10 78:19
**properly** 13:7
17:17 31:8
**property** 65:15
**propose** 74:12
**proposed** 38:12
88:23
**proposition**
17:5
**protect** 73:5
**protecting** 73:2
**protective** 37:6
76:18,23 77:5
78:20 81:14,21
82:9
**prove** 31:24

**proves** 60:15
**provides** 48:22
**providing** 28:17
**provision** 20:7
20:11 30:16
33:8 41:6 47:9
47:25 48:6,8,10
48:12,19,21,22
50:12 57:14
65:23
**proximity** 7:3
**public** 15:15
33:2 34:6 44:3
48:3 50:17
70:13 71:5
**publically** 10:7
**publicly** 44:5
**puerto** 68:9
**purchase** 20:1
**pure** 81:11
**purport** 83:23
**purported**
20:24
**purpose** 9:16
28:19 29:5,5,7,8
30:10 37:19
62:10 68:16
76:15,25 77:12
77:25
**purposes** 14:13
18:1 44:3
**pursuant** 73:3
**push** 49:15
**put** 8:7 45:10
83:16

**putting** 13:22
17:15 32:23

**q**

**qua** 10:6
**question** 38:9
43:6 45:16 57:6
59:3 63:1 69:9
71:13 84:2
**questions** 51:19
62:16 68:21
86:12
**quick** 62:2,4
75:6
**quickly** 35:24
36:24 79:25
80:13 82:16
85:2
**quite** 25:19 38:2
85:6
**quote** 17:21
46:12,14 48:14
48:15,23,24
56:4,6,19 60:6
**quoted** 48:21

**r**

**r** 5:16
**race** 35:23
**raise** 13:14 16:3
76:21 78:14
86:7,10
**raised** 9:21,23
36:24 37:24
60:24 75:16
86:6

**raising** 44:4
**random** 7:14
66:4
**rapped** 66:12
**rate** 61:7
**rather** 82:15
**ratify** 31:8
**ratio** 60:12,17
60:18,20
**rational** 49:9
**reach** 11:20
35:12 49:7
**reacting** 45:8
**reaction** 23:6
**read** 46:3,6
56:23 87:23
**readdress** 64:18
**real** 34:7 53:5
62:2,4
**realizing** 16:10
**really** 12:7
18:18 20:6,17
22:14 24:9
28:11 32:22,25
38:7 39:24
40:24 42:7,12
42:19 43:1
45:20 47:6,16
50:18 51:11,24
52:21 55:12
57:18 58:22
59:25 64:2
65:10 68:22
71:11 75:22
76:3 80:13

**realtime** 90:7
**reason** 18:22
　19:11 21:1
　33:24 35:3 48:9
　48:11 49:9 55:2
　61:5 63:18
　64:11 74:4
**reasons** 20:13
　20:18,23 33:11
　43:17
**recast** 57:5
**receive** 26:9
**received** 25:5
　26:8 32:3 55:21
　79:6
**receiving** 35:9
**recent** 10:4 60:9
**recently** 34:17
**recess** 50:2
　89:18
**recommended**
　32:6
**reconfirm** 89:14
**recordkeeping**
　25:7 31:8
**records** 24:22
**redo** 5:23
**refer** 30:17
**reference** 65:13
　65:24
**referenced**
　17:25 64:2
　65:18 66:5,11
　71:9

**references**
　66:17
**referred** 41:7
　53:21
**referring** 80:19
**refiled** 73:19
**refuge** 49:6
**refused** 15:5,9
**regard** 24:13
**regarding** 38:12
**regardless** 44:6
**registered** 90:6
**regularly** 58:3
**regulatory**
　17:12 79:16
**rejected** 21:12
　21:14
**relate** 14:20
　21:25 22:20,23
　63:10
**related** 19:7,12
　19:13,23 21:12
　21:24 57:12
　63:8 68:6
**relates** 16:2
　17:19 20:19
　26:12 71:5
**relevant** 47:8
　77:20
**relief** 56:2 60:3
　60:15 61:4
**relieve** 73:11
**rely** 39:7 55:16
　62:25

**remedied** 80:2
**remedy** 46:13
**remember** 8:4
　89:1,10
**remind** 62:18
**removed** 67:23
**replead** 29:23
　57:15 58:5
　64:17 65:7
**reply** 7:19,21
　13:20 17:6 18:7
　18:13 22:5 27:2
　59:9 61:2,15
　67:10 68:22
　69:2 72:3,5
**report** 88:21
　90:9
**reported** 16:17
**reporter** 4:14
　5:24 6:9 7:1 9:5
　9:9 90:1,6,7,8
**reputation** 79:2
**request** 41:20
　74:15
**requests** 78:5
　84:17,20
**require** 47:10
**required** 13:18
**requirements**
　68:20
**requires** 73:8
　84:13
**res** 38:4
**reside** 55:20

**remedied** 80:2

**resident** 14:5
　34:3
**resolution** 39:24
　60:20
**resolve** 35:14
　60:21
**resolved** 59:21
**respect** 21:11
　43:21 54:11
　60:18 63:1,13
　64:14 66:20
　67:25 68:10
　70:12
**respond** 53:15
　75:9 78:9 80:5
　80:11,11
**respondents**
　14:10
**responding**
　73:12 82:6
**response** 7:18
　7:20,23 8:7 13:2
　13:15 16:3,12
　16:24 17:5
　21:18 24:20
　32:1 35:13 49:4
　59:25 69:1 72:3
　74:14
**responses** 82:23
　83:4 85:25 86:4
**rest** 45:16 60:10
**restroom** 49:24
**result** 49:8
　53:18 58:9 64:5
　79:18

resulting   17:13
results   76:6
retaining   49:11
review   65:19
reviewed   70:3
revisionist
   10:15
rico   68:9
right   12:12
   19:15 20:21
   23:19 25:16
   26:9 29:18
   31:23 42:7
   43:14 45:7 47:6
   47:12 49:7
   51:11 52:17
   54:20,23 57:21
   57:24 63:16
   65:2 70:19
   75:17
rights   59:20
   77:24 78:16
risk   79:15,21
rmr   1:16 90:18
rmtg   56:20
road   10:22
   11:21 40:24
   44:16
rolling   83:6
   84:2,7
round   24:4,5
rubber   40:23
rule   46:10 47:19
   48:2 50:15 73:4
   73:10 81:17

83:18,18,19,23
ruled   73:24,25
   77:18
rules   81:18
ruling   4:7,12,13
   71:21 74:5
   75:12 82:22
running   32:18
   59:4
rush   35:18

**s**

s   5:16
sake   23:3 57:8
salario   2:4 4:5
   5:10,10 8:18
   36:13,15 39:13
   39:14,15 41:14
   41:18 42:3
   43:12 46:25
   47:5 50:6,7
   51:23 52:11
   54:20 57:17
   58:25 59:1,10
   62:7 67:1 71:19
   71:24 88:17,20
   89:3,10
sam   5:10
samuel   2:4,7
sanction   78:1
   82:5
sanctions   78:4
   82:21
sarasota   1:1
   12:17 13:3,4,7
   13:10 14:23

17:1,2 27:8,25
34:4 44:10,12
44:14 46:2,3,7
46:17 56:8,12
56:14,16,20
57:2 58:14 63:7
64:4 90:4
satisfactory
   46:12
saw   8:10,10
saying   12:16,18
   22:12 25:10
   29:18 34:24
   43:1 54:24
   55:19 64:20
   74:18 76:17
   77:3,7,10 81:22
   83:24 89:7,8
says   17:10 19:1
   19:3,21 20:11
   24:22 26:14
   27:6,15,15 33:8
   35:5 37:8 42:1,2
   42:10,18 46:11
   48:10,13 56:10
   56:11,13,15
   57:23 58:1,12
   60:6 64:4,12,14
   65:3,17 75:18
   81:20
scale   75:23
schedule   82:13
schwartz   3:2
   4:4,6 6:3,4 8:3
   8:20 9:3,8,10

10:19,22 11:1,5
11:8,12,18
12:10,19,25
18:24 23:2,8,17
25:13,17 27:19
27:21 29:18
34:22 36:8,11
36:19,22 38:11
39:7 49:22
62:19,19,20,21
62:22 65:1
66:16 83:5,12
84:19 85:20
88:3 89:1,9,12
scibak   87:1
scope   76:16
   79:3,5
scoundrel   49:7
seal   83:20
search   85:8
seasons   3:13
sec   17:14 19:19
   26:22 31:16
   32:4,13 53:15
   53:25 56:19
   79:7 80:16,17
   81:4,7
second   11:18
   16:8 19:11 21:1
   23:21 30:4
   32:10,19 40:7
   41:10,25 42:1
   47:6 65:16 66:3
   66:9 67:3 74:15

**secondary** 11:19

**secondly** 43:20 48:19 58:10 59:22

**seconds** 62:5

**section** 31:1 52:6 69:6

**securities** 17:19 17:23 18:3,4,8,9 18:15,18,20,20 19:7,23 20:6 24:10 40:11

**security** 20:19 40:12,14

**see** 16:1 36:19 36:19 46:23 50:6 57:7,15 60:4 61:11 67:11 69:25 70:1,14 71:15 82:12,16 84:10 86:18 87:6

**seek** 80:23

**seeking** 22:16 22:17,19 37:15 69:4,4,5

**seem** 33:15

**seemed** 22:15

**seems** 25:10 33:15 47:15

**seen** 82:1

**selection** 48:19

**self** 22:25

**sell** 27:13

**seller** 27:15

**selling** 22:7

**sells** 27:10

**sending** 25:3 34:24

**sends** 27:14

**sentence** 46:10 48:21

**sentences** 9:13

**separate** 16:14 16:16,18

**separately** 16:21,22

**serious** 39:19

**served** 61:11,23

**service** 21:7 52:16 61:18,20 63:20 71:17

**services** 25:5 28:6 52:17

**servicing** 41:16 41:18

**serving** 15:14 40:16

**set** 37:20 69:17 85:20 88:9,12 88:13,22

**settled** 80:17

**settlement** 17:13 26:22 53:14

**settlements** 21:13

**several** 70:4 80:1

**share** 44:15

**shareholder** 10:9

**shareholders** 10:2,5,8 15:24 17:11 33:10,12

**shares** 37:17 39:2 60:12,13 67:19

**shock** 39:16

**shopping** 35:6 35:22

**short** 10:6 71:19

**show** 24:17 29:22 42:11 63:5

**showed** 39:1

**showing** 73:5

**shows** 37:7 42:22 52:24 56:5,8 80:21

**side** 39:11 40:3 40:5 48:1

**sides** 45:23 51:17 72:22 85:18

**signature** 90:16

**significant** 53:25 78:23

**similar** 59:14

**simply** 43:25 44:1 75:11 77:23

**simultaneously** 55:6

**sine** 10:6

**single** 17:14

**singular** 12:5

**sir** 9:9 62:18 86:15

**sit** 5:6

**sitting** 78:16

**situation** 12:8

**six** 89:8

**sleight** 46:1

**sleights** 46:1

**sold** 27:10,15 52:22

**sole** 17:1 70:21 70:24

**solely** 59:17,19

**solicitation** 16:4 17:20,21 18:14 19:13 20:21

**solicited** 16:25

**someone's** 28:15

**someplace** 42:12,17

**somewhat** 7:3,7 23:13

**sorry** 6:9 7:21 14:11 65:4

**sort** 18:25 22:9 24:1 27:9 28:13 28:19,22 30:22 30:23 32:15 33:1,4 35:6,19 38:25 80:16

| | | | |
|---|---|---|---|
| 81:9 82:5 83:10 | **started** 16:12 | **step** 75:8 | **suddenly** 9:23 |
| **sought** 46:13 | **starting** 5:8 | **stipulation** | **suffered** 53:10 |
| 73:15 | **state** 12:1,9,11 | 38:11,16 39:1 | **sufficiency** |
| **sound** 7:11 | 18:10,20,25 | 61:12 | 44:20 45:15,18 |
| **sounds** 85:15 | 19:8 24:25 25:1 | **stock** 20:1 | 54:22,23 55:9 |
| **south** 2:5,9,18 | 25:2 46:23 47:2 | **stockholder** | **sufficient** 13:19 |
| **spac** 9:17 10:3 | 51:3,11 68:8,18 | 48:14 49:10 | 54:6 |
| **speak** 7:3 84:3 | 69:7,17,19 70:5 | 70:22 | **sufficiently** |
| **speaker** 7:12,14 | 70:13,20 71:9 | **straightforward** | 43:18 |
| **speaking** 80:15 | 71:11 77:19 | 11:14 | **suggest** 72:22 |
| **special** 9:16 | 90:3 | **street** 2:9 3:8 | **suggesting** |
| **specific** 30:8 | **stated** 9:15 | **strictly** 21:6 | 11:21 24:15 |
| 60:17 62:10,10 | 34:10 47:18 | **strong** 47:20 | 64:23 |
| 68:14,15 83:8 | 81:22 | 50:14 51:14 | **suggests** 35:21 |
| 84:17 | **statements** 9:14 | **stuck** 32:25 | **suit** 40:1,5 |
| **specifically** | 15:15 | **style** 81:12 | **suite** 2:6,9,19 |
| 15:19 26:19 | **static** 7:8 | **subject** 53:4 | 3:4 |
| 53:21 63:10,10 | **statute** 12:12 | 75:18 79:20 | **sum** 28:4 68:15 |
| 65:20 66:17 | 52:5,18 58:2 | **submission** 79:6 | **summary** 25:8 |
| 85:1 | 64:12 | **submit** 13:6 | 29:16 40:23 |
| **speculation** | **statutes** 16:6 | 38:23 71:22 | 41:22 |
| 47:12,13 | 69:6 | 85:11 | **support** 13:19 |
| **spend** 59:7 | **statutory** 20:8 | **submitted** 77:4 | 55:11 73:11 |
| **spent** 26:14 | **stay** 4:8 7:20 | 79:10 | 81:25 |
| **sponsor** 9:20 | 59:3 62:1 68:25 | **subsequent** | **supported** |
| **square** 24:4 | 71:14,18 72:2 | 21:12 | 55:25 56:3 |
| **stafford** 2:17 | 72:19 75:11,14 | **substance** 59:22 | **supports** 12:20 |
| **standard** 31:6 | 76:14,20 77:15 | **substantial** 54:3 | **supposed** 26:8 |
| **standing** 55:13 | 77:23 80:24 | 56:19 | 29:14 69:15 |
| **stanley** 18:12 | 81:13,20 82:10 | **substantially** | **sure** 8:25 52:11 |
| **staple** 71:21 | 85:23 | 59:14 | 69:25 83:13,15 |
| **start** 11:4 12:25 | **stayed** 8:9 77:2 | **substantive** | 85:4,21 88:7 |
| 13:17 74:6 | **staying** 73:25 | 56:1 57:13 | **survive** 20:15 |
| 84:14 | **stenographic** | **successful** 7:10 | **survivorship** |
| | 90:12 | 9:22 10:1,3 | 28:22 |

**sustain**   54:6
**system**   10:18
  86:18

**t**

**t**   3:2
**table**   7:5
**tacks**   39:18
**tactics**   35:6,20
**take**   5:9 12:2
  25:10 41:8
  45:22 49:5,16
  49:19,24,25
  52:6,11,13
  57:20 59:1 60:2
  69:15 86:25
**taken**   1:12,16
  5:2 15:12 50:2
**takes**   29:6 71:25
**talk**   35:14 48:6
  85:7,8 87:10,22
  88:4,9
**talked**   87:5
**talking**   28:13
  46:16 47:1 50:8
  55:22 62:9 83:2
  83:3
**talks**   17:10 53:4
  83:20
**tallahassee**   2:10
**tami**   1:16 90:6
  90:18
**tampa**   2:6
**target**   16:5,25
  18:14

**targeting**   31:17
  31:21
**taubert**   24:25
  25:1,2
**technically**
  34:22 35:4
  71:10
**technology**   2:3
  9:25
**tell**   27:11 33:18
  86:16
**tells**   33:18 48:3
**temporary**   81:9
**tenancy**   28:21
**term**   21:2 63:16
  64:11 87:8
  88:15
**termination**
  22:19
**terms**   50:24
  56:22 59:15,15
  59:22 81:12
  85:8 89:4
**test**   52:19,21,25
  53:1
**text**   48:8 49:3,5
  50:13 52:5
**thank**   6:2,23 9:9
  10:21 39:10
  49:22 50:7
  72:20,20 80:12
  87:2,3 89:17
**theory**   13:14
  16:2 17:17
  20:19 30:1

**thin**   43:8 54:16
**thing**   20:2,4
  25:18 40:7,20
  42:5,7 49:3
  50:18 61:14
  81:1 86:21
  87:23
**things**   23:18
  32:15 35:2
  39:25 44:4
  56:10 66:13,21
  68:6,7 83:21
**think**   8:6 10:23
  11:13,19 13:1
  17:6,7 21:20
  23:17 24:17
  27:21 30:13
  31:19 32:24
  33:3 39:19,23
  39:25 40:7,21
  40:24 42:5 43:5
  43:12,12,13
  44:6,13,16,21
  44:25 45:11,14
  45:19,20 47:5
  48:7 50:8,10,23
  51:12,23 52:4
  52:17 54:4,8,15
  54:20 55:7,12
  55:12,15 56:24
  57:17,18 58:9
  58:10,21 59:11
  60:1 61:2,16,25
  62:25 63:14
  64:19 65:9 68:8

**thin**   43:8 54:16
  68:19 69:13,20
  69:23,24 70:18
  71:2,10 72:23
  72:24 74:1,3,13
  74:21 75:9
  77:11 78:3
  82:17 83:5 85:1
  85:6 87:9,17
  88:16,24 89:3
  89:12,12
**third**   23:19
  25:21 30:2,3,4
  30:12 40:20
  45:1
**thorough**   32:13
**thought**   33:9
**thoughts**   87:7
**three**   20:18
  28:12,19,24
  39:25 48:9
  77:15 78:12
  89:2,4,5,7,11
**tie**   43:19
**time**   1:13 16:3
  16:15,17,19
  30:3,4,4 31:20
  34:4 41:22
  49:18,19 50:25
  51:5 59:2,5
  62:23 64:14
  72:19 82:21
  86:18,19,20,23
  88:23 89:1,17
**times**   44:11 48:9
  48:11 70:5

**tmtg** 10:12
15:22 16:13,25
17:14 20:22
34:3 35:18
40:18 43:22
44:2,9,11 50:25
52:3 53:9,21
54:1 56:11,15
59:19 60:9 68:1
**today** 8:2,12,12
10:2 57:14
81:25 88:25
**today's** 86:1,4
**together** 11:23
84:8 85:7
**took** 9:16,20
14:15,16 45:7
75:10
**top** 67:25
**tort** 14:12,12,15
**total** 28:4 62:6
**touch** 30:12
62:3
**tower** 3:13
**track** 74:24
**trade** 7:12
**traded** 10:7
44:5
**trader** 16:5
**train** 33:9
**transaction**
17:19 18:19
39:3 40:13
53:12

**transactions**
18:8 19:7
**transcript** 1:10
38:23 90:11
**transcription**
90:12
**transfer** 42:14
46:20 77:2
**transferred**
13:12
**transferring**
70:12
**treated** 16:21,22
**trial** 61:6 87:6,7
88:8,10,13,15
88:16,23,23
89:1,4
**true** 18:2 21:22
23:23 33:17
90:11
**trump** 2:3 9:24
**trust** 77:3
**try** 7:4 8:25
16:10 18:16
24:2 29:23,24
31:3 32:1 36:25
45:2 65:7
**trying** 7:9 24:18
32:14 35:22
37:1,2 40:1
69:11 77:12,22
82:4
**turn** 21:16
**twelfth** 1:1

**two** 10:13 12:12
16:14,16,18,20
19:12,13 20:23
23:18 31:5
32:24 33:11,17
35:1 41:20
43:17 45:25
48:11 55:24
63:4,23 72:22
77:15 84:8
87:15 89:6
**type** 22:15 25:9
26:6 31:10
35:22 64:22
66:7 70:23
**typed** 17:7
**types** 23:21
33:20 64:21
**typically** 84:7
**typo** 17:7

**u**

**ultimate** 19:15
56:1 69:17 70:2
**ultimately** 7:10
17:13 71:6
86:17
**unable** 28:7
**unambiguous**
49:4
**unbeknownst**
35:15
**uncommon** 42:7
**under** 12:4 16:6
17:21 18:10,17
18:21 19:6,20

21:3 26:15 28:9
29:3 30:15,23
34:23 36:1
41:20 50:15
57:11 58:2 66:9
81:16 83:17,20
83:23
**understand**
9:11 77:18
78:17 79:9,25
**understanding**
7:16
**undue** 73:7
**unfair** 40:18
**unfortunately**
10:11
**university** 81:15
**unlawful** 67:14
**unlawfully**
16:24
**unquote** 17:21
**upfront** 78:25
**use** 10:13 30:7
41:9 49:23
**used** 9:23 24:22
28:18 29:5,11
30:9 35:6 46:4
51:4 62:12
68:13,15
**uses** 29:6
**utilizing** 85:8

**v**

**v** 18:10,12 24:25
25:1,2 41:17,18
55:17 65:15

81:15

**value** 21:7 52:15
52:16

**various** 15:22

**veal** 65:15

**vedder** 3:3 6:4

**vedderprice.c...**
3:5,6

**venue** 10:24
11:11,13,19,22
11:23 12:5 13:1
13:3,10,19
14:13 16:12
20:13 33:5,5
42:6,9,12,16,18
42:20,22 43:4
43:11,12,13,19
44:18,20 45:15
46:20 51:20
54:18,21,25
55:3,11,13,25
56:5,8 57:4,11
57:14,20 58:8
58:11,19 63:1
63:12 64:18,24
65:4,7,8 69:10
69:12 71:10,10

**venues** 12:6

**versa** 24:5

**versus** 81:13

**vice** 24:5

**view** 63:2

**views** 41:24

**vindicate** 71:16

**vintage** 27:8
64:4

**violates** 17:22

**violation** 15:17
18:15 25:7

**violations** 24:10
24:11

**virtue** 80:15

**vitali** 3:12 4:9
4:11 6:17,18
72:7,7,7,8,9,10
72:11,11,12,15
72:17,20 73:21
74:8,11 75:8
80:8,12 82:25
86:14 87:2,9,13
87:17,20 88:11
89:16

**vote** 39:2

**voyager** 65:15

**vs** 1:6 5:4

**w**

**wait** 22:11
35:16 57:15

**waited** 79:22
80:23

**waivable** 48:20

**waived** 78:15
86:5

**waiver** 78:2

**walk** 15:1 56:9

**walker** 8:8,9
88:1

**walker's** 87:24

**walking** 25:17

**walsh** 18:11

**want** 7:5,6 9:12
29:23 32:25
33:15 35:7 39:5
39:20 43:21,22
44:24 45:16
48:6 49:10
51:13 54:14
58:15 59:1,2
62:2 71:20 74:8
74:10 75:3 80:5
84:10,21,24
85:9 86:8 87:21
87:22 88:4,8,9

**wanted** 17:16
54:10 58:17
65:12 68:22
75:8

**wants** 70:1

**warranted**
52:23

**washington** 3:8

**way** 19:10 23:11
31:3 32:18
45:25 46:18
49:20 52:19
55:2 60:1,25
62:2 73:24 84:9

**we've** 39:19
42:22 80:9 85:4

**wedding** 52:24

**wednesday**
35:14,16

**week** 38:19
85:14,18,21
86:8 87:12
88:10 89:14

**weeks** 87:15
89:2,5,6,6,7,11

**weight** 47:20

**weinberg** 14:12

**wells** 32:3,11,16
79:6,6 84:24

**went** 73:16

**whatnot** 76:12

**whistle** 22:11

**win** 64:7

**wish** 86:10

**wishes** 84:3

**withdrew** 24:21
28:5 56:16

**withheld** 24:21

**witnesses** 47:12

**wondering**
41:14

**word** 46:4

**work** 7:2 49:21
83:14 85:6,12

**working** 9:6
84:8

**world** 1:3 2:15
5:4 9:18 13:24
14:21 15:4,6,7
15:11 29:11
30:18

**worth** 44:13
55:15

**[wrap - zoom]**                                         Page 120

| |
|---|
| **wrap** 69:12 |
| **write** 7:24 |
| **writing** 48:24 |
| **wrong** 18:3 48:8 |
| 48:9,12 |
| **x** |
| **x** 4:1 29:5 74:6 |
| **y** |
| **y** 29:7 |
| **y'all** 5:6 49:18 |
| 87:7,22 88:7,8 |
| **yeah** 11:1 25:17 |
| 27:15,21 39:7 |
| 51:21,23 52:7 |
| 53:6 73:21 |
| 88:11 |
| **year** 80:18 |
| **years** 32:10 |
| **yesterday** 36:25 |
| 37:7 |
| **york** 20:9,11 |
| **young** 10:8 |
| **z** |
| **zero** 81:22 |
| **zoom** 1:14 2:1 |
| 5:14 6:20,25 7:1 |

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA
CIVIL DIVISION

CASE NO.: 2024 CA 001061 NC

DIGITAL WORLD ACQUISITION
CORPORATION, a Delaware Corporation,
and TRUMP MEDIA & TECHNOLOGY
GROUP CORP., a Delaware Corporation,

        Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO,

        Defendants.

_____

### VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND JUDICIAL ADMINISTRATION 2.510

Comes now, Jeanah Park, Movant herein, and respectfully represents the following:

1.      Movant resides in Chicago, Illinois. Movant is not a resident of the State of Florida.

2.      Movant is an attorney and a member of the law firm of (or practices law under the name of) Vedder Price P.C., 222 N LaSalle Street, Chicago, Illinois 60601; T: (312) 609-7500.

3.      Movant has been retained personally or as a member of the above named law firm on February 29, 2024 by Patrick Orlando to provide legal representation in connection with the above-styled matter now pending before the above-named court of the State of Florida.

4.      Movant is an active member in good standing and currently eligible to practice law in the following jurisdiction(s):

| JURISDICTION | ATTORNEY/BAR NUMBER |
|---|---|
| Illinois | 6278193 |
| U.S. District Court for the Northern District of Illinois | X |
| U.S. District Court, Northern District of Illinois – Trial Bar | X |
| U.S. Court of Appeals, Seventh Circuit | X |
| *See attachment for additional bar information* | |

5.      A judicial officer or the entity responsible for attorney regulation has neither initiated disciplinary, suspension, disbarment or contempt proceedings or disciplined, suspended, disbarred or held Movant in contempt in the preceding 5 years.

6.      Movant, either by resignation, withdrawal, or otherwise, never has terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

7.      Movant is not an inactive member of The Florida Bar.

8.      Movant is not now a member of The Florida Bar.

9.      Movant is not a suspended member of The Florida Bar.

10.      Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation or disciplinary revocation from The Florida Bar.

11.      Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

12.      Movant has filed a motion to appear as counsel in Florida state courts during the past five (5) years in the following matter:

| Date of Motion | Case Name | Case No. | Court | Date Motion Granted |
|---|---|---|---|---|
| 10/06/2021 | Trans-Audit, Inc. v. Kristy Bishop | 2021-CA-00745 | Eighth Judicial Circuit (Alachua) | 10/13/2021 |
| 2/10/2022 | Kristy Bishop v. Trans-Audit, Inc. | 1D2022-178 | First District Court of Appeal | 03/01/2022 |

13.      Local counsel of record associated with Movant in this matter is Vedder Price (FL), LLP; Adam L. Schwartz; Florida Bar No. 103163 who is an active member in good standing of The Florida Bar and has offices at 600 Brickell Ave., Suite 1500, Miami, Miami-Dade County, Florida, 33131; T: (786) 741-3200.

14.   Movant has read the applicable provisions of Florida Rule of General Practice and Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

15.   Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

WHEREFORE, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 5th day day of August, 2024.

_____
Jeanah Park
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: (312) 609-7500
jpark@vedderprice.com

STATE OF ILLINOIS

COUNTY OF COOK

I, JEANAH PARK, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

_____
Movant

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

- 3 -

DATED this 5th day of August, 2024.

/s/ Adam L. Schwartz
Adam L. Schwartz
Vedder Price (FL), LLP
600 Brickell Ave., Suite 1500
Miami, Florida 33131
T: (786) 741-3200
Florida Bar No.: 103163
aschwartz@vedderprice.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by mail to PHV Admissions, The Florida Bar, 651 East Jefferson Street, Tallahassee, Florida 32399-2333 and by e-mail to:

Christopher G. Oprison, Esq.
Florida Bar No. 122080
Tal Aburos, Esq.
Florida Bar No. 1010901
**DLA PIPER LLP (US)**
200 South Biscayne Blvd., Suite 2500
Miami, FL 33131
Phone: +1 (305) 423 8422
Fax: +1 (305) 657 6366
chris.oprison@dlapiper.com
tal.aburos@dlapiper.com

*Attorneys for Plaintiffs Digital World Acquisition Corp. and Trump Media & Technology Group Corp.*

Samuel J. Salario, Jr., Esq.
Florida Bar No. 83460
Jason B. Gonzalez, Esq.
Florida Bar No. 146854
Raymond F. Treadwell, Esq.
Florida Bar No. 93834
**LAWSON HUCK GONZALEZ PLLC**
215 S. Monroe St., Suite 320
Tallahassee, FL 32301
samuel@lawsohuckgonzalez.com
jason@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com

*Attorneys for Plaintiff Trump Media & Technology Group Corp.*

Kevin P. Jacobs, Esq.
Florida Bar No. 169821
Andrew Vitali, III, Esq.
Florida Bar No. 057828
**HOMER BONNER JACOBS ORTIZ, P.A.**
1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
kjacobs@homerbonner.com
avitali@homerbonner.com

and that the movant has paid the fees described in the Rules Regulating The Florida Bar concerning non- Florida lawyers appearances in a Florida court or has notified The Florida Bar of movant's request for a judicial waiver of said fees.

this 5th day of August , 2024.

/s/ Adam L. Schwartz
Adam L. Schwartz

## <u>ADDITIONAL BAR INFORMATION</u>

| JURISDICTION | ATTORNEY/BAR NUMBER |
|---|---|
| U.S. Supreme Court | 298344 |
| Colorado | 57301 |
| U.S. Court of Appeals, Sixth Circuit | X |
| U.S. District Court, Eastern District of Michigan | X |
| U.S. District Court, Southern District of Indiana | X |
| U.S. District Court, District of Columbia | X |

# CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## SARASOTA COUNTY, FLORIDA
### CIVIL DIVISION

DIGITAL WORLD ACQUISITION CORP.,
a Delaware Corporation, and TRUMP
MEDIA & TECHNOLOGY GROUP CORP.,        Case No.: 2024-CA-001061-NC
a Delaware Corporation,

      Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO,

      Defendants.
_____/

## NOTICE OF HEARING

TO: All Counsel of Record.

YOU ARE HEREBY notified that on **September 10 at 9:00 a.m.** (15 minutes – Confirmation #311633) the undersigned will call up for hearing before the Honorable Hunter Carroll: Plaintiffs' Motion for Leave to File Second Amended Complaint dated August 31, 2024 (DIN #33).

### ***PLEASE BE GOVERNED ACCORDINGLY.***

Judge Carroll has a hybrid Courtroom, meaning that Judge Carroll can conduct court with parties appearing in-person and remotely via Zoom simultaneously. Each party has the discretion to choose which appearance method that party prefers. If you wish to attend via Zoom, please follow Judge Carroll's Zoom credentials:

- Launch Zoom
- Click "Join A Meeting"
- **Meeting ID**: 353 234 4884
- **Password**: 756433

1

- Note: You must appear with a working camera; no telephone appearances.

**AMERICANS WITH DISABILITIES ACT OF 1990 ADA NOTICE**

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Sarasota County Jury Office, P.O. Box 3079, Sarasota, Florida 34230-3079, (941) 861-8000, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you have a hearing or voice impaired, call 711.

Dated: August 7, 2024          Respectfully Submitted,

*/s/ Samuel J. Salario, Jr.*
Samuel J. Salario, Jr., Esq. (FBN: 83460)
Jason B. Gonzalez, Esq. (FBN: 146854)
Raymond F. Treadwell, Esq. (FBN: 93834)
**LAWSON HUCK GONZALEZ, PLLC**
215 S. Monroe St., Suite 320
Tallahassee, FL 32301
Phone: (850) 825-4334
samuel@lawsonhuckgonzalez.com
jason@lawsonhuckgonzalez.com
ray@lawsonhuckgonzalez.com
michelle@lawsonhuckgonzalez.com
marsha@lawsonhuckgonzalez.com
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been filed via the Florida Courts E-Portal, and a copy of said document has been served via the Florida Courts EPortal on August 7, 2024 to all counsel of record.

/s/ Samuel J. Salario, Jr.
Attorney

2

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 557 of 1832
PageID 4034

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

             Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II LLC, and
PATRICK ORLANDO,

             Defendants.

---

**[PROPOSED] ORDER GRANTING JEANAH PARK'S VERIFIED MOTION FOR
ADMISSION TO APPEAR *PRO HAC VICE* PURSUANT TO
FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510**

THIS CAUSE is before the Court on the Verified Motion of Jeanah Park to appear *pro hac vice* in the above-styled action. Ms. Park, a resident of Chicago, Illinois and a member of the law firm of Vedder Price P.C., with offices at 222 North LaSalle Street, Chicago, Illinois 60601, has been retained as a member of Vedder Price by Defendant, Patrick Orlando, to provide legal representation in connection with the above-styled matter. She commenced her representation in relation to this case on February 29, 2024.

Ms. Park is an active member in good standing and currently eligible to practice law in the State of Illinois. She has no disciplinary history and is not a past or present member of The Florida Bar and has no pending application to join The Florida Bar. She has filed two motions to appear as counsel in Florida state courts during the past five years. In all material respects, her verified motion is proper in form and complies with Fla. Rule Jud. Admin. 2.510 and Rule 1-3.10 of the Rules Regulating the Florida Bar.

Local counsel of record associated with Ms. Park in this matter is:

> Adam L. Schwartz
> Florida Bar No. 103163
> Vedder Price (FL), LLP
> 600 Brickell Ave., Suite 1500
> Miami, Florida 33131
> aschwartz@vedderprice.com
> Telephone: (786) 741-3200
> Facsimile: (786) 741-3202

Upon due consideration, it is hereby ORDERED and ADJUDGED that Jeanah Park's Verified Motion for Admission to Appear *Pro Hac Vice* pursuant to Florida Rule of Judicial Administration 2.510 is hereby **GRANTED**. Ms. Park shall comply with the Florida Rules of Professional Conduct and be subject to the jurisdiction of the courts and the Bar of the State of Florida in matters relating to this *pro hac vice* admission. Ms. Park may enter her appearance of record.

If not already completed, within 10 days, Movant shall tender the required fees to the Clerk of the Court as well as The Florida Bar, Pro Hac Vice division.

DONE AND ORDERED, in Chambers, at Sarasota, Sarasota County, Florida on 08/08/2024.

e-Signed 8/8/2024 7:28 AM 2024 CA 001061 NC

Hunter W. Carroll
Circuit Judge

2

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT

1700 N. Tampa Street, Suite 300, Tampa FL 33602

August 8, 2024

ARC GLOBAL INVESTMENTS, II,    CASE NO.: 2D2024-1780
LLC, AND PATRICK ORLANDO,    L.T. No.: 2024CA-001061
           APPELLANT(S)
V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
           APPELLEE(S).

_____

**BY ORDER OF THE COURT:**

Appellants' motion for extension of time is granted, and the initial brief shall be served by September 19, 2024.

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

*Mary Elizabeth Kuenzel*
Mary Elizabeth Kuenzel, Clerk
2D2024-1780 8/8/24



JR

Served:
JODY A. ARENAS STAFFORD
SARASOTA CLERK
ANDREW THOMAS FIGUEROA
JASON BRENT GONZALEZ
MATHEW DANIEL GUTIERREZ
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
CHRISTOPHER KING
CHRISTOPHER GEORGE OPRISON
SAMUEL JOSEPH SALARIO, JR.
ADAM LOUIS SCHWARTZ
RAYMOND FREDERICK TREADWELL
ANDREW VITALI, III

**Vedder**Price

Chicago
New York
Washington, DC
London
San Francisco
Los Angeles
Singapore
Dallas
Miami
vedderprice.com

TO: THE CLERK OF COURT
FROM: JUDGE HUNTER W. CARROLL

August 7, 2024

DATE:_____8/8/24_____
THE JUDGE REVIEWED THIS DOCUMENT.
PLEASE PLACE IN APPROPRIATE COURT FILE.

Andrew T. Figueroa
Associate
+1 (786) 741 3244
afigueroa@vedderprice.com

**VIA EPORTAL**

Honorable Hunter W. Carroll
Judge Lynn N. Silvertooth Judicial Center
2002 Ringling Blvd.
Sarasota, FL 34237

Re:     *Digital World Acquisition Corp. et al. v. ARC Global Investments II LLC et al.*, Case No. 2024-CA-001061-NC

Dear Judge Carroll:

Jeanah Park submitted a Verified Motion for Admission to Appear *Pro Hac Vice* pursuant to Florida Rule of Judicial Administration 2.510, seeking to appear on behalf of Defendant Patrick Orlando. Please find attached a proposed order granting the Motion.

Plaintiffs have no objection to entry of the proposed order.

Thank you for your attention in this matter.

Respectfully Submitted,

Andrew T. Figueroa
Associate

ATF/msc

600 Brickell Avenue, Suite 1500  |  Miami, Florida 33131  |  T +1 (786) 741 3200  |  F +1 (786) 741 3202

Vedder Price P.C. is affiliated with Vedder Price LLP, which operates in England and Wales, Vedder Price (CA), LLP, which operates in California, Vedder Price Pte. Ltd., which operates in Singapore, and Vedder Price (FL) LLP, which operates in Florida.

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

        Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II LLC and
PATRICK ORLANDO,

        Defendants.

_____/

## <u>DEFENDANTS' NOTICE OF HEARING</u>

**TO: All counsel of Record.**

YOU ARE HEREBY notified that the undersigned will call up for hearing before The Honorable Hunter Carroll, one of the Judges in the above styled court on September 10, 2024 at 9:45 a.m. (30 minutes – Confirmation # 312065), said hearing is set on:

**Docket Identification Number 106:**

**DEFENDANTS' MOTION TO STAY PENDING APPEAL**

***PLEASE BE GOVERNED ACCORDINGLY.***

Judge Carroll has a hybrid Courtroom, meaning that Judge Carroll can conduct court with parties appearing in-person and remotely via Zoom simultaneously. Each party has the discretion to choose which appearance method that party prefers. If you wish to attend via Zoom, please follow Judge Carroll's Zoom credentials:

- Launch Zoom
- Click "Join A Meeting"

- **Meeting ID:** 353 234 4884
  **Password:** 756433
- Note: You must appear with a working camera; no telephone appearances.

## <u>AMERICANS WITH DISABILITIES ACT OF 1990 ADA NOTICE</u>

If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Sarasota County Jury Office, P.O. Box 3079, Sarasota, Florida 34230-3079, (941) 861-8000, at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you have a hearing or voice impaired, call 711.

Dated: Miami, Florida
      August 12, 2024

**Homer Bonner**

1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Phone: +1 (305) 350-5100
Fax: +1 (305) 372-2738

By: /s/ Kevin P. Jacobs
kjacobs@homerbonner.com
Florida Bar No. 169821
Andrew Vitali, III, Esq.
avitali@homerbonner.com
Florida Bar No. 057828

*Attorneys for Defendant ARC Global
Investments II LLC*

    Respectfully submitted,


VEDDER PRICE (FL), LLP
600 Brickell Avenue, Suite 1500
Miami, Florida 33131
Phone: +1 (786) 741 3200
Fax: +1 (786) 741 3202

By: /s/ Adam L. Schwartz
    Adam L. Schwartz
    aschwartz@vedderprice.com
    Florida Bar No. 103163
    Jeanah Park
    jpark@vedderprice.com
    Admitted *Pro Hac Vice*
    Andrew T. Figueroa
    afigueroa@vedderprice.com
    Florida Bar No. 1002745

and

DECHERT LLP
Joshua D. N. Hess
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Phone: +1 (415) 262 4583
Fax: +1 (415) 262 4555
joshua.hess@dechert.com
Admitted *Pro Hac Vice*

*Attorneys for Defendant Patrick Orlando*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2024, a true and correct copy of the foregoing was served by email generated by the Florida Courts E-Filing system to all parties of record.

Dated: August 12, 2024                    Respectfully submitted,

By: /s/ Adam L. Schwartz

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 565 of 1832
PageID 4042

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT, IN AND
FOR SARASOTA COUNTY, FLORIDA

CASE NO.: 2024-CA-001061

DIGITAL WORLD ACQUISITION
CORPORATION *et al.*,

          Plaintiffs,

v.

ARC GLOBAL INVESTMENTS II LLC and
PATRICK ORLANDO,

          Defendants.

_____/

### DEFENDANTS' JOINT MOTION FOR EXTENSION OF TIME TO ANSWER THE AMENDED COMPLAINT

Pursuant to Florida Rules of Civil Procedure 1.090 and 1.140, Defendants ARC Global Investments II LLC and Patrick Orlando respectfully request that the Court extend the deadline for Defendants to answer the Amended Complaint (DIN 22). Specifically, Defendants request that the Court grant an extension of time to respond to the Amended Complaint through **September 17, 2024**.

1.      On July 29, 2024, this Court entered an Order denying Defendants' Joint Motion to Dismiss Amended Complaint or, Alternatively, to Stay this Proceeding and set an August 19, 2024 deadline for Defendants to answer the Amended Complaint. (DIN 93.)

2.      Defendants appealed the Court's Order and immediately sought to stay this action pending the appeal. (DIN 106.) The Motion to Stay Pending Appeal is scheduled for a 30-minute special set hearing on September 10, 2024.

3.      Separately, on July 31, 2024, Plaintiffs filed a 338-page Motion for Leave to File Second Amended Complaint (DIN 103), seeking to combine the claims alleged in the complaint in the matter stayed before Judge Walker in Case No. 2024-CA-1545-NC and the Amended Complaint in this action.

4.      The Motion for Leave to File Second Amended Complaint is presently scheduled to be heard on September 10, 2024, during a 15-minute special set hearing. (DIN 109.)

5.      As noted, Defendants' current deadline to answer the Amended Complaint is August 19, 2024. In light of the pending motions and the hearings scheduled on September 10, 2024, Defendants request that the August 19, 2024 deadline be extended to September 17, 2024.

6.      Good cause exists for extending the answer deadline for two principal reasons.

7.      First, Defendants have presented meritorious grounds to stay this proceeding pending the appeal. Specifically, a stay is warranted given the efficiencies that might be gained from awaiting resolution of certain issues in the appeal—namely, the appropriate venue to litigate this action. Defendants note that allowing the Court to rule on the motion to stay, before answers, counterclaims, and third-party claims will be filed, will conserve the resources of both the parties and the Court. Further, proceeding with counterclaims and third-party claims while a stay is being sought would unfairly prejudice third parties who may not necessarily need to be added as a party to the action in the event a stay is granted.

8.      Second, Plaintiffs have sought leave to file a second amended complaint, which would substantially amend the allegations against Defendants and add new Defendants to this action. The hearing on Plaintiffs' motion for leave is currently scheduled for September 10, 2024. If the Court grants the *opposed* request for leave to amend, the requested extension will streamline

the proceedings and save Defendants from the labor and expense of answering a soon-to-be stale Amended Complaint.

9.      The proposed extension will not cause inconvenience to the Court or impact any other deadlines set by the Court. Nor is the proposed extension sought in bad faith.

10.     Good cause exists for extending the answer deadline given that, despite their diligence, Defendants will need additional time to prepare, evaluate, and finalize their answers to the Amended Complaint.

11.     The undersigned counsel hereby certifies that counsel for Plaintiffs and Defendants have met and conferred prior to submitting this Motion. Plaintiffs oppose the requested relief herein.

Based on the points contained herein, Defendants respectfully request that the Court extend the August 19, 2024 deadline to answer the Amended Complaint to September 17, 2024.

Dated: Miami, Florida
August 12, 2024

Respectfully submitted,

**Homer Bonner**

1200 Four Seasons Tower
1441 Brickell Avenue
Miami, Florida 33131
Phone: +1 (305) 350-5100
Fax: +1 (305) 372-2738

By: /s/ Kevin P. Jacobs
kjacobs@homerbonner.com
Florida Bar No. 169821
Andrew Vitali, III, Esq.
avitali@homerbonner.com
Florida Bar No. 057828

*Attorneys for Defendant ARC Global
Investments II LLC*

VEDDER PRICE (FL), LLP
600 Brickell Avenue, Suite 1500
Miami, Florida 33131
Phone: +1 (786) 741 3200
Fax: +1 (786) 741 3202

By: /s/ Adam L. Schwartz
Adam L. Schwartz
aschwartz@vedderprice.com
Florida Bar No. 103163
Jeanah Park
jpark@vedderprice.com
Admitted *Pro Hac Vice*
Andrew T. Figueroa
afigueroa@vedderprice.com
Florida Bar No. 1002745

and

DECHERT LLP
Joshua D. N. Hess
45 Fremont Street, 26th Floor
San Francisco, CA 94105
Phone: +1 (415) 262 4583
Fax: +1 (415) 262 4555
joshua.hess@dechert.com
Admitted *Pro Hac Vice*

*Attorneys for Defendant Patrick Orlando*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 12, 2024, a true and correct copy of the foregoing Joint Motion for Extension of Time to Respond to the Amended Complaint was served by email generated by the Florida Courts E-Filing system to all parties of record.

Dated: August 12, 2024

Respectfully submitted,

By: /s/ Adam L. Schwartz

## DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
## SECOND DISTRICT

1700 N. Tampa Street, Suite 300, Tampa FL 33602

August 13, 2024

| | |
|---|---|
| ARC GLOBAL INVESTMENTS, II, LLC, AND PATRICK ORLANDO, | CASE NO.: 2D2024-1780 |
| APPELLANT(S) | L.T. No.: 2024CA-001061 |
| V. | |
| DIGITAL WORLD ACQUISITION CORPORATION, ET AL., | |
| APPELLEE(S). | |

_____

**BY ORDER OF THE COURT:**

The motion for admission to appear pro hac vice by Attorney Joshua D.N. Hess is denied without prejudice to filing an amended motion that states in paragraph 15 "the date, case name, and case number [of] all matters in Florida state courts in which pro hac vice admission has been sought in the preceding 5 years, including any lower tribunals for the case in which the motion is filed, and whether such admission was granted or denied" as required by Florida Rule of General Practice and Judicial Administration 2.510(b)(2).

I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

*Mary Elizabeth Kuenzel*
Mary Elizabeth Kuenzel, Clerk
2D2024-1780 8/13/24



JR

Served:
JODY A. ARENAS STAFFORD
SARASOTA CLERK
ANDREW THOMAS FIGUEROA
JASON BRENT GONZALEZ
MATHEW DANIEL GUTIERREZ
JOSHUA D.N. HESS

CASE NO. 2D2024-1780
Page 2

KEVIN PATRICK JACOBS
CHRISTOPHER KING
CHRISTOPHER GEORGE OPRISON
SAMUEL JOSEPH SALARIO, JR.
ADAM LOUIS SCHWARTZ
RAYMOND FREDERICK TREADWELL
ANDREW VITALI, III

**DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA**
**SECOND DISTRICT**

1700 N. Tampa Street, Suite 300, Tampa FL 33602

August 14, 2024

| | |
|---|---|
| ARC GLOBAL INVESTMENTS, II, LLC, AND PATRICK ORLANDO, APPELLANT(S) | CASE NO.: 2D2024-1780 L.T. No.: 2024CA-001061 |

V.

DIGITAL WORLD ACQUISITION
CORPORATION, ET AL.,
      APPELLEE(S).

_____

**BY ORDER OF THE COURT:**

    Attorney Joshua D.N. Hess's motion to appear as a foreign attorney in this proceeding is granted. All parties must serve sponsoring Florida attorney Adam Louis Schwartz with all submissions when serving foreign attorney Joshua D.N. Hess with documents.

    I HEREBY CERTIFY that the foregoing is a true copy of the original court order.

Mary Elizabeth Kuenzel, Clerk
2D2024-1780 8/14/24

DS

Served:
JODY A. ARENAS STAFFORD
SARASOTA CLERK
ANDREW THOMAS FIGUEROA
JASON BRENT GONZALEZ
MATHEW DANIEL GUTIERREZ
JOSHUA D.N. HESS
KEVIN PATRICK JACOBS
CHRISTOPHER KING
CHRISTOPHER GEORGE OPRISON
SAMUEL JOSEPH SALARIO, JR.
ADAM LOUIS SCHWARTZ

CASE NO. 2D2024-1780
Page 2

RAYMOND FREDERICK TREADWELL
ANDREW VITALI, III

CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
SARASOTA COUNTY, FLORIDA
CIVIL DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

      Plaintiffs,

v.                                        Case No. 2024-CA-001061-NC

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO,

      Defendants.

_____/

## PLAINTIFFS' MOTION FOR TEMPORARY
## <u>INJUNCTION WITH NOTICE AND HEARING</u>

To avoid irreparable harm and preserve the status quo pending a disposition on the merits,

Plaintiffs Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1]

("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] (collectively, "Plaintiffs"), pursuant

to Florida Rule of Civil Procedure 1.610, request that the Court render an order temporarily

enjoining Defendants ARC Global Investments II, LLC ("ARC") and United Atlantic Ventures

LLC's ("UAV")[3] imminent sale of more than 18 million shares in TMTG to which they are not

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media & Technology Group Corp. On March 25, 2024, Old TMTG merged with DWAC. Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc. DWAC, in turn, changed its name to Trump Media & Technology Group. Corp.

[3] As a threshold matter, Plaintiffs recognize that UAV is not yet currently a party in this action and that Florida law generally disfavors enjoining non-parties. Given the magnitude of obvious misconduct by UAV, and its principals Andrew Litinsky and Wesley Moss, in connection with the matters raised herein, Plaintiffs seek a temporary injunction in connection with Plaintiffs' Motion for Leave to File Second Amended Complaint, dated July 31, 2024, which Plaintiffs anticipate the Court will grant. If the Court denies Plaintiffs Motion for Leave to File Second Amended Complaint, Plaintiffs will withdraw the present request to the extent that it seeks to enjoin proposed Defendants UAV,

entitled following the expiration of a lock-up restriction as soon as September 19, 2024 (the "Lock-Up Period"). If permitted to proceed, this fire sale will cause significant, irreparable harm to Plaintiffs.

## I.    INTRODUCTION

For the reasons set forth further below, ARC and UAV cannot be permitted to sell their more than 18 million locked-up shares of TMTG, a publicly-traded company with a multi-billion dollar enterprise value. Defendants are fraudsters who have directly and intentionally brought substantial harm to the Company. Permitting them to sell shares worth hundreds of millions of dollars (received in consideration for a collective investment of ~$25,000) will egregiously reward illegal conduct and irreparably harm TMTG where (a) ARC and UAV collectively own approximately 10% of TMTG's outstanding shares and one third of its float[4] and, therefore, such sales will have a substantial market impact; (b) TMTG will be left without the possibility of disgorging these shares, which both ARC and UAV obtained as a result of illegal conduct and consequently should forfeit; and (c) with respect to ARC, its misconduct has created share disputes amongst ARC and persons to whom ARC promised at least some of its TMTG shares and, according to ARC, these ARC-created share disputes now have led to exposure to TMTG that will be realized if ARC is permitted to sell or transfer its shares prior to such disputes being resolved. Accordingly, it is critical and in the public interest for this Court to preserve the status quo and prevent ARC and UAV from selling TMTG shares.

*******

---

Andrew Litinsky, and Wesley Moss. Plaintiffs therefore maintain that the present request for temporary injunction does not seek relief concerning a contingent irreparable harm; rather, Plaintiffs' request is predicated on a conditional procedural outcome and is therefore appropriate.

[4] As used herein, "float" refers to the number of shares available to the public for trading.

ARC purports to own millions of shares of TMTG stock, including at least 7,400,520 locked-up shares, that are worth hundreds of millions of dollars. In reality, ARC flagrantly violated the duties it owed and assumed in order to receive those shares. As a result, ARC is not entitled to their benefit, let alone their sale pending the adjudication of this case. It is undisputed that ARC was the sponsor of the DWAC special purpose acquisition company ("SPAC"). As a sponsor, ARC was charged with creating a SPAC (here, DWAC), and raising money for it to acquire and merge with a private operating company (here, Old TMTG) within a specified time period. As a sponsor, ARC provided DWAC with an initial $25,000 capital contribution in exchange for a portion of the shares presently at issue and with the underlying agreement that ARC, as sponsor, and Orlando, as ARC's controlling member, would guide DWAC towards a *legitimate* and *lawful* merger. ARC's significant shares presently at issue were conditioned on its strict adherence to the fiduciary duties ARC owed to DWAC as its sponsor and successful fulfilment of ARC's overarching obligation to effectuate a legally permissible merger. ARC and Orlando did not, however, steer DWAC towards an efficient and issue-free merger. Instead, their unlawful and tortious acts prompted a government investigation and cost TMTG millions of dollars in regulatory fines and legal fees.

ARC and Orlando, with the knowledge and support of UAV and its principals Litinsky and Moss, formulated and engaged in an unlawful pre-targeting scheme. Specifically, the parties conspired to merge Old TMTG and DWAC before DWAC had gone public through an initial public offering ("IPO"). To effectuate this scheme, Orlando and ARC—with UAV's knowledge— falsely represented in public filings that DWAC did not intend to merge, and had no substantive conversations with, any specific company. This was false because an Old TMTG/DWAC merger had been expressly communicated and planned over the course of several months and was

3

therefore at the time of the public filings all but certain to occur. SPACs such as DWAC are prohibited from such pre-IPO targeting, as well as from making false or misleading statements to investors and the public in connection with potential mergers. *See* 17 C.F.R. § 230.419; 17 C.F.R. § 240.10b-5; 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b). As a result of ARC, Orlando, and UAV's pre-targeting scheme, the U.S. Securities and Exchange Commission ("SEC") launched an investigation into the merger which led to an $18 million penalty against DWAC, more than $11 million in legal fees incurred by Plaintiffs, and two years of unnecessary delay that cost incalculable damage to TMTG in lost business opportunities and reputational harm. The SEC has now separately sued Orlando while simultaneously implicating UAV, Moss, and Litinsky, further illustrating and corroborating the litany of unlawful pre-targeting misconduct that has harmed and continues to harm Plaintiffs. A true and correct copy of the SEC's complaint against Orlando (the "SEC Complaint") is attached hereto as **Exhibit 1** to the Declaration of Scott L. Glabe dated August 14, 2024 ("Glabe Aff.") and incorporated herein by reference.

Similar to its co-conspirator ARC, UAV claims entitlement to 10,912,141 shares of Old TMTG (now TMTG) stock, also worth hundreds of millions of dollars, despite its unlawful pre-targeting conduct and without any real investment in the business. Indeed, in exchange for the shares at issue, UAV and its principals, Moss and Litinsky, put in little to no cash of their own and were principally responsible for faithfully shepherding Old TMTG through its early development and a merger transaction. They "failed on all fronts." (*See* Proposed Second Amended Complaint ("SAC") ¶ 47, **Exh. 3** to Glabe Aff.). UAV, Moss, and Litinsky failed to properly organize the company. They made wasteful and reckless decisions that threatened the launch of Old TMTG's social media network, Truth Social. Once new leadership was appointed, their failures and misconduct threatened the company and its business operations and future success to advantage

themselves. But perhaps even more damaging, UAV, Moss, and Litinsky partnered with ARC and Orlando in the above-mentioned unlawful pre-targeting scheme, which led to millions of dollars in fines, legal fees, and lost revenues and business.

Despite their unlawful conduct, UAV and ARC have made clear that they intend to sell or transfer all of their shares in TMTG upon expiration of the Lock-Up Period restricting that sale until at least September 19, 2024. Permitting the sale would unjustly enrich these bad actors and implicitly condone the wrongful dissipation of the stock TMTG seeks to recover—assets to which UAV was not entitled in the first place and which ARC obtained through unlawful means—before the Court can hold a trial, or even a substantive hearing, on the merits. Moreover, the intended sale of a significant percentage of TMTG's stock—representing many multiples of TMTG's recent average daily trading volume—would inflict further irreparable harm by depressing TMTG's stock price and its access to capital, negatively impacting TMTG's business reputation. To timely resolve this issue before the Defendants' threatened fire sale of TMTG stock, Plaintiffs seek a temporary injunction to preserve the status quo, with notice and a hearing in the near term—indeed, as soon as possible.[5]

## II.    BACKGROUND

### A.    Procedural History

1.    DWAC n/k/a TMTG initiated this action on February 27, 2024, seeking declaratory relief and alleging several causes of action against ARC and Orlando concerning their tortious conduct and purported shares in Old TMTG. DWAC n/k/a TMTG amended its complaint on March 17, 2024, adding additional fiduciary duty and statutory claims against ARC and Orlando.

---

[5] Plaintiffs do not presently seek *ex parte* relief.

The facts and claims alleged are stated more fully in the original and first amended Complaints and are incorporated herein by reference.

2.      On July 17, 2024, the SEC Complaint was filed, alleging in great detail that Orlando, ARC's controlling member, engaged in securities fraud in connection with the pre-targeting scheme to merge Old TMTG and DWAC. (*See generally* SEC Compl.). Although UAV, Moss, and Litinsky are not named as defendants or expressly identified in the SEC Complaint, they are clearly and prominently featured therein, and their involvement in the unlawful scheme is irrefutable.

3.      On July 31, 2024, in the wake of the SEC Complaint, TMTG and Old TMTG filed a Motion for Leave to File Second Amended Complaint against ARC, Orlando, UAV, Litinsky, and Moss. Among other things, TMTG and Old TMTG seek damages, including the disgorgement and/or return of any TMTG shares or other benefits ARC, Orlando, UAV, Litinsky, and Moss received, and other relief the Court deems appropriate. (*See* SAC, Counts I-XII).

4.      As alleged in the SAC—and as will be shown at a hearing—UAV agreed in February 2021 to establish Old TMTG's corporate governance, make all preparations to launch Truth Social, and identify a suitable merger partner to take Old TMTG public and provide it with capital to advance its business plan. (Glabe Aff. ¶ 8). In exchange for taking on these responsibilities, UAV received stock in Old TMTG rather than cash.

5.      UAV, Moss, and Litinsky, however, acted recklessly and in bad faith in managing Old TMTG. (*Id.* ¶¶ 8-9). When new management took over Old TMTG's operations, they discovered, among other things:

> a.      UAV, Moss, and Litinsky failed to establish Old TMTG's corporate governance. They failed to adopt incorporator resolutions or corporate

6

bylaws and failed to facilitate the adoption of a shareholders' agreement that would have established a corporate government structure. (Glabe Aff. ¶ 9, Exh. 4 at 2). Consequently, Old TMTG had no choice but to expend substantial effort and resources to remediate and reverse their failures and establish its authority to make and execute on important business decisions. (Glabe Aff. ¶ 10).

b.   UAV, Moss, and Litinsky also selected an unqualified technical team and managed it abusively, recklessly hastening development, setting arbitrary and unattainable deadlines, and establishing a toxic corporate culture. These decisions impaired and impeded Truth Social's launch and undermined Old TMTG's business reputation. (Glabe Aff. ¶ 9, Exh. 4 at 3-4).

6.    ARC and Orlando acted as DWAC's sponsor, which is an entity that creates a SPAC (here, DWAC) and raises money to acquire and merge with a private operating company (here, Old TMTG) within a specified time period. (*See* SEC Compl. ¶¶ 19-20, 27). In exchange for its initial $25,000 capital contribution in the DWAC SPAC—and the representation that DWAC could rely on ARC and Orlando, as sponsor, to lawfully acquire a target company—ARC, controlled by Orlando, received 8,625,000 Class B shares of DWAC stock. (*Id.* ¶ 27).

7.    Regarding the merger transaction, and as laid out in further detail in the SEC Complaint, UAV, Moss, and Litinsky negotiated an illicit deal with ARC and Orlando whereby Old TMTG would merge with one of two Orlando-controlled SPACs: first, Benessere Capital Acquisition Corp., which Defendants referred to as "Plan A," and second, DWAC, which Defendants referred to as "Plan B." (*See* Glabe Aff. ¶¶ 12-14, 16-18; *see also* SEC Compl. ¶¶ 31-43). Importantly, Defendants' decision to merge Old TMTG with one of the Orlando-

7

controlled entities—and Orlando's subsequent publicly filed statements on behalf of DWAC which failed to disclose the parties' pre-targeting communications and efforts—not only violated securities regulations, but also flagrantly violated the fiduciary duties ARC and Orlando owed to DWAC and UAV, Moss, and Litinsky owed to Old TMTG.

8.      Indeed, Litinsky himself both acknowledged and then astonishingly disregarded the illegality and serious risk the pre-targeting scheme posed not only to a successful merger, but also to Old TMTG itself, asking in notes he drafted to himself "is [Orlando] wearing a wire?" (Glabe Aff. ¶ 16, Exh. 6 at 4).[6] Nonetheless, UAV, Moss, and Litinsky persisted in partnering with ARC and Orlando, which led to the SEC's investigation into the ultimate merger between Old TMTG and DWAC. (*See* Glabe Aff. ¶ 17).

9.      The SEC's investigation resulted in an $18 million penalty imposed against DWAC. (*See* Glabe Aff. ¶ 6, Exh. 2). It also delayed the SEC's approval of the merger—which was required for the deal to close—for two years. (*Id.* ¶¶ 6, 27-29). This, in turn, caused Plaintiffs to incur millions of dollars in legal fees and costs. (*Id.* ¶ 26).

10.      Moreover, the delay prevented Old TMTG from accessing the hundreds of millions of dollars in capital it would have received from a quick, efficient, and lawful SPAC merger. (Glabe Aff. ¶ 27). Without this capital—which was vital to this young startup company's success and future—Old TMTG was forced to operate on a limited budget, eliminate several positions, and abandon certain business opportunities it would have otherwise pursued absent the SEC investigation. (*See id.* ¶¶ 27-28). Old TMTG was also forced to seek capital contributions from other sources, including the issuance of promissory notes, which resulted in the issuance of

---

[6] Plaintiffs' allegations in this Motion and in the Proposed Second Amended Complaint are further supported by documents that are in the possession of both Defendants and the SEC. Plaintiffs have requested the production of these documents, but Defendants have refused.

additional Old TMTG and TMTG shares. (*Id.* ¶ 28). Ultimately, despite UAV agreeing to effectuate an expeditious SPAC merger, ARC and UAV's pre-targeting scheme and the resulting SEC investigation and delay forced Old TMTG to operate without SPAC capital for a much longer period of time than it had anticipated.

11.     On April 11, 2024, UAV filed a Second Amended Complaint in the Delaware Court of Chancery, Case No. 2024-0184-MTZ (the "Delaware Action") requesting, *inter alia*, declaratory relief to invalidate a provision contained in TMTG's corporate charter restricting Old TMTG stockholders from selling post-merger TMTG stock during the Lock-Up Period. (*See* Delaware Action, Second Amended Complaint, **Exh. 19** to Glabe Aff.). As detailed below, UAV has clearly indicated that it plans to sell every one of its shares at the first possible opportunity—when the Lock-Up Period expires.

### B.     The TMTG Market

12.     On March 26, 2024, New TMTG's eligible shares began trading on the public markets via the Nasdaq Stock Exchange ("Nasdaq") under the symbol DJT. On the first five days of trading, average daily trading volume was understandably high. Over the last 10 trading days, from July 30, 2024 to August 12, 2024, TMTG's daily trading volume has averaged approximately 3.65 million shares per day.

### C.     UAV's Shares

13.     Moss and Litinsky, as initial *de facto* directors of Old TMTG, were principally responsible for its day-to-day operations with the goal of establishing Old TMTG's corporate governance structure, launching the Truth Social platform, and finding a publicly traded merger partner. (*See* Glabe Aff. ¶¶ 8-9).

14.     Post-merger, UAV is recorded as the holder of 10,912,141[7] shares of TMTG's issued and outstanding stock—more than 5% of total outstanding shares as of August 7, 2024. (*See* TMTG Form S-1 at 133, dated July 3, 2024, **Exh. 20** to Glabe Aff.). It is those shares that are challenged due to UAV's utter failure to perform and its involvement with ARC and Orlando in the unlawful pre-targeting scheme.

### D.     ARC and Orlando's Shares

15.     ARC, as DWAC's sponsor, initially invested $25,000 in DWAC in exchange for 8,625,000 Class B "founder" shares of DWAC stock. (*See* SEC Compl. ¶ 27).

16.     ARC retained the majority of these "founder" shares, which converted into ordinary, Class A common shares upon closing of the merger. Post-merger, ARC is recorded as the beneficial owner at least 7,400,520 shares of TMTG's issued and outstanding stock that converted from "founder" shares[8]—approximately 4% of total outstanding shares as of August 7, 2024. (*See* Glabe Aff., Exh. 20 at 133). While ARC is the record holder of these TMTG shares, TMTG's public disclosures reflect that "Orlando is the current managing member of ARC and has sole voting and dispositive power with respect to the shares held of record by ARC. By virtue of this relationship, Mr. Orlando may be deemed to share beneficial ownership of the securities held of record by ARC." (*Id.*).

17.     ARC's ownership of TMTG shares is also the subject of several active litigations in which alleged ARC investors assert that their interests in ARC entitle them to converted shares in TMTG. These cases include:

---

[7] This figure excludes 52,859 shares included in TMTG's public filings which will remain in an indemnification escrow beyond the expiration of the Lock-Up Period.

[8] The precise number of such shares is subject to separate, pending litigation in the Delaware Court of Chancery.

      a.      Michael J. Melkersen v. ARC, TMTG, and Odyssey Transfer and Trust Company ("Odyssey"): Case No. 2024-011456-CA-01 in Florida Circuit Court, Miami-Dade County ("*Melkersen*");

      b.      Edwin Tucker, et al. v. ARC and DWAC: Case No. 2024-008668-CA-01 in Florida Circuit Court, Miami-Dade County ("*Tucker*");

      c.      Dan Akers, et al. v. ARC: Case No. 652515/2024 in the Supreme Court of New York, New York County ("*Akers*"); and

      d.      Odyssey v. ARC and Melkerson, with TMTG as nominal defendant: Case No. 24-cv-729-GBW in the United States District Court for the District of Delaware ("*Odyssey*").

(*See* Glabe Aff., ¶ 22, Exhs. 14-17). *Melkerson*, *Tucker*, and *Akers* generally concern disputes over shares that the plaintiffs claim ARC promised them. Relatedly, *Odyssey* is an interpleader action filed by TMTG's transfer agent to resolve the aforementioned shareholder dispute between Melkersen and ARC.

18.      Accordingly, it appears that ARC and Orlando have agreed to provide some percentage of these shares to downstream investors, including, but not limited to, the plaintiffs listed above as well as various foreign trusts including at least one set up for the benefit of Orlando and his family.

19.      ARC has alleged that TMTG has liability in connection with these investor disputes for its purported failure to transfer TMTG shares to these alleged investors. (*See* Glabe Aff. ¶ 23, Exh. 18). Despite repeated requests, however, ARC and Orlando have refused to provide a capitalization table and other evidence sufficient to identify the investors or evidence their investment in ARC and, thus, entitlement to TMTG shares. (Glabe Aff. ¶ 24).

20.     Orlando's failure to provide this information is calculated. The evidence suggests that Orlando engaged in illegal conduct with respect to the sale of interests in ARC and TMTG shares. For example, Orlando appeared to enter into arrangements whereby he (i) exchanged TMTG shares for sums of cash, (ii) provided TMTG shares as repayment for personal debts, and (iii) allocated TMTG shares to his children for no financial consideration. (*See* Declaration of Alexander Cano dated August 14, 2024 ¶¶ 6-9). The individuals and entities alleged to have received these shares were indeed listed as ARC shareholders in a corporate disclosure statement filed in another shareholder litigation involving ARC and Orlando. (*See* Glabe Aff., Exh. 24). Moreover, Orlando entered into agreements whereby Orlando-backed entities borrowed millions of dollars from offshore funds purportedly to use for DWAC's operating expenses and convertible into TMTG shares. But DWAC never received those proceeds. (*See* Declaration of Eric Swider dated August 14, 2024 ¶¶ 4-7, Exh. 1).

**E.     The Lock-Up Agreements**

21.     At the time of DWAC's IPO, DWAC, ARC, and other investors entered into a letter agreement that contained a Lock-Up Provision. (*See* Glabe Aff., Exh. 20 at Attachment 10.1).

22.     Moreover, on March 25, 2024, TMTG filed a second amended corporate charter overwhelmingly approved by its stockholders, which, *inter alia*, changed the name of the corporation from DWAC to TMTG (the "Second Amended Charter"). (*See* Second Amended Charter, **Exh. 21** to Glabe Aff.). The Second Amended Charter too contained a Lock-Up Provision.

23.     The Lock-Up Provision in both the DWAC IPO Letter Agreement and Second Amended Charter state, in pertinent part, that lock-up holders may not transfer any lock-up shares until:

> the earliest of (i) the date that is six months after the closing
> date of the DWAC Transaction, (ii) the date on which the

closing price for the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalization and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after the closing date of the DWAC Transaction, and (iii) the date after the closing of the DWAC Transaction on which the Corporation consummates a liquidation, merger, share exchange or other similar transaction that results in all of the Corporation's stockholders having the right to exchange their equity holdings in the Corporation for cash, securities or other property.

(*See* Glabe Aff., Exh. 21; *see also* Glabe Aff., Exh. 20 at Attachment 10.1).

24.    Assuming TMTG does not earlier "consummate[] a liquidation, merger, share exchange or other similar transaction that results in all of [its] stockholders having the right to exchange their equity holdings . . . for cash, securities or other property," the Lock-up Period set forth above expires as early as September 19, 2024—a little more than a month from today.  (UAV has advocated for an even earlier date and sought to remove the lock-up altogether.)

### F.    UAV's Intent to Sell

25.    UAV has explicitly stated that, absent the Lock-Up Provision, it would have sold its shares in TMTG, to wit:

UAV is suffering irreparable harm due to the restrictions on its stock because it is unable to trade or transfer its stock.  In addition, by the time the restrictions expire, UAV will face adverse market conditions that will greatly reduce the value of its stock and likely will be unable to collect money damages . . . .

(Delaware Action, Second Amended Complaint ¶ 108; *see also id.* ¶ 12 ("UAV's post-merger stock in New TMTG is unreasonably restricted and cannot currently be sold by UAV due to the lock-up provisions . . . .").  UAV has reaffirmed this intention, stating that "***[b]ut for the Charter Lockup, UAV would have traded all its shares on the first day of trading under the DJT ticker***."

(*See* Delaware Action, Opp. to Mot. to Vacate, dated April 25, 2024, **Exh. 22** to Glabe Aff.)

(emphasis added). As such, upon the expiration or removal of the Lock-Up Provisions, UAV will immediately seek to sell almost 11 million shares in TMTG—more than 5% of its issued and outstanding shares, approximately 20% of its public float, and approximately 3 times the recent average daily trading volume. That will unavoidably have a significant and negative effect on the market for TMTG stock,[9] which impact will be difficult or impossible to precisely calculate in the future. More fundamentally, UAV is not entitled to retain these shares, which TMTG is seeking to disgorge.

## III.    LEGAL STANDARD

26.    In deciding an application for a temporary injunction, the Court "considers whether the moving party has demonstrated (1) irreparable harm to the moving party unless the injunction issues, (2) unavailability of an adequate legal remedy, (3) a substantial likelihood of success on the merits, and (4) that the public interest is supported by the entry of the injunction." *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 64-65 (Fla. 2d DCA 2010) (citing *Masters Freight, Inc. v. Servco, Inc.*, 915 So. 2d 666, 666 (Fla. 2d DCA 2005)).

27.    The "purpose of a temporary injunction is to maintain a status quo of the subject matter of the suit pending a final determination of the cause." *N. Dade Water Co. v. Adken Land Co.*, 114 So. 2d 347, 348 (Fla. 3d DCA 1959). "As the name would imply, a temporary injunction is not conclusive and the provisions of same may be merged in or dissolved by the final decree, dependent upon a determination of the issues made by the complaint and answer." *Id.*

---

[9] *See Initial Public Offerings: Lockup Agreements*, United States Secs. & Exch. Comm'n., *available at* https://www.investor.gov/introduction-investing/investing-basics/glossary/initial-public-offerings-lockup-agreements (last visited August 14, 2024) ("If you are considering investing in a company that has recently conducted an initial public offering, you should determine whether the company insiders have a lockup and when it expires. This is important information because a company's stock price may drop in anticipation that locked up shares will be sold into the market when the lockup ends.").

IV.    **ARGUMENT**

   A.    **ARC and Orlando Should Be Enjoined from Selling or Transferring Their TMTG Shares.**

      i.    **ARC and Orlando's Sale of TMTG Shares Would Irreparably Harm TMTG Because There Is No Adequate Remedy at Law.**

28.    A movant seeking a temporary injunction must first demonstrate irreparable harm and an inadequate remedy at law. *See Atomic Tattoos*, 45 So. 3d at 64. Courts often examine these elements as a single requirement. *See, e.g.*, *Polk Cnty. v. Mitchell*, 931 So. 2d 922, 926 (Fla. 2d DCA 2006) (requiring as an element for temporary injunction "a likelihood of irreparable harm *and* the unavailability of an adequate remedy at law"). That is, a movant must demonstrate "the likelihood of . . . irreparable harm *because of* the unavailability of an adequate remedy at law." *See De Leon v. Aerochago, S.A.*, 593 So. 2d 558, 559 (Fla. 3d DCA 1992) (emphasis added).

29.    DWAC accepted ARC's sponsor contribution with the expectation that ARC and its controlling member, Orlando, would assist in a lawful and legitimate business merger. DWAC did not receive this benefit, but ARC nonetheless benefited handsomely and illegally. Indeed, ARC has been issued over 13 million shares of TMTG stock, which more than 7 million it intends to sell upon the expiration of the Lock-Up Period. But as stated above, ARC and Orlando breached the fiduciary duties they owed to DWAC and are therefore not entitled to these shares. *See Bailey v. St. Louis*, 268 So. 3d 197, 201 (Fla. 2d DCA 2018) ("Disgorgement is a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior."); *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 698 (Fla. 3d DCA 2018) ("The equitable remedy of disgorgement is measured by the defendant's ill-gotten profits or gains rather than the plaintiff's losses."). Thus, if ARC is able to sell its shares before this matter is fully adjudicated, disgorgement of the shares will be unavailable to TMTG when it prevails. And the unavailability of this remedy is precisely why failing to preserve the status quo and hold these

15

shares in abeyance pending the disposition of this matter would irreparably harm TMTG. *See, e.g.,* *Gator Boring & Trenching, Inc. v. Westra Constr. Corp.*, 210 So. 3d 175, 181 (Fla. 2d DCA 2016) (holding release of a bond before trial constituted irreparable harm because the plaintiff "would be without a remedy on the bond" even after a successful plenary appeal); *see also Farrey's Wholesale Hardware Co., Inc. v. Coltin Elec. Servs., LLC*, 263 So. 3d 168, 179 (Fla. 2d DCA 2018). Indeed, ARC received TMTG's stock under false pretenses and should not be rewarded for that misconduct by reaping tens of millions in profits. *See Shands Teaching Hosp. & Clinics, Inc. v. Beech St. Corp.*, 899 So. 2d 1222, 1227 (Fla. 1st DCA 2005); *King Mountain Condo. Ass'n v. Gundlach*, 425 So. 2d 569, 571 (Fla. 4th DCA 1982) (holding that disgorgement of profits as a remedy for breach of fiduciary duty is equitable in nature).

30.     Moreover, the dissipation of ARC's wrongfully held assets that will undoubtedly occur absent a temporary injunction also amounts to irreparable harm without an adequate legal remedy. In *In re Estate of Barsanti*, for example, a decedent's heir removed stock certificates from the control of the decedent's estate and claimed ownership. 773 So. 2d at 1207-08. On the estate's appeal of the denial of its application for a temporary injunction, the court held that based on the evidence, "[t]he Estate is subject to immediate and irreparable harm if [the heir and her husband were] recognized as the rightful owner[s] of the bearer certificates because this could subject the assets of the Estate to dissipation." *Id.* at 1208.

31.     Similarly, in *Vargas v. Vargas*, corporate shares were transferred to certain children of a wealthy patriarch as an early inheritance. 771 So. 2d 594, 595 (Fla. 3d DCA 2000). Some of these shares and a certain sum of money, however, were alleged to belong to the children excluded from the inheritance. *Id.* The excluded children sought a temporary injunction freezing various

safe deposit boxes containing the bearer shares, as well as $4.4 million in bank accounts. *Id.* The court affirmed the granting of the temporary injunction, holding that:

> The sisters have shown common ownership of the bearer shares, as well as the $4.4 million in bank accounts, and that a lifting of the injunction would expose those assets to conversion or dissipation by a third party over which the sisters have no control. Thus, if the assets are not shielded from the potential conversion or dissipation, they might no longer be within the jurisdiction of the court. If the assets are taken outside the court's jurisdiction, the corpus of any possible constructive trust would no longer be available, thereby rendering such equitable relief unattainable should the sisters ultimately prevail on their complaint.

*Id.* at 595-96.

32.     As such, Florida courts routinely enter injunctions to freeze assets from dissipation. *See Gyptec, S.A. v. Hakim-Daccach*, 299 So. 3d 481, 484 (Fla. 3d DCA 2020) (collecting cases and holding that an "injunction was necessary to protect the specific identified res of the constructive trust claim and to prevent further dissipation of the funds"); *see also Pendergraft v. C.H.,* 225 So. 3d 420, 421 (Fla. 5th DCA 2017) (explaining "an order freezing assets for further determination of the ownership right to those assets is in the nature of an injunction"); *TJ Mgmt. Grp., L.L.C. v. Zidon*, 990 So. 2d 623, 625 (Fla. 3d DCA 2008) (affirming an injunction order freezing funds held in a bank account for further determination on the ownership rights to those funds).

33.     Accordingly, ARC's planned fire sale of TMTG stock will cause Plaintiffs irreparable injury by foreclosing a significant legal remedy Plaintiffs seek (disgorgement of wrongfully held TMTG shares) and by dissipating wrongfully held assets. Thus, absent prompt action by this Court, Plaintiffs will be left irreparably harmed and without any ability to adequately recoup their losses.

ii.      **TMTG is Substantially Likely to Succeed on the Merits.**

34.      To establish a substantial likelihood of success, a movant for a temporary injunction need only establish "good reasons for anticipating" it will ultimately prevail on the merits. *City of Jacksonville v. Naegle Outdoor Advert. Co.*, 634 So. 2d 750, 753 (Fla. 1st DCA 1994); *see also Miami-Dade Cnty. v. Miami Gardens Square One, Inc.*, 314 So. 3d 389, 397 (Fla. 3d DCA 2020). After all, temporary injunctions serve to "preserve the status quo or prevent ongoing harm before a full hearing." *Hasley v. Harrell*, 971 So. 2d 149, 152 (Fla. 2d DCA 2007). A "likelihood of probable success," not certain success, is what is required. *See Southards v. Motel Mgmt. Co.*, 567 So. 2d 523, 524 (Fla. 3d DCA 1990).

35.      TMTG is substantially likely to succeed on the merits in this action. As asserted in the Proposed Second Amended Complaint—and in the SEC's recent complaint against Orlando— ARC and Orlando engaged in a pre-targeting scheme to merge DWAC and Old TMTG before DWAC's IPO. (*See* Glabe Aff. ¶¶ 12-14, 16-18). In furtherance of this scheme, Orlando made numerous false representations in public filings that DWAC did not intend to merge with, or had any substantive conversations with, any specific company. (*Id.* ¶¶ 19-21). This conduct was in direct violation of ARC and Orlando's duty of care and loyalty to DWAC, specifically its obligation (for which ARC received millions of shares in DWAC) to provide guidance and support in a *legitimate* and *lawful* merger with a private company. ARC and Orlando's numerous breaches of their fiduciary duties led to an SEC investigation and $18 million penalty, as well as incalculable loss and reputational damage stemming from the approximately two-year delay in an ultimate merger between Old TMTG and DWAC. (*Id.* ¶¶ 25-29). Plaintiffs are entitled to recoup this benefit, as permitting ARC to retain and then sell the disputed shares will unjustly enrich ARC at Plaintiffs' expense. *See Shands*, 899 So. 2d at 1227.

### iii. Granting the Temporary Injunction Will Serve the Public Interest.

36.     The final requirement for a temporary injunction is a demonstration that the relief will serve the public interest. As stated in *Bronson v. Bd. of Pub. Instruction*, 145 So. 833, 836 (Fla. 1933),

> This court is committed to the doctrine that extraordinary relief will not be granted in cases where it plainly appears that, although the complaining party may be ordinarily entitled to it, the granting of such relief in the particular case will result in confusion and disorder, and will produce an injury to the public which outweighs the individual right of the complainant to have the relief he seeks.

37.     Granting Plaintiffs' temporary injunction will not injure the public but will instead serve the public interest by preventing ARC from wrongfully converting stock it should be forced to return after violating its fiduciary duties and engaging in an unlawful and harmful pre-targeting scheme. This, in turn, will protect TMTG's present shareholders from a fire sale of a significant percentage of the company's stock—which would undoubtedly have a diluting and depressive effect on the stock price.

38.     The public interest served by preventing ARC and Orlando from wrongfully converting shares currently held in ARC's name is particularly acute. ARC, through Orlando, has steadfastly (and by design) refused to account for the money it has raised from shareholders in connection with purportedly raising capital for DWAC or produce a comprehensive capitalization table reflecting individuals and entities to which it owes TMTG shares. (*See* Glabe Aff. ¶ 24; *see also id.* ¶¶ 22-23). If ARC is permitted to sell its wrongfully held shares, these alleged shareholders, like Plaintiffs, will be forced to litigate their disputes for an inadequate remedy. It is likely that the list of disputes outlined above will only grow, clogging the dockets of this Court and others throughout the country with causes of action and motion practice, thereby further injuring the public's access to the courts.

**B.    UAV Should Be Enjoined from Selling or Transferring Its TMTG Shares.**

**i.    UAV's Sale of TMTG Shares Would Irreparably Harm TMTG Because There Is No Adequate Remedy at Law.**

39.    As stated above, a movant seeking a temporary injunction must first demonstrate irreparable harm and an inadequate remedy at law. *See Atomic Tattoos*, 45 So. 3d at 64; *see also De Leon*, 593 So. 2d at 559 (a movant must demonstrate "the likelihood of . . . irreparable harm because of the unavailability of an adequate remedy at law").

40.    Plaintiffs assert several counts of breach of fiduciary duty against UAV, Litinsky, and Moss for their involvement in the pre-targeting scheme as well as their general failures to put the best interests of both DWAC and Old TMTG above their own. (*See* SAC Counts VI-IX, XI-XII). Disgorgement is a proper remedy for such a breach of fiduciary duty. *See King Mountain Condo*, 425 So. 2d at 571 ("[T]he beneficiary is entitled to obtain the benefits derived by the fiduciary through the breach." (internal quotations and citation omitted)); *see also Bailey*, 268 So. 3d at 201; *Duty Free World, Inc.*, 253 So. 3d at 698. If, however, UAV is permitted to sell or transfer its TMTG shares upon the expiration of the Lock-Up Period and before this matter is fully adjudicated, Plaintiffs will be unable to pursue the remedy of disgorgement of the shares upon successfully establishing their claims. *See*, *e.g.*, *Gator Boring*, 210 So. 3d at 181; *see also Farrey's Wholesale*, 263 So. 3d at 179.  And importantly, and for reasons outlined in more detail below, *see infra* ¶¶ 47-48, any disgorgement of the monetary value of UAV's imminent fire sale of TMTG shares will be woefully insufficient to fully and adequately remedy Plaintiffs for these fiduciary breaches. Rather, it is the actual shares that must be disgorged to make Plaintiffs whole. But without the equitable path of relief presently sought, Plaintiffs are without an adequate remedy at law to resolve their irreparable harm. As such, the status quo should be maintained in this matter.

41.      As stated above, *see supra* ¶¶ 30-32, the dissipation of UAV's wrongfully held assets that will imminently occur itself amounts to irreparable harm without an adequate legal remedy. *See Barsanti*, 773 So. 2d at 1207-08; *Vargas*, 771 So. 2d at 595; *see also Gyptec*, 299 So. 3d at 484 (collecting cases).

42.      Here, UAV is obligated to restore the shares to TMTG. UAV received the shares as consideration for work it—through its principals, Moss and Litinsky—was obligated to perform in Old TMTG's early stages as a company. But UAV failed to manage Old TMTG using good faith and due care as required. Not only did UAV fail to successfully launch Truth Social, but it, *inter alia*, (i) failed to adequately establish Old TMTG's corporate governance structure and business plans; (ii) hired and contracted with inexperienced, unqualified, and expensive technical employees and companies; and (iii) when rightfully replaced as leaders at the company, created a hostile and threatening corporate culture that jeopardized Old TMTG's business operations and reputation. (Glabe Aff. ¶ 9, Exh. 4). This conduct was extremely harmful to Old TMTG and in clear violation of the fiduciary duties UAV owed to Old TMTG while managing the company.

43.      Moreover, UAV—through its principals Litinsky and Moss—engaged in an unlawful pre-targeting scheme with ARC and Orlando to merge Old TMTG and DWAC before DWAC had gone public through an initial public offering. (*See* Glabe Aff. ¶¶ 12-14, 16-18). This scheme included Orlando's numerous false statements and misrepresentations to investors and in public filings, with UAV, Moss, and Litinsky's knowledge and complicit conduct, that DWAC was considering multiple merger targets and that the Old TMTG/DWAC merger was not, in reality, preordained, in violation of securities laws. (*Id.* ¶¶ 19-21). UAV's scheme with ARC and Orlando led to an investigation by the SEC and an $18 million penalty, as well as a long delay in

21

the merger, which itself caused significant lost revenues and opportunities and reputational harm. (*Id.* ¶¶ 25-29).

44.     Accordingly, to prevent UAV from being unjustly enriched, UAV must surrender its shares of TMTG stock. Even after violating their fiduciary duties to TMTG through their mismanagement of Old TMTG's operations and their participation in the unlawful pre-targeting scheme, UAV, Litinsky, and Moss seek to damage Plaintiffs further by selling hundreds of millions of dollars of TMTG stock which, in turn, is subject to dissipation or transfer outside of this Court's jurisdictional reach to avoid satisfying a judgment. This would be unfair and inequitable and would effectively moot remedies Plaintiffs seek in their proposed Second Amended Complaint. Consequently, UAV should be preliminarily enjoined from engaging in any such sales.

45.     Indeed, as described above, UAV has indicated on several occasions that it intends to sell shares in TMTG as soon as the lock-up is lifted. Thus, it is a near certainty that on or after September 19, 2024, UAV will attempt to sell its shares of TMTG, which sales would—among other harms—result in a significant and potentially incalculable market impact.

46.     TMTG already has been substantially harmed by UAV's conduct and will be irreparably harmed if UAV executes its planned fire sale. TMTG is without remedy at law to cure that injury; TMTG will be unable to pursue disgorgement of shares as it is entitled for establishing a breach of fiduciary duty and unjust enrichment, and money damages will be wholly insufficient to deal with the cascade of consequences resulting from such a sell off.

47.     Indeed, as noted, UAV plans to sell a volume of stock that well exceeds TMTG's recent average daily trading volume, which will cause an immediate and irreparable depressive effect on TMTG's market capitalization and business reputation. Furthermore, TMTG will be deprived of the ability to cancel the shares wrongfully held by UAV or avoid harm to the market

capitalization and reputation of the company. For example, if a company's stock price is performing well, TMTG is likely to receive more favorable media and analyst commentary. Such information helps investors determine the long-term viability of the company and facilitates future growth through equity raises particularly where creditors favor companies with higher share prices because such share prices often correlate with better health and higher earnings.

48.     These concerns are particularly acute where TMTG is an emerging growth company that intends to expand through strategic investments and transactions, and its financial reputation is the foundation for this plan. (*See* New TMTG Form 10-Q at 21, 24-25, dated August 9, 2024, **Exh. 23** to Glabe Aff.). Accordingly, the stock price decline from UAV's planned fire sale of wrongfully held securities would irreparably harm these efforts. A company's ability to raise capital, grow, and maintain a favorable reputation is predicated on the market's perception of the company, which is reflected in its stock price. Indeed, insofar as selling its shares all at once would not maximize UAV's economic gain (as at least Mr. Moss, a FINRA-registered broker, surely knows), ***UAV's threat to conduct a fire sale suggests an intent to harm TMTG even at the expense of UAV's and its principals' financial interest***.

49.     In sum, UAV's planned liquidation of a massive amount of TMTG stock in the near future will cause irreparable harm both by foreclosing a significant portion of Plaintiffs' legal remedies in this matter and by dissipating assets UAV wrongly holds and harming TMTG's business as a whole. Thus, absent prompt action by this Court, Plaintiffs will be left irreparably harmed and without any ability to recoup their losses.

### ii.     TMTG is Substantially Likely to Succeed on the Merits.

50.     As stated above, to establish a substantial likelihood of success, a movant for a temporary injunction need only establish "good reasons for anticipating" it will ultimately prevail

on the merits. *Naegle Outdoor Advert.*, 634 So. 2d at 753 (Fla. 1st DCA 1994); *see also Southards*, 567 So. 2d at 524 (providing that a "likelihood of probable success," not a certain success, is required to establish substantial likelihood of success).

51.     TMTG is substantially likely to succeed on the merits in this action. As alleged in the Proposed Second Amended Complaint, UAV and its principals, Litinsky and Moss violated their respective fiduciary duties to TMTG and DWAC by, *inter alia*, engaging in a pre-targeting scheme to merge Old TMTG and DWAC and generally placing their own personal interests above those of TMTG and DWAC. (*See* Glabe Aff. ¶¶ 12-14, 16-18). Moreover, UAV failed to confer on Old TMTG the benefits it agreed to provide and has therefore been unjustly enriched. (*Id.* ¶¶ 9-10). As a result of these fiduciary breaches and unjust enrichment, UAV is required to restore the TMTG shares it wrongfully obtained. *See Bailey*, 268 So. 3d at 201 ("Disgorgement is a remedy designed to deter wrongdoers by making it unprofitable to engage in the wrongful behavior."); *see also Henry M. Butler, Inc. v. Trizec Properties, Inc.*, 524 So. 2d 710, 711 (Fla. 2d DCA 1988) (unjust enrichment serves to prevent the "wrongful retention of a benefit, or the retention of money or property of another, in violation of good conscience and fundamental principles of justice or equity"); *id.* at 712 (explaining the essential elements as "a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under such circumstances that it would be inequitable for him to retain it without paying the value thereof").

52.     UAV received Old TMTG's stock with the expectation and a condition that UAV would establish Old TMTG, get Truth Social operational, and position Old TMTG for a merger. UAV also received Old TMTG's stock subject to its adherence to general fiduciary duties to manage the company in good faith and with due care. But as stated above, UAV accepted and

retained the shares, even while abandoning its obligations and causing great harm to TMTG through woeful mismanagement and participation in an unlawful pre-targeting scheme. Permitting UAV to retain and then sell the disputed shares will unjustly enrich UAV at TMTG's expense. *See Shands*, 899 So. 2d at 1227.

### iii.    Granting the Temporary Injunction Will Serve the Public Interest.

53.    The final requirement for a temporary injunction is a demonstration that the relief will serve the public interest. *See Bronson*, 145 So. at 836.

54.    Granting Plaintiffs' temporary injunction will not injure the public. In fact, the requested temporary injunction would serve the public interest by preventing UAV from converting stock it is not entitled to retain into a huge amount of liquid cash, and by protecting TMTG's present shareholders from a fire sale of a significant percentage of the Company's stock—which would undoubtedly have a diluting and depressive effect on the stock price.

55.    If UAV is permitted to sell this significant portion of TMTG's shares, these shareholders will face substantial uncertainty—and potential decreased share value—all at the hands of a party wrongfully holding the stock. Accordingly, the relief requested herein would advance, not hinder, the public interest.

### C.    Plaintiffs' Motion Is Ripe and Should be Considered by the Court.

56.    Finally, although UAV and ARC's wrongful sale may not occur until September 19, 2024 at the earliest, both are already taking steps to effectuate the actions that would irreparably harm TMTG (including in UAV's case, suing TMTG's transfer agent in a bid to obtain freely trading shares).

57.    Plaintiffs believe that the Court can set a feasible albeit expeditious schedule for briefing and argument before Defendants attempt to sell their purported shares and inflict

irreparable harm on TMTG. In the alternative, the Court should maintain the status quo at least until Plaintiffs receive their day in court.

58.    Accordingly, Plaintiffs respectfully submit that their present motion is not a request for contingent relief, but rather a request for the Court to exercise its inherent discretion over its docket to allow for this motion to proactively proceed prior to the near-certain occurrence of irreparable harm.

## V.    CONCLUSION

For the reasons set forth above, immediate injunctive relief to preserve the status quo is critical to protect TMTG's interests and is in the best interests of TMTG's shareholders. Indeed, ARC and UAV are holding hundreds of millions of dollars' worth of TMTG shares that they must disgorge. Monetary damages are insufficient to ensure an equitable and just result because the harm inflicted upon TMTG is not merely the value of the ill-gotten shares effectively stolen from it, but the damage the Defendants' sales will have on TMTG's market, reputation, and business prospects. Accordingly, equity and fairness dictate that the status quo should be maintained, and Defendants should be enjoined from selling or otherwise transferring their shares, until this matter is adjudicated.

WHEREFORE, Plaintiffs very respectfully request that this Honorable Court GRANT the instant Motion for Temporary Injunction.

[REMAINDER INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]

Dated: August 14, 2024                    Respectfully submitted,

                                                */s/ Christopher G. Oprison*
                                                Christopher G. Oprison (FBN: 122080)
                                                Tal Aburos (FBN: 1010901)
                                                **DLA PIPER LLP (US)**
                                                200 South Biscayne Boulevard
     Suite 2500
     Miami, Florida 33131
     Telephone: (305) 423-8522
     Facsimile: (305) 657-6366
     chris.oprison@dlapiper.com
     tal.aburos@dlapiper.com
     *Counsel for Plaintiffs*

     */s/ Samuel J. Salario, Jr.*
     Samuel J. Salario, Jr., Esq. (FBN: 83460)
     Jason B. Gonzalez, Esq. (FBN: 146854)
     Mathew D. Gutierrez, Esq. (FBN: 94014)
     Raymond F. Treadwell, Esq. (FBN: 93834)
     **LAWSON HUCK GONZALEZ PLLC**
     215 S. Monroe St., Suite 320
     Tallahassee, Florida 32301
     Telephone: (850) 825-4334
     samuel@lawsonhuckgonzalez.com
     jason@lawsonhuckgonzalez.com
     mathew@lawsonhuckgonzalez.com
     ray@lawsonhuckgonzalez.com
     *Counsel for Plaintiffs*

# Declaration of Scott L. Glabe

## CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
## SARASOTA COUNTY, FLORIDA
## CIVIL DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

     Plaintiffs,

v.                                                                Case No. 2024-CA-001061-NC

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO,

     Defendants.

_____/

### DECLARATION OF SCOTT L. GLABE IN SUPPORT OF
### PLAINTIFFS' MOTION FOR TEMPORARY INJUNCTION

     I, Scott L. Glabe, declare under penalty of perjury that the following is true and correct:

     1.     I am over 18 years of age, of sound mind, and otherwise competent to make this

Declaration. I am a resident of the State of Connecticut. The matters set forth in this Declaration

are based on my personal knowledge and I could and would competently testify thereto if called

upon to do so.

     2.     I submit this Declaration in connection with Plaintiff Trump Media & Technology

Group Corp. f/k/a Digital World Acquisition Corp.[1] ("TMTG" or "DWAC") and TMTG Sub Inc.'s

("Old TMTG")[2] (collectively, "Plaintiffs") motion for a temporary injunction pursuant to Florida

Rule of Civil Procedure 1.610.

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, I will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media & Technology Group Corp. On March 25, 2024, Old TMTG merged with DWAC. Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc.  DWAC, in turn, changed its name to Trump Media & Technology Group. Corp.

3.      I am General Counsel of TMTG and Old TMTG. I have held these positions since March 2024 and April 2022, respectively.

4.      TMTG is a publicly traded company that was, until a March 2024 merger with Old TMTG, known as DWAC.  Prior to the merger, DWAC was a special purpose acquisition company ("SPAC") and Old TMTG, which operates the Truth Social social media platform, was a private company. Old TMTG is now a wholly-owned subsidiary of TMTG.

5.      DWAC n/k/a TMTG initiated this action on February 27, 2024, against Defendants ARC Global Investments II, LLC ("ARC") and Patrick Orlando alleging, *inter alia*, tortious conduct and breach of fiduciary duty against ARC and Orlando in the lead up to the DWAC/Old TMTG merger. On March 17, 2024, DWAC n/k/a TMTG amended its complaint to include additional factual allegations and claims.

6.      On July 17, 2024, the U.S. Securities and Exchange Commission ("SEC") filed an enforcement action against Orlando (the "SEC Complaint") alleging that Orlando engaged in securities fraud by formulating and executing an unlawful scheme to agree to merge DWAC and Old TMTG before DWAC had gone public through an Initial Public Offering ("IPO"). (*See generally* SEC Compl.). According to the SEC, to effectuate the scheme, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company at any time before its IPO, and that he had participated in no discussions or contacts with any potential merger targets. (*See id.* ¶¶ 49-52, 78-79, 86-92). The SEC maintains that Orlando's statements were knowingly false because Orlando and Old TMTG representatives—proposed Defendants United Atlantic Ventures LLC ("UAV"), Andrew Litinsky, and Wesley Moss—discussed the merger and Old TMTG's status as DWAC's preferred target—and, indeed, actively pursued investors for the merger—at length in the months before DWAC's IPO. (*See id.* ¶¶ 52, 89). A true

and correct copy of the SEC Complaint is attached hereto as **Exhibit 1**. This pre-targeting conduct previously resulted in an SEC investigation and $18 million penalty against DWAC through a Cease-and Desist Order, dated July 20, 2023. A true and correct copy of the SEC's Cease-and Desist Order is attached hereto as **Exhibit 2**.

       7.     The SEC Complaint corroborated information alleged in Plaintiffs' Proposed Second Amended Complaint, filed July 31, 2024 and attached hereto as **Exhibit 3**. By way of illustration:

## I.    <u>UAV's Mismanagement of Old TMTG</u>

       8.     In February 2021, UAV entered into an agreement whereby UAV—through its principals Litinsky and Moss—agreed to, *inter alia*, incorporate Old TMTG on behalf of its shareholders, establish its corporate governance, execute a plan to get the social media platform operating, and work toward a near-term merger between Old TMTG and a SPAC. UAV, Litinsky, and Moss, however, utterly failed to fulfill their obligations under the agreement.

       9.     On June 12, 2022, the Board of Directors of Old TMTG established a Special Committee to review certain actions taken by UAV, Litinsky, and Moss during their time as *de facto* directors of the company. A true and correct copy of the Special Committee's January 16, 2023 report is attached hereto as **Exhibit 4**. The Special Committee's investigation determined, among other findings, that:

              a.     UAV, Moss, and Litinsky failed to establish Old TMTG's corporate governance. They failed to adopt incorporator resolutions or corporate bylaws and failed to facilitate the adoption of a shareholders' agreement that would have established a corporate government structure. (*See* Exh. 4 at 2).

    b.      UAV, Moss, and Litinsky also selected an unqualified technical team and managed it abusively, recklessly hastening development, setting arbitrary and unattainable deadlines, and establishing a toxic corporate culture. (*Id.* at 3-4). These decisions impaired and impeded Truth Social's launch and undermined Old TMTG's business reputation. (*Id.* at 4).

10.     As a result of UAV, Litinsky, and Moss's mismanagement, Old TMTG had to expend substantial effort and resources to remediate and reverse their failures and establish its authority to make and execute on important business decisions.

## II.    ARC and UAV's Pre-Targeting Scheme

11.     As evidenced by, *inter alia*, the SEC Complaint and Cease-and-Desist Order, ARC and Orlando formulated and engaged in an unlawful and harmful pre-targeting scheme to merge Old TMTG and DWAC before DWAC had gone public through an IPO. (*See generally* Exhs. 1, 2). To effectuate this scheme, Orlando made multiple false statements in public filings concerning pre-IPO merger conversations and plans. (*See generally id.*).

12.     UAV and its members were aware of and breached their fiduciary duties to Old TMTG by participating in ARC and Orlando's pre-targeting scheme. On or about March 12, 2021, Old TMTG and Benessere Capital Acquisition Corp. ("Benessere"), another Orlando-backed SPAC, signed a non-exclusive letter of intent to explore a potential merger between the two companies (the "Benessere LOI"). Orlando and UAV's principals were involved in the negotiation and execution of the Benessere LOI. For example, attached hereto as **Exhibit 5** is a true and correct copy of a March 2021 email chain between Litinsky, Moss, Orlando, and an outside attorney for Old TMTG ("Lawyer A") concerning the final edits for the Benessere LOI with a near final draft attached.

4

13.    In connection with UAV's efforts to secure a merger between Old TMTG and a SPAC, Litinsky took notes memorializing meetings, negotiations, and his overall impressions. A true and correct copy of these notes, contained in a November 12, 2021 email Litinsky sent to himself, is attached hereto as **Exhibit 6**. These notes demonstrate that during Old TMTG and Benessere's post-LOI negotiations, UAV learned that some Benessere directors and officers opposed a merger with Old TMTG. For example, Litinsky states in his notes that during an April 14, 2021 meeting, Orlando told him that the Benessere chief operations officer "freaked out" and informed him that "his dad won't let him do the deal" with Old TMTG. (*See* Exh. 6 at 3-4). In another version of Litinsky's notes, contained in a November 16, 2021 email from Litinsky to an Old TMTG employee (a true and correct copy of which is attached hereto as **Exhibit 7**), Litinsky states it more directly: as of April 14, 2021, "the BENE deal [was] OFF!!!!" (*See* Exh. 7 at 3).

14.    Litinsky further notes that during the April 14, 2021 meeting, Orlando pitched Litinsky an alternative "Plan B" to the Old TMTG/Benessere merger: a merger between Old TMTG and DWAC. (*See* Exh. 6 at 4; *see also* SEC Compl. ¶ 39).

15.    ARC was the sponsor of the DWAC SPAC. As a sponsor, ARC provided DWAC with an initial $25,000 capital contribution in exchange for a portion of the shares presently at issue and with the underlying agreement that ARC, as sponsor, and Orlando, as ARC's controlling member, would guide DWAC towards a legitimate and lawful merger.

16.    Litinsky's notes reflect that he "got scared" at Orlando's Plan B pitch and questioned whether Orlando was "wearing a wire," (*see* Exh. 6 at 4), demonstrating that Litinsky was well aware and even acknowledged the illegality and serious risk of such pre-targeting.

17.    Despite Litinsky's fears, and despite the Old TMTG/Benessere merger being "off" in private conversations, ARC, Orlando, and UAV continued to pursue the Old TMTG/Benessere

merger in public. For example, on May 5, 2021, three weeks after the April 14, 2021 meeting, Lawyer A emailed Orlando (with Litinsky and Moss copied) a draft letter of intent that contemplated a merger between Old TMTG and Benessere with new terms, including a breakup fee releasing Orlando of any liability. A true and correct copy of this email and attachment is attached hereto as **Exhibit 8**. The letter of intent was eventually executed on June 4, 2021. A true and correct copy of the executed letter of intent is attached hereto as **Exhibit 9**.

18.    Simultaneously, however, UAV, ARC, and Orlando moved forward with the Old TMTG/DWAC merger. For example, from in or about June 2021 to in or about August 2021, Lawyer A was copied on a series of email communications with Orlando and an existing DWAC investor to prospective investors. The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in a "call with Patrick [Orlando]'s team, and [Lawyer A] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity." A true and correct copy of one such email is attached hereto as **Exhibit 10**.

19.    ARC and Orlando did not disclose Defendants' pre-IPO merger discussions and plans to the public. DWAC's Form S-1 dated May 25, 2021 (the "May Form S-1"), for example, included the following statements regarding discussions between DWAC and potential targets:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

A true and correct copy of the May Form S-1 is attached hereto as **Exhibit 11**. At the time, Orlando was Chairman and CEO of DWAC and signed the filing on DWAC's behalf. (*See* Exh. 11 at II-8).

20.    DWAC's amended Form S-1 dated July 8, 2021 (the "July Form S-1"), which was again signed by Orlando as Chairman and CEO, included the same statements regarding

6

discussions between DWAC and potential targets. A true and correct copy of the July Form S-1 is attached hereto as **Exhibit 12**.

21.    Finally, DWAC's amended Form S-1 dated August 31, 2021 (the "August Form S-1"), again signed by Orlando as Chairman and CEO, and filed three days prior to the commencement of DWAC's IPO, included the following statements regarding discussions between DWAC and potential targets:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.
>
> [. . .]
>
> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.
>
> […]
>
> We have not contacted any of the prospective target businesses that [Benessere and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such

target business, or the benefits of any potential transaction with such
target business, would be attractive.

A true and correct copy of the August Form S-1 is attached hereto as **Exhibit 13**.

## III.   Pending Litigation Concerning ARC Shares

22.   The rightful ownership of ARC's shares in TMTG is the subject of several pending

litigations throughout the country, including:

a.   Michael J. Melkersen v. ARC, Orlando, TMTG, and Odyssey Transfer and Trust Company ("Odyssey"): Case No. 2024-011456-CA-01 in Florida Circuit Court, Miami-Dade County ("*Melkersen*");

b.   Edwin Tucker, et al. v. ARC and DWAC: Case No. 2024-008668-CA-01 in Florida Circuit Court, Miami-Dade County ("*Tucker*");

c.   Dan Akers, et al. v. ARC: Case No. 652515/2024 in the Supreme Court of New York, New York County ("*Akers*"); and

d.   Odyssey v. ARC and Melkerson, with TMTG as nominal defendant: Case No. 24-cv-729-GBW in the United States District Court for the District of Delaware ("*Odyssey*").

Attached hereto as **Exhibits 14, 15, 16, and 17** are the operative pleadings in each of the above-

mentioned actions. *Melkerson*, *Tucker* and *Akers* generally concern disputes over shares that the

plaintiffs claim ARC promised them. Relatedly, *Odyssey* is an interpleader action filed by TMTG's

transfer agent (Odyssey) to resolve the aforementioned Melkersen and ARC shareholder dispute.

23.   At the center of each litigation is ARC's alleged transfer of DWAC n/k/a TMTG

shares to ARC investors. ARC, however, alleges that TMTG itself is subject to personal liability

in connection with these disputes. Attached hereto as **Exhibit 18** is ARC's brief in opposition to

TMTG's motion for discharge and dismissal in *Odyssey*.

24.     Moreover, despite the numerous disputes concerning the alleged ARC investors'
ownership in TMTG, ARC has repeatedly refused (even in discovery) to provide a capitalization
table of the company or a complete accounting of its use of funds.

## IV.    Impact of ARC and UAV's Pre-Targeting Scheme and Potential Sale of TMTG Shares on Plaintiffs

25.     The statements made by Orlando in DWAC's May, July, and September Forms S-1
led to an SEC investigation and $18 million penalty against DWAC through the July 2023 Cease-
and-Desist Order. (*See generally* Exh. 2).

26.     In addition to the monetary fine imposed upon DWAC by the SEC, Plaintiffs have
incurred more than $11 million in legal fees in connection with the SEC's investigation into the
pre-targeting scheme.

27.     The SEC investigation also delayed Old TMTG's merger with a SPAC—which
UAV was retained to effectuate quickly, efficiently, and legally—for approximately two years.
This delay prevented Old TMTG from accessing hundreds of millions of dollars in capital until
the end of the SEC's investigation and the SEC's subsequent approval of the Old TMTG/DWAC
merger.

28.     Without this capital, Old TMTG was forced to operate as a nascent startup for much
longer than anticipated (despite UAV's obligation to facilitate an expeditious SPAC transaction),
eliminate several positions within the company, and raise capital through alternative sources. Old
TMTG was also unable to pursue certain business opportunities, including marketing, product
development, and acquisition plans that it would have otherwise pursued but for the SEC's
investigation into ARC and UAV's pre-targeting scheme and accompanying delay. Given the legal
fees, SEC penalty, and operational expenses incurred by DWAC during the pendency of the
merger, the investigation and the associated delay arising from Defendants' conduct also reduced

by tens of millions of dollars the amount of money Old TMTG ultimately received from the business combination.

29.    Moreover, Defendants' mismanagement, breach of fiduciary duty, and the delay in completing the merger directly attributable to the pre-targeting scheme had a negative impact on Plaintiffs' business reputation.

30.    Now, TMTG's directors and officers have grave concerns about the additional threat the company faces from ARC and UAV's threatened sale of a substantial amount of TMTG shares. ARC and UAV's immediate sale of more than 18 million locked-up shares, which would exceed recent daily trading volume by several multiples, would have a significantly depressive effect on TMTG's share price and cause irreparable harm to the company.

31.    Attached hereto as **Exhibit 19** is a true and correct copy of the Second Amended Complaint filed by UAV in the Delaware Court of Chancery, Case No. 2024-0184-MTZ (the "Delaware Action").

32.    Attached hereto as **Exhibit 20** is a true and correct copy of TMTG's Form S-1, dated July 3, 2024.

33.    Attached hereto as **Exhibit 21** is a true and correct copy of TMTG's second amended and restated corporate charter, dated March 25, 2024.

34.    Attached hereto as **Exhibit 22** is a true and correct copy of the Opposition to Defendants' Motion to Vacate, dated April 25, 2024, filed by UAV in the Delaware Action.

35.    Attached hereto as **Exhibit 23** is a true and correct copy of the TMTG's Form 10-Q, dated August 9, 2024.

36.     Attached hereto as **Exhibit 24** is a true and correct copy of ARC's Third Amended

Corporate Disclosure Statement filed in the United States District Court for the Southern District

of Florida, Case No. 21-cv-24324.

I declare under penalty of perjury of the laws of the State of Florida that my statements

herein are true and correct.

Executed in Bethlehem, Connecticut this 14th day of August, 2024.



_____

Scott L. Glabe

11

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>**100 F Street NE**<br>**Washington, DC 20549**<br><br>**Plaintiff,**<br>**v.**<br><br>**PATRICK ORLANDO,**<br><br>**Defendant.** | **1:24-CV-2097**<br><br>**Complaint**<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Patrick Orlando, alleges as follows:

**SUMMARY**

1.      This case involves fraudulent conduct and materially false and misleading statements and omissions made by Patrick Orlando ("Orlando"), in his capacity as the Chief Executive Officer ("CEO") and Chairman of Digital World Acquisition Corp. ("DWAC"), in filings made with the Commission. Through these publicly available filings, Orlando falsely represented that DWAC, a special purpose acquisition company ("SPAC") that he controlled, did not intend to merge with any specific company and, indeed, had had no discussions or contacts with any potential merger targets. Orlando knew these statements were false because he personally engaged in numerous lengthy discussions with representatives of Trump Media & Technology Group Corp. ("TMTG"), a social media company, and because he had targeted TMTG for merger with DWAC for months.

2. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC and managing member of DWAC's sponsor ("DWAC Sponsor"). In those roles, Orlando reviewed and signed the relevant filings at issue in this action.

3. In February 2021, Orlando and others who later became involved with DWAC began extensive merger discussions with TMTG. Orlando initially pursued these discussions with TMTG on behalf of SPAC A, another SPAC he controlled.

4. In the spring of 2021, Orlando planned and executed a scheme to use DWAC, which had not yet had its IPO, to pursue a merger with TMTG. Orlando discussed his scheme with at least one individual at TMTG.

5. As part of this scheme, Orlando signed Forms S-1 in the spring and summer of 2021 that falsely and misleadingly stated that DWAC had not selected any merger target or engaged in any substantive discussions with any merger target. These Forms S-1 were filed with the Commission on DWAC's behalf.

6. On September 8, 2021, DWAC completed an IPO, pursuant to which the company raised $287.5 million from the investing public. In support of its IPO, DWAC filed an amended Form S-1 with the Commission on or about August 31, 2021 (the "Final Form S-1"). Orlando signed the Final Form S-1.

7. Among other defects, the Final Form S-1 contained material misrepresentations and omissions regarding DWAC's conduct prior to its IPO. Specifically, the Final Form S-1 falsely and misleadingly stated that: (a) neither DWAC nor its officers and directors had any discussions or contacts with any potential target companies prior to the IPO; and (b) that DWAC had not selected any specific business combination target.

8.     In October 2021, DWAC announced an agreement to merge with TMTG. Following the disclosure of the planned merger and its target, the price of DWAC stock rose over 400% in a single day of trading.

9.     As a result of Orlando's actions, DWAC's spring and summer Forms S-1 and its Final Form S-1 were materially false and misleading.

10.     On May 16, 2022, Orlando signed, and DWAC filed, a Form S-4 regarding its planned merger with TMTG that continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.

11.     On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing an $18 million civil penalty. On November 13, 2023, DWAC filed an amended Form S-4 that made disclosures consistent with the findings in the Commission's published order instituting the settled cease-and-desist proceeding.

12.     DWAC closed its merger with TMTG on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT." This Complaint will solely refer to the entity names prior to the closing of the merger.

13.     As a result of the conduct alleged herein, Defendant violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

14.     The Commission seeks a permanent injunction against Defendant that enjoins him from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], an officer and director bar pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22 of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

16.     Venue lies in this Court pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the District of Columbia, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. Specifically, Orlando signed at least four different documents containing the misrepresentations at issue, all of which were filed with the SEC, an agency headquartered in this judicial district. Additionally, records indicate that at least one investor located in Washington, D.C., sold shares of DWAC prior to the October disclosure of the merger agreement, presumably without the benefit of the information that Orlando concealed from investors and the market.

17.     Orlando, directly and indirectly, made use of means or instruments of transportation or communication in interstate commerce, or of the mails, or of any facility of a

national securities exchange in connection with the acts, practices, and courses of conduct alleged herein.

## BACKGROUND AND TERMINOLOGY

18.    A SPAC sponsor is the management team primarily responsible for establishing and launching the SPAC. After a SPAC is launched, it is managed by a board of directors and management.

19.    A SPAC has no underlying business operations. The SPAC sponsor creates the SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an unidentified private operating company, within a specified period (typically two years).

20.    Once it has raised funds through an IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction, after which the company will continue the operations of the acquired company as a public company. Although the post-IPO SPAC is technically led by a new board of directors and management, these roles are often filled by the leaders of the SPAC's sponsor. Thus, investors in a SPAC at the IPO stage rely on the management team that formed the sponsor to expend efforts after the IPO to identify and acquire or combine with a private operating company.

21.    Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, a reasonable SPAC investor would want to know about the SPAC's future acquisition targets and steps the SPAC has taken in furtherance of a particular acquisition.

22.    Generally, in a SPAC IPO, investors purchase units. A unit is a security that is typically redeemable for one share of common stock and a fraction of a warrant. A warrant gives the holder the right to purchase a certain number of shares of the SPAC's common stock at a specific price on a future date.

23.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities (typically called "founder's shares") for nominal consideration at or around the time of the SPAC's formation. These founder's shares convert into the SPAC's common stock when the SPAC completes its acquisition of the private operating company, giving the sponsor a significant ownership interest (typically 20% of the common stock) in the SPAC – provided that the SPAC completes the business combination. Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO. Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash and are subject to forfeit in the event the SPAC fails to complete a business transaction. Moreover, the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

## **DEFENDANT**

24.     <u>Patrick Orlando</u>, age 52, is a resident of Miami, Florida. At the time of the relevant conduct, Orlando was the CEO and Chairman of DWAC. He owns a significant percentage of, and at the time of the relevant conduct was the managing member of, DWAC's sponsor ("DWAC Sponsor"). Orlando also was the CEO and Chairman of SPAC A (*see infra* ¶ 2) and the managing member of SPAC A's sponsor until SPAC A was unwound in late October 2022. Orlando is also involved with several other SPACs. In addition, Orlando currently is (and, at the time of the relevant conduct, was) a registered representative of a broker-dealer registered with the Commission.

## **RELATED PARTIES AND ENTITIES**

25.     <u>DWAC</u>, a Delaware corporation based in Miami, Florida, was a SPAC. DWAC had no operations of its own and existed for the purpose of merging with a privately held company to, in effect, take that company public. On September 8, 2021, DWAC completed an

6

IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until completion of a business combination. DWAC had securities that traded on the NASDAQ Global Market under the ticker symbols DWACU (units), DWACW (warrants) and DWAC (common stock).

26.     TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. TMTG operates a social media platform. On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was subsequently amended several times. TMTG was initially named Trump Media Group, and accordingly, some documents refer to it as "TMG" instead of TMTG. TMTG closed its merger with DWAC on March 25, 2024. The surviving entity renamed itself "Trump Media & Technology Group Corp." and now trades under the ticker symbol "DJT."

27.     DWAC Sponsor is a Delaware corporation based in Miami, Florida. DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares"). At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.

28.     SPAC A was a Delaware corporation with its principal place of business in Miami, Florida. SPAC A had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised). In October 2022, SPAC A dissolved and delisted its securities. Orlando was the CEO and Chairman of SPAC A and the managing member of the SPAC A sponsor during the relevant period.

29.     Investment Bank is an investment bank based in Shanghai, China that describes itself as a leading advisor in the SPAC market in the United States. Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

30.    Individual X was a DWAC Director and investor in the sponsors of both SPAC A and DWAC. Individual X held no formal management role with respect to SPAC A.

**FACTS**

A.    **Orlando's Initial Interactions With TMTG**

31.    TMTG was incorporated on approximately February 8, 2021. Its founders intended to use the company to create a social media platform, among other business lines. From the time of TMTG's formation, its founders intended for it to become a public company by seeking to be acquired by a SPAC.

32.    In mid-February 2021, a representative of TMTG approached Orlando regarding a potential deal between SPAC A and TMTG. About a week later, Orlando and Individual X met in person with TMTG representatives.

33.    A few weeks after the initial contact, SPAC A and TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies. The letter was then extended to last through April 5, 2021. Orlando negotiated and signed that letter on behalf of SPAC A.

34.    As the non-exclusive letter of intent neared its expiration date, TMTG and SPAC A discussed signing a mutually exclusive letter of intent. Two directors and one officer of SPAC A opposed pursuing a merger with TMTG. SPAC A ultimately did not sign that mutually exclusive letter of intent.

35.    On or about April 8, 2021, discussions between SPAC A and TMTG paused, and Orlando began exploring two plans to pursue a merger with TMTG, which he called "Plan A" and "Plan B."

36.     "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG. For example, Orlando discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.

37.     "Plan B" referred to Orlando's attempt to identify an alternative SPAC to pursue a merger with TMTG. Orlando considered several SPACs with ties to Investment Bank that could be used for "Plan B." Orlando started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs. One of SPAC A's directors invested in this effort. In a communication with Orlando, both the director and Orlando referred to this as an investment in "the Trump SPAC." That SPAC A director later became a DWAC director and, in June 2021, rolled his investment into the purchase of DWAC Sponsor shares.

38.     As part of Plan B, on April 9, 2021, a representative of Investment Bank wrote an email to Orlando stating: "DWAC could be a solution for Trump." At the time, Investment Bank had a majority interest in DWAC Sponsor (which was still pre-IPO), and Orlando had no ownership interest in DWAC Sponsor or role with DWAC. Investment Bank had worked with others to incorporate DWAC Sponsor and DWAC in December 2020.

39.     On April 14, 2021, Orlando had two meetings with representatives of TMTG. During the first meeting, Orlando told the TMTG executives that SPAC A was not available to pursue a merger with TMTG because of opposition from at least one SPAC A officer or director. Orlando then suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Orlando would try to identify another vehicle to potentially pursue a merger with TMTG.

40.     Shortly after that first meeting, TMTG representatives asked Orlando to meet them again. In that second meeting, a TMTG executive said that they could only discuss other merger options after those companies were public. Orlando acknowledged that those are "the

rules we have to play by," that they "have to be very smart," but that "obviously we can talk hypothetically about if there were another vehicle."

41.     Later that day, Orlando exchanged messages with a representative of Investment Bank and wrote, "Met with TMG today." The Investment Bank representative asked, "How was it?" Orlando replied, "Was fabulous,[. . . ] wonderful then once I left all went sideways. Better to jump on the phone and discuss. . . . I had a clear strategy – got a little complicated."

42.     On April 18, 2021, four days later, a representative of Investment Bank sent a message to Orlando and wrote, "We do Trump one way or other. Now let's sign up Trump. That's the way to get the most $$$. Anyhow, we'll figure it out. Opciones hay." The last sentence of the message roughly translates to "There are options." Orlando responded, "Yes. Done this week."

43.     Also on April 18, 2021, Orlando exchanged messages with Individual X and referred to a meeting scheduled for April 20, 2021 at the offices of TMTG's outside counsel. Individual X wrote, "We will get this done!" Orlando responded, "It is done. Just need to keep the black swan out of the picture." The "black swan" was a reference to one of the SPAC A officers who opposed a deal with TMTG.

**B.     Orlando Took Control of DWAC and Resumed Merger Discussions With TMTG**

44.     On or about April 24, 2021, Investment Bank told Orlando that he had an opportunity to obtain substantial control over DWAC. A few days later, on April 28, Orlando signed a letter of intent with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor. Orlando met with TMTG's representatives on April 29 and continued discussions with TMTG about a potential merger shortly thereafter.

45.     On May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news . . . Patrick called [TMTG's outside counsel] yesterday. . . . The LOI with our other

group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with SPAC A and a big breakup fee." The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?"

46.    On May 4, 2021, TMTG's outside counsel emailed Orlando and others a draft letter of intent that contemplated a merger between SPAC A and TMTG. That draft contained a break-up fee clause that would have held Orlando and Individual X personally liable for a $5 million fee if SPAC A did not consummate a merger agreement with TMTG. Notably, however, the draft also contained an exception: the fee would not be owed if Orlando and/or Individual X "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG]."

47.    On May 8, 2021, Orlando exchanged messages with representatives of Investment Bank. The message group name, which appears to have been coined by Orlando, was, "Get it done one way or another." Orlando shared with the message group a spreadsheet that presented different merger scenarios for TMTG and another target under consideration. One of the scenarios was "47-DWAC" and "[other target]-[SPAC A]." According to Orlando, the number "47" is a reference to TMTG. The spreadsheet listed the cons for this transaction as, "Timing, can't happen, 47 too" and listed the pros as "Great $." Orlando wrote to the group, "[O]ptimal combination is clearly [SPAC A]-[other target] or another good target and DWAC-47 . . . how do we make that happen." A representative of Investment Bank responded, "Yes absolutely, that's the best. It's just time. Get enough time to get DWAC to mkt."

48.    On May 14, 2021, Investment Bank and Orlando executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Orlando.

Orlando was appointed CEO and Chairman of DWAC around this same time. These two actions gave Orlando effective control over DWAC.

49.     On the night of May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"). The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board. Both of those new DWAC directors were also SPAC A directors who had been supportive of a transaction between SPAC A and TMTG.

50.     The May Form S-1 also identified a CFO for DWAC. Before being named DWAC's CFO, that person had communicated with Orlando and Individual X about TMTG in connection with SPAC A. Records of the DWAC CFO's communications suggest that he hoped to create a Latin American version of TMTG. The SPAC A directors and officer who had opposed a transaction with TMTG did not assume any role with DWAC.

51.     The Form S-1 contained several statements about the state of discussions between DWAC and potential targets. For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

52.     The statement described in the prior paragraph was misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with TMTG, because Orlando had been in discussions with TMTG for several months, and because Orlando had discussed Plan B with representatives of TMTG. The statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with TMTG) that had already taken steps toward accomplishing that goal.

53.     Given the operation of the SEC's document filing system, the May Form S-1 became publicly visible on the morning of May 26, 2021.

54.     On May 26, 2021, an entity was incorporated in New Mexico. That entity entered into an agreement to invest in DWAC Sponsor on May 29, 2021. TMTG's external counsel signed that agreement as the "authorized representative" for the New Mexico entity. Orlando counter-signed this May 29 agreement.

55.     On May 30, 2021, Orlando, Individual X, DWAC's in-house counsel, one of the TMTG founders, and TMTG's external counsel met at Individual X's home to engage in "brainstorming sessions." A video of this event shows that, during the meeting, they called DWAC's CFO. In the video, Orlando thanked everyone for figuring out "how to get this done." The TMTG representative thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this."

56.     On May 31, 2021, an individual who helped raise funds for DWAC Sponsor sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TMG deal. It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." The potential investor responded and asked, "Is there any brochure ready for the TMG SPAC?" Orlando responded, "There is no TMG SPAC. There is a SPAC and I have a great relationship with TMG. I believe with extremely high confidence that TMG will [end] up in one of my SPACs. Better I explain in person."

## C.     The June 4 LOI and Break-Up Fee Clause

57.     By at least June 1, 2021, Orlando made plans with TMTG to sign a unilaterally exclusive letter of intent between SPAC A and TMTG on Friday, June 4, 2021. The June 4 LOI would prevent TMTG from negotiating with any other acquirers but would not require SPAC A

to be exclusive to TMTG. At that time, the SPAC A officer and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

58.    On June 1, 2021, Orlando communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the letter of intent signing event, texting: "I want Trump to meet the SPAC A AND DWAC team."

59.    On June 3, 2021, Individual X, who had hosted the May 30 meeting with TMTG, wrote to a TMTG representative and stated, "My apologies, but I will not be able to join this coming Friday. If you think it makes sense for [DWAC's CFO] and I to say a few words to the 47th, we will be ready and at his disposal." Individual X and the DWAC CFO had no formal role with SPAC A.

60.    On June 4, 2021, SPAC A, TMTG, and Orlando (in his personal capacity and on behalf of SPAC A) signed the unilaterally exclusive letter of intent (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.

61.    The June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and absolute discretion) and such terms are ultimately accepted by the Company." The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. The extensions collectively extended the trigger date for the Break-Up Fee Clause from

August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021.

62.     After the signing of the June 4 LOI, Orlando met with a representative of TMTG. During this meeting, they discussed, among other things, potential logos and names for the future public company.

**D.     Orlando Contemplated a DWAC Merger With TMTG**

63.     Within days of signing the June 4 LOI, Orlando communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG. On June 7, 2021, Orlando received a text from an individual who was a director for both SPAC A and DWAC, stating: "I still don't know why you are switching it out of [SPAC A] other than you will make more money. I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic." Orlando responded: "DWAC is better and will make the project clear [sic] more successful."

64.     As noted in the director's text message, Orlando stood to "make more money" if DWAC merged with TMTG than if SPAC A did because Orlando owned a substantial percentage of DWAC Sponsor, a position that was significantly larger than his ownership interest in SPAC A's sponsor.

65.     On June 7, 2021, Orlando exchanged messages with representatives of Investment Bank. Orlando wrote, "Let's make DWAC great. I gave [T]rump a [SPAC A] tombstone. I will [g]ive him a DWAC ONE THE SIZE OF A GOLF CART!!" In the financial industry, a "tombstone" is a notice that is used to formally announce a transaction, such as an IPO. At the LOI signing event on June 4, 2021, Orlando gave TMTG representatives a commemorative plaque tombstone related to SPAC A's IPO.

66.     On June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!! I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [SPAC A]. [sic] It's crazy but let me try!!"

67.     In yet another message regarding the other target company for SPAC A, Orlando explained to an Investment Bank executive, "[C]an't do a deal until earlier [of] aug 6 or another target switching SPACs." The Investment Bank executive asked, "Why the August 6th date? It's basically enough time to IPO DWAC, right?" Orlando replied, "Read Trump LOI." As discussed above, the June 4 LOI required Orlando to pay a $1 million Break-Up Fee if there was not a merger by August 6.

68.     On June 9, 2021, Orlando emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG at approximately $375 million.

69.     On June 11, 2021, DWAC's in-house counsel emailed Orlando and wrote, "I think the digital world logo can be a little bit more fun. Maybe we can use [TMTG representative]'s logo idea for the digital world logo and that may entice him even more to make the switch."

70.     By contrast, Orlando's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other acquisition targets.

### E.    Orlando Had Discussions With TMTG About a Merger With DWAC

71.    In the spring and summer of 2021, Orlando met and talked with representatives of TMTG about a merger with DWAC.

72.    In addition to the April 14 conversation between Orlando and TMTG representatives in which Orlando acknowledged that he could not talk with TMTG about a merger involving a pre-IPO company, *see supra* ¶¶ 39-41, Orlando had an email exchange in late June with potential investors in DWAC Sponsor, in which he made similar disclaimers. One of those investors wrote that he had "discussed with Patrick a ROFR on future payment processing needs for the Trump Media Group." Orlando responded:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other. TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO. We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

73.    Despite having this understanding, Orlando had discussions with at least one TMTG representative about a potential merger with DWAC prior to DWAC's IPO.

74.    Orlando, DWAC's in-house counsel, and Individual X participated in more than 100 phone calls with representatives from TMTG and TMTG's outside counsel from the time DWAC filed the Form S-1 on May 25, 2021 through September 2, 2021, which was the day before the commencement of DWAC's IPO. Orlando told at least one TMTG representative (specifically, TMTG's outside counsel) during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

75.    During the same time, Orlando raised funds from numerous individuals who made investments in DWAC Sponsor. Orlando informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

76.     Orlando also signed "consulting agreements" with some individuals that, in addition to other terms, contemplated rewarding those individuals with shares for helping Orlando raise funds for DWAC Sponsor. On June 5, 2021, TMTG's outside attorney signed one such agreement on behalf of the New Mexico company that had been formed on May 26. *See supra* ¶ 54. This link between DWAC's sponsor and TMTG's outside attorney is further evidence that Orlando had discussed a DWAC/TMTG combination with highly placed individuals at TMTG in the spring and early summer of 2021.

77.     TMTG's outside counsel was copied on some emails from an existing DWAC investor to prospective investors. The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick's team, and [TMTG's outside counsel] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."

78.     On July 8, 2021, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Individual X and two other individuals as directors. Individual X had been involved with Orlando in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

79.     The July Form S-1 contained several of the same material misstatements that appeared in the May Form S-1. Orlando reviewed and signed the July Form S-1.

80.     Two days before this filing, Individual X sent a WhatsApp message to DWAC's CFO and wrote: "AVANTE! Vamos fazer historia com a DWAC + TMG," which roughly translates to "Onward! Let's make history with DWAC + TMG."

81.     Orlando travelled to TMTG's offices on July 8 and spent the entire day there. After Orlando left, a representative of TMTG sent a message to Orlando stating, "Today was a big day for TMG and a huge step for our team to be able to meet and spend time with you. Thank you so much for making the trip."

82.     Individuals at TMTG were aware that Orlando hoped to use DWAC to pursue a merger with TMTG. For example, on July 15, 2021, a TMTG executive emailed himself an audio recording in which he made mental notes to himself, including, "For [another TMTG executive], TMTG ticker symbol. Tell him about that. . . . The merger agreement arrived. Also potentially flipping it to another SPAC."

83.     On August 11, 2021, DWAC's CFO sent a message to Individual X and asked, "Tudo certo para semana que vem?", which roughly translates to "Everything OK for next week?" Minutes after that, Individual X sent a message to a TMTG executive and wrote, "Are we set to meet in Atlanta next week?" Individual X then called that TMTG executive and spoke for several minutes. A few hours later, Individual X replied to DWAC's CFO and wrote, "TMG pede para confirmar o encontro depois do IPO," which roughly translates to, "TMG is asking to confirm the meeting after the IPO," referring to DWAC's IPO scheduled for September.

84.     On August 18, 2021, a TMTG representative emailed himself and wrote, "Everything is lined up. Platform is weeks away. Backed by $300 million in cash. Billions of stock. Press conference video is ready. Only thing missing is license Agreement." At the time, TMTG was in the process of renegotiating a licensing agreement. Also, at the time, SPAC A had approximately $115 million in its trust account. As mentioned above, DWAC had filed a Form S-1/A on July 8, 2021 announcing that it planned to do a $300 million IPO.

85.     On August 28, 2021, Orlando received a text from a DWAC representative that read, "Talked to [TMTG's outside counsel]. TMTG wants to announce soon so if it's plan B,

they're going to push hard for relative immediate announcement. I told them we'd need a month.

Probably gonna settle at 2-3 weeks."

**F.      DWAC's Form S-1 Contained Material Misrepresentations**

86.      On August 31, 2021, three days prior to the commencement of its IPO, DWAC

filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed and signed. The

Final Form S-1 contained several material misrepresentations about discussions between DWAC

and potential targets, including the following:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

87.      The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

88.      The Final Form S-1 also contained the following statement regarding DWAC's

contact with potential targets:

> We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such

target business, or the benefits of any potential transaction with such target business, would be attractive.

89.     Certain statements in the preceding paragraphs were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with TMTG; (b) Orlando told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC to complete a merger with TMTG; (c) it appears that TMTG's outside attorney was being paid to find investors for DWAC's sponsor in June 2021; (d) the discussions between SPAC A and TMTG had ceased before DWAC's IPO; and (e) Orlando and others at DWAC had selected TMTG as DWAC's preferred target prior to its IPO.

90.     The misstatements described above were material to investors because SPAC investors base their investment decisions on a SPAC's disclosures about discussions with potential targets. This information is particularly important because the purpose of a SPAC is to identify and acquire an operating business.

91.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

92.     DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described above.

## G.     DWAC's Post-IPO Negotiations With TMTG

93.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement. On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement. TMTG's outside counsel

emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent the next day. Two days later, on September 15, 2021, DWAC began coordinating an in-person event to sign the letter of intent on September 22, 2021 and started discussing TMTG's hope to do a press announcement by the end of September 2021. On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

94.     On September 21, 2021, DWAC's Board (including Orlando) met and voted to "follow up/negotiate and execute LOIs with TMG" and two other purported potential targets (one of which was "Target B"). As mentioned above, DWAC in-house counsel, working with Orlando, was already in the process of negotiating a letter of intent with TMTG and had already scheduled a signing event, a fact that Orlando knew.

95.     DWAC representatives had previously sent Target B an NDA on September 8, 2021. A representative of Target B responded on September 9 and wrote: "Given [Target B's] transaction objectives and timing of requested indications of interest next week, it may make sense for our team to reach out to you with any future opportunities that arise rather than this particular target." DWAC later disclosed this fact in its Form S-4 filed February 14, 2024, which stated:

> DWAC sent an NDA to Target B, an American pet care company that offers a technology platform to enable on-demand and scheduled dog-walking, training, and other pet care related services. However, Target B informed Digital World that it was in advanced discussions with other groups and did not want to pursue separate SPAC discussions with Digital World at that time.

96.     The discussions about Target B at the September 21 board meeting appear to have been pretextual because Target B was not, in fact, an acquisition option for DWAC.

97.     During the September 21 board meeting, DWAC's directors also purportedly discussed the merits of four other potential merger targets. One of those targets was "Target G."

DWAC sent Target G an NDA on September 8, 2021. A representative of Target G responded on September 9: "We're currently under exclusivity with a potential buyer for [Target G]. We'll reach out if the situation changes." In its February 14, 2024 Form S-4, DWAC disclosed: "Target G, a defense contractor and arms manufacturer, was sent an NDA; however, Digital World was informed that Target G was under exclusivity with another SPAC at the time and could not engage in conversations until after that exclusivity period expired."

98.     The discussions about Target G at the September 21 board meeting appear to have been pretextual because Target G was not, in fact, an acquisition option for DWAC.

99.     A third potential "target" discussed at the September 21 board meeting was "Target I." Target I did not even sign an NDA with DWAC until the evening of September 21.

100.     On September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with TMTG. That same day, Orlando met with representatives from TMTG and signed a mutually exclusive letter of intent between DWAC and TMTG. Also on that same day, Orlando (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause under the June 4 LOI. That letter was backdated to be effective as of September 1, 2021.

101.     On October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with TMTG. DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market close that day. DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on EDGAR at approximately 6 a.m. on October 21, 2021.

102.     DWAC's common stock closed at $9.96 on October 20, 2021. On October 21, 2021, it closed at $45.50, up more than 400% from the prior day's closing price.

103.    On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG. DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts. For example, DWAC's Form S-4:

      a.    Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.

      b.    Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. As discussed above in detail, Orlando had numerous interactions with TMTG prior to DWAC's IPO. DWAC also did not disclose that Orlando assumed control of DWAC in spring 2021 envisioning it as a potential vehicle to close a deal with TMTG or that Orlando told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

104.    On July 20, 2023, the Commission instituted a settled cease-and-desist proceeding against DWAC, finding that DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder and, in addition to other remedies, imposing a civil penalty of $18 million. The settlement also imposed an undertaking on DWAC, requiring any amended Form S-4 to be materially complete, accurate, and consistent with the findings in the Commission's order. On November 23, 2023, pursuant to the undertaking, DWAC filed an amended Form S-4 incorporating many of the Commission's findings.

### FIRST CLAIM FOR RELIEF
**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Thereunder**

105.     The Commission realleges and incorporates by reference paragraphs 1 through 104, as though fully set forth herein.

106.     By engaging in the conduct described above, Patrick Orlando, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, directly or indirectly, knowingly or recklessly (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

107.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of merging with TMTG. That conduct included, but was not limited to, the following: (1) he discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG; and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary conversations with potential "target" companies in September 2021 without any intention of moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

selected a merger target and had not engaged in discussions with potential targets. Orlando

carried out this deceptive course of business as part of a scheme to allow him to reap the

financial benefit of the DWAC merger and avoid opposition from the SPAC A directors.

Orlando's scheme continued through the spring of 2022, when he continued to mislead investors

through false statements and omissions in the Form S-4, which he signed.

108.     While engaging in the conduct described above, Orlando acted knowingly or

recklessly.

109.     By reason of the conduct described above, Orlando, directly or indirectly, violated

and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act

110.     The Commission realleges and incorporates by reference paragraphs 1 through

104, as though fully set forth herein.

111.     By engaging in the conduct described above, Orlando, directly or indirectly, in

connection with the offer or sale of securities, by the use of means or instrumentalities of

interstate commerce, or of the mails, directly or indirectly: (i) employed devices, schemes, or

artifices to defraud; (ii) obtained money or property by means of any untrue statement of

material fact or any omission to state a material fact necessary in order to make the statements

made, in the light of the circumstances under which they were made, not misleading; and/or (iii)

engaged in transactions, practices, or courses of business that operated or would operate as a

fraud or deceit upon the purchaser.

112.     In the spring of 2021, Orlando engaged in deceptive conduct that would allow

him to acquire a controlling interest in DWAC and take it public as a SPAC, with the goal of

merging with TMTG. That conduct included, but was not limited to, the following: (1) he

discussed this plan with TMTG officials even though DWAC was still pre-IPO; (2) he then

entered into a letter of intent between himself, SPAC A, and TMTG that purported to link SPAC

A and TMTG but, in reality, allowed SPAC A to pursue other targets and gave him the ability to

bring DWAC to TMTG once its IPO was complete; (3) he orally informed certain investors who

possessed necessary capital that he intended to use DWAC to acquire and merge with TMTG;

and (4) he, along with the DWAC board, voted to direct DWAC to conduct preliminary

conversations with potential "target" companies in September 2021 without any intention of

moving forward, in part to conceal his preselection of TMTG. All the while, Orlando signed

multiple public filings that falsely stated, among other misrepresentations, that DWAC had not

selected a merger target and had not engaged in discussions with potential targets. Orlando

carried out this deceptive course of business as part of a scheme to allow him to reap the

financial benefit of the DWAC merger and avoid opposition from the SPAC A directors.

Orlando's scheme continued through the spring of 2022, when he continued to mislead investors

through false statements and omissions in the Form S-4, which he signed.

113.    While engaging in the conduct described above, Orlando acted knowingly,

recklessly, or negligently.

114.    By reason of the conduct described above, Orlando, directly or indirectly, violated

and, unless enjoined will again violate, Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court grant the following

relief:

## **I.**

Enter a Final Judgment permanently restraining and enjoining Defendant and his agents,

servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## II.

Enter a Final Judgment directing Defendant to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)].

## III.

Enter a Final Judgment directing Defendant to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Sections 21(d)(3) of the Exchange Act [15 U.S.C. §§ 78u(d)(3)].

## IV.

Enter a Final Judgment permanently barring Defendant from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

## V.

Grant such other and further relief as this Court may deem equitable and just.

**JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.


Dated: July 17, 2024                                 Respectfully submitted,

                                                     By: */s/ John B. Timmer*
                                                     John B. Timmer (D.C. Bar No. 997309)
                                                     Andrew McFall (D.C. Bar No. 497878)
                                                     Securities and Exchange Commission
                                                     100 F Street NE
                                                     Washington, DC 20549
                                                     (202) 551-7687 (Timmer)
                                                     (202) 551-5538 (McFall)
                                                     Email: TimmerJ@SEC.gov
                                                     Email: McFallA@SEC.gov

                                                     *Attorneys for the Plaintiff*

Of Counsel

Lindsay S. Moilanen

# EXHIBIT 2

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

**SECURITIES ACT OF 1933**
**Release No. 11213 / July 20, 2023**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 97958 / July 20, 2023**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-21534**

| | |
|---|---|
| **In the Matter of**<br><br>**DIGITAL WORLD**<br>**ACQUISITION CORP.,**<br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Digital World Acquisition Corp. ("DWAC" or "Respondent").

**II.**

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, Respondent admits the Commission's jurisdiction over it and the subject matter of these proceedings and consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

---

[1]    The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

**Summary**

1.      This matter concerns materially false and misleading statements and omissions by DWAC, a special purpose acquisition company ("SPAC") that in October 2021 announced an agreement to merge with Trump Media & Technology Group Corp. ("TMTG"), a social media company.  In an amended Form S-1 filed with the Commission in support of its initial public offering ("IPO") in early September 2021, DWAC stated that neither DWAC nor its officers and directors had had any discussions with any potential target companies prior to the IPO.  In a Form S-4 filed with the Commission following the announcement of the proposed merger with TMTG, DWAC mischaracterized and omitted information about the history of its interactions with TMTG.

2.      DWAC's filings were materially false and misleading.  Dating back to February 2021, an individual who would later become DWAC's Chief Executive Officer ("CEO") and Chairman ("Individual A"), and others involved with DWAC, had extensive discussions with TMTG.  While Individual A initially pursued these discussions with TMTG on behalf of another SPAC that he also controlled ("SPAC A"), Individual A created a plan in the spring and summer of 2021 to potentially use DWAC to pursue a merger with TMTG.

3.      DWAC also failed to disclose that Individual A had a potential conflict of interest stemming from a Letter of Intent ("LOI") that SPAC A had entered into with TMTG in June 2021. This agreement made Individual A personally liable to pay a $1 million break-up fee if SPAC A or another substitute entity did not complete a merger with TMTG.  DWAC failed to disclose this potential conflict of interest in any of the documents filed with the Commission and never otherwise disclosed this information to the public.

**Respondent**

4.      **DWAC**, a Delaware corporation based in Miami, Florida, is a SPAC.  DWAC has no operations of its own and exists for the purpose of merging with a privately held company with the effect of taking that company public.  On September 8, 2021, DWAC completed an IPO of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated. DWAC has securities that trade on the Nasdaq Global Market under the symbols DWACU, DWACW and DWAC.[2]   Each of these securities is registered under Section 12(b) of the Exchange Act.

---

[2]      DWACU is the symbol for units consisting of one share of Class A DWAC common stock and one half of one redeemable warrant.  DWACW is the symbol for redeemable warrants exercisable for one share of Class A DWAC common stock.  DWAC is the symbol for Class A DWAC common stock.

### Other Relevant Individuals and Entities

5.    **DWAC Sponsor**, a Delaware corporation based in Miami, Florida, is the sponsor of DWAC.  DWAC Sponsor initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC.[3]  At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 restricted DWAC units.  DWAC Sponsor's investments fund DWAC's operations and will not be returned to DWAC Sponsor if a business combination is not consummated.

6.    **Individual A**, a resident of Miami, Florida, was the CEO and Chairman of DWAC. Individual A owns a significant percentage of, and is the managing member of, DWAC Sponsor. Individual A also was the CEO and Chairman of SPAC A and the managing member of SPAC A's sponsor.

7.    **SPAC A**, a Delaware corporation based in Miami, Florida, was a SPAC controlled by Individual A.  In October 2022, SPAC A issued a press release announcing it was dissolving, would liquidate its trust account, and would return the funds held in trust to investors.

8.    **TMTG**, a Delaware corporation with its principal place of business in Sarasota, Florida, operates a social media platform.  On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement, which was amended on May 11, 2022.

9.    **Investment Bank** is a Shanghai, China-based investment bank that describes itself as a leading advisor in the SPAC market in the United States.  Investment Bank was a financial advisor to DWAC and SPAC A and had ownership interests in DWAC Sponsor and SPAC A's sponsor.

### Facts

#### *Background*

10.    A SPAC is a company with no underlying business operations that is formed to raise capital through an IPO for the purpose of using the proceeds to acquire an unidentified private operating company at a later date but within a specified period of time (typically two years).

11.    Following its IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction after which the company will continue the operations of the acquired company as a public company.  Investors in a SPAC at the IPO stage therefore are relying on the management team that formed the SPAC[4] to expend efforts after the IPO to identify and look to acquire or combine with a private operating company.

---

[3]    This quantity of shares reflects a three-for-one stock split effected on July 1, 2021.

[4]    A SPAC sponsor is the entity and/or persons primarily responsible for establishing the SPAC, which is thereafter managed by a board of directors and management.

3

12.     Given that the purpose of a SPAC is to identify and acquire an operating business after conducting its IPO, steps a SPAC has taken in furtherance of a particular acquisition would be material to a reasonable SPAC investor, who would want to know about the SPAC's prospects with future acquisition targets.  Disclosures made in a SPAC's IPO – including as it relates to any pre-IPO discussions or negotiations with future acquisition targets or concerning potential business combinations – need to be clear and accurate, and cannot be materially false or misleading.

13.     In addition, the economic interests of the sponsors and the directors, officers, and affiliates of a SPAC often differ from the economic interests of public shareholders, which may lead to conflicts of interests as they evaluate and decide whether to recommend business combination transactions to shareholders.  Clear and accurate disclosure regarding these potential conflicts of interest and the nature of the sponsors', directors', officers' and affiliates' economic interests in the SPAC is particularly important because these parties are generally responsible for negotiating the SPAC's post-IPO business combination transaction.

14.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities at a discount at or around the time of the SPAC's formation.  Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO.  Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash in the event the SPAC fails to complete a business transaction, and the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

### *Individual A's Initial Interactions with TMTG*

15.     In mid-February 2021, a representative of TMTG approached Individual A regarding a potential deal between SPAC A and TMTG.  Shortly after that initial contact, SPAC A and TMTG signed a non-exclusive LOI to explore a potential merger between the two companies which, after being extended, lasted through April 5, 2021.  As that LOI neared expiration, TMTG and SPAC A discussed entering into a mutually exclusive LOI.  Two directors and one officer of SPAC A opposed pursuing a merger with TMTG, and SPAC A ultimately did not sign that exclusive LOI.

16.     On or about April 8, 2021, Individual A began exploring two plans to pursue a merger with TMTG, "Plan A" and "Plan B."  "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG.  For example, Individual A discussed options to replace the SPAC A officials who were opposed to a transaction with TMTG.  "Plan B" referred to Individual A's attempt to identify an alternative SPAC to pursue a merger with TMTG.  Individual A considered several SPACs that could be used for "Plan B," and Individual A started raising capital from investors to purchase an ownership interest in the sponsor of one of those SPACs.  By April 9, 2021, a representative of Investment Bank wrote an email to Individual A stating: "DWAC could be a solution for [TMTG]."  At the time, Investment Bank had a majority interest in DWAC Sponsor, and Individual A had no ownership interest in DWAC Sponsor or role with DWAC.

4

17.    On April 14, 2021, Individual A met with representatives of TMTG.  During the meeting, Individual A suggested to TMTG's representatives that if SPAC A could not pursue a merger with TMTG there could be a Plan B, *i.e.*, that Individual A would try to identify another vehicle to potentially pursue a merger with TMTG.

18.    On April 18, 2021, a representative of Investment Bank sent a message to Individual A and wrote: "We do [TMTG] one way or other.  Now let's sign up [TMTG].  That's the way to get the most $$$.  Anyhow, we'll figure it out.  Opciones hay."[5]  Individual A responded: "Yes.  Done this week."

### Individual A Took Control of DWAC and Resumed Merger Discussions with TMTG

19.    On or about April 24, 2021, Individual A learned that there was an opportunity for him to obtain substantial control over DWAC.  A few days later, Individual A signed a LOI with Investment Bank under which he would obtain 90% ownership of DWAC Sponsor.  Individual A met with TMTG's representatives the next day and continued discussions with TMTG about a potential merger shortly thereafter.

20.    On May 14, 2021, Investment Bank and Individual A executed several agreements by which Investment Bank transferred a 90% ownership interest in DWAC Sponsor to Individual A.  Individual A was appointed CEO and Chairman of DWAC around this same time.  These two actions gave Individual A effective control over DWAC.

21.    On the night of May 25, 2021, DWAC filed a Form S-1 (the "Form S-1").  The Form S-1 was signed by Individual A and included two additional nominee directors to DWAC's Board.  Both of those new DWAC directors were also SPAC A directors who were supportive of a transaction between SPAC A and TMTG.  This Form S-1 also identified a DWAC officer, who had been involved in some preliminary discussions about TMTG in connection with SPAC A prior to being named a DWAC officer.  The SPAC A directors and officer who opposed a transaction with TMTG did not assume any role with DWAC.

22.    The Form S-1 contained several statements about the state of discussions between DWAC and potential targets.  For example, it included the following statement:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

### The June 4 LOI and Break-Up Fee Clause

23.    By at least June 1, 2021, Individual A made plans with TMTG to sign a unilaterally exclusive LOI between SPAC A and TMTG on June 4, 2021.  At that time, the SPAC A officer

---

[5]    In Spanish, "Opciones hay" translates to "There are options."

5

and two SPAC A directors that opposed pursuing a transaction with TMTG had not dropped their opposition to such a transaction.

24.     On June 1, 2021, Individual A communicated with an individual who was a director of both SPAC A and DWAC and who planned to attend the LOI signing event and wrote: "I want [TMTG] to meet the [SPAC A] AND DWAC team."

25.     On June 4, 2021, SPAC A, TMTG, and Individual A (in his personal capacity and on behalf of SPAC A) signed a LOI (the "June 4 LOI") expressing intent to pursue a merger between SPAC A and TMTG.  The June 4 LOI included a break-up fee clause under which Individual A would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause").  The Break-Up Fee Clause had several conditions that would result in Individual A owing no break-up fee.  One of those conditions was that Individual A would owe no break-up fee if he "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG] (in its sole and absolute discretion) and such terms are ultimately accepted by [TMTG]."  The parties signed several extensions to the June 4 LOI over the summer of 2021, the last extension of which was signed on or about August 27, 2021.  The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021.

26.     The Break-Up Fee Clause created a potential conflict of interest for Individual A in that it put him at personal financial risk if he did not find a way complete a merger with TMTG.

### *Individual A Contemplated a DWAC Merger with TMTG*

27.     Within days of signing the June 4 LOI, Individual A communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with TMTG.  For example, on June 7, 2021, Individual A received a text in which an individual who was a director for both SPAC A and DWAC wrote: "I still don't know why you are switching it out of [SPAC A] other than you will make more money.  I think using [SPAC A] to grab the deal knowing you are going to move it is very problematic."  Individual A responded: "DWAC is better and will make the project clear [sic] more successful."

28.     On June 8, 2021, Individual A exchanged additional messages with representatives of Investment Bank.  Individual A sent a picture from the June 4 LOI signing event and wrote: "You have no idea!!  I worked thousands of hours to get this," and "It's ours wherever we want. Let's make it DWAC."

29.     On June 9, 2021, Individual A emailed a DWAC representative a financial analysis that modeled the value of DWAC Sponsor's shares of DWAC if DWAC were to merge with TMTG.

6

30.     By contrast, Individual A's communications with Investment Bank regarding SPAC A during the summer of 2021 predominantly related to SPAC A's evaluation of other targets.

### *Discussions with TMTG*

31.     Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG.

32.     During the same time period, Individual A raised funds from numerous individuals who made investments in DWAC Sponsor.  Individual A informed some of those investors that DWAC viewed TMTG as one potential merger target and a very promising opportunity.

33.     On July 8, 2021, DWAC filed an amended Form S-1 increasing its planned offering from $100 million to $300 million and announcing three additional directors.  One of those directors had been involved with Individual A in discussions with TMTG since discussions between SPAC A and TMTG began in February 2021.

34.     Individual A travelled to TMTG's offices on July 8 and spent the entire day there. After Individual A left, a representative of TMTG sent a message to Individual A stating: "Today was a big day for [TMTG] and a huge step for our team to be able to meet and spend time with you.  Thank you so much for making the trip."

35.     On August 28, 2021, Individual A received a text from a DWAC representative that stated: "Talked to [TMTG's outside counsel].  TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate announcement.  I told them we'd need a month. Probably gonna settle at 2-3 weeks."

### *DWAC's IPO*

36.     On August 31, 2021, three days prior to the commencement of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") signed by Individual A.  The Final Form S-1 contained several statements about discussions between DWAC and potential targets, including the following statement:

> To date, our efforts have been limited to organizational activities as well as activities related to this offering.  We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

37.     The Final Form S-1 also contained the following statement regarding DWAC's contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. From the period commencing with our formation through the date of this prospectus, there have been no communications or discussions between any of our officers, directors or our sponsor and any of their potential contacts or relationships regarding a potential initial business combination. Additionally, we have not engaged or retained any agent or other representative to identify or locate any suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

38.     In addition, the Final Form S-1 contained the following statement regarding DWAC's contact with potential targets:

> We have not contacted any of the prospective target businesses that [SPAC A and another SPAC] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

39.     Certain of the statements described in paragraphs 36 through 38 were false or misleading because, among other things and as discussed above: (a) Individual A assumed control of DWAC in May 2021 with the idea that it might be used to pursue a merger with TMTG; (b) Individual A told at least one TMTG representative during the summer of 2021 of the possibility of using DWAC as the vehicle to complete a merger with TMTG; and (c) the discussions between SPAC A and TMTG had ceased before DWAC's IPO.

40.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.  The funds held in trust will be returned to shareholders if a business combination is not consummated.

41.     DWAC filed a prospectus on September 8, 2021 that included the same statements described in paragraphs 36 through 38.

### *DWAC's Post-IPO Negotiations with TMTG*

42.     On the day that DWAC's IPO closed, DWAC sent TMTG (and other companies) a draft nondisclosure agreement.  On September 13, 2021, five days after the DWAC IPO had closed, DWAC and TMTG signed the nondisclosure agreement.  TMTG emailed DWAC a draft LOI the next day.  Two days later, DWAC and TMTG began coordinating an in-person event to sign the LOI on September 22, 2021.  On September 18, 2021, TMTG's counsel emailed a SPAC A representative a draft agreement to terminate the June 4 LOI and release Individual A from the Break-Up Fee clause.

43.     On September 22, 2021, DWAC's Board communicated via WhatsApp and voted to approve signing an LOI with TMTG.  That same day, Individual A met with representatives from TMTG and signed a mutually exclusive LOI between DWAC and TMTG.  That same day, Individual A (on behalf of SPAC A) and TMTG signed a termination agreement ending the June 4 LOI and freeing Individual A from the $1 million Break-Up Fee Clause under the June 4 LOI.  That letter was dated to be effective as of September 1, 2021.

44.     On October 19, 2021, DWAC's Board approved the signing of a definitive merger agreement with TMTG.  DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after market close that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing was publicly available on Edgar at approximately 6 a.m. on October 21, 2021.  DWAC's common stock, which had closed at $9.96 on October 20, 2021, closed at $45.50 on October 21, 2021.

### *DWAC's Form S-4*

45.     On May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  DWAC's Form S-4 contains materially inadequate and misleading disclosures regarding various issues.  For example, DWAC's Form S-4:

     a.  Did not disclose the Break-Up Fee Clause contained in the June 4, 2021 LOI between SPAC A and TMTG and did not disclose Individual A's potential conflict of interest caused by the Break-Up Fee Clause.

     b.  Disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed, and accordingly Individual A was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Individual A met with TMTG and executed the LOI between DWAC and TMTG.

     c.  Described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021.  As discussed above in detail, Individual A had numerous interactions with TMTG prior to DWAC's IPO.  DWAC also did not disclose that Individual A assumed control

of DWAC in spring 2021 with the idea that it might be the vehicle to close a deal with TMTG and that Individual A told investors in DWAC Sponsor that TMTG was one possible merger target for DWAC in the summer of 2021.

### **Violations**

46.    As a result of the conduct described above, the Commission finds that DWAC violated Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, which prohibit any person, in connection with the purchase or sale of any security, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

47.    As a result of the conduct described above, the Commission finds that DWAC also violated Section 17(a)(2) of the Securities Act, which prohibits any person, in the offer or sale of any securities, to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

### **Undertaking**

48.    Respondent undertakes that, should it file an amended Form S-4, any such Form S-4 will be materially complete and accurate and consistent with the findings in this Order.

### **IV.**

In view of the foregoing, the Commission deems it appropriate and in the public interest to impose the sanctions agreed to in Respondent DWAC's Offer.

Accordingly, it is hereby ORDERED that**:**

A.    Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent DWAC cease and desist from committing or causing any violations and any future violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

B.    Respondent shall comply with the undertaking enumerated in Section III, paragraph 48 above.

C.    Respondent shall pay a civil money penalty in the amount of $18 million to the Securities and Exchange Commission.  The penalty shall be due the earlier of: (a) 14 days after the closing of any merger or a comparable business combination or transaction, whether with TMTG or any other entity; or (b) January 1, 2025.  If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, the Commission will forgo the penalty upon written notice that the funds in trust have been returned to shareholders.  The Commission may distribute civil money penalties collected in this proceeding if, in its discretion, the Commission orders the

10

establishment of a Fair Fund pursuant to 15 U.S.C. § 7246, Section 308(a) of the Sarbanes-Oxley Act of 2002.  The Commission will hold funds paid pursuant to this paragraph in an account at the United States Treasury pending a decision whether the Commission, in its discretion, will seek to distribute funds or, subject to Exchange Act Section 21F(g)(3), transfer them to the general fund of the United States Treasury.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1)    Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2)    Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3)    Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying DWAC as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Thomas P. Smith, Jr., Division of Enforcement, Securities and Exchange Commission, 100 Pearl St., Suite 20-100, New York, NY 10004-2616.  If DWAC dissolves the SPAC and returns the money in trust to the shareholders before January 1, 2025, DWAC will provide written notice to Mr. Smith regarding the decision to dissolve the SPAC and an additional written notice when the money in trust has been returned to the shareholders.  DWAC shall provide these written notices no later than 5 business days after dissolving the SPAC and no later than 5 business days after the money in trust has been returned to the shareholders.

D.     Regardless of whether the Commission in its discretion orders the creation of a Fair Fund for the penalties ordered in this proceeding, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in

11

this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

     By the Commission.


               Vanessa A. Countryman
               Secretary

# EXHIBIT 3

CIRCUIT COURT OF THE TWELFTH JUDICIAL CIRCUIT
SARASOTA COUNTY, FLORIDA
CIVIL DIVISION

TRUMP MEDIA & TECHNOLOGY GROUP
CORP., a Delaware Corporation (f/k/a Digital
World Acquisition Corp.) and TMTG Sub Inc.,

       Plaintiffs,

v

ARC GLOBAL INVESTMENTS II, LLC, a
Delaware Limited Liability Company, and
PATRICK ORLANDO, UNITED ATLANTIC
VENTURES LLC, a Delaware Limited Liability
Company, ANDREW LITINSKY and WESLEY
MOSS

Case No.: 2024-CA-001061-NC

## SECOND AMENDED COMPLAINT

Plaintiffs Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp.[1]

("TMTG" or "DWAC") and TMTG Sub Inc. ("Old TMTG")[2] allege in support of their Second

Amended Complaint as follows:

## NATURE OF THE ACTION

1.     TMTG is a publicly traded company that was formed through the merger of a

Special Purpose Acquisition Company ("SPAC") called Digital World Acquisition Corp.

---

[1] DWAC no longer exists as a separate entity and is now known as TMTG following a merger on March 25, 2024. For the purpose of clarity, Plaintiffs will generally refer to TMTG as "DWAC" or "DWAC n/k/a TMTG" when referring to events taking place prior to the merger.

[2] Old TMTG was formerly known as Trump Media and & Technology Group Corp.  On March 25, 2024, Old TMTG merged with DWAC.  Through the merger, Old TMTG became a wholly owned subsidiary of DWAC and changed its name to TMTG Sub Inc.  DWAC, in turn, changed its name to Trump Media & Technology Group Corp.

1

("DWAC") and a private company, Old TMTG, which operates the Truth Social social media platform and is now a wholly-owned subsidiary of TMTG.

2.      The SPAC merger process is intended to be an efficient process for taking private companies public that follows a detailed and predictable timeline.  The process is subject to federal securities laws which require that truthful disclosures about the SPAC be made to the investing public.

3.      The DWAC merger was anything but efficient and predictable.  This routine process was intentionally derailed by the misconduct of Patrick Orlando (DWAC's former Chairman and Chief Executive Officer), with the aid and assistance of ARC Global Investments II, LLC ("ARC"), an entity controlled by Orlando that acted as DWAC's sponsor.

4.      Orlando did not act alone, however.  He enlisted Andrew Litinsky, Wesley Moss, and United Atlantic Ventures LLC, ("UAV"), an entity controlled by Litinsky and Moss (collectively, the "UAV Parties"), as his co-conspirators.  At the time, Moss and Litinsky were directors and officers of Old TMTG.  They were responsible for managing its day-to-day operations including the process of engaging in a merger with a SPAC and instructing Old TMTG's outside counsel.

5.      Together, Orlando, ARC, and the UAV Parties (collectively, the "Co-Conspirators") devised and executed an unlawful scheme to agree to merge Old TMTG and DWAC before DWAC had gone public through an Initial Public Offering (hereinafter referred to as part of the "Pre-Targeting Conspiracy" or "Plan B").[3]  The Co-Conspirators hid the Pre-Targeting Conspiracy from the public, regulators, the other members of the Board of Directors of DWAC, and others affiliated with Old TMTG.

---

[3] "Plan A" consisted of Orlando's pursuit of a merger with TMTG via another SPAC, non-party Benessere Capital Acquisition Corp.

6.     To effectuate the scheme, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company at any time before its initial public offering ("IPO").  He further falsely represented that he had participated in no discussions or contacts with any potential merger targets.  The Co-Conspirators knew that these statements were false when made.  Indeed, the Co-Conspirators had personally engaged in numerous discussions together and agreed to target Old TMTG for a merger with DWAC.

7.     The Co-Conspirators also breached their respective fiduciary duties to DWAC and Old TMTG by, among other things, engaging in the Pre-Targeting Conspiracy.  Together, their misconduct had a devastating impact on Plaintiffs.  What should have been a predictable and efficient six-month merger process between DWAC and Old TMTG transformed into a 29-month ordeal that included an investigation by the United States Securities & Exchange Commission ("SEC") into DWAC and dramatically delayed the business combination.  The damage to Plaintiffs was substantial.  On July 20, 2023, the SEC imposed an $18 million penalty through a Cease-and-Desist Order, attached hereto as **Exhibit 1**.  DWAC incurred more than $11 million in legal fees, which ultimately became the responsibility of TMTG.  In addition, Plaintiffs suffered hundreds of millions of dollars of loss as a result of the delay and damage to TMTG's reputation.

8.     Two weeks ago, on July 17, 2024, the SEC filed an enforcement action against Orlando alleging that Orlando engaged in securities fraud in connection with the Pre-Targeting Conspiracy.  A copy of the complaint in *SEC v. Orlando,* Case No. 24-cv-2097 (D.C. 2024) (ECF No. 1) ("SEC Orlando Complaint") is attached hereto as **Exhibit 2**.  The UAV Parties are not named as defendants or expressly identified by name in the SEC Orlando Complaint.  They are, however, clearly and prominently featured in the SEC Complaint and their involvement in the unlawful Pre-Targeting Conspiracy is irrefutable.  The claims set out herein are based, at least in

part, on the allegations contained in the SEC Orlando Complaint.  Plaintiffs will prove those allegations through discovery once they have access to the documents that Orlando and the UAV Parties provided to the SEC and which are referred to or relied upon by the SEC as well as other relevant discovery.

9.      The Pre-Targeting Conspiracy along with Defendants' other fiduciary breaches threatened the viability of what is now a public Nasdaq-listed company valued at more than $5 billion.  Despite the Co-Conspirators' best efforts to undermine TMTG, the merger was consummated but not until, and *only because*, they were ousted from control of DWAC and Old TMTG.

10.     Of course, the completion of the merger does not negate Defendants' staggering pre-merger harm that severely impacted Plaintiffs.  Plaintiffs are therefore entitled to the relief sought herein.

## **PARTIES**

11.     Plaintiff TMTG is formerly known as DWAC.  DWAC began as a SPAC that was formed for the purpose of effecting a merger or similar business combination following its initial public offering.  DWAC was a Delaware corporation with its principal place of business in Miami, Florida.  Post-merger, DWAC was renamed TMTG, which is a Delaware corporation with its principal place of business in Sarasota, Florida.

12.     Plaintiff Old TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida.  Old TMTG is a wholly owned subsidiary of TMTG.

13.     Defendant Patrick Orlando is an individual domiciled in Miami, Florida.  He is the managing member of ARC.  He served as a director of DWAC until the merger and previously served as DWAC's Chairman and CEO from in or about May 2021 to in or about March 2023.

14.     Defendant ARC is a Delaware limited liability company whose managing member (Orlando) is a Florida resident.  ARC has its principal place of business in Florida.  ARC served as DWAC's sponsor and is controlled by Orlando.  ARC initially invested $25,000 in DWAC in exchange for 8,625,000 Class B shares of DWAC stock (the "DWAC founder shares").  At the time of DWAC's IPO, ARC invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.  A unit is a security that is made up of one class of a common share and a fraction of a warrant.  A warrant is similar to a traditional stock option in that it gives the holder the right to buy or sell shares of a company at a pre-agreed price.  Units are commonly offered by SPACs that are seeking to raise money in a public stock offering with the primary goal of merging with a private business and taking it public.

15.     Defendant UAV is a Delaware limited liability company with its principal place of business in Fort Lauderdale, Florida.

16.     Defendant Andrew Litinsky is a resident of the State of Florida.  At all relevant times, Litinsky was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022.

17.     Defendant Wesley Moss is a resident of the State of Georgia.  At all relevant times, Moss was a founder and member of UAV.  He was also a *de facto* officer and director of Old TMTG until in or about March 2022, and a director of Old TMTG until in or about September 2022.

18.     At all relevant times, Moss and Litinsky controlled and dominated UAV.  UAV served as the vehicle for Moss and Litinsky's wrongdoing, including breaching fiduciary duties owed to TMTG by participating in the Pre-Targeting Conspiracy, assisting in the submission of misleading financial statements to the SEC, and mismanaging the Company.  At all times during

2021, Moss and Litinsky controlled and dominated Old TMTG.  Together, Moss and Litinsky constituted the majority of the *de facto* board of Old TMTG.  In that capacity, Moss and Litinsky retained and directed outside counsel and were responsible for managing TMTG's business including its potential SPAC merger.

19.    Non-party Benessere Capital Acquisition Corp. ("Benessere") was a Florida limited liability company with its principal place of business in Miami, Florida.  It had its IPO on January 5, 2021, during which it raised $115 million (less than half of what DWAC raised).  In October 2022, Benessere dissolved and delisted its securities.  Orlando served as the CEO and Chairman of Benessere and the managing member of its sponsor during the relevant period.

## JURISDICTION AND VENUE

20.    This Court has personal jurisdiction over Orlando as a Florida resident.

21.    This Court has personal jurisdiction over ARC under Florida's long-arm statute, Fla. Stat. § 48.193, because ARC has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, ARC has its principal place of business in Florida, and ARC has committed the tortious acts alleged in this Second Amended Complaint within Florida.

22.    This Court has personal jurisdiction over Litinsky as a Florida resident.

23.    This Court has personal jurisdiction over Moss under Florida's long-arm statute, Fla. Stat. § 48.193, because Moss has operated, conducted, engaged in, and/or carried on a business or business venture within Florida that resulted in harm to Plaintiffs, and Moss has committed the tortious acts alleged in this Second Amended Complaint within Florida.

24.    This Court has personal jurisdiction over UAV under Florida's long-arm statute, Fla. Stat. § 48.193, because UAV has operated, conducted, engaged in, and/or carried on a business

or business venture within Florida that resulted in harm to Plaintiffs, UAV has its principal place of business in Florida, and UAV has committed the tortious acts alleged in this Second Amended Complaint within Florida.

25.    This Court has jurisdiction over the subject matter of this action because the amount in controversy exceeds $50,000, exclusive of interest, court costs, and attorney's fees.

26.    Venue is proper in Sarasota County, Florida, pursuant to Fla. Stat. § 47.051, because the subject matter of the dispute affects a corporation with its principal place of business and headquarters in Sarasota County, Florida, and because the causes of action brought herein accrued in Sarasota County, Florida.

**FACTUAL BACKGROUND**

I.    **SPACs and Regulatory Framework**

27.    The UAV Parties incorporated Old TMTG on or around February 8, 2021.  From the time of Old TMTG's formation, the UAV Parties intended for it to become a public company by seeking to be acquired by a SPAC.

28.    A SPAC is a publicly traded corporation with a limited life span.  A SPAC is formed with the sole purpose of effecting a merger with a privately held business to enable it to go public.

29.    A SPAC has no underlying business operations.

30.    Each SPAC must have a "sponsor."  The SPAC sponsor creates the SPAC to raise capital through an IPO for the purpose of using the proceeds to later acquire an unidentified and, as yet, undetermined private operating company within a specified time period (typically 18 months).

31.    During the fundraising period (IPO), investors rely on the management team that formed the SPAC (generally the sponsor) to acquire or combine with a target company.

32.     A SPAC may identify in its IPO *prospectus* (otherwise known as a Registration Statement or Form S-1) a specific *industry* that it will target as it seeks to combine with an operating company.  However, it cannot guarantee to investors that a certain target will be merged with or engage in substantive discussions with a potential target until *after* the SPAC's IPO.  *See* 17 C.F.R. § 230.419

33.     Under applicable securities regulations, SPACs are prohibited from making false or misleading statements to investors and from engaging in fraudulent conduct in connection with merging with a target.  15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  In the event a SPAC has identified a target prior to its IPO, it must disclose the target to the regulatory authorities and all potential investors.

34.     Once the SPAC has identified a merger target, its management negotiates with the operating company and, if approved by SPAC shareholders (if a shareholder vote is required), executes the merger with the target company.

35.     As will be thoroughly alleged herein, the Co-Conspirators planned and carried out a Pre-Targeting Conspiracy wherein an Orlando-affiliated entity (Benessere or DWAC) would merge with Old TMTG.  Orlando devised a scheme where he would publicly pursue a merger with Old TMTG through Benessere ("Plan A") as a rouse to cover up his real intentions: a merger between DWAC and Old TMTG ("Plan B").

36.     To carry out his scheme, Orlando, through ARC, gained control of DWAC prior to DWAC's IPO and for the purpose of merging it with Old TMTG.  According to the SEC, DWAC, under ARC and Orlando's control, did not disclose to regulatory bodies or potential investors that it had pre-determined before its IPO that it would merge with Old TMTG in violation of federal

securities laws. *See* Ex. 2, SEC Compl. ¶ 1. The UAV Parties knowingly assisted Orlando and ARC in unlawful conduct.

37.     The Co-Conspirators' misconduct breached the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

**II.     The UAV Parties' Fiduciary Relationship with Old TMTG**

38.     In January 2021, Donald J. Trump returned to private life after serving as President of the United States. President Trump agreed to work with Moss and Litinsky to create a social media platform that would become a safe harbor for free expression amid censorship by other social media companies.

39.     To facilitate their participation in the business opportunity with President Trump, Moss and Litinsky formed UAV on January 26, 2021.

40.     The UAV Parties agreed that they would, *inter alia*, incorporate Old TMTG on behalf of President Trump and other shareholders, establish its corporate governance, execute a plan to get the social media platform operating, and work toward a near-term merger between Old TMTG and a SPAC.

41.     Old TMTG was incorporated on February 8, 2021. The UAV Parties served as *de facto* directors of Old TMTG and constituted the majority of the *de facto* Board.

42.     In their role as *de facto* directors, the UAV Parties were responsible for hiring, directing, and instructing legal counsel, managing Old TMTG's day to day operations, and for carrying out Old TMTG's business plan.

43.     The UAV Parties' charge was straightforward: (1) establish Old TMTG's governance structure; (2) launch a social media platform; and (3) find a publicly traded merger partner so Old TMTG could obtain the capital necessary to carry out its business plan. The UAV

9

Parties received 8.6 million shares in Old TMTG.  Moss and Litinsky were significantly incentivized to secure a merger partner and carry out the remainder of their duties.

44.    As initial *de facto* directors, the UAV Parties were required to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Old TMTG.  *See* Fla. Stat. § 607.0830.

45.    The UAV Parties owed Old TMTG a duty of care, including but not limited to:

    a.    ensuring that all corporate formalities were carried out;

    b.    establishing an adequate corporate governance structure for Old TMTG;

    c.    allocating resources in a lawful manner and in Old TMTG's best interests;

    d.    executing contracts and business ventures that were commercially reasonably and beneficial to Old TMTG and with the proper approval from the Old TMTG Board;

    e.    launching the social media platform, including employing a technical team with the requisite technical skills;

    f.    accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

    g.    lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch the social media platform; and

    h.    retaining, managing and overseeing outside counsel in a manner that was in the best interests for Old TMTG.

46.    The UAV Parties owed Old TMTG a duty of loyalty and good faith, including but not limited to:

    a.    avoiding self-dealing and conflicts with Old TMTG's best interests;

    b.    securing a successful and lawful merger between Old TMTG and a third party;

    c.    accurately representing information to regulatory authorities, the Old TMTG Board, and the general public;

d.    refraining from violating the law while carrying out their duties at Old TMTG; and

e.    managing Old TMTG's employees and outside counsel in a lawful manner and avoiding incurring any liabilities to third parties or regulatory bodies.

47.    The UAV Parties failed on all fronts, violating the fiduciary duties owed to Old TMTG.

48.    As the entity through which Litinsky and Moss conducted business, UAV had an obligation to act in good faith and with due care.

49.    Because Litinsky and Moss dominated and controlled UAV, UAV had knowledge of Litinsky and Moss's breaches of fiduciary duties.

50.    UAV, through Litinsky and Moss, substantially assisted Litinsky and Moss in their breaches of fiduciary duties.

51.    Most critically, the UAV Parties assisted with and actively participated in Orlando's Pre-Targeting Conspiracy to unlawfully pursue a merger with Old TMTG through Benessere ("Plan A") while concealing their efforts to pursue a merger with DWAC ("Plan B"), in violation of their fiduciary duties to Old TMTG and in violation of the federal securities laws that require truthful disclosures to the public in connection with the purchase and sale of securities.

52.    In doing so, the UAV Parties placed their own financial interests above the interests of Old TMTG.  Indeed, by participating in the Pre-Targeting Conspiracy, the UAV Parties ensured that a merger with an Orlando-affiliated entity would occur, instead of focusing on other possible merger combinations that did not involve an unlawful scheme that could potentially harm Old TMTG and DWAC n/k/a TMTG.

53.    The Pre-Targeting Conspiracy was ultimately the subject of two separate enforcement actions against DWAC and Orlando, resulting in an $18 million fine against DWAC and at least $11 million in related legal fees.

54.    The UAV Parties were also aware of several conflicts of interest and instances of self-dealing involving an outside attorney for Old TMTG ("Lawyer A").

55.    While Lawyer A held himself out as counsel for Old TMTG, in reality, Lawyer A was acting as *de facto* counsel to the UAV Parties to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy.  Lawyer A took actions purportedly on behalf of Old TMTG that were, in reality, adverse to Old TMTG's interests and designed to ensure that he and all the Co-Conspirators benefited from the Pre-Targeting Conspiracy while covering their tracks. Notably, Lawyer A communicated with Orlando using a messaging application that was set to automatically delete such communications.

56.    Despite Lawyer A's obvious and troubling conflicts of interest, Lawyer A did not recuse himself and the UAV Parties did not terminate Lawyer A's representation of Old TMTG. Instead, the UAV Parties worked alongside Orlando and Lawyer A to advance a merger between Old TMTG and DWAC in a manner that was not in the best interests of Old TMTG.  Particularly, the Co-Conspirators and Lawyer A knowingly assisted DWAC in making statements in public filings and misleading potential investors that the SEC has alleged were false.

57.    The UAV Parties also failed to establish the Company's corporate governance and made a series of reckless and wasteful decisions that caused significant damage to Old TMTG and a decline in the stock price of its ultimate merger partner (DWAC).

### III.     Orlando's Fiduciary Relationship with DWAC and ARC's Knowledge Thereof

58.     As DWAC's Chairman and CEO, Orlando was responsible for the day-to-day operations of DWAC through March 2023.

59.     Orlando, during his tenure as CEO and Chairman of DWAC, director of DWAC, and managing member of ARC, owed fiduciary duties of care and loyalty to Plaintiffs.

60.     Orlando had a duty to act in good faith, with reasonable care, and in a manner that was independent and in the best interests of Plaintiffs and their shareholders.  *See* Fla. Stat. § 607.0830.

61.     Orlando was required to manage DWAC's daily operations in good faith and in a manner that would not harm DWAC.

62.     Orlando owed DWAC a duty of care, including but not limited to:

    a.     ensuring that all corporate formalities were carried out;

    b.     establishing an adequate corporate governance structure for DWAC,

    c.     allocating resources in a lawful manner and in DWAC's best interest;

    d.     accurately representing information to regulatory authorities, DWAC's Board, and the general public;

    e.     accurately accounting for funds raised by ARC, as DWAC's sponsor;

    f.     lawfully and successfully causing a merger between Old TMTG and a merger target to raise the necessary capital to launch Truth Social;

    g.     safely handling and storing DWAC-related documents, including vendor contracts and invoices, in his personal email account; and

    h.     maintaining separate corporate formalities between Benessere and DWAC.

63.     Orlando owed DWAC a duty of loyalty including but not limited to:

    a.     lawfully and successfully causing a merger between DWAC and a merger target;

    b.    avoiding self-dealing or self-interested actions and conflicts with DWAC's best interests;

    c.    using his position at DWAC to benefit DWAC and its shareholders, not himself;

    d.    refraining from violating the law while carrying out his duties at DWAC;

    e.    abstaining from making public statements that were harmful to DWAC and leaking information to the press;

    f.    ensuring all encumbrances on behalf of DWAC to ARC, such as promissory notes, were ratified by disinterested board members; and

    g.    releasing all funds raised by ARC for the benefit of DWAC to DWAC.

64.    As set forth herein, Orlando violated the aforementioned duties, placing his own interests above those of DWAC and failing to exercise due care or in good faith.

65.    As a sponsor of DWAC, ARC had an obligation to act with due care and in good faith.

66.    Because Orlando dominated and controlled ARC, ARC had knowledge of Orlando's breaches of fiduciary duties.

67.    ARC, through Orlando, substantially assisted and encouraged Orlando's breaches of fiduciary duty.

## IV.    The UAV Parties, Orlando, and ARC Conspire to a Pre-Targeting Conspiracy

### A.    <u>Old TMTG and Benessere's Initial Negotiations (Plan A)</u>

68.    In mid-February 2021, Litinsky approached Orlando regarding a potential deal between Benessere and Old TMTG.  According to the SEC, about a week later, Orlando met in person with TMTG representatives.  *See* Exh. 2, SEC Compl. ¶ 32.  Upon information and belief, the TMTG representatives included Litinsky.

69.    On or about March 12, 2021, Benessere and Old TMTG signed a non-exclusive letter of intent to explore a potential merger between the two companies ("Benessere LOI").  The Benessere LOI was then extended to last through April 5, 2021.  Orlando negotiated and signed the Benessere LOI on behalf of Benessere.  Litinsky and Moss were both actively involved in the negotiation of the Benessere LOI.

70.    According to the SEC, as the non-exclusive letter of intent neared its expiration date, the UAV Parties and Orlando discussed having Old TMTG and Benessere sign a mutually exclusive letter of intent.  *See* Exh. 2, SEC Compl. ¶ 34.  Benessere ultimately did not sign that mutually exclusive letter of intent.

71.    During the negotiations, Orlando learned that some of Benessere's directors and officers opposed the merger with Old TMTG.  He shared this information with the UAV Parties. In light of this hurdle, Orlando conjured a scheme to ensure that a merger with Old TMTG would occur and that Orlando would individually benefit from any such merger.  Orlando enlisted the Co-Conspirators to assist with carrying out the Pre-Targeting Conspiracy, which they referred to as "Plan B."

**B.    Orlando Takes Control of DWAC and Resumes Merger Discussions With Old TMTG**

72.    In or about April 2021, merger discussions between Benessere and Old TMTG paused, and the Co-Conspirators put "Plan B" into effect.

73.    The Co-Conspirators began referring to "Plan A" which was a continued effort to find a way for Benessere to merge with Old TMTG.  According to the SEC, Orlando discussed options to replace the Benessere officials who were opposed to a transaction with Old TMTG in order to effectuate Plan A.  *See* Exh. 2, SEC Compl. ¶ 36.

74.    "Plan B" referred to Orlando's scheme to pursue a competing merger between DWAC and Old TMTG, ensuring that he would financially gain from either business opportunity. *See* Ex. 2, SEC Compl. ¶ 37.

75.    Orlando planned to continue publicly pursuing a merger between Old TMTG and Benessere (Plan A), while secretly pursuing a competing merger between Old TMTG and DWAC (Plan B).

76.    Orlando's scheme was simple: merge an Orlando-affiliated SPAC with Old TMTG in order to ensure that Orlando would financially benefit under any merger.

77.    Orlando recognized that he would lose the opportunity to merge a SPAC with Old TMTG in light of strong opposition to the TMTG merger from Benessere's Board.  To avoid losing a deal with Old TMTG, Orlando shared the details of the Pre-Targeting Conspiracy with the UAV Parties and enlisted the UAV Parties' support.

78.    The UAV Parties knew or had reason to know that Orlando's Plan B violated securities laws and that their participation in it would breach their fiduciary duties to Old TMTG. Indeed, Litinsky wrote about the April 14 meeting: "roughest day so far, meet in board room in coconut grove - Patrick says [the Benessere COO] freaked out - he is 28 - his dad won't let him do the deal - plus 2 [Benessere] directors already replaced - ***Patrick [Orlando] pitches [h]is plan b. I get scared, is he wearing a wire?***"

79.    Despite knowing that Plan B could potentially violate securities laws, the UAV Parties continued assisting Orlando with the scheme to secure a merger between Old TMTG and an Orlando-affiliated company (either Benessere or DWAC).

80.    According to the SEC, on or about April 24, 2021, Orlando learned that he had an opportunity to obtain substantial control over DWAC.  *See* Exh. 2, SEC Compl. ¶ 44.  Then, on or

about April 28, 2021, Orlando signed a letter of intent under which he would obtain 90% ownership of ARC, DWAC's sponsor. *Id.*

81.     Orlando, through ARC, raised millions of dollars for the benefit of DWAC n/k/a TMTG by promising various investors shares of DWAC n/k/a TMTG in exchange for capital.

82.     Litinsky memorialized in his notes that Orlando met with the UAV Parties on or about April 29, 2021 in Palm Beach, Florida and continued discussions about a potential merger with Old TMTG.

83.     According to the SEC, on or about May 2, 2021, a TMTG representative texted a second TMTG representative, "Good news. . . Patrick called [TMTG's outside counsel] yesterday. . . The LOI with our other group scared them so they want to try to lock us up . . . so this week [TMTG's outside counsel] is going to try to get us a tieup with Benessere and a big breakup fee." *See* Exh. 2, SEC Compl. ¶ 45.  The other TMTG representative responded, "Wow. Wonder if it is that or if they are less confident about raising funds for Plan B?" *Id.*  Upon information and belief, the two "TMTG representatives" referred to by the SEC in these allegations are Moss and Litinsky and "TMTG's outside counsel" refers to Lawyer A.

84.     On or about May 4, 2021, Lawyer A, at the direction of the UAV Parties, emailed Orlando and others a draft letter of intent that contemplated a merger between Benessere and Old TMTG "with new terms they discussed," including a breakup fee releasing Orlando of any liability. *See infra* ¶ 108.  The letter of intent (the "June 4 LOI") was eventually executed on June 4, 2021. *Id*.

85.     The purpose of the June 4 LOI was to further Orlando's self-dealing.  In particular, Orlando wanted to ensure that TMTG would merge with a SPAC that he controlled so that he would financially benefit from the merger.

86.     By this time, the UAV Parties knew that the Plan A merger with Benessere was highly unlikely and would be used solely as a placeholder for Plan B.  Indeed, on or about April 14, 2021, Litinsky and Moss met in person with Orlando.  Litinsky and Moss left that meeting with a clear understanding that Plan A no longer in consideration.  Indeed, Litinsky memorialized in his notes for April 14, 2021 that "the BENE deal is OFF!!!!"

87.     Before the June 4 LOI was even signed, Orlando made it clear that his preference was a DWAC and Old TMTG combination (Plan B).  According to the SEC, on or about May 8, 2021, Orlando exchanged messages with representatives of a Shanghai investment bank (the "Investment Bank").  *See* Exh. 2, SEC Compl. ¶ 47.  The message group name between Orlando and the Investment Bank, which appears to have been coined by Orlando, was, "Get it done ***one way or another***."  *Id.*   Orlando and the Investment Bank representative discussed possible combinations for both DWAC and Benessere.  Orlando stated that the "optimal" combinations were ones between Benessere and another target and a combination between DWAC and Old TMTG.  A representative of the Investment Bank responded, "Yes absolutely, that's the best.  It's just time.  Get enough time to get DWAC to mkt."  *Id.*

88.     According to the SEC, on or about May 14, 2021, the Investment Bank transferred a 90% ownership interest in ARC to Orlando.  *See* Exh. 2, SEC Compl. ¶ 48.  Around this same time, Orlando was appointed CEO and Chairman of DWAC.  *Id.*  These two actions gave Orlando effective control over DWAC.  *Id.*

89.     Notably, even though a draft of the June 4 LOI was circulated on May 4, 2021, Orlando did not execute it until June 4, 2021, *after* he obtained control of DWAC.

C.     **DWAC's May 2021 Form S-1 and Conflicted Lawyer A**

90.     Once Orlando took control over DWAC, he moved to file its Form S-1 in May 2021.

91.     A Form S-1 may be used to prepare a registration statement prior to an IPO.  A registration statement on Form S-1 is an investment prospectus describing material information about the business' operations, financial condition, risk factors, and management.

92.     Notably, on or about May 20, 2021, five days before the filing of the Form S-1 and six days after Orlando gained control over DWAC, Lawyer A pivoted from helping Old TMTG raise money and began collaborating directly with Orlando to raise funding for DWAC's sponsor, ARC.  In so doing, Lawyer A's conduct violated the fiduciary duties owed to Old TMTG.  The UAV Parties knew or should have known of Lawyer A's misconduct.

93.     On May 25, 2021, DWAC filed an initial Form S-1 (the "May Form S-1"), which is attached hereto as **Exhibit 3**.  The May Form S-1 was reviewed and signed by Orlando and included two additional nominee directors to DWAC's Board.   According to the SEC, both of those new DWAC directors were also Benessere directors who had been supportive of a transaction between Benessere and Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 49.  Notably, the Benessere directors and officer who had opposed a transaction with Old TMTG was not given the opportunity to assume any role with DWAC.  *Id.* ¶ 50.

94.     The May Form S-1 contained several statements—by or at the direction of Orlando—about the state of discussions between DWAC and potential targets, including:

> We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

95.     The SEC subsequently alleged that the foregoing statement was misleading.  *See* Exh. 2, SEC Compl. ¶ 52.

19

96.     According to the SEC, these statements are misleading because when Orlando took over DWAC, he intended it to be the vehicle to pursue a merger with Old TMTG, because Orlando had been in discussions with the UAV Parties for several months, and because Orlando had discussed Plan B with the UAV Parties.  *See* Exh. 2, SEC Compl. ¶ 52.

97.     According to the SEC, the statements were material because investors in DWAC would have wanted to know that DWAC was not the "blank check" company it professed to be, but rather a company with a specific goal (to acquire and merge with Old TMTG) that had already taken steps toward accomplishing that goal.  *See* Exh. 2, SEC Compl. ¶ 52.

98.     By conspiring to make material misstatements in furtherance of a DWAC/Old TMTG business combination, the Co-Conspirators violated their respective fiduciary duties to DWAC and Old TMTG, respectively.

99.     The May Form S-1 became publicly available on the morning of May 26, 2021. *See* Exh. 2, SEC Compl. ¶ 53.

100.     The SEC alleges that same day, presumably at Orlando's direction, Lawyer A incorporated a limited liability company in New Mexico. *Id*. at ¶ 54.  That entity entered into an agreement to invest in ARC, DWAC's sponsor, on or about May 29, 2021.  *Id*. Lawyer A signed that agreement as the "authorized representative" for the New Mexico entity. Upon information and belief, Lawyer A is the sole member of the New Mexico entity. Orlando counter-signed this May 29 agreement.  *Id*.

101.     According to the SEC, on or about May 30, 2021, Orlando, "one of the TMTG founders," and TMTG's "external counsel", believed to be Lawyer A, met at the home of a DWAC director to engage in "brainstorming sessions."  *See* Exh. 2, SEC Compl. ¶ 55.  A video of this event shows that during the meeting, they called DWAC's CFO.  *Id*. In the video, Orlando thanked

everyone for figuring out "how to get this done." *Id*. The "TMTG representative" then thanked the DWAC executive on the phone and said that the DWAC executive would be a "big part of this." *Id*. Upon information and belief, Litinsky is the TMTG founder/representative referred to by the SEC in connection with this allegation. *Id*.

102.    The SEC further alleges that on May 30, 2021, an individual who helped raise funds for ARC sent a WhatsApp message to Orlando and a potential investor and wrote, "I just got off the phone with Patrick and he is officially moving forward with the TM[T]G deal." *Id*. at ¶ 56. "It's now game time to start teeing up investor calls and showing Patrick what we can bring to the table." *Id.* The potential investor responded and asked, "Is there any brochure ready for the TM[T]G SPAC?" *Id*. Orlando responded, "There is no TM[T]G SPAC. There is a SPAC and I have a great relationship with TM[T]G. I believe with extremely high confidence that TM[T]G will [end] up in one of my SPACs. Better I explain in person." *Id*.

103.    Litinsky records in his notes for May 30, 2021: "Orlando tells Litinsky he 'wants [Litinsky] to sign LOI in Miami on [M]ay 31.'"

104.    Between May 31 and June 1, 2021, Litinsky instructed Lawyer A to remove Litinsky's name as the signatory of the June 4 LOI and replace it with the only founder of Old TMTG who was not affiliated with UAV and was unaware of the Pre-Targeting Conspiracy. Lawyer A did exactly as Litinsky instructed.

105.    On June 5, 2021, Lawyer A, on behalf of that same New Mexico LLC, *infra* at ¶ 119, entered into a consulting agreement with ARC to formalize Lawyer A's ongoing efforts to introduce investors to ARC and raise money for DWAC (the "Consulting Agreement"). The Consulting Agreement created a compensation structure payable in an equity interest in ARC. This arrangement constitutes a clear conflict of interest. Lawyer A created a financial advantage for

himself based on his representation of Old TMTG.  The UAV Parties were aware or should have been aware of Lawyer A's conflict of interest in the continued representation of Old TMTG.

### D.     The Co-Conspirators Continue the Pre-Targeting Conspiracy

106.    The Co-Conspirators knew that Plan A with Benessere would never go forward, yet they used Plan A as a placeholder until they could "legally" reveal DWAC as the merger partner (Plan B).  Indeed, revealing a merger between DWAC and Old TMTG before DWAC's IPO would violate securities laws.

107.    Although the Co-Conspirators knew by no later than April 14, 2021 that certain Benessere directors opposed a Benessere/Old TMTG merger and would not approve the transaction, the Co-Conspirators arranged to have Old TMTG and Benessere sign the June 4 LOI on June 4, 2021 to keep up the ruse.  The June 4 LOI would prevent Old TMTG from negotiating with any acquirers other than a SPAC controlled by Orlando but would not require Benessere to be exclusive to Old TMTG.

108.    According to the SEC, on June 4, 2021, Orlando (in his personal capacity and on behalf of Benessere) signed the June 4 LOI, expressing an intent to pursue a merger between Benessere and Old TMTG. *See* Exh. 2, SEC Compl. ¶ 60.

109.    According to the SEC, the June 4 LOI included a break-up fee clause under which Orlando would be personally liable to pay a $1 million break-up fee ($4 million less than the break-up fee contained in the draft June 4 LOI, *supra* ¶ 84) if Benessere and Old TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). *See* Exh. 2, SEC Compl. ¶ 61.  The Break-Up Fee Clause contained several exceptions, including that Orlando would owe no break-up fee if he "should propose to the Company [Old TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and

absolute discretion) and such terms are ultimately accepted by the Company." *Id.* Notably, the break-up fee was inconsequential to Orlando as he knew that if Plan A with Benessere did not close, there was a Plan B: a merger between Old TMTG and DWAC. This further demonstrates the Co-Conspirator's intent to use Plan A with Benessere as a placeholder for Plan B with DWAC and to benefit Orlando at the expense of DWAC.

110.    The parties signed several extensions to the June 4 LOI over the summer of 2021, the last of which was signed on or about August 27, 2021. *See* Exh. 2, SEC Compl. ¶ 61. The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021 and the exclusivity period from September 2, 2021 to October 2, 2021. *Id.*

111.    Thus, while Orlando outwardly pursued the Plan A merger between Benessere and Old TMTG, the Co-Conspirators continued plotting the Plan B merger between DWAC and Old TMTG.

112.    According to the SEC, on or about June 8, 2021, Orlando exchanged additional messages with representatives of Investment Bank. *See* Exh. 2, SEC Compl. ¶ 66. Orlando sent a picture from the June 4 LOI signing event and wrote, "You have no idea!!  I worked thousands of hours to get this," and, "It's ours wherever we want. Let's make it DWAC." Orlando also wrote, "[T]hey['re] exclusive to us, us not to them so earlier of AUG 6 or 14 days after DWAC IPO so we move TMTG there and close [other target] [Benessere]. [sic] It's crazy but let me try!!"

113.    Also, according to the SEC, in spring and summer of 2021, Orlando met and talked with TMTG representatives about a merger with DWAC. *See* Exh. 2, SEC Compl. ¶¶ 67–71. On information and belief, those representatives include Moss and Litinsky.

114.    Nevertheless, according to the SEC, in late June 2021, Orlando misrepresented to a potential investor in DWAC that Old TMTG was merely one of the many targets DWAC was considering.  Orlando stated:

> For clarity, we really like TMG, but there is absolutely no guarantee that we will close that deal or any other.  TMG is just one of many companies in our pipeline of deals but we have had no substantive discussions with TMG with respect to DWAC as we can't until after the IPO.  We are a SPAC and cannot guarantee we will combine with anyone because no deal can be made until after IPO.

*See* Exh. 2, SEC Compl. ¶ 72.

115.    According to the SEC, despite this and similar misrepresentations to potential investors, Orlando and the UAV Parties continued pursing a potential merger between DWAC and Old TMTG (Plan B) before DWAC's IPO, while also maintaining the fig leaf of a potential merger between Benessere and Old TMTG (Plan A).  *See* Exh. 2, SEC Compl. ¶ 71.

### E.    The Co-Conspirators Aided and Abetted Each Other in Furthering the Pre-Targeting Conspiracy and Breach of Fiduciary Duties

116.    The UAV Parties, Orlando, and ARC assisted each other and participated in furthering the Pre-Targeting Conspiracy, which violated the fiduciary duties owed to Old TMTG and DWAC n/k/a TMTG.

117.    The UAV Parties knew or should have known—based on Orlando's statements to them—that Orlando was pursuing an unlawful Plan B and was misrepresenting to potential investors DWAC's communications (or lack thereof) with Old TMTG.  Indeed, the UAV Parties communicated with Orlando about a DWAC merger before DWAC's IPO and while Old TMTG was seemingly still in negotiations with Benessere. Litinsky's own notes specifically reference discussing "plan B" with Orlando almost five months prior to DWAC's IPO.

118.    According to the SEC, Orlando participated in more than 100 phone calls with representatives from Old TMTG and Lawyer A from the time DWAC filed the Form S-1 on May 25, 2021 through on or about September 2, 2021, which was the day before the commencement of DWAC's IPO.  *See* Exh. 2, SEC Compl. ¶ 74.  Upon information and belief, the Old TMTG representatives and outside counsel referred to by the SEC in these allegations are the UAV Parties and Lawyer A.

119.    Orlando also signed "consulting agreements" with individuals that, in addition to other terms, provided financial incentives to individuals (such as Lawyer A) for helping Orlando raise funds for ARC, DWAC's Sponsor.  *See* Exh. 2, SEC Compl. ¶ 76.  The June 5, 2021 Consulting Agreement, created and executed by Lawyer A and Orlando, is one such agreement. *See supra* at ¶ 105.  This link between Orlando and Lawyer A is further evidence that the UAV Parties knew or should have known about Orlando's Plan B when they continued participating in, and aiding and abetting, the Pre-Targeting Conspiracy in violation of their fiduciary duties.

120.    Additionally, according to the SEC, from in or about June 2021 to in or about August 2021, Lawyer A was copied on a series of email communications from an existing DWAC investor to prospective investors.  *See* Exh. 2, SEC Compl. ¶ 77.  The emails referred to "one major standout [target company] which makes this SPAC opportunity even greater" and noted that after signing a confidentiality agreement, potential investors could participate in "a call with Patrick [Orlando]'s team, and [Lawyer A] on the possible SPAC acquisition to understand the uniqueness of this possible opportunity."  *Id.*  Lawyer A proceeded to attend videoconference meetings with Orlando and potential DWAC investors throughout May, June and July of 2021.

121.    According to the SEC, on or about July 8, 2021, Orlando traveled to Old TMTG's offices and spent the entire day there.  *See* Exh. 2, SEC Compl. ¶ 81.

25

122.     That same day, DWAC filed an amended Form S-1 (the "July Form S-1") increasing its planned offering from $100 million to $300 million and announcing the addition of Rodrigo Veloso and two other individuals as directors.  *See* Exh. 2, SEC Compl. ¶ 78.  According to the SEC, Veloso had been involved with Orlando in discussions with Old TMTG.  *Id*.

123.     The timing of Orlando's visit to Old TMTG's offices and the subsequent filing of DWAC's amended Form S-1 indicate that the UAV Parties assisted or, at a minimum, knew of Orlando's plan to cause DWAC to file the Form S-1.  In doing so, the UAV Parties breached the fiduciary duties they owed to Old TMTG.

124.     The July Form S-1 contained several of the same material statements alleged by the SEC to be false that appeared in the May Form S-1.  Orlando reviewed and signed the July Form S-1.

125.     According to the SEC, on July 15, 2021, a TMTG executive emailed himself an audio recording in which he made mental notes to himself, including, "For [another TMTG executive], TMTG ticker symbol.  Tell him about that. . . . The merger agreement arrived.  Also potentially flipping it to another SPAC." *See* Exh. 2, SEC Compl. ¶ 82. Upon information and belief, the "TMTG executive" referenced by the SEC is either Litinsky or Moss.

126.     Also, according to the SEC, on or about August 18, 2021, a TMTG representative emailed himself and wrote, "Everything is lined up. Platform is weeks away.  Backed by $300 million in cash.  Billions of stock.  Press conference video is ready.  Only thing missing is licensing Agreement."  *See* Exh. 2, SEC Compl. ¶ 84.  At the time, Old TMTG was in the process of renegotiating a licensing agreement.  *Id*.  Also, at the time, Benessere had approximately $115 million in its trust account.  *Id*.  DWAC, on the other hand, had filed a Form S-1/A on July 8, 2021

26

announcing that it had planned to do a $300 million IPO.  *Id*.  Upon information and belief, the

"TMTG representative" referred to by the SEC in this allegation is either Litinsky or Moss.

127.    According to the SEC, on or about August 28, 2021, Orlando received a text from

a DWAC representative that read, "Talked to [TMTG's outside counsel].  [He represented that Old]

TMTG wants to announce soon so if it's plan B, they're going to push hard for relative immediate

announcement.  I told them we'd need a month.  Probably gonna settle at 2-3 weeks."  *See* Exh. 2,

SEC Compl. ¶ 85.  Upon information and belief, the SEC's reference to "TMTG's outside counsel"

is to Lawyer A.

128.    The SEC alleged that on August 31, 2021, three days prior to the commencement

of its IPO, DWAC filed another amended Form S-1 (the "Final Form S-1") that Orlando reviewed

and signed.  *See* Exh. 2, SEC Compl. ¶ 86.  Orlando, in breach of his fiduciary duties, caused

DWAC to make several representations that the SEC has alleged were materially false and

misleading in the Final Form S-1 about discussions between DWAC and potential targets,

including the following:

> To date, our efforts have been limited to organizational activities as
> well as activities related to this offering.  We have not selected any
> specific business combination target and we have not, nor has
> anyone on our behalf, engaged in any substantive discussions,
> directly or indirectly, with any business combination target with
> respect to an initial business combination with us.

129.    Orlando also caused the Final Form S-1 to contain the following statements

regarding DWAC's contact with potential targets:

> We have not, nor has anyone on our behalf, initiated any substantive
> discussions, directly or indirectly, with any business combination
> target.  From the period commencing with our formation through the
> date of this prospectus, there have been no communications or
> discussions between any of our officers, directors or our sponsor and
> any of their potential contacts or relationships regarding a potential
> initial business combination.  Additionally, we have not engaged or
> retained any agent or other representative to identify or locate any

suitable acquisition candidate, to conduct any research or take any measures, directly or indirectly, to locate or contact a target business. However, we may contact such targets subsequent to the closing of this offering if we become aware that such targets are interested in a potential initial business combination with us and such transaction would be attractive to our stockholders. Accordingly, there is no current basis for investors in this offering to evaluate the possible merits or risks of the target business with which we may ultimately complete our initial business combination.

[…]

We have not contacted any of the prospective target businesses that [SPAC A and another SPAC controlled by Orlando] had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

*See* Exh. 2, SEC Compl. ¶¶ 86–89.

130.    The SEC has found that these statements were false or misleading because, among other things: (a) Orlando assumed control of DWAC in May 2021 envisioning that it could be used to pursue a merger with Old TMTG; (b) Orlando told Lawyer A, Litinsky, and perhaps others during the summer of 2021 of the possibility of using DWAC to complete a merger with Old TMTG and Litinsky even noted that by April 14, 2021 he was aware of Plan B; (c) through the Consulting agreement, Lawyer A was actively soliciting investments for DWAC through ARC, for which it had a compensation structure in the spring of 2021; (d) the discussions between Benessere and Old TMTG had ceased before DWAC's IPO; and (e) Orlando had selected Old TMTG as DWAC's preferred target prior to its IPO. *See* Exh. 1, SEC Cease and Desist Order ¶ 39.

131.    DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which were held in trust for the benefit of shareholders until the completion of the business combination in March 2024.

132.    According to the SEC, DWAC filed a prospectus on September 8, 2021 that included the same misrepresentations described in paragraphs ¶¶ 128–29.  *See* Exh. 2, SEC Compl. ¶ 92.

133.    The UAV Parties knew or should have known that Orlando's conduct with respect to the SEC filings was improper.

F.    **DWAC's Post-IPO Negotiations with Old TMTG**

134.    Following DWAC's IPO, DWAC and Old TMTG could publicly engage in merger communications.  However, to avoid raising red flags for securities violations, the Co-Conspirators had to make it seem like DWAC was considering multiple merger targets, including Old TMTG.

135.    According to the SEC, on or about September 8, 2021—the day DWAC's IPO closed—DWAC sent Old TMTG (and other companies) a draft nondisclosure agreement.  *See* Exh. 2, SEC Compl. ¶ 95.

136.    On September 13, 2021, DWAC and Old TMTG signed the nondisclosure agreement.  The next day, Lawyer A emailed DWAC's in-house counsel a draft of a mutually exclusive letter of intent to pursue a merger between DWAC and Old TMTG.

137.    According to the SEC, on or about September 15, 2021, a mere week after DWAC's IPO closed, DWAC began coordinating an in-person event to sign the letter of intent with Old TMTG on September 22, 2021, and started preparing a press announcement by the end of September 2021.  *See* Exh. 2, SEC Compl. ¶ 93.

138.    On September 18, 2021, Lawyer A emailed Benessere a draft agreement to terminate the June 4 LOI and release Orlando from the Break-Up Fee clause.

139.    According to the SEC, on or about September 22, 2021, DWAC's Board (including Orlando) formally approved the signing of a letter of intent with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 100.  That same day, Orlando met with representatives from Old TMTG and signed a mutually exclusive letter of intent between DWAC and Old TMTG.  *Id*.

140.    Also on September 22, 2021, Orlando (on behalf of Benessere) and Old TMTG signed a termination agreement ending the June 4 LOI and freeing Orlando from the $1 million Break-Up Fee Clause.

141.    According to the SEC, on or about October 19, 2021, DWAC's Board (including Orlando) approved the signing of a definitive merger agreement with Old TMTG.  *See* Exh. 2, SEC Compl. ¶ 101.  DWAC and Old TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after the market closed that day.  DWAC filed a Form 8-K regarding the deal late on October 20, 2021, and the filing became publicly available at approximately 6 a.m. on October 21, 2021.

142.    Also, according to the SEC, on May 16, 2022, DWAC filed a Form S-4 regarding its planned merger with TMTG.  *See* Ex. 2, SEC Compl. ¶ 103.  DWAC's Form S-4, which Orlando reviewed and signed, continued to misrepresent the nature of the negotiations between DWAC and TMTG and to omit material facts.  *Id*.  For example, the Form S-4 disclosed that the June 4, 2021 LOI between SPAC A and TMTG was terminated effective September 1, 2021, but did not disclose that the termination agreement was executed.  Accordingly Orlando was released from the Break-Up Fee Clause, on September 22, 2021, the same day that Orlando met with TMTG and executed the letter of intent between DWAC and TMTG.  *Id.*

143.    According to the SEC, the Form S-4 described the timeline of interactions between DWAC and TMTG as starting only after DWAC completed its IPO on September 8, 2021. *See*

Ex. 2, SEC Compl. ¶ 103.  However, the SEC found that Orlando had numerous interactions with TMTG prior to DWAC's IPO.  *Id*.

G.    **SEC Investigation Into DWAC Merger with Old TMTG and Related Fines**

144.    Shortly thereafter, the legal consequences of the Co-Conspirators' conduct began to threaten the merger between DWAC and Old TMTG.  In or about January 2022, the SEC initiated an investigation and subsequently declined to review a registration statement on form S-4, effectively stalling the deal to the determine of both DWAC and Old TMTG.

145.    On or about July 20, 2023—after Orlando was removed as DWAC CEO—the SEC instituted a cease-and-desist proceeding against DWAC, finding that, under Orlando's leadership, DWAC violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.  *See generally* Exh. 1, SEC Cease and Desist Order. In addition to other remedies, the SEC imposed a civil penalty of $18 million and required to DWAC to file an amended registration statement on form S-4.  *Id*.

146.    Among other findings, the SEC determined that Orlando "communicated with various people regarding his desire to use DWAC as the vehicle to complete a merger with [Old] TMTG."  Exh. 1, SEC Cease and Desist Order ¶ 27.  He did so despite DWAC's interest in [Old] TMTG not being public, and despite the fact that SPACs, by definition, are not permitted to have a predetermined merger target.  *See generally* 17 C.F.R. § 230.419.

147.    As noted above, the government investigation and enforcement action substantially delayed the merger between DWAC and Old TMTG.  This delay threatened DWAC's survival and frustrated Old TMTG's access to the capital the merger was anticipated to provide and its ability to timely pursue its business plans.

### H.    Orlando and the UAV Parties' Pre-Targeting Conspiracy Damaged DWAC and Old TMTG

148.    The Co-Conspirators' conduct harmed DWAC n/k/a TMTG and Old TMTG in several ways.

149.    First, and most obvious, the Co-Conspirator's misconduct harmed DWAC n/k/a TMTG and its shareholders and exposed the company to regulatory liability and financial harm, ultimately resulting in a settlement with the SEC resulting in, among other things, the imposition of an $18 million penalty.  Further, DWAC and its shareholders incurred at least $11 million in related legal costs and fees.

150.    The Co-Conspirators' misconduct also jeopardized DWAC's pending merger with Old TMTG.  As a result of the investigation, Old TMTG (with the UAV parties no longer in control) threatened to withdraw from the Merger Agreement, pending renegotiation.  It was only *after* the DWAC Board of Directors navigated the SEC investigation—and Orlando was removed as CEO—that Old TMTG eventually agreed to reenter the Merger Agreement with DWAC.

151.    Notwithstanding Old TMTG's reaffirmation the Merger Agreement, the SEC investigation resulted in material delay to DWAC's merger timeline with Old TMTG.  As a result of the investigation, DWAC was forced to conduct two shareholder votes to extend the Company's automatic liquidation date, *i.e.*, the Company's deadline by which it was required to effectuate the merger.  DWAC was also forced to incur legal and administrative expenses as a direct result of the Co-Conspirators' tortious conduct, breaches of fiduciary duties, and other misconduct.

152.    Facilitating and executing two major shareholder votes resulted in massive monetary costs to DWAC.  To facilitate the votes and the necessary proxies, DWAC was forced to expend millions of dollars.  These votes would not have been necessary but for the delays imposed by the SEC investigation caused by the Co-Conspirators' conduct.

153.    Old TMTG further suffered significant monetary harm in delaying its plans to go public because of the Co-Conspirators' conduct.  The timing of such mergers is highly consequential and the delays imposed by the SEC investigation caused substantial injury to Old TMTG.

154.    The reputational damage to DWAC and Old TMTG as a result of the SEC investigation was also substantial.  For example, during and immediately following the SEC investigation, DWAC faced extreme difficulty in raising funds to continue its efforts towards a de-SPAC merger.  Consequently, DWAC and Old TMTG were forced to issue additional convertible notes to finance operations.

155.    Moreover, not wanting to be associated with Orlando and the SEC investigation, nearly all of DWAC's Board of Directors resigned in November and December 2022.  Orlando's conduct therefore forced a company leadership changeover in an already-turbulent time for DWAC.

## V.    The UAV Parties Failed to Manage Old TMTG Using Good Faith or Due Care

156.    In addition to the damage the UAV Parties caused to Old TMTG and DWAC through their knowledge of and participation in the Pre-Targeting Conspiracy, the UAV Parties further breached their fiduciary obligations to Old TMTG through their woeful mismanagement of the company and subsequent retaliatory conduct.

157.    As the *de facto* officers and directors of Old TMTG, the UAV Parties were in control of Old TMTG's day-to-day operations and major decisions of corporate policy until the new CEO and Board of Directors took the reins in early 2022.  The UAV Parties' primary responsibility (apart from securing a successful merger) was to competently prepare Old TMTG to launch the Truth Social platform.

158.    Instead, the UAV Parties misallocated Old TMTG's resources, executed (or attempted to execute) bad contracts without proper approval, and failed to carry out Old TMTG's most important goals.

159.    The UAV Parties failed to successfully launch Truth Social, leading an already hostile media to criticize Old TMTG for long user wait times and technical failings, to the detriment of the Old TMTG's business reputation.

160.    On June 12, 2022, Old TMTG's Board authorized the creation of the "Special Committee re: United Atlantic Ventures" (the "Special Committee") to investigate events that occurred in early 2022, including the UAV Parties' derelict management of Old TMTG.

161.    On January 16, 2023, the Special Committee issued a report making numerous findings of pervasive, reckless mismanagement by the UAV Parties, dating back to the beginning of Moss and Litinsky's service as Old TMTG's *de facto* officers and directors.  This included findings that:

> a.    The UAV Parties failed to conduct an organizational meeting, adopt incorporator resolutions, adopt corporate by-laws, or cause the adoption of a shareholders' agreement that would have established a corporate governance structure for Old TMTG.  This required Old TMTG to spend substantial effort and resources to ensure that Moss and Litinsky's failures did not call into question the authority Old TMTG had to make and execute on several of the business decisions to which it was committed;
>
> b.    The UAV Parties hand-picked a technical team to develop the Truth Social platform that lacked the skill and maturity necessary to build a platform at the size and scale needed to achieve commercial success;
>
> c.    The UAV Parties failed to manage the technical team;
>
> d.    The UAV Parties caused Old TMTG to enter into a commercially unreasonable relationship with a cloud services provider, who charged exorbitant rates for substandard or non-existent services.  The provider's equipment operated slowly, severely limiting capacity, while suffering frequent outages; and
>
> e.    Even after a new CEO was appointed, the UAV Parties attempted to assert control of Old TMTG's operations by, among other things, threatening that

if their decisions were not followed, they would cause a walkout of their hand-picked technical team, to the detriment of Old TMTG and the Truth Social launch.

162.    In addition to these problems, the UAV Parties failed entirely to develop a business plan for Old TMTG's streaming video on demand services, which jeopardized Plaintiffs' ability to follow through on representations made to investors and the public.

## VI.    Orlando Failed to Manage DWAC Using Good Faith or Due Care

163.    Throughout his tenure as a DWAC officer and director, Orlando failed to exercise minimum levels of competence and care required of a CEO. These failures caused extensive harm to DWAC and its shareholders.

164.    Orlando failed to employ basic company governance necessary to protect company and shareholder interests. He failed to hold formal votes for major company decisions, failed to record Board meeting proceedings with formal minutes or notes, failed to maintain sufficient records, and withheld pertinent information from Board members when seeking ratification of his decisions. Upon information and belief, despite conducting dozens of Board meetings during his tenure as DWAC CEO, Orlando failed to ensure minutes were recorded for many of them.

165.    Orlando failed to employ or institute basic accounting and record-keeping functions that further caused harm to DWAC. In particular, Orlando failed to institute proper corporate partitions between DWAC and Benessere Enterprises, Inc., another Orlando-affiliated entity, resulting in two material restatements to DWAC's financials and extensive costs for accounting services. Such deficiencies negatively impacted market confidence in DWAC's business and shareholder value, and also resulted in the resignation of DWAC's auditor.

166.    Similarly, Orlando, acting as an agent of ARC, engaged in negligent and reckless handling of storage of DWAC-related documents, including vendor contracts and invoices, in his

personal email account. Such conduct resulted in the omission of multiple vendors in internal company reporting, and required DWAC to remedy actions that violate industry standard practices.

167.    As CEO of DWAC and as a member of its Board of Directors, Orlando utilized his position to enrich himself and ARC, often in direct conflict with DWAC's interests.

168.    As CEO, Orlando executed promissory notes on behalf of DWAC to ARC with no ratification by a disinterested Board of Directors. Because Orlando controls ARC, he had a duty to follow proper procedures to ensure that the interests of DWAC's shareholders were represented by disinterested leadership.

169.    Orlando continued to leverage his position as a director in relation to the promissory notes that he issued to himself via ARC. For example, he chose to prioritize his own enrichment over the needs of DWAC at a critical moment for the Company as part of its annual 10-K report.

170.    As part of the 10-K reporting process, DWAC's external auditor sent letters to all entities to whom the Company owed a form of debt such as promissory notes. To finalize the reporting process, the auditor required a response and verification from all such persons. In his capacity as controller of ARC, Orlando received such a notice with regard to the promissory notes he issued to ARC as DWAC CEO.

171.    Rather than sign and verify the forms as requested, Orlando refused to sign unless DWAC agreed to transform his promissory notes into convertible notes. By transforming the notes, Orlando stood to profit substantially through the prospect of obtaining DWAC shares in far excess of the monetary value of the notes in their original promissory form.

172.    Knowing that DWAC faced potential de-listing from the NASDAQ stock exchange for failure to complete the 10-K audit process, Orlando effectively forced DWAC to transform his

standard shareholder loan into more-profitable convertible notes for the benefit of ARC, and by extension, himself.

173.    Orlando's actions related to the promissory notes, aided by ARC, were calculated to benefit ARC and Orlando, not DWAC.  As a Director, Orlando had a fiduciary duty to DWAC to facilitate the audit process, not utilize the process as an opportunity for self-enrichment.

174.    Such self-interested conduct by Defendants extends further back as well. Throughout the merger process, Orlando—both in his personal and ARC capacities—made a habit of obstructing straightforward board-of-director votes, meetings, and actions by DWAC as a means to demand additional monetary compensation.  For example, Orlando refused to sign routine SEC filings and necessary amendments to the Merger Agreement. Such actions had no material benefit to DWAC's shareholders.  Instead, Orlando used such instances as means to exert leverage over DWAC for pending disagreements or disputes.  Orlando's reckless and irrational behavior extended beyond the boardroom.  On more than one occasion, Orlando published social media posts that were harmful to the standing and reputation of DWAC as a public company.

175.    Upon information and belief, Orlando went so far as to discourage investors from investing money in DWAC based on his own personal grievances.  After being removed as DWAC's CEO in March 2023, Orlando convinced a DWAC investor who previously had earned money from DWAC's IPO not to invest more money in DWAC.  When confronted about why he did this, Orlando stated that it was his turn to make the life of the new CEO miserable.

176.    Upon information and belief, Orlando also leaked confidential business information to the press for his own personal benefit and without benefit to DWAC's shareholders.  On at least one occasion when Orlando was on the phone with other DWAC personnel, he excused himself to take another phone call but forgot to mute the first call.  As a result, DWAC personnel heard

Orlando leaking details about DWAC's prospective merger with Old TMTG to the press. When confronted, Orlando lied and claimed that he told the reporter "no comment."

177.     After years of additional negotiation, coordination, and preparation, DWAC completed one of the final prerequisites to the merger consummation by having its registration statement on Form S-4 declared "effective" by the SEC on February 14, 2024. Building off the registration statement, DWAC filed a merger proxy/prospectus for DWAC's proposed business combination with Old TMTG on February 16, 2024, and scheduled a special shareholder meeting for approval of the merger and related matters on March 22, 2024.

## VII.     ARC and Orlando's Obstruction of Business Operations and Merger Consummation

178.     In the lead-up to the merger consummation and imminent shareholder vote, Orlando and ARC sought to frustrate and obstruct the consummation as a means to extract monetary consideration from DWAC and its shareholders, notwithstanding Orlando and ARC's obligation to help lead DWAC toward consummation as fiduciaries. Throughout that time, Orlando and ARC's motivation was self-dealing—*i.e.*, not in the best interest of DWAC, its shareholders, or the merger.

179.     One of the closing prerequisites of the Merger Agreement was that all DWAC Board members must provide conditional resignation letters to take effect at the moment of the merger consummation. The purpose of the resignations was to enable the combined entity to establish its Board pursuant to the structure and allocations set forth in the Merger Agreement, and consistent with the proxy/prospectus delivered to DWAC's stockholders.

180.     In the months leading up to the shareholder vote, Orlando, in both his personal capacity and as a controller of ARC, attempted a blatant shakedown extortion effort, stating that he would decline to issue his resignation—and thus attempt to kill the merger in its entirety by preventing a necessary closing condition—unless DWAC agreed to a series of unconscionable

demands. These demands included a $100,000 note convertible into 10,000 Class A shares, an additional 97,000 shares for being a director, and 6.5 million warrants exercisable at $11.50 per share, which, net of the warrant exercise price, would reflect approximately $222,587,500 in additional value to Orlando based on a per share DWAC Class A common stock trading price of $45.00 (DWAC closed at $47.23 per share on February 26, 2024).

181.    Additionally, as a result of the SEC investigation and settlement, a significant portion of DWAC's management and Board turned over, yet Orlando refused to provide promised compensation to management and directors for their service, reducing the incentive for such individuals to take on the burden and potential liability of managing DWAC through the merger. As a result, in December 2023, DWAC received shareholder approval for a management and director compensation plan and arrangement. Orlando's refusal to fulfill these promised compensatory obligations, in favor of his own pecuniary and personal interests, caused DWAC significant delay and expense. His failure to do so also resulted in potential future dilution to the public shareholders.

182.    Orlando also levied additional demands that had nothing to do with the well-being of DWAC's shareholders, but rather related only to his own pecuniary and personal interests. For example, he demanded that in exchange for his resignation commitment, the then-CEO of DWAC would need to provide a signed affidavit providing witness testimony regarding a collateral dispute concerning Orlando and a non-party that has no connection to DWAC. Orlando further demanded that DWAC provide "cooperation" in any investigation by the SEC into Orlando's past conduct.

183.    These motivations and demands had nothing to do with DWAC shareholders, and would have served to benefit Orlando only.

184.    DWAC was forced to expend hundreds of thousands of dollars in time and legal fees to address these demands by Orlando and ARC through its lawyers.  Such expenditures were borne by DWAC, and by extension, its shareholders.

185.    Orlando also withdrew money from DWAC to serve his own purposes.  For example, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal being for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.  Upon information and belief, Orlando failed to utilize the $15,000 in cash for legal services as represented to DWAC.  At no time prior or subsequent to the withdrawal did Orlando purport to pay for legal services in cash.

186.    Around the time of the merger consummation, Orlando failed to identify justifiable business bases for his conduct which violated his fiduciary obligations, ultimately reflecting his continued desire to utilize his position and control over DWAC to enrich himself at the expense of DWAC's shareholders.  The enumerated purpose of DWAC was to effectuate a SPAC merger, and Orlando and ARC's conduct disregarded this corporate mandate in pursuit of personal gain.

187.    Orlando and ARC sought to undermine, threaten, and oppose the merger through a series of actions motivated by a desire to extort the company, and by extension, its public shareholders.  For example, in its role as sponsor of DWAC, ARC had a contractual obligation to vote its shares in favor of the business combination.  ARC, however, withheld its vote even though the voting window had opened.  This conduct resulted in millions of dollars of added expense to the Company in effectuating the merger on the contingency that ARC would not perform its contractual duties at Orlando's direction.

188.    As noted above, at the time that the voting window for the merger consummation opened in February 2024, Orlando communicated to DWAC that he was supposedly entitled to

40

additional unreasonable compensation in his personal capacity as a director of the Company. The Board declined his request. Additionally, after the voting window for the merger consummation opened, Orlando made unfounded and unreasonable demands for personal reimbursement without adequate proof or justification for the demands.

189.    While Orlando was making demands of DWAC for his personal benefit during the voting window for the merger consummation, ARC declined to lodge its vote despite its contractual obligation to do so. During this time, ARC made its demands on DWAC separate from that of Orlando. In particular, ARC demanded certain adjustments be made to the ratio by which its shares in DWAC would be converted to new shares in the new merger entity. By withholding ARC's vote, both Orlando and ARC attempted to leverage DWAC into a less favorable bargaining positions on these various disputes, with each standing to benefit in separate capacities, but nonetheless providing aid to the other in the process. Old TMTG suffered similar harm as a result of the uncertainty and increased complexity of a last-minute vote scenario.

190.    And just seven days before the vote on the business combination, Orlando sent an extensive demand for documents clearly aimed to interfere with the vote and the closing of the business combination. In the demand, Orlando indicated that his vote in favor of the business combination was contingent upon receipt of the documents, even though the documents had no bearing on the merits of the business combination and should have been requested long before the vote. The demand caused DWAC to incur additional, substantial costs and distraction in its efforts to comply with the demand.

191.    Orlando, through ARC, raised millions of dollars, through various means, based on misrepresentations about his personal, financial self-dealing and adherence to statutory and

regulatory requirements, promising investors shares in DWAC n/k/a TMTG in exchange for capital to be used in support of DWAC's merger with Old TMTG.

192.    Orlando, through ARC, failed to maintain and produce a clear accounting of who is owed what shares of DWAC n/k/a TMTG, leading to significant disruption to TMTG, including damages.

193.    Indeed, Orlando's failure is the subject of several multiple litigation matters brought by investors against Orlando and ARC. DWAC n/k/a TMTG has been tangentially brought into those litigations resulting in business disruption and expenditure of attorney's fees and costs.

194.    Orlando's misconduct and deficient accounting practices breached the fiduciary duties owed to DWAC n/k/a TMTG.

195.    Moreover, upon information and belief, Orlando failed to release the funds collected through ARC for the benefit of the merger between Old TMTG and DWAC and at issue in various lawsuits to DWAC n/k/a TMTG.

196.    Orlando's failure to turn these funds over to DWAC n/k/a TMTG breached the fiduciary duties owed to DWAC n/k/a TMTG.

197.    All conditions precedent to the maintenance of this action have occurred or have been performed, waived, or otherwise satisfied.

**COUNT I**
**BREACH OF FIDUCIARY DUTY OF LOYALTY**
**(BY DWAC N/K/A TMTG AGAINST ORLANDO)**

198.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 58–62, 68–155, 163–194 as though fully alleged herein.

199.    Orlando, during his tenure as CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of loyalty to DWAC.

200.    To fulfill this duty, Orlando was required to place the best interest of DWAC and its shareholders above his own.

201.    Orlando breached his fiduciary duty of loyalty by engaging in conduct which benefitted himself or ARC at the expense of DWAC and its shareholders.

202.    Orlando devised and engaged in a scheme to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

203.    In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with Old TMTG representatives, including the UAV Parties, for a merger between Old TMTG and DWAC.

204.    Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

205.    Orlando also generally refused to cooperate in DWAC corporate governance and business processes in furtherance of his personal interests.

206.    While serving as a Director of DWAC, Orlando made public statements that were harmful to the company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

207.    Orlando also continuously obstructed DWAC's eventual merger with Old TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

208.    Orlando also engaged in self-interested issuance of various encumbrances from DWAC to ARC (essentially himself) without the ratification of disinterested board members.

209.    Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures.

210.    Upon information and belief, Orlando also failed to deliver all funds raised by ARC for the benefit of DWAC.

211.    As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his fiduciary breaches that are subject to disgorgement.

212.    The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's fiduciary breaches, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, disgorgement of benefits, and such other relief as the Court deems appropriate

## COUNT II
## BREACH OF FIDUCIARY DUTY OF CARE
### (BY DWAC N/K/A TMTG AGAINST ORLANDO)

213.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 6, 63, 68–155, 163–194 as though fully alleged herein.

214.    Orlando, as the now-former CEO of DWAC from May 2021 to March 2023, a director of DWAC, and as managing member of ARC, owed a fiduciary duty of care to DWAC.

215.     To fulfill this duty, Orlando was required to exercise his responsibilities as CEO and a Director of DWAC in an informed and considered manner which an ordinarily prudent and careful CEO and Director would have used in the same circumstances.

216.     Orlando breached his fiduciary duty of care by engaging in the Pre-Targeting Conspiracy.

217.     Specifically, Orlando devised and engaged in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

218.     In furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite repeated and numerous communications and plans with his fellow Co-Conspirators.

219.     Orlando's conduct led to an SEC investigation that resulted an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

220.     Orlando further breached his fiduciary duty of care by failing to employ industry standard governance and business practices, including inadequate recordkeeping, failure to properly ratify Company decisions, and deficient accounting practices.

221.     Orlando also caused DWAC to incur fees and costs as well as business interruptions in connection with various lawsuits filed as a result of Orlando's accounting failures and deficiencies.

222.     Upon information, Orlando also failed to accurately account for or deliver funds raised by ARC, as DWAC's sponsor.

223.    As a direct and proximate result of Orlando's breaches of his fiduciary duties, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.  Further, Orlando reaped unearned benefits as a result of his breaches of fiduciary duty that are subject to disgorgement.

224.    The damages available to DWAC are inadequate to compensate DWAC for the entire extent of the harm incurred by DWAC that resulted from Orlando's breaches of his fiduciary duties, including his destruction of records, his self-interested transactions made without board approval, his violations of SEC regulations, and his efforts to derail the merger.  Such harm is irreparable.  DWAC n/k/a TMTG has a clear legal right to relief.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT III
## CONVERSION
### (BY DWAC N/K/A TMTG AGAINST ORLANDO)

225.    DWAC n/k/a TMTG realleges and incorporates Paragraph 185 as though fully alleged herein.

226.    Orlando wrongfully asserted dominion over DWAC assets inconsistent with DWAC's possessory rights over those assets.

227.    On at least one occasion, Orlando withdrew $15,000 in cash from a DWAC bank account and recorded the withdrawal as having been for "legal services."  Orlando provided no invoices substantiating his assertion that funds from this withdrawal were used to pay legal services.

Upon information and belief Orlando has engaged in similar improper utilization of Company funds without prior authorization or verification of valid business purpose.

228.    Plaintiffs have demanded return of their property and assets.

229.    Plaintiffs have suffered damages as a direct and proximate result of Orlando's wrongful assertion of dominion over DWAC's assets.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against Orlando for the fair market value of DWAC's assets at the time of their conversion, plus interest, together with the costs of this action, including along with all such other relief and remedies as the Court finds fit and proper under the circumstances.

## COUNT IV
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY DWAC N/K/A TMTG AGAINST ARC)

230.    DWAC n/k/a TMTG realleges and incorporates Paragraphs 68–143, 148–155 as though fully alleged herein.

231.    Orlando owed fiduciary duties of care and loyalty to DWAC.

232.    Orlando breached those fiduciary duties by exposing DWAC to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

233.    Orlando also repeatedly threatened to obstruct DWAC's merger with Old TMTG and threatened to cause DWAC to lose its business operations to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

234.    ARC had knowledge of Orlando's breaches of fiduciary duty.

235.    ARC substantially assisted and encouraged Orlando's breaches of fiduciary duty.

236.    Orlando has, and at all relevant times, had a personal stake in the object of his conduct that is separate and distinct from ARC's interest.

237.    As a direct and proximate result of ARC aiding and abetting Orlando's breaches of fiduciary duty, DWAC has suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, DWAC n/k/a TMTG respectfully requests that this Court enter final judgment against ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, injunctive relief barring future conduct as alleged herein, and such other relief as the Court deems appropriate.

## COUNT V
## VIOLATION OF FLORIDA'S DECEPTIVE
## AND UNFAIR TRADE PRACTICES ACT
### (BY ALL PLAINTIFFS AGAINST ORLANDO AND ARC)

238.    Plaintiffs reallege and incorporate Paragraphs 63, 68–143, 168–173, 180, 187 as though fully alleged herein.

239.    FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

240.    Solicitation of Old TMTG as a DWAC merger target constitutes "trade or commerce" as defined by Fla. Stat. § 501.203(8).

241.    Orlando issued promissory notes to ARC for his personal benefit, and later refused to cooperate in critical accounting processes unless DWAC agreed to transform the promissory notes into convertible notes.

242.    Orlando generally refused to cooperate in Company governance and business processes in furtherance of his personal interests.

243.    While serving as a Director of DWAC, Orlando made public statements that were harmful to the Company in violation of his duties and leaked information to the press for personal benefit despite the resulting harm to DWAC.

244.    Orlando also continuously obstructed DWAC's merger with TMTG to extort various concessions that only benefitted himself while harming DWAC and its shareholders.

245.    Old TMTG and DWAC are both harmed by Defendants' conduct alleged herein. The conduct of Orlando and ARC, which caused a delay of the merger and the SEC investigation, has caused significant harm to both DWAC and Old TMTG in the form of lost opportunity costs and substantial out of pocket costs.

246.    The damages available to Plaintiffs are inadequate to compensate Plaintiffs for the entire extent of the harm incurred by them that results from Defendants' violations of FDUTPA, including their violations of regulations and corporate governance standards, self-interested transactions made without DWAC board approval, and their efforts to derail the merger.  Such harm is irreparable. Plaintiffs have a clear legal right to relief.

247.    As the direct and proximate result of Defendants' deceptive and unfair acts or practices, Plaintiffs have sustained substantial actual damages in an amount to be proven at trial. Plaintiffs also are entitled to attorneys' fees arising from Defendants' violations of FDUTPA.

WHEREFORE, Plaintiffs respectfully requests that this Court enter final judgment against Orlando and ARC for monetary damages, including, without limitation, loss of revenue, lost profits, lost business value, costs, any statutorily-available exemplary damages, injunctive relief barring future conduct as alleged herein, reasonable attorneys' fees and court costs, and such other relief as the Court deems appropriate.

## COUNT VI
## BREACH OF FIDUCIARY DUTY OF CARE
### (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

248.    Plaintiffs reallege and incorporate Paragraphs 5, 45, 47, 68–144, 156–162 as though fully alleged herein.

249.    Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

250.    Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

251.    As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of care.  This means that they were required to exercise their duties in a manner in which ordinary careful and prudent men would use in the same circumstances and consider all material information reasonably available in making business decisions.

252.    During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

253.    Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to agree to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

254.    Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

255.    This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

256.    Litinsky and Moss also failed to ensure that all corporate formalities were carried out, to establish an adequate corporate governance structure for Old TMTG, and to allocate resources in a lawful and efficient manner.

257.    Litinsky and Moss also breached their duty of care by failing to execute contracts and business ventures that were commercially reasonable and beneficial to Old TMTG and with the proper approval from the Old TMTG Board.

258.    Litinsky and Moss also failed to launch the social medial platform, including hiring a technical team with the requisite technical skills to launch the platform.

259.    Plaintiffs suffered damages as a result of Moss and Litinsky's breaches of care, including increased legal and administrative costs, additional costs to remedy their breaches, lost business opportunities, and lost ability to execute on the Company's business plan.

WHEREFORE, Plaintiffs respectfully request that this Court render a judgment against Moss and Litinsky for damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VII
## BREACH OF FIDUCIARY DUTY OF LOYALTY
### (BY ALL PLAINTIFFS AGAINST LITINSKY AND MOSS)

260.    Plaintiffs reallege and incorporate Paragraphs 5, 46, 47, 68–162 as though fully alleged herein.

261.    Litinsky was a *de facto* director of Old TMTG from February 8, 2021 until March 11, 2022.

262.    Moss was a *de facto* director of Old TMTG from February 8, 2021, until March 11, 2022, and a member of Old TMTG's duly constituted Board of Directors from March 11, 2022, until September 23, 2022.

263.    As directors, Litinsky and Moss owed Plaintiffs a fiduciary duty of loyalty.

264.    To fulfill this duty, Litinsky and Moss were required to place the best interest of Plaintiffs and their shareholders above their own.

265.    During their terms as directors and/or *de facto* directors of Plaintiffs, Litinsky and/or Moss breached their duty of loyalty.

266.    During their terms as directors of Old TMTG, Litinsky and Moss acted grossly negligently and breached their duty of care by engaging in the Pre-Targeting Conspiracy.

267.    Specifically, Litinsky and Moss participated and assisted Orlando in the Pre-Targeting Conspiracy to merge DWAC and Old TMTG before DWAC had gone public and without informing the public, in violation of securities laws.

268.    Litinsky and Moss were aware that in furtherance of the Pre-Targeting Conspiracy, Orlando falsely represented in public filings that DWAC did not intend to merge with any specific company, despite Orlando's repeated and numerous communications and plans with Moss, Litinsky, and Lawyer A for a merger.

269.    This conduct led to an SEC investigation that resulted in an $18 million penalty, at least $11 million in legal fees, loss of reputation, and significant delays in the eventual merger between Old TMTG and DWAC.

270.     Litinsky and Moss held Plaintiffs hostage by threatening that any deviation from their directives would result in Litinsky and Moss retaliating against Old TMTG by provoking a walkout of the Company's technical team.

271.     Upon information and belief, Litinsky and Moss directed Plaintiffs' personnel to wipe servers belonging to one of social media platform's contractual partners in a retaliatory effort to destroy valuable code and sabotage the social media platform.

WHEREFORE, Plaintiffs respectfully request that this Court enter final judgment against Moss and Litinsky for monetary damages, including, without limitation, compensatory damages for the harm caused to Plaintiffs, disgorgement of the benefits Litinsky and Moss obtained, prejudgment interest, and such other relief as the Court deems appropriate.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST UAV)

272.     Plaintiffs reallege and incorporate Paragraphs 5, 18, 68–162 as though fully alleged herein.

273.     Litinsky and Moss owed fiduciary duties of care and loyalty to Plaintiffs.

274.     Litinsky and Moss breached those fiduciary duties by exposing Plaintiffs to regulatory liability through the practice of pre-targeting, which resulted in an $18 million dollar penalty and significant reputational harm.

275.     Litinsky and Moss also failed to manage Plaintiffs with due care or in good faith as alleged in Paragraphs 246 through 269.

276.     UAV, as the entity through which Litinsky and Moss conducted business and was controlled and dominated at all times by Litinsky and Moss, substantially assisted Litinsky and Moss's breaches of fiduciary duties.

277.     Litinsky and Moss have, and had at all relevant times, a personal stake in the object of their conduct that is separate and distinct from UAV's interest.

278.     As a direct and proximate result of UAV aiding and abetting Litinsky and Moss's breaches of fiduciary duties, Plaintiffs have suffered and will suffer damages in an amount to be proven at trial but substantially in excess of the jurisdictional limits of this Court, exclusive of attorneys' fees and costs.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against UAV and award damages for UAV's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT IX
## CONSPIRACY TO BREACH FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST ORLANDO, LITINSKY, AND MOSS)

279.     Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

280.     At all relevant times, Old TMTG entrusted Moss and Litinsky as its fiduciaries to act with due care and in good faith.

281.     At all relevant times, DWAC n/k/a TMTG entrusted Orlando as its fiduciary to act with due care and in good faith.

282.     Moss and Litinsky breached their fiduciary duties of care and loyalty by allowing Orlando to dual-track merger discussions with Benessere and DWAC as alleged in Counts VI and VII.

283.     Orlando breached his fiduciary duties of care and loyalty by placing his own self-interests above those of Plaintiffs', as alleged in Counts I and II and throughout this Second

Amended Complaint.

284.    Orlando, Moss, and Litinsky constituted a confederation of persons who have taken unlawful acts as alleged in herein and in furtherance of an agreement causing each other to breach their fiduciary duties to Plaintiffs.

285.    Plaintiffs have suffered damages a result of Orlando, Moss, and Litinksy's breaches of fiduciary duty as alleged in Counts I, II, VI, and VII.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment against Orlando, Moss, and Litinsky and award damages for their conspiracy to breach fiduciary duties owed to Plaintiffs, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT X
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS AGAINST ORLANDO)

286.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

287.    Moss and Litinsky breached their fiduciary duties of care and loyalty to Plaintiffs through their partnership with Orlando as alleged in Counts VI and VII.

288.    Orlando knew that Moss's and Litinksy's conduct constituted a breach of their fiduciary duties because of the severe legal risk it posed to the merger, which risk materialized in the form of investigations and a substantial delay of the merger.

289.    Orlando substantially assisted Moss's and Litinksy's breaches.

290.    Plaintiffs have suffered damages as a result of Moss's and Litinksy's breaches of fiduciary duty as alleged in Counts VI and VII.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Orlando and award damages for Orlando's aiding and abetting Moss's and Litinksy's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (BY ALL PLAINTIFFS LITINSKY AND MOSS)

291.    Plaintiffs reallege and incorporate Paragraphs 68 through 155 as though fully alleged herein.

292.    Orlando breached his fiduciary duties of care and loyalty to DWAC n/k/a TMTG through the carrying out of the Pre-Targeting Conspiracy alleged in Counts I and II and throughout this Second Amended Complaint.

293.    Litinsky and Moss knew that Orlando's conduct constituted a breach of his fiduciary duties owed to DWAC n/k/a TMTG because of the severe legal risk it posed to the merger with Old TMTG, which risk materialized in the form of investigations and a substantial delay of the merger.

294.    Litinsky and Moss substantially assisted Orlando in the breaching of the fiduciary duties of loyalty and care owed to DWAC n/k/a TMTG.

295.    Plaintiffs have suffered damages as a result of Orlando's breaches of fiduciary duty as alleged in Counts I and II.

WHEREFORE, Plaintiffs respectfully request that the Court render a judgment against Moss and Litinsky and award damages for Moss's and Litinsky's aiding and abetting Orlando's breaches of fiduciary duty, together with prejudgment interest and such other relief as the Court deems appropriate.

## COUNT XII
## UNJUST ENRICHMENT
### (BY PLAINTIFFS AGAINST UAV)

296.    Plaintiffs reallege and incorporate Paragraph 43 as though fully alleged herein.

297.    Old TMTG conferred a benefit upon UAV in the form of 8.6 million shares of stock in Old TMTG.

298.    UAV voluntarily accepted the benefit, has knowledge of that benefit, and has retained it.[4]

299.    Equity and good conscience require that UAV restore the benefit to Plaintiffs. UAV provided nothing of value to Plaintiffs in exchange for its shares: it failed to establish Old TMTG's corporate structure, its principals were a cause of legal hurdles and delay for the merger; it botched the management of Old TMTG to the company's detriment; and it failed to develop and execute a plan for streaming video on demand services.

300.    Old TMTG has no adequate remedy at law.

WHEREFORE, Plaintiffs respectfully requests that the Court render a judgment ordering UAV to return the shares of stock it received, or, alternatively, to restore the value of those shares to Plaintiffs together with prejudgment interest and such other relief as the Court deems appropriate.

---

[4] UAV benefited because its Old TMTG shares have been exchanged for TMTG shares and are of significant value.

## **PRAYER FOR RELIEF**

WHEREFORE, for the reasons set forth herein, Plaintiffs respectfully request the Court

enter judgment in their favor and against Defendants for damages, attorneys' fees where available

by contract or statute, any statutorily-available exemplary damages, and any other and further relief

as the Court deems just and proper.

Dated: July 31, 2024                    Respectfully submitted,

                              */s/ Christopher G. Oprison*
                              Christopher G. Oprison (FBN: 122080)
                              Tal Aburos (FBN: 1010901)
                              **DLA PIPER LLP (US)**
                              200 South Biscayne Boulevard
                              Suite 2500
                              Miami, Florida 33131
                              Telephone: (305) 423-8522
                              Facsimile: (305) 657-6366
                              chris.oprison@dlapiper.com
                              tal.aburos@dlapiper.com
                              *Counsel for Plaintiffs*

                              */s/ Samuel J. Salario, Jr.*
                              Samuel J. Salario, Jr., Esq. (FBN: 83460)
                              Jason B. Gonzalez, Esq. (FBN: 146854)
                              Mathew D. Gutierrez, Esq. (FBN: 94014)
                              Raymond F. Treadwell, Esq. (FBN: 93834)
                              **LAWSON HUCK GONZALEZ PLLC**
                              215 S. Monroe St., Suite 320
                              Tallahassee, Florida 32301
                              Telephone: (850) 825-4334
                              samuel@lawsonhuckgonzalez.com
                              jason@lawsonhuckgonzalez.com
                              mathew@lawsonhuckgonzalez.com
                              ray@lawsonhuckgonzalez.com
                              *Counsel for Plaintiffs*

# EXHIBIT 4

PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT

**To:    TMTG Board of Directors**

**Re:    Interim Report of the Special Committee re: United Atlantic Ventures**

**Date:  January 16, 2023**

**From: Kash Patel (Board Member)
        Scott Glabe (General Counsel)**

PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT

**<u>Interim Report of the Special Committee re: United Atlantic Ventures</u>**
**January 16, 2023**

On June 12, 2022, the Board of Directors of Trump Media & Technology Group Corp. ("TMTG," or "Company") established a Special Committee to review certain actions taken by and on behalf of the Company.  This report, compiled by the TMTG's General Counsel pursuant to the supervision of Special Committee member Kash Patel, contains findings with respect to United Atlantic Ventures, LLC ("UAV") and accompanying recommendations (see page 7).

**Chronological Summary of Findings**

*February 2021 to September 2021*

On February 2, 2021, a Services Agreement was executed by and among Donald J. Trump; Trump Media LLC; and UAV, a Delaware limited liability company formed in January 2021 whose members are Andrew Litinsky and Wesley Moss).

- Trump Media Group Corp. ("TMG"), now TMTG, was not a party to the Services Agreement (TMTG did not yet exist).  Instead, TM[T]G was an intended *beneficiary* of the Services Agreement.

- However, UAV failed to follow through on its contractual commitments, to the detriment of TMTG.

- For example, the Services Agreement required UAV to "cause to be created the Certificate of Incorporation, Shareholders Agreement and Corporate Bylaws for TM[T]G . . . ."  Although Trump Media Group Corp. ("TMG," now "TMTG") was subsequently incorporated as a Delaware corporation on February 8, 2021, neither <u>UAV nor the incorporator retained by UAV</u> <u>held an organizational meeting or adopted incorporator resolutions electing an initial board of</u> <u>directors—resulting in a cascading "failure of authorization" as defined in Section 204(h)(2) of</u> <u>the Delaware General Corporation Law.</u>

The Registration Statement ("S-4") filed with the Securities and Exchange Commission ("SEC") by Digital World Acquisition Corporation ("DWAC") on May, 16, 2022, included the following direct quotation:

- "On July 30, 2021, an attorney for the Trump Organization transmitted to counsel for TMTG correspondence, on behalf of President Trump, declaring *void ab initio* a Services Agreement that had granted TMTG, among other things, extensive intellectual property and digital media rights related to President Trump for purposes of commercializing the various TMTG initiatives."

**PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT**

- As a board member, Mr. Moss reviewed the S-4 and subsequently affirmed that he had not identified any errors in the chronology contained therein.

- Subsequent to President Trump's declaration, UAV's members negotiated a new agreement that neither makes the Services Agreement binding on TMTG nor binds President Trump with respect thereto.

    Non-party TMTG therefore has no obligation to UAV or any other party pursuant to the Services Agreement.

*September 2021 to March 10, 2022*

Notwithstanding the declaration by President Trump that the Services Agreement was *void ab initio*, members of UAV attempted to retain *de facto* and *ultra vires* control of TMTG. This attempt continued *after* the Company publicly announced the hiring of a prominent Chief Executive Officer ("CEO"), to take effect in January 2022, via a press release issued on December 6, 2021. TMTG also announced, in a December 14 press release, that it had "entered into a wide-ranging technology and cloud services agreement with Rumble Inc. ('Rumble')." The press release further specified that, "As part of the partnership, Rumble will deliver video and streaming for TRUTH Social."

The Company continues to investigate events that occurred during this period, but pertinent findings include the following:

- Members of UAV were informed in early January 2022 by the Company's newly-hired senior management that Mr. Moss's and Mr. Litinsky's hand-picked technical team lacked the skill and emotional maturity necessary to build a social media platform to the scale and specifications needed to achieve commercial success.

- Members of UAV attempted to retain control of TMTG by threatening others in the Company that any deviation from Mr. Moss's and Mr. Litinsky's purported directives would prompt them to retaliate by provoking a walkout of TMTG's technical team—to the detriment of TMTG and the Truth Social platform.

- Members of UAV also attempted to retain control of TMTG without disclosing their intentions to multiple Company investors, who provided capital to TMTG based on an understanding that the Company's leadership was empowered to exercise decision-making authority commensurate with their positions—and that TMTG would be closely partnering with Rumble, as publicly announced.

- Members of UAV attempted to headquarter the company in Atlanta, Georgia, without the knowledge or consent of the Majority Shareholder, President Trump. This attempt entailed significant legal and financial risk for the Company—and for President Trump personally.

- Members of UAV fostered an unpredictable and toxic corporate culture exemplified by their Chief Product Officer ("CPO") slamming and breaking a door during an argument—leaving Mr.

**PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT**

Moss and Mr. Litinsky trapped in a conference room and the CPO crying outside the Company's office. Additionally, some TMTG employees who regularly interacted with the members of UAV were so alarmed by their mood swings, erratic behavior, and flashes of anger that they suspected one or both suffered from a substance abuse problem.

- Members of UAV did not develop, or cause to be developed, a business plan for Streaming Video on Demand ("SVOD") services. This failure jeopardized the Company's ability to follow up on representations made to investors and the public regarding SVOD.

- Members of UAV mismanaged the highly publicized rollout of TMTG's Truth Social platform in late February 2022. Specifically, they disregarded senior management's strong recommendation that the target launch date be pushed back to the end of the first quarter of 2022, and they pushed ahead when they knew or should have known that the platform, as designed by their hand-picked technical team, was not ready for a full launch. Miscommunication by UAV around Truth Social's initial rollout resulted in significant damage to the Company's public reputation.

- Members of UAV attempted to coerce the TMTG communications staff to issue a press release announcing the full launch of the Truth Social platform in late February 2022, without the CEO's knowledge—and in direct contravention of public statements made by both the Majority Shareholder and CEO to *Fox News* that the platform would not be fully operational until the end of the first quarter of 2022.

- While scrambling to roll out Truth Social, members of UAV caused TMTG to form a commercially unreasonable relationship with cloud services provider RightForge. RightForge materially breached its agreements with TMTG and attempted to charge exorbitant prices for substandard and non-existent services. RightForge's equipment operated slowly, severely limiting capacity, while suffering frequent outages—deficiencies that had a material adverse impact on TMTG's operations and reputation. Furthermore, RightForge withheld or failed to timely provide basic information about its hardware and contracts, and leaked false and misleading information about TMTG to the media.

- In late February 2022, without the knowledge or consent of the CEO or Majority Shareholder, members of TMTG hired a RightForge-affiliated executive for the position of "Chief Architect or Chief Operating Officer," accompanied by a lucrative contract, notwithstanding the fact that the Company already employed a Chief Operating Officer. Members of UAV knew this executive also intended to remain on the payroll of RightForge until July 2021. Company management continue to probe conflict-of-interest issues related to RightForge.

- Also in late February 2022, despite TMTG's publicly-announced partnership with Rumble, UAV's handpicked technical team repeatedly denied Rumble access to Truth Social code, notwithstanding commitments from UAV's members to provide such access.

PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT

*March 11, 2022 and Aftermath*

On March 11, 2022, TMTG's Majority Shareholder took action pursuant to Delaware law to name a Board of Directors, adopt corporate bylaws, and enable a regularized management structure to keenly focus on corporate governance. (Mr. Moss was appointed to the board but resigned from that position—on his own initiative—on September 23, 2022.)

On the next day, March 12, 2022, TMTG personnel furtively and inexplicably wiped servers belonging to the cloud services provider Rumble, destroying valuable code and creating significant risk for the Company given TMTG's legal obligations to Rumble arising from their publicly-announced partnership. The Company reasonably believes that the delay by UAV's handpicked technical team in partnering with Rumble in a manner consistent with the December 14, 2021 press release, combined with the subsequent wiping of the Rumble servers, meaningfully contributed to the delay of Truth Social's full operability on iOS from the end of the first quarter target date until April 2022. The Company further reasonably believes that the apparent vandalism of the Rumble servers was directed by Mr. Moss and/or Mr. Litinsky—who, as noted above, had repeatedly suggested they would sabotage Truth Social if their own directives were not followed.

Consistent with these threats, after President Trump appointed a Board of Directors that did not include Mr. Litinsky, the Company contractor serving as Chief Technical Officer resigned, and the CPO abruptly took vacation and never returned to work. Echoing statements previously made by members of UAV and relying exclusively on anonymous sources, an April 4, 2022, *Reuters* article parroted the narrative that these departures represented a major setback for Truth Social. To the extent that such sources were affiliates of TMTG, their comments to *Reuters* represented a blatant breach of their non-disclosure obligations.

*Mid-March 2022 to Mid-October 2022*

After new team members took effective control of day-to-day operations of TMTG in mid-March 2022, they immediately established a culture of compliance and took steps to strengthen the Company's financial position. Moreover, since April 2022, TMTG has fully launched Truth Social in the Apple App Store, on the web, in the Samsung Galaxy Store, and in the Google Play Store. Truth Social has also successfully migrated to the Rumble cloud, cleared its waitlist, executed multiple feature updates, expanded to the United Kingdom, and introduced advertisements to the platform. Truth Social now has millions of users and is among the fastest growing social media platforms in history.

Despite UAV's failures, the Company's outside counsel has heretofore maintained common interest agreements with counsel for Mr. Moss and Mr. Litinsky in relation to ongoing investigations by the SEC and Department of Justice ("DOJ"). Moreover, although neither the Delaware law nor the Company's certificate of incorporation on file with the state of Delaware requires advancement or indemnification, <u>TMTG has also voluntarily paid approximately $100,000 each toward Mr. Moss's and Mr. Litinksy's legal fees—despite having no obligation to do so</u>. These agreements and payments were grounded in a shared understanding that no one affiliated with TMTG had engaged in wrongdoing with respect to the Company's pre-merger negotiations with DWAC.

PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT

*Recent Developments*

On October 13, 2022, TMTG terminated the employment of Will Wilkerson following unauthorized disclosures by Wilkerson of the Company's confidential information to the press. Wilkerson had recently been reprimanded for making lewd and unprofessional posts on the Truth Social platform, and Company management is continuing to investigate his online activity.

On October 15, 2022, the *Washington Post* published an article focusing on Mr. Wilkerson and his role as a close associate of Mr. Moss and Mr. Litinsky in the Company's early days (making Mr. Wilkerson a likely co-conspirator in some or all of the wrongdoing detailed above).  Mr. Wilkerson's purported revelations implicate Mr. Moss and Mr. Litinsky in significant wrongdoing:

- The article linked to a document alleging that Mr. Wilkerson "witnessed substantive communications between DWAC and TMTG in violation of SEC regulations" at a time when TMTG was managed by Mr. Moss and Mr. Litinsky.

- The article also references, and quotes excerpts from, a recording of DWAC CEO Patrick Orlando made by Mr. Moss and/or Mr. Litinsky in apparent violation of Florida law.

- Mr. Wilkerson's unauthorized disclosures to the press also indicate that he—as well as Mr. Litinsky and Mr. Moss—have willfully withheld from TMTG documents and information belonging to the Company.

- Moreover, a related review has revealed that, as part of a visa petition submitted to the U.S. Department of Homeland Security, Mr. Wilkerson signed off on an inaccurate and seemingly fraudulent prospective job description for another former TMTG employee hired by Mr. Moss and Mr. Litinsky (who, on information and belief, is a family friend and/or relative of Mr. Moss). Upon becoming aware of the issue, current Company management acted swiftly to terminate the petition in compliance with applicable immigration laws.

In light of these disclosures, TMTG may have claims for—without limitation—defamation, breach of contract, breach of fiduciary duty, conversion, unauthorized computer access, misappropriation of trade secrets, and tortious interference with business relationships.

PRIVILEGED & CONFIDENTIAL//ATTORNEY WORK PRODUCT

**Recommendations and Next Steps**

Based on the findings above, the Board should consider:

- Identifying an appropriate replacement for Mr. Moss;

- Adopting resolutions that use the process established by Delaware law to remedy corporate governance issues attributable to UAV;

- Declining to reimburse any additional legal fees for Mr. Moss or Mr. Litinsky;

- Incorporating the findings of this report—including with respect to TMTG's lack of obligations to UAV—into future decision-making; and

- Authorizing Company management to share relevant information regarding UAV, its members, and/or Mr. Wilkerson with SEC, DOJ, the State of Florida, and the Certified Financial Planner Board of Standards, Inc.

# EXHIBIT 5

| | |
|---|---|
| **From:** | Patrick Orlando[porlando@benesserecapital.com] |
| **Sent:** | Wed 3/10/2021 3:18:49 PM (UTC) |
| **To:** | Andy L[andy@trumpmedia.group] |
| **Cc:** | Wes Moss[wes@trumpmedia.group] |
| **Subject:** | Re: FLOO - 3-8-20 - 510pm - BENEU - TMG |
| **Attachment:** | LOI for Acquisitions - BENEU - TMG PO 3.10.21 900AM.docx |

Please see attached. Just one minor note on the footnote and we are ready to go.
Best Regards,
Patrick Orlando - Founder and CEO

Notice - The information contained in this email is confidential and is for use only by the intended recipient. If you are not the intended recipient, you must not disclose or use the information in this email in any way. If you received it in error, please advise us immediately by return email and delete the document.

On Mon, Mar 8, 2021 at 5:10 PM Andy L <andy@trumpmedia.group> wrote:

Hey Patrick, I hope all is well.  Please see the attached.  I think we are at the goal line.  Are you free at 6pm for a quick call?  Thanks.

---------- Forwarded message ------

Sent from my iPhone

Begin forwarded

Andy and Wes – last few changes to the LOI that we just discussed.

Best,

John

**JOHN F. HALEY** PARTNER

john.haley@nelsonmullins.com

**2 SOUTH BISCAYNE BLVD. | 21ST FLOOR**

**MIAMI, FL 33131**

T 305.373.9422   M 305.588.1860   F 305.373.9443

**280 PARK AVENUE | 15TH FLOOR** WEST

**NEW YORK, NY 10017**

T 646.428.2600   F 646.428.2610

**NELSONMULLINS.COM** VCARD **VIEW BIO**

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

**BENESSERE CAPITAL ACQUISITION CORP.**
78 SW 7th Street, Miami
FL 33130, United States

March 10th, 2021

<u>**CONFIDENTIAL**</u>

Trump Media Group Corp
Attn: President Donald J. Trump

Re:      <u>**Non-Binding Letter of Intent**</u>

Dear President Donald J. Trump,

This non-binding letter of intent (this "***LOI***") outlines the general terms and conditions of a potential business combination involving Benessere Capital Acquisition Corp., a Delaware Corporation ("***Investor***"), and Trump Media Group Corp., a Delaware Corporation (together with its subsidiaries to the extent reasonably applicable, the "***Company***").  The proposed transaction between *Investor* and the Company (the "***Proposed Transaction***") is intended to be on substantially the terms and conditions as set forth in <u>Exhibit A</u> hereto (the "***Term Sheet***").

      **1.**      **No Commitment.**  This LOI is intended to express only a mutual indication of interest in the Proposed Transaction.  No agreement providing for any Proposed Transaction or any other transaction or the participation by either party therein will be deemed to exist unless and until the Definitive Agreements (as defined below) have been executed and delivered by the Investor, the Company and each of the other parties thereto, if any.  Unless and until the Definitive Agreements have been so executed and delivered, none of the parties shall have any legal obligation to any other party of any kind with respect to the Proposed Transaction, whether because of this LOI or any other written or oral expression with respect to the Proposed Transaction or otherwise, except, in the case of this paragraph and paragraphs 3 through 11 of this LOI, which shall be legally binding upon the parties (the "***Binding Matters***").  Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its affiliates or any of their respective officers, directors, employees, consultants, contractors, agents and financial and legal advisors (collectively with such affiliates, such party's "***Representatives***") with regard to its participation in the Proposed Transaction.   Neither party will have (and each party hereby irrevocably waives) any claims against the other party or any of its Representatives arising out of or relating to the Proposed Transaction other than those, if any, that either such party may in the future have with respect to the Binding Matters and then only in accordance with the terms thereof, or as a party to the Definitive Agreements (if any) with the other party.

      **2.**      **Definitive Agreements.**   The obligations of the Investor and the Company to consummate the Proposed Transaction are subject to and conditioned upon the negotiation and execution of a definitive agreement, including a purchase, share exchange, merger or other acquisition agreement (the "***Acquisition Agreement***") and other documents (collectively with the Acquisition Agreement, the "***Definitive Agreements***"), containing such terms and provisions as are customarily included in documentation for a transaction of this nature and magnitude and as are otherwise agreed to by the Investor and the Company, including those in the Term Sheet.  The closing of the Proposed Transaction contemplated hereby (the "***Closing***") will be subject to the satisfaction of all conditions precedent to Closing as identified in the Acquisition Agreement and as set forth on the attached Term Sheet.

      **3.**     **Waiver Against Trust.**  Reference is made to the final prospectus of Benessere, dated as of January 4, 2021 and filed with the SEC (File No. 333-249814) on January 6, 2021 (the "*Prospectus*"). The Company represents and warrants that it has read the Prospectus and understands that SPAC has established a trust account (the "*Trust Account*") containing the proceeds of its initial public offering (the "*IPO*") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of SPAC's public stockholders (including overallotment shares acquired by SPAC's underwriters, the "*Public Stockholders*"), and that, except as otherwise described in the Prospectus, SPAC may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their SPAC shares in connection with the consummation of SPAC's initial business combination (as such term is used in the Prospectus) (the "*Business Combination*") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if SPAC fails to consummate a Business Combination within 24 months after the closing of the IPO, subject to extension by amendment to SPAC's organizational documents, (c) with respect to any interest earned on the amounts held in the Trust Account, as necessary to pay any taxes or for working capital or (d) to SPAC after or concurrently with the consummation of a Business Combination.  For and in consideration of SPAC entering into this LOI and into discussions with the Company regarding the Proposed Transaction, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this LOI, neither the Company nor any of its affiliates do now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this LOI or any proposed or actual business relationship between SPAC or its Representatives, on the one hand, and the Company or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "*Released Claims*"). The Company on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that the Company or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with SPAC or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with SPAC or its affiliates).  The Company agrees and acknowledges that such irrevocable waiver is material to this LOI and specifically relied upon by SPAC and its affiliates to induce SPAC to enter into this LOI, and the Company further intends and understands such waiver to be valid, binding and enforceable against the Company and each of its affiliates under applicable law.  To the extent the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, monetary relief against SPAC or its Representatives, the Company hereby acknowledges and agrees that the Company's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit the Company or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein.  In the event the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, relief

against the Trust Account (including any distributions therefrom) or the Public Stockholders, whether in the form of money damages or injunctive relief, SPAC and its Representatives, as applicable, shall be entitled to recover from the Company and its affiliates the associated legal fees and costs in connection with any such action, in the event SPAC or its Representatives, as applicable, prevails in such action or proceeding.

4.     **Confidentiality.**   The parties acknowledge and affirm the terms of the Confidentiality Agreement, dated as of February 5, 2021 (the "*NDA*"), between Investor and the Company.  The parties acknowledge and agree that the existence and terms of this LOI and the Proposed Transaction are strictly confidential (provided, that they may be disclosed by the Investor to Significant Investors as contemplated below).  Except as required by applicable law, rule or regulation (including SEC and applicable stock exchange requirements) or any governmental, judicial, regulatory or supervisory authority having jurisdiction over such party or its Representatives, neither the Investor nor its Representatives, on the one hand, nor the Company nor its Representatives, on the other hand, will make any public announcements relating to the Proposed Transaction without the prior written consent of the other party.  The Company acknowledges that U.S. securities laws and other laws prohibit any person who has material, non-public information concerning a public company from purchasing or selling any of its securities, and from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.  The Company acknowledges that the confidentiality provisions of the NDA and this LOI shall be deemed to be an agreement to keep the confidential information of the Investor in confidence as contemplated by Regulation FD promulgated by the SEC.  In addition, the Company acknowledges and agrees that some of the confidential information of the Investor (including this LOI) may be considered "material non-public information" for purposes of the federal securities laws and that the Company and its Representatives will abide by all securities laws relating to the handling of and acting upon material non-public information regarding the Investor.  Notwithstanding the foregoing, the Company understands and acknowledges that after each party executes this LOI, the Investor and its Representatives may on a confidential basis share this LOI and certain confidential information about the Company with certain of the Investor's significant existing selected and potential co-investors (together, the "*Significant Investors*") in order to gauge their support of the Proposed Transaction and the Company hereby consents to the foregoing and agrees to cooperate in a timely manner with, and provide reasonable support for, such efforts (including having its Chief Executive Officer and other senior management reasonably available to participate in conversations, presentations and meetings with Significant Investors).

5.     **Exclusivity.**.

(a)     **Initial Non-Exclusivity and Further Company Exclusivity.**     In consideration of the considerable time, effort and expense to be undertaken by the Investor in connection with the Proposed Transaction, the Company agrees that during the period from the execution of this LOI and ending sixteen (16) days thereafter (the "*Initial Non-Exclusive Period*"), neither the Company nor the Investor shall be bound by exclusivity provisions; however, at the sole option of the Investor (exercisable upon written notice to the Company not less than two (2) days prior to the expiration of the Initial Non-Exclusive Period and revocable upon written notice to the Company at any time prior to the expiration of the Initial Non-Exclusive Period), during a further period from the expiration of the Initial Non-Exclusive Period and ending ninety (90) days after the execution of this LOI (the "*Exclusivity Period*"), the Company will not, and the Company will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with, or encourage, or provide any information to, any individual, corporation, partnership, limited liability company or other entity or group (other than the

Investor and its affiliates) concerning any transaction with respect to the direct or indirect sale, transfer, license or other disposition of the Company or its subsidiaries, or their respective equity interests, business or material assets (outside of the ordinary course of business), whether by purchase, merger, consolidation, recapitalization, exclusive license or otherwise, or any similar transaction that would reasonably be expected to prohibit or impair the Proposed Transaction (a "**Competing Transaction**"), or enter into any agreement in principle, letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto. The Company shall immediately suspend any pre-existing discussion with all parties other than the Investor and its affiliates regarding any solicitation or offer for a Competing Transaction. During the Exclusivity Period, the Company shall promptly (but in any event within 48 hours) after receipt notify the Investor if it receives any solicitation or offer for a Competing Transaction and thereafter keep the Investor reasonably informed as to the terms and status of such Competing Transaction. The Company represents that neither the Company nor any of its affiliates or equity holders is party to or bound by any binding or non-binding agreement or understanding with respect to any Competing Transaction. For the avoidance of doubt the provisions of this paragraph 5(a) shall in no way prohibit, curtail or limit the Company's ability to raise capital from existing or new investors in a private placement of equity or debt securities.

(b)     **Investor Exclusivity.**  In consideration of the considerable time, effort and expense to be undertaken by the Company in connection with the Proposed Transaction, the Investor agrees that during the Exclusivity Period, if any, the Investor will not, and the Investor will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with, or encourage, or provide any information to, any individual, corporation, partnership, limited liability company or other entity or group (other than the Company and its affiliates) concerning any Business Combination other than the Proposed Transaction (an "**Alternative Transaction**"), or enter into any agreement in principle, letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto. Upon the commencement of the Supplemental Exclusivity Period, if any, the Investor shall immediately suspend any pre-existing discussion with all parties other than the Company and its affiliates regarding any solicitation or offer for an Alternative Transaction.

6.     **Conduct of Business.**  During the Exclusivity Period, except with the prior written consent of the Investor, the Company will:  (a) conduct its business in a manner consistent with what has been described in that certain presentation, dated February 24, 2021 (the "**TMG Deck**"), and delivered to the Investor (except as expressly otherwise contemplated herein); (b) maintain its properties and other assets in good working condition (normal wear and tear excepted); and (c) use its best efforts to further the business and operations of the Company in accordance with what has been described in the TMG Deck.

7.     **Access.**  Prior to the Termination Date, the Company will, upon reasonable advance notice and during normal business hours afford the Investor and its Representatives with reasonable access to its and its affiliates' respective assets, properties, facilities, books and records and personnel. The Company will furthermore cooperate, and cause its Representatives to cooperate, with the Investor and its Representatives regarding all due diligence matters, including document requests. Prior to the Termination Date, the Company will promptly (but in any event within 72 hours) after it becomes aware of such event notify the Investor of any material adverse event affecting the Company or its affiliates, their respective businesses or the Company's ability to consummate the Proposed Transaction in accordance with the terms and conditions of this LOI.

8.     **Expenses.**  Whether or not the parties enter into Definitive Agreements with respect to the Proposed Transaction (but subject to the terms and conditions of the Definitive Agreements if the

parties do enter into the Definitive Agreements), and except as otherwise provided herein, each of the parties hereto will pay its own costs and expenses (including legal, financial advisory, consulting and accounting fees and expenses) incurred at any time in connection with pursuing or consummating the Proposed Transaction.

       **9.**     **Termination.**  This LOI can be terminated as follows:  (a) by the mutual written agreement of the parties to terminate this LOI; (b) by the Investor (in its sole discretion) or the Company (in its sole discretion) (as applicable) at any time if it no longer desires to pursue the Proposed Transaction; provided, however, neither the Company nor the Investor shall terminate this LOI pursuant to this clause (b) prior to the expiration of the Exclusivity Period so long as each of the parties is diligently working in good faith and the negotiations and drafting of the Definitive Agreements are advancing ; or (c) by the Company after the expiration of the Exclusivity Period.  Any termination of this LOI pursuant to clauses (b) or (c) above shall be pursuant to a written notice provided by the terminating party to the other party and, except as otherwise set forth in such notice, any termination in accordance with this paragraph 9 shall be effective upon receipt of such written notice by the non-terminating party (the date of termination being the "***Termination Date***").  Upon termination of this LOI, this LOI will be deemed null, void and of no further force or effect, and all obligations and liabilities of the parties under this LOI or otherwise related to the Proposed Transaction will terminate, except for the respective continuing obligations of the parties relating to the Binding Matters, which will survive any termination of this LOI indefinitely (unless a lesser period is expressly contemplated by their terms).  The termination of this LOI will not relieve any of the parties of liability for such party's pre-termination breach of any of the Binding Matters or any other agreement between the parties.

       **10.**     **Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.**  This LOI and the rights and obligations of the parties hereunder will be governed by and construed under and in accordance with the laws of the State of New York, without regard to any conflict of law rule or principle that would result in the application of any laws other than the laws of the State of New York.  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts seated in New York County, New York (and any appellate courts thereof) in any action or proceeding arising out of or relating to this LOI, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, DISPUTE, CLAIM, LEGAL ACTION OR OTHER LEGAL PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS LOI.

       **11.**     **Miscellaneous.**  This LOI supersedes any prior written or oral understanding or agreements between the parties related to the subject matter hereof (other than the NDA).  This LOI may be amended, modified, waived or supplemented only by written agreement of the parties.  No failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.  The headings set forth in this LOI are for convenience of reference only and shall not be used in interpreting this LOI.  In this LOI, the term: (x) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation";

(y) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (z) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this LOI to an affiliate of the Investor prior to the Business Combination will include the Investor's sponsor, ARC Global Investments LLC (the "***Sponsor***"). This LOI may be executed in any number of counterparts (including by facsimile, pdf or other electronic document transmission), each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

*{Remainder of Page Intentionally Left Blank; Signature Page Follows}*

**Confidential**

Please acknowledge your acceptance of and agreement to the foregoing by signing and returning to the undersigned as soon as possible a counterpart of this LOI.

Sincerely,

**BENESSERE CAPITAL ACQUISITION CORP.**


By: _____
    Name:
    Title:


*Accepted and agreed to by the undersigned on
behalf of itself and its subsidiaries and affiliates as
of this ____ day of [_____], 20[__]:*

**TRUMP MEDIA GROUP CORP.**


By:_____
Name:  President Donald J. Trump
Title:   Chairman, CEO, and President

**Exhibit A - TERM SHEET**

*This Term Sheet is intended to set forth the material financial and business terms and conditions of the Proposed Transaction. However, all such terms and conditions are subject to further refinement and detail as the parties shall mutually agree, as shall be set forth in the Definitive Agreements. All capitalized terms used in this Term Sheet and not otherwise defined herein shall have the respective meanings ascribed to such terms in the letter of intent to which this Term Sheet is attached.*

| | |
|---|---|
| **Transaction:** | A business combination between the Company and SPAC pursuant to which SPAC will acquire 100% of the outstanding equity and equity equivalents of the Company (including options, warrants or other securities that have the right to acquire or convert into equity securities of the Company), or all of the Company's business, in exchange for the consideration described below (in whatever form as agreed by the parties, whether merger, consolidation, share exchange, asset purchase or otherwise, the "***Acquisition***"). The deal structure will be determined by the parties based on the due diligence findings as well as business, legal, tax, accounting and other considerations. At the closing of the Acquisition (the "***Closing***"), SPAC would change its name to use the "Trump Media Group Corp" name. The post-Closing entity is referred to as the "***Surviving Company***". |
| **Transaction Consideration:** | The total consideration provided to or for the benefit of the Company or the Company equity holders (including holders of options, warrants and other convertible securities), as applicable, in the Acquisition (the "***Transaction Consideration***") is based on a total enterprise value of the Company of $1,500,000,000 consisting of the components of uses of funds on <u>Annex I</u> hereto. The Transaction Consideration would be paid by the Surviving Company by issuance of shares of common stock of the Surviving Company (the "***Transaction Shares***"), which would each be valued at an amount equal to the redemption amount payable to Public Stockholders that redeem in connection with the Closing (the "***Redemption Price***"). |
| | The Transaction Consideration assumes that at the Closing the Company on a consolidated basis will have no undisclosed debt (including prepayment penalties that would be due if paid off at Closing) after deducting any excess cash on the balance sheet ("***Net Debt***"), with a normalized level of net working capital (in such amount as agreed by the parties) in order to operate its business. A dollar for dollar adjustment in the Transaction Consideration will be made if the actual working capital at the Closing is [greater than or] less than the agreed upon target, as well as for the amount of any Net Debt, unpaid Company transaction expenses and transaction bonuses, with such adjustments being estimated at Closing and subject to a post-Closing true-up. |
| | See the Transaction Sources & Uses table and Pro Forma Ownership table in <u>Annex I</u> hereto. |
| **Lock-Up:** | Significant Company stockholders will be required to subject their Transaction Shares to a lock-up for a period substantially identical to the lock-up applicable to the Sponsor with respect to its founder shares, subject to any exceptions that are mutually agreed upon in the Definitive Documents and permitted under applicable law. All Transaction Shares will be subject to all applicable holding periods and requirements under the Securities Act of 1933 and SEC rules. |

| | |
|---|---|
| **Non-Compete:** | The significant stockholders of the Company shall each enter into a non-competition and non-solicitation agreement for a period of four (4) years after the Closing in return for the consideration being delivered, which shall be in addition to any non-competes in any employment agreements to which they may be a party. |
| **Employment Arrangements:** | Certain executives of the Company will be required to enter into mutually acceptable employment agreements with the Surviving Company, which will include customary confidentiality, non-compete and assignment of inventions and other customary restrictive covenant provisions. |
| | |
| **Acquisition Agreement:** | The obligations of the parties will be subject to execution of the Acquisition Agreement containing terms and conditions satisfactory to SPAC and the Company. The execution of the Acquisition Agreement would also be subject to completion of confirmatory due diligence by SPAC, as well as the delivery of PCAOB audited financial statements by the Company and, if deemed legally necessary, the receipt by SPAC of a fairness opinion issued by a reputable firm opining that the Acquisition is fair to SPAC's shareholders. The Acquisition Agreement will contain representations, warranties, covenants, closing conditions, break-up fees, and indemnification provisions customary for M&A transactions of this type, as well as a general release of the Company by the Company's equity holders. The required diligence will include an in-depth review of the Company's management team and the Company's preparedness to become listed on Nasdaq, and the Company will make any appropriate hires necessary to fill any gaps. |
| | In connection with the Acquisition Agreement, Company management will be required to participate in roadshow presentations to help with SPAC's share recycling efforts, and generally make themselves available to assist in such efforts. |
| | The Acquisition Agreement will also require that (i) all assets, including intellectual property, used by (or licensed to) the Company in its business that are held or licensed by affiliates or other related parties be transferred to the Company, and (ii) the Surviving Company not have any related party transactions that are not on arms-length terms or that are otherwise unnecessary. For purposes of clarification, the Company shall only transfer its intellectual property licenses to the Surviving Company and will not be required to cause its licensors to transfer such intellectual property to the Surviving Company. |
| | Each of SPAC and the Company will designate in the Acquisition Agreement a representative to represent such party's interests after the Closing in connection with the Acquisition Agreement, including with respect to post-Closing Transaction Consideration adjustments and indemnification claims. |
| **Closing Conditions:** | The obligations of either party to consummate the transaction are subject to standard closing conditions for a transaction of this nature, including without limitation: (i) completion of any required stock exchange and regulatory review, including SEC/NASDAQ, receipt of any required regulatory approvals and necessary third party approvals, and expiration of any waiting periods under HSR or other applicable anti-trust laws, (ii) approval by SPAC's shareholders of the Acquisition and related matters, (iii) there shall have not been any material adverse changes in the business, customer relationships, operations, financial condition, |

| | |
|---|---|
| | regulatory environment or prospects of the Company, (iv) the execution of all related agreements as contemplated by the Acquisition Agreement including lockup agreements, an escrow agreement, non-compete and non-solicitation agreements, the Surviving Company incentive plan and employment agreements and [(v) SPAC having at least $5,000,001 in net tangible assets. |
| **Use of Proceeds:** | Immediately upon Closing, SPAC's cash, including the funds remaining in the Trust Account after the redemption of SPAC's Public Stockholders, will be used as follows: (i) payment of SPAC's accrued but unpaid expenses, including transaction expenses, deferred IPO fees and deferred advisor fees, and obligations owed to the Sponsor, and (ii) the remaining cash will be used for working capital and general corporate purposes. |
| **Filings:** | As soon as practicable following the execution of the Acquisition Agreement, the parties will file all submissions for shareholder, regulatory and governmental approval, including a proxy statement (the "***Proxy Statement***") with the SEC for the purpose of obtaining SPAC shareholder approval.  The Proxy Statement will include PCAOB audited annual financial statements of the Company prepared in accordance with U.S. GAAP as required by applicable securities laws. |
| **Governing Law:** | The Acquisition Agreement and other applicable Definitive Agreements will be governed by New York law and jurisdiction. |
| | |

**Annex I**

**Illustrative Sources & Uses and Ownership table**

### Transaction Sources & Uses

| Sources[1] | | Uses | |
|---|---|---|---|
| SPAC cash in trust (assuming no redemptions) | $116,725,000 | Cash to Surviving Company balance sheet | $116,725,000 |
| Roll-over existing net debt | $0 | Roll-over existing net debt | $0 |
| Seller rollover equity | $1,500,000,000 | Seller rollover equity | $1,500,000,00 |
| Assumption of Cash from Target | $0 | Transaction Expenses[2] | $6,450,000 |
| **Total sources** | **$1,616,725,000** | **Total uses** | **$1,623,175,000** |

### Pro Forma SPAC Ownership Post-Closing[3]

| Security Holders | Shares Outstanding | % of Outstanding | Fully-Diluted Shares | Fully-Diluted % |
|---|---|---|---|---|
| Rollover equity shares for Company shareholders[4][5] | 150,000,000 | 90.3% | 150,000,000 | 90.0% |
| SPAC public shareholders [(including rights)] | 12,650,000 | 7.6% | 12,650,000 | 7.6% |
| SPAC sponsor promote | 2,875,000 | 1.73% | 2,875,000 | 1.73% |
| SPAC private placement shares [(including rights)] | 433,125 | 0.26% | 433,125 | 0.26% |
| Underwriter IPO shares | 125,000 | 0.08% | 125,000 | 0.08% |
| Public warrants[5] | 0 | 0.0% | 528,061 | 0.32% |
| Private warrants[5] | 0 | 0.0% | 18,080 | 0.01% |
| Shares underlying underwriter UPO [(including rights)] | 0 | 0 | 0 | 0 |
| Warrants underlying underwriter UPO | 0 | 0 | 0 | 0 |
| **Total shares outstanding** | 166,083,125 | 100.0% | 166,629,267 | 100.0% |

*(1) The amounts from the various sources of cash may change based on (i) the amount of Public Stockholder redemptions prior to Closing, (ii) investor interest in the Acquisition and (iii) the then current markets for equity and debt financing.*

*(2) Includes deferred IPO fees and underwriter business combination fee.*

*(3) Assumes that there are no new awards under any new Surviving Company equity incentive plan. Assumes that there are no adjustments to the Transaction Consideration or indemnification claims.*

*(4) Assuming a Redemption Price of $10.00 per share, although the Redemption Price will likely be higher.*

*(5) The Surviving Company shall maintain an equity option pool representing approximately 7.5% of the total equity capital of the Surviving Company which shall be reserved from the rollover equity.*

Confidential

# EXHIBIT 6

| | |
|---|---|
| **From:** | Andy L[andy@trumpmedia.group] |
| **Sent:** | Fri 11/12/2021 12:47:11 PM (UTC) |
| **To:** | Andy Dean[andy@andydeanradio.com]; Andy L[andy@trumpmedia.group] |
| **Subject:** | Fwd: Deal notes - up to Nov 7 - deal history |

---------- Forwarded message ---------
From: **Andy Dean** <andy@andydeanradio.com>
Date: Mon, Nov 8, 2021 at 8:39 AM
Subject: Deal notes - up to Nov 7 - deal history
To: Andy L <andy@trumpmedia.group>, Andy Dean <andy@andydeanradio.com>


I think of idea very late night nov 4-5
Call Wes
I text Burnett around nov 7
We visit Dana white around Dec 4 in vegas

Will and I do FedEx boards -
Brad gets involved
I get deathly ill for 2 days Jan 24-25
Next day, Tuesday Jan 26 - cheeseburger summit - will Russell is Donald body man - Molly is spy - the pitch of SPAC
Doing the legal deal, john Haley, firing Harvard law lawyer who hates trump - maria, Carlos Romero in little Havana over charges us and demands $10k retainer before he'll do any work
Friday Jan 29 - trump and Brad supposed  to meet - gets cancelled because Donald fired his impeachment lawyers
Trump calls Brad on Monday, feb 1... wants to see him on Tuesday feb 2
Brad and Donald meet - Donald calls me for an hour to discuss deal - I'm looking at real estate commercial space - Donald signs deal on feb 2 - I go to cafe europa to countersign on feb 2 and my pen doesn't work - I call Wes/Brad
Larry Kudlow and Wilbur ross launch a SPAC
Feb 8 - Donald calls with Ike Perlmutter from marvel - will and I are doing boards - Brad Cohen gets Andrew Torba's number from Gab - I call Andrew Torba - tells me to talk on Signal
Grab boards at FedEx -
On Feb 9, meet at breakers at 2pm w Wes and john Haley - go to maralago at 3pm - real secret service this time, pat down, metal detector, etc - last meeting 2 weeks ago, no good security at all
Trump storms in - Ike pearlmutter is there with angry Australian tech guy - I do presentation. - tech guy goes on about gab (my line - mastodon fork, etc)
Dan Bongino comes in - Donald leaves after  45 minutes to watch impeachment

- Dan talks about Parler deal, and his cancer he is a great guy
- Thursday feb 11, visit 9 banks to open up UAV bank account
- Friday, feb 12, first presentation to a SPAC - Jeffrey Schoonover from lionheart II from Naples in downtown ft Lauderdale at nelson Mullins office ... 3 hour meeting... they like

it, but pass on it, one of the main guys is Canadian liberal
• Monday, Feb 15, Will W flies in again from RDU, we go through 326 SPAC list -create top list of Spacs and cross reference to see if their Republican
• I speak to Dan b about Parler
• Wes calls trump about Parler vs gab and discusses Wilbur Ross
• Meeting on feb 16 w john Haley and Bill Hinkle (database guy)
• Brad c calls me on feb 16, I have a complete meltdown!  trump kids and Jared trying to kill deal
• I panic and switch strategies!
• Immediately cold call Spacs - assemble list of 326
• Mentally ill paul packer from GLAQ SPAC yells at me
• I talk to Bonanno from far peak on feb 17
• BENE and otra are positive calls
• Big meeting wed feb 24 at maralago with BENE Patrick Orlando and team
• Every investment bank has said no
• Marcum accountants say yes
• Feb 24 at maralago - 12 people in boardroom - investor presentation 24 pages - trump shows up on time in golf outfit - BENE loves trump - attendees Kraig kitchen, Scott St. John, will w, Patrick Orlando, Brad Cohen, Wes
• Patrick and 5 of us go into tea room - he offers $1.3bb valuation in tea room
• LOI comes the next day
• Feb 25, Brad tells us story of djt wanting to go to Morocco
• I go down to Miami on feb 26 to negotiate LOI w Haley
• Will w is living w me MON-Friday
• Mar 2 - Otra Nicholas singer is interested, PK from cantor Fitzgerald is interested - cantor's lawyer refused to help us so I sent a letter to CEO that our political affiliation was preventing us from doing business
• Mar 2 - another accounting firm says no, Cherry-beckhard says no to Wes who is in deer valley skiing
• Mar 2 - spoke to Patrick about LOI exclusivity and $1.5bb valuation - I sent Patrick the budgets for 2 trump plus shows (Tim Gaydos helped me)
• Mar 2 - wired $25k to nelson Mullins today
• Mar 3 - meeting w Ernesto about private investor
• Mar 4 - office space tour w Brad c - Capstar Spac in Texas passes 20 minutes after receiving the deck
• Mar 9 - Kirk Schenck comes to town
• Mar 10 - went to Maralago for 2 hours in djt office at Maralago - signs LOI
• March 11 - Isos Spac with WWE call - zoom
• Mar 12 - Miami signing of LOI w Patrick Orlando and Rodrigo at Nelson Mullins
• Mar 15 - zoom with Ian zinin about raising $3mm for 90 day loan - Greg Norman? Interviewed CFO and trump called to discuss wsj Spac article - idea of press conference before 8k comes to me - Isos Spac passes on deal
• Mar 16 - grant Thornton meeting and meeting with Chris pavlavski from rumble and Dan Bongino at breakers
• Mar 17 - Harry's pizza with Wes and Patrick Orlando in coconut grove , we tell him go exclusive or we are going w Otr on Friday

• Thursday Mar 18 - sky labs meeting at Maralago w Chris p, meeting was in tea room, dinner at Maralago after, lobster buffet w Chris p djt, Wes, Brad, and Dan Scavino - Patrick calls about sec issue

• Friday Mar 19 - Wes has been staying all week at my place, flies back to Atlanta, looked at axis office space, call w cantor Fitzgerald at 1pm zoom call - Howard lutnick and PK... amazing call - Howard says for us to drop other spacs - he will fly down on March 30 to meet prez

• Patrick Orlando goes missing for 4 days

• Prez calls me on weekend for update

• Thursday March 24 - Patrick asks for one week extension, he is in Colorado - he is looking at other deal, trump-et proposal emailed to me by Dan Scavino - trump-et people meet with President every few months

• Nicholas singer Otra meeting at continuum condo on Friday March 25 - lunch meeting at patio restaurant - all in white shirts - it's me, Nicholas, and his assistant guy at lunch - Nicholas calls this 'his favorite deal'

• Friday March 25, I call prez - we discuss Patrick, Howard lutnick dinner on Tuesday 3/30, Wilbur Ross Spac reach out, pres tells me to call Charles herring of OAN freetalk24

• Also I emailed Jason Ader of Ader Spac - trump supporter - sent deck - he is in Colorado returning 3/31

• Tuesday, March 30 - lunch w cfo candidate Philip juhan at lobster sea grille - dinner w Howard Lutnick and djt at Mar-a-Lago - Howard pitches his idea to buy an OTC company and raise pipe to avoid SEC

• Thursday April 1, I call Patrick and Rodrigo at 830pm and tell them they are our top choice and we will cut valuation

• Friday April 2, I go to visit Howard Lutnick, 25th floor at saint Regis in Miami bal harbour - we meet outside on patio - discuss otc, spacs, etc - Howard has a Lamborghini urus and he went to play golf after our meeting

• Saturday, April 3, djt calls in morning at 9am, we discuss updates

• Monday, April 5 - zoom call w Larry kudlow and Jason trenner

• Tuesday April 6, call w BENE board in the morning via zoom - all over the world, Abraham and Jesus from ark capital, Rodrigo call about St Michael wing, tonight is legal call with BENE and Andy Tucker

• Wednesday Apr 7, Trump calls, I'm at Houston's and I don't pick up, I call back after talking to Rodrigo - djt keeps mentioning that he wants to join social media now - Patrick calls, he says board is voting tonight, he asks why did we pick his group? I say because good chemistry but we have backups.

• Thursday, April 8, Patrick wants LOI signed by midnight to prevent nanotechnology company from getting advantage, Patrick replaced 2 board members, meeting with trump at 9pm at maralago, Wes flies in from atl, Brad c comes to meeting, valuation lowered to $900mm, Rodrigo and st michael of the wing, trump signs doc

• Friday, April 9 - top hat breakfast w Wes and Brad c, open TMG bank account at chase, Mandy gets sick during spay surgery

• Monday April 12 - will w comes in today

• Tues April 13 - Moss construction meeting about $5mm loan in big conference room - old man Moss doesn't love it - Chad Moss says send us budget for the money

• Wed April 14 - roughest day so far, meet in board room in coconut grove - Patrick says

BENE coo freaked out - he is 28 - his dad won't let him do the deal - plus 2 directors already replaced - Patrick pitches is plan b, I get scared, is he wearing a wire?  I lose my sport jacket also... lunch was Indian food with no utensils - Miami office tours before Patrick meeting - I left my blue jacket in rodrigos board room in his park grove building

• Also all week, dealing with press headache, some guy in Hamburg Germany from managar magazines or our investor deck - deck was from March 26 we know because of typos - axios reaches out to Duane w and John Norton and me and Wes - axios has deck

• Thursday April 15 - real estate tour of Fort Lauderdale w Stephanie Machato - Andy Tucker the lawyer tells me to calm down and everything is legal... Reached out to Acii Taylor Redding, Isos George Barrios - Otra Nicholas singer - Howard lutnick cfIV - Wilbur Ross - Igor from Spartacus in Georgia

• Friday April 16 - go to Miami at 3pm Nelson Mullins to talk w Patrick and Rodrigo - also I talk with Taylor Redding from atlas crest

• Monday April 19, I give djt an update while he is in nyc about mike lindell's site frank, and Parler gets put back in App Store, I speak to Dan Bongino, Haley sends Moss construction all the info for $5mm loan, I'm sending NDA's to Parler, talked Chris p from rumble - Twitter build costs $2 million, $100k monthly maintenance

• Wed, April 21... Parler call w George farmer and Matt Richardson got canceled by me - looking at office at 530pm, I got a call back from Patrick Ford from NGCA from next gen Acquistions - Wes Moss arrives - tour Fll office space - talk to Roy bailey about raising $5mm - spoke to Matt saffei from arrowroot Spac - spoke to Taylor Redding from atlas crest who recommended mike Powell

• Thursday, apr 22... 3pm meeting w Patrick In Miami, rob frederick call aws - Jon Willis was afraid we are poaching rob, 5pm at four seasons with Matt saffei from arrowroot, had call w mike Powell from early bird who recommended Steven Vogel from Tuscan holdings II

• Fri apr 23, call w Parler at 11am, zoom call w Tuscan holdings II Steve Vogel, call w Bongino

• Sat apr 24 - mike from early bird sends Tuscan LOI

• Tuesday apr 27 - djt calls in morning for update, spoke to Jean who is referral from Rhona Graff, Roy bailey sets up zoom call with Lorenzo and Frank Fertitta,

• Wed April 28 - Stephen Vogel from tuscan mtg at the breakers

• Thursday April 29 - Patrick and Rodrigo mtg at breakers, I reached out to Nicholas singer of Otra on signal, called mike Powell of early bird for other Spac referrals

• Friday, April 30

• Tuesday, may 4 - spoke to dr Peter noble, mike Rubino, Amb. Ed McMullen - about German reporter (media insider) who was selling our stolen deck, Brad Parscale disaster release article on 'from the desk of trump' - Fox News reporter calls it new communications platform - this confuses everyone

• Wed, may 5 - Facebook decides to keep trump banned for 6 more months, zoom call w nick from Troutt family about $3mm note

• Thursday may 6 - zoom call Merida Spac - cannabis Spac from mike from early bird - Peter Lee is CEO

• Friday may 7 - 1130am Patrick meeting, 6pm maralago signing - Chad Moss - had dinner with Chad and Wes and Brad after - saw Melania trump

• Monday - may 10, waiting on $2mm wire from Chad, it's not here yet, Patrick floats LOI idea, create org chart

- Tuesday - may 11, send due diligence docs to Merida and Troutt group
- Wed, may 12 - 11am zoom with Israel Spac (meringa) set up by Mike Powell, 12pm Merida Spac follow up, 1230pm - Phillip juhan

Thursday may 13 - finalize Troutt note
Friday may 14 - Rodrigo lunch in Miami at inter American democratic institute, drove Patrick to Haley - Merida Spac sends LOI to us via mike Powell from early bird
Sunday may 16 - Riss graduates law school
Tuesday - may 18, American Airlines almost thrown off flight for mask - trump criminal probe makes news
Wednesday- may 19, Bedminster meeting, Wes rent suburban, trump in golf outfit, we debrief him, Kenny and Lisa Troutts, nick Merrick, sign doc for $3mm, $2mm funds tomorrow, and $1mm after license fee
Thursday may 20 - Phillip juhan CFO wants to join, Lewis fenton at ritz lobby in philly, flew spirit air home
Monday may 24 - food poisoning from rainbow palace, Haley call
Tuesday may 25 - Susie wiles, TMG debit card arrives, move into new office, will w in fll Wed
Thursday may 27 - djt calls while I'm at top hat, we discuss Nj visit next week
Friday may 28 - soltech zoom w veanne, I talk to Chris crane, I set up Susie wiles and Chris pavolvski on text
Sunday may 30 - Patrick wants me to sign LOI  in Miami on may 31
Tuesday June 1 - call w Chris p and developer Vlad from cosmic who will review code of SkyLabs - call w soltech about hiring
Wed June 2 - Phillip juhan CFO kick off call w will - coffee w Roy bailey friend bob McNutt at Anne's coffee shop
Friday June 4 - Bedminster signing w Trump  and Patrick etc
Sat - June 5 - Lewis f and Scott St. John in Philly
Sunday June 6 - fly to atlanta to look at office space
Monday-Tuesday- June 7/8 - looked at office space, stayed at four seasons midtown
Wed-Thursday - June 9-10 - went to lake rabun, then on Thursday, trump calls and Dan Scavino about getter social network
Friday June 11 - in Savannah, meltdown day about Jason Miller - meeting w getter, they offer $5 million and 2.5% - dinner with will on my bday at Jw Marriott steakhouse in Savannah
Sat - June 12 - drive from Savannah to Fll - calls in car all day - Haley to find litigator - tacos w Riss tonight
Sunday June 13 - I call Trump on Sunday while he is playing golf - Jason Miller revelation! Getter app is backed by miles guo, the crazy Chinese billionaire… call with Dan Bongino today, Parler is meeting w President on Tuesday w Candace Owens and Rebekah Mercer, Dan Bongino hates Jason Miller,
Monday June 14 - I talk to litigator - Jorge Mestre
Tuesday June 15 - trump calls me - he is cooling on Jason Miller deal - meets w Parler and they offer 12.5%
Wed June 16 - nick Warnock joins us in office, meet with Charles Pich the tech guy from boxycharm, porch light does more logos for truth social, call with Chris/Vlad about presenting on June 29 to djt - I talk with Lewis f and send him my press conference outline for video
Monday - June 21 - call w Chris p and Vlad and Wes about truth social - it lasted 2-3 hours

Tues - June 22 - talked to mike Powell about consulting - Wes had lunch with Veanne and jay dalke

Wed June 23 - talk w Vlad about fixes to truth social site, talked w Kristin Ahr and sue stover about improving employment agreements

Thursday- June 24 - insight global interview calls with 3 tech talent

Friday June 25 - call w Lewis f and Welborn about the video

Monday June 28 - fly to nyc to present tomorrow to djt

Tuesday - June 29, wake up early at trump international Columbus circle, walk Central Park with will, go to Wes room, we have heart to heart - he needs to commit, go to wills room - prep presentation, call Patrick Orlando, print, go to trump tower, present from 2-345pm w djt, Eric and don in meeting on 25th floor conference room, we go through TMG milestones and truth social, drinks at plaza and see lady Gaga at bar, dinner w Chris Pavlavski at quality Italian

Wed June 30 - go to dc on Acela train - stay at trump hotel DC

Thurs July 1 - Jason Miller, GETTR drama, I get a litigator to send letter to Jason Miller, Brad Cohen calls trump, also Allen w drama was today - charged by ny state for tax stuff

Friday July 2 - talk to Chris p about rumble cloud - fly BWI back to FLL

Tuesday July 6 - drive from Fll to ATL to open ATL office w nick Warnock In car

Wed July 7 - first day in office, Phillip Juhan, jay dalke

Thursday July 8 - Scott St. John visits, Mike mcmullin

Fri July 9 - head to Savannah - meet with Welborn on Saturday to watch rough cut

Monday July 12 - back in atlanta

Tuesday July 13 - Kirk Schenck is in town and meeting with Veanne smith and Donna hall

Wed July 14 - Vlad arrives from Macedonia, he meets with Jay Dalke and Phillip security guy

Thursday July 15 - [ninety.io](ninety.io) meeting - meeting with 2 CEO candidates - Vicki - drive to Savannah at night

Friday July 16 - drive back to Fort Lauderdale from Savannah

Wed-Friday July 21-23 - Lewis f and Welborn come to Fll office to edit presentation tape, djt calls on Thursday

Tues July 27 - Eric trump calls me, they want to see license agreement

Wed July 28 - I go over license agreement w Haley who is sending to trump lawyer Adam Rosen

Thursday July 29 - I'm in atlanta- editing presentation tape with Welborn, trump kids speak with Haley on a big conference call that I skip

Fri July 30 - Eric trump calls me this morning to say deal is on but they want to fix some Ip in services agreement, trump org from Alan garten sends letter to [andy@andydeanradio.com](andy@andydeanradio.com) cancelling services agreement, Wes talks to djt on phone to discuss potential plan b and presentation video, we screen tmtg video for everyone in ATL office

Monday - aug 2 - still in atlanta, at grand Hyatt in buckhead, Eric trump calls me to discuss services agreement

Tuesday - aug 3 - still in ATL - Haley calls Adam Rosen and Alex cannon and tells them you can't cancel services agreement - meeting with Donna Hall and IR firm - Eric calls me to say service agreement still canceled- at night in atlanta office, Wes calls djt to say we have been terminated, djt loses his temper, djt calls back and tells Wes to call Eric and work it out, Eric wants all docs

Wed - aug 4 - we send all docs today, Adam Rosen sends new consulting services agreement which strips us of board seats and rights, Eric trump and Wes have a good chat

Thursday aug 5 - I'm back in fll, I meet with Lori H about internet TOS legal, Haley and I do our draft of consulting services agreement

Monday aug 9 - license agreement calls w Haley

Tuesday aug 10 - Trump calls me, says get it done - 2pm conf call with don and Eric, Alan garten is really dumb, we are meeting at their trump Jupiter club on Thursday

Thursday aug 12 - meet w wes, Eric and don jr in Jupiter clubhouse - we meet for 90 min and discuss the deal

MON aug 16 - Eric tells don jr to take over because he is so busy

Wed aug 18 - don jr calls me and says he hasn't read agreement but that I should fix it - lawyer Alex cannon said it's too similar to last one

Thursday aug 19 - I meet with Lori Heyer in fll office to go over truth social tos, pp, gdpr

Fri aug 20 - don jr texts me if I fixed agreement- I text back saying agreement is radically different and they should read it, Philip Juhan sends me the new deck, don jr doesn't respond as of Sunday aug 22

Wed aug 25 - supposed to meet w Trump in Bedminster - djt has dementia - we meet in his office, can barely remember the deal - we watch press conference video, Scavino is there, we meet from 7-930pm, Trump orders steak well done

Thursday aug 26 - 90.io call, don jr gets license Agreement back to us

Fri aug 27 - phone call with billy about truth social app design, phone call with Chris p to discuss servers and Spac, plane delayed 3 hours at lga, dinner with Marissa at cafe Europa at 10pm

Monday aug 30 - drive to Savannah and ATL

Tues aug 31 - arrive in ATL and stay at four seasons for 2 nights and company house at cresthill for one night with nick and will w

Wed sept 1 - new office at WeWork in atlanta, full half floor, Phillip Juhan gets in fight with corporate Christie

Thursday sept 2 - developer meeting, 90.io

Sat - sept 4 - drive from Savannah to Fll - stay at Perry lane

Tuesday sept 7 - Haley writes don jr and Alex cannon asking for docs from aug 6 and aug 26, services agreement notes - they go radio silent

Wed sept 8 - I'm in office in fll with will - Haley calls to tell me that dwac is $293mm, Haley meets with Patrick today, working on new deck, call with billy b about landing page

Thursday sept 9 - big call with djt, I tell him about dwac and 2 week deadline and Alex cannon being friends with Jason Miller, will w is in town, hive moderation mtg

Friday sept 10 - Alex cannon and don jr email about getting me and Haley about getting deal done

Sat sept 11 - boxing night _ triller fight club - dinner at hard rock guitar hotel cipresso restaurant w haley, Alex Monje.. I saw Brad Cohen… didn't go to trump box - Mandy ate a piece of gum today

Sun sept 12 - don jr texts us about Omeed Malik who runs a Spac

Monday sept 13 - worked on deck w Philip and Wes

Tues sept 14 - spoke to Haley about LOI for dwac this morning, spoke on zoom call to Omeed Malik, lori Heyer was witness in office with me, Wes was on call, as was a guy named Jared Cohen? Cohen who went to seafood Buffett w my parents, told Omeed we can't discuss specifics because of our LOI

Thursday sept 16 - Haley asked cannon for signed license agreement- cannon lied and said djt

was traveling - don jr is pheasant hunting in England, I met with Lori Heyer - sent nick w and will w their EA agreements
Friday sept 17 - spoke to djt who was in Bedminister, told him about dwac board mtg on Tuesday, we will see him Wednesday sept 22 for LOI signing and full tech update, spoke to Lewis f about fixing press conference tape, press conference is set for sept 29 or 30… spoke to Rubino

Tues sept 21 - Wes and will w land in fll and billy Boozer is in town  - I sign EA agreements for Lori h, nick w, will w… I draft press release mike Rubino
Wed sept 22 - meeting at breakers w Rubino and ambassador Ed mcmullin and team, signing of dwac LOI at maralago with President trump in white and gold room, Alex cannon calls Haley multiple times for don jr who wants anwar Sadat- Omeed malik involved, went to maralago, license Agreement signed, dinner at cafe Europa with billy Boozer and will w
Thursday - sept 23 - don jr signature page arrives, President trump calls me in morning to yell at me because don jr is upset, VO session with Lou Lambert, Wes to call don jr
Fri sept 24 - Welborn editor arrives to finish tape for press conference, don jr calls Wes and freaks out, Patrick texts to say he doesn't want to announce on LOI but on the merger agreement, wes calls djt to tell him we are delaying and djt is ok with it.. Wes and I decide to delay press conference for 2 weeks
Sun sep 26 - jay Dalke CTO quits, Vlad from Macedonia threatens to quit… Wes and I talk to Patrick and get mad at him for canceling press conference - josh is new CTO
MON sep 27 - finish press conference tape, due diligence for merger agreement - data room
Tues sep 28, 2021 - big kick off zoom call - EGS lawyers, Patrick, auditors.  I have photo of this on phone.  Wes and I talk to nick Merrick about calling don jr to get him on board the deal.  Patrick gets drunk and wants a fairness opinion.  Chris Pavlavski to call don
Thursday sept 30-2021- big day!! Investor day in atlanta in WeWork office - Patrick and Rodrigo visit ATL office - see photos and video!  Patrick says he will drop idea of fairness opinion - we talk to nick Merrick who says don needs a bedtime story and some love - I fly back from ATL to fll
Friday- oct 1 - Wes flies to palm beach to see don jr - we meet for lunch at breakers hotel seafood bar - lori prepares jay dalke separation agreement - don jr is on board - we find out from Brad and will Russell that djt yelled at don jr from golf course
Sat Oct 2 - Wes calls djt, and then I call djt - a good call - let's set press conference
Monday Oct 4 - press conference is set for Oct 21 via Will Russell - EGS sends notes back to merger agreement
Wed - Oct 6 - creation of 'DJT's list' for tech guys, yahoo news writes article about djt social media, Haley sends our notes back to merger agreement
Thurs Oct 7, 2021 - Patrick visits Fll office, Scott St. John visits, will Wilkerson visits, we visit penthouse space at 110 east
Fri Oct 8, 2021 - tiny meat gang (TMG) trademark issue
Sat Oct 9, 2021 - Wes talks to don jr, and he talks to dba guys about becoming full time hires for TMG
Mon Oct 11, 2021 - talk to Chris kocsis - HR lady
Tues Oct 12 - Patrick meeting in Miami to go over merger agreement at Nelson Mullins office - Patrick still won't drive anywhere, I'm writing press release - djt calls in crazy mood and he tries to renegotiate the entire deal and take away 10% - don jr walks in room and wants to get paid - djt approves name change to tmtg - don and Wes talk, don is upset Brad is getting more

Wed Oct 13 - Wes and don jr are supposed to talk

Thursday Oct 14 - wes and don - don wants 2mm shares for him and Eric, we settle 1.7mm each

Fri Oct 15 - meet w djt and Melania at library bar at maralago - melania likes truth social

Sat Oct 16 - zoom call with Andy Tucker and nick Merrick about sec rules and how we can communicate

Mon Oct 18 - Scott St. John deal Closes

Tues Oct 19 - talk to Vince and Ross speechwriters about wsj op-Ed, finish tmtg corporate site

Wed Oct 20 - signing at maralago of merger agreement- pres trump calls me in w don jr 45 min before signing and scares the shit out of me, djt calls Jason Miller, we sign around 645pm, stay at Brazilian, the company fastly cancels our account at 3am

Thurs Oct 21 - stock opens, before market opens, trading was slow pointing to $11 open and the open was scary and it was not moving much higher at all, then it gets to $14 within an hour… then it explodes to $45… closes at $45.50, volume was over 491 million shares - djt calls me around 330pm and he is happy

Fri Oct 22 - stock halts trading several times, hits $137… hits high of $175… Lara trump almost goes on tv to discuss… I urgently work with Haley to write a memo calling for radio silence, stock closes at $94 - Patrick talks to djt to approve the memo

Sat Oct 23 - don jr tweets a rocketship to the moon on Instagram, patrick calls and says he can get a $1 billion pipe

Monday Oct 25 - drive up to atlanta

Tuesday Oct 26 - stock down 30%, Ef Hutton comes to atlanta with Patrick - 4 guys who look like American psycho to help $1 billion pipe raise

Wed oct 27 - stock is up 10% today to $64, talk to Roy bailey about raising $25 mm bridge to despac, don jr is on call with our lawyers saying he wants part of our 10%, djt calls to discuss rumble

Thurs oct 28 - Scott St. John visit and Lewis f visit ATL office

Fri Oct 29 - ny times article 'trump Spac $300mm' - Patrick and lawyers decide not to comment

Sat Oct 30 - djt leaves vmail posted about article and djt is pissed

Monday Nov 1 - in atlanta office, will Russell visits, atlanta SEC guy (Aaron lipson) who used to run enforcement division at SEc and now works at 'King and Spaulding' and we have meeting outside on balcony in which we discuss

Wed Nov 3 - mike mcmullin visits, Scott St. John visits, Dr. Ben Carson says yes to board seat after 2 zoom calls

Thurs Nov 4 - more pipe calls - see Megan Doyle email at EF Hutton for full schedule, lunch w Veanne smith at four seasons and offer her CEO, meet w wes friend Pittsfield about CEO, Chris p from rumble offered CEO or board seat, he says no, we have tense meeting with rumble and Josh about server structure, I agree with Josh, we all go out drinking with rumble guys at four seasons

Fri Nov 5 - more pipe calls - Chris p meeting w wes - djt calls at 10pm when I'm in Savannah, Linda McMahon might join board, meet w Dave Pitfield recruiter to help find CEO

Mon Nov 8 - more pipe calls

Sent from my iPhone

# EXHIBIT 7

| | |
|---|---|
| **From:** | Andy L[andy@trumpmedia.group] |
| **Sent:** | Tue 11/16/2021 12:43:19 AM (UTC) |
| **To:** | Will Wilkerson[will.wilkerson@tmediatech.com] |
| **Bcc:** | Andy L[andy@trumpmedia.group]; Andy Dean[andy@andydeanradio.com] |
| **Subject:** | TMTG - ADL deal notes - up to Nov 7 - sent Nov 15 |

I think of idea on nov 5-2020
Will W and I do fedex boards in jan-2021

**<u>Deal Notes begin: most important days are underlined</u>**

Tuesday Jan 26, 2021 - cheeseburger lunch at Mar-a-lago - the pitch of SPAC idea to DJT (Wes Moss, me, and Brad Cohen)

Doing the services agreement - legal deal, Carlos Romero in Miami

Trump calls Brad Cohen on Monday, feb 1... wants to see him on Tuesday feb 2

<u>Feb 2 - Brad and Donald meet - DJT signs services agreement deal on feb 2</u>
Larry Kudlow and Wilbur ross launch a SPAC
Feb 8 - Donald calls with Ike Perlmutter from marvel - will and I are doing boards - Brad Cohen gets Andrew Torba's number from Gab - I call Andrew Torba
On Feb 9, meet at breakers at 2pm w Wes and john Haley - go to maralago at 3pm -  Trump storms in - Ike pearlmutter is there with angry Australian tech guy - I do presentation. - tech guy goes on about gab
Dan Bongino comes in - Donald leaves after 45 minutes to watch his own impeachment

- Dan talks about Parler deal
- Thursday feb 11, open up UAV bank account
- Friday, feb 12, first presentation to a SPAC - Jeffrey Schoonover from lionheart II from Naples in downtown ft Lauderdale at nelson Mullins office ... 3 hour meeting... they like it, but pass on it, one of the main guys is Canadian liberal
- Monday, Feb 15, Will W flies in again from RDU, we go through 326 SPAC list -create top list of Spacs and cross reference to see if their Republican
- I speak to Dan b about Parler
- Wes calls trump about Parler vs gab and discusses Wilbur Ross
- Meeting on feb 16 w john Haley and Bill Hinkle (database guy)
- Brad c calls me on feb 16, I have a meltdown - trump kids trying to kill deal
- I panic and switch strategies
- Immediately cold call Spacs - assemble list of 326
- Crazy paul packer from GLAQ SPAC yells at me
- I talk to Dave Bonanno from far peak SPAC on feb 17
- BENE spac and otra spac (Nicholas Singer) are positive calls
- Big meeting wed feb 24 at maralago with BENE Patrick Orlando and team
- Every investment bank has said no

- Marcum accountants say yes
- <u>Feb 24 at maralago - 12 people in boardroom - investor presentation 24 pages - trump shows up on time in golf outfit - BENE loves trump - attendees Kraig kitchen, Scott St. John, will w, Patrick Orlando, Duane ward, Brad Cohen, Wes</u>
- Patrick and 5 of us go into tea room - he discusses $1.3bb valuation in tea room
- LOI comes the next day
- I go down to Miami on feb 26 to negotiate LOI w Haley
- Mar 2 - Otra Nicholas singer is interested, PK from cantor Fitzgerald is interested - cantor's lawyer refused to help us so I sent a letter to CEO that our political affiliation was preventing us from doing business
- Mar 2 - another accounting firm says no, Cherry-beckhard says no to Wes who is in deer valley skiing
- Mar 2 - spoke to Patrick about LOI exclusivity and $1.5bb valuation - I sent Patrick the budgets for 2 TV shows - trump plus shows (Budget expert Tim Gaydos helped me)
- Mar 3 - meeting w Ernesto about private investor
- Mar 4 - Capstar Spac in Texas passes 20 minutes after receiving the deck
- <u>Mar 10 - went to Maralago for 2 hours in djt office at Maralago - signs LOI</u>
- March 11 - Isos Spac with WWE call - zoom
- <u>Mar 12 - Miami signing of LOI w Patrick Orlando and Rodrigo at Nelson Mullins</u>
- Mar 15 - zoom with Ian zinin about raising $3mm for 90 day loan - Greg Norman? Interviewed CFO and trump called to discuss wsj Spac article - idea of press conference with 8k comes to me - Isos Spac passes on deal
- Mar 16 - grant Thornton meeting and meeting with Chris pavlavski from rumble and Dan Bongino at breakers
- Mar 17 - Harry's pizza with Wes and Patrick Orlando in coconut grove , we tell him go exclusive or we are going w Otra on Friday
- Thursday Mar 18 - sky labs meeting at Maralago w Chris p, meeting was in tea room, dinner at Maralago after, lobster buffet w Chris p djt, Wes, Brad, and Dan Scavino
- Friday Mar 19 - call w cantor Fitzgerald at 1pm zoom call - Howard lutnick and PK... amazing call - Howard says for us to drop other spacs - he will fly down on March 30 to meet prez
- Patrick Orlando goes missing for 4 days
- Prez calls me on weekend for update
- Thursday March 24 - <u>Patrick asks for one week extension</u>, he is in Colorado - he is looking at other deal, trump-et proposal emailed to me by Dan Scavino - trump-et people meet with President every few months
- Nicholas singer Otra meeting at continuum condo on Friday March 25 - lunch meeting at patio restaurant - it's me, Nicholas, and his assistant at lunch - Nicholas calls this 'his favorite deal'
- Friday March 25, I call prez - we discuss Patrick, Howard lutnick dinner on Tuesday 3/30, Wilbur Ross Spac reach out, pres tells me to call Charles herring of OAN freetalk24
- Also I emailed Jason Ader of Ader Spac - trump supporter - sent deck - he is in Colorado returning 3/31
- <u>Tuesday, March 30 - lunch w cfo candidate Philip juhan at lobster sea grille - dinner w Howard Lutnick and djt at Mar-a-Lago - Howard pitches his idea to buy an OTC company and raise pipe</u>

• Thursday April 1, I call Patrick and Rodrigo at 830pm and tell them they are our top choice and we will cut valuation

• Friday April 2, I go to visit Howard Lutnick, 25th floor at saint Regis in Miami bal harbour - we meet outside on patio - discuss otc, spacs, etc - Howard has a Lamborghini in valet area and he speeds away to go golf after our meeting

• Saturday, April 3, djt calls in morning at 9am, we discuss updates

• Monday, April 5 - zoom call w Larry kudlow and Jason trenner

• Tuesday April 6, call w BENE board in the morning via zoom - all over the world, Abraham and Jesus from ark capital, Rodrigo call about St Michael wing, tonight is legal call with BENE and Andy Tucker

• Wednesday Apr 7, Trump calls, djt keeps mentioning that he wants to join social media now - Patrick calls, he says board is voting tonight, he asks why did we pick his group? I say because good chemistry but we have backups.

• Thursday, April 8, Patrick wants LOI signed by midnight to prevent nanotechnology company from getting advantage, Patrick replaced 2 board members, meeting with trump at 9pm at maralago, Wes flies in from atl, Brad c comes to meeting, valuation lowered to $900mm, Rodrigo and st michael of the wing, trump signs doc

• Friday, April 9 - open TMG bank account at chase,

• Tues April 13 - Moss construction meeting about $5mm loan in big conference room - old man Moss doesn't love it - Chad Moss says send us budget for the money

• Wed April 14 - roughest day so far, meet in board room in coconut grove - Patrick says BENE coo freaked out - he is 28 - his dad won't let him do the deal - plus 2 directors already replaced - the BENE deal is OFF!!!!... lunch was Indian food with no utensils - I left my blue jacket in rodrigos board room in his park grove building

• Also all week, dealing with press headache, some guy in Hamburg Germany from managar magazines or our investor deck - deck was from March 26 we know because of typos - axios reaches out to Duane w and John Norton and me and Wes - axios has deck

• Thursday April 15 - Reached out to ACII spac Taylor Redding, Isos spac George Barrios - Otra Nicholas singer - Howard lutnick cfIV - Wilbur Ross - Igor from Spartacus spac in Georgia

• Friday April 16 - go to Miami at 3pm Nelson Mullins to talk w Patrick and Rodrigo - also I talk with Taylor Redding from atlas crest

• Monday April 19, I give djt an update while he is in nyc about mike lindell's site frank, and Parler gets put back in App Store, I speak to Dan Bongino, Haley sends Moss construction all the info for $5mm loan, I'm sending NDA's to Parler, talked

• Wed, April 21... Parler call w George farmer and Matt Richardson got canceled by me - looking at office at 530pm, I got a call back from Patrick Ford from NGCA SPAC from next gen Acquistions - talk to Roy bailey about raising $5mm - spoke to Matt saffei from arrowroot Spac - spoke to Taylor Redding from atlas crest who recommended mike Powell

• Thursday, apr 22... 3pm meeting w Patrick In Miami, rob frederick call aws - Jon Willis was afraid we are poaching rob, 5pm at four seasons with Matt saffei from arrowroot, had call w mike Powell from early bird who recommended Steven Vogel from Tuscan holdings II

• Fri apr 23, call w Parler at 11am, zoom call w Tuscan holdings II Steve Vogel, call w Bongino

• Sat apr 24 - mike from early bird sends Tuscan Holdings LOI

- Tuesday apr 27 - djt calls in morning for update, spoke to Jean who is referral from Rhona Graff, Roy bailey sets up zoom call with Lorenzo and Frank Fertitta,
- <u>Wed April 28 - Stephen Vogel from tuscan mtg at the breakers</u>
- Thursday April 29 - Patrick and Rodrigo mtg at breakers, I reached out to Nicholas singer of Otra on signal, called mike Powell of early bird for other Spac referrals
- Tuesday, may 4 - spoke to dr Peter noble, mike Rubino, Amb. Ed McMullen - about German reporter (media insider) who was selling our stolen deck, Brad Parscale article on 'from the desk of trump' - Fox News reporter calls it new communications platform - this confuses everyone
- Wed, may 5 - Facebook decides to keep trump banned for 2 more years, zoom call w nick from Troutt family about $3mm note
- <u>Thursday may 6 - zoom call Merida SPAC - cannabis Spac from mike from early bird - Peter Lee is CEO</u>
- <u>Friday may 7</u> - 1130am Patrick meeting, <u>6pm maralago signing with Chad Moss  for $2MM in seed capital</u> - had dinner with Chad and Wes
- Monday - may 10, waiting on $2mm wire from Chad, it's not here yet, Patrick floats LOI idea, create org chart
- Tuesday - may 11, send due diligence docs to Merida and Troutt group
- <u>Wed, may 12 - 11am zoom with Israel Spac (meringa SPAC) set up by Mike Powell, 12pm Merida Spac follow up, 1230pm - Phillip juhan</u>

Thursday may 13 - finalize Troutt note
<u>Friday may 14</u> - Rodrigo lunch in Miami at inter American democratic institute, drove Patrick to Haley - <u>Merida Spac sends LOI to us via mike Powell from early bird</u>

<u>Wednesday- may 19, Bedminster meeting, trump in golf outfit, we debrief him, Kenny and Lisa Troutts, nick Merrick, sign doc for $3mm, $2mm funds tomorrow, and $1mm after license fee</u>
Thursday may 20 - Phillip juhan CFO wants to join, Lewis fenton at ritz lobby in philly,
Tuesday may 25 - TMG debit card arrives, move into new office,
Thursday may 27 - djt calls while I'm at top hat, we discuss Nj visit next week
Friday may 28 - soltech zoom w veanne, I talk to Chris crane,
Tuesday June 1 - call w Chris p and developer Vlad from cosmic who will review code of SkyLabs - call w soltech about hiring
Wed June 2 - Phillip juhan CFO kick off call w will - coffee w Roy bailey friend bob McNutt at Anne's coffee shop
<u>Friday June 4 - BIg LOI Signing - Bedminster signing w Trump and Patrick etc</u>
Sat - June 5 - Lewis f and Scott St. John in Philly
Sunday June 6 - fly to atlanta to look at office space

Wed-Thursday - June 9-10 - trump calls and Dan Scavino about getter social network
Friday June 11 - in Savannah, meltdown day about Jason Miller - meeting w getter, they offer $5 million and 2.5% -
Sat - June 12 - drive from Savannah to Fll - calls in car all day - to find litigator -
Sunday June 13 - I call Trump on Sunday while he is playing golf - Jason Miller revelation! Getter app is backed by miles guo, the crazy Chinese billionaire… call with Dan Bongino today, Parler is meeting w President on Tuesday w Candace Owens and Rebekah Mercer, Dan Bongino hates Jason Miller,

Monday June 14 - I talk to litigator - Jorge Mestre

Tuesday June 15 - trump calls me - he is cooling on Jason Miller deal - meets w Parler and they offer 12.5%

Wed June 16 - nick Warnock joins us in office, porch light does more logos for truth social, call with Chris/Vlad about presenting on June 29 to djt - I talk with Lewis f and send him my press conference outline for video

Monday - June 21 - call w Chris p and Vlad and Wes about truth social - it lasted 2-3 hours

Tues - June 22 - talked to mike Powell about consulting - Wes had lunch with Veanne and jay dalke

Wed June 23 - talk w Vlad about fixes to truth social site, talked w Kristin Ahr and sue stover about improving employment agreements

Thursday- June 24 - insight global interview calls with 3 tech talent

Friday June 25 - call w Lewis f and Welborn about the video

Monday June 28 - fly to nyc to present tomorrow to djt

Tuesday - June 29, wake up early at trump international Columbus circle, walk Central Park- prep presentation, go to trump tower, present from 2-345pm w djt, Eric and don in meeting on 25th floor conference room, we go through TMG milestones and truth social, dinner w Chris Pavlavski at quality Italian

Wed June 30 - trump hotel DC

Thurs July 1 - Jason Miller, GETTR drama, I get a litigator to send letter to Jason Miller, Brad Cohen calls trump, also Allen w drama was today - charged by ny state for tax stuff

Friday July 2 - talk to Chris p about rumble cloud - fly BWI back to FLL

Tuesday July 6 - drive from Fll to ATL to open ATL office w nick Warnock In car

Wed July 7 - first day in office, Phillip Juhan, jay dalke

Thursday July 8 - Scott St. John visits, mike mcmullin

Fri July 9 - head to Savannah - meet with Welborn on Saturday to watch rough cut of presentation video

Monday July 12 - back in atlanta

Tuesday July 13 - Kirk Schenck is in town and meeting with Veanne smith and Donna hall

Wed July 14 - Vlad arrives from Macedonia, he meets with Jay Dalke and Phillip security guy

Thursday July 15 - ninety.io meeting - meeting with 2 CEO candidates - Vicki - drive to Savannah at night

Friday July 16 - drive back to Fort Lauderdale from Savannah

Wed-Friday July 21-23 - Lewis f and Welborn come to Fll office to edit presentation tape, djt calls on Thursday

Tues July 27 - Eric trump calls me, they want to see license agreement

Wed July 28 - I go over license agreement w Haley who is sending to trump lawyer Adam Rosen

Thursday July 29 - I'm in atlanta- editing presentation tape with Welborn, trump kids speak with Haley on a big conference call that I skip

Fri July 30 - Eric trump calls me this morning to say deal is on but they want to fix some Ip in services agreement, trump org from Alan garten sends letter to andy@andydeanradio.com cancelling services agreement, Wes talks to djt on phone to discuss potential plan b and presentation video, we screen tmtg video for everyone in ATL office

Monday - aug 2 - still in atlanta, at grand Hyatt in buckhead, Eric trump calls me to discuss services agreement

Tuesday - aug 3 - still in ATL - Haley calls Adam Rosen and Alex cannon and tells them you

can't cancel services agreement - meeting with Donna Hall and IR firm - Eric calls me to say service agreement still canceled- at night in atlanta office, Wes calls djt to say we have been terminated, djt loses his temper, djt calls back and tells Wes to call Eric and work it out, Eric wants all docs

Wed - aug 4 - we send all docs today, Adam Rosen sends new consulting services agreement which strips us of board seats and rights, Eric trump and Wes have a good chat

Thursday aug 5 - I'm back in fll, I meet with Lori H about internet TOS legal, Haley and I do our draft of consulting services agreement

Monday aug 9 - license agreement calls w Haley

Tuesday aug 10 - Trump calls me, says get it done - 2pm conf call with don and Eric, Alan garten, we are meeting at their trump Jupiter club on Thursday

Thursday aug 12 - meet w wes, Eric and don jr in Jupiter, Florida clubhouse - we meet for 90 min and discuss the deal

MON aug 16 - Eric tells don jr to take over because he is so busy

Wed aug 18 - don jr calls me and says he hasn't read agreement but that I should fix it - lawyer Alex cannon said it's too similar to last one

Thursday aug 19 - I meet with Lori Heyer in fll office to go over truth social tos, pp, gdpr

Fri aug 20 - don jr texts me if I fixed agreement- I text back saying agreement is radically different and they should read it, Philip Juhan sends me the new deck, don jr doesn't respond as of Sunday aug 22

Wed aug 25 - supposed to meet w Trump in Bedminster - we meet in his office, - we watch press conference video, Scavino is there, we meet from 7-930pm, Trump orders steak well done

Thursday aug 26 - 90.io call, don jr gets license Agreement back to us

Fri aug 27 - phone call with billy about truth social app design, phone call with Chris p to discuss servers and Spac, plane delayed 3 hours at lga,

Wed sept 1 - new office at WeWork in atlanta, full half floor, Phillip Juhan gets in fight with corporate Christie

Tuesday sept 7 - Haley writes don jr and Alex cannon asking for docs from aug 6 and aug 26, services agreement notes - Don jr and Alex go radio silent

Wed sept 8 - I'm in office in fll with will - Haley calls to tell me that dwac is $293mm, Haley meets with Patrick today, working on new deck, call with billy b about landing page

Thursday sept 9 - big call with djt, I tell him about dwac - and I tell him that no one is helping with license agreement so the deal is frozen - and I tell DJT that Alex cannon is friends with Jason Miller, will w is in town, hive moderation mtg

Friday sept 10 - Alex cannon and don jr email about getting me and Haley about getting deal done

Sat sept 11 - boxing night _ triller fight club - dinner at hard rock guitar hotel cipresso restaurant w haley, Alex Monje..

Sun sept 12 - don jr texts us about Omeed Malik who runs a Spac

Monday sept 13 - worked on deck w Philip and Wes

Tues sept 14 - spoke to Haley about LOI for dwac this morning, spoke on zoom call to Omeed Malik, lori Heyer was witness in office with me, Wes was on call, as was a guy named Jared Cohen? - told Omeed we can't discuss specifics because of our LOI

Thursday sept 16 - Haley asked cannon for signed license agreement- cannon said djt was traveling when djt was not traveling - don jr is pheasant hunting in England, I met with Lori Heyer - sent nick w and will w their EA agreements

Friday sept 17 - spoke to djt who was in Bedminister, we will see him Wednesday sept 22 for LOI signing and full tech update, spoke to Lewis f about fixing press conference tape, press conference is set for sept 29 or 30… spoke to Rubino

Tues sept 21 - Wes and will w land in fll and billy Boozer is in town  - I sign EA agreements for Lori h, nick w, will w… I draft press release mike Rubino
Wed sept 22 - meeting at breakers w Rubino and ambassador Ed mcmullin and team, signing of dwac LOI at maralago with President trump in white and gold room, Alex cannon calls Haley multiple times for don jr who wants Sadat- Omeed malik involved, went to maralago, license Agreement signed, dinner at cafe Europa with billy Boozer and will w
Thursday - sept 23 - don jr signature page arrives for license agreement, President trump calls me in morning to yell at me because don jr is upset, VO session with Lou Lambert, Wes to call don jr
Fri sept 24 - Welborn editor arrives to finish tape for press conference, don jr calls Wes and yells at him, Patrick texts to say he doesn't want to announce on LOI but on the merger agreement, wes calls djt to tell him we are delaying and djt is ok with it.. Wes and I decide to delay press conference for 2 weeks
Sun sep 26 - jay Dalke CTO quits, Vlad from Macedonia threatens to quit… - josh is new CTO
MON sep 27 - finish press conference tape, due diligence for merger agreement - data room
Tues sep 28, 2021 - big kick off zoom call - EGS lawyers, Patrick, auditors.  Wes and I talk to nick Merrick about calling don jr to get him on board the deal.  Patrick discusses a fairness opinion.  Chris Pavlavski to call don
Thursday sept 30-2021- big day!! Investor day in atlanta in WeWork office - Patrick and Rodrigo visit ATL office - see photos and video!  Patrick drops idea of fairness opinion - we talk to nick Merrick who talk do don jr - I fly back from ATL to fll
Friday- oct 1 - Wes flies to palm beach to see don jr - we meet for lunch at breakers hotel seafood bar - lori prepares jay dalke separation agreement - don jr is on board - we find out from Brad and will Russell that djt yelled at don jr from golf course
Sat Oct 2 - Wes calls djt, and then I call djt - a good call - let's set press conference
Monday Oct 4 - press conference is set for Oct 21 via Will Russell - EGS sends notes back to merger agreement
Wed - Oct 6 - creation of 'DJT's list' for tech guys, yahoo news writes article about djt social media, Haley sends our notes back to merger agreement
Thurs Oct 7, 2021 - Patrick visits Fll office, Scott St. John visits, will Wilkerson visits, we visit penthouse space at 110 east
Fri Oct 8, 2021 - tiny meat gang (TMG) trademark issue - name change to TMTG on Oct. 12
Sat Oct 9, 2021 - Wes talks to don jr, and he talks to dba guys about becoming full time hires for TMG
Mon Oct 11, 2021 - talk to Chris kocsis - HR lady
Tues Oct 12 - Patrick meeting in Miami to go over merger agreement at Nelson Mullins office - writing press release - djt calls about deal and don jr walks in room and wants to get paid - djt approves name change to tmtg - don and Wes talk,
Thursday Oct 14 - wes and don - don wants 2mm shares for him and Eric, we settle 1.7mm each
Fri Oct 15 - meet w djt and Melania at library bar at maralago - melania likes truth social
Sat Oct 16 - zoom call with Andy Tucker and nick Merrick about sec rules and how we can communicate
Mon Oct 18 - Scott St. John deal - Closes

Tues Oct 19 - talk to Vince and Ross speechwriters about wsj op-Ed, finish tmtg corporate site

Wed Oct 20 - Big Day - signing at maralago of merger agreement- pres trump calls me in w don jr 45 min before signing and scares the shit out of me, djt calls Jason Miller, we sign around 645pm, stay at Brazilian, the company fastly cancels our account at 3am

Thurs Oct 21 - stock opens, before market opens, trading was slow pointing to $11 open and the open was scary and it was not moving much higher at all, then it gets to $14 within an hour… then it explodes to $45… closes at $45.50, volume was over 491 million shares - djt calls me around 330pm and he is happy

Fri Oct 22 - stock halts trading several times, hits $137… hits high of $175… Lara trump almost goes on tv to discuss… I urgently work with Haley to write a memo calling for radio silence, stock closes at $94 - Patrick talks to djt to approve the memo

Sat Oct 23 - don jr tweets a rocketship to the moon on Instagram, patrick calls and says he can get a $1 billion pipe

Monday Oct 25 - drive up to atlanta

Tuesday Oct 26 - stock down 30%, Ef Hutton comes to atlanta with Patrick -  $1 billion pipe raise

Wed oct 27 - stock is up 10% today to $64, talk to Roy bailey about raising $25 mm bridge to despac,

Thurs oct 28 - Scott St. John visit and Lewis f visit ATL office

Fri Oct 29 - ny times article 'trump Spac $300mm' - Patrick and lawyers decide not to comment

Sat Oct 30 - djt leaves vmail posted about article and djt is pissed

Monday Nov 1 - in atlanta office, will Russell visits, atlanta SEC guy (Aaron lipson) who used to run enforcement division at SEc and now works at 'King and Spaulding' and we have meeting outside on balcony in which we discuss

Wed Nov 3 - mike mcmullin visits, Scott St. John visits, Dr. Ben Carson says yes to board seat after 2 zoom calls

Thurs Nov 4 - more pipe calls - see Megan Doyle email at EF Hutton for full schedule, lunch w Veanne smith at four seasons and offer her CEO, meet w wes friend Pittsfield about CEO, Chris p from rumble offered CEO or board seat, he says no, we have tense meeting with rumble and Josh about server structure,

Fri Nov 5 - more pipe calls - Chris p meeting w wes - djt calls at 10pm when I'm in Savannah, Linda McMahon might join board, meet w Dave Pitfield recruiter to help find CEO

Mon Nov 8 - more pipe calls

Sent from my iPhone

# EXHIBIT 8

| | |
|---|---|
| **From:** | John F. Haley[John.Haley@nelsonmullins.com] |
| **Sent:** | Wed 5/5/2021 1:06:02 AM (UTC) |
| **To:** | Patrick Orlando[porlando@benesserecapital.com] |
| **Cc:** | Andy L[andy@trumpmedia.group]; wes@trumpmedia.group[wes@trumpmedia.group]; Will Wilkerson[will@trumpmedia.group]; Andy Tucker[andy.tucker@nelsonmullins.com] |
| **Subject:** | TMG - NEW LOI FOR BENE 4832-8049-6104 v.2 |
| **Attachment:** | TMG - NEW LOI FOR BENE 4832-8049-6104 v.2.docx |

Patrick:

As promised, please find attached an initial draft of the LOI for a proposed business combination between TMG and BENE.

In the interest of time, I am sending the attached draft of the LOI to you without the benefit of TMG's review. Accordingly, the attached remains subject to TMG's further review and comment.

We look forward to discussing the attached LOI with you tomorrow. I would ask if you could please copy me when you forward the attached draft to your counsel and introduce us.

The yellow highlighted sections in the attached reflect the sections where we made substantive changes as compared to prior drafts.

Be well,

John



**JOHN F. HALEY** PARTNER
john.haley@nelsonmullins.com
2 SOUTH BISCAYNE BLVD. | 21ST FLOOR
MIAMI, FL 33131
T 305.373.9422   M 305.588.1860   F 305.373.9443

280 PARK AVENUE | 15TH FLOOR WEST
NEW YORK, NY 10017
T 646.428.2600   F 646.428.2610

NELSONMULLINS.COM   VCARD   VIEW BIO

**Confidentiality Notice**

This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

NMBC Draft 05/04/2021

**BENESSERE CAPITAL ACQUISITION CORP.**
78 SW 7th Street, Miami
FL 33130, United States

May [●], 2021

**CONFIDENTIAL**

Trump Media Group Corp
Attn: President Donald J. Trump

     **Re:**     **Letter of Intent**

Dear President Donald J. Trump,

This letter of intent (this "***LOI***") outlines the general terms and conditions of a potential business combination involving Benessere Capital Acquisition Corp., a Delaware Corporation ("***Investor***"), and Trump Media Group Corp., a Delaware Corporation (together with its subsidiaries to the extent reasonably applicable, the "***Company***"). The proposed transaction between the Investor and the Company (the "***Proposed Transaction***") is intended to be on substantially the terms and conditions as set forth in <u>Exhibit A</u> hereto (the "***Term Sheet***").

     **1.**     **No Commitment.** This LOI is intended to express only a mutual indication of interest in the Proposed Transaction. No agreement providing for any Proposed Transaction or any other transaction or the participation by either party therein will be deemed to exist unless and until the Definitive Agreements (as defined below) have been executed and delivered by the Investor, the Company and each of the other parties thereto, if any. Unless and until the Definitive Agreements have been so executed and delivered, none of the parties shall have any legal obligation to any other party of any kind with respect to the Proposed Transaction, whether because of this LOI or any other written or oral expression with respect to the Proposed Transaction or otherwise, except, in the case of this paragraph and paragraphs 3 through 12 of this LOI, which shall be legally binding upon the parties (the "***Binding Matters***"). Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its affiliates or any of their respective officers, directors, employees, consultants, contractors, agents and financial and legal advisors (collectively with such affiliates, such party's "***Representatives***") with regard to its participation in the Proposed Transaction. Neither party will have (and each party hereby irrevocably waives) any claims against the other party or any of its Representatives arising out of or relating to the Proposed Transaction other than those, if any, that either such party may in the future have with respect to the Binding Matters and then only in accordance with the terms thereof, or as a party to the Definitive Agreements (if any) with the other party.

     **2.**     **Definitive Agreements.** The obligations of the Investor and the Company to consummate the Proposed Transaction are subject to and conditioned upon the negotiation and execution of a definitive agreement, including a purchase, share exchange, merger or other acquisition agreement (the "***Acquisition Agreement***") and other documents (collectively with the Acquisition Agreement, the "***Definitive Agreements***"), containing such terms and provisions as are customarily included in documentation for a transaction of this nature and magnitude and as are otherwise agreed to by the Investor and the Company, including those in the Term Sheet. The closing of the Proposed Transaction contemplated hereby (the "***Closing***") will be subject to the satisfaction of all conditions precedent to Closing as identified in the Acquisition Agreement and as set forth on the attached Term Sheet.

1
Confidential

3.    **Waiver Against Trust.**  Reference is made to the final prospectus of Benessere, dated as of January 4, 2021 and filed with the SEC (File No. 333-249814) on January 6, 2021 (the "*Prospectus*"). The Company represents and warrants that it has read the Prospectus and understands that SPAC has established a trust account (the "*Trust Account*") containing the proceeds of its initial public offering (the "*IPO*") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of SPAC's public stockholders (including overallotment shares acquired by SPAC's underwriters, the "*Public Stockholders*"), and that, except as otherwise described in the Prospectus, SPAC may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their SPAC shares in connection with the consummation of SPAC's initial business combination (as such term is used in the Prospectus) (the "*Business Combination*") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if SPAC fails to consummate a Business Combination within 24 months after the closing of the IPO, subject to extension by amendment to SPAC's organizational documents, (c) with respect to any interest earned on the amounts held in the Trust Account, as necessary to pay any taxes or for working capital or (d) to SPAC after or concurrently with the consummation of a Business Combination.  For and in consideration of SPAC entering into this LOI and into discussions with the Company regarding the Proposed Transaction, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this LOI, neither the Company nor any of its affiliates do now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this LOI or any proposed or actual business relationship between SPAC or its Representatives, on the one hand, and the Company or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "*Released Claims*"). The Company on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that the Company or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with SPAC or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with SPAC or its affiliates).  The Company agrees and acknowledges that such irrevocable waiver is material to this LOI and specifically relied upon by SPAC and its affiliates to induce SPAC to enter into this LOI, and the Company further intends and understands such waiver to be valid, binding and enforceable against the Company and each of its affiliates under applicable law.  To the extent the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, monetary relief against SPAC or its Representatives, the Company hereby acknowledges and agrees that the Company's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit the Company or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein.  In the event the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, relief

against the Trust Account (including any distributions therefrom) or the Public Stockholders, whether in the form of money damages or injunctive relief, SPAC and its Representatives, as applicable, shall be entitled to recover from the Company and its affiliates the associated legal fees and costs in connection with any such action, in the event SPAC or its Representatives, as applicable, prevails in such action or proceeding.

4.    **Confidentiality.**  The parties acknowledge and affirm the terms of the Confidentiality Agreement, dated as of February 5, 2021 (the "*NDA*"), between Investor and the Company.  The parties acknowledge and agree that the existence and terms of this LOI and the Proposed Transaction are strictly confidential (provided, that they may be disclosed by the Investor to Significant Investors as contemplated below).  Except as required by applicable law, rule or regulation (including SEC and applicable stock exchange requirements) or any governmental, judicial, regulatory or supervisory authority having jurisdiction over such party or its Representatives, neither the Investor nor its Representatives, on the one hand, nor the Company nor its Representatives, on the other hand, will make any public announcements relating to the Proposed Transaction without the prior written consent of the other party.  The Company acknowledges that U.S. securities laws and other laws prohibit any person who has material, non-public information concerning a public company from purchasing or selling any of its securities, and from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.  The Company acknowledges that the confidentiality provisions of the NDA and this LOI shall be deemed to be an agreement to keep the confidential information of the Investor in confidence as contemplated by Regulation FD promulgated by the SEC.  In addition, the Company acknowledges and agrees that some of the confidential information of the Investor (including this LOI) may be considered "material non-public information" for purposes of the federal securities laws and that the Company and its Representatives will abide by all securities laws relating to the handling of and acting upon material non-public information regarding the Investor.  Notwithstanding the foregoing, the Company understands and acknowledges that after each party executes this LOI, the Investor and its Representatives may on a confidential basis share this LOI and certain confidential information about the Company with certain of the Investor's significant existing selected and potential co-investors (together, the "*Significant Investors*") in order to gauge their support of the Proposed Transaction and the Company hereby consents to the foregoing and agrees to cooperate in a timely manner with, and provide reasonable support for, such efforts (including having its Chief Executive Officer and other senior management reasonably available to participate in conversations, presentations and meetings with Significant Investors).

5.    **Exclusivity.**.

(a)    **Company Exclusivity.**  In consideration of the considerable time, effort and expense to be undertaken by the Investor in connection with the Proposed Transaction, the Company agrees that during the period from the execution of this LOI and ending ninety (90) days after the execution of this LOI (the "*Exclusivity Period*"), the Company will not, and the Company will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with, or encourage, or provide any information to, any individual, corporation, partnership, limited liability company or other entity or group (other than the Investor and its affiliates) concerning any transaction with respect to the direct or indirect sale, transfer, license or other disposition of the Company or its subsidiaries, or their respective equity interests, business or material assets (outside of the ordinary course of business), whether by purchase, merger, consolidation, recapitalization, exclusive license or otherwise, or any similar transaction that would reasonably be expected to prohibit or impair the Proposed Transaction (a "*Competing Transaction*"), or enter into any agreement in principle, letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto.  The Company shall immediately suspend any pre-

existing discussion with all parties other than the Investor and its affiliates regarding any solicitation or offer for a Competing Transaction. During the Exclusivity Period, the Company shall promptly (but in any event within 48 hours) after receipt notify the Investor if it receives any solicitation or offer for a Competing Transaction and thereafter keep the Investor reasonably informed as to the terms and status of such Competing Transaction. The Company represents that neither the Company nor any of its affiliates or equity holders is party to or bound by any binding or non-binding agreement or understanding with respect to any Competing Transaction. For the avoidance of doubt the provisions of this paragraph 5(a) shall in no way prohibit, curtail or limit the Company's ability to raise capital from existing or new investors in a private placement of equity or debt securities.

**(b)    Investor Exclusivity.** In consideration of the considerable time, effort and expense to be undertaken by the Company in connection with the Proposed Transaction, the Investor agrees that during the period commencing on May 31, 2021 and until the expiration of the Exclusivity Period, the Investor will not, and the Investor will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with, or encourage, or provide any information to, any individual, corporation, partnership, limited liability company or other entity or group (other than the Company and its affiliates) concerning any Business Combination other than the Proposed Transaction (an "***Alternative Transaction***"), or enter into any agreement in principle, letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto. Upon the execution of this LOI, the Investor shall immediately suspend any pre-existing discussion with all parties other than the Company and its affiliates regarding any solicitation or offer for an Alternative Transaction.

**6.    Conduct of Business.** During the Exclusivity Period, except with the prior written consent of the Investor, the Company will: (a) conduct its business in a manner consistent with what has been described in that certain presentation, dated February 24, 2021 (the ***"TMG Deck"***), and delivered to the Investor (except as expressly otherwise contemplated herein); (b) maintain its properties and other assets in good working condition (normal wear and tear excepted); and (c) use its best efforts to further the business and operations of the Company in accordance with what has been described in the TMG Deck. Notwithstanding any of the foregoing, the Investor hereby acknowledges that the Company may pursue the creation of a free social media platform as opposed to the acquisition of an existing social media network.

**7.    Access.** Prior to the Termination Date, the Company will, upon reasonable advance notice and during normal business hours afford the Investor and its Representatives with reasonable access to its and its affiliates' respective assets, properties, facilities, books and records and personnel. The Company will furthermore cooperate, and cause its Representatives to cooperate, with the Investor and its Representatives regarding all due diligence matters, including document requests. Prior to the Termination Date, the Company will promptly (but in any event within 72 hours) after it becomes aware of such event notify the Investor of any material adverse event affecting the Company or its affiliates, their respective businesses or the Company's ability to consummate the Proposed Transaction in accordance with the terms and conditions of this LOI.

**8.    Expenses.** Whether or not the parties enter into Definitive Agreements with respect to the Proposed Transaction (but subject to the terms and conditions of the Definitive Agreements if the parties do enter into the Definitive Agreements), and except as otherwise provided herein, each of the parties hereto will pay its own costs and expenses (including legal, financial advisory, consulting and accounting fees and expenses) incurred at any time in connection with pursuing or consummating the Proposed Transaction.

4
**Confidential**

9.      **Termination.**  This LOI can be terminated as follows:  (a) by the mutual written agreement of the parties to terminate this LOI; (b) by the Company (in its sole discretion) (as applicable) at any time if it no longer desires to pursue the Proposed Transaction, or (c) by the Investor (in its sole discretion) at any time if it no longer desires to pursue the Proposed Transaction subject to the payment of the Break-Up Fee described in paragraph 11 hereof; provided, however, neither the Company nor the Investor shall terminate this LOI pursuant to clause (b) or (c) prior to the expiration of the Exclusivity Period so long as each of the parties is diligently working in good faith and the negotiations and drafting of the Definitive Agreements are advancing; or (d) by the Company after the expiration of the Exclusivity Period.  Any termination of this LOI pursuant to clauses (b), (c) or (d) above shall be pursuant to a written notice provided by the terminating party to the other party and, except as otherwise set forth in such notice, any termination in accordance with this paragraph 9 shall be effective upon receipt of such written notice by the non-terminating party (the date of termination being the "***Termination Date***").  Upon termination of this LOI, this LOI will be deemed null, void and of no further force or effect, and all obligations and liabilities of the parties under this LOI or otherwise related to the Proposed Transaction will terminate, except for the respective continuing obligations of the parties relating to the Binding Matters (including the payment of the Break-Up Fee), which will survive any termination of this LOI indefinitely (unless a lesser period is expressly contemplated by their terms).  The termination of this LOI will not relieve any of the parties of liability for such party's pre-termination breach of any of the Binding Matters or any other agreement between the parties.

10.      **Governing Law; Jurisdiction; Waiver of Jury Trial.**  This LOI and the rights and obligations of the parties hereunder will be governed by and construed under and in accordance with the laws of the State of New York, without regard to any conflict of law rule or principle that would result in the application of any laws other than the laws of the State of New York.  Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts seated in New York County, New York (and any appellate courts thereof) in any action or proceeding arising out of or relating to this LOI, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each party hereby knowingly, voluntarily and intentionally irrevocably waives the right to a trial by jury in respect to any litigation, dispute, claim, legal action or other legal proceeding based hereon, or arising out of, under, or in connection with, this LOI.

11.      **Break-Up Fee.**  In connection with the negotiation and signing of this LOI, the Investor acknowledges and agrees that the Company, its representatives and advisors have devoted significant time and efforts and have incurred significant expenses in reviewing and analyzing the Proposed Transaction. The Company and the Investor further agree that in the event that the Merger Agreement is not entered into by the Company and the Investor on or before July 7, 2021 and the parties are not actively engaging in the negotiation and preparation of the same at that time, then Patrick Orlando and Rodrigo Veloso shall be, jointly and severally, responsible to promptly (and in any event within 30 Days after the occurrence giving rise to such payment obligation) pay the Company a fee equal to $5,000,000 (the "***Break-Up Fee***").  Notwithstanding the foregoing, in the event that (1) Patrick Orlando and/or Rodrigo Veloso should propose to the Company an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company or (2) the Company should elect, in its discretion, to terminate this LOI, then no Break-Up Fee shall be due and payable to the Company.

    **12.**    **Miscellaneous.**    This LOI supersedes any prior written or oral understanding or agreements between the parties related to the subject matter hereof (other than the NDA). This LOI may be amended, modified, waived or supplemented only by written agreement of the parties. No failure or delay in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. The headings set forth in this LOI are for convenience of reference only and shall not be used in interpreting this LOI. In this LOI, the term: (x) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; (y) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (z) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this LOI to an affiliate of the Investor prior to the Business Combination will include the Investor's sponsor, ARC Global Investments LLC (the "***Sponsor***"). This LOI may be executed in any number of counterparts (including by facsimile, pdf or other electronic document transmission), each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

*{Remainder of Page Intentionally Left Blank; Signature Page Follows}*

4832-8049-6104 v.2 /, 8:59 PM, 05/04/2021

Please acknowledge your acceptance of and agreement to the foregoing by signing and returning to the undersigned as soon as possible a counterpart of this LOI.

Sincerely,

**BENESSERE CAPITAL ACQUISITION CORP.**

By: _____
    Name:
    Title:

*Accepted and agreed to by the undersigned on behalf of itself and its subsidiaries and affiliates as of this ____ day of May, 2021:*

**TRUMP MEDIA GROUP CORP.**

By: _____
Name:  President Donald J. Trump
Title:   Chairman, CEO, and President

7
Confidential

## Exhibit A - TERM SHEET

*This Term Sheet is intended to set forth the material financial and business terms and conditions of the Proposed Transaction. However, all such terms and conditions are subject to further refinement and detail as the parties shall mutually agree, as shall be set forth in the Definitive Agreements. All capitalized terms used in this Term Sheet and not otherwise defined herein shall have the respective meanings ascribed to such terms in the letter of intent to which this Term Sheet is attached.*

| | |
|---|---|
| **Transaction:** | A business combination between the Company and SPAC pursuant to which SPAC will acquire 100% of the outstanding equity and equity equivalents of the Company (including options, warrants or other securities that have the right to acquire or convert into equity securities of the Company), or all of the Company's business, in exchange for the consideration described below (in whatever form as agreed by the parties, whether merger, consolidation, share exchange, asset purchase or otherwise, the "***Acquisition***"). The deal structure will be determined by the parties based on the due diligence findings as well as business, legal, tax, accounting and other considerations. At the closing of the Acquisition (the "***Closing***"), SPAC would change its name to use the "Trump Media Group Corp" name. The post-Closing entity is referred to as the "***Surviving Company***". |
| **Transaction Consideration:** | The total consideration provided to or for the benefit of the Company or the Company equity holders (including holders of options, warrants and other convertible securities), as applicable, in the Acquisition (the "***Transaction Consideration***") is based on a total enterprise value of the Company of [$900,000,000] consisting of the components of uses of funds on <u>Annex I</u> hereto. The Transaction Consideration would be paid by the Surviving Company by issuance of shares of common stock of the Surviving Company (the "***Transaction Shares***"), which would each be valued at an amount equal to the redemption amount payable to Public Stockholders that redeem in connection with the Closing (the "***Redemption Price***"). |
| | The Transaction Consideration assumes that at the Closing the Company on a consolidated basis will have no undisclosed debt (including prepayment penalties that would be due if paid off at Closing) after deducting any excess cash on the balance sheet ("***Net Debt***"), with a normalized level of net working capital (in such amount as agreed by the parties) in order to operate its business. A dollar for dollar adjustment in the Transaction Consideration will be made if the actual working capital at the Closing is [greater than or] less than the agreed upon target, as well as for the amount of any Net Debt, unpaid Company transaction expenses and transaction bonuses, with such adjustments being estimated at Closing and subject to a post-Closing true-up. |
| | See the Transaction Sources & Uses table and Pro Forma Ownership table in <u>Annex I</u> hereto. |
| **Earnout Shares:** | An aggregate of _____ shares of common stock of the Surviving Company shall be issued to the pre-closing security holders of the Company pro-rata in accordance with their respective ownership interests if the following stock price targets are met.<br><br>• 15,000,000 shares shall be issued if SPAC stock price trades at |

| | |
|---|---|
| | - or above $15.00 for any 20 out of 30 trading days from the Transaction closing through December 31, 2022<br><br>- 15,000,000 shares shall be issued if the Surviving Company stock price trades at or above $20.00 per share for any 20 out of 30 trading days from the Transaction closing through December 31, 2023<br><br>- 10,000,000 shares shall be issued if Surviving Company stock price trades at or above $30.00 per share for any 20 out of 30 trading days from the Transaction closing through December 31, 2024<br><br>The foregoing targets are to be met on an all-or-nothing basis, and there shall be no partial awards.<br><br>The foregoing Earnout Shares consideration has a value of $825 million (valued at the applicable stock price trading thresholds of $15.00, $20.00 and $30.00, respectively). |
| **Lock-Up:** | Significant Company stockholders will be required to subject their Transaction Shares to a lock-up for a period substantially identical to the lock-up applicable to the Sponsor with respect to its founder shares, subject to any exceptions that are mutually agreed upon in the Definitive Documents and permitted under applicable law. All Transaction Shares will be subject to all applicable holding periods and requirements under the Securities Act of 1933 and SEC rules. |
| **Non-Compete:** | The significant stockholders of the Company shall each enter into a non-competition and non-solicitation agreement for a period of four (4) years after the Closing in return for the consideration being delivered, which shall be in addition to any non-competes in any employment agreements to which they may be a party. |
| **Employment Arrangements:** | Certain executives of the Company will be required to enter into mutually acceptable employment agreements with the Surviving Company, which will include customary confidentiality, non-compete and assignment of inventions and other customary restrictive covenant provisions. |
| **Minimum Cash:** | The minimum cash delivery obligation by SPAC in the Transaction shall be $75 million; provided, however, the Company may waive this condition is its sole and absolute discretion. While the Investor fully expects to satisfy this condition through the funds held in its Trust Account, it retains the right to satisfy this condition through the private sale of its equity securities on terms reasonably satisfactory to Trump Media. |
| **Timeline:** | The parties hereto will negotiate a definitive agreement, with a signing date of no later than July 7, 2021. |
| **Acquisition Agreement:** | The obligations of the parties will be subject to execution of the Acquisition Agreement containing terms and conditions satisfactory to SPAC and the Company. The execution of the Acquisition Agreement would also be subject to completion of |

9

**Confidential**

| | confirmatory due diligence by SPAC, as well as the delivery of PCAOB audited financial statements by the Company and, if deemed legally necessary, the receipt by SPAC of a fairness opinion issued by a reputable firm opining that the Acquisition is fair to SPAC's shareholders.  The Acquisition Agreement will contain representations, warranties, covenants, closing conditions, break-up fees, and indemnification provisions customary for M&A transactions of this type, as well as a general release of the Company by the Company's equity holders.  The required diligence will include an in-depth review of the Company's management team and the Company's preparedness to become listed on Nasdaq, and the Company will make any appropriate hires necessary to fill any gaps. |
|---|---|
| | In connection with the Acquisition Agreement, Company management will be required to participate in roadshow presentations to help with SPAC's share recycling efforts, and generally make themselves available to assist in such efforts. |
| | The Acquisition Agreement will also require that (i) all assets, including intellectual property, used by (or licensed to) the Company in its business that are held or licensed by affiliates or other related parties be transferred to the Company, and (ii) the Surviving Company not have any related party transactions that are not on arms-length terms or that are otherwise unnecessary.  For purposes of clarification, the Company shall only transfer its intellectual property licenses to the Surviving Company and will not be required to cause its licensors to transfer such intellectual property to the Surviving Company. |
| | Each of SPAC and the Company will designate in the Acquisition Agreement a representative to represent such party's interests after the Closing in connection with the Acquisition Agreement, including with respect to post-Closing Transaction Consideration adjustments and indemnification claims. |
| **Closing Conditions:** | The obligations of either party to consummate the transaction are subject to standard closing conditions for a transaction of this nature, including without limitation:  (i) completion of any required stock exchange and regulatory review, including SEC/NASDAQ, receipt of any required regulatory approvals and necessary third party approvals, and expiration of any waiting periods under HSR or other applicable anti-trust laws, (ii) approval by SPAC's shareholders of the Acquisition and related matters, (iii) there shall have not been any material adverse changes in the business, customer relationships, operations, financial condition, regulatory environment or prospects of the Company, (iv) the execution of all related agreements as contemplated by the Acquisition Agreement including lockup agreements, an escrow agreement, non-compete and non-solicitation agreements, the Surviving Company incentive plan and employment agreements, and (v) SPAC having at least $5,000,001 in net tangible assets. |
| **Use of Proceeds:** | Immediately upon Closing, SPAC's cash, including the funds remaining in the Trust Account after the redemption of SPAC's Public Stockholders, will be used as follows: (i) payment of SPAC's accrued but unpaid expenses, including transaction expenses, deferred IPO fees and deferred advisor fees, and obligations owed to the Sponsor, and (ii) the remaining cash will be used for working capital and general corporate purposes. |
| **Filings:** | As soon as practicable following the execution of the Acquisition Agreement, the parties will file all submissions for shareholder, regulatory and governmental |

| | |
|---|---|
| | approval, including a proxy statement (the "***Proxy Statement***") with the SEC for the purpose of obtaining SPAC shareholder approval. The Proxy Statement will include PCAOB audited annual financial statements of the Company prepared in accordance with U.S. GAAP as required by applicable securities laws. |
| **Governing Law:** | The Acquisition Agreement and other applicable Definitive Agreements will be governed by New York law and jurisdiction. |
| | |

11
**Confidential**

**Annex I**

**Illustrative Sources & Uses and Ownership table**

*[TO BE REVISED BASED ON EARN-OUT AND VALUATION TERMS ABOVE]*

**Transaction Sources & Uses ($mm)**

| Sources[1] | | Uses | |
|---|---|---|---|
| SPAC cash in trust (assuming no redemptions) | $116,725,000 | Cash to Surviving Company balance sheet | $116,725,000 |
| Roll-over existing net debt | $0 | Roll-over existing net debt | $0 |
| Seller rollover equity | $900,000,000 | Seller rollover equity | $900,000,00 |
| Assumption of Cash from Target | $0 | Transaction Expenses[2] | $6,450,000 |
| Total sources | $1,016,725,000 | Total uses | $1,023,175,000 |

**Pro Forma SPAC Ownership Post-Closing[3]**

| Security Holders | Shares Outstanding | % of Outstanding | Fully-Diluted Shares | Fully-Diluted % |
|---|---|---|---|---|
| Rollover equity shares for Company shareholders[4] | 90,000,000 | 84.84% | 90,000,000 | 82.30% |
| SPAC public shareholders [(including rights)] | 12,650,000 | 11.92% | 12,650,000 | 11.60% |
| SPAC sponsor promote | 2,875,000 | 2.71% | 2,875,000 | 2.63% |
| SPAC private placement shares [(including rights)] | 433,125 | 0.41% | 433,125 | 0.40% |
| Underwriter IPO shares | 125,000 | 0.12% | 125,000 | 0.11% |
| Public warrants[5] | 0 | 0.0% | 0 | 0.00% |
| Private warrants[5] | 0 | 0.0% | 0 | 0.00% |
| If Stock issued to Repurchase Warrants ($18 per Share) | 0 | 0 | 3,221,224 | 2.95% |
| Warrants underlying underwriter UPO | 0 | 0 | 0 | 0 |
| Total shares outstanding | 106,083,125 | 100.0% | 109,304,349 | 100.0% |

*(1) The amounts from the various sources of cash may change based on (i) the amount of Public Stockholder redemptions prior to Closing, (ii) investor interest in the Acquisition and (iii) the then current markets for equity and debt financing.*

*(2) Includes deferred IPO fees and underwriter business combination fee.*

*(3) Assumes that there are no new awards under any new Surviving Company equity incentive plan. Assumes that there are no adjustments to the Transaction Consideration or indemnification claims.*

*(4) Assuming a Redemption Price of $10.00 per share, although the Redemption Price will likely be higher.*

*(5) The Surviving Company shall maintain an equity option pool representing approximately 7.5% of the total equity capital of the Surviving Company.*

# EXHIBIT 9

# BENESSERE CAPITAL ACQUISITION CORP.

78 SW 7th Street, Miami
FL 33130, United States

June 4, 2021

**CONFIDENTIAL**

Trump Media Group Corp
Attn: President Donald J. Trump

> Re:    **Letter of Intent**

Dear President Donald J. Trump,

This letter of intent (this "*LOI*") outlines the general terms and conditions of a potential business combination involving **BENESSERE CAPITAL ACQUISITION CORP.**, a Delaware Corporation (the "*Investor*" or "*SPAC*"), and **TRUMP MEDIA GROUP CORP.**, a Delaware corporation (together with its subsidiaries to the extent reasonably applicable, the "*Company*"), and Patrick Orlando, an individual ("*PO*"), solely with respect to paragraph 11 below. The proposed transaction between the Investor and the Company (the "*Proposed Transaction*") is intended to be on substantially the terms and conditions as set forth in Exhibit A hereto (the "*Term Sheet*"). Each of the Investor and the Company may be hereinafter referred to as a "*Party*" and collectively, as the "*Parties*".

1.      **No Commitment.** This LOI is intended to express only a mutual indication of interest in the Proposed Transaction. No agreement providing for any Proposed Transaction or any other transaction or the participation by either party therein will be deemed to exist unless and until the Definitive Agreements (as such term is defined below) have been executed and delivered by the Investor, the Company and each of the other parties thereto, if any. Unless and until the Definitive Agreements have been so executed and delivered, none of the parties shall have any legal obligation to any other party of any kind with respect to the Proposed Transaction, whether because of this LOI or any other written or oral expression with respect to the Proposed Transaction or otherwise, except, in the case of (x) this paragraph, (y) clause number (4) of the section titled "Timeline" of the Term Sheet attached hereto, and (z) paragraphs 3 through 12 of this LOI, which shall each be legally binding upon the parties (collectively, the "*Binding Matters*"). Each party reserves the right, in its sole discretion, to reject any and all proposals made by the other party or its affiliates or any of their respective officers, directors, employees, consultants, contractors, agents and financial and legal advisors (collectively with such affiliates, such party's "*Representatives*") with regard to its participation in the Proposed Transaction. Neither party will have (and each party hereby irrevocably waives) any claims against the other party or any of its Representatives arising out of or relating to the Proposed Transaction other than those, if any, that either such party may in the future have with respect to the Binding Matters and then only in accordance with the terms thereof, or as a party to the Definitive Agreements (if any) with the other party.

2.      **Definitive Agreements.** The obligations of the Investor and the Company to consummate the Proposed Transaction are subject to and conditioned upon the negotiation and execution of a definitive agreement, including a purchase, share exchange, merger or other acquisition agreement (the "*Acquisition Agreement*") and other documents (collectively with the Acquisition Agreement, the "*Definitive Agreements*"), containing such terms and provisions as are customarily included in documentation for a transaction of this nature and magnitude and as are otherwise agreed to by the Investor and the Company, including those in the Term Sheet. The closing of the Proposed Transaction contemplated hereby (the

1
Confidential

"***Closing***") will be subject to the satisfaction of all conditions precedent to Closing as identified in the Acquisition Agreement and as set forth on the attached Term Sheet.

      3.    **Waiver Against Trust.** Reference is made to the final prospectus of Benessere, dated as of January 4, 2021 and filed with the SEC (File No. 333-249814) on January 6, 2021 (the **"*Prospectus*"**). The Company represents and warrants that it has read the Prospectus and understands that SPAC has established a trust account (the "*Trust Account*") containing the proceeds of its initial public offering (the "*IPO*") and the overallotment shares acquired by its underwriters and from certain private placements occurring simultaneously with the IPO (including interest accrued from time to time thereon) for the benefit of SPAC's public stockholders (including overallotment shares acquired by SPAC's underwriters, the "*Public Stockholders*"), and that, except as otherwise described in the Prospectus, SPAC may disburse monies from the Trust Account only: (a) to the Public Stockholders in the event they elect to redeem their SPAC shares in connection with the consummation of SPAC's initial business combination (as such term is used in the Prospectus) (the "*Business Combination*") or in connection with an extension of its deadline to consummate a Business Combination, (b) to the Public Stockholders if SPAC fails to consummate a Business Combination within 24 months after the closing of the IPO, subject to extension by amendment to SPAC's organizational documents, (c) with respect to any interest earned on the amounts held in the Trust Account, as necessary to pay any taxes or for working capital or (d) to SPAC after or concurrently with the consummation of a Business Combination. For and in consideration of SPAC entering into this LOI and into discussions with the Company regarding the Proposed Transaction, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company hereby agrees on behalf of itself and its affiliates that, notwithstanding anything to the contrary in this LOI, neither the Company nor any of its affiliates do now or shall at any time hereafter have any right, title, interest or claim of any kind in or to any monies in the Trust Account or distributions therefrom, or make any claim against the Trust Account (including any distributions therefrom), regardless of whether such claim arises as a result of, in connection with or relating in any way to, this LOI or any proposed or actual business relationship between SPAC or its Representatives, on the one hand, and the Company or its Representatives, on the other hand, or any other matter, and regardless of whether such claim arises based on contract, tort, equity or any other theory of legal liability (collectively, the "*Released Claims*"). The Company on behalf of itself and its affiliates hereby irrevocably waives any Released Claims that the Company or any of its affiliates may have against the Trust Account (including any distributions therefrom) now or in the future as a result of, or arising out of, any negotiations, contracts or agreements with SPAC or its Representatives and will not seek recourse against the Trust Account (including any distributions therefrom) for any reason whatsoever (including for an alleged breach of any agreement with SPAC or its affiliates). The Company agrees and acknowledges that such irrevocable waiver is material to this LOI and specifically relied upon by SPAC and its affiliates to induce SPAC to enter into this LOI, and the Company further intends and understands such waiver to be valid, binding and enforceable against the Company and each of its affiliates under applicable law. To the extent the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, monetary relief against SPAC or its Representatives, the Company hereby acknowledges and agrees that the Company's and its affiliates' sole remedy shall be against funds held outside of the Trust Account and that such claim shall not permit the Company or its affiliates (or any person claiming on any of their behalves or in lieu of any of them) to have any claim against the Trust Account (including any distributions therefrom) or any amounts contained therein. In the event the Company or any of its affiliates commences any action or proceeding based upon, in connection with, relating to or arising out of any matter relating to SPAC or its Representatives, which proceeding seeks, in whole or in part, relief against the Trust Account (including any distributions therefrom) or the Public Stockholders, whether in the form of money damages or injunctive relief, SPAC and its Representatives, as applicable, shall be entitled to recover from the Company and its affiliates the associated legal fees and costs in connection with any such action, in the event SPAC or its Representatives, as applicable, prevails in such action or proceeding.

2

**Confidential**

4.      **Confidentiality.**  The Parties acknowledge and affirm the terms of the Confidentiality Agreement, dated as of February 5, 2021- (the "***NDA***"), between Investor and the Company.  The Parties acknowledge and agree that the existence and terms of this LOI and the Proposed Transaction are strictly confidential (provided, that they may be disclosed by the Investor to Significant Investors as contemplated below).  Except as required by applicable law, rule or regulation (including SEC and applicable stock exchange requirements) or any governmental, judicial, regulatory or supervisory authority having jurisdiction over such Party or its Representatives, neither the Investor nor its Representatives, on the one hand, nor the Company nor its Representatives, on the other hand, will make any public announcements relating to the Proposed Transaction without the prior written consent of the other Party.  The Company acknowledges that U.S. securities laws and other laws prohibit any person who has material, non-public information concerning a public company from purchasing or selling any of its securities, and from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities.  The Company acknowledges that the confidentiality provisions of the NDA and this LOI shall be deemed to be an agreement to keep the confidential information of the Investor in confidence as contemplated by Regulation FD promulgated by the SEC.  In addition, the Company acknowledges and agrees that some of the confidential information of the Investor (including this LOI) may be considered "material non-public information" for purposes of the federal securities laws and that the Company and its Representatives will abide by all securities laws relating to the handling of and acting upon material non-public information regarding the Investor.  Notwithstanding the foregoing, the Company understands and acknowledges that after each Party executes this LOI, the Investor and its Representatives may on a confidential basis share this LOI and certain confidential information about the Company with certain of the Investor's significant existing and potential co-investors (together, the "***Significant Investors***") in order to gauge their support of the Proposed Transaction and the Company hereby consents to the foregoing and agrees to cooperate in a timely manner with, and provide reasonable support for, such efforts (including having its Chief Executive Officer and other senior management reasonably available to participate in conversations, presentations and meetings with Significant Investors).

5.      **Exclusivity.**

(a)      **Company Exclusivity.**  In consideration of the considerable time, effort and expense to be undertaken by the Investor in connection with the Proposed Transaction, the Company agrees that during the period from the execution of this LOI and ending ninety (90) days after the execution of this LOI (the "***Exclusivity Period***"), the Company will not, and the Company will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into discussions, negotiations or transactions with, or encourage, or provide any information to, any individual, corporation, partnership, limited liability company or other entity or group (other than the Investor and its affiliates) concerning any transaction with respect to the direct or indirect sale, transfer, license or other disposition of the Company or its subsidiaries, or their respective equity interests, business or material assets (outside of the ordinary course of business), whether by purchase, merger, consolidation, recapitalization, exclusive license or otherwise, or any similar transaction that would reasonably be expected to prohibit or impair the Proposed Transaction (a "***Competing Transaction***"), or enter into any agreement in principle, letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto.  The Company shall immediately suspend any pre-existing discussion with all parties other than the Investor and its affiliates regarding any solicitation or offer for a Competing Transaction.  During the Exclusivity Period, the Company shall promptly (but in any event within 48 hours) after receipt notify the Investor if it receives any solicitation or offer for a Competing Transaction and thereafter keep the Investor reasonably informed as to the terms and status of such Competing Transaction.  The Company represents that neither the Company nor any of its affiliates or equity holders is party to or bound by any binding or non-binding agreement or understanding with respect to any Competing Transaction.  For the avoidance of doubt the provisions of this paragraph 5(a) shall in no way prohibit,

3
**Confidential**

curtail or limit the Company's ability to raise capital from existing or new investors in a private placement of equity or debt securities up to an aggregate maximum of $25 million.

(b)      **Investor Exclusivity.** In consideration of the considerable time, effort and expense to be undertaken by the Company in connection with the Proposed Transaction, the Investor agrees that during the Exclusivity Period, the Investor will not, and the Investor will cause its Representatives not to, directly or indirectly, solicit or initiate or enter into any Business Combination other than the Proposed Transaction (an "*Alternative Transaction*"), or enter into any exclusive agreement in principle, exclusive letter of intent or definitive agreement, or make any filing with the SEC (including the filing of any registration statement) or other governmental authority, with respect thereto.

6.      **Conduct of Business.** During the Exclusivity Period, except with the prior written consent of the Investor, the Company will: (a) conduct its business in a manner consistent with what has been described in that certain presentation, dated February 24, 2021 (the *"TMG Deck"*), and delivered to the Investor (except as expressly otherwise contemplated herein); (b) maintain its properties and other assets in good working condition (normal wear and tear excepted); and (c) use its best efforts to further the business and operations of the Company in accordance with what has been described in the TMG Deck. Notwithstanding any of the foregoing, the Investor hereby acknowledges that the Company may pursue the creation of a free social media platform as opposed to the acquisition of an existing social media network.

7.      **Access.** Prior to the Termination Date, the Company will, upon reasonable advance notice and during normal business hours afford the Investor and its Representatives with reasonable access to its and its affiliates' respective assets, properties, facilities, books and records and personnel. The Company will furthermore cooperate, and cause its Representatives to cooperate, with the Investor and its Representatives regarding all due diligence matters, including document requests. Prior to the Termination Date, the Company will promptly (but in any event within 72 hours) after it becomes aware of such event notify the Investor of any material adverse event affecting the Company or its affiliates, their respective businesses or the Company's ability to consummate the Proposed Transaction in accordance with the terms and conditions of this LOI.

8.      **Expenses.** Whether or not the Parties enter into Definitive Agreements with respect to the Proposed Transaction (but subject to the terms and conditions of the Definitive Agreements if the Parties do enter into the Definitive Agreements), and except as otherwise provided herein, each of the Parties hereto will pay its own costs and expenses (including legal, financial advisory, consulting and accounting fees and expenses) incurred at any time in connection with pursuing or consummating the Proposed Transaction.

9.      **Termination.** This LOI can be terminated as follows: (a) by the mutual written agreement of the Company and the Investor to terminate this LOI; (b) by the Company (in its sole discretion) at any time if it no longer desires to pursue the Proposed Transaction, or (c) by the Investor (in its sole discretion) at any time if it no longer desires to pursue the Proposed Transaction; provided, however, that such termination by the Investor shall remain subject to the payment of the Break-Up Fee described in paragraph 11 hereof; provided, further, that neither the Company nor the Investor shall terminate this LOI pursuant to clause (b) or (c) prior to the expiration of the Exclusivity Period; or (d) by the Company after the expiration of the Exclusivity Period. Any termination of this LOI pursuant to clauses (b), (c) or (d) above shall be pursuant to a written notice provided by the terminating party to the other Party and, except as otherwise set forth in such notice, any termination in accordance with this paragraph 9 shall be effective upon receipt of such written notice by the non-terminating party (the date of termination being the "*Termination Date*"). Upon termination of this LOI, this LOI will be deemed null, void and of no further force or effect, and all obligations and liabilities of the Parties under this LOI or otherwise related to the Proposed Transaction will terminate, except for the respective continuing obligations of the Parties relating to the Binding Matters (including the payment of the Break-Up Fee), which will survive any termination of this LOI indefinitely

4
**Confidential**

(unless a lesser period is expressly contemplated by their terms). The termination of this LOI will not relieve any of the Parties of liability for such Party's pre-termination breach of any of the Binding Matters or any other agreement between the Parties.

10.    **Governing Law; Jurisdiction; WAIVER OF JURY TRIAL.** This LOI and the rights and obligations of the Parties hereunder will be governed by and construed under and in accordance with the laws of the State of New York, without regard to any conflict of law rule or principle that would result in the application of any laws other than the laws of the State of New York. Each Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts seated in New York County, New York (and any appellate courts thereof) in any action or proceeding arising out of or relating to this LOI, and each of the Parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court. Each Party agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. **EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY IRREVOCABLY WAIVES THE RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, DISPUTE, CLAIM, LEGAL ACTION OR OTHER LEGAL PROCEEDING BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS LOI.**

11.    **Break-Up Fee.** In connection with the negotiation and signing of this LOI, the Investor acknowledges and agrees that the Company, its representatives and advisors have devoted significant time and efforts and have incurred significant expenses in reviewing and analyzing the Proposed Transaction. The Company and the Investor further agree that in the event that the Parties fail to enter into an Acquisition Agreement on or before August 6, 2021 (unless such date is extended by mutual written agreement of the Parties), then Patrick Orlando shall be responsible to promptly (and in any event within 18 months after the occurrence giving rise to such payment obligation) pay the Company a fee equal to $1,000,000 (the "*Break-Up Fee*").

Notwithstanding the foregoing, in the event that any of the following should occur:

(1) Patrick Orlando should propose to the Company an alternative special purpose acquisition corporation with combination terms that are acceptable to the Company (in its sole and absolute discretion) and such terms are ultimately accepted by the Company;

(2) the Company should elect, in its discretion, to terminate this LOI for any reason;

(3) the Company unreasonably delays its agreement to the terms of the Acquisition Agreement or frustrates its completion; or

(4) the Investor shall have delivered its signature page to the Acquisition Agreement;

then no Break-Up Fee shall be due and payable to the Company, and the Break-Up Fee shall no longer apply or be enforceable and the Company agrees to waive any potential claim to the Break-Up Fee.

12.    **Miscellaneous.** This LOI supersedes any prior written or oral understanding or agreements between the Parties related to the subject matter hereof (other than the NDA). This LOI may be amended, modified, waived or supplemented only by written agreement of the Parties. No failure or delay in

5

**Confidential**

exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder. Nothing contained in this LOI shall create any rights in, or be deemed to have been executed for the benefit of, any person that is not a party hereto or a successor or permitted assign of such a party. The headings set forth in this LOI are for convenience of reference only and shall not be used in interpreting this LOI. In this LOI, the term: (x) "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding or succeeding such term and shall be deemed in each case to be followed by the words "without limitation"; (y) "person" shall refer to any individual, corporation, partnership, trust, limited liability company or other entity or association, including any governmental or regulatory body, whether acting in an individual, fiduciary or any other capacity; and (z) "affiliate" shall mean, with respect to any specified person, any other person or group of persons acting together that, directly or indirectly, through one or more intermediaries controls, is controlled by or is under common control with such specified person (where the term "control" (and any correlative terms) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such person, whether through the ownership of voting securities, by contract or otherwise). For the avoidance of doubt, any reference in this LOI to an affiliate of the Investor prior to the Business Combination will include the Investor's sponsor, ARC Global Investments LLC (the "*Sponsor*"). This LOI may be executed in any number of counterparts (including by facsimile, pdf or other electronic document transmission), each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.

*{Remainder of Page Intentionally Left Blank; Signature Page Follows}*

4834-6500-1963 v.4 156178/00004, 6:43 PM, 06/01/2021

Please acknowledge your acceptance of and agreement to the foregoing by signing and returning to the undersigned as soon as possible a counterpart of this LOI.

Sincerely,

**BENESSERE CAPITAL ACQUISITION CORP.**

By: _____
  Name:  Patrick Orlando
  Title:  Chairman and CEO



By: _____

**PATRICK ORLANDO,** *an individual, but solely with respect to Section 11 of this LOI*

*Accepted and agreed to by the undersigned on behalf of itself and its subsidiaries and affiliates as of this 4th day of June, 2021:*

**TRUMP MEDIA GROUP CORP.**

By: _____
Name:  President Donald J. Trump
Title:  Chairman and President



4813-2920-0612 v.2 /, 10:24 AM, 04/08/2021
4834-6500-1963 v.4 15617&/00004, 6:43 PM, 06/01/2021

## Exhibit A - TERM SHEET

*This Term Sheet is intended to set forth the material financial and business terms and conditions of the Proposed Transaction. However, all such terms and conditions are subject to further refinement and detail as the Parties shall mutually agree, as shall be set forth in the Definitive Agreements. All capitalized terms used in this Term Sheet and not otherwise defined herein shall have the respective meanings ascribed to such terms in the letter of intent to which this Term Sheet is attached.*

| | |
|---|---|
| **Transaction:** | A business combination between the Company and SPAC pursuant to which SPAC will acquire 100% of the outstanding equity and equity equivalents of the Company (including options, warrants or other securities that have the right to acquire or convert into equity securities of the Company), or all of the Company's business, in exchange for the consideration described below (in whatever form as agreed by the Parties, whether merger, consolidation, share exchange, asset purchase or otherwise, the "*Acquisition*"). The deal structure will be determined by the Parties based on the due diligence findings as well as business, legal, tax, accounting and other considerations. At the closing of the Acquisition (the "*Closing*"), SPAC would change its name to use the "TRUMP MEDIA GROUP CORP." name. The post-Closing entity is referred to as the "*Surviving Company*". |
| **Transaction Consideration:** | The total consideration provided to or for the benefit of the Company or the Company equity holders (including holders of options, warrants and other convertible securities), as applicable, in the Acquisition (the "*Transaction Consideration*") is based on a total enterprise value of the Company of $875,000,000 consisting of the components of uses of funds on Annex I hereto. The Transaction Consideration would be paid by the Surviving Company by issuance of shares of common stock of the Surviving Company (the "*Transaction Shares*"), which would each be valued at an amount equal to the redemption amount payable to Public Stockholders that redeem in connection with the Closing (the "*Redemption Price*"). |
| | The Transaction Consideration assumes that at the Closing the Company on a consolidated basis will have no undisclosed debt (including prepayment penalties that would be due if paid off at Closing) after deducting any excess cash on the balance sheet ("*Net Debt*"), with a normalized level of net working capital (in such amount as agreed by the Parties) in order to operate its business. A dollar for dollar adjustment in the Transaction Consideration will be made if the actual working capital at the Closing is greater than or less than the agreed upon target, as well as for the amount of any Net Debt, unpaid Company transaction expenses and transaction bonuses, with such adjustments being estimated at Closing and subject to a post-Closing true-up. |
| | See the Transaction Sources & Uses table and Pro Forma Ownership table in Annex I hereto. |
| **Earnout Shares:** | In addition to the Transaction Shares, an aggregate of an additional 40,000,000 shares of common stock of the Surviving Company shall be issued to the pre-closing security holders of the Company pro-rata in accordance with their respective ownership interests if the following stock price targets are met. |

|  | • 15,000,000 shares shall be issued if the Surviving Company stock price trades at or above $15.00 for any 20 out of 30 trading days from the Transaction closing through December 31, 2022 |
|--|--|
|  | • 15,000,000 shares shall be issued if the Surviving Company stock price trades at or above $20.00 per share for any 20 out of 30 trading days from the Transaction closing through December 31, 2023 |
|  | • 10,000,000 shares shall be issued if Surviving Company stock price trades at or above $30.00 per share for any 20 out of 30 trading days from the Transaction closing through December 31, 2024 |
|  | The foregoing targets are to be met on an all-or-nothing basis, and there shall be no partial awards. |
|  | The foregoing Earnout Shares consideration has a value of $825 million (valued at the applicable stock price trading thresholds of $15.00, $20.00 and $30.00, respectively). |
| **Lock-Up:** | Significant Company stockholders will be required to subject their Transaction Shares to a lock-up for a period substantially identical to the lock-up applicable to the Sponsor with respect to its founder shares, subject to any exceptions that are mutually agreed upon in the Definitive Agreements and permitted under applicable law. All Transaction Shares will be subject to all applicable holding periods and requirements under the Securities Act of 1933 and SEC rules. |
| **Non-Compete:** | The significant stockholders of the Company shall each enter into a non-competition and non-solicitation agreement for a period of four (4) years after the Closing in return for the consideration being delivered, which shall be in addition to any non-competes in any employment agreements to which they may be a party. |
| **Employment Arrangements:** | Certain executives of the Company will be required to enter into mutually acceptable employment agreements with the Surviving Company, which will include customary confidentiality, non-compete and assignment of inventions and other customary restrictive covenant provisions. |
| **Board of Directors:** | The initial board of directors of the Surviving Company will have a majority of directors which shall be considered independent under NASDAQ requirements. Each Party's ability to designate directors prior to the Closing to serve on the initial board will be set forth in the Acquisition Agreement. |
| **Minimum Cash:** | The minimum cash delivery obligation by SPAC in the Transaction shall be $60 million; provided, however, the Company may waive this condition is its sole and absolute discretion. While the Investor fully expects to satisfy this condition through the funds held in its Trust Account, it retains the right to satisfy this condition through the private sale of its equity securities on terms reasonably satisfactory to the Company. |

| | |
|---|---|
| **Timeline:** | The Parties hereto will negotiate an Acquisition Agreement, with a signing date of no later than August 6, 2021 (unless such date is extended by mutual and reasonable agreement of the Parties, and such extension is not unreasonably withheld by either Party); provided, however, that (1) the Investor shall have executed and delivered its signature page on or before August 6, 2021 (unless such date is extended by mutual and reasonable agreement of the Parties, and such extension is not unreasonably withheld by either Party), (2) the Company may elect to hold its signature of the Acquisition Agreement in escrow for an additional six-week period after August 6, 2021 (unless such date is extended by mutual and reasonable agreement of the Parties) and the transactions contemplated therein (the "**Acquisition Agreement Escrow Period**"), (3) once the Investor delivers its signature page to the Acquisition Agreement, then the Break-Up Fee shall no longer apply or be enforceable and the Company agrees to waive any potential claim to the Break-Up Fee, and (4) subject to the Investor delivering its signature page to the Acquisition Agreement, the Company hereby agrees that it shall not seek to complete any Competing Transaction during such Acquisition Agreement Escrow Period and for six (6) months thereafter. |
| **Acquisition Agreement:** | The obligations of the Parties will be subject to execution of the Acquisition Agreement containing terms and conditions satisfactory to SPAC and the Company. The execution of the Acquisition Agreement would also be subject to completion of confirmatory due diligence by SPAC, as well as the delivery of PCAOB audited financial statements by the Company and, if deemed legally necessary or reasonably appropriate by SPAC and agreed upon by the Company, the receipt by SPAC of a fairness opinion issued by a reputable firm opining that the Acquisition is fair to SPAC's shareholders.  The Acquisition Agreement will contain representations, warranties, covenants, closing conditions, break-up fees, and indemnification provisions customary for M&A transactions of this type, as well as a general release of the Company by the Company's equity holders.  The required diligence will include an in-depth review of the Company's management team and the Company's preparedness to become listed on Nasdaq, and the Company will make any appropriate hires necessary to fill any gaps.

In connection with the Acquisition Agreement, Company management will be required to participate in roadshow presentations to help with SPAC's share recycling efforts, and generally make themselves available to assist in such efforts.

The Acquisition Agreement will also require that (i) all assets, including intellectual property, used by (or licensed to) the Company in its business that are held or licensed by affiliates or other related parties be transferred to the Company, and (ii) the Surviving Company not have any related party transactions that are not on arms-length terms or that are otherwise unnecessary.  For purposes of clarification, the Company shall only transfer its intellectual property licenses to the Surviving Company and will not be required to cause its licensors to transfer such intellectual property to the Surviving Company.

Each of SPAC and the Company will designate in the Acquisition Agreement a representative to represent such Party's interests after the Closing in connection with the Acquisition Agreement, including with respect to post-Closing Transaction Consideration adjustments. |

4834-6500-1963 v.4 156178/00004, 6:43 PM, 06/01/2021

| Closing Conditions: | The obligations of either Party to consummate the transaction are subject to standard closing conditions for a transaction of this nature, including without limitation: (i) completion of any required stock exchange and regulatory review, including SEC/NASDAQ, receipt of any required regulatory approvals and necessary third party approvals, and expiration of any waiting periods under HSR or other applicable anti-trust laws, (ii) approval by SPAC's shareholders of the Acquisition and related matters, (iii) there shall have not been any material adverse changes in the business, customer relationships, operations, financial condition, regulatory environment or prospects of the Company, (iv) the execution of all related agreements as contemplated by the Acquisition Agreement including lockup agreements, an escrow agreement, non-compete and non-solicitation agreements, the Surviving Company incentive plan and employment agreements, and (v) SPAC having at least $5,000,001 in net tangible assets. |
|---|---|
| Use of Proceeds: | Immediately upon Closing, SPAC's cash, including the funds remaining in the Trust Account after the redemption of SPAC's Public Stockholders, will be used as follows: (i) payment of SPAC's accrued but unpaid expenses, including transaction expenses, deferred IPO fees and deferred advisor fees, and obligations owed to the Sponsor, and (ii) the remaining cash will be used for working capital and general corporate purposes. |
| Filings: | As soon as practicable following the execution of the Acquisition Agreement, the Parties will file all submissions for shareholder, regulatory and governmental approval, including a proxy statement (the "*Proxy Statement*") with the SEC for the purpose of obtaining SPAC shareholder approval. The Proxy Statement will include PCAOB audited annual financial statements of the Company prepared in accordance with U.S. GAAP as required by applicable securities laws. |
| Extensions with the SEC: | Each of the Company and the Investor hereby agrees that the Company shall be responsible for any capital needs required to seek an extension of time from the SEC and the SPAC investors in order to complete a business combination between the Parties. The Company's obligations in this paragraph are subject to the Company and the Investor working and being engaged in a review process of a Proxy Statement with the SEC at that time. Notwithstanding any of the foregoing, each of the Company and the Investor shall each bear their respective legal counsel expenses in connection with any such extensions. |
| Governing Law: | The Acquisition Agreement and other applicable Definitive Agreements will be governed by New York law and jurisdiction. |
| Capitalization | Attached as Annex II hereto are resolutions of the Company confirming (among other things) its capitalization as of the date hereof. |

4834-6500-1963 v.4 156178/00004, 6:43 PM, 06/01/2021

## Annex I

### Illustrative Sources & Uses and Ownership table

*[See Attached]*

4834-6500-1963 v.4 156178/00004, 6:43 PM, 06/01/2021

## Annex I

### Illustrative Sources & Uses and Ownership table

**Transaction Sources & Uses ($mm)**

| Sources[1] | | Uses | |
|---|---|---|---|
| SPAC cash in trust (assuming no redemptions) | $116.725 | Cash to Surviving Company balance sheet | $106.275 |
| Roll-over existing net debt | $0 | Roll-over existing net debt and cash | $1.5 |
| Seller rollover equity | $875.0 | Seller rollover equity | $875.0 |
| Assumption of Cash from Target | $1.5 | Transaction Expenses[2] | $10.45 |
| **Total sources** | **$993.225** | **Total uses** | **$993.225** |

### Pro Forma SPAC Ownership Post-Closing[3]      At $10 per share

| Security Holders | Shares Outstanding | % of Outstanding |
|---|---|---|
| Rollover equity shares for Company shareholders[4] | 87,650,000 | 84.50% |
| SPAC public shareholder shares | 11,500,000 | 11.09% |
| SPAC public shareholder rights | 1,150,000 | 1.11% |
| SPAC sponsor promote | 2,875,000 | 2.77% |
| SPAC private placement shares | 393,750 | 0.38% |
| SPAC private placement rights | 39,375 | .04% |
| Underwriter IPO shares | 125,000 | 0.12% |
| Public warrants[5] | 0 | 0.00% |
| Private warrants[5] | 0 | 0.00% |
| **Total shares outstanding** | **103,733,125** | **100.0%** |

### DILUTION TABLE AT $15 PER SHARE      +15M shares for Company at $15 per share

| Security Holders | Shares Outstanding | % of Outstanding |
|---|---|---|
| Rollover equity shares for Company shareholders[4] | 102,650,000 | 80.41% |
| SPAC public shareholders shares | 11,500,000 | 9.01% |
| SPAC public shareholders rights | 1,150,000 | 0.90% |
| SPAC sponsor promote | 2,875,000 | 2.25% |
| SPAC private placement shares | 393,750 | 0.31% |
| SPAC private placement rights | 39,375 | 0.03% |
| Underwriter IPO shares | 125,000 | 0.10% |
| Public warrants[5] | 8,625,000 | 6.76% |
| Private warrants[5] | 295,312 | 0.23% |
| **Total shares outstanding** | **127,653,437** | **100.0%** |

## DILUTION TABLE AT $20 PER SHARE

+15M shares for Company at $20 per share

| Security Holders | Shares Outstanding | % of Outstanding |
|---|---|---|
| Rollover equity shares for Company shareholders[4] | 117,650,000 | 87.97% |
| SPAC public shareholders | 11,500,000 | 8.60% |
| SPAC public shareholders rights | 1,150,000 | 0.86% |
| SPAC sponsor promote | 2,875,000 | 2.15% |
| SPAC private placement shares | 393,750 | 0.29% |
| SPAC private placement rights | 39,375 | 0.03% |
| Underwriter IPO shares | 125,000 | 0.09% |
| Public warrants[5] | 0 | 0.00% |
| Private warrants[5] | 0 | 0.00% |
| Total shares outstanding | 133,733,125 | 100.0% |

## DILUTION TABLE AT $30 PER SHARE

+10M shares for Company at $30 per share

| Security Holders | Shares Outstanding | % of Outstanding |
|---|---|---|
| Rollover equity shares for Company shareholders[4] | 127,650,000 | 88.81% |
| SPAC public shareholders shares | 11,500,000 | 8.00% |
| SPAC public shareholders rights | 1,150,000 | 0.80% |
| SPAC sponsor promote | 2,875,000 | 2.00% |
| SPAC private placement shares | 393,750 | 0.27% |
| SPAC private placement rights | 39,375 | 0.03% |
| Underwriter IPO shares | 125,000 | 0.09% |
| Public warrants[5] | 0 | 0.00% |
| Private warrants[5] | 0 | 0.00% |
| Total shares outstanding | 143,733,125 | 100.0% |

(1) The amounts from the various sources of cash may change based on (i) the amount of Public Stockholder redemptions prior to Closing, (ii) investor interest in the Acquisition and (iii) the then current markets for equity and debt financing.

(2) Includes deferred IPO fees and underwriter business combination fee.

(3) Assumes that there are no new awards under any new Surviving Company equity incentive plan. Assumes that there are no adjustments to the Transaction Consideration. Includes issuance of 1/10th of a share for each right at the Closing.

(4) The Surviving Company shall maintain an equity option pool representing approximately 7.5% of the total equity capital of the Surviving Company reserved from the rollover equity shares for company shareholders.

**Annex II**

## COMPANY ORGANIZATIONAL RESOLUTIONS

### CONFIRMING (AMONG OTHER THINGS) ITS CURRENT CAPITALIZATION

*[See Attached]*

4834-6500-1963 v.4 156178/00004, 6:43 PM, 06/01/2021

## TRUMP MEDIA GROUP CORP.

## ACTION BY UNANIMOUS WRITTEN CONSENT
## IN LIEU OF A MEETING
## OF
## THE STOCKHOLDERS

### June 4, 2021

Pursuant to Delaware General Corporation Law ("*DGCL*"), the undersigned, being the stockholders (the "*Stockholders*") of Trump Media Group Corp., a Delaware corporation (the "*Corporation*"), hereby consent to and adopt the following preambles and resolutions, which action shall have the same force and effect as if taken by unanimous affirmative vote at a meeting of the Stockholders, duly called and held pursuant to the applicable provisions of the DGCL, and directs that this written consent to such action be filed with the minutes of the proceedings of the Stockholders.

**WHEREAS**, the Corporation was duly formed on February 8, 2021 as Trump Media Group Corp., a Delaware corporation, by filing a Certificate of Incorporation with the Delaware Secretary of State; and

**WHEREAS**, the Stockholders now desire to adopt resolutions in connection with the organization of the Corporation's affairs.

### Acceptance and Approval of Actions of Incorporator

**RESOLVED**, that the Board approves, adopts, ratifies and accepts all the actions of the sole incorporator of the Corporation, including without limitation, the formation of the Corporation by the filing with the Delaware Secretary of State of the Certificate of Incorporation, a copy of which is attached hereto as Exhibit A, and that all such actions shall be binding upon the Corporation to the same extent as if authorized by this resolution and all the duties and obligations of the sole incorporator of the Corporation shall forever hereafter be completely discharged, and the Corporation hereby relieves the incorporator from any liability for acts performed prior to the date hereof.

### Resignation of Sole Incorporator

**RESOLVED**, to approve the resignation of Mitchell Garonce as the sole incorporator of the Corporation (the "*Sole Incorporator*") effective upon the earlier of the execution of this Consent or a written consent of the Sole Incorporator in which the Sole Incorporator resigns.

### Approval of Certificate of Incorporation

**RESOLVED**, the Stockholders hereby ratify and approve the Corporation's Certificate of Incorporation, filed with the Delaware Secretary of State, and the certified copy of same issued by the Delaware Secretary of State is ordered to be filed in the minute book of the Corporation.

### Election of the Board of Directors

**RESOLVED**, that the number of directors of the Corporation be set at three (3), and that each of President Donald J. Trump, Andrew Litinsky, and Wes Moss be, and they hereby are, appointed to serve as the initial directors of the Corporation until their respective successors are duly elected and qualified, or until their earlier death, resignation, or removal.

## Election of Initial Officers

**RESOLVED,** that the following individuals are hereby duly elected to the offices of the Corporation set forth below opposite their respective name, to serve until his successor is elected and qualified, or until his earlier resignation, removal from office or death:

| Name | Position |
|------|----------|
| Donald J. Trump | President, Chief Executive Officer, and Secretary |
| Andrew Litinsky | Authorized Representative |
| Wes Moss | Authorized Representative |

Each of the above is hereby appointed as an officer of the Corporation (each an "*Authorized Officer*").

## Stock Books

**RESOLVED,** that the Authorized Officers of the Corporation (or any designee) shall cause to be prepared appropriate books and records with respect to the capital stock of the Corporation in which shall be recorded, among other things, the names and addresses of the several stockholders and the number of shares held by each stockholder.

## Authorization and Approval of Issuance of Common Stock to Initial Stockholders

**RESOLVED,** that the Authorized Officers are authorized to sell and issue on behalf of the Corporation a total of 10,000 shares of Common Stock (the "*Shares*") to the individuals or entities listed below (collectively, the "*Initial Stockholders*") in the amounts specified opposite each name, at a par value of $0.00001 per share for a total purchase price of $1 which the Board determines to be the fair value of such Shares, in exchange for cash, cancellation of indebtedness (including organizational costs incurred by the purchasers prior to the incorporation of the Corporation), promissory note, assets or any combination of the foregoing:

| Initial Stockholder Name | Number of Shares |
|--------------------------|------------------|
| Donald J. Trump | 9,000 |
| United Atlantic Ventures, LLC | 860 |
| Bradford Cohen | 140 |
| **TOTAL** | 10,000 |

## Bank Accounts

**RESOLVED,** that each of the Authorized Officers (or his/her designee) is hereby authorized and directed to open one or more bank accounts in the name and on behalf of the Corporation in such bank or banks or trust company or trust companies as he may select and to prepare, execute and deliver in the name of and on behalf of the Corporation such documents or instruments as may be necessary to open such account or accounts, and if in connection with the foregoing any particular form of resolution shall be

2

required, such resolution shall be deemed hereby adopted, provided that a copy of such resolution shall be inserted in the minute book of the Corporation following this Consent and that the Secretary of the Corporation is authorized to certify such resolution as having been adopted by this Consent.

## Foreign Qualification

**RESOLVED,** that for the purpose of authorizing the Corporation to do business in any state, territory or dependency of the United States or any foreign country in which it is necessary or expedient for the Corporation to transact business, each of the Authorized Officers of the Corporation (or his/her designee) is hereby authorized to appoint and change the location of all necessary statutory offices, to make and file all necessary certificates, reports, powers of attorney and instruments as may be required or appropriate under the laws of such state, territory, dependency or country, to authorize the Corporation to transact business therein and, whenever it is expedient for the Corporation to cease doing business therein, to withdraw therefrom, to revoke any appointment of agent or attorney for service of process, and to file such certificates, reports, revocation of appointment or surrender of authority of the Corporation to do business in any such state, territory, dependency or country, and if in connection with the foregoing any particular form of resolution shall be required, such resolution shall be deemed hereby adopted, provided that a copy of such resolution shall be inserted in the minute book of the Corporation following this Consent and that the Secretary of the Corporation is authorized to certify such resolution as having been adopted by this Consent.

## Adoption of Fiscal Year End

**RESOLVED,** that the fiscal year of the Corporation shall end on the 31st day of December in each year.

## Authorization of Payment of Organizational Expenses

**RESOLVED,** that each of the Authorized Officers (or his/her designee) is hereby authorized and directed to pay all fees and expenses incident to or arising from the organization of the Corporation, and to reimburse any person who has made reasonable disbursements therefor, and that each of the Authorized Officers of the Corporation (or his/her designee) is hereby authorized and directed to file any and all documents they shall deem necessary, proper or advisable to amortize such expenses pursuant to Section 248 of the Internal Revenue Code of 1986, as amended.

## Miscellaneous Organization

**RESOLVED,** that each of the Authorized Officers (or his/her designee) is hereby authorized, for and on behalf of the Corporation, to execute, deliver, file, acknowledge and record any and all such documents and instruments, and to take or cause to be done any and all such other things as they, or any of them, may deem necessary or desirable to effectuate and carry out the resolutions adopted hereby and complete the due organization of the Corporation.

## General Resolutions

**RESOLVED,** that the actions heretofore taken by the Authorized Officers of the Corporation in connection with the foregoing resolutions are hereby in all respects confirmed, approved and ratified; that the Authorized Officers of the Corporation, together or individually, may take any and all action and do any and all things as may be deemed by and of them to be necessary or advisable or appropriate to carry out the purposes and intent of the foregoing resolutions; and that the taking of any and all such action and the performance of any and all such things by any of them in connection with the foregoing shall

3

conclusively establish such authority therefor from the Corporation and the approval and ratification therefor by the Corporation.

**RESOLVED FURTHER**, that this written consent may be executed in counterparts and by facsimile signature, each of which shall be deemed an original and effective for all purposes, but all of which together shall be deemed one in the same written consent.

**RESOLVED FURTHER**, that this written consent of shall be filed with the minutes of the proceedings of the Corporation.

*[Signature Page Follows]*

4

WITNESS WHEREOF, this written consent has been signed by the undersigned as the sole
of the Corporation effective as of the date first written above.

**STOCKHOLDERS:**

**TM MEDIA, LLC**

By: _____

Name:

Title:

**UNITED ATLANTIC VENTURES, LLC**

By: _____

Name: Andrew Litinsky

Title: Member

By: _____

Name: Wes Moss

Title: Member

By: _____

Bradford Cohen, an individual

*[Signature Page to Organizational Board Consent (DE)]*

## EXHIBIT A

**Certificate of Incorporation**

(attached)

# EXHIBIT 10

| | |
|---|---|
| **From:** | Michael Fay[michaelfay@fayfamilyinvestments.com] |
| **Sent:** | Mon 6/28/2021 3:23:08 PM (UTC) |
| **To:** | aamine1@me.com[aamine1@me.com] |
| **Cc:** | Patrick Orlando[porlando@benesserecapital.com]; John F. Haley[John.Haley@nelsonmullins.com] |
| **Subject:** | SPAC Opportunity |

◄**External Email**► - From: michaelfay@fayfamilyinvestments.com

Aundrea,

I hope the family is well and the start of the summer has been great!

As you all know, I have been involved, on a personal level, in many real estate partnerships, business ventures, and investing over the years.  Through Fay Family Investments, our newly formed family office, we are investing in many other ventures.  The newest venture, which I am very excited about, is a SPAC venture with Patrick Orlando, who is a friend and experienced operator.  His SPAC, Digital World Acquisition Corp to be listed on the NASDAQ, has over 25 companies they are reviewing to combine with.  However, there is one major standout which makes this SPAC opportunity even greater, and why I am excited to be investing in this.

I have copied the attorney, John Haley, with Nelson Muillins,  who is the attorney for the possible acquisitions.  If you are interested, and, to fully understand and learn about this opportunity, we need you to sign an NDA, which would be sent to via a separate email.  Once signed, we would like to set up a call with Patrick's team, and John Haley on the possible SPAC acquisition to understand the uniqueness of this possible opportunity.

Please let us know if you are interested, and an NDA will be sent.  This investment will not be for everyone once you understand its uniqueness.

Thanks so much!

Kind regards,
**Michael T. Fay**, Chairman
**Fay Family Investments**
Real Estate | Business Interests | Philanthropy
michaelfay@fayfamilyinvestments.com

**C** 305.495.0003



LinkedIn | Twitter | Instagram

# EXHIBIT 11

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 796 of 1832
PageID 4273
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

S-1 1 tm2117087d1_s1.htm FORM S-1

**As filed with the U.S. Securities and Exchange Commission on May 25, 2021**

Registration No. 333-

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# Digital World Acquisition Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 6770 | 85-4293042 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Patrick Orlando**
**Chairman and Chief Executive Officer**
**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

*Copies to:*

| | |
|---|---|
| **Barry I. Grossman, Esq.** | **Mitchell S. Nussbaum, Esq.** |
| **Wei Wang, Esq.** | **David J. Levine, Esq.** |
| **Ellenoff Grossman & Schole LLP** | **Loeb & Loeb LLP** |
| **1345 Avenue of the Americas** | **345 Park Avenue** |
| **New York, New York 10105** | **New York, New York 10154** |
| **Telephone: (212) 370-1300** | **Telephone: (212) 407-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

### CALCULATION OF REGISTRATION FEE

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security[1] | Proposed Maximum Aggregate Offering Price[1] | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value, one-half of one redeemable warrant and a right entitling the holder to receive one-tenth of one share of Class A common stock[2] | 11,500,000 Units | $ 10.00 | $ 115,000,000 | $ 12,547 |
| Shares of Class A common stock included as part of the units[3] | 11,500,000 Shares | — | — | —[4] |
| Rights included as part of the units[2] | 11,500,000 Rights | | | |
| Shares of Class A common stock underlying rights included as part of the units | 1,150,000 Shares | $ 10.00 | $ 11,500,000 | 1,255 |
| Redeemable warrants included as part of the units[3] | 5,750,000 Warrants | — | — | —[4] |
| Total | | | $ 126,500,000 | $ 13,802 |

(1) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended (the "Securities Act").

(2) Includes 1,500,000 units, consisting of 1,500,000 shares of Class A common stock, 1,500,000 rights and 750,000 redeemable warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3) Pursuant to Rule 416, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4) No fee pursuant to Rule 457(g).

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                    **SUBJECT TO COMPLETION, DATED MAY 25, 2021**

**$100,000,000**
**Digital World Acquisition Corp.**
**10,000,000 Units**

Digital World Acquisition Corp. is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination throughout this prospectus. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we may pursue an initial business combination target in any business or industry, we intend to focus our search on middle-market emerging growth technology-focused companies in the Americas, in the SaaS and Technology or Fintech and Financial Services sector.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock, one-half of one redeemable warrant and one right as described in more detail in this prospectus. Only whole warrants are exercisable. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Each right entitles the holder thereof to receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination, so you must hold rights in multiples of 10 in order to receive shares for all of your rights upon closing of a business combination. The underwriters have a 45-day option from the date of this prospectus to purchase up to an additional 1,500,000 units to cover over-allotments, if any.

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination, subject to the limitations described herein. If we are unable to complete our initial business combination within 18 months from the closing of this offering, we will redeem 100% of the public shares for cash, subject to applicable law and certain conditions as further described herein.

Our sponsor, ARC Global Investments II LLC, has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriter's over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250 if the over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units will be sold in a private placement that will close simultaneously with the closing of this offering.

Our initial stockholders own an aggregate of 2,875,000 shares of our Class B common stock (up to 375,000 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised), which will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein.

Currently, there is no public market for our units, Class A common stock, warrants or rights. We intend to apply to have our units listed on The Nasdaq Capital Market, or Nasdaq, under the symbol "DWACU". We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless Kingswood Capital Markets, division of Benchmark Investments (the "representative") informs us of its decision to allow earlier separate trading, subject to our satisfaction of certain conditions. Once the securities comprising the units begin separate trading, we expect that the Class A common stock, warrants and rights will be listed on Nasdaq under the symbols "DWAC", "DWACW", and "DWACR," respectively.

1

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

| | Per Unit | | Total |
|---|---|---|---|
| Public offering price | $ | 10.00 | $ 100,000,000 |
| Underwriting discounts and commissions[1] | $ | 0.475 | $ 4,750,000 |
| Proceeds, before expenses, to Digital World Acquisition Corp. | $ | 9.525 | $ 95,250,000 |

(1)   Includes $0.35 per unit, or $3,500,000 (or $4,025,000 if the over-allotment option is exercised in full) in the aggregate, payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative of the underwriters only on completion of an initial business combination, as described in this prospectus. Does not include certain fees and expenses payable to the underwriters in connection with this offering. In addition, designees of the representative of the underwriters will receive a fee equal to 0.5% of the gross proceeds payable in shares of Class A Common Stock at the public offering price of $10.00 per share. See the section of this prospectus entitled "Underwriting" beginning on page 154 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the placement units described in this prospectus, $100,500,000 or $115,575,000 if the underwriters' over-allotment option is exercised in full ($10.05 per unit in either case) will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about                    , 2021.

Sole Book-Running Manager

# KINGSWOOD CAPITAL MARKETS

division of Benchmark Investments, Inc.

, 2021

## TABLE OF CONTENTS

| | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 70 |
| Use of Proceeds | 71 |
| Dividend Policy | 75 |
| Dilution | 75 |
| Capitalization | 78 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
| Proposed Business | 85 |
| Management | 113 |
| Principal Stockholders | 121 |
| Certain Relationships and Related Party Transactions | 123 |
| Description of Securities | 126 |
| United States Federal Income Tax Considerations | 144 |
| Underwriting | 154 |
| Legal Matters | 164 |
| Experts | 164 |
| Where You Can Find Additional Information | 164 |
| Index to Financial Statements | F-1 |

      **We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

      This prospectus includes estimates regarding market and industry data and forecasts which are based on publicly available information, industry reports and publications, reports from government agencies and management's estimates based on third-party data. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable. The third-party industry sources referenced in this prospectus include, among others, EY Global and Deal Logic. We have not independently verified such third-party information, nor have we ascertained the underlying economic assumptions relied upon in those sources, and we cannot assure you of the accuracy or completeness of such information contained in this prospectus. Such data involve risks and uncertainties and is subject to change based on various factors, see "Risk Factors".

      This prospectus contains trademarks, service marks and trade names of other companies which are the property of their respective owners. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;*

- *"initial stockholders" are to our sponsor and any other holders of our founder shares (including the holders of the representative shares) prior to this offering (or their permitted transferees);*

- *"management" or our "management team" are to our officers and directors;*

- *"placement units" are to the units being purchased by our sponsor, with each placement unit consisting of one placement share, one-half of one placement warrant and one placement right;*

- *"placement shares" are to the shares of our common stock included within the placement units being purchased by our sponsor in the private placement;*

- *"placement rights" are to the rights included within the placement units being purchased by our sponsor in the private placement;*

- *"placement warrants" are to the warrants included within the placement units being purchased by our sponsor in the private placement;*

- *"private placement" are to the private placement of 306,275 placement units (up to 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 (up to $3,325,250 if the underwriters' over-allotment option is exercised in full), which will occur simultaneously with the completion of this offering;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"public rights" are to the rights sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public warrants" are to our redeemable warrants sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market, including warrants that may be acquired by our sponsor or its affiliates in this offering or thereafter in the open market);*

- *"representative" are to Kingswood Capital Markets, division of Benchmark Investments, Inc., who is the representative of the underwriters in this offering;*

1

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 803 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4280

- *"representative shares"* are the 50,000 shares of our Class A common stock issuable to the representative and/or its designees at the closing of this offering (or 57,500 shares if the underwriters' over-allotment option is exercised in full);

- *"rights"* are to our rights, which include the public rights as well as the placement rights;

- *"sponsor"* are to ARC Global Investments II LLC, a Delaware limited liability company;

- *"underwriters"* are to the underwriters of this offering, for which the representative is acting as representative;

- *"warrants"* are to our redeemable warrants, which includes the public warrants as well as the placement warrants and any warrants sold as part of the placement units issued upon conversion of working capital loans; and

- *"we," "us," "company"* or *"our company"* are to Digital World Acquisition Corp.

*Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

2

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 189-5    Filed 09/12/24    Page 804 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4281

## General

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services

## Our Management Team

Our management team is led by Mr. Patrick Orlando, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as Executive, Sponsor and Director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021. Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

***Our CFO,*** *Mr. Luis Orleans-Braganza* is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

3

### Our directors and director nominees

*Eric Swider,* our director nominee, has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Justin Shaner,* our director nominee, founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

*Lee Jacobson,* our director, is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997.

4

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in Fintech and Financial Services or SaaS and Technology. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled , industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- *Established Deal Sourcing Network.* We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor, have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

5

- ***Status as a Publicly Listed Acquisition Company***. We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

## Industry Opportunity

While we may acquire a business in any industry, our focus will be middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We believe that our target industries are attractive for a number of reasons:

### *SaaS and Technology*

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. This is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

### *FinTech and Financial Services*

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

6

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join with us, as we believe they have fewer exit options than presently exist for unicorns.

**Acquisition Criteria**

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We will use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- ***Target Size***: Consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services

- ***Businesses with Revenue and Earnings Growth Potential.*** We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.

- ***Businesses with Potential for Strong Free Cash Flow Generation.*** We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.

- ***Strong Management.*** We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.

- ***Benefit from Being a Public Company.*** We intend to acquire one or more businesses that will benefit from being publicly-traded and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- ***Defensible Market Position.*** We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

**Initial Business Combination**

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

7

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

8

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

## Sourcing of Potential Initial Business Combination Targets

Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have developed a wide network of professional services contacts and business relationships in that industry. The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and bring additional relationships that further broaden our industry network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

9

**Corporate Information**

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130, and our telephone number is (305) 735-1517.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company will have the meaning associated with it in the JOBS Act. Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

## THE OFFERING

*In deciding whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

| | |
|---|---|
| Securities offered | 10,000,000 units (or 11,500,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of: |
| | • one share of Class A common stock; and |
| | • one-half of one redeemable warrant; and |
| | • one right to receive one-tenth (1/10) of one share of Class A common stock upon the consummation of our initial business combination. |

| | |
|---|---|
| Proposed Nasdaq symbols | Units: "DWACU" |
| | Class A Common Stock: "DWAC" |
| | Warrants: "DWACW" |
| | Rights: "DWACR" |
| Trading commencement and separation of Class A common stock, warrants and rights | The units will begin trading on or promptly after the date of this prospectus. We expect the Class A common stock, warrants and rights comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock, warrants and rights commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock, warrants and rights. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. |
| Separate trading of the Class A common stock, warrants and rights is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock, warrants and rights be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

**Units:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 0 |
| Number or placement units to be sold in a private placement simultaneously with this offering | 306,275 [(1)] |
| Number outstanding after this offering and the private placement | 10,306,275 [(1)] |

**Common stock:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 2,875,000 shares of Class B common stock[(2)] |

11

| Number outstanding after this offering and the private placement | 12,856,275 shares of Class A common stock and Class B common stock[1][3] |

**Rights:**

| Number outstanding before this offering and the private placement | 0 |
| Number outstanding after this offering and the private placement | 10,306,275 [1] |

**Warrants:**

| Number outstanding before this offering and the private placement | 0 |
| Number of warrants to be outstanding after this offering and the private placement | 5,153,138 [1] |

Exercisability

Each whole warrant is exercisable to purchase one share of our Class A common stock, subject to adjustment as provided herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade and are exercisable.

We structured each unit to contain one-half of one redeemable warrant, with each whole warrant exercisable for one share of Class A common stock, as compared to units issued by some other similar special purpose acquisition companies which contain whole warrants exercisable for one whole share, in order to reduce the dilutive effect of the warrants upon completion of an initial business combination as compared to units that each contain a whole warrant to purchase one whole share, thus making us, we believe, a more attractive initial business combination partner for target businesses.

(1)    Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 375,000 founder shares. Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) for an aggregate purchase price of $3,062,750 ($3,325,250 if the underwriters' over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units are not subject to forfeiture but will be subject to transfer restrictions as described in "Principal Stockholders — Transfers of Founder Shares and Placement Units".

(2)    Includes 2,875,000 founder shares of which an aggregate of up to 375,000 shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3)    Comprised of 10,306,275 shares of Class A common stock (including 306,275 placement shares), 2,500,000 shares of Class B common stock (or founder shares) and 50,000 representative shares (57,500 representative shares if the underwriters' over-allotment option is exercised in full). The Class B common stock is convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution rights."

12

7/21/24, 4:51 PM                    sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

| | |
|---|---|
| Exercise price | $11.50 per share, subject to adjustment as described herein. In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Class A common stock during the 20 trading day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described below under "Redemption of warrants" will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. |
| Exercise period | The warrants will become exercisable on the later of: |

- 30 days after the completion of our initial business combination, and

- 12 months from the closing of this offering;

provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis.

13

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation.  On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants

Once the warrants become exercisable, we may redeem the outstanding warrants (except as described herein with respect to the placement warrants):

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing after the warrants become exercisable and ending on the third trading day before we send the notice of redemption to the warrant holders.

We will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of Class A common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of Class A common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

14

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants.

Please see the section of this prospectus entitled "Description of Securities — Redeemable Warrants — Public Stockholders' Warrants" for additional information.

None of the placement warrants will be redeemable by us so long as they are held by the sponsor or its permitted transferees.

|                    |                                                                                                                                                                                                                                             |
|--------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Terms of Rights    | Each holder of a right will receive one-tenth (1/10) of one share of Class A common stock upon consummation of our initial business combination. In the event we will not be the survivor upon completion of our initial business combination, each holder of a right will be required to affirmatively convert his, her or its rights in order to receive the 1/10 share underlying each right (without paying any additional consideration) upon consummation of the business combination. If we are unable to complete an initial business combination within the required time period and we liquidate the funds held in the trust account, holders of rights will not receive any of such funds for their rights and the rights will expire worthless. No fractional shares will be issued upon conversion of any rights. As a result, you must have 10 rights to receive one share of Class A common stock at the closing of the business combination. |
| Founder shares     | On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.009 per share. On May 19, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our independent director and director nominees. Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). As such, our initial stockholders will collectively own approximately 21.8% of our issued and outstanding shares after this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Neither our sponsor nor any of our officers, directors or director nominees have expressed an intention to purchase any units in this offering. Up to 375,000 founder shares held by our sponsor will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering (excluding the representative shares and the placement units |

and underlying securities). We will effect a stock dividend or share contribution prior to this offering should the size of the offering change, in order to maintain such ownership percentage.

15

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

- our sponsor, officers and directors have entered, and we anticipate our director nominees will enter, into a letter agreement with us, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

16

- pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. As a result, in the event that only the minimum number of shares representing a quorum is present at a stockholders' meeting held to vote on our initial business combination, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795, or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction); and

- the founder shares are entitled to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). Any permitted transferees will be subject to the same restrictions and other agreements of our initial stockholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the lock-up. |
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (excluding the representative shares and the placement units and underlying securities) plus all |

shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of working capital loans made to us). The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities.

17

| | |
|---|---|
| Voting Rights | Holders of record of the Class A common stock and holders of record of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, with each share of common stock entitling the holder to one vote, except as required by law. |
| Placement units | Our sponsor has agreed to purchase an aggregate of 306,275 placement units (or 332,525 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $3,062,750 ($3,325,250) if the underwriters' over-allotment option is exercised in full). Each placement unit is identical to the units offered by this prospectus except as described below. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares, placement warrants or placement rights, which will expire worthless if we do not consummate a business combination within 18 months from the closing of this offering. Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares or placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto, to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the completion of this offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) if we fail to consummate a business combination within 18 months from the completion of this offering or if we liquidate prior to the expiration of the 18-month period. However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 18-month period. |
| Transfer restrictions on placement units | The placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees. |

18

| Redeemability and exercise of placement warrants | The placement warrants will be non-redeemable and exercisable on a cashless basis so long as they are held by our sponsor or its permitted transferees. If the placement warrants are held by someone other than our sponsor or its permitted transferees, the placement warrants will be redeemable by us and exercisable by such holders on the same basis as the warrants included in the units being sold in this offering. If holders of placement warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering their warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of warrant exercise is sent to the warrant agent. The reason that we have agreed that these warrants will be exercisable on a cashless basis so long as they are held by the sponsor or its permitted transferees is because it is not known at this time whether they will be affiliated with us following an initial business combination. If they remain affiliated with us, their ability to sell our securities in the open market will be significantly limited. We expect to have policies in place that prohibit insiders from selling our securities except during specific periods of time. |
| :--- | :--- |
| | Accordingly, unlike public stockholders who could sell the shares of Class A common stock issuable upon exercise of the warrants freely in the open market, the insiders could be significantly restricted from doing so. As a result, we believe that allowing the holders to exercise such warrants on a cashless basis is appropriate. |
| Accounting Treatment | Due to certain provisions contained in our warrant agreement, both the public warrants and the placement warrants will be treated as a derivative liability and, upon the issuance of such warrants, we will be required to record the fair value of each warrant as a liability in accordance with the guidance contained in ASC 815-40. As a result, for each reporting period, we will be required to determine the fair value of each warrant and record the change in the value of the warrants from the prior reporting period as a gain or a loss on our income statement, which will change the value of the liability for the warrants on our balance sheet. |
| Representative shares | Upon the closing of this offering, we will issue to the representative and/or its designee 50,000 shares of Class A common stock (57,500 shares of Class A common stock if the underwriters' over-allotment option is exercised in full). The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 18 months from the closing of this offering. The representative shares are deemed to be underwriters' compensation by FINRA pursuant to FINRA Rule 5110. |
| Proceeds to be held in trust account | Nasdaq rules provide that at least 90% of the gross proceeds from this offering and the sale of the placement units be deposited in a trust account. Of the net proceeds of this offering and the sale of the placement units, $100,500,000, or $10.05 per unit ($115,575,000, or $10.05 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee. |

These proceeds include $3,500,000 (or $4,025,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions.

19

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 18-5 Filed 09/13/24 Page 824 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4301

|  | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units held in the trust account will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 18 months from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $200,000 of pre-tax interest annually assuming an interest rate of 0.2% per year; however, we can provide no assurances regarding this amount. |

Unless and until we complete our initial business combination, we may pay our expenses only from:

- the net proceeds of this offering and the sale of the placement units not held in the trust account, which will be approximately $650,000 in working capital after the payment of approximately $662,750 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of an initial business combination.

20

| Conditions to completing our initial business combination | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination target, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination target, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. There is no limitation on our ability to raise funds privately, or through loans in connection with our initial business combination. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors. |
|---|---|
| | We anticipate structuring our initial business combination either (i) in such a way so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses, or (ii) in such a way so that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders, or for other reasons. However, we will only complete an initial business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. |
| | Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. |

21

| | |
|---|---|
| | In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be taken into account for purposes of Nasdaq's 80% fair market value test. If the initial business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the transactions and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |
| Permitted purchases of public shares and public warrants by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares or warrants our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, apart from the purchase of the placement units, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements. |
| | None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination. See "Proposed Business — Permitted purchases of our securities" for a description of how our sponsor, initial stockholders, directors, officers or any of their affiliates will select which stockholders to purchase securities from in any private transaction. |

22

7/21/24, 4:51 PM    Case 8:24-cv-02161-KKM-AEP    Document 185-5    Filed 09/12/24    Page 827 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4304

|  | The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange. |
|---|---|
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.05 per public share, however, there is no guarantee that investors will receive $10.05 per share upon redemption. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants or rights. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and placement shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our initial business combination or otherwise. |

23

| | |
|---|---|
| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed initial business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Under Nasdaq rules, asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would typically require stockholder approval. We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. So long as we obtain and maintain a listing for our securities on Nasdaq, we will be required to comply with Nasdaq's stockholder approval rules.

If stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will:

- conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and

- file proxy materials with the SEC.

If we seek stockholder approval, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of our outstanding shares of common stock representing a majority of the voting power of all outstanding shares of our common stock entitled to vote at such meeting. Our initial stockholders will count towards this quorum and, pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares acquired by them during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need only 357,795 or 3.58%, of the 10,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, and that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 50,000 representative shares are voted in favor of the transaction). |

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 829 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4306

We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, officers and directors, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Whether or not we maintain our registration under the Exchange Act or our

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 830 of 1832
PageID 4307
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 831 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4308

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 832 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4309

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 836 of 1832
PageID 4313
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 837 of 1832
PageID 4314
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 838 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4315

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 839 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4316

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 840 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4317

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 843 of 1832 sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

PageID 4320

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 844 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4321

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 847 of 1832
PageID 4324
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 848 of 1832 PageID 4325
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 851 of 1832
PageID 4328
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 8-5    Filed 09/12/24    Page 853 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4330

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 857 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/...m211...tm2117087d1_s1.htm
PageID 4334

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 859 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4336

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 860 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4337

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 861 of 1832
PageID 4338
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 866 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4343

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 867 of 1832
PageID 4344
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 868 of 1832
PageID 4345
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 870 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4347

sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 875 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4352

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 18-5    Filed 09/12/24    Page 876 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4353

7/21/24, 4:51 PM                    Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 877 of 1832
                                                  sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
                                                                  PageID 4354

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 878 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4355

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 879 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4356

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 880 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4357

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 881 of 1832
PageID 4358
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 882 of 1832 sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

PageID 4359

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 895 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4362

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP  Document 81-5  Filed 09/12/24  Page 887 of 1832
PageID 4364
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 890 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4367

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 891 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4368

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 894 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4371

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 18-5 Filed 09/12/24 Page 895 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4372

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 897 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4374

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 898 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4375

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 899 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4376

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 902 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4379

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 904 of 1832
PageID 4381
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 906 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4383

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 908 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4385

sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 18-5    Filed 09/12/24    Page 912 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4389

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 91 of 183
PageID 4390
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 91 of 1832
PageID 4392
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 918 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4395

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 923 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4400

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 927 of 1832
sec.gov/Archives/edgar/data/1849635/000111046592107110982/tm2117087d1_s1.htm
PageID 4404

7/21/24, 4:51 PM    Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/13/24    Page 929 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4406

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 930 of 1832
PageID 4407
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 931 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4408

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 933 of 1832
PageID 4410
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 934 of 1832
PageID 4411
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 935 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4412

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 938 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4415

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 940 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4417

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/13/24    Page 943 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4420

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 944 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4421

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 945 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4422

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/13/24    Page 947 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4424

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 948 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4425

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 949 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4426

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 951 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4428

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 956 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4433

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 957 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4434

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 958 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4435

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 959 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4436

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 961 of 1832
PageID 4438
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/13/24   Page 962 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4439

sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 965 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4442

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 967 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4444

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 969 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4446

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 971 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4448

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 973 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4450

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 974 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4451

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 976 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4453

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP
Document 81-5
Filed 09/12/24
Page 977 of 1832
PageID 4454
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 978 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4455

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/13/24 Page 979 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4456

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 984 of 1832
PageID 4461
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 985 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4462

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 986 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4463

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 81-5   Filed 09/12/24   Page 987 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4464

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP Document 81-5 Filed 09/12/24 Page 988 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4465

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 989 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4466

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 990 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4467

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 992 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4469

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 81-5    Filed 09/12/24    Page 997 of 1832
PageID 4474
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1004 of 1832
PageID 4481
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1006 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4483

7/21/24, 4:51 PM Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1008 of 1832 s-1 sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm

PageID 4485

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1012 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4489

7/21/24, 4:51 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1014 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921071982/tm2117087d1_s1.htm
PageID 4491

# EXHIBIT 12

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm Document 15-5 Filed 09/12/24 Page 1017 of 1832
PageID 4494

S-1/A 1 tm2117087d2_s1a.htm FORM S-1/A

As filed with the U.S. Securities and Exchange Commission on July 8, 2021

**Registration No. 333-256472**

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**AMENDMENT NO. 1**
**TO**
**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# Digital World Acquisition Corp.

(Exact name of registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **6770** | **85-4293042** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Patrick Orlando**
**Chairman and Chief Executive Officer**
**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

*Copies to:*

| | |
|---|---|
| **Barry I. Grossman, Esq.** | **Mitchell S. Nussbaum, Esq.** |
| **Wei Wang, Esq.** | **David J. Levine, Esq.** |
| **Ellenoff Grossman & Schole LLP** | **Loeb & Loeb LLP** |
| **1345 Avenue of the Americas** | **345 Park Avenue** |
| **New York, New York 10105** | **New York, New York 10154** |
| **Telephone: (212) 370-1300** | **Telephone: (212) 407-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

7/21/24, 7:15 PM   Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1018 of 1832
Sec.gov/Archives/edgar/data/1849635/00011046592109032... tm2117087d2_s1a.htm
PageID 4495

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security[1] | Proposed Maximum Aggregate Offering Price[1] | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value and one-half of one redeemable warrant [2] | 34,500,000 Units | $ 10.00 | $ 345,000,000 | $ 37,640 |
| Shares of Class A common stock included as part of the units[3] | 34,500,000 Shares | — | — | —[4] |
| Redeemable warrants included as part of the units[3] | 12,650,000 Warrants | — | — | —[4] |
| Representative Shares | 172,500 Shares | $ 10.00 | 1,725,000 | 189 |
| Total | | | $ 346,725,000 | $ 37,829[5] |

(1)    Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended (the "Securities Act").

(2)    Includes 1,500,000 units, consisting of 1,500,000 shares of Class A common stock and 750,000 redeemable warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3)    Pursuant to Rule 416, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4)    No fee pursuant to Rule 457(g).

(5)    Includes $13,802 previously paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1019 of 1832
SEC.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4496

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                                  **SUBJECT TO COMPLETION, DATED JULY 8, 2021**

**$300,000,000**
**Digital World Acquisition Corp.**
**30,000,000 Units**

Digital World Acquisition Corp. is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination throughout this prospectus. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we may pursue an initial business combination target in any business or industry, we intend to focus our search on middle-market emerging growth technology-focused companies in the Americas, in the SaaS and Technology or Fintech and Financial Services sector.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock and one-half of one redeemable warrant as described in more detail in this prospectus. Only whole warrants are exercisable. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. The underwriters have a 45-day option from the date of this prospectus to purchase up to an additional 4,500,000 units to cover over-allotments, if any.

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination, subject to the limitations described herein. If we are unable to complete our initial business combination within 12 months from the closing of this offering (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus), we will redeem 100% of the public shares for cash, subject to applicable law and certain conditions as further described herein.

Our sponsor, ARC Global Investments II LLC, has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriter's over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 ($13,203,590 if the over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units will be sold in a private placement that will close simultaneously with the closing of this offering.

Our initial stockholders own an aggregate of 8,625,000 shares of our Class B common stock (up to 1,125,000 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised), which will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein.

Currently, there is no public market for our units, Class A common stock or warrants. We have applied to have our units listed on The Nasdaq Capital Market, or Nasdaq, under the symbol "DWACU". We expect the Class A common stock and warrants comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless EF Hutton, division of Benchmark Investments, LLC (the "representative") informs us of its decision to allow earlier separate trading, subject to our satisfaction of certain conditions. Once the securities comprising the units begin separate trading, we expect that the Class A common stock and warrants will be listed on Nasdaq under the symbols "DWAC" and "DWACW," respectively.

1

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/13/24 Page 1021 of 1832
PageID 4498
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

| | Per Unit | Total |
|---|---|---|
| Public offering price | $ 10.00 | $ 300,000,000 |
| Underwriting discounts and commissions[1] | $ 0.475 | $ 14,250,000 |
| Proceeds, before expenses, to Digital World Acquisition Corp. | $ 9.525 | $ 285,750,000 |

(1) Includes $0.35 per unit, or $10,500,000 (or $12,075,000 if the over-allotment option is exercised in full) in the aggregate, payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative of the underwriters only on completion of an initial business combination, as described in this prospectus. Does not include certain fees and expenses payable to the underwriters in connection with this offering. In addition, designees of the representative of the underwriters will receive a fee equal to 0.5% of the gross proceeds payable in shares of Class B Common Stock at the public offering price of $10.00 per share. See the section of this prospectus entitled "Underwriting" beginning on page 154 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the placement units described in this prospectus, $306,000,000 or $351,900,000 if the underwriters' over-allotment option is exercised in full ($10.20 per unit in either case) will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about              , 2021.

Sole Book-Running Manager

**EF HUTTON**

division of Benchmark Investments, LLC

, 2021

## TABLE OF CONTENTS

| | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 70 |
| Use of Proceeds | 71 |
| Dividend Policy | 75 |
| Dilution | 75 |
| Capitalization | 78 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
| Proposed Business | 85 |
| Management | 113 |
| Principal Stockholders | 121 |
| Certain Relationships and Related Party Transactions | 123 |
| Description of Securities | 126 |
| United States Federal Income Tax Considerations | 144 |
| Underwriting | 154 |
| Legal Matters | 164 |
| Experts | 164 |
| Where You Can Find Additional Information | 164 |
| Index to Financial Statements | F-1 |

**We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.**

This prospectus includes estimates regarding market and industry data and forecasts which are based on publicly available information, industry reports and publications, reports from government agencies and management's estimates based on third-party data. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable. The third-party industry sources referenced in this prospectus include, among others, EY Global and Deal Logic. We have not independently verified such third-party information, nor have we ascertained the underlying economic assumptions relied upon in those sources, and we cannot assure you of the accuracy or completeness of such information contained in this prospectus. Such data involve risks and uncertainties and is subject to change based on various factors, see "Risk Factors".

This prospectus contains trademarks, service marks and trade names of other companies which are the property of their respective owners. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;*

- *"initial stockholders" are to our sponsor and any other holders of our founder shares (including the holders of the representative shares) prior to this offering (or their permitted transferees);*

- *"management" or our "management team" are to our officers and directors;*

- *"placement units" are to the units being purchased by our sponsor, with each placement unit consisting of one placement share and one-half of one placement warrant;*

- *"placement shares" are to the shares of our common stock included within the placement units being purchased by our sponsor in the private placement;*

- *"placement warrants" are to the warrants included within the placement units being purchased by our sponsor in the private placement;*

- *"private placement" are to the private placement of 1,174,109 placement units (up to 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 (up to $13,203,590 if the underwriters' over-allotment option is exercised in full), which will occur simultaneously with the completion of this offering;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"public warrants" are to our redeemable warrants sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market, including warrants that may be acquired by our sponsor or its affiliates in this offering or thereafter in the open market);*

- *"representative" are to EF Hutton, division of Benchmark Investments, LLC, who is the representative of the underwriters in this offering;*

1

- *"representative shares"* are the 150,000 shares of our Class B common stock issuable to the representative and/or its designees at the closing of this offering (or 172,500 shares if the underwriters' over-allotment option is exercised in full) ;

- *"sponsor"* are to ARC Global Investments II LLC, a Delaware limited liability company;

- *"underwriters"* are to the underwriters of this offering, for which the representative is acting as representative;

- *"warrants"* are to our redeemable warrants, which includes the public warrants as well as the placement warrants and any warrants issued upon conversion of working capital loans; and

- *"we," "us," "company" or "our company"* are to Digital World Acquisition Corp.

*Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.*

2

## General

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services

## Our Management Team

Our management team is led by *Mr. Patrick Orlando*, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as Executive, Sponsor and Director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021. Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

*Our CFO, Mr. Luis Orleans-Braganza* is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

3

*Our directors and director nominees*

*Lee Jacobson,* our director, is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for Robot Cache US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997.

*Bruce J. Garelick* is our director nominee. Mr. Garelick is a venture capitalist/entrepreneur/c-level executive and disruptive technology investing enthusiast. Since August 2020, he has served as the chief-strategy-officer at Rocket One Capital. From May 2019 to August 2020, he served as Chief Financial Officer of Leaf Logix Technologies, Inc., a software company. From 2012 to May 2019, Mr. Garelick was the founder and Managing Partner of Garelick Capital Partners LP, a technology hedge fund. Prior thereto, from January 2005 to 2012, Mr. Garelick was a portfolio manager at Adge Capital LP. Mr. Garelick has dedicated his career to investing, molding, and guiding transformative growth technology companies. He has managed one of the largest technology hedge fund pools of capital in the world for a former Harvard University endowment investment manager to starting his own hedge fund, which grew into one of the top dedicated technology hedge funds in the world. He has since transitioned his investment focus and managerial skills to the private technology world, where he served as a lead investor and CFO of an industry defining software company to his current venture capital focus on early-stage technology companies at Rocket One Capital. Mr. Garelick received his MBA from The Wharton School at University of Pennsylvania and his bachelor's degree at Vanderbilt University. He is a CFA (Chartered Financial Analyst) holder.

*Justin Shaner,* our director nominee, founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

*Brian C. Shevland* is our director nominee. Mr. Shevland has served since 2010 as CEO of Bluestone Capital Management, LLC, an SEC-registered investment advisor, and since 2012 as CEO of MCG Securities (d.b.a. "Merion Capital Group"), a FINRA registered Broker- Dealer. At Bluestone, in addition to his role as CEO, Mr. Shevland serves as lead portfolio manager and head of the Investment Committee that serves the needs of various investors, including an ETF, managed accounts, and a private fund. At MCG Securities, Mr. Shevland manages the growth strategy of the firm which is focused on macro-level research, investment banking, capital raising, and product distribution. Mr. Shevland has been in the financial services industry for over 20 years. Mr. Shevland earned his degree in Business and Spanish from the Honors Scholars Program at the University of North Carolina at Wilmington, studied International Finance at Roehampton University in London, England, and earned a certificate for coursework completed in Alternative Investments from the Wharton School at the University of Pennsylvania.

*Eric Swider,* our director nominee, has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From

Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1027 of 1832 PageID 4504

December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Rodrigo Veloso* is our director nominee. Mr. Veloso was the founder and served as Chief Executive Officer of O.N.E. Coconut Water from 2005 to 2012, one of the original three ready-to-drink coconut water beverage companies. Mr. Veloso built the O.N.E. brand into a multi-million dollar business with distribution in over 25,000 retail stores in the United States and Canada. Mr. Veloso secured strategic and private equity investors for the company – PepsiCo and Catterton Partners, respectively, which led to PepsiCo's purchase of O.N.E. Coconut Water in 2012. Mr. Veloso has been serving as the principal of Unik Capital since 2013, a boutique investment firm with investments in technology, consumer goods and housing, which currently operates in the United States and Brazil. Mr. Veloso has been serving as the board member of Segurar.com since 2012, Brazil's first online insurance company. Mr. Veloso has been also serving since 2010 as the Co-Founder of BRIC Chamber, an organization established to encourage people from around the world to meet and talk about the development and advancement of programs and services in the fields of investment, entrepreneurship and innovation in Brasil, Russia, India, China ("BRIC") and other emerging countries.

4

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in Fintech and Financial Services or SaaS and Technology. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled , industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- ***Established Deal Sourcing Network.*** We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor, have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

5

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1029 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4506

- **Status as a Publicly Listed Acquisition Company**. We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

## Industry Opportunity

While we may acquire a business in any industry, our focus will be middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We believe that our target industries are attractive for a number of reasons:

### SaaS and Technology

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. This is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

### FinTech and Financial Services

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

6

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join with us, as we believe they have fewer exit options than presently exist for unicorns.

**Acquisition Criteria**

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We intend to use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- ***Target Size***: Consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services

- ***Businesses with Revenue and Earnings Growth Potential.*** We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.

- ***Businesses with Potential for Strong Free Cash Flow Generation.*** We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.

- ***Strong Management.*** We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.

- ***Benefit from Being a Public Company.*** We intend to acquire one or more businesses that will benefit from being publicly-traded and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- ***Defensible Market Position.*** We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

**Initial Business Combination**

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

7

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

8

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Sourcing of Potential Initial Business Combination Targets**

Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have developed a wide network of professional services contacts and business relationships in that industry. The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and bring additional relationships that further broaden our industry network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

9

## Corporate Information

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130, and our telephone number is (305) 735-1517.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company will have the meaning associated with it in the JOBS Act. Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

## THE OFFERING

*In deciding whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

Securities offered

30,000,000 units (or 34,500,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of:

- one share of Class A common stock; and

- one-half of one redeemable warrant.

10

| Proposed Nasdaq symbols | Units: "DWACU" |
| --- | --- |
| | Class A Common Stock: "DWAC" |
| | Warrants: "DWACW" |
| Trading commencement and separation of Class A common stock and warrants | The units will begin trading on or promptly after the date of this prospectus. We expect the Class A common stock and warrants comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. |
| Separate trading of the Class A common stock and warrants is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock and warrants be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

**Units:**

| Number outstanding before this offering and the private placement | 0 |
| --- | --- |
| Number or placement units to be sold in a private placement simultaneously with this offering | 1,174,109 [1] |
| Number outstanding after this offering and the private placement | 31,174,109 [1] |

**Common stock:**

| Number outstanding before this offering and the private placement | 8,625,000 shares of Class B common stock[2] |
| --- | --- |

11

| | |
|---|---|
| Number outstanding after this offering and the private placement | 38,824,109 shares of Class A common stock and Class B common stock[1][3] |

**Warrants:**

| | |
|---|---|
| Number outstanding before this offering and the private placement | 0 |
| Number of warrants to be outstanding after this offering and the private placement | 15,587,055 [1] |
| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock, subject to adjustment as provided herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade and are exercisable.<br><br>We structured each unit to contain one-half of one redeemable warrant, with each whole warrant exercisable for one share of Class A common stock, as compared to units issued by some other similar special purpose acquisition companies which contain whole warrants exercisable for one whole share, in order to reduce the dilutive effect of the warrants upon completion of an initial business combination as compared to units that each contain a whole warrant to purchase one whole share, thus making us, we believe, a more attractive initial business combination partner for target businesses. |

(1) Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 1,125,000 founder shares. Our sponsor has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) for an aggregate purchase price of $11,741,090 ($13,203,590 if the underwriters' over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units are not subject to forfeiture but will be subject to transfer restrictions as described in "Principal Stockholders — Transfers of Founder Shares and Placement Units".

(2) Includes 8,625,000 founder shares of which an aggregate of up to 1,125,000 shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3) Comprised of 31,174,109 shares of Class A common stock (including 1,174,109 placement shares), 7,500,000 shares of Class B common stock (or founder shares) and 150,000 representative shares (172,500 representative shares if the underwriters' over-allotment option is exercised in full). The Class B common stock is convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution rights."

12

| | |
|---|---|
| Exercise price | $11.50 per share, subject to adjustment as described herein. In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Class A common stock during the 20 trading day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described below under "Redemption of warrants" will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. |
| Exercise period | The warrants will become exercisable on the later of: |

- 30 days after the completion of our initial business combination, and

- 12 months from the closing of this offering;

provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).

We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis.

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation. On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants

Once the warrants become exercisable, we may redeem the outstanding warrants:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing after the warrants become exercisable and ending on the third trading day before we send the notice of redemption to the warrant holders.

We will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of Class A common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of Class A common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

14

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1038 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4515

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants.

Please see the section of this prospectus entitled "Description of Securities — Redeemable Warrants — Public Stockholders' Warrants" for additional information.

Founder shares

On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.003 per share. On July 1, 2021, we effected a three-for-one stock split, such that our sponsor held 8,625,000 founder shares. Effective as of July 2, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 founder shares to each of our independent director and director nominees.  Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). As such, our initial stockholders will collectively own approximately 22.4% of our issued and outstanding shares after this offering (including the placement shares to be issued to the sponsor and assuming they do not purchase any units in this offering). Neither our sponsor nor any of our officers, directors or director nominees have expressed an intention to purchase any units in this offering. Up to 1,125,000 founder shares held by our sponsor will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering (excluding the representative shares and the placement units and underlying securities). We will effect a stock dividend or share contribution prior to this offering should the size of the offering change, in order to maintain such ownership percentage.

15

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

- our sponsor, officers and directors have entered, and we anticipate our director nominees will enter, into a letter agreement with us, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

16

- pursuant to the

letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. As a result, in the event that only the minimum number of shares representing a quorum is present at a stockholders' meeting held to vote on our initial business combination, in addition to our initial stockholders' founder shares and placement shares, we would need only 844,420, or 2.8%, of the 30,000,000 public shares sold in this offering to be voted in favor of an initial business combination in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 150,000 representative shares are voted in favor of the transaction); and

- the founder shares are entitled to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). Any permitted transferees will be subject to the same restrictions and other agreements of our initial stockholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the lock-up. |
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (excluding the |

representative shares and the placement units and underlying securities) plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of working capital loans made to us). The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities.

17

| | |
|---|---|
| Voting Rights | Holders of record of the Class A common stock and holders of record of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, with each share of common stock entitling the holder to one vote, except as required by law. |
| Placement units | Our sponsor has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 ($13,203,590) if the underwriters' over-allotment option is exercised in full). Each placement unit is identical to the units offered by this prospectus except as described below. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares or placement warrants, which will expire worthless if we do not consummate a business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering. Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares or placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto, to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the completion of this offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) if we fail to consummate a business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the completion of this offering or if we liquidate prior to the expiration of the 12-month period (or up to 18 month period, if we extend the time to complete a business combination as described in this prospectus). However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 12-month period (or up to 18-month period, if we extend the time to complete a business combination as described in this prospectus). |
| Transfer restrictions on placement units | The placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees. |

18

| | |
|---|---|
| Representative shares | Upon the closing of this offering, we will issue to the representative and/or its designee 150,000 shares of Class B common stock (172,500 shares of Class B common stock if the underwriters' over-allotment option is exercised in full).  The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering .  The representative shares are deemed to be underwriters' compensation by FINRA pursuant to FINRA Rule 5110. |
| Proceeds to be held in trust account | Nasdaq rules provide that at least 90% of the gross proceeds from this offering and the sale of the placement units be deposited in a trust account. Of the net proceeds of this offering and the sale of the placement units, $306,000,000, or $10.20 per unit ($351,900,000, or $10.20 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.<br><br>These proceeds include $3,750,000 (or $4,312,500 if the underwriters' over-allotment option is exercised in full) in deferred  underwriting commissions. |

19

| | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units held in the trust account will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $448,800 of pre-tax interest annually assuming an interest rate of 0.2% per year; however, we can provide no assurances regarding this amount. |

Unless and until we complete our initial business combination, we may pay our expenses only from:

- the net proceeds of this offering and the sale of the placement units not held in the trust account, which will be approximately $1,435,000 in working capital after the payment of approximately $556,090 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of an initial business combination.

| Conditions to completing our initial business combination | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination target, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination target, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. There is no limitation on our ability to raise funds privately, or through loans in connection with our initial business combination. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors. |
|---|---|
|  | We anticipate structuring our initial business combination either (i) in such a way so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses, or (ii) in such a way so that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders, or for other reasons. However, we will only complete an initial business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act. |
|  | Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. |

21

|  | In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be taken into account for purposes of Nasdaq's 80% fair market value test. If the initial business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the transactions and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |
|---|---|
| Permitted purchases of public shares and public warrants by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares or warrants our sponsor, initial stockholders, directors, officers, advisors or their affiliates may purchase in such transactions, subject to compliance with applicable law and Nasdaq rules. However, apart from the purchase of the placement units, they have no current commitments, plans or intentions to engage in such transactions and have not formulated any terms or conditions for any such transactions. If they engage in such transactions, they will not make any such purchases when they are in possession of any material nonpublic information not disclosed to the seller or if such purchases are prohibited by Regulation M under the Exchange Act. We do not currently anticipate that such purchases, if any, would constitute a tender offer subject to the tender offer rules under the Exchange Act or a going-private transaction subject to the going-private rules under the Exchange Act; however, if the purchasers determine at the time of any such purchases that the purchases are subject to such rules, the purchasers will comply with such rules. We expect that any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

None of the funds held in the trust account will be used to purchase shares or public warrants in such transactions prior to completion of our initial business combination. See "Proposed Business — Permitted purchases of our securities" for a description of how our sponsor, initial stockholders, directors, officers or any of their affiliates will select which stockholders to purchase securities from in any private transaction. |

22

| | The purpose of any such purchases of shares could be to vote such shares in favor of the initial business combination and thereby increase the likelihood of obtaining stockholder approval of the initial business combination or to satisfy a closing condition in an agreement with a target that requires us to have a minimum net worth or a certain amount of cash at the closing of our initial business combination, where it appears that such requirement would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. Any such purchases of our securities may result in the completion of our initial business combination that may not otherwise have been possible. In addition, if such purchases are made, the public "float" of our shares of Class A common stock or warrants may be reduced and the number of beneficial holders of our securities may be reduced, which may make it difficult to maintain or obtain the quotation, listing or trading of our securities on a national securities exchange. |
| Redemption rights for public stockholders upon completion of our initial business combination | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the trust account as of two business days prior to the consummation of our initial business combination, including interest earned on the funds held in the trust account and not previously released to us to pay our taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. The amount in the trust account is initially anticipated to be $10.20 per public share, however, there is no guarantee that investors will receive $10.20 per share upon redemption. The per-share amount we will distribute to investors who properly redeem their shares will not be reduced by the deferred underwriting commissions we will pay to the underwriters. There will be no redemption rights upon the completion of our initial business combination with respect to our warrants. Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed to waive their redemption rights with respect to any founder shares and placement shares held by them and any public shares they may acquire during or after this offering in connection with the completion of our initial business combination or otherwise. |

23

| Manner of conducting redemptions | We will provide our public stockholders with the opportunity to redeem all or a portion of their public shares upon the completion of our initial business combination either (i) in connection with a stockholder meeting called to approve the initial business combination or (ii) by means of a tender offer. The decision as to whether we will seek stockholder approval of a proposed initial business combination or conduct a tender offer will be made by us, solely in our discretion, and will be based on a variety of factors such as the timing of the transaction and whether the terms of the transaction would require us to seek stockholder approval under applicable law or stock exchange listing requirements. Under Nasdaq rules, asset acquisitions and stock purchases would not typically require stockholder approval while direct mergers with our company where we do not survive and any transactions where we issue more than 20% of our outstanding common stock or seek to amend our amended and restated certificate of incorporation would typically require stockholder approval. We may conduct redemptions without a stockholder vote pursuant to the tender offer rules of the SEC unless stockholder approval is required by law or stock exchange listing requirements or we choose to seek stockholder approval for business or other legal reasons. So long as we obtain and maintain a listing for our securities on Nasdaq, we will be required to comply with Nasdaq's stockholder approval rules. |
|---|---|
| | If stockholder approval of the transaction is required by law or stock exchange listing requirements, or we decide to obtain stockholder approval for business or other legal reasons, we will: |
| | • conduct the redemptions in conjunction with a proxy solicitation pursuant to Regulation 14A of the Exchange Act, which regulates the solicitation of proxies, and not pursuant to the tender offer rules, and |
| | • file proxy materials with the SEC. |
| | If we seek stockholder approval, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. A quorum for such meeting will consist of the holders present in person or by proxy of shares of our outstanding shares of common stock representing a majority of the voting power of all outstanding shares of our common stock entitled to vote at such meeting. Our initial stockholders will count towards this quorum and, pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares acquired by them during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. For purposes of seeking approval of the majority of our outstanding shares of common stock voted, non-votes will have no effect on the approval of our initial business combination once a quorum is obtained. As a result, in addition to our initial stockholders' founder shares and placement shares, we would need only 844,420, or 2.8%, of the 30,000,000 public shares sold in this offering to be voted in favor of an initial business combination (assuming only the minimum number of shares representing a quorum are voted) in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, and that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 150,000 representative shares are voted in favor of the transaction). |

24

We intend to give approximately 30 days (but not less than 10 days nor more than 60 days) prior written notice of any such meeting, if required, at which a vote shall be taken to approve our initial business combination. These quorum and voting thresholds, and the voting agreements of our initial stockholders, officers and directors, may make it more likely that we will consummate our initial business combination. Each public stockholder may elect to redeem its public shares irrespective of whether they vote for or against the proposed transaction.

If a stockholder vote is not required and we do not decide to hold a stockholder vote for business or other legal reasons, we will, pursuant to our amended and restated certificate of incorporation:

- conduct the redemptions pursuant to Rule 13e-4 and Regulation 14E of the Exchange Act, which regulate issuer tender offers, and

- file tender offer documents with the SEC prior to completing our initial business combination which contain substantially the same financial and other information about the initial business combination and the redemption rights as is required under Regulation 14A of the Exchange Act, which regulates the solicitation of proxies.

Whether or not we maintain our registration under the Exchange Act or our listing on Nasdaq, we will provide our public stockholders with the opportunity to redeem their public shares by one of the two methods listed above. Upon the public announcement of our initial business combination, if we elect to conduct redemptions pursuant to the tender offer rules, we or our sponsor will terminate any plan established in accordance with Rule 10b5-1 to purchase shares of our Class A common stock in the open market, in order to comply with Rule 14e-5 under the Exchange Act.

In the event we conduct redemptions pursuant to the tender offer rules, our offer to redeem will remain open for at least 20 business days, in accordance with Rule 14e-1(a) under the Exchange Act, and we will not be permitted to complete our initial business combination until the expiration of the tender offer period. In addition, we will not redeem any public shares unless our net tangible assets will be at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. If public stockholders tender more shares than we have offered to purchase, we will withdraw the tender offer and not complete the initial business combination.

We may require our public stockholders seeking to exercise their redemption rights, whether they are record holders or hold their shares in "street name," to either tender their certificates to our transfer agent prior to the date set forth in the tender offer documents mailed to such holders, or up to two business days prior to the vote on the proposal to approve the initial business combination in the event we distribute proxy materials, or to deliver their shares to the transfer agent electronically. We believe that this will allow our transfer agent to efficiently process any redemptions without the need for further communication or action from the redeeming public stockholders, which could delay redemptions and result in additional administrative cost. If the proposed initial business combination is not approved and we continue to search for a target company, we will promptly return any certificates delivered, or shares tendered electronically, by public stockholders who elected to redeem their shares.

|  | Our amended and restated certificate of incorporation will provide that in no event will we redeem our public shares unless our net tangible assets are at least $5,000,001 either immediately prior to or upon consummation of our initial business combination and after payment of underwriters' fees and commissions (so that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. For example, the proposed initial business combination may require: (i) cash consideration to be paid to the target or its owners, (ii) cash to be transferred to the target for working capital or other general corporate purposes or (iii) the retention of cash to satisfy other conditions in accordance with the terms of the proposed initial business combination. In the event the aggregate cash consideration we would be required to pay for all shares of Class A common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the proposed initial business combination exceed the aggregate amount of cash available to us, we will not complete the initial business combination or redeem any shares, and all shares of Class A common stock submitted for redemption will be returned to the holders thereof. |
|---|---|
| Limitation on redemption rights of stockholders holding 15% or more of the shares sold in this offering | Notwithstanding the foregoing redemption rights, if we seek stockholder approval |

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1063 of 1832
PageID 4540
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1075 of 1832
PageID 4552
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1093 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4570

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1107 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4584

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1113 of 1832
PageID 4590
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1115 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4592

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1116 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4593

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1117 of 1832
PageID 4594
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1125 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4602

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1131 of 1832 PageID 4608
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1137 of 1832
PageID 4614
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1146 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4623

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1154 of 1832 PageID 4631
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1157 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4634

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1163 of 1832
PageID 4640
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1165 of 1832
PageID 4642
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1168 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4645

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1171 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4648

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1175 of 1832
PageID 4652
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1185 of 1832
PageID 4662
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1186 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4663

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1187 of 1832
PageID 4664
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM                Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1192 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4669

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1195 of 1832
PageID 4672
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1200 of 1832
PageID 4677
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1203 of 1832
PageID 4680
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1211 of 1832
PageID 4688
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1213 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4690

7/21/24, 7:15 PM
Case 8:24-cv-02161-KKM-AEP Document 15 Filed 09/12/24 Page 1217 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921090302/tm2117087d2_s1a.htm
PageID 4694

# EXHIBIT 13

S-1/A 1 tm2124624d5_s1a.htm S-1/A

**As filed with the U.S. Securities and Exchange Commission on August 31, 2021**

Registration No. 333-256472

UNITED STATES
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

AMENDMENT NO. 6
TO
**FORM S-1**
**REGISTRATION STATEMENT**
**UNDER THE SECURITIES ACT OF 1933**

# Digital World Acquisition Corp.

(Exact name of registrant as specified in its charter)

| Delaware | 6770 | 85-4293042 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Patrick Orlando**
**Chairman and Chief Executive Officer**
**78 SW 7th Street**
**Miami, Florida 33130**
**Telephone: (305) 735-1517**
(Name, Address, Including Zip Code, and Telephone Number, Including Area Code, of Agent For Service)

*Copies to:*

| | |
|---|---|
| **Barry I. Grossman, Esq.** | **Mitchell S. Nussbaum, Esq.** |
| **Wei Wang, Esq.** | **David J. Levine, Esq.** |
| **Ellenoff Grossman & Schole LLP** | **Loeb & Loeb LLP** |
| **1345 Avenue of the Americas** | **345 Park Avenue** |
| **New York, New York 10105** | **New York, New York 10154** |
| **Telephone: (212) 370-1300** | **Telephone: (212) 407-4000** |

**Approximate date of commencement of proposed sale to the public:** As soon as practicable after the effective date of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Security Being Registered | Amount Being Registered | Proposed Maximum Offering Price per Security[1] | Proposed Maximum Aggregate Offering Price[1] | Amount of Registration Fee |
|---|---|---|---|---|
| Units, each consisting of one share of Class A common stock, $0.0001 par value and one-half of one redeemable warrant [2] | 34,500,000 Units | $ 10.00 | $ 345,000,000 | $ 37,640 |
| Shares of Class A common stock included as part of the units[3] | 34,500,000 Shares | — | — | —[4] |
| Redeemable warrants included as part of the units[3] | 17,250,000 Warrants | — | — | —[4] |
| Representative Shares | 172,500 Shares | $ 10.00 | 1,725,000 | 189 |
| Total | | | $ 346,725,000 | $ 37,829[5] |

(1) Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended (the "Securities Act").

(2) Includes 4,500,000 units, consisting of 4,500,000 shares of Class A common stock and 2,250,000 redeemable warrants, which may be issued upon exercise of a 45-day option granted to the underwriters to cover over-allotments, if any.

(3) Pursuant to Rule 416, there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(4) No fee pursuant to Rule 457(g).

(5) Previously paid.

**The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the Registration Statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

7/21/24, 6:20 PM    Case 8:24-cv-02161-KKM-AEP   Document 45   Filed 09/12/24   Page 1243 of 1832
                    sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
                    PageID 4720

**The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**PRELIMINARY PROSPECTUS**                                  **SUBJECT TO COMPLETION, DATED AUGUST 31, 2021**

$300,000,000
**Digital World Acquisition Corp.**
**30,000,000 Units**

Digital World Acquisition Corp. is a newly organized blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination throughout this prospectus. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, initiated any substantive discussions, directly or indirectly, with any business combination target. While we may pursue an initial business combination target in any business or industry, we intend to focus our search on middle-market emerging growth technology-focused companies in the Americas, in the SaaS and Technology or Fintech and Financial Services sector.

This is an initial public offering of our securities. Each unit has an offering price of $10.00 and consists of one share of our Class A common stock and one-half of one redeemable warrant as described in more detail in this prospectus. Only whole warrants are exercisable. Each whole warrant entitles the holder thereof to purchase one share of our Class A common stock at a price of $11.50 per share, subject to adjustment as described herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. The underwriters have a 45-day option from the date of this prospectus to purchase up to an additional 4,500,000 units to cover over-allotments, if any.

Eleven qualified institutional buyers or institutional accredited investors, namely (i) accounts or funds managed by Radcliffe Capital Management, L.P., (ii) Meteora Capital Partners, LP (an affiliate of Glazer Capital LLC), (iii) Castle Creek Strategies (and sub-funds associated with Castle Creek), (iv) The K2 Principal Fund L.P., (v) Context Partners Master Fund LP, (vi) Boothbay Absolute Return Strategies, LP (or its affiliate Boothbay Diversified Alpha Master Fund LP, commonly controlled by Boothbay Fund Management LLC), (vii) investment funds and accounts managed by Shaolin Capital Management, LLC, (viii) Hudson Bay Master Fund Ltd. and/or its affiliates, (ix) Saba Capital Master Fund, Ltd., Saba Capital Master Fund II, Ltd., Saba Capital Master Fund III, LP and Saba Capital SPAC Opportunities, Ltd., (x) D. E. Shaw Valence Portfolios, L.L.C. and (xi) Yakira Capital Management, Inc. (none of which are affiliated with any member of our management, our sponsor or any other anchor investor), which we refer to as the "anchor investors", have entered into investment agreements with our sponsor and us pursuant to which they each expressed an interest to purchase up to 8.3% of the units sold in this offering (excluding any units sold upon exercise of the underwriters' over-allotment option), or 2,490,000 units (which would aggregate to 91.3% of the units subject to this offering if all such indications of interest become confirmed orders in full following effectiveness of the registration statement of which this prospectus forms a part). We do not expect that all of the anchor investors will be allocated the full 8.3% of the units to be sold, and such allocations will be determined by the underwriters, subject to satisfying Nasdaq initial listing requirements, including the minimum number of round lot holders. There can be no assurance that the anchor investors will acquire any units in this offering, or as to the amount of such units the anchor investors will retain, if any, prior to or upon the consummation of our initial business combination. In addition, none of the anchor investors has any obligation to vote any of their public shares in favor of our initial business combination. Subject to each anchor investor purchasing 100% of the units allocated to it, in connection with the closing of this offering, our sponsor will sell 150,000 founder shares to each anchor investor, or an aggregate of 1,650,000 founder shares to all 11 anchor investors, at a purchase price of approximately $0.0029 per share. For a discussion of certain additional arrangements with our anchor investors, see "Summary — The Offering — Expressions of Interest."

We will provide our public stockholders with the opportunity to redeem all or a portion of their shares of our Class A common stock upon the completion of our initial business combination, subject to the limitations described herein. If we are unable to complete our initial business combination within 12 months from the closing of this offering (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus), we will redeem 100% of the public shares for cash, subject to applicable law and certain conditions as further described herein.

Our sponsor, ARC Global Investments II LLC, has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriter's over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 ($13,203,590 if the over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units will be sold in a private placement that will close simultaneously with the closing of this offering.

Our initial stockholders own an aggregate of 8,625,000 shares of our Class B common stock (up to 1,125,000 shares of which are subject to forfeiture depending on the extent to which the underwriters' over-allotment option is exercised), which will automatically convert into shares of Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment as described herein.

Currently, there is no public market for our units, Class A common stock or warrants. We have applied to list our units on The Nasdaq Global Market, or Nasdaq, under the symbol "DWACU". We expect the Class A common stock and warrants comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless EF Hutton, division of Benchmark Investments, LLC (the "representative") informs us of its decision to allow earlier separate trading, subject to our satisfaction of certain conditions. Once the securities comprising the units begin separate trading, we expect that the Class A common stock and warrants will be listed on Nasdaq under the symbols "DWAC" and "DWACW," respectively.

1

We are an "emerging growth company" under applicable federal securities laws and will be subject to reduced public company reporting requirements. Investing in our securities involves a high degree of risk. See "Risk Factors" beginning on page 33 for a discussion of information that should be considered in connection with an investment in our securities. Investors will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

---

|  | Per Unit | Total |
|---|---|---|
| Public offering price | $ 10.00 | $ 300,000,000 |
| Underwriting discounts and commissions[1] | $ 0.475 | $ 14,250,000 |
| Proceeds, before expenses, to Digital World Acquisition Corp. | $ 9.525 | $ 285,750,000 |

(1)  Includes $0.35 per unit, or $10,500,000 (or $12,075,000 if the over-allotment option is exercised in full) in the aggregate, payable to the underwriters for deferred underwriting commissions to be placed in a trust account located in the United States as described herein. The deferred commissions will be released to the representative of the underwriters only on completion of an initial business combination, as described in this prospectus. Does not include certain fees and expenses payable to the underwriters in connection with this offering. In addition, designees of the representative of the underwriters will receive a fee equal to 0.5% of the gross proceeds payable in shares of Class B Common Stock at the public offering price of $10.00 per share. See the section of this prospectus entitled "Underwriting" beginning on page 154 for a description of compensation and other items of value payable to the underwriters.

Of the proceeds we receive from this offering and the sale of the placement units described in this prospectus, $306,000,000 or $351,900,000 if the underwriters' over-allotment option is exercised in full ($10.20 per unit in either case) will be deposited into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.

The underwriters are offering the units for sale on a firm commitment basis. The underwriters expect to deliver the units to the purchasers on or about                    , 2021.

Sole Book-Running Manager

# EF HUTTON

division of Benchmark Investments, LLC

, 2021

## TABLE OF CONTENTS

|  | Page |
|---|---|
| Summary | 1 |
| Risk Factors | 33 |
| Cautionary Note Regarding Forward-Looking Statements | 70 |
| Use of Proceeds | 71 |
| Dividend Policy | 75 |
| Dilution | 75 |
| Capitalization | 78 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 79 |
| Proposed Business | 85 |
| Management | 113 |
| Principal Stockholders | 121 |
| Certain Relationships and Related Party Transactions | 123 |
| Description of Securities | 126 |
| United States Federal Income Tax Considerations | 144 |
| Underwriting | 154 |
| Legal Matters | 164 |
| Experts | 164 |
| Where You Can Find Additional Information | 164 |
| Index to Financial Statements | F-1 |

We are responsible for the information contained in this prospectus. We have not authorized anyone to provide you with different information, and we take no responsibility for any other information others may give to you. We are not, and the underwriters are not, making an offer to sell securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information contained in this prospectus is accurate as of any date other than the date on the front of this prospectus.

This prospectus includes estimates regarding market and industry data and forecasts which are based on publicly available information, industry reports and publications, reports from government agencies and management's estimates based on third-party data. Third-party industry publications and forecasts generally state that the information contained therein has been obtained from sources generally believed to be reliable. The third-party industry sources referenced in this prospectus include, among others, EY Global and Deal Logic. We have not independently verified such third-party information, nor have we ascertained the underlying economic assumptions relied upon in those sources, and we cannot assure you of the accuracy or completeness of such information contained in this prospectus. Such data involve risks and uncertainties and is subject to change based on various factors, see "Risk Factors".

This prospectus contains trademarks, service marks and trade names of other companies which are the property of their respective owners. We do not intend our use or display of such names or marks to imply relationships with, or endorsements of us by, any other company.

## SUMMARY

*This summary only highlights the more detailed information appearing elsewhere in this prospectus. You should read this entire prospectus carefully, including the information under the section of this prospectus entitled "Risk Factors" and our financial statements and the related notes included elsewhere in this prospectus, before investing.*

*Unless otherwise stated in this prospectus, or the context otherwise requires, references to:*

- *"anchor investors" are to (i) accounts or funds managed by Radcliffe Capital Management, L.P., (ii) Meteora Capital Partners, LP (an affiliate of Glazer Capital LLC), (iii) Castle Creek Strategies (and sub-funds associated with Castle Creek), (iv) The K2 Principal Fund L.P., (v) Context Partners Master Fund LP, (vi) Boothbay Absolute Return Strategies, LP (or its affiliate Boothbay Diversified Alpha Master Fund LP, commonly controlled by Boothbay Fund Management LLC), (vii) investment funds and accounts managed by Shaolin Capital Management, LLC, (viii) Hudson Bay Master Fund Ltd. and/or its affiliates, (ix) Saba Capital Master Fund, Ltd., Saba Capital Master Fund II, Ltd., Saba Capital Master Fund III, LP and Saba Capital SPAC Opportunities, Ltd., (x) D. E. Shaw Valence Portfolios, L.L.C. and (xi) Yakira Capital Management, Inc. (none of which are affiliated with any member of our management, our sponsor or any other anchor investor), each of which has entered into an Investment Agreement pursuant to which it has expressed an interest to purchase up to 8.3% of the units sold in this offering as further described herein;*

- *"common stock" are to our Class A common stock and our Class B common stock, collectively;*

- *"founder shares" are to shares of our Class B common stock initially purchased by our sponsor in a private placement prior to this offering, and the shares of our Class A common stock issuable upon the conversion thereof as provided herein;*

- *"initial stockholders" are to our sponsor and any other holders of our founder shares (including the holders of the representative shares) prior to this offering (or their permitted transferees), not including the anchor investors who purchase units in the offering, if any;*

- *"management" or our "management team" are to our officers and directors;*

- *"placement units" are to the units being purchased by our sponsor, with each placement unit consisting of one placement share and one-half of one placement warrant;*

- *"placement shares" are to the shares of our common stock included within the placement units being purchased by our sponsor in the private placement;*

- *"placement warrants" are to the warrants included within the placement units being purchased by our sponsor in the private placement;*

- *"private placement" are to the private placement of 1,174,109 placement units (up to 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 (up to $13,203,590 if the underwriters' over-allotment option is exercised in full), which will occur simultaneously with the completion of this offering;*

- *"public shares" are to shares of our Class A common stock sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market);*

- *"public stockholders" are to the holders of our public shares, including our initial stockholders and management team to the extent our initial stockholders and/or members of our management team purchase public shares, provided that each initial stockholder's and member of our management team's status as a "public stockholder" shall only exist with respect to such public shares;*

- *"public warrants" are to our redeemable warrants sold as part of the units in this offering (whether they are purchased in this offering or thereafter in the open market, including warrants that may be acquired by our sponsor or its affiliates in this offering or thereafter in the open market);*

- *"representative" are to EF Hutton, division of Benchmark Investments, LLC, who is the representative of the underwriters in this offering;*

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1249 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4726

- *"representative shares"* are the 150,000 shares of our Class A common stock issuable to the representative and/or its designees at the closing of this offering (or 172,500 shares if the underwriters' over-allotment option is exercised in full) ;

- *"sponsor"* are to ARC Global Investments II LLC, a Delaware limited liability company;

- *"underwriters"* are to the underwriters of this offering, for which the representative is acting as representative;

- *"warrants"* are to our redeemable warrants, which includes the public warrants as well as the placement warrants and any warrants issued upon conversion of working capital loans; and

- *"we," "us," "company" or "our company"* are to Digital World Acquisition Corp.

Unless we tell you otherwise, the information in this prospectus assumes that the underwriters will not exercise their over-allotment option.

2

7/21/24, 6:20 PM Case 8:24-cv-02161-KKM-AEP Document 15-5 Filed 09/12/24 Page 1251 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4728

## General

We are a newly-organized blank check company incorporated in December 2020, whose business purpose is to effect a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, which we refer to as our initial business combination. To date, our efforts have been limited to organizational activities as well as activities related to this offering. We have not selected any specific business combination target and we have not, nor has anyone on our behalf, engaged in any substantive discussions, directly or indirectly, with any business combination target with respect to an initial business combination with us.

While we may pursue an initial business combination opportunity in any business, industry, sector or geographical location, we intend to focus on middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services

## Our Management Team

Our management team is led by *Mr. Patrick Orlando*, our Chairman and CEO, who has served many executive roles in Finance over a 25-year career. Mr. Orlando's experience covers all aspects related to special purpose acquisition corporations ("SPACs") as he has been involved as executive, sponsor and director in several SPACs including Yunhong International (Nasdaq: ZGYH), Benessere Capital Acquisition Corporation (Nasdaq: BENE) and Maquia Capital Acquisition Corporation (Nasdaq: MAQC). Over his career, Mr. Orlando has developed an extensive network and we believe his knowledge and exposure on a global scale will enable us to locate and attract potential targets.

Mr. Orlando has been serving as Chief Executive Officer of Yunhong International since January 2020 and as Chief Executive Officer of Benessere Capital Acquisition Corp. since September 2020. Mr. Orlando has also been a director of Maquia Capital Acquisition Corporation since February 2021. Mr. Orlando is also Chief Executive Officer of Benessere Capital, LLC, an investment consulting and investment banking firm he founded in Miami in October 2012. At Benessere Capital, LLC, he has advised on fundraising, capital deployment, mergers and acquisitions, private placements, and products marketing. From March 2014 to August 2018, Mr. Orlando also served as the Chief Financial Officer of Sucro Can Sourcing LLC, a sugar trading company he co-founded, where he managed all financial matters including insurance and banking relationships. From March 2011 to March 2014, Mr. Orlando served as the Managing Director and the Head of Structuring and Derivatives of BT Capital Markets, LLC, a boutique investment bank in Miami, Florida, where he was involved in managing global derivatives and structuring activities. From September 2006 to March 2011, Mr. Orlando served in roles including Chief Technical Officer and Director of Pure Biofuels Corporation, a renewable fuel corporation headquartered in Houston, Texas with operations in Peru. From April 1998 to December 2003, Mr. Orlando served as the Director of Emerging Markets Fixed Income Derivatives of Deutsche Bank. Mr. Orlando earned bachelors of science degrees in Mechanical Engineering and Management Science from the Massachusetts Institute of Technology.

*Our CFO, Mr. Luis Orleans-Braganza* is a businessman and currently a member of Brazil's National Congress, originally elected in 2018, representing the state of São Paulo. He founded Zap Tech in February of 2012 and remained there until 2015, during which time Zap Tech developed a mobile payment platform. As the CEO he was responsible for all aspects of product design, geo localization and payment protocols. In August of 2005 he founded IKAT do Brasil, an automobile and motorcycle company which developed new automotive technology in ignitions. Mr. Braganza was responsible for all aspects of general management including team building, business development, research and development and capital allocation. Prior to his political and entrepreneurial days, his professional trajectory began in the United States, where he harnessed experiences in planning, finance and mergers and acquisitions. Mr. Braganza was part of the sales and operations planning effort of Companie de Saint-Gobain, a French multinational, between January of 1994 and December of 1996. Later he extended his financial experience at JP Morgan investment banking division in London and at Lazard Frères in New York City. From April 2000 to May 2005, he acted as a director at Time Warner's, AOL Latin America division where he was responsible for managing strategic alliances with media and telecom players in multiple countries in the region. Mr. Braganza earned a degree in Business Administration from the Fundação Armando Álvares Penteado.

3

### Our directors and director nominees

*Lee Jacobson,* our director, is an entertainment executive with over 25 years of experience in the video game industry and 16 years of experience managing digital distribution at some of the most well-known publishers in the world. In January 2018, he co-founded and currently serves as the Chief Executive Officer for ROBOT CACHE US, Inc., a PC games digital distribution company. From January 2017 to January 2018, Lee was the Managing Director of Converge Direct, LLC, a digital advertising agency, where he managed all of the analytics and software development operations for its clients. Beginning in September 2012, Lee was the Chief Executive Officer of Apmetrix Analytics Inc. until it liquidated its assets in 2019 in a Chapter 7 bankruptcy proceeding. From September 2009 to September 2012, Lee was a Senior Vice President, Licensing and Digital Publishing for Atari, where he was responsible for global licensing activities for all consumer products and interactive categories for the Atari brand and global publishing operations for the console and mobile business units. From August 1998 to August 2009, Lee was a Vice President, Business Development and Licensing, for Midway Games Inc., during which time he managed the worldwide licensing and business development functions. Prior to 1998, Lee was a Director of Business Development for Virgin Interactive Entertainment beginning in January 1997.

*Bruce J. Garelick* is our director nominee. Mr. Garelick is a venture capitalist/entrepreneur/c-level executive and disruptive technology investing enthusiast. Since August 2020, he has served as the chief-strategy-officer at Rocket One Capital. From May 2019 to August 2020, he served as Chief Financial Officer of Leaf Logix Technologies, Inc., a software company. From 2012 to May 2019, Mr. Garelick was the founder and Managing Partner of Garelick Capital Partners LP, a technology hedge fund. Prior thereto, from January 2005 to 2012, Mr. Garelick was a portfolio manager at Adge Capital LP. Mr. Garelick has dedicated his career to investing, molding, and guiding transformative growth technology companies. He has managed one of the largest technology hedge fund pools of capital in the world for a former Harvard University endowment investment manager to starting his own hedge fund, which grew into one of the top dedicated technology hedge funds in the world. He has since transitioned his investment focus and managerial skills to the private technology world, where he served as a lead investor and CFO of an industry defining software company to his current venture capital focus on early-stage technology companies at Rocket One Capital. Mr. Garelick received his MBA from The Wharton School at University of Pennsylvania and his bachelor's degree at Vanderbilt University. He is a CFA (Chartered Financial Analyst) holder.

*Justin Shaner,* our director nominee, founded and has been serving as Chief Executive Officer of Shaner Properties LLC, a real estate investment and development company, since February 2011. Mr. Shaner has been Vice President of Development for Shaner Hotels LP, one of the foremost award-winning hospitality owner-operators and management companies in the hospitality industry, since March 2018. Mr. Shaner has been serving as the Chief Executive Officer of Sobe Brooke Studios LLC, an independent film production company, since October 2012. From August 2013 to June 2016, Mr. Shaner served as a Partner and Producer of Radar Pictures in Los Angeles, California. From September 2007 to September 2015, Mr. Shaner served as the President and Chief Creative Officer of The JLS Agency, an award winning digital marketing agency. Since February 2021, Mr. Shaner has also served as a director of Benessere Capital Acquisition Corp. Mr. Shaner also serves as a board member for Shaner Ciocco S.r.l. which developed and manages the Renaissance Tuscany hotel. Mr. Shaner holds a Bachelor's degree from Pennsylvania State University.

*Eric Swider,* our director nominee, has been serving as the Chief Executive Officer of RUBIDEX, a start-up company focusing on data security, since January 2020. Mr. Swider founded Renatus Advisors and has been serving as the Partner of Renatus LLC since June 2016, where he is responsible for FEMA grant management and government advisory services. From September 2016 to January 2018, Mr. Swider served as the Managing Director of Great Bay Global where he oversaw launch of new business division focused on investing in alternative strategies. From December 2014 to June 2016, Mr. Swider served as the Managing Director of OHorizons Global, where he oversaw expansion of new investment team and was responsible for working on a global basis to expand client base and investment portfolio. From February 2010 to December 2015, Mr. Swider served as the Managing Director of Oceano Beach Resorts, where he was responsible for growing new property and resort management group. Since February 2021, Mr. Swider has also served as a director of Benessere Capital Acquisition Corp. Mr. Swider received his education in Mechanics Engineering and Nuclear Science Studies at US Naval Engineering and Nuclear A Schools, an intensive two-year program studying nuclear physics, heat transfer and fluid flow, advanced mathematical practices and engineering principles.

*Rodrigo Veloso* is our director nominee. Mr. Veloso was the founder and served as Chief Executive Officer of O.N.E. Coconut Water from 2005 to 2012, one of the original three ready-to-drink coconut water beverage companies. Mr.

Veloso built the O.N.E. brand into a multi-million dollar business with distribution in over 25,000 retail stores in the United States and Canada. Mr. Veloso secured strategic and private equity investors for the company – PepsiCo and Catterton Partners, respectively, which led to PepsiCo's purchase of O.N.E. Coconut Water in 2012. Mr. Veloso has been serving as the principal of Unik Capital since 2013, a boutique investment firm with investments in technology, consumer goods and housing, which currently operates in the United States and Brazil. Mr. Veloso has been serving as the board member of Segurar.com since 2012, Brazil's first online insurance company. Mr. Veloso has been also serving since 2010 as the Co-Founder of BRIC Chamber, an organization established to encourage people from around the world to meet and talk about the development and advancement of programs and services in the fields of investment, entrepreneurship and innovation in Brazil, Russia, India, China ("BRIC") and other emerging countries.

4

**Business Strategy**

While we may pursue an initial business combination target in any industry or geographic location, we intend to focus our search on middle market and emerging growth technology-focused companies in the Americas, in Fintech and Financial Services or SaaS and Technology. Most of these companies will ultimately need to consolidate to achieve the scale necessary to attain high revenue growth and attractive profitability. We believe that acquiring a leading emerging growth technology company will provide platform to fund consolidation and fuel growth for our company. Segments we might explore include, but are not limited to, technology and technologically enabled , industrial, supply chain, logistics, vehicles, security, and manufacturing businesses. There is no restriction in the geographic location of targets we can pursue, although we intend to initially prioritize the Americas as the geographical focus.

**Competitive Advantages**

We intend to capitalize on the following competitive advantages in our pursuit of a target company:

- *Established Deal Sourcing Network.* We believe the strong track record of our management team and our financial advisor, ARC Group Limited, will enable us to get access to quality deal pipeline. In addition, we believe we, through our management team and financial advisor, have contacts and sources from which to generate acquisition opportunities and possibly seek complementary follow-on business arrangements. These contacts and sources include those in government, private and public companies, private equity and venture capital funds, investment bankers, attorneys and accountants.

5

- ***Status as a Publicly Listed Acquisition Company***. We believe our structure will make us an attractive business combination partner to prospective target businesses. As a publicly listed company, we will offer a target business an alternative to the traditional initial public offering process. We believe that some target businesses will favor this alternative, which we believe is less expensive, while offering greater certainty of execution, than the traditional initial public offering process. During an initial public offering, there are typically underwriting fees and marketing expenses, which would be costlier than a business combination with us. Furthermore, once a proposed business combination is approved by our shareholders (if applicable) and the transaction is consummated, the target business will have effectively become public, whereas an initial public offering is always subject to the underwriter's ability to complete the offering, as well as general market conditions that could prevent the offering from occurring. Once public, we believe our target business would have greater access to capital and additional means of creating management incentives that are better aligned with shareholders' interests than it would as a private company. It can offer further benefits by augmenting a company's profile among potential new customers and vendors and aid in attracting talented management staffs.

**Industry Opportunity**

While we may acquire a business in any industry, our focus will be middle market and emerging growth technology-focused companies in the Americas, in SaaS and Technology or Fintech and Financial Services. We believe that our target industries are attractive for a number of reasons:

*SaaS and Technology*

We believe we are currently in the midst of a secular shift in the SaaS sub-segment of the technology industry, which is driving rapid growth in both annual spending and the number of actionable acquisition targets requiring a public market solution. This is driven in part by large corporations, which are constantly upgrading legacy technology and expanding their SaaS toolkits. We believe another major driver are new corporations which heavily rely in SaaS solutions given their cost-efficiency and scalability. Specifically, we see great opportunity in companies that are constantly evolving.

Private technology companies are fundamentally changing the world at an unprecedented pace by establishing new markets, creating new experiences and disrupting legacy industries. Key technological advances and practices, such as cloud computing, data analytics and intelligence platforms, open-source software development, developer-focused software tools, and software-defined networking, storage and computing, are allowing technology companies to rapidly effect change in every major sector of the global economy. Agile private technology companies have embraced these advances and practices to create business models and address market needs that will enable them to reach significant financial scale and create shareholder value.

*FinTech and Financial Services*

The FinTech landscape has matured from a niche venture market to an expansive global industry comprised of numerous large-scale institutionalized businesses that consistently experience strong growth in revenue and profits. FinTech adoption by both consumers and businesses continues to benefit from robust secular tailwinds including the growth in digital commerce, the proliferation of mobile technology, the ubiquitous acceptance of digital payments, and continuous technological advancement, positioning the sector for long-term growth. In 2019, the EY Global FinTech Adoption Index estimated that 64% of digitally active consumers globally utilized FinTech products and that consumer awareness of FinTech is even higher.

The number of technology company initial public offerings has also diminished. An average of 159 technology companies went public each year during the 1990s, according to the research firm Deal Logic. Since 2010, however, that yearly average plummeted to only 38, a 76% drop. That smaller initial public offering market has also been predominantly focused on so-called "unicorn" companies (meaning start-up, typically VC-backed companies, often focused on technology, with valuations of over $1 billion). The median market capitalization of a venture-backed initial public offering was about $660 million in 2012; in 2017 it was $1.1 billion, based on data from the University of Florida. We believe this means that very promising, but non-unicorn companies (such as we will likely target for our initial business combination) are in many instances missing out on the ability to do a traditional initial public offering.

6

Our management team believes that these factors present an intriguing paradox: a growing number of new companies have attracted more private capital. Yet once they flourish, they have a narrower exit route. In addition, that exit route is often reserved for larger companies, a substantial disadvantage for smaller private technology companies.

Ultimately, we believe this same paradox creates a long-term opportunity for stockholder return via an initial business combination with a smaller, high-performing private technology company or companies. Additionally, it provides a persuasive argument for such companies to join with us, as we believe they have fewer exit options than presently exist for unicorns.

## Acquisition Criteria

Consistent with our strategy, we have identified the following general criteria and guidelines that we believe are important in evaluating prospective target businesses. We intend to use these criteria and guidelines in evaluating acquisition opportunities, but we may decide to enter into our initial business combination with a target business that does not meet these criteria and guidelines.

- *Target Size*: Consistent with our investment thesis as described above, we plan to target businesses of total enterprise value from $400 million to $2 billion in the Americas, companies in the SaaS and Technology or Fintech and Financial Services

- *Businesses with Revenue and Earnings Growth Potential.* We will seek to acquire one or more businesses that have the potential for significant revenue and earnings growth through a combination of both existing and new product development, increased production capacity, expense reduction and synergistic follow-on acquisitions resulting in increased operating leverage.

- *Businesses with Potential for Strong Free Cash Flow Generation.* We will seek to acquire one or more businesses that have the potential to generate strong, stable and increasing free cash flow. We may also seek to prudently leverage this cash flow in order to enhance shareholder value.

- *Strong Management.* We will seek companies that have strong, experienced management teams in place, or are a platform to assemble an effective management team with a track record of driving growth and profitability. We will spend significant time assessing a company's leadership and human fabric, and maximizing its efficiency over time.

- *Benefit from Being a Public Company.*  We intend to acquire one or more businesses that will benefit from being publicly-traded and can effectively utilize the broader access to capital and the public profile that are associated with being a publicly traded company.

- *Defensible Market Position.* We intend to acquire one or more businesses that have a defensible market position, with demonstrated advantages when compared to their competitors and which create barriers to entry against new competitors.

These criteria are not intended to be exhaustive. Any evaluation relating to the merits of a particular initial business combination may be based, to the extent relevant, on these general guidelines as well as other considerations, factors and criteria that from time to time our management may deem relevant.

We have not contacted any of the prospective target businesses that Benessere Capital Acquisition Corporation or Maquia Capital Acquisition Corporation had considered and rejected. We do not currently intend to contact any of such targets; however, we may do so in the future if we become aware that the valuations, operations, profits or prospects of such target business, or the benefits of any potential transaction with such target business, would be attractive.

## Initial Business Combination

Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or

prospects. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

7

7/21/24, 6:20 PM    Case 8:24-cv-02161-KKM-AEP    Document 15    sec.gov/Archives/edgar/data/1849635/00...    Filed 09/12/24    Page 1258 of 1832    tm2124624d5_s1a.htm

PageID 4735

We anticipate structuring our initial business combination so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses. We may, however, structure our initial business combination such that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the prior owners of the target business, the target management team or stockholders or for other reasons, but we will only complete such business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act of 1940, as amended (the "Investment Company Act"). Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the business combination transaction. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock, shares or other equity interests of a target. In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our issued and outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be valued for purposes of the 80% fair market value test. If the business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the target businesses and we will treat the target businesses together as our initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable.

8

To the extent we effect our initial business combination with a company or business that may be financially unstable or in its early stages of development or growth, we may be affected by numerous risks inherent in such company or business. Although our management will endeavor to evaluate the risks inherent in a particular target business, we cannot assure you that we will properly ascertain or assess all significant risk factors.

In evaluating a prospective target business, we expect to conduct a thorough due diligence review which will encompass, among other things, meetings with incumbent management and employees, document reviews, inspection of facilities, as well as a review of financial, operational, legal and other information which will be made available to us.

The time required to select and evaluate a target business and to structure and complete our initial business combination, and the costs associated with this process, are not currently ascertainable with any degree of certainty. Any costs incurred with respect to the identification and evaluation of a prospective target business with which our initial business combination is not ultimately completed will result in our incurring losses and will reduce the funds we can use to complete another business combination.

**Sourcing of Potential Initial Business Combination Targets**

Certain members of our management team have spent significant portions of their careers working with businesses in the industries referred to above and have developed a wide network of professional services contacts and business relationships in that industry. The members of our board of directors also have executive management and public company experience with companies in the industries referred to above and bring additional relationships that further broaden our industry network.

This network has provided our management team with a flow of referrals that have resulted in numerous transactions. We believe that the network of contacts and relationships of our management team will provide us with an important source of acquisition opportunities. In addition, we anticipate that target business candidates will be brought to our attention from various unaffiliated sources, including investment market participants, private equity groups, investment banks, consultants, accounting firms and large business enterprises.

Members of our management team and our independent directors will directly or indirectly own founder shares and/or placement units following this offering and, accordingly, may have a conflict of interest in determining whether a particular target business is an appropriate business with which to effectuate our initial business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, each of our officers and directors presently has, and any of them in the future may have additional, fiduciary or contractual obligations to other entities pursuant to which such officer or director is or will be required to present a business combination opportunity to such entity. In particular, Patrick Orlando, our Chief Executive Officer and Chairman, serves as Chief Executive officer and director of Benessere Capital Acquisition Corp. and Eric Swider and Justin Shaner, our director nominees, both serve as directors of Benessere Capital Acquisition Corp. Benessere Capital Acquisition Corp. is a special purpose acquisition corporation that focuses its search for a business combination on technology-focused middle market and emerging growth companies in North, Central and South America, which overlaps with the industry and geographic scope of our search. Mr. Orlando also serves as a director of Maquia Capital Acquisition Corp., a special purpose acquisition corporation that initially focuses its search for a business combination with technology-focused middle market and emerging growth companies in North America. As of the date of this prospectus, neither Benessere Capital Acquisition Corp., nor Maquia Capital Acquisition Corp. has entered into a business combination. Further, each of our officers and directors may have a conflict of interest with respect to evaluating a particular business combination if the retention or resignation of any such officers and directors was included by a target business as a condition to any agreement with respect to our initial business combination.

In addition, our sponsor and our officers and directors may sponsor or form other special purpose acquisition companies similar to ours or may pursue other business or investment ventures during the period in which we are seeking an initial business combination. Any such companies, businesses or investments may present additional conflicts of interest in pursuing an initial business combination. However, we do not believe that any such potential conflicts would materially affect our ability to complete our initial business combination.

9

## Corporate Information

Our executive offices are located at 78 SW 7th Street, Miami, Florida 33130, and our telephone number is (305) 735-1517.

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act of 1933, as amended (the "Securities Act"), as modified by the Jumpstart Our Business Startups Act of 2012, or the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not emerging growth companies including, but not limited to, not being required to comply with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act of 2002, or the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an emerging growth company can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We intend to take advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) the last day of the fiscal year (a) following the fifth anniversary of the completion of this offering, (b) in which we have total annual gross revenue of at least $1.07 billion, or (c) in which we are deemed to be a large accelerated filer, which means the market value of our Class A common stock that is held by non-affiliates exceeds $700 million as of the prior June 30, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period. References herein to emerging growth company will have the meaning associated with it in the JOBS Act. Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our common stock held by non-affiliates exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues exceeded $100 million during such completed fiscal year and the market value of our common stock held by non-affiliates exceeds $700 million as of the prior June 30th.

## THE OFFERING

*In deciding whether to invest in our securities, you should take into account not only the backgrounds of the members of our management team, but also the special risks we face as a blank check company and the fact that this offering is not being conducted in compliance with Rule 419 promulgated under the Securities Act. You will not be entitled to protections normally afforded to investors in Rule 419 blank check offerings. You should carefully consider these and the other risks set forth in the section of this prospectus entitled "Risk Factors."*

Securities offered · · · · · · · · · · · · · · · · · 30,000,000 units (or 34,500,000 units if the underwriters' over-allotment option is exercised in full), at $10.00 per unit, each unit consisting of:

- one share of Class A common stock; and

- one-half of one redeemable warrant.

10

| Proposed Nasdaq symbols | Units: "DWACU" |
| | Class A Common Stock: "DWAC" |
| | Warrants: "DWACW" |

| Trading commencement and separation of Class A common stock and warrants | The units will begin trading on or promptly after the date of this prospectus. We expect the Class A common stock and warrants comprising the units will begin separate trading on the 90th business day following the date of this prospectus unless the representative informs us of its decision to allow earlier separate trading, subject to our having filed the Current Report on Form 8-K described below and having issued a press release announcing when such separate trading will begin. Once the shares of Class A common stock and warrants commence separate trading, holders will have the option to continue to hold units or separate their units into the component securities. Holders will need to have their brokers contact our transfer agent in order to separate the units into shares of Class A common stock and warrants. No fractional warrants will be issued upon separation of the units and only whole warrants will trade. Accordingly, unless you purchase at least two units, you will not be able to receive or trade a whole warrant. |

| Separate trading of the Class A common stock and warrants is prohibited until we have filed a Current Report on Form 8-K | In no event will the Class A common stock and warrants be traded separately until we have filed a Current Report on Form 8-K with the SEC containing an audited balance sheet reflecting our receipt of the gross proceeds at the closing of this offering. We will file the Current Report on Form 8-K promptly after the closing of this offering, which is anticipated to take place three business days from the date of this prospectus. If the underwriters' over-allotment option is exercised following the initial filing of such Current Report on Form 8-K, a second or amended Current Report on Form 8-K will be filed to provide updated financial information to reflect the exercise of the underwriters' over-allotment option. |

**Units:**

| Number outstanding before this offering and the private placement | 0 |
| Number or placement units to be sold in a private placement simultaneously with this offering | 1,174,109 [1] |
| Number outstanding after this offering and the private placement | 31,174,109 [1] |

**Common stock:**

| Number outstanding before this offering and the private placement | 8,625,000 shares of Class B common stock[2] |

11

| Number outstanding after this offering and the private placement | 38,824,109  shares of Class A common stock and Class B common stock[1][3] |

**Warrants:**

| Number outstanding before this offering and the private placement | 0 |

| Number of warrants to be outstanding after this offering and the private placement | 15,587,055 [1] |

| Exercisability | Each whole warrant is exercisable to purchase one share of our Class A common stock, subject to adjustment as provided herein. No fractional warrants will be issued upon separation of the units and only whole warrants will trade and are exercisable. |
| | We structured each unit to contain one-half of one redeemable warrant, with each whole warrant exercisable for one share of Class A common stock, as compared to units issued by some other similar special purpose acquisition companies which contain whole warrants exercisable for one whole share, in order to reduce the dilutive effect of the warrants upon completion of an initial business combination as compared to units that each contain a whole warrant to purchase one whole share, thus making us, we believe, a more attractive initial business combination partner for target businesses. |

(1) Assumes no exercise of the underwriters' over-allotment option and the forfeiture by our sponsor of 1,125,000 founder shares. Our sponsor has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) for an aggregate purchase price of $11,741,090 ($13,203,590 if the underwriters' over-allotment option is exercised in full). Each placement unit will be identical to the units sold in this offering, except as described in this prospectus. The placement units are not subject to forfeiture but will be subject to transfer restrictions as described in "Principal Stockholders — Transfers of Founder Shares and Placement Units".

(2) Includes 8,625,000 founder shares of which an aggregate of up to 1,125,000 shares are subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised.

(3) Comprised of 31,174,109 shares of Class A common stock (including 1,174,109 placement shares), 7,500,000 shares of Class B common stock (or founder shares) and 150,000 representative shares (172,500 representative shares if the underwriters' over-allotment option is exercised in full). The Class B common stock is convertible into shares of our Class A common stock on a one-for-one basis, subject to adjustment as described below adjacent to the caption "Founder shares conversion and anti-dilution rights."

12

| | |
|---|---|
| Exercise price | $11.50 per share, subject to adjustment as described herein. In addition, if (x) we issue additional shares of Class A common stock or equity-linked securities for capital raising purposes in connection with the closing of our initial business combination at an issue price or effective issue price of less than $9.20 per share of Class A common stock (with such issue price or effective issue price to be determined in good faith by our board of directors and, in the case of any such issuance to our sponsor or its affiliates, without taking into account any founder shares held by our sponsor or such affiliates, as applicable, prior to such issuance) (the "Newly Issued Price"), (y) the aggregate gross proceeds from such issuances represent more than 60% of the total equity proceeds, and interest thereon, available for the funding of our initial business combination on the date of the consummation of our initial business combination (net of redemptions), and (z) the volume weighted average trading price of our Class A common stock during the 20 trading day period starting on the trading day prior to the day on which we consummate our initial business combination (such price, the "Market Value") is below $9.20 per share, then the exercise price of the warrants will be adjusted (to the nearest cent) to be equal to 115% of the greater of the Market Value and the Newly Issued Price, and the $18.00 per share redemption trigger price described below under "Redemption of warrants" will be adjusted (to the nearest cent) to be equal to 180% of the greater of the Market Value and the Newly Issued Price. |
| Exercise period | The warrants will become exercisable on the later of:<br><br>• 30 days after the completion of our initial business combination, and<br><br>• 12 months from the closing of this offering;<br><br>provided in each case that we have an effective registration statement under the Securities Act covering the shares of Class A common stock issuable upon exercise of the warrants and a current prospectus relating to them is available (or we permit holders to exercise their warrants on a cashless basis under the circumstances specified in the warrant agreement).<br><br>We are not registering the shares of Class A common stock issuable upon exercise of the warrants at this time. However, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants, to cause such registration statement to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to those shares of Class A common stock until the warrants expire or are redeemed, as specified in the warrant agreement. If a registration statement covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is not effective by the 60th business day after the closing of our initial business combination, warrant holders may, until such time as there is an effective registration statement and during any period when we will have failed to maintain an effective registration statement, exercise warrants on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act or another exemption. If that exemption, or another exemption, is not available, holders will not be able to exercise their warrants on a cashless basis. |

13

The warrants will expire at 5:00 p.m., New York City time, five years after the completion of our initial business combination or earlier upon redemption or liquidation.  On the exercise of any warrant, the warrant exercise price will be paid directly to us and not placed in the trust account.

Redemption of warrants

Once the warrants become exercisable, we may redeem the outstanding warrants:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption given after the warrants become exercisable (the "30-day redemption period") to each warrant holder; and

- if, and only if, the reported last sale price of the Class A common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30-trading day period commencing after the warrants become exercisable and ending on the third trading day before we send the notice of redemption to the warrant holders.

We will not redeem the warrants as described above unless a registration statement under the Securities Act covering the issuance of the shares of Class A common stock issuable upon exercise of the warrants is then effective and a current prospectus relating to those shares of Class A common stock is available throughout the 30-day redemption period, except if the warrants may be exercised on a cashless basis and such cashless exercise is exempt from registration under the Securities Act. If and when the warrants become redeemable by us, we may not exercise our redemption right if the issuance of shares of Class A common stock upon exercise of the warrants is not exempt from registration or qualification under applicable state blue sky laws or we are unable to effect such registration or qualification. We will use our best efforts to register or qualify such shares of Class A common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in this offering.

14

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of Class A common stock issuable upon the exercise of our warrants. In such event, each holder would pay the exercise price by surrendering the warrants for that number of shares of Class A common stock equal to the quotient obtained by dividing (x) the product of the number of shares of Class A common stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" for this purpose shall mean the average reported last sale price of the Class A common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants.

Please see the section of this prospectus entitled "Description of Securities — Redeemable Warrants — Public Stockholders' Warrants" for additional information.

**Founder shares**

On January 20, 2021, our sponsor purchased 2,875,000 founder shares for an aggregate purchase price of $25,000, or approximately $0.003 per share. On July 1, 2021, we effected a three-for-one stock split, such that our sponsor held 8,625,000 founder shares. Effective as of July 2, 2021, our sponsor transferred 10,000 founder shares to our Chief Financial Officer and 7,500 shares to each of our independent director and director nominees. On August 18, 2021, 7,500 founder shares were returned to our sponsor from a former director nominee.  Prior to the initial investment in the company of $25,000 by our sponsor, the company had no assets, tangible or intangible. The per share purchase price of the founder shares was determined by dividing the amount of cash contributed to the company by the aggregate number of founder shares issued. The number of founder shares issued was determined based on the expectation that the founder shares would represent 20% of the outstanding shares after this offering (excluding the representative shares and the placement units and underlying securities). As such, our initial stockholders will collectively own approximately 22.3% of our issued and outstanding shares after this offering (including the placement shares to be issued to the sponsor and assuming they and the anchor investors do not purchase any units in this offering). Neither our sponsor nor any of our officers, directors or director nominees have expressed an intention to purchase any units in this offering. Up to 1,125,000 founder shares held by our sponsor will be subject to forfeiture by our sponsor depending on the extent to which the underwriters' over-allotment option is exercised so that our initial stockholders will maintain ownership of 20% of our common stock after this offering (excluding the representative shares and the placement units and underlying securities). We will effect a stock dividend or share contribution prior to this offering should the size of the offering change, in order to maintain such ownership percentage.

Subject to each anchor investor purchasing 100% of the units allocated to it, in connection with the closing of this offering, our sponsor will sell 150,000 founder shares to each anchor investor, or an aggregate of 1,650,000 founder shares to all 11 anchor investors, at a purchase price of $0.0029 per share.

15

The founder shares are identical to the shares of Class A common stock included in the units being sold in this offering, except that:

- the founder shares are shares of Class B common stock that automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination, on a one-for-one basis, subject to adjustment pursuant to certain anti-dilution rights, as described herein;

- the founder shares are subject to certain transfer restrictions, as described in more detail below;

- our sponsor, officers and directors have entered, and we anticipate our director nominees will enter, into a letter agreement with us, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to any founder shares, placement shares and public shares held by them in connection with a stockholder vote to approve an amendment to our amended and restated certificate of incorporation (A) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering or (B) with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) waive their rights to liquidating distributions from the trust account with respect to any founder shares and placement shares held by them if we fail to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

16

- pursuant to the letter agreement, our sponsor, officers, directors and director nominees will agree to vote any founder shares and placement shares held by them and any public shares they may acquire during or after this offering (including in open market and privately negotiated transactions) in favor of our initial business combination. If we submit our initial business combination to our public stockholders for a vote, we will complete our initial business combination only if a majority of the then outstanding shares of common stock present and entitled to vote at the meeting to approve the initial business combination are voted in favor of the initial business combination. As a result, in the event that only the minimum number of shares representing a quorum is present at a stockholders' meeting held to vote on our initial business combination, in addition to our initial stockholders' founder shares and placement shares and our anchor investors' founder shares (if any), we would need only 844,420, or 2.8%, of the 30,000,000 public shares sold in this offering to be voted in favor of an initial business combination in order to have our initial business combination approved (assuming the underwriters' over-allotment option is not exercised, that the initial stockholders do not purchase any units in this offering or units or shares in the after-market and that the 150,000 representative shares are voted in favor of the transaction). The anchor investors who purchase public shares in the offering and anchor founder shares are not included as founders for such purpose, however, if our anchor investors purchase all of the units that they have collectively expressed an interest in purchasing in this offering and vote their public shares in favor of our initial business combination, no affirmative votes from other public stockholders would be required to approve our initial business combination; and

- the anchor investors have entered into investment agreements with us and our sponsor, pursuant to which they have agreed to (i) waive their redemption rights with respect to any founder shares, held by them in connection with the completion of our initial business combination, and (ii) waive their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering, although they will be entitled to liquidating distributions from the trust account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame;

- the founder shares are entitled to registration rights.

| | |
|---|---|
| Transfer restrictions on founder shares | Our initial stockholders have agreed not to transfer, assign or sell any of their founder shares (or shares of common stock issuable upon conversion thereof) until the earlier to occur of: (A) six months after the completion of our initial business combination and (B) subsequent to our initial business combination, (x) if the reported last sale price of our Class A common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within any 30-trading day period commencing at least 150 days after our initial business combination , or (y) the date on which we complete a liquidation, merger, capital stock exchange or other similar transaction that results in all of our stockholders having the right to exchange their shares of common stock for cash, securities or other property (except as described herein under the section of this prospectus entitled "Principal Stockholders — Restrictions on Transfers of Founder Shares and Placement Units"). Any permitted transferees will be subject to the same |

restrictions and other agreements of our initial stockholders with respect to any founder shares. We refer to such transfer restrictions throughout this prospectus as the lock-up.

| | |
|---|---|
| Founder shares conversion and anti-dilution rights | The shares of Class B common stock will automatically convert into shares of our Class A common stock at the time of the consummation of our initial business combination on a one-for-one basis, subject to adjustment for stock splits, stock dividends, reorganizations, recapitalizations and the like, and subject to further adjustment as provided herein. In the case that additional shares of Class A common stock, or equity-linked securities, are issued or deemed issued in excess of the amounts offered in this prospectus and related to the closing of the initial business combination, the ratio at which shares of Class B common stock shall convert into shares of Class A common stock will be adjusted (unless the holders of a majority of the outstanding shares of Class B common stock agree to waive such adjustment with respect to any such issuance or deemed issuance) so that the number of shares of Class A common stock issuable upon conversion of all shares of Class B common stock will equal, in the aggregate, on an as-converted basis, 20% of the sum of the total number of all shares of common stock outstanding upon the completion of this offering (excluding the representative shares and the placement units and underlying securities) plus all shares of Class A common stock and equity-linked securities issued or deemed issued in connection with the initial business combination (excluding any shares or equity-linked securities issued, or to be issued, to any seller in the initial business combination or any private placement-equivalent units and their underlying securities issued to our sponsor or its affiliates upon conversion of working capital loans made to us). The term "equity-linked securities" refers to any debt or equity securities that are convertible, exercisable or exchangeable for shares of Class A common stock issued in a financing transaction in connection with our initial business combination, including but not limited to a private placement of equity or debt. Securities could be "deemed issued" for purposes of the conversion rate adjustment if such shares are issuable upon the conversion or exercise of convertible securities, warrants or similar securities. |
| Expressions of Interest | Our anchor investors(none of which are affiliated with any member of our management, our sponsor or any other anchor investor), have entered into investment agreements with our sponsor and us pursuant to which they each have expressed an interest to purchase up to 8.3% of the units sold in this offering (excluding any units sold upon exercise of the underwriters' over-allotment option), or 2,490,000 units (which would aggregate to 91.3% of the units subject to this offering if all such indications of interest become confirmed orders in full following effectiveness of the registration statement of which this prospectus forms a part). We do not expect that all of the anchor investors will be allocated the full 8.3% of the units to be sold, and such allocations will be determined by the underwriters subject to satisfying Nasdaq initial listing requirements, including the minimum number of round lot holders. There is also no guarantee that all anchor investors will participate in the offering. Subject to each anchor investor purchasing 100% of the units allocated to it, in connection with the closing of this offering our sponsor will sell 150,000 founder shares to each anchor investor, or an aggregate of 1,650,000 founder shares to all 11 anchor investors, at a purchase price of $0.0029 per share, which we refer to as the "anchor founder shares". The obligation of our sponsor to sell such anchor founder shares to each anchor investor is conditioned upon each such anchor investor purchasing all of the units in this offering, if any, it may be offered by the underwriters (which shall not exceed 8.3% of the units in this offering). However, the anchor investors' interest in the anchor founder shares will not be reduced if the underwriters allocate the anchor investors less than 8.3% of the units sold in this offering (excluding any units sold upon exercise of the underwriters' over-allotment option). Further, the anchor founder shares shall have the right not to be subject to adjustments or cutbacks in the event our sponsor agrees to any such adjustments or cutbacks (of its shares) in connection |

with our initial business combination. The anchor investors have agreed to (a) vote any anchor founder shares held by them in favor of our initial business combination and (b) subject any anchor founder shares held by them to the same lock-up restrictions as the founder shares held by our sponsor and independent directors. The negotiations between our sponsor, each anchor investor and us were separate and there are no arrangements or understandings among the anchor investors with regard to voting, including voting with respect to our initial business combination.

The anchor investors would not be required to (i) hold any units, shares of common stock or warrants they may purchase in this offering or thereafter for any amount of time, (ii) vote any shares of common stock they may own at the applicable time in favor of our initial business combination or (iii) refrain from exercising their right to redeem their public shares at the time of our initial business combination. However, if the anchor investors purchase units in this offering or our securities in the open market (or both) and hold such securities, they or any one of them could assert influence over our company, including with respect to our initial business combination. See "Risk Factors — Our anchor investors have provided indications of interest to purchase up to 91.3% of the units sold in this offering. Depending on how many units are purchased by the anchor investors, the trading volume, volatility and liquidity for our shares could be reduced, the trading price of our shares could be adversely affected and other investors could be prevented from influencing significant corporate decisions."

There can be no assurance that the anchor investors will acquire any units in this offering, or as to the amount of such units the anchor investors will retain, if any, prior to or upon the consummation of our initial business combination. In the event that the anchor investors purchase such units (either in this offering or after), continue to own units or shares at the time of the stockholder vote, and vote in favor of our initial business combination, no affirmative votes from other public stockholders would be required to approve our initial business combination. However, because our anchor investors would not be obligated to continue owning any public shares following the closing and would not be obligated to vote any public shares in favor of our initial business combination, we cannot assure you that any of these anchor investors will be stockholders at the time our stockholders vote on our initial business combination, and, if they are stockholders, we cannot assure you as to how such anchor investors will vote on any business combination.

17

| | |
|---|---|
| Voting Rights | Holders of record of the Class A common stock and holders of record of the Class B common stock will vote together as a single class on all matters submitted to a vote of our stockholders, with each share of common stock entitling the holder to one vote, except as required by law. |
| Placement units | Our sponsor has agreed to purchase an aggregate of 1,174,109 placement units (or 1,320,359 placement units if the underwriters' over-allotment option is exercised in full) at a price of $10.00 per unit, for an aggregate purchase price of $11,741,090 ($13,203,590) if the underwriters' over-allotment option is exercised in full). Each placement unit is identical to the units offered by this prospectus except as described below. There will be no redemption rights or liquidating distributions from the trust account with respect to the founder shares, placement shares or placement warrants, which will expire worthless if we do not consummate a business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering. Our initial stockholders have agreed to waive their redemption rights with respect to any founder shares or placement shares (i) in connection with the consummation of a business combination, (ii) in connection with a stockholder vote to amend our amended and restated certificate of incorporation to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto, to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the completion of this offering or with respect to any other provision relating to stockholders' rights or pre-initial business combination activity and (iii) if we fail to consummate a business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the completion of this offering or if we liquidate prior to the expiration of the 12-month period (or up to 18 month period, if we extend the time to complete a business combination as described in this prospectus). However, our initial stockholders will be entitled to redemption rights with respect to any public shares held by them if we fail to consummate a business combination or liquidate within the 12-month period (or up to 18-month period, if we extend the time to complete a business combination as described in this prospectus). |
| Transfer restrictions on placement units | The placement units and their component securities will not be transferable, assignable or saleable until 30 days after the consummation of our initial business combination except to permitted transferees. |

| Representative shares | Upon the closing of this offering, we will issue to the representative and/or its designee 150,000 shares of Class A common stock (172,500 shares of Class A common stock if the underwriters' over-allotment option is exercised in full). The holders of the representative shares have agreed not to transfer, assign or sell any such shares without our prior consent until the completion of our initial business combination. In addition, the holders of the representative shares have agreed (i) to waive their redemption rights (or right to participate in any tender offer) with respect to such shares in connection with the completion of our initial business combination and (ii) to waive their rights to liquidating distributions from the trust account with respect to such shares if we fail to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering . The representative shares are deemed to be underwriters' compensation by FINRA pursuant to FINRA Rule 5110. |
| --- | --- |
| Proceeds to be held in trust account | Nasdaq rules provide that at least 90% of the gross proceeds from this offering and the sale of the placement units be deposited in a trust account. Of the net proceeds of this offering and the sale of the placement units, $306,000,000, or $10.20 per unit ($351,900,000, or $10.20 per unit, if the underwriters' over-allotment option is exercised in full) will be placed into a trust account in the United States with Continental Stock Transfer & Trust Company acting as trustee.<br><br>These proceeds include $10,500,000 (or $12,075,000 if the underwriters' over-allotment option is exercised in full) in deferred underwriting commissions. |

|  | Except with respect to interest earned on the funds held in the trust account that may be released to us to pay our tax obligations and up to $100,000 of interest that may be used for our dissolution expenses, the proceeds from this offering and the sale of the placement units held in the trust account will not be released from the trust account until the earliest to occur of: (a) the completion of our initial business combination, (b) the redemption of any public shares properly submitted in connection with a stockholder vote to amend our amended and restated certificate of incorporation (i) to modify the substance or timing of our obligation to allow redemption in connection with our initial business combination or certain amendments to our charter prior thereto or to redeem 100% of our public shares if we do not complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering or (ii) with respect to any other provision relating to stockholders' rights or pre-business combination activity, and (c) the redemption of our public shares if we are unable to complete our initial business combination within 12 months (or up to 18 months, if we extend the time to complete a business combination as described in this prospectus) from the closing of this offering, subject to applicable law. The proceeds deposited in the trust account could become subject to the claims of our creditors, if any, which could have priority over the claims of our public stockholders. |
|---|---|
| Anticipated expenses and funding sources | Except as described above with respect to the payment of taxes, unless and until we complete our initial business combination, no proceeds held in the trust account will be available for our use. The proceeds held in the trust account will be invested only in U.S. government securities with a maturity of 185 days or less or in money market funds meeting certain conditions under Rule 2a-7 under the Investment Company Act which invest only in direct U.S. government treasury obligations. We will disclose in each quarterly and annual report filed with the SEC prior to our initial business combination whether the proceeds deposited in the trust account are invested in U.S. government treasury obligations or money market funds or a combination thereof. Based upon current interest rates, we expect the trust account to generate approximately $448,800 of pre-tax interest annually assuming an interest rate of 0.2% per year; however, we can provide no assurances regarding this amount. |

Unless and until we complete our initial business combination, we may pay our expenses only from:

- the net proceeds of this offering and the sale of the placement units not held in the trust account, which will be approximately $1,435,000 in working capital after the payment of approximately $556,090 in expenses relating to this offering; and

- any loans or additional investments from our sponsor, members of our management team or their affiliates or other third parties, although they are under no obligation to advance funds or invest in us, and provided that any such loans will not have any claim on the proceeds held in the trust account unless such proceeds are released to us upon completion of an initial business combination.

20

| Conditions to completing our initial business combination | Nasdaq rules require that we must complete one or more business combinations having an aggregate fair market value of at least 80% of the value of the assets held in the trust account (excluding the deferred underwriting commissions and taxes payable on the interest earned on the trust account) at the time of our signing a definitive agreement in connection with our initial business combination. Our board of directors will make the determination as to the fair market value of our initial business combination. If our board of directors is not able to independently determine the fair market value of our initial business combination target, we will obtain an opinion from an independent investment banking firm or another independent entity that commonly renders valuation opinions with respect to the satisfaction of such criteria. While we consider it unlikely that our board of directors will not be able to make an independent determination of the fair market value of our initial business combination target, it may be unable to do so if it is less familiar or experienced with the business of a particular target or if there is a significant amount of uncertainty as to the value of a target's assets or prospects. There is no limitation on our ability to raise funds privately, or through loans in connection with our initial business combination. Additionally, pursuant to Nasdaq rules, any initial business combination must be approved by a majority of our independent directors.

We anticipate structuring our initial business combination either (i) in such a way so that the post-transaction company in which our public stockholders own shares will own or acquire 100% of the equity interests or assets of the target business or businesses, or (ii) in such a way so that the post-transaction company owns or acquires less than 100% of such interests or assets of the target business in order to meet certain objectives of the target management team or stockholders, or for other reasons. However, we will only complete an initial business combination if the post-transaction company owns or acquires 50% or more of the outstanding voting securities of the target or otherwise acquires a controlling interest in the target sufficient for it not to be required to register as an investment company under the Investment Company Act.

Even if the post-transaction company owns or acquires 50% or more of the voting securities of the target, our stockholders prior to the initial business combination may collectively own a minority interest in the post-transaction company, depending on valuations ascribed to the target and us in the initial business combination. For example, we could pursue a transaction in which we issue a substantial number of new shares in exchange for all of the outstanding capital stock of a target. |

21

|  | In this case, we would acquire a 100% controlling interest in the target. However, as a result of the issuance of a substantial number of new shares, our stockholders immediately prior to our initial business combination could own less than a majority of our outstanding shares subsequent to our initial business combination. If less than 100% of the equity interests or assets of a target business or businesses are owned or acquired by the post-transaction company, the portion of such business or businesses that is owned or acquired is what will be taken into account for purposes of Nasdaq's 80% fair market value test. If the initial business combination involves more than one target business, the 80% fair market value test will be based on the aggregate value of all of the transactions and we will treat the target businesses together as the initial business combination for purposes of a tender offer or for seeking stockholder approval, as applicable. |
| Permitted purchases of public shares and public warrants by our affiliates | If we seek stockholder approval of our initial business combination and we do not conduct redemptions in connection with our initial business combination pursuant to the tender offer rules, our sponsor, initial stockholders, directors, officers, advisors or their affiliates (not including anchor investors who purchase public shares in the offering) may purchase public shares or public warrants in privately negotiated transactions or in the open market either prior to or following the completion of our initial business combination. There is no limit on the number of shares or warrants our sponsor, initial stockholders, directors, officers, advisors or |

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1276 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4753

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1278 of 1832
PageID 4755
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1281 of 1832
PageID 4758
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1291 of 1832
PageID 4768
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1292 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4769

7/21/24, 6:20 PM                                    sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1295 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4772

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
Document 1-5
Filed 09/12/24
Page 1300 of 1832
PageID 4777

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1301 of 1832
PageID 4778
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1309 of 1832
PageID 4786
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 1311 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4788

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1312 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4789

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1316 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4793

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1319 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4796

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1322 of 1832
PageID 4799
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
Document 15
Filed 09/12/24
Page 1325 of 1832
PageID 4802

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1327 of 1832
PageID 4804
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1329 of 1832
PageID 4806
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 1331 of 1832
PageID 4808
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1334 of 1832
PageID 4811
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
94/231

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 1339 of 1832
PageID 4816

sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 15    Filed 09/12/24    Page 1349 of 1832
PageID 4826
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1352 of 1832
PageID 4829
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1353 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4830

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1355 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4832

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
Document 15-5
Filed 09/12/24
Page 1360 of 1832
PageID 4837

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1364 of 1832
PageID 4841
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1369 of 1832
PageID 4846
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1370 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4847

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEB   Document 1-5   Filed 09/12/24   Page 1391 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4868

7/21/24, 6:20 PM Case 8:24-cv-02161-KKM-AEP Document 1-5 sec.gov/Archives/edgar/data/1849635/00011046599/112/524/m212re2g05_s1a9mon Page 1396 of 1832

PageID 4873

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1400 of 1832
PageID 4877
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEB Document 1-5 Filed 09/12/24 Page 1406 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4883

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1407 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4884

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1409 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4886

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1411 of 1832
PageID 4888
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1413 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4890

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1415 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4892

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1416 of 1832
PageID 4893
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1417 of 1832
PageID 4894
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1424 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4901

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1425 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4902

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1426 of 1832
PageID 4903
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1429 of 1832
PageID 4906
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEB   Document 1-5   Filed 09/12/24   Page 1431 of 1832
PageID 4908
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 1433 of 1832
PageID 4910
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM Case 8:24-cv-02161-KKM-AEP sec.gov/Archives/edgar/data/1849635/0001104659Document 1-521111753/tm2124Filed 09/12/24d5_s1a.htmPage 1439 of 1832

PageID 4916

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
Document 1-5
Filed 09/12/24
Page 1440 of 1832
PageID 4917

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1442 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4919

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1447 of 1832
PageID 4924
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 15   Filed 09/12/24   Page 1449 of 1832
PageID 4926
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1453 of 1832
PageID 4930
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1457 of 1832
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
PageID 4934

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/m2124d5_s1a.htm
Document 1-5
Filed 09/12/24
Page 1458 of 1832
PageID 4935

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1467 of 1832
PageID 4944
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm

7/21/24, 6:20 PM
Case 8:24-cv-02161-KKM-AEP
sec.gov/Archives/edgar/data/1849635/000110465921111753/tm2124624d5_s1a.htm
Document 15-5
Filed 09/12/24
Page 1471 of 1832
PageID 4948

# EXHIBIT 14

# IN THE CIRCUIT COURT OF THE 11th JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. _____

MICHAEL J. MELKERSEN, an individual

      Plaintiff,

v.

ARC GLOBAL INVESTMENTS II, LLC,
a Delaware Corporation,

-and-

PATRICK ORLANDO, an individual,

-and-

TRUMP MEDIA & TECHNOLOGY GROUP CORP.,
f/k/a DIGITAL WORLD ACQUISITION CORP.,
A Delaware Corporation,

-and-

ODYSSEY TRANSFER AND TRUST COMPANY,
A Minnesota Corporation,

      Defendants.

_____/

## **VERIFIED COMPLAINT**

Plaintiff Michael J. Melkersen ("Plaintiff" or "Melkersen"), *pro se*, sues Defendants ARC Global Investments II, LLC ("ARC"), Patrick Orlando ("Orlando"), Trump Media & Technology Group Corp., f/k/a Digital World Acquisition Corp. ("TMTG") and Odyssey Transfer and Trust Company ("Odyssey") (collectively referred to as "Defendants"), and alleges the following:

## **INTRODUCTION**

1.      Digital World Acquisition Corp. ("DWAC") is a special purpose acquisition company ("SPAC") that merged with Trump Media & Technology Group Corp. ("TMTG") on March 25, 2024.[1]  TMTG is the surviving entity post-merger with DWAC.  The term TMTG as used herein shall be used inclusively to include the surviving post-merger entity Trump Media & Technology Group Corp. as well as DWAC.  TMTG is responsible for all DWAC liabilities that existed prior to March 25, 2024, or that are based on DWAC acts or omissions that occurred prior to March 25, 2024.  The term DWAC when used herein shall mean Digital World Acquisition Corp. prior to the closing of its business combination with TMTG on March 25, 2024.

2.      ARC served as DWAC's sponsor, and Orlando, in turn, served as ARC's manager.

3.      Odyssey Transfer and Trust Company ("Odyssey") serves as the share-transfer and escrow agent for certain shares of TMTG common stock.

4.      In 2023, Plaintiff purchased LLC membership interests in ARC from ARC and Orlando, which granted Plaintiff an agreed-upon number of DWAC shares to be delivered to Plaintiff after consummation of the merger in the form of TMTG shares.

5.      Separately, between July 2022 and March 2023—at a time when ARC and DWAC were having liquidity issues—Plaintiff injected much needed capital into ARC by providing it with three significantly sized loans.  In consideration for those loans, ARC executed three convertible promissory notes, which, among other things: (1) granted Plaintiff a security interest in a specified number of DWAC securities, and (2) provided Plaintiff with the option of converting any unpaid

---

[1] The merger occurred by and through DWAC's subsidiary with TMTG, and upon consummation of the closing of the business combination, DWAC amended its charger and changed its name to TMTG as the surviving entity post-merger.

principal on his loans to additional DWAC securities after consummation of DWAC's merger with

TMTG.

6.      After the merger, Plaintiff exercised his option and converted all unpaid principal

due under those promissory notes to additional DWAC securities.

7.      Plaintiff has made demand upon Defendants that they register the shares belonging

to him in his name (or for ARC/Orlando to direct DWAC/TMTG to do so as ARC is entitled to do

under the DWAC/TMTG Merger Agreement and Registration Rights Agreement to which ARC

is a party), notify the transfer agent Odyssey Transfer and Trust Company ("Odyssey") of

Plaintiff's ownership interests to cause Odyssey to properly create the needed account and ledger

on its books and records to facilitate the issuance and transfer process, and otherwise cause the

transfer all of Plaintiff's shares to him. Notwithstanding Defendants' contractual obligations to do

so, Defendants have failed to abide by the terms of their prior agreements, have failed or otherwise

refused to register the shares belonging to Plaintiff into Plaintiff's name (or otherwise failing to

direct TMTG/DWAC to do so), failed to notify Odyssey of Plaintiff's share ownership or to request

that Odyssey create the necessary account and ledger recognizing Plaintiff's shares, and otherwise

failed to deliver the at-issue securities to Plaintiff, which necessitated the filing of this lawsuit.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff Michael Melkersen is an individual domiciled and residing in Puerto Rico.

9.      Defendant ARC Global Investments LLC is a Delaware limited liability company with its principal place of business at 78 SW 7th Street, Miami, Florida.

10.     Defendant Patrick Orlando is an individual domiciled and residing in Miami-Dade County, Florida.

11.     Defendant Digital World Acquisition Corp. is a Delaware corporation with its principal place of business in Florida.

12.     Defendant Trump Media and Technology Group is a Delaware corporation with its principal place of business in Florida.

13.     Venue is proper in Miami-Dade County, Florida because the MIPA (as herein defined) contains a forum selection clause, which states that "[t]he jurisdiction for any legal action with respect to this Agreement shall be exclusively vested in, and the Parties hereby submit to the jurisdiction of, the state and federal courts located in Miami-Dade County, Florida."  Venue is also appropriate with this Court because the Defendants regularly conduct and solicit business in Miami-Dade County and some of the wrongful acts at issue were committed in Miami-Dade County.

14.     All conditions precedent for filing and maintaining this action have been performed, waived, or excused.

## BACKGROUND

A.     **DWAC's Formation and Merger with Trump Media & Technology Group**

15.     DWAC was formed on December 11, 2020, for the purpose of effecting a merger or similar business combination following its initial public offering ("IPO").

4

16.     SPACs are publicly traded companies created for the sole purpose of acquiring an existing target company.

17.     After a SPAC completes its IPO, the SPAC uses the initial capital it raised to acquire a target company.

18.     Absent receiving an extension, SPACs are typically required to complete a business combination with a target company within a specified timeframe, usually 18 to 24 months.  If a business combination fails to occur by that time, the SPAC is forced to liquidate and return unused funds to its shareholders.

19.     SPACs are formed by "sponsors," who provide capital to cover the SPAC's initial expenses.  In exchange for this capital, sponsors receive an approximate 20% interest in the SPAC via Class B shares—which are typically referred to as "founder shares"—with the remaining 80% interest in the SPAC being held by the public in the form Class A shares.

20.     ARC was DWAC's sponsor.  As its sponsor, ARC received approximately 19% of the interest in DWAC, primarily in the form of Class B shares.

21.     At the time that DWAC made its initial public filings with the SEC in May 2021, ARC was listed as DWAC's sponsor and Orlando was listed as ARC's managing member.  From at least May 2021 through the present, Orlando served as ARC's managing member.

22.     On October 20, 2021, DWAC entered into a merger agreement with DWAC Merger Sub Inc., and TMTG. ARC executed that merger agreement as representative of the stockholders of DWAC and was defined as a "Party" to that agreement. Shareholders of DWAC securities (automatically converting to TMTG securities at the closing of the business combination), or persons entitled to such securities, including Melkersen, were and are intended third-party beneficiaries of the merger agreement, or should otherwise be entitled to rely upon the recognition

5

by ARC, DWAC and TMTG, as set out in the merger agreement, that failure to transfer securities as required by the merger agreement would result in irreparable harm.

23.    Specifically, the merger agreement contains the following clause, "Each Party acknowledges that the rights of each Party to consummate the transactions contemplated hereby are unique, recognizes and affirms that in the event of a breach of this Agreement by any Party, money damages may be inadequate and the non-breaching Parties may have not adequate remedy at law, and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by an applicable Party in accordance with their specific terms or were otherwise breached. Accordingly, each Party shall be entitled to seek an injunction or restraining order to prevent breaches of this Agreement and to seek to enforce specifically the terms and provisions hereof, without the requirement to post any bond or other security or to prove that money damages would be inadequate, this being in addition to any other right or remedy to which such Party may be entitled under this Agreement, at law or in equity."

**B.    Melkersen's Investment in DWAC Through ARC**

24.    Melkersen made several investments with ARC, entitling him to DWAC shares.

25.    First, on August 2, 2021, Melkersen signed a subscription agreement (the "Subscription Agreement") with ARC in which he purchased $100,000.00 of ARC's limited liability company interests (the "LLC Interests").  *See* Subscription Agreement dated August 2, 2021, attached hereto as **Exhibit 1.**

26.    As specified in the Subscription Agreement, Melkersen's purchase of LLC Interests entitled him to 25,000 shares of Class B common stock (or "Founder Shares") of DWAC.  *See* Ex. 1 at 1.

6

27.     Under the terms of the Subscription Agreement, although the DWAC shares were allocated to Melkersen, ARC retained possession of the shares, as well as voting rights of those shares "until the consummation of the Business Combination, following which time the Company [ARC] will distribute such securities to [Melkersen] . . . ." *Id.*

28.     In 2022, DWAC's planned merger with TMTG hit numerous roadblocks, including delays causes by separate investigations by the Securities and Exchange Commission ("SEC") and United States Department of Justice ("DOJ").

29.     As a result of those delays, DWAC needed additional liquidity to fund ongoing operations.

30.     During this time, Orlando contacted Melkersen to solicit additional funds. Specifically, Orlando asked Melkersen to loan funds to ARC, which ARC would, in turn, utilize to pay for DWAC's ongoing expenses.

31.     On July 14, 2022, Melkersen agreed to loan ARC $250,000.00.  In exchange, ARC issued a convertible promissory note to Melkersen in which ARC promised to repay Melkersen the amount loaned (the "First Convertible Promissory Note").  *See* Convertible Promissory Note dated July 14, 2022, attached hereto as **Exhibit 2.**

32.     The First Convertible Promissory Note granted Melkersen a security interest in and to 50,000 shares of DWAC, consisting of 25,000 Class A shares and 25,000 Class B shares, which shares ARC represented and warranted were "unencumbered" other than being subject to "applicable lock-up periods."  Ex. 2, § 1.

33.     The First Convertible Promissory Note also provided that "[w]ithin five (5) days after the business combination closing, [Melkersen] may elect to convert the full principal amount

7

into a package of securities of Digital World Acquisition Corp. ('SPAC') held by [ARC]." *Id.*, §

3.

34.    On July 18, 2022, Melkersen agreed to loan ARC an additional $50,000.00.  In

exchange, ARC issued a second convertible promissory note to Melkersen in which ARC promised

to repay Melkersen the amount loaned (the "Second Convertible Promissory Note").  *See*

Convertible Promissory Note dated July 18, 2022, attached hereto as **Exhibit 3.**

35.    The Second Convertible Promissory Note granted Melkersen a security interest in

and to 10,000 shares of DWAC, consisting of 5,000 Class A shares and 5,000 Class B shares,

which ARC again represented and warranted it owned "unencumbered" other than being subject

to "applicable lock-up periods."  Ex. 3, § 1.

36.    Like the First Convertible Promissory Note, the Second Convertible Promissory

Note also granted Melkersen the option to convert any unpaid principal into DWAC securities

within five days after the business combination between DWAC and TMTG.  *Id.*, § 3.

37.    In 2023, with the merger still delayed, DWAC required access to additional capital.

38.    Once again, Orlando solicited funds from Melkersen, and once again, Melkersen

obliged.

39.    On March 16, 2023, Melkersen entered into a Membership Interest Purchase

Agreement between him, as the "Buyer," and ARC and Orlando, as the "Seller" (the "MIPA").

*See* Membership Interest Purchase Agreement, dated March 16, 2023, attached hereto as **Exhibit**

**4.**

40.    The MIPA provides, in pertinent part, that Melkersen would purchase $350,000.00

of additional LLC Interests from ARC and Orlando.  Those LLC Interests equated to 500,000

DWAC shares, consisting of 250,000 Class A shares and 250,000 Class B shares, which were defined in the Agreement as the "Offered Units." Ex. 4, Recitals; *id.* at § 1.1.

41.    ARC and Orlando represented and warranted that they had the "complete legal right, power, and authority to transfer and deliver all the Offered Units free of any liens or encumbrances whatsoever." *Id.* § 2.1(b).

42.    The MIPA further provided that Melkersen had the "right to require the transfer agent [Odyssey] post-closing of the DWAC business combination to transfer to Buyer the DWAC shares as more particularly described herein [the Offered Units,]" which rights "survive[d] the consummation of the transactions contemplated hereby on the date hereof." *Id.* § 4.1.

43.    Similarly, the MIPA provided that, upon its execution, "Seller and Buyer shall execute and deliver such other documents and take such other action as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement." *Id.* § 6.1.

44.    The MIPA contained further assurances from the Seller [ARC and Orlando] that they would "not seek to amend or modify the ARCII Operating Agreements, or take any action under such Operating Agreements, that would materially and adversely impact [Melkersen's] rights under this Agreement." *Id.* § 6.1.

45.    As additional consideration for entry of the MIPA, Melkersen agreed to loan DWAC an additional $250,000.00. *Id.* § 1.2.

46.    In exchange for the additional $250,000.00 loan, on March 21, 2023, ARC issued a third convertible promissory note to Melkersen in which ARC promised to repay Melkersen the

amount loaned (the "Third Convertible Promissory Note"). *See* Convertible Promissory Note dated March 21, 2023, attached hereto as **Exhibit 5.**[2]

47.    The Third Convertible Promissory Note granted Melkersen a security interest in and to 25,000 Class A shares of DWAC and 25,000 warrants.. Ex. 5, § 1. ARC represented and warranted it owned the rights to the shares and warrants unencumbered. *Id.*

48.    The Third Convertible Promissory Note, like the prior two notes, granted Melkersen the option to convert the full principal amount of the loan into DWAC shares and/or warrants "[w]ithin five (5) days after the business combination closing [as between DWAC and TMTG] . . . ." *Id.*, § 3.

49.    On March 13, 2024, Melkersen recorded his security interest in the shares identified in the Promissory Notes, as well as the 500,000 DWAC shares purchased by way of the MIPA, with the Delaware Department of State. *See* UCC Financing Statements, dated March 13, 2024, attached hereto as Composite **Exhibit 6.**

**C.    DWAC Merges With TMTG and Melkersen Exercises His Conversion Rights**

50.    On March 22, 2024, DWAC shareholders voted to complete its merger with TMTG.

51.    On March 25, 2024, DWAC's merger with TMTG closed.

52.    As a result of the merger, DWAC Merger Sub Inc., a wholly owned subsidiary of DWAC, was merged into and became part of TMTG, with TMTG being the surviving company post-merger.

53.    ARC has not repaid any portion of the loans, and the Promissory Notes remain unpaid.

---

[2] The First Convertible Promissory Note, the Second Convertible Promissory Note, and Third Convertible Promissory Note shall be collectively referred to as the "Promissory Notes."

54.    On March 22, 2024, after DWAC voted to approve the TMTG merger but before the merger closed, Melkersen wrote to Orlando and ARC advising that he would be exercising his option under the Promissory Notes to convert the unpaid principal to DWAC securities in the manner specified in the Promissory Notes.

55.    On March 27, 2024, having not heard from ARC or Orlando, Melkersen provided formal notice that he was exercising his right to convert the unpaid principal due under the Promissory Notes into DWAC securities. *See* Correspondence from Melkersen to Orlando and ARC, dated March 27, 2024, attached hereto as **Exhibit 7.**

56.    In that correspondence, Melkersen also advised ARC and Orlando that the terms of the MIPA required ARC and Orlando to convey the 500,000 shares of DWAC—consisting of 250,000 Class A shares and 250,000 Class B shares—to Melkersen. *Id.* In doing so, Melkersen complied with the notice requirements of the MIPA and sent copies of the correspondence to both ARC and its designated legal counsel by certified mail, return receipt requested.

57.    As Melkersen advised ARC and Orlando, between Melkersen's initial 2021 investment in LLC Interests, Melkersen's conversion of the sums owed under the Promissory Notes to DWAC shares, and the shares conveyed by way of the MIPA, Melkersen was entitled to a total of 610,000 shares of DWAC stock, namely, 305,000 Class A shares, 305,000 Class B shares, and 25,000 warrants. *Id.* (These figures exclude additional shares Melkersen is entitled to as to all Class B shares in which Melkersen maintains an interests by an increase in those shares by a factor of 1.348 and such additional amount as determined in the True-Up Litigation discussed hereinafter).

58.    Per DWAC's Amended and Restated Certificate of Incorporation (the "DWAC Charter"), upon the consummation of the merger with TMTG, all Class B shares automatically

convert to Class A shares, but Class B shares are not converted to Class A shares on a one-to-one ratio. Rather, Class B shares are converted in accordance with a formula set forth in DWAC's Charter.

59.    At present, DWAC/TMTG and ARC are involved in pending litigation (the "True-Up Litigation") regarding the correct conversion ratio at which Class B shares will convert to Class A shares. DWAC has calculated the conversion ratio as 1.348:1, while ARC has calculated a higher conversion ratio. On information and belief, ARC calculates the ratio as 1.81:1.

60.    DWAC/TMTG has paid over these additional shares to ARC at the 1.348:1 ratio, which are held by Odyssey, and has escrowed with Odyssey additional shares calculated as the difference between the 1.348:1 ratio and a 2.0:1 ratio, all pending the outcome of the litigation between ARC and DWAC/TMTG in Delaware. Upon information and belief, two escrow accounts exist – one for those whose rights to B-shares derive from ARC membership interests, and one for others whose rights to B-shares derive from sources other than ARC membership interests. Given that Melkersen holds an ARC membership interest as well as converted promissory notes, Melkersen maintains rights in and two the escrowed shares in both escrow accounts held by Odyssey.

61.    Accordingly, pursuant to the agreements described above, Melkersen is entitled to, at a minimum, the 305,000 TMTG Class A shares derived from DWAC Class B shares owed to him under the MIPA and the Promissory Notes increased to 411,140 TMTG shares (305,000 x 1.348), along with the 305,000 TMTG Class A shares derived from DWAC Class A shares owed to Melkersen under the terms of the MIPA and the Promissory Notes, for a combined total of 716,140 shares owed to Melkersen by ARC and/or Orlando (Orlando is personally on the hook for the obligations under the MIPA). Melkersen is also owed by ARC the additional 25,000 warrants

under the terms of Promissory Note#3. Additionally, Melkersen will be owed such additional amount of TMTG Class A shares derived from DWAC Class B shares beyond 1.348:1 ratio, as determined by the outcome of the True-Up Litigation.

62.     Upon closing of the business combination which occurred March 25, 2024, all DWAC shares, including A Shares and B Shares, automatically converted into A Shares of TMTG on a 1:1 basis, except that the DWAC B Shares that automatically converted to TMTG A Shares remain subject to certain lockup provisions that restrict resale that follow those shares.

63.     The DWAC warrants automatically converted to TMTG warrants on a 1:1 basis at the closing of the business combination on March 25, 2024.  Beginning March 26, 2024, TMTG A shares that have been registered and are sellable on the public markets are traded under the ticker symbol DJT on the Nasdaq Stock Exchange ("Nasdaq"), and the TMTG warrants that have been registered and are sellable on the public markets are traded under the ticker symbol DJTWW on the Nasdaq.

64.     A single warrant entitles the holder of the warrant to exercise the option to purchase a single TMTG A share at $11.50 per share, but such warrants also maintain their own stand-alone value and, therefore, are regularly traded on the Nasdaq without the need to exercise the underlying option to purchase TMTG A shares at the $11.50 strike price.

65.     Melkersen demanded that ARC and Orlando provide instructions to DWAC's transfer agent responsible for registering shares, Odyssey Transfer and Trust Company ("Odyssey"), to register Melkersen's allotted shares in his name, and transfer those shares to Melkersen's personal brokerage account.  *See* Ex. 7.

66.     Melkersen also made demand on DWAC and TMTG that they honor Melkersen's agreements with ARC, given that DWAC benefitted from the money provided by Melkersen

pursuant to those agreements (the money Melkersen provided was either passed along to DWAC by ARC or provided directly by Melkersen to DWAC with ARC's consent) and given that TMTG benefitted by merging with DWAC that would not have occurred, but for Melkersen providing desperately needed funds at a time it was questionable whether DWAC could survive. Specifically, Melkersen requested that DWAC and TMTG: (a) direct Odyssey that Melkersen was the beneficial owner of the shares and warrants described herein; and (b) list Melkersen in the S1 registration statement to be filed with the SEC to recognize Melkersen, rather than ARC or Orlando, as the rightful owner of the shares described herein.

67.    DWAC and TMTG failed to direct Odyssey to recognize on its books and records that Melkersen was the rightful owner of the shares described herein despite the fact that there is no dispute that Melkersen is the rightful owner of those securities and despite the fact that both DWAC and TMTG had notice of Melkersen's correct ownership interest, as described herein, before providing the official written list to Odyssey identifying the owners of the unregistered securities.

68.    DWAC and TMTG also failed to list Melkersen as the rightful owner and registrant of the shares described herein, in either the S1 filed on April 15, 2024, or the amended S1 filed on June 10, 2024.   Instead, DWAC and TMTG included a footnote (footnote#18 in the most-recent amended S1 filed on June 10, 2024), indicating, "Mr. Melkersen claims beneficial ownership to 411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants through separate contractual agreements with ARC, which are not reflected in his beneficial ownership information for the reasons stated above."

69.    On April 14, 2024, TMTG provided a copy of its draft S1 for comment from those claiming ownership of the shares to be registered (to the extent that the party claiming ownership

14

responded to agree to confidentiality until the S1 was filed/made public, after which time the draft

was provided).  Melkersen requested and received the draft S1 and promptly and in writing advised

TMTG that the draft registration statement was incorrect because it failed to list Melkersen as the

true owner of the at-issue 411,140 Founder Shares, 305,000 shares of Common Stock and 25,000

Warrants, and instead, relegated Melkersen to a footnote indicating that Melkersen "claimed" such

ownership.  TMTG made this decision despite benefitting from the money paid by Melkersen for

such shares and despite knowing such ownership claims by Melkersen were true, given that

Melkersen had previously provided DWAC/TMTG copies of his agreements with ARC and

Orlando entitling Melkersen to the at-issue shares, which occurred well prior to the filing by

DWAC/TMTG of the S1 registration statements on April 15, 2024.

70.    For unknown reasons, DWAC/TMTG repeated this same mistake, by failing once

again to identify Melkersen as the true owner/registration of the at-issue 411,140 Founder Shares,

305,000 shares of Common Stock and 25,000 Warrants, when DWAC/TMTG filed its amended

S1 on June 10, 2024.

71.    In preparing to file its S1 on April 15, 2024, DWAC/TMTG distributed a form to

each of known owner of the DWAC/TMTG unregistered securities and requested that each person

or entity to complete the form to identify their specific ownership interests to facilitate the

inclusion of that information in the S1.  Melkersen timely completed that form as requested and

returned it to DWAC/TMTG as instructed. In that completed form,  Melkersen identified, *inter

alia*, the 411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants

described in foothote#18 of the S1 that he was supposed to have received from ARC and/or

Orlando and requested that DWAC/TMTG recognize Melkersen as the true owner of those

securities and list Melkersen as the sole and proper owner of those securities in the S1 to ensure
that such securities were registered Melkersen's name as the rightful owner of those shares.

72.    On information and belief, ARC and/or Orlando similarly completed the requested
DWAC/TMTG form and returned it to DWAC/TMTG prior to the April 15, 2024, S1 filing, but
ARC and/or Orlando failed to identify Melkersen as the proper owner and registrant of the 411,140
Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants referenced above.
Instead, on information and belief, ARC and/or Orlando falsely claimed that ARC was the owner
of such securities and that ARC was entitled to registration of those securities.

73.    Melkersen maintains other DWAC securities (which automatically converted to
TMTG securities at the closing of the business combination), which are not issue in this lawsuit,
that were purchased or otherwise acquired from DWAC or one of its affiliates, which include
TMTG A shares derived from DWAC A shares issued directly by DWAC and convertible notes
exercisable on similar conversion terms to the Promissory Notes at-issue in this case, as well as
TMTG warrants derived from DWAC warrants.   Unlike ARC, DWAC/TMTG properly and
promptly identified Melkersen as the owner of such DWAC securities (now automatically
converted into TMTG securities) in communications and directives sent to Odyssey on or about
March 25, 2024, the date of the closing of the business combination, which is the expected and
reasonable time for such actions to occur.   This has caused Odyssey to open accounts in
Melkersen's name and to identify these securities not at-issue in the current lawsuit as being owned
by Mekersen in the official Odyssey share list/register.

74.    To their further credit, DWAC/TMTG timely took steps to include these shares in
its S1 registration statement that was filed with the SEC to register the Melkersen's shares that are
not at-issue in this lawsuit, to enable those shares to be sellable on the open market.   ARC has

failed to take either of these steps, or to otherwise request Odyssey or DWAC/TMTG do so, with respect to the securities Melkersen is entitled to that are at-issue in the current lawsuit (411,140 Founder Shares, 305,000 shares of Common Stock, and 25,000 Warrants referenced in footnote#18 of the S1 filed by DWAC/TMTG on June 10, 2024).

75.     On information and belief, ARC has not paid and has otherwise been unable to pay its debts as they become due, including, on information and belief, at least 46 other noteholders (not counting the Melkersen Promissory Notes), which lenders, on information and belief, have collectively loaned ARC over $3 million dollars.

76.     On information and belief, ARC has minimal cash-on-hand or other liquidity to enable it to pay any money judgment that might be entered in Melkersen's favor if money damages were being sought in this action (they are not at this time other than payment of reasonable attorneys' fees and costs – Melkersen is an attorney), rather than the remedy of legal title, registration and transfer of the securities to which Melkersen is entitled and is seeking in this lawsuit.

77.     The stock price of DJT and DJTWW has been volatile since the closing of the business combination, making time of the essence to get the securities to which Melkersen is entitled from ARC registered and transferred to Melkersen to allow such securities to be traded on the public market and to permit Melkersen to attempt to mitigate any further harm that the actions and inactions of ARC/Orlando have caused and will continue to cause. DJT shares last closed at a price of $31.31 per share on June 18, 2024, and DJTWW last closed at a price of $20.64 per warrant on June 18, 2024. Given as much, the securities to which Melkersen is entitled from ARC/Orlando that are at-issue in this lawsuit (not counting the additional shares Melkersen is entitled to above 1.1348:1 in the True-Up Litigation), which have been wrongfully withheld from Melkersen, if

tradeable on the public market and registered in his name and transferred to Melkersen as required by his agreements, have a value of $22,938,343 ((305,000 TMTG A-Shares derived from DWAC A-Shares + 411,140 TMTG A-Shares derived from DWAC B-Shares) * $31.31/share) + 25,000 Warrants * 20.64), based on the June 18, 2024, closing prices.

78.     Because Melkersen is entitled to the specific securities described herein, the acts and inactions by ARC/Orlando in depriving Melkersen of his property has caused, is causing and will continue to cause Melkersen irreparable harm.  Irreparable harm further exists, and a money judgment would be an inadequate remedy (except with respect to Melkersen's attorneys' fees and costs sought herein), because of the nature of the at-issue shares, the peculiarity of the rights accompanying such shares (i.e. rights to additional shares in the True-Up Litigation), the difficulty of measuring damage given the volatility of the price, and because, on information and belief, it is doubtful that ARC/Orlando have the liquidity or resources to satisfy any money judgment if one were sought in lieu of recovery of the securities to which Melkersen is contractually entitled and in which he maintains a perfected security interest.   Moreover, the merger agreement, to which Melkersen is a third-party beneficiary, specifically envisions that the harms arising from the type of dispute at-issue in this lawsuit are irreparable and, for that independent reason, Melkersen is entitled to the relief sought herein, rather than a judgment at law, which would be inadequate.

79.     To date, neither ARC nor Orlando have made good on their prior contractual commitments to Melkersen, and Melkersen has not received any of his allotted shares detailed herein, despite repeated demands for delivery.

80.     On April 1, 2024, after Melkersen had already converted his Promissory Notes into the securities described herein, and after all other prerequisites to conversion had been satisfied, Orlando sent Melkersen, along with other noteholders, a mass email claiming: that ARC was

prepared to repay the Promissory Notes; that ARC was allegedly waiting to receive wiring instructions to make payment; that ARC purportedly had made repeated prior requests for payment instructions at the time of maturity of the Promissory Notes to allow repayment to be made; and that, if payment instructions were not promptly forthcoming, ARC would repay the loans represented by the Promissory Notes by depositing funds into escrow. ARC further advised that such funds, if not claimed within a reasonable time, are customarily delivered to the state's office of unclaimed property.

81.     In sending this bulk April 1, 2024, email, Orlando included a prior email purportedly sent to other noteholders who loaned money to ARC, in an apparent attempt to substantiate the false claim that Orlando/ARC had made prior requests for wiring instructions to Melkersen to facilitate repayment of the Promissory Notes. In fact, prior to the April 1, 2024, email, neither ARC nor Orlando made any request of Melkersen for payment instructions to repay the Promissory Notes, nor did they ever suggest to Melkersen that ARC intended to repay the Promissory Notes or otherwise make any attempt to repay the Promissory Notes.

82.     In any event, each of the Promissory Notes contain specific protections, not contained in ARC's notes with other lenders, that grant Melkersen the right to unilaterally extend the maturity dates on the Promissory Notes, and to unilaterally reject any attempted payment of the sums due under the Promissory Notes to preserve all rights under the Promissory Notes to convert them into the securities as more particularly described herein.

83.     In addition to ARC's wrongful repudiation of ARC's obligations to deliver the at-issue shares under the terms of the Promissory Notes (as well as its repeated failure to do so despite Melkersen's demands), on March 4, 2024, ARC/Orlando materially breached the MIPA by soliciting the members of ARC, including Melkersen, to agree to an Amended Operating

19

Agreement dated February 29, 2024 that, *inter alia*, sought to bar Orlando's removal as manager of ARC by requiring the vote of 100% of disinterested ARC members. ARC/Orlando sought such approval deceptively by including the approval language as part of that certain "Know Your Customer" form that Orlando stated was required to be completed to facilitate the transfer of DWAC/TMTG securities to ARC's members including Melkersen. In an action pending in the Delaware Chancery Court, Leon et als v. ARC & Orlando, the Defendants have affirmatively represented to that Court that the February 29, 2024, operating agreement has been adopted by ARC and now governs its affairs.

84. Melkersen never agreed to the Amended Operating Agreement (or any prior Operating Agreement for that matter), and instead, returned the KYC form with the required customer information, but not before removing the language approving the Amended Operating Agreement. Orlando/ARC never acknowledged the return of the KYC information by Melkersen, but instead, emailed Melkersen again on March 27, 2024, with a second attached "KYI" form that, yet again, deceptively sought approval of yet another version of an Amended Operating Agreement under the guise of attempting to obtain information to facilitate the distribution to Melkersen of the securities to which he is entitled.

85. Orlando has created at least one offshore trust located in Belize and managed by a Peruvian trustee. Melkersen believes that Orlando and ARC may attempt to transfer Melkersen's shares beyond the jurisdictional reach of this Court.

86. On information and belief, Orlando has transferred large sums of money out of ARC and into other SPACS in which Orlando holds an interest, which further calls into question the financial viability of ARC as a going concern.

87.     On information and belief, absent the requested injunctive relief, there is a risk that some of the at-issue shares belonging to Melkersen could be subject to potential forfeiture to the government because of the illegal or otherwise improper actions of ARC and/or Orlando, and the ongoing investigations and anticipated legal actions that will likely be filed, and because ARC and Orlando have wrongfully kept Melkersen's shares held in the name of ARC and/or Orlando, even though Melkersen is the beneficial owner of those shares, thereby potentially subjecting Melkersen to this additional risk of irreparable harm.

88.     On information and belief, post-business combination, TMTG controlled the actions of DWAC or otherwise had the power or authority to control DWAC or otherwise is a successor-in-interest to DWAC, by virtue of the business combination described herein, or has otherwise now become the same entity by virtue the name change of DWAC to TMTG as described in footnote 1 herein, and therefore, TMTG is responsible for the DWAC failures described herein, or is otherwise responsible.

### COUNT I – BREACH OF CONTRACT
### (Against Orlando and ARC)

89.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

90.     Melkersen, Orlando, and ARC entered into the MIPA whereby Melkersen agreed to purchase, and Orlando and ARC agreed to sell, LLC Interests in ARC equal to 250,000 Class A shares and 250,000 Class B shares of DWAC.

91.     By virtue of the true-up approved by DWAC/TMTG, the 250,000 Class B shares referred to in this Count that Melkersen is entitled to have increased, at a minimum, to a ratio of 1.348:1, to wit: 337,000 B Shares (250,000 x 1.348).  Melkersen is further entitled to additional

shares, above the 1.348:1 ratio, pending the outcome of the True-Up Litigation, which shares are currently sitting in escrow accounts maintained by Odyssey.

92.     The MIPA required ARC and Orlando to represent and warrant that they would transfer the specified number of shares to Melkersen upon completion of the merger.  Ex. 4, § 4.1.

93.     The MIPA further provided that "Seller and Buyer shall execute and deliver such other documents and take such other action as shall be reasonably requested by any other party hereto to carry out the transactions contemplated by this Agreement."  Ex. 4, § 6.1.

94.     Melkersen placed his confidence in ARC and Orlando to hold his shares in trust until such time that DWAC and TMTG merged, at which point ARC and Orlando were required to cause Melkersen's shares to be registered in his name and delivered to him.

95.     Orlando, as ARC's managing member, additionally owed fiduciary duties of loyalty and care to ARC's members, including Melkersen, who is a member of ARC by virtue of his purchase of LLC Interests in ARC.

96.     In reliance on ARC's and Orlando's representations, warranties, and assurances, Melkersen purchased LLC Interests in accordance with the terms of the MIPA.

97.     Despite ARC's and Orlando's representations, warranties, and assurances, ARC and Orlando breached the MIPA by refusing to appropriately register and deliver the securities to which Melkersen is entitled under the MIPA.

98.     Orlando and ARC further breached the MIPA by adopting or attempting to adopt the February 29, 2024, operating agreement which substantially increased the required vote necessary to remove Orlando as manager, which directly violates MIPA Section 6.1 which prohibits such operating agreement amendments.

99.    As a result of the foregoing breaches, Melkersen has been damaged in that he has been deprived of the DWAC/TMTG shares and warrants to which he is entitled.

100.    ARC and Orlando have been unjustly enriched in that they still hold legal title to Melkersen's shares, and to date, have refused to tender those shares to Melkersen.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendants Patrick Orlando and ARC Global Investments II, LLC for breach of the MIPA, and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's shares in his name and deliver those shares to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such shares in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the shares in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement entered into by DWAC/TMTG/ARC), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, dissipating, hypothecating or otherwise encumbering the shares to which Melkersen is entitled pursuant to the terms of the MIPA, (4) impose a constructive trust upon the shares ARC and Orlando have wrongfully detained, (5) award Melkersen his reasonable attorneys' fees and costs under Section 6.4 of the MIPA, and (6) award all other relief this Court deems just and proper.

## COUNT II – BREACH OF CONTRACT
### (Against ARC)

101.    Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

102.    Melkersen issued three loans to ARC totaling $550,000.00 in exchange for ARC executing the Promissory Notes.

103.    In accordance with the terms of the Promissory Notes, Melkersen exercised his option of converting the principal amount of the Promissory Notes to a total of 55,000 Class A shares, 30,000 Class B shares, and 25,000 warrants.

104.    By virtue of a true-up approved by DWAC/TMTG, the 30,000 Class B shares referred to in this Count that Melkersen is entitled to have increased, at a minimum, to a ratio of 1.348:1, to wit: 40,440 B Shares (30,000 x 1.348).

105.    All conditions precedent giving rise to the right of conversion of the Promissory Notes were satisfied to permit Melkersen to exercise his conversion rights, which Melkersen exercised in the manner and within the time required by the Promissory Notes.

106.    Since ARC was entitled to maintain legal title in the shares until the closing of the merger, the Promissory Notes required ARC to represent and warrant that it would not encumber those shares.  Ex. 2, § 1; Ex. 3, § 1; Ex. 5 § 1.

107.    Melkersen placed his confidence in ARC to hold his shares in trust until such time that DWAC and TMTG merged, at which point Melkersen's shares were required to be registered and delivered to him.

108.    In reliance on ARC's representations, warranties, and assurances set forth in the Promissory Notes, Melkersen loaned ARC sums, which Melkersen later converted to DWAC/TMTG shares.

24

109.     Despite ARC's representations, warranties, and assurances that ARC would deliver DWAC shares to Melkersen, ARC breached the terms of the Promissory Notes by failing and otherwise refusing to appropriately register and deliver Melkersen's shares to him.

110.     ARC further materially breached the terms of the Promissory Notes by disregarding Melkersen's conversion of the Promissory Notes into the at-issue securities, and thereafter, by claiming that ARC would be repaying the principal amounts of the Promissory Notes as set forth in the Orlando/ARC email to Melkersen on April 1, 2024.

111.     Melkersen is also entitled to further true-up, above the 1.348:1 ratio already paid over to ARC, in an amount to be determined by the Court in the True-Up Litigation, including the right to shares in that certain escrow account held by Odyssey. Melkersen made demand for those shares on ARC, by and through counsel, and was unequivocally informed that Melkersen, in his capacity as a noteholder, would be provided no additional TMTG shares derived from B-Shares to which Melkersen is entitled under the Promissory Notes, which constitutes breach by anticipatory repudiation of Melkersen's rights to such shares.

112.     As a result of the foregoing breaches, Melkersen has been damaged because he has been deprived of the TMTG securities to which he is entitled.

113.     ARC has been unjustly enriched because it still holds legal title Melkersen's securities to which Melkersen entitled.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, for breach of the Promissory Notes, and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's securities in his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise

identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities ARC has wrongfully detained, (5) award Melkersen his reasonable attorneys' fees and costs under Section 12 of the First and Second Convertible Promissory Notes, Section 13 of the Third Convertible Promissory Note, and (6) award all other relief this Court deems just and proper.

## COUNT III – BREACH OF CONTRACT
### (Against ARC and TMTG)

114.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

115.     ARC entered into the Subscription Agreement with Melkersen on August 2, 2021, whereby ARC agreed to provide Melkersen with an interest equal to 25,000 Founders Shares in DWAC in exchange for a $100,000 investment.

116.     Melkersen, ARC and DWAC (now TMTG) were all signatories to the Subscription Agreement.

26

117.    The Subscription Agreement contemplated that ARC and Melkersen would work cooperatively to agree upon and enter into a registration rights agreement to facilitate registration of the shares to which Melkersen was entitled, as well as an operating agreement. The contemplated registration rights agreement and the operating agreement were required to be "typical for transactions of this nature" but also that are "reasonably acceptable to the undersigned" (Melkersen, ARC and DWAC).

118.    The only operating agreement validly adopted by ARC occurred with its formation in December 2020.  No other operating agreement for ARC exists that is signed or otherwise expressly agreed to by Melkersen as required by the Subscription Agreement.  Yet, ARC has taken the position that Melkersen is subject to an operating agreement that ARC unilaterally adopted, without the consent of Melkersen, on August 4, 2021, <u>after</u> the execution of Melkersen's Subscription Agreement and the payment by Melkersen of his $100,000 for membership interests in ARC equal to 25,000 Founders Shares of DWAC, or alternatively, an operating agreement unilaterally adopted by Orlando on behalf of ARC on February 29, 2024.  Neither the August 4, 2021, operating agreement, nor the February 29, 2024, operating agreement were ever agreed to by Melkersen, and contains provisions, including those relating to dilution of Founders Shares, that are not "typical for transactions of this nature."  Moreover, even if the August 4, 2021, operating agreement were binding, Orlando's and ARC's attempts to replace it with the February 24, 2024, operating agreement (which increased the disinterested member voting requirement to remove Orlando as manager from 80% of the membership interest to 100% of the membership interest), constitutes a material breach of the MIPA as previously alleged herein.

119.     ARC's attempt to force Melkersen to be bound by an operating agreement he never agreed to and that is atypical for transactions of this nature constitutes a material breach of the Subscription Agreement.

120.     ARC and DWAC (now TMTG) failed to propose or otherwise execute any registration rights agreement in favor of Melkersen as required by the Subscription Agreement to facilitate the registration of Founders Shares that Melkersen is entitled to under the Subscription Agreement.  The failure by ARC or DWAC (now TMTG) to provide Melkersen with a registration rights agreement is a material breach of the Subscription Agreement.

121.     Because of the agreed upon true-up between DWAC/TMTG and ARC, Melkersen is entitled to, at a minimum, 33,700 Founders Shares (25,000 x 1.348) (now TMTG shares) under his Subscription Agreement.

122.     The failure to pay over the 33,700 shares that Melkersen is entitled to under his Subscription Agreement is a material breach of the Subscription Agreement by ARC and DWAC.

123.     The failure by ARC or DWAC to cause registration of the 33,700 shares that Melkersen is entitled to under his Subscription Agreement is a material breach of the Subscription Agreement by ARC and DWAC.

124.     Upon the conclusion of the business combination between DWAC and TMTG, neither ARC nor DWAC (now TMTG) took any action, despite Melkersen's repeated requests, to ensure that the shares to which Melkersen is entitled under the Subscription Agreement were transferred or otherwise conveyed to Melkersen, or otherwise registered in Melkersen's name. These failures by ARC and DWAC constitute material breaches of the Subscription Agreement.

125.    Melkersen is also entitled to further true-up, above the 1.348:1 ratio already paid over to ARC, in an amount to be determined by the Court in the True-Up Litigation, including the right to shares in that certain escrow account held by Odyssey.

126.    WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Digital World Acquisition Corp. and Trump Media and Technology Group for breach of the of Subscription Agreement, and prays for additional relief as follows: (1) order ARC and/or TMTG to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to register Melkersen's securities in his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto or, alternatively, order Odyssey directly to do so, (2) order Orlando and ARC to irrevocably direct TMTG in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or, alternatively, order TMTG directly to do so, (3) issue an immediate injunction prohibiting ARC or Orlando or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities ARC has wrongfully detained, and (6) award all other relief this Court deems just and proper.

## COUNT IV – REPLEVIN
### (Against Orlando, ARC, TMTG and Odyssey)

127.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

128.     This is an action to recover possession of personal property in Miami-Dade County, Florida.

129.     The property, as more fully described above, consists of: (1) 337,000 Class B shares of DWAC stock (now TMTG A-shares subject to lockup) and 250,0000 Class A shares of DWAC stock (now TMTG A-shares) to which Melkersen is entitled pursuant to the MIPA, (2) 40,440 Class B shares of DWAC stock (now TMTG A-shares subject to lockup), 55,000 Class A shares of DWAC stock (now TMTG A-shares), and 25,000 DWAC warrants (now TMTG warrants) to which Melkersen is entitled pursuant to the terms of the Promissory Notes, and (3) 33,700 Class B Shares of DWAC stock (now TMTG A-shares subject to lockup) pursuant to Melkersen's Subscription Agreement.  Melkersen is further entitled to his proportional share, based on the B shares of DWAC stock to which Melkersen is entitled under the agreements set forth herein, in an amount over the 1:348:1 ratio already paid over by DWAC/TMTG to ARC, depending on the outcome of the True-Up Litigation.

130.     Upon information and belief, the foregoing 716,140 shares are in Orlando's and/or ARC's custody or control in Miami-Dade County Florida.  Upon information and belief, the additional shares to which Melkersen will become entitled to upon conclusion of the True-Up Litigation, although held in trust by Odyssey, are in Orlando's and/or ARC's custody or control in Miami-Dade County Florida.

131.     Alternatively, Melkersen alleges that his 716,140 shares (and the additional true up shares to which Melkersen will become entitled referred to above) are in TMTG's control or

control of Odyssey, which control may be or has been exercised over such shares in Miami-Dade County Florida.

132.      Melkersen is entitled to possession of the aforementioned 716,140 shares pursuant to the terms of the MIPA, Promissory Notes and the Subscription Agreement (along with the additional shares referred to herein pending the result of the True-Up Litigation), but ARC and/or Orlando has wrongfully detained the shares in its own name, and on information and belief, while TMTG and/or Odyssey have the power to pay over the shares to which Melkersen is entitled as described herein, they have all failed to do so despite Melkersen's repeated demands for such shares.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Orlando, Trump Media and Technology Group Corp. and/or Odyssey Transfer and Trust Company for immediate return of his property, including an order setting forth those shares Melkersen is entitled to that are currently held in trust by Odyssey pending the result of the True-Up Litigation, and such other relief the Court deems just and proper.

### COUNT V – UNJUST ENRICHMENT
### (Against ARC/ORLANDO /DWAC/TMTG)
### (Pleaded in the Alternative to Breach of Contract Counts)

133.      Melkersen repeats and realleges all the allegations in paragraphs 1 through 88 as if fully set forth herein.

134.      In the alternative, at all times material, Melkersen conferred a direct benefit upon ARC/Orlando/DWAC (and ultimately also to TMTG by virtue of the merger) by providing funds to DWAC, by and through ARC at the request of Orlando, pursuant to the terms of the MIPA. DWAC was also directly involved in facilitating this funding and in approving it.

135.    Melkersen also conferred a direct benefit upon ARC/Orlando/DWAC (and ultimately also to TMTG by virtue of the merger) by providing loans to ARC, which were to be repaid in shares of DWAC stock.  On information and belief, the vast majority of the money Melkersen loaned to ARC as memorialized in the Promissory Notes, and paid by Melkersen in connection with the MIPA, information and belief, was paid over to DWAC by ARC or was otherwise used for DWAC's direct benefit. TMTG also benefited from the use of Melkersen's funds by virtue of the merger.

136.    DWAC (now TMTG) voluntarily accepted and retained the benefit of Melkersen's funds, which were loaned with the purpose of obtaining a specified number of DWAC shares as heretofore described and which benefitted DWAC (now TMTG).  These funds also benefitted ARC/Orlando who are now, on information and belief, entitled to a substantial number of shares that would have been otherwise lost had DWAC been forced to de-SPAC, which was likely to have occurred in the absence of Melkersen's infusion of cash into ARC, which then flowed through to DWAC.

137.    To be sure, the cash infusion made by Melkersen at the time of the MIPA was a last-ditch effort by DWAC/ARC to save DWAC from being delisted from the NASDAQ and being forced to de-SPAC, or otherwise dissolve, for insufficient liquidity needed to pay its obligations as they were becoming due.

138.    Under the circumstances, it would be inequitable for ARC and Orlando to accept and retain Melkersen's shares without delivering those shares to Melkersen, or for DWAC/TMTG not to make Melkersen whole by paying Melkersen the shares to which he would have been entitled to under the at-issue agreements, which is, at minimum, the fair value of the benefit that Melkersen conveyed upon ARC, DWAC and TMTG in light of the timing of Melkersen providing those

resources and the enormous benefit, as a financial lifeline, that these Defendants have enjoyed as a result of Melkersen's efforts and money.

139.     Accordingly, Orlando/ARC/DWAC/TMTG have been unjustly enriched by failing to deliver Melkersen's shares to him.

WHEREFORE, Plaintiff Michael Melkersen asks the Court to enter judgment against Defendant ARC Global Investments II, LLC, Orlando, and Trump Media and Technology Group and prays for additional relief as follows: (1) order Orlando and ARC to irrevocably direct Odyssey Transfer and Trust Company, in a signed writing, to transfer Melkersen's securities into his name and deliver those securities to Melkersen in the amounts more particularly set forth herein and/or to otherwise identify Melkersen as the owner of such securities in the official books and records of Odyssey with all attendant rights flowing therefrom or relating thereto, or alternatively, directly order Odyssey to do so, (2) order Orlando and ARC to irrevocably direct TMTG, in a signed writing to identify Melkersen as the owner of the securities in the amounts more particularly set forth herein on its books and records and in its registration statement, including any S1 or similar document, filed with the SEC and in any amendment, supplement or correction thereto, or any similar document, that is used to facilitate registration of TMTG securities that have not yet been registered (all of which ARC maintains the right to do under that certain Registration Rights Agreement to which DWAC, TMTG and ARC are signatories), or otherwise direct TMTG to directly do so, (3) issue an immediate injunction prohibiting Orlando or ARC or Odyssey from transferring, liquidating, hypothecating or otherwise encumbering the securities to which Melkersen is entitled, (4) impose a constructive trust upon the securities that Orlando and ARC have wrongfully detained, and (5) award such other relief this Court deems just and proper.

## COUNT V – DECLARATORY JUDGMENT
### (Against Orlando and ARC)

140.     Melkersen repeats and realleges all the allegations in paragraphs 1 through 88, as if fully set forth herein.

141.     The Court may "declare rights, status, and other equitable or legal relations whether or not further relief is or could be claimed." Fla. Stat. § 86.011.

142.     A plaintiff "claiming to be interested or who may be in doubt about his . . . rights under a . . . contract . . . may have determined any question of construction or validity arising under such . . . contract . . . ." Fla. Stat. § 86.021.

143.     Given ARC's and Orlando's refusal to register Melkersen's securities as described herein, and failure to deliver those shares to him pursuant to the terms of the MIPA and the Promissory Notes and the Subscription Agreement and the failure by TMTG and Odyssey to transfer such shares to Melkersen or otherwise cause such shares to register in Melkersen's name despite timely and repeated demands by Melkersen that they do so, Melkersen has a bona fide, actual, present, and practical need for a declaration from this Court that those contracts afford Melkersen the right to delivery and registration of those shares.

144.     Based on the foregoing allegations, real and substantial justiciable controversies exist between ARC and Orlando on the one hand, and Melkersen on the other hand.

145.     These are actual, definite, concrete, and substantial controversies that require an immediate determination of Melkersen's rights under the MIPA and Promissory Notes and the Subscription Agreement.

146.     Declaratory relief is appropriate here because such judgment will serve a useful purpose in clarifying Melkersen's rights under the MIPA and Promissory Notes and the Subscription Agreement.

147.     There is a bona fide, actual, present practical need for a declaration.  Declaratory relief will terminate and afford relief from uncertainty, insecurity, and controversy concerning the Melkersen's rights under the subject contracts.

148.     All antagonistic and adverse interests relating to the declaration sought herein are parties to this action.

149.     The relief sought is not merely to seek legal advice of the Court nor does Melkersen seek answers to questions propounded from mere curiosity.

150.     Melkersen is consequently entitled to a declaration of his rights pursuant to Fla. Stat. § 86.021.

151.     WHEREFORE, Plaintiff Michael Melkersen respectfully requests that this Court issue a judicial declaration that Melkersen is entitled to: (1) receive 250,000 Class A shares and 337,000 Class B shares (250,000 x 1.348) of DWAC stock (now TMTG stock) from ARC and Orlando pursuant to the terms of the MIPA, (2) 25,000 Class A shares and 33,700 Class B shares (25,000 x 1.348) of DWAC stock (now TMTG stock) from ARC pursuant to the terms of the First Convertible Promissory Note, (3) 5,000 Class A shares and 6,740 Class B shares of DWAC stock (now TMTG stock) pursuant to the terms of the Second Convertible Promissory Note, (4) 25,000 Class A shares of DWAC stock (now TMTG stock) and 25,000 warrants (now TMTG warrants) pursuant to the terms of the Third Convertible Promissory Note, (5) an additional proportional number of shares, above the 1.348:1 ratio, pending the outcome of the True-Up Litigation; (6) an injunction freezing the at-issue shares to require that they not be moved, transferred or otherwise

35

encumbered by any Defendant hereto until the resolution of this action, except for otherwise transferring and conveying such shares to Melkersen in the amounts requested herein, and (7) any and all further relief as the Court deems just and proper.

152.    As to all counts herein, except quantum meruit, Melkersen requests that the jury or the court, as applicable, award him his reasonable attorneys' fees and costs against ARC and Orlando.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury for all claims so triable.

Dated:  June 20, 2024.


Respectfully submitted,


By:    */s/ Michael Melkersen*_____
**MICHAEL MELKERSEN, *pro se***
Cedro Street #6, Palmas del Mar
Humacao, Puerto Rico 00791
540-435-2375 (Telephone)
540-242-3200 (Facsimile)
mike@mlawpc.com (Email)

## <u>VERIFICATION</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury, that I have read the allegations set forth in this Complaint, and with the exception of those allegations expressly based upon information and belief, the facts alleged herein are true and correct to the best of my knowledge.

Dated: June 20, 2024                    */s/ Michael Melkersen*_____
                                        Michael J. Melkersen

# EXHIBIT 15

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1511 of 1832 PageID 4988

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE No.

EDWIN B. TUCKER, WILLIAM MCGILTON,
FADI S. GARICA, DOUGLAS R. CASEY,
JOHN HUNT, JOHN A. HOLMES, AARON
TYRRELL, MICKEY KEENAN, and
MAVERICK HOLDINGS LLC

      Plaintiffs,

vs.

ARC GLOBAL INVESTMENTS II, LLC, and
DIGITAL WORLD ACQUISITION CORP., now
known as Trump Media & Technology Group,
Corp.,

      Defendants.

_____

## COMPLAINT

Plaintiffs hereby sue the defendants, and allege the following:

### Jurisdiction and Venue

*a.*    *Nature of Action and Jurisdiction.*

1.    This is an action for specific performance and, alternatively, for damages where the matter in controversy exceeds the sum of $6,000,000, exclusive of interest and costs.

2.    By this action, plaintiffs seek delivery of shares of Trump Media & Technology Group, Inc. free and clear of all claims, interests, and encumbrances pursuant to a series of convertible notes under which plaintiffs exercised their rights to convert the principal amounts of their notes into shares of stock. Plaintiffs also seek damages to the extent the delay in delivery of the shares causes them losses. Alternatively, plaintiffs seek compensatory damages for breach of contract.

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

3.    This court has jurisdiction of the matters alleged herein pursuant to section 26.012, Fla.Stat.

b.    *The Plaintiffs*

4.    Plaintiff Edwin B. Tucker is a citizen and resident of the State of Florida.

5.    Plaintiff William McGilton is a citizen and resident of the State of South Carolina.

6.    Plaintiff Fadi S. Garcia is a citizen and resident of the State of Florida.

7.    Plaintiff John Hunt is a resident of the State of Virginia.

8.    Plaintiff Douglas Casey is a resident of Uruguay.

9.    Plaintiff Maverick Holdings LLC is a limited liability company with its principal place of business in Miami-Dade County, Florida.

10.    Plaintiff John A. Holmes is a citizen and resident of the State of Florida.

11.    Plaintiff Aaron Tyrrell is a resident of the State of Florida.

12.    Plaintiff Mickey Keenan is a citizen and resident of the State of Florida.

c.    *The Defendants.*

13.    Defendant ARC Global Investments II, LLC ("ARC II") is organized and existing under the laws of Delaware with its principal place of business in Miami-Dade County, Florida.

14.    Defendant Digital World Acquisition Corp ("Digital World"), is a Delaware corporation with its principal place of business in Miami-Dade County, Florida. Digital World recently changed its name to Trump Media & Technology Group Corp.

d.    *Venue*

15.    The causes of action alleged herein arose in Miami-Dade County, Florida.

16.    Venue is proper in Miami-Dade County, Florida pursuant to section 47.011, Fla.Stat.

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

Factual Background

*a.    History of Digital World*

17.    ARC II is the "Sponsor" of Digital World.  ARC II is a shell corporation with no assets other than shares of Digital World.

18.    Digital World is a SPAC, which is a special purpose acquisition company, formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization, or similar business combination with one or more operating businesses. Digital World was incorporated by Defendant ARC II under the laws of the State of Delaware on December 11, 2020.  As an initial capital contribution, ARC II purchased 8,625,000 shares of Class B common stock of Digital World for $25,000.  ARCII's investment in Digital World stock funded Digital World's expenses.

19.    Beginning in February of 2021, Patrick Orlando, the managing member of ARC II, who would later become Digital World's CEO and Board Chairman, and others involved with Digital World, had extensive merger discussions with Trump Media & Technology Group, Inc., which owned and operated the social media platform Truth Social.

20.    On September 8, 2021, Digital World consummated an initial public offering (the "IPO") of 28,750,000 Units, with each Unit consisting of one share of Class A common stock and one-half of one redeemable Warrant, with each whole Warrant entitling the holder thereof to purchase one share of Class A common stock for $11.50 per share, pursuant to a Form S-1 filed with the Securities and Exchange Commission ("SEC"). The Units were sold at a price of $10.00 per Unit, generating gross proceeds to Digital World of $287,500,000.  Pursuant to the terms of the IPO, all of those funds were placed in escrow pending a merger transaction ("Business Combination"), at which time the Class A investors could decide to either redeem their investment or go forward as shareholders in the contemplated Business Combination.  In the

registration statement filed with the Securities and Exchange Commission ("SEC"), Digital World failed to disclose that it was already in extensive merger discussions with Trump Media & Technology Group, Inc.

21.    Simultaneously with the closing of the IPO, ARC II purchased 1,133,484 Placement Units of Digital World  in a private placement at a purchase price of $10.00 per Unit, generating gross proceeds of $11,334,840.  The Placement Units included one share of Class A Digital World common stock per Unit. These funds from the private placement were not required to be placed in escrow and were used to fund Digital World's expenses.

22.    On October 18, 2021, Digital World formed DWAC Merger Sub, Inc., a wholly owned subsidiary, solely for the purpose of consummating a merger with Trump Media & Technology Group, Inc.

23.    On October 20, 2021, an Agreement and Plan of Merger was entered into between Digital World (as parent of DWAC Merger Sub), DWAC Merger Sub (as one of the merging entities), Trump Media (as the other merging entity), and ARC II (as the representative of the shareholders of Digital World), which was subsequently amended by the First Amendment to Agreement and Plan of Merger, dated May 11, 2022, the Second Amendment to Agreement and Plan of Merger, dated August 9, 2023, and the Third Amendment to Agreement and Plan of Merger, dated September 29, 2023 (collectively the "Merger Agreement").

24.    Among other things, the Merger Agreement provided, upon completion of the merger, that:

a.    Trump Media & Technology Group, Inc. would be a wholly owned subsidiary of Digital World;

b.    The name of Digital World would be changed to Trump Media & Technology Group Corp.;

c.      The outstanding shares of Class A and Class B common stock of Digital World would be redesignated as common stock, par value $0.0001 per share, of Trump Media & Technology Group Corp.;

d.      The Class A shares of Digital World would be redesignated on a one-for-one basis for the new Trump Media & Technology Group Corp. common stock;

e.      The Class B shares of Digital World would be redesignated on at least a one-for-1.348 basis for the new Trump Media & Technology Group Corp. common stock, meaning that one share of Class B of Digital World would be redesignated for at least 1.348 shares of Trump Media & Technology Group Corp.

25.      On May 16, 2022, in connection with the Merger Agreement, Digital World filed a Form S-4 with the SEC. In that Form S-4, Digital World mischaracterized and omitted information about the history of its interactions with Trump Media & Technology Group, Inc. The SEC initiated an investigation and held up approval of the merger and the effective date of the Form S-4.

b.      *ARC II sells Convertible Notes to pay for lawyers to fight the SEC*

26.      Because of the SEC's actions relative to the Form S-4, Digital World needed to hire attorneys to help resolve the situation so that the merger could proceed.  Since Digital World could not spend the funds it raised in the IPO that were held in escrow, as the Sponsor of Digital World, ARC II needed to raise the funds to hire attorneys for Digital World to deal with the SEC.

27.      In and around September of 2022, ARC II raised approximately $3 million by selling convertible notes to various individuals.  True and correct copies of each ARC II Convertible Note Binding Term Sheet ("Agreement") sold to the plaintiffs are attached as

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

Exhibits A through I (the "Convertible Note(s)").  Each Convertible Note is identical as to its

terms.  Each of the plaintiffs is defined in the Convertible Notes as the "Lender."  Each

Convertible Note defines the "SPAC" as Digital World.

28.    Digital World knew of and approved the sale of the Convertible Notes to the

plaintiffs and others.  At the time of the sale of the Convertible Notes, Patrick Orlando was the

managing member of ARC II and CEO and Chairman of Digital World.  Digital World knew

that the sale of Convertible Notes was its direct benefit and it accepted the funds knowing of the

terms of the Convertible Note and the benefit it was receiving.

29.    In pertinent part, the Convertible Notes provide the loan principal may be

converted by the Lender into shares of the Business Combination that is created by the merger of

Digital World and an operating entity:

> Within three (3) Business Days after the closing of the SPAC's
> initial business combination (the "Business Combination"), the
> Lender may elect to convert the outstanding unpaid principal
> balance of the Loan into a package of securities of SPAC held by
> [ARC II].  For each $10 converted, the Lender will receive:
>
> (i)    One Class A share of SPAC [i.e., Digital World] ("Class A
>        Share"); and
>
> (ii)   Four Class B shares of SPAC [i.e., Digital World] ("Class
>        B Share"), for
>
> (iii)  An equivalent of 5 total shares for every $10 or $2.000 per
>        share.

30.    From the funds raised through the sale of the Convertible Notes, ARC II hired

attorneys who negotiated with the SEC.  On July 20, 2023, the SEC announced that it settled the

fraud charges against Digital World.

31.    On February 14, 2024, Digital World announced that the SEC declared effective

the Registration Statement on Form S-4 for the proposed Business Combination with Trump

Media & Technology Group, Inc.  It also announced that the Business Combination was subject
to the approval of the shareholders of Digital World.

c.      *Each plaintiff exercised the right to convert to shares of Digital World.*

32.     Each of the plaintiffs timely elected to convert the principal balance of their
Convertible Notes into Class A and B shares of Digital World through the delivery of separate
Notices of Exercise of Conversion Rights by their counsel on March 1, 2024, to ARC II.  True
and correct copies of counsel's transmittal letter of March 1, 2024, and the Notices of Exercise of
Conversion Rights that were transmitted therewith are attached as Exhibit J.

33.     On March 22, 2024, Digital World convened a virtual special meeting of
stockholders to consider and vote upon certain proposals related to the Merger Agreement.  At
the Special Meeting, the holders of 19,593,108 shares of Digital World Class A Common Stock,
or 65.32% of the voting power of all outstanding Digital World Class A Common Stock, and
7,158,025 shares of Digital World Class B Common Stock, or 100% of the voting power of all
outstanding shares of Digital World Class B Common Stock, were represented in person or by
proxy, which constituted a quorum.  At the Special Meeting, the stockholders approved the
proposal to approve and adopt the Merger Agreement and approve the Business Combination,
including the merger of Digital World Merger Sub with and into Trump Media and Technology
Group, Inc.  The stockholders of Digital World also approved the proposal that the name of
Digital World be changed to "Trump Media & Technology Group Corp."

34.     On March 25, 2024, Digital World and Trump Media & Technology Group, Inc.
jointly announced "the completion of their business combination (the 'Business Combination').
Digital World now operates as 'Trump Media & Technology Group Corp.'"  As a result, (a) each
share of Class A Digital World common stock was redesignated as one share of Trump Media &
Technology Group Corp. common stock, and (b) each share of Class B Digital World common

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

stock was redesignated as 1.348 shares of Trump Media & Technology Group Corp. common stock.

35.    On March 26, 2024, counsel for plaintiffs again notified ARC II in writing that the plaintiffs exercised their right to convert the principal balance of their Convertible Notes into shares of Digital World and again provided the Notices of Exercise of Conversion Rights signed by each of the plaintiffs.  A true and correct copy of this communication of March 26, 2024, is attached as Exhibit K.  In this communication, counsel for plaintiffs forwarded his prior communication of March 1, 2024, and the plaintiffs' Notices of Exercise of Conversion Rights executed by each of the plaintiffs which are attached as part of Exhibit J, and said:

> Dear Mr. Orlando:
>
> I am following up on my prior letters and emails.  I understand that a Business Combination, as that term is defined in the ARC II Convertible Notes (the "Notes") issued to my clients by ARC Global Investments II LLC ("ARC"), occurred on March 25, 2024.  The Notes state, "Within three (3) Business Days after the closing of the SPAC's initial business combination (the "Business Combination"), the Lender may elect to convert the outstanding unpaid principal of the Loan into a package of securities of SPAC held by Company," meaning held by ARC.  The SPAC is, of course, Digital Word Acquisition Corp. ("DWAC").
>
> Therefore, I am again providing you with my letter to you dated March 1, 2024, along with the Notices of Exercise of Conversion Rights of my clients and the chart showing the number of shares of DWAC to be issued to each of my clients.
>
> We expect prompt compliance.  Each day that passes creates risk and my clients will you hold you and ARC responsible for any losses they suffer as a result of delay.
>
> /s/Curtis Carlson

d.    *Digital World recognized its duty to issue shares to plaintiffs.*

36.    In the meantime, Digital World recognized its duty to issue shares of Trump Media & Technology Group Corp. to each of the plaintiffs pursuant to their exercise of the

conversion rights.

37.     On March 21, 2024, Digital World sent a form via DocuSign to all of the

Plaintiffs to confirm their election to convert all of the principal balances of their Convertible

Notes into shares of Digital World (the "Election Form").  True and correct copies of the

Election Forms signed by plaintiffs via DocuSign are attached as Exhibit L (Tucker), Exhibit M

(McGilton), Exhibit N (Garcia), Exhibit O (Casey), Exhibit P (Hunt), Exhibit Q (Keenan),

Exhibit R (Tyrrell) and Exhibit S (Maverick).  Plaintiff Holmes also signed the Election Form,

but cannot locate his copy of the form.  Each plaintiff chose Option 1 on the Election Form,

which states, "I hereby give written notice to the Company to irrevocably convert the principal

amount of the Convertible Note in accordance with the terms and conditions of the Agreement."

The Election Form is signed by "Digital World Acquisition Corp. Management."

38.     On March 27, 2024, which was still within three days from the completion of the

Business Combination with Trump Media & Technology Group, Inc., counsel for plaintiff sent

an email to Mr. Alex Cano of Digital World in order to deliver (a) counsel's letter of March 1,

2024, to ARC II, which is attached hereto as Exhibit J, (b) the Notices of Exercise of Conversion

Rights signed by each of the plaintiffs, which are included in Exhibit J, and (c) the follow-up

email to ARC II of March 26, 2024, which is attached hereto as Exhibit K, and to explain the

following:

> Dear Mr. Cano:
>
> I am forwarding herewith an email (with attachments) that I sent
> yesterday to Mr. Orlando in his capacity as a managing member of
> ARC Global Investments II LLC relating to the conversion of
> convertible notes into shares of DWAC by my clients.
>
> Please read my email and the attachments.
>
> /s/Curtis Carlson

39.     Digital World is now known as Trump Media & Technology Group Corp.

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

40.     Both ARC II and Trump Media & Technology Group Corp. have failed to deliver

shares of Trump Media & Technology Group Corp. to the plaintiffs as required by the

Convertible Notes, the Notices of Exercise of Conversion Rights, and the Election Forms.

41.     Pursuant to the terms of the Convertible Notes and the Merger Agreement, the

plaintiffs are entitled to shares of Trump Technology & Media Group Corp. in at least the

following amounts:

| Plaintiff | Principal | Shares of Class A DWAC | Shares of Class B DWAC | Shares of TMTG From Class A DWAC | Shares of TMTG From Class B DWAC | Total Shares of of TMTG |
|---|---|---|---|---|---|---|
| Edwin Tucker | $ 60,000.00 | 6,000 | 24,000 | 6,000 | 32,352 | 38,352 |
| William McGilton | $ 40,000.00 | 4,000 | 16,000 | 4,000 | 21,568 | 25,568 |
| Douglas R. Casey | $100,000.00 | 10,000 | 40,000 | 10,000 | 53,920 | 63,920 |
| Fadi Garcia | $ 10,000.00 | 1,000 | 4,000 | 1,000 | 5,392 | 6,392 |
| Maverick Holdings | $ 10,000.00 | 1,000 | 4,000 | 1,000 | 5,392 | 6,392 |
| John Hunt | $ 10,000.00 | 1,000 | 4,000 | 1,000 | 5,392 | 6,392 |
| John Holmes | $ 50,000.00 | 5,000 | 20,000 | 5,000 | 26,960 | 31,960 |
| Aaron Tyrrell | $100,000.00 | 10,000 | 40,000 | 10,000 | 53,920 | 63,920 |
| Michael Keenan | $ 25,000.00 | 25,000 | 10,000 | 2,500 | 13,480 | 15,980 |
| Totals | | | | | | 258,876 |

## COUNT I

42.     This is an action against both defendants for specific performance of the

Convertible Notes to deliver shares of Trump Media & Technology Group Corp and for damages

to the extent a delay in the delivery causes plaintiffs to sustain a decline in the value of the shares

with interest thereon. Plaintiffs adopt and reallege the allegations in the previous paragraphs.

43.     The plaintiffs purchased Convertible Notes totaling $380,000 from ARC II in

these amounts as shown in the Exhibit indicated:

| Plaintiff | Amount | Exhibit |
|---|---|---|
| Edwin B. Tucker | $60,000 | A |
| William McGilton | $40,000 | B |
| Fadi S. Garcia | $10,000 | C |
| Douglas R. Casey | $100,000 | D |
| John Hunt | $10,000 | E |
| John A. Holmes | $50,000 | F |
| Micheal Keenan | $25,000 | G |
| Aaron Tyrrell | $100,000 | H |

10

Maverick Holdings    $10,000              I

44.    The essential terms of the Convertible Notes are clear, definite, certain, and complete as to each Lender's rights relative to conversion of principal into shares of Digital World, which is now known as Trump Media & Technology Group Corp.

45.    The plaintiffs have each timely exercised their rights to convert the principal balances of their Convertible Notes into shares of Trump Media & Technology Group Corp. by delivering (a) the Notices of Exercise of Conversion Rights, and (b) the Election Forms.

46.    Both ARC II and Trump Media & Technology Group Corp. have failed and refused to deliver shares of Trump Media & Technology Group Corp. as required by the Convertible Notes, the Notices of Exercise of Conversion Rights, and the Election Forms.

47.    Because of the defendants' failure to deliver shares of Trump Media & Technology Group Corp. as required by the Convertible Notes, (a) ARCII is in breach of the Convertible Notes, and (b) Trump Media & Technology Group Corp. is in breach of the Election Forms.

48.    Under the circumstances alleged herein, damages at law would be incomplete and inadequate.

49.    Justice demands that the Convertible Notes be enforced and defendants be required to specifically perform and deliver shares of Trump Media & Technology Group Corp. in at least the amounts set forth in paragraph 41.

WHEREFORE, plaintiffs pray for entry of judgment in their favor requiring the defendants to specifically perform their obligations under the Convertible Notes and the Election Forms and to award compensatory damages with interest thereon for the delay in delivery, and the costs of this action.

## COUNT II

50.    In the alternative, this is an action for damages for breach of contract.  Plaintiffs adopt and reallege the allegations of paragraphs 1 through 41.

51.    Plaintiffs and ARC II entered into binding contracts in the form of the Convertible Notes.  Plaintiffs timely exercised their rights to convert the principal balances of their Convertible Notes to shares of Digital World, which is now known as Trump Media & Technology Group Corp.

52.    ARC II has breached the Convertible Notes by failing to deliver to plaintiffs shares of Digital World, now known as Trump Media & Technology Group Corp.

53.    Plaintiffs have been damaged as a result of the failure to deliver the shares.

WHEREFORE, plaintiffs pray for entry of judgment in their favor and against ARC II for compensatory damages, interest thereon, and the costs of this action.

*Counsel for Plaintiffs:*

CARLSON & ASSOCIATES, P.A.


By: /s/Curtis Carlson
          Curtis Carlson, FBN 236640
          2655 South LeJeune Road
          Suite 1108
          Coral Gables, FL 33134
          Tel: 305-372-9700
          Email: carlson@carlson-law.net

CARLSON & ASSOCIATES, P.A.
2655 South Le Jeune Road • Suite 1108 • Coral Gables Florida 33134 • 305-372-9700

# EXHIBIT 16

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF New York

----------------------------------------

DAN AKERS, JOSHUA RYAN ARANT, DAVID BRAGGINS, ANDREW CLARK, BRETT HEATH, CLARK HEATH AS TRUSTEE OF THE HEATH FAMILY TRUST, DEREK HEATH, SEAN HEATH, CHRISTOFFER KJELDSEN, JAMES NELSON, PDS FAMILY HYCET TRUST, EDWARD PREBLE, SUNDEEP SARA, JAMES RYAN SIMMONS, IAN SELLS, and TIMOTHY B. TOTTEN,

Index No. [type in Index No]

Summons

                                    Plaintiff(s),

                *-against-*

ARC GLOBAL INVESTMENTS II LLC

Date Index No. Purchased: May 15, 2024

                                    Defendant(s).

To the above named Defendant(s)

ARC Global Investments II LLC, 78 SW 7th Street, Miami, FL 33130

You are hereby summoned to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorney within 20 days after the service of this summons, exclusive of the day of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

The basis of venue is CPLR § 501

which is stated in the "Governing Law" section of each contract quoted in Complaint paragraph 23.

Dated: New York, New York

May 15, 2024

Chiipman Brown Cicero & Cole LLP

by_____

Adam D. Cole

Attorneys for Plaintiff

501 Fifth Avenue, 15th Floor
New York, NY 10017

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1525 of 1832
PageID 5002

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------x

DAN AKERS, JOSHUA RYAN ARANT, : \
DAVID BRAGGINS, ANDREW CLARK, : \
BRETT HEATH, CLARK HEATH AS : \
TRUSTEE OF THE HEATH FAMILY : \
TRUST, DEREK HEATH, SEAN HEATH, : \
CHRISTOFFER KJELDSEN, JAMES : \
NELSON, PDS FAMILY HYCET TRUST, : \
EDWARD PREBLE, SUNDEEP SARA, : \
JAMES RYAN SIMMONS, IAN SELLS, : \
and TIMOTHY B. TOTTEN, :

                    Plaintiffs, :

                         :        Index No: _____

      -against- :

                         :       **COMPLAINT**

ARC GLOBAL INVESTMENTS II LLC :

                Defendant. :

-------------------------------------------------------x

      Plaintiffs Dan Akers, Joshua Ryan Arant, David Braggins, Andrew Clark, Brett Heath,

Clark Heath as Trustee of The Heath Family Trust, Derek Heath, Sean Heath, Christoffer Kjeldsen,

James Nelson, PDS Family Hycet Trust, Edward Preble, Sundeep Sara, James Ryan Simmons, Ian

Sells, and Timothy B. Totten (collectively, the "Plaintiffs"), by and through their undersigned

attorneys, Chipman Brown Cicero & Cole LLP, bring this complaint against Defendant ARC

Global Investments II LLC ("ARC Global" or "Defendant") and allege as follows:

## INTRODUCTION

      1.    This dispute arises out of ARC Global's failure to deliver stock owed to each

Plaintiff pursuant to an ARC II Convertible Note Binding Term Sheet (the "Convertible Note")

entered into between ARC Global and each Plaintiff.  The Convertible Notes contain personal

information, are the subject to confidentiality and are available if so ordered.

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM

NYSCEF DOC. NO. 1

INDEX NO. 652515/2024

RECEIVED NYSCEF: 05/16/2024

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1526 of 1832
PageID 5003

2.     The Convertible Notes issued to each Lender are identical and were entered between September 2, 2022 and September 7, 2022 for certain Plaintiffs, and in November 2022 for another.

3.     Each Plaintiff provided capital to ARC Global in its role as the sponsor of Digital World Acquisition Corporation, the Special Purpose Acquisition Company ("DWAC") that merged with Trump Media & Technology Group ("TMTG").  ARC Global marketed the Convertible Notes to Plaintiffs as a structure through which Plaintiffs would receive TMTG stock upon the merger, and it was the promise of receiving the stock that induced each Plaintiff into entering the Convertible Notes.

4.     The Plaintiffs timely and duly exercised their conversion rights under the Convertible Notes to receive TMTG stock and have been stonewalled by ARC Global in its has failed to deliver the shares, thereby breaching the Convertible Notes and depriving the Plaintiffs of the economic benefit of the shares to which they are entitled, as well as the ability to hold or sell those shares at a moment of their own choosing.

5.     By this action, Plaintiffs seek equitable and injunctive relief requiring ARC Global to deliver the TMTG stock to which Plaintiffs are each entitled.  The Convertible Notes are clear and unambiguous and there can be no debate that ARC Global materially breached the Convertible Notes by refusing to deliver the TMTG stock.  Alternatively, the Plaintiffs are entitled to damages in an amount to be determined at trial including, but not limited to, damages equal to the full value of the TMTG stock to which they were entitled on the conversion dates.

## THE PARTIES

6.     Plaintiff Dan Akers is an individual residing in Georgetown, Texas.

7.     Plaintiff Joshua Arent is an individual residing in Humacao, Puerto Rico.

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM
NYSCEF DOC. NO. 1

INDEX NO. 652515/2024

RECEIVED NYSCEF: 05/16/2024

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1527 of 1832
PageID 5004

8.      Plaintiff David Braggins is an individual residing in Humacao, Puerto Rico.

9.      Plaintiff Andrew Clark is an individual residing in Toronto, Canada.

10.     Plaintiff Brett Heath is an individual residing in Humacao, Puerto Rico.

11.     Plaintiff Clark Heath is an individual residing in Cota de Caza, California and is the Trustee of the Heath Family Trust.

12.     Plaintiff Derek Heath is an individual residing in Humacao, Puerto Rico.

13.     Plaintiff Sean Heath is an individual residing in Aliso Viejo, California.

14.     Plaintiff Christoffer Kjeldsen is an individual residing in Florida.

15.     Plaintiff James Nelson is an individual residing in Dorado, Puerto Rico.

16.     Plaintiff PDS Family Hycet Trust is a trust with its situs in Brooklyn, New York.

17.     Plaintiff Edward Preble is an individual residing in Fernandina, Florida.

18.     Plaintiff Sundeep Sara is an individual residing in Ontario, Canada.

19.     Plaintiff Ian Sells is an individual residing in San Diego, California.

20.     Plaintiff James Simmons is an individual residing in Houston, Texas.

21.     Plaintiff Timothy B. Totten is an individual residing in Humacao, Puerto Rico.

22.     Defendant ARC Global Investments II LLC is a Delaware Limited Liability Company that was formed as the sponsor of the Special Purpose Acquisition Company, DWAC. Upon information and belief, ARC's principal place of business is 78 SW 7th Street, Miami, FL 33130.  ARC's *de facto* managing member is Patrick Orlando ("Orlando"), who is a resident of Miami, Florida.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction to hear the matter before it and venue is proper by agreement of the parties pursuant to CPLR § 501, and/or New York General Obligations Law §5-

3

Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1528 of 1832
PageID 5005

1402. Specifically, each Convertible Note includes a section entitled "Governing Law" which states:

> Each party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the state and federal courts seated in New York County, New York (and any appellate courts thereof) in any action or proceeding arising out of or relating to this Term Sheet, and each of the parties hereby irrevocably and unconditionally (a) agrees not to commence any such action or proceeding except in such courts, (b) agrees that any claim in respect of any such action or proceeding may be heard and determined in such court, (c) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any such action or proceeding in any such court, and (d) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

## **FACTUAL ALLEGATIONS**

**ARC Global**

24.    ARC Global was formed on December 11, 2020 under the Delaware Limited Liability Company Act.

25.    ARC Global was formed to act as the sponsor of DWAC, a special purpose acquisition company ("SPAC") also formed under Delaware law on December 11, 2020. Upon information and belief, DWAC was formed to merge with a "middle market and emerging growth technology-focused compan[y] in the Americas, in SaaS and Technology or Fintech and Financial Services."

26.    Based upon its public filings with the Securities and Exchange Commission, as of September 24, 2021, ARC Global held 6,623,484 shares of DWAC stock consisting of (i) 5,490,000 shares of Class B common stock, convertible into shares of DWAC Class A common upon a business combination, and (ii) 1,133,484 shares of DWAC Class A common stock underlying units (consisting of one share of Class A common stock and one-half of one warrant to purchase of one share of Class A common stock).

4

27.     DWAC ultimately merged with Trump Media and Technology Group ("TMTG"). As a result of the completion of that merger, on March 26, 2024, Trump Media began trading publicly under the symbol DJT.  Until registered, the shares of TMTG stock to which the Plaintiffs are entitled are not publicly tradeable.

**The Convertible Notes**

28.     Pursuant to DWAC's corporate charter, DWAC was required to liquidate and return investor funds by September 8, 2022 if it had not completed a transaction with a target company or obtain a vote of 65% of its shareholders to approve an extension.  DWAC also could obtain an automatic, three-month extension by September 8, 2022 if it deposited $2,875,000 in the DWAC investor trust account held by  Continental Stock Transfer & Trust.

29.     As September 8, 2022 approached, DWAC found itself unable to finalize a timely merger transaction with TMTG and thus ARC Global sought approval to extend the transaction date by one year from 65% of DWAC's stockholders.

30.     By September 2, 2022, ARC Global realized it would be unable to meet the 65% vote threshold in time.  Accordingly, ARC Global launched a desperate, and last minute, attempt to raise the $2,875,000 necessary to obtain an automatic three-month extension.

31.     To raise the deposit, on or about September 2, 2022, ARC Global contacted certain of the Plaintiffs (principally those that were also ARC limited liability company members) and warned that short of depositing $2,875,000, "DWAC WILL LIQUIDATE AND YOUR INVESTMENT WILL BE RENDERED WORTHLESS."  ARC Global explained that the automatic three-month extension "should provide time to finalize the vote to extend for a year without additional extension funding."

5

32.    ARC Global proposed to raise the funds through an ARC Global convertible note structure, but the parties always intended the investment to be ultimately an equity investment in DWAC.  Indeed, the negotiations leading to the convertible notes centered entirely upon the equity interests in DWAC investors would receive on conversion, when the equity interests received would be freely tradable, and the profits investors would generate from conversion.  Note conversion was always intended by ARC Global to be the selling point of the investment.

33.    Thus, ARC Global made clear the equity investment intent of its offer:

> To compensate those that support DWAC's survival, we are extending the following offer. For each $10 Invested in the extension round the investor will receive:
> - 1 A share
> - 4 B shares (with a clawback)
> - TOTAL = 5 Shares for every $10 invested at an equivalent price $2.00 PRICE PER SHARE.
>
> With the market around $25 currently, the mark-to-market (not taking into account liquidity or lookup considerations) on each $30,000 you invest now is $375,000 or a 1150% (12.5x) gain on the extension financing.

34.    As of September 5, 2022, ARC Global had not yet raised the $2,875,000 deposit for DWAC and desperation was growing.  Thus, DWAC board member Eric Swider attempted to generate interest, stating that "[w]e have a high degree of confidence we will finish the raise. Having said that, time is tight.  For those of you who have decided to participate, the wires really need to go out Tuesday."

35.    Swider then confirmed the equity nature of the proposed investment.  Without mentioning any loan terms, Swider explained that "[e]ssentially the cost per share is $2.00 unless the stock trades above $50.  If it trades above $50 then the strike price increases to $4.  This ensures a min return of 12.5X if the merger gets done."

6

36.     As of September 7, 2022, ARC Global had not yet raised the $2,875,000 deposit

for DWAC.  Thus, ARC Global made an additional pitch, stating that

> We would like to thank you for your support - it has truly been an
> incredible turnout. We are very close to the finish line but still need
> one last push to make this a success.
> <u>If you would still like to participate in this Extension Financing raise
> and take advantage of this deal, please let us know by the end of
> today.</u> We have provided NDAs that allow us to share the terms of
> the deal with you, but please bear in mind that the mandatory closing
> of the financing is tomorrow at 5PM and your investment must be
> funded before the cut-off time.

37.     ARC Global raised the $2,875,000 deposit from the Plaintiffs, among others,

through sales of Convertible Notes by September 8, 2022.

38.     A second round of Convertible Notes with identical terms were sold in or about

November 2022.

39.     The ability to convert the Convertible Notes into DWAC common stock at a

discount to the market value and thereafter sell the stock on the public market was, to Plaintiffs,

the principal provision of the Convertible Notes.  Plaintiffs would not have purchased the

Convertible Notes simply to earn interest.  The ARC Global Convertible Note was a highly risky

investment and, consistent with the parties intent in entering into the Convertible Note transactions,

Plaintiffs always intended to recoup their investments by converting the Convertible Notes into

DWAC common stock.

40.     The Convertible Notes each Plaintiff and ARC Global signed contains a provision

entitled "Repayment" which provides:

> Except to the extent the outstanding principal of the Loan is
> converted pursuant to the Conversion, the Company shall repay all
> outstanding principal of the Loan, together with all accrued and
> unpaid interest and all other amounts accrued or outstanding under
> this Agreement, by wire transfer to the Lender on the Final
> Repayment Date.

7

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM
INDEX NO. 652515/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 05/16/2024

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1532 of 1832
PageID 5009

In relevant part, the "Final Repayment Date" was "the expiration of eighteen (18) months from the date of the execution of a Note."

41.     Consistent with the terms outlined in ARC Global's correspondence, the Convertible Notes each Plaintiff and ARC Global signed also contains a provision entitled "Conversion" which provides, in relevant part:

> Within three (3) Business Days after the closing of the SPAC's initial business combination (the "Business Combination"), the Lender may elect to convert the outstanding unpaid principal of the Loan into a package of securities of SPAC held by Company.  For each $10 converted, the Lender will receive:
>
> (i)     one Class A share of SPAC ("Class A Share"); and
> (ii)    four Class B shares of SPAC ("Class B Share"), for
> (iii)   an equivalent of 5 total shares for every $10 or $2.00 per share

42.     Thus, consistent with the parties intent that the instrument would result in a purchase of DWAC stock, the right to convert under the convertible note was tied to the date and event of the Business Combination, not to the nominal maturity date of the loan.

43.     Referring to Plaintiff Brett Heath as an example, upon an "initial business combination" and conversion of the unpaid principal of $35,000, Mr. Heath would be entitled to 17,500 shares of DWAC, made up of 3,500 Class A shares, and 14,000 Class B shares.  Attached is a schedule of the investment amounts and related conversion amounts associated with each Plaintiff.

44.     The "initial business combination" was to be a merger of DWAC with TMTG.  Upon the combination, DWAC changed its name to "Trump Media & Technology Group Corp."

45.     On or about November 30, 2022, more than 65% of DWAC investors approved a twelve-month extension of the transaction date.

8

46.    In November and December 2022, ARC Global raised additional money by issuing additional Convertible Notes under the identical terms and with the identical purpose of a resulting conversion and equity investment in DWAC.

47.    The transaction date was thereafter extended until September 2024.

**ARC Global Fails to Deliver Stock on Plaintiffs' Converted Notes**

48.    Consistent with the equity intent of the investment, the "Final Payment Date" of the Convertible Notes issued between September 2, 2022 and September 7, 2022 came and went without ARC Global making a valid tender of repayment.

49.    Rather, on March 7, 2024, ARC Global sought to extend the maturity dates of the Convertible Notes, but never provided a written proposed amendment.  Indeed, Plaintiffs notified ARC Global of the default and throughout March 2022, Orlando continuously indicated that ARC Global would provide draft written terms of an extension.  Ultimately, ARC Global written terms of an extension were never provided.

50.    The merger between DWAC and TMTG closed on March 25, 2024.

51.    Consistent with the "Conversion" provision in each Plaintiff's Convertible Note, on March 25, 2024, certain of the Plaintiffs issued conversion election notices through notice delivered by law firm DLA Piper.

52.    The next day, the same Plaintiffs confirmed their conversion election through notice delivered by WhatsApp.

53.    And various Plaintiffs individually delivered conversion notices.

54.    Despite valid conversion notices having been delivered, ARC Global has failed, and continues to fail, to deliver the "package of securities" required under the Binding Term Sheets.

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM
NYSCEF DOC. NO. 1

INDEX NO. 652515/2024

RECEIVED NYSCEF: 05/16/2024

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1534 of 1832
PageID 5011

55.     Rather, on or about April 1, 2024 after conversion notices were delivered, Orlando, the *de facto* managing member of ARC Global, contacted Plaintiffs in a frantic attempt to repay the notes in cash rather than issue the shares ARC Global is required to deliver.

56.     Upon information and belief, keeping the shares and paying cash would provide a significant windfall for ARC Global and Mr. Orlando in keeping the shares. However, the Convertible Notes are unambiguous in the Plaintiffs' entitlement to shares after issuing their conversion notice – there is no mechanism by which that conversion can be undone through cash repayment.

57.     The Plaintiffs are entitled to the benefit of their bargain. They were induced to provide capital to ARC Global and enter the Convertible Notes based upon an understanding and mutual intent that they would be entitled to post-merger shares; they issued their conversion notices, and now are entitled to the shares.

**Plaintiffs Lack an Adequate Remedy at Law**

58.     Plaintiffs lack an adequate remedy at law from ARC Global's failure to deliver the stock for three principal reasons.

59.     *First*, the stock to which Plaintiffs are currently entitled is unregistered, meaning that there is no ready market from which to purchase the particular shares to be delivered to the Plaintiffs.

60.     *Second*, ARC Global has no present business function or material assets other than its right to receive TMTG stock for distribution to its members and to its convertible noteholders. Upon information and belief, ARC Global may not receive sufficient TMTG shares to meet its obligations to all constituencies leaving Plaintiffs at risk of never receiving the shares to which they are entitled or recovering the massive damages attributable to ARC Capital's failure to deliver

the shares. ARC Capital's financial health and likely inability to survive as a going concern sufficient to pay damages attributable to its failure to deliver TMTG stock to the Plaintiffs leaves Plaintiffs an inadequate remedy at law.

61.     ARC Global is involved in litigation in multiple jurisdictions (Florida, Delaware, and New York) regarding the number of shares it possesses and to which it is entitled from TMTG. Accordingly, it remains unclear whether ARC Global would ever be allocated enough shares to distribute, much less to sell to cover damages.

62.     And *third*, there is substantial risk that ARC Global's TMTG stock, or the proceeds of its sale, will be dissipated. Upon information and belief, over the course of the ARC Global's existence, Orlando used his position as the ARC Global's *de facto* Manager and/or Managing Member to engage in a variety of egregious misconduct that included, *inter alia*, preferring his own interest over that of ARC. Orlando's actions compelled ARC Global members to move to oust him from control of the company.

63.     Among Orlando's egregious misconduct was his causing to be filed with the SEC on behalf of ARC Global a Schedule 13D beneficial owner report declaring that Orlando was the beneficial owner of all shares of DWAC held by ARC Global and not its investing members.

64.     According to a Complaint filed by ARC Global members in the Delaware Court of Chancery (the "Delaware Complaint"), Orlando formed the Bigfivefam Trust under the laws of Belize with its trustee being Wilber Callapina, who is located in Peru. Belize is a known tax haven that has stringent privacy laws that permit individuals to form trusts and to maintain the privacy of a trust's corpus.

65.     According to the Delaware Complaint, Orlando also formed Franlu, LLC under the laws of the State of Florida, which is also controlled by Orlando.

11

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM
NYSCEF DOC. NO. 1

INDEX NO. 652515/2024
RECEIVED NYSCEF: 05/16/2024

Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1536 of 1832
PageID 5013

66.     Upon information and belief, Orlando has transferred, caused to be transferred, or has plans to transfer TMTG shares from ARC Global to Franlu, LLC and/or Bigfivefam Trust, which may place the same TMTG shares that must be distributed to Plaintiffs or be sold to pay damages beyond the reach of the Plaintiffs or this Court.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Breach of Contract - Specific Performance)**

67.     The Plaintiffs repeat and reallege paragraphs 1-66 as though stated fully herein.

68.     The Convertible Notes are valid and enforceable contracts.

69.     The Convertible Notes provide the Plaintiffs a right to convert the outstanding principal under each of their Convertible Notes for shares of DWAC (now TMTG) by delivering a notice of conversion within three business days of the completion of the initial Business Combination (ultimately merger with TMTG).

70.     The Convertible Notes further provide that each Plaintiff is each entitled to 5 shares for every $10 of principal converted, pursuant to the formula provided in the Convertible Notes.

71.     The merger with TMTG closed on March 25, 2024, triggering the Plaintiffs' rights to convert their outstanding principal to shares of TMTG.

72.     The Plaintiffs provided their conversion notices to ARC Global within three days of the merger.

73.     The Plaintiffs have fully performed their obligations under the Convertible Notes.

74.     ARC Global has refused to honor the conversion notices, and therefore has materially breached the Convertible Notes.

75.     As a result of ARC Global's breach of the Convertible Notes, the Plaintiffs are entitled to a decree of specific performance requiring ARC Global to comply with the express

12

terms of the Convertible Notes and deliver to each of the Plaintiffs the TMTG shares to which each

Plaintiff is entitled under the Convertible Notes.

76.     An award of damages would be inadequate because (i) the amount of loss suffered

by each Plaintiff is difficult to quantify, (ii) it is highly unlikely that ARC Global will be able to

satisfy any likely damages judgment, and (iii) there is evidence that ARC Global intends to transfer

and conceal the TMTG stock to which the Plaintiffs are entitled and from which any damages

could be recovered.  Accordingly, the Plaintiffs have no adequate remedy at law.

### SECOND CAUSE OF ACTION
#### (Breach of Contract – Damages)

77.     The Plaintiffs repeat and reallege paragraphs 1-66 as though stated fully herein.

78.     The Convertible Notes are valid and enforceable contracts.

79.     The Convertible Notes provide the Plaintiffs a right to convert the outstanding

principal under each of their Convertible Notes for shares of the DWAC (now TMTG) by

delivering a notice of conversion within three business days of the completion of the initial

Business Combination (ultimately merger with TMTG).

80.     The Convertible Notes further provide that each Plaintiff is each entitled to 5 shares

for every $10 of principal converted, pursuant to the formula provided in the Convertible Notes.

81.     The merger with TMTG closed on March 25, 2024, triggering the Plaintiffs' rights

to convert their outstanding principal to shares of TMTG.

82.     The Plaintiffs provided their conversion notices to ARC Global within three days

of the merger.

83.     The Plaintiffs have fully performed their obligations under the Convertible Notes.

84.     ARC Global has refused to honor the conversion notices, and therefore has

materially breached the Convertible Notes.

FILED: NEW YORK COUNTY CLERK 05/15/2024 03:17 PM
INDEX NO. 652515/2024
NYSCEF DOC. NO. 1
RECEIVED NYSCEF: 05/16/2024
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1538 of 1832
PageID 5015

85.     As a result of ARC Global's breach of the Convertible Notes, the Plaintiffs are entitled to a decree of specific performance requiring ARC Global to comply with the express terms of the Convertible Notes and deliver to each of the Plaintiffs the TMTG shares to which each Plaintiff is entitled under the Convertible Notes.

86.     In the alternative, as a result of ARC Global's breach of the Convertible Notes, the Plaintiffs are entitled to damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

A. On the First Cause of Action, a decree of specific performance requiring ARC Global to honor the Plaintiffs' conversion notices and deliver the shares of TMTG owed to each Plaintiff;

B. On the Second Cause of Action, awarding compensatory damages in an amount to be determined at trial as well as pre- and post-judgment interest;

C. Awarding Plaintiffs their attorney's fees and costs; and

D. Granting such other further relief as the Court may deem just and proper.

Dated: New York, New York

May 15, 2024

**CHIPMAN BROWN CICERO & COLE LLP**

By:_____

Adam D. Cole
Melissa R. Chernofsky
501 Fifth Avenue, 15th Fl.
New York, NY 10017
(646) 685-8363

*Attorneys for Plaintiffs*

14

# EXHIBIT 17

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ODYSSEY TRANSFER AND TRUST COMPANY, | Civil Action No. |
| Plaintiff, | Complaint Filed: June 20, 2024 |
| v. | |
| ARC GLOBAL INVESTMENTS II, LLC, and MICHAEL J. MELKERSEN, | |
| Defendants, | |
| and | |
| TRUMP MEDIA & TECHNOLOGY GROUP CORP. f/k/a DIGITAL WORLD ACQUISITION CORP., | |
| Nominal Defendant. | |

### COMPLAINT FOR INTERPLEADER

Interpleader Plaintiff Odyssey Transfer and Trust Company ("Odyssey"), in its capacity as securities transfer and escrow agent for Trump Media & Technology Group Corp. ("TMTG") f/k/a Digital World Acquisition Corp. ("DWAC"), hereby states the following claim for interpleader pursuant to Federal Rule of Civil Procedure 22 and 28 U.S.C. § 1332 against ARC Global Investments II, LLC ("ARC") and Michael J. Melkersen ("Melkersen," and together with ARC, "Defendants"). In support thereof, Odyssey alleges as follows:

### NATURE OF THE ACTION

1.     This is an interpleader action to resolve competing claims between the Defendants regarding 716,140 Class A shares of TMTG, and 25,000 TMTG warrants

(collectively, the "Disputed Securities") currently recorded on the books and records of Odyssey.

2.      Odyssey is indifferent to and has no stake regarding which Defendant is entitled to the Disputed Securities.

3.      Odyssey seeks an Order from this Court requiring the Defendants to interplead and resolve between themselves their respective rights to the Disputed Securities without further involvement of Odyssey, discharging Odyssey from further liability as to the Disputed Securities, dismissing it from this case, and awarding Odyssey its attorneys' fees.

## PARTIES AND JURISDICTION

4.      Plaintiff Odyssey is a Minnesota corporation with a principal place of business in Minnesota. Odyssey is therefore a citizen of Minnesota.

5.      Defendant ARC is a Delaware limited liability company with over one-hundred members residing in various states and countries. Upon information and belief, none of those members is a citizen of Minnesota.

6.      Defendant Melkersen is an individual domiciled and residing in Puerto Rico. Melkersen is therefore a citizen of Puerto Rico.  Upon information and belief, Melkersen filed a UCC-1 financing statement with the State of Delaware in respect of the Disputed Securities.

7.      Nominal Defendant TMTG is a Delaware corporation with a principal place of business in Florida. TMTG is therefore a citizen of Delaware and Florida.

8.      Jurisdiction is proper in this Court under 28 U.S.C.A. § 1332(a), which provides for original jurisdiction over civil actions between citizens of different states in which the amount in controversy exceeds $75,000.  Odyssey is a citizen of Minnesota, and neither Defendant is a citizen of Minnesota, such that there is complete diversity of citizenship, and the value of the Disputed Securities exceeds $75,000.

2

9.      Venue is proper in this Court under 28 U.S.C. §§ 1391(c)(2) and 1397 because at least one of the Defendants is domiciled in this judicial district.

## FACTUAL BACKGROUND

10.      ARC was the sponsor of DWAC, a Special Purpose Acquisition Company (SPAC).  Ultimately, DWAC Merger Sub, Inc. merged with and into TMTG, with TMTG n/k/a TMTG Sub Inc. continuing as the surviving corporation and as a wholly owned subsidiary of DWAC.  Upon the merger, DWAC was renamed TMTG.

11.      Odyssey serves as the securities transfer and escrow agent for TMTG, and in that capacity is responsible for, among other thing, maintaining its security holder records and recording changes of ownership, including regarding TMTG common stock and warrants.

12.      The Disputed Securities are currently recorded in book entry form with Odyssey in ARC's name, meaning they have not been issued as certificates or otherwise in physical form.

13.      TMTG's registration statement on Form S-1 filed with the Securities and Exchange Commission on April 15, 2024, became effective on June 18, 2024, satisfying a prerequisite to permit the transfer of the Disputed Securities.

14.      However, Odyssey is faced with competing claims to the Disputed Securities and is unable to determine the lawful owner of the Disputed Securities and/or who may be entitled and authorized to give instructions regarding the disposition or transfer of same.

15.      ARC has asserted rights in and to the Disputed Securities.  Among other things, through its counsel, ARC has requested that Odyssey transfer to ARC's brokerage account upon effectiveness of TMTG's Form S-1 registration statement 148,785 shares in account #XXX517; 297,570 shares in account #XXX616; 566,742 warrants in account # XXX770 WARRANTS, and upon expiration of a contractual "lock-up period," an additional 1,133,484 shares in the

3

account # XXX 770 COMMON. Upon information and belief, the Disputed Securities are a subset of the securities subject to ARC's transfer request.

16. Melkersen has also asserted rights in the Disputed Securities and requested that Odyssey register the Disputed Securities in his name and transfer them to him. On June 20, 2024, Melkerson indicated an intent to file suit in Miami (Dade County) Florida state court seeking, among other things, an injunction prohibiting Odyssey from transferring the Disputed Securities.

17. Therefore, Odyssey is faced with competing claims for the Disputed Securities from ARC and Melkersen.

## COUNT I
## INTERPLEADER

18. Odyssey hereby incorporates by reference each of the averments in the above Paragraphs as if set forth herein at length.

19. The Defendants both claim an interest in the Disputed Securities.

20. Based on the foregoing, there is presently an actual, justiciable controversy between and among the Defendants as to their respective rights to the Disputed Securities.

21. The claims of the Defendants are adverse and conflicting, and Odyssey is unable to fully determine which party has the legal rights to the Disputed Securities.

22. Odyssey seeks certainty regarding the Defendants' respective rights to receive the Disputed Securities.

23. Odyssey is an innocent stakeholder that wishes to transfer or distribute the Disputed Securities to the appropriate party.

4

24.     Odyssey is prepared to segregate and retain the Disputed Securities pending resolution of the parties' claims, or to transfer the Disputed Securities to the appropriate person(s) as directed by the Court.

25.     Unless the adverse and conflicting interests to the Disputed Securities are resolved in a single proceeding pursuant to an appropriate Court order, Odyssey may be subject to multiple proceedings and is at substantial risk of suffering multiple liability and/or inconsistent rulings.

26.     Odyssey has filed this Complaint For Interpleader of its own free will to avoid multiple liabilities and unnecessary suits and costs.

27.     Odyssey is entitled to recover its costs and reasonable attorneys' fees.

## RELIEF REQUESTED

**WHEREFORE**, Odyssey asks that judgment of interpleader be entered in its favor and that:

a.     The Court order Odyssey to segregate and retain the Disputed Securities pending resolution of this action;

b.     The Court order Defendants to interplead and resolve between themselves their respective rights to the Disputed Securities without further involvement of Odyssey;

c.     The Court enjoin and restrain Defendants, their agents, attorneys, and assigns, from commencing or further prosecuting any other proceedings in any state or United States Court against Odyssey on account of the Disputed Securities;

5

    d.    Odyssey be fully and finally discharged and dismissed from this litigation

        and any and all liability in connection with, arising out of, or relating to this

        action and the Disputed Securities;

    e.    The Court direct and declare the respective rights of Defendants with

        respect to the Disputed Securities, and direct and declare to whom the

        Disputed Securities should be transferred;

    f.    Odyssey be awarded attorneys' fees, disbursements, and all other proper

        costs and charges incurred in connection with this action; and

    g.    The Court award such other and further relief as it may deem just and

        proper.

Dated:  June 20, 2024

                           **FAEGRE DRINKER BIDDLE**
                           **& REATH LLP**

                           */s/ Jaclyn C. Marasco*

OF COUNSEL:               Joseph C. Schoell (#3133)
                           Jaclyn C. Marasco (#6477)
Michael MacPhail           222 Delaware Avenue, Suite 1410
1144 15th Street, Suite 3400    Wilmington, DE 19801
Denver, CO 80202           (302) 467-4200
(303) 607-3500            jaclyn.marasco@faegredrinker.com
michael.macphail@faegredrinker.com

-and-                     *Attorneys for Odyssey Transfer and Trust*
                           *Company*
Josh Peterson
2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
(612) 766-7000
josh.peterson@faegredrinker.com

6

# EXHIBIT 18

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ODYSSEY TRANSFER AND TRUST COMPANY, | |
| Plaintiff, | |
| v. | |
| ARC GLOBAL INVESTMENTS II LLC, and MICHAEL J. MELKERSEN, | C.A. No. 24-729-GBW |
| Defendants, | |
| and | |
| TRUMP MEDIA & TECHNOLOGY GROUP CORP. f/k/a DIGITAL WORLD ACQUISITION CORP., | |
| Nominal Defendant. | |

## DEFENDANT ARC GLOBAL INVESTMENTS II LLC'S ANSWERING BRIEF IN OPPOSITION TO TRUMP MEDIA & TECHNOLOGY CORP.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR DISCHARGE AND DISMISSAL

Jason J. Rawnsley (#5379)
Matthew D. Perri (#6066)
Jessica E. Blau (#7163)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
rawnsley@rlf.com
perri@rlf.com
blau@rlf.com

Dated: August 6, 2024

*Attorneys for Defendant ARC Global Investments II LLC*

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...............................................................................1

II.   SUMMARY OF ARGUMENT ..........................................................2

III.  STATEMENT OF FACTS ...............................................................3

    A.    Melkersen Files Complaint in Florida State Court.....................4

    B.    Odyssey Files Interpleader Complaint in the District of Delaware ..........5

    C.    The Florida Action Is More Advanced.......................................7

IV.  NATURE AND STAGE OF THE PROCEEDINGS.....................7

V.   ARGUMENT....................................................................................8

    A.    Standard.......................................................................................8

    B.    ARC's Motion to Dismiss for *Forum Non Conveniens* Should Moot TMTG's Motion ..............................................................9

    C.    TMTG's Motion Is Premature...............................................10

    D.    TMTG Does Not Have a Reasonable Basis to Fear Double Liability .....12

    E.    The Limited Record Calls into Question Whether TMTG Is a Disinterested Stakeholder ........................................................13

VI.  CONCLUSION...............................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allegheny Child Care Academy v. Klein*,
   No. 02-0897, 2003 WL 23112776 (W.D. Pa. Nov. 17, 2003) ...........................12

*ARC Global Investments II LLC v. Digital World Acquisition Corp.*,
   C.A. No. 2024-0186-LWW (Del. Ch. filed July 29, 2024).................................4

*Bierman v. Marcus*,
   246 F.2d 200 (3d Cir. 1957) ..............................................................................8

*CNA Ins. Cos. v. Waters*,
   926 F.2d 247 (3d Cir. 1991) ............................................................................12

*Delaware Life Insurance Co. v. Short*,
   No. 20-996-LPS, 2021 WL 1027169 (D. Del. Mar. 17, 2021) .........................14

*Grubbs v. Gen. Elec. Credit Corp.*,
   405 U.S. 699 (1972)..........................................................................................11

*Lexington Ins. Co. v. Jacobs Indus. Maint. Co.*,
   435 F. App'x 144 (3d Cir. 2011) ......................................................................12

*Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*,
   368 F. Supp. 3d 460 (E.D.N.Y. Mar. 25, 2019) ...............................................11

*Metro. Life Ins. Co. v. Price*,
   501 F.3d 271 (3d Cir. 2007) ..............................................................................8

*NYLife Distribs., Inc. v. Adherence Grp., Inc.*,
   72 F.3d 371 (3d Cir. 1995) ................................................................................9

*Phoenix Ins. Co. v. Small*,
   307 F.R.D. 426 (E.D. Pa. 2015)........................................................................11

*Prudential Ins. Co. of Am. v. Hovis*,
   553 F.3d 258 (3d Cir. 2009) ..............................................................................8

*Stone St. Asset Tr. v. Blue*,
821 F. Supp. 2d 672 (D. Del. Aug. 1, 2011)...........................................................9

**STATUTES & RULES**

Rule 12 .....................................................................................................1, 3, 10, 12

Rule 22 ...........................................................................................................................10

**OTHER AUTHORITIES**

7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL
PRACTICE & PROCEDURE § 1715 (4th ed. 2019) ................................................10

Case 8:24-cv-00782-KKM-AEP Document 89 Filed 08/06/24 Page 1 of 6 PageID 1673
Case 1:24-cv-01513-GBW Document 35 Filed 07/09/24 Page 155 of 163 PageID #: 5028
PageID 5028

## I.    INTRODUCTION

Following the lead of the plaintiff, Odyssey Transfer and Trust Company ("Odyssey"), nominal defendant Trump Media & Technology Group Corp. ("TMTG"), f/k/a Digital World Acquisitions Corp. ("DWAC"), has moved the Court to find that it has no responsibility for its actions with regard to securities (the "Disputed Securities") claimed by both ARC Global Investments II LLC ("ARC") and defendant Michael Melkersen ("Melkersen").  Once the Court accepts TMTG's inaccurate premise that it is blameless, TMTG's motion also asks that TMTG be dismissed from this lawsuit (the "Motion").  The Motion should be denied.

First, the Court can moot TMTG's Motion by granting ARC's motion to dismiss for *forum non conveniens*.  *See* D.I. 27.  No party should have the benefit of a judicial declaration discharging it from liability in an action that should not have been filed in the first place.

Second, TMTG's motion puts the cart before the horse.  As a party seeking relief, TMTG should first plead any claims it believes it has so that they can be tested, if appropriate, on Rule 12 motions.  There is no justification to allow TMTG to get a quick exit with a declaration of immunity for its conduct solely for being named as a defendant.

Third, even if there were a threat that TMTG could suffer multiple liability, that threat has rapidly diminished, as there is a single, more advanced case

proceeding elsewhere in the proper forum for the resolution of the underlying disputes, and TMTG recognizes that it does not have a *bona fide* fear of multiple liability.

Fourth, the limited record suggests that TMTG is not a disinterested stakeholder. Defendant Michael Melkersen is DWAC's former attorney. Odyssey, TMTG's transfer agent, alleges that it is acting upon TMTG's instructions in refusing to transfer securities to ARC in ARC's name on Odyssey's own books, thereby allowing Melkersen to make a claim to such securities. On this record, neither TMTG (nor Odyssey, for that matter) should be dismissed and discharged of liability.

For each of these reasons, TMTG's Motion should be denied.

## II.   SUMMARY OF ARGUMENT

ARC's pending motion to dismiss for *forum non conveniens* should moot the Motion (and all other pending motions). If not granted, however, TMTG's Motion should be denied, first, as a procedural irregularity, since TMTG has not yet made any claim for relief in a pleading; second, because TMTG has admitted that it does not fear multiple liability, a requirement for a party asserting a claim in interpleader; and third, the limited record at this stage does not allow for a determination that TMTG is a disinterested stakeholder, and certain facts suggest otherwise.

## III.   STATEMENT OF FACTS

Defendant ARC was the sponsor of the special purpose acquisition company Digital World Acquisition Corp.  D.I. 1 ¶ 10.  Special purpose acquisition companies are public companies created to acquire private companies.  In April 2024, DWAC merged with TMTG, and does business today under the latter's name.  *Id.*

ARC received shares of TMTG for its efforts, although it could not access them until certain events occurred.  When TMTG announced its S-1 registration with the SEC such that ARC could access a small portion of its holdings, D.I. 1 ¶ 13, ARC sought to transfer those shares to itself consistent with ARC's ownership of the shares and its contractual obligations.  Odyssey, the securities transfer and escrow agent for TMTG, refused ARC's request, including by citing a purported claim to the same shares made by Melkersen.  *See* Ex. 1 (June 20, 2024 Letter from Odyssey to ARC).[1]

Melkersen is an attorney who previously served as counsel to DWAC, now TMTG:

> DWAC entered into an agreement for legal services with attorney Michael Melkersen. Melkersen's engagement agreement with DWAC indicated that he would provide legal services to DWAC, and nothing more. DWAC issued the Legal Services Note for $500,000 to compensate Melkersen for his legal services. Melkersen did not provide cash or capital in connection with the Legal Services Note, and ARC

---

[1] Exhibits are attached to the Declaration of Jessica E. Blau in support of this brief, filed contemporaneously.

does not dispute that the Legal Services Note was compensation for Melkersen's legal services.

Ex. 2 (Defs.' Am. Pre-Trial Ans. Br. in *ARC Global Investments II LLC v. Digital World Acquisition Corp.*, C.A. No. 2024-0186-LWW (Del. Ch. filed July 29, 2024)) at 15 (footnotes omitted).

## A. Melkersen Files Complaint in Florida State Court

On June 20, 2024, Melkersen filed a complaint in the 11th Judicial Circuit in Miami-Dade County, Florida (the "Florida Complaint," Ex. 3) against ARC; ARC's manager, Patrick Orlando; TMTG; and Odyssey. Across five counts for breaches of contract, replevin, unjust enrichment, and a declaratory judgment, Melkersen alleges rights to shares of TMTG under agreements and instruments entered into among himself, ARC, and Orlando (the "Florida Action"). Fla. Compl. ¶¶ 25, 31, 34, 39, 46.

One of those agreements, the Membership Interest Purchase Agreement among ARC, Orlando, and Melkersen dated March 16, 2023 (the "MIPA"), has a mandatory choice-of-forum provision favoring "the state and federal courts located in Miami-Dade County, Florida." Fla. Compl. ¶ 13 (quoting MIPA, Ex. 4 § 6.4). It further notes that ARC, Orlando, and TMTG are all domiciled or have principal places of business in Florida. Fla. Compl. ¶¶ 9–12. The MIPA and three Promissory Notes at issue have choice-of-law clauses selecting the law of the State of Florida.

**B.     Odyssey Files Interpleader Complaint in the District of Delaware**

Odyssey has securities belonging to ARC recorded in book entry form in its own records.  D.I. 1. ¶ 12; *see also* Ex. 1 at 1 ("We are writing to inform you of our client's position regarding certain TMTG securities as to which your client, ARC Global Investments II, LLC ("ARC") is the owner of record.").  Though Odyssey sent its letter to ARC and filed suit on June 20, 2024, it was aware of a claim to ARC's shares made by Melkersen at least four months earlier. On March 27, 2024, Melkersen copied Odyssey on a letter to ARC demanding the Disputed Securities, which stated that he had also "notified Odyssey and [TMTG] of my perfected security interest in the at-issue securities and my rights to have such securities registered in my name and transferred to me."  Ex. 5.  Odyssey further claims that at some point it became aware that Melkersen "indicated an intent to file suit in Florida state court (Miami-Dade County) against Odyssey, among others, to enforce his asserted rights" to the Disputed Securities, D.I. 5 ¶ 1, and so filed this interpleader action on June 20, 2024 in this Court, D.I. 1.  Odyssey named Melkersen, ARC, and TMTG as defendants.

Odyssey's interpleader complaint seeks to have Melkersen and ARC litigate in the U.S. District Court for the District of Delaware the identical dispute that Melkersen has raised in Florida.  *Compare* D.I. 1 ¶ 1 ("This is an interpleader action to resolve competing claims between the Defendants regarding 716,140 Class A

shares of TMTG, and 25,000 TMTG warrants . . . currently recorded on the books and records of Odyssey."), *with* Fla. Compl. ¶ 61 (Melkersen alleging entitlement to "a combined total of 716,140 shares owed to Melkersen by ARC and/or Orlando (Orlando is personally on the hook for the obligations under the MIPA)" and "the additional 25,000 warrants under the terms of Promissory Note #3").

Initially, Odyssey moved to enjoin the defendants from "[i]nstituting or prosecuting further any proceeding in any United States court against Odyssey *or* on account of the property that is the subject of this interpleader," D.I. 4, Proposed Order at 2 (emphasis added).  Odyssey then partially changed its mind and stipulated to exempt Melkersen from the injunction it sought against other defendants by allowing Melkersen (and only Melkersen) to proceed with his Florida Action after all—albeit not against Odyssey or TMTG.  D.I. 19 ¶ 4.  Melkersen then dismissed TMTG from the Florida Action.  Ex. 6.

TMTG alleges that it shares the same fear alleged by Odyssey in its Complaint, namely, that it "may be subject to multiple proceedings and is at substantial risk of suffering multiple liability and/or inconsistent rulings."  *Compare* D.I. 1 ¶ 25, *with* D.I. 32 at 4 (stating that the "[t]he Court should discharge and dismiss TMTG because the corporation is exposed to the same potential liability arising from the Disputed Securities as Odyssey").  TMTG has not identified any

other person or entity from which it may be at risk of multiple liability that is not already a party in the Florida Action.

### C. The Florida Action Is More Advanced

ARC has answered the Florida Complaint and asserted counterclaims. *See* Ex. 7. Odyssey has accepted service and summons of the Florida Complaint. *See* Ex. 8. ARC has moved for partial summary judgment in the Florida action, and a hearing on that motion has been scheduled for September 5, 2024. *See* Ex. 9 (Florida Action docket). The Florida court has scheduled a case management conference for October 23, 2024. *See* Ex. 10.

## IV. NATURE AND STAGE OF THE PROCEEDINGS

Odyssey filed this action on June 20, 2024. D.I. 1. At the same time, Odyssey moved to enjoin the parties from suing Odyssey for any reason anywhere else, D.I. 4, and to expedite the resolution of that motion, D.I. 5. On July 11, 2024, the Court denied Odyssey's request for a preliminary injunction. D.I. 23.

Odyssey has moved for a Motion for Retention, Discharge, Dismissal and Attorneys' Fees based on its Complaint for Interpleader, D.I. 26, and ARC has moved to dismiss the case in it its entirety for *forum non conveniens*, D.I. 27. Briefing on these motions is ongoing.

TMTG has moved for discharge of liability and dismissal as a party to this action. D.I. 31. This is ARC's answering brief in opposition to the Motion.

## V. ARGUMENT

### A. Standard

Interpleader is an "equitable remedy" that "allows a person holding property to join in a single suit two or more persons asserting claims to that property." *Metro. Life Ins. Co. v. Price*, 501 F.3d 271, 275 (3d Cir. 2007) (quotation marks and citation omitted). As interpleader is an equitable proceeding, an interpleader plaintiff must be "blameless with respect to the existence of the ownership controversy." *Prudential Ins. Co. of Am. v. Hovis*, 553 F.3d 258, 265 (3d Cir. 2009). Lastly, to "justify interpleader," the stakeholder's fear of multiple liability must be "real and reasonable[.]" *Bierman v. Marcus*, 246 F.2d 200, 202 (3d Cir. 1957). Thus, to gain the benefit of the equitable remedy of interpleader, a plaintiff must be (1) an innocent stakeholder (2) in real fear of multiple claims (3) to a single disputed *res*.

These threshold tests for determining whether the plaintiff can claim the benefit of interpleader require that "[t]he typical interpleader action proceeds in two distinct stages." *Hovis*, 553 F.3d at 262. In the first stage, "the court determines whether the interpleader complaint was properly brought and whether to discharge the stakeholder from further liability to the claimants." *Id*. In the second stage, "the court determines the respective rights of the claimants to the interplead funds." *Id*.

8

## B. ARC's Motion to Dismiss for *Forum Non Conveniens* Should Moot TMTG's Motion

ARC has moved to dismiss this entire action on the basis of *forum non conveniens* because this case should not be heard here when there is another court that can more effectively resolve the dispute. *See* D.I. 27–29 (ARC's motion to dismiss, brief, and declaration); *see also NYLife Distribs., Inc. v. Adherence Grp., Inc.*, 72 F.3d 371, 383 (3d Cir. 1995) (stating that, when faced with an interpleader case for which there is a parallel state case, courts "should evaluate which forum will protect the stakeholder more effectively while providing the claimants with the more efficient, convenient, and expeditious vehicle to settle their dispute to the fund"); *cf. Stone St. Asset Tr. v. Blue*, 821 F. Supp. 2d 672, 679–81 (D. Del. Aug. 1, 2011) (staying declaratory judgment case under *Brillhart* abstention when parallel action was proceeding in state court).

Consideration of ARC's motion to dismiss logically precedes consideration of TMTG's Motion. If the Court finds that this case should never have been filed here, then TMTG should not gain the advantage of discharge in an interpleader action that will never proceed to the second stage. The relief awarded to an interpleader plaintiff in the first stage is premised on the Court's resolution of the competing claims to the *res* in the second stage, so that the plaintiff can be instructed to dispose of the *res* lawfully. *See, e.g.*, D.I. 31-2 (TMTG seeking relief that, *inter*

*alia*, the "Court shall determine the respective rights of Defendants with respect to the Disputed Securities, and direct and declare to whom the Disputed Securities should be transferred").  Otherwise, the interpleader plaintiff continues to face competing claims.

Thus, the Court should first determine whether this action should proceed at all before adjudicating TMTG's Motion.

### C.  TMTG's Motion Is Premature

TMTG has yet to file an answer or response to the Complaint.  *See* D.I. 7 (deadline for TMTG to move, answer, or respond is August 19).  Nor has TMTG set forth in its own pleading against any of the parties any claim or request for relief it may have, so that any such claim could be tested by a Rule 12 motion before TMTG immediately seeks discharge of liability.

Initiating an interpleader action requires a complaint.  *See* 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY K. KANE, FEDERAL PRACTICE & PROCEDURE § 1715 (4th ed. 2019) (stating that the "usual rules of good pleading are applicable in an interpleader action").  Defendants also have the ability to seek the relief available through an interpleader claim—provided that they also submit a pleading. Under Rule 22 of the Federal Rules of Civil Procedure, "[p]ersons with claims that may expose a plaintiff to double or multiple liability may be joined as defendants and required to interplead. . . .  *A defendant exposed to similar liability* may seek

interpleader *through a crossclaim or counterclaim*." (emphasis added). *See also Grubbs v. Gen. Elec. Credit Corp.*, 405 U.S. 699, 705 n.2 (1972) ("[A] defendant seeking interpleader must frame his pleading either as a cross-claim seeking relief against a co-party already in the lawsuit, or as a counterclaim seeking relief against the plaintiff."); *Phoenix Ins. Co. v. Small*, 307 F.R.D. 426, 432 (E.D. Pa. 2015) (stating that the defendant, through his insurer, "properly sought interpleader through crossclaim or counterclaim under both the Federal Rules of Civil Procedure and the federal interpleader statute").

In every federal decision cited in TMTG's motion, the party seeking interpleader (whether offensively or defensively) had set forth its claim or defense in a pleading. TMTG identifies no procedure available under the Federal Rules of Civil Procedure for a defendant to seek the relief of the plaintiff without stating a claim (or even yet responding to the complaint). *See, e.g.*, *Madison Stock Transfer, Inc. v. Exlites Holdings Int'l, Inc.*, 368 F. Supp. 3d 460, 477 (E.D.N.Y. Mar. 25, 2019) ("[W]hile a conflicting claim to property need not be concrete and final for a stakeholder to initiate an interpleader action, it cannot be based on the Court's speculation. *It at least must be in the Complaint*." (emphasis added)).

Without having submitted a pleading that puts the other parties on reasonable notice of its allegations, TMTG should not be able to exit a suit with immunity for its actions merely by filing a tag-along motion. The Court should wait for TMTG's

11

response to the Complaint and any Rule 12 motion practice before ruling on the request for relief that TMTG makes in the Motion.

### D. TMTG Does Not Have a Reasonable Basis to Fear Double Liability

In the Third Circuit, the party asserting that it is an innocent stakeholder must have a "bona fide fear of adverse claims" that it is exposed to multiple liability. *See CNA Ins. Cos. v. Waters*, 926 F.2d 247, 251 (3d Cir. 1991) ("The question then is whether CNA has a 'bona fide fear' that the fourth theoretically possible outcome discussed above actually might occur. We believe that CNA does not."); *Lexington Ins. Co. v. Jacobs Indus. Maint. Co.*, 435 F. App'x 144, 147 (3d Cir. 2011) ("While adverse claims need not be meritorious, they cannot be so wanting that the stakeholder lacks 'a bona fide fear of adverse claims.'") (citation omitted); *Allegheny Child Care Academy v. Klein*, No. 02-0897, 2003 WL 23112776, at *1 (W.D. Pa. Nov. 17, 2003) ("[A] party is entitled to interpleader only if it can demonstrate that it has a bona fide fear that there is or might be adverse claims to a fund which could potentially result in the exposure of the stakeholder to double or multiple liability.").

TMTG has no such fear. As it tells the Court in its motion, TMTG "does not believe that the parties' claims will ultimately result in double liability," but asserts that "there need only be the *potential* of double liability" (citing decisions from the Delaware Superior Court, not federal law). D.I. 32 at 6. That is not the test, nor is it enough for this Court to declare, on a motion with no exhibits, that TMTG should

12

receive immunity for any actions it has taken with regard to the Disputed Securities. D.I. 32 at 6. For this additional reason, the Court should deny the Motion.

### E. The Limited Record Calls into Question Whether TMTG Is a Disinterested Stakeholder

Nor does the state of the record in this case allow for a definitive ruling that TMTG is a disinterested stakeholder. Odyssey's own records show securities belonging to ARC recorded in book entry form. D.I. 1 ¶ 12; Ex. 1 at 1 ("We are writing to inform you of our client's position regarding certain TMTG securities as to which your client, ARC Global Investments II, LLC ("ARC") is the owner of record."). Yet, upon the apparent instruction of TMTG, Odyssey refuses to release the securities to ARC. Ex. 11 at 1 (June 25, 2024 Letter from Odyssey ("Odyssey has been instructed by TMTG to rely on the Transfer Requirements Memorandum for purposes of effectuating any transfer of TMTG securities, and to refuse to effectuate any contrary instructions from ARC.")).

Additionally, DWAC, which has now merged with TMTG, had previously retained Melkersen as its counsel. *See supra* pp. 3-4. And although Odyssey sought an injunction that would prevent the defendants from filing or proceeding with a claim anywhere else, Odyssey quickly reached a deal with Melkersen by which he voluntarily agreed to be enjoined from pursuing the claims against TMTG in his Florida Complaint. D.I. 19 ("Defendant Melkersen may continue to prosecute the

Florida Action against defendants in that action other than Odyssey and TMTG.").

Shortly after, Melkersen dismissed his claims against TMTG. *See* Ex. 6. In sum,

Melkersen, TMTG, and Odyssey appear to be giving favorable treatment to one

another that is at odds with the purported goal of an interpleader action.

The record put before the Court by TMTG in the Motion—a hastily filed

afterthought to Odyssey's motion, without any exhibits and before TMTG has even

responded to the Complaint—does not allow a determination at this stage of whether

TMTG is an innocent stakeholder. In *Delaware Life Insurance Co. v. Short*, No. 20-

996-LPS, 2021 WL 1027169, at *3 (D. Del. Mar. 17, 2021), the interpleader

plaintiff, an insurance company, faced a counterclaim that it had acted in bad faith

in refusing to pay life insurance benefits to one of the defendants. In moving to

dismiss the counterclaim, the insurance company argued that, as a plaintiff in an

interpleader action, it was discharged from any such liability. The Court denied the

motion,[2] since it could not "conclude at this stage – based on the record it is allowed

to consider, which must be viewed in the light most favorable to [the defendant] –

---

[2] The insurer in that case had moved to dismiss the counterclaim for failure to state a claim, and even in that procedural posture the Court was unable to determine that the plaintiff was discharged from liability solely for having filed an action in interpleader. *See id.* at *4 (stating that the plaintiff "may relatedly prove it 'has a bona fide fear of adverse claims given the underlying related litigation that ensued' in the Court of Chancery . . . . But a motion to dismiss does not present an occasion to weigh conflicting evidence. Instead, it requires the Court to accept the well-pleaded factual allegations of the party asserting the claim").

that [the insurer] is necessarily, as a matter of law, a legitimate stakeholder in a properly-brought interpleader action."

TMTG's Motion puts the Court here in the same position. For this reason as well, the Motion should be denied.

## VI. CONCLUSION

For the foregoing reasons, ARC respectfully requests the Court deny TMTG's Motion.

/s/ Jason J. Rawnsley
Jason J. Rawnsley (#5379)
Matthew D. Perri (#6066)
Jessica E. Blau (#7163)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
rawnsley@rlf.com
perri@rlf.com
blau@rlf.com

*Attorneys for Defendant ARC
Global Investments II LLC*

Dated: August 6, 2024

# EXHIBIT 19

EFiled:  Apr 16 2024 08:18PM EDT
Transaction ID 72761829
Case No. 2024-0184-MTZ

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| UNITED ATLANTIC VENTURES, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 2024-0184-MTZ |
| v. | ) |
| | ) **PUBLIC VERSION FILED** |
| TMTG SUB INC. f/k/a TRUMP MEDIA | ) **APRIL 16, 2024** |
| & TECHNOLOGY GROUP CORP. | ) |
| TRUMP MEDIA & TECHNOLOGY | ) |
| GROUP CORP f/k/a DIGITAL WORLD | ) |
| ACQUISITION CORP., DONALD J. | ) |
| TRUMP, DEVIN G. NUNES, DONALD J. | ) |
| TRUMP, JR., KASHYAP "KASH" PATEL, | ) |
| DANIEL SCAVINO, JR., ERIC SWIDER, | ) |
| W. KYLE GREEN, LINDA MCMAHON, | ) |
| ROBERT LIGHTHIZER, | ) |
| | ) |
| Defendants. | ) |

## SECOND AMENDED VERIFIED COMPLAINT[1]

Plaintiff United Atlantic Ventures, LLC ("UAV" or "Plaintiff"), by and through its undersigned counsel, in accordance with Court of Chancery Rule 15(aaa), hereby asserts this Second Amended Verified Complaint for declaratory and injunctive relief against defendants TMTG Sub Inc. f/k/a Trump Media & Technology Group Corp. ("Old TMTG"), Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Corp. ("New TMTG"), and the directors of Old

---

[1] A blackline comparing this Second Amended Verified Complaint against UAV's First Amended Verified Complaint in this action is attached hereto as Exhibit 1.

TMTG and New TMTG: Donald J. Trump, Devin Nunes, Donald J. Trump, Jr., Kashyap "Kash" Patel, Daniel Scavino, Jr., Eric Swider, W. Kyle Green, Linda McMahon, and Robert Lighthizer.  In support hereof, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      This case is about the relentless, multifaceted scheme to deprive UAV of the fruits of their creation of Truth Social, which provides the only value to New TMTG and its shareholders.  UAV's right to its share of the value it created was accepted and ratified by Old TMTG and its controller, Trump, through corporation actions, was known to and disclosed by Digital World Acquisition Corp. ("DWAC") in its pre-Merger regulatory filings, was acknowledged by Old TMTG in multiple representations made to the Court of Chancery, and was recognized by the Court of Chancery's March 15, 2024 Order (the "March 15 Order").

2.      Notwithstanding these indisputable facts, the controllers of Old TMTG, DWAC, and now New TMTG continue their scheme to retaliate against UAV and deprive UAV of its right to the value it owns.  The retaliation scheme began when Trump removed Andy Litinsky, one of UAV's members, from Old TMTG's Board after UAV refused Trump's demand that UAV give some of its stock to Trump's

wife.[2]  Old TMTG then ignored multiple correspondence from UAV attempting to seek confirmation of its rights.

3.    As UAV began to assert its rights, Old TMTG and its controllers planned to dilute UAV's stock and authorized 1,000,000,000 shares of new stock without notice to UAV or any shareholder vote (the "Billion Share Authorization"). When UAV focused on the Billion Share Authorization, Old TMTG persuaded DWAC to insert a lock-up provision in DWAC's post-Merger Charter to lock-up UAV's stock.  On March 25, 2024, New TMTG filed a Second Amended and Restated Certificate of Incorporation of Digital World Acquisition Corp. (the "New TMTG Second Amended Charter"), which includes a lock-up provision that locks-up UAV's stock in New TMTG for a period of up to six months.

4.    This Charter lock-up was not required by the Merger Agreement, not necessary for regulatory compliance, has no basis in ordinary market practice, and serves no legitimate business purpose.  New TMTG already had a contractual right under the Merger Agreement to lock-up Trump's New TMTG stock.  DWAC's regulatory filings disclosed that certain TMTG insiders would be subject to lock-up

---

[2]  As further discussed below, the malicious conduct of TMTG's controller began well before this, when Eric Trump and a Trump representative took the legally baseless and invalid position that the Services Agreement was "*void ab initio*."

agreements post-Merger to promote stability to the leadership and governance of TMTG.  The contractual lock-up provision in the Merger Agreement served a legitimate business purpose because Trump: (i) was a current director of TMTG and therefore was privy to insider, non-public information, (ii) owned more than 10% of Old TMTG's outstanding stock, (iii) would own more than 10% of New TMTG's stock post-Merger, and (iv) is subject to a lock-up period under the rules and regulations of the U.S. Securities and Exchange Commission (the "SEC").

5.      But the contractual lock-up provision in the Merger Agreement, by its plain terms, did not apply to UAV or UAV's stock.  Locking-up UAV's post-Merger stock serves no reasonable purpose because: (i) neither Moss nor Litinsky had personally served on Old TMTG's Board since September 2022, and therefore were not privy to any insider information not known to the marketplace (ii) UAV did not own more than 10% of Old TMTG stock, (iii) UAV would not own more than 10% of New TMTG post-Merger stock, and (iv) UAV was not subject to any lock-up period under SEC rules and regulations.  None of DWAC's regulatory filings have offered any reason why UAV's post-Merger stock is subject to a lock-up.

6.      Indeed, DWAC filed *four* versions of its Registration Statement that did not mention a lock-up of UAV's stock post-Merger, thereby confirming with the SEC on *four* separate occasions that locking-up UAV's stock post-Merger was not

necessary to close the Merger.  It was not until UAV objected to the Billion Share Authorization and asserted its rights that Old TMTG and DWAC agreed to include this new Charter lock-up at the 11th hour.  For all these reasons and as more fully alleged below, the Charter lock-up represents a retaliatory and discriminatory corporate act, violates 8 *Del. C.* § 202, and constitutes a breach of the fiduciary obligations the boards of directors of Old TMTG and New TMTG owe to UAV.

7.      The retaliation did not stop there.  At 11:18 PM on the Sunday night before the Merger was set to close, the controllers of Old TMTG caused it to sue UAV, and its members Andy Litinksy and Wesley Moss, in Sarasota County, Florida seeking the disgorgement of UAV's stock for alleged contractual and fiduciary breaches (the "Sarasota Action").[3]  New TMTG's Board now prosecutes the Sarasota Action post-Merger.

8.      The Sarasota Action is an improper collateral attack on the Court of Chancery's March 15 Order, which required TMTG to "cooperate with Plaintiff and the New Digital World's transfer agent to ensure that Plaintiff receives all New Digital World stock and earn-out stock to which it is entitled concurrent with the delivery of any stock to Donald J. Trump, Bradford Cohen and/or the TMTG

---

[3] A true and correct copy of the complaint in the Sarasota Action is attached hereto as Exhibit A.

Noteholders."   The March 15 Order further unequivocally declared UAV's ownership of 8,600,000 shares and ordered that they "remain through Closing of the DWAC-TMTG Merger."

9.      Notwithstanding the March 15 Order, in the Sarasota Action, Old TMTG: (a) alleges that UAV wrongfully commenced and pursued the instant action before this Court (Ex. A ¶¶ 4, 63-65), (b) alleges that Litinsky and Moss breached their fiduciary duties of care and loyalty owed to Old TMTG under Delaware law (*id*. ¶¶ 124-135), and (c) seeks "a judgment ordering UAV to return to TMTG the shares of stock it received …" *Id*. at 29 (WHEREAS clause) (emphasis supplied).

10.     The claims in the Sarasota Action are also compulsory counterclaims that must be brought in this action, if at all, because they arise out of the same transaction or occurrence that is the subject matter of UAV's claims here. Defendants are seeking to improperly split their claims between two jurisdictions solely to retaliate against UAV.  Defendants' retaliatory motive is clear because the Services Agreement underlying the claims in the Sarasota Action includes an exclusive venue provision that requires claims brought under that document to be filed either  in Palm Beach County, Florida, or the federal district court for the southern district of Florida.  TMTG's controllers' reason for filing the Sarasota Action in the wrong venue can only be explained by animus towards UAV and an

attempt to seek a different result in a perceived "friendly" (but improper) venue than the one delivered by this Court in the March 15 Order.

11.     In bringing the Sarasota Action, TMTG's controllers also ignored Old TMTG's corporate resolutions, under which UAV has established a right to receive both an undiluted and unrestricted right to New TMTG post-Merger Stock (the "Stock Ownership Right") that was first memorialized in the Services Agreement. UAV's Stock Ownership Right was approved by the Old TMTG's stockholders in June 2021 and then again through a series of resolutions validly adopted and approved at the Old TMTG Board's October 13, 2021 meeting in accordance with 8 *Del. C.* § 152 (the "October 2021 Resolutions").

12.     Without further intervention by the Court of Chancery, TMTG's controllers will continue their retaliation campaign against UAV to deprive UAV and its members of the value they created and own.  For reasons that will be more fully explained through the presentation of UAV's motion for preliminary injunction (filed contemporaneously herewith), UAV faces an imminent threat of serious irreparable harm absent the injunctive and declaratory relief it seeks.  UAV's post-Merger stock in New TMTG is unreasonably restricted and cannot currently be sold by UAV due to the lock-up provisions in the New TMTG Second Amended Charter,

██████████████████████████████████████████████

██████████████████████████████████████████████.

13.    Accordingly, through this Second Amended Complaint, UAV seeks declaratory and injunctive relief: (a) declaring Section 4.8 of the New TMTG Second Amended Charter void and unenforceable as applied to UAV, (b) requiring New TMTG to remove legends from UAV's stock that prevent UAV from selling or transferring its stock, (c) declaring that Old TMTG ratified and approved UAV's rights emanating from the Services Agreement, (d) declaring the Services Agreement a valid and enforceable agreement, and (e) enjoining TMTG from further prosecuting the Sarasota Action.

## PARTIES

14.    Plaintiff United Atlantic Ventures, LLC is a Delaware limited liability company with its principal place of business in Fort Lauderdale, Florida.

15.    Defendant TMTG Merger Sub Inc. f/k/a Trump Media & Technology Group Corp ("Old TMTG") is a Delaware corporation with its principal place of business in Sarasota, Florida.

16.    Defendant Trump Media & Technology Group Corp. f/k/a Digital World Acquisition Group ("New TMTG") is a Delaware corporation.  New TMTG's stock is publicly traded on NASDAQ with the ticker symbol DJT, which are the initials of its controlling stockholder, defendant Donald J. Trump.  As a result of the Merger, Old TMTG is a wholly owned subsidiary of New TMTG.

17.    Defendant Donald J. Trump is the chairman of the Board of Directors of Old TMTG and was the President of the United States of America from 2017 to 2021.  He is currently campaigning for the Republican Party nomination for the 2024 presidential election.  Trump was the controlling shareholder of Old TMTG and is currently the controlling shareholder of New TMTG.

18.    Defendant Devin G. Nunes was CEO and director of Old TMTG. Nunes is currently the CEO and a director of New TMTG.

9

19.     Defendant Donald J. Trump, Jr., one of Trump's sons, was a director of Old TMTG.  He is an executive vice president of the Trump Organization.  He is currently a director of New TMTG.

20.     Defendant Kashyap "Kash" Patel is a director of Old TMTG.  Patel is currently a director of New TMTG.

21.     Defendant Daniel Scavino, Jr. is a director of Old TMTG. He previously served as the personal assistant to Trump and Director of Social Media for the Trump Administration.  He is currently a Senior Advisor to Trump's 2024 presidential campaign.

22.     Defendant Eric Swider is a director of New TMTG.

23.     Defendant W. Kyle Green is a director of New TMTG.  DWAC's pre-Merger registration statement claimed that Green is an independent director.

24.     Defendant Linda McMahon is a director of New TMTG.  DWAC's pre-Merger registration statement claimed that McMahon is an independent director.

25.     Defendant Robert Lighthizer is a director of New TMTG.  DWAC's pre-Merger registration statement claimed that Lighthizer is an independent director.

## JURISDICTION

26.     This Court has subject matter jurisdiction over this action pursuant to 10 *Del. C.* § 341 and §6501 and 8 *Del. C.* § 111.

10

27.     The Court has personal jurisdiction over Old TMTG and New TMTG because they are Delaware corporations.  The Court has personal jurisdiction over the individual defendants pursuant to 10 *Del. C.* § 3114 because, at all times relevant hereto, they were or are directors of Delaware corporations.

## FACTS

### A. The Agreement to Form TMTG and UAV's Stock Ownership Rights.

28.     On February 2, 2021, in the wake of Trump's defeat in the 2020 presidential election and his being banned from Twitter, Facebook and other social media platforms, Trump and TM entered into the Services Agreement with UAV.[4] By way of the Services Agreement, Trump and TM engaged UAV to form TMTG (then referred to as "Trump Media Group Corp." or "TMG") as a Delaware corporation and provide consulting services to help TMTG develop and implement a strategic business plan for the eventual launch of Trump's "Truth Social" platform and related business lines.

29.     The primary goal of the Services Agreement was ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ To that end, the Services

---

[4] A true and correct copy of the Services Agreement is attached hereto as Exhibit C.

11

Agreement granted UAV ██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████    The Services Agreement also granted the Company an exclusive license to all digital media associated with Trump.

30.    With respect to the UAV's Stock Ownership Right, the Services Agreement set forth the corporate and capital structure under which TMTG would be formed.  TMTG was to be formed as a Delaware corporation ████████████████ ████████████████████████████████████████    Under the Services Agreement, TMTG's common stock was to be distributed as follows:

- 90,000,000 shares, representing 90% of the issued and outstanding TMTG stock, to Trump.

- 8,600,000 shares, representing 8.6% of TMTG's issued and outstanding stock, to UAV.

- 1,400,000 shares, representing 1.4% of TMTG's issued and outstanding stock, to Cohen, an attorney who advised Trump and TM in connection with the Services Agreement and other matters.[5]

---

[5] At Trump's direction, UAV agreed to pay Cohen's equity stake on behalf of Trump and TM out of what would have otherwise been UAV's 10% equity stake in TMTG.

12

31.    The Services Agreement did not provide that UAV's stock would be restricted or otherwise include any agreed upon stock restrictions.

32.    The Services Agreement further provides that ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

33.    The Services Agreement also grants UAV the right to appoint and replace two members of the TMTG board of directors, as well two members of the boards of directors of all TMTG's ██████████████████████████

████████████████████████████ (the "Director Designation Right").

34.    Finally, the Services Agreement granted UAV's managing partner the

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *Id.*

35.    TMTG was not a party to the Services Agreement.  Accordingly, the Services Agreement envisioned that once formed, TMTG would adopt and assume the commitments in the Services Agreement relative to it, including the Stock Ownership and Anti-Dilution Rights.

36.    In reliance on the Services Agreement, UAV set about forming TMTG and executing the business plan it had developed for the Company.  Because they received no cash compensation or salary in the deal, UAV's members were determined for the Company to succeed.  Within 13 months of their initial meeting with Trump, UAV had successfully launched TMTG, raised millions of dollars, hired dozens of employees, found a SPAC partner, and launched "Truth Social," a full-fledged social media platform comparable to X (formally Twitter), which on February 24, 2022 became the number one app in America.

37.    UAV quickly moved to ensure the financial longevity of the Company. As reflected in the Services Agreement, the parties' intent was for TMTG to combine with a special purpose acquisition company or SPAC.  Accordingly, UAV's managing member contacted representatives of dozens of different SPACs and spent nearly all his waking hours devoted to the success of TMTG.  Eventually, this work paid off when TMTG executed an agreement and plan of merger with a SPAC in October 2021.

**B. The Formation of TMTG as a Delaware Corporation and Ratification of the Pertinent Services Agreement Commitments and Obligations.**

38.     On February 8, 2021, Trump Media Group Corp. (later to be renamed TMTG) filed a Certificate of Incorporation with the Delaware Secretary of State (the "Original Charter").   A true and correct copy of the Original Charter is attached hereto as Exhibit D.

39.     In order to reduce franchise-tax expenses, Old TMTG's corporate counsel ██████████████████████████████████████████ ███████████████████████████████████████████ ███████████ However, ████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████ TMTG's ███████████████████████████ ██████████████████████████████████.

40.     The Original Charter did not contain any restrictions on UAV's Old TMTG stock.

41.     On June 4, 2021, acting by Unanimous Written Consent in Lieu of a Meeting of the Stockholders, Trump, Cohen, and UAV (the "TMTG Stockholders")

passed a series of formative resolutions (the "June 2021 Resolutions"). A true and correct copy of the June 2021 Resolutions is attached hereto as Exhibit E.

42.    Through June 2021 Resolutions, the TMTG Stockholders ratified and approved the following actions:

- The filing of the Original Charter.

- The setting of the number of Company's Board at three.

- The appointment of Trump, Litinsky and Moss as the Company's initial Board.

- The election of Trump, Litinsky and Moss as the "Authorized Officers" of the Company.

- The issuance of 10,000 shares of the Company's common stock to the following persons and entities in the following amounts:

  o  Trump – 9,000 shares (or 90%)

  o  UAV – 860 shares (or 8.6%)

  o  Cohen – 140 shares (or 1.4%)

43.    The June 2021 Resolutions also contained a General Resolution that (among other things) "in all respects confirmed, approved and ratified" all actions previously "taken by the Authorized Officers of the Corporation in connection with the foregoing resolutions."  This aspect of the June 2021 Resolutions thus ratified

and adopted, among other things, TMTG's commitments and obligations under the Services Agreement, which agreement was signed by Trump and Litinsky (*i.e.*, two of the "Authorized Officers"). The commitments and obligations so ratified included all of UAV's rights under the Services Agreement.

**C. Trump Attempts to Renege on the Services Agreement.**

44.     On July 30, 2021, a Trump representative informed TMTG's corporate counsel via email, *inter alia*, that the Services Agreement "was simply not what [Trump and TM] understood they were agreeing to and that the actual terms of [the Services Agreement] had never been adequately explained to them prior to signing." The email attached an unsigned letter, purportedly from Eric Trump on behalf of his father, Donald Trump. Both the email and the letter purported to declare the Services Agreement "*void ab initio*."

45.     There was and is no basis in law or fact for Trump and/or his representatives to declare the Services Agreement void or to renege on the commitments and obligations contained therein. Indeed, Trump was represented by counsel in connection with the negotiation and execution of the Services Agreement.

46.     In any event, as further explained herein, Trump and TM affirmed the commitments and obligations in the Services Agreement in subsequent contracts,

through partial performance and by otherwise taking valid and binding actions under Delaware law in conformity with the parties' contractual arrangements.

**D. Trump and Old TMTG Abandon, Waive, and Forgo Their Prior Repudiation of the Services Agreement.**

47.  Shortly after purporting to declare the Services Agreement null and void, Trump and Old TMTG realized that they still needed UAV, Litinsky and Moss.

48.  On October 13, 2021, Trump, Litinsky and Moss, acting as the Old TMTG Board pursuant to the June 2021 Resolutions, convened a board meeting. Moss acted as Chairman of the meeting and Lori Heyer ("Heyer"), Old TMTG's Chief Legal Officer, served as Secretary.

49.  At its October 13, 2021 meeting, the Old TMTG Board unanimously approved the following resolutions (the "October 2021 Resolutions"):

- Authorization for the filing of an amended and restated certificate of incorporation with the Delaware Secretary of State (the "First Amended Charter") changing the corporation's name to "Trump Media & Technology Group Corp."

- Authorization to increase, through the filing of the First Amended Charter, TMTG's authorized shares of Common Stock from 11,000 to 110,000,000.

- Affirming and confirming "the issuance of a total of 100,000,000 shares of Common Stock to the [following] individuals or entities": (a)

90,000,000 shares to Trump (90%), (b) 8,600,000 shares to UAV (8.6%), and (c) 1,400,000 shares to Cohen (1.4%).

- Reserving in treasury a total of 7,500,000 shares of Common Stock for an equity incentive plan to be adopted by TMTG.

- Ratifying, approving and confirming in all respects all prior actions taken by the Company, the Board or any Officer of the Company on the Company's behalf in connection with the matters approved, authorized, or contemplated by the foregoing Board actions. [6]

50.    By way of the June 2021 and October 2021 Resolutions, the TMTG Stockholders and Old TMTG Board affirmed and ratified UAV's Stock Ownership Right and took the corporate action required to issue stock to UAV (consistent with its Stock Ownership Right) under Delaware law.

51.    Finally, through the General Resolutions adopted by the Old TMTG Board on October 13, 2021, Old TMTG "ratified, approved and confirmed in all respects" any actions "taken by the Company, the Board, or any officer of the Company on behalf of the Company, in connection with the matters approved by

---

[6] Attached hereto as Exhibit B is a true and correct copy of the October 2021 Resolutions, along with the accompanying Minutes of the October 13, 2021 Board meeting and Amended and Restated Certificate of Incorporation adopted by the Board at the October 13, 2021 Board meeting and filed with the Delaware Secretary of State on October 18, 2021.

[the October 2021 Resolutions]." Ex. B at 3. Because Trump and Litinsky signed the Services Agreement and were Authorized Officers of Old TMTG, this General Resolution constituted board ratification – and hence adoption by the Old TMTG – of the Stock Ownership Rights and all additional rights of UAV emanating from the Services Agreement.

52.    Following the October 2021 Resolutions, Old TMTG filed an Amended and Restated Certificate of Incorporation with the Delaware Secretary of State on October 18, 2021. The Amended and Restated Certificate of Incorporation did not contain any restrictions on UAV's stock.

53.    In addition to the other actions ratifying, confirming and reaffirming the obligations emanating from the Services Agreement (including corporate actions undertaken in conformity with Delaware law, as further detailed above), on December 22, 2021, Trump and TM executed an Amended and Restated License, Likeness, Exclusivity and Restrictive Covenant Agreement (the "License Agreement") in favor of Old TMTG. Among other things, the License Agreement expressly confirmed the existence and validity of the Services Agreement.[7]

---

[7] The License Agreement, which confirms the existence and validity of the Services Agreement, is expressly referenced over 100 times in the various S-4s filed by DWAC in connection with the Merger. Additionally, an October 2021 action by written consent of the TMTG stockholders approved, ratified, and confirmed the execution, delivery, and performance of the License Agreement. As noted above,

20

54.    Further confirming UAV's Stock Ownership Rights, on June 2, 2022, Scott Glabe ("Glabe"), who became Old TMTG's Chief Legal Officer after Heyer resigned and is New TMTG's General Counsel, emailed a member of UAV in response to that member's numerous requests that the Company confirm UAV's 8.6% stock ownership.  In his email, Glabe wrote ███████████████████ ███████████████████.

### E. Trump Thwarts UAV's Board Designation Rights After a UAV Board Member Declines to Transfer Old TMTG Stock to Trump's Wife.

55.    In or around March 2022, Trump demanded that then-TMTG Board member Litinsky transfer to Trump's wife, Melania Trump, a portion of UAV's Old TMTG stock.  When Litinsky refused, Trump (acting through former US Secretary of the Interior, David Bernhardt, and former US Congressman, Devin Nunes, then CEO of TMTG) purported to remove Litinsky from the Old TMTG Board.

56.    TMTG's then-Chief Legal Officer, Heyer, was not consulted about or informed of the purported removal of Litinsky from the Board, which was undertaken in violation of UAV's Board Designation Right and in breach of Nunes' fiduciary duties as an officer of TMTG. As a result of her concern over the legality

---

the License Agreement expressly confirms the existence and validity of the Services Agreement. Plaintiff reserves all rights with respect to the Amended License Agreement.

of Litinsky's purported removal, Heyer executed a "noisy withdrawal" as TMTG's

Chief Legal Officer. Ken Bednar, Senior Legal Officer, also abruptly resigned.

57.    On June 10, 2022, counsel for UAV wrote to Old TMTG's new

corporate counsel seeking to confirm its rights as a shareholder and reminding

TMTG of UAV's right to designate two directors.  Old TMTG did not respond to

UAV's correspondence. Instead, Old TMTG intentionally walled off UAV's other

director, Moss, ultimately forcing him to resign from the Old TMTG Board in

September 2022.

**F. The Merger Agreement Does Not Restrict UAV's Post-Merger Stock.**

58.    On October 20, 2021, Old TMTG entered into an Agreement and Plan

of Merger (the "Merger Agreement") with Digital World Acquisition Corp. and

DWAC Merger Sub Inc. (both Delaware companies) to accomplish the SPAC

reverse merger transaction envisioned under the Services Agreement (the "Merger").

A true and correct copy of the Merger Agreement is attached hereto as Exhibit G.

59.    The Merger Agreement required DWAC and Old TMTG to agree upon

a form of Amended Charter, which DWAC was required to adopt. DWAC was

required to adopt an Amended Charter to: (i) change DWAC's name to Trump Media

& Technology Group, (ii) provide for the size and structure of the post-Merger

Board,  and  (iii) ███████████████████████████████████████████████

████████████████████████████████████ Merger

Agreement at § 1.7.

60.     Nothing in the Merger Agreement, however, required DWAC and Old

TMTG to agree to adopt Charter amendments that would restrict UAV's post-

Merger stock.

61.     Section 1.9 of the Merger Agreement, entitled "Effect of Merger on

Company Securities" provides that UAV, Trump, and Cohen had to surrender their

Old TMTG shares, which would be canceled in exchange for the Merger

Consideration.  This Section does not provide that UAV's Merger Consideration

would include a lock-up of its post-Merger stock.

62.     Section 1.10 of the Merger Agreement, entitled "Surrender of Company

Securities and Disbursement of Merger Consideration" provides that UAV was to

receive its Pro Rata Share of the Stockholder Merger Consideration, which term is

defined in Section 1.8.  Neither Sections 1.8 nor 1.10 of the Merger Agreement

contemplate that UAV's Stockholder Merger Consideration would include stock that

would be locked-up post-Merger.

63.     Under the Merger Agreement, as Stockholder Merger Consideration

and in exchange for the cancellation of their shares, each Old TMTG shareholder

was to receive their *pro rata* share of a pool of post-Merger stock worth $875

million. In addition, the ████████████████████████████████████

████████████████████████████████████████[8]    The    Company

Stockholders are entitled to their *pro rata* shares of 40,000,000 in Earnout Shares if

the DWAC Stock reaches all the earnout milestones.

64.    The Merger Agreement gives Old TMTG the right to designate six

directors to the DWAC board upon closing of the Merger.

65.    The Merger Agreement also provides that Significant Company

Holders (holders of 10% or more of TMTG stock) will enter into a form lock-up

agreement with DWAC (the "Lock-Up Agreement").[9]    Execution of the Lock-Up

Agreements is a condition to closing but is waivable by DWAC.

66.    UAV is not a Significant Company Holder because UAV owns less

than 10% of TMTG's stock.  Accordingly, UAV was not required under the Merger

Agreement to enter into a Lock-Up Agreement with DWAC.

67.    The Lock-Up Agreement mandates that the holder agree not to sell or

otherwise transfer DWAC Stock during the period ████████████████████████

████████████████████████████████████████████████████████

---

[8] Unless otherwise noted capitalized terms from the Merger Agreement shall have
the same meaning as set forth in the Merger Agreement.

[9] A copy of the true and correct Form Lock-Up Agreement is attached hereto as
Exhibit H.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ (the "Lock-Up Provision"). Ex. H at

2.

68.     Notwithstanding the Lock-Up Provision, the Lock-Up Agreement also

grants Trump broad power to transfer his post-merger DWAC stock to a "Permitted

Transferee."   DWAC's Registration Statement also reinforces that the Lock-Up

Agreement can be waived. Ex. F at 2. ("The Merger Agreement, unless otherwise

waived by Digital World, provides that at or prior to the Closing, certain significant

TMTG stockholders will enter into a Lock-Up Agreement with Digital World.").[10]

69.     After the Merger Agreement was signed in October of 2021,

consummation of the Merger was delayed by (among other things) an SEC

investigation.  The Merger was placed back on track in the latter part of 2023.

70.     On August 9, 2023, DWAC, DWAC Merger Sub, and TMTG entered

into the Second Amendment to Agreement and Plan of Merger (the "Second

Amendment to Merger Agreement"), amending certain provisions of the Merger.

---

[10] Unless otherwise noted, capitalized terms from the Registration Statement shall
have the same meaning as set forth in the Registration Statement.

Attached hereto as Exhibit I.  Most critically, amending the Merger Consideration

(the "Amended Merger Consideration").

71.    Under the Amended Merger Consideration,

the Company Security Holders collectively, shall be entitled to receive from the Purchaser, in the aggregate, a number of Purchase Securities with an aggregate value equal to (the "Merger Consideration") (A) Eight Hundred-Seventy-Five Million U.S. Dollars ($875,000,000)…with each Company Stockholder (*other than the Company Principal who shall instead receive the Purchaser High Vote Common Stock*) receiving for each share of Company Stock held…a number of shares of Purchaser Class A Common Stock equal to (I) the Per Share Price, divided by (II) the Redemption Price…[.]" Ex. I at 2 (emphasis added).

72.    Company Principal, as defined in the Merger Agreement, means former

President Donald J. Trump. Ex. G at 80.

73.    The Second Amendment to Merger Agreement defines Purchaser High

Vote Common Stock as follows:

Notwithstanding anything to the contrary herein, the Parties agree that the Amended Purchaser Charter will reflect the creation of the Purchaser High Vote Common Stock to be issued to the Company Principal. Each share of Purchaser High Vote Common Stock shall have the same voting, dividend, liquidation and other rights as one share of Purchaser Class A Common Stock, except that each share of Purchaser High Vote Common Stock shall entitle its holder to a number of votes equal to the greater of (i) one vote and (ii) the number of votes that would cause the aggregate number of shares issued to the Company Principal as consideration in the Merger

(excluding any Earnout Shares) to represent 55% of the voting power…of (A) all shares of Purchaser Common Stock entitled to vote on the election of directors as of immediately following the Closing plus (B) the maximum number of shares of Purchaser Common Stock issuable upon the conversion of all convertible preferred stock or other convertible securities of the Purchaser (if any) outstanding….Each share of Purchaser High Vote Common Stock will automatically convert into a share of Purchaser Class A Common Stock upon transfer (other than to an affiliate)…."

Ex. I at 3.

74.     Under the Amended Merger Consideration, Trump was the only TMTG stockholder to receive Purchaser High Vote Common stock for his TMTG stock. Thus, even if Trump were to sell all but one share of his TMTG stock, he would retain majority voting control over New TMTG.

75.     Trump, through a Board he controls and dominates, negotiated for himself a new class of stock, with rights no other shareholder will receive. The DWAC High Vote Common Stock that Trump (and only Trump) will receive in the Merger gave him voting control over New TMTG post-Merger, without Trump giving up any additional consideration in exchange.[11]

---

[11] This is a clear breach of fiduciary duty by a self-interested controlling stockholder and a board of directors he controls. TMTG's approval of this aspect of the Merger Agreement is neither the product of fair process nor fair price. Plaintiff reserves all rights with respect to the DWAC High Vote Common Stock.

76.     Nothing in the Second Amendment to Merger Agreement, however, required DWAC to lock-up UAV's post-Merger Stock.   Indeed, the Second Amendment to Merger Agreement does not provide for any restrictions on UAV's post-Merger stock.

77.     The Second Amendment also amended the board designation rights found in the Merger Agreement.   Under the Second Amendment, the post-closing DWAC board will consist of "the one (1) person that is designated by the Purchaser (which shall be the Chief Executive Officer of the Purchaser…)…and the six (6) persons that are designated by the Company prior to the Closing…at least three (3) of whom shall qualify as an independent director under Nasdaq rules." Ex. I at 2.

**F.      UAV Seeks to Enforce Its Rights.**

78.     On January 18, 2024, counsel for UAV wrote to DWAC's regulatory counsel to advise DWAC that the December S-4 contained material misstatements and omissions because it failed to disclose UAV's Stock Ownership, Anti-Dilution and Board Designation Rights.   A true and correct copy of the January 18, 2024 letter sent on UAV's behalf is attached hereto as Exhibit J.

79.     Specifically, among other things, the December S-4 failed to disclose and/or is false and misleading with respect to the following:

- UAV's full and complete Stock Ownership Right, which would cause UAV to be a greater than 5% owner in DWAC post-Merger.

- UAV's Anti-Dilution Right, which includes UAV's right to approve the issuance of additional TMTG shares and the creation of different classes of TMTG stock.

- UAV's right to designate two TMTG directors and, post-Merger, two DWAC directors.

- UAV's expense reimbursement rights under the Services Agreement, including the fact that, as of January 2024, UAV was owed in excess of $1 million.

- The License Agreement's recognition of the validity of the Services Agreement while simultaneously maintaining that the Services Agreement had been declared *void ab initio* prior to the execution of the License Agreement.[12]

80.   UAV's January 18 letter expressed "serious concerns that DWAC and TMTG do not intend to honor certain rights that UAV holds with respect to TMTG" in connection with the Merger. Ex. J at 1.  UAV requested confirmation that DWAC

---

[12] After receiving UAV's counsel's January 18, 2024 letter, TMTG purported to execute a new License Agreement removing reference to the Services Agreement.

intended to honor UAV's Stock Ownership, Anti-Dilution and Director Designation Rights and amend DWAC's existing disclosures accordingly.

81.    Rather than respond directly to UAV's January 18, 2024 letter, on January 22, 2024, DWAC filed with the SEC Amendment No. 3 on Form S-4 (the "January S-4").  The January S-4 claimed, among other things, that the Services Agreement was purportedly "declared void nearly two and a half years previously" and that "[o]n July 30, 2021, an attorney for the Trump Organization transmitted to counsel for TMTG correspondence, on behalf of President Trump declaring *void ab initio* a Services Agreement that had granted TMTG, among other things, extensive intellectual property and digital media rights related to President Trump for purposes of commercializing the various TMTG initiatives."

82.    As set forth further below, the January 22 Amendment No. 3, however, did not disclose the existence of any post-Merger Charter lock-up provisions or any intent to implement such restrictions.

83.    On February 9, 2024, counsel for UAV again wrote to DWAC's underwriting counsel, noting that the January S-4 appeared to be false and inaccurate.  A true and correct copy of UAV's February 9. 2024 letter is attached hereto as Exhibit K.

30

84.    Specifically, the disclosures in the January S-4 were materially misleading for at least the following reasons:

- First, there was and is no basis in law or fact for Trump (through his son, Eric Trump) to unilaterally declare the Services Agreement *void ab initio*, as Trump was informed by counsel for TMTG in August 2021, so the Services Agreement remains in full force and effect.

- Second, in December 2021, Trump and TMTG executed the License Agreement, which expressly affirms the existence and validity of the Services Agreement, again underscoring that the Services Agreement remains in full force and effect.

- Third, the conduct of the parties to the Services Agreement post-July 2021, including the codification of UAV's Stock Ownership and Anti-Dilution rights through the June 2021 and October 2021 Resolutions.

- Fourth, the use of the Services Agreement to solicit TMTG investors in late 2021 and in 2022, further confirms that the Services Agreement remains in full force and effect.

- Fifth, DWAC failed to disclose that the Services Agreement was expressly recognized in the License Agreement, which in turn was ratified by the TMTG Board.

31

Notwithstanding this further correspondence from UAV to DWAC's underwriting counsel, DWAC failed to correct the false and misleading disclosures in the January S-4.

### G. Trump Causes Old TMTG and New TMTG to Discriminate and Retaliate Against UAV by Attempting to Dilute and Lock-Up UAV's Stock.

85.    A week after receiving UAV's January 18 letter, on January 26, 2024, Old TMTG caused to be filed with the Delaware Secretary of State a Third Amended and Restated Certificate of Incorporation (the "Third Amended Charter"). The Third Amended Charter purports to authorize Old TMTG to issue *one billion shares* of common stock, of which 900,000,000 are designated voting stock and 100,000,000 are classified as non-voting common stock (the "Billion Share Authorization").

86.    The Billion Share Authorization is indicative of a broader scheme to retaliate and discriminate against UAV and Cohen because it occurred a mere eight days after UAV's counsel's first letter to DWAC raising concerns over the December S-4 and four days after the Cohen 220 Demand (defined below), which inquired (among other things) into Old TMTG's current capitalization.

87.    In DWAC's February 14, 2024 Registration Statement, DWAC advised stockholders, among other things, of TMTG's position that "the capitalization of TMTG is based on TMTG's corporate documents, including a resolution dated

32

October 13, 2021 … and not the Services Agreement." [13]   Yet, the Registration

Statement represents that the Billion Share Authorization "***has not been approved***

***by TMTG's shareholders nor given effect via the filing of amended certificate of***

***incorporation with the Delaware Secretary of State***" and therefore, "***the number***

***of TMTG's authorized shares remains 120,000,000 as of the date hereof.***"  *Id.*  At

least part of this disclosure is demonstrably false – TMTG *had filed* the Third

Amended Charter with the Delaware Secretary of State on January 26, 2024.  This

demonstrates that the TMTG Board, which again is dominated and controlled by

Trump, did not inform DWAC that it had filed the Third Amended Charter.

Otherwise, the disclosure in DWAC's Registration Statement would be knowingly

false.[14]

---

[13] Excerpts of DWAC's Registration Statement cited herein are attached hereto as
Exhibit F. Exhibit F has been supplemented with additional exceptions.  The entire
Registration Statement is available at:
https://www.sec.gov/Archives/edgar/data/1849635/000119312524036093/d408563
ds4a.htm (last visited February 28, 2024).

[14] DWAC and TMTG admit they are treating Trump's TMTG stock differently than
UAV's TMTG stock.  Footnote 6 of the Registration Statement states: "shares to be
issued, directly or indirectly, to former President Trump *pursuant to the terms of the
Merger Agreement*…[.]" Ex. F at 6 (emphasis added).  While footnote 8 of the
Registration Statement states: "shares to be issued, directly or indirectly, to United
Atlantic Ventures, LLC *as a result of the conversion of its TMTG common stock into
New Digital World common stock.*" Ex. F at 6 (emphasis added).

33

88.     The timing of the Billion Share Authorization further underscores the obvious nefarious intent underlying Old TMTG's effort to dilute UAV and Cohen. After the Old TMTG Board purportedly sat on the Third Amended Charter for more than 11 months, it caused the document to be filed with the Delaware Secretary of State *just four days* after Cohen – the third largest Old TMTG stockholder – submitted a books-and-records demand to Old TMTG under Section 220 of the DGCL seeking information on his ownership interests (the "Cohen 220 Demand"). A true and correct copy of the Cohen 220 Demand is attached hereto as Exhibit L.

89.     Trump and TMTG's retaliation against UAV did not end with the now-thwarted attempt to dilute UAV.  On or about February 11, 2024, having received the above-referenced letters from UAV's counsel and with the Registration Agreement on the verge of gaining final approval, Trump and Nunes unilaterally agreed to an amendment to the License Agreement that (a) removed any reference to UAV and the Services Agreement, and (b) stripped from the License Agreement the vast majority of rights that Trump granted to Old TMTG in the License Agreement (the "Amended License Agreement").

90.     On information and belief, Old TMTG received nothing in return for the extremely valuable rights it purportedly surrendered through the Amended License Agreement.  On further information and belief, Trump conspired with

Nunes over the Amended License Agreement so that Trump could demand additional consideration before and or after the Merger for the rights TMTG purportedly surrendered through the Amended License Agreement.

91.    Defendants also retaliated against UAV by locking up its post- Merger stock through the New TMTG Second Amended Charter.

92.    DWAC filed four Form S-4 Registration Statements with the SEC that did not disclose any lock-up of UAV's post-Merger stock.    DWAC's first Registration Statement with the SEC on May 16, 2022, did not disclose any lock-up of UAV's post-Merger stock.[15]  DWAC filed Amendment No. 1 on November 13, 2023,[16] Amendment No. 2 on December 22, 2023,[17] and Amendment No. 3 to its Registration Statement on January 22, 2024.[18]  Neither the original S-4 nor the

---

[15] DWAC's Registration Statement is available at:
https://www.sec.gov/Archives/edgar/data/1849635/000119312522150801/d226205 ds4.htm.

[16] Amendment No. 1 to the Registration Statement is available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001849635/000119312523276 045/d408563ds4a.htm

[17] Amendment No. 2 to the Registration Statement is available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001849635/000119312523302 199/d408563ds4a.htm

[18] Amendment No. 3 to the Registration Statement is available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001849635/000119312524011 615/d408563ds4a.htm

Amendments Nos. 1, 2, or 3 provide that DWAC would adopt Charter lock-up provisions post-Merger that would apply to UAV and lock-up UAV's stock.

93.    On February 12, 2024, DWAC filed Amendment No. 4 to the Registration Statement.[19]  For the first time, DWAC disclosed that it would adopt post-Merger charter amendments to lock-up certain stock.  It stated: "Subject to certain customary exceptions, the Amended Charter will also include Lock-Up Trading Restrictions, which shall apply to holders who received New Digital World common stock in exchange for their TMTG common stock, but excluding shares of New Digital World common stock issued to holders of TMTG common stock, which were issued by TMTG prior to the Closing in exchange for their TMTG Convertible Notes."  Amendment No. 4 at p. 173.

94.    On February 14, 2024, DWAC filed Amendment Nos. 5 and 6 to the Registration Statement.[20]  Amendment No. 6 was approved by the SEC on February 14 and became DWAC's final Registration Statement.  Both documents filed on

---

[19] Amendment No. 4 to the Registration Statement is available at:
https://www.sec.gov/ix?doc=/Archives/edgar/data/0001849635/000119312524031070/d408563ds4a.htm

[20] Amendment No. 5 to the Registration Statement is available at:
https://www.sec.gov/Archives/edgar/data/1849635/000119312524035214/d408563ds4a.htm

February 14 contain the same disclosure made two days earlier in Amendment No. 4.

95.     On March 25, 2024, DWAC filed the New TMTG Second Amended Charter, which included stock restrictions on UAV's post-Merger stock.  Section 4.8(a) states, in relevant part, "Subject to Section 4.8(b), the Locked-up Holders may not Transfer any Lock-up Shares until the end of the Lock-up Period."  Section 4.8(c) defines the Lock-Up Shares as "the shares of capital stock [] of the Corporation received by the stockholders of TMTG, excluding, shares of capital stock of the Corporation issued in exchange for TMTG shares that were issued by TMTG to holder of Company Convertible Notes . . . For the avoidance of doubt, nothing in this charter shall modify any contractual obligations between the Corporation and the applicable stockholders."

96.     This Charter lock-up provision serves no legitimate business purpose. New TMTG did not need to lock-up UAV's stock because it already had a contractual right to lock-up Trump's stock.  There is no reason to lock-up UAV's stock because (i) neither Moss nor Litinsky had personally served on Old TMTG's Board since September 2022, and therefore were not privy to any insider information that is not known to the marketplace, (ii) UAV did not own more than 10% of Old TMTG stock, (iii) UAV would not own more than 10% of New TMTG post-Merger

stock, and (iv) UAV was not subject to any lock-up period under SEC rules and regulations.

97.    New TMTG, with the active participation of Old TMTG and the boards of both entities, filed the Second Amended Charter with the lock-up provision to retaliate against UAV.   There is no explanation for why DWAC's original Registration Statement and Amendment Nos. 1, 2, and 3 to the Registration Statement did not include a Charter lock-up, but that DWAC's Amendment Nos. 4, 5, and 6, included such a Charter lock-up.  Amendment No. 3 was filed January 22, 2024 and Amendment No. 4 was filed on February 12, 2024.  The only thing that changed between January 22 and February 12 is that UAV asserted its rights under Delaware law to receive non-diluted post-Merger stock and Cohen made a Section 220 demand.

98.    On March 28, 2024, UAV received notice from Odyssey Trust, New TMTG's transfer agent, advising that UAV owned 7,472,141 restricted shares of New TMTG stock.  Odyssey Trust advised that UAV's stock is restricted due to the lock-up provision in the New TMTG Second Amended Charter, advising that "The securities represented hereby are subject to the limitations on transfer and lock-up restrictions described in section 4.8 of the Second Amended and Restated

Certificate of Incorporation of Trump Media & Technology Group Corp. adopted as of March 25, 2024."

## H.    The Retaliation Continues—The Sarasota Action

99.    UAV filed this action on February 29, 2024, and sent copies of its pleadings to Old TMTG's counsel the same day.  During the pendency of this action, neither Old TMTG nor its Board asserted that UAV breached any fiduciary obligations owed to Old TMTG, or that UAV was not the owner of 8,600,000 shares of Old TMTG stock.

100.    Based on representations made by Trump and TMTG's counsel at hearings on March 9 and March 15, the Court entered the March 15 Order that required TMTG to "cooperate with Plaintiff and the New Digital World's transfer agent to ensure that Plaintiff receives all New Digital World stock and earn-out stock to which it is entitled concurrent with the delivery of any stock to Donald J. Trump, Bradford Cohen and/or the TMTG Noteholders."

101.    Despite Old TMTG never asserting in this action that Litinsky and Moss breached fiduciary obligations, and never asserting that UAV was not the

lawful owner of 8,600,000 shares of stock,[21] at 11:18 PM on Sunday night before the Merger closed, Old TMTG filed the Sarasota Action alleging Litinsky and Moss breached their fiduciary duties of care and loyalty and seeking the disgorgement of UAV's stock.[22]

102.    The filing of the Sarasota Action was made in bad faith and solely to retaliate against UAV.  Old TMTG and now New TMTG filed and maintain the fiduciary and disgorgement claims in the Sarasota Action in an effort to discriminate against UAV.  There is no legitimate business purpose for asserting Litinsky and Moss breached their fiduciary obligations and seeking to disgorge UAV's stock.

---

[21] TMTG also never informed the Court that DWAC and Old TMTG had agreed to the Charter lock-up, which would restrict the sale of UAV's stock post-merger.

[22] A true and correct copy of the Complaint in the Sarasota Action is attached hereto as Exhibit A.

## COUNT I
### (Violation of 8 *Del. C.* § 202)
### (UAV v. New TMTG)

103.   Plaintiff repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

104.   Section 4.8 of the Second Amended and Restated Certificate of Incorporation is unreasonable, manifestly unjust and serves no legitimate business purpose. It therefore runs afoul of 8 *Del. C.* § 202 and is invalid and unenforceable.

105.   Because DWAC already had a contractual right to lock-up Trump's post-Merger stock under the Merger Agreement, there was no legitimate reason to include lock-up provisions in New TMTG's Second Amended Charter applicable to UAV.  The lock-up requirements in the Merger Agreement do not apply to UAV.

106.   UAV's stock is not subject to any statutory or regulatory lock-up period under SEC rules and regulations.  UAV did not own more than 10% of Old TMTG stock and does not own more than 10% of New TMTG stock.  Moss and Litinsky have not personally served on Old TMTG's Board since September 2022. Accordingly, neither they nor UAV are privy to any insider information that is not otherwise known to the public in the marketplace.

107.  UAV never agreed to the lock-up provisions in the New TMTG's Second Amended Charter.  Moreover, in effect, UAV's securities were issued before the adoption of the Second Amended Charter.

108.  UAV is suffering irreparable harm due to the restrictions on its stock because it is unable to trade or transfer its stock.  In addition, by the time the restrictions expire, ██████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████.

109.  UAV has no adequate remedy at law and seeks declaratory and injunctive relief against New TMTG requiring it to amend its Charter to release UAV from the improper and unlawful lock-up provisions in Section 4.8.

## COUNT II
### (Breach of Fiduciary Duty)
### (UAV v. Nunes, Trump Jr., Patel, Swider, Green, McMahon, Lighthizer, Trump, Scavino Jr.)

110.  Plaintiff repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

111.  For the reasons set forth herein, New TMTG's Board, pursuant to an agreement with Old TMTG, included the lock-up provisions in the New TMTG's

Second Amended Charter to retaliate and discriminate against UAV (and Cohen) in response to UAV asserting its shareholder rights under Delaware law.

112.  New TMTG's Board breached its fiduciary duty of loyalty by acting in bad faith with discriminatory and retaliatory purposes.

113.  Old TMTG's Board breached its fiduciary duty of loyalty by acting in bad faith with discriminatory and retaliatory purposes.

114.  UAV has no adequate remedy at law and seeks declaratory and injunctive relief against New TMTG's Board requiring it cause New TMTG to amend its Charter and to otherwise release UAV from the improper and unlawful lock-up restrictions in Section 4.8.

<u>**COUNT III**</u>
**(Declaratory Relief Concerning Old TMTG's Ratification of UAV's Rights Emanating From the Services Agreement)**
**(UAV v. Old TMTG)**

115.  Plaintiff repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

116.  By and through the stockholder action in June 2021 and the October 2021 Resolutions, the stockholders and the Old TMTG Board ratified, approved and confirmed all prior acts undertaken by or on behalf of Old TMTG in connection with the stock issuance to UAV.  The acts so ratified, approved and confirmed by way of

stockholder action and the October 2021 Resolutions include all obligations and commitments relative to Old TMTG emanating from the Services Agreement.

117. Because Old TMTG approved and ratified the Services Agreement, New TMTG is now estopped from claiming that the Services Agreement is void and unenforceable.

118. A real and justiciable controversy exists concerning whether Old TMTG approved and ratified UAV's rights emanating from the Services Agreement.

119. UAV has no adequate remedy at law.

**COUNT IV**
**(Declaratory Relief Concerning Old TMTG's Ratification of UAV's Rights Emanating From the Services Agreement)**
**(UAV v. Trump)**

120. Plaintiff repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

121. On February 2, 2021, UAV and Trump entered into the Services Agreement, a valid and enforceable contract. UAV performed all of its obligations under the Services Agreement.

122. Trump unilaterally, through his representatives, wrongly and improperly attempted to declare the Services Agreement void *ab initio*. There was no legal basis for such a declaration, and a party to a contract cannot unilaterally declare a contract void *ab initio*.

44

123.    Despite Trump's declaration, the parties continued to perform under the Services Agreement and acknowledge by their conduct and in written agreements the continued validity and enforceability of the Services Agreement.

124.    In regulatory filings and in the Sarasota Action, Old TMTG contends that the Services Agreement is void *ab intio*.

125.    A real and justiciable controversy exists concerning exists concerning the validity and enforceability of the Services Agreement.

126.    UAV has no adequate remedy at law.

## COUNT V
### (Issuance of Litigation Injunction)
### (UAV v. Old TMTG and New TMTG)

127.    Plaintiff repeats and realleges the allegations of the above paragraphs as if fully set forth herein.

128.    The Sarasota Action was filed for an improper purpose to retaliate against UAV.

129.    The Sarasota Action violates the March 15 Order because, by filing the Sarasota Action, Old TMTG did not cooperate with UAV to ensure that it receives all the stock to which it is entitled.  The Sarasota Action further violates the March 15 Order's declaration of the capital structure of Old TMTG, including UAV's

ownership of 8,600,000 shares, and the Court's directive that such capital structure remain in place through the Merger.

130.   The Sarasota Action is also a breach of the exclusive venue provision in the Services Agreement that required all actions seeking to enforce the Services Agreement to be brought in Palm Beach County, Florida or the federal district court for the southern district of Florida.  As a result of TMTG's breach, TMTG waived any right to rely on the Services Agreement's venue provision and is estopped from asserting that provision in this action.

131. The Sarasota Action asserts claims that constitute compulsory counterclaims because the claims arise out of the same transactions and occurrences underlying UAV's claims here.  The Sarasota Action involves questions of the internal affairs and governance of a Delaware corporation and, therefore, are governed by Delaware law.

132.   UAV faces an imminent risk of irreparable harm that the Sarasota Action will impede, impair, or otherwise frustrate UAV's rights to and in its post-Merger stock because TMTG improperly seeks the disgorgement of UAV's stock.

133.   UAV has not adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor on all counts and grant the following relief:

1.    A declaration that Section 4.8 of the New TMTG Second Amended Charter is void and unenforceable as applied to UAV;

2.    An injunction requiring New TMTG to remove the restriction legends on UAV's stock;

3.    A declaration that Old TMTG approved and ratified all of UAV's rights emanating from the Services Agreement;

4.    A declaration that the Services Agreement is a valid and enforceable contract and that UAV has valid and enforceable rights thereunder, including the continuing right to appoint directors to the Old and New TMTG boards.

5.    An injunction enjoining Old TMTG from further prosecuting the Sarasota Action;

6.    Awarding Plaintiff its attorneys' fees and costs based upon the bad faith conduct of Defendants and/or based on the benefit conferred on the Company and its minority stockholders through the prosecution of this action.

7.    Awarding such other relief as the Court deems equitable, just and proper.

DATED:  April 11, 2024

**BERGER MCDERMOTT LLP**

*/s/ Richard I. G. Jones., Jr.*

**OF COUNSEL**:

Richard I. G. Jones, Jr. (No. 3301)
David B. Anthony (No. 5452)
Harry W. Shenton IV (No. 6919)

Christopher Clark
Benjamin Dozier
**CLARK SMITH VILLAZOR LLP**
250 West 55th Street, 30th Floor
New York, NY 10019
(212) 582-4400
(347) 338-2532 (Fax)
clark@csvllp.com
benjamin.dozier@csvllp.com

1105 North Market Street, 11th Floor
Wilmington, Delaware 19801
(302) 655-1140
rjones@bergermcdermott.com
danthony@bergermcdermott.com
hshenton@bergermcdermott.com

*Attorneys for Plaintiff United Atlantic Ventures, LLC*

48

## <u>CERTIFICATE OF SERVICE</u>

I, Harry W. Shenton, IV, do hereby certify on April 16, 2024, I caused the

foregoing *Public Version of Second Amended Verified Complaint* to be served upon

the following individuals in the manner indicated below:

### <u>VIA FILE & SERVEXPRESS</u>

Theodore A. Kittila, Esq.
William E. Green, Jr., Esq.
Halloran Farkas + Kittila LLP
5801 Kennett Pike, Suite C/D
Wilmington, Delaware 19807

*/s/ Harry W. Shenton*
Harry W. Shenton, IV (No. 6919)

# EXHIBIT 20

TABLE OF CONTENTS

As filed with the Securities and Exchange Commission on July 3, 2024

Registration No. 333-

# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM S-1
## REGISTRATION STATEMENT
### *Under*
### *The Securities Act of 1933*

# Trump Media & Technology Group Corp.
(Exact name of Registrant as specified in its charter)

| Delaware | 6770 | 85-4293042 |
|---|---|---|
| **(State or other jurisdiction of incorporation or organization)** | **(Primary Standard Industrial Classification Code Number)** | **(I.R.S. Employer Identification No.)** |

**401 N. Cattlemen Rd., Ste. 200**
**Sarasota, Florida 34232**
**(941) 735-7346**
**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Devin G. Nunes**
**Chief Executive Officer**
**Trump Media & Technology Group Corp.**
**401 N. Cattlemen Rd., Ste. 200**
**Sarasota, Florida 34232**
**(941) 735-7346**
**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

**Jonathan H. Talcott, Esq.**
**Nelson Mullins Riley & Scarborough LLP**
**101 Constitution Avenue, NW, Suite 900**
**Washington, D.C. 20001**
**(202) 689-2800**

**Approximate date of commencement of proposed sale to the public**: From time to time after this Registration Statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box: ☒

If this form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

The Registrant hereby amends this Registration Statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this Registration Statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the Registration Statement shall become effective on such date as the Commission acting pursuant to said Section 8(a) may determine.

TABLE OF CONTENTS

**The information in this preliminary prospectus is not complete and may be changed. These securities may not be issued until the registration statement filed with the U.S. Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and does not constitute the solicitation of an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

PRELIMINARY PROSPECTUS

SUBJECT TO COMPLETION, DATED JULY 3, 2024



# TRUMP MEDIA & TECHNOLOGY GROUP CORP.

### 37,969,380 Shares of Common Stock

This prospectus relates to the resale of 37,969,380 shares of common stock of Trump Media & Technology Group Corp. ("TMTG," "Company," "we" or "our") consisting of (i) 37,644,380 shares of the common stock, par value $.0001 per share (the "Shares"), by YA II PN, LTD., a Cayman Islands exempt limited partnership ("Yorkville"), (ii) 200,000 shares of Common Stock to be issued to Yorkville concurrently or within one business day of the filing of this registration statement as consideration for entering into the SEPA (as hereinafter defined) (the "Commitment Shares") and (iii) 125,000 shares of Common Stock (the "Placement Agent Shares") issuable to EF Hutton LLC ("EF Hutton") concurrently or within one business day of the filing of this registration statement, as exclusive placement agent in connection with the transactions contemplated by the SEPA (as defined below). The shares of common stock included in this prospectus consist of Shares that we may, in our discretion, elect to issue and sell to Yorkville, from time to time after the date of this prospectus, pursuant to a standby equity purchase agreement we entered into with Yorkville on July 3, 2024 (the "SEPA"), in which Yorkville has committed to purchase from us, at our direction, up to $2,500,000,000 of Shares, subject to terms and conditions specified in the SEPA. As of the date of this prospectus, we have not issued any Shares to Yorkville.

The Company may not effect any sales under the SEPA and Yorkville will not have any obligation to purchase Shares under the SEPA to the extent that after giving effect to such purchase and sale the aggregate number of shares of Common Stock issued under the SEPA together with any shares of Common Stock issued in connection with any other transactions that may be considered part of the same series of transactions, where the average price of such sales would be less than $31.73 and the number of shares issued would exceed the number of shares representing 19.99% of the outstanding voting common stock as of June 25, 2024 (the "Exchange Cap"). Thus, the Company may not have access to the right to sell the full $2,500,000,000 of Shares to Yorkville.

In connection with the SEPA, we are registering herein 37,969,380 shares of Common Stock, which represents the number of shares of Common Stock representing the Exchange Cap as of the date hereof, which amount includes (i) 200,000 Commitment Shares and (ii) 125,000 Placement Agent Shares. As of the date of the SEPA, there were 189,941,870 shares of Common Stock outstanding, and therefore the Exchange Cap would be 37,969,380 shares of Common Stock. Thus we are registering the maximum amount that we could register without obtaining approval of stockholders in accordance with Nasdaq's "minimum price rule." However, if the Company desires to issue more than 37,969,380 Shares at an average price per share that does not equal or exceed $31.73 (which represents the lower of (i) the Nasdaq Official Closing Price (as reflected on Nasdaq.com) immediately preceding the date of the SEPA; or (ii) the average Nasdaq Official Closing Price for the five trading days immediately precedent the date of the SEPA), it would be required to obtain stockholder approval under the Nasdaq listing rules.

See the section entitled "Committed Equity Financing" for a description of the SEPA and the section entitled "Selling Securityholders" for additional information regarding Yorkville and EF Hutton (collectively, the "Selling Securityholders").

Our registration of the securities covered by this prospectus does not mean that Yorkville will offer or sell any of the Shares. Yorkville may offer, sell or distribute all or a portion of their Shares publicly or through private transactions at prevailing market prices or at negotiated prices. We will not receive any proceeds from the sale of Shares by Yorkville pursuant to this prospectus. However, we may receive up to $2,500,000,000 in aggregate gross proceeds from sales of Shares to Yorkville that we may, in our discretion, elect to make, from time to time after the date of this prospectus, pursuant to the SEPA. The sale of the Shares being offered by Yorkville pursuant to this prospectus, or the perception that these sales could occur, could result in a decline in the public trading price of our Common Stock. Though we have been advised by Yorkville and Yorkville represents in the SEPA, that Yorkville is purchasing the Shares for its own account, for investment purposes in which it takes investment risk (including, without limitation, the risk of loss), and without any view or intention to distribute such shares in violation of the Securities Act of 1933, as amended (the "Securities Act") or any other applicable securities laws, the Securities and Exchange Commission (the "SEC") may take the position that Yorkville may be deemed an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act and any profits on the sale of shares of our common stock by Yorkville and any discounts, commissions or concessions received by Yorkville are deemed to be underwriting discounts and commissions under the Securities Act.

Our shares of Common Stock and Public Warrants are currently listed on the Nasdaq Global Market ("**Nasdaq**") under the symbols "DJT" and "DJTWW," respectively. On July 2, 2024, the closing price of our Common Stock was $31.73 per share and the closing price of our Public Warrants was $20.26 per Public Warrant.

We are an "emerging growth company" and a "smaller reporting company" under the federal securities laws and are subject to reduced public company reporting requirements.

---

**Investing in our securities involves a high degree of risk. You should review carefully the risks and uncertainties described in the section titled "Risk Factors" beginning on page <u>17</u> of this prospectus, and under similar headings in any amendments or supplements to this prospectus. Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of the securities to be issued under this prospectus or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.**

---

**Prospectus dated              , 2024**

# TABLE OF CONTENTS

| | |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 8 |
| SUMMARY OF THE PROSPECTUS | 10 |
| THE OFFERING | 16 |
| RISK FACTORS | 17 |
| COMMITTED EQUITY FINANCING | 66 |
| USE OF PROCEEDS | 70 |
| MARKET INFORMATION FOR COMMON STOCK AND DIVIDEND POLICY | 71 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 73 |
| OUR BUSINESS | 98 |
| MANAGEMENT | 116 |
| EXECUTIVE AND DIRECTOR COMPENSATION | 124 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 128 |
| PRINCIPAL SECURITYHOLDERS | 132 |
| SELLING SECURITYHOLDERS | 134 |
| DESCRIPTION OF SECURITIES | 135 |
| UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS | 143 |
| PLAN OF DISTRIBUTION | 148 |
| LEGAL MATTERS | 150 |
| EXPERTS | 150 |
| CHANGE IN REGISTRANT'S CERTIFYING ACCOUNTANT | 150 |
| WHERE YOU CAN FIND MORE INFORMATION | 152 |

i

TABLE OF CONTENTS

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement on Form S-1 that we filed with the Securities and Exchange Commission (the "**SEC**") using the "shelf" registration process. Under this shelf registration process, the Selling Securityholders may, from time to time, sell the securities offered by them described in this prospectus. We will not receive any proceeds from the sale by such Selling Securityholders of the securities offered by them described in this prospectus.

Neither we nor the Selling Securityholders have authorized anyone to provide you with any information or to make any representations other than those contained or incorporated by reference in this prospectus or in any free writing prospectuses we have authorized for use in connection with this offering. We and the Selling Securityholders take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. We and the Selling Securityholders are offering to sell, and seeking offers to buy, shares of our Common Stock only in jurisdictions where offers and sales are permitted. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or sale of our securities. Our business, financial condition, results of operations and prospects may have changed since those dates.

We may also provide a prospectus supplement or post-effective amendment to the registration statement to add information to, or update or change information contained in, this prospectus. You should read both this prospectus and any applicable prospectus supplement or post-effective amendment to the registration statement together with the additional information to which we refer you in the sections of this prospectus entitled "Where You Can Find More Information."

For investors outside of the United States: Neither we nor the Selling Securityholders, have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about and observe any restrictions relating to, the offering of our securities and the distribution of this prospectus outside the United States.

On March 25, 2024 (the "**Closing Date**"), Digital World Acquisition Corp., now known as Trump Media & Technology Group Corp. ("**TMTG**"), consummated a business combination pursuant to that certain Agreement and Plan of Merger, dated as of October 20, 2021 (as amended by the First Amendment to Agreement and Plan of Merger, dated May 11, 2022, the Second Amendment to Agreement and Plan of Merger, dated August 9, 2023, the Third Amendment to Agreement and Plan of Merger, dated September 29, 2023, and as it may be further amended or supplemented from time to time, the "**Merger Agreement**"), by and among TMTG, DWAC Merger Sub Inc., a Delaware corporation ("**Merger Sub**"), Trump Media & Technology Group Corp., a Delaware corporation now known as TMTG Sub Inc. ("**Private TMTG**"), ARC Global Investments II, LLC, a Delaware limited liability company (which was replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024), in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in its capacity as representative of the stockholders of Private TMTG, pursuant to which, among other transactions, Merger Sub merged with and into Private TMTG, with TMTG continuing as the surviving corporation and as a wholly owned subsidiary of Digital World (the "**Business Combination**"). In addition, in connection with the consummation of the Business Combination, Digital World was renamed "Trump Media & Technology Group Corp." and Private TMTG was renamed "TMTG Sub Inc."

1

TABLE OF CONTENTS

## FREQUENTLY USED TERMS

Unless the context otherwise requires, "we," "us," "our" and the "Company" refer to TMTG. All references herein to the "Board" refer to the board of directors of TMTG. References to "DWAC" or "Digital World" refer to our predecessor company prior to the consummation of the Business Combination.

In this document:

"**Adeptus**" means Adeptus Partners LLC, Digital World's and, upon the Closing, TMTG's independent registered public accounting firm between August 8, 2023 and April 1, 2024.

"**Amended Charter**" means the Second Amended and Restated Certificate of Incorporation of the Company, effective as of March 25, 2024.

"**Anchor Investors**" means (i) accounts or funds managed by Radcliffe Capital Management, L.P., (ii) Meteora Capital Partners, LP (an affiliate of Glazer Capital LLC), (iii) Castle Creek Strategies (and sub-funds associated with Castle Creek), (iv) The K2 Principal Fund L.P., (v) Context Partners Master Fund LP, (vi) Boothbay Absolute Return Strategies, LP (or its affiliate Boothbay Diversified Alpha Master Fund LP, commonly controlled by Boothbay Fund Management LLC), (vii) investment funds and accounts managed by Shaolin Capital Management, LLC, (viii) Hudson Bay Master Fund Ltd. and/or its affiliates, (ix) Saba Capital Master Fund, Ltd., Saba Capital Master Fund II, Ltd., Saba Capital Master Fund III, LP and Saba Capital SPAC Opportunities, Ltd., and/or its affiliates, (x) D. E. Shaw Valence Portfolios, L.L.C. and (xi) Yakira Capital Management, Inc. (none of which are affiliated with any member of Digital World management, ARC or any other anchor investor), each of which entered into an investment agreement pursuant to which it expressed an interest to purchase up to 8.3% of the Public Units sold in the Digital World IPO.

"**ARC**" means ARC Global Investments II, LLC.

"**Board**" or "**TMTG Board**" means the board of directors of TMTG.

"**Bylaws**" means the Amended and Restated Bylaws of the Company.

"**Closing**" means the consummation of the Business Combination pursuant to the Merger Agreement.

"**Closing Date**" means March 25, 2024.

"**Code**" means the Internal Revenue Code, as amended.

"**Company**" "**TMTG**" "**we**" "**our**" or "**us**" means Trump Media & Technology Group Corp.

"**Company common stock**" or "**TMTG common stock**" or "**Common Stock**" means the common stock, par value $0.0001 per share, of the Company following the Business Combination.

"**Convertible Note Compensation Plan**" mean that certain convertible note compensation plan approved by the requisite holders of Class A common stock of Digital World at the annual meeting of Digital World's stockholders on December 19, 2023, pursuant to which Digital World issued Digital World Convertible Notes to certain officers, directors and affiliates for an aggregate amount of $9,651,250, which were converted into 965,125 shares of Common Stock upon the Closing of the Business Combination.

"**Convertible Note Post IPO Warrants**" means up to 369,509 shares of Common Stock that are issuable upon the exercise of warrants originally issued in connection with the conversion of Digital World Convertible Notes, immediately prior to the consummation of the Business Combination.

"**DGCL**" means the Delaware General Corporation Law.

"**Digital World**" or "**DWAC**" means Digital World Acquisition Corp., a Delaware corporation, which has been renamed to "Trump Media & Technology Group Corp." in connection with the Closing.

"**Digital World Alternative Financing Notes**" means up to $50,000,000 in 8.00% interest bearing convertible promissory notes due on March 22, 2025, in either (i) Working Capital Units, (ii) cash or (iii) a combination of both Working Capital Units and cash, in each case, at the election of the holder. Such Digital World Alternative Financing Notes may be redeemed by the Company, in whole or in part, commencing on the date on which all Company common stock issuable to the holders has been registered with the SEC, by providing a 10-day notice of such redemption (the "**Alternative Notes Redemption**

2

TABLE OF CONTENTS

**Right" or "Redemption Right"**). This Alternative Notes Redemption Right is contingent upon the trading price of Company common stock exceeding 130% of the applicable conversion price on at least three (3) trading days, whether consecutive or not, within the 15 consecutive trading days ending on the day immediately preceding the day on which a redemption notice is issued by the Company. The redemption price will be the total of the principal amount redeemed under such note plus any applicable portion of accrued and unpaid interest up to, but excluding, the redemption date. The Digital World Alternative Financing Notes have a floor conversion price of $8.00 or greater.

"**Digital World Alternative Warrants**" means the 3,055,000 Post IPO-Warrants issued to certain institutional investors in settlement of the terminated PIPE Investment.

"**Digital World Charter**" means Digital World's first amended and restated certificate of incorporation as filed with the Secretary of State of the State of Delaware as amended on September 6, 2023.

"**Digital World Class A common stock**" means the shares of Class A common stock of Digital World, par value $0.0001 per share.

"**Digital World Class B common stock**" means the shares of Class B common stock of Digital World, par value $0.0001 per share, including the Founder Shares.

"**Digital World common stock**" means any of the Digital World Class A common stock or Digital World Class B common stock.

"**Digital World Convertible Notes" or "DWAC Convertible Notes**" means the $16,853,950 in non-interest-bearing convertible promissory notes paid upon the stockholders' approval of the Business Combination, (A) either (i) Working Capital Units or (ii) cash or Working Capital Units, at the election of the holder or (B) in the case of such convertible promissory notes issued pursuant to the Convertible Note Compensation Plan, Company common stock. $4,832,700 of such convertible promissory notes were issued to ARC or its affiliates or Digital World's officers or directors in connection with any loans made by them to Digital World prior to Closing. Up to $10,000,000 of such convertible promissory notes may be issued to either third parties providing services or making loans to Digital World or to ARC or its affiliates or Digital World's officers or directors in connection with any loans made by them to Digital World prior to the Closing.

"**Digital World IPO" "IPO**" or "**Initial Public Offering**" means Digital World's initial public offering that was consummated on September 8, 2021.

"**Earnout Period**" means the three (3)-year period following March 25, 2024 to determine the contingent right to Earnout Shares.

"**Earnout Shares**" means the additional 40,000,000 shares of Company common stock that were issued by the Company based on a contingent right based on the price performance of Company common stock during the Earnout Period. The Earnout Shares were to be earned and payable during the Earnout Period as follows: (i) if the dollar volume-weighted average price ("VWAP") of TMTG's shares of Common Stock equals or exceeds $12.50 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 15,000,000 Earnout Shares; if the VWAP of TMTG shares of Common Stock equals or exceeds $15.00 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 15,000,000 Earnout Shares; and if the VWAP of TMTG shares of Common Stock equals or exceeds $17.50 per share for any 20 trading days within any 30 trading day period, TMTG will issue to certain holders an aggregate of 10,000,000 Earnout Shares. As of April 26, 2024, the Earnout Shares had been earned and issued, and President Donald J. Trump received 36,000,000 Earnout Shares.

"**Effective Time**" means the effective time of the Closing, as determined in accordance with the Merger Agreement.

"**Equity Incentive Plan**" means the Digital World Acquisition Corp. 2024 Equity Incentive Plan, as such may be amended, supplemented or modified from time to time, which was adopted by TMTG and approved in accordance with the Incentive Plan Proposal and became effective as of Closing.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

3

TABLE OF CONTENTS

"**FASB**" means the Financial Accounting Standards Board.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**First Amendment to the Agreement**" means the First Amendment to Agreement and Plan of Merger, dated May 11, 2022, by and among Digital World, Merger Sub, Private TMTG, ARC (which has been replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Founder Shares**" means the shares of Digital World Class B common stock initially purchased by ARC in the Private Placement.

"**Insiders**" means the Digital World directors, officers or other initial stockholders named in an amendment on May 12, 2022 to that certain letter agreement dated September 2, 2021.

"**Investigation**" means the investigation by the SEC with respect to certain statements, agreements and the timing thereof included in Digital World's registration statements on Form S-1 in connection with its IPO and Form S-4 relating to the Business Combination.

"**Investment Company Act**" means the Investment Company Act of 1940, as amended.

"**JOBS Act**" means the Jumpstart Our Business Startups Act of 2012.

"**Lock-up Period**" means the period beginning on March 25, 2024 and ending on the earliest of (i) September 25, 2024, (ii) the date on which the closing price for the Common Stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalization and the like) for any 20 trading days within any 30-trading day period commencing on August 22, 2024, and (iii) the date on which the Company consummates a liquidation, merger, share exchange or other similar transaction that results in all of the Company's stockholders having the right to exchange their equity holdings in the Company for cash, securities or other property.

"**Locked-up Shares**" means certain shares of TMTG common stock held by certain TMTG stockholders and certain of TMTG's directors and officers, including (i) their shares of TMTG common stock held immediately following the Closing and (ii) any of their shares of TMTG common stock that resulted from converting securities held immediately following the Closing, that are subject to a lock-up agreement contractually restricting the holders from selling or transferring the shares and/or to lock-up restrictions applicable under the Amended Charter.

"**Management**" or "**Management Team**" means the Company's executive officers and directors.

"**Merger**" means the merger of Merger Sub with and into Private TMTG, with Private TMTG continuing as the surviving corporation and as a wholly owned subsidiary of TMTG, in accordance with the terms of the Merger Agreement.

"**Merger Agreement**" means the Agreement and Plan of Merger, dated October 20, 2021, as amended by the First Amendment to the Agreement, the Second Amendment to the Agreement and the Third Amendment to the Agreement, and as it may further be amended or supplemented from time to time, by and among Digital World, Merger Sub, Private TMTG, ARC (which has been replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Merger Consideration**" means the aggregate merger consideration paid to TMTG securityholders (other than holders of TMTG Convertible Notes) as of immediately prior to the Effective Time in an amount equal to $875,000,000.

"**Merger Sub**" means DWAC Merger Sub Inc., a Delaware corporation that, until the Closing, was a wholly owned subsidiary of Digital World.

"**Nasdaq**" means Nasdaq Global Market.

4

TABLE OF CONTENTS

"**Odyssey**" means Odyssey Transfer and Trust Company, our transfer agent, warrant agent, and escrow agent.

"**Order**" means the cease-and-desist order entered into by the SEC against Digital World in connection with the Investigation.

"**PCAOB**" means the Public Company Accounting Oversight Board (United States).

"**PIPE Investment**" means that certain private placement originally entered into on December 4, 2021 pursuant to certain securities purchase agreements with certain institutional investors, pursuant to which such investors agreed to purchase shares of Digital World's Series A Convertible Preferred Stock for a purchase price of $1,000 per share. The PIPE Investment was terminated in full on January 10, 2024.

"**Placement Shares**" means the shares of Digital World Class A common stock included within the Placement Units purchased by ARC in the Private Placement.

"**Placement Units**" means 1,133,484 units issued to ARC in the Private Placement (including the additional units purchased after the Digital World IPO in connection with underwriters' exercise of the over-allotment option to purchase additional securities). Each Placement Unit consisted of one Placement Share and one-half of one Placement Warrant.

"**Placement Warrants**" means the warrants included within the Placement Units purchased by ARC in the Private Placement. Each Placement Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share.

"**Post-IPO Financing**" means any financing transaction undertaken by Digital World following its IPO but prior to Closing, pursuant to which Digital World Convertible Notes, Digital World Alternative Financing Notes or Digital World Alternative Warrants were issued.

"**Post-IPO Warrants**" means any additional warrants issued pursuant to the Warrant Agreement by Digital World after the IPO, including any Digital World Alternative Warrants. Each Post-IPO Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share and each Post-IPO Warrant and has made on substantially the same terms and in the same form as the Public Warrants.

"**Private Placement**" means the private placement consummated simultaneously with the Digital World IPO in which Digital World issued to ARC the Placement Units.

"**Private TMTG**" means the pre-merger TMTG entity.

"**Public Shares**" means shares of Digital World Class A common stock included in the Public Units and shares of Digital World Class A common stock underlying the Public Warrants.

"**Public Stockholders**" means holders of Public Shares.

"**Public Units**" means units issued in the Digital World IPO, consisting of one Public Share and one-half of one Public Warrant.

"**Public Warrants**" means warrants underlying the Units issued in the Digital World IPO. Each whole Public Warrant entitles the holder thereof to purchase one share of TMTG common stock for $11.50 per share.

"**Registration Rights Agreement**" means the agreement, dated as of September 2, 2021, by Digital World to register for resale under a registration statement all of the shares held by holders of Founder Shares and issuable upon conversion of Digital World Warrants.

"**Sarbanes-Oxley Act**" means the Sarbanes-Oxley Act of 2002.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**Second Amendment to the Agreement**" means the Second Amendment to Agreement and Plan of Merger, dated August 9, 2023, by and among Digital World, Merger Sub, Private TMTG, ARC (which was

5

TABLE OF CONTENTS

replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Semple**" means Semple, Marchal & Cooper, LLC, TMTG's independent registered public accounting firm as of May 4, 2024.

"**Third Amendment to the Agreement**" means the Third Amendment to Agreement and Plan of Merger, dated September 29, 2023, by and among Digital World, Merger Sub, Private TMTG, ARC (which was replaced and succeeded by RejuveTotal LLC, a New Mexico limited liability company effective as of March 14, 2024) in the capacity as the representative of the stockholders of Digital World, and Private TMTG's General Counsel in the capacity as the representative of the stockholders of Private TMTG.

"**TMTG**" means Trump Media & Technology Group Corp., a Delaware corporation, formerly known as Digital World Acquisition Corp. References in this prospectus to TMTG include its subsidiaries to the extent reasonably applicable.

"**TMTG Convertible Notes**" means the series of convertible promissory notes in the aggregate principal amount of up to $60,000,000 issued by Private TMTG pursuant to those certain note purchase agreements, by and among Private TMTG and the holders party thereto including any additional convertible promissory notes of like tenor entered into after the date of the Merger Agreement.

"**TMTG Convertible Securities**" means, collectively, any TMTG Options, TMTG RSUs, warrants or rights to subscribe for or purchase any capital stock of TMTG or securities convertible into or exchangeable for, or that otherwise confer on the holder any right to acquire any capital stock of TMTG.

"**TMTG Executive Promissory Notes**" means, collectively, the $6,900,000 in non-interest-bearing promissory notes entered into with certain TMTG directors and officers, which automatically converted into TMTG common stock prior to the Effective Time.

"**TMTG Options**" means, collectively, all outstanding options to purchase shares of TMTG common stock, whether or not exercisable and whether or not vested.

"**TMTG RSUs**" means all outstanding restricted stock units with respect to shares of TMTG common stock, whether or not vested.

"**TMTG securities**" means any of the TMTG common stock and any TMTG Convertible Securities following the Merger.

"**TMTG securityholders**" means, collectively, the holders of TMTG securities (other than, and to the extent that, such TMTG securities were received as a result of the conversion of the TMTG Convertible Notes).

"**TMTG stockholders**" means, collectively, the holders of TMTG common stock, each a "**TMTG stockholder**" (other than, and to the extent that, such TMTG common stock was received as a result of the conversion of the TMTG Convertible Notes).

"**TMTG Sub**" means, with respect to the period following the Closing, TMTG Sub Inc., a Delaware corporation and the surviving corporation of the Merger between Merger Sub and Private TMTG.

"**Treasury**" means the U.S. Department of Treasury.

"**Trust Account**" means the trust account of Digital World, which held the net proceeds of (i) the Digital World IPO, including from over-allotment securities sold by Digital World's underwriters, (ii) the sale of the Placement Units and (iii) the additional funds deposited by ARC to the Trust Account to extend the period of time to consummate an initial business combination, together with interest earned thereon, less amounts released to pay tax obligations and up to $100,000 for dissolution expenses, and amounts paid pursuant to Redemptions.

"**U.S. GAAP**" means generally accepted accounting principles in the United States.

"**Units**" means the Public Units, Placement Units, and the Working Capital Units.

6

TABLE OF CONTENTS

"**Warrant Agreement**" means the warrant agreement, dated September 2, 2021, as amended, by and between the Company and Continental Stock Transfer & Trust Company, as succeeded by Odyssey, as warrant agent.

"**Warrants**" means any of the Post-IPO Warrants, Public Warrants, the Placement Warrants and the warrants underlying the Working Capital Units, excluding any warrants of Private TMTG.

"**Working Capital Units**" means the units issued pursuant to the Digital World Convertible Notes or the Digital World Alternative Financing Notes, as applicable. Each unit consists of one share of Digital World Class A common stock and one-half Warrant. Each unit issuable pursuant to the applicable Digital World Convertible Notes or the Digital World Alternative Financing Notes, subject to the terms and conditions of each such applicable note, has a price not lower than $8.00 per unit.

7

TABLE OF CONTENTS

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus includes forward-looking statements regarding, among other things, the plans, strategies and prospects, both business and financial, of TMTG. We have based these forward-looking statements on our current expectations and projections about future events. Although we believe that our plans, intentions and expectations reflected in or suggested by these forward-looking statements are reasonable, we cannot assure you that we will achieve or realize these plans, intentions or expectations. Forward-looking statements are inherently subject to risks, uncertainties and assumptions. Generally, statements that are not historical facts, including statements concerning possible or assumed future actions, business strategies, events or results of operations, are forward-looking statements. These statements may be preceded by, followed by or include the words "believes," "estimates," "expects," "projects," "forecasts," "may," "will," "should," "seeks," "plans," "scheduled," "anticipates" or "intends" or similar expressions. The forward-looking statements are based on projections prepared by, and are the responsibility of, our Management Team. Semple, our independent auditor, has not examined, compiled or otherwise applied procedures with respect to the accompanying forward-looking financial information presented herein and, accordingly, expresses no opinion or any other form of assurance on it. Our financial statements included in this prospectus relate only to TMTG's historical financial information. It does not extend to the forward-looking information and should not be read as if it does. Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- the ability of TMTG to realize the benefits from the Business Combination;

- the ability of TMTG to maintain the listing of TMTG common stock on Nasdaq;

- future financial performance following the Business Combination;

- the impact of the outcome of any known or unknown litigation or other legal proceedings;

- the ability of TMTG to forecast and maintain an adequate rate of revenue growth and appropriately plan its expenses;

- expectations regarding future expenditures of TMTG;

- the future revenue and effect on gross margins of TMTG;

- the attraction and retention of qualified directors, officers, employees and key personnel of TMTG;

- the ability of TMTG to compete effectively in a competitive industry;

- the impact of the ongoing legal proceedings in which President Donald J. Trump is involved on TMTG's corporate reputation and brand;

- expectations concerning the relationships and actions of TMTG and its affiliates with third parties;

- the short- and long-term effects of the consummation of the Business Combination on TMTG's business relationships, operating results and business generally;

- the impact of future regulatory, judicial, and legislative changes in TMTG's industry;

- the ability to locate and acquire complementary products or product candidates and integrate those into TMTG's business;

- Truth Social, TMTG's initial product, and its ability to generate users and advertisers;

- future arrangements with, or investments in, other entities or associations;

- competition and competitive pressures from other companies in the industries in which TMTG operates;

- changes in domestic and global general economic and macro-economic conditions;

- TMTG's ability to meet conditions precedent to issue shares to Yorkville under the SEPA;

- the volatility of the price of Common Stock that may result from sales of Shares by Yorkville or other Shares we previously registered for resale;

- the dilution of holders of Common Stock from TMTG's issuance of Shares to Yorkville. There can be no guarantee that how many Shares TMTG will issue under the SEPA, if at all; and

8

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1630 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5107

TABLE OF CONTENTS

- other factors detailed under the section entitled "*Risk Factors*."

These and other factors that could cause actual results to differ from those implied by the forward-looking statements in this prospectus are more fully described under the heading "Risk Factors" and elsewhere in this prospectus. The risks described under the heading "Risk Factors" are not exhaustive. Other sections of this prospectus describe additional factors that could adversely affect our business, financial condition or results of operations. New risk factors emerge from time to time and it is not possible to predict all such risk factors, nor can we assess the impact of all such risk factors on our business, or the extent to which any factor or combination of factors may cause actual results to differ materially from those contained in any forward-looking statements. Forward-looking statements are not guarantees of performance. You should not put undue reliance on these statements, which speak only as of the date hereof. All forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the foregoing cautionary statements. We undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

9

TABLE OF CONTENTS

## SUMMARY OF THE PROSPECTUS

*This summary highlights selected information included in this prospectus and does not contain all of the information that may be important to you in making an investment decision. This summary is qualified in its entirety by the more detailed information included in this prospectus. Before making your investment decision with respect to our securities, you should carefully read this entire prospectus, including the information under "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" and the financial statements included elsewhere in this prospectus.*

**The Company**

***Trump Media & Technology Group Corp.***

TMTG believes free and open communication, particularly political speech, is essential to self-government and democracy. Free expression allows citizens to keep their government in check and inform themselves as voters. Free speech also enables the discovery of truth through the uninhibited marketplace of ideas. Truth often emerges only when opposing ideas can compete against each other on a level playing field. TMTG further believes that the ability to freely express core political speech is among the inalienable rights affirmed by the Declaration of Independence that underlay America's system of government.

TMTG therefore aspires to build a media and technology powerhouse to rival the liberal media consortium and promote free expression. TMTG was founded to fight back against the big tech companies — Meta (Facebook, Instagram and Threads), X (formerly Twitter), Netflix, Alphabet (Google), Amazon and others — that may curtail debate in America and censor voices that contradict their "woke" ideology. As confirmed by the "Twitter Files" exposés, X has long suppressed conservative speech (including at the behest of U.S. government officials) through various means, including "shadow banning" — a surreptitious process in which users may not even know their posts are being hidden from other users. X also outright banned conservative users such as President Donald J. Trump, who was banned for one year and ten months — even while X continued to allow the Taliban to freely post their views to the world. In July 2023, a federal district court judge found that Biden White House personnel likely colluded with big tech companies to violate Americans' First Amendment rights. The opinion expressed that "targeted suppression of conservative ideas is a perfect example of viewpoint discrimination of political speech." Big tech companies' transformation into the arbiters of public speech and organs of state-sponsored censorship contradicts American values. Their suppression of dissident speech constitutes the most serious threat today to a free and democratic debate. Thus, TMTG aims to safeguard public debate and open dialogue, and to provide a platform for all users to freely express themselves.

TMTG's first product, Truth Social, is a social media platform aiming to disrupt big tech's control on free speech by opening up the internet and giving the American people their voices back. It is a public, real-time platform where any user can create content, follow other users and engage in an open and honest global conversation without fear of being censored or "cancelled" due to their political viewpoints. TMTG does not restrict whom a user can follow, which greatly enhances the breadth and depth of available content. Additionally, users can be followed by other users without requiring a reciprocal relationship, enhancing the ability of TMTG users to reach a broad audience.

**Background**

TMTG was incorporated on December 11, 2020 as Digital World Acquisition Corp., a blank check company formed for the purpose of entering into an initial business combination with one or more businesses or entities. On the Closing Date, Digital World, now known as Trump Media & Technology Group Corp., consummated the Business Combination with Private TMTG pursuant to the Merger Agreement. In connection with the consummation of the Business Combination, Digital World was renamed "Trump Media & Technology Group Corp." and Private TMTG, which became a wholly owned subsidiary of TMTG, was renamed "TMTG Sub Inc."

Effective upon consummation of the Business Combination, DWAC authorized the issuance of new Common Stock described in the section of this prospectus titled "*Description of Securities*."

10

TABLE OF CONTENTS

### Recent Developments

#### *Committed Equity Financing*

On July 3, 2024, we entered into the Standby Equity Purchase Agreement ("SEPA") with Yorkville pursuant to which we have the right to sell to Yorkville up to $2,500,000,000 of shares our Common Stock, subject to certain limitations and conditions set forth in the SEPA, from time to time during the term of the SEPA. Sales of Shares to Yorkville under the SEPA, and the timing of any such sales, are at our option, and we are under no obligation to sell any securities to Yorkville under the SEPA. In accordance with our obligations under the SEPA, we have filed the registration statement that includes this prospectus with the SEC to register under the Securities Act the resale by Yorkville of 37,644,380 Shares that we may elect, in our sole discretion, to issue and sell to Yorkville, under the SEPA as well as 200,000 Commitment Shares to be issued to Yorkville concurrently or within one business day of the filing of this registration statement issued as consideration for its entrance into the SEPA and 125,000 Placement Agent Shares issuable to EF Hutton concurrently or within one business day of the filing of this registration statement.

We shall not effect any sales under the SEPA and Yorkville shall not have any obligation to purchase Shares under the SEPA to the extent that after giving effect to such purchase and sale the aggregate number of shares of Common Stock issued under the SEPA together with any shares of Common Stock issued in connection with any other transactions that may be considered part of the same series of transactions, where the average price of such sales would be less than $31.73 and the number of shares issued would exceed the number of shares representing 19.99% of the outstanding voting common stock as of June 25, 2024. Thus, we may not have access to the right to sell the full $2,500,000,000 Shares to Yorkville.

In connection with the SEPA, we are registering herein 37,969,380 shares of Common Stock, which amount shall include the (i) 200,000 Commitment Shares and (ii) 125,000 Placement Agent Shares, and which represents the maximum amount that we could register without obtaining approval of stockholders in accordance with Nasdaq's "minimum price rule." However, if the Company desires to issue more than 37,969,380 Shares at an average price per share that does not equal or exceed $31.73 (which represents the lower of (i) the Nasdaq Official Closing Price (as reflected on Nasdaq.com) immediately preceding the date of the SEPA; or (ii) the average Nasdaq Official Closing Price for the five trading days immediately precedent the date of the SEPA), it would be required to obtain stockholder approval under the Nasdaq listing rules.

Upon the satisfaction of the conditions to Yorkville's purchase obligation set forth in the SEPA, we will have the right, but not the obligation, from time to time at our discretion until the first day of the month following the 36-month period after the date of the SEPA, to direct Yorkville to purchase a specified amount of Shares (each such sale, an "Advance") by delivering written notice to Yorkville (each, an "Advance Notice").

The per share subscription price Yorkville will pay for the Shares will be 97.25% of the market price during a one- or three-day pricing period elected by TMTG. The "Market Price" is defined in the SEPA as the lowest daily VWAPs (as defined below) during one trading day, in the case of a one-day pricing period, or of the three consecutive trading days, in the case of a three-day pricing period, commencing on the trading day following the date TMTG submits an Advance Notice to Yorkville. "VWAP" means, for any trading day, the daily volume weighted average price of the Shares for such date on NASDAQ as reported by Bloomberg L.P. during regular trading hours. There is no upper limit on the subscription price per share that Yorkville could be obligated to pay for the Shares.

We will control the timing and amount of any sales of Shares to Yorkville. Actual sales of Shares to Yorkville under the SEPA will depend on a variety of factors to be determined by us from time to time, which may include, among other things, market conditions, the trading price of our Common Stock and determinations by us as to the appropriate sources of funding for our business and its operations.

Yorkville will not be obligated to subscribe to Shares under the SEPA which, when aggregated with all other shares of Common Stock then beneficially owned by Yorkville and its affiliates (as calculated pursuant to Section 13(d) of the Exchange Act, and Rule 13d-3 promulgated thereunder), would result in the beneficial ownership by Yorkville and its affiliates to exceed 4.99% of the outstanding voting power or number of our shares of Common Stock (the "Beneficial Ownership Limitation").

11

TABLE OF CONTENTS

The net proceeds under the SEPA to us will depend on the frequency and prices at which we sell Shares to Yorkville. We expect that any proceeds received by us from such sales to Yorkville will be used for working capital and general corporate purposes.

Yorkville has agreed that it and its affiliates will not engage in any short sales of the Shares nor enter into any transaction that establishes a net short position in the Shares during the term of the SEPA.

The SEPA will automatically terminate on the earliest to occur of (i) the first day of the month next following the 36-month anniversary of the date of the SEPA or (ii) the date on which Yorkville shall have made payment of Advances pursuant to the SEPA for Shares equal to $2,500,000,000. We have the right to terminate the SEPA at no cost or penalty upon five (5) trading days' prior written notice to Yorkville, provided that there are no outstanding Advance Notices for which Shares need to be issued and TMTG has paid all amounts owed to Yorkville pursuant to the SEPA. We and Yorkville may also agree to terminate the SEPA by mutual written consent. Neither we nor Yorkville may assign or transfer our respective rights and obligations under the SEPA, and no provision of the SEPA may be modified or waived by us or Yorkville other than by an instrument in writing signed by both parties.

As consideration for Yorkville's commitment to purchase Shares at our direction upon the terms and subject to the conditions set forth in the SEPA, we paid YA Global II SPV, LLC, a subsidiary of Yorkville, (i) a structuring fee in the amount of $25,000 and (ii) a commitment fee in the form of 200,000 Commitment Shares.

EF Hutton acted as the exclusive placement agent in connection with the transactions contemplated by the SEPA, for which we will issue to EF Hutton 125,000 Placement Agent Shares concurrently with or within one business day of the filing of this registration statement.

The SEPA contains customary representations, warranties, conditions and indemnification obligations of the parties. The representations, warranties and covenants contained in such agreements were made only for purposes of such agreements and as of specific dates, were solely for the benefit of the parties to such agreements and may be subject to limitations agreed upon by the contracting parties.

We do not know what the subscription price for our Shares will be and therefore cannot be certain as to the number of shares we might issue to Yorkville under the SEPA. The number of shares ultimately offered for resale by Yorkville is dependent upon the number of Shares we may elect to sell to Yorkville under the SEPA.

If and when we elect to issue and sell shares to Yorkville, we may need to register for resale under the Securities Act additional shares in order to receive aggregate gross proceeds equal to the $2,500,000,000 available to us under the SEPA. If we elect to issue and sell more than the 37,644,380 Shares to Yorkville, such additional issuance of shares could cause additional dilution to existing shareholders. The number of shares ultimately offered for resale by Yorkville is dependent upon the number of shares we may elect to sell to Yorkville under the SEPA.

There are substantial risks to our stockholders as a result of the sale and issuance of Shares to Yorkville under the SEPA. These risks include the potential for substantial dilution and significant declines in the price of our Common Stock. See the section entitled "*Risk Factors.*" Issuances of the Shares in this offering will not affect the rights or privileges of our existing stockholders, except that the economic and voting interests of each of our existing shareholders will be diluted as a result of any such issuance. Although the number of shares of Common Stock that our existing shareholders own will not decrease as a result of sales, if any, under the SEPA, the shares of Common Stock owned by our existing shareholders will represent a smaller percentage of our total outstanding Common Stock after any such issuance to Yorkville.

For more detailed information regarding the SEPA, see the section entitled "*Committed Equity Financing.*"

### *WCT Asset Acquisition*

On July 3, 2024, TMTG, WorldConnect Technologies, L.L.C. ("**WCT**"), WorldConnect IPTV Solutions, LLC ("**Solutions**") and JedTec, L.L.C. ("**JedTec**") entered into an asset acquisition agreement (the "**Asset Acquisition Agreement**"), pursuant to which TMTG agreed to acquire substantially all of the assets of WCT or its affiliate, which mainly include certain agreements, including an option agreement (the "**Option Agreement**"), dated February 5, 2024, by and between WCT, Perception Group, Inc., Perception TVCDN Ltd., and FORA, FOrum RAčunalništva, d.o.o., as amended (each of the parties thereto other than WCT, collectively, "**Perception**"), as well as ancillary agreements related to the source code purchase (the "**Source Code Purchase Agreement**") and support and maintenance (the "**Support and Maintenance Agreement**", together with the Source Code Purchase Agreement, the

12

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1634 of 1832
edgar.sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5111

TABLE OF CONTENTS

"CDN Agreements"). The transaction is expected to close on the date TMTG has implemented the Perception Software and Network (as defined below) with all back-end API services having become generally available on iOS, Google/Android, and web media services and with streaming enabled from at least one data-center, which closing is expected to occur as early as July 2024 (the "**Asset Closing Date**"). Pursuant to the Option Agreement on the Asset Closing Date, WCT entered and will assign on the Asset Closing Date to TMTG the CDN Agreements, which are expected to be used for the roll out of the CDN technology for the Truth platform (the updated version of TMTG's Truth Social web and mobile application with streaming enabled using intellectual property obtained from Perception, the "**Perception Software and Network**"). In addition, Perception and its affiliates agreed not to use or permit other parties to use the source code for a period of five (5) years after the closing of the Asset Acquisition Agreement for any purpose that competes, in the United States, with the Truth platform or commercialization of such source code in the United States. In addition, the Option Agreement grants the (i) option to purchase Perception, until July 3, 2026, subject to a future negotiation of the price and terms of such acquisition and (ii) right of first refusal, until February 5, 2026, to purchase Perception in the event of a bona fide written offer from an unaffiliated third party to purchase more than 50% of the assets of Perception. TMTG does not have any current intention to exercise those rights.

Pursuant to the Asset Acquisition Agreement, TMTG agreed to issue to Solutions and JedTec as consideration up to 5,100,000 shares (the "**Asset Acquisition Shares**") of TMTG common stock, 2,600,000 of which will be issued on the Asset Closing Date and 2,500,000 of which will be issuable upon the satisfaction of certain Milestones (as defined in the Asset Acquisition Agreement). In addition, with respect to all of the Asset Acquisition Shares, for a period of 12 months after the Asset Closing Date, neither JedTec, Solutions nor their respective affiliates will be permitted to collectively sell an amount of the Asset Acquisition Shares during any consecutive two trading week period (the "**Two Week Sale Period**") exceeding the "Set Percentage." For the purposes of this restriction, the "**Set Percentage**" means a percentage of the average daily trading volume of the TMTG common stock during the immediately preceding two consecutive trading weeks as reported on the primary exchange on which the TMTG common stock is traded (i.e., currently the NASDAQ) (the **"Prior Two Week ADTV"**). Unsold amounts from a Two Week Sale Period do not carry over to a subsequent Two Week Sale Period. The "Set Percentage" is 3% for the first six months after the Asset Closing Date and 5% from six to 12 months after the Asset Closing Date. For example, if during the first six months after the Asset Closing Date a Prior Two Week ADTV is 5,000,000 Asset Acquisition Shares, restricted holders cannot sell more than 150,000 Asset Acquisition Shares during the following Two Week Sale Period. Under the same fact pattern during six to 12 months after the Asset Closing Date, restricted holders could not sell more than 250,000 Asset Acquisition Shares during such Two Week Sale Period.

Concurrently with the execution of the Asset Acquisition Agreement, and as a condition and inducement to the willingness of TMTG to enter into it, WCT agreed to exercise the Option Agreement and enter into the Source Code Purchase Agreement and the Support and Maintenance Agreement, which agreements will be assigned to TMTG on the Asset Closing Date. Under the Source Code Purchase Agreement, Perception agreed to sell a copy of the source code of the software related to the CDN technology ("**Source Code**") and grant the WCT (which grant was assigned under the Asset Acquisition Agreement to TMTG) an irrevocable, non-exclusive, worldwide, perpetual right and license to forever retain, copy, reproduce, use, modify, enhance, create modifications and derivative works of, display, distribute, perform, compile, execute, sublicense, and otherwise exploit the Source Code and all resulting compiled software for commercial exploitation. The purchase price of $17,500,000 will be payable by TMTG in four installments to be completed by the third anniversary of the execution date of the Source Code Purchase Agreement. Further to supplement the Source Code Purchase Agreement, WCT entered into a Support and Maintenance Agreement, under which Perception is to assist TMTG in commercializing the Source Code to develop, launch, and grow the platform. The acquisition of the Source Code is effective as of the Asset Closing Date. Pursuant to the Asset Acquisition Agreement, TMTG will assume on the Asset Closing Date WCT's rights and obligations under the Source Code Purchase Agreement and the Support and Maintenance Agreement. In connection with the Source Code Agreement, TMTG entered into a code escrow agreement related to the sale of the Source Code. Pursuant to such agreement, Perception will deposit a copy of the Source Code into an escrow account. Subject to certain terms and conditions, immediately after the Asset Closing Date, the escrow agent will hold the Source Code until Perception receives the full purchase price of $17,500,000 for the Source Code. Upon full payment, the Source Code and any modifications will be released to TMTG. TMTG will enter into a registration rights agreement with Solutions and JedTec on the Asset Closing Date, pursuant to which TMTG will file a registration statement with the SEC to register for resale the Asset Acquisition Shares as soon as practicable upon the Asset Closing Date and use its reasonable best efforts to cause such registration statement to become effective and remain effective until all the Asset Acquisition Shares covered by such registration statement have been sold.

13

**Stock Exchange Listing**

Our Common Stock and Public Warrants are currently listed on Nasdaq and trade under the symbols "DJT" and "DJTWW," respectively. On June 25, 2024, the closing price of our Common Stock was $36.37 per share and the closing price of our Public Warrants was $24.73 per Public Warrant.

**Summary of Risk Factors**

Investing in our securities involves risks. You should carefully consider the risks described in "Risk Factors" beginning on page 17 before making a decision to invest in our Common Stock. If any of these risks actually occurs, our business, financial condition and results of operations would likely be materially adversely affected. Some of the risks related TMTG's business and industry are summarized below.

*Risks Related to TMTG's Business*

- TMTG has a limited operating history, making it difficult to evaluate TMTG's business and prospects and may increase the risks associated with your investment.

- TMTG's actual financial position and results of operations may differ materially from the expectations of TMTG's Management Team.

- If Truth Social fails to develop and maintain followers or a sufficient audience, if adverse trends develop in the social media platforms generally, or if President Donald J. Trump were to cease to be able to devote substantial time to Truth Social, TMTG's business would be adversely affected.

- Digital World previously identified material weaknesses in its internal control over financial reporting, and TMTG may identify additional material weaknesses in its previously issued financial statements and in the future, which may cause TMTG to fail to meet its reporting obligations or result in material misstatements of its financial statements.

- Adeptus, TMTG's former independent registered public accounting firm, has indicated that TMTG's financial condition raises substantial doubt as to its ability to continue as a going concern.

- TMTG's estimates of market opportunity and forecasts of market growth may be inaccurate.

- TMTG's business is subject to complex and evolving U.S. and foreign laws and regulations regarding privacy, data protection, and other matters.

- In the future, TMTG may be involved in numerous class action lawsuits and other lawsuits and disputes.

- Computer malware, viruses, hacking, phishing attacks, and spamming could adversely affect TMTG's business and results of operations.

*Risks Related to President Donald J. Trump*

- TMTG's success depends in part on the popularity of its brand and the reputation and popularity of President Donald J. Trump. Adverse reactions to publicity relating to President Donald J. Trump, or the loss of his services, could adversely affect TMTG's revenues and results of operations.

- President Donald J. Trump is the subject of numerous legal proceedings. An adverse outcome in one or more of the ongoing legal proceedings could negatively impact TMTG.

- The terms of a license agreement with President Donald J. Trump are not terminable by TMTG when it may be desirable to TMTG. In addition, the license agreement does not require President Donald J. Trump to use Truth Social in certain circumstances, including with respect to posts that he determines, in his sole discretion, to be politically-related. If TMTG disagrees with President Donald J. Trump about the scope of his obligation to use, or first post on, Truth Social, TMTG lacks any meaningful remedy with respect to such disagreement—which could have a material adverse effect on the business and/or operations of TMTG.

- Because President Donald J. Trump is a candidate for president, he may, subject to the Lock-up Period, divest his interest in Truth Social.

- TMTG depends on numerous third-parties to operate successfully, and many of these third parties may not want to engage with TMTG to provide any services.

14

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 14-5   Filed 09/12/24   Page 1636 of 1832
sec.gov/Archives/edgar/data/1849635/000114036142032424/ny20031506x1_s1.htm
PageID 5113

TABLE OF CONTENTS

### Risks Related to Ownership of TMTG Securities

- Nasdaq may delist TMTG's securities from trading on its exchange, which could subject TMTG to trading restrictions.

- The market price of TMTG's common stock may decline as a result of the Business Combination.

- TMTG has discretion in the use of the funds available to it after the Closing and may not use them effectively.

- TMTG stockholders may experience significant dilution in the future.

- As of June 25, 2024, President Donald J. Trump holds approximately 60.4% of the outstanding TMTG Common Stock, which limits other stockholders' ability to influence the outcome of matters submitted to stockholders for approval.

- The sale and issuance of Shares to Yorkville will cause dilution to our existing stockholders, and the sale of Shares acquired by Yorkville, or the perception that such sales may occur, could cause the price of our Common Stock to fall.

### Emerging Growth Company

We are an "emerging growth company," as defined in Section 2(a) of the Securities Act, as modified by the JOBS Act. As such, we are eligible to take advantage of certain exemptions from various reporting requirements that are applicable to other public companies that are not "emerging growth companies" including, but not limited to, not being required to comply with the independent registered public accounting firm attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a non-binding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. If some investors find our securities less attractive as a result, there may be a less active trading market for our securities and the prices of our securities may be more volatile.

In addition, Section 107 of the JOBS Act also provides that an "emerging growth company" can take advantage of the extended transition period provided in Section 7(a)(2)(B) of the Securities Act for complying with new or revised accounting standards. In other words, an "emerging growth company" can delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. We have taken advantage of the benefits of this extended transition period.

We will remain an emerging growth company until the earlier of (1) (a) December 31, 2026, (b) the last day of the fiscal year in which we have total annual gross revenue of at least $1.235 billion, or (c) the last day of the fiscal year in which we are deemed to be a large accelerated filer, which means the market value of our Common Stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (2) the date on which we have issued more than $1.0 billion in non-convertible debt securities during the prior three-year period.

Additionally, we are a "smaller reporting company" as defined in Rule 10(f)(1) of Regulation S-K. Smaller reporting companies may take advantage of certain reduced disclosure obligations, including, among other things, providing only two years of audited financial statements. We will remain a smaller reporting company until the last day of the fiscal year in which (1) the market value of our Common Stock held by non-affiliates equals or exceeds $250 million as of the end of the prior June 30th, or (2) our annual revenues equaled or exceeded $100 million during such completed fiscal year and the market value of our Common Stock held by non-affiliates exceeds $700 million as of the prior June 30th.

We expect to lose our emerging growth company and smaller reporting company status at the end of the fiscal year ended December 31, 2024, when we expect to qualify as a large accelerated filer based on the worldwide market value of our common equity held by non-affiliates as at June 30, 2024.

### Corporate Information

TMTG's principal executive office is located at 401 N. Cattlemen Rd., Suite 200, Sarasota, FL 34232. TMTG's telephone number is (941) 735-7346.

15

TABLE OF CONTENTS

**THE OFFERING**

| | |
|---|---|
| **Issuer** | Trump Media & Technology Group Corp. |
| **Shares of Common Stock offered by us** | Up to 37,969,380 shares of Common Stock, consisting of: |

- 37,644,380 Shares that we may sell to Yorkville, from time to time at our sole discretion, pursuant to the SEPA;

- 200,000 shares of our Common Stock to be issued to Yorkville as consideration for its commitment to purchase shares of our Common Stock under the SEPA (the "Commitment Shares");

- 125,000 shares of our Common Stock to be issued to EF Hutton as the exclusive placement agent in connection with the transactions contemplated by the SEPA.

| | |
|---|---|
| **Shares of Common Stock outstanding after the Offering** | 227,911,250 shares of Common Stock. |
| **Use of Proceeds** | We may receive up to $2,500,000,000 in aggregate gross proceeds from the sale of Shares under the SEPA to be offered in this offering. We intend to use the net proceeds from this offering for working capital and general corporate purposes. See "Use of Proceeds." |
| **Listing** | Our Common Stock and Warrants are currently traded on Nasdaq under the symbol "DJT" and "DJTWW," respectively. |
| **Risk Factors** | Before investing in our securities, you should carefully read and consider the information set forth in "Risk Factors" beginning on page 17. |

For additional information concerning the offering, see "*Plan of Distribution*" beginning on page 148.

Unless otherwise indicated, all information in this prospectus relating to the number of shares of our common stock outstanding is based on 189,941,870 shares of Common Stock outstanding as of June 25, 2024 and does not include:

- 14,499,940 shares of Common Stock issuable upon the exercise of certain outstanding warrants outstanding as of June 25, 2024; or

- 4,667,033 shares of Common Stock being held in escrow pending a resolution of a dispute with certain stockholders.

16

8/13/24, 12:34 PM    Case 8:24-cv-02161-KKM-AEP    Document 14-5    Filed 09/12/24    Page 1638 of 1832
sec.gov/Archives/edgar/data/1849635/00011403612403242/ny20031506x1_s1.htm
PageID 5115

TABLE OF CONTENTS

## RISK FACTORS

*An investment in our securities involves a high degree of risk. You should carefully consider the following risk factors, together with all of the other information included in this prospectus, before making an investment decision. Our business, prospects, financial condition or operating results could decline due to any of these risks and, as a result, you may lose all or part of your investment.*

*Unless the context otherwise requires, all references in this section to the "Company," "we," "us" or "our" refer to the business of TMTG and its subsidiaries following the consummation of the Business Combination.*

### Risks Related to TMTG's Business

*The value of your investment in us will be subject to the significant risks affecting us and inherent to the industry in which we operate. You should carefully consider the risks and uncertainties described below and other information included in this prospectus. If any of the events described below occur, the business and financial results could be adversely affected in a material way. This could cause the trading price of our Common Stock to decline, perhaps significantly, and you therefore may lose all or part of your investment. As used in the risks described in this subsection, references to "we," "us" and "our" are intended to refer to TMTG unless the context clearly indicates otherwise.*

### TMTG has a limited operating history, making it difficult to evaluate TMTG's business and prospects and may increase the risks associated with your investment.

Private TMTG was formed on February 8, 2021 and started formulating its business plan at that time. Private TMTG did not begin developing the Truth Social platform until June 2021. Private TMTG made Truth Social available for general use in the first quarter of 2022. We pride ourselves on building Truth Social without relying on hostile technology companies. Working exclusively with alternative technology firms that share our commitment to free speech, Private TMTG fully launched Truth Social for iOS in April 2022. Private TMTG debuted the Truth Social web application in May 2022, and the Truth Social Android App became available in the Samsung Galaxy and Google Play stores in October 2022. Private TMTG introduced direct messaging to all versions of Truth Social in 2022, released a new "Groups" feature for users in May 2023, and announced the general availability of Truth Social internationally in June 2023. TMTG cannot assure you that it will be able to operate its business successfully or implement its operating policies and strategies as described elsewhere in this prospectus. TMTG may encounter risks and challenges frequently experienced by growing companies in rapidly developing industries, including risks related to its ability to:

- build a reputation for providing a superior platform and customer service, and for creating trust and long-term relationships with its potential customers;

- implement a revenue model allowing it to develop predictable revenues;

- distinguish itself from competitors and navigate political issues;

- develop and offer a competitive platform that meets TMTG's customers' needs as they change;

- improve TMTG's current operational infrastructure and non-platform technology to support its growth and to respond to the evolution of TMTG's market and competitors' developments;

- develop, maintain and expand TMTG's relationships with suppliers of quality advertising;

- respond to complex, evolving, stringent, contradictory industry standards and government regulation on an international scale that impact TMTG's business;

- prevent, detect, respond to, or mitigate failures or breaches of privacy and security; and

- hire and retain qualified and motivated employees.

If TMTG is unable to do so, its business may suffer, its revenue and operating results may decline and TMTG may not be able to achieve further growth or sustain profitability.

17

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1639 of 1832
PageID 5116
www.sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

TABLE OF CONTENTS

*Since inception, Private TMTG has continuously sought to, and following the Closing, TMTG continues to seek to, improve its business model by developing its technology as an early stage company. TMTG expects to incur operating losses for the foreseeable future.*

Truth Social has been generally available only since the first quarter of 2022. Further, although Private TMTG targeted and assembled certain intellectual property and real or intangible property rights, our business plan is still developing. Accordingly, TMTG has no way to evaluate the likelihood that its business will be successful. Potential investors should be aware of the difficulties normally encountered by a new social media platform and the high rate of failure for such enterprises. The likelihood of success must be considered in light of the problems, expenses, difficulties, complications and delays encountered in connection with the operations that TMTG plans to undertake. These potential problems include, but are not limited to, unanticipated problems relating to the development of Truth Social, lack of widespread acceptance of Truth Social by users, and challenges attracting potential vendors to participate in Truth Social's development, and any additional costs and expenses that may exceed current estimates. TMTG expects to incur significant losses into the foreseeable future. TMTG recognizes that if the effectiveness of its business plan is not forthcoming it will not be able to continue business operations. There is limited operating history upon which to base any assumption as to the likelihood that TMTG will prove successful, and TMTG may never generate sufficient operating revenues to achieve profitable operations. If TMTG is unsuccessful in addressing these risks, its business will most likely fail.

*TMTG's actual financial position and results of operations may differ materially from the expectations of TMTG's Management Team.*

TMTG's actual financial position and results of operations may differ materially from management's expectations. As a result, TMTG's revenue, net income and cash flow may differ materially from TMTG's expected revenue, net income and cash flow. The process for estimating TMTG's revenue, net income and cash flow requires the use of judgment in determining the appropriate assumptions and estimates. These estimates and assumptions may be revised as additional information becomes available and as additional analyses are performed.

*TMTG does not currently, and may never, collect, monitor or report certain key operating metrics used by companies in similar industries.*

Since its inception, Private TMTG focused on developing Truth Social by enhancing features and user interface rather than relying on traditional performance metrics like average revenue per user, ad impressions and pricing, or active user accounts, including monthly and daily active users. While many industry peers may gather and report on these or similar metrics, given the early development stage of Truth Social, Private TMTG's management and board did not rely on, and TMTG's Management Team does not anticipate relying on, any particular key performance metric to make business or operating decisions. Concurrent with access to new capital and resources following the Business Combination, TMTG is actively evaluating the most relevant, reliable and appropriate key operating metrics that align with its evolving business model. At this juncture in its development, TMTG believes that adhering to traditional key performance indicators ("KPIs"), such as signups, average revenue per user, ad impressions and pricing, or active user accounts including monthly and daily active users, could potentially divert its focus from strategic evaluation with respect to the progress and growth of its business. TMTG believes that focusing on these KPIs might not align with the best interests of TMTG or its stockholders, as it could lead to short-term decision-making at the expense of long-term innovation and value creation. Therefore, TMTG believes that this strategic evaluation is critical and aligns with its commitment to a robust business plan that includes introducing innovative features and new technologies.

In connection with such evaluation, and consistent with SEC guidance, TMTG will consider whether it has effective controls and procedures in place to process information related to the disclosure of key performance indicators and metrics to ensure consistency as well as accuracy period over period, or the feasibility of implementing any such controls and procedures. If so, TMTG may decide to collect and report such metrics if they are deemed to significantly enhance investors' understanding of TMTG's financial condition, cash flows, and other aspects of its financial performance. However, TMTG may find it difficult or resource-prohibitive to implement such effective controls and procedures and may never collect, monitor or report any or certain key operating metrics, which is likely to make it difficult it for stockholders in TMTG to evaluate and compare TMTG's performance to that of companies in similar industries.

18

TABLE OF CONTENTS

*If the use of third-party cookies or other tracking technology is restricted by third parties outside of TMTG's control, rejected by Truth Social's users, or otherwise subject to unfavorable regulation, TMTG's ability to tailor, improve and provide a consistent experience to Truth Social's users would be negatively impacted, which could materially and adversely affect TMTG's growth prospects and financial performance.*

TMTG's Truth Social platform is still in an early development stage, however, as other similar companies in the space, TMTG expects to generate substantial revenue from advertisements. Accordingly, Truth Social's ability to use third-party cookies to provide advertising companies relevant data for their advertisements is critical to its revenue generation potential. However, with increasing restrictions on third party cookies, Truth Social may lose the ability to track user behavior across its platform, which could negatively affect its ability to retain advertisers on its platform and effectively advertise their services.

Truth Social's use of cookies aids its development and ability to improve its services in response to user preferences and to provide its users with relevant offers from advertisers. Recently, web and mobile browser developers, such as Apple, Microsoft or Google, have implemented and may continue to implement changes, including requiring additional user permissions, in their browsers or device operating systems that impair Truth Social's ability to track cookies and improve the effectiveness of advertising on its platform. Such changes include limiting the use of first-party and third-party cookies and related tracking technologies, such as mobile advertising identifiers, and other changes that limit Truth Social's ability to collect information that allows it to attribute members' actions on advertisers' websites to the effectiveness of advertising campaigns run on the platform. For example, Apple launched its Intelligent Tracking Prevention ("ITP") feature in its Safari browser. ITP blocks some or all third-party cookies by default on mobile and desktop and ITP has become increasingly restrictive over time. Similarly, on January 4, 2024, Google began testing a new feature on its Chrome browser called "Tracking Protection." This feature limits cross-site tracking by restricting website access to third-party cookies by default. Google is expected to implement the Tracking Protection Tool in all Chrome browsers by the end of the second quarter of 2024, essentially no longer supporting third-party cookies in its Google Chrome browser. Third-party cookies have been a fundamental part of the web for nearly three decades, aiding platforms in generating relevant ads, among other functions. These web and mobile browser developers have also implemented and may continue to implement changes and restrictions in browser or device functionality that limit TMTG's ability to communicate with or understand its business and users. As such, the implementation of these changes could significantly impair TMTG's ability to tailor, improve and provide a consistent experience to its users, which in turn could materially and adversely affect its growth prospects and financial performance.

In addition, federal, state and international governmental authorities continue to evaluate the privacy implications inherent in the use of proprietary or third-party cookies and other methods of online tracking for behavioral advertising and other purposes. U.S. and foreign governments have enacted, have considered or are considering legislation or regulations that could significantly restrict the ability of companies and individuals to engage in these activities, such as by regulating the level of consumer notice and consent required before a company can employ cookies or other electronic tracking tools or the use of data gathered with such tools. Additionally, some providers of consumer devices and web browsers have implemented, or announced plans to implement, means to make it easier for internet users to prevent the placement of cookies or to block other tracking technologies, which could if widely adopted significantly reduce the effectiveness of such practices and technologies. The regulation of the use of cookies and other current online tracking and advertising practices or a loss in TMTG's ability to make effective use of services that employ such technologies could increase its costs of operations and limit its ability to acquire new customers on cost-effective terms and consequently, materially adversely affect its business, financial condition and operating results.

*TMTG's reputation, competitive advantage, financial position and relationships with its users could be materially harmed if TMTG is unable to comply with complex and evolving data protection and privacy, security, and breach of notification laws and regulations, and the costs and resources required to achieve compliance may have a materially adverse impact.*

TMTG's reputation, competitive advantage, financial position and relationships with its users could be materially harmed if TMTG is accused of a violation or is unable to comply with complex and evolving data protection and privacy, security, and breach of notification laws and regulations, and the costs and resources required to achieve compliance on an international scale may have a materially adverse impact on its business. In the course of delivering TMTG's product(s), TMTG expects to use, disclose, control, process, collect, transmit and store information that is related to and seeks to correlate internet-connected devices, user activity and the advertisements it places. Federal, state, and international laws and regulations govern the protection, collection,

19

TABLE OF CONTENTS

use, processing, retention, sharing, privacy, and security of data that TMTG may access, use, disclose, transfer, store, and collect across TMTG's operational and advertising solutions. TMTG strives to comply with all applicable laws, regulations, policies and legal obligations relating to privacy, security, and data protection, collection, processing use, disclosure, transmission, and storage. However, the applicability of specific laws may be unclear in some cases and domestic and foreign government laws, regulations, and enforcement of data practices and data tracking technologies is expansive, poorly defined and rapidly evolving. In addition, it is possible that these requirements may be interpreted and applied in a manner that is new or inconsistent from one jurisdiction to another and may conflict with other laws, regulations, or rules or TMTG's practices. Any actual or perceived failure by TMTG to comply with U.S. federal, state or international laws, including laws and regulations regulating data privacy, security or consumer protection, or use, disclosure or unauthorized access to or by third parties to this information, could result in proceedings or actions against TMTG by government entities, competitors, private parties or others. Any proceedings or actions against TMTG alleging violations of consumer or data protection laws or asserting privacy-related or security-related theories could hurt TMTG's reputation, force TMTG to cease operations or force TMTG to spend significant amounts in defense of these proceedings, distract our Management Team, increase its costs of doing business, adversely affect the demand for its solutions and ultimately result in the imposition of monetary liability. TMTG may also be contractually liable to indemnify and hold harmless TMTG's customers, vendors or third parties from the costs or consequences of litigation resulting from using TMTG's solutions or from the disclosure of confidential information, which could damage TMTG's reputation among its current and potential customers, and may require significant expenditures of capital and other resources that could cause it to lose significant business and revenue.

The collection, protection and use of personal information, personally identifiable information and/or personal data (collectively referred to as "personal data" for ease of reference) is governed by data protection, privacy, security and breach laws and regulations enacted in the United States and other jurisdictions around the world in which TMTG operates or plans to operate. These laws and regulations continue to evolve and may be inconsistent from one jurisdiction to another. Compliance with applicable privacy, security and breach laws and regulations may increase TMTG's costs of doing business and adversely impact its ability to conduct its business and market its solutions, products and services to its users and potential users.

In the U.S., there is not one comprehensive data protection, consumer protection, data privacy, security, youth social media or breach notification law. Rather, numerous state and federal laws must be complied with by TMTG simultaneously across U.S. jurisdictions. Various types of companies and their data are regulated by stringent industry specific regulations and standards based on data type and sensitivity. All 50 states and four U.S. territories have enacted consumer protection laws that require notice of data breaches. Many U.S. states (at least 27) require comprehensive data protection, privacy and/or security compliance programs. These include, but are not limited to, the California Consumer Privacy Act, as amended by the California Privacy Rights Act, the Arkansas Social Media Safety Act, and the Utah Social Media Regulation Act may affect TMTG. There are also a number of legislative proposals pending before the U.S. Congress, various state legislative bodies, and foreign governments concerning data protection that could affect TMTG. At this time some states have laws restricting the use and disclosure of minor's user data, biometric data and/or health information without notice and/or express consent of a natural person of the age of majority with appropriate legal authority to consent. If TMTG fails to comply with the federal and/or state data protection and data privacy laws, or if regulators or plaintiffs assert TMTG has failed to comply with them, it may lead to court orders, injunctions, regulatory enforcement actions, private lawsuits, a reduction in revenue, and/or reputational damage.

All 50 U.S. states and some territories have adopted and/or are likely to adopt in the near future state privacy laws similar to stringent European privacy laws that require data mapping, consumer rights to erasure, deletion, and portability that will be materially costly for TMTG to interpret, implement and maintain. If TMTG fails to comply with federal or state data protection and data privacy laws, or if regulators or plaintiffs assert TMTG has failed to comply with them, it may lead to regulatory enforcement actions, private lawsuits and/or reputational damage. For example, in June 2018, California was the first U.S. state to pass the California Consumer Privacy Act ("CCPA"), which provides data privacy rights for consumers and operational requirements for companies like TMTG. The CCPA gives California residents new rights to access and requires deletion of their personal information, opt out of certain personal information sharing, and receipt of detailed information about how their personal information is collected, used, and shared, among other stringent requirements. The CCPA provides for civil penalties for violations, and creates a private right of action for privacy and security violations/breaches that could lead to consumer class actions and other litigation against

20

TABLE OF CONTENTS

TMTG. Additionally, the California Privacy Rights Act ("CPRA"), passed in November 2020. The CPRA imposes additional data protection obligations on companies doing business in California, including additional consumer rights processes and opt outs for certain uses of sensitive data. The majority of the provisions took effect on January 1, 2023. TMTG may be required to make additional compliance investments and changes to its business processes in order to comply with individual state privacy and security laws currently in effect and/or as they are enacted.

The FTC Act prohibits unfair and deceptive practices. The FTC has broad investigatory authority, including the authority to subpoena witnesses, demand civil investigation, and require businesses to submit written reports under oath. The FTC can and does engage in enforcement actions, issue rulings, and seek civil penalties in federal court. An FTC enforcement action may lead to court orders, injunctions, additional regulatory enforcement actions, consent decrees which are posted publicly on the FTC's website, consent orders, a reduction in revenue, and/or reputational damage.

The Children's Online Privacy Protection Act ("COPPA") expands liability for the collection of information by operators of websites and other electronic solutions that are directed to children. Legal guardian consent is required for certain activities involving the data of children. Questions exist as to how regulators and courts may interpret the scope and circumstances for potential liability under COPPA, but this remains a significant focus of the FTC in light of mental health and other concerns over children's use of social media. FTC continues to provide guidance and clarification regarding COPPA. FTC guidance or enforcement precedent may make it difficult or impractical for TMTG to provide advertising on certain websites, services or applications. In addition, the FTC has fined an advertising network for certain methods of collecting and using data from mobile applications, including certain applications directed at children, and failing to disclose the data collection to mobile application developers in its network.

TMTG is subject to the European Union's General Data Protection Regulation (EU) 2016/679 ("GDPR"), which applies to all members of the European Economic Area ("EEA") and, in some circumstances, to controllers and processors in a jurisdiction outside the EEA including any business, regardless of its location, that provides goods or services to data subjects located in the EEA, or monitors the behavior of EEA data subjects. The GDPR imposes significant restrictions, obligations and penalties on data controllers and data processors, including stringent requirements for the processing of personal data. If TMTG fails to comply with the GDPR, it may lead to regulatory investigation with possible enforcement of monetary penalties ranging from 10 million to 20 million euros, or 2% to 4% of annual worldwide revenue (whichever is higher), private or class action lawsuits and/or reputational damage.

Further, withdrawal of the United Kingdom ("UK") from the European Union ("EU") has led to legal uncertainty and divergent national laws and regulations. In particular, while the Data Protection Act of 2018, which supplements the GDPR, is now effective in the UK alongside the UK GDPR, it is still unclear whether transfer of data from the EEA to the UK will remain lawful under the GDPR without additional safeguards.

EU laws regulate transfers of EEA personal data to third countries, such as the United States, that have not been found to provide adequate protection of such personal data. Recent legal developments in the EU have created complexity and uncertainty regarding transfers of personal data from the EEA and the UK to the United States and other jurisdictions. For example, on July 16, 2020, the European Court of Justice ("CJEU") invalidated the EU-U.S. Privacy Shield framework ("Privacy Shield"), which provided companies with a mechanism to comply with data protection requirements when transferring personal data from the EEA/UK to the United States. The same decision also cast doubt on the ability to use one of the primary alternatives to the Privacy Shield, namely, the European Commission's Standard Contractual Clauses ("SCCs"), to lawfully transfer personal data from Europe to the United States and most other countries (though the SCCs currently remain a valid data transfer mechanism under the GDPR and UK GDPR). On July 10, 2023, the European Commission adopted an adequacy decision concluding that the United States ensures an adequate level of protection for personal data transferred from the European Union to organizations in the United States that are included in the "Data Privacy Framework List," which is maintained by the U.S. Department of Commerce pursuant to the EU-U.S. Data Privacy Framework. The impact of the European Commission's adequacy decision is complex, evolving, and may be reviewed by the CJEU. A future invalidation of the Privacy Shield by the CJEU will create additional uncertainty and will mean there are few if any viable alternatives to the Privacy Shield and the SCCs for the foregoing purposes, which may lead to government enforcement actions, litigation, fines and penalties or adverse publicity that could have an adverse effect on TMTG's reputation, revenue, operations and business.

21

TABLE OF CONTENTS

In Canada, TMTG is subject to the laws of the individual provinces, as well as Canada's Personal Information and Protection of Electronic Documents Act ("PIPEDA"). PIPEDA provides Canadian residents with privacy protections and sets out rules for how companies may collect, use and disclose personal information in the course of commercial activities. The costs of compliance with, and other burdens imposed by, these and other international data privacy and security laws may limit the use and adoption of TMTG's solutions, products and services and could have a materially adverse impact on its business. Any failure or perceived failure by TMTG or third-party service providers to comply with international data privacy and security laws may lead to regulatory enforcement actions, fines, private lawsuits or reputational damage.

Evolving definitions of personal data within the EU, especially relating to the classification of IP addresses, machine or device identifiers, geo-location data and other such information, may cause TMTG to change its business practices, diminish the quality of its data and the value of its solution, and hamper its ability to provide or expand its offerings. TMTG's failure to comply with evolving interpretations of applicable laws and regulations, or to adequately protect personal data, could result in enforcement action against TMTG or reputational harm, which could have a material adverse impact on TMTG's business, financial condition and results of operations.

In addition to compliance with government regulations, TMTG expects to participate in trade associations and industry self-regulatory groups that promulgate best practices or codes of conduct addressing the provision of internet advertising. TMTG could be adversely affected by changes to these guidelines and codes in ways that are inconsistent with its practices or in conflict with the laws and regulations of U.S. or international regulatory authorities. For instance, new guidelines, codes or interpretations, by self-regulatory organizations or government agencies, may require additional disclosures or additional consumer consents, such as "opt-in" permissions to share, link or use data, such as health data from third parties, in certain ways. If TMTG fails to abide by, or is perceived as not operating in accordance with, industry best practices or any industry guidelines or codes with regard to privacy, its reputation may suffer and TMTG could lose relationships with advertisers and digital media properties.

***Economic downturns and market conditions beyond TMTG's control could adversely affect its business, financial condition and operating results.***

TMTG's business depends on the overall demand for advertising and on the economic health of advertisers that benefit from Truth Social. Economic downturns or unstable market conditions may cause advertisers to decrease their advertising budgets, which could reduce spend with Truth Social and adversely affect TMTG's business, financial condition and operating results. For example, to the extent there is a disruption in economic activity globally, it could adversely affect our business, financial condition and operating results through prolonged decreases in advertising spend, credit deterioration of our customers, depressed economic activity, or declines in capital markets.

***The loss of key personnel or the inability of replacements to quickly and successfully perform in their new roles could adversely affect TMTG's business.***

TMTG depends on the leadership and experience of its relatively small number of key executive management personnel. The pursuit of the merger and the preparation for the integration have placed a burden on TMTG's management and internal resources. TMTG has experienced management departures, and may continue to experience management departures. Any significant diversion of management attention away from ongoing business concerns and any difficulties encountered in the transition and integration process could have a material adverse effect on TMTG's business, financial condition and results of operations. The loss of the services of these key employees or TMTG's executive management members could have a material adverse effect on TMTG's business and prospects, as TMTG may not be able to find suitable individuals to replace such personnel on a timely basis or without incurring increased costs. Furthermore, if TMTG loses or terminates the services of one or more of its key employees or if one or more of TMTG's current or former executives or key employees joins a competitor or otherwise competes with TMTG, it could impair TMTG's business and its ability to successfully implement TMTG's business plan. Additionally, if TMTG is unable to hire qualified replacements for its executive and other key positions in a timely fashion, its ability to execute its business plan would be harmed. Even if TMTG can quickly hire qualified replacements, TMTG could experience operational disruptions and inefficiencies during any such transition. TMTG believes that its future success will depend on its continued ability to attract and retain highly skilled and qualified personnel.

22

TABLE OF CONTENTS

In addition, many of TMTG's key technologies and systems will be custom-made for TMTG's business by TMTG's personnel. The loss of key engineering, product development, marketing and sales personnel could disrupt TMTG's operations and have an adverse effect on TMTG's business.

As TMTG continues to grow, TMTG cannot guarantee that it will continue to attract the personnel it needs to maintain its competitive position. In particular, TMTG intends to hire additional technically-skilled personnel following the Closing, and TMTG expects to face significant competition from other companies in hiring such personnel. As TMTG matures, the incentives to attract, retain and motivate employees provided by TMTG's equity awards or by future arrangements, such as through cash bonuses, may not be effective. If TMTG does not succeed in attracting, hiring and integrating excellent personnel, or retaining and motivating existing personnel, TMTG may be unable to grow effectively.

***If Truth Social fails to develop and maintain followers or a sufficient audience, if adverse trends develop in the social media platforms generally, or if President Donald J. Trump were to cease to be able to devote substantial time to Truth Social, TMTG's business would be adversely affected.***

Social media platforms are speculative businesses because revenues and income derived from them depend primarily upon the continued acceptance of that platform. Public acceptance of a particular platform depends upon, among other things, the ease of use of the platform, promotion of that platform, and the quality and acceptance of competing platforms. A user decline could make it economically inefficient to continue providing for the use of the platform. If President Donald J. Trump fails to retain the public's interest, or if the customer base were to cease using Truth Social, it could result in a write-down of TMTG's capitalized development costs. The amount of any write-down would vary depending on a number of factors, including when the product or service ceased.

***TMTG has placed emphasis on building a platform for all Americans to freely express themselves through Truth Social. In particular, President Donald J. Trump has stated that this is a platform for all who have been censored by big tech. Failure to realize this vision would adversely affect TMTG's brand and business prospects.***

Truth Social is being developed as a global platform for public self-expression and conversation in real time, and the market for Truth Social is relatively new and may not develop as expected, if at all. People who are not Truth Social users may not understand the value of Truth Social. Convincing potential new users, especially users who oppose big tech censorship, of the value of Truth Social is critical to increasing TMTG's user base and to the success of TMTG's business. In addition, there are a number of other social media platforms that focus on the same audience that Truth Social will focus on. To the extent users prefer a platform that is not associated with President Donald J. Trump, our ability to attract users may decrease. Additionally, as a private company under new ownership, X may demonstrate a sustained commitment to free speech principles that will heighten competition for users who prioritize such principles. Failure to attract a sufficient user base would adversely affect TMTG's business prospects.

***If TMTG's users do not continue to contribute content or their contributions are not valuable to other users, TMTG may experience a decline in the number of users accessing its products and services and user engagement, which could result in the loss of advertisers and revenue.***

TMTG's success depends on its ability to provide users with products, which in turn for Truth Social depends on the content contributed by TMTG's users. TMTG believes that one of Truth Social's competitive advantages will be the quality, quantity and real-time nature of the content on Truth Social, and that access to unique or real-time content is one of the main reasons users may visit Truth Social. TMTG seeks to foster a broad and engaged user community, and TMTG intends to encourage high-profile individuals and entities to use TMTG's products and services to freely express their views to broad audiences without the fear of being censored or cancelled for any unpopular or non-woke opinions. TMTG may also encourage media outlets to use its products and services to distribute their content. If users, including influential users, do not contribute content to Truth Social, and it is unable to provide users with valuable and timely content, TMTG's user base and user engagement may decline. Additionally, if TMTG is not able to address user concerns regarding the safety and security of Truth Social or if TMTG is unable to successfully prevent abusive or other hostile behavior on Truth Social, the size of the Truth Social user base and user engagement may decline. TMTG may rely on the sale of advertising services for the substantial majority of TMTG's revenue. If TMTG experiences a decline in the

23

8/13/24, 12:34 PM Case 8:24-cv-02161-KKM-AEP Document 49-5 Filed 09/12/24 Page 1645 of 1832
sec.gov/Archives/edgar/data/1849635/000110361240324/ny20031506x1_s1.htm
PageID 5122

TABLE OF CONTENTS

number of users or a decline in user engagement, including as a result of the loss of high-profile individuals and entities who generate content on Truth Social, advertisers may not view Truth Social as attractive for their marketing expenditures, and may reduce their spending with TMTG-which would harm TMTG's business and operating results.

***TMTG's focus on product innovation and user engagement rather than short-term operating results may adversely affect TMTG's revenues.***

TMTG is committed to quickly developing and launching new and innovative features. TMTG intends to focus on improving the user experience for Truth Social and on developing new and improved products and services for the advertisers on Truth Social. TMTG intends to prioritize innovation and the experience for users and advertisers on Truth Social over short-term operating results. TMTG may frequently make product and service decisions that may reduce TMTG's short-term operating results if it believes that the decisions are consistent with its goals to improve the user experience and performance for advertisers, which it believes will improve its operating results over the long term. These intended decisions may not be consistent with the short- term expectations of investors and may not produce the long-term benefits that TMTG expects, in which case Truth Social user growth and user engagement, its relationships with advertisers and its business and operating results could be harmed. In addition, TMTG's intent to focus on the user experience may negatively impact TMTG's relationships with prospective advertisers. This could result in a loss of advertisers, which could harm TMTG's revenue and operating results.

***Truth Social user growth and engagement on mobile devices depend upon effective operation with mobile operating systems, networks, and standards that TMTG does not control.***

TMTG intends to make its products and services available across a variety of operating systems and through websites. TMTG will be dependent on the interoperability of Truth Social with popular devices, desktop and mobile operating systems and web browsers that TMTG does not control, such as Mac OS, Windows, Android, iOS, Chrome and Firefox. Any changes in such systems, devices or web browsers that degrade the functionality of TMTG's products and services or give preferential treatment to competitive products or services could adversely affect usage of TMTG's products and services. Further, if the number of platforms for which TMTG develops its product expands, it will result in an increase in TMTG's operating expenses. In order to deliver high- quality products and services, it is important that TMTG's products and services work well with a range of operating systems, networks, devices, web browsers and standards that TMTG does not control. In addition, because a majority of TMTG's future users may access TMTG's products and services through mobile devices, TMTG is particularly dependent on the interoperability of its products and services with mobile devices and operating systems. TMTG may not be successful in developing relationships with key participants in the mobile industry or in developing products or services that operate effectively with these operating systems, networks, devices, web browsers and standards. In the event that it is difficult for TMTG's users to access and use TMTG's products and services, particularly on their mobile devices, TMTG's user growth and engagement could be harmed, and its business and operating results could be adversely affected.

***TMTG may not be successful in its efforts to grow and monetize Truth Social.***

TMTG may not be successful in building products that maintain user engagement. If TMTG is not successful in its efforts to grow Truth Social and monetize such growth, TMTG's user growth and user engagement and TMTG's financial results may be adversely affected.

***TMTG has suffered negative cash flows and recurring losses from its operations that may raise substantial doubt about its ability to continue as a going concern.***

Prior to the Closing, DWAC financed its operations principally through loans or offerings of securities exempt from the registration requirements of the Securities Act. TMTG used a portion of the capital raised from the Business Combination to retire pre-Closing debt, and the Management Team believes that the remaining amount of such capital will be sufficient to fund existing operations should projected cash flow be insufficient to fund operations. TMTG may require substantial additional financing at various intervals in order to continue to develop and promote Truth Social, including significant requirements for operating expenses including intellectual property protection and enforcement, for pursuit of regulatory approvals, and for commercialization of Truth Social. TMTG can provide no assurance that additional funding will be available on a timely basis, on

24

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 14-5   Filed 09/12/24   Page 1646 of 1832
PageID 5123
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

TABLE OF CONTENTS

terms acceptable to TMTG, or at all. In the event that TMTG is unable to obtain such financing, it will not be able to fully develop and commercialize Truth Social. If TMTG becomes unable to obtain additional capital and to continue as a going concern, it may have to liquidate its assets and the value TMTG receives for its assets in liquidation or dissolution could be significantly lower than the values reflected in TMTG's financial statements. See "*Risk Factors — Risks Related to TMTG's Business — TMTG may need additional capital, and TMTG cannot be sure that additional financing will be available.*"

### *TMTG's estimates of market opportunity and forecasts of market growth may prove to be inaccurate.*

Market opportunity estimates and growth forecasts, whether obtained from third-party sources or developed internally, are subject to significant uncertainty and are based on assumptions and estimates that may prove to be inaccurate. Any estimates and forecasts relating to the size and expected growth of the target market and market demand which may inform TMTG's financial model may also prove to be inaccurate. The estimated addressable market may not materialize in the timeframe estimated by the Management Team, if ever, and even if the markets meet the size estimates and growth estimates considered in relation to TMTG's financial model, our business could fail to grow at similar rates.

### *TMTG's business depends on continued and unimpeded access to Truth Social on the internet by TMTG's users and advertisers. If TMTG's users experience disruptions in internet service or if internet service providers are able to block, degrade or charge for access to TMTG's products and services, TMTG could incur additional expenses and the loss of users and advertisers.*

TMTG depends on the ability of TMTG's users and advertisers to access the internet. This access will be provided by companies-including hostile legacy technology companies-that have significant market power in the broadband and internet access marketplace, including incumbent telephone companies, cable companies, mobile communications companies, government-owned service providers, device manufacturers and operating system providers, any of whom could take actions that degrade, disrupt or increase the cost of user access to TMTG's products or services, which would, in turn, negatively impact TMTG's business. The adoption of any laws or regulations that adversely affect the growth, popularity or use of the internet, including laws or practices limiting internet neutrality, could decrease the demand for, or the usage of, TMTG's products and services, increase TMTG's cost of doing business and adversely affect TMTG's operating results. TMTG will also rely on other companies to maintain reliable network systems that provide adequate speed, data capacity and security to us and TMTG's users. As the internet continues to experience growth in the number of users, frequency of use and amount of data transmitted, the internet infrastructure that TMTG and its users rely on may be unable to support the demands placed upon it. The failure of the internet infrastructure that TMTG's users rely on, even for a short period of time, could undermine TMTG's operations and harm TMTG's operating results.

### *If TMTG fails to expand effectively in international markets, TMTG's revenue and TMTG's business will be harmed.*

Notwithstanding Truth Social's recent announcement of the general availability of Truth Social internationally, TMTG may not be able to monetize TMTG's products and services internationally as a result of competition, advertiser demand, differences in the digital advertising market and digital advertising conventions, as well as differences in the way that users in different countries access or utilize TMTG's products and services. Differences in the competitive landscape in international markets may impact TMTG's ability to monetize TMTG's products and services.

### *TMTG's business is highly competitive. Competition presents an ongoing threat to the success of TMTG's business. If TMTG is unable to compete effectively for users and advertiser spend, TMTG's business and operating results could be harmed.*

Competition for users of TMTG's products and services is intense. Although TMTG has developed a global platform for public self-expression and conversation in real time, TMTG faces strong competition in its business. TMTG competes against many companies to attract and engage users, including companies which have greater financial resources and substantially larger user bases, such as X (formerly known as Twitter), Meta (including Facebook and Instagram), Alphabet/Google, Netflix, Disney+, Hulu, Microsoft (including LinkedIn), and Yahoo!, which offer a variety of internet and mobile device-based products, services and content. For example, Facebook

25

TABLE OF CONTENTS

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1657 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5134

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1660 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5137

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1680 of 1832
PageID 5157
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1687 of 1832
PageID 5164
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1707 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5184

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1727 of 1832
PageID 5204
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1730 of 1832
PageID 5207
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM    Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1737 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5214

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1748 of 1832 PageID 5225
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1751 of 1832
PageID 5228
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1754 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5231

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1759 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5236

# SEMPLE, MARCHAL & COOPER, LLP
### CERTIFIED PUBLIC ACCOUNTANTS AND CONSULTANTS

3101 NORTH CENTRAL AVENUE, SUITE 1600, PHOENIX, ARIZONA 85012

sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1781 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5258

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP
Document 1-5
Filed 09/12/24
Page 1788 of 1832
PageID 5265
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1789 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5266

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1792 of 1832
PageID 5269
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1794 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5271

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1799 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5276

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP    Document 1-5    Filed 09/12/24    Page 1802 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5279

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 181 4 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5291

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1816 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5293

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1817 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5294

8/13/24, 12:34 PM Case 8:24-cv-02161-KKM-AEP Document 1-5 Filed 09/12/24 Page 1818 of 1832
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm
PageID 5295

8/13/24, 12:34 PM
Case 8:24-cv-02161-KKM-AEP   Document 1-5   Filed 09/12/24   Page 1823 of 1832
PageID 5300
sec.gov/Archives/edgar/data/1849635/000114036124032424/ny20031506x1_s1.htm